**FILED**
2016 Feb-17 PM 01:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

|  |  |  |
|---|---|---|
| KEITH EDMUND GAVIN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| JEFFERSON S. DUNN, Commissioner of | ) | |
| the Alabama Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY PRISONER IN STATE CUSTODY UNDER SENTENCE OF DEATH

John D. Watson
(Local Counsel)
Grant A. Premo
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Phone: (205) 521-8436
Fax: (205) 488-6436

Melanie E. Walker (*pro hac pending*)
(Lead Counsel)
Steven J. Horowitz (*pro hac pending*)
Matthew Fogelberg (*pro hac pending*)
Nicholas K. Tygesson (*pro hac pending*)
Rachel R. Goldberg (*pro hac pending*)
Katherine R. Nichols (*pro hac pending*)
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Phone: (312) 853-7000
Fax: (312) 853-7036

Counsel for Petitioner Keith Edmund Gavin

Prisoner's Name:          Keith Edmund Gavin

Prisoner's Number:        Z-665

Place of Confinement:     Holman Correctional Facility

Petitioner Keith Edmund Gavin ("Petitioner" or "Gavin"), now incarcerated under sentence of death at Holman Correctional Facility in Atmore, Alabama, respectfully petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 upon the ground that Petitioner is held in the custody of the Respondent in violation of the Constitution and Laws of the United States. As set forth more fully herein, Petitioner contends that his convictions and sentences were secured by the State of Alabama in violation of his rights under the United States Constitution.

## I.    INTRODUCTION

1.    On November 6, 1999, Mr. Gavin was convicted of first degree murder and attempted murder. His conviction is the result of juror misconduct and ineffective assistance of counsel, among other violations of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

2.    From the day he was arrested to present day, Gavin has steadfastly maintained his innocence. The true perpetrator, Dwayne Meeks, Gavin's cousin, remains free, having agreed to testify against Gavin after the State dropped his indictment.

3.    In 1998, Meeks was involved in running drugs between prisons in Illinois, where he was employed as a corrections officer, and northeastern

Alabama, where he grew up. In March 1998, Gavin agreed to accompany Meeks on a trip to Alabama.

4.     On March 6, 1998, Meeks and Gavin drove through Centre, Alabama, in Meeks' Chevy Blazer. While stopped at a main intersection, one of the men exited the vehicle, approached a white van, and shot and killed the driver, William Clayton. The perpetrator then climbed in the van and drove off. Police officer Danny Smith responded to the scene and came upon the stolen van. He testified that the perpetrator fired multiple shots at him.

5.     Meeks and Gavin each pointed to the other as the culprit. Gavin has maintained that after Meeks shot Mr. Clayton, Gavin drove off in Meeks' car with Meeks following in the van. Meeks was honking the horn and flashing the headlights, and Gavin eventually pulled over and got out of the car. As they were exchanging heated words with one another, a police vehicle pulled up. Meeks fired shots in the air and jumped in his car. As Gavin was going to get in the passenger seat, Meeks drove off. Gavin ran into the woods where he was later apprehended.

6.     Meeks testified at trial that Gavin shot Mr. Clayton. He claimed that as soon as Gavin fired the shots, Meeks fled the scene, retrieved his wife and child from a motel in Chattanooga, and drove straight back to Chicago. Meeks testified that once he was in Chicago, he contacted friends in law enforcement for advice and submitted a report that his gun had been missing for several weeks.

2

7.     Meeks and Gavin were both originally indicted for Mr. Clayton's murder. But Meeks agreed to testify against Gavin, and the charges against him were dropped. Meeks claimed that Gavin shot Mr. Clayton with Meeks' own gun and that he was entirely unaware of Gavin's plan to do so.

8.     Gavin was indicted for the murder of Mr. Clayton and the attempted murder of Officer Smith. He pled not guilty.

9.     After a constitutionally deficient trial, a jury convicted Gavin on all counts. The jury, by a vote of 10-2, recommended a sentence of death for Mr. Clayton's murder. Making its own sentencing determination under Alabama's capital sentencing scheme, the trial court found the existence of three aggravating factors beyond a reasonable doubt and sentenced Gavin to death for murder and to life in prison for attempted murder.

10. Post-conviction counsel uncovered evidence of significant juror misconduct that violated Gavin's rights to a fair and impartial trial. Jury foreman Terry Manley explained that during their deliberations at the guilt phase, all of the jurors voted not just on the question of guilt or innocence but also on whether to impose the death penalty. This fact was confirmed by two additional jurors, Cheryl Beard and Belinda Martinez. The jury voted 10-2 in favor of death. Thus, before jurors had been properly charged by the court or even heard any mitigation evidence, they had already voted to execute Gavin.

11. That's not all. During sequestration, some jurors also engaged in improper extra-juror communications with an outside party who was privy to trial information withheld from the jurors.

12. Post-conviction counsel have tried in vain to introduce evidence regarding jury misconduct. As a result, Gavin has been denied a meaningful opportunity to present the serious constitutional questions that rendered his convictions and sentences unlawful.

13. In addition, Gavin received constitutionally ineffective assistance from his counsel during both the guilt and sentencing phases of his capital murder trial. The numerous failures and deficiencies were highly prejudicial to Gavin.

14. The State had no forensic or DNA evidence against Gavin, and thus its case rose or fell on the jury believing Meeks' story. Though Meeks was the State's key witness, trial counsel failed to investigate and effectively cross-examine his damning testimony. For example, counsel did not investigate or present evidence showing that Meeks lied at trial about why he had a gun—the weapon used to kill Mr. Clayton.

15. Counsel was similarly ineffective regarding the State's other key eyewitness, Larry Twilley. Twilley was stopped in his truck across the intersection where the shooting happened. In his statement to police immediately after the shooting, Twilley provided a description of the shooter that matched Meeks—not

Gavin. At trial, the only fact regarding the appearance of the shooter he could state with any certainty was that he was black; hardly a helpful observation given both Gavin and Meeks are African-American. Twilley never picked Gavin out of a line-up or photo array; in fact, he was never even asked to do so. Twilley's only identification of Gavin came in the courtroom 18 months after the crime occurred, when Gavin was seated at the defendant's table between his white lawyers. Gavin's counsel never sought to have Twilley's unreliable identification excluded, and compounded the error by not impeaching his unreliable and unhelpful testimony on cross-examination.

16.    Counsel also failed Gavin in a number of other respects during trial. For example, counsel neglected to point out numerous irregularities and improprieties that occurred in the course of the State's investigation of the crime, many of which served to benefit Meeks. Additionally, counsel failed to call Gavin to testify in his own defense even though Gavin was competent and eager to do so. Given that the jury's verdict came down to determining whether Meeks or Gavin had shot Mr. Clayton, there could be no strategic reason to refuse to call Gavin to tell his side of the story. These many guilt-phase failures were unreasonable and prejudiced Gavin's defense.

17.    Trial counsel's performance was even more ineffective during the penalty phase of the trial. Although trial counsel had been told that powerful

mitigating evidence existed, they simply dropped the ball on investigating that evidence. Instead, counsel tendered only two witnesses: Gavin's mother—whom counsel admitted he had not had "an opportunity to prepare"—and a local Jehovah's Witness minister who had befriended Gavin while he awaited trial but did not know Gavin well and knew nothing about his background.

18.     In fact, there was a wealth of compelling mitigation evidence presented by post-conviction counsel and available at the time of trial, which trial counsel neglected to even investigate. The jury never heard about Gavin's multi-generational family dysfunction, the existence of domestic violence and impaired parenting in his life, and the poor, violent community in which he grew up. They also never heard about the profound effects of Gavin's 17 years of institutionalization in Illinois, which both would have helped the jury understand how Gavin ended up in Alabama with this cousin, and also would have shown the jury that Gavin would not be a danger to others in prison. There can be no strategic decision for neglecting to offer this crucial evidence when Gavin's life was at stake.

19.     In addition to the juror misconduct and ineffectiveness of Gavin's counsel, numerous other errors rendered Gavin's trial unjust. In closing arguments, for example, the State impermissibly commented on the fact that Gavin did not testify at trial. The central theme of its closing was that the evidence presented at

trial against Gavin was "uncontroverted." The repeated references implicitly challenged Gavin to tell his version of the events and offered a powerful suggestion to the jury that Gavin was guilty because he did not do so.

20.    The trial court denied Gavin's well-established right to represent himself pro se.

21.    The trial court erred in admitting impermissibly unreliable eyewitness testimony from Twilley, described above, and Officer Danny Smith, the police officer at whom the perpetrator shot, who, despite being a victim in the crime, nevertheless continued to serve as an investigator on the case.

22.    Finally, Gavin's death sentence was unconstitutional under the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002). Under *Ring*, any determination that increased Gavin's sentence should have been decided by the jury, not the judge. But in Alabama's statutory scheme, the decision whether to impose the death penalty because the aggravating factors are not outweighed by the mitigating factors lies solely in the hands of the judge. Ala. Code § 13A-5-47(e). The jury's finding is therefore rendered merely advisory in violation of Gavin's constitutional rights.

23.    The state court adjudication of Gavin's claims resulted in decisions that were contrary to, and/or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Moreover, the State court adjudications of Gavin's claims were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

## II.   PROCEDURAL HISTORY

### A.   Trial and Direct Appeal

24.     Gavin was indicted on two counts of capital murder for the murder of Mr. Clayton under Ala. Code § 13A-5-40(a)(2) (murder during a first-degree robbery) and § 13A-5-40(a)(13) (murder when the defendant has been convicted of another murder within 20 years) and one count of attempted murder against Danny Smith under Ala. Code § 13A-4-2. C. 10–11, 13–14.[1] The murder was capital eligible because it was allegedly committed during the course of robbery in the first degree and because Gavin had previously been convicted of murder in Illinois within the last 20 years. The trial court appointed Bayne Smith[2] and John Ufford[3] to serve as Gavin's capital trial counsel. R. 4.

25.     Gavin pleaded not guilty to all three charges and has maintained his innocence at all times. R. 4–6.

---

[1] References to the record appear as follows: References to the original trial record are cited as "C. __." References to the court reporter's transcript of the original trial proceedings are cited as "R. __." References to the clerk's post-conviction record are cited as " P.C. __." References to the court reporter's transcript of the post-conviction evidentiary hearing are cited as "P.R. __." References to the clerk's post-conviction supplemental record are cited as "P.S.C. __."

[2] Bayne Smith is deceased.

[3] Though Mr. Ufford was appointed counsel alongside Mr. Smith, Mr. Smith performed the bulk of representation at trial. As such, discussions herein primarily refer only to Mr. Smith but are meant to incorporate the performance of Mr. Ufford as well.

26.   On three separate occasions prior to trial, Gavin presented pro se motions to dismiss his appointed counsel. C. 17–18; C. 69; R. 293. Gavin withdrew one of his motions, and the trial court denied the other two. R. 8–9; C. 71; R. 302.

27.   Gavin was tried before Cherokee County Circuit Court Judge David A. Rains.

28.   After the guilt phase of the trial, the jury returned verdicts of guilty on all counts. R. 1211–15; C. 149–151.

29.   At the sentencing phase of trial, Gavin's court-appointed counsel offered only two witnesses: Annette Gavin, Gavin's mother, and Reverend S.J. Johnson, a pastor with the local Kingdom Hall of Jehovah's Witnesses. After the sentencing phase of the trial, the jury returned an advisory verdict to the court. Ten members of the jury recommended a sentence of death while two members recommended life imprisonment without parole. R. 1300; C. 152. Taking the jury's advisory sentence recommendation into account, the trial court made its own determination. The court found that no mitigating circumstances existed and sentenced Gavin to death for murder and to life in prison for attempted murder. R. 1300–15.

30.   Gavin timely appealed. On September 26, 2003, the Alabama Court of Criminal Appeals affirmed Gavin's convictions and sentences. 891 So. 2d 907

(Ala. Crim. App. 2003). Gavin's petition for writ of certiorari to the Alabama Supreme Court was denied on May 28, 2004, 891 So. 2d 998 (Ala. 2004), and his petition for writ of certiorari to the United States Supreme Court was denied on January 24, 2005, 543 U.S. 1123 (2005).

### B.    Post-Conviction Proceedings

31.    Gavin filed a petition for post-conviction relief under Alabama Rule of Criminal Procedure 32 in Alabama Circuit Court on May 26, 2005. P.C. 21–36. He filed amended Rule 32 Petitions on July 19, 2005, P.C. 46–70, August 18, 2006, P.C. 297–500, and April 2, 2010,[4] P.C. 2633–2700. On January 4, 2007, the Circuit Court dismissed all claims other than ineffective assistance of counsel and ordered Gavin to tender his evidence supporting his ineffective assistance of counsel claims by written submission, pursuant to Rule 32.9, P.C. 581–87, which Gavin did on October 9, 2007. P.C. 688–1185. That submission included eleven affidavits, four depositions, numerous documents, and several expert reports. The State then requested an evidentiary hearing so it could cross-examine Gavin (who had submitted an affidavit denying his guilt), as well as Gavin's expert witnesses. The Circuit Court granted the State's request, and the evidentiary hearing was conducted on February 8 and 9, 2010.

---

[4] In the Rule 32 proceedings, the parties disputed whether Gavin's Second Amended Petition had been considered and dismissed on the merits. On appeal, the Court of Criminal Appeals concluded that it had. Op. at 46–47.

32.     Gavin tendered four witnesses at the hearing and supplemented the record with a deposition. He testified that he had wanted to testify at trial but had been denied the opportunity by his trial counsel. P.R. 108–09, 169. Gavin again proclaimed his innocence, and declared that Meeks, not he, had murdered Mr. Clayton.

33.     Kenneth Webb, a retired police officer, testified as an expert in police investigative procedures. P.R. 220. Mr. Webb described the numerous irregularities and deficiencies that plagued the State's investigation of the crime, none of which trial counsel investigated or presented to the jury.

34.     Lucia Penland testified that she was engaged by Gavin's trial counsel to help develop Gavin's mitigation case. P.R. 309–10. At the time of Gavin's trial, Ms. Penland was the Executive Director of the Alabama Prison Project, which provides "assistance to defense attorneys in [c]apital cases in developing the mitigation aspect of the case." P.R. 302. She explained, however, that after retaining her, trial counsel did not contact her again about the case until the eve of trial, did not timely collect the records needed to prepare the mitigation case, and did not seek a continuance when it became clear that an adequate mitigation case could not be prepared in time for trial. P.C. 1023. In fact, trial counsel misled the court as to the mitigation evidence available and claimed that they had not received "any useable mitigation material." P.C. 498.

35.     Dr. Betty Paramore, who has a Ph.D. in Psychology, was retained by post-conviction counsel and testified as a mitigation specialist at the evidentiary hearing on Gavin's Rule 32 Petition. Dr. Paramore developed a mitigation profile for Gavin, including a wealth of information about the detrimental effects of his difficult childhood. Dr. Paramore identified a number of dominant risk factors in Gavin's life, such as multi-generational family dysfunction, domestic violence and impaired parenting, and the poor, violent community in which Gavin grew up.

36.     Dr. Craig Haney, a social psychologist, testified about how Mr. Gavin's long-term incarceration in Illinois may have impacted his later thinking and behavior. P.S.C. 24. Ms. Penland had urged Gavin's trial counsel to retain Dr. Haney for Gavin's mitigation case. However, trial counsel never retained Dr. Haney or even spoke to him. P.S.C. 150–51, 178–80. During the post-conviction proceedings, Dr. Haney investigated Gavin's 17 years of confinement with the Illinois Department of Corrections. P.S.C. 42–45. Dr. Haney opined that Gavin, who had spent most of his adult life in prison, "left prison as very much an 'institutionalized' man," and explained how this institutionalization impeded his post-prison adjustment in the months leading up to the crime, and made him susceptible to the influence of his cousin, Meeks, who worked in corrections. P.C. 1054; P.S.C. 46 (opining that Gavin "did not emerge from those 17 years unscathed"). In addition, Dr. Haney opined that Gavin's institutional history also

provided evidence of another potentially mitigating factor in his case—his positive prospects for institutional adjustment. P.S.C. 226–28.

37.   None of these witnesses testified at Gavin's criminal trial. Each of these witnesses—or, in the case of retained experts, witnesses with similar areas of expertise—could have testified at Gavin's trial.

38.   The State called Dr. Glen King, Ph.D., J.D. Dr. King interviewed Gavin once and found him to be "most pleasant" and "absolutely a gentleman." P.R. 548. Dr. King reviewed Gavin's records but did not interview any of his family or compile a comprehensive social history for Gavin. P.R. 585, 599. Ultimately, Dr. King determined that Gavin would not pose a threat to other prisoners or guards if he were incarcerated instead of executed. P.R. 628.

39.   Following the hearing, the Alabama Circuit Court denied all claims for relief in a Final Order entered on April 18, 2011. P.C. 3484–526.

40.   Gavin filed a timely Notice of Appeal. P.C. 3527–29. After briefing and oral argument, the Court of Criminal Appeals issued an opinion affirming the Circuit Court's judgment on August 22, 2014. *Gavin v. State*, CR-10-1313 (Ala. Crim. App. Aug. 22, 2014). Gavin filed an Application for Rehearing with the Court of Criminal Appeals on October 31, 2014, which the court denied on March 20, 2015. Gavin's petition for writ of certiorari to the Alabama Supreme

Court was denied on October 23, 2015. *Ex parte Gavin*, No. 1140665 (Ala. Oct. 23, 2015) (no opinion).

41.    This is Gavin's first and only application for habeas corpus relief. Gavin has exhausted all state court post-conviction procedures on all claims raised in this Petition.

## III.    GROUNDS SUPPORTING PETITION FOR RELIEF

### A.    JUROR MISCONDUCT DENIED GAVIN A FAIR TRIAL

42.    Gavin was denied his Sixth and Fourteenth Amendment rights to a fair trial before an impartial jury by two separate instances of juror misconduct: the jury's deliberations and formal vote on the death sentence *before* any evidence was presented on the subject, and improper contact between jurors and the bailiff during the proceedings. Both violated Gavin's rights and prejudiced him, and the need for relief is plain.

43.    The Rule 32 Circuit Court dismissed Gavin's juror misconduct claims without so much as a hearing on the serious constitutional issues presented. P.C. 3521. On appeal, the Court of Criminal Appeals affirmed the denial of the premature deliberations claim based on Alabama Rule of Evidence 606(b). Op. at 45. In so doing, it did not address Gavin's Federal claim under the Sixth and Fourteenth Amendments. And the court affirmed the denial of the extra-juror communications claim by concluding that Gavin failed to plead sufficient facts,

even as it denied the request for an evidentiary hearing where those facts would have been presented. Op. at 46.

### 1.    The Jury Engaged in Premature Penalty Deliberations

44.    The Sixth Amendment secures the accused's right to trial by an impartial jury. An impartial jury bases its verdict on all the evidence presented at trial, not on prior judgments or conclusions. The Supreme Court has explained that "[t]he requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965). And in the specific context of capital sentencing, the Supreme Court has held that the Constitution is violated if even a single member of the defendant's jury would vote automatically for the death penalty upon a guilty verdict. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). A juror who has prejudged the sentence is not impartial, because that juror "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Id.*; *see also Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("The theory of our law is that a juror who had formed an opinion cannot be impartial." (quoting *Reynolds v. United States*, 98 U.S. 145, 155 (1879)).

45.    For this reason, "[i]t is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have

heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body." *United States v. Resko*, 3 F.3d 684, 688 (3d Cir. 1993); *Valdez v. State*, 196 P.3d 465, 474 (Nev. 2008) (premature deliberation "denied Valdez his Sixth Amendment right to a fair trial by an impartial jury"); *Commonwealth v. Kerpan*, 498 A.2d 829, 832 (Pa. 1985) ("appellant's right to an impartial jury was violated" by pre-charge deliberations); *Ramirez v. State*, 922 So. 2d 386, 390 (Fla. Dist. Ct. App. 2006) ("Deciding a case before hearing all the evidence is antithetical to a fair trial."). A new trial is the appropriate remedy where a jury has formed its opinion prior to deliberations based on improper conversations. *Hayes v. State*, 647 So. 2d 11, 14 (Ala. Crim. App. 1994) ("If it is found that any of the jurors had formed opinions due to any conversations before the jury retired to deliberate, the appellant was denied an impartial jury and is entitled to a new trial.").

46.     Investigation by post-conviction counsel revealed that the jurors voted on guilt and sentencing at the same time, notwithstanding the trial court's repeated admonishments not to discuss the case before it was submitted for decision. This improper vote occurred before the penalty phase even began, and thus before any evidence was presented as to mitigation or aggravation and indeed before the jury was instructed on the law governing sentencing. Counsel spoke with jury foreman Terry Manley, who recalled the moment juror Clifford Higgins addressed the

group, just before the guilt-phase vote. P.C. 2688. Mr. Higgins said that if the other jurors thought that he would vote differently because he and the defendant were both black, he wanted them to know that he was going to vote guilty *and in favor of the death penalty*. Each of the jurors then formally voted by writing his or her vote down on a piece of paper, voting on both guilt *and* the sentence (death or life without parole) at the same time. The vote was unanimous in favor of guilt and 10 to 2 in favor of the death penalty. Jurors Cheryl Beard and Belinda Martinez have corroborated Mr. Manley's account that the jurors voted on both guilt and sentencing at the same time. *Id.*

47.     The jury's premature deliberation on sentencing, and its commitment to a sentencing decision prior to the presentation of *any* evidence on the subject, was misconduct. As the Third Circuit has explained, premature deliberations (1) lead jurors to "continue to adhere to" opinions expressed, often despite the evidence; (2) deprive the defendant of a properly instructed jury; and (3) shift the burden of proof to the defendant, who must "chang[e] by evidence the opinion thus formed." *Resko*, 3 F.3d at 689 (quoting *Winebrenner v. United States*, 147 F.2d 322 (8th Cir. 1945)).

48.     The jury in Gavin's case reached its 10-2 vote in favor of death without hearing any evidence to support the sentence. The 10 jurors who voted for death did so without having been instructed by the Court on the law, without

17

subjecting the prosecution to any burden, much less the burden of proof of an aggravating factor beyond a reasonable doubt, and without weighing that evidence against the evidence presented by the defense in mitigation, as they were required to do. *See* Ala. Code § 13A-5-48. Lest there be doubt as to the significance of the improper and untimely vote, the jury's ultimate vote at the conclusion of the sentencing trial was exactly the same as the illicit one during the guilt-phase deliberations: 10-2 in favor of death. R. 1300. The jurors were set in their conclusions before they heard the sentencing phase evidence. Ten members of the jury voted automatically upon the guilty verdict, a clear violation of Gavin's Sixth and Fourteenth Amendment rights under *Morgan v. Illinois*.

49.    Gavin's jury misconduct claim is much stronger than many successful claims of premature deliberation. Often, such claims involve little more than early discussions of evidence or witnesses, discussions that may sometimes relate only to peripheral issues. In *Resko*, for example, it was unclear what issues the jury had discussed, and whether they were central or peripheral, but the Third Circuit ordered a new trial for fear that the discussion *might* have been significant. 3 F.3d at 691. The discussion in Gavin's case did not concern merely a significant element in the sentencing phase; it was a vote on the ultimate question the jury would be charged to answer.

50.    Gavin's claim is strong even among cases of juror misconduct in death penalty litigation. In *Holland v. State*, for example, the Mississippi Supreme Court ordered resentencing where the jury voted on the sentence during a break between the two phases of the trial. 587 So. 2d 848 (Miss. 1991). That court held that "the jury's premature deliberations prejudiced [defendant's] right to a fair hearing during the sentencing phase." *Id.* at 874. And in *Valdez*, the Nevada Supreme Court noted that "the misconduct was more egregious" than the early penalty determination in the *Holland* case "because the jury [in *Valdez*] had not yet made the guilt determination, as it had in *Holland*." 196 P.3d at 475. Like Gavin's jury, the jury in *Valdez* voted on guilt and penalty at the same time. A simultaneous vote is especially troubling because it casts doubt on both the guilty verdict and sentencing determination. *Id.* at 475–76 ("Because of the possibility that the jury decided Valdez's guilt by choosing its desired sentence, rather than based on the evidence, there is a reasonable probability that the jury's deliberation of Valdez's sentence while deliberating his guilt affected the verdict."). Gavin was prejudiced even as to the jury's guilt determination, and he therefore is entitled to a new trial both on guilt and, if necessary, on penalty.

51.    The Court of Criminal Appeals, however, did not reach this important Federal question. It instead held that Alabama Rule of Evidence 606(b) prohibits a juror from testifying about deliberations in one trial (on guilt) to challenge the

19

verdict in a second trial (on penalty). The application of the Rule in this manner was a case of first impression in Alabama. And despite the significant Federal constitutional implications, the Court resolved the question against Gavin without even giving him the opportunity to file a brief on the subject. The Rule 32 Circuit Court's decision did not refer to, much less rest on, Rule 606(b), and the State did not so much as cite the Rule in its brief in the Court of Criminal Appeals. Notwithstanding the lack of guidance from the Alabama Supreme Court or briefing from the parties, the Court of Criminal Appeals offered its own interpretation of the Rule, to Gavin's detriment. Its holding is based on an unduly expansive reading of the Rule; it leads to manifest injustice; and it renders the Rule unconstitutional as applied here.

52.    If the Court of Criminal Appeals' decision is allowed to stand, Gavin will be forever barred from introducing the very evidence that would establish serious juror misconduct and a violation of his Federal constitutional rights, including his right to a fair and impartial jury. Gavin's penalty-phase jury reached its verdict on the sentence before the trial had even begun, but there is no way to prove that without entering testimony into the record regarding the premature deliberations. Gavin respectfully petitions this Court for an evidentiary hearing on the matter. Because the Alabama Court of Criminal Appeals did not reach the merits of Gavin's federal claim, this Court's review is *de novo*.

### 2. The Jury Had Improper Contact with an Officer of the Court

53.     Investigation by post-conviction counsel also revealed a second instance of jury misconduct, which on its own justifies relief. Jury foreman Manley reported that on the Sunday between the guilt and sentencing phases of the trial, while the jurors were sequestered at a hotel in Lake Guntersville, he and other jurors played golf with the trial court's bailiff. P.C. 2689. Such *ex parte* communication and contact with an officer of the court during the trial's pendency is intolerable, presumptively prejudicial, and entitles Gavin to a new trial on sentencing.

54.     The Sixth Amendment requires shielding jurors in their deliberations from outside influences that may unlawfully affect the verdict. Permitting extraneous information to be introduced to the jurors through contact and communication with the bailiff denied Gavin his rights to due process and a fair trial. *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965); *Remmer v. United States*, 347 U.S. 227, 229 (1954) ("The integrity of jury proceedings must not be jeopardized by unauthorized invasions."); *Reed v. State*, 547 So. 2d 596, 597 (Ala. 1989); *Ex parte Troha*, 462 So. 2d 953, 954 (Ala. 1984). The Supreme Court has policed third-party influence on juries for well over a century: "Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the

21

verdict, at least unless their harmlessness is made to appear." *Mattox v. United States*, 146 U.S. 140, 150 (1892).

55.   It is axiomatic that *extra*-juror influences, such as communications with third parties, pose a serious threat to the fairness of a criminal proceeding. That threat is even more serious than improper *intra*-jury communications because the extraneous information completely evades the safeguards of the judicial process. *Resko*, 3 F.3d at 690; *see also United States v. Ronda*, 455 F.3d 1273, 1299 (11th Cir. 2006) (if the defendant shows "the jury has been exposed to extrinsic evidence or extrinsic contacts," then "prejudice is presumed and the burden shifts to the government to rebut the presumption" (citing *Remmer*, 347 U.S. at 229)); *Ex parte Pilley*, 789 So. 2d 888, 893 (Ala. 2000) (requiring reversal or mistrial so long as the contact *might* have prejudiced the defendant). Indeed, the jury was sequestered in this case for that purpose. The safeguards of sequestration were thwarted by having the bailiff—who was privy to information withheld from the jurors—spend several hours socializing with jurors beyond the watchful eye of the trial court and outside the presence of the defendant and his counsel.

56.   Although any external influence is presumptively prejudicial, improper contact with court officers is especially troubling. The Supreme Court has emphasized the risk of prejudice from improper contacts with a bailiff in

particular. *See Parker v. Gladden*, 385 U.S. 363, 365 (1966) (per curiam) (noting that the "official character of the bailiff—as an officer of the court as well as the State—beyond question carries great weight with a jury which he had been shepherding"). So have other courts. *E.g.*, *Turpin v. Todd*, 519 S.E.2d 678, 682 (Ga. 1999) ("The very nature of the bailiff's position serves to heighten the prejudicial potential a bailiff's communication may have on the jury."); *State v. Johnson*, 105 P.3d 85, 94 (Wash. Ct. App. 2005) (noting that a bailiff may be seen as "the judge's agent," and that "the bailiff is viewed by the jury as speaking on behalf of the judge").

57.    Although the improper contact here would justify relief even in a run-of-the-mill case, courts are especially solicitous of juror misconduct claims in capital cases. *Cf. Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (noting that "the penalty of death is different in kind from any other punishment imposed under our system of criminal justice"). As the Supreme Court explained in *Mattox*, "It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated." 146 U.S. at 149; *see also Pilley*, 789 So. 2d at 893 (holding that "where the penalty is the maximum inflicted by law, death," improper "contact with a prospective juror by a [state official is] intolerable" and ordering a new trial).

58.    The Court of Criminal Appeals, however, denied Gavin the opportunity to present the claim before the court. The court first held that Gavin had failed to plead sufficient facts to support his allegation, namely that the contact with the bailiff resulted in "improper communications." Op. at 46. But only a few lines later, it denied Gavin's opportunity for a hearing because "the circuit court correctly dismissed Gavin's two substantive claims regarding juror misconduct." Op. at 46. In essence, the court held that because Gavin did not argue the facts, he lost his opportunity to establish the facts that he should have argued. This circular reasoning deprived Gavin the opportunity to argue his constitutional right to a fair and impartial jury.

59.    The Court of Criminal Appeals' decision was based on an unreasonable determination of the facts and involved an unreasonable application of Supreme Court precedent such as *Mattox*, *Remmer*, and *Turner*. Gavin was entitled "to have the jury decide his punishment based on the evidence presented in court, in accordance with the rules and instructions of the court and with the full knowledge of *the parties*." *Ward v. Hall*, 592 F.3d 1144, 1179 (11th Cir. 2010) (emphasis added) (ordering resentencing in capital case where bailiff engaged in an improper exchange with the jury). Having been denied the rights guaranteed to him by the Sixth and Fourteenth Amendments, he is now entitled to relief in this Court.

### B.   TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN THE GUILT PHASE OF GAVIN'S TRIAL

60.    Setting the juror misconduct aside, Gavin never had a fair chance as his trial counsel's ineffective assistance prejudiced Gavin from the very beginning. Gavin's counsel provided an anemic defense that fell far below the constitutional minimum. Trial counsel's failure to render effective assistance denied Gavin his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. *See Strickland v. Washington*, 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003).

61.    To establish ineffective assistance of counsel, a defendant must show (1) "that counsel's performance was deficient," and (2) that "counsel's failures prejudiced his defense." *Wiggins*, 539 U.S. at 521, 534 (citing *Strickland*, 466 U.S. at 687, 692). Gavin's trial counsel failed to investigate basic information surrounding the case and failed to adduce at trial evidence that would have raised a reasonable doubt regarding Gavin's guilt. Considered individually or as a *whole*, these deficiencies establish that trial counsel fell woefully short of the constitutional minimum, to Gavin's prejudice. He is therefore entitled to a new trial.

### 1.   Trial Counsel Failed to Investigate and Impeach the State's Key Witness, Dwayne Meeks

62.   Gavin's trial counsel was patently ineffective in failing to investigate and impeach Meeks—the State's key witness. Meeks and Gavin traveled in Meeks' vehicle from Chicago to Alabama twice in early 1998. Unlike Gavin, Meeks had connections in Alabama, having spent much of his youth in Fort Payne and having attended high school there. Meeks' close proximity to Mr. Clayton at the time of the shooting, his ownership of the murder weapon, and his flight from the scene all suggests that he, and not Gavin, may have shot Mr. Clayton. In fact, Meeks was viewed by the lead investigators as a suspect in the crime, P.C. 835, was indicted by a grand jury, P.C. 857–58, and was initially charged, along with Gavin, with the murder of Mr. Clayton. Although Meeks' testimony was essential to the State's case against Gavin, trial counsel utterly failed to undermine Meeks' credibility or to introduce evidence suggesting that Meeks may have been the shooter.

63.   Gavin's counsel failed to conduct even a minimal investigation that would have enabled him to effectively cross-examine Meeks or impeach many of Meeks' statements through other witnesses or documents. For example, trial counsel failed to uncover or exploit during cross-examination the unusual circumstances surrounding the murder weapon—Meeks' .40-caliber Glock. The gun was not found in Gavin's possession; rather, it was found in the woods seven

days after he was apprehended. Meeks' account of his ownership and use of the weapon was suspicious and contradictory, and the seven-day delay provided ample opportunity for Meeks (or someone else) to plant the gun in the woods.

64.     At trial, Meeks testified that the gun used to shoot Mr. Clayton was not his personal weapon but had been issued to him by his employer, the Illinois Department of Corrections ("IDOC"). R. 679. The prosecution elicited this testimony to show that Meeks had a legitimate reason for having a gun and to bolster Meeks' credibility as a quasi-law enforcement officer.

65.     However, this testimony was false. Meeks never mentioned that the gun was state-issued in his first interview with law enforcement. P.C. 886 ("Dwayne said the gun that Keith had was his gun. He said he had come back and reported it stolen."). And for good reason: it was not. IDOC confirmed that there was "no record in Dwayne Meeks' personnel file of him being issued a weapon by the Illinois Department of Corrections in the course of his employment." P.C. 909–10. This fact was readily obtainable by subpoena of Meeks' personnel files.

66.     Any competent attorney would have investigated the murder weapon and its connection to the prosecution's central witness. However, there is no record that trial counsel performed such an investigation. Instead, counsel's cross-examination of Meeks regarding the weapon focused on Meeks' parenting skills. R. 720–21 (eliciting testimony that Meeks kept the gun in an unlocked drawer,

despite having a three-year-old son at home). While Gavin's trial counsel was occupied with Meeks' domestic concerns, the prosecution used the false information regarding the issuance of the gun to its benefit. R. 1104 ("This is the same Glock that [Meeks] testified he had just been assigned through his job as a corrections officer just a few months before.").

67.     Meeks also told a made-up tale to the jury about the reason for his trip from Chicago to Alabama. Meeks testified that he and Gavin went to Alabama to go "whoring" and to look "for girls and to party." R. 650, 699–700. But at the Rule 32 proceedings, the evidence showed that Meeks was running drugs between Alabama and Chicago. P.R. 131–32; 134–36. Gavin's trial counsel, however, failed to investigate and adduce readily available evidence about Meeks' drug and gang activities. Had trial counsel bothered to investigate, he would have learned from Meeks' cousin, Titus Johnson, that Meeks once brought him to Alabama to sell cocaine and heroin. P.C. 946. Johnson could have further explained that Meeks "use[d] his size to intimidate people, including other family members." P.C. 947. Gavin's brother-in-law, Keith Clark, could have revealed that, at the time of the shooting, Meeks "owed a large sum of money to Willie Lloyd, the former head of the Vice Lords gang," P.C. 954, a fact that Johnson could corroborate. P.C. 946.

68.     Consistent with the statements from Meeks' family, Gavin testified that the real reason he was in Alabama was because Meeks offered to pay him to

help drive Meeks from Chicago to the Fort Payne area while Meeks did his drug deals. P.R. 136–37; 146; 149. Indeed, the State recognized that its star witness was a drug trafficker and had made a drug run with Gavin only a few weeks prior: [By Assistant Attorney General Maze] "Nobody doubts that there was a drug deal going on during the first trip . . . ." P.R. 140. This evidence would have been highly probative at trial to show that Meeks, not Gavin, was the likely shooter, and at the very least that Meeks was willing to lie on the stand and therefore not worthy of belief.

69.    Gavin's trial counsel also failed to impeach Meeks on many inaccuracies and inconsistencies in his testimony beyond those relating to the murder weapon, as even a marginally competent attorney would have done. In fact, the prosecutor's own files reveal doubts regarding Meeks' character and authenticity. P.C. 940 (noting that Meeks' "[t]ime frames don't make much sense" and that it "doesn't make sense that he would just drive around 'looking for this girl'"). Law enforcement officers involved in the investigation also questioned Meeks' version of events. P.C. 837–39 (stating opinion that Meeks was "guilty" and was "involved" in the crime). Gavin's jury never knew this.

70.    The list of disparities between Meeks' trial testimony and prior statements is a long one. To take a few examples: At trial Meeks testified that Gavin took his gun without permission and used it to shoot Mr. Clayton, but

29

Meeks—unbeknownst to Gavin's jury—had earlier reported no knowledge of who might have taken his gun. R. 722–24; P.C. 876–78. Meeks also reported to investigators that Gavin had been living with him—perhaps to explain how Gavin would have access to Meeks' gun—although Meeks later testified that Gavin lived with his mother after his release from prison (which was true). R. 648–49. Meeks also asserted at trial that "everybody in the family" knew about Gavin's murder conviction, R. 649, but Meeks failed to report his cousin's incarceration on his application for employment with IDOC. P.C. 913. Trial counsel never brought these disparities to the jury's attention.

71.   No conceivable strategic reason could justify counsel's failure to expose these inconsistencies—readily available to any competent defense counsel—during cross-examination of Meeks. In fact, the prosecution used the failure of Gavin's trial counsel to impeach Meeks as an essential element in its closing, arguing that if Meeks "hadn't been [consistent], when they were cross-examining him with those statements, you would have heard it." R. 1097. The jury did not hear about Meeks' inconsistency, but not because Meeks was a model witness. Gavin's trial counsel simply neglected to impeach him, permitting the jury to infer, as the State urged, that Meeks testified truthfully.

72.   Trial counsel's utter failure to impeach the State's key witness with readily available evidence—from prior inconsistent statements to testimony

regarding Meeks' drug ties—constitutes ineffective assistance of counsel. In similar circumstances, numerous courts applying *Strickland* have so held. *See, e.g.*, *Nixon v. Newsome*, 888 F.2d 112, 115 (11th Cir. 1989) (holding that trial counsel's failure to impeach key witness was "not within the wide range of professional competence" because it "sacrificed an opportunity to weaken the star witness's inculpatory testimony"); *Tyler v. State*, 793 So. 2d 137, 144 (Fla. Dist. Ct. App. 2001) ("[T]rial counsel's failure to impeach a key witness with inconsistencies constitutes ineffectiveness of counsel and warrants relief.").

### 2.    Trial Counsel Failed to Expose Irregularities in the State's Investigation

73.    Trial counsel also was ineffective in failing to investigate or to bring to light at trial blatant deficiencies and abnormalities in the State's own investigation of the murder. Trial counsel has a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also Richards v. Quarterman*, 566 F.3d 553, 568 (5th Cir. 2009) (finding ineffective assistance of counsel where trial counsel failed to conduct a reasonable investigation and present exculpatory evidence). In Gavin's case, even a minimally reasonable investigation would have revealed that the State permitted much of the potentially probative physical evidence to become tainted or to disappear and that some investigators had substantial conflicts of interest.

74.   Gavin's trial counsel did not call an expert in police investigative procedures at trial. Nor did counsel request from the court authority to spend funds on such an expert. In the Rule 32 proceedings, post-conviction counsel retained Kenneth Webb, a retired police officer who has investigated approximately 500 violent crimes. P.R. 216–17. He was tendered and accepted without objection as an expert in police investigative procedures. P.R. 220. Had trial counsel considered proper police investigative procedures, they could have elicited similar expert testimony. Mr. Webb's testimony established defects in the investigation into the shooting of Mr. Clayton, the cumulative nature of which would have seriously undermined the State's case against Gavin at trial:

75.   Contamination of the victim's van. Mr. Clayton was shot inside a Corporate Express Systems van. The van was therefore a crime scene that should have been preserved. P.R. 228–30. But the scene was almost immediately compromised when a rescue squad drove the van to the Cherokee County Sheriff's Office for processing, P.C. 796, sitting where the victim and shooter both sat.[5] This contamination of the crime scene was entirely unnecessary: if the van could not be processed where it was located, it should have been towed. P.C. 965. Webb testified that driving the van was contrary to standard police practices, as it risked

---

[5] The evidence at Gavin's trial was muddled as to how law enforcement handled the van once it was recovered on Highway 68, several miles from where Mr. Clayton was shot. P.R.228. There was trial testimony that the van was driven (not towed) from where it was recovered. R.568.

the van's becoming contaminated and thus losing or tainting evidence associated with the crime (*e.g.*, hair samples, drug residue, fingerprints, etc.). P.R. 230. As it was, no useable fingerprint or DNA evidence was ever recovered from the van. R. 928.

76.     Police did no better with the scene by the woods where Gavin was apprehended. Officers there performed an initial, unsuccessful search for the weapon. P.C. 969. Meeks' gun was not recovered until seven days later, and only after the investigating officers returned from interviewing Meeks in Chicago. P.C. 972. In the meantime, the scene was not secured by any means, contrary to standard police practice. P.C. 969–70; P.R. 259–62. This lapse in procedure raises the possibility that the weapon was placed at the scene after the incident. P.C. 969–70.

77.     Trial counsel failed to investigate or to expose the extent to which evidence was compromised by the police's failure to follow standard procedure. Any competent counsel would have marshaled these irregularities to raise the specter of doubt in jurors' minds.

78.     Meeks' "interview." Trial counsel also failed to explore the irregularities in the investigation of Meeks' involvement in the shooting. Immediately after Mr. Clayton was shot, Meeks claimed that he fled the scene, picked up his wife and son in Chattanooga, drove back to Chicago, and telephoned

a close friend involved in law enforcement, Marty Tutor. P.C. 886; R. 672–76. Meeks told Tutor that he had been at the scene when Mr. Clayton was shot, that Meeks' vehicle was involved, that he had fled the scene, and that Meeks' weapon was likely the murder weapon. R. 676–79. At that point, standard police practice would be to consider Meeks a suspect, not merely a by-stander witness. P.R. 240–41. Law enforcement, however, never interrogated Meeks; they interviewed him. P.R. 241. The difference between an interview and an interrogation is not mere semantics. In Meeks' case, the interviewers included personal friends of his, including one in particular, Tom Arambasich, whom Meeks considered "a fatherly figure." P.R. 241–42. Allowing Meeks' friends in law enforcement to be present during the interview "created an atmosphere that was friendly" and thus, according to Webb, "improper." P.R. 241. Permitting a close personal friend to sit in on an interview of a key suspect in a murder case was something Webb had never seen or allowed in decades of professional experience. P.R. 243.

79. Equally inappropriate, law enforcement provided Meeks with significant advance notice that they intended to interview him. P.R. 244–45. Meeks had *over 18 hours' notice* that the Alabama authorities were coming to Illinois to interview him regarding the incident, notice far in excess of that given under proper police practice. P.C. 967. ("As a general principle, an interview should take place as soon as possible after the event."). As Detective Webb explained, "most

interrogations are based upon the element of surprise." P.R. 247. Providing a witness with advance notice of the interview provides the witness "an opportunity to get [his] story straight." *Id.* Permitting a suspect advance notice of his "interview"—especially a prime suspect in what should have been a "he said-he said" murder case—is simply improper. P.R. 245–46.

80.     Trial counsel also did not bring to light at trial the troubling conflicts of interest that should have barred Tom Arambasich, Tony Burch, and Danny Smith from participating in the investigation.

81.     Deputy Sheriff Arambasich and Officer Burch were both personal friends of Meeks. The day after the shooting, Arambasich called Burch to say that they (Arambasich and Burch) needed to "help" Meeks. P.C. 875. Although the authorities were well aware of the friendship, P.C. 866–67, both men were present when Meeks was interviewed, contrary to the accepted police practice to exclude friends when a suspect is interviewed. P.R. 243. Worse, Arambasich actually conducted the interview of Marty Tutor, whom Meeks contacted immediately upon returning to Illinois after the shooting. P.C. 864. Meeks' friends should not have had any role in the investigation, let alone the role of interviewing such a crucial potential witness. But the jury could not appreciate this, for counsel never revealed it.

82.   Officer Smith, too, had a conflict of interest that should have barred his participation. Gavin was charged with (and convicted of) shooting at Smith. Most victims would have a natural and understandable bias toward conviction, yet Smith acted as one of the lead investigators. Even without actual bias, authorities should make every effort to avoid any appearance of bias. P.C. 971. They did not do so, but again, trial counsel failed to exploit this fact.

83.   <u>Meeks' polygraph examination.</u> According to Webb, evidence of a witness's lack of cooperation during a polygraph examination raises the probability that the witness may have participated in the crime. P.R. 238–39. Meeks was asked to take a polygraph examination, but refused. P.R. 236–38. This should have been yet another red flag to law enforcement to take a meaningful look at Meeks' involvement but, inexplicably, there is no evidence that law enforcement ever acted on this information. Gavin's jury was never told this, either through an expert or by cross-examination of witnesses.

84.   <u>Failure to investigate Meeks' vehicle, clothing, and home.</u> Because Meeks was a suspect, standard law enforcement practice would have included impounding Meeks' vehicle, confiscating his clothing, and searching his home. P.R. 250–51. Law enforcement never tried to do any of these things. Confiscating Meeks' clothing or vehicle could have uncovered "trace evidence. We don't know if there was blood splatter or fibers taken from the crime scene." P.R. 251.

36

Searching Meeks' house could have uncovered "[a]ny evidence of the clothes that he wore, [or] anything that would connect him to the scene," including the murder weapon, which was not discovered for a week following Mr. Clayton's murder. P.R. 251. The jury, however, never heard about the consequences of this shoddy police work because trial counsel never uncovered or presented the relevant evidence.

85.    <u>Failure to interview key witnesses.</u> Law enforcement also improperly failed to interview potentially critical witnesses.[6] Sharon Meeks, Dwayne Meeks' wife, accompanied Gavin and Meeks on the trip from Illinois, and was with them for several hours shortly before Mr. Clayton was shot. She was again with her husband for many hours thereafter as Meeks fled the scene, picked her and their son up in Chattanooga, and returned to Chicago. P.R. 253–54. Marty Tutor was a friend of Meeks and was the first person Meeks contacted after Mr. Clayton was shot. P.R. 254–55. Vickie Twilley was at the scene of the crime and told Webb a version of events different from the testimony her husband provided at Gavin's trial. P.R. 255–56. It is, of course, common for two eyewitnesses to perceive the same event differently, which is why it is important that law enforcement interview all eyewitnesses. None of these individuals was ever questioned by law

---

[6] Gavin's trial counsel failed to interview these witness as well or to retain a police procedures expert to establish this investigational impropriety. P.R.253–56.

37

enforcement, and trial counsel failed to exploit these inconsistencies on Gavin's behalf at trial.

86.    <u>Irregularities in the recovery of the murder weapon.</u> The murder weapon was recovered in the same general area where Gavin was apprehended hours after the shooting. P.C. 482. But the gun was not recovered for one full week after the crime. R. 264. Law enforcement failed to follow standard procedures for (1) securing the area, (2) searching for the weapon, and (3) logging ingress and egress to the crime scene. P.R. 259–62. These improprieties created a risk that the murder weapon was planted during the week after Gavin was arrested and in custody. P.R. 264–65. And this risk of planted evidence could well have created reasonable doubt in the jury's mind, given the above-described law enforcement improprieties coupled with the facts that (1) it was Meeks', not Gavin's, gun; (2) Meeks lied at trial about the gun's provenance, saying it was state issued, *compare* R. 679, *with* P.C. 909–10; (3) no fingerprints were found on the clip, which, according to Webb is "extremely unusual," P.R. 265; and (4) law enforcement made no effort to search Meeks' home or vehicle for the weapon when they interviewed Meeks in Chicago, P.R. 250–51.

### 3. Trial Counsel Failed to Suppress Identification Evidence and to Effectively Cross-Examine Unreliable Identification Testimony

87.     Eyewitness identification testimony is powerful and persuasive to a jury. *See, e.g.*, *Watkins v. Sowders*, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting) ("[T]here is almost *nothing more convincing* than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'"). It is also famously unreliable. *See, e.g.*, *United States v. Wade*, 388 U.S. 218, 228 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification."); *Harris v. Senkowski*, 298 F. Supp. 2d 320, 336 (E.D.N.Y. 2004) ("Identification testimony is at once the 'least reliable' form of evidence but 'among the most influential' to a jury." (quoting *Kampshoff v. Smith*, 698 F.2d 581, 587 (2d Cir. 1983)).

88.     Cross-racial identifications only magnify the risk of error, for they are "much less likely to be accurate than same race identifications." *Arizona v. Youngblood*, 488 U.S. 51, 72 n.8 (1988) (Blackmun, J., dissenting) (*quoting* Rahaim & Brodsky, *Empirical Evidence versus Common Sense: Juror and Lawyer Knowledge of Eyewitness Accuracy*, 7 Law and Psych. Rev. 1, 2 (1982)); *see also* Radha Natarajan, Note, *Racialized Memory and Reliability: Due Process Applied to Cross-Racial Eyewitness Identifications*, 78 N.Y.U. L. Rev. 1821 (2003) (surveying studies showing cross-racial identifications substantially more likely to

be erroneous than same-race identifications due to the psychological phenomena of own-race bias).

89.   In light of the power yet concomitant unreliability of identification testimony, Gavin's trial counsel should have made every effort to exclude or at least to impeach the testimony of Larry Twilley, who provided an unreliable cross-racial identification of Gavin. Twilley never gave a detailed description of Gavin that would distinguish him from Dwayne Meeks, the other black man at the scene of the crime, nor did Twilley identify Gavin in a line-up or photo array. In fact, the authorities never even asked Twilley to view a line-up or photo array.

90.   Trial counsel fell far short of professional obligations, failing either to effectively impeach Twilley's testimony or to seek to exclude it. Twilley's in-court identification was "suggestive," thereby creating a "a very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (quoting *Simmons v. United States*, 390 U.S. 377, 394 (1968)). He was not asked to choose among several similar-looking candidates, and indeed, since Gavin's conviction, he has admitted that when asked if he saw the offender in court, he simply looked over at the counsel table and "saw Gavin sitting between his two attorneys." P.C. 977.

91.   Moreover, consideration of factors from the *Neil v. Biggers* totality-of-the-circumstances test only confirms the deficiencies of Twilley's testimony.

409 U.S. at 196–200. Twilley only saw the side of the shooter's face, and only for a few moments as the shooter turned. R. 523. His prior description matched neither Gavin nor the testimony he gave at trial. To police, Twilley described the shooter as a "black male," "slim, about 6 feet tall." P.C. 979.  But Gavin is only 5'8" tall, and at trial, Twilley testified (contrary to his prior description) that the shooter "wasn't slim." R. 521. Gavin is slim, weighing only 145 pounds at the time of the shooting. P.C. 980. Twilley's identification also lacked conviction; he weakly stated that he thought Gavin was the shooter because of his "hairline." R. 523. And there was a significant length of time—over eighteen months—between the incident and identification.

92.    Gavin's trial counsel did not seek to exclude Twilley's identification testimony at a pre-trial hearing, notwithstanding its obvious unreliability. Even on its own, that failure constitutes ineffective assistance of counsel under *Strickland*. *See Thomas v. Varner*, 428 F.3d 491, 501 (3d Cir. 2005) (affirming habeas relief and noting that "failure to move to suppress or otherwise object to an in-court identification by the prosecution's central witness, when there are compelling grounds to do so, is not objectively reasonable representation, absent some informed strategy"). A motion to exclude Twilley's testimony should have been

granted by the trial court, leaving the State with the drug dealing Meeks as the sole eyewitness to the crime—and without much of a case.[7]

93.    Having failed to seek to exclude Twilley's testimony, trial counsel compounded the error by failing to impeach the testimony on cross-examination. *See Berryman v. Morton*, 100 F.3d 1089, 1102 (3d Cir. 1996) (holding that failure to impeach identification witness with prior inconsistent statements constitutes deficient performance and that prejudice to defendant was "obvious"). Twilley offered inconsistent accounts of the assailant's height and weight—from 6 feet initially to the identification of the 5'8" defendant and from "slim" to "not slim"— but trial counsel neglected to confront Twilley with these discrepancies, even though the description of a 6-foot tall shooter of moderate build with a distinctive hairline better matches Meeks than Gavin. *See* P.C. 981 (stating that Meeks was 5'10" and weighed 240 pounds); P.C. 982 (photograph of Dwayne Meeks). Failure to use height and weight discrepancies to impeach identification testimony is a standard ground for relief under *Strickland*. *See, e.g., Matthews v. Abramajtys*, 319 F.3d 780, 789 (6th Cir. 2003) (height); *Berryman*, 100 F.3d at 1097–99 (height); *Harris*, 298 F. Supp. 2d at 329 (height and weight); *People v. Winston*, 134 A.D.2d 546, 547 (N.Y. App. Div. 1987) (height). Trial counsel also failed to emphasize the circumstances of the identification that rendered it unreliable, including that

---

[7] The State acknowledged Meeks' drug dealing at the Rule 32 hearing, a fact which never surfaced at Gavin's trial.  P.R. 140.

Twilley identified Gavin for the first time at trial, eighteen months after the shooting.

### 4. Trial Counsel Failed to Prevent the Jury From Hearing Prejudicial Evidence of Gavin's Prior Conviction During the Guilt Phase

94.     Throughout its case, including during the guilt phase of the trial, the prosecution presented highly prejudicial evidence of Gavin's prior conviction to the jury. In referring to Gavin as the "convicted murderer from Chicago" numerous times, *see, e.g.*, R. 492, 494, 497, 499, 503–04; P.R. 21, 60, 104, the State relied on Section 13A-5-40(a)(13) of the Code of the State of Alabama. That provision requires the State to prove as an element of the capital murder charge that a defendant had been convicted of another murder within the 20 years preceding the crime.

95.     The offense with which Gavin was charged made the *fact* of the prior conviction relevant, but the details of the crime were irrelevant and unduly prejudicial. Indeed, the Supreme Court has noted the "significant prejudice" associated with "the introduction of evidence of a defendant's prior crimes," *Almendarez-Torres v. United States*, 523 U.S. 224, 235 (1998), and partly for that reason, "the fact of a prior conviction" is the only kind of fact the Court has excepted from the jury trial right in the Sixth Amendment. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *see also id.* at 521 (Scalia, J., concurring) (noting that

one reason for the *Almendarez-Torres* holding is "a concern for prejudicing the jury by informing it of the prior conviction").

96.     When the jury is asked to determine the fact of a prior conviction, it is a standard practice for defense counsel to offer to stipulate to that fact, thereby eliminating the risk that the prosecution will present prejudicial and inflammatory evidence of the prior crime. *E.g.*, 1 Anthony G. Amsterdam, Trial Manual for the Defense of Criminal Cases 199 (1984) ("Since there is ordinarily no contest to be made about the defendant's record, it is usually wise to plead guilty to the priors (or to stipulate the priors, as local practice may have it)."). Alabama law permits such stipulation. The failure of Gavin's counsel to offer to stipulate to his prior conviction, and the failure even to realize that such offers were the norm, constitutes deficient performance under *Strickland*.

97.     Gavin's counsel failed to offer to stipulate to the fact of Gavin's prior conviction. Because of that failure, the Court did not exclude highly prejudicial and inflammatory prosecutor statements. The prosecutor made repeated references to Gavin as the "convicted murderer from Chicago." And recognizing the powerful effect of the conviction, the prosecutor ended his closing argument by describing the graphic facts of the murder to the jury. R. 1263; *see also* R. 1274 (prosecutor reminding the jury of the facts of the prior murder at the sentencing hearing). This constitutes plainly deficient performance for a capital murder defense.

### 5.   Trial Counsel Failed to Call Gavin to Testify in His Own Defense

98.   In this case, the only conceivable strategy for raising a reasonable doubt as to Gavin's guilt was to implicate Meeks. Because Gavin and Meeks were alone during the time period leading up to and during the shooting of Mr. Clayton, in order to rebut Meeks' account, it was imperative that Gavin testify to provide his version of the facts. And he had wanted to testify on his own behalf at his criminal trial, but his attorney Bayne Smith advised against it. P.R. 108–09. Gavin further explained that his lawyers "wouldn't allow me to testify" at his criminal trial.[8] P.R. 169.

99.   Trial counsel's decision not to allow Gavin to testify constituted deficient performance. The Supreme Court has long held that there is "no rational justification for prohibiting the sworn testimony of the accused, who above all

---

[8] The State did not refute this testimony at the Rule 32 hearing despite having possession of Gavin's affidavit, which had been tendered months earlier. The State attempted to impeach Gavin with portions of the trial transcript where he told the trial court that Bayne Smith "did a lot of work" on the case. P.R. 180–82. This testimony actually *supports* Gavin's claims. Gavin stated that even if Bayne Smith "*might have*" done "a lot of work," they had "been bickering back and forth about the truth" to the point Smith "tried to pressure" Gavin to plead guilty. R. 294 (emphasis added). Gavin made this statement at the time he asked the Court to dismiss Smith as his attorney. R. 293.   Gavin made clear at that point that "I am innocent of shooting William Mr. Clayton." R. 294.  Smith nonetheless attempted to "convinc[e] me to plead to this case, this charge, when I'm not guilty of it." R. 294. These remarks were made on November 3, 1999, before jury selection. Gavin had expressed concern to the Court about Smith's inadequate representation twice before—in September 1998 and August 1999, stating "my court-appointed attorneys" were "putting no emphasis on my innocence." R. 1552.  The Court denied each of Gavin's motions to replace counsel.

others may be in a position to meet the prosecution's case." *Ferguson v. Georgia*,

365 U.S. 570, 582 (1961). As the Eleventh Circuit has recognized:

> "[T]he most important witness for the defense in many criminal cases is the defendant himself." Further, in a case . . . where the question was not whether a crime was committed, but whether *the defendant* was the person who committed the crime, his testimony takes on even greater importance. Indeed, "[w]here the very point of a trial is to determine whether an individual was involved in criminal activity, the testimony of the individual himself must be considered of prime importance."

*Nichols v. Butler*, 953 F.2d 1550, 1553–54 (11th Cir. 1992) (quoting *Rock v. Arkansas*, 483 U.S. 44, 52 (1987) and *United States v. Walker*, 772 F.2d 1172, 1179 (5th Cir. 1985)) (holding that counsel rendered ineffective assistance in failing to call the defendant to testify); *see also Reeves v. State*, 974 So. 2d 314, 324 (Ala. Crim. App. 2007) (same).

100.   Here, there was no question that a crime had been committed—the only question was who committed it. At the Rule 32 hearing, Gavin emphatically denied shooting Mr. Clayton and testified that Meeks was the perpetrator. P.R. 114. Gavin testified that he did not know Meeks was going to shoot Mr. Clayton before Meeks did so. P.R. 115.

101.   Gavin also explained why he was in Meeks' company. Gavin had recently been released from Illinois prison, was unemployed, depressed, and his family was destitute. P.R. 117–18. Meeks, who is Gavin's first cousin and, unlike Gavin, a northeast Alabama native, was running drugs between the Fort Payne area

and metropolitan Chicago. P.R. 131–32; 134–36. Gavin testified that Meeks offered to pay Gavin to help drive Meeks from Chicago to the Fort Payne area while Meeks did his drug deals. P.R. 136–37; 146; 149. And indeed, on cross-examination, the State elicited testimony from Gavin that Meeks was a drug dealer and had recruited Gavin to help in his drug business when he was no longer satisfied with assistance from Gavin's brother Sterling. P.R. 185–86. By contrast, Meeks testified at the trial that the reason for the trips to Alabama was, in Meeks' crude term, to go "whoring." R. 699–700. Meeks' concocted testimony would have been completely undermined had Gavin testified, and it was therefore unreasonable to fail to call him.

102.    None of this evidence was brought out by Gavin's trial attorney. The testimony would have provided an explanation as to why Gavin was with Meeks but did not shoot Mr. Clayton. Gavin was simply an eyewitness. Importantly, no scientific or forensic evidence was offered at Gavin's trial—or at the Rule 32 hearing—to refute the possibility that Meeks was the shooter or to corroborate Meeks' self-serving trial testimony that Gavin was the shooter.

103.    Moreover, Gavin's Rule 32 testimony withstood the State's cross-examination.[9] For the most part, the State had Gavin repeat his testimony on direct

---

[9] The State established that Gavin was an accomplished chess player—negating any suggestion that Gavin's lawyer may have concluded that Gavin was not articulate enough to provide credible testimony at trial.  Subsequently, the State's only Rule 32 witness, Glen King, opined

examination; no inconsistencies of any consequence were brought to light.[10]
Perhaps most significantly, the State itself all but conceded at the Rule 32 hearing
what it never acknowledged at trial: its key witness, Meeks, had offered perjured
testimony about the reason for his and Gavin's trips to Alabama. The State
acknowledged that Gavin's Rule 32 testimony, not Meeks' trial testimony, was
true: [By Assistant Attorney General Maze] "Nobody doubts that there was a drug
deal going on during the first trip . . . ." P.R. 140.

### 6. Trial Counsel's Failures Were Prejudicial Under *Strickland*

104.  To establish prejudice under *Strickland*, a defendant must establish "a
reasonable probability that, but for counsel's unprofessional errors, the result of the
proceeding would have been different. A reasonable probability is a probability
sufficient to undermine confidence in the outcome." 466 U.S. at 694. Each of trial
counsel's failures, on its own, is sufficient to undermine confidence in the outcome
of Gavin's trial, and taken together, the need for a new trial becomes manifest.

105.  The State had scant direct evidence against Gavin. The eyewitness
testimony was spotty at best. There was no physical evidence, such as blood,

---

that Gavin does not suffer from any mental disease or defect.  King observed Gavin to be "most
pleasant" and "absolutely a gentleman"—negating any suggestion that Gavin would be deemed
uncontrollable if he testified on his own behalf.  P.R. 548

[10] The State did establish that upon fleeing the scene, Gavin recalled having followed road signs
directing him north, when in fact he had turned west.  This was hardly significant impeachment,
particularly given the passage of time and the fact that Gavin was unfamiliar with the area.
Gavin explained that he knew enough to know that he did not want to go south.  P.R. 197–99.

gunpowder residue, or fingerprints to link Gavin to the crime, nor was any incriminating evidence found on Gavin when he was apprehended. Meeks' gun, the provenance of which Meeks lied about at trial, was not found until a week after the crime.

106.   Still, the only reasonable trial strategy was to cast doubt on Gavin's role by implicating Meeks, a fact Gavin's counsel apparently appreciated. Bayne Smith began his opening statement by claiming that the story told at trial involved "three men" (Gavin, Mr. Clayton, and Meeks), rather than, as the State had suggested, "two men" (Gavin and Mr. Clayton), and he assured the jury that they would "hear an awful lot about that third man before this trial is over," R. 504–05, and why Meeks had "reason to lie about who shot William Clinton Clayton." R. 508. Although counsel knew he had to implicate Meeks, he did not do the necessary investigation to support the theory or follow through on the theory during the trial. Had he done so—by impeaching Meeks and Twilley, by exposing shoddy police work, and preparing Gavin to testify—there is a very good chance that Gavin would have been acquitted.

107.   Indeed, counsel's failure to impeach a key witness like Meeks is sufficient on its own to establish prejudice under *Strickland*. *See Ex parte Womack*, 541 So. 2d 47, 70–71 (Ala. 1988) (holding that the prejudice caused by counsel's failure to impeach the prosecution's key witnesses was "devastating"). So, too, is

the unreasonable failure to challenge Twilley's identification testimony. *See Griffin v. Warden*, 970 F.2d 1355, 1359 (4th Cir. 1992) (granting habeas relief and stating that "[e]yewitness identification evidence, uncorroborated by a fingerprint, gun, confession, or coconspirator testimony, is a thin thread to shackle a man for forty years"); *Blackburn v. Foltz*, 828 F.2d 1177, 1186 (6th Cir. 1987) (granting habeas relief where counsel failed to challenge identifying witness's testimony).

108.  Any competent counsel would have adduced evidence and explained to the jury that Meeks was a violent, intimidating man who repeatedly traveled to Alabama to traffic in illegal drugs, and was not to be believed. The jury should have been exposed to an effective impeachment of Meeks, a full account of the police errors and conflicts of interest, and Gavin's testimony. In the absence of this crucial evidence that any reasonable attorney would have introduced, one cannot be confident in the outcome at trial. Counsel's failure to preclude unnecessarily inflammatory evidence about Gavin's prior crime from being presented to the jury, which evidence was at least reasonably likely to prejudice the jury in its vote on Gavin's innocence or guilt, further casts doubt on the verdict.

109.  That counsel was unprepared to defend a case of this magnitude is no excuse. Gavin's lead counsel Bayne Smith suffered a broken bone in his foot before trial and on October 19, 1999—13 days before the start of trial—asked the court for a continuance. R. 149. He explained that "my professional obligation

being first and foremost to my client, I feel that at this point in time I cannot physically commit to providing the kind of representation that I feel that this case deserves." R. 149–50. He stated that he had been able to function "only by taking extremely strong medication for the last four to five days." R. 150. Mr. Ufford also explained that, with less than two weeks before trial, there was still "significant work to be done, both evidentiary and preparation of argument." R. 157. But the State opposed the motion, and the Court denied counsels' request for a continuance. R. 162. This conceded lack of preparation by counsel violated Gavin's right to effective counsel. And, in short, there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

110.   The Court of Criminal Appeals held that each failure of trial counsel either was not supported by the record, did not amount to deficient performance, or did not cause Gavin prejudice. Op. at 19–33. This decision was based on an unreasonable determination of the facts and involved an unreasonable application of *Strickland* and its progeny.

### 7.   The Court of Criminal Appeals Failed to Consider the Cumulative Effect of Trial Counsel's Unprofessional Errors, in Conflict with Strickland and Its Progeny

111.   Moreover, the Court of Criminal Appeals also improperly denied relief on Gavin's guilt-phase *Strickland* claim by considering each of trial

counsel's unprofessional errors in isolation, *see* Op. at 19–33, whereas *Strickland* and its progeny require a *cumulative* analysis of the effect of counsel's failures on the trial as whole. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 399 (2000) (evaluating effectiveness based on the entire "record, viewed as a whole and cumulative of . . . evidence presented originally").

112.   As described above, Gavin's trial counsel failed to investigate basic information surrounding the case, failed to impeach the State's key witnesses, and failed to obtain the exclusion of prejudicial evidence introduced during the guilt phase. Gavin submits that each of these failures on its own demonstrates trial counsel's ineffectiveness and entitles him to a new trial. The Court of Criminal Appeals considered each deficiency one by one, and held that there was not a single deficiency that justified relief under *Strickland*.

113.   The problem, however, is that the Appellate Court never considered the *cumulative effect* of counsel's unprofessional errors. Instead, it only considered those errors in isolation—referring to each deficiency as a separate "claim." *See, e.g.*, Op. at 23 ("Gavin failed to establish how such an investigation regarding the firearm would have altered the outcome of Gavin's trial. Therefore, . . . the circuit court did not err in denying *this claim*." (emphasis added)); *id.* at 25 ("Gavin has failed to establish how he was prejudiced by the cross-examination his trial counsel conducted. Gavin is due no relief on *this claim*." (emphasis added)); *id.* at 30

("Gavin has not demonstrated that the circuit court erred in denying his Rule 32 ineffective-assistance-of-counsel claim based on the admission of Twilley's identification of Gavin, and Gavin therefore is due no relief on *this claim*." (emphasis added)).

114. In this respect, the decision below clearly conflicts with the prior decisions of the Supreme Court of the United States in *Strickland* and its progeny, which require a consideration of the *cumulative* effect of counsel's performance at trial. *Strickland*, for example, explained that claims of ineffectiveness must be considered "in light of all of the circumstances." 466 U.S. at 690. Similarly, *Williams v. Taylor*, 529 U.S. 362, 399 (2000), evaluated effectiveness based on the entire "record, viewed as a whole and cumulative of . . . evidence presented originally." And *Dobbs v. Zant*, 506 U.S. 357, 359 n.* (1993), teaches that "an inadequate or harmful closing argument, *when combined . . . with* a failure to present mitigating evidence, may be highly relevant to the ineffective-assistance determination." (emphasis added).

115. When the errors of trial counsel in Gavin's case are considered cumulatively, Gavin's entitlement to relief under *Strickland* becomes plain. With competent counsel, Gavin would have faced a trial in which Larry Twilley's eyewitness identification testimony would have been excluded as unconstitutionally suggestive; Dwayne Meeks would have been shown to be in

Alabama for another in a series of drug transactions, carrying his own personal weapon for protection; and the State's investigation would have been shown to be riddled with procedural irregularities.

116.   With Twilley's testimony out of the picture and Meeks' credibility undermined by effective cross-examination, competent counsel would have put Gavin on the stand to implicate Meeks as the shooter. The remaining evidence presented by the State was likewise unreliable and unconvincing, and ultimately would not have supported guilty verdicts. For example, the State seized on the toboggan cap as an attempt to connect Gavin to the two crime scenes. R. 1100, 1105. But Twilley only gave a vague description, R. 521 (noting that he saw "something red, but I don't know it if was on his head or not"), and Officer Smith's testimony that the shooter had on a cap may well have been unconsciously influenced by his participation in the investigation. *See also* R. 536–37, 545–46 (testimony by eyewitnesses Baker and Henry describing the shooter without mention of a cap). Importantly, the State never presented any DNA evidence that the hairs found in the seized toboggan matched Gavin. R. 171, 854. Officer Smith was also permitted to give an unqualified—and therefore improper—expert opinion regarding blood-flow patterns, splatter, and absorption in the van, ostensibly to explain why no blood was detected on his Gavin's clothing though he allegedly drove the bloodstained van some distance. R. 610–11, 940. Likewise, the

State extolled the keen abilities of a tracking dog to locate Gavin in the woods. R. 1101. But the handler "scented" Spanky the beagle—i.e. instructed him pick up a scent—not from the van but from a location already in the woods. R. 732. But there was no dispute that Gavin had entered the woods, *see* P.C. 162 (Gavin's testimony that he ran into the woods when Meeks drove off), and so scenting Spanky from inside the woods yielded no information about who shot Mr. Clayton and drove the van. Finally, the State also presented a number of items that no more connected Gavin to the shooting than Meeks. *See, e.g.*, R. 1093 (motel room key showing Gavin stayed in a motel); R. 1101 (shell casings on the ground); R. 1103 (evidence in the van but none even indicating a connection to Gavin—no fingerprints, hair samples, or other DNA); R. 1103 (autopsy report); R. 1104 (fact that Meeks' gun was used); R. 1094 (eyewitness testimony from Baker and Henry that the shooter was a black male).

117. Without reliable evidence or any forensic link to Gavin, the jury would have been left with two individuals at the scene of the crime, each accusing the other of shooting the victim. In these circumstances, a reasonable jury would not have been able to find that Gavin was guilty beyond any reasonable doubt. At the very least, there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Ex parte Womack*, 541 So. 2d 47, 70–71 (Ala.

1988) (holding that counsel's failure to impeach the prosecution's key witnesses caused prejudice under *Strickland*); *Harris v. Senkowski*, 298 F. Supp. 2d 320, 336 (E.D.N.Y. 2004) ("Identification testimony is at once the 'least reliable' form of evidence but 'among the most influential' to a jury." (quoting *Kampshoff v. Smith*, 698 F.2d 581, 587 (2d Cir. 1983)).

118.   In sum, the Court of Criminal Appeals' decision dismissing trial counsel's numerous failings, individually and in the aggregate, by concluding there was no deficient performance or resulting prejudice involved an unreasonable application of the clear precedent from *Strickland* and its progeny and was based on an unreasonable determination of the facts in light of the evidence before it. This Court should afford Gavin the opportunity to try his case of life or death before a jury, this time with assistance from competent counsel.

## C.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE DURING THE PENALTY PHASE OF GAVIN'S TRIAL

119.   The Sixth Amendment right to effective assistance of counsel extends to the penalty phase of a capital murder trial. *Hardwick v. Crosby*, 320 F.3d 1127, 1162 (11th Cir. 2003). This makes sense, for sentencing is often "the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." *Anderson v. Sirmons*, 476 F.3d 1131, 1142 (10th Cir. 2007) (quoting *Romano v. Gibson*, 239 F.3d 1156, 1180 (10th Cir. 2001)). The Supreme Court has explained that the

"principal concern in deciding whether [counsel] exercised 'reasonable professional judgment' is not whether counsel should have presented a mitigation case ... [but] whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant's] background *was itself reasonable*." *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003) (citation omitted).

120.  Here, Gavin's trial counsel failed to conduct any meaningful investigation into mitigating evidence at all, although there was ample mitigating evidence available that should have been presented to the jury. Had Gavin enjoyed reasonably competent counsel, there is a reasonable possibility that he would not have been sentenced to death. The Court of Criminal Appeals' decision was based on an unreasonable determination of the facts and, moreover, involved three distinct legal errors in violation of clear Supreme Court precedent.

*Trial Counsel Presented a Constitutionally Deficient Mitigation Case*

121.  Trial counsel's mitigation case was limited to calling two witnesses, Annette Gavin, Gavin's mother, and Reverend S.J. Johnson, a lay minister from the local Kingdom Hall of Jehovah's Witnesses. R. 1243–59. Counsel told the jury that he had not had "an opportunity to prepare [Mrs. Gavin] for [her] testimony today." R. 1258. Mrs. Gavin was asked no questions about Gavin's background. R. 1258–59. She simply asked the jury to spare her son's life. R. 1259.

122. Gavin was no better served by Reverend Johnson's testimony. To begin, trial counsel evidenced his complete lack of preparation by calling the Reverend by the wrong name in front of the jury. R. 1243. And on the stand, Reverend Johnson added little substance. He testified that Gavin blamed everyone else for the things that happened to him, and that he told Gavin "God is really not to blame for anything we might do personally" and "we're going to have to suffer whatever consequences for what actions we take." R. 1246–47. The Reverend went on to recount several biblical stories, and he opined, without foundation, that "I feel that there is hope for Keith if he's given time and opportunity." R. 1249. He even reminded the jury that Gavin had failed to testify in his own behalf. R. 1252; 1254. Rather than support Gavin's mitigation case, the State actually used Reverend Johnson's testimony to its advantage, urging the jury to vote for death: "Mr. Johnson gave very eloquent and very compelling testimony, but I believe it was compelling on the side of death. He said we have a choice in the decisions we make. That's what he told Keith Edmund Gavin." R. 1274.

### 1.   There Was a Wealth of Mitigation Evidence Available to but Ignored by Trial Counsel

123. At Gavin's Rule 32 hearing, post-conviction counsel tendered numerous witnesses who both presented a compelling mitigation case and exposed trial counsel's failure to develop, or even attempt to prepare, such a case.

124. <u>Lucia Penland</u>. At the time of Gavin's trial, Lucia Penland was the Executive Director of the Alabama Prison Project, which provides "assistance to defense attorneys in [c]apital cases in developing the mitigation aspect of the case." P.R. 302. According to Ms. Penland, that assistance usually involves "obtain[ing] as much information about the defendant as I can, which is done through interviews of as many people as I can get information about the defendant [and from] obtaining records." P.R. 307. Penland's assistance does not include testifying because Penland does not "have the ability to do assessments or the training to do things like psychological assessments." P.R. 308. Instead, Penland assists with the mitigation investigation and aids trial counsel in identifying appropriate experts to testify during the penalty phase of the trial. P.R. 302. As Penland explained, "in order to present a full mitigation case, there needs to be expert witnesses that can put the defendant into the context of the crime. They need to . . . show who the person is and how he or she got to the place where they were involved in this crime, and that takes . . . witnesses that can look at and attest to the circumstances of the person's life."[11] P.R. 323.

125. Bayne Smith had worked on a prior case with Penland and, in October 1998, asked her to assist in the preparation of Gavin's mitigation case. P.R. 309–

---

[11] Smith never retained a qualified mitigation expert to advise him or testify at trial. Gavin's Rule 32 counsel retained Dr. Betty Paramore, who testified at the Rule 32 hearing and whose testimony is recounted *infra* ¶¶ 133–45.

10. Penland agreed, provided there was "time to prepare a case and to be sure there is enough flexibility . . . to prepare the case." P.R. 310. Although Smith and Penland first discussed her providing Smith assistance in October 1998 and Smith sent Penland an engagement letter at the end of December 1998, the two did not communicate again until March of 1999.[12]  P.R. 314–15. Smith did not arrange to have Penland interview Gavin until April 28, 1999. P.R. 319–20; 322. Neither Smith nor Penland had procured any of Gavin's records by that time. P.R. 322.

126.   Also in April 1999, Penland contacted Dr. Craig Haney regarding the possibility of Dr. Haney testifying as an expert on institutionalization, given that Gavin had been incarcerated in Illinois for 17 years prior to his trial in Alabama. P.R. 344. Dr. Haney tentatively agreed to work on the case, and Penland passed his name on to Bayne Smith. Smith expressed interest in having Dr. Haney testify, but, as discussed further below, neither he nor anyone else on Gavin's trial team ever followed up with Dr. Haney to retain him as an expert. P.S.C. 150–51.

127.   Penland wrote Smith shortly after the meeting with Gavin elaborating on some of the work that Smith needed to have done to prepare a mitigation case:

> Regarding the defense, what I see right now that will need to be done in this case is: retrieval and review of school, medical (if pertinent) and prison records. I will also need to travel to Chicago to interview family of Gavin, which consists of his mother and his 12 siblings, and interview friends and at

---

[12] Penland testified that proper preparation of a mitigation case requires "a minimum of six months." P.R. 316. Penland conveyed that information to Smith no later than March 1999. P.R. 316.

least one teacher. I, of course, do not know what I'll find in Chicago, which might extend what I know now that I need to do there. Once I see what information I have I will need to identify what expert witnesses we might need to assist in preparation of the mitigation case, and work with you and them to develop the case strategy.

P.C. 1019. Despite this written reminder to Smith, Smith did not contact Penland between May and September 1999. P.R. 326. No mitigation work was done on Gavin's case during those five months. Smith never provided any records to Penland before Gavin's trial commenced on November 1, 1999. P.R. 324–25.

128.   On September 20, 1999—less than six weeks before trial and after defense counsel finally contacted Penland and informed her of the impending trial—Penland urged Smith to seek a continuance so that Smith could prepare and present an adequate mitigation defense. P.R. 326–28. Smith refused, offering to Penland only that "he didn't believe he could get one." P.R. 328.

129.   Part of the reason so much needed to be done to prepare Gavin's mitigation case was Gavin's and his mother's hesitancy to cooperate with Penland. P.R. 346–49. As developed by the State during Penland's cross-examination, however, capital defendants are often hesitant to cooperate in a mitigation case, as they do not comprehend the benefit of the mitigation defense. P.R. 342; P.C. 1009. Gavin's case was no exception. Eventually, Gavin's family was—in Smith's own words to Penland—"coming around and beginning to cooperate to some extent." P.C. 1034.

130.   Smith nevertheless continued to refuse to seek a continuance. P.R. 327–28. Just weeks before trial, Penland (not Smith) engaged the services of a Chicago-based sentencing consultant, John Sturman. P.C. 1010. Within days, Sturman had advised Penland that he had conducted initial interviews and requested educational records. P.C. 1025–29. Penland immediately sent Sturman's work product to Smith and advised Smith "[t]here are issues that need to be pursued in this case." P.C. 1023. Penland "urge[d] [Smith] again to request a continuance." P.C. 1023. "An adequate mitigation case," Penland advised Smith, "can not [sic] be developed otherwise." P.C. 1023.

131.   Smith continued to rebuff Penland's advice, P.R. 331–32, even after Penland sent Smith yet another letter describing the work that Sturman had done, and the work that still needed to be done "[i]n order to present an effective, comprehensive, and adequate mitigation case." P.C. 1031. As Penland explained at the Rule 32 hearing, given Sturman's preliminary work product, much work remained. Among other things, expert witnesses still had not been retained and additional witness interviews had not been conducted. P.R. 332–33.

132.   Instead of seeking a continuance of the November 1, 1999 trial date on the ground that he was not prepared to present an adequate mitigation defense on Gavin's behalf, Smith misled the trial court and concealed the work Sturman and Penland had done. On the day before trial, Smith wrote the Court, transmitting

correspondence from Penland—but not the Sturman materials—and represented to the Court as follows:

> October 31, 1999
>
> Dear Judge Rains,
>
> In accordance with your instructions, enclosed are copies of all materials received from the Alabama Prison Project in connection with this case. As you can see, it consists only of correspondence from Ms. Penland and not, at this point, any useable mitigation material.
>
> *   *   *
>
> Sincerely,
>
> H. Bayne Smith

P.C. 498.

133. <u>Betty Paramore, Ph.D</u>. Dr. Betty Paramore has a Ph.D. in Psychology and has previously served as a mitigation specialist. P.R. 381–82. She was retained by Gavin's Rule 32 attorneys to develop a mitigation profile for Gavin. P.R. 385; P.C. 1091. The Court found Dr. Paramore qualified to testify as a mitigation specialist. P.R. 383–84. In her expert declaration and in her testimony at the hearing, she identified several mitigating factors that could have and should have been provided during Gavin's sentencing hearing, but were not. "I feel that the information that is included in the mitigation report was available during the trial and should have been considered." P.R. 389.

134.   In performing her mitigation investigation, Dr. Paramore interviewed Gavin, Gavin's mother, eight of his surviving siblings, his sister-in-law, two cousins who lived with the Gavins while Gavin was growing up, an uncle, and two women from Gavin's neighborhood whom he identified as having been positive influences in his life. P.C. 1091. Dr. Paramore interviewed some of these individuals on multiple occasions, including Gavin's mother five times. P.R. 404. Dr. Paramore also reviewed arrest reports, prison records, and available school records. P.R. 389–90; P.C. 1124.

135.   In order to put the information she had—and Smith could have— uncovered regarding Gavin's life in context, Dr. Paramore drew on the concepts of risk factors, protective factors, and resiliency, which are well recognized in the field of psychology. P.R. 394–95. Foremost among those recognized risk factors, "[t]here are basically four main domains or categories, one would be individual factors, family factors, school related factors, peer grouping and environmental or social factors. And the theory is the higher the number of factors, the greater the probability of delinquent outcome." P.R. 395–96.

136.   Dr. Paramore identified numerous risk factors present in Gavin's life, and a small number of protective factors—that is, "conditions that protect an individual from the adverse experiences that they have been exposed to." P.R. 396. The dominant risk factors in Gavin's life were (1) multi-generational family

dysfunction; (2) domestic violence and impaired parenting; and (3) the poor, violent community in which Gavin grew up. She also described the environmental conditions Gavin encountered upon his release from prison. Dr. Paramore elaborated upon each of these risk factors in detail at the evidentiary hearing.

137.   Multi-generational family dysfunction. Gavin's parents (Annette and Willie) both came from highly dysfunctional families with histories of drug use, alcoholism, and incarceration. P.C. 1100–02. Some of Willie's sisters were involved in prostitution, which Keith witnessed at a young age. P.R. 406–07; P.C. 1101. Willie was physically abused as a child and later abused his own children and wife. P.R. 405–06, 427–28. Willie also had problems with gambling and alcohol abuse. P.R. 406. Willie was incarcerated when Gavin was two, leaving behind four children and a pregnant wife. P.R. 407. When Gavin was 14, Willie was shot in the chest and out of work for approximately six months. P.R. 407–08. All of these factors impacted Willie and Annette's ability to raise their 12 children.

138.   The dysfunction in Willie and Annette's generation continued with their own children. Gavin was the third of twelve children, and was most influenced by the five siblings closest in age to him—Willie, Jr., Elaine, Victor, Steven, and Sterling. P.R. 408–09. Each of these siblings has a history of incarceration and drug use, P.R. 411, 413–16, 420–21, and most were gang members. P.R. 420–21. Willie, Jr. and Elaine both started abusing drugs at 13 or

14. P.R. 411, 413. Gavin was sent to highly dangerous parts of the housing projects to retrieve his siblings and bring them home. P.R. 412–13. In addition to having a history of incarceration, drug use, and gang membership, Victor was a victim of a gang shooting when he was 16. P.R. 415–16. After this incident, Gavin started carrying a gun. P.R. 456–57. Steven, who was described by some family members as abusive and mentally unstable, has a history of incarceration for violent crime. P.R. 419–20. When Gavin was seventeen years old, he was attacked by a group of gang members, beaten by baseball bats and guns, and ended up hospitalized. P.R. 419; P.C. 1111. The next day, Steven was confronted by the same group and shot two people. *Id.*

139.    When Gavin was released from prison in 1997, Willie, Jr. had passed away and Elaine, Steven, and Sterling were all struggling with drug addiction. P.R. 409–10, 414, 420–21. Gavin's jury never knew any of this.

140.    Domestic violence and impaired parenting. Gavin's father physically abused him, Annette, and Gavin's siblings. P.R. 427–28. Gavin witnessed his father abuse his mother and other siblings with his fists, extension cords, and whatever else was available. P.R. 427–29. When asked to describe the "whippings" they received, several of the Gavin children reported that Willie would stop "when he drew blood." P.R. 429. Gavin was beaten more than his other siblings because

he often took responsibility in order to shield his brothers and sisters from abuse. P.R. 429–30.

141.   Although Gavin had a close and loving relationship with his mother, that relationship was characterized by what Dr. Paramore described as "role reversal"—although Gavin was the child, he took on adult responsibilities, caring for his siblings because his mother was unable to do so. P.R. 434–35. This role-reversal caused Gavin to engage in criminal activities to get the money he needed to support the family. P.R. 435. Gavin's parents did not discourage this; his father took and used some money Gavin had stolen. P.R. 435–36.

142.   Community. Gavin grew up in the "ABLA" Chicago public housing projects. P.R. 437–38. The Gavins lived in a two bedroom row house until 1967, when they moved to a four bedroom row house. P.R. 445. Overcrowding was a major problem: by that time, Willie and Annette had seven children, Willie Jr. was married and had two children, and Elaine had two children, all of whom lived at times in the same row house. P.R. 445–46. Conditions in the apartment were poor. P.R. 446–47.

143.   As of 1965, there were 13,600 people living in the ABLA development, which was homogenously poor and riddled with gangs, crime and violence. P.R. 441–42. Growing up, Gavin witnessed race riots, gang riots, and tenant riots, including major rioting in 1968 following the assassination of Dr.

Martin Luther King. P.R. 442–43. As gang and drug activity increased, guns became prevalent. P.R. 443–44. Gavin's mother was threatened by gang members and, ultimately, seven of the Gavin children joined gangs. P.R. 444. Gavin was also the victim of gang violence in the neighborhood. He was once beaten so severely he needed to be hospitalized, and his brother Steven shot two members of the responsible gang later that day. P.R. 419. His brother Victor was shot in the back at 16 while walking down the street. P.R. 416. At a young age, Gavin took on the role of care-taker for the family. P.R. 412, 434–35. He assisted his mother by retrieving his older siblings from drug houses. P.R. 412–13. Later, he began stealing to help the family. P.R. 435–36. He bought school clothes and supplies for his younger sisters. P.R. 434–35. Again, Gavin's jury remained ignorant of these facts.

144. Living conditions when Gavin was released from prison. Gavin returned home to live with his mother when he was released from prison in 1997. His sister Geanetta and her four children also were living in the home, as was his sister Sharon. P.R. 448–49. His brother Sterling lived there off and on. P.R. 449. The condition of the house was deplorable, filled with clutter and garbage. The kitchen sink was not working. There were exposed wires and pipes. The front door was broken. P.R. 450–56. Gavin slept on a bunk bed in the unfinished basement. P.R. 453. Gavin was very distressed by the conditions in which his mother—and

now he—were living and tried to get his cousins and siblings to raise money and assist with repairs. P.R. 456. Gavin also was distressed to find that several of his siblings were strung out on drugs. P.C. 1000. Gavin was desperate to help but had no money and no job prospects. P.R. 117. He was therefore particularly susceptible to the negative influences of Dwayne Meeks, his first cousin and a corrections officer, who lured Gavin with the promise of easy money by driving Meeks around as Meeks did his drug deals.

145.   Although all of this information regarding Gavin's background was available at the time of the original trial, trial counsel presented none of it to the jury. P.R. 471. Worse, counsel affirmatively misrepresented to the trial judge there was no mitigating evidence to be found. P.R. 646, 648.

146.   <u>Craig Haney, Ph.D.</u> Dr. Craig Haney is a professor of psychology at the University of California at Santa Cruz. P.S.C. 7–8. Dr. Haney is a social psychologist and specializes in studying "the way in which people are changed and affected by living and working in prison environments," P.S.C. 10, and the "historical and social circumstances that influence and affect people in criminal behavior, essentially the historical determinants of criminal and particularly serious criminal behavior." P.S.C. 11.

147.   As established in Lucia Penland's Rule 32 testimony, Penland had urged Smith to retain Dr. Haney to review Gavin's prison history for mitigation

and possibly to testify at Gavin's sentencing trial. However, as Dr. Haney testified in the Rule 32 proceeding, Smith never tried to retain Dr. Haney, never spoke to him, and never bothered to collect Gavin's prison records in advance of Gavin's trial. P.S.C. 150–51, 178–180.

148.   When he was 19, Gavin was sentenced to 34 years in prison for murder. P.C. 1058; P.R. 116. Although his good conduct led to release after only 17 years, P.R. 116, 619, incarceration had a profound effect on him. P.C. 1054. Early in his imprisonment, Gavin was stabbed by gang members. P.C. 1060. Over time, he adapted, but institutionalization made adjusting to life outside prison difficult: he suddenly had to make his own decisions, something he had never done as an adult before, and he had no counseling or job training to ease his transition. P.C. 1083.

149.   Dr. Haney was retained by Gavin's post-conviction counsel to testify concerning "the effects of imprisonment on Gavin, whether or not he appeared to be institutionalized as a result of his 17 years in prison, and [to opine] about his potential for positive adjustment in prison." P.S.C. 24.

150.   Institutionalization is "the process of change that occurs in people when they are placed in institutional—typically total institutional settings." P.S.C. 24. Institutionalization has been researched and studied scientifically for decades "by psychologists, sociologists, social workers and other mental health

professionals" and is "a well confirmed, elaborately researched phenomenon or process," which describes "what happens to people when they are placed in institutional settings, the way they are changed . . . often times . . . in ways that impede their readjustment." P.S.C. 27, 35.

151.   In reaching the opinions he offered in Gavin's Rule 32 proceeding,[13] Dr. Haney primarily relied on Gavin's prison records for the 17 years he was incarcerated in various institutions within the Illinois Department of Corrections as well as a three-to-four-hour interview of Gavin. After reviewing those records and interviewing Gavin, Dr. Haney concluded that Gavin's 17 years in the Illinois prison system had "impeded or undermined his ability to positively adjust to free society once he had been released." P.S.C. 46.

152.   Dr. Haney identified several underlying factors that influenced Gavin's degree of institutionalization. Gavin's relatively early age (22 years old) when incarcerated was one such factor. P.S.C. 47. The length of Gavin's incarceration (17 years) was another. P.S.C. 48–49. Gavin's traumatic pre-incarceration childhood also impacted the degree of Gavin's institutionalization once he was incarcerated. P.S.C. 57–58.

153.   Gavin's "relatively sparse education" and "spotty, sporadic" work history before his incarceration—"[h]e had worked in a variety of menial jobs"—

---

[13] Dr. Haney has consulted as an expert on institutionalization in "over a hundred" capital cases, P.S.C. 31, and has been qualified as an expert witness "60 times or so," P.S.C. 33.

also impacted Gavin's social development while in prison. P.S.C. 64. "[H]e was not able to participate in very many significant . . . vocational training programs or work experiences." P.S.C. 65. "People like Gavin who go in without a high school diploma and without a GED are typically assigned to very menial tasks in prison. And indeed his prison record reflects exactly that." *Id.*

154.   Although Gavin spent much of his incarceration at Illinois prisons known for their violence, P.S.C. 66–67, Gavin was able to adjust well to a prison environment. Gavin's behavior in prison showed that he adjusted fairly quickly to prison life and became virtually a model prisoner. He had only one serious write-up in 17 years, which occurred early on in his incarceration. That write-up was for allegedly possessing a shank, which was never used on another inmate or correctional officer, and resulted in lost good time credit of 180 days. P.S.C. 77–78. Other write-ups were for conduct that would be considered trivial in the free community – such as "listening to his television without his earphones on." P.S.C. 77–78. Notably, the number of disciplinary infractions incurred by Gavin decreased significantly over time. P.S.C. 347. Dr. Haney explained that evidence of Gavin's good conduct in prison is the type of evidence juries often find mitigating because jurors are less likely to sentence defendants to death who have shown a capacity for positive future prison adjustment. P.S.C. 129–30.

155.   In Gavin's case, his ability to adapt to prison life is manifest:

[T]his is a man who has learned how to live in an institutional environment, to adjust well in that environment, to adapt his conduct to the requirements of that environment and that, too, bodes well for his ability to adjust in the future.

P.S.C. 126–27.

156.   This evidence could have been presented at Gavin's trial. It was not.

157.   <u>Glen King, Ph.D., J.D.</u> Dr. Glen King was the State's sole witness at the Rule 32 hearing. He apparently was retained by the State to rebut the testimony of Drs. Paramore and Haney.

158.   Dr. King interviewed Gavin for 2-3 hours at Holman prison. Dr. King found Gavin to be "most pleasant" and "absolutely a gentleman," P.R. 548, with no evidence he was malingering. P.R. 552. Dr. King testified that the purpose of the interview was "an evaluation to aid in Rule 32 litigation," P.R. 577–78, but acknowledged that concept has no meaning in either forensic psychology or clinical psychology. P.R. 578–79. Dr. King did not administer any tests to Gavin during the interview. P.R. 579–81. Dr. King also did not undertake to perform a full mitigation evaluation. P.R. 582. He agreed that a full mitigation evaluation entails more than a records review and a single interview of the defendant. *Id.* Dr. King did not interview any of Gavin's family members. P.R. 585. He conceded he had not compiled a "comprehensive social history" for Gavin. P.R. 599.

159.   Ultimately, Dr. King's testimony supported Gavin's Rule 32 claim. Based on his evaluation of Gavin and review of the relevant records, he testified

that Gavin would not pose a threat to other prisoners or guards if he were incarcerated instead of executed:

> A:     [I]t would be my opinion based on the knowledge that I have and my knowledge about how we predict violence and offenses and things of that nature that he would not pose a risk.

P.R. 628.

### 2.    Counsel's Failure to Fulfill the Duty to Investigate Gavin's Background Constituted Deficient Performance

160.   Trial counsel failed to fulfill its "duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." *Williams v. Allen*, 542 F.3d 1326, 1337 (11th Cir. 2008); *see also Harries v. Bell*, 417 F.3d 631, 637 (6th Cir. 2005) ("Counsel's constitutional duty to investigate a defendant's background in preparation for the sentencing phase of a capital trial is 'well-established.'"). The record here shows that counsel's mitigation "investigation" amounted to little more than one interview with the defendant, a few attempts by an overworked paraprofessional to interview the defendant's mother, and a last-ditch effort to obtain the testimony of an evangelist minister who had known Gavin for a few months while he was in jail in Cherokee County but who had no knowledge of Gavin's history.

161.   Trial counsel's failure in this case to reasonably investigate Gavin's background cannot be chalked up to "strategy." As the record makes clear, the supposed "choice" here not to follow up on or present evidence related to Gavin's

74

background was not a matter of considered professional judgment at all, but rather the result of unforgiveable inattentiveness. Under *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Williams*, 542 F.3d at 1337 (quoting *Strickland*, 466 U.S. at 690–91.) The deference owed to counsel's strategic judgments about mitigation is directly proportional to the adequacy of the investigations supporting such judgments. *See Wiggins*, 539 U.S. at 521.

162.   Trial counsel's investigation into Gavin's background in this case, done almost entirely through the Alabama Prison Project ("APP") and sentencing consultant John Sturman, was limited to one interview with Gavin and one interview with his mother. Still, Sturman's interview with Annette Gavin revealed some information regarding Gavin's background that would have prompted reasonable counsel to inquire further, including that many of Gavin's siblings had drug problems and criminal histories, that he grew up in a gang-infested neighborhood and was exposed to significant violence and racial riots, and that he entered prison at a young age. Nonetheless—and despite the fact that the APP specifically informed trial counsel that the limited evidence they had uncovered indicated that additional investigation was warranted, P.R. 330—trial counsel never followed up by interviewing additional witnesses, obtaining records, or

finding or preparing anyone to testify as to these matters during the penalty phase
of Gavin's trial. P.R. 331–33. Under these circumstances, trial counsel's failure to
broaden the scope of the investigation was unreasonable under prevailing
professional norms.

163.   Trial counsel's failure to perform an investigation into Gavin's
background cannot be excused by pointing the finger at consultants. The attorney
is ultimately responsible for ensuring that the investigation is performed in
accordance with the professional standards set for attorneys in capital cases. *See*
Alabama Rule of Professional Conduct 5.3(b) ("[A] lawyer having direct
supervisory authority over the nonlawyer shall make reasonable efforts to ensure
that the person's conduct is compatible with the professional obligations of the
lawyer[.]"); ABA Supplementary Guidelines for the Mitigation Function of
Defense Teams in Death Penalty Cases ("Supplementary Guidelines"),
Introduction ("[U]ltimate responsibility for the investigation of [mitigation] issues
rests irrevocably with counsel."); *id.* 4.1(B) (counsel has a duty "to supervise and
direct the work of all team members . . . and must ensure on an ongoing basis that
their work is of high professional quality"); *id.* 10.4(A) ("Counsel bears ultimate
responsibility for the performance of the defense team and for decisions affecting
the client and the case."); *see also Johnson v. Bagley*, 544 F.3d 592, 601–02 (6th

Cir. 2008) (finding counsel's performance deficient where counsel did not properly supervise mitigation specialists).

164.   Nor can counsel's deficient performance be attributed to Gavin and his family's lack of cooperation early on. Indeed, the Supreme Court has held, as a matter of law, that lack of cooperation cannot excuse counsel from performing an investigation into the defendant's background. *See Rompilla v. Beard*, 545 U.S. 374, 377 (2005) (defendant's lack of cooperation in mitigation case and reports by family members that there was no mitigating evidence in defendant's background did not excuse counsel's failure to examine record of prior conviction).

165.   In this case, trial counsel unreasonably failed to use available sources to investigate Gavin's background. Indeed, the State's (and trial counsels') post-hoc rationalization that they could not perform a mitigation investigation because Gavin and his family were uncooperative elides critical facts. Lucia Penland from the APP testified that Gavin, although initially reticent, provided her with sufficient information to begin a mitigation work-up when she met with him in April 1999. P.R. 320–22. And although Annette Gavin apparently refused to speak to Penland in May 1999, P.R. 348, she cooperated with Sturman in October 1999. P.R. 331. The fact that Annette was not interviewed for the first time until mid-October 1999 was a problem of trial counsel's own making—after the initial contact in April 1999, no one reached out to her again for more than five months.

77

The standards for capital defense counsel set forth by the ABA—which the United States Supreme Court has long referred to as "guides to determining what is reasonable," *Strickland*, 466 U.S. at 688; *see also Williams*, 529 U.S. at 396; *Wiggins*, 539 U.S. at 524—make clear that such feeble, last-minute attempts to conduct mitigation interviews are objectively unreasonable. *See* Supplementary Guidelines 10.11(C) ("Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation."); *see also id.* at 5.1(C) (noting that mitigation specialists "must be able to establish a rapport" with the client's family "that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information").

166.   In any event, no lack of cooperation could explain counsel's complete failure to investigate other sources of mitigation evidence. Most obviously, any reasonable counsel would have investigated how the prison where Gavin spent 17 years might have affected his conduct. *See* Guidelines for the Appointment & Performance of Defense Counsel in Death Penalty Cases (Am. Bar Ass'n 2003) ("ABA Guidelines), Guideline 10.7(A)(2) ("The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented."); *id.*, Comments to Guideline 10.7 ("The duty to investigate [mitigating evidence] exists regardless of the

expressed desires of a client."). Counsel failed to do so, notwithstanding Dr. Haney's willingness to assist in the preparation of the mitigation case. After Penland notified trial counsel that Dr. Haney was willing to act as an expert, trial counsel never contacted him or made any effort to retain him.

### 3. Counsel's Failure to Perform a Proper Mitigation Investigation Was Unquestionably Prejudicial

167.   Trial counsel's failure to investigate and present available mitigation evidence concerning Gavin's background was unquestionably prejudicial. Under *Strickland*, a defendant is prejudiced by his counsel's deficient performance "if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. To assess that probability, a court must consider "'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced at the habeas proceeding' and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (alteration in original) (quoting *Williams v. Taylor,* 529 U.S. 362, 397–98 (2000)).

168.   Gavin has presented ample evidence to cast doubt on the sentence. As in *Porter*, "'[t]his is not a case in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing judge.'" 558 U.S. at 454 (quoting *Strickland*, 466 U.S. at 700) (finding that counsel's failure to present evidence regarding defendant's abusive childhood, military service, and long-term

substance abuse was prejudicial). The judge and jury at Gavin's original sentencing hearing heard almost nothing that would humanize Gavin or allow them to accurately gauge his moral culpability. *See id.* at 454. They learned about Gavin's crimes, that he had been visited by an evangelist minister in jail, and almost nothing else. Annette Gavin's testimony was, charitably, pitiful. The jury returned its 10-2 recommendation to execute Gavin after only 1 hour and 15 minutes of deliberation. R. 1298.

169.   Had Gavin's counsel been competent, the judge and jury would have learned of the "kind of troubled history" the United States Supreme Court has "declared relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535; *see also Mason v. Mitchell*, 543 F.3d 766, 773 (6th Cir. 2008) ("The Supreme Court has specifically observed that 'the graphic description of [a defendant's] childhood, filled with abuse and privation . . . might well have influenced the jury's appraisal of his moral culpability." (quoting *Williams*, 529 U.S. at 398)).

170.   Post-conviction counsel presented voluminous and compelling mitigation evidence that was readily available at the time of Gavin's trial. But the jury heard none of this evidence, all because of the failures of trial counsel that were unquestionably prejudicial. *See Williams*, 542 F.3d at 1342 (finding prejudice where "[t]he mitigation evidence that Williams' trial counsel failed to discover

paints a vastly different picture of his background than that created by [his mother's] abbreviated testimony"); *Jells*, 538 F.3d at 499–501 (finding prejudice where withheld evidence, including evidence of learning disabilities and mother's abusive relationships, "provides a more nuanced understanding of Jells's psychological background and presents a more sympathetic picture of Jells"); *Dickerson v. Bagley*, 453 F.3d 690, 698–99 (6th Cir. 2006) (finding prejudice where counsel failed to discover evidence that, inter alia, petitioner grew up in an unstable environment surrounded by "pimps, prostitutes, and drug dealers").

171. There was no conceivable tactical advantage to not presenting this evidence. The most damaging evidence—concerning Gavin's crimes—was already before the jury; a competent mitigation would not have opened the door to anything else. The State came up with nothing at the Rule 32 hearing—all it could show was that Gavin himself has downplayed the negative influences in his life. But the jury did not get a full account of those influences. Had trial counsel appropriately investigated and presented mitigation evidence, the outcome would very likely have been different.

172. A reasonable mitigation case would have been especially likely to prevail in light of the fact that even the State's own expert, Dr. King, gave testimony supportive of mitigation. *See*, e.g., P.R. 548 (describing Gavin as "most pleasant" and "absolutely a gentleman"); P.R. 552–53 (noting that Gavin was

81

"often the caretaker for all his siblings, both the two older ones and the younger ones" and that he was charged with "following his siblings around and making sure that they stayed out of trouble"); P.R. 557–58 (explaining that Gavin was not provided any services when he was released from prison); P.R. 626–28 (opining that Gavin would not pose a risk to others in prison).

173.   Indeed, it is well settled that evidence that a defendant likely will not present a danger to others in prison should be presented during the mitigation phase of a trial. *See* ABA Guidelines, Comments to Guideline 10.11 ("Evidence that the client has adapted well to prison had has had few disciplinary problems can allay jurors' fears and reinforce other positive mitigating evidence."). The Supreme Court has explained that "a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." *Skipper v. South Carolina*, 476 U.S. 1, 7 (1986); *see also Moore v. Johnson*, 194 F.3d 586, 618 (5th Cir. 1999) (finding counsel deficient for failing to argue defendant's early release from prison as a mitigation factor). Gavin's trial counsel's deficient performance at the penalty phase of the trial was prejudicial under Strickland, and Gavin is therefore entitled to relief from his sentence of death.

174.   The Alabama Court of Criminal Appeals ruled that it was "unable to say that the investigative steps taken by Gavin's trial counsel were unreasonable."

Op. at 43. That decision involved an unreasonable application of the clear precedent from Strickland and its progeny and was based on an unreasonable determination of the facts in light of the evidence before it.

### 4.   The Court of Criminal Appeals Excused Counsel's Deficient Investigation by Citing a Lack of Cooperation, in Conflict with *Porter*.

175.   The Court of Criminal Appeals also denied relief under Strickland in part based on an assessment that counsel's unprofessional investigation into mitigation evidence was excused by a lack of cooperation by Gavin and his family early on. Yet *Porter v. McCollum* teaches such a lack of cooperation cannot "obviate the need for defense counsel to conduct some sort of mitigation investigation." 558 U.S. 30, 40 (2009) (citing *Rompilla*, 545 U.S. at 381–82).

176.   The Court of Criminal Appeals' holding that trial counsel rendered constitutionally adequate performance turned largely on the implicit premise that the holes in Gavin's trial counsel's investigation were attributable to others. In particular, the Court emphasized that Gavin and his family were uncooperative early on. *See, e.g.*, Op. at 42 ("Gavin was hesitant to provide any mitigation evidence."); *id.* ("Gavin's mother would not speak with [Lucia Penland of the Alabama Prison Project] while Penland was in Chicago."). As an initial matter, that decision was based on a unreasonable determination of the facts. Gavin's mother clearly wanted to cooperate, since she took the initiative to travel to Alabama to

testify in mitigation (without any preparation from trial counsel). And Gavin's family became more cooperative over time, and it was clear from what Lucia Penland of the Alabama Prison Project was telling trial counsel that a reasonable investigation would reveal powerful mitigation evidence.

177.   But even accepting the Court's incorrect view of the facts, the reliance of its decision on a supposed lack of cooperation to deny relief under Strickland conflicts directly with the decision of the Supreme Court of the United States in *Porter*. In *Porter*, trial counsel blamed his own failure to investigate on the fact that his client was "fatalistic and uncooperative." 558 U.S. at 40. But the Supreme Court held that that did not excuse counsel's incompetence: the "decision not to investigate did not reflect reasonable professional judgment." *Id.* (citing *Wiggins*, 539 U.S. at 534). More to the point, the fact that *Porter* was "uncooperative" did "not obviate the need for defense counsel to conduct some sort of mitigation investigation." *Id.* (citing *Rompilla*, 545 U.S. at 381–82).

178.   Whereas the Supreme Court in *Porter* held that lack of cooperation does not excuse counsel from conducting a competent mitigation investigation, the Court of Criminal Appeals' decision is based on the opposite view—that Gavin's and his family's lack of cooperation fully excuses counsel's failures. Such a decision was based on an unreasonable determination of the facts and is contrary to

and involves an unreasonable application of such cases as *Porter*, *Wiggins*, and *Rompilla*.

### 5. The Court of Criminal Appeals Based Its Decision on the "Idiosyncrasies of the Particular Decisionmaker," in Conflict with *Strickland*.

179.   The decision of the Court of Criminal Appeals also denied Strickland relief based on the idiosyncrasies of jurors from a particular geographic area (i.e., Cherokee County, Alabama). *Strickland*, however, clearly instructs the court that the "assessment of prejudice . . . should not depend on the idiosyncrasies of the particular decisionmaker." 466 U.S. at 695 (emphasis added).

180.   If the compelling mitigation evidence presented during the Rule 32 proceedings had been presented to an objectively reasonable jury, that jury might well have recommended against a sentence of death. But the Circuit Court did not evaluate the evidence from the perspective of an objectively reasonable jury. Instead, it considered how jurors in Cherokee County, Alabama would respond to evidence of life in the Chicago housing projects:

> If the purpose of such testimony . . . would have been to "humanize" the defendant, the portrayal of the defendant as the product of a violent family from a violent, gang ridden and drug-infested Chicago ghetto where the defendant has previously committed a murder would not be likely to achieve that result *in the eyes of a Cherokee County, Alabama, jury*.

P.C. 3517 (emphasis added). Implicit in this holding is an assumption about the harshness of Cherokee County juries, and about their unusual propensity to

discount the harshness of life in "a violent, gang ridden and drug-infested" section of Chicago. Moreover, the Circuit Court's reliance on the geographic and demographic make-up of the jury to support his denial of Gavin's petition has no basis in fact or law, and no case was cited by the court for this proposition. There is simply no reason to believe that evidence that has been found to be mitigating in cases across the county—and throughout the State—somehow could not be understood or appreciated by people in rural northern Alabama. And we cannot know in this case, because the jury was never given the opportunity to consider this evidence. Moreover, in not one of the many cases the United States Supreme Court has decided related to mitigation has the Court ever suggested that what constitutes compelling mitigating evidence turns on the location in which the trial takes place. To the contrary, the very notion that whether a defendant will be sentenced to death depends on whether the trial takes place in north Alabama or south Alabama, or in a rural area or urban area, suggests that the death penalty is being imposed in an arbitrary and capricious manner. *Cf. Furman v. Georgia*, 408 U.S. 238, 274 (1972) (per curiam) (Brennan, J., concurring) ("Indeed, the very words 'cruel and unusual punishments' imply condemnation of the arbitrary infliction of severe punishments.")

181.   On appeal, the Court of Criminal Appeals conducted an independent review and adopted the Rule 32 Circuit Court's findings on this point: "The

evidence presented at Gavin's Rule 32 evidentiary hearing was to a great extent centered around Gavin's childhood in Chicago and imprisonment and, as the circuit court noted, likely would have been given very little weight by the jury." Op. at 43. Like the Rule 32 Circuit Court, the Court of Criminal Appeals emphasized that the Alabama jury was unlikely to be swayed by the difficulties of Gavin's life in Chicago.

182.   This line of reasoning is foreclosed by *Strickland*. The decisionmaker must be assumed to be objectively reasonable, not unusually predisposed to reject certain kinds of arguments, particularly not where that assumed predisposition is the result of geographic, class-based, or implicit racial bias. As the *Strickland* Court explained,

> An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like. . . . The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Thus, . . . evidence about, for example, a particular judge's sentencing practices, should not be considered in the prejudice determination.

466 U.S. at 695.

183.   Even if the assumptions underlying the decision below were factually true—that the predominately white and Southern jury could not have sympathy for an African-American man growing up in a violent and poverty-ridden urban public

housing project[14]—*Strickland* unequivocally teaches that the "idiosyncrasies of the particular decisionmaker" do not matter. *Strickland*, 466 U.S. 695.

184.   The Supreme Court of the United States has held that, to a reasonable fact-finder, "'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse.'" *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *see also Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (noting that consideration of the offender's life history is a "'part of the process of inflicting the penalty of death'"). Under *Strickland*, Gavin was entitled to have his mitigation case considered in light of how a reasonable fact-finder would have evaluated it. The decision by the Court of Criminal Appeals therefore involved an unreasonable application of clear precedent from Strickland and its progeny.

---

[14] The Circuit Court characterized it as "a violent, gang ridden and drug-infested Chicago ghetto." P.C. 3517.

**D.   THE STATE MADE REPEATED IMPERMISSIBLE REFERENCES TO THE JURY THAT GAVIN DID NOT TESTIFY, IN VIOLATION OF HIS FIFTH AMENDMENT RIGHT**

185.   In *Griffin v. California*, the Supreme Court announced that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." 380 U.S. 609, 615 (1965); *see also Carter v. Kentucky*, 450 U.S. 288, 301 (1981) ("The *Griffin* case stands for the proposition that a defendant must pay no court-imposed price for the exercise of his constitutional privilege not to testify."). During closing argument, the State impermissibly referenced the fact that Gavin did not testify over a dozen times.[15] That was a clear violation of Gavin's Fifth Amendment rights.

186.   The main theme of the State's closing argument was that the evidence against Gavin was "uncontroverted." For example, it argued that Meeks "saw Mr. Gavin shoot the driver. Now, is that a controverted fact? Absolutely not." R. 1094. The State continued summarizing Meeks' narrative for the jury—Meeks heard shots, he starting driving away, his car door hit Gavin causing it to close, and he turned back towards Leesburg—and then asserted once again that "[t]hose facts are uncontroverted." R. 1095. Additionally, the State argued that Danny Smith's

---

[15] As discussed above, Gavin was eager and willing to testify in his own defense, but trial counsel refused to call him. *See supra* ¶¶ 98–103.

testimony that Gavin fired a shot at him constituted "uncontroverted" evidence. R. 1098. And in arguing to the jury that there is only one reason Gavin would have been found in the woods, the State contended, "Why? You know why. The facts that we presented in this case are uncontroverted." R. 1102. In all, the State referred to "uncontroverted" evidence over a dozen times during the closing.[16]

187.   By characterizing all of "the facts we presented in this case" as "uncontroverted," the State implicitly challenged Gavin to take the stand to contradict the State's version of events. R. 1102. Its closing argument "suggest[ed] to the jury that it may treat the defendant's silence as substantive evidence of guilt." *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976).

188.   The Alabama Court of Criminal Appeals determined that most of the comments were constitutionally innocuous because someone other than Gavin could have testified. 891 So. 2d at 983–85. For example, the Court held that there were three eyewitnesses to the murder and thus Gavin was not the only person who could have contradicted Meeks' testimony. *Id.* at 983. But the record does not bear this out. Two of the eyewitnesses—Ronald Baker and Richard Henry—testified that they could not identify the shooter because they could not even see his face. R.

---

[16] Gavin's trial counsel objected, arguing that the State impermissibly commented on Gavin's decision not to testify. R.1114. The State responded in a conclusory fashion, arguing that it "was commenting on testimony that came from the stand and there was no reference or any inclination of a reference toward Mr. Gavin's failure to testify." R.1114. The court accepted the State's response and overruled the objection but cautioned the State to avoid further reference to "uncontroverted" evidence. R.1114.

537; R. 545. At most, Henry stated that the shooter was a black male. R. 545. Similarly, as has been shown above, Twilley's identification of Gavin was highly unreliable to the point of being unconstitutional. Thus, as the jury was well aware, none of these men was in a position to contradict Meeks' testimony that Gavin, and not he, was the shooter—Gavin alone had that power.

189.   The Court did determine, however, that the State's references to Officer Smith's comments being uncontroverted were impermissible because "[i]t is clear from the evidence presented at the trial that the only person who could have contradicted Investigator Smith's testimony that it was, in fact, Gavin . . . was Gavin himself." 891 So. 2d at 983. And even though Investigator Smith's testimony was the basis for the attempted murder charge, for which Gavin was sentenced to life in prison, the Court considered the references harmless under *Chapman v. California*, 386 U.S. 18 (1967), and refused to grant relief. 891 So. 2d at 983–85.

190.   The Supreme Court has declared that "a defendant must pay no court-imposed price for the exercise of his constitutional privilege not to testify." *Carter v. Kentucky*, 450 U.S. 288, 301 (1981). Gavin did indeed pay a price, and the violation necessitates a new trial. The Court of Criminal Appeals' decision was based on an unreasonable determination of the facts and involved an unreasonable application of *Griffin* and its progeny as well as *Chapman*.

91

### E.   THE ADMISSION OF TAINTED EYEWITNESS IDENTIFICATIONS VIOLATED GAVIN'S DUE PROCESS RIGHTS

191.   The admission of tainted and patently unreliable eyewitness testimony at trial by two witnesses violated Gavin's due process rights. The Supreme Court has held that procedures to identify an individual may be "so unnecessarily suggestive and conducive to irreparable mistaken identification" that the accused is "denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 302 (1967); *see Neil v. Biggers*, 409 U.S. 188, 198 (1972) ("It is the likelihood of misidentification which violates a defendant's right to due process[.]"). The identifications by Twilley and Officer Smith constituted just such violations.[17]

192.   At trial, Twilley identified Gavin as the man who shot Mr. Clayton. He testified that he was waiting at a red light when he saw a black man open the door to a van and fire several shots. R. 520–21. When asked to describe the shooter, Twilley said that he "wasn't real heavy, but he wasn't slim," and he acknowledged that he could only see "[t]he side of the face of the guy that done the shooting." R. 521, 523. Despite this fuzzy description, Twilley told the jury that Gavin, who was then seated between his two white attorneys, was the shooter. R. 523. Twilley posited that "the hairline is what stood out the most," R. 523, even

---

[17] Counsel's failure to seek to exclude Twilley's damaging but unreliable identification also constituted ineffective assistance, as described above. *See supra* ¶¶ 87–93.

though he had told police that the shooter was wearing a hat,[18] R. 528. Twilley also claimed that the scene—in which the shooter opened the door, immediately shot Mr. Clayton, and drove off in the van—transpired in about three to four minutes' time. R. 527.

193. Twilley's in-court identification of Gavin approximately 18 months after the crime was the first and only time the State sought such an identification from Twilley. There is no evidence that Twilley ever selected Gavin out of a photo or in-person lineup.

194. The Supreme Court has cautioned that the danger of an incorrect identification is "increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw." *Simmons v. United States*, 390 U.S. 377, 383 (1968). Here, the circumstances were even more suggestive than an improper photo lineup because Twilley's first identification of Gavin came while Gavin was the sole black man seated at the defense table. In fact, Twilley admitted post-trial that to identify Gavin he simply looked over at the defense table and "saw Gavin sitting between his two attorneys." P.C. 977. There could be no doubt in Twilley's mind, therefore, that the police, the prosecutor, and

---

[18] When asked by the State if the shooter was wearing a hat, Twilley first responded, "Not that I can remember. I mean, I kept seeing something seems like something red, but I don't know if it was on his head or not." R. 521. Later, Twilley attempted to clarify that the shooter had something "[a]round his head" rather than on it. R. 528.

the State of Alabama confidently believed Gavin had murdered Mr. Clayton in cold blood. At that point, all Twilley had to do was agree.

195.   Applying factors from the *Neil v. Biggers* totality of the circumstances test confirms the unreliability of Twilley's identification. 409 U.S. at 199–200. Twilley's opportunity to view the crime was limited—he could only ever see the side of the shooter's face. The consistency between his statements to police and his in-court testimony was low: Twilley described the shooter to police as being "slim, about 6 feet tall," but Gavin is only 5'8" and Twilley said at trial that the shooter "wasn't slim." R. 521. Moreover, Twilley did not establish a high level of certainty in his testimony, but instead based his identification almost wholly on the shooter's "hairline." And a significant amount of time had elapsed between the crime and Twilley's identification in court—over 18 months.

196.   The State never asked Twilley to perform a proper photo array or lineup identification, Twilley picked Gavin out at trial from between two white attorneys, Twilley's identification was, charitably, ambiguous. These circumstances demonstrate that the identification was "so unnecessarily suggestive and conducive to irreparable mistaken identification" that Gavin "was denied due process of law." Stovall, 388 U.S. at 302.

197.   Officer Smith's in-court identification was similarly tainted and unreliable, and its admission violated Gavin's due process rights. Officer Smith

testified at trial that he stopped his police vehicle behind the white van, and the perpetrator got out. The office explained that at the time, it was "dusky dark" and had it was "beginning to mist a little." R. 558. And while the officer's headlights were on the perpetrator, he also stated that another car had driven up from the other direction and had to stop to avoid hitting the shooter. R. 558. Officer Smith explained that the effect of this additional car was that the perpetrator "was silhouetted from the back with the headlights of the vehicle." R. 558. The officer asserted that the perpetrator fired two shots at him and then fled. R. 558.

198.   Officer Smith first identified Gavin shortly after Gavin was arrested. Other officers were transporting Gavin to the jail, and they pulled over so Officer Smith could take a look at the suspect. R. 592. Officer Smith testified that the man in custody in the back of the police car was the same man who had shot at him several hours earlier and was "the defendant seated at the defendant's table." R. 593–94.

199.   "[T]he primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'" *Neil*, 409 U.S. at 198 (quoting *Simmons*, 390 U.S. at 384). A "showup" lineup—such as Officer Smith's identification of Gavin in the police vehicle—"has been widely condemned" because it is especially suggestive. *Stovall*, 388 U.S. at 302. And here, as with Twilley, the circumstances are far more suggestive than a photo array because Officer Smith was not merely shown a photo

of the suspect, he was instructed to view Gavin while Gavin was handcuffed in the back of a police vehicle. *See Biggers v. Tennessee*, 390 U.S. 404, 407 (1968) (Douglas, J., dissenting) ("Whatever may be said of lineups, showing a suspect singly to a victim is pregnant with prejudice. The message is clear: the police suspect *this* man.").

200. The Court of Criminal Appeals ruled that Officer Smith's identification was not unnecessarily and impermissibly suggestive and that any likelihood of misidentification was low. 891 So. 2d at 958–62. The court likewise ruled that there was no error in admitting Twilley's identification testimony. *Id.* at 962 n.23. This decision denied Gavin's due process rights and was based on an unreasonable determination of the facts and involved an unreasonable application of cases such as *Biggers*, *Stovall*, and *Simmons*.

### F.   THE FAILURE TO DISMISS APPOINTED COUNSEL AND PERMIT GAVIN TO PROCEED PRO SE VIOLATED GAVIN'S SIXTH AMENDMENT RIGHT TO REPRESENT HIMSELF

201. The Supreme Court's decision in *Faretta v. California* unequivocally established the right to represent oneself at trial. 422 U.S. 806 (1975); *see also Martinez v. Court of Appeal*, 528 U.S. 152, 154 (2000). As the Court emphatically explained: "The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case

counsel is to his advantage." *Faretta*, 422 U.S. at 834. Gavin sought to represent himself but was denied the opportunity in violation of his Sixth Amendment right.

202.   Gavin sought to remove his appointed counsel on three separate occasions prior to trial. On September 22, 1998, Gavin filed a pro se motion to dismiss his counsel. C. 17–18. He then withdrew the motion in a hearing on October 13, 1998, indicating to the court that he and counsel had come to an understanding. R. 8–9.

203.   On July 14, 1999, Gavin renewed his pro se motion to have counsel dismissed. C. 69. At the August 10, 1999 hearing on the motion, Gavin explained that he had withdrawn his earlier motion because counsel had "lured me into thinking that things could work out," namely that trial counsel agreed to focus on his innocence. R. 1552. But he had come to realize that trial counsel were "putting no emphasis on my innocence," and he explained that "there has been a conflict [with counsel] from the first day." R. 1552. Gavin recognized that he could not "pick and choose" his appointed counsel, but he expressed dismay that he was not receiving effective representation afforded him by the Constitution. R. 1552. The trial court denied his motion. C. 71.

204.   Finally, just before jury selection on November 2, 1999, Gavin again addressed the court pro se: "I would like to make a couple of motions this morning. I wanted to on behalf of myself as pro se." R. 293. Gavin brought motions for

mistrial, to remove counsel, and to dismiss count two of the indictment. R. 293. Referring to his previous motions to remove counsel, Gavin explained there were irreconcilable differences between him and Mr. Smith. He told the court that Mr. Smith wanted Gavin to accept a plea deal from the State and that rather than merely advising Gavin, Mr. Smith was "pressuring" Gavin to accept the deal. R. 301. Gavin acknowledged that he felt neutral toward Mr. Ufford but that, in any event, Mr. Ufford would not agree to serve as his lead counsel. R. 296. Ultimately, the court understood Gavin's request to be a "motion to remove your attorney*s*," and the court denied that motion as well as Gavin's motions for mistrial and to dismiss count two of the indictment. R. 302 (emphasis added).

205.   Gavin's Rule 32 testimony sheds further light on the conflicts with his attorneys. He told the court that he had wanted to testify on his own behalf at his criminal trial, but his attorneys "wouldn't allow me to testify." P.R. 169.

206.   The trial court's denial of Gavin's motion violated his right, recognized in *Faretta*, to represent himself. The Court of Criminal Appeals, however, misconstrued Gavin's motion, determining that "a review of the colloquy clearly shows that Gavin did not want to proceed pro se." 891 So. 2d at 943. To support its determination, the court asserted that Gavin only sought to remove Mr. Smith and not Mr. Ufford. *Id.* But as noted above, the trial court understood Gavin's request to pertain to both "attorneys." R. 302. The Court of Criminal

Appeals also seized upon Gavin's statement that he felt "neutral" about Mr. Ufford, but that has little bearing in light of the fact that Mr. Ufford refused to serve as his lead counsel. Thus, Gavin had no option but to seek the removal of both counsel and proceed pro se.

207.   The Court of Criminal Appeals also derived support for its conclusion from Gavin's motion for mistrial, presuming that this "further show[ed] that he did not want to proceed pro se, but that he wanted the trial delayed so that new counsel could be appointed." 891 So. 2d at 943. But the record does not support this leap. Gavin explained that his counsel was trying to pressure him to accept a plea deal and he stated, "That's why I'm asking you to declare this as a mistrial at this moment because this is, my life is at stake." R. 294. Such a statement is entirely consistent with a desire to represent oneself. Gavin made no mention of new counsel and his statement cannot be used to infer that he was seeking a delay for new appointed counsel.

208.   The Court of Criminal Appeals' ruling that Gavin's "right to represent himself is not implicated in this case," 891 So. 2d at 943, was based on an unreasonable determination of the facts and involved an unreasonable application of the established precedent from *Faretta* and its progeny.

### G. GAVIN'S DEATH SENTENCE VIOLATES THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

209. Alabama's death sentencing scheme permits a defendant to be sentenced to death based on a non-unanimous "advisory verdict" by the jury, Ala. Code § 13A-5-46, and indeed the trial judge may override the jury's verdict on whether the aggravating circumstances outweigh the mitigating circumstances, even if the jury unanimously votes in favor of life imprisonment, *id.* § 13A-5-47(e); *see also Ex parte Carroll*, No. 1010546, 2002 Ala. LEXIS 285, at *8 (Sept. 20, 2002) (explaining that a jury's vote of life in prison should be treated as a mere "mitigating circumstance" by the judge). In Gavin's case, the jury's advisory verdict was not unanimous: two jurors recommended against a death sentence, finding that the aggravating circumstances did not outweigh the mitigating circumstances.[19] Nevertheless, the trial judge imposed a sentence of death.

210. The key factual finding underlying the sentence in this case—that the aggravating circumstances outweigh the mitigating circumstances—was made by the judge rather than by a unanimous jury. *See* Ala. Code § 13A-5-47(e) ("[T]he

---

[19] Moreover, the jury was informed that their only responsibility would be to recommend a sentence, thus removing most of the gravity from their life or death determination. *See* R. 1224 (trial court judge telling Gavin's sentencing jury "you will deliberate this case and make a recommendation of a sentence in this case"); Ala. Code § 13A-5-46(d) ("After hearing the evidence and the arguments of both parties at the sentencing hearing, the jury shall be instructed on its function . . . by the trial judge."). *Cf. Caldwell v. Mississippi*, 472 U.S. 320, 328–29 (1985) ("[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.").

trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist."); *id.* ("While the jury's recommendation concerning sentence shall be given consideration, *it is not binding upon the court.*" (emphasis added)). And this determination was made with information not presented or considered by the jury in rendering their advisory verdict. *See id.* § 13A-5-47; *see also* C. 184 (trial court's sentencing order showing that after receiving the jury's advisory verdict, the court considered additional evidence to make its decision); *Ex parte Carroll*, 2002 Ala. LEXIS 285, at *8 ([T]he jury's recommendation may be overridden based upon information known only to the trial court and not to the jury[.]").

211.  But *Ring v. Arizona* holds that if a "State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact— no matter how the State labels it—must be found by a jury beyond a reasonable doubt." 536 U.S. at 602. This constitutional requirement, originally formulated in *Apprendi v. New Jersey*, 530 U.S. 499 (2000), requires the jury to make any finding of fact that is "necessary for imposition of the death penalty." *Ring*, 536 U.S. at 609; *see also Hurst v. Florida*, 136 S. Ct. 616 (2016), 2016 U.S. LEXIS 619, at **4 (Jan. 12, 2016) (confirming *Ring*'s principle requiring "a jury, not a judge, to find each fact necessary to impose a sentence of death" because "[a] jury's mere recommendation is not enough"). Because Alabama conditions the

increase of an authorized sentence from life imprisonment to death on a factual determination regarding the relative weight of aggravating and mitigating circumstances, that determination must be left to the jury.

212.   The Court of Criminal Appeals denied Gavin's Ring claim by citing *Ex Parte Waldrop*, 859 So. 2d 1181 (Ala. 2002). 891 So. 2d at 987–88. In Waldrop, the Alabama Supreme Court considered whether Alabama's death sentencing scheme was unconstitutional in light of Ring. The Court held that "the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense." 859 So. 2d at 1190; *see also id.* at 1189–90 (discussing *Ford v. Strickland*, 696 F.2d 804 (11th Cir. 1983)); *Ex Parte Hodges*, 856 So. 2d 936, 943–44 (Ala. 2003). This conclusion finds no support in *Ring* or *Apprendi*. "[T]he relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Apprendi*, 530 U.S. at 494.

213.   The Supreme Court's recent decision in *Hurst v. Florida*, 2016 U.S. LEXIS 619, makes the error of *Waldrop* clear. *Hurst* applied *Ring* to strike down Florida's death penalty scheme because it gave the trial court the final authority to make "the critical findings necessary to impose the death penalty." *Id.* at **10; *see also id.* ("The analysis the *Ring* court applied to Arizona's sentencing scheme

applies equally to Florida's."). *Hurst* confirms that *Ring* required the jury to find "all facts necessary to sentence a defendant to death." *Hurst*, 2016 U.S. LEXIS 619, at **13 (emphasis added). This includes the finding that an aggravating factor outweighs any mitigating factors. *Id.* at **12. As *Hurst* explained, Florida law was problematic insofar as it provided that "[t]he trial court alone must find the facts that sufficient aggravating circumstances exist and *that there are insufficient mitigating circumstances to outweigh the aggravating circumstances.*" *Id.* (alterations and internal quotation marks omitted) (emphasis added). Because the jury's advisory verdict recommending death in Gavin's case contained no such finding, his death sentence is constitutionally impermissible. *See Brooks v. Alabama*, 577 U.S. __ (2016) (Breyer, J., dissenting) (analyzing *Ring* and *Hurst* and recognizing that Alabama has "similarly unconstitutional procedures").

214.  *Waldrop* was wrong when it was decided and, as such, the Court of Criminal Appeals' decision involved an unreasonable application of cases such as *Apprendi* and *Ring*. Gavin's sentence therefore violates the Sixth, Eighth, and Fourteenth Amendments and should be vacated.

## IV.   PRAYER FOR RELIEF

215.  For all of the above reasons and other such reasons as may be made upon amendment of this petition and a full evidentiary hearing, Petitioner Keith

Edmund Gavin respectfully asks this Honorable Court to grant him the following relief:

(a)    Grant Petitioner's accompanying motion to proceed in this matter *in forma pauperis*;

(b)    Afford Petitioner an opportunity to reply to any responsive pleading filed by Respondent;

(c)    Grant Petitioner an evidentiary hearing at which additional proof may be offered supporting the allegations set forth in this petition;

(d)    Permit Petitioner after additional factual development an opportunity to brief and argue the issues presented in this petition;

(e)    Issue a writ of habeas corpus granting Petitioner relief from his unconstitutionally obtained convictions and sentences; and

(f)    Grant such further and other relief as may be appropriate.

Respectfully Submitted,

John D. Watson

John D. Watson
(Local Counsel)
Grant A. Premo
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Phone: (205) 521-8436
Fax: (205) 488-6436

Melanie E. Walker (*pro hac pending*)
(Lead Counsel)
Steven J. Horowitz (*pro hac pending*)
Matthew Fogelberg (*pro hac pending*)
Nicholas K. Tygesson (*pro hac pending*)
Rachel R. Goldberg (*pro hac pending*)
Katherine R. Nichols (*pro hac pending*)
Sidley Austin LLP
One South Dearborn Street
Chicago, IL  60603
Phone: (312) 853-7000
Fax: (312) 853-7036

**Counsel for Petitioner
Keith Edmund Gavin**

## ATTORNEY'S VERIFICATION

I affirm under penalty of perjury that, upon information and belief, this

Petition for Writ of Habeas Corpus is true and correct.

Executed on February 12, 2016.

s/Melanie E. Walker
Melanie E. Walker

## CERTIFICATE OF SERVICE

I certify that on February ___, 2016, a copy of the attached was mailed by

first-class mail, postage prepaid, to:

Beth Jackson Hughes
State of Alabama
Office of the Attorney General
501 Washington Avenue
P.O. Box 300152
Montgomery, AL  36130

John D. Watson

107