FILED
2020 Aug-17 PM 04:58
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

KEITH EDMUND GAVIN,     )
                                     )
     Petitioner,         )
                                     )
v.                            )     Case No.  4:16-cv-00273-KOB
                                     )
JEFFERSON S. DUNN,      )
Commissioner of the Alabama   )
Department of Corrections,    )
                                     )
     Respondent.       )

# VOLUME 10

# State Court – Trial Transcript

LUTHER STRANGE
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

COURT OF CRIMINAL APPEALS NO. ___CR-99-1127___
___CR-00-0133___

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

## CIRCUIT COURT OF ___CHEROKEE___ COUNTY, ALABAMA

**CIRCUIT COURT NO.** CC-98-61 & CC-98-62

**CIRCUIT JUDGE** DAVID A. RAINS

**Type of Conviction / Order Appealed From:** CC-98-61 JURY VERDICT / GUILTY OF CAPITAL MURDER
CC-98-62 JURY VERDICT / GUILTY OF ATTEMPTED MURDER

**Sentence Imposed:** CC-98-61 DEATH          CC-98-62 LIFE

**Defendant Indigent:** ☒ YES   ☐ NO

KEITH EDMUND GAVIN

**NAME OF APPELLANT**

Stephen P. Bussman          256-845-7900
(Appellant's Attorney)                    (Telephone No.)
P. O. Box 680925
(Address)
Fort Payne,     Alabama     35967
(City)          (State)          (Zip Code)

v.

## STATE OF ALABAMA

**NAME OF APPELLEE**

(State represented by Attorney General)
**NOTE:** If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

**(For Court of Criminal Appeals Use Only)**

Appellant's Attorney:

Steven G. Noles          256-845-0716
P. O. Box 680883
Fort Payne, Alabama       35967



Volume 10

day.  I think the jury, in view of the rapidity with which this case has progressed and what I feel is the benefit that the jury would gain by getting a better appreciation, a less sterile appreciation, I just feel, and, again, it, you know, the State's only photograph is of a situation that it's not the way it was in March of 1998.

THE COURT:  I'll take it under consideration.

MR. SMITH:  Thank you, judge.

THE COURT:  Thank you.

(12:21 A.M.  Recess)

(1:58 P.M.  Jury present)

THE COURT:  You may be seated.  Thank you. Ladies and gentlemen, thanks for your patience this afternoon.  We've been delayed a little, but I think we're ready the get started back.  State ready with the next witness?

MR. O'DELL:  Yes, sir.

THE COURT:  All right.

MR. O'DELL:  State would call Investigator Larry Wilson.

LARRY WILSON

Being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. O'DELL:

Q    State your name, please, sir.

A    My name is Larry Wilson.

Q    Mr. Wilson, where do you reside?

A    I reside in Cherokee County.

Q    All right.  And are you employed?

A    Yes, sir.

Q    In what capacity and for how long, please?

A    I work with the Cherokee County Sheriff's
Department for the last 11 years, and I'm chief
deputy.

Q    All right.  Do you also serve as an investigator
for this county?

A    Yes, sir, I do.

Q    And in that capacity I'll ask you if you've had an
occasion to be involved in an investigation
involving the death of William Clinton Clayton?

A    Yes, sir, I did.

Q    I believe the testimony has been that he was shot
on March the 6th, 1998?

A    Yes, sir.

Q    If you would, tell these ladies and gentlemen how
you got involved in that investigation and what
procedures you utilized, please.

A    I received a call from dispatch around 7, I think

```
 1                    it was 7:02, on the 6th.
 2       Q          7:02?
 3       A          P.M.
 4       Q          Okay.
 5       A          And they told me there had been a shooting at the,
 6                    between the bank and the courthouse, the Regions
 7                    Bank and the courthouse, and that the subject had
 8                    left in a van with writing on the side going
 9                    towards Leesburg.  And I, at that time I came out
10                    and started to Leesburg, and on the way to
11                    Leesburg before I got started out they called, I
12                    heard Danny, Investigator Danny Smith, call out
13                    that he was stopping the vehicle on 68.
14       Q          All right, and did you as a result of that
15                    communication, did you go to that location?
16       A          Yes, sir, I did.
17       Q          And tell these ladies and gentlemen what, if
18                    anything, you did when you arrived there.
19       A          When I arrived at the scene, they already had Mr.
20                    Clayton out of the van and into the ambulance.  At
21                    that time I started taking pictures of the scene.
22       Q          All right.  And do you recall what photographs you
23                    began taking?
24       A          Yes, sir.
25       Q          Okay, let me ask you if can identify this
```

photograph?

A   Yes, sir.

Q   Do you know who took that photograph?

A   Yes, sir, that was one of the pictures that I took.

Q   You took that photograph.  Okay, and what does that photograph purport to depict, please, sir?

A   That's the interior of the van, front seat, and this is the passenger's seat, and this is the driver's seat, and there is blood on the passenger area.

    MR. O'DELL:  We need to stop and let that be marked.

Q   You took this photograph?

A   Yes.

Q   And when did you take this photograph, please, sir?

A   On the night of the 6th.

Q   Was it -- obviously there is no one in the passenger's compartment of the van.

A   No, sir.

Q   So it was taken after Mr. Clayton had been removed?

A   Yes, sir.

Q   Does that reasonably and accurately depict the interior of the van on the night that you took

1    that picture?

2  A  Yes, sir, it does.

3     MR. O'DELL:  We would offer State's exhibit

4  number 22.

5     MR. SMITH:  No objection.

6     THE COURT:  It's admitted.

7      (Whereupon, State's exhibit number 22

8      admitted into evidence at this time)

9  Q  Ask you to take a look at this photograph, please.

10  A  Yes, sir, that's a picture of the Corporate

11  Express van.

12  Q  Do you know who took that picture?

13  A  Yes, sir, that's one of the ones I took.

14  Q  Okay.  And do you recall when you took that?

15  A  That was also the night of the 6th of March.

16  Q  And is that, in fact, the Corporate Express van in

17  which you had taken the interior photograph just

18  previous?

19  A  Yes, sir, it is.

20     MR. O'DELL:  We would like to get this one

21  marked, also, Judge.

22  Q  Does that photograph reasonably and accurately

23  depict the van as you saw it that night on Highway

24  68 and 48?

25  A  Yes, sir, it does.

1    MR. O'DELL:  We offer State's exhibit 23.

2    MR. SMITH:  No objection.

3    THE COURT:  23 is admitted.

4         (Whereupon, State's exhibit number 23

5         admitted into evidence at this time)

6    Q    Mr. Wilson, let me ask you to look at this

7         photograph.  Do you know who took this photograph?

8    A    Yes, sir, I'm pretty sure I took that picture.  It

9         was either me or Doug Machleit, and I'm pretty

10        sure I took it.

11   Q    Were you present if -- you either took this

12        photograph or someone else did.  Were you present

13        when this photograph was taken?

14   A    Yes, sir, he would have been there with me.

15   Q    Tell these ladies and gentlemen what this

16        photograph depicts.

17   A    This is a picture of the creek where the suspect

18        was found.

19   Q    Are you talking about the defendant, Keith Gavin?

20   A    Yes, sir.

21   Q    Do you know what part of the creek, do you know

22        whether or not this was a picture of the area in

23        which Mr. Gavin was taken from?

24   A    Yes, sir, that's the area that he was in, in this

25        area here.  (Indicating)

1    Q    What's the time frame for this?  Do you know when

2         that photograph was taken?

3    A    That was taken the next day, on the 7th.

4    Q    7th of March, 1998?

5    A    Yes, sir.

6    Q    Does that photograph reasonably and accurately

7         depict the creek on that occasion that you took

8         it?

9    A    Yes, sir, it does.

10             MR. O'DELL:  We would like this one marked and

11        we would offer it as well.

12             MR. SMITH:  No objection.

13             THE COURT:  24 is admitted.

14                 (Whereupon, State's exhibit number 24

15                 admitted into evidence at this time)

16   Q    Investigator Wilson, you said you got out there

17        some time after 7?

18   A    I think I arrived on the scene at 7:22 P.M.

19   Q    All right.  And did you say that Mr. Clayton had

20        already been removed from the van?

21   A    Yes, sir, he had.

22   Q    Okay.  After you got there and you saw that the

23        victim had been removed what, if anything, did you

24        do or where did you go?

25   A    Like I say, we started taking pictures of the



| | | |
|---|---|---|
| 1 | | crime scene, and also we had the officers that was |
| 2 | | there to seal off the area. |
| 3 | Q | Did you notice anything unusual about the van |
| 4 | | other than the blood? |
| 5 | A | It also had a bullet hole in the passenger door. |
| 6 | Q | All right.  Did you request any assistance with |
| 7 | | respect to investigation personnel, particularly |
| 8 | | from the state lab? |
| 9 | A | Yes, sir.  We called the -- after we had the van |
| 10 | | pulled and took to the sheriff's department where |
| 11 | | it was locked up, and then we asked for forensic |
| 12 | | sciences to have somebody come and fingerprinted |
| 13 | | the van. |
| 14 | Q | Okay.  After you did that, did you continue to |
| 15 | | assist in the attempt to apprehend the suspect? |
| 16 | A | Yes, sir, I did. |
| 17 | Q | What else, if anything, did you do during the course |
| 18 | | of that night, Mr. Wilson? |
| 19 | A | We went -- I went back to the scene and, like I |
| 20 | | say, we had the scene blocked off, all the |
| 21 | | officers surrounded the area where he was at.  We |
| 22 | | looked for the subject there and at the time that |
| 23 | | we hadn't found him, and I got a call to go back |
| 24 | | to the office to meet with Val Courtney and talk |
| 25 | | with one of the witnesses. |



Q   All right.  Did you have an occasion to receive or
to find items of evidence involving this case
during that day or the next day?

A   Yes, sir.  That night I found a spent .40 caliber
hull in the roadway.

Q   All right, let me see if I can locate the
photograph.  Ask you to look at State's exhibit 3,
and using that laser pointer, if you would,
demonstrate or point out for the ladies and
gentlemen of the jury where you found that spent
hull.

A   It would have been right in this area here.
(Indicating)

Q   Okay.  What did you do with that item of evidence,
please, Mr. Wilson?

A   I bagged the evidence up and kept it in my locker
until I carried it to the Department of Forensic
Sciences at Birmingham.

Q   Who at the Department of Forensic Sciences did you
turn that over to, please?

A   I turned it over to David Higgins.

Q   Okay.  I believe you said you came back to the
courthouse and met with Chief Val Courtney?

A   Yes, sir, I did.

Q   Did you receive any items of evidence from the

1          Chief?

2    A    Yes, sir, I received two spent .40 caliber shells

3          or hulls.

4    Q    Okay.  And let me back up just one second.  When

5          you gave the .40 caliber spent hull that you found

6          on Highway 68 to David Higgins, was it in the same

7          or substantially the same condition as it was when

8          you found it?

9    A    Yes, sir, it was.

10   Q    Okay.  And you received two spent hulls from Val

11         Courtney, and those were given to you by him?

12   A    Yes, sir, they were.

13   Q    And what did you do with them, please?

14   A    I took those and put them in evidence and also

15         took those to the lab in Birmingham and turned

16         them over to David Higgins.

17   Q    Okay.  And when you turned those two spent hulls

18         over to Mr. Higgins, were they in the same or

19         substantially the same condition as when you

20         received them from Val Courtney?

21   A    Yes, sir, they were.

22   Q    Okay.  I'll ask you if you also received an item

23         from Deputy DeBerry?

24   A    Yes, sir.  On March the 7th, the morning of March

25         7, Jimmy DeBerry brought me a toboggan that he had



1        found.

2    Q   All right.  And what did you do with that

3        toboggan, please, sir?

4    A   That was also bagged and kept in my locker until I

5        took it to the lab, and at the lab I took it and

6        put it in serology locker at the lab.

7    Q   Did you subsequently receive that back from the

8        lab?

9    A   Yes, sir, I received it back by UPS from Angelo

10       Della Manna.

11   Q   And did you then subsequently turn it back over to

12       one of your officers?

13   A   Yes, sir.  Well, at that time I kept it in my

14       locker until later, and then it was turned back

15       offer to Jimmy DeBerry.

16   Q   Okay.  All right.  Let me ask you about the

17       clothing that Mr. Gavin was in on the night he was

18       arrested.  Do you know what happened to that,

19       please?

20   A   Yes, sir.  The night he was arrested, they brought

21       him to the jail.  Of course, his clothes was wet,

22       they had him to change clothes.  The clothes were

23       taken by me and kept in my possession, and also I

24       searched the clothes at that time and found a key

25       inside the clothes.

Q   Okay.  Let me drop back for just one second.  I believe you said you got the toboggan by way of UPS?

A   Yes, sir.

Q   Do you have the package that that came in?

A   This is the box here.

Q   Was the package that you received it in from UPS, would you describe how it was fixed up.

A   It was sealed and taped in, basically in the, what it's in now.  It was in a box, and I opened it up when I got it back to see what was in it.

Q   Okay.  Do you have the clothing — You took the clothing, you received the clothing at the jail?

A   At the jail.

Q   And you were present when it was removed?

A   Yes, sir, I was.

Q   And you did what with it, please, sir?

A   I took the clothing and kept it in my locker.  Of course, we had to dry the clothes because they were wet before we could put them in a bag.

Q   Okay.

A   I kept them locked up in the locker and we bagged them and took them to the lab.

Q   Okay.  And when you took them to the lab, what did you do with them, please?



```
 1    A    I took them and turned them over to -- those also
 2         were locked up in serology locker.
 3    Q    Serology locker?
 4    A    Yes, sir.
 5    Q    And when you put them in the serology or they were
 6         placed in the serology locker, were they still
 7         sealed as you had sealed them up?
 8    A    Yes, sir, they were.
 9    Q    Were they in the same or substantially the same
10         condition as they were when you received them at
11         the jail?
12    A    Yes, sir.
13    Q    Are those still at the lab or did you receive them
14         back from the lab?
15    A    No, sir, I received those back.
16    Q    All right, and from whom did you receive those?
17    A    I received those from UPS.
18    Q    Again, was it in the same package as you received
19         the toboggan?
20    A    Yes, sir.
21    Q    And I believe you said the package was sealed and
22         secured and you received it that way?
23    A    Yes, sir.
24    Q    Would you please -- excuse me just one second.
25         Just in case I failed to ask this, was the
```



```
 1            toboggan in the same or substantially the same

 2            condition when you received it back as when you

 3            sent it to the lab?

 4    A       Yes, sir, it was.

 5    Q       And you sent it to the lab in the same or

 6            substantially the same condition as when you

 7            received it from DeBerry?

 8    A       Yes, sir.

 9    Q       Would you produce the clothing for us today,

10            please.  One other question while you're doing

11            that.  When you gave the toboggan back to Deputy

12            DeBerry, was it in the same or substantially the

13            same condition as it was when you received it?

14    A       Yes, sir, it was.

15    Q       Okay.  What items did you receive?

16    A       I got back a pair of long johns, a T-shirt, white,

17            and a pair of undershorts and some socks, and a

18            blue headband in this bag.

19    Q       Okay.  Was there a separate bag?

20    A       Yes, sir.

21    Q       And are those items the same items that you

22            received from him at the jail?

23    A       Yes, sir, they are.

24    Q       You can put them back in the bag, I'm sorry.

25                 MR. O'DELL:  I think we need to have that bag
```

1      marked.

2    Q    When you were taking that out, did I see a pair of

3      long johns in that bag?

4    A    Yes, sir.

5    Q    All right, if you would, get out the other bag,

6      please.  I've asked you to open up the second bag

7      that came in, that UPS package, and what does this

8      bag contain, please, sir?

9    A    This bag contains a pair of black shoes and a

10      Levis blue jeans.

11    Q    Okay.  Why don't we go ahead and take that out

12      just briefly so we can see the contents.  And you

13      have opened the package that this contains a pair

14      of denim jeans and shoes; is that correct?

15    A    Yes, sir.

16    Q    If you would, pack that back up and we'll get

17      that marked.  Investigator Wilson, did you receive

18      a third package of clothing from the lab in that

19      same UPS package?

20    A    Yes, sir.

21    Q    All right.  If you would, open that up and check

22      the contents.  And what does this package purport

23      to be?

24    A    Extra long type short sleeve shirt, a large pink

25      with flowers long sleeve shirt, and I think it is

1       a Cherokee brand.

2   Q   All right.  If you would, open that white bag just

3       to confirm its contents.  You have the pink

4       shirt?

5   A   Yes, sir.

6   Q   And what's below it there?  Okay, you can wrap it

7       back up, please, and then we need to have it

8       marked.  Mr. Wilson, were there any other items

9       other than those three clothing bags and the

10      toboggan, was there anything else contained in the

11      UPS bag that you received from the lab?

12   A   No, sir.  And this bag here, it was not sent to

13       the lab.  This one was one I had in my possession

14       the whole time.

15   Q   Which bag is that?

16   A   This is the pair of long johns and the T-shirt and

17       the pair of undershorts and the socks.

18   Q   So that never went to the lab?

19   A   No, sir, it did not.  When they sent the stuff

20       back from the lab, I put all of it together in the

21       one box.

22   Q   Okay.  Is that in the same or substantially the

23       same condition as it was the night you received it

24       from Mr. Gavin?

25   A   Yes, sir, it is.

1    MR. O'DELL:  Okay.  Let's get that one marked
2    separately, then.
3    THE COURT:  That's already been marked.  That
4    was 25, wasn't it?
5    MR. O'DELL:  We would move to offer exhibit
6    number 25.
7    MR. SMITH:  No objection.
8    THE COURT:  All right, 25 is admitted.
9            (Whereupon, State's exhibit number 25
10           admitted into evidence at this time)
11   THE COURT:  Let me make sure that you clarify
12   something.
13   MR. O'DELL:  Okay.
14   THE COURT:  I believe the question was whether
15   he received three bags back from the lab, and he's
16   testified about exhibits 25, 26, and 27.  Now it
17   appears that 25 was not sent to the lab.
18   MR. O'DELL:  That's correct.
19 A  No, sir, it was not.
20   THE COURT:  Were three bags received back from
21   the lab?
22 A  Two bags.
23   THE COURT:  Two bags.  Okay, thank you.
24 Q  Mr. Wilson, you had an occasion to go, you said
25   you were out at the scene.  Did you have -- did

1        you make an attempt or have any occasion to look

2        for evidence at the scene where Mr. Gavin was

3        retrieved from the woods?

4    A   Yes, sir, we looked for a weapon there at the

5        scene.  At that time, that night and also the next

6        day, and we were unable to find a weapon until the

7        13th of March.

8    Q   Did you leave the state at any time during that

9        week?

10   A   Yes, sir, we left the state on March the 8th and

11       then didn't arrive back until late on March the

12       10th.

13   Q   And where did you go on that occasion?

14   A   We went to Illinois.

15   Q   Okay.  Did you subsequently find an item of

16       evidence on March the 13th?

17   A   Yes, sir, we did.  We found a .40 caliber Glock.

18   Q   Okay.  Let me ask you if you would, please, to

19       turn around and using the laser pointer

20       demonstrate or point out to the ladies and

21       gentlemen where you found that Glock.

22   A   It would be, I think it was right in this area

23       here.  (Indicating)  This is a ditch that runs

24       this way, and a little opening right in here.

25       (Indicating)

| | | |
|---|---|---|
| 1 | Q | Okay.  You found the Glock in this area here? |
| 2 | | (Indicating) |
| 3 | A | It may have been further down.  There is an |
| 4 | | opening right in these woods, right in here, and |
| 5 | | there was a trail that they went down in and it |
| 6 | | was about, I guess, about 30 feet off the -- from |
| 7 | | the main road into the woods. |
| 8 | Q | Okay.  What did you do with that pistol, please |
| 9 | | sir?  That Glock. |
| 10 | A | We took it, bagged it up, and took it to the lab |
| 11 | | in Birmingham and I turned it over to David |
| 12 | | Higgins. |
| 13 | Q | Okay.  I believe you said that when Mr. Gavin was |
| 14 | | transported to the sheriff's department and you |
| 15 | | received those items of clothing that you sent to |
| 16 | | the lab, that you also found another item in the |
| 17 | | clothing? |
| 18 | A | Yes, sir, found a key to a motel room. |
| 19 | Q | Okay, do you have that with you at this time? |
| 20 | A | Yes, sir, I do. |
| 21 | Q | While you're looking for that, let me ask you a |
| 22 | | follow-up question on the Glock.  When you took |
| 23 | | that Glock to the lab and turned it over to David |
| 24 | | Higgins, was it in the same or substantially the |
| 25 | | same condition as it was when you found it at the |

| | | |
|---|---|---|
| 1 | | scene? |
| 2 | A | Yes, sir, it was. |
| 3 | Q | Okay.  Would you identify that for the jury. |
| 4 | A | This is the key that I found in his pocket.  It's |
| 5 | | got number 47 wrote on it. |
| 6 | Q | Did this come from the jeans pocket of the |
| 7 | | defendant? |
| 8 | A | Yes, sir, it did. |
| 9 | Q | During the course of your investigation over the |
| 10 | | hours of March the 6th and March the 7th, did you |
| 11 | | ever receive any information from anybody |
| 12 | | concerning the events that transpired in Cherokee |
| 13 | | County from out of state? |
| 14 | A | Yes, sir, I received a call at home from  dispatch |
| 15 | | that said that there was an officer from Joliet, |
| 16 | | Illinois, by the name of Tom Arambisich that |
| 17 | | called and said he had information about the |
| 18 | | shooting. |
| 19 | Q | All right, and were you given information about |
| 20 | | that from him? |
| 21 | A | Yes, sir, I called Mr. Arambisich and talked with |
| 22 | | him and he at that time told me that -- |
| 23 | | MR. SMITH:  Objection, hearsay. |
| 24 | | THE COURT:  Sustained. |
| 25 | Q | Without telling us what Mr. Arambisich did, was it |

1  P   because of that phone call that you left the state
2      and went to Illinois?
3  A   Yes, sir, it was.
4  Q   And in the course of your trip to Illinois, did
5      you have occasion to interview anybody?
6  A   Yes, sir, when we arrived at the Illinois we
7      interviewed Dewayne Meeks.
8  Q   And pursuit to that interview, did you receive
9      information concerning a motel in Chattanooga?
10 A   Yes, sir, he advised us that he had --
11         MR. SMITH:  Same objection.  Hearsay.
12         THE COURT:  Just answer the question.  The
13     answer was yes.
14         MR. O'DELL:  Larry, I'm sorry, I tried to stop
15     you before you started telling us.
16 A   Yes, sir.
17 Q   Pursuit to the information concerning the motel,
18     did you, in fact, take that key to some location?
19 A   Yes, sir, to the Super 8 Motel in Chattanooga,
20     Tennessee.
21 Q   All right.  And when you got there, did you
22     request -- did you ask them about the key?
23 A   Yes, sir, I asked them if the --
24 Q   Go ahead and tell me what you asked them, but
25     don't tell me what they told you.

A    Okay.  I asked them if this key was a key to one

of their rooms.

Q    And as a result of their response did you, in

fact, try that key in a motel room at the Super 8?

A    Yes, sir.

Q    And what room was that, please?

A    It fit room 113.

Q    So the key did fit room 113 at the Super 8 in

Chattanooga?

A    Yes, sir.

MR. O'DELL:  We would offer that key at this

time, Judge, State's exhibit --

MR. SMITH:  We ask to voir dire, Judge.

THE COURT:  Yes, sir.

VOIR DIRE EXAMINATION

BY MR. SMITH:

Q    How many other rooms did you try that key in, Mr.

Wilson?

A    Just that one.

Q    That's a Super 8 Motel?

A    Yes, sir.

Q    Do you know how many Super 8 motels there are in

the country?

A    Yes, sir.

Q    How many?

1    A    There is several.

2    Q    More than five?

3    A    I would imagine quite more than five, yes, sir.

4    Q    Obviously, you didn't try that key in any of those

5         other motel rooms?

6    A    No, sir, I did not.

7              MR. SMITH:  Judge, we're going to object on

8         relevance.  I'm not sure that it's been shown that

9         merely because that key may have fit one room at

10        one Super 8 Motel, that it has any relevance at

11        all to this investigation.

12             THE COURT:  Overruled.

13                  DIRECT EXAMINATION RESUMED

14   BY MR. O'DELL:

15   Q    Mr. Wilson, one more question concerning the key.

16        Did you attempt to use that key on 113 based on

17        the information you received?

18   A    Yes, sir, I did.

19             THE COURT:  Number 28 is admitted.

20                 (State's exhibit number 28 admitted

21                  into evidence at this time)

22   Q    I believe you said you had left the location and

23        gone back to the office to meet Val Courtney and

24        you received some items of evidence?

25   A    Yes.

Q    Did you have occasion to go back to the scene
     where Mr. Gavin was apprehended?

A    No, sir, they had apprehended him before I came
     back.

Q    All right.  And then he was brought -- Do you know
     who transported him or who brought him to the
     sheriff's office?

A    I think it was Camp Reese and Kevin Ware and
     another officer.

Q    Did you have an occasion to -- just one second.  I
     withdraw that question.

          MR. O'DELL:  I believe that's all.  Thank you,
     Mr. Wilson.

          THE COURT:  Before you begin your questions,
     let me make sure I understand 26 and 27 have not
     been offered; is that correct?

          MR. O'DELL:  That's correct.

          THE COURT:  Okay, thank you.

                    CROSS EXAMINATION

BY MR. UFFORD:

Q    Mr. Wilson, you have a picture up there.  I can't
     remember, but I'll look at the number there, it's
     State's exhibit number 3?

A    Uh-huh.

Q    You said earlier that you went to this scene; is

1       that correct?

2   A   Yes, sir.

3   Q   And you went to the scene on the evening of March

4       the 6th; is that correct?

5   A   Yes, sir, I did.

6   Q   All right.  Do you know the number of this road

7       that's running all the way to the bottom of the

8       page there, out of the bottom of the page there

9       around the bottom of the picture there?

10          THE COURT:  Where is the pointer?

11          MR. O'DELL:  Oh, sorry.

12          MR. UFFORD:  Thank you.

13  Q   Do you know the number of that road right there?

14      (Indicating)

15  A   I'm not for sure about the number of that one.  I

16      know 68 is the one that runs out at the main

17      highway.

18  Q   68?

19  A   I mean 48 is the one that runs into 68.

20  Q   Is this 48 right here or is this 48?  (Indicating)

21  A   No, sir.  The main road, this one is 48.

22  Q   But these roads merge right here; is that correct?

23  A   Yes, sir, they do.

24  Q   In the course of your investigation, did you

25      travel this road?

1   A   Yes, sir, I'm sure we did.

2   Q   Did you travel this road?

3   A   Yes, sir.

4   Q   How many times did you travel that road?

5   A   I'm sure I went up it probably two or three times

6       at least, if not more.

7   Q   Would it be consistent with your memory of your

8       trips down that road during your investigation to

9       say that that road is a narrow road?

10   A   Yes, sir, it is a narrow road.

11   Q   And is that road a road that curves around behind

12       this area of woods here?  (Indicating)

13   A   Yes, sir, it curves and comes back out on another

14       main road, yes, sir.

15   Q   Okay.  And before you get to that curve, do you

16       recall a very significant dip in the road?

17   A   Significant dip?

18   Q   Right.  The road dips down.  Would it be that it

19       dips down and goes back up and curves back around?

20   A   It goes up a hill, yes, sir.

21   Q   Do you recall the dip?

22   A   Yes, sir, I think there is a dip that when you

23       start up the hill, yes, sir.

24   Q   Okay.  After you go up this road aways, do you

25       recall -- it looks like here there are woods, but

1    do you recall if there are woods on this, I guess

2    that would be the east side of the road going

3    towards Leesburg?

4    A    Yes, sir.

5    Q    Are there woods on that side of the road?

6    A    There is some woods on that side and then there is

7    sort of off to the, up the other, 48 there, is

8    also a building.

9    Q    Well, I'm talking about on this road right here.

10   A    Yes, sir.  Now, there is woods up almost all the

11   way up through it.

12   Q    On both sides of the road; is that correct?

13   A    Yes, sir.

14   Q    Okay.  This road also goes all the way around,

15   doesn't it?

16   A    Yes, sir.

17   Q    And comes back around behind and I believe goes

18   into state Highway 176; is that correct?

19   A    I believe that's right, yes, sir.

20   Q    Okay.  Now, could you tell me -- well, have you

21   gone down in the course of your investigation

22   state Highway 176?

23   A    Oh, yes, sir.

24   Q    Okay.  And 176 comes right back to Highway 68.

25   A    Yes, sir.



1  Q    Could you tell me if there are woods on both sides

2       of that road?  I'm going to try to clarify.

3       Obviously, there is woods in the tringle.

4  A    Yeah, there is woods all the way this way until

5       you get to the one, to the road here that comes

6       back off 68.  There is also some woods on this

7       side.  (Indicating)

8  Q    I'm just trying to make clear that there are woods

9       on both sides of that road, also.  Do you

10      understand what I'm saying?  Just like there are?

11  A   Yes, sir.  Yes, sir.

12  Q   Okay.  You testified regarding some clothing that

13      you say you got from the defendant and you

14      testified that you sent part of those clothing,

15      that clothing to the lab?

16  A   Yes, sir.

17  Q   But you didn't send all of that clothing to the

18      lab?

19  A   No, sir.

20  Q   How long have you been working as an investigator,

21      Mr. Wilson?

22  A   Several years, probably 10 or 11 or more.

23  Q   And how long have you been Chief Deputy?

24  A   I've been Chief Deputy going on five years.

25  Q   And have you ever investigated a murder before?

1    A    Yes, sir.

2    Q    Have you ever investigated a murder regarding a

3         gunshot at close range?

4    A    Yes, sir.

5    Q    Do you understand that the blood evidence in a

6         case like that, from your experience as an

7         investigator, is very important?

8    A    Yes, sir.

9    Q    Then why did you fail to send some of the alleged

10        or some of the suspect's clothing to the lab?

11   A    The lab, I think, advised Investigator Smith that

12        they wanted the outer clothes.

13   Q    Okay, but you're saying that you took the lab's

14        advice?

15   A    Yes, sir.

16   Q    Do you take it because you're saying I don't want

17        to know what someone else said, why weren't you as

18        the chief investigating -- Were you the chief

19        investigator?

20   A    I was in charge, yes, sir.

21   Q    Okay.  So why did you not send it to the lab?

22   A    Like I say, the lab said they wanted the outer

23        clothes, not the inner clothes.

24   Q    Well, in your investigating experience, has it

25        occurred to you that blood, being a liquid, would

```
 1           soak through to inner clothing?
 2     A     Yes, sir.
 3     Q     But you chose not to send it?
 4     A     No, sir, I sent the outer clothes, yes, sir.
 5     Q     Were you at the location, this location here that
 6           is in the State's exhibit 3 here?
 7     A     Yes, sir.
 8     Q     The entire time during the search?
 9     A     No, sir.  Like I say, I had to go back to the
10           office to meet with Val Courtney, Chief Val
11           Courtney, and also I interviewed, talked to some
12           other witnesses.
13     Q     Did you order that the suspect be shown to Danny
14           Smith at the service station?
15     A     No, sir, I did not.
16     Q     Okay.  When did you call off the search?
17     A     When did we call off the search?
18     Q     Well, you're the chief investigator, you were in
19           charge, you said.  When did you call off the
20           search?
21     A     After the suspect, he was apprehended, we called
22           off the search then for that, for the subject in
23           the woods, yes, sir.
24     Q     Well, maybe you don't -- Did you have the
25           authority to call off the search?
```

1   A   Yes, sir.

2   Q   So who called off the search?

3   A   I guess I did.

4   Q   So...

5   A   But we also went back to the scene, like I say, to

6       look for the pistol.

7   Q   But when you called off the search, it was because

8       you said you had the suspect; is that what you

9       said?

10  A   Yes, sir.

11  Q   Okay.  Did you cordon off the area where the

12      suspect was found?

13  A   No, sir, we did not.

14  Q   Isn't that standard procedure?

15  A   Well, it was pouring down rain that night and he

16      was -- we, like I said, we looked for the gun, we

17      went back and looked for the gun before everybody

18      left from the scene.

19  Q   But you didn't answer my question.

20  A   Yes, sir, I guess it would be standard, yes, sir.

21  Q   Okay.  I don't want to shoot anybody with this.

22      Maybe I'd better lay it down.  I pushed the button

23      on the laser pointer.  Earlier you showed a

24      picture of the creek.  What time of day was that

25      picture taken?

| | | |
|---|---|---|
| 1 | A | I believe it was taken in the morning. |
| 2 | Q | Early morning?  Mid-morning?  Late morning? |
| 3 | A | Probably mid-morning. |
| 4 | Q | In the course of your investigation I believe you |
| 5 | | already testified, or if you haven't I'll ask, did |
| 6 | | you travel to Chicago, Illinois? |
| 7 | A | Yes, sir, we did. |
| 8 | Q | Okay.  And when was the first time you went to |
| 9 | | Chicago, Illinois? |
| 10 | A | On March the 8th, I believe is when we went. |
| 11 | Q | And why did you go there? |
| 12 | A | We went there to talk with Dewayne Meeks. |
| 13 | Q | Okay.  Did you receive the assistance of the |
| 14 | | police in Illinois in that investigation? |
| 15 | A | Yes, sir, we did. |
| 16 | Q | And who would that have been? |
| 17 | A | Tom Arambisich I believe is the way you pronounce |
| 18 | | it. |
| 19 | Q | Now, were you aware that Tom Arambisich was a |
| 20 | | friend of Dewayne Meeks? |
| 21 | A | He said he knew him and had knowed him for |
| 22 | | awhile, yes, sir. |
| 23 | Q | Not friends, just known him? |
| 24 | A | Well, they could have been friends, but he said he |
| 25 | | had knowed him for quite some time, yes, sir. |

1   Q   Okay.  Did anyone go with you from Cherokee
2       County?
3   A   Yes, sir.
4   Q   And who was that?
5   A   Investigator Danny Smith.
6   Q   Okay.  When you first interviewed Mr. Meeks, did
7       you get a -- before you interviewed him, did you
8       get a summary of his previous statement to Mr.
9       Arambisich?
10  A   Nothing other than what was told to me over the
11      phone.
12  Q   I'm going to show you something that was given to
13      me, given to the defense, by the District
14      Attorney's office.  It may have a little
15      highlighter or something on it, but basically it
16      is something that was provided as part of your
17      reports, evidence in your investigation.  And tell
18      me if you recognize that report.
19  A   Yes, sir, I do.
20  Q   Okay, is that a report from Mr. Arambisich to you?
21  A   Yes, sir, it is.
22  Q   Okay.  And have you read this report?
23  A   Yes, sir.
24  Q   Okay, and that was in the course of your
25      investigation that you read that report?

1    A    Yes, sir.

2    Q    Okay.  Now, the very last point, and I call it a

3         point because he has dots beside his items here,

4         excuse me, he has dots beside certain items here,

5         and the very last item in his report right before

6         it says end of report regarding Mr. Meeks, it says

7         he also advised me that a friend of his was one of

8         the responding officers and that Mr. Gavin had

9         shot at him while trying to get away.  Now, is

10        that what it says?

11   A    That's what it says, yes, sir.

12   Q    Okay.  Now, in your course -- in the course of you

13        interviewing Mr. Meeks, did you ask who that

14        friend was?

15   A    No, sir.

16   Q    You didn't ask anything about this remark?

17   A    No, sir.

18   Q    You didn't ask anything about this remark?

19   A    No, sir.  The only thing we -- I don't think we

20        asked about it.

21   Q    Well, Danny Smith was there.

22   A    Yes, sir.

23   Q    Okay.  There was nothing asked regarding that

24        remark?

25   A    No, sir.

| | | |
|---|---|---|
| 1 | Q | Was that first interview with Mr. Meeks taped? |
| 2 | A | Yes, sir, it was. |
| 3 | Q | Okay.  And do you have the tape recording? |
| 4 | A | I have a blank tape. |
| 5 | Q | It didn't tape; is that right? |
| 6 | A | No, sir, it did not. |
| 7 | Q | Did you do a summary of that first investigation, |
| 8 | | that first interview, excuse me? |
| 9 | A | Yes, sir, we did. |
| 10 | Q | And did you subsequently go back and interview Mr. |
| 11 | | Meeks again? |
| 12 | A | Yes, sir, on April the 6th, I believe. |
| 13 | Q | Okay.  And the first interview was when? |
| 14 | A | On March 6 -- on March the 9th would have been |
| 15 | | when. |
| 16 | Q | I'm going to show you another investigative report |
| 17 | | from the items regarding your investigation that |
| 18 | | was supplied to me by the District Attorney's |
| 19 | | office.  Again, it's got a little bit of |
| 20 | | highlighting and maybe a few penciled notes on it, |
| 21 | | but it's all readable.  I'm going to ask you if |
| 22 | | this is your summary that you did of the taped |
| 23 | | interview, that the tape didn't tape with. |
| 24 | A | Yes, sir. |
| 25 | Q | Okay.  Now, again, at the end, conveniently for me |

1 and conveniently for the record, the end of that,

2 at least the end of the last, of the third page of

3 that statement that was in your investigative

4 report it states in the last sentence regarding

5 Mr. Meeks, or the last two sentences, Dewayne said

6 the gun that Keith had was his gun.  He said he

7 had come back and reported it stolen is one more

8 sentence.  He said he didn't know when Keith took

9 the gun out of his Blazer, at the motel or if he

10 got it out of his house.  And it says took the gun

11 out of his Blazer; is that correct?

12 A Out of his Blazer or at the house, yes, sir.

13 Q Yes, okay.

14  THE COURT:  May I ask you to question the

15 witness from this side over here.  If you are

16 going to continue to question him about documents

17 there at the stand, if you will do it from over

18 here it won't block the jury.

19  MR. UFFORD:  Okay, I'm sorry.

20 Q Did you question Mr. Meeks regarding that

21 statement about the gun being in his Blazer?

22 A We asked him about the gun, yes, sir.

23 Q Being in his Blazer?

24 A Whether it was in his Blazer or whether it was in

25 his house, yes, sir.

Q    But subsequently when you questioned him on, was it April the 6th you said?

A    Yes, sir.

Q    Did you specifically ask him about this issue?

A    Yes, sir, I'm sure we asked him about it, yes, sir.

Q    You're sure or you recall?

A    I'm sure we asked him about it, yes, sir.  I can't say I recall, but I'm sure we asked him about it, yes, sir.

Q    Now, what I just showed you was the statement of Dewayne Meeks from March the 9th, 1998?

A    Yes, sir.

Q    Now --

       MR. O'DELL:  Your Honor, could I interject here for just one minute.  We have not objected, despite the fact that Mr. Ufford has continued to cross-examine Mr. Wilson on someone else's statement.  And if he wants to introduce the statement, we would be more than glad for him to do that and then have the jury read the entire statement.  But we're going to object to him continuing to just pick and choose pieces out of this.  In fact, we would not object having all the statements obtained from Mr. Meeks or Investigator

1    Arambisich introduced as well.

2        THE COURT:  I'm going to allow Mr. Ufford to

3    continue examining the witness from this document

4    if he wishes to do so without introducing the

5    entire.

6  Q    Mr. Wilson, you said that you're sure that you did

7    question him, but you don't recall.  So on a page

8    of this report where it says what I just told you,

9    what I just read, that he said he didn't know when

10    Keith took the gun out of the Blazer.  I show you

11    a document where it was signed by Dewayne Meeks.

12  A    Uh-huh.  It also says out of the Blazer at the

13    motel or out of his house.

14  Q    Right, it does say that.

15  A    Yes.

16  Q    But you had him specifically sign it on the 6th of

17    April, 1998; is that correct?

18  A    Yes, sir, we did.

19  Q    Did you investigate or examine Mr. Meeks' Blazer?

20  A    We took pictures of the Blazer, yes, sir.

21  Q    How many pictures?

22  A    Two or three, I'm sure.

23  Q    Who took the pictures?

24  A    I believe I took the pictures.

25  Q    Okay.  Did you take pictures of the inside of the

1           Blazer?

2    A     No, sir, we took pictures of the outside.

3    Q     Okay.  Did you examine the Blazer other than to

4           take pictures?

5    A     No, sir.

6    Q     Now, you knew from the statement that that Blazer

7           right out here at the corner, or you had good

8           reason to believe it was, real good reason to

9           believe that it was out there at the corner when

10         Mr. Clayton was shot; is that correct?

11   A    Yes, sir.

12   Q    And you also knew that there was a real good

13        possibility that that vehicle was the vehicle from

14        which the assailant exited to do the shooting; is

15        that correct?

16   A    Yes, sir.

17   Q    Did you impound the Blazer?

18   A    No, sir, I did not.

19   Q    You didn't examine the interior in any way?

20   A    No, sir, I did not.

21   Q    Would it be reasonable to think that in

22        investigating a murder with these facts, that the

23        interior of the vehicle in that position, that was

24        that vehicle, the one that was there when it

25        happened, that the assailant exited from, at least

1            was it definitely involved, would it be reasonable

2            to say that that should have been examined?

3    A   There was no reason to examine it because he

4            didn't get back in that vehicle.

5    Q   But you haven't -- had you already determined the

6            facts?

7    A   Witnesses said that he exited, and the evidence

8            shows that he did not get back in that vehicle.

9    Q   I understand.  But we're here today to determine

10          the facts of the case.  Are you saying that you

11          had already determined the facts of the case on

12          that day?

13    A   No, sir, I was just going by what the witnesses

14          said.

15    Q   Well, in your experience as an investigator, do

16          you find that the rendition of what happened of

17          every witness to every act, if it's the same act,

18          you've got three different witnesses or five, are

19          they all going to be the same?

20    A   Not necessarily, no, sir.

21    Q   Well, are they?

22    A   No, sir, they're probably not going to tell you

23          the same thing.

24    Q   Okay.  So you didn't know what happened yet, did

25          you?

905

```
 1    A    From the evidence and from the people that we
 2         talked to, we had no reason to believe the subject
 3         got back in that vehicle.
 4    Q    So you decided to give up the investigation; is
 5         that correct?
 6    A    No, sir, we didn't give up the investigation.
 7    Q    You gave up the investigation of Mr. Meeks; is
 8         that correct?
 9    A    No.  We interviewed Mr. Meeks and we brought the
10         evidence that we had back, presented it to the
11         Grand Jury.
12    Q    Didn't have a lot of evidence, did you?
13    A    Yes, sir, I felt like we had a pretty good bit of
14         evidence.
15    Q    Well, did you question Mr. Meeks' wife?
16    A    No, sir, we did not.
17    Q    Wasn't she there?  Wasn't she pretty close?
18    A    She was not with them.
19    Q    Wasn't she involved, at least indirectly, in this?
20         I mean, she came from Chicago to Chattanooga in
21         the middle of the night.  I mean, wasn't there a
22         reason to ask her something?
23    A    No, sir, I didn't see no need in asking her
24         because she wasn't with them.
25    Q    Well, isn't motive an issue?  Do you know what I'm
```

1                          talking about?

2        A        Yes, sir, I know what you're talking about, yes,

3                 sir.

4        Q        I mean, your investigation doesn't center on one

5                 little spot, does it?

6        A        No, sir.

7        Q        You've been an investigator for a long time.  You

8                 know that.

9        A        Yes, sir.  Yes, sir.

10       Q        So, weren't there some obvious questions for Mrs.

11                Meeks?

12       A        Well, we didn't feel like she would know anything

13                about the shooting.

14       Q        What about why?

15       A        I don't know that she would have knowed why.

16       Q        Well, did you get -- did you ask Mr. Meeks when

17                you went there on the 9th what clothing he was

18                wearing?

19       A        No, sir, we did not.

20       Q        Didn't ask him what clothing he was wearing?

21       A        No, sir.

22       Q        Didn't gather any clothing that he was wearing?

23       A        No, sir, we sure didn't.

24       Q        Did you let the fact that the police that assisted

25                you were acquaintances for a long time of Mr.

1    Meeks have anything to do with your decisions not

2    to pursue it any more than that?

3  A    No, sir, I did not.

4  Q    Was Mr. Meeks subsequently arrested for the murder

5    of Mr. Clayton?

6  A    He was indicted, yes, sir.

7  Q    He was arrested and he was indicted first; is that

8    right?

9  A    Yes, sir.

10  Q    Then he was arrested?

11  A    Yes, sir.

12  Q    You start investigating him again?

13  A    No, sir.  The evidence that we had, we presented

14    to the Grand Jury and they indicted.  Also

15    indicted him.

16  Q    Well, did you start investigating him again?

17  A    No, sir.

18  Q    Well, if the Grand Jury thought there was a

19    question, why didn't you think there was a

20    question?

21  A    He was arrested and charged, then, like I say, we

22    presented everything we had to the Grand Jury.

23  Q    So you gave up on Mr. Meeks' investigation,

24    correct?

25  A    I wouldn't say gave up.  We presented everything

```
 1              we had.

 2      Q       Well, an investigation doesn't have to end, does

 3              it?

 4      A       No, sir.

 5      Q       Okay.  And an investigation could be resumed,

 6              can't it?

 7      A       Yes, sir, it can.

 8      Q       Did you inventory every item in the Corporate

 9              Express van?

10      A       Yes, sir, we took the items out of it and I put it

11              in my office.

12      Q       You inventoried every item?

13      A       Yes, sir.

14      Q       There was a lot of items, weren't there?

15      A       Yes, sir, there was.

16      Q       You were very thorough; is that correct?

17      A       Like I say, we inventoried everything in there, in

18              the van, that we saw.

19      Q       Every piece of paper; is that correct?

20      A       No, sir, we did not inventory each piece of paper.

21              We inventoried the bags.

22      Q       Each bag?

23      A       The bags that were in the van.

24      Q       Any pieces of paper?

25      A       There may have been some paper in there, also.
```



1    Q    Did you inventory them?

2    A    Yes, sir, we would have inventoried them if they

3         were individual.

4    Q    Okay.  Did you say that you took the pictures of

5         the van, of the Corporate van?

6    A    Yes, sir, the one at the scene, yes, sir.

7    Q    Okay.  And you took pictures of the inside of the

8         van; is that correct?

9    A    I think I took the pictures of the inside, it was

10        either me, or Dean Buttram may have took -- no, I

11        took the ones on the inside, he took the pictures

12        of the evidence that we took out of it when it was

13        released back to the victim.

14   Q    So the picture that we saw earlier, you didn't

15        take that picture?

16   A    Which?

17   Q    You didn't see it earlier, that's okay.

18             THE COURT:  Do you need a minute to talk to

19        him?

20             MR. UFFORD:  Yes, sir.

21             THE COURT:  Could we get a little air

22        conditioning in here, please.  I know it's hard to

23        hear sometimes, but it's gotten so stuffy in here

24        that maybe we can cool it down a little bit.  Do

25        we need to stop for a bathroom break?  We're all

1    among friends.

2         MR. UFFORD:  May I resume?

3         THE COURT:  Yes, sir.

4    Q    Mr. Wilson, do you know where Keith, I'm sorry,

5         where Dewayne Meeks', where Dewayne Meeks' Blazer

6         is now?

7    A    No, sir, I don't.

8    Q    Do you know if it's available if somebody wanted

9         to investigate it or examine it?

10   A    I suppose he still has the vehicle, yes, sir.

11   Q    Do you know?

12   A    I don't know that he has the vehicle, no, sir.  I

13        have not saw the vehicle.

14   Q    That's been years ago.  I mean, well, a year and a

15        half ago when you took the picture, right?

16   A    Yes, sir.

17   Q    So you don't know anything from then, do you?

18   A    No, sir, I don't.

19   Q    Do you know -- You said that when you went to

20        Chicago that Investigator Danny Smith went with

21        you?

22   A    Yes, sir.

23   Q    Anybody else go with you?

24   A    Yes, sir.

25   Q    Who was that?

1   A   Tony Burch I think is what his name is, officer
2       from Fort Payne.
3   Q   Fort Payne.   Fort Payne what?
4   A   P.D.
5   Q   Fort Payne P.D.   That would be the police
6       department.   Do you know if he's a friend of Mr.
7       Meeks?
8   A   I think he is, yes, sir.
9   Q   So you went up there with a friend of Mr. Meeks to
10      talk to a police officer with Mr. Meeks who was a
11      long time acquaintance of Mr. Meeks?
12  A   Yes, sir.
13  Q   How long does it take to get up there?
14  A   A good eight hours, maybe a little longer.   It
15      just depends.
16  Q   I know, it depends, doesn't it?   All right.   Were
17      you present when Mr. Gavin was taken into custody?
18  A   No, sir.
19  Q   When was the first time you saw Mr. Gavin?
20  A   When they brought him to the sheriff's department
21      at the jail.
22  Q   The what department?
23  A   At the sheriff's department at the jail.
24  Q   At the jail.   So approximately what time would
25      that have been?

1    A    It was somewhere around, I think they called in

2         that they had picked him up somewhere around 10:00

3         10:02 P.M., so it would have took them probably

4         15, 20 minutes to drive, so probably...

5    Q    Did you notice anything unusual about Mr. Gavin

6         other than he's Mr. Gavin?

7    A    No, sir, other than he was just wet.

8    Q    Okay.  Did you take any pictures of him?

9    A    No, sir, not at that time.

10    Q    Did anybody take any pictures of him?

11    A    I'm sure they took some pictures of him when they

12         booked him in, yes, sir.

13    Q    Is that standard procedure?

14    A    Yes, sir, it is.

15    Q    Okay.  There is facilities right there where you

16         take them in?

17    A    Yes, sir.

18    Q    To take pictures.  Have you ever placed Mr. Gavin

19         in a lineup?

20    A    No, sir.

21    Q    Has it been done?

22    A    No, sir, it has not.

23    Q    Have you ever had any of the witnesses look up,

24         witnesses in this case, that may say they saw or

25         didn't see or might have seen or partially saw

1        someone that might have looked like Mr. Gavin, any

2        potential witness or witness, have you ever had

3        any of them view a lineup in this case?

4    A   No, sir.  No, sir.

5    Q   What about a, what's called a photo array, you know

6        what I'm talking about because you're a police

7        officer.

8    A   Yes, sir.

9    Q   Could you tell the Court and the jury what a photo

10       array is?

11   A   It's a lineup with six or seven, depends on who,

12       it depends on whether -- a lot of people use six

13       photos and some of them use more, but you use six

14       different photos in a lineup.

15   Q   And what you're saying is that you have suspect's

16       picture in there somewhere, right?

17   A   Yes, sir.  Yes, sir.

18   Q   And then you have five or six pictures of other

19       people?

20   A   Yes, sir.

21   Q   That look?

22   A   Similar to him, yes, sir.

23   Q   In a generic way like the suspect.

24   A   Yes, sir.

25   Q   And then you ask the witness, person who might

1    have seen, you ask them if they see him there; is

2    that correct?

3    A    Yes, sir.

4    Q    See the person?

5    A    Yes, sir, that's right.

6    Q    That wasn't done?

7    A    No, sir.

8    Q    Did Mr. Gavin have any other keys on his person?

9    A    No, sir, that was the only key that I found.

10   Q    Did you inventory the items that were taken from

11   his person?

12   A    I had the clothes and the key, yes, sir.  That's

13   the items that I had.

14   Q    You took the key out of the clothes?

15   A    Out of his -- they were out of his blue jeans is

16   what they were out of.

17   Q    But the things that were taken from his person, do

18   you know anything about anything that was taken

19   from his person?  Do you understand what I mean

20   when I say it that way?

21   A    No, sir, I don't.  I did not take anything off of

22   Mr. Gavin, other than his clothes was taken off in

23   front of me and gave to me.

24   Q    Do you know if anybody took anything off of him?

25   A    No, sir.



```
 1   Q    Took any personal item, billfold, ring?  Change

 2        from his pocket, another set of keys?

 3   A    No, sir.  There was no billfold, no, sir, there

 4        was none that I know of.

 5   Q    The only thing on his entire person was one key;

 6        is that what you're --

 7   A    No, sir.  That's the only thing that I know of

 8        that was found, yes, sir.

 9   Q    Were you there?

10   A    Yes, sir, I was there when he was being -- when

11        his clothes were being taken off, and like I say,

12        they were taken off and handed to me.

13   Q    Okay.  This road that I've referred to earlier?

14   A    Yes, sir.

15   Q    That goes out the bottom of the picture there?

16   A    Yes, sir.

17   Q    Do you know the name of that road?

18   A    No, sir, I don't.  That's got a county road

19        number, but I can't just sit here and tell you

20        what the county road number is.  I can't tell you,

21        no, sir.

22   Q    Okay.  The other road, that goes off from the "Y"

23        there, that's 48 you've testified; is that

24        correct?

25   A    Yes, sir.
```

```
1    Q    And that goes to Sand Rock, doesn't it?

2    A    Yes, sir.

3    Q    This is a rural area out here?

4    A    Yes, sir, it is.

5    Q    There is woods all around, isn't there?

6    A    Yes, sir.

7    Q    There are a few houses around there, too, aren't

8         there?

9    A    Yes, sir, there's a few, yes, sir.

10   Q    And just a little bit up the road there, there is

11        a service station, isn't there, just not far away?

12   A    Yes, sir, not far from the intersection.

13   Q    You can almost see it from the...

14   A    Yes, sir.

15   Q    You've already said you didn't cordon off the area

16        against standard procedure.  Now, you said that

17        you went back, looked for the gun.  How did you do

18        that?

19   A    We went back and searched the area for the gun.

20        There was several of us that went back together

21        and looked for it.

22   Q    How long did you look before you found it?

23   A    That morning we looked, it was a pretty good

24        little while.  I'm not sure exactly how long it

25        was we looked for it that morning.
```

| | | |
|---|---|---|
| 1 | Q | Which morning are you talking about? |
| 2 | A | I'm talking about the morning that we found it. |
| 3 | Q | That would have been about the 13th, right? |
| 4 | A | Yes, sir. |
| 5 | Q | Two hours? |
| 6 | A | Probably, yes, sir.  Could have been more, could |
| 7 | | have been less. |
| 8 | Q | Mr. Wilson, you're still in charge of this |
| 9 | | investigation; is that correct?  I mean, it's |
| 10 | | ongoing, isn't it? |
| 11 | A | Yes, sir. |
| 12 | Q | Have you received any information in the course of |
| 13 | | your investigation that Mr. Gavin has been allowed |
| 14 | | to send items that were taken off of his person |
| 15 | | back to his home in Illinois? |
| 16 | A | I think the jailers did send a watch back. |
| 17 | Q | Could there have been anything else? |
| 18 | A | Not that I know of, no, sir.  There was nothing |
| 19 | | else that I saw. |
| 20 | Q | Okay. |
| 21 | | MR. UFFORD:  Nothing further. |
| 22 | | MR. O'DELL:  Two questions. |
| 23 | | RE-DIRECT EXAMINATION |
| 24 | | BY MR. O'DELL: |
| 25 | Q | Investigator Wilson, you've been cross-examined |

```
 1         extensively about certain portions of several
 2         reports.  I believe you were asked about a
 3         statement that Tony Burch said that Mr. Meeks gave
 4         to him.  You were asked about a statement that Mr.
 5         Lieutenant or Deputy Arambisich from Will County
 6         Sheriff's Department wrote out that Meeks had
 7         given to him, and I believe you went and
 8         interviewed him with Danny Smith on two separate
 9         occasions; is that correct?
10    A    Yes, sir, that's right.
11    Q    One you attempted to tape record and it didn't
12         work, but you wrote out a synopsis?
13    A    Yes, sir.
14    Q    And then you went back a month later, basically,
15         and interviewed him a second time, this time on
16         tape.
17    A    Yes, sir.
18    Q    All of these statements have been given to your
19         knowledge to the defendant.
20    A    Yes, sir.
21    Q    And have you read all those statements yourself?
22    A    Yes, sir.
23    Q    In any of those statements do you find any
24         contradictory statements made by Mr. Meeks about
25         what happened on March the 6th?
```



1    A    No, sir.

2    Q    Let me ask you a follow-up question on that.

3         Based on the information that you received from

4         all of those statements that were consistent, were

5         you able to take items of those statements and

6         corroborate Mr. Meeks' story?

7    A    Yes, sir.

8    Q    Have you found anything in your efforts to

9         corroborate Mr. Meeks' statement that has appeared

10        or that it has occurred that was untruthful to you

11        or in any of those statements?

12   A    No, sir.

13   Q    When Mr. Gavin was taken from the creek and

14        brought to the sheriff's office, I believe you

15        said that he didn't have anything on him.  Did

16        that include an absence of identification?

17   A    Yes, sir, he didn't have any identification.

18   Q    None whatsoever?

19   A    No, sir.

20   Q    And this is a very rural area of Cherokee County,

21        Alabama, isn't it?

22   A    Yes, sir.

23   Q    Nothing like Chicago, is it?

24   A    No, sir.

25   Q    Do you know if Mr. Gavin had any family or friends

1      down here?

2   A   I don't know of any, no, sir.

3         MR. O'DELL:  I believe that's all.

4         THE COURT:  Anything?

5         MR. UFFORD:  One more question.

6                RE-CROSS EXAMINATION

7   BY MR. UFFORD:

8   Q   Who is Nelson Burris?

9   A   Nelson Burris?

10  Q   Yes.

11        THE COURT:  How do you spell that?

12        MR. UFFORD:  B-u-r-r-i-s.

13  A   He was one of the first people, I think, that

14      Dewayne had called.

15  Q   Where?

16  A   In Fort Payne.

17  Q   So did Dewayne call Fort Payne first?

18  A   I'm not for sure whether he called him first or

19      not, but I know he was -- Nelson Burris was one of

20      the people that he called.

21  Q   In your investigation of this case regarding

22      Dewayne Meeks, who was the first person, who was

23      the first entity in Alabama that he contacted?

24  A   I believe the first person that they contacted in

25      Alabama was Tony Burch, I believe, with the police

1        department.

2    Q    His friend in the Fort Payne Police Department,

3        DeKalb County?

4    A    Yes, sir, I think that's right.

5            MR. UFFORD:  That's all at this time.

6            MR. O'DELL:  Just one more question.

7            FURTHER RE-DIRECT EXAMINATION

8    BY MR. O'DELL:

9    Q    Isn't it a fact, Mr. Wilson, or is it a fact that

10       within 24 hours of this shooting taking place,

11       your records and based on the question that Mr.

12       Ufford gave to you, Mr. Meeks went to at least two

13       separate law enforcement agents and gave full and

14       complete statements?

15   A    Yes, sir.

16   Q    Statements that you have been able to corroborate?

17   A    Yes, sir.

18   Q    And statements to which you have found no

19       falsehoods?

20   A    That's correct.

21           MR. O'DELL:  That's all.

22           MR. UFFORD:  I've got to ask.

23           FURTHER RE-CROSS EXAMINATION

24   BY MR. UFFORD:

25   Q    Are you saying within 24 hours?



A   I think that's right, yes, sir.  He left here, my understanding he left here and he went back to Chicago and that's when he called his friends in Chicago.

Q   I understand he called his friends in Chicago.  Do you know the capacity in the Illinois police department of Mr. Arambisich?

A   He is a deputy is my understanding.

Q   Okay.  So this statement, do you know where this statement was made?

A   I think he talked, went to his house or he may have called him on the phone and talked to him about it, yes, sir.

Q   That's not standard procedure, is it?

A   Well, you know, if he called him and told him, yes.

Q   Let me ask you.  In Alabama, is that the way we do it?

A   No, sir, we probably went and talked to him face to face.

Q   I understand.

     MR. UFFORD:  Nothing further.

     MR. O'DELL:  State has nothing further, Judge.

     THE COURT:  Thank you, sir, you may come down.
Ladies and gentlemen, let's take a recess for a few minutes.  Hopefully we can get started back in

1    about 10 minutes.  Please do not discuss the case

2    and do not allow it to be discussed.

3                    (3:26 P.M.   Recess)

4                    (3:45 P.M.   Jury present)

5            MR. O'DELL:  Judge, we have this box.  We've

6    got some additional witnesses one of them has, but

7    I think she's gotten that one.

8            THE COURT:  25, 26 and 27 were marked, 25 was

9    admitted, 26 and 27 were not offered, they were

10   marked for identification.

11           MR. O'DELL:  May we move them over here when

12   we get through with our next witness, the next

13   witness will be the one we admit them with.

14           THE COURT:  Thank you.  You may call your next

15   witness.

16           MR. O'DELL:  State calls Mark Hopwood.

17                        MARK HOPWOOD

18       Being duly sworn, testified as follows:

19                    DIRECT EXAMINATION

20   BY MR. O'DELL:

21   Q    State your name, please.

22   A    Mark Hopwood.

23   Q    And, Mr. Hopwood, how are you employed?

24   A    As a forensic scientist with the Alabama

25        Department of Forensic Sciences.

1   Q   How long have you been so employed?

2   A   The past 10 and a half years.

3   Q   Let me you ask if back on March the 6th, 1998, or

4       March 7th, 1998, you had an occasion to be

5       requested, your assistance to be requested here in

6       Cherokee County as a result of a homicide?

7   A   Yes.

8   Q   Involving William Clinton Clayton?

9   A   Correct.

10  Q   Would you tell these ladies and gentlemen what you

11      did when you came up here, please.

12  A   We were requested to process a van that had been

13      recovered related to that particular incident, and

14      they had impounded it at the sheriff's department

15      and we processed it for latent prints and

16      basically photographed it and I managed to recover

17      one projectile from the vehicle.

18  Q   Let me ask you, if you would, to tell these ladies

19      and gentlemen what kind of training you've had,

20      please, in the area of forensic sciences.

21  A   I have Undergraduate from UAB, Masters of Science

22      and Forensic Science from UAB and an M.P.A. from

23      Jacksonville, certified by the American Board of

24      Criminalistics, certified as a senior crime scene

25      analyst of International Association for

1        Identification, and numerous continuing education

2        every year.

3    Q   Thank you for that.  Let me ask you this.  When

4        you came up here, were you alone or did someone

5        from the department come with you?

6    A   Warren Stuart out of our Birmingham office met me

7        here and he's the senior fingerprint person.

8    Q   All right.  As part of your investigation or your

9        processing of this van, what steps did you take,

10       please.

11   A   Just, it's a general process.  You look at it over

12       all, see what you can see, photograph the inside,

13       the outside, and try to determine what you're not

14       going to damage as you're processing it, and

15       initially start from the out and work your way in.

16       We initially started dusting the outside around

17       the doors.  By dusting I mean processing for

18       prints, and then moved inward, door panels, dash,

19       controls, light switch, rear view mirror, stuff

20       like that.  And you work it for prints first

21       because that's probably the most likely thing you

22       would destroy as you're going through it, and then

23       from there we noticed the defect in the passenger

24       door, and after we had finished processing for

25       prints, just removed the panel from the door and



1    kept the bottom portion to recover the spent

2    bullet from the door panel.

3    Q    Which door was that, please, sir?

4    A    The driver's -- I mean, the passenger's door

5    opposite the driver's side.

6    Q    With respect to your processing the van for

7    prints, I notice you said the dash and all the

8    dials and stuff.  Did you process the steering

9    wheel as well?

10   A    Yes.

11   Q    In your investigation and your procedure and

12   processing for prints, were you able to detect any

13   latent prints of any use?

14   A    We did not recover anything useable from that

15   vehicle.

16   Q    All right.  And with respect to the projectile,

17   who actually, which one of you two actually took

18   possession of the projectile, please, sir?

19   A    I actually recovered that.

20   Q    And what did you do with it, please, sir?

21   A    After photographing it in place and recovering it,

22   I released it to Bryant Dooley who was a contract

23   employee with us that transported evidence and

24   bodies at that time.

25   Q    When you gave that .40 caliber projectile from the

1         van to Bryant Dooley, was it in the same or

2         substantially the same condition as it was when

3         you recovered it from the van?

4   A    It was.

5   Q    Is it unusual or uncommon for you not to be able

6         to locate prints in a vehicle or in a scene like

7         this?

8   A    It's actually more unusual to get prints from a

9         vehicle like this.  The interior of a vehicle, you

10       have all the textured dash components, the doors

11       and everything are textured plastic and vinyl, you

12       really don't have a smooth, solid surface like

13       glass or this shellacked wood for a print to adhere

14       to, so it's amazing you might process -- well, as

15       a matter of fact, we've got one going right now in

16       this county that we're processing right now

17       sitting there being fumed right now, and I checked

18       it at lunch and so far I haven't seen anything.

19       So, it's not uncommon not to get prints from the

20       interior.

21        MR. O'DELL:  I think that's all we have.

22      Thank you, Mr. Hopwood.  Mr. Smith will have some

23      questions for you.

24               CROSS EXAMINATION

25   BY MR. SMITH:



1   Q   Mr. Hopwood, you stated, I think, that you didn't

2       recover anything useable from the van.

3   A   Fingerprints.

4   Q   Fingerprints.  Is that to say that you did not

5       recover any whole prints that were of sufficient

6       quality that you could get enough points to make a

7       comparison, is that?

8   A   All we were able to develop was smudges.  I mean,

9       just a fraction of ridgeous detail sometimes is

10      useable, so we lift anything that has sufficient

11      ridge detail that could be compared, and we did

12      not recover anything with sufficient detail to be

13      comparable.

14  Q   Now, you said that you dusted this van from the

15      outside working your way in; is that correct?

16  A   Correct.

17  Q   Is dusting the most common method of looking for

18      latent prints?

19  A   Yes.

20  Q   Are there more sophisticated methods of looking

21      for latent prints?

22  A   Yes.

23  Q   You mentioned fuming?

24  A   Correct.

25  Q   Is that not -- that's a different method from the

1   dusting, is it not?

2   A   It supplements dusting, and in this case we didn't

3       fume because we used florescent powders and a

4       different light source, so that kind of deletes

5       the need to fume.

6   Q   There is also a method, or maybe I'm getting my

7       methodology confused here.  Isn't there a method

8       that involves using a form of acrylic liquid that

9       vaporizes in the air?

10  A   That's fuming.

11  Q   That's fuming?

12  A   That's cyanoacrylate fuming.

13  Q   Okay.  But that wasn't done in this case?

14  A   No.

15  Q   Are you telling us that of all the

16      surfaces on this truck, interior, the

17      exterior, all you got was smudges?

18  A   Yes.

19          MR. SMITH:  That's all I have.

20          MR. O'DELL:  State has no further questions

21      and we ask this gentleman be excused.

22          THE COURT:  You may come down.  Thank you very

23      much.

24              DAVID HIGGINS

25      Being duly sworn, testified as follows:

```
 1    A    Permission to address the bench.

 2              THE COURT:  I'm not comfortable with you

 3         making a remark in the presence of the jury.

 4    A    It's a physical thing with me, sir.

 5              THE COURT:  Yes, sir.

 6    A    For the attorneys, I have a hearing impairment

 7         that's very -- and I ask you just to look at me

 8         and speak clearly because I have sworn to tell the

 9         truth I want to understand the question to make

10         sure I can.

11              THE COURT:  Very well, thank you.

12    A    Thank you, Your Honor.

13                      DIRECT EXAMINATION

14    BY MR. O'DELL:

15    Q    Would you tell us your name, please.

16    A    I'm David Higgins.

17    Q    And, Mr. Higgins, what do you do for a living?

18    A    I'm retired.

19    Q    So you live for a living, huh?  What did you used

20         to do for a living?

21    A    I was a firearms and tool marks examiner for the

22         Alabama Department of Forensic Sciences,

23         Birmingham Regional Laboratory.

24    Q    And for how long did you do that, please, sir?

25    A    A little over 14 years.
```



1    Q    When did you retire?

2    A    July of last year.

3    Q    Let me ask you if you had an occasion to receive

4         some items of evidence in the case involving the

5         murder of William Clinton Clayton?

6    A    Yes, sir, the death investigation involving Mr.

7         Clayton.

8    Q    Yes, sir.  Let me ask you specifically if you

9         received a .40 caliber projectile from a van?

10   A    Yes, sir, I did.

11   Q    And from whom did you receive that, please, sir?

12   A    From Mr. Bryant Dooley.

13   Q    And to whom did you give that item, please, sir?

14   A    It was placed in evidence storage in the firearms

15        section, and I retired before I had an opportunity

16        to work the case.

17   Q    Okay.  When you put it in the evidence storage,

18        was it in the same or substantially the same

19        condition as it was when you received it from Mr.

20        Dooley?

21   A    Yes, sir, it was in a sealed envelope.

22   Q    Okay.  Let me ask you about a .40 caliber shell

23        casing from Highway 68.

24   A    I don't know the location.

25   Q    All right.  Do you have an indication of a single

1                shell casing that was given to you?

2     A     I received a single shell extended .40 caliber

3                cartridge in a sealed plastic bag.

4     Q     From whom did you receive that, please?

5     A     That was from Mr. Larry Wilson.

6     Q     And to whom did you give that, please?

7     A     That was also placed with the other items that I

8                had received relative to this case at that time.

9     Q     All right.  Was that also sealed?

10    A     Yes, sir.

11    Q     And when you put it in the evidence locker, was it

12             in the same or substantially the same condition

13             and sealed as it was when you received it?

14    A     Yes, sir, it was.

15    Q     Okay.  Let me ask you about another item, a .40

16             caliber Glock pistol.  Did you receive such an

17             item?

18    A     I received a brown paper bag sealed that was

19             reported to contain a Glock pistol, .40 caliber.

20    Q     Who was that from, please, sir?

21    A     That was also from Mr. Larry Wilson.

22    Q     All right, and what did you do with that pistol,

23             please, sir.

24    A     It was also placed with the other items relative

25             to this case.



Q    And was that, likewise, placed in that locker in the
     same or substantially the same condition as you
     received it in the bag?

A    Yes, sir, it was.

Q    Okay.  And I'll ask you about two .40 caliber
     shell casings.

A    Yes, sir.

Q    Did you receive a package or items of evidence
     relating to those shell casings?

A    Yes, sir, I received a sealed brown paper bag that
     was purported to contain two extended .40 caliber
     cartridge cases.

Q    And from whom did you receive those, please?

A    That was also from Mr. Wilson.

Q    Okay.  And what did you do with those two shell
     casings, please, sir?

A    Along with the other items, they were placed in
     the locker.

Q    Okay.  And was that, you said again, in the
     firearms locker?

A    We have two -- we had a room and then there is a
     locked cabinet, and I indicate here on my note
     that it was in the cabinet.  It remained locked
     after I worked and all that during work time and
     that was it.

Q    When you placed that in the evidence locker, was
     it in the same or substantially the same condition
     as it was when you got it from Mr. Wilson, those
     two shell casings?

A    Yes, sir.

     MR. O'DELL:  Okay.  I believe that's all I
     have at this time for him.

                    CROSS EXAMINATION

BY MR. SMITH:

Q    Good afternoon, Mr. Higgins, I just have a few
     questions for you.  My name is Bayne Smith and I
     represent the defendant in this case.  You said
     you retired as a firearms and tool examiner; is
     that correct?

A    Tool marks examiner, yes, sir.

Q    Tool marks examiner, yes, sir.  Would it be fair
     to say you probably have some fair amount of
     experience with firearms generally; is that true?

A    In the area of firearms and tool marks
     examination, I started in 1972.  And in the area
     of firearms, I was raised around them.  I was also
     army national guard and retired from the
     international guard and been a competitive
     shooter, also.

Q    Are you familiar with the Glock arms line of



1    pistols generally?

2  A    Yes, sir.  I carried a 9 millimeter caliber Glock

3       as my gun while I worked at forensics full time.

4  Q    Are you familiar with the .40 caliber Glock?

5  A    Yes, sir.

6  Q    Now, is that a semi-automatic?  We've seen a

7       picture of it, so I'm assuming it's either a

8       semi-automatic or an automatic.

9  A    It's a semi-automatic, which means it fires every

10      time you pull the trigger.

11 Q    All right, sir.  And when a semi-automatic weapon

12      like the Glock .40 in particular fires a shot, it

13      ejects a shell casing automatically; is that

14      correct?

15 A    If it's functioning properly, that's correct.

16 Q    Can you tell me with that particular weapon,

17      the .40 caliber Glock, does it -- can you tell me

18      what direction the shell casing is ejected at the

19      time it's fired?

20 A    I haven't fired -- the only .40  calibers that I

21      fired I believe were in a test fire room and

22      we caught them in a box.   Glocks will vary with

23      your grip to throwing them directly back over your

24      shoulder to putting them to the right, depending

25      on how you're holding the gun.  It's a short

1      recoil-type operating mechanism.

2   Q   If we were to show you a picture of this
3       particular weapon, is there any way just from
4       looking at it you could tell us which, where the
5       shell casing, in which direction that particular
6       weapon would have ejected a shell casing?

7   A   As I said, it could either go to the right or back
8       toward the rear, somewhere in that range.  And,
9       no, sir, I couldn't tell you that by looking.  I
10      could look at the firearm itself and I couldn't
11      tell you.

12  Q   I understand.  Can you give us, again, any
13      approximation how far it might eject that shell
14      casing?

15  A   No, sir.  Like I said, I've had the only
16      experience I've had with the Glock 40's was in the
17      test fire room and we tried to catch the
18      cartridges in a box right next to it, so it's hard
19      to get a pattern.  I really wouldn't know, to
20      honestly answer your question.

21          MR. SMITH:  All right, sir.  That's all I have
22      at this time.  Thank you very much, Mr. Higgins.

23          MR. O'DELL:  Judge, that's all the State has
24      of this witness and we would ask that he be
25      excused.

```
 1        THE COURT:  Thank you for being here.  You're
 2   excused.
 3        MR. HIGGINS:  Thank you, Your Honor.
 4        MR. O'DELL:  I think he needs to return to
 5   retirement.
 6        MR. HIGGINS:  Sir?
 7        MR. O'DELL:  I said are you ready to return
 8   back to your retirement?
 9        MR. HIGGINS:  Yes, sir.
10                ANGELO DELLA MANNA
11   Being duly sworn, testified as follows:
12                DIRECT EXAMINATION
13   BY MR. O'DELL:
14   Q    Good afternoon.
15   A    Hello, sir.
16   Q    If you would, state your name for these ladies and
17        gentlemen of the jury.
18   A    My name is Angelo Della Manna, D as in David,
19        e-l-l-a, capital M as in Mary, a-n-n-a.
20   Q    What do you do for a living?
21   A    I'm a forensic scientist in the DNA section of the
22        Alabama Department of Forensic Sciences,
23        Birmingham laboratory.
24   Q    And how long have you been so employed in that
25        capacity?
```

1    A    Approximately seven years.

2    Q    If you would, tell us a little bit about your

3         background and your education in this field.

4    A    I received my Bachelor's Degree in Chemistry

5         from the University of Toronto in Toronto, Canada.

6         I then received my Master's Degree in Forensic

7         Sciences from the University of Alabama in

8         Birmingham and then completed the extensive DNA

9         training, both in-house as well as the FBI academy

10        in Quantico, Virginia.

11   Q    Let me ask you, pursuit to your occupation and

12        your experience, were you asked or did you receive

13        any items of evidence from officials here in

14        Cherokee County concerning the death of Mr.

15        Clayton, William Clinton Clayton?

16   A    Yes, sir, I did.

17   Q    If you would, tell these ladies and gentlemen what

18        you received, please.

19   A    On March 16th of 1998, Investigator Larry Wilson

20        of the Cherokee County Sheriff's Department

21        submitted three items separately packaged to the

22        Birmingham laboratory for my examination.  One was

23        a moderately soiled black toboggan identified from

24        being from the woods of County Road 48.  The

25        second item was a pair of Levi blue jeans and a

939

pair of black shoes identified as being from Keith
Edmund Gavin, and the third item was a pink
long-sleeved pullover shirt and a gray T-shirt
also identified as being from Mr. Gavin.

Q    What was the request with respect to these items,
please, sir?

A    To examine them, to see if there is any biological
stains on them, primarily blood sustains.

Q    And tell us what kind of test or analysis you
performed on these items, please.

A    Routinely what I do whenever I receive clothing or
items of evidence within the laboratory, I'll
examine them, both visually to see if there is any
biological stains on them such as a blood stain,
for example, and if I identify what I think might
be a blood stain, then the analysis proceeds from
the very general to the very specific.  Is it a
new blood stain?  There is certain chemical tests
we can do to identify if it is a blood stain.
If it is, indeed, a blood stain, then is it a
human blood stain or is it deer blood, dog blood,
cat blood, things of that nature.  And if it is,
indeed, a human blood stain, then we go forward
and characterize it through its DNA profile to see
who could be the donor of that blood stain.

1   Q   Did you, in fact, perform these tests on those

2       items of evidence that were submitted to you?

3   A   Yes, sir, I examined them to see if there was any

4       biological stains upon them.

5   Q   And what were your results, please?

6   A   I didn't find any blood stains on any of the

7       items.

8   Q   And that included the three items that you've

9       talked to us about, the toboggan, the jeans, and

10      the shirt?

11  A   That's correct.

12          MR. O'DELL:  I believe that's all.

13          MR. SMITH:  Good afternoon, Mr. Della Manna.

14          MR. DELLA MANNA:  Hello, sir.

15          MR. SMITH:  We met once earlier this spring, I

16      don't know if recall or not, but there was another

17      trial in Anniston you testified, different case, I

18      just wanted to say hi.  I don't have any

19      questions.

20          MR. DELLA MANNA:  Hello.

21          THE COURT:  You may come down.  Anything else?

22          MR. O'DELL:  Judge, we would offer at this

23      time the toboggan, and I'm not sure what number

24      that is, let me look and see, State's exhibit

25      number 10, and State's exhibits, I believe they're

1        26 and 27.

2                THE COURT:  Let me speak to you here at the

3        bench just a minute.

4                      (Sidebar conference)

5                      (In open court)

6                      DIRECT EXAMINATION RESUMED

7        BY MR. O'DELL:

8   Q    Mr. Della Manna, when you finished analyzing these

9        items, what if anything, did you do with them?

10  A    I re-sealed the items in the package that they

11       were submitted into with my initials across the

12       seal to insure the integrity of the evidence and

13       then returned them via delivery confirmation

14       through UPS to Investigator Wilson, a detective

15       down at the sheriff's office.

16  Q    Were they delivered in the same or substantially

17       the same condition as when you received them?

18  A    Yes, they were.

19              MR. O'DELL:  I'm sorry, now I would ask

20       that they be admitted.

21              THE COURT:  Okay.  State's exhibits 10,

22       State's exhibits 26 and 27 are admitted.

23                  (Whereupon, State's exhibits 10, 26,

24                  and 27 admitted into evidence at this

25                  time)

1           MR. O'DELL:  Thank you, Judge, and we ask that

2      this witness be excused.

3           THE COURT:  Yes, sir, you're excused.  Thank

4      you very much.

5           MR. O'DELL:  Could we have just a second,

6      Judge?

7           THE COURT:  Yes, sir.

8                  CHRISTOPHER LUCKIE

9     Being duly sworn, testified as follows:

10               DIRECT EXAMINATION

11  BY MR. O'DELL:

12  Q    Would you state your name, please.

13  A    Christopher Luckie.

14  Q    And, Mr. Luckie, where are you from?

15  A    Birmingham, Alabama.

16  Q    What do you do for a living, please, sir?

17  A    I work for the Alabama Department of Forensic

18      Sciences.

19  Q    In what capacity, please, sir?

20  A    I'm a firearms and tool marks examiner in

21      training.

22  Q    Let me ask you if you were here as part of a chain

23      on some evidence?

24  A    Yes, sir, as an employee.

25  Q    Okay.  And what we're going to do is we're going

1       to mark these items.  From where did you get these

2       items, please?

3   A   From our storage room, sir.

4   Q   Okay.  The best way to go about this, would you

5       please, one at a time, take a package and identify

6       it, what it appears to be on the outside, where

7       you got it, please, sir.

8   A   It has our case number and it has an item number

9       which is familiar to me, as well as this one, this

10      one as well, as well you see here, here, here,

11      here, there as well as there.  (Indicating)

12  Q   All right.  Let me you ask on each of these items,

13      where did you get these, please?

14  A   From our storage room.

15  Q   All right, and were they sealed like they are now

16      when you retrieved them?

17  A   Yes, sir.

18  Q   And from the time you brought them up from

19      Birmingham today to right now, have you done

20      anything to them?

21  A   Oh, no, sir.

22  Q   Are they in the same or substantially the same

23      condition right now as they were when you took

24      them out of the locker earlier today?

25  A   Yes, sir.

1          MR. O'DELL:  I believe that's all we have of

2     this witness, Judge.

3          MR. SMITH:  No questions, Judge.

4          THE COURT:  You may come down, sir.

5                        RICH RECTOR

6     Being duly sworn, testified as follows:

7                    DIRECT EXAMINATION

8     BY MR. O'DELL:

9   Q     Mr. Rector, we kind of boxed you in there.  We'll

10        work through it one at a time.  If you would,

11        please state your full name for the record.

12  A     My name is Rich Rector.

13  Q     Mr. Rector, where do you live?

14  A     I live in Tuscaloosa, Alabama.

15  Q     What do you do for a living, please, sir?

16  A     I'm a firearms examiner with the Alabama

17        Department of Forensic Sciences in their

18        Birmingham lab.

19  Q     And how long have you been so employed?

20  A     I've been with the department for 12 years, and

21        I've been exclusively in the firearms department

22        going on five now.

23  Q     Okay.  In furtherance of your duties and

24        responsibilities at the Department of Forensic

25        Sciences, were you asked to examine and do

1    analysis or any kind of analytical tests on any

2    items of evidence pertaining to a homicide case of

3    William Clinton Clayton?

4    A    Yes, sir.

5    Q    If we can go maybe one at a time, if you will

6    identify those bags, these exhibits, and we'll

7    find out what's in them and get them marked, please,

8    sir.

9    A    Is there any particular order you would like me to

10   go in?

11   Q    Which ever way you prefer.

12   A    I would prefer to go in numerical order if that's

13   okay.

14   Q    Okay, that would be fine.

15   A    This bundle I'm taking right now is, let's start

16   with item 1.

17   Q    Please describe them.

18   A    Sealed manilla envelope that I received into

19   evidence in our laboratory.  Item number 2 is a

20   sealed plastic bag identified or actually does

21   contain the expended cartridge casing.  Item

22   number 3 is a brown paper bag that is identified

23   to contain .40 caliber Glock pistol.  Item number

24   4 is a sealed brown paper bag identified to

25   contain shell casings.  Item number 8 is a brown

1    paper bag identified to contain clothing.  Item

2    number 9 is a brown paper bag identified to

3    contain clothing.  Item number 10 is another brown

4    paper bag identified to contain clothing.  And

5    item 11 which is attached to this bundle is a

6    sealed manilla envelope identified to contain a

7    bullet.

8  Q   Okay.  Let's now go back.  Starting in numerical

9    order, if you would, open or let us mark and you

10    open and identify what you have in item number 1,

11    please, sir.

12  A   You say you would like me to open the package?

13  Q   Yes, sir.

14  A   Incidentally, these particular packages are all

15    sealed right now and they have my initials on the

16    outside.

17  Q   While you're opening that, let me ask you this

18    question.  We just had a gentleman testify that he

19    removed those from the locker today.

20  A   Yes.

21  Q   And can you tell us who put those in the locker?

22  A   Sure.  I put those in the locker.

23  Q   All right, are they sealed in the same fashion

24    now as they were when you put them in the locker?

25  A   Yes.

Q    And they appear to be in the same or substantially
     the same condition as they were when you put them
     in the locker?

A    Yes, sir.

Q    Okay, go ahead.

A    Okay, we're at item number 1, and item 1 contains
     an expended full metal jacket bullet.

Q    If you would, describe it for us.

A    Okay, it's -- the bullet is a, like I said, copper
     jacketed metal jacket bullet.  On my examination
     of this bullet based on certain physical
     characteristics I came to the conclusion that this
     was a .40 caliber or 10 millimeter caliber bullet,
     40 and 10 millimeter are basically the same
     bullet, but the cartridges are the differences
     between the two calibers.

Q    Can you tell us where that item came from?

A    This item was identified as coming from the
     passenger door.

Q    That's what it says on the package?

A    Correct.

Q    Do you know from whom you received that?

A    This came in -- I'm not certain.  I don't have
     that receipt right in front of me.  I think
     that's, no, I can't, I can't tell you who I had

|   |   |   |
|---|---|---|
| 1 |   | that from.  You most likely have a copy of that |
| 2 |   | receipt.  I seldom have that, so I don't know. |
| 3 | Q | We'll look for that as you testify. |
| 4 | A | Okay. |
| 5 | Q | Let me back up while he's looking at that and ask |
| 6 |   | you, if you would, for these ladies and gentlemen |
| 7 |   | give us a synopsis of your background and |
| 8 |   | education, please. |
| 9 | A | Okay.  To have the job that I have, the job |
| 10 |   | classification is forensic science.  In the state |
| 11 |   | of Alabama, the requirements are, number one,  is |
| 12 |   | to have a four year degree from an accredited |
| 13 |   | college in a natural science, natural science |
| 14 |   | being chemistry, physics, biology or something of |
| 15 |   | that nature.  The second requirement is in that |
| 16 |   | four year degree to have eight chemistry courses |
| 17 |   | which usually amounts to somewhere in the |
| 18 |   | neighborhood of three semester hours, not always, |
| 19 |   | but eight chemistry courses.  The way you become a |
| 20 |   | firearms examiner, there is no school that you go |
| 21 |   | to where upon graduation you are blessed as being |
| 22 |   | a firearms examiner and given a case load. |
| 23 |   | Firearms examiner is an apprenticeship where you |
| 24 |   | work with other people who have been in the field |
| 25 |   | for quite some time.  That's what I did, I worked |



```
 1              with people who had been recognized as firearms
 2              examiners by our laboratory system and the courts.
 3      Q       All right, I appreciate that.  I believe you were
 4              asking about a receipt.  Let me you ask if this is
 5              what you're talking about?
 6      A       Yeah, this is the one.  I received that bullet
 7              from, well, the bullet was brought into the
 8              laboratory by Bryant Dooley, a contract driver.
 9              It was signed into our laboratory by David
10              Higgins.  I believe he's already presented
11              testimony here.  I then signed the bullet over
12              from Mr. Higgins at a later date.
13      Q       Okay.  Did you receive any other items of
14              evidence?
15      A       Yes.
16      Q       In ballistics form?
17      A       Yes.
18      Q       If you would, take your next one sequently.
19      A       Okay.
20      Q       If you would, open the package and identify it for
21              us.  Item 1 was a projectile from the van; is that
22              correct?
23      A       That's correct.  Item 2, as I described earlier,
24              is a plastic bag containing an expended cartridge
25              case.  The cartridge case is the gold colored
```

1       object in the back.  Again, I received -- I signed
2       this evidence over from Mr. Higgins in our
3       laboratory.
4   Q   Okay, let's have that one marked as well, please.
5       Why don't I go ahead and identify them and mark
6       them all at one time.  If you would, please, Mr.
7       Rector, any other items?
8   A   Sure.  In sequence, item number 3 is the brown
9       bag.  Do you want me to open this?
10   Q   Yes, sir, please.
11   A   Okay, the bag contains a pistol.  This is a Glock
12       model 22, from Smith and Wesson semi-automatic
13       pistol.
14   Q   Okay.  And from whom did you receive that Glock
15       pistol?
16   A   Under the same circumstances.  It was signed into
17       our laboratory from Mr. Higgins and I consequently
18       signed it over from Mr. Higgins.  Also in the bag
19       is an ammunition magazine, it will fit and
20       function in the pistol, and some ammunition,
21       some .40 caliber ammunition.
22   Q   Okay, you can put those back in the bag.
23       THE COURT:  What was the last this thing you
24       said?
25   A   .40 caliber ammunition.

1            THE COURT:  Unfired?

2    A    Yes, sir.

3            THE COURT:  I want to make sure that that is

4    kept separate from the pistol.

5    A    Okay, it's in the bag.

6            THE COURT:  Is the .40 caliber ammunition in

7    the pistol?

8    A    No, it is not.  It's in here as well as the pistol

9    is in here.

10           THE COURT:  I saw you opened the breach on the

11    pistol.  Thank you.  Do you want the sack marked

12    with an exhibit number?  I have asked her to mark

13    the pistol as exhibit 31, the magazine as 31A and

14    the ammunition as 31B.  That leaves the sack

15    unmarked.  Let's mark it as 31C.

16    Q    Just so I won't get confused, item number 1 that

17    you have testified to, the .40 caliber projectile

18    from the van has been marked as State's exhibit

19    number...

20    A    29.

21    Q    29.  And the .40 caliber shell casing from Highway

22    68 is 30?

23    A    Correct.

24    Q    And the .40 caliber Glock pistol, we've got 31 as

25    the pistol, 31A as the magazine, 31B as the



1          ammunition and 31C is the sack?  Item 4?

2    A    Item 4 is another sealed paper bag and it contains

3          two expended Smith and Wesson .40 caliber

4          cartridge casings.

5    Q    Can you tell us from whom you got those casings,

6          please, sir.

7    A    Yes.  Again, that was signed into the lab by Mr.

8          Higgins and I signed that over from Mr. Higgins in

9          the laboratory.

10    Q    And those are two .40 caliber shell casings from

11          the bank/courthouse area?

12    A    Yes, I'll read the bag to you.  It says street

13          between courthouse and Regions Bank.

14    Q    Let's go ahead and get the last one so she can

15          mark those two at the same time.  Item number 11?

16    A    Would you like the two in the one bag and mark the

17          one bag?

18        THE COURT:  Yes, sir, that'll be fine.  Let me

19          tell you what I would even prefer.  If she has a

20          clear plastic bag, put the two cartridges in a

21          clear plastic bag, staple that to the brown paper

22          bag and mark all that as number 32.

23    Q    Okay.  And I believe that brings us to the last

24          item, item number 11?

25    A    Yes, it's a manilla envelope, it's sealed, it's



1      identified to contain a bullet from back.

2   Q   Okay, and from whom did you receive that?

3   A   I received this from an evidence locker within our

4      laboratory.

5   Q   Okay.  And has it got any seal or any -- does it

6      have any markings on it?

7   A   Yes, it has two separate particular markings on

8      it, it has my mark, my seal, my mark, and then

9      another seal that I recognize as one of the

10      pathologists in our laboratory.

11   Q   Dr. Steve Pustilnik?

12   A   Correct.

13   Q   So you received it in that sealed condition with

14      his --

15   A   Yes.

16   Q   If you would, open that up and tell us what item

17      number 11 contains, please.

18   A   Inside is a tissue paper fold.  Some pathologist

19      use that fold to cover items of evidence, and this

20      is another bullet similar to the one before.  It's

21      a full metal jacketed bullet I determined to be

22      consistent within size, physical characteristics

23      with a .40 caliber or a 10 millimeter.

24   Q   Okay.  Let's go back, then, and have you tell us

25      more specifically what kind of test you did,

1    particularly on each of these five items or five

2    separate pieces of evidence.

3           THE COURT:  Let's get that one marked.

4           MR. O'DELL:  I'm sorry.

5           THE COURT:  33 is now marked, it's the

6    envelope containing the .40 caliber bullet.

7  Q    Mr. Rector, let me, just to be certain that I

8    asked you this.  On each of these items, number

9    29, 30, 31 through 31B and 32, I believe your

10   response when I asked you from whom you received

11   them, they were locked into the evidence locker by

12   Mr. Higgins and you -- or they were signed into

13   the lab by Mr. Higgins and you signed for them

14   through the lab, forensic?

15 A    That's correct.

16 Q    Okay.  And then on the last one, this one was from

17   Dr. Pustilnik and you signed it out at the lab as

18   well?

19 A    Correct.

20 Q    Okay.  If you would, tell us what your findings

21   were.  What were you asked to do in this case,

22   please, sir?

23 A    In general what we're asked to do in firearms

24   section most of the time is to examine guns,

25   ammunition, ammunition components which includes

bullets, cartridge casings, sometimes powders, and we're usually asked to examine these and attempt, if we can, to make a determination of whether a particular gun fired a particular ammunition component, a bullet or a cartridge casing, or in some cases if a particular gun did not fire a bullet or cartridge casing. That's the bulk of the work in a firearms examination laboratory. Sometimes we're asked to examine items of clothing, we're asked to perform sometimes tests to determine or to see if we can determine an approximate distance that a gun may have been away from a target when it was fired. But as I said, mainly our job concentrates on identifying or attempting to identify ammunition and its components with guns.

Q   And were you asked to do so in this case?

A   Yes.

Q   And what exactly were you asked to compare, please, sir?

A   To compare the submitted bullets and cartridge casings to the gun that was submitted in this case, to see if this gun did or did not fire.

Q   All right, did you, in fact, conduct such tests?

A   Yes.

Q     And what tests did you do, please, sir, if you
      could tell us how that works?

A     Okay, do you want me to explain the concept of
      identifying?

Q     Yes, sir.

A     All right.  When a gun is made, it's made by
      people like you and me, most of the times in a
      factory.  Now, in the process of making a gun,
      people use tools, and during the course of
      manufacture, these tools make marks on the guns,
      on the barrels, on an area called the breach face,
      sometimes they make marks on other components of
      the gun, but we're mainly concerned with the
      barrels and breach faces of guns.  The barrels in
      most modern guns are riffled.  That means that
      they have high spots and low spots inside the
      barrel that cause the bullet or the projectile to
      twist as it goes out the barrel after the gun is
      fired.  And everybody here has seen a football
      game and seen the quarterback throw a pass.  Well,
      you know, a football is long, and when he throws
      the pass, he puts a spin on that ball.  Well, that
      spin on that ball causes that ball to be more
      stable as it flies, more accurate.  That's the
      same principle behind the rifle and the barrel.

1    It imparts a spin to the bullet or the projectile

2    which causes that bullet to be more stable while

3    it's flying, makes it more accurate.  In doing

4    this in the factory, these tools make marks on the

5    barrels that are individual, they are particular,

6    they are unique to a particular gun.  As the

7    bullet travels down the barrel, these markings are

8    passed from the barrel, from the lands, that's

9    what these high spots in the barrel are called,

10   they're impressed on to the bullet.  So when we

11   recover a bullet, the bullet is submitted, first

12   thing we do is look at the bullet to determine

13   approximately what caliber it may be, what size it

14   is, what kind of gun it come out of, and to see if

15   there is any of these identifiable markings that

16   were passed from the barrel to the bullet that

17   we might be able to use to identify whether a

18   bullet came from a particular gun.  Now, these

19   unique markings are not only found in the

20   barrel, but are also found on other parts of the

21   gun.  In this particular case we'll talk about

22   the breach face of the gun.  Now, if you remember

23   when I held that gun up, I have a handle that I

24   hold and there is a long part up here.  Well, this

25   part here on this particular type of gun is called

1    a slide.  Okay?  Now, the slide when the gun is
2    fired, the recoil from the gun causes the slide to
3    move backwards.  Now, the force that propels the
4    bullet out of the end of the barrel also causes
5    the slide to be forced back to its stopped
6    position.  Well, when it does this, the cartridge
7    case that held the bullet and the powder is shoved
8    against the breach face, it's just slammed against
9    it really hard.  Now, if there are any markings
10   that were made during manufacture on this breach
11   face, they may well be passed from the breach face
12   to the cartridge.  And that's what we use to try
13   and identify or to link cartridge case or shotgun
14   hull or whatever back to a particular gun.  So we
15   have two things we look at.  We have the bullet
16   and we have the cartridge case.
17   Q    Did you follow that procedure and process in
18        analyzing the objects that were submitted to you?
19   A    Yes.
20   Q    Did you, in fact, take item number 3, which you
21        have identified as a Glock pistol -- let me ask
22        you, if you would, to check your record and see
23        what the serial number of that pistol was, please.
24   A    I have the serial number of item 3 is CCN449US.
25   Q    All right.  Taking that .40 caliber Glock pistol

1      with that serial number, did you then do

2      comparison tests on items fired from that weapon

3      with items submitted?

4  A   Yes.  We don't do it -- we can't do a direct

5      comparison between a bullet or a cartridge case to

6      the inside of a barrel or to the breach face.

7      That would be like comparing an apple to an

8      orange.  We want to compare apples to apples.  So

9      what we want to do is take ammunition and we test

10     fire the gun in question and we recover the

11     bullets and the cartridge casings and then compare

12     bullets that we know were test fired or were fired

13     from a particular gun to bullets that are being

14     questioned as to if they were fired from a

15     particular gun.

16  Q  And you did that in this case?

17  A  Yes.

18  Q  Let's go specifically item by item.  On item

19     number 1, .40 caliber projectile from the van.

20     Were you able to do a comparison test from that to

21     see if it was fired from item number 3?

22  A  Yes.

23  Q  And what were your results, please?

24  A  I found item number 1 was, in fact, fired through

25     the barrel of that particular pistol.

Q      Okay.  Item number 2, .40 caliber shell casing
found on Highway 68, did you do a comparison test
on that as well?

A      Yes.

Q      Do you have a finding for us on that one?

A      Yes.

       MR. SMITH:  Judge, excuse me, at this point
I'm going to have to ask if I could take this
gentleman on voir dire briefly.

       THE COURT:  You may.

                    VOIR DIRE EXAMINATION

BY MR. SMITH:

Q      Mr. Rector, before we go any further, you've
testified that the projectiles and the shell
casings have individual characteristics.  Rather
than simply telling us that these shell casings
and these projectiles came from this .40 caliber
Glock, are you going to be able to tell us today
what those individual characteristics were that
lead you to conclude that the projectile and the
shell casings came from the Glock?

A      Do you mean a visual representation of what I saw?

Q      Well, I would simply like to know, you've given us
a conclusion.  But you haven't told us how you
arrived at that conclusion.

1   A      Okay.  Certainly.

2           THE COURT:  Before you begin that explanation,

3   this is a voir dire examination.

4           MR. SMITH:  I simply asked him the question is

5   he going to be able to do that.

6           THE COURT:  And his answer was certainly,

7   which I take to be yes?

8   A      Yes.

9           THE COURT:  Okay.  Now, for voir dire

10  examination, I think you're through.  For cross-

11  examination --

12          MR. SMITH:  Yes, sir.  I didn't expect to go

13  through the whole process with him right now.  If

14  he says he can do it, that's fine, I'll turned it

15  back over to Mr. O'Dell.

16          THE COURT:  Apparently Mr. O'Dell doesn't

17  intend to carry him through that, and I think that

18  would be matter for cross-examination.

19          MR. SMITH:  All right, sir, that's fine.

20          THE COURT:  All right, thank you.

21                DIRECT EXAMINATION RESUMED

22  BY MR. O'DELL:

23  Q      Item number 1, I believe you said that it was

24  fired from the .40 caliber Glock pistol that was

25  submitted to you?

1    A    Yes.

2    Q    Item number 2, the .40 caliber shell casing from

3         Highway 68?

4    A    Yes, I determined that it, too, was fired from that

5         particular pistol.

6    Q    How about item number 4?

7         THE COURT:  I'm sorry, I hate to be so ticky

8    about this, but those items are exhibit numbers

9    now.

10        MR. O'DELL:  I'm sorry.  You're right.

11        THE COURT:  Let's go back and start over.

12   Q    Exhibit number 29, State's exhibit number 29,

13        which purports to be a .40 caliber projectile from

14        the van.

15   A    Yes, I determined it was fired through the barrel

16        of the submitted pistol, State's exhibit 31.

17   Q    Correct.  How about item, exhibit number 30,

18        please, the one .40 caliber shell casing from

19        Highway 68?

20   A    Yes, I determined it, too, was fired from State's

21        exhibit number 31.

22   Q    Okay.  State's exhibit number 32 which contained

23        two .40 caliber shell casings from the bank and

24        the courthouse.

25   A    Yes, I determined that they were also fired in

1      State's exhibit 31.

2  Q   And finally, State's exhibit number 33, the .40

3      caliber projectile from the victim's body.

4  A   Yes.  I determined it also was fired through the

5      barrel of State's exhibit 31.

6  Q   I believe that's got all four of the exhibits that

7      we wanted to have compared; is that correct, Mr.

8      Rector?

9  A   Yes.

10  Q   Okay.

11      MR. O'DELL:  We would move to admit State's

12      exhibits number 29, 30, 31 through 31C, 32 and 33.

13      THE COURT:  All of those exhibits are

14      admitted.

15      MR. SMITH:  Judge, may I be heard?

16      THE COURT:  Yes, sir.

17            VOIR DIRE EXAMINATION

18  BY MR. SMITH:

19  Q   On the last exhibit which was, tell me again, Mr.

20      Rector, was that not the projectile that was

21      recovered from -- that was given to you as having

22      been recovered from the body of Mr. Clayton?

23  A   You refer to State's exhibit 33, I think?

24      MR. O'DELL:  Yes, sir, that's correct.

25  Q   Yes.

1    A    Yes.

2    Q    And you concluded and you just told the jury that

3         that projectile was determined to have been fired

4         from this .40 caliber Glock; is that correct?

5    A    Yes.

6    Q    Well, didn't you say in your report dated March

7         11, 1999, that that projectile lacked the detail

8         for an identification?

9    A    What report are you looking at?

10   Q    I think you have a report I don't have.

11        THE COURT:  Let's take a break for a minute

12   and let them look at their paperwork a minute and

13   give you a break for a minute.   Don't talk about

14   the case and do not allow it to be discussed in

15   your presence.   We'll be in recess.

16            (4:50 P.M.   Recess)

17            (5:07 P.M.   Jury present)

18        THE COURT:  Thank you, ladies and gentlemen.

19   You may be seated.   Had you finished your

20   examination?

21        MR. O'DELL:   I believe I had, Judge, and we

22   took a break and I had one additional question

23   that came to me while you were at break.

24        THE COURT:  All right, go ahead.

25            DIRECT EXAMINATION RESUMED

BY MR. O'DELL:

Q    Mr. Rector, do you recall an occasion when Mr.
     Smith came to the lab?

A    Yes.

Q    Do you recall opening these items of evidence to
     enable him to photograph them?

A    Yes.

          THE COURT:  Which Mr. Smith?

          MR. O'DELL:  Danny Smith, I'm sorry,
     Investigator Smith.

Q    Did he, in fact, photograph them and you re-sealed
     them?

A    Yes.

          MR. O'DELL:  I believe that's all.

          MR. SMITH:  Judge, I have no questions of Mr.
     Rector.

          THE COURT:  Thank you very much, sir, you may
     come down.

          MR. O'DELL:  In that case, Judge, we would now
     move to offer those items that have not
     been admitted into evidence.

          THE COURT:  Exhibits 29, 30, 31, 31A, 31B,
     31C, 32 and 33 are admitted.

               (Whereupon, State's exhibits 29, 30, 31,
                31A, 31B, 31C, 32, 33 admitted into

1       evidence at this time)

2               MR. O'DELL:  Thank you, Judge.  We ask that

3       Mr. Rector be excused.

4               THE COURT:  You are excused.  Thank you very

5       much for being here.

6                           CURTIS MASSEY

7           Being duly sworn, testified as follows:

8                        DIRECT EXAMINATION

9       BY MR. O'DELL:

10      Q    State your name, please, sir.

11      A    Curtis Massey.

12      Q    And, Mr. Massey, where do you live?

13      A    In Fort Payne.

14      Q    And where do you work, please, sir?

15      A    The Fort Payne Police Department.

16      Q    In what capacity?

17      A    I'm an investigator.

18      Q    How long have you been employed by the Fort Payne

19      Police Department?

20      A    Approximately 12 years.

21      Q    In addition to being an investigator, do you serve

22      another function or another role in that

23      department?

24      A    Yes, I do.  On the tactical unit.

25      Q    I'll ask you with reference to your participation

1          with the tactical unit if you had an occasion to

2          be in Cherokee County, Alabama, on March the 6th,

3          1998?

4   A   Yes.

5   Q   If you would, tell these ladies and gentlemen what

6          that involvement was, please.

7   A   To attempt to apprehend a person.

8   Q   Was that at a location at Highway 68/48?

9   A   Yes, it was.

10   Q   Tell us, if you would, when you received a call,

11          if you recall, and how long you stayed at the

12          scene.

13   A   I do not recall what time I received the call.  I

14          stayed until it was over.

15   Q   All right.  We had testimony from a dog handler,

16          Mr. Holladay, that tactical SWAT units from Fort

17          Payne assisted him in the apprehension of Mr.

18          Gavin.  Were you a part of that group?

19   A   Yes, sir.

20   Q   Were you a part -- were you with, physically with,

21          Mr. Holladay at or about the time Mr. Gavin was,

22          in fact, seized?

23   A   Yes, sir.

24   Q   If you would, tell these ladies and gentlemen what

25          that involved, please, and what you observed.

1    A    I was with the dog team, a track was found by a

2         dog and the suspect or a person was seen in the

3         creek and I assisted the dog handler in

4         handcuffing the subject.

5    Q    All right.  After the suspect was handcuffed, what

6         was done with him, please?

7    A    The suspect was -- or the subject was walked up

8         the creek and then walked up an embankment.

9    Q    And how far did you accompany this individual,

10        please?

11   A    I assisted in pushing the subject up the

12        embankment to another person.

13   Q    All right.  And during the time that you were with

14        Mr. Holladay from prior to the, to his

15        apprehension, to the apprehension of Mr. Gavin and

16        to your turning this suspect over to the next

17        person, did you have any conversation with Mr.

18        Gavin?

19   A    Yes, sir, I did.  I told him to stand up and walk,

20        and that was all.

21   Q    Did you or anybody in your presence discuss the

22        circumstances of Mr. Clayton's shooting or the

23        fact that this suspect was believed to be armed?

24   A    No.

25   Q    Did you, in fact, have any, other than what you've

1   just said, was there any other discussion or any

2   questioning of Mr. Gavin?

3   A   No.

4   Q   Did you or any members of the team that was there

5   in that location, did you have any conversation

6   amongst yourselves in the earshot of Mr. Gavin

7   concerning a weapon or the shooting of an

8   individual?

9   A   No.

10  Q   All right.  And I believe you testified that you,

11  you pushed him up to the next level, to the next

12  individual; is that correct?

13  A   Yes.

14      MR. O'DELL:  I believe that's all.  Your

15  witness.

16              CROSS EXAMINATION

17  BY MR. SMITH:

18  Q   Mr. Massey, my name is Bayne Smith, I'm Mr.

19  Gavin's attorney?

20  A   Yes, sir.

21  Q   How long were you on the scene that evening before

22  Mr. Gavin was arrested?

23  A   I don't know.

24  Q   I mean, had you just arrived on the scene or had

25  you been there assisting in the hunt for a period

```
 1              of time?

 2    A    I had been there.

 3    Q    Do you recall?

 4    A    I don't recall how long.

 5    Q    More than an hour?

 6    A    I would say more than an hour, yes, sir.

 7    Q    More than an hour.  When you arrived on the scene,

 8         how many officers were in the area, roughly?

 9    A    I don't know.  I don't know.

10    Q    How many officers were within your immediate

11         eyesight at the time that you arrested Mr. Gavin?

12    A    Immediate eyesight?

13    Q    Yes, s0ir.

14    A    At the time I assisted in arresting Mr. Gavin.

15    Q    Yes, sir.

16    A    There was only me and the dog handler that I saw.

17    Q    Well, how did you get there?

18    A    Through the woods with the dog team.

19    Q    How did you arrive at the site?  I mean, you came

20         in a police car, did you not?

21    A    Yes, I did.

22    Q    Did you come with anyone else?

23    A    No, I was by myself.

24    Q    And you don't recall how long you'd been there?

25    A    No, I don't.
```

Q    And you don't have any idea how many other
     officers were in the immediate area?

A    There was several, but I'm not sure how many.

Q    Okay, several officers.  Where were they?    In
     fact, there is a diagram right behind you there if
     you could sort of tell us.  Tell us, when you
     arrived at the scene, where did you arrive and how
     did you come on the scene?

A    I arrived on the Dogtown road, but I don't know
     any kind of road number.

Q    Okay, well, I don't know Dogtown road, either, but
     this is highway, we been told this is Highway
     68?

A    Yes, sir.

Q    And that would be from, that's Leesburg, and
     that's the direction going towards Collinsville,
     and this is Highway 48 and we heard differing
     testimony, but one of those is 48 and one is
     perhaps another unnamed road.  (Indicating)  When
     you arrived in the area, can you tell us where you
     parked your car and got out?

A    Dogtown road is on this side, on the right-hand
     side.

Q    How far away is that?

A    I don't know.

1      MR. SMITH:  I have no further questions of Mr.

2  Massey.

3      THE COURT:  Anything else?

4      MR. O'DELL:  No, sir.  Ask that he be excused.

5      THE COURT:  Thank you very much, Mr. Massey,

6  you may come down.

7                    CHRIS GRAHAM

8      Being duly sworn, testified as follows:

9                  DIRECT EXAMINATION

10  BY MR. O'DELL:

11  Q    Would you state your name, please, sir.

12  A    Chris Graham.

13  Q    And, Mr. Graham, where are you employed?

14  A    I'm employed by the City of Fort Payne.

15  Q    In what capacity, please?

16  A    I'm a narcotics investigator assigned to the Ninth

17       Circuit Narcotics Task Force.

18  Q    The gentleman that just testified before you,

19       Curtis Massey, testified that he was with the SWAT

20       and tactical unit.  Are you a part of that unit?

21  A    Yes, sir, I am.

22  Q    All right.  And as part of that unit did you

23       travel to Cherokee County or March the 6th, 1998,

24       to try to apprehend a suspect that had run into

25       the woods?

1    A    Yes, sir.

2    Q    Do you know approximately what time you arrived at

3         the scene?

4    A    I remember it was dark.  My tour of duty at that

5         time I was a canine handler, I work from 6 P.M.

6         until 2 A.M.  It was somewhere around 6 o'clock.

7         I had just came in to work, so it was some time

8         during that time frame.

9    Q    I'll ask you if you were on the scene or at that

10        particular site there when Mr. Gavin was

11        apprehended by the dog handlers?

12   A    Yes, sir, I was.

13   Q    Where were you located?

14   A    It's hard to tell by looking at the aerial shot,

15        but to my knowledge I was somewhere right in here

16        parked, seated in my patrol car initially.

17        (Indicating)

18   Q    All right.  And did you get out and go over to the

19        corner of the woods or the edge of the woods?

20   A    Yes, sir.  There was a big, a very, very steep

21        embankment that lead down to a creek and I stepped

22        off the embankment down towards the creek.

23   Q    Okay.  And at some point did you observe Officer

24        Massey and others attempting to help Mr. Gavin up

25        or navigate the, negotiate the embankment?

1    A    Yes, sir.

2    Q    And did you assist in that?

3    A    Yes, sir, I did.

4    Q    All right.  Did you or anybody in your vicinity

5         have any conversation with Mr. Gavin at that time?

6    A    No, sir.

7    Q    Did you have any conversation amongst yourselves

8         concerning the developments, the fact that a man

9         had been shot and that this suspect may be armed?

10   A    No, sir.

11   Q    So there was no conversation whatsoever?

12   A    No, sir.

13   Q    Okay.  And do you recall, were you in sight of the

14        bank, visible from the edge of the road from where

15        you were?

16   A    Yes, sir.

17   Q    Do you know Kevin Ware?

18   A    Yes, sir, I do.

19   Q    Did you see Kevin Ware that night?

20   A    I had seen him, but at that particular time I

21        don't remember seeing him.

22            MR. O'DELL:  I believe that's all.  Your

23        witness.

24                    CROSS EXAMINATION

25   BY MR. SMITH:



1   Q   Mr. Graham, do you know how you arrived at the
2       scene of the manhunt that night?

3   A   In reference to?

4   Q   How you physically got there.

5   A   I drove my canine vehicle, patrol car.

6   Q   That's a good start.  How long had you been on the
7       scene that night when Mr. Gavin was arrested?

8   A   Time frame, I don't know.  Awhile.  It was later
9       that night.  I think I was, myself and a detective
10      from the City of Fort Payne was the first ones to
11      respond other than the first Cherokee officers, so
12      we were there pretty quick.

13  Q   Okay.  And you remained there pretty much during
14      the evening?

15  A   Until it was over.

16  Q   Did you and the other officers, if you can tell
17      us, how did you take up position around this
18      general area?

19  A   When we initially arrived, everybody was starting
20      to come in.  Somebody had dispatched over the
21      radio to set a perimeter around, there was
22      supposedly, I don't know, they described there was
23      a road that sort of enclosed a wooded area, and
24      they set a perimeter up to close the area off, if
25      anybody was in there, they stayed contained in

1      that area.

2   Q   Were you a part of that perimeter?

3   A   Yes, sir.

4   Q   And now this, of course, is only a part of that

5      area, but I think what you're telling us is that

6      the perimeter, from what you're saying, probably

7      would have gone -- and this is not to scale,

8      obviously -- but would have gone up this way

9      somewhere and then go on around to the right and

10      come on back; is that correct?

11  A   To my knowledge.

12  Q   All right.  Were you a part of that perimeter?

13  A   Yes, sir.

14  Q   All right.  Can you show us -- were you on a part

15      that's in the photograph or were you on a part

16      that's not in the photograph?

17  A   Yes, sir, my patrol car was parked somewhere right

18      in this area, it being this time, that's the only

19      time I've been there, first time and last time,

20      and I was parked right on the side of the road on

21      the wrong side of the road facing this way.

22      (Indicating)

23  Q   Uh-huh.

24  A   And from where it appeared they apprehended him, I

25      was just straight looking straight ahead from him.

1    Q     Now, were you and the other officers, after you

2          arrived, what sort of communications did you have

3          amongst yourselves?  Were you talking by radio?

4          Were you talking face to face?

5    A     Not a lot of radio traffic.  We were kind of quiet

6          just in case anybody spotted anybody, but there

7          was some radio traffic.

8    Q     All right.  But as far as your face-to-face

9          communication, how was that conducted?

10   A     Just normal conversation.  Nothing that I would

11         remember that stood out other than wondering where

12         he's at, wonder where he went.

13   Q     Was there any -- During the course of that time,

14         how far away was the furtherest officer or, I'm

15         sorry, the closest officer from you, how far away

16         was he?

17   A     I would say maybe 50 yards at the most to my rear.

18         There was an officer stationed at this

19         intersection right here.  (Indicating)

20   Q     Uh-huh.

21   A     And I was closer to this intersection.  Another

22         officer would have been back this way somewhere,

23         and I believe there were Rainsville officers.  I'm

24         not real sure.

25   Q     Uh-huh.  And were you having any face-to-face

1      conversation with them as opposed to radio

2      conversation or communication with them?

3   A   At which point in time?

4   Q   During the course of the evening.

5   A   I don't think I ever did talk to them at all.

6   Q   Were they talking to each other?

7   A   I have no idea.  I wasn't that close to them to

8      overhear.

9   Q   How about the officers that would have been down

10      posted along this area here, how many officers do

11      you think were down in this area over the course

12      of the evening?

13   A   I have no idea.  I never went that far.  Where I

14      initially arrived is where I stayed most of the

15      time.

16   Q   Uh-huh.  Did you ever have any idea how many

17      officers were around the perimeter?

18   A   Just about every officer in DeKalb and Cherokee

19      County, just about.

20          MR. SMITH:  All right, sir.  That's all I

21      have, thank you very much.  You've been very

22      helpful.

23          MR. O'DELL:  State has nothing further, Your

24      Honor, and ask that this witness be excused.

25          THE COURT:  Thank you, sir.  You may come down

1   and you are excused.  Ladies and gentlemen, I

2   think it's time for us to stop for today.  I would

3   like for us to plan to get started back at 8:30

4   again tomorrow morning.  I'm going to talk to the

5   lawyers about that to confirm in a few minutes

6   that that is a reasonable time for us to begin

7   again tomorrow, but I understand the schedule

8   worked out okay for us this morning to start at

9   8:30, so we'll try to do that again tomorrow, and

10  I'll talk to the lawyers.  But whether I give you

11  a different time or not, I mean, I'll tell Dorothy

12  in a minute if there is going to be a different

13  time, but let's plan on 8:30.  I'll see you in the

14  morning.  Don't talk about the case and do not

15  allow it to be discussed in your presence.  I hope

16  you have a good night.  Good night.

17          (5:25 P.M.  Jury excused for the evening)

18     THE COURT:  I was just going to make sure that

19  we're all still okay with 8:30 in the morning.

20     MR. O'DELL:  Yes, sir.

21     MR. SMITH:  Yes, sir.

22     THE COURT:  Have you got your witness to be

23  here?

24     MR. O'DELL:  We've got everybody lined up and

25  I expect we wouldn't take more than an hour

1      tomorrow, hour and a half at best.

2          THE COURT:  Even with cross?

3          MR. O'DELL:  Yes.

4          THE COURT:  And if that concludes the State's

5      case, are you going to be ready to crank up at 1

6      or 1:15 tomorrow afternoon?

7          MR. SMITH:  Yes, sir.  1:30 would be

8      preferable.  I have some witnesses coming from out

9      of the area.

10         THE COURT:  Well, let's try to make the most

11     of the day.  I would like for us to try to start

12     about 1:15.  I mean, that's only -- I'll split the

13     difference with you, 1 to 1:30.  Let's make it

14     1:15.  But for now, our plans are to start at

15     8:30.  See you then.

16             (5:27 P.M.  Recess for the evening)

17   CENTRE, ALABAMA

18   NOVEMBER 5, 1999

19             (8:37 A.M.  Jury not present)

20         THE COURT:  I'll have the jury brought in if

21       you're ready.

22         MR. O'DELL:  I'm ready.

23         MR. SMITH:  We're ready.

24         THE COURT:  Okay, bring them in.

25

(8:38 A.M.   Jury present)

THE COURT:  Good morning, ladies and gentlemen.  I saw you when you came in this morning, everybody continues to be cheerful and I thank you for that.  I appreciate you being here on time each morning.  Sometimes we kept you waiting a little bit, but you've never kept us waiting and I'm grateful for that, also.  I believe we're ready to pick up again this morning. Is the State ready with their witness?

MR. O'DELL:  Yes, sir, we are.

THE COURT:  Is the defendant ready?

MR. SMITH:  Yes, sir, we are.

MR. O'DELL:  State would call Mr. Joseph Dooley, please.

<u>JOE LANE DOOLEY, SR.</u>

Being duly sworn, testified as follows:

<u>DIRECT EXAMINATION</u>

<u>BY MR. O'DELL:</u>

Q     Would you state your full name for the record, please, sir.

A     Joe Lane Dooley, Sr.

Q     Mr. Dooley, where do you live?

A     I live in Meridianville, Alabama.

Q     What do you do for a living, please?

A    I am a contract driver for the Alabama Department of Forensic Science.

Q    In that capacity, Mr. Dooley, I'll ask you if you had an occasion back on or about March the 6th, 1998, to come to Cherokee County to receive a body, the body of Mr. William Clinton Clayton?

A    Yes, sir, I did.

Q    And from whom did you receive that body, please, sir?

A    I received that body from the coroner.

Q    Mr. Don Rogers?

A    Don Rogers.

Q    And what did you do with that body, please, sir?

A    I transported that body to the Alabama Department of Forensic Sciences in Birmingham, Cooper Green Hospital.

Q    Do you know who you turned it over to?

A    Dr. Stephen Pustilnik.

Q    Was Mr. Clayton's body in the same or substantially the same condition when you received it from Mr. Rogers as it was when you took it to Dr. Pustilnik?

A    Yes, sir, it was.

        MR. O'DELL:  I believe that's all.

        MR. SMITH:  No questions, Judge.

1        THE COURT:  Thank you very much, sir.  You may

2    come down.

3        MR. O'DELL:  We ask that he be excused,

4    please.

5        THE COURT:  Absolutely, you may be excused.

6        MR. O'DELL:  Judge, the State at this time

7    would like to recall Danny Smith.

8        THE COURT:  All right.  You're still under

9    oath.  Thank you.  Have a seat.

10                      DANNY SMITH

11    Being recalled to the stand, testified as follows:

12              FURTHER RE-DIRECT EXAMINATION

13   BY MR. O'DELL:

14   Q    Mr. Smith, we had some testimony yesterday from

15        forensic or ballistics man dealing with some

16        photographs, I believe he testified that he opened

17        some exhibits for you to be able to photograph

18        items; is that correct?

19   A    Yes, sir, he did.

20   Q    Let me you ask to examine these, we have them

21        marked.  Please take them out of the jacket, if

22        you would.  Have you look at those items, those

23        photographs?

24   A    Yes, sir, these are the items that I photographed

25        there at the lab in Birmingham.

1    Q    Okay, let's let Trina mark these and then we'll go

2         through them.

3    A    I said at the lab in Birmingham --

4         MR. O'DELL:  Hold on, she's got to finish

5         marking them.

6    Q    Investigator Smith, let me take these sequentially

7         here.  We have an exhibit marked, a photograph

8         marked as State's exhibit number 34.  Let me you

9         ask to look at that and tell us if you can

10        identify that photograph?

11   A    Yes, sir, this is a photograph that I took at the

12        Department of Forensic Sciences in Birmingham,

13        Rich Rector opened the evidence and allowed me to

14        photograph.  This is the projectile that was

15        recovered, or a photo of the projectile recovered

16        from the passenger door of the 1996 courier van.

17   Q    Does that reasonably and accurately depict the

18        projectile at the time you photographed it?

19   A    Yes, sir.

20        MR. O'DELL:  State would offer exhibit number

21        34.

22        MR. SMITH:  No objection.

23        THE COURT:  It's admitted.

24             (Whereupon, State's exhibit number 34

25              admitted into evidence at this time)



1    Q    Let me you ask to examine State's exhibit 35.

2    A    Yes, sir, this is a photograph of the two spent

3         casings or the two shell casings that was re-

4         covered from the street labeled as being re-

5         covered from the street between the bank and the

6         courthouse.

7    Q    Were those photographed at the same time exhibit

8         34 was, under the same circumstances?

9    A    Same circumstances, yes, sir.

10   Q    Does that photograph reasonably and accurately

11        depict the shell casings at the time you

12        photographed?

13   A    Yes, sir.

14        MR. O'DELL:  We would offer State's exhibit

15        number 35.

16        MR. SMITH:  No objection.

17        THE COURT:  35 is admitted.

18             (Whereupon, State's exhibit number 35

19             admitted into evidence at this time)

20   Q    I'll ask you now to look at what's been marked

21        State's exhibit number 36.

22   A    This is a photograph of the shell casing that was

23        recovered by Larry Wilson on Highway 68, and it

24        was photographed at the Birmingham lab under the

25        same -- at the same time as the others.

1    Q    And does that photograph reasonably and accurately

2         depict the shell casing as it appeared the date

3         you photographed it?

4    A    Yes, sir, it does.

5           MR. O'DELL:  State would offer exhibit number

6         36.

7           MR. SMITH:  No objection.

8           THE COURT:  36 is admitted.

9             (Whereupon, State's exhibit number 36

10            admitted into evidence at this time)

11    Q    Let me ask you also to look at State's exhibit

12         number 37, please.

13    A    This is a photograph of the .40 caliber Glock

14         pistol with the clip positioned in the photograph

15         or the magazine removed from it.  This is also

16         photographed at the Birmingham lab in which Rector

17         opened it, allowed me to photograph it and

18         re-sealed it.

19    Q    Does it reasonably and accurately depict the

20         weapon at the time you photographed it?

21    A    Yes, sir, it does.

22           MR. O'DELL:  We offer State's exhibit number

23         37.

24           MR. SMITH:  No objection.

25           THE COURT:  37 is admitted.

1          (Whereupon, State's exhibit number 37

2          admitted into evidence at this time)

3    Q    Let me you ask if you had an occasion to

4         photograph an item of evidence here at the

5         sheriff's department?

6    A    Yes, sir.

7    Q    Let me ask you to take a look at State's exhibit

8         number 38 and identify that for us, please.

9    A    Okay, this is a photograph that I made here at the

10        sheriff's department.  Investigator Larry Wilson

11        had received back some of the evidence from the

12        forensic sciences involved in this case and the

13        toboggan was one of those items and it was

14        photographed at the sheriff's office here in the

15        presence of Larry Wilson.

16   Q    Does this photograph reasonably and accurately

17        depict the tarboggin at the time you took the

18        photograph?

19   A    Yes, sir, it does.

20             MR. O'DELL:  We would move to admit State's

21        exhibit number 38.

22             MR. SMITH:  No objection.

23             THE COURT:  38 is admitted.

24                 (Whereupon, State's exhibit number 38

25                 admitted into evidence at this time)

Q    Danny, let me you ask if you had an occasion or if you can tell us the make and model of the van that Mr. Clayton was in the night he was killed?

A    The Express van was a 1996 Econoline, I believe it was an F-250 series, had a Birmingham registration on it.

Q    What model was it?

A    1996 Ford, Econoline, F-250.

Q    Thank you.

        MR. O'DELL:  Give me one second, please.

Q    Danny, let me you ask to take a look at this picture, please.  Can you tell us what that is?

A    Yes, sir, this is a photocopy of a slide or a photograph of the creek, the area where the arrest took place of Gavin.

Q    All right, and who took that photograph, please, sir?

A    It's one of the aerial photographs that I had taken.

Q    Okay.  Hold up this overview of that location and ask you if you can point out where that particular photograph appears on this one?

        THE COURT:  What exhibit number is that on the tripod?

        MR. O'DELL:  Exhibit 3, State's exhibit 3.

1  A    Okay.  Again, this is a slide which you can see

2       the power lines, where they're crossing here on

3       the creek, and the creek is running in this

4       direction.  So you're looking at approximately

5       that area right there. (Indicating)

6           MR. O'DELL:  Have this marked.  This

7       photograph has been marked as State's exhibit

8       number 39.  State would offer it at this time.

9           MR. SMITH:  May I ask one question on voir

10      dire briefly, Judge?

11          THE COURT:  You may.

12              VOIR DIRE EXAMINATION

13  BY MR. SMITH:

14  Q    Mr. Smith, can you tell us, is this photograph

15      simply an enlargement of this photograph or is it

16      a separately made photograph?

17  A    Actually when I reduced this photograph to a slide

18      and printed the slide out it reduced the area

19      down.  It's actually an exerpt from the original

20      photograph.  It's not a separate photograph.

21  Q    That was my question.  Thank you.

22  A    It's just more or less extracted that part of it

23      out.

24          MR. SMITH:  No objection.

25          THE COURT:  39 is admitted.

1      (Whereupon, State's exhibit number 39

2      admitted into evidence at this time)

3      MR. O'DELL:  I believe that's all I have of

4      this witness, Judge.

5      MR. SMITH:  I just have a couple of questions

6      of Mr. Smith.

7      FURTHER RE-CROSS EXAMINATION

8      BY MR. SMITH:

9    Q   With respect to State's exhibits number 36 and 37

10         which I believe are the pictures of the single

11         shell casing that was recovered at the scene and

12         also 37 is the Glock, the pistol that was re-

13         covered, at the risk of belaboring the obvious,

14         you said there were, I believe, two shots fired at

15         that scene that night is your recollection and

16         your testimony?

17   A   Up on 68?

18   Q   On 68, yes, sir.

19   A   Yes, sir, that's correct.

20   Q   And you only recovered one shell casing; is that

21         correct?

22   A   That's correct, yes, sir.

23   Q   And in, I think, one of your original statements

24         you stated that the -- when you first saw the

25         individual that fired at you and the first shot

1     was fired at you, you identified the weapon as a

2     revolver; is that correct?

3  A  I believe I did, yes, sir.

4  Q  Okay.  And, again, not to belabor the obvious, but

5     by its very nature, a Glock ejects shell casings

6     after each shot; is that correct?

7  A  If it's functioning properly, yes, sir.

8  Q  And a revolver does not.

9  A  No, sir, it does not, it's considered a wheel gun.

10        MR. SMITH:  Yes, sir.  That's all the

11     questions I have.

12        MR. O'DELL:  State has nothing further of this

13     witness.

14        THE COURT:  You may come down, sir.

15        MR. O'DELL:  State would now call Barbara

16     Genovese.

17        MR. SMITH:  Judge, may we be heard outside the

18     presence of the jury before Ms. Genovese

19     testifies?

20        THE COURT:  You may.  Ladies and gentlemen, I

21     think Dorothy has gone that direction, I'm going

22     to send you this direction.  Please do not discuss

23     this case and please do not allow it to be

24     discussed in your presence.  Please retire.

25        (8:58 A.M.   Jury excused)

1      THE COURT:  Do we need to have her come in?

2      MR. SMITH:  Yes, sir, I think we do.

3      THE COURT:  Go ahead and have a seat.

4      MR. SMITH:  I'll simply state very briefly

5  much the same objection to Miss Genovese's

6  testimony as we made concerning the statements

7  that were testified to yesterday by Deputy Kevin

8  Ware.  I expect that Miss Genovese is going to be

9  asked and that she is going to testify concerning

10  an alleged statement made by Mr. Gavin while he

11  was incarcerated some months after he was

12  arrested, and we're going to make basically the

13  same objection that we made to officer, to Deputy

14  Ware's statements.  First, the State is obviously

15  offering them as a spontaneous admission against

16  interest.  For the record we would note it's our

17  understanding that Mr. Gavin had long since been

18  given his Miranda Rights and had never waived

19  those rights.  We're not suggesting that the

20  statement that's going to be offered in this case

21  is pursuit to any questioning, but we would note

22  that and note that as the basis for our objection.

23  But, more to the point, I think, it's our

24  expectation based on the evidence, based on the

25  statement of Miss Genovese that we've been given

that she is going to testify to a statement that
was made by the accused, and the State is going to
attempt to draw the inference from the statement
that was allegedly made by Mr. Gavin, that it was
in essence a confession to the crime in question,
although it's going to be a very ambiguous
statement, and it is our position that the
statement that is going to be offered is so
ambiguous, and especially under the circumstances
in which it was offered, that is, that Mr. Gavin
was incarcerated, that there was apparently some
type of fracas going on at the time.  But the
State is going to offer the statement by Miss
Genovese and the essence of the statement is going
to be why are you hassling Dewayne Meeks, he
didn't do anything, I did it.  And we simply feel
that that statement, to the extent that it is
offered and to the extent that the State would
have the jury infer that the statement, the
alleged statement by Mr. Gavin that I did it is in
any sense a confession to either of the crimes
with which he is charged here today.  If it is
offered for that reason, it is terribly ambiguous,
and to the extent that the State offers that
inference, it is far more prejudicial -- that the

1     prejudicial effect with this jury far outweighs

2     any probative effect the statement might have

3     toward proving the State's case.  And we would

4     object for those reasons.

5          THE COURT:  Tell me a little about it from the

6     State's point of view.

7          MR. O'DELL:  Your Honor, we think it's a

8     statement that was initiated by Mr. Gavin in

9     response to a question about wanting to go out and

10    exercise with Mr. Meeks.  And as Mr. Smith said,

11    Mr. Gavin, essentially, I expect the witness to

12    testify that Mr. Meeks shouldn't be here, he

13    didn't do anything, I did it.  Whether or not

14    that's ambiguous to Mr. Bayne Smith, you know, I

15    can't say.  But I think that's an issue for the

16    jury to decide whether or not they feel like

17    that's a statement that is ambiguous or not.  And

18    we do want to point out that on this occasion,

19    this particular witness, Miss Genovese, was

20    escorting Mr. Meeks and another prisoner out to

21    an exercise yard, and it was Mr. Gavin who called

22    her to his cell and began the conversation, and

23    his statement is not in response to any

24    questioning of any nature by Miss Genovese

25    whatsoever, and I think Mr. Smith has acknowledged

1       that.

2           THE COURT:  Well, now, I guess the part of the

3       argument that Mr. Smith made that caught my ear

4       was I think he used the word altercation going on

5       at the time.

6           MR. SMITH:  It's my understanding that, and

7       certainly Miss Genovese could testify as to

8       the more particulars of what actually was going on

9       at the time, but it's my understanding that --

10          MR. O'DELL:  I think I can clear that up.

11      According to this witness, there was an earlier

12      time when Mr. Meeks was brought in that Mr. Gavin

13      apparently made a pretty big ruckus and was

14      shouting at guards and threatening guards and

15      talking about doing bodily harm.  And this

16      statement was made, apparently in reference to an

17      earlier, that earlier altercation, where he calls

18      Miss Genovese over.  In fact, I think he called

19      her Bobbi, he said, Bobbi, come over here and he

20      says can I go out and exercise with Dewayne, to

21      which she said no, I don't believe so.  And then

22      there is some conversation about the previous

23      altercation and he said, look, I wasn't going

24      dumping on Dewayne, I was dumping on the guards

25      because Dewayne shouldn't be here.  So there was

1    no altercation on the date this statement was

2    made, and my intention was not to get into this

3    previous argument.  If Mr. Smith wanted to

4    do that, that's fine, but all she was going to

5    testify to was he wanted to know if he could go

6    out and exercise, to which she said no, and he

7    said well, you know, I would like to do that or

8    something to that effect and he said -- that's

9    when he responded, well, Dewayne shouldn't even be

10   here, he didn't do anything, I did it.

11        THE COURT:  Well, it sounds to me -- excuse

12   me, go ahead.

13        MR. SMITH:  Well, I just, you know, to me that

14   simply confirms my earlier understanding of the

15   circumstances and makes the statement all the more

16   ambiguous, and to the extent that the jury would

17   be allowed, and I'm sure encouraged, to infer that

18   that statement by Mr. Gavin was in essence a

19   confession to either of the crimes with which he

20   is charged as opposed to some comment on an

21   altercation that may have occurred at an earlier

22   stage of the proceedings, which we don't even know

23   exactly when it occurred, but clearly there was a

24   prior altercation.  I just think the implications

25   of that statement and the inference that the

District Attorney would undoubtedly have the jury to draw, that that's a confession to the crime. Those implications and those inferences, the prejudicial effect just vastly outweighs any probative effect that the evidence might have, and for that reason we would strenuously object.

MR. O'DELL:  Judge, State's response is that from the opening statements up to this very moment the defense has tried to place the burden for this crime on Dewayne Meeks.  That's the thrust of their case, and this clearly is a situation where the statement was made that Meeks shouldn't even be here, he didn't do anything, I did it.

MR.SMITH:  Well, we still don't know that we're referring to the crime or merely the little fracas that occurred earlier.

MR. O'DELL:  Let me go back to this fracas. The fracas was not a fight between Mr. Meeks and Mr. Gavin, it was a situation where Mr. Gavin was screaming at jail employees.  He was shouting at them and banging on the bars.  It had nothing to do with Mr. Meeks at the time.

MR. SMITH:  Mr. Gavin may well have been referencing his frustration expressed at the guard as opposed to saying Mr. Meeks didn't do anything

1  with the guard, I did it.  It's unclear, it would

2  be terribly unfair to allow the statement.

3      THE COURT:  Well, it doesn't sound to me like

4  the guard on the occasion when this statement was

5  made was causing Mr. Meeks any problem.

6      MR. O'DELL:  That's correct.

7      THE COURT:  So if your argument is that this

8  remark was made by Mr. Gavin to sort of take up

9  for Mr. Meeks, it doesn't sound like the guards

10  were -- there is no evidence they were giving him

11  any problem at the time, other than the fact that

12  they had him in custody.

13      MR. SMITH:  That may well be the case, Judge,

14  and even if that is the case, I still would assert

15  that a statement that, I did it, in the context

16  which occurred months after the arrest and during

17  which Mr. Gavin and Mr. Meeks were both

18  incarcerated is simply too ambiguous, and the

19  inference that the jury would be permitted to draw

20  from that, and as I say, even encouraged by the

21  D.A. to draw from that is simply too prejudicial

22  and has little, if any, probative value to prove

23  an admission against interest with respect to the

24  offenses charged, and we just would strongly urge

25  that the Court should exclude this testimony.

1    THE COURT:  I believe that that is a matter

2    for the jury to determine from the evidence.  It's

3    a question of weight rather than admissibility,

4    and I'm going to allow the witness to testify and

5    you're free to cross-examine her with respect to

6    what "it" was referring to.  So, I'll allow her to

7    testify.

8              (9:09 A.M.  Jury present)

9         THE COURT:  Thank you very much.  You may be

10   seated, please.

11                   BARBARA GENOVESE

12   Being duly sworn, testified as follows:

13                  DIRECT EXAMINATION

14   BY MR. O'DELL:

15   Q    State your name, please, ma'am.

16   A    Barbara Genovese.

17   Q    Let me ask you where you reside, please, ma'am.

18   A    In Cedar Bluff.

19   Q    And I notice you have a uniform on.  How are you

20        employed?

21   A    I'm a supervisor of corrections at the detention

22        center.

23   Q    Here in Cherokee County?

24   A    Yes.

25   Q    Just so I understand we're talking about the

1           Cherokee County Jail.

2        A    Yes.

3        Q    And how long have you supervised activities over

4             there, please, ma'am?

5        A    Be four years in April.

6        Q    Okay.  And you were so supervising and in charge

7             of jail activities back in April of 1998?

8        A    Yes.

9        Q    Let me ask you this, Ms. Genovese.  As a result of

10            your supervision, did you have occasion to have

11            Mr. Keith Gavin in your facility?

12       A    Yes.

13       Q    Incarcerated in your facility?

14       A    Yes.

15       Q    And simultaneously, did you have an occasion to

16            have Mr. Dewayne Meeks incarcerated in your

17            facility?

18       A    Yes.

19       Q    Were they in the same cell or separate cells?

20       A    Separate cells.

21       Q    I'll ask you if you recall an occasion during

22            the time when both were incarcerated in your

23            facility, if you recall being summonsed to Mr.

24            Gavin's cell?

25       A    Yes.

1     Q     What were the circumstances of that, please, ma'am?

2     A     I had went and got Dewayne Meeks out of his cell

3          which was 204, it was on the right side of the

4          jail, upstairs on the cat walk.  I had gotten

5          Dewayne, brought him down to Tim Hudgins' cell,

6          which is another person that was incarcerated for

7          the same type of offense.  When I had opened up

8          the door to let Tim out, Keith had called me to

9          his cell which was 201.

10    Q     All right.  And what exactly do you recall -- how

11         did he get your attention, please?

12    A     Called me Bobbi.

13    Q     And asked to you come over to his cell?

14    A     Yes.

15    Q     Okay.  And when you got to his cell, what, if

16         anything, did he ask you, please, ma'am?

17    A     He asked me could he come out in the exercise area

18         with Dewayne and Tim.

19    Q     Okay, and what did you respond to him, please?

20    A     I said no.  And he asked me why or -- and then at

21         that time when he asked me why, I said because of

22         the screaming and yelling and banging on the doors

23         when Dewayne was initially brought to jail.

24    Q     All right.  And after you told him that you would

25         not allow them to exercise with one another, what

1'  did he say?

2   A   He wanted to know if there was any way, you know,

3       that I would speak to somebody, and I told him

4       that I would.  And he said, well, he said, Dewayne

5       didn't do anything.  He said I did it.  He said

6       Dewayne should not be in here, he should not be

7       locked down, and he was referring to the, I guess

8       the way he was --

9           MR. SMITH:  Object to what he was referring

10      to, Judge.

11  A   He said he shouldn't be locked down.

12          MR. O'DELL:  I believe that's all.

13                     CROSS EXAMINATION

14  BY MR. SMITH:

15  Q   Miss Genovese, no other officer, law enforcement

16      officer or sheriff's deputy overheard this

17      conversation that you heard that you've testified

18      to here today; is that correct?

19  A   That's correct.

20  Q   And you, in fact, don't know what Keith was

21      referring to when he said I did it; isn't that

22      true?

23  A   That's true.

24          MR. SMITH:  That's all I have.

25          MR. O'DELL:  That's all we have of this

1    witness.

2         THE COURT:   Thank you very much.   You may come

3    down.

4         MR. O'DELL:   I think I got this right, Severia

5    Morris.

6              SEVERIA MORRIS

7    Being duly sworn, testified as follows:

8              DIRECT EXAMINATION

9    BY MR. O'DELL:

10   Q    State your name, please, ma'am.

11   A    Severia Morris.

12   Q    And, Ms. Morris, where are you from?

13   A    I'm from Chicago, Illinois.

14   Q    And how long have you lived in Chicago?

15   A    I lived in Chicago since 1967.

16   Q    Where did you live before you moved to Chicago?

17   A    Mobile, Alabama.

18   Q    So you're a hometown girl?

19   A    Yes, I am.

20   Q    Just transplanted.   Let me ask you what you do for

21   a living?

22   A    I am employed with the Illinois Department of

23   Corrections for the past 31 years and I'm a parole

24   supervisor.

25   Q    And as a parole supervisor, do you supervise other

1  parole officers and also supervise parolees.

2  A  Yes, I do.

3  Q  I'll ask you in that capacity if you have

4     knowledge of or have supervised one parolee by the

5     name of Keith Gavin?

6  A  Yes, I have.

7  Q  Could you tell us what your records indicate about

8     Mr. Gavin, what that conviction was, please, ma'am?

9  A  That conviction was held in Cook County, Chicago,

10    Illinois.  He was charged with murdering and

11    intent to kill with injury, and sentenced on 7-8

12    of '82.

13 Q  Okay.  Do you have a photograph in your file of

14    Mr. Gavin?

15 A  Yes, sir, I do.

16 Q  Okay.  Would you produce that for us, please.

17    MR. O'DELL:  Judge, we would offer State's

18    exhibit number 40.

19    MR. SMITH:  Judge, we would object to the

20    relevance of that document or that picture.  I

21    don't know what it adds to the State's

22    presentation.

23    MR. O'DELL:  Judge, Count Two charges murder

24    within the last 20 years, and we have to prove

25    beyond a reasonable doubt to this jury that that

1005

1   is, in fact, the same Keith Gavin we have the

2   conviction for.

3       MR. SMITH:  Ms. Morris is here, and if she

4   wants to identify Keith as her parolee, she can do

5   that.  I would object to that photograph coming in

6   for any reason.

7       THE COURT:  40 is admitted.

8           (Whereupon, State's exhibit number 40

9           admitted into evidence at this time)

10  Q   In light of that statement by defense counsel, Ms.

11      Morris, is Mr. Keith Gavin the gentleman involved,

12      convicted in June 9th, 1982, and sentenced on July

13      8th, 1982, for murder in Cook County, Illinois, in

14      the courtroom today?

15  A   Yes, sir, he is.

16  Q   Would you please point him out for the jury.

17  A   That's the gentleman, yes, sir.  (Indicating)

18      MR. O'DELL:  Let the record reflect that she's

19      pointed out Mr. Keith Gavin.

20  Q   One other question.  The case number we have is

21      812719.  Do your records reflect a case number?

22  A   Yes, sir, it does.

23  Q   Is that the same case number?

24  A   Yes, it is.

25      MR. O'DELL:  I believe that's all.

1'  MR. SMITH:  No questions.

2   THE COURT:  You may come down, ma'am.  Thank

3   you very much.

4   MR. O'DELL:  Judge, we thank Ms. Morris for

5   traveling down and ask she be excused so she can

6   go back to Chicago.

7   THE COURT:  You're excused, Ms. Morris.  Thank

8   you.

9   MS. MORRIS:  Thank you.

10  MR. O'DELL:  Judge, the State would call Mrs.

11  Elizabeth Clayton.

12  <u>ELIZABETH MAYOLA CLAYTON</u>

13  Being duly sworn, testified as follows:

14  <u>DIRECT EXAMINATION</u>

15  <u>BY MR. O'DELL:</u>

16  Q   Would you state your full name for the record,

17      please, ma'am.

18  A   Elizabeth Mayola Clayton.

19  Q   Mrs. Clayton, where do you live?

20  A   In Birmingham.

21  Q   And let me ask you, please, up front, were you

22      related to William Clinton Clayton?

23  A   Yes, I was.  I am.

24  Q   How so, please, ma'am?

25  A   I'm his wife.

1  Q   And how long were you married?

2  A   37, nearly 38 years.

3  Q   I'll ask you if you have a photograph?  Did we ask

4      you to bring a photograph of Mr. Clayton?

5  A   Yes, you did.

6  Q   Could you produce that for us.  For the record,

7      please, Mrs. Clayton, could you identify the

8      person in that photograph?

9  A   That's my husband, Bill Clayton.

10 Q   Does that reasonably and accurately depict how

11     your husband looked on the date of that

12     photograph?

13 A   I would say so, yes, sir.

14     MR. O'DELL:  State would offer exhibit number

15     41.

16     MR. SMITH:  No objection.

17     THE COURT:  41 is admitted.

18        (Whereupon, State's exhibit number 41

19        admitted into evidence at this time)

20 Q   Mrs. Clayton, I have one final question for you.

21     Your husband was killed here in Centre, March the

22     6th, 1998.  Do you know why your husband was in

23     Centre at 6:40 on that night?

24 A   He was going by Regions Bank to get some money out

25     of the ATM to take me out to dinner.  On the

1   weekends we ate out some.

2   Q   Let me ask you one more question.  The last time

3   you saw your husband alive was on what date, please,

4   ma'am?

5   A   At breakfast that morning.

6   Q   And the next time you saw your husband was when?

7   A   Was in the funeral home.

8       MR. O'DELL:  I believe that's all.  Your

9   witness, Mr. Smith.

10      MR. SMITH:  We have no questions, Judge.

11      THE COURT:  Thank you, ma'am, you may come down.

12      MR. O'DELL:  Your Honor, with the testimony of

13  Mrs. Clayton, the State rests.

14      THE COURT:  Ladies and gentlemen, I'm going to

15  ask you to retire to the jury room for a few

16  minutes and I'm going to take up some matters with

17  the attorneys before I tell you what our schedule

18  is going to be hereafter, so let me confer with

19  them for a few minutes and I'll report to you

20  shortly.  Please do not discuss the case and do

21  not allow it to be discussed in your presence.

22  You may retire.

23          (9:17 A.M.  Jury excused)

24      THE COURT:  I indicated yesterday that if we

25  were able to finish this morning, I would not

1      expect the defendant to call any witnesses until

2      after lunch today, but I just want to confirm with

3      you that you will be ready to proceed after lunch

4      today.

5           MR. SMITH:  Yes, sir.

6           THE COURT:  And my hope is that we can start

7      about 1:15, does that still seem a reasonable

8      target for you?

9           MR. SMITH:  Yes, sir.

10          THE COURT:  Are there any matters that we need

11     to take up this morning before we adjourn and give

12     you that break?  Any issues or matters that need

13     to be discussed at this time?

14          MR. SMITH:  We would expect to move for a

15     dismissal of the indictments and all the counts

16     thereunder on the grounds the State has not met

17     its burden of having proved a prima facia case of

18     those indictments.  We can take that up now or

19     after lunch.

20          THE COURT:  I would be pleased for you to make

21     such a motion now.

22          MR. SMITH:  Yes, sir.  We would so move for a

23     dismissal of the indictments and all counts under

24     indictment on the grounds the State has failed to

25     prove a prima facia case as to each one.

1ʾ    THE COURT:  That motion is overruled.  Any

2    other motions?

3        MR. SMITH:  No, sir.

4        THE COURT:  I would like for us to make an

5    inventory, I would like for you to not leave until

6    we've made sure all the exhibits are here before

7    we take this recess.

8        MR. O'DELL:  I think we did that yesterday

9    afternoon, didn't we?  We'll do it again, but we

10    did that yesterday just to be sure it was.

11        THE COURT:  There have been a few more added

12    this morning, so let's make sure we have them all

13    here.  There are a few pieces back here that have

14    not been offered and they have not been exhibited

15    or displayed.  I would like for those to be

16    removed so that we don't mistakenly or accidently

17    get them shuffled in with the others.  And before

18    we all go our separate ways, I guess I would like

19    to talk to you just, again, informally in my

20    office about our schedule.  We're here on Friday

21    and going to start this afternoon and continue

22    into tomorrow, but let's meet informally with a

23    cup of coffee for a few minutes and talk about our

24    schedule for the next few days.  And one of the

25    things that I want to talk to you about, I think,

1  is Sunday.  And I would not -- it is my position I

2  would not require us to go to court, to be in

3  court on Sunday if there was any objection from

4  anybody involved in the case, jurors, witnesses,

5  parties, lawyers, clerks.  That does not

6  include court reporters.  But that is something I

7  want to talk to you about.

8          (Recess)

9          (9:44 A.M.  Jury present)

10      THE COURT:  Please be seated, thank you.

11  Ladies and gentlemen, you know, these cases, this

12  one and any other case, can be somewhat difficult

13  to administer from a scheduling standpoint.

14  Witnesses have to be here at certain intervals and

15  certain times and so forth and it's often

16  difficult to arrange a case and administer a case.

17  The lawyers work hard to do that and the Court is

18  involved in some of that and we just have to all

19  work together to try to make sure things flow

20  evenly and easily for everybody's benefit.  I have

21  decided that what I'm going to do is not require

22  Mr. Smith and his team to have their witnesses

23  here until after lunch today.  So, that means that

24  we're going to be in recess until after lunch.

25  Now, I realize that that's some inconvenience for

1013

1>   THE COURT:  And there being none, has any

2    member of the jury seen any news accounts or read

3    any news reports of this case in violation of my

4    instructions to you?

5         (No audible response)

6    THE COURT:  There being none, we will be in

7    recess until 1:15.  Thank you very much.

8         (9:47 A.M.  Jury excused.

9    THE COURT:  We stand adjourned.

10        (Recess)

11        (1:56 P.M.  Jury not present)

12   THE COURT:  Bayne, are y'all about ready?

13   MR. SMITH:  We're ready, Judge.

14   THE COURT:  All right.

15        (2:00 P.M.  Jury present)

16   THE COURT:  After you all left we got worried.

17   We remembered that Dorothy would be leading the

18   way and you might end up in Atlanta.  When you

19   didn't get back quite at 1 or 1:15, we knew you

20   were in Atlanta.  I hope you had a nice leisurely

21   lunch and thank you so much for your patience.  Is

22   the defendant ready with the first witness?

23   MR. SMITH:  Defendant is ready, Your Honor.

24   THE COURT:  You may call your first witness,

25   please, sir.

1    MR. UFFORD:  Dr. Klimasewski.

2    THE COURT:  Come around, please, sir.

3    DR. TED KLIMASEWSKI

4    Being duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MR. UFFORD:

7    Q    Would you state your name again, please.

8    A    It's Ted Klimasewski, but you can say Dr. K.

9    Q    Do you not use the Klimasewski?

10   A    Not too often, yeah.  I teach at the university,

11        so to make it easier for the students we say Dr.

12        K.

13   Q    That is the name you use, then?

14   A    Yes.

15   Q    Then I'll call you Dr. K.  Dr. K, you say you work

16        at the university.  What is your field of

17        expertise?

18   A    I am a full professor at Jacksonville State

19        University and Climatology is my expertise as well

20        as T.V. meteorology.

21   Q    Climatology, now, what does that entail?

22   A    Climatology is looking at weather data or weather

23        information over long periods of time rather -- a

24        meteorologist would look at information today to

25        try to figure out what was going to happen for



1       tomorrow, for example.

2   Q   Do you also do that type of work?

3   A   Yes, I do weekend weather at Fox 6 in Birmingham.

4   Q   And meteorologist work is very closely related to

5       climatological work of a climatologist; is that

6       correct?

7   A   Yes, they're both essentially the same.

8   Q   So you've had experience as a meteorologist, also?

9   A   Yes.

10  Q   What do you teach at JSU?

11  A   At Jacksonville State University I teach

12      meteorology and climatology, the courses that deal

13      with the weather.

14  Q   Okay.  And you also work as a meteorologist for a

15      television station; is that correct?

16  A   Yes.

17  Q   Okay.  And how long have you done that?

18  A   Well, this one at Fox 6, I started doing this

19      since April.  I used to work at T.V. 40 at

20      Anniston, Alabama, for 12 years doing that.

21  Q   Prior to the Fox 6?

22  A   Yes.

23  Q   Okay.  And did you work before that as a

24      meteorologist?

25  A   There were a couple of one episode in Huntsville

```
1   for a short period of time, and Birmingham back in
2   1990, also.
3 Q  Okay.  How long have you worked as a professor of
4   climatology?
5 A  25 years.
6 Q  All right.  And where did you receive your
7   Bachelor's Degree?
8 A  At Central Connecticut State University.
9 Q  And your Master's Degree?
10 A  At Peabody College at Vanderbilt University.
11 Q  And your Ph.D?
12 A  At the University of Tennessee.
13 Q  Was that in 1974?
14 A  Yes.  Yes.
15 Q  Okay.  And what's your title at Jacksonville
16   State?
17 A  Full Professor.
18 Q  Okay.  Dr. K, I'm going to ask you some questions
19   regarding temperature, temperature on a certain
20   day in 1998.  Would you -- Would that be within
21   your field of expertise, within your field of
22   studies, what you teach, what you do, what you
23   research, those kind of things?
24 A  Yes.
25 Q  Okay.  Is there a place where you gather
```



1       scientific data that shows weather conditions?

2    A  Yes.  NOAA at -- the National Weather Service is

3       part of NOAA, and we get our information from the

4       National Weather Service.

5    Q  Okay.  You get your data from the National Weather

6       Service, and I'm going to show you a document and

7       I'm going to ask you to tell us if that document

8       is a regular official document that you use in

9       your profession for the purposes of your

10      profession and professions?

11   A  Yes.

12   Q  Okay.  In that regard, I would like to ask you on

13      the evening of March 6th of 1998, could you tell

14      me what the time sunset was?

15   A  The time of sunset is 5:45 according to this

16      climatological data for the month of March.

17   Q  And that climatological data is what you use when

18      you study weather, when you report about weather

19      and that kind of thing; is that correct?

20   A  Yes.

21   Q  5:45 P.M. would be sunset.  Now, in the course of

22      your studies and regarding weather and those

23      things, is it part of that that you determine

24      daylight and dark conditions?

25   A  Yes.  Yes.

1    Q    Okay.  This time of year, March 6, 1998, if the

2          sun goes down at 5:45, what time does it get dark?

3    A    You could bet on a dark moment probably at 6

4          o'clock would be a safe time to say that it's

5          dark.

6    Q    Okay.  On the evening of March 6th of 1998,

7          obviously after 6:45, 6:40, 6:35, would it be

8          dark?

9    A    Yes.

10    Q    Okay.  What was the temperature that night, that

11         evening?

12    A    Okay, temperature information comes from, one

13         source of information, the climatical data for

14         March and...

15    Q    Do you have something that would refresh your

16         memory regarding that?

17    A    Yes, that piece of paper would.

18    Q    I'm showing you this piece of paper which you are

19         using to refresh your memory, and I'm going to ask

20         you if at one point you knew this without the

21         refreshing of your memory, but you're using that

22         now?

23    A    Yes, yes, because there is information on this

24         sheet of paper from March 1st until March 8th.

25    Q    Okay.  March 1st through March 8th, 1998?

1   A   Right.

2   Q   Okay.  Not so much concerned about March 8th, but

3       I might be concerned about March 6th and March

4       7th, but not March 8th; do you understand?

5   A   Yes.

6   Q   I guess that would be, March 7th would be the end

7       of a week; is that --

8   A   Yes.

9   Q   -- of a seven-day period.  Actually it begins

10      March 1st, so I'm not really interested in March

11      8th with my questions today.  I would just ask

12      you, then, again regarding the evening of March

13      6th after 6:50 P.M., 6:53, 6:50 P.M. to 7 o'clock

14      -- I mean to 10 o'clock that evening, what would

15      have been the range of the temperature that

16      evening?

17  A   From looking at the data that I have here, I would

18      suspect that the temperature at that time would be

19      between 47, possibly 48, 49 degrees.

20  Q   Between 47 to 49.

21  A   Yes.

22  Q   Okay.  For the time prior to that, March 1st

23      through that evening, was there anything unusual

24      about the weather pattern for that week?  Was

25      there anything remarkable as far as the weather in

1      this part of Alabama?

2   A  Probably if you look at that week and then you

3      compare it to all the records that have been

4      established, say high record and low temperature

5      records, you could suspect this was very typical

6      of March.  There is some fluctuation of

7      temperatures during the week.

8   Q  But not unusual?

9   A  There is no record lows, there is no record highs.

10  Q  Okay.  What about the morning, what were the

11     morning lows on the period prior to March 6th,

12     1998?  If you would just tell me, if you could, by

13     the dates.

14  A  Okay, the low morning temperatures?

15  Q  Yes.

16  A  The minimum temperatures, there were on the 2nd,

17     3rd, 4th and 5th temperatures that were below

18     freezing or near to freezing.  So temperatures

19     went from 30, 33, 30 and 29 degrees.  On the 5th

20     it was 29 degrees in the morning.

21  Q  So the day before.

22  A  Yes.

23  Q  It was 29 degrees in the morning.  Now, regarding

24     the weather patterns that you saw there, which you

25     have stated there, would there be any reason to

1'          think that water temperatures would be any higher

2          than normal on March the 6th, 1998?

3   A    No, because the morning temperatures were below

4          normal between the 2nd and the 5th, and also

5          afternoon temperatures were essentially below

6          normal from the 2nd to the 5th, also, even on the

7          6th they were below normal on the afternoon.

8   Q    Okay.  Dr. K, I've been discussing the weather.

9          In talking about the weather, we're talking about

10         the weather around here.  You've been giving us

11         this information, I think the jury may understand

12         we're talking about the weather around here, but

13         is that the weather conditions that you're

14         referring to here in Cherokee County towards

15         Collinsville from here, between here and

16         Collinsville, is that where you determined these

17         weather conditions to exist?

18   A    The weather data itself comes from Gadsden, from

19         the airport in Gadsden.  So the data itself is

20         from Gadsden.  However, since we don't have

21         weather gauges and temperature gauges everywhere

22         and in every neighborhood, we have to figure out

23         what's happening in one place and assume that it's

24         happening in another place.  We call that

25         interpolation.

1   Q    And that interpolation, when you say we call it,

2        when you refer to we, would that be your

3        colleagues in the profession?

4   A    Yes.  Yes.

5   Q    And in the professions that you deal, that is

6        standard practice; is that correct?

7   A    Yes.

8            MR. UFFORD:  Nothing further.

9            MR. O'DELL:  Just one question.

10                    CROSS EXAMINATION

11   BY MR. O'DELL:

12   Q    Doctor, I believe you told Mr. Ufford that you

13        make an assumption that that's what the

14        temperatures would be in this location; is that

15        correct?

16   A    Yes.

17   Q    So by interpolation you're making a guess, but you

18        have no way of knowing how cold or how hot it was

19        at that location on that night, do you?

20   A    We know what the temperatures are in a number of

21        locations in this area, and then what we

22        anticipate is that if the temperatures are this

23        degrees in all these other locations, then it must

24        be that temperature at that particular spot.

25   Q    You say it must be?

1   A   Oh, it's interpolated that's what it is, yes, sir.

2   Q   But you don't know for sure, do you?

3   A   We don't know for sure.

4           MR. O'DELL:  That's all.

5           MR. UFFORD:  Nothing further.

6           THE COURT:  Thank you very much, sir.  You may

7   come down.

8           MR. SMITH:  Judge, may we approach?

9           THE COURT:  You certainly may.

10              (Sidebar conference)

11              (In open court)

12          THE COURT:  Ladies and gentlemen, we're going

13  to take a recess for just a few minutes.  Please

14  don't discuss the case or allow it to be discussed

15  in your presence.

16              (2:17 P.M.  Jury excused)

17              (2:52 P.M.  Jury not present)

18          THE COURT:  How are we doing?  Are we ready to

19  get started back.

20          MR. SMITH:  Yes, sir.

21          THE COURT:  All right, bring in the jury.

22              (2:53 P.M.  Jury present)

23          THE COURT:  Thank you, ladies and gentlemen.

24  Please be seated.  You may call your next witness.

25          MR. UFFORD:  Mark Edward Meade.

1                 DR. MARK EDWARD MEADE

2        Being duly sworn, testified as follows:

3                DIRECT EXAMINATION

4 BY MR. UFFORD:

5 Q    State your name for the court, please.

6 A    Mark Meade.

7 Q    Mr. Meade, what's your full name?

8 A    Mark Edward Meade.

9 Q    Yes, sir.  How are you employed?

10 A    I'm a Professor in the biology department at

11      Jacksonville State University.

12 Q    So that would mean that you're a professor.  Does

13      that mean you're a Ph.D?

14 A    Yes, I am.

15 Q    Okay.  So that would be Dr. Meade.

16 A    Yes.

17 Q    Could you tell this Court if you have expertise

18      regarding human physiology, just yes or no?

19 A    Yes.

20 Q    And based -- What is that expertise?  What

21      education, what knowledge, what experience, what

22      is that based upon?

23 A    Well, my teaching background since I was a

24      graduate student years ago is teaching human

25      physiology, medical physiology.  I teach courses,

1      preparatory courses for students that are going to

2      go to medical school.  I've tutored from time to

3      time UAB medical students in physiology and

4      related disciplines.

5   Q   Okay.  That would be human physiology; is that

6      correct?

7   A   Yes.

8   Q   Okay.  Based on your area of study and your

9      teaching art and your skills acquired thereby and

10      knowledge acquired thereby, do you have knowledge

11      and information regarding the affects of

12      temperature upon the human body?

13   A   Yes.

14   Q   Okay.  Would this include the impact of the

15      presence of water upon or about the human body?

16   A   Yes.

17   Q   Is there a condition, very commonly known

18      condition, that, a term for the condition, of the

19      impact of water upon the temperature of the human

20      body?

21   A   Yes.

22   Q   What is that term?

23   A   Hypothermia.

24   Q   Okay.  Let me you ask, first of all, if the

25      temperature on the outside of, on the outside, a

1    human, a person were in 48 degree, 47, 48, 49, say

2    48 degree temperature and they stepped into water

3    that was 55 degrees, would they notice that it was

4    warm?

5  A  Yes, immediately they would.

6  Q  Would that be the initial feeling?

7  A  Yes.

8  Q  Okay.  Would it be instantly perceived?

9  A  Yes.

10 Q  Okay.  But, water -- Well, let me ask you what

11   temperatures can hypothermia set in?

12 A  Any temperature below body temperature.

13 Q  Generally, I think it's general knowledge 98.6;

14   is that correct?

15 A  That's correct.

16 Q  Thereabouts.  So, let me ask you about an

17   individual, 48 degrees outside, an individual with

18   the general characteristics of Mr. Gavin, have you

19   generally just taken note of his general

20   appearance, examined him as far as size and

21   height?

22 A  Yes.

23 Q  An individual such as Mr. Gavin, of that build and

24   all, if he were submerged in water in a creek in

25   this area, submerged in water, and the temperature



1       outside was 48 degrees thereabouts, and he were

2       submerged in water up to his waist, what would be

3       the affect on that individual after an hour?

4    A  Very good possibility that person would be

5       unconscious following an hour of exposure, of

6       exposure to that kind of temperature.

7    Q  What other things might the individual experience

8       if he were not unconscious after an hour?

9    A  Well, the body is going to respond by trying to

10      maintain core body temperature, which means the

11      extremities are going to be the first to respond

12      or show the first effects of hypothermia.  Blood

13      is going to be shunted from the extremities, from

14      the legs to the arms, again to the core, to try to

15      maintain body temperature.  The legs would more

16      likely go numb.  The person may experience, after

17      prolonged exposure, actually completely lose the

18      feelings in the extremities.  They may get drowsy,

19      lethargic, incoherent of their surroundings with

20      prolonged exposure.

21   Q  You're talking about an hour here to his waist.

22   A  An hour is long enough to, again, induce

23      unconsciousness at those sorts of temperatures.

24   Q  Why is that?  Why did he lose that -- You said

25      something about not being aware of his



1     surroundings or something of that nature?

2     A    Again, because the blood is cooling, the heart

3          rate will slow, the blood flow to the brain is

4          going to decrease and slow down.  Again, leading

5          to the lethargic state of the person, feeling of

6          drowsiness.  Person may want to fall asleep or

7          think that they're getting tired and they want to

8          go to sleep, again, because of the decrease blood

9          flow, decreased heart rate, and that sort of

10         effect.

11    Q    When you say lethargic, does that mean anything

12         regarding movement?

13    A    Yes.  Obviously, if someone's blood flow is

14         decreasing to your extremities, blood slowing

15         down, legs are going numb, the mobility of that

16         person is going to be drastically reduced.  Again,

17         the person may feel like they're going to sleep

18         and actually just want to stay where they are and

19         go to sleep.

20    Q    And if that person is able to be removed from that

21         water, how long would those conditions of

22         inability to move and as you have just described,

23         how long would that go on?

24    A    Again, based upon exposure time, again, assuming

25         an hour, it's not going to be an immediate

1    response.  There are emergency techniques,

2    treatments for persons that have undergone

3    hypothermic conditions.  You don't just warm a

4    person up and then they regained full abilities.

5    In fact, that can cause damage to the person in

6    the long run, potentially cause other problems.

7    But within a person exposed an hour, temperature

8    50 degrees, water, it's potentially going to take

9    an hour or several hours to recuperate from that

10   condition.  But it's not going to be

11   instantaneous.  It's not a matter of just warming

12   that person up and then they're fine.

13   Q    Would they have difficulty walking?

14   A    Definitely, if -- again, their lower extremities

15        was the part of their body that had been exposed.

16   Q    Okay, could it be that they couldn't walk?

17   A    Yes, that's very likely, the possibility.

18   Q    What about if that individual were in the water

19        for two hours?

20   A    Prolonged exposure to --

21   Q    I'm talking about two hours, doctor; do you

22        understand?

23   A    Yes.

24   Q    From your expertise, we're talking about the same

25        individual.

1   A   Two hours, more than likely, again, the person was

2       unconscious, but, again, at this point in time

3       you're talking about reducing core body

4       temperatures to the point that they could become

5       or you could reach a lethal situation where this

6       person could actually die from this condition.

7   Q   You're talking about death after two hours, so

8       we've gotten from a stage of lethargy, immobility,

9       reduced mental function, to death.  From that hour

10      to that two hours does there become a point where

11      you lose mobility completely?

12  A   Yes, obviously, again, that person, the body will

13      actually respond or the brain will be interpreting

14      to that person that they're basically tired and

15      they want to go to sleep, and that's basically

16      what happens to hypothermic or in a hypothermic

17      situation where someone becomes so cold in their

18      bodies, their functions decrease to the point that

19      they basically just fall asleep and die from heart

20      stopping below a particular core body temperature.

21  Q   Okay.  Would you say a person would be unable to

22      move under those conditions in this situation?

23  A   Obviously, yes.

24  Q   Okay.  The mental function, even less?  I mean --

25  A   Yes.

1   Q     Could you say that they may not be able to speak

2          at that point?

3   A     Yes, obviously, with decreased brain functions

4          abilities, your ability to make coherent speech

5          and such would be inhibited and, in fact, that is

6          one of the, again, signs of hypothermia is the

7          disorientation and inability to function from all

8          standpoints, whether it's moving around or

9          speaking or what have you in terms of mobility and

10         functions of that person.

11  Q     What about three hours?

12  A     Three hours in 50 degree, 48 degree water for even

13         the healthiest of individuals is likely to result

14         in death of that individual.

15  Q     When you say likely to result, is that --

16  A     Well, I know of no cases where anybody has

17         survived three hours exposure to 50 degree water.

18  Q     Okay.  That's part of your research, the types of

19         things you do, you study the cases and the

20         research they do and the tests they do and the

21         research they have done and the situations where

22         these things happened; is that correct?

23  A     Yes.

24          MR. UFFORD:  Just one minute, Dr. Meade.

25         Judge, if I may.



1   Q   Let me ask you regarding if this same individual

2       were in the water up to his shoulders, maybe up to

3       his neck, his chest area, to his chest area, after

4       one hour temperature out, say, is 48, he's in a

5       creek.

6   A   It's a good possibility that that individual

7       wouldn't survive an hour submerged in water

8       temperatures of such.

9   Q   To that level?

10  A   To that level, that's correct.

11  Q   What about two hours?

12  A   Well, again, the cases that I'm aware of survival,

13      survival is typically between one and three hours

14      at that temperature, again, based upon the depth

15      that you're submerged and the fitness of the

16      person, but, again, you're looking at the

17      likelihood that that person won't survive that

18      length of time submerged up to their chest in 40

19      or 50 degree water.

20  Q   Okay.  So it's possible death at one hour.  What

21      about two hours?

22  A   Well, again, death is a possibility, but it's

23      unlikely that they would live for that length of

24      time in that temperature.

25  Q   What would be the condition of a person that was

1      brought out of the water after an hour, between an

2      hour to two hours, this person that we're using in

3      our hypothetical here?

4   A   Well, again, the likelihood that this person is

5      going to be completely incoherent to their

6      surroundings, lethargic, unable to physically get

7      out of the water at that point in time because of

8      the effects of hypothermia to their limbs and

9      their over all system.

10   Q   What about three hours?

11   A   Again, it's unlikely they would survive that

12      length of time, so death or the possibility of

13      death is increased even more.  But, again, it's

14      unlikely they're going to survive that long at

15      that temperature.

16   Q   It's possible they would be dead in an hour --

17   A   Yes.

18   Q   -- submerged to that height.  What if the water

19      were 30 degrees?

20   A   You're talking a matter of minutes, 15 minutes to

21      half an hour, somebody could easily die to

22      exposure.  Again, depending upon the fitness of

23      the person.  But your body losses heat 25 times

24      faster in water than it does in air, and it's just

25      amazing at how quickly the body would decrease in

1   terms of its core temperature.  Your heart shuts

2   down when your body temperature goes below about

3   85 degrees.  So, again, the likelihood of

4   surviving very long in 30 degree water is not very

5   good, even for a short period of time, 15 minutes.

6   Q   What if they were submerged just to their waist?

7   A   At 30 degrees, again, as I mentioned for someone

8   at 50 degrees, they're going to lose function in

9   those limbs that are exposed to that water

10  temperature.  If it's their lower body, again,

11  their lower limbs are going to become numb, the

12  chance of even when bringing that person out from

13  that condition, the changes of regaining function

14  in those limbs is highly reduced.  It may even

15  lead to amputation or loss of limbs, complete loss

16  of function in those sorts of temperatures.

17  Q   What about two hours?  Would they make it an hour?

18  Would they make it an hour at the waist in that

19  kind of water?

20  A   They would likely be unconscious or to the point of

21  unconsciousness and, again, based upon the

22  individual, 30 minutes to an hour could be the

23  maximum time they could survive.  But it's likely

24  that death will occur, there is more likelihood

25  that death will occur at that sort of low

1    temperature.

2    Q    Is this hypothermia that you're describing?

3    A    Yes.  Yes, all the conditions I've been speaking

4         of are hypothermic conditions.

5    Q    Let me ask you this -- these conditions that

6         you've discussed, what about if the individual is

7         wearing blue jeans, what if he's wearing, you

8         know, good substantial leather shoes, he's wearing

9         a thick cotton knit shirt, undershirt, are these

10        conditions going to be changed significantly by

11        the fact that he's clothed?

12   A    Not significantly unless this person is wearing

13        clothing that has been specifically designed for

14        survival in cold water.

15   Q    That would be a specialized suit that something

16        like the Navy SEALS or something?

17   A    Yes, that's correct.  That's correct.

18   Q    So regular clothing, are you saying would have --

19        make little or no difference to what you just told

20        us?

21   A    Little or no effect, yes.

22   Q    Okay.

23            MR. UFFORD:  That's all.

24                   CROSS EXAMINATION

25   BY MR. O'DELL:



1   Q   Dr. Meade, let me show you the photograph, please.
2       I believe you testified under the condition,
3       whether it was one hour or two hours or three
4       hours, at some point an individual who was in a
5       creek and temperatures somewhere around 50 would
6       become lethargic, have trouble walking, have
7       difficulty using their limbs; is that correct?
8   A   That's correct.
9   Q   Would that include the ability to climb up a steep
10      hillside?
11  A   Yes, it would.
12  Q   And they would require assistance?
13  A   Yes.
14  Q   Your testimony today is very general and I
15      appreciate the opportunity to hear what you have
16      to say, but, truth is, you don't know what the
17      outside temperature was on Highway 68/48 on March
18      6th, 1998, do you?
19  A   No, I do not.
20  Q   And you do not know what the water temperature was
21      at that time, do you?
22  A   No, I do not.
23  Q   So what you're giving us is general information
24      which has really no specific bearing on our
25      circumstances as far as you know.



1     A     As far as I know, that's correct.

2     Q     Generally when people lose heat, where do they

3           lose it the fastest?

4     A     From the extremities, from their arms and legs.

5     Q     How about through the head?

6     A     Because of trying to maintain brain functions,

7           your brain is, obviously, a major organ

8           that's controlling functions of the rest of your

9           body.  Your body will try to conserve as much heat

10          as it possibly can with the core of vital organs

11          and in the brain.

12    Q     Would wearing something such as a toboggan help in

13          that respect?

14    A     Yes.

15    Q     Significantly, wouldn't it?

16    A     Significantly, yes.

17    Q     What about the impact of adrenaline on your

18          scenario here?  If somebody was greatly excited or

19          anxious or upset?

20    A     The fight or flight response that you're speaking

21          of regarding an adrenaline rush and such would

22          potentially affect the ability or the amount of

23          time that someone could withstand certain

24          temperatures.  Again, it's going to vary quite a

25          bit among individual from individual to

1   individual, so it's hard to say about one specific

2   person, what that effect would be.

3   Q   Got one other question, Dr. Meade, and maybe you

4       might not be able to answer this, but assuming the

5       temperature was 47 to 50 degrees in the water.

6   A   Uh-huh.

7   Q   Can you give us any reason why someone would want

8       to risk their life to spend any considerable

9       amount of time in a creek like that?

10          MR. SMITH:  Object to that question, Judge.

11      That calls for a conclusion.

12          THE COURT:  Sustained.

13          MR. O'DELL:  That's all.

14          MR. UFFORD:  Nothing further of this witness.

15          THE COURT:  Thank you very much, sir.  You may

16      come down.

17          MR. SMITH:  May I go get our next witness,

18      Judge?  Be just a moment.

19          THE COURT:  Yes, sir.

20          MR. SMITH:  Call Mr. Pat Coffey.

21                  PATRICK EARL COFFEY

22      Being duly sworn, testified as follows:

23                  DIRECT EXAMINATION

24   BY MR. SMITH:

25   Q   State your name for the record, please, sir.



```
1    A    Patrick Earl Coffey.

2    Q    Where do you live, Mr. Coffey?

3    A    I live in Lawrenceville, Georgia.

4    Q    Where are you employed?

5    A    I'm self-employed.  I own a private investigation

6         firm in Lawrenceville, Georgia.

7    Q    Could you tell us briefly your professional

8         background.

9    A    I'm retired criminal investigator from the

10        Department of the Army.  I served 20 years with

11        the Department of the Army as criminal

12        investigator and criminal police investigator, and

13        then once retired I became self-employed as a

14        private investigator.

15   Q    And what is the nature of your employment now, you

16        said?

17   A    I own a private investigation firm in

18        Lawrenceville.

19   Q    Lawrenceville, Georgia?

20   A    Georgia.

21   Q    Do you have any areas that you have, in essence,

22        specialized knowledge as a result of your

23        professional background and your education?

24   A    I have extensive training in crime scene

25        processing, blood splatter interpretation, and
```

1       collection of crime scene evidence.

2   Q   Can you tell us some of the schools that you've

3       attended to develop that information and that

4       knowledge?

5   A   I attended the basic criminal investigation

6       course, which is 16 weeks long.  I attended the

7       scene management and examination course through

8       the advanced detective training school, Scotland

9       Yard.  I attended the blood spatter interpretation

10      course.  I've been an instructor in the physical

11      evidence branch for three years.  I have

12      accumulated about 3,000 hours of training in

13      criminal investigations.

14  Q   Okay.  Have you ever testified in various judicial

15      proceedings previously?

16  A   Yes, I have.  I've testified in federal court, in

17      military court marshals, and state court of

18      Georgia.

19  Q   And in what capacities have you testified?

20  A   Most of my testimony is as a criminal investigator

21      for the government.  I have testified twice

22      previously as a private investigator.

23  Q   And on those occasions when you have testified,

24      have you ever testified as an expert without

25      particular involvement in the case before the

| | | |
|---|---|---|
| 1 | | Court? |
| 2 | A | Yes, I have. |
| 3 | Q | And how many times have you done that? |
| 4 | A | Approximately seven as a criminal investigator and |
| 5 | | twice as a private investigator. |
| 6 | Q | And on those occasions when you have testified |
| 7 | | both as an investigator and as an expert, on how |
| 8 | | many occasions have you testified, roughly, on |
| 9 | | behalf of the prosecution? |
| 10 | A | As an expert? |
| 11 | Q | Yes, sir. |
| 12 | A | Seven or eight times. |
| 13 | Q | Well, let me back up.  I gather that most, if not |
| 14 | | all, of your opportunities to testify when you |
| 15 | | were an investigator were for the prosecution? |
| 16 | A | That's correct, yes. |
| 17 | Q | And how many of those would you estimate there |
| 18 | | were? |
| 19 | A | Hundreds. |
| 20 | Q | So now let's fast forward now to your testimony as |
| 21 | | an expert.  How many times have you testified for |
| 22 | | the prosecution as an expert? |
| 23 | A | Seven or eight. |
| 24 | Q | And how many times for the defense? |
| 25 | A | Twice. |

1  Q   So it would be fair to say you're not a hired gun
2      for the defense; is that correct?
3  A   That's correct.
4  Q   Now, with respect to crime scene processing, you
5      testified that two of your areas of experience are
6      in the crime scene processing and collection of
7      crime scene evidence fields.  Does your experience
8      specifically include processing of vehicles for
9      forensic evidence?
10 A   Yes, it does.
11 Q   Would you tell the Court, roughly, how many
12     vehicles you have processed for crime scene
13     forensic evidence?
14 A   I would estimate over, well over a hundred.
15 Q   In your experience, what is the probability that a
16     properly processed vehicle, one which had been in
17     frequent use, would yield no usable evidence in
18     the course of a forensic evidence investigation?
19 A   I would find it very unlikely.
20 Q   Why is that?
21 A   Well, there is -- there is all type of evidence in
22     a vehicle, one being latent prints.  I mean, a
23     vehicle is touched in hundreds of places,
24     literally hundreds of places, by a perpetrator or
25     even by just, in just normal use.  It's real hard

1   to operate a vehicle without leaving your

2   fingerprints or some type of some type of evidence

3   that you were, in fact, in the vehicle.

4   Q   If you were processing a vehicle that had been,

5   for example, a rental vehicle, and that vehicle

6   was being used for the first time by a particular

7   individual, what, if anything, would you expect

8   the find in the area of forensic or in the way of

9   forensic evidence?

10  A   Well, the first thing that I would look for would

11  be, obviously, would be fingerprints.  As I

12  mentioned earlier, it's hard to operate a vehicle

13  without making certain adjustments.  It's

14  certainly hard to drive a vehicle without touching

15  the steering wheel.  Most of us, when we get in a

16  vehicle, we adjust a mirror of some sort or the

17  seat latch in which, you know, to comfortably

18  position ourself to operate the vehicle.  Those, I

19  would expect, and in the past have always found

20  latent prints there.  It's hard to get in and out

21  of a vehicle without touching the door handle or

22  closing the vehicle without touching some type of

23  handle in there to actually close the door.  I

24  would also look for any type of fiber transfers

25  from the subject's clothes, suspect's clothes, any

1044

1       type of debris or anything picked up by the shoes,

2       possibly footwear impressions on the floor mats.

3       There is just a whole array of things that can be

4       found in a vehicle.

5    Q  Are there any areas of the vehicle you might give

6       special attention to with the view for finding

7       forensic evidence?

8    A  Well, obviously, the passenger, I mean the

9       driver's compartment, if you felt that the suspect

10      had operated the vehicle, that would be my primary

11      focus initially.  But I would process the entire

12      vehicle.

13   Q  Is the -- Can you tell us the dusting method of

14      processing a vehicle for latent fingerprints; is

15      that the most sophisticated method?

16   A  Well, in a serious case, what I personally would

17      do would be to seal the vehicle up and process it

18      with super glue fuming.  And what that does is

19      that locks in any type of latent prints and it

20      makes them a lot less fragile at that point and

21      they're easier to locate with an alternate light

22      source.  And then if you -- then you go back and

23      you dust it to actually lift the fingerprint.

24      That's what I would do in a case of this severity.

25      But at a minimum, I would dust those areas that I

1        previously mentioned.

2    Q    Have you had an opportunity to examine the

3        photographs that were introduced as the State's

4        exhibits in this case of the gun which was

5        allegedly used which was the murder weapon in this

6        case?

7    A    Yes, I have.

8    Q    What, if any, forensic evidence would you expect to

9        find on a properly processed weapon like that?

10   A    Well, I would expect at a minimum to find

11        fingerprints on the clip, whoever loaded the clip,

12        the rounds into the clip.  I would expect to find

13        fingerprints on the rounds inside the clip, and

14        the slide on the top of the weapon to actually

15        load a round into the chamber.

16   Q    So you're saying, whether it's the fingerprints of

17        the person that fired the gun that killed the

18        victim, or whether it's the fingerprints of

19        someone else, you would expect to find someone's

20        prints on a gun like that?

21   A    That's correct, yes.

22   Q    Other than fingerprints, is there any other

23        forensic evidence you might expect to see on a gun

24        that had been used in a shooting at close range?

25   A    At close range it's common to find what we call

1  high velocity back splatter of blood which is

2  projected back towards the weapon.  It's usually a

3  very small amount, but there should be some, and

4  sometimes even there is a phenomenon called

5  drawback.  There's been little discussion as to

6  whether it really occurs, a vacuum actually occurs

7  that actually draws the blood into the barrel of a

8  weapon, but nonetheless, I would expect to find

9  some at close range, even if it were a small

10  amount.

11      MR. SMITH:  Judge, I would like to have two

12  exhibits marked at this time as defendant's

13  exhibits.  These were pictures which were provided

14  by the State, they have not previously been marked

15  or offered, but I believe the State will agree

16  that they fairly and accurately depict the objects

17  which are the subject of the pictures.

18      THE COURT:  Have her mark them.

19  Q   Mr. Coffey, I'm handing you what's been previously

20      marked as defendant's exhibits 1 and 2.  You have

21      had a previous opportunity to examine those

22      pictures, have you not?

23  A   Yes, I have.

24  Q   Those were photographs that were provided to us by

25      the District Attorney's office that purport to be

1    photographs of the interior of the van where the
2    homicide in this case took place.  Now, what, if
3    anything, do you see in those pictures which first
4    of all would suggest the opportunity to recovery
5    -- to recover forensic evidence from those
6    pictures?
7    A    Well, the obvious blood stains or what appears to
8         be blood stains on the seat would definitely need
9         to be processed.  And it's hard to tell in this
10        particular picture, but what I would look for in
11        the smooth portion of the seat, I would look for a
12        close examination to see if there is an actual
13        transfer pattern of the pattern of the pants or
14        the pattern of the shirt at the upper portion of
15        the seat to see if that pattern may, in fact, match
16        the fabric of the suspect.  It appears that from
17        the photograph that there was blood on the seat or
18        the lower portion of the seat and the back of the
19        seat and I -- what the appears to be, and I can't
20        say for certain -- on the floor, which appears to
21        be blood as well and, therefore, I would expect to
22        find blood, blood stains on the shirt of the
23        suspect, the pants of the suspect, and the lower
24        leg, right leg and right shoe or sock of the
25        suspect.

1    Q    If an individual were to occupy the driver's side

2         of that van for the amount of time that it would

3         take to drive from the immediate vicinity of the

4         courthouse here to an area approximately 10 to 15

5         miles away, what, if any, impact would that have

6         on any blood stains which might have been absorbed

7         into the clothing of that individual?

8    A    Well, for that length of time I would say that

9         they would be well absorbed into the material and

10        begin actually drying on the surface during that

11        period of time.

12   Q    Have you had occasion to during the course of your

13        professional education do any reading on the

14        effect of cold water on the blood absorbed into

15        denim material?

16   A    Yes, sir, there was recently an article published

17        in the International Association of Blood Stain

18        Analysis newsletter -- that's a mouth full --

19        concerning denim and cold water, and there were

20        several tests run because in this particular case

21        there was blood where the, where they could not

22        understand why there was blood, and several tests

23        were done by staining the denim with blood and

24        then actually submersing it in water.  And the

25        test revealed that the blood remained, though

1  small amounts, remained up to three hours, were

2  still detected after submersion in water.

3  Q  Based on the background that you have, the

4  education and the reading you've been telling us

5  about and having reviewed the photographs in this

6  case, if an individual wearing denim jeans had

7  been driving this van, seated in the seat which

8  you see depicted in those two photographs, had

9  driven that vehicle for approximately 10 to 12

10  miles, abandoned that vehicle and was then

11  apprehended approximately three hours later, what

12  is the probability that a forensic examination of

13  the most sophisticated type, including DNA, would

14  detect the presence of blood in that clothing?

15  A  I would say it would be very likely through the

16  laboratory examination there would be some blood

17  still left in the clothing, very likely.

18      MR. SMITH:  That's all the questions that I

19  have.  Answer any questions that Mr. O'Dell might

20  have for you.

21              CROSS EXAMINATION

22  BY MR. O'DELL:

23  Q  Mr. Coffey, are you being paid for your testimony

24  today?

25  A  Yes, sir, I am.



Q    And for the services you've provided?

A    Yes, sir.

Q    How much is that, please?

A    55 an hour.

Q    55 an hour, and how many hours have you put into
this?

A    Approximately eight.

Q    Eight hours?  So, in a sense you are a hired gun
in response to what Mr. Smith said, you have been
hired by the defense to testify today.

A    I think we're all getting paid, sir.  Yes, sir.
If that's -- I'm not a hired gun, I do get paid
for doing my profession.

Q    You're being paid by the defense to do this.

A    Yes, sir, that's correct.

Q    And, if you would, tell me what you have spent
eight hours on particularly, if you can give me
categories of time that you've spent on this case
of those eight hours, how you spent that time?

A    Just reviewing photographs and reviewing the
information in the case and waiting to testify.

Q    Let me be more specific.  How long have you had
those photographs?

A    Approximately two to three weeks.

Q    And how much time did you spend examining the

1          photographs?

2    A    I would say roughly an hour initially, and then

3          reviewing them again today probably an hour.

4    Q    You've testified on several different occasions

5          with response to your conclusions that you can't

6          say for sure or it's very likely or you would

7          expect to find, but you're not telling these

8          ladies and gentlemen that based on your

9          examination of these photographs and things that

10         you know for sure that any of these things could

11         be found?

12   A    That's correct.

13   Q    If they didn't exist, if the defendant didn't

14         leave any fingerprints, you wouldn't expect to

15         find any, would you?

16   A    I would not expect to find his fingerprints if he

17         did not leave them.

18   Q    All right.  If it's a rental van and it's the dash

19         and the steering wheel and the van is washed on a

20         regular basis as people use it, would that have

21         any bearing on the ability to locate fingerprints?

22   A    I would say it would have some effect, but, I,

23         it's my understanding of the case that the vehicle

24         had been operated earlier that day.

25   Q    But you would say that that would have a bearing



```
 1              on it, wouldn't you?

 2     A        That would have some bearing on it, yes.

 3     Q        And, in fact, your assessment of the blood in the

 4              van is based on the victim not being moved; isn't

 5              that correct?

 6     A        I'm --

 7     Q        That that blood was there as a result of where the

 8              victim was shot and left?

 9     A        I'm not real clear on your question.

10     Q        Let me rephrase my question.  You did not see the

11              body in the van that day, did you?

12     A        No, I did not.

13     Q        So you do not know the location of the body in

14              that van?

15     A        No.

16     Q        So you're making assumptions about the blood as

17              you see it in the photograph based solely on the

18              photograph that you were given; is that correct?

19     A        That's correct.

20     Q        Now, would it have any bearing on your opinion if

21              the body was moved and had to be transferred or

22              transported across the driver's seat on to a back

23              board and put in an ambulance?

24     A        Would it have bearing on it?

25     Q        Yes, sir, on your opinion about where blood would
```

1          be and how --

2     A    Yes, it would have a bearing, yes, sir.

3     Q    It would have a substantial bearing, wouldn't it?

4     A    It would definitely have a bearing, yes.

5     Q    And I know, because you don't know how much of the

6          blood was transferred from the victim on to those

7          seats or on to the floor mats or on to the side of

8          the vehicle when he was removed?

9     A    That's correct.

10    Q    So you're giving an opinion under the best case

11         scenario, aren't you, based on what you were told?

12    A    That's correct.

13    Q    And if I told you that the defendant -- I mean the

14         victim was, in fact, removed through the driver's

15         side and then placed on a back board, then that

16         would have -- it could conceivably seriously

17         challenge or change your opinion on whether or not

18         blood could have been on him based on the scenario

19         you were given?

20    A    Based on the scenario that I'm given, I would

21         still expect to find blood on the suspect.

22    Q    I understand, and I have no problem with that, Mr.

23         Coffey, your qualifications are excellent.  But

24         you're, you may not be deemed a scientist, but as

25         an expert in this field, you know that your



1    assumptions or your conclusions have to be based

2    on valid information.

3  A    That's correct.

4  Q    Were you told before you made your assumptions

5    that this victim had been moved across the seat in

6    the driver's area?

7  A    I have been told that before, before I actually

8    have testified today, yes.

9  Q    Maybe five minutes or 10 minutes before you

10    testified?

11  A    Well, no, I would say at 11:30 today as I reviewed

12    the photographs again.

13  Q    Okay, but after you came to the conclusions you

14    came to.

15  A    After my initial conclusions that I sent to Mr.

16    Smith.

17  Q    Do you know -- you talked about blow black and

18    blood splatter.

19  A    Uh-huh.

20  Q    Can you give us a, or let me rephrase that.  Is

21    there a difference or would you expect to see a

22    difference in the amount or the existence of blood

23    splatter based on the proximity of the shooter to

24    the victim?

25  A    Absolutely.



1   Q    And if you were one inch away, you would certainly
2        expect blood splatter?
3   A    That's correct.
4   Q    If you're a foot away, it diminishes; is that
5        correct?
6   A    That is correct, yes.
7   Q    If you're as far as three feet away when you fire,
8        the chance of blood splatter on the defendant or
9        on the shooter are minimized extensively or
10       greatly?
11  A    Extensively, that's correct.
12  Q    In this case, you don't know how far the shooter
13       was, do you?
14  A    That's correct.
15  Q    So when you say you would expect to find that,
16       again, that's under the most optimum of
17       circumstances with a close range or close contact
18       for firing?
19  A    As it pertains to the blood splatter, yes.
20  Q    Do you know with respect to the potential transfer
21       of blood, are you familiar with wounds and how
22       they seal up if it's muscle or tissue as opposed
23       to just the into a fleshy part, I mean a vital
24       organ part?
25  A    Yes.

1    Q    Are you aware of the fact, and is it not true,

2         that a shot into a muscle part when the body is

3         tended to be contorted, the muscle will close in

4         and seal off that particular wound?

5    A    You're getting into an area now that I'm not

6         comfortable with testifying, but, yes, there are

7         things that I've learned through death

8         investigations about different muscles and

9         whatever, but I'm not comfortable in testifying

10        what a muscle is actually going to do in its

11        sealing in.

12   Q    Let me give and you hypothetical then.

13   A    Okay.

14   Q    Assuming this victim is shot in the hip and he's a

15        rather large man, and he is shot in the arm with

16        his arm tucked in and he is subsequently moved, it

17        is possible and probably likely that the muscles

18        would enclose that wound and gravity would then

19        take over and he would bleed out of the lowest

20        place, wouldn't he?

21   A    That's very possible, yes.

22   Q    And if that were to happen, the possibility of

23        blood transfer is reduced greatly, isn't it?

24   A    It is reduced, yes.

25   Q    And is it also not reduced greatly by the kind of



1      clothing that the victim is wearing?

2   A  That is correct.

3   Q  Do you know what kind of clothing the victim was

4      wearing in this case?

5   A  No.

6   Q  You were not told that by the defendant?

7   A  No.

8   Q  So you did not plug that into your calculations in

9      arriving at your conclusions?

10  A  I based my calculations on the volume of blood, or

11     what appears to be blood, in the photographs.

12  Q  Mr. Coffey, I'm not trying to give you a hard

13     time.

14  A  I understand.

15  Q  I'm just trying to get to this fact, that you have

16     testified about a great many generalities,

17     including the blood and how long it would stay on

18     materials in cold water.

19  A  That's correct.

20  Q  You don't know what the outside temperature was on

21     Highway 68/48 on March the 6th, 1998, do you?

22  A  No.

23  Q  You don't know the water temperature, do you?

24  A  No.

25  Q  You don't know if the water was moving or still,

1        do you?

2    A    No.

3    Q    And, in fact, if the water was moving, it would

4        greatly increase the possibility, if there were

5        blood on the clothing, that it would be gone over

6        a period of time.

7    A    It would increase that, yes.

8            MR. O'DELL:  I believe that's all.  Thank you,

9        sir.

10          MR. SMITH:  Just a couple of follow-up

11       questions, Mr. Coffey.

12             RE-DIRECT EXAMINATION

13   BY MR. SMITH:

14    Q    Mr. O'Dell asked you about your familiarity with

15       the effect of the closure of wounds and he

16       described a wound from the left arm passing

17       through the fleshy part of the arm and also a

18       wound into the hip of the victim, and I think he

19       asked you about the closure of those wounds.  If

20       we give you, as long as we're giving you a

21       hypothetical, if we give you a third wound

22       possibility, and that is a wound from that same

23       gun that entered the left chest area or the left

24       rib cage area of the victim, passed through two

25       chambers of the heart and two lobes of the lung



1     and then exited on the right side, and that that

2     body then turned to the right, would that not in

3     your experience account for or predictably cause a

4     substantial amount of blood to be bled into the

5     interior of the vehicle?

6  A    I would expect to find that, yes.

7  Q    And in response to Mr. O'Dell's question about

8     moving water increasing the possibility of

9     diminishing retained blood in the clothing of a

10    person standing in that water, is it likely that

11    that would be, that that blood would be completely

12    erased and eradicated under those same

13    circumstances?

14  A   I still don't think that it would be totally

15    washed clean.  I mean, it would be -- I would

16    expect very small amounts, but still expect it to

17    show under laboratory examination.

18  Q   I have to qualify Mr. O'Dell's question here.  He

19    stated that and you acknowledged that you were

20    being paid for your services here today; is that

21    correct?

22  A   That is correct.

23  Q   But I think he also asked you if you were being

24    paid for your testimony?

25  A   No, I'm not being paid for testimony, I'm being

1    paid as he is, I'm sure, to do his job in this

2    particular trial.

3        MR. SMITH:  Thank you very much.  No further

4    questions.

5                    RE-CROSS EXAMINATION

6    BY MR. O'DELL:

7    Q    And yet I haven't been looking at my watch while

8         I've been on the stand, either, have I, while I've

9         been cross-examining you, have I?

10   A    No, but you asked me how long that I had put on

11        this and I needed my watch to answer that with a

12        reasonable certainty.

13   Q    Well, I was going to see if I found a picture that

14        we had of the truck, Mr. Coffey, but let me ask

15        you if, once again, you would expect a great deal

16        of blood somewhere in the car or somewhere in the

17        van if somebody got shot through the chest and it

18        perforated the heart and lungs and exited; is that

19        correct?

20   A    I would expect a pretty good bit of blood, yes.

21   Q    And you would expect that blood to be at the

22        lowest place where the body would bleed, right, in

23        terms of elevation?

24   A    Well, it depends on whether the heart is still

25        pumping at the time.  If I'm leaning this way and

1    my heart is still pumping, there would still be
2    blood coming out of a higher point.
3  Q    Unless, of course, that wound was sealed off and, of
4    course, if the clothing kept it from being released
5    to the surface?
6  A    Absolutely.
7  Q    And if your body had been pushed over to where
8    you're leaning down and your wound in your chest
9    was lower than the seat itself, where would that
10   blood go?
11 A    To the passenger's seat.
12 Q    On the floorboard?
13 A    Yes.
14 Q    And it would rain this way and not that way?
15   (Indicating)
16 A    Yes.
17 Q    All right.
18 A    If I understand your question correctly, yes.
19 Q    Okay.  And if you were a convicted murderer who
20   had just shot somebody else and was fleeing the
21   scene in the murder vehicle itself, do you think
22   your tendency might be to be a little more
23   cautious than the average person getting in a van
24   and leaning up against somebody?
25      MR. SMITH:  Objection, Your Honor.

1       THE COURT:  Sustained.

2       MR. O'DELL:  That's all.

3            FURTHER RE-DIRECT EXAMINATION

4  BY MR. SMITH:

5  Q     Once again, Mr. Coffey, if an individual's heart

6        is still pumping, I believe I heard you say that

7        you could expect the blood to be bleeding from

8        basically any available exit areas; is that

9        correct?

10 A     That is correct.

11      MR. SMITH:  Thank you.  I have no further

12 questions, Mr. Coffey.

13      MR. O'DELL:  I have nothing further.

14      MR. SMITH:  Judge, we would offer defendant's

15 exhibits 1 and 2.

16      MR. O'DELL:  No objection.

17      THE COURT:  1 and 2 are admitted, and you may

18 come down, sir.  Thank you.

19           (Whereupon, defendant's exhibits 1 and 2

20           admitted into evidence at this time)

21      MR. SMITH:  May we approach, Judge?

22           (Sidebar conference)

23           (In open court)

24      THE COURT:  We're going to take a recess for a

25 few minutes, ladies and gentlemen.  Please do not

1    discuss the case and do not allow it to be

2    discussed.

3              (3:54 P.M.   Jury excused)

4              (Recess)

5              (4:23 P.M.   Jury not present)

6        THE COURT:   Mr. Smith, what's your

7    announcement?   Have you had an opportunity to

8    confer with your client?

9        MR. SMITH:   Yes, we have, Judge.   At this time

10   the defense would state to the Court that we do

11   not intend to call any further witnesses and it is

12   the defenses' intention to rest at this time.   I

13   have advised Mr. Gavin of his options with respect

14   to testifying himself and I have advised him

15   privately of my views in that matter and he has

16   indicated to me that he elects not to testify.

17       THE COURT:   Mr. Gavin, you understand that you

18   do have a right to testify in this case?

19       MR. GAVIN:   Yes, sir.

20       THE COURT:   And is it your choice not to

21   testify?

22       MR. GAVIN:   No, it's not really my choice,

23   Your Honor, but I opt not to testify.

24       THE COURT:   Well, do you understand that you

25   have that opportunity this afternoon to testify?

1        MR. GAVIN:  Yes, sir.  Yes, sir.

2        THE COURT:  And if you wish to testify, you

3    may do so today.

4        MR. GAVIN:  Yes, sir, I know that.

5        THE COURT:  Given the opportunity to testify

6    today, what is your choice?

7        MR. GAVIN:  Under advice of my counsels, I

8    elect not to testify.

9        THE COURT:  Mr. Smith, is that a sufficient

10    recitation for the record this afternoon?

11        MR. SMITH:  I believe that it is, Judge.

12        THE COURT:  Is there anything that the State

13    would like to amend to the record for this

14    purpose?

15        MR. O'DELL:  No, sir.

16        THE COURT:  I think what we should do is have

17    the jury come in and let you rest in the presence

18    of the jury, and once you've done that, I'm going

19    to dismiss the jury for the night to have them

20    come back tomorrow morning at 9 o'clock.  Bring

21    them in.

22            (4:26 P.M.  Jury present)

23        THE COURT:  You may be seated, thank you.  Mr.

24    Smith, what says the defendant?

25        MR. SMITH:  Your Honor, the defense rests.