FILED
2020 Aug-17  PM 05:11
U.S. DISTRICT COURT
N.D. OF ALABAMA



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| KEITH EDMUND GAVIN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No.   4:16-cv-00273-KOB |
| | ) | |
| JEFFERSON S. DUNN, | ) | |
| Commissioner of the Alabama | ) | |
| Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

# VOLUME 18A

# Direct Appeal Briefs and Orders

LUTHER STRANGE
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

Gavin v. Alabama

**FILED**

SENTENCING ORDER
STATE OF ALABAMA VS. KEITH EDMUND GAVIN
CC-98-61  (CHEROKEE COUNTY)
PAGE 2

JAN 0 5 2000

*[signature]*
CIRCUIT CLERK
CHEROKEE COUNTY, AL

Attorney, urged the Court to follow the jury recommendation and fix the Defendant's punishment at death.  The Defendant, through his attorneys, argued that the Court should fix the Defendant's punishment at life imprisonment without parole.  The Defendant was asked whether he had anything to say why the sentence should not be pronounced.  The Defendant has said nothing in bar or preclusion of sentence.

### FINDINGS OF FACT SUMMARIZING THE CRIME AND THE DEFENDANT'S PARTICIPATION IN IT

William Clinton Clayton, Jr. was a contract courier for Corporate Express Delivery Systems, Incorporated.  Although his routine typically involved the use of his private automobile to provide courier services, on March 6, 1998, he drove a Corporate Express van because his personal vehicle was having mechanical problems.

As Mr. Clayton sat in the driver's seat of this marked van at the curb near the entrance to Region's Bank in Centre, Cherokee County, Alabama, the Defendant approached him from the street, opened the driver's door, and shot Mr. Clayton twice.  One of the bullets passed through his heart and both lungs.  The other through his hip.  He died of these multiple gunshot wounds.

The reason for the Defendant's presence at that place and at

Gavin v. Alabama

Case No. 04A136

**186**

SENTENCING ORDER
STATE OF ALABAMA VS. KEITH EDMUND GAVIN
CC-98-61  (CHEROKEE COUNTY)
PAGE 3

**FILED**

JAN 0 5 2000

*Carla M. Bird*
CIRCUIT CLERK
CHEROKEE COUNTY, AL

that time was recounted by the Defendant's companion on this occasion, Mr. Dwayne Meeks.  Meeks and the Defendant are cousins and both were residing in the Chicago, Illinois area in early 1998. Meeks worked for the Illinois Department of Corrections, and the Defendant had been recently paroled after serving approximately seventeen years of a thirty-four year sentence imposed by the Circuit Court of Cook County, Illinois, for Murder.

Meeks grew up in Fort Payne, Alabama, and had other relatives and friends residing in this area.  Meeks brought the Defendant to Fort Payne in February 1998, for a "change of scenery" and to go "whoring".

Meeks testified that following the February visit to Alabama, the Defendant wanted to return in March to find a woman whom he had met the month before.  Meeks agreed to drive the Defendant to Chattanooga, Tennessee, where Meeks charged two motel rooms on his credit card, and from which said location Meeks and the Defendant were to conduct the search for the woman.  If she was located, the Defendant intended to remain in this area, and Meeks planned to return to Chicago after being reimbursed by the woman for the motel and other expenses.

In addition to the Defendant, Meeks was accompanied to Chattanooga by his wife and child, where they remained while the

*Gavin v. Alabama*                                        Case No. 04A136

**187**

**FILED**

SENTENCING ORDER
STATE OF ALABAMA VS. KEITH EDMUND GAVIN
CC-98-61  (CHEROKEE COUNTY)
PAGE 4

JAN 0 5 2000

*[signature]*
CIRCUIT CLERK
CHEROKEE COUNTY, AL

efforts to locate the woman proceeded.   Meeks and the Defendant
went to Fort Payne, and from there to Centre, Alabama, at the
corner where Mr. Clayton sat in his courier van.

There was tension between Meeks and the Defendant because of
the expenses which Meeks had incurred for this trip, and because of
Meeks' concern that he would not be reimbursed if the woman could
not be located.  Nevertheless, when the Defendant exited the car at
the intersection by Region's Bank, Meeks thought the Defendant was
going to ask for directions.   Instead, the Defendant shot and
killed William Clinton Clayton, Jr.

Meeks fled from the scene in his car.  The Defendant pushed
the mortally wounded courier aside and followed Meeks in the
Corporate Express van.  When the Defendant stopped in response to
a blue light, he exited the van.  When Officer Danny Smith exited
his pursuit vehicle, the Defendant took aim at short range and
attempted to kill the officer by firing two shots at him.   The
Defendant fled into the nearby woods.

Following a four hour manhunt the Defendant was apprehended
standing waist deep in a creek where he was detected by search
dogs.

*Petition for Writ of Certiorari, Appendix Page 103*

SENTENCING ORDER
STATE OF ALABAMA VS. KEITH EDMUND GAVIN
CC-98-61  (CHEROKEE COUNTY)
PAGE 5

**FILED**

JAN 0 5 2000

CIRCUIT CLERK
CHEROKEE COUNTY, AL

<u>FINDINGS CONCERNING THE EXISTENCE</u>
<u>OR NONEXISTENCE OF AGGRAVATING CIRCUMSTANCES</u>

The law requires the trial Court to enter specific findings concerning the existence or non-existence of each aggravating circumstances enumerated by statute.   This Court finds that the following three aggravating circumstances were proven beyond a reasonable doubt:

1.  THE CAPITAL OFFENSE WAS COMMITTED WHILE THE DEFENDANT WAS UNDER A SENTENCE OF IMPRISONMENT.

The term "under sentence of imprisonment" is defined under Title 13A-5-39(7) as "while serving a term of imprisonment, while under a suspended sentence, while on probation or parole, or while on work release, furlough, escape, or any other type of release or freedom while or after serving a term of imprisonment, other than unconditional release and freedom after expiration of the term of sentence".

The Defendant was convicted of Murder in the Circuit Court of Cook County, Illinois, on June 9, 1982, and he was sentenced to thirty-four years in prison.  The Defendant was paroled on December 28, 1997, and was still on parole at the time of the murder on March 6, 1998.

At the time of the murder of William Clinton Clayton, Jr. on

Gavin v. Alabama                                    Case No. 04A136

189

FILED

SENTENCING ORDER
STATE OF ALABAMA VS. KEITH EDMUND GAVIN          JAN 0 5 2000
CC-98-61  (CHEROKEE COUNTY)
PAGE 6                                            _Judy M. Smith_
                                                 CIRCUIT CLERK
                                                 CHEROKEE COUNTY, AL

March 6, 1998, the Defendant was under a sentence of imprisonment

as that term is defined by Alabama Law.

    2.  THE DEFENDANT WAS PREVIOUSLY CONVICTED OF ANOTHER FELONY
INVOLVING THE USE OF VIOLENCE TO THE PERSON.

    The Defendant was convicted of Murder in the Circuit Court of

Cook County, Illinois on June 9, 1982.

    3.   THE CAPITAL OFFENSE WAS COMMITTED WHILE THE DEFENDANT WAS
ENGAGED IN OR WAS AN ACCOMPLICE IN THE COMMISSION OF OR AN ATTEMPT
TO COMMIT, OR FLIGHT AFTER COMMITTING, OR ATTEMPTING TO COMMIT,
ROBBERY.

    Count  One  of  the  Indictment  charged  the  Defendant  with

intentional murder in the course of committing a theft of a 1996

Ford  van  belonging  to  Corporate  Express  Delivery  Systems,

Incorporated  by  the  use  of  force  against  the  driver,  William

Clinton Clayton, Jr.

    The Defendant took Meeks' 40 calibre Glock pistol either from

Meeks' residence or from the Meeks' vehicle without the consent or

permission of Meeks.  According to Meeks, the Defendant secreted

the weapon until the Defendant used it to kill William Clinton

Clayton, Jr. and took the vehicle which Mr. Clayton was driving.

    The capital crime of intentional killing of another during the

commission  of  robbery  is  a  single  offense  consisting  of  two

elements.  The intentional killing of Mr. Clayton and the theft of

**FILED**

SENTENCING ORDER
STATE OF ALABAMA VS. KEITH EDMUND GAVIN
CC-98-61 (CHEROKEE COUNTY)
PAGE 7

JAN 0 5 2000

CIRCUIT CLERK
CHEROKEE COUNTY, AL

the vehicle were part of a continuous chain of events. Therefore, the capital offense was committed while the Defendant was engaged in the commission of or attempt to commit robbery.

### FINDINGS CONCERNING THE EXISTENCE OR NONEXISTENCE OF MITIGATING CIRCUMSTANCES

#### I.

In compliance with the statutory requirement that the trial Court enter specific findings concerning the existence or nonexistence of each mitigating circumstance enumerated by statute, the Court finds that NONE OF THE FOLLOWING MITIGATING CIRCUMSTANCES EXIST in this case:

1. THAT THE DEFENDANT HAD NO SIGNIFICANT HISTORY OF PRIOR CRIMINAL ACTIVITY.

The Defendant was convicted of Burglary in Cook County, Illinois, on October 25, 1979. He was also convicted of Murder on June 9, 1982, in Cook County, Illinois.

The presentence report indicates that the Defendant has been charged or implicated in other criminal activity, but there is no record of conviction for any offense other than the prior crime of murder and burglary as stated above. To the extent that the presentence report suggests any other criminal activity, same is not considered an aggravating circumstance, and has not been

Gavin v. Alabama                                    Case No. 04A136

**191**

SENTENCING ORDER
STATE OF ALABAMA VS. KEITH EDMUND GAVIN
CC-98-61  (CHEROKEE COUNTY)
PAGE 8

**FILED**

JAN 0 5 2000

*[signature]*
CIRCUIT CLERK
CHEROKEE COUNTY, AL

weighed as such by this Court.

This Court finds that there is no support for this mitigating circumstance.

2.  THAT THE CAPITAL OFFENSE WAS COMMITTED WHILE THE DEFENDANT WAS UNDER THE INFLUENCE OF EXTREME MENTAL OR EMOTIONAL DISTURBANCE.

During the few hours leading up to the murder of Mr. Clayton, Meeks had apparently insisted on being reimbursed for his expenses in bringing the Defendant to Alabama.  These demands did not invoke extreme mental or emotional disturbance, although this may explain the Defendant's motive for the robbery.

The Defendant is an intelligent person capable of making independent choices.

There was no plea of mental disease or defect, and at no time did the Defendant seek to have a mental evaluation for the purpose of asserting such a defense.

The Court finds that there is no support for this mitigating circumstance.

3.  THAT THE VICTIM WAS A PARTICIPANT IN THE DEFENDANT'S CONDUCT OR CONSENTED TO IT.

The Court finds that there is no support for this mitigating circumstance.

Gavin v. Alabama                                    Case No. 04A136

**192**

SENTENCING ORDER
STATE OF ALABAMA VS. KEITH EDMUND GAVIN
CC-98-61   (CHEROKEE COUNTY)
PAGE 9

**FILED**

JAN 0 5 2000

*Cindy M. Wood*
CIRCUIT CLERK
CHEROKEE COUNTY, AL

    4.   THAT THE DEFENDANT WAS AN ACCOMPLICE IN THE CAPITAL OFFENSE COMMITTED BY ANOTHER, AND HIS PARTICIPATION WAS RELATIVELY MINOR.

    The Defendant was identified by an eye witness as the person who committed the offense in question.  Likewise, Meeks reported that the Defendant committed the murder and robbery of Mr. Clayton. Nevertheless, Meeks was indicted along with the Defendant.  The State subsequently dismissed the charge against Meeks who thereafter testified against the Defendant on behalf of the State.

    There is no direct evidence that the State's dismissal was a quid-pro-quo for Meeks' testimony, but throughout the trial, the Defendant's attorneys attempted to impeach Meeks' credibility by proving that he was originally charged in the case, and that by virtue of the dismissal of those charges, he was thereby motivated to testify falsely against the Defendant.

    The Defendant's attorneys also challenged the forensic evidence in an effort to try to implicate Meeks as the guilty party.  For example, the Defendant argued that the driver would have been covered with the victim's blood, but no blood was found on the Defendant or on his clothes even by DNA examination.  In addition, there was no evidence of the Defendant's fingerprints in or on the courier van.  The Defendant also argued that even though he was arrested standing waist deep in a creek, he was not

Gavin v. Alabama                                    Case No. 04A136

193

FILED

JAN 0 5 2000

SENTENCING ORDER
STATE OF ALABAMA VS. KEITH EDMUND GAVIN
CC-98-61  (CHEROKEE COUNTY)
PAGE 10

*Chely m. Hera*
CIRCUIT CLERK
CHEROKEE COUNTY AL

submersed long enough to completely cleanse blood from his clothes, and that if he had been submersed long enough to have that effect, he would have died from hypothermia.

The Defendant was identified by Officer Danny Smith who viewed the Defendant at a distance of only a *few feet* when the Defendant exited the stolen van, fired at Officer Smith and escaped into the woods. A toboggan matching the description reported by eyewitnesses was found near the site where the Defendant was apprehended, and Meeks' gun was later found near where the Defendant entered the woods as he escaped from Officer Smith.

The ballistics analysis established that the shell casings ejected by the weapon fired at Officer Smith were identical to the shell casings found in the street at the site where Mr. Clayton was shot, and that the casings from both sites were fired by the weapon found in the woods near where the Defendant was apprehended.

In summary, the Defendant attempted to implicate Meeks as the killer by a combination of the challenges to the forensic evidence coupled with his challenge of Meeks' credibility. The Defendant emphasized the undisputed fact that Meeks drove the Defendant to the scene of the crime, and that Meeks' pistol was the murder weapon. The evidence of the Defendant's guilt is, however, overwhelming.

Gavin v. Alabama                                      Case No. 04A136

**194**

FILED

SENTENCING ORDER                          JAN 0 5 2000
STATE OF ALABAMA VS. KEITH EDMUND GAVIN
CC-98-61  (CHEROKEE COUNTY)               *~signature~*
PAGE 11                                    CIRCUIT CLERK
                                           CHEROKEE COUNTY, AL

There is no basis on which to conclude that the Defendant was merely an accomplice with minor participation in the crime. This Court finds that there is no support for this mitigating circumstance.

5.  THAT THE DEFENDANT ACTED UNDER EXTREME DURESS OR UNDER THE SUBSTANTIAL DOMINATION OF ANOTHER PERSON.

This Court finds that there is no support for this mitigating circumstance.

6.  THAT THE CAPACITY OF THE DEFENDANT TO APPRECIATE THE CRIMINALITY OF HIS CONDUCT OR TO CONFORM HIS CONDUCT TO THE REQUIREMENTS OF LAW WAS SUBSTANTIALLY IMPAIRED.

This Court finds that there is no support for this mitigating circumstance.

7.  THE AGE OF THE DEFENDANT AT THE TIME OF THE CRIME.

At the time of the commission of the offense on March 6, 1998, the Defendant was 37 years of age. The age of the Defendant is not a mitigating circumstance.

II.

In addition to the mitigating circumstances specified by statute, and the findings of this Court relating thereto as set out above, mitigating circumstances include any aspect of the Defendant's character or record and any of the circumstances of the

Gavin v. Alabama

Case No. 04A136

**195**

FILED

SENTENCING ORDER
STATE OF ALABAMA VS. KEITH EDMUND GAVIN
CC-98-61 (CHEROKEE COUNTY)
PAGE 12

JAN 0 5 2000

CIRCUIT CLERK
CHEROKEE COUNTY, AL

offense that the Defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the Defendant offers as a basis for a sentence of life imprisonment without parole instead of death.

As a supplement to the Probation Officer's written report, the Defendant has provided a memorandum from sentencing consultant, John David Sturman and Associates of Chicago, Illinois; the whole of which said memorandum has been considered by this Court. In that memorandum the Defendant's mother is reported to have described the Defendant's life as influenced by, or subject to, a combination of drugs and gang violence while living in a Chicago housing project. The Defendant's mother also testified at the Sentence Hearing conducted before the jury. The Defendant's attorney has advised the Court, however, that the Defendant denies ever having a drug problem.

At the Sentence Hearing conducted before the jury the Court heard testimony of Rev. A. J. Johnson who spoke eloquently on behalf of the Defendant as a result of his frequent meetings with the Defendant over the many months of the Defendant's incarceration. Rev. Johnson opines that the Defendant has concern and sympathy for the victim's family, and that the Defendant is

Gavin v. Alabama                                    Case No. 04A136

                                                        **196**

FILED

SENTENCING ORDER
STATE OF ALABAMA VS. KEITH EDMUND GAVIN          JAN 0 5 20?0
CC-98-61  (CHEROKEE COUNTY)
PAGE 13                                          ~~ ~~ ~~
                                                CIRCUIT CLERK
                                                CHEROKEE COUNTY, AL

capable of a closer relationship with God.

     This Court has considered all matters presented by the
Defendant, but this Court does not find any support for any non-
statutory mitigating circumstance.

                          <u>CONCLUSION</u>

     This Court has carefully considered the aggravating
circumstances which have been proven to the satisfaction of the
Court beyond a reasonable doubt.  There are no mitigating
circumstances.  The aggravating circumstances, therefore, outweigh
the mitigating circumstances.

     This Court has also carefully considered the jury
recommendation that the Defendant be sentenced to death.

     It is hereby ORDERED, ADJUDGED AND DECREED that the Defendant
shall be punished by death.  The sentence of death shall be
consecutive to the sentence imposed in case number CC-98-62 in the
circuit Court of Cherokee County, Alabama.  The Sheriff shall
remove the Defendant to the custody of the Alabama Department of
Corrections where in strict accordance with the law the Defendant
shall be put to death.  In accordance with the Alabama Rules of
Court the Supreme Court of Alabama shall set an execution date, and
the Supreme Court Order fixing the execution date shall constitute
the execution warrant.

**FILED**

SENTENCING ORDER
STATE OF ALABAMA VS. KEITH EDMUND GAVIN                JAN 0 5 2000
CC-98-61   (CHEROKEE COUNTY)
PAGE 14                                                *Judy M. Busch*
                                                       CIRCUIT CLERK
                                                    CHEROKEE COUNTY, AL

    Even though every case in which the death penalty is imposed

is subject to automatic review by the Alabama Court of Criminal

Appeals and the Alabama Supreme Court, the Defendant is hereby

advised of the right to appeal.  If the Defendant wishes to appeal

he must do so by giving notice of appeal within forty-two (42) days

from the date of this Order.  If the Defendant is an indigent and

cannot afford a lawyer to represent him on appeal, the Court will

appoint a lawyer for him and provide a free transcript of all

proceedings in this case.

    This Court having previously determined that the Defendant is

indigent, the Court hereby appoints MR. STEPHEN P. BUSSMAN, 212

ALABAMA AVENUE SOUTH, P.O. BOX 925, FORT PAYNE, ALABAMA   35967

(256) 845-7900 to represent the Defendant on appeal.

    The defendant will receive credit for the time during which

he has been incarcerated on the present charge.

    Done this 5th day of January, 2000.

**FILED**

JAN 0 5 2000                     _____
                                 DAVID A. RAINS, CIRCUIT   JUDGE
*Judy M. Busch*
CIRCUIT CLERK
CHEROKEE COUNTY, AL

Gavin v. Alabama

Case No. 04A136
**198**

SENTENCING ORDER
STATE OF ALABAMA VS. KEITH EDMUND GAVIN
CC-98-61   (CHEROKEE COUNTY)
PAGE 15

**FILED**

JAN 0 5 2000

*[signature]*
CIRCUIT CLERK
CHEROKEE COUNTY, AL

Copies to:                          Attorney for:

Mr. Michael E. O'Dell    ) .        State of Alabama
Mr. Robert F. Johnston    )

Mr. H. Bayne Smith                  Edmund Keith Gavin
Mr. John H. Ufford

Mr. Lane Mann
Clerk
Court of Criminal Appeals
300 Dexter Avenue
Montgomery, Alabama  36104-3741

Mr. Robert G. Esdale Sr.
Clerk
Supreme Court of Alabama
P.O. Box 157
Montgomery, Alabama  36101

Hon. Carolyn Smith,
Clerk
Cherokee County Circuit Court
Cherokee County Courthouse
Room 203
100 Main Street
Centre, Alabama  35960

Ms. Trina Higgins,
Court Reporter

Mr. Stephen P. Bussman

Mr. Keith Edmund Gavin

Gavin v. Alabama

Case No. 04A136

1301

1       MR. O'DELL:  Judge, we have Grand Jury the

2    week before that, so if it could be set after

3    that, if it's not going to be December the 6th, if

4    you could make it later than December 6th.

5       THE COURT:  All right.  Thank you very much.

6    We stand concluded.

7          (3:00 P.M.  The proceedings were concluded

8          at this time)

9  CENTRE, ALABAMA

10 JANUARY 5, 2000

11          (1:40 P.M.)

12      THE COURT:  The record should show that Mr.

13   Keith Edmund Gavin appears before the Court at

14   this time for sentencing.  He appears with his

15   attorneys, Mr. Baine Smith and Mr. John Ufford.

16   Will the defendant and his counsel please rise.

17   In case number CC-98-62, Mr. Gavin, you have been

18   found guilty of the offense of Attempted Murder

19   and you have been adjudged guilty of that offense.

20   The Court hereby sentences you for the offense of

21   Attempted Murder to life in the state

22   penitentiary.  The sentence in this case shall run

23   consecutively to the sentence to be imposed in

24   case number 98-61.  In case 98-61 the defendant,

25   Keith Edmund Gavin, was charged in a two count

1    indictment.   Count One charged the defendant with

2    Capital Murder for the intentional killing of

3    William Clinton Clayton, Jr., during the

4    commission of Robbery in the First Degree.   Count

5    Two charges him with Capital Murder for the

6    intentional killing of William Clinton Clayton,

7    Jr., after the defendant had been previously

8    convicted of another murder within 20 years

9    preceding the murder of William Clinton Clayton,

10   Jr.

11      On November 6, 1999, the jury returned a

12   verdict finding the defendant guilty of Capital

13   Murder under both counts of the indictment.   In

14   accordance with the verdict of the jury, the

15   defendant has been adjudged by the Court guilty of

16   Capital Murder under both counts of the

17   indictment.

18      A separate sentence hearing was conducted

19   before the same jury pursuant to Title 13A-5-46 of

20   the Code of Alabama, and on a vote of 10 to two

21   the jury recommended that the defendant be

22   sentenced to death.   The Court ordered and

23   received a written pre-sentence investigation

24   report and conducted an additional sentence

25   hearing pursuit to Title 13A-5-47 of the Code of

Gavin v. Alabama                                    Case No. 04A136

Alabama.  At the sentence hearing the State, through the District Attorney, urged the Court to follow the jury recommendation and fix the defendant's punishment at death.  The defendant, through his attorneys, argued that the Court should fix the defendant's punishment at life imprisonment without parole.  The defendant was asked whether he had anything to say why the sentence should not be pronounced.  The defendant has said nothing, in bar or preclusion, of sentence.

Findings of fact summarizing the crime and the defendant's participation in it:  William Clinton Clayton, Jr., was a contract courier for Corporate Express Delivery Systems, Incorporated.  Although his routine typically involved the use of his private automobile to provide courier services, on March 6, 1998, he drove a Corporate Express van because his personal vehicle was having mechanical problems.  As Mr. Clayton sat in the driver's seat of this marked van at the curb near the entrance of Regions Bank in Centre, Cherokee County, Alabama, the defendant approached him from the street, opened the driver's door, and shot Mr. Clayton twice.  One of the bullets passed through

1304

his heart and both lungs, the other through his
hip.  He died of multiple gunshot wounds.  The
reason for the defendant's presence at the place
and at that time was recounted by the defendant's
companion on this occasion, Mr. Gerald Meeks.
Meeks and the defendant are cousins, and both were
residing in Chicago, Illinois, early in 1998.
Meeks worked for the Illinois Department of
Corrections, and the defendant had been recently
paroled after serving approximately 17 years of a
34-year sentence imposed by the Circuit Court of
Cook County, Illinois, for murder.  Meeks grew up
in Fort Payne, Alabama, and had other relatives
and friends residing in this area.  Meeks brought
the defendant to Fort Payne in February, 1998, for
a "change of scenery" and to go "whoring".  Meeks
testified that following the February visit to
Alabama, the defendant wanted to return in March
to find a woman whom he had met the month before.
Meeks agreed to drive the defendant to
Chattanooga, Tennessee, where Meeks charged two
motel rooms on his credit card and from which said
location Meeks and the defendant were to conduct
the search for the woman.  If she was located, the
defendant intended to remain in this area and

Gavin v. Alabama                                    Case No. 04A136

1  Meeks planned to return to Chicago after being

2  reimbursed by the woman for the motel and other

3  expenses.  In addition to the defendant, Meeks was

4  accompanied to Chattanooga by his wife and child

5  where they remained while the efforts to locate

6  the woman proceeded.  Meeks and the defendant went

7  to Fort Payne and from there to Centre, Alabama,

8  at the corner where Mr. Clayton sat in his courier

9  van.

10      There was tension between Meeks and the

11  defendant because of the expenses which Meeks had

12  incurred for this trip and because of Meeks'

13  concern that he would not be reimbursed if the

14  woman could not be located.  Nevertheless, when

15  the defendant exited the car at the intersection

16  of Regions Bank, Meeks thought the defendant was

17  going to ask for directions.  Instead, the

18  defendant shot and killed William Clinton Clayton,

19  Jr.  Meeks fled from the scene in his car.  The

20  defendant pushed the mortally wounded courier

21  aside and followed Meeks in the Corporate Express

22  van.  When the defendant stopped in response to a

23  blue light, he exited the van.  When Officer Danny

24  Smith exited his pursuit vehicle, the defendant

25  took aim at short range and attempted to kill the

Gavin v. Alabama                                    Case No. 04A136

1306

1    officer by firing two shots at him.  The defendant

2    fled into the nearby woods.  Following a four-hour

3    manhunt, the defendant was apprehended standing

4    waist deep in a creek where he was detected by

5    search dogs.

6        Findings concerning the existence or non-

7    existence of aggravating circumstances:  The law

8    required the trial Court to enter specific

9    findings concerning the existence or non-

10   existence of each aggravating circumstance

11   enumerated by statute.  This Court finds that the

12   following three aggravating circumstances were

13   proven beyond a reasonable doubt.  Number one, the

14   capital offense was committed while the defendant

15   was under a sentence of imprisonment.  The term

16   under sentence of imprisonment is defined by Title

17   13A-5-39(7) as "while serving a term of

18   imprisonment, while under a suspended sentence,

19   while on probation or parole, or while on work

20   release, furole, escape, or any other type of

21   release or freedom while or after serving a term

22   of imprisonment other than unconditional release

23   and freedom after expiration of the term of

24   sentence."  The defendant was convicted of murder

25   in the Circuit Court of Cook County, Illinois, on

Gavin v. Alabama                                              Case No. 04A136

June 9, 1992, and he was sentenced to 34 years in
prison.  The defendant was paroled on December 28,
1997, and was still on parole at the time of the
murder on March 6, 1998.  At the time of the
murder of William Clinton Clayton, Jr., on March
6, 1998, the defendant was under a sentence of
imprisonment as that term is defined by Alabama
law.

Number two, the defendant was previously
convicted of another felony involving the use of
violence to the person.  The defendant was
convicted of Murder in the Circuit Court of Cook
County, Illinois, on June 9, 1992.

Number three, the capital offense was committed
while the defendant was engaged in or was an
accomplice in the commission of or an attempt to
commit or flight after committing or attempting to
commit Robbery.  Count one of the indictment
charged the defendant with intentional murder in
the course of committing a theft of a 1996 Ford
van belonging to Corporate Express Delivery
Systems, Incorporated, by the use of force against
the driver, William Clinton Clayton, Jr.  The
defendant took Meeks' .40 caliber Glock pistol,
either from Meeks' residence or from Meeks'

Gavin v. Alabama                                    Case No: 04A136

1305

1     vehicle, without the consent or permission of

2     Meeks.   According to Meeks, the defendant secreted

3     the weapon until the defendant used it to kill

4     William Clinton Clayton, Jr., and took the vehicle

5     which Mr. Clayton was driving.   The capital crime

6     of intentional killing of another during the

7     commission of robbery is a single offense

8     consisting of two elements.   The intentional

9     killing of Mr. Clayton and the theft of the

10    vehicle were part of a continuous chain of events.

11    Therefore, the capital offense was committed while

12    the defendant was engaged in the commission of or

13    attempt to commit robbery.

14         Findings concerning the existence or non-

15    existence of mitigating circumstances:   In

16    compliance with the statutory requirement that the

17    trial Court enter specific findings concerning the

18    existence or non-existence of each mitigating

19    circumstance enumerated by statute, the Court

20    finds that none of the following mitigating

21    circumstance exists in this case.   One, that the

22    defendant had no significant history of prior

23    criminal activity.   The defendant was convicted of

24    Burglary in Cook County, Illinois, on October

25    25th, 1979.   He was also convicted of Murder on

 1      June 3, 1982, in Cook County, Illinois.  The

 2      pre-sentence report indicates that the defendant

 3      has been charged or implicated in other criminal

 4      activity, but there is no record of conviction for

 5      any offense other than the prior crime of Murder

 6      and Burglary as stated above.  To the extent that

 7      the pre-sentence report suggests any other

 8      criminal activity, same is not considered an

 9      aggravating circumstance, and has not been weighed

10      as such by the Court.  This Court finds that there

11      is no support for this mitigating circumstance.

12      Number two, that the capital offense was

13      committed while the defendant was under the

14      influence of extreme mental or emotional

15      disturbance.  During the few hours leading up to

16      the murder of Mr. Clayton, Meeks had apparently

17      insisted on being reimbursed for his expenses in

18      bringing the defendant to Alabama.  These demands

19      did not invoke extreme mental or emotional

20      disturbance, although this may explain the

21      defendant's motive for the robbery.  The defendant

22      is an intelligent person, capable of making

23      independent choices.  There was no plea of mental

24      disease or defect and at no time did the defendant

25      seek to have a mental evaluation for the purpose

1    of asserting such a defense.  This Court finds

2    that there is no support for this mitigating

3    circumstance.

4       Number three, that the victim was a participant

5    in the defendant's conduct or consented to it.

6    This Court finds that there is no support for this

7    mitigating circumstance.

8       Number four, that the defendant was an

9    accomplice in the capital offense committed by

10   another and his participation was relatively

11   minor.  The defendant was identified by an eye

12   witness as the person who committed the offense in

13   question.  Likewise, Meeks reported to the --

14   excuse me.  Likewise, Meeks reported that the

15   defendant committed the murder and robbery of Mr.

16   Clayton.  Nevertheless, Meeks was indicted along

17   with the defendant.  The State subsequently

18   dismissed the charge against Meeks who thereafter

19   testified against the defendant on behalf of the

20   State.  There is no direct evidence that the

21   State's dismissal was a quid pro quo for Meeks'

22   testimony, but throughout the trial the

23   defendant's attorneys attempted to impeach Meeks'

24   credibility by proving that he was originally

25   charged in the case and that by virtue of the

Gavin v. Alabama                                    Case No. 04A136

1311

dismissal of those charges he was thereby
motivated to testify falsely against the
defendant.  The defendant's attorneys also
challenged the forensic evidence in an effort to
try to implicate Meeks as the guilty party.  For
example, the defendant argued that the driver
would have been covered with the victim's blood,
but no blood was found on the defendant or on his
clothes even by DNA examination.  In addition,
there was no evidence of the defendant's
fingerprints in or on the courier van.  The
defendant also argued that even though he was
arrested standing waist deep in a creek, he was
not submersed long enough to completely cleanse
blood from his clothes, and that if he had been
submerged long enough to have that effect, he
would have died from hypothermia.

The defendant was identified by Officer Danny
Smith who viewed the defendant at a distance of
only a few feet when the defendant exited the
stolen van, fired at Officer Smith and escaped
into the woods.  A toboggan matching
the description reported by witnesses was found
near the site where the defendant was apprehended
and Meeks' gun was later found near where the

Gavin v. Alabama                                    Case No. 04A136

1312

1    defendant entered the woods as he escaped from

2    Officer Smith.  The ballistics analysis

3    established that the shell casings ejected by

4    the weapon fired at Officer Smith were identical

5    to the shell casings found in the street at the

6    site where Mr. Clayton was shot and that the

7    casings from both sites were fired by the weapon

8    found in the woods near where the defendant was

9    apprehended.

10    In summary, the defendant attempted to

11    implicate Meeks as the killer by a combination of

12    the challenges to the forensic evidence, coupled

13    with his challenge of Meeks' credibility.  The

14    defendant emphasized the undisputed fact that

15    Meeks drove the defendant to the scene of the

16    crime and that Meeks' pistol was the murder

17    weapon.  The evidence of the defendant's guilt is,

18    however, overwhelming.  There is no basis on which

19    to conclude that the defendant was merely an

20    accomplice with minor participation in the crime.

21    This Court finds that there is no support for this

22    mitigating circumstance.

23    Number five, that the defendant acted under

24    extreme duress or under the substantial domination

25    of another person.  This Court finds that there is

Gavin v. Alabama

Case No. 04A136

1313

1      no support for this mitigating circumstance.

2          Number six, that the capacity of the defendant

3      to appreciate the criminality of his conduct or to

4      conform his conduct to the requirements of the law

5      was substantially impaired.  This Court finds that

6      there is no support for this mitigating

7      circumstance.

8          Number seven, the age of the defendant at the

9      time of the crime.  At the time of the commission

10     of the offense on March 6, 1998, the defendant was

11     37 years of age.  The age of the defendant is not

12     a mitigating circumstance.

13         In addition to the mitigating circumstances

14     specified by the statute, and the findings of this

15     Court relating thereto as set out hereinabove,

16     mitigating circumstances include any aspect of the

17     defendant's character or record, and any of the

18     circumstances of the offense that the defendant

19     offers as a basis for a sentence of life

20     imprisonment without parole instead of death, and

21     any other relevant mitigating circumstance which

22     the defendant offers as a basis for a sentence of

23     life imprisonment without parole instead of death.

24     As a supplement to the probation officer's written

25     report, the defendant has provided a memorandum

Gavin v. Alabama                                    Case No. 04A136

1314

1    from sentencing consultant John David Sturman &

2    Associates of Chicago, Illinois, the whole of

3    which said memorandum has been considered by this

4    Court.  In that memorandum, the defendant's mother

5    is reported to have described the defendant's life

6    as influenced by or subject to a combination of

7    drugs and gang violence while living in a Chicago

8    housing project.  The defendant's mother also

9    testified at the sentence hearing conducted before

10   the jury.  The defendant's attorney has advised

11   the Court, however, that the defendant denies ever

12   having a drug problem.  At the sentence hearing

13   conducted before the jury, the Court heard

14   testimony of Reverend A.J. Johnson who spoke

15   eloquently on behalf of the defendant as a result

16   of his frequent meetings with the defendant over

17   the many months of the defendant's incarceration.

18   Reverend Johnson opines that the defendant has

19   concern and sympathy for the victim's family, and

20   that the defendant is capable of a closer

21   relationship with God.  This Court has considered

22   all matters presented by the defendant, but this

23   Court does not find any support for any non-

24   statutory mitigating circumstance.

25        Conclusion:  This Court has carefully

1   considered the aggravating circumstances which

2   have been proven to the satisfaction of the Court

3   beyond a reasonable doubt.  There are no

4   mitigating circumstances.  The aggravating

5   circumstances, therefore, outweigh the mitigating

6   circumstances.  This Court has also carefully

7   considered the jury recommendation that the

8   defendant be sentenced to death.  It is, hereby

9   ordered, adjudged and decreed that the defendant

10  shall be punished by death.  The sentence of death

11  shall be consecutive to the sentence imposed in

12  case number 98-62 in the Circuit Court of Cherokee

13  County, Alabama.  The Sheriff shall remove the

14  defendant to the custody of the Alabama Department

15  of Corrections where, in strict accordance with

16  the law, the defendant shall be put to death.  In

17  accordance with the Alabama Rules of Court, the

18  Supreme Court of Alabama shall set an execution

19  date and the Supreme Court Order fixing the

20  execution date shall constitute the execution

21  warrant.

22      Even though every case in which the death

23  penalty is imposed is subject to automatic review

24  by the Alabama Court of Criminal Appeals and the

25  Alabama Supreme Court, the defendant is hereby

1       advised of the right to appeal.  If the defendant

2       wishes to appeal, he must do so by giving notice

3       of appeal within 42 days from the date of this

4       Order.  If the defendant is an indigent and cannot

5       afford a lawyer to represent him on appeal, the

6       Court will appoint a lawyer for him and provide a

7       free transcript of all proceedings in this case.

8       This Court having been previously -- this Court

9       having previously determined that the defendant is

10      indigent, the Court hereby appoints Mr. Stephen P.

11      Bussman, 212 Alabama Avenue South, Post Office Box

12      925, Fort Payne, Alabama, 35967, phone number 256

13      845-7900, to represent the defendant on appeal.

14      The defendant will receive credit for the time

15      during which he has been incarcerated on the

16      present charge.  Done this 5th day of January,

17      2000.  Signed David A. Rains, Circuit Judge.

18          In case number 98-62, the Court also appoints

19      Mr. Bussman to represent the defendant on appeal.

20      You are further advised that in that case, if you

21      wish to file an appeal, you must do so by giving

22      notice of appeal within 42 days from this date.

23      You will receive credit for the time during which

24      you have been incarcerated on this charge.  We

25      stand adjourned.

Gavin v. Alabama                                        Case No. 04A136

1317

1           (The proceedings were concluded

2           at this time)

3           (2:35 P.M.  Hearing resumed)

4       THE COURT:  I have asked that Mr. Gavin and

5     his counsel be returned to the courtroom along

6     with the District Attorney.  In pronouncing the

7     sentence in this case, I referred to the witness

8     Meeks as Gerald Meeks.  The witness is Mr. Dewayne

9     Meeks and, therefore, I wanted to make sure that

10    even though I misspoke the name during the

11    sentencing, that the record clearly states and

12    clearly shows at this time that the person

13    referred to as Mr. Meeks is Mr. Dewayne Meeks who

14    was the witness during the trial of this case.

15    The written Order will be corrected to show the

16    name of Dewayne Meeks instead of Gerald Meeks.  I

17    apologize to you for that error on my part.

18    Anything else that we need to take up at this

19    time?  Anything from the State?

20       MR. O'DELL:  No, sir.

21       THE COURT:  Anything from the defendant?

22       MR. SMITH:  No, sir.

23       MR. UFFORD:  Nothing further, Judge.

24       THE COURT:  Thank you, gentlemen.

25       (The proceedings were concluded

Gavin v. Alabama

Case No. 04A136
## 152

STATE OF ALABAMA,                    IN THE CIRCUIT COURT

VS.                                  OF CHEROKEE COUNTY, ALABAMA

KEITH EDMUND GAVIN,                  CASE NO. <u>CC-98-061</u>

    DEFENDANT.
_____/

### SENTENCING VERDICT

    We, the jury, recommend that the Defendant, Keith Edmund Gavin, be punished by death.  The vote is as follows:

_10_ Death

_2_ Life without parole

F I L E D

NOV 0 3 1999

*Jerry L. Manley Sr.*
FOREPERSON

CIRCUIT CLERK
CHEROKEE COUNTY, ALA.

## IN THE CIRCUIT COURT OF CHEROKEE COUNTY, ALABAMA

STATE OF ALABAMA,                    *

      PLAINTIFF                     *

VS.                                  * CASE NUMBER: CC-98-62

KEITH EDMUND GAVIN,                  *

      DEFENDANT                     *

## MOTION FOR NEW TRIAL

Without benefit of any documentation or transcript save for an uncertified copy of the court file and to preserve any and all issues reviewable either on direct appeal or other post-conviction remedies and reserving the right to amend or modify this motion within a reasonable time upon receipt of a transcript and additional documentation, Defendant Keith Edmund Gavin moves the Court to set aside the verdict and imposition of sentence and to grant him a new trial on the adjudication of guilt phase and/or the sentencing phase and/or a rehearing on the imposition of sentence for one or more of the following reasons:

1. The verdict is contrary to the law.

2. The verdict is contrary to the facts.

3. The verdict is contrary to the weight of the evidence.

4. The verdict is contrary to the law and to the weight of the evidence.

5. The sentence is contrary to the law.

6. The sentence does not comport to the facts.

7. The sentence does not comport to the weight of the

Gavin v. Alabama

8.  The sentence does not comport to the law and to the weight of the evidence.

9.  The defendant was denied a fair and impartial trial because of improper judicial rulings and actions before and during the guilt and penalty phases of the trial.

10.  The defendant was denied a fair and impartial trial because the Court erred in sustaining objections to questions addressed to a witness.

11.  The defendant was denied a fair and impartial trial because the Court erred in admitting testimony of a witness.

12.  The defendant was denied a fair and impartial trial because the Court erred in charging the jury.

13.  The defendant was denied a fair and impartial trial because the Court erred in refusing to charge the jury as requested by defendant.

14.  The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's motion to dismiss appointed counsel.

15.  The defendant was denied a fair and impartial trial because the Court erred in granting the State's motion for consolidation of cases.

16.  The defendant was denied a fair and impartial trial because of extensive pretrial publicity.

17.  The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's motion to permit discovery from all news organizations.

18.  The defendant was denied a fair and impartial trial

Gavin v. Alabama

because the Court erred in denying the defendant's motion to require the prosecution to make known any incentives or agreements they have made with any witness who will give testimony in this case.

19. The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's motion to require the State of Alabama and other investigators working on the case, in particular the chief investigating officer in this cause, to produce for the defendant the names and information concerning any person or persons suspected of involvement in the death of the deceased or who have information touching on such death.

20. The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's motion to require the prosecution to produce all information available on the DNA tests performed.

21. The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's motion to require to prosecution to produce the criminal history of all witnesses whom it expects to call to testify in this case as impeachment material under *Brady*.

22. The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's motion for the prosecution to make known to the defendant as to any witness who has identified the defendant as connected with this crime at issue whether such witness has ever made a prior misidentification or was previously hesitant or equivocating in

Gavin v. Alabama                                    Case No. 04A136

**221**

their identification.

23.   The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's motion for discovery of prosecution files, records, and information necessary for a fair trial.

24.   The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's motion to change location of the defendant's incarceration.

25.   The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's assertion of right to proceed ex parte on application of funds.

26.   The defendant was denied a fair and impartial trial because the Court erred in denying in whole or in part the defendant's application for funds.

27.   The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's motion to continue dated April 19, 1999, so as to allow the assistance of the Alabama Prison Project.

28.   The defendant was denied a fair and impartial trial because the Court erred in denying in whole or in part the defendant's ex parte application for additional investigative expenses.

29.   The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's motion to renew motion to dismiss counsel.

30.   The defendant was denied a fair and impartial trial because the Court erred in granting the State's motion to compel

Gavin v. Alabama

Case No. 04A136

222

discovery.

31. The defendant was denied a fair and impartial trial because the Court erred in granting the State's motion for hair samples.

32. The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's motion to suppress in court identification of defendant.

33. The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's motion in opposition to the use of stun belt.

34. The defendant was denied a fair and impartial trial because the Court erred in granting the State's motion to compel attendance of out-of state witness.

35. The defendant was denied a fair and impartial trial because the Court erred in the convening of the Grand Jury.

36. The defendant was denied a fair and impartial trial because the Court erred in composing the Grand Jury.

37. The defendant was denied a fair and impartial trial because the Court erred in the selection of the foreperson.

38. The defendant was denied a fair and impartial trial because the Court erred in the convening of the jury venire.

39. The defendant was denied a fair and impartial trial because the Court erred in composing the jury venire.

40. The defendant was denied a fair and impartial trial because the Court erred in the convening of the Petit Jury.

41. The defendant was denied a fair and impartial trial because the Court erred in composing the Petit Jury.

Gavin v. Alabama

Case No. 04A136

223

42. The defendant was denied a fair and impartial trial because the method of selecting the grand jury and the jury venire in Cherokee County deprived him to his right to a trial by jury of his peers.

43. The defendant was denied a fair and impartial trial because the Court erred in sustaining objections to questions addressed to the jury venire.

44. The defendant was denied a fair and impartial trial because the Court erred in allowing questions to be posed to the jury venire.

45. The defendant was denied a fair and impartial trial because the Court erred in granting the State's challenges for cause after qualifying on death.

46. The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's challenges for cause.

47. The defendant was denied a fair and impartial trial because the Court erred in denying the defendant's *Batson* challenges.

48. The defendant was denied a fair and impartial trial because the Court erred in allowing the State to use its peremptory challenges to exclude black persons and other groups.

49. The defendant was denied a fair and impartial trial because the Court rested its decision in part on erroneous, and/or inaccurate, incomplete information in the presentence investigation report which the defendant had no meaningful opportunity to explain or deny.

Petition for Writ of Certiorari, Appendix Page 138

Gavin v. Alabama

50.  The defendant was denied a fair and impartial trial because he was denied the effective assistance of counsel at the guilt phase of this trial in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the Constitution and Laws of the state of Alabama.

51.  The defendant was denied a fair and impartial trial because the Court erred in failing to appoint experienced counsel for the defendant.

52.  The defendant was denied a fair and impartial trial because the Court erred in failing to appoint counsel who met the American Bar Association's guidelines for the appointment and performance of counsel in death penalty cases.

53.  The defendant was denied a fair and impartial trial because the Court erred in failing to properly monitor the performance of assigned counsel to ensure that the defendant is receiving quality representation.

54.  The defendant was denied a fair and impartial trial because the Court erred in not removing appointed counsel *ex mero motu*.

55.  The defendant was denied a fair and impartial trial because of ineffective assistance of counsel.

56.  The defendant was denied a fair and impartial trial because of ineffective assistance of counsel prior to indictment.

57.  The defendant was denied a fair and impartial trial because of ineffective assistance of counsel prior to trial.

58.  The defendant was denied a fair and impartial trial because of ineffective assistance of counsel during the guilt

Gavin v. Alabama                                              Case No. 04A136

phase of the trial.

59.  The defendant was denied a fair and impartial trial because of ineffective assistance of counsel during the sentencing hearing.

60.  The defendant was denied a fair and impartial trial because of incompetency of counsel.

61.  The defendant was denied a fair and impartial trial because of prosecutorial misconduct during penalty phase argument.

62.  The defendant was denied a fair and impartial trial because of prosecutorial misconduct during sentencing hearing.

63.  The foregoing errors of the Court violate the rights of the defendant under the Constitutions of the United States and Alabama, including, but not limited to, the right to due process of law established by U.S. Const., Amends. V amd XIV and Ala. Const., Art. I § 6; the right to equal protection of the laws established by U.S. Const., Amend. XIV and Ala. Const., Art. I §§ 1, 6 and 22; the freedom from cruel and unusual punishments established by U.S. Const., Amend. VIII and XIV and Ala. Const., Art. I § 15; the right to freedom from unreasonable searches and seizures, as established by U.S. Const., Amends. IV and XIV and Ala. Const., Art. I § 5; the right to effective assistance of counsel, as established by U.S. Const., Amends, VI and XIV and Ala. Const., Art. I § 6; the right to be heard through self or counsel, as established by Ala. Const., Art. I, §§ 6 and 13; the right to compulsory process for witnesses, as established by U.S. Const., Amends. VI and XIV and Ala. Const., Art. I § 6; the right

Gavin v. Alabama

Case No. 04A136

226

to confrontation of witnesses, as established by U.S. Const., Amends. VI and XIV and Ala. Const., Art. I § 6; the right to be informed of the nature of an accusation, as established by the U.S. Const., Amends. VI and XIV and Ala. Const., Art. I § 6; the right to trial by a fair and impartial jury, as established U.S. Const., Amends. VI and XIV and Ala. Const., Art. I § 6 and 11; the freedom from self-incriminating testimony, as established by U.S. Const., Amends. V and XIV and Ala. Const., Art. I § 6; and the right to indictment by a fair and impartial grand jury, as established by Ala. Const., Art I § 8.

STEPHEN P. BUSSMAN
Attorney for Defendant
P. O. Box 680925
Fort Payne, AL   35968

## CERTIFICATE OF SERVICE

I do hereby certify that I have served a copy of the foregoing on the District Attorney and Keith Edmund Gavin, by placing a copy of the same in the United States mail, properly addressed and postage prepaid, this 5th day of February, 2000.

STEPHEN P. BUSSMAN

FILED

FEB 0 4 2000

CIRCUIT CLERK
CHEROKEE COUNTY, AL

Gavin v. Alabama                                    Case No. 04A136

1231

1        of business in your file?

2    A    Yes, it is.

3    Q    Do such statements of facts, are they required in

4        all your parole files?

5    A    Yes, sir.

6    Q    If you would, is it a regular practice of business

7        to keep these records in your parole files?

8    A    That's correct.

9    Q    And could you tell me, it purports to have been

10       signed by Michelle Jordan, Assistant State's

11       Attorney.  Is it your usual practice in your

12       parole division for such statements of fact to be

13       submitted as a part of the parole record?

14    A    Yes, it is.

15    Q    And could you tell us when this official statement

16       of facts would have become a part of your official

17       business record there, please, ma'am?

18    A    That report either arrived with the subject at the

19       time of his -- at the time of him returning to our

20       facility or within a 60 day period of after we got

21       him.

22    Q    I believe it has an indictment number.  Have you

23       checked that indictment number against the

24       conviction number that you have?

25    A    Yes, sir.

Gavin v. Alabama                                      Case No. 04A136

1082

```
 1    Q    And is it the same?

 2    A    It is the same number.

 3         MR. O'DELL:  We would offer State's exhibit

 4    number 42 at this time, Judge.

 5         MR. SMITH:  May I ask a question or two,

 6    Judge?

 7         THE COURT:  You certainly may.

 8              VOIR DIRE EXAMINATION

 9    BY MR. SMITH:

10    Q    Ms. Morris, you have no personal familiarity with

11    the facts contained in that document; is that

12    correct?

13    A    That's correct.

14    Q    You had no access to the information, source of

15    information, from which that document was

16    prepared; is that correct?

17    A    Ask that question again, please.

18    Q    You had no -- You never reviewed a record of trial

19    or anything from which that document was prepared;

20    is that correct?

21    A    That's correct.

22    Q    That document was prepared by a District Attorney;

23    is that correct?

24    A    That's correct.

25    Q    You don't work for or with a District Attorney
```

Gavin v. Alabama                                    Case No. 04A136

1233

1          that was responsible for the preparation of that

2          document; is that correct?

3    A   That is correct.

4    Q   And you said it arrived either with the parolee or

5          within 60 days thereafter.  How do you know that?

6    A   That is the basic procedure.  Very seldom, it's

7          always an exception to a rule, but very seldom

8          that happens.  Normally when we receive a subject

9          from Cook County Jail, this type of report, the

10         statement of facts, arrives with him at the

11         receiving center or within a 60 day period.

12   Q   But you don't know when this particular document

13         arrived and came to be in Keith Gavin's records;

14         is that correct?

15   A   No, I do not.

16   Q   In fact, it could have arrived before or after,

17         so, I mean, it could have come in the mail as far

18         as you know?

19   A   It could have.

20   Q   You just don't know; isn't that true?

21   A   No, I don't.

22         MR. SMITH:  Judge, we're going to object to

23         the document for not only for the failure of the

24         State to establish the Business Record Exception,

25         but also for the previous matters we have

Gavin v. Alabama                                   Case No. 04A136

1234

1    discussed concerning this document, the fact it is

2    a hearsay document and does not fall within the

3    Business Records Exception.  The fact that the

4    defense has not had the opportunity to properly

5    rebut this document, we did not have access to the

6    record of trial which is the only official source

7    of facts from which that document could have been

8    prepared, that we were given investigation only

9    and not the official record of trial in

10    determination of the facts.  This document

11    contains conclusions which were made by a person,

12    obviously a District Attorney, who has a

13    substantial vested interest in establishing these

14    documents and the facts therein, and that the

15    admission of this document is pursuant to the

16    statute of the Alabama Code with regard to the

17    admission of aggravating matter and the Code

18    indicates, as does the case law, that all

19    aggravating matters are to be -- the admission of

20    all aggravating matters are to be received pursuit

21    to statute only, and that all statutes in a case

22    of this nature to be construed strictly in favor

23    of the defendant and against the proponent and

24    State.  And we suggest that the statute should be

25    interpreted in such a fashion that this document

1    should not be received.  For all those above

2    reasons we would object to the admission of the

3    document.

4         THE COURT:  Could you go back with the witness

5    for me please, sir, and establish the predicate

6    for the Business Records Exception to the hearsay

7    rule.

8              DIRECT EXAMINATION RESUMED

9    BY MR. O'DELL:

10   Q    Ms. Morris, is this writing or this record that

11        you've identified as being an official statement

12        of fact, is it a record that's made in the

13        ordinary course of business with your department?

14   A    Yes, it is.  It's made with the state attorney's

15        office.

16   Q    And it is provided for your parole files on a

17        regular and routine basis as part of your ordinary

18        course of business?

19   A    Yes, it is.

20   Q    And you have told us the method that is used that

21        the state's attorney's office prepares it and it

22        is submitted to your department and for placement

23        in your file in the regular course of business; is

24        that correct?

25   A    That's correct.

Gavin v. Alabama                                    Case No. 04A136

1236

| | | |
|---|---|---|
| 1 | Q | And was it a regular practice of business to make |
| 2 | | this kind of a record by the state's attorney for |
| 3 | | admission to your parole file? |
| 4 | A | That's correct. |
| 5 | Q | And I believe you have testified that the |
| 6 | | time frame that this record was presented or would |
| 7 | | have been presented was either at the time that |
| 8 | | the defendant was put into the institution, |
| 9 | | accompanied him into his records at that time or |
| 10 | | within 60 days? |
| 11 | A | That's correct. |
| 12 | Q | Okay. |

13              THE COURT:  The objection is overruled.

14              MR. UFFORD:  Judge, we have another

15      objection.

16              THE COURT:  I'm sorry, sir.  Excuse me, I'm

17      sorry.

18              MR. UFFORD:  Object to its relevance.  Judge,

19      the aggravating circumstances, I believe that the

20      State has alluded to regarding a capital offense

21      committed while a person was under sentence of

22      imprisonment or parole has not been -- has been

23      presented to the jury at this point.  We must say

24      that that's the only reason we could see why it

25      would be brought in, it's already been

Gavin v. Alabama                                     Case No. 04A136

154

IN THE CIRCUIT COURT OF CHEROKEE COUNTY, ALABAMA

STATE OF ALABAMA,           *
        PLAINTIFF,          *
                            *
VS.                         *        CASE NO.: CC-98-61
                            *
KEITH EDMUND GAVIN,         *
        DEFENDANT.          *

## MOTION CHALLENGING THE METHOD OF EXECUTION

Keith Edmund Gavin respectfully prays that this Court bar any possible imposition of death by electrocution as cruel and unusual punishment, pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Sections 1, 5, 6, 7, 8, 9, 11, 13, 15 & 16 of Article I of the Alabama Constitution.

In support of his motion, the defendant states as follows:

1. Alabama law provides that all persons sentenced to death shall suffer execution by electrocution. This-raises a question that cuts to the very heart of the Eighth Amendment's ban on cruel and unusual punishment. This question demands measured judicial consideration.

2. Many of the officially sponsored executions carried out since Gregg v. Georgia, 428 U.S. 153 (1976) have been by means of electrocution. Since Gregg, an ever-increasing body of evidence has developed to demonstrate that electrocution is a cruel and barbaric method of extinguishing human life--per se, as it is carried out in this state, and as compared with other available means of execution.

### The Facts Surrounding Electrocution

3. There is considerable empirical evidence and eyewitness testimony demonstrating that electrocution violates every one of the principles guarded by the Eighth Amendment. This evidence suggests that death by electrical current is extremely violent and inflicts pain and indignities far beyond the "mere extinguishment of life". Witnesses routinely report that, when the switch is thrown, the condemned prisoner "cringes", "leaps", and "fights the straps with amazing strength."

4. "The hands turn red, then white, and the cords of the neck stand out like steel bands". The prisoner's limbs, fingers, toes, and face are severely contorted. The force of the electrical current is so powerful that the prisoner's eyeballs sometimes pop out and "rest on [his] cheeks." The prisoner often defecates, urinates, and vomits blood and drool.

Gavin v. Alabama                                                    Case No. 04A136

**155**

5. "The body turns bright red as its temperature rises," and the prisoner's "flesh swells and his skin stretches to the point of breaking." Sometimes the prisoner catches on fire, particularly "if [he] perspires excessively." Witnesses hear a loud and sustained sound "like bacon frying," and "the sickly sweet smell of burning flesh" permeates the chamber. This "smell of frying human flesh in the immediate neighborhood of the chair is sometimes bad enough to nauseate even the Press representatives who are present."

6. In the meantime, the prisoner almost literally boils: "the temperature in the brain itself approaches the boiling point of water," and when the post-electrocution autopsy is performed "the liver is so hot that doctors have said that it cannot be touched by the human hand." The body frequently is badly burned and disfigured. There is considerable evidence suggesting that death inflicted by electrocution is anything but instantaneous or painless.

7. Throughout this century a number of distinguished electrical scientists and medical doctors have argued that the available evidence strongly suggests that electrocution causes unspeakable pain and suffering. Because "[t]he current flows along a restricted path into this body, and destroys all the tissues confronted in the path...[i]n the meantime the vital organs may be preserved; and pain, too great for us to imagine, is induced...For the sufferer, time stands still; and this excruciating torture seems to last for an eternity."

8. L.G.V. Rota, a renowned French electrical scientist, concluded after extensive research that

"[i]n every case of electrocution,....death inevitably supervenes but it may be very long, and above all, excruciatingly painful...[T]he space of time before death supervenes varies according to the subject. Some have a greater physiological resistance than others. I do not believe that anyone killed by electrocution dies instantly, no matter how weak the subject may be. In certain cases death will not have come about even though the point of contact of the electrode with the body shows distinct burns. Thus, in particular cases, the condemned person may be alive and even conscious for several minutes without it being possible for a doctor to say whether the victim is dead or not... This method of execution is a form of torture."

9. Whether because of shoddy technology and poorly trained personnel--as in the case here in Alabama, where the retarded Horace Dunkins was not killed for 30 minutes because the executioner attached the wires the wrong way around--or because of the inherent differences in the "physiological resistance" of condemned prisoners to electrical current, it is an inescapable fact that the 95-year history of electrocution in this country has been characterized by repeated failures to execute swiftly and the resulting need to send recurrent charges into condemned prisoners to ensure deaths.

10. The very first electrocution required attempts before death resulted, and our cultural lore is filled with examples of attempted electrocutions that had to be restaged when it was discovered that the condemned "tenaciously clung to life." Attending physicians routinely acknowledge that electrocutions must often be repeated in order to ensure death. It is difficult to

Gavin v. Alabama                                                    Case No. 04A136

**156**

imagine how such procedures constitute anything less than "death by installments"-- "a form of torture [that] would rival that of burning at the stake." Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 474, 476 (1947) (Burton, J., dissenting).

11. The pattern of "death by installments" is by no means confined to bygone decades. Here is one eyewitness account of Alabama's electrocution of John Evans on April 12, 1983:

"At 8:30 p.m., the first jolt of 1900 volts of electricity passed through Mr. Evans' body. It lasted thirty seconds. Sparks and flames erupted from the electrode tied to Mr. Evans' left leg. His body slammed against the straps holding him in the electric chair and his fist clenched permanently. The electrode apparently burst from the strap holding it in place. A large puff of greyish smoke and sparks poured out from under the hood that covered Mr. Evans' face. An overpowering stench of burnt flesh and clothing began pervading the witness room. Two doctors examined Mr. Evans and declared that he was not dead.

"The electrode on the left leg was refastened. At 8:30 p.m. [sic] Mr. Evans was administered a second thirty second jolt of electricity. The stench of burning flesh was nauseating. More smoke emanated from his leg and head. Again, the doctors examined Mr. Evans. The doctors reported that his heart was still beating, and that he was still alive. At that time, I asked the prison commissioner, who was communicating on an open telephone line to Governor George Wallace to grant clemency on the grounds that Mr. Evans was being subjected to cruel and unusual punishment. The request for clemency was denied.

"At 8:40 p.m., a third charge of electricity, thirty seconds in duration, was passed through Mr. Evans' body. At 8:44, the doctors pronounced him dead. The execution of John Evans took fourteen minutes."

12. This was the description of the execution of Alpha Otis Stephens on December 12th, 1984, in Georgia:

The first charge of electricity administered today to Alpha Otis Stephens in Georgia's electric chair failed to kill him, and he struggled to breathe for eight minutes before a second charge carried out his death sentence for murdering a man who interrupted a burglary.

              *    *    *    *    *    *

A few seconds after a mask was placed over his head, the first charge was applied, causing his body to snap forward and his fists clench.

His body slumped when the current stopped two minutes later, but shortly afterward witnesses saw him struggle to breathe. In the six minutes allowed for the body to cool before doctors could examine it, Mr. Stephens took about 23 breaths.

At 12:26 a.m., two doctors examined him and said he was still alive. A second two-minute charge was administered at 12:28 a.m.

Gavin v. Alabama                                          Case No. 04A136

**157**

13. There is considerable evidence suggesting that death by electrocution causes far more than the "mere extinguishment of life." In re Kemmler, 136 U.S. 436, 447 (1890). This evidence raises a substantial question about whether electrocution violates the Eighth Amendment.

14. First, electrocution appears to inflict "unnecessary and wanton...pain" and cruelty, and to cause "torture or a lingering death" in at least a significant number of cases. Gregg v. Georgia, 428 U.S. 153, 173 (1976) (opinion of Stewart, Powell, and Stevens, J.J.); In re Kemmler, 136 U.S. at 447. Second, the physical violence and mutilation that accompany this method of execution would seem to violate the basic "dignity of man." Trop v. Dulles, 356 U.S. 86, 100 (1959) (plurality opinion).

15. Finally, even if electrocution does not invariably produce pain and indignities, the apparent century-long pattern of "abortive attempts" and lingering deaths suggests that this method of execution carries an unconstitutionally high risk of causing such atrocities. Louisiana ex rel. Francis v. Resweber, 329 U.S. at 471 (Frankfurter, J., concurring).

16. These features of electrocution seem so "inherent in [this] method of punishment" as to render it per se cruel and unusual and therefore forbidden by the Eighth Amendment. Id at 464.

17. Moreover, commentators and medical experts have urged that other currently available means of execution– particularly some forms of lethal gas and fast-acting barbiturates– accomplish the purpose of extinguishing life in a surer, swifter, less violent, and more humane manner. Several state legislatures have abandoned electrocution in favor of lethal injection for these very reasons; one of the architects of this change has emphasized that it resulted precisely from the recognition that the electric chair is "a barbaric torture device" and electrocution a "gruesome ritual." Other states have rejected electrocution in favor of the use of lethal gas.

18. Turning to the facts of this case, it is further clear that the antiquated electric chair used in Alabama has inherent design flaws that create an intolerable likelihood that Mr. Keith Edmund Gavin would be tortured to death.

### The Horace Dunkins Execution in Alabama

19. The execution of Horace Dunkins, a former death row prisoner in Alabama, makes clear that death by electrocution has been unusual and uniquely torturous in the State of Alabama. Far from receiving the kind of instantaneous death that is at least claimed to be adequate for Eighth Amendment purposes, Mr. Dunkins was forced to suffer through a process that was both cruel and unusual.

20. On July 13, 1989, Mr. Dunkins had his head shaved by prison guards at 11:22 p.m. At 11:25 p.m., prison guards began to shave Mr. Dunkins' left leg from knee to ankle. After the procedure was completed at 11:33 p.m., Mr. Dunkins dressed himself and was led into the execution chamber at 11:50 p.m. After being strapped into Alabama's antiquated electric chair and having a small helmet containing electrodes attached to his head and electrodes attached to his left leg, a dark hood was placed over his face.

21.   Sometime shortly after midnight, the prison warden activated Alabama's electric chair. Eyewitnesses said they observed Mr. Dunkin's' right hand tense and left arm jerk upward against the restraints as the noise of the electric chair droned through the area. It quickly became apparent that Mr. Dunkins was not dead.

22.  It has been reported by state representatives that cables attaching Alabama's very old power supply and electric chair were improperly connected, resulting in the discharge of voltage insufficient to kill Mr. Dunkins instantaneously. It has been reported that Mr. Dunkins may have received 60 or 70 volts of electricity during the state's first attempt at execution which would likely have caused a great deal of pain but would not have produced death.

23.  A second execution was attempted which resulted in severe burning and mutilation of Mr. Dunkins' body. Nearly twenty minutes elapsed before Mr. Dunkins was pronounced dead.

24.  Alabama's antiquated electric chair has malfunctioned several times and had in fact malfunctioned just two days before Mr. Dunkins' scheduled execution. The chair has consistently resulted in excessive burning and mutilation of condemned prisoners and rendered death by electrocution in Alabama unpredictably torturous.

25.  The state seeks Mr. Keith Edmund Gavin's execution by equipment, methods and procedures all of which are unnecessarily offensive to the Eighth Amendment.

### Design Flaws and Age Make Alabama's Chair Unreliable

26.  Alabama's electric chair was built in the 1920's through use of inmate labor. The chair was not constructed or designed by an electrical engineer who could properly effectuate a constitutional execution.

27.  Numerous design flaws in Alabama's electrocution system make it unreliable and unnecessarily cruel to those condemned to die at the hands of the state. If Mr. Keith Edmund Gavin is subjected to electrocution in Alabama's electric chair, his death will likely be slow and painful, his body burned and mutilated.

28.  The headgear is also poorly designed. When the helmet is tightened onto the prisoner's head, metal is next to the skin and produces severe burns. This faulty design all but ensures that Mr. Keith Edmund Gavin's execution would result in the burning and mutilation of his body.

29.  Unlike other states that have updated their execution equipment, Alabama still employs an electric chair system that has only one leg electrode. Systems are now designed with two leg electrodes, one for each leg, in order to ensure that electricity passes evenly through the condemned inmate's body and instantly causes death. Electrocution in an electric chair with only one leg electrode is considered by experts to be unreliable and it may therefore result in cruelty and unnecessary pain to Mr. Keith Edmund Gavin.

30. Alabama's single leg electrode is also attached in an unreliable manner, with a leather strap around the prisoner's leg. New and updated electric chair systems now use a wooden stocks mechanism that houses the leg electrode and prevents movement of the electrode or the prisoner's leg. The leather strap with which Alabama secures its leg electrode stretches and twists as the muscles of a condemned man convulse and quiver in response to the electrical current and thereby allows slippage of the electrode on the leg. Slippage may also result if the leather strap burns apart as it did during the John Evans' execution in 1983. When such slippage of the electrode occurs again, it would not only cause burning and mutilation of Mr. Keith Edmund Gavin's body but would increase the likelihood that death for Mr. Keith Edmund Gavin would not be instantaneous. Slippage of the electrode creates resistance, thereby decreasing the amount of current received by the prisoner and prolonging his pain and death.

31. Individually and collectively, these design defects create a significant likelihood that Mr. Keith Edmund Gavin would be subjected to cruel and unusual punishment in violation of his Eighth Amendment rights should the State of Alabama be permitted to attempt to execute him in its present electric chair.

### Improper Amperage and Inadequate Equipment Have Resulted in Severe Burning and Mutilation of the Body

32. The Alabama electric chair is designed to administer 8.5 to 9 amps for 22 seconds, then fall off to approximately 5.2 amps in twelve seconds, then jump up to 9 amps in five seconds and shut off. This amperage, voltage, and cycle are all totally inappropriate in light of present knowledge about electrocution.

33. If over 6 amps are administered to a condemned prisoner, he is literally cooked. Electric chairs are currently being built and those that have been properly inspected and maintained do not exceed 6 amps of current. Alabama's chair, when functioning properly, administers 8.5 to 9 amps. Even if Alabama's chair were to work perfectly, Mr. Keith Edmund Gavin would be subject to excessive burning and mutilation.

34. Because the equipment utilized by Alabama does not efficiently conduct current or adequately secure a condemned person, condemned prisoners suffer severe burns over parts of the body that are not even attached to electrodes.

35. The amperage and equipment utilized have resulted in charring of the body, arcing and electrical burns to the backs, thighs, arms and abdominal areas of the condemned. Although electrodes were fixed on the head and left leg near the knee, Horace Dunkins received electrical burns in his hip, left thigh, buttocks, lower back, right shoulder and right thigh.

36. Michael Lindsey received burn marks on his scrotum and left arm. State Medical Examiner LeRoy Riddick, M.D., in Lindsey's autopsy report, stated that Lindsey had a "2- inch zone of burn on the left side of the scrotum." Dr. Riddick also described "[a]rcing marks around left groin." Furthermore, the state medical examiner's autopsy revealed that Michael Lindsey's

body contained both "a small abrasion on the mid-portion of the right clavicle" and a 4- inch semicircular burn on his left forearm.

37. Wayne Ritter's autopsy similarly revealed burns to his scrotum and even burns to his chest, neck and abdomen. Ritter, as did Lindsey, had a "2- inch zone of burns on the left side of the scrotum." This burn corresponded to a zone of burns on Ritter's inside left leg. Ritter's autopsy also revealed injuries to his chest in the form of "a zone of violaceus [having a violet color] changes to the upper portion of the chest on each side of the sternal notch." LeRoy Riddick, M.D. and Gary Cumberland, M.D., the State Medical Examiners for Ritter's autopsy, also located burns on Ritter's neck, "[a]nteriorly on each side of the central portions of the neck."

38. Basic notions of human dignity protected by the Eighth Amendment command that the state minimize mutilation and distortion of the condemned person's body. As Justice Brennan noted:

> The Eighth Amendment's protection of "the dignity of man" extends beyond prohibiting unnecessary infliction of pain when extinguishing life. Civilized standards, for example, require a minimization of physical violence during execution irrespective of the pain that such violence might inflict on the condemned.

Glass v. Louisiana, 471 U.S. 1080 (1985) (Brennan, J., dissenting from denial of certiorari) (citations omitted).

### Improper Voltage

39. Over 2000 volts of electricity are required in order to guarantee that a prisoner's heart will be stopped with one cycle in the chair. Alabama's chair has previously been cycled at 1800 to 1900 volts at its peak in attempting execution of death row prisoners. This is precisely what happened in the grotesquely botched executions of both John Evans and Horace Dunkins when repeated electrocution was necessary to kill the prisoner. Furthermore, by quickly increasing the voltage at the end of the cycle, Alabama's electric chair actually tends to defibrillate the heart of a condemned man and keep it beating longer, prolonging his death and creating the necessity for repeated application of current. Mr. Keith Edmund Gavin would undoubtedly be subjected to unnecessary torture and mutilation if he were required to submit to such repeated electrocution.

### Inadequate Testing and Supervision of Executions
### by Trained Experts

40. Alabama's testing of its execution is shamefully inadequate by any standards, but given the age of that system, its suspect design, and repeated malfunctions, the lack of proper testing demonstrates a depraved indifference on the part of The State to the right of the condemned to be free from torture and mutilation.

41. Executions are administered by an "execution team" of full-time employees of Holman State Prison. Most of the members of the execution unit are correctional guards who are trained in security matters. There are no rank or educational requirements for membership on the execution team. The unit members have no specialized training in electrical engineering or administration of death by electrocution.

42. There is insufficient testing and training of execution team members. While the team reportedly tests the equipment prior to an execution and prepares itself, the Dunkins execution makes clear that unit members cannot competently perform the requirements of a humane execution.

43. By the state's own admission, team members negligently connected cables during the Dunkins execution which resulted in a prolonged, torturous death that failed to satisfy Eighth Amendment requirements.

44. While head and leg electrodes should be subjected to visual, mechanical and even microscopic examination before an execution, prison guards at Holman are in no way qualified to determine if the head and leg electrodes are working properly.

45. Furthermore, what cursory testing is provided is conducted by a prison maintenance electrician, employed by the general maintenance staff of the prison. An electrician does not have the training necessary to supervise testing of an electric chair system adequately or to ensure that it is functioning reliably.

46. The Eighth Amendment has never been construed to uphold the kind of butchery that has attended executions in Alabama. The "human error" that was partially responsible for he torturous execution of Horace Dunkins revealed fundamental problems with the Department of Corrections' ability to facilitate executions competently.

### Eighth Amendment Law

47. It is now well established that the Eighth Amendment applies to the states through the Fourteenth Amendment. See, e.g., Gregg v. Georgia, 428 U.S. 153, 173 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); Robinson v. California, 370 U.S. 660 (1962). The cruel and unusual punishment clause has an expansive and vital character that "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality opinion). Accordingly, Eighth Amendment claims must be evaluated "in the light of contemporary human knowledge," Robinson v. California, 370 U.S. at 666, rather than in reliance on century-old factual premises that may no longer be accurate.

48. To be sure, the fact that the Alabama legislature chose, many years ago, to sanction death by electrocution cannot shield the law from judicial review. In common with all constitutional guarantees, "it is evident that legislative judgements alone cannot be determinative of Eighth Amendment standards since that Amendment was intended to safeguard individuals

Gavin v. Alabama                                      Case No. 04A136

# 162

from the abuse of legislative power." <u>Gregg v. Georgia</u>, 428 U.S. at 174 n.19 (opinion of Stewart, Powell, and Stevens, JJ.); <u>see also, Weems v. United States</u>, 217 U.S. 349, 371-73 (1910).

49. "[T]he Constitution contemplates that in the end [a court's] own judgement will be brought to bear on the question of the acceptability' of a challenged punishment, guided by "objective factors to the maximum possible extent." <u>Coker v. Georgia</u>, 433 U.S. 584, 592, 597 (1977) (plurality opinion).

50. Thus, it is firmly within the "historic process of constitutional adjudication" for courts to consider, through a "discriminating evaluation" of all available evidence, whether a particular means of carrying out the death penalty is "barbaric" and unnecessary in light of currently available alternatives. <u>Furman v. Georgia</u>, 408 U.S. 238, 420, 430 (1972) (Powell, J., dissenting).

51. In explaining the obvious unconstitutionality of such ancient practices as disemboweling while alive, drawing and quartering, public dissection, burning alive at the stake, crucifixion, and breaking at the wheel, the Court has emphasized that the Eighth Amendment forbids "inhuman and barbarous" methods of execution that go beyond "the mere extinguishment of life" and cause "torture or a lingering death." <u>In re Kemmler</u>, 136 U.S. 436, 447 (1890).

52. It is beyond debate that the Amendment proscribes all forms of "unnecessary cruelty" that cause gratuitous "terror, pain, or disgrace." <u>Wilkerson v. Utah</u>, 99 U.S. 130, 135-136 (1879).

53. The Eighth Amendment's protection of "the dignity of man", <u>Trop v. Dulles</u>, 356 U.S. at 100 (plurality opinion) extends beyond prohibiting the unnecessary infliction of pain when extinguishing life. Civilized standards, for example, require a minimization of physical violence during execution irrespective of the pain that such violence might inflict on the condemned. <u>See, e.g., Royal Commission on Capital Punishment</u>, 1949-1953 Report paragraph 732 (1953). Similarly, basic notions of human dignity command that the state minimize "mutilation" and "distortion" of the condemned prisoner's body. <u>Id</u>. These principles explain the Eighth Amendment's prohibition of such barbaric practices as drawing and quartering. <u>See, e.g., Wilkerson v. Utah</u>, 99 U.S. at 135.

54. In evaluating the constitutionality of a challenged method of capital punishment, courts must determine whether the factors discussed above–unnecessary pain, violence, and mutilation–are "inherent in the method of punishment." <u>Louisiana es rel. Francis v. Resweber</u>, 329 U.S. at 464. If a method of execution does not satisfy these criteria– if it causes "torture or a lingering death" in a significant number of cases, <u>In re Kemmler</u>, 136 U.S. at 447– then unnecessary cruelty inheres in that method of execution and the method violates the cruel and unusual punishment clauses.

55. To quote the eloquent words of Justice Brennan:

For the reasons set forth above, there is an evermore urgent question whether electrocution in fact is a "humane" method for extinguishing life or is, instead, nothing less than the contemporary technological equivalent of burning people at the stake.

Gavin v. Alabama                                           Case No. 04A136

**163**

<u>Glass v. Louisiana</u>, 471 U.S. 1080 (1985) (Brennan, J., dissenting from denial of certiorari).

WHEREFORE, Mr. Keith Edmund Gavin respectfully requests that this Court:

(a) allow Mr. Keith Edmund Gavin to present evidence and argument on this motion;
(b) schedule a hearing on this motion;
(c) enter a order, similar to the attached proposed order, granting the motion and striking down, as unconstitutional, the imposition of the death penalty by electrocution in Alabama's electric chair; and
(d) grant any other relief that is just and proper under the circumstances of this motion.

Respectfully submitted,

H. Bayne Smith
105 Seaboard Avenue
Piedmont, AL 36272
(256)447-0022

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all parties in accordance with Rule 5, on this _24th_ day of November, 1999.

H. Bayne Smith

**FILED**

NOV 2 4 1999

CIRCUIT CLERK
CHEROKEE COUNTY, AL

Gavin v. Alabama                                    Case No. 04A136

## ARGUMENT

### I

### ALABAMA'S STATUTORY SCHEME FOR IMPOSING THE DEATH PENALTY VIOLATES THE RIGHT OF THE DEFENDANT TO A JURY DETERMINATION OF WHETHER AGGRAVATING CIRCUMSTANCES OUTWEIGH MITIGATING CIRCUMSTANCES, AND THEREBY DEPRIVED THE APPELLANT OF HIS RIGHT TO A JURY TRIAL ON THE SENTENCE OF DEATH

In Alabama, the Legislature has adopted a scheme for the imposition of the death penalty wherein the final determination is made by the trial judge. Ala. Code § 13A-5-47. Prior to the trial judge's determination of the sentence, a defendant is allowed a jury hearing, which renders an "advisory verdict" to the trial judge. Ala. Code § 13A-5-46.

This Court has held that the advisory nature of a jury in the sentencing phase does not violate the right to a jury trial established by Ala. Const., Art. I § 11.[1] *Edwards v. State*, 515 So.2d 86 (Ala.Crim.App. 1987). However, in making that determination, this Court underscored the advisory-only nature of the jury's role:

> Contrary to appellant's argument, the death penalty is not invoked on the basis of the jury's recommendation. ***The jury's role in sentencing under our bifurcated trial process is merely advisory in nature.*** 515 So.2d at 89

The Alabama Supreme Court has held that it is necessary, under Alabama's statutory scheme, that the trial judge must determine at least one of the aggravating circumstances enumerated in Ala. Code § 13A-5-49 exists in order to

---

[1]   "[we declare] ... That the right of trial by jury shall remain inviolate."

Gavin v. Alabama                                                    Case No. 04A136

impose a death sentence:

> The whole catalog of aggravating circumstances must outweigh
> mitigating circumstances before a trial court may opt to impose the
> death penalty by overriding the jury's recommendation. *Ex parte
> Jones*, 456 So.2d 380, 382 (Ala. 1984)

If there is no aggravating circumstance, then, by necessity, the aggravating
circumstances cannot outweigh the mitigating circumstances.

This Court has further held that, in addition to the finding of at least one
aggravating circumstance, the trial judge (and this Court, *de novo* on appeal
pursuant to Ala. Code § 13A-5-53) must find that the aggravating circumstances
outweigh the mitigating circumstances to impose the death penalty:

> In deciding upon the sentence, the trial court shall determine whether
> the aggravating circumstances it finds to exist outweigh the
> mitigating circumstances it finds to exist ... Ala. Code § 13A-5-
> 47(e)  *see, Stallworth v. State*, 2001 WL 1149071 (Ala. Crim. App.
> 2001).

Into this statutory scheme has burst the landmark ruling of the United States
Supreme Court in the case of *Ring v. Arizona*, 122 S.Ct. 2428 (2002).  Earlier, the
Supreme Court, in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), had ruled that
the jury trial right of U.S. Const., Amend. VI, required that a defendant not be
"expose[d] ... to a penalty exceeding the maximum he would receive if punished
according to the facts reflected in the jury verdict alone."  530 U.S. at 483.
However, the Supreme Court, in *Walton v. Arizona*, 497 U.S. 639 (1990), had
previously ruled that there was no Sixth Amendment Jury Clause violation in the
Arizona regime.

Gavin v. Alabama                                              Case No. 04A136

Under the Arizona regime, the jury made the initial determination of guilt, and then went home. The trial judge then conducted the sentencing phase, and made a determination of the existence *vel non* of an aggravating circumstance. Upon finding one or more aggravating circumstances, the trial judge then weighed those aggravating circumstances against any mitigating circumstances:

> In determining whether to impose a sentence of death or life imprisonment, the court shall take into account the aggravating and mitigating circumstances included in subsections G and H of this section and shall impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated in subsection G of this section and that there are no mitigating circumstances sufficiently substantial to call for leniency. Ariz. Rev. Stat. § 13-703F. [2]

In *Ring*, the Supreme Court overruled *Walton*, and held that the right to a jury trial required that the jury make the determination of the existence of an aggravating circumstance in the Arizona statutory scheme.

> For the reasons stated, we hold that *Walton* and *Apprendi* are irreconcilable; our Sixth Amendment jurisprudence cannot be home to both. Accordingly, we overrule *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. See 497 U.S., at 647-649, 110 S.Ct. 3047. Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," *Apprendi*, 530 U.S., at 494, n. 19, 120 S.Ct. 2348, the Sixth Amendment requires that they be found by a jury. 122 S.Ct. at 2443.

Justice Scalia, in his concurring opinion, correctly stated that:

> I believe that the fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the

---

[2]      Ariz. Rev. Stat. § 13-703 is reproduced in its entirety as Appendix A hereto.

level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt. 122 S.Ct. at 2445

There are only two differences between the Arizona and Alabama statutory schemes. The first is that Alabama interposes the purely advisory jury recommendation. The second is that Arizona's statute, by referring to mitigating circumstances establishing "leniency," seems to place something of a burden of persuasion, if not of proof, on the defendant.[3] For purposes of this case, each of these is a "distinction without a difference," Henry Fielding, *Tom Jones*, Bk. VI, ch. 13.

The death sentence in this case is not "saved" by the fact that the jury convicted the Defendant of capital murder, thereby making an implied finding that the murder was in the course of a robbery, and/or that the Defendant had a prior criminal record. For example, the State may argue that the conviction on the count involving robbery, made capital by Ala. Code 13A-5-40(a)(2), also constitutes a finding of a robbery aggravating circumstance under Ala. Code § 13A-5-49(4). However, the ultimate sentencing decision is required to be based not on the existence *vel non* of one or more aggravating circumstances, but on the finding that those aggravating circumstances outweigh the mitigating circumstances. On such an outweighing, or even on the existence *vel non* of mitigating circumstances, the guilt phase verdict is silent.

Nor will it "save" the sentence in this case that the jury voted 10-2 in favor of a death sentence. (R. 1297). Criminal jury verdicts in Alabama are required to be unanimous under Ala.R.Crim.P. 23.1(a):

---

[3]   The opinion in *Ring* undertook a survey of state statutes in the field. That survey, located at n. 6 of the Court's opinion, is made Appendix B to this Brief.

11

(a) Form of Verdict. The verdict of the jury shall be unanimous, shall be in writing, signed by the foreman, and shall be returned in open court.

As the official comment to this portion of the Rule further states:

Rule 23.1(a) provides that the jury's verdict must be unanimous. Alabama case law clearly states that this is a fundamental requisite of a jury. *Baader v. State*, 201 Ala. 76, 77 So. 370 (1917); *Dixon v. State*, 27 Ala.App. 64, 167 So. 340 (1936).

Thus, two members of the jury either determined that the mitigating circumstances outweighed the aggravating circumstances under Ala. Code § 13A-5-46, or that there were no aggravating circumstances. Therefore, the requirement that a criminal jury be unanimous under the Rule and Ala. Const., Art. I § 11, was not satisfied.[4]   Taking *Ring*, Ala.R.Civ.P. 23.1(a), and the established jurisprudence of Ala. Const., Art. I § 11 together, it is clear that the jury vote in the sentencing phase of the Appellant's trial does not support the sentence of death.

It is also clear that the Appellant is entitled to have *Ring* applied to the holding in this appeal. As the United States Supreme Court held in *Griffith v. Kentucky*, 479 U.S. 314 (1987):

---

[4]   Ala. Code § 13A-5-46 purports to permit a jury to recommend death with at least 10 concurring votes. However, as *Ring* now makes clear that the determination is within the domain of the jury, it becomes subject to the holding that Ala. Const., Art. I § 11 requires that a jury verdict be unanimous. "In the second place, section 11 of the Constitution does not prevent the Legislature from making such regulations as it thinks proper touching the selection of a jury, so long as the fundamental requisites of a jury are not impaired. Those fundamental requisites are that the jury shall be composed of 12 persons, that they shall be impartial, *and that the verdict must be unanimous.*" *Dixon v. State*, 27 Ala.App. 64, 73, 167 So. 340, 348 (1936)(emphasis added) *Accord, Baader, supra; Kirk v. State*, 247 Ala. 43, 45, 22 So.2d 431, 432 (1945).

12

> We therefore hold that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a "clear break" with the past. 479 U.S. at 328

The Appellant filed a Motion for New Trial in his death penalty case on 4 February 2000. (C. 207) That motion specifically alleges that the sentence in this case is contrary to the law. (*ibid.*, ¶ 5)  It also stated that:

> The defendant was denied a fair and impartial trial because of the trial court's instructions on the weighing of the aggravating and mitigating circumstances *and the role of the jury in the sentencing process*. (C. 208, ¶ 17) (emphasis added)

The Motion for New Trial specifically invoked the rights of the Appellant under U.S. Const., Amend. VI, and Ala. Const., Art. I § 11 to a trial by jury.  (C. 216-17, ¶ 78) Therefore, the issue was properly raised before the trial court, and the denial by lapse of time of the new trial motion under Ala.R.Crim.P. 24.4 preserved this issue for appeal.[5]

However, even if the Court was to hold the Appellant to the strict standard of plain error under Ala.R.App.P. 45A, that standard is clearly met:

> In all cases in which the death penalty has been imposed, the court of criminal appeals *__shall__* notice any plain error or defect in the proceedings under review. whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected

---

[5]  The Motion for New Trial also based these claims on the prohibition of cruel and unusual punishment by U.S. Const., Amend. VIII and Ala. Const., Art. I § 15. Justice Breyer, concurring in *Ring*, noted that he concurred based on Eighth Amendment grounds, not Sixth Amendment grounds. 122 S.Ct. at 2446 (Breyer, J., concurring)

Gavin v. Alabama                                    Case No. 04A136

the substantial right of the appellant. [6]

The Alabama Supreme Court made the mandatory nature of this review clear in *Ex parte Carroll*. 627 So.2d 874 (Ala. 1993):

> In reviewing a death penalty case, this Court *will* notice any plain error or defect in the proceeding under review, regardless of whether it was brought to the attention of the trial court. This Court *will* take appropriate appellate action whenever the error "has *or probably has* adversely affected the substantial right of the appellant. 627 So.2d at 875 (citations omitted, emphasis added)

It is indeed questionable whether the plain error rule should even apply in the instant case, as the law in effect at the time of Appellant's trial was the adverse holding of *Walton*, and *Ring* was not decided until this year. As the Sixth Circuit noted in *United States v. Humphrey*, 287 F.3d 422 (6th Cir. 2002):

> The preservation of a constitutional right is not a parlor game. Defendants should not be required, on penalty of forfeiture, to guess not only which substantial right will be impacted by a pending Supreme Court decision, but also which precise sequence of words will be necessary to preserve that right on appeal.

> [Indeed, we believe too high a hurdle for *de novo* review will raise the specter of defendant's counsel making a long and virtually useless laundry list of objections to rulings that were plainly supported by existing precedent in order to preserve the issue for appeal.] 287 F.3d at 443 (citations omitted, bracketed material located at n. 4)(defendant entitled to raise *Apprendi* argument for first time on appeal when United States Supreme Court had not decided *Apprendi* at time of trial)

---

[6]   *See Ex Parte Looney*, 797 So.2d 427, 428 (Ala. 2001) ("The word 'shall' is clear and unambiguous and is imperative and mandatory. ... The word in ordinary usage means "must" and is inconsistent with a concept of discretion.") (citations omitted) *quoting Ex parte Prudential Ins. Co. of America*, 721 So.2d 1135, 1138 (Ala. 1998).

Gavin v. Alabama                                    Case No. 04A136

The denial of the right to have a jury determine that aggravating circumstances outweighed mitigating circumstances was clearly violated in this case. Therefore. the Appellant's death sentence is due to be vacated and the lesser sentence of life imprisonment without parole imposed.  This is the construction given the similar provisions of N.J. Rev. Stat. § 2C:11-3 in the case of *State v. Hunt*, 115 N.J. 330, 558 A.2d 1259 (1989):

> In a capital case, unlike the ordinary criminal prosecution, jurors need not reach a unanimous verdict [for life without parole]. Thus, a decision not to agree is a legally acceptable outcome, which results not in a mistrial, but in a final verdict.   For this reason, trial courts should not charge juries in the penalty phase on the importance of reaching a unanimous verdict. Ibid. *As long as one juror believes that the aggravating factors do not outweigh the mitigating factors, the jury must not impose the death penalty.*  558 A.2d at 1286. (citations omitted, emphasis added)

This is also the interpretation given the similar Georgia statute, Ga. Code Ann. § 17-10-30(b)(7):

> [I]n a murder case, after conviction, where only two sentences can be imposed, life imprisonment or death, *if the convicting jury is unable to agree on which of those two sentences to impose, the trial judge must impose the lesser, life imprisonment. Hill v. State*, 250 Ga. 821, 301 S.E.2d 269, 270 (1983) (emphasis added)

In the alternative, the cause should be remanded for retrial on the sentence.

Gavin v. Alabama                                    Case No. 04A136

293

1        CENTRE, ALABAMA

2        NOVEMBER 2, 1999

3             (8:35 A.M.  Jury Venire not present)

4                  THE COURT:  Yes, sir.

5                  MR. SMITH:  Mr. Gavin would like to address

6        the Court, sir.

7                  THE COURT:  All right, what is it?

8                  MR. GAVIN:  Yes, Judge, I would like to make a

9        couple of motions this morning.  I wanted to on

10       behalf of myself as pro se.

11                 THE COURT:  Yes, sir.

12                 MR. GAVIN:  And one of the motions is that I,

13       excuse me, since this is an early stage of this

14       trial here that we are about to go into.

15                 THE COURT:  I'm sorry, this is an early stage

16       of the trial, and what?

17                 MR. GAVIN:  That we are about to go into.

18                 THE COURT:  Yes, sir.

19                 MR. GAVIN:  And also the latest stage of the

20       proceedings.  I would like to ask the Court to

21       declare this trial as a mistrial at this point and

22       have my attorney removed as my defense attorney in

23       this matter on the grounds of conflict of

24       interest, misrepresentation, and poorly

25       advisement.

Gavin v. Alabama                                    Case No. 04A136

294

1              THE COURT:  Poor what?

2              MR. GAVIN:  Poor advisement.  Me and Mr. Bayne

3    Smith has been bickering back and forth about the

4    truth, the facts, the evidence, and the law

5    concerning this case, the State of Alabama versus

6    Keith Edmund Gavin.  Yesterday Mr. Bayne Smith

7    come to me telling me that Mike O'Dell, the D.A.,

8    offered a plea to me.  I've been telling Mr. Bayne

9    Smith from the very day that I am innocent of

10   shooting Mr. William Clayton.  He doesn't hear me,

11   Judge.  He tried to persuade me.  Not only that,

12   he tried to pressure me into taking this plea of

13   life imprisonment without the possibility of

14   parole.  He went as far as calling my investigator

15   to have him call my mother and pressure her into

16   telling me or convincing me to plead to this case,

17   this charge, when I'm not guilty of it.  That's

18   why I'm asking you to declare this as a mistrial

19   at this moment because this is, my life is at

20   stake.  It doesn't matter, really, what people

21   think when it comes to an innocent person.  Mr.

22   Bayne Smith does not hold me as presumably

23   innocent until proven guilty.  He don't have that

24   presumption of innocence from his standpoint.

25              True, he might have did a lot of work, that's

Gavin v. Alabama                                    Case No. 04A136

1     procedure, that's his job to do a lot of work or

2     whatever work he might have done, but the fact of

3     the matter is, Judge, he cannot go in this trial in

4     front of this jury with a clear conscious and try

5     to defend me with his complete heart.  It is not

6     there with him.  It would be, it would be a gross

7     miscarriage of justice if I am forced to go to

8     trial with Mr. Bayne Smith as my lead attorney in

9     this matter.  This is my third request to have Mr.

10    Bayne Smith removed.  The first one, I withdrew

11    that one under advisement of Mr. Ufford, to my

12    right.  The second one, you've written an Order on

13    that and denied my motion to have Mr. Bayne Smith

14    removed from this case.  Judge, I'm sorry I have

15    to come to you like this here, but, I've been

16    trying to work with Mr. Bayne Smith.  Mr. Bayne

17    Smith doesn't want to work with me.  Our

18    differences is irreconcilable and it's not going

19    to get any better.  That's why I'm asking this

20    Court this morning, this day --

21         THE COURT:  I guess the record should show

22    that the power has just gone out in the courtroom

23    and there are no windows in here and, therefore --

24    well, now the power is back on and we have lights

25    again.  Excuse me.  I wanted to ask you, Mr.

Gavin v. Alabama                                    Case No. 04A136

296

1       Gavin, what is your relationship, your working

2       relationship with Mr. Ufford?

3          MR. GAVIN:  It's assumably neutral.  But, Mr.

4       Ufford, he shares the same views of Mr. Smith.  He

5       feels Mr. Smith is a more suitable in leading this

6       defense than he is.  I asked Mr. Ufford about it

7       months before I had filed that motion, the second

8       motion, would he take the lead in this defense.

9       He declined to do so.

10         THE COURT:  I don't have the court files here

11      in the courtroom right now, but I happen to recall

12      that Mr. Smith and Mr. Ufford were appointed by

13      the District Court Judge, John Kelsey, I believe

14      in March of 1998, and they have served as your

15      counsel now for roughly 18 months and you've been

16      in confinement during that entire time.  Did you

17      indicate to me when we started that there were two

18      motions that you wanted to make, one was for the

19      mistrial and the other was for the removal of the

20      attorney, Mr. Smith.  Is there anything else that

21      you have or any other motion that you are making

22      at this time?

23         MR. GAVIN:  Yes, sir, I also would like to ask

24      that you dismiss that second count, Section

25      13A-5-40, 13A-540 -- 13A-5-40, 813 of the Code of

Gavin v. Alabama                                          Case No. 04A136

1    Alabama.  I believe that that violates my Sixth

2    and Eighth Amendment right to have that in the

3    indictment.  I'm asking the Court that you drop

4    that count from the indictment.

5         THE COURT:  Is that Count Two of the

6    indictment?

7         MR. GAVIN:  Yes, sir.

8         THE COURT:  What other motions do you have to

9    make this morning?

10        MR. GAVIN:  That's it, Your Honor.  That is

11   it.

12        THE COURT:  Mr. Smith, do you feel it

13   appropriate for you to respond in any way, and if

14   you do not wish to respond, I'm not asking you to

15   do so.  I leave it to your good, sound judgment

16   and discretion as to whether you would care to

17   make a response.

18        MR. SMITH:  Judge, I would simply say that I

19   have attempted to represent Mr. Gavin with the

20   best of my professional judgment.  If you have any

21   questions about the factual matters that he has

22   raised, Mr. Ufford has been a witness to virtually

23   all of our proceedings since the last couple of

24   weeks.  Miss Talley has been with me and John on

25   each occasion when we visit Mr. Gavin.  If you

Gavin v. Alabama                                                    Case No. 04A136

Page 171 was mistakenly omitted

Gavin v. Alabama                                Case No. 04A136

298

1       have any questions about the factual issues he's

2       raised, I would invite the Court to ask a response

3       from either of those folks.

4           THE COURT:  Well, just for the record's sake,

5       Miss Talley is your paralegal.

6           MR. SMITH:  Yes, sir.

7           THE COURT:  Who has been with you on many

8       occasions when I've seen you and I think she's

9       been in the courtroom throughout yesterday and, of

10      course, this morning.

11          MR. SMITH:  John pointed out to me, Judge,

12      perhaps for technical purposes we should point out

13      Miss Talley is my legal assistant, she's not

14      paralegal per se, she's in her last year of

15      criminal justice studies at JSU, if that makes a

16      difference for the record, I would point that out.

17          THE COURT:  She doesn't have a degree in

18      paralegal studies?

19          MR. SMITH:  No, sir.

20          THE COURT:  She serves and functions as a

21      legal assistant?

22          MR. SMITH:  Yes, sir.  But she is in my

23      employ.

24          THE COURT:  Does the State wish to make any

25      observations for the record or any response?

Gavin v. Alabama                                    Case No. 04A136

1     MR. O'DELL:  Yes, sir, just very briefly, the

2     State would like the record to reflect that we

3     have had a number of discussions with Mr. Smith

4     and with Mr. Ufford over the course of the last 18

5     months, including open discovery, numerous

6     occasions where I have discussed the facts from

7     our standpoint with Mr. Smith and Mr. Ufford.  At

8     no time has Mr. Smith or Mr. Ufford ever violated

9     any confidences that I'm aware of with respect to

10    Mr. Gavin.  With respect to an offered plea, we

11    would want the record to reflect that there was

12    not a plea offered, but a solicitation for them to

13    discuss a plea with their client.  Based on the

14    circumstances that we knew of them and related to

15    the defense, there was a potential unavailability

16    of a witness, that I believe we made them aware

17    that that witness was now available, which would

18    have a bearing on how they would proceed with this

19    case, and I believe the State would only say to

20    the Court and for the record that both attorneys,

21    Mr. Smith and Mr. Ufford, have in my opinion

22    worked as hard or harder on this case than any

23    attorneys that I've ever dealt with on the

24    opposite side of the bench.  Also with respect to

25    his third motion to dismiss Count Two, I think the

1      law is clear on that and there is an abundance of

2      case law that that count is due to remain and that

3      he is to be tried upon that count.

4          THE COURT:  As best I know, the District

5      Attorney has furnished to Mr. Smith and Mr. Ufford

6      a great deal of information concerning the

7      evidence expected to be offered in this case and

8      has furnished to the defendant's attorneys

9      probably more than is required under the discovery

10     rules.  In fact, I think we've generally, it's

11     been generally acknowledged in this case that

12     there has been open file discovery; is that a

13     correct description of the --

14         MR. O'DELL:  Yes, sir.

15         THE COURT:  -- of the process so far?

16         MR. SMITH:  Yes, sir.

17         MR. O'DELL:  Yes, sir.

18         THE COURT:  I think it is the duty of any

19     lawyer to discuss with their client the evidence

20     or expected evidence that the State intends to

21     offer in a case, and I have no reason to believe

22     that Mr. Smith and Mr. Ufford have failed to carry

23     out that responsibility.  I believe that it is the

24     duty of every lawyer to be candid with their

25     client, to explain the consequences or potential

Gavin v. Alabama

Case No. 04A136

301

1    consequences of any particular development in a

2    case.

3         MR. GAVIN:  Excuse me, Judge, not meaning to

4    cut you off.  You said candid and open up with

5    your client.  Mr. Smith hasn't been that the past

6    24 hours.  Mr. Smith has been pressuring.  I don't

7    know how you may have said, what you really mean

8    about it's okay for a defense attorney to discuss

9    pleas, open pleas, with their client.  That's

10   different just discussing it, but to pressure, to

11   pressure, to put pressure on a person, that's

12   totally, that's totally out of character, I would

13   say more so.

14        THE COURT:  Well, to the extent that Mr.

15   Ufford and Mr. Smith have exerted any pressure on

16   you or on your family, it appears to me that no

17   such pressure has resulted in any inappropriate or

18   improper result.  I mean, you've resisted any such

19   pressure, you're here today having rejected any

20   suggestion or any offer.

21        MR. GAVIN:  I'm here today to talk to you.

22        THE COURT:  Well, you've rejected any offer,

23   apparently, that the District Attorney has made or

24   any suggestion that they've made with respect to

25   the settlement of this case, and to the extent

Gavin v. Alabama                                    Case No. 04A136

1       that the lawyers have discussed that with you and

2       even to the extent that they've pressured you

3       about that, I understand that you have rejected,

4       not only the offer that the District Attorney has

5       made, but you have also rejected or repelled any

6       kind of pressure that's been put on you, and I

7       certainly find that there's been no prejudice to

8       you, there's been absolutely no reason develop in

9       the last 24 hours that this case should not go

10      forward with the trial.  We have 60 jurors roughly

11      today to interview, and I'm prepared for us to

12      move forward with it.  The motion for mistrial is

13      denied.  The motion to remove your attorneys is

14      denied.  The motion to dismiss Count Two of the

15      indictment is denied.  Please be seated.

16          MR. GAVIN:  Thank you.

17          THE COURT:  Now, just as a housekeeping kind

18      of a thing here for the questioning of the jury,

19      I've handed out some little diagrams that Dorothy

20      drew up when I was thinking about having the

21      venire questioned in panels of 20, so there are 20

22      blocks on there.  We're going to ask the jury to

23      come in and be seated alphabetically, but we've

24      only got 16 in each panel, so you need to adjust

25      your little diagram there.  If you're going to use

Gavin v. Alabama

Case No. 04A136
340

# APPENDIX

## MURDER PROSECUTIONS INCLUDED IN REVIEW

| DEFENDANT | COUNTY | CASE NO | RACE | CAPITAL ELIGIBLE | CAPITAL INDICTED |
|---|---|---|---|---|---|
| Allen, Michael | DeKalb | CC-98-528 | W | yes | yes |
| Bentley, James | DeKalb | CC-96-95 | W | yes | yes |
| Betton, Jonathan | DeKalb | CC-98-195 | AA | yes | yes |
| Bryant, William | DeKalb | CC-97-591 | W | no | N/A |
| Butler, Louis | Cherokee | CC-94-01 | W | no | no |
| Conkle, Kevin Dion | Cherokee | CC-00-55 | W | yes | yes |
| Dupree, Timothy | DeKalb | CC-97-792 | AA | yes | yes |
| Fleming, Jason | DeKalb | CC-98-96 | W | yes | no |
| Floyd, Wilson | DeKalb | CC-95-388 | W | yes | no |
| Ford, Reynard | DeKalb | CC-97-796 | AA | yes | yes |
| Gavin, Keith Edmund | Cherokee | CC-98-61 | AA | alleged | yes |
| Guzman, Pastor | DeKalb | CC-94-185 | H | no | N/A |
| Headrick, Waylon | DeKalb | CC-98-760 | W | yes | yes |
| Headrick, William | DeKalb | CC-98-653 | W | yes | yes |
| Higginson, Scott | DeKalb | CC-98-001 | W | yes | yes |
| Hudgins, Timothy | Cherokee | CC-98-60 | W | no | no |
| Jelks, Charles | DeKalb | CC-90-304 | AA | no | N/A |

| Kerley, Charlie | DeKalb | CC-93-560 | AA | yes | no |
|---|---|---|---|---|---|
| Kuykendall, Mary | DeKalb | CC-92-423 | W | no | N/A |
| Lawrence, Ronald | DeKalb | CC-95-92 | AA | yes | yes |
| Long, Nell Rae | DeKalb | CC-95-80 CC-95-294 | W | yes | no |
| Mabry, Charles | DeKalb | CC-99-803 | W | no | N/A |
| Manning, Tammy | DeKalb | CC-94-379 | W | no | N/A |
| Meeks, Dewayne | Cherokee | CC-98-69 | AA | yes | yes |
| Mendenhall, Angela | DeKalb | CC-96-493 | W | yes | no |
| Mendenhall, David | DeKalb | CC-96-464 | W | yes | no |
| Midkiff, Early | DeKalb | CC-94-626 | W | no | N/A |
| Miller, Lewis | DeKalb | CC-93-687 | W | no | N/A |
| Morton, Charles Michael | DeKalb | CC-98-003 | W | yes | yes |
| Naylor, Stevie | DeKalb | CC-98-683 | W | no | N/A |
| Nunnery, Terry | DeKalb | CC-91-461 | W | no | N/A |
| Phillips, Johnathan | DeKalb | CC-97-793 | W | yes | yes |
| Ramon, Juan | DeKalb | CC-95-182 | H | no | N/A |
| Rhoden, Gary | DeKalb | CC-93-501 | W | no | N/A |
| Smith, Kenneth | DeKalb | CC-99-393 | W | no | N/A |
| Stephens, John | DeKalb | CC-94-398 | W | yes | no |
| Spaulding, Robert | DeKalb | CC-98-327 | W | no | N/A |
| Teems, Michelle | Cherokee | CC-95-69 | W | yes | no |

Gavin v. Alabama                                           Case No. 04A136

342

| | | | | | |
|---|---|---|---|---|---|
| Thompson, Michael | DeKalb | CC-94-27 | W | yes | no |
| Vartanian, John | DeKalb | CC-96-746 | W | no | N/A |
| Wells, Jerry Wayne | Cherokee | CC-00-54 | W | yes | yes |
| Williams, Roy C. | DeKalb | CC-99-525 | W | no | N/A |
| Young, Johnny | DeKalb | CC-94-18 | W | yes | no |

Gavin v. Alabama

Case No. 04A136

1451

1   THE COURT:  Well, it would be -- he will give

2   you whatever he gets.  He's going to get

3   everything from the arraignment all the way up

4   until now and July and everything.  He's going to

5   get it all.

6   MR. GAVIN:  And I'll receive a copy of that?

7   THE COURT:  Well, I'm going to let him make

8   the copy for you, yeah.

9   MR. GAVIN:  Okay.  Thank you, Judge.  That's

10  all.

11  THE COURT:  Okay, thank you.  We're adjourned.

12  (The proceedings were concluded at this

13  time)

14  AUGUST 4, 2000

15  FORT PAYNE, ALABAMA

16  THE COURT:  This is the case of State of

17  Alabama versus Keith Edmund Gavin.  Mr. Gavin is

18  present with his attorneys, Mr. Steve Bussman and

19  Mr. Steve Noles.  The matter is set for hearing

20  today on the defendant's motion for a new trial.

21  I guess as one housekeeping matter, I want to

22  verify that the defendant and his attorneys have

23  consented for the hearing today to be held in

24  DeKalb County, Alabama.  We actually had a hearing

25  on this motion, I believe, May the 30th.

Gavin v. Alabama                                    Case No. 04A136

1452

1   MR. NOLES:  Yes, sir.

2   THE COURT:  And at that time for purposes of

3   scheduling of the courtroom in Cherokee County, I

4   discovered that it was going to be difficult to

5   get this motion heard if we had to have it in

6   Cherokee County, and I think everybody agreed that

7   we could do it here, which is the sister county of

8   this circuit.  Is it agreeable with the defendant

9   and his counsel that we conduct this hearing in

10  DeKalb County, Alabama?

11  MR. BUSSMAN:  Yes, Your Honor.

12  MR. NOLES:  Yes, sir.

13  THE COURT:  On June the 1st I entered an Order

14  that set out a briefing schedule which the lawyers

15  have complied with, and I have the briefs which

16  have been filed with respect to this motion.  I

17  took an opportunity yesterday to have a brief

18  conference with the attorneys and I understand

19  that the defendant wishes to present evidence

20  today in support of the motion for new trial.  Is

21  there -- before we begin to take the evidence, is

22  there anything that you want to offer or anything

23  else that we need to consider before we commence

24  these proceedings this morning from the standpoint

25  of the defendant?

Gavin v. Alabama                                   Case No. 04A136

1       MR. NOLES:  Judge, I think at this point

2   unless the Court wants to address -- we have

3   submitted to the Court, even though it has not

4   been filed with the clerk's office, certified

5   copies of exhibits from the Tarber case in Russell

6   County.

7       THE COURT:  I believe you gave me that

8   yesterday.

9       MR. NOLES:  Yes, sir.  And we would -- that

10  contains in a single binder, it contains five

11  distinct exhibits, and since those are -- the

12  first four of those are certified copies of court

13  record, the fifth is a public record on the

14  internet, we would offer those as defendant's

15  exhibits 1 through 5 for this hearing.

16      THE COURT:  All right, then, I think in that

17  case, if they're going to be offered as exhibits

18  to this hearing, they need to be marked by the

19  court reporter.  The collective package can be one

20  exhibit, can't it?

21      MR. NOLES:  Be fine with me, yes, sir.

22      THE COURT:  Okay.

23          (Whereupon, defendant's exhibits 1,

24          4, 5 admitted into evidence at this time)

25      THE COURT:  Anything else we need to do this

Gavin v. Alabama                                    Case No. 04A136

1454

1     morning before we get started?

2     MR. NOLES:  No, sir, I think we would be ready

3     to go with witnesses.

4     THE COURT:  Anything else from the State

5     before we get started?

6     MR. JOHNSTON:  No, sir.

7     MR. NOLES:  Judge, I will say we will probably

8     want to discuss some law, but for the convenience

9     of the witnesses I think we can take them first.

10     THE COURT:  I would prefer that.  You may call

11     your first witness.

12     MR. NOLES:  Mike James.  And, Judge, we would

13     ask for the rule with respect to the remaining

14     witnesses.

15     THE COURT:  Do you expect any of these

16     witnesses to overlap with respect to the subject

17     matter about which they'll testify?

18     MR. NOLES:  There could be some potential

19     overlap, Judge, and I think out of an over

20     abundance of caution, I need to ask for the rule.

21     THE COURT:  All right, gentlemen, those of you

22     who are witnesses in the case will need to wait

23     outside the courtroom.

24     (Witnesses excused at this time)

25     THE COURT:  Raise your right hand to be sworn,

Gavin v. Alabama                                          Case No. 04A136

Page 184 was mistakenly omitted

Gavin v. Alabama                                    Case No. 04A136

1455

1       please, sir.

2                   CARL MICHAEL JAMES

3           Being duly sworn, testified as follows:

4                   DIRECT EXAMINATION

5       BY MR. NOLES:

6       Q    Mr. James, would you please state your name and

7            your place of employment position.

8       A    Mike James.  I'm investigator with the Sheriff's

9            Department, DeKalb County, Alabama.

10      Q    And how long have you held that position, please,

11           sir?

12      A    I've been employed by the Sheriff's office

13           continually since 1981.

14      Q    In that capacity did you have an occasion to

15           investigate the murder of Mr. Michael Sharkey?

16      A    Yes, I did.

17      Q    In 1995?  And did your investigation result in the

18           charging of a suspect in that case?

19      A    Yes, sir, it did.

20      Q    And who was that suspect, please?

21      A    I don't recall his name.

22      Q    Would it have been Mr. Wilson Slayton Floyd the

23           second?

24      A    Yes, sir, it was.

25      Q    Okay.  How did Mr. Floyd and Mr. Sharkey come to

Gavin v. Alabama                                    Case No. 04A136

1456

1       be connected to each other?

2    A  Through drugs.

3    Q  Okay.  In the course of your investigation, did

4       you have occasion to come across some evidence,

5       hearsay or otherwise, that at or about the time of

6       his death the victim had some money in his

7       possession?

8    A  No, sir, that's not exactly true.

9    Q  Did you have occasion at some point in time during

10      your investigation to come across information to

11      the effect that the victim had been sent money for

12      automotive repair from a family up north?

13   A  Yes, sir.

14   Q  Was that money accounted for?

15   A  No, sir.

16   Q  Did you come across any evidence to indicate that

17      the defendant had that money?

18   A  You mean on his person?

19   Q  Subsequent to the murder, or anywhere.

20   A  There was no money on the body when I found the

21      body.

22   Q  Okay.  Was the money ever accounted for?

23   A  No, sir.

24   Q  Was there any statement from a witness that

25      indicated that that money might have been part of

Gavin v. Alabama                                    Case No. 04A136

1457

1    the motive for the killing?

2  A   Mr. Noles, I don't recall, to be honest.

3  Q   Okay.  And just for the record, Mr. Floyd was

4    charged with intentional murder?

5  A   Yes, sir.

6  Q   Was indicted for that offense?

7  A   He was indicted for murder, what level I'm not

8    sure.

9  Q   Okay.  And what was the disposition of that case?

10  A   He was convicted.

11  Q   Okay.

12    MR. NOLES:  Judge, I believe that's all I have

13    of the witness.

14    THE COURT:  Thank you.  Any questions from the

15    State?

16    MR. JOHNSTON:  No questions.

17    MR. JAMES:  Judge, may I be excused?

18    MR. NOLES:  Let me ask him one follow-up

19    question before I release him.

20  Q   Mr. James, did you have any involvement in the

21    investigation of the homicide of Sara Lynn

22    Mendenhall?

23  A   Yes, I did.

24  Q   Let me ask you a few questions about that case,

25    then, and then I can let you go.  I believe there

Gavin v. Alabama                                    Case No. 04A136

1458

1    were two individuals charged in that offense; is

2    that correct?

3  A  That's correct.

4  Q  And that would be the two parents of the child?

5  A  Yes, sir.

6  Q  And those would be David and Angela Mendenhall?

7  A  That's correct.

8  Q  And did your investigation indicate that David Lee

9    Mendenhall killed Sara Lynn Mendenhall by blunt

10   force trauma?

11 A  Yes, sir.

12 Q  Was there anything that came up in your

13   investigation as to how that happened?

14 A  The statement, and this is out of memory, I

15   haven't read that statement in several years, was

16   from Mr. Mendenhall is Mr. Mendenhall dropped the

17   child and the child struck the edge of the water

18   bed.

19 Q  Okay.  But I believe that the indictment refers to

20   the infliction of blunt force trauma; is that

21   correct?

22 A  Yes, sir.

23 Q  Now, he was charged by -- with also with child

24   abuse; is that correct?

25 A  Yes, sir.

Gavin v. Alabama                                     Case No. 04A136

1459

1    Q    Okay.  Did your investigation reveal that the

2         circumstances were such that it was likely an

3         intentional infliction?

4    A    The word intent in that case was a big issue.

5         There was not enough clear evidence in that case

6         to prove intentional murder of the child to be

7         issued.

8    Q    But the infliction was intentional; is that

9         correct?

10   A    According to the statements Mr. Mendenhall gave,

11        it was not.

12   Q    Okay.  But those statements would have been

13        inconsistent with what he was indicted for; is

14        that correct?

15   A    Mr. Noles, I would have to look at the indictment.

16        I don't remember how he was indicted.  I would

17        have to look at the statement to answer that

18        question truthfully.  I know there was a question

19        about intent in that case, it was an issue.

20   Q    Okay, well, let me ask you this.  How old was the

21        victim in that case?

22   A    Just a mere infant.

23   Q    Well under the age of 14?

24   A    Yes, sir.

25   Q    Okay.

Gavin v. Alabama                                    Case No. 04A136

1460

1    MR. NOLES:  Judge, I believe that's all I have

2  of the witness.

3    MR. BUSSMAN:  Judge, could we have a moment?

4    MR. NOLES:  Just a minute, Judge.  Just a few

5  more questions.

6  Q  Was there an autopsy conducted in that case?

7  A  Yes, there was.

8  Q  Did the autopsy report indicate there had been

9  multiple occasions of injuries inflicted on the

10  child?

11  A  Yes, sir.

12  Q  Okay.  Did the autopsy report indicate those

13  injuries had been inflicted over a period of time?

14  A  Yes, sir.

15  Q  Okay.

16    MR. NOLES:  I think that'll do it, Judge.  We

17  would agree to release this witness, he has

18  national guard duties to attend to.

19    MR. O'DELL:  Mike, let me ask you just a

20  follow-up question.

21                    CROSS EXAMINATION

22  BY MR. O'DELL:

23  Q  Do you recall how many people were living in the

24  house?

25  A  The mother and the father and the child, and a

Gavin v. Alabama                                   Case No. 04A136

1461

1    grandmother who lived next door was in and out of

2    the house a great deal.

3  Q    We heard the autopsy indicated there were multiple

4    injuries.  Did the autopsy report indicate who

5    inflicted those injuries?

6  A    No, sir.

7  Q    Did your investigation reflect with certainly who

8    did inflict those injuries?

9  A    No, sir, it did not.

10         MR. O'DELL:  That's all.

11         THE COURT:  Thank you very much, sir, you may

12   come down and you are excused.

13         MR. JAMES:  Thank you.

14         MR. NOLES:  Judge, we would call Mr. Wayne

15   Parker at this time.

16                    WAYNE PARKER

17     Being duly sworn, testified as follows:

18                  DIRECT EXAMINATION

19  BY MR. NOLES:

20  Q    Mr. Parker, would you please state your name for

21    the record.

22  A    Wayne Parker.

23  Q    And do you reside in Fort Payne, Alabama?

24  A    Yes, sir.

25  Q    And where are you employed currently, Mr. Parker?

1　　A　　V.I. Prewett & Son.

2　　Q　　But you've not been in the sock business forever,

3　　　　have you?

4　　A　　No, sir.

5　　Q　　Where were you previously employed before that?

6　　A　　City of Fort Payne.

7　　Q　　And that would have been in the capacity of

8　　　　criminal investigator and deputy chief of police

9　　　　at one time?

10　　A　　Yes, sir.

11　　Q　　And how long were you in those positions?

12　　A　　Deputy Chief of Police in '82, investigator, '71,

13　　　　I guess.

14　　Q　　In the course of those duties did you have an

15　　　　occasion to investigate the murder of George

16　　　　Ledwell?

17　　A　　Yes, sir.

18　　Q　　Would you please tell the Court what your

19　　　　investigation revealed about the sequence of

20　　　　events on the day of Mr. Ledwell's murder?

21　　A　　He was beat up by Mike Thompson, shot by Mike

22　　　　Thompson, and the body was disposed of by two

23　　　　other boys.

24　　Q　　Was Mr. Ledwell alive at the time he was

25　　　　transported from the scene of the shooting?

Gavin v. Alabama                                    Case No. 04A136

1463

1    A    Yes, sir.

2    Q    I believe that you had statements from several

3         witnesses to the effect that he was talking to

4         them right before and during his being

5         transported?

6    A    He was mumbling.  Very few things could be made

7         out what he was saying.

8    Q    But he was alive at that time?

9    A    Yes, sir.

10   Q    Was he taken or transported anywhere prior to

11        being shot?

12   A    No, sir.

13   Q    Where did the shooting take place?

14   A    He was shot in a house trailer in a trailer park

15        in front of Kirby Ford.

16   Q    Is that where he was residing at the time?

17   A    No, sir.

18   Q    Who was -- Whose residence was that?

19   A    I don't recall this off the top of my head, but it

20        wasn't his.

21   Q    Okay.  Was it Mr. Thompson's residence?

22   A    No, sir.

23   Q    Okay.  Did you have any indication that he

24        attempted to leave that residence before he was

25        beaten up and shot?

Gavin v. Alabama                                    Case No. 04A136

1464

A    I don't recall it, no, sir.

Q    Okay.  Did your investigation reveal any

indication that this was motivated by Mr.

Thompson's belief that Mr. Ledwell had informed on

him?

A    They thought he was a narc, yes, sir.

Q    Okay.  Was an autopsy conducted on Mr. Ledwell?

A    Yes, sir.

Q    Did that autopsy suggest that exposure contributed

to Mr. Ledwell's death?

THE COURT:  What's the question again?  Say it

again.

Q    Did the autopsy indicate that exposure contributed

to his death?

THE COURT:  Exposure to the elements?

MR. NOLES:  Yes, sir.

A    Is it all right to answer?

THE COURT:  Yes, please, I just didn't

understand the question.

A    No, sir, I don't recall.  That's been several

years ago and I would just have to go back and

read the autopsy report to give you a correct

answer on that.

Q    All right.  I believe this occurred in the winter

time and the weather was cold; is that correct?

Gavin v. Alabama                                    Case No. 04A136

1465

1   A   That's correct.

2   Q   And that these two individuals that assisted Mr.

3       Thompson by transporting Mr. Ledwell abandoned him

4       somewhere in the woods?

5   A   Yes, sir.

6   Q   Okay, and he was later found dead?

7   A   Yes, sir.

8   Q   And was Mike Thompson charged with his murder?

9   A   Yes, sir.

10  Q   Was Mr. Thompson charged with capital murder?

11  A   No, sir.

12  Q   What was the disposition of that case?

13  A   He was sentenced.  I don't recall what it was,

14      probably life.

15  Q   But he was convicted of that murder?

16  A   Yes, sir.

17  Q   Was Mr. Johnny Young also charged in that case?

18  A   To the best of my knowledge he was.  I can't say

19      for sure.

20  Q   Would it be consistent with your memory that he

21      was charged the same as Mr. Thompson, but the

22      charges against Mr. Young were later dismissed?

23  A   I don't know about the dismissal.

24  Q   Was Mr. Young one of the two individuals who

25      helped move Mr. Ledwell?

Gavin v. Alabama                                    Case No. 04A136

1466

1   A   Repeat that.

2   Q   Was Mr. Young one of the individuals who helped

3       move Mr. Ledwell?

4   A   That's correct.

5   Q   Okay.  And for the record, who was the third

6       individual?

7   A   I don't recall off the top of my head.

8   Q   Okay.  Just a minute, Judge.  Just for the record,

9       Detective Parker, I believe that Mr. Thompson and

10      Mr. Young are both white; is that correct?

11  A   Yes, sir.

12  Q   And Mr. Ledwell was white?

13  A   Yes, sir.

14  Q   Okay.

15          MR. NOLES:  Judge, that's all the questions I

16      think we have.

17                  CROSS EXAMINATION

18  BY MR. O'DELL:

19  Q   Just a brief question, Mr. Parker.  I believe you

20      testified on direct to Mr. Noles that there was a

21      shooting in a trailer involving Michael Thompson

22      and Mr. Ledwell?

23  A   That's correct.

24  Q   And that the body was transported by someone else?

25  A   Yes, sir.

1          MR. O'DELL:  All right, that's all.

2               RE-DIRECT EXAMINATION

3  BY MR. NOLES:

4  Q    Let me ask you this, then.  Did your investigation

5      reveal that these three individuals were acting in

6      concert in these series of acts?

7  A    (No audible response)

8  Q    Let me withdraw that question just a second and

9      you ask another one instead.  The two individuals

10     who transported Mr. Ledwell did so at Mr.

11     Thompson's instance; is that correct?  Is that

12     what your investigation revealed?

13  A    I believe that's correct.

14       MR. NOLES:  Okay, nothing further.

15       MR. O'DELL:  That's all.

16       THE COURT:  Thank you very much, sir.  Is he

17  needed for any other questions?

18       MR. NOLES:  No, sir.

19       THE COURT:  Thank you, you're excused.

20       MR. PARKER:  Thank you, sir.

21       MR. NOLES:  Mr. Jimmy Phillips, please.

22           JIMMY PHILLIPS

23   Being duly sworn, testified as follows:

24          DIRECT EXAMINATION

25  BY MR. NOLES:

Gavin v. Alabama                                    Case No. 04A136

1468

| | | |
|---|---|---|
| 1 | Q | Mr. Phillips, would you please state your name for |
| 2 | | the record. |
| 3 | A | Jimmy Phillips. |
| 4 | Q | And how are you employed? |
| 5 | A | DeKalb County Sheriff's Department. |
| 6 | Q | In what capacity, please, sir? |
| 7 | A | I'm investigator with the Sheriff's office. |
| 8 | Q | And how long have you been so employed? |
| 9 | A | With the Sheriff's office? |
| 10 | Q | Yes, sir. |
| 11 | A | 19 years. |
| 12 | Q | As an investigator throughout that time? |
| 13 | A | No, sir, not the whole time. |
| 14 | Q | When did you begin in investigation? |
| 15 | A | I've been in investigation about 10 years now. |
| 16 | Q | Okay.  In the course of working investigation, |
| 17 | | have you had an occasion to investigate the |
| 18 | | homicide of Jaclyn Thompson Kerley? |
| 19 | A | Yes, sir. |
| 20 | Q | And I believe that occurred here in DeKalb County? |
| 21 | A | Yes, sir. |
| 22 | Q | Was there an individual charged in that killing? |
| 23 | A | Yes, sir. |
| 24 | Q | And who was charged in that killing? |
| 25 | A | I believe his name was Charles Kerley, I'm not |

Gavin v. Alabama                                    Case No. 04A136

1469

1       sure about the name.

2    Q  Charlie Berdell Kerley?

3    A  Yes, sir.

4    Q  Herman Kerley's boy?

5    A  Yes, sir.

6    Q  Okay.  Where did that homicide occur?

7    A  It occurred in Collinsville on Hall Street.

8    Q  Did it occur in the victim's home?

9    A  Yes.

10   Q  Did it occur inside the house?

11   A  Yes.

12   Q  Did your investigation reveal that Mr. Kerley

13      entered the home prior to committing the shooting?

14   A  (No audible response)

15   Q  Let me ask you, I'm assuming Mrs. Kerley was shot

16      to death; is that correct?

17   A  Yes.

18   Q  And did your investigation reveal that Mr. Kerley

19      did the shooting from within the home?

20   A  Yes, sir.

21   Q  Okay.  Had there been any -- Did your

22      investigation reveal that there had been any

23      confrontation or words between the victim and her

24      family and the defendant prior to the shooting?

25   A  There had been some discussion earlier, before the

Gavin v. Alabama                                          Case No. 04A136

1470

1        shooting took place.

2    Q    Okay.  Was there any lapse of time between that

3         discussion and the shooting?

4    A    It was pretty well when he went in and, you know,

5         it was all together, there wasn't that much a

6         lapse of time on it.

7    Q    Okay.  Did your investigation reveal that there

8         was any initial consent for him to enter the home?

9    A    He was invited in the home.

10   Q    By whom?

11   A    By the wife.

12   Q    By the victim?

13   A    By the victim and her family that was up at her

14        house.

15   Q    Okay.  Did he have his gun at that time?

16   A    He had a gun.

17   Q    Was it on his person at the time he was invited?

18   A    Yes.

19   Q    Okay.  What kind of -- Was it a handgun?

20   A    Yes, sir.

21   Q    Did your investigation reveal whether that gun was

22        visible at the time he was invited in?

23   A    It was not visible that I can remember.

24   Q    Okay.  To the best of your information it was

25        concealed?

Petition for Writ of Certiorari, Appendix Page 200

Gavin v. Alabama                                    Case No. 04A136

1471

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | And that he then produced the gun and shot her? |
| 3 | A | Yes, sir. |
| 4 | Q | Several times, I believe? |
| 5 | A | Yes, sir. |
| 6 | Q | And I believe she was also pregnant at the time; |
| 7 | | is that correct? |
| 8 | A | Yes, sir. |
| 9 | Q | And the fetus died as a result of the shooting as |
| 10 | | well? |
| 11 | A | I'm not sure.  I'm sure it probably did, yes, sir. |
| 12 | Q | Okay.  And for the record, both victim and |
| 13 | | defendant in this case were African-American? |
| 14 | A | Yes. |
| 15 | | MR. NOLES:  Just a minute. |
| 16 | Q | Were there any other persons present when the |
| 17 | | shooting took place? |
| 18 | A | Yes, sir. |
| 19 | Q | Who was present there? |
| 20 | A | I don't have the list here.  There was several |
| 21 | | people in the house. |
| 22 | Q | Just who you know, best of your memory. |
| 23 | A | That's a good question.  I know there was a guy, I |
| 24 | | can't think of his name, I know -- I'm wanting to |
| 25 | | say George, but I'm not sure about that.  There |

Gavin v. Alabama                                    Case No. 04A136

1472

1        was a female, her name I can't call.

2    Q   Were any of these members of the family that

3        resided there at the house?

4    A   Of her family?

5    Q   Yes.

6    A   Yes.

7    Q   Okay.  Did anybody attempt to make any resistance

8        to Mr. Kerley to your knowledge?

9    A   Not to my knowledge.  I'm not sure.

10   Q   Do you know that they did or didn't?

11   A   I don't know.

12   Q   You have no knowledge?

13   A   No, sir.

14   Q   Let me ask you this, just in passing.  Are you

15       familiar with the Mendenhall cases in this county?

16   A   I know the name, but I'm not sure.  I've heard

17       that name, yes.

18   Q   Okay.  Did you have any participation in

19       investigating those cases?

20   A   I'm not sure if I did.  I might have.  I remember

21       the name, but I'm not sure if I had any active

22       part in that case.

23   Q   Okay.  Did you participate in the investigation of

24       Wilson Floyd?

25   A   I assisted some in it, but I didn't do a whole lot

Gavin v. Alabama                                              Case No. 04A136

1473

1        in that case, no, sir.

2     Q   Are you familiar with Mr. Floyd?

3     A   I've never talked to him or seen him.  I know his

4        name and that's about it.

5     Q   Do you know if he's black or white?

6     A   I think he's white, I'm not sure.

7     Q   Okay.  Have you had any participation in

8        investigation of big Mike Thompson?

9     A   No, sir.

10    Q   Are you familiar with Mr. Thompson?

11    A   I know Mr. Thompson, yes, sir.

12    Q   Is he white?

13    A   Yes.

14    Q   What about Johnny Young, who was his co-defendant

15       in the Ledwell cases?

16    A   I know of him, but I never worked a case on Mr.

17       Young.

18    Q   Have you seen him?

19    A   I'm not sure if I've even seen him.

20    Q   Do you know if he's white or black?

21    A   I couldn't say.

22    Q   Okay.

23          MR. NOLES:  Judge, I think that's all I have

24       at this point subject to re-direct.

25          MR. JOHNSTON:  May I have just a moment,

Gavin v. Alabama                                    Case No. 04A136

1474

1    Judge?

2        THE COURT:  Yes.

3        MR. JOHNSTON:  That's all, Judge.

4        THE COURT:  Is he needed any further?

5        MR. NOLES:  No, sir.

6        THE COURT:  Thank you very much.  You may come

7    down and you're excused.

8        MR. PHILLIPS:  Thank you, Judge.

9        MR. NOLES:  Judge, could I have just one

10   minute?

11       THE COURT:  Yes, sir.

12       MR. NOLES:  Judge, I was going to call or the

13   next case I was going to take up was Mr. Gary

14   Bell.  Is he present?

15       MR. O'DELL:  They indicated to me his subpoena

16   said Cherokee County, Centre, so he was on his way

17   back.  As far as I know he's on his way.

18       MR. NOLES:  Okay.  Well, I had also because

19   she had a matter pending, we were going to have

20   Ms. Rhonda Jackson, but we went faster through

21   these than even I had anticipated, Judge.  And

22   I've noticed Sheriff Reed has entered the

23   courtroom.  He is a subpoenaed witness?

24       THE COURT:  Well, for the record's sake, if

25   that remark is your suggestion that the Sheriff

Gavin v. Alabama                                    Case No. 04A136

1475

1    needs to be excused from the courtroom, I will not

2    require Sheriff Reed to be excused from the

3    courtroom.

4         MR. NOLES:  Very well, Judge.

5         MR. O'DELL:  I think the record should point

6    out that the Sheriff just walked in within the

7    last 60 seconds and was not present for any of the

8    other testimony as well.

9         THE COURT:  Yes, sir.

10        MR. NOLES:  Judge, while these witnesses are

11   on the way --

12             (Sidebar conference)

13             (In open court)

14        THE COURT:  Well, let me see if I understand

15   what you've just told me.  We got two witnesses

16   who are not here, is that what you're saying?

17        MR. NOLES:  But expected to be here, yes, sir.

18        THE COURT:  One of them is Gary Bell and one

19   of them is Rhonda Jackson?

20        MR. NOLES:  Rhonda Jackson.

21        THE COURT:  Are there any others?

22        MR. NOLES:  Judge, we had subpoenaed Mr. Clay

23   Simpson.  Do you know his status?

24        MR. O'DELL:  I have no knowledge of that.  I

25   have not heard from him or had any conversation

1    with him.  I was not aware he was subpoenaed or

2    not.

3        THE COURT:  Ask the Sheriff to step back

4    around the corner just a minute if you don't mind.

5        MR. NOLES:  You said he could stay and he

6    decided to leave.

7        THE COURT:  Sir?

8        MR. NOLES:  I said you said he could stay and

9    he decided to leave.

10       THE COURT:  Sheriff, excuse me for asking you

11   to come back a second.  We apparently have a need

12   for some witnesses that are presently unaccounted

13   for.  Would it be possible to have someone,

14   somebody out there or around here is bound to have

15   a radio on and could call and find out about

16   Rhonda Jackson, Gary Bell and Clay Simpson.

17       SHERIFF REED:  Clay Simpson is on vacation and

18   unavailable for sure.  Rhonda is across the

19   street, I sent for her and also Gary Bell.

20       THE COURT:  Thank you very much.

21       SHERIFF REED:  The only one I can't account

22   for is Clay Simpson.

23       MR. NOLES:  For the record, Sheriff, was Mr.

24   Simpson served with his subpoena?

25       SHERIFF REED:  I think not.

Gavin v. Alabama                                    Case No. 04A136

1   MR. NOLES:  When did his vacation begin, for

2   the record?

3   SHERIFF REED:  He's been gone all this week I

4   know, so probably started a week ago on Friday.

5   MR. NOLES:  But he would have been in the

6   office prior to that time?

7   SHERIFF REED:  He should have.  The other two

8   will be here shortly.

9   THE COURT:  Thank you very much.  Mr. Noles,

10  what's your preference for making use of this

11  time?

12  MR. NOLES:  Judge, I think probably the best

13  thing to do is, rather than go back and forth

14  between law and facts, let me do one thing that I

15  wanted to do and take a moment to make some

16  references to what we have offered and I assume

17  the Court has admitted as exhibits 1 through 5 and

18  summarize what those are.  Excuse me, defendant's

19  collective 1 which includes five items in it.

20  THE COURT:  Yes, sir.

21  MR. NOLES:  The first four of these items are

22  certified copies of exhibits that were admitted in

23  the case of State versus Walter Lee Tarber in the

24  Russell County Circuit Court.  These parts of that

25  exhibit relate to the matters raised in

1   defendant's memorandum of May 30th, being the

2   first memorandum -- I'll just refer to these

3   memoranda by date -- refer to the issue raised

4   beginning at page 41 of that memorandum, and for

5   the sake of brevity that is the section where we

6   are arguing that the imposition of the sentence of

7   death by electrocution creates an impermissible

8   risk of cruel and unusual punishment.  At the time

9   of that memorandum, we had anticipated getting

10  some affidavits from two witnesses, Dr. Leuchter

11  and Dr. Bernstein.  What we have submitted is

12  something of a shift from that, but not a shift of

13  substance.  The two items are prior testimony

14  offered by a Dr. Donald Price.

15      THE COURT:  Now, wait a minute, the two items?

16      MR. NOLES:  This would be items three and four

17  in exhibit 1.  Item three would be the testimony

18  of Dr. Donald Price who is a neuropsychologist and

19  psychologist at the University of Florida, and

20  item number four is some testimony given by Dr.

21  Oren Devinsky, D-e-v-i-n-s-k-y, who is a

22  neurologist at the New York University School of

23  Medicine.  By way of predicate, these exhibits or

24  parts one through four of exhibit 1 were submitted

25  to and considered by the Court in Russell County,

1   and what you have are certified copies of those

2   exhibits from that court.  The substance of the

3   testimony of these two doctors, Judge, is

4   substantially what we had expected we would have

5   by the affidavits of Dr. Leuchter and Bernstein

6   and is consistent with our assertions of fact set

7   out in that section of our brief.

8       THE COURT:  I'm looking at page 43, just so we

9   can clarify the record here a second, page 43 of

10  your memorandum which was filed on May the 30th

11  says in addition the defendant expects shortly to

12  submit the affidavits of Drs. Leuchter and

13  Bernstein to the effect that electrocution is by

14  necessity a more painful and barbaric method of

15  execution than other methods.  Is that what, when

16  you keep talking about your affidavits of Leuchter

17  and Bernstein, is that your reference if in your

18  memo that ties that together?

19      MR. NOLES:  Yes, sir.  We are submitting these

20  instead of those, and I'll just let the Court know

21  we saved the fair trial tax fund some money, it

22  turned out we were going to need some expert fees

23  to get their affidavits it appeared, and it

24  appeared these exhibits would serve the same

25  purpose and cost significant less to copy and

1   verify.  But the sum and substance, I do encourage

2   the Court to read these in their entirety, but the

3   sum and substance of their testimony is that

4   consciousness is apt to persist for a period of

5   time after the first application of electricity,

6   that substantial pain is likely just given the

7   physiology and physics that are involved in the

8   act of electrocution.  One of the reasons --

9   Another reason that I went with these rather than

10  an affidavit is that I think that in both of these

11  cases these two doctors whose exhibits you have

12  were subjected to rigorous cross examination, and

13  I think it's obvious from the questions that were

14  asked that in both cases the cross examining

15  attorneys were extremely well prepared

16  technically, however, they did not move these two

17  gentlemen one whit from their testimony, and both

18  of these gentlemen hold elevated positions at

19  highly regarded institutions and we think their

20  testimony is incredibly powerful on that issue.

21  Noticing that Ms. Jackson has entered the

22  courtroom, let me briefly summarize the other

23  three items.  Item number one in exhibit 1 is a

24  certified copy of an exhibit which constitutes the

25  autopsy of Horace Dunkins, Jr.  That issue came up

1481

1   because as the Court will note in that autopsy,

2   there were some very serious burns and other

3   mutilations to Mr. Dunkins' body resulting from

4   his electrocution in the Alabama electric chair,

5   which I think the Court can take notice is the

6   same basic hardware that is currently in use at

7   this time, the infamous ole Yellow Momma.  And the

8   state medical examiner conducting the autopsy

9   shows several burns on his legs and neck, in

10  essence a mutilation of the body.  Whether that

11  occurred prior to or after his loss of

12  consciousness I think would almost be immaterial

13  because it almost constitutes judicially

14  sanctioned abuse of a corpse even if there is no

15  sensation of pain.  Item number two is also a

16  document connected with the execution of Mr.

17  Dunkins, it is the instant report from Holman

18  Prison relative to Mr. Dunkins' death.  It sets

19  out in great detail the final hours of an inmate

20  to be executed, and we fundamentally offer that to

21  show the concrete proof of the horrible

22  psychological trauma that leads up to that that

23  constitutes what we would assert consistent with

24  our memorandum that this violates the protection

25  against cruel and unusual punishment.  Item five

Gavin v. Alabama

Case No. 04A136

1482

1   of exhibit 1 is a hard copy printout of a data

2   quarery which I ran on the website of the United

3   States Census Bureau.

4          THE COURT:  That's item five?

5          MR. NOLES:  Item five in there, yes, sir.

6   That relates, Your Honor, to the issue -- well, it

7   essentially relates, Your Honor, to the issue

8   raised in the May 30th memorandum at page 56

9   relative to the method of selecting grand and

10  petit juries.  That's the basis, Your Honor, for

11  the statistics set out.  We filed our reply

12  memorandum on July 24 and on page 10 of that

13  memorandum I refer to some statistics, and in

14  essence the printout you have as item five is the

15  source of those statistics.

16         THE COURT:  Wait a minute, now.  Reply

17  memorandum.

18         MR. NOLES:  Filed on we -- filed a reply

19  memorandum on July 24th.

20         THE COURT:  Yes, sir, page 10 of that one.

21         MR. NOLES:  Page 10 of that memorandum quotes

22  statistics.  In essence the State cited cases to

23  the effect that the use of driver's license for

24  drawing juries had been judicially approved.  We

25  are offering evidence in rebuttal to factual

Gavin v. Alabama

Case No. 04A136

1483

1   assumptions that that line of decisions is based

2   on.   And as that exhibit indicates, 23.2 percent

3   of African households in Cherokee County have no

4   motor vehicle.   And by comparison, only 7.2

5   percent of white households have no motor vehicle.

6   And we think that creates a strong presumption

7   that African-Americans would be seriously under-

8   represented in the pool from which grand and petit

9   juries were paneled.   And that would be the fact

10  for which we offer that census data to back that

11  up.

12       THE COURT:  I've made a couple of marginal

13  notes here as you've spoken in some of these

14  briefs.   Does anybody object to me doing that?

15       MR. JOHNSTON:  Doing what?  I'm sorry, Judge.

16       THE COURT:  Making marginal notes in these

17  briefs.

18       MR. JOHNSTON:  No, sir, I don't object.

19       MR. NOLES:  We expect the briefs to be in the

20  record to show --

21       THE COURT:  Well, it's easier for me.  When

22  you're cross-referencing these things, I need some

23  way to remind myself where an exhibit is that

24  might be referred to that might be filed in a

25  memorandum that was filed at different times, so

Gavin v. Alabama

Case No. 04A136

1484

1    if you will give me a marginal note I want to make

2    a note of where this marginal note is found.

3         MR. NOLES:  Yes, sir.

4         THE COURT:  Thank you, go ahead.

5         MR. NOLES:  Judge, before I put Ms. Jackson

6    on, I'm going to do one thing, and I hope nobody

7    at the State's table faints when I do this, but

8    I'm actually going to concede a point, and that is

9    upon review of the court record, on your

10   memorandum reference here would be the May 30th

11   memorandum on page 10 where we're setting out the

12   cases we're discussing.

13        THE COURT:  Yes, sir.

14        MR. NOLES:  It would appear based on my re-

15   review of the record yesterday that the Teems case

16   would probably not be capital eligible because that

17   did involve a driving of a motor vehicle under the

18   influence of alcohol and not an intentional

19   homicide.  Our position would be that's really at

20   the end of the day not going to materially alter

21   the disparities or the arbitrary and capricious.

22   The statistical disparities that support our -- or

23   demand a finding of racial bias or the arbitrary

24   and capricious imposition under the Eighth

25   Amendment.  I don't think it makes any difference,

Gavin v. Alabama                                    Case No. 04A136

1485

1    but I just want to make the record clear on this

2    Teems case.

3        THE COURT:  Thank you.  Before you go, let me

4    make some more notes here on some things you have

5    said.  Let me backtrack and make sure I've got it.

6    Okay, thank you very much.

7        MR. NOLES:  We would call Rhonda Jackson.

8        MR. JOHNSTON:  Excuse me, Judge.  Before she

9    takes the stand, would it be appropriate at this

10   point for me to respond to just the portion he

11   just talked about dealing with electrocution and

12   dealing with Grand Jury and petit methods of

13   drawing?

14       THE COURT:  I would be glad for to you do

15   that.

16       MR. JOHNSTON:  I meant to do that after you

17   made your notes, and I would like to refer you to

18   the State's memorandum.  The State's first

19   memorandum supporting the State's objection to the

20   defendant's motion for new trial, and I have page

21   numbers at the bottom if you will flip to page 6

22   Roman numeral VI, excuse me, page...

23       THE COURT:  I don't believe you've got page

24   numbers.

25       MR. JOHNSTON:  I don't.  If you will, count

Gavin v. Alabama                                          Case No. 04A136

1486

1    them.  And excuse me, it's Roman numeral V.

2         THE COURT:  Yes, sir.

3         MR. JOHNSTON:  I'm not going to read you my

4    quotes there, I just want to point out both the

5    contentions in this final exhibit that we

6    discussed that Mr. Noles has referred to are

7    abrogating a change in the current and existing

8    law.  There is a rather long string site that I'm

9    not going to read into the record and I'm sure the

10   Court is well aware what the existing law is, so

11   rather than reading that I just want to point out

12   that existing law approves our methodology for

13   selecting grand and petit juries.

14        THE COURT:  Thank you.

15        MR. JOHNSTON:  I should also direct the Court

16   one page before that in Roman numeral II of the

17   State's argument, portion of the first memorandum,

18   again, the Appellate Courts have repeatedly held

19   the death penalty is not unusual and that the

20   death penalty, I site Taylor there.  I guess I

21   just wanted to point that out because I believe

22   I've already got some references for you to

23   reference the exhibits that the State has attached

24   and that particular decision, that Taylor case, is

25   D-2 in Griffin versus State.  That was a December

Gavin v. Alabama                                    Case No. 04A136

1487

1   of '99 case, <u>Taylor</u> was February of 2000 case, so

2   we had very recent reviews of this jurisprudence

3   and it's been upheld time and time again.  I just

4   wanted to point that out before we move to the

5   next witness.

6        THE COURT:  Thank you very much.  Go ahead.

7        MR. NOLES:  Miss Jackson.

8                    <u>RHONDA JACKSON</u>

9        Being duly sworn, testified as follows:

10                  <u>DIRECT EXAMINATION</u>

11   BY MR. NOLES:

12   Q    Ms. Jackson, would you state your name and place

13        of residence for the record.

14   A    Rhonda Jackson.  I live at Sylvania.

15   Q    And how are you employed, Ms. Jackson?

16   A    DeKalb County Sheriff's Department.

17   Q    How long have you been in the Sheriff's

18        department?

19   A    Since '85.

20   Q    And in what capacity are you currently employed

21        there?

22   A    Investigator.

23   Q    How long have you been an investigator?

24   A    Six years.

25   Q    In the course of your duties as an investigator,

1    did you have an opportunity to investigate Mr.

2    John Allen Stephens in a charge of homicide?

3  A  Yes, sir.

4  Q  And I believe that -- first off, Mr. Stevens is a

5    white individual; is that correct?

6  A  That's correct.

7  Q  And who was Mr. Stephens charged with killing?

8  A  Mr. Henderson.  I can't remember the first name.

9  Q  Okay, I believe that killing happened out on

10   Lookout Mountain somewhere?

11 A  That's correct.

12 Q  Did you interview Mr. Stephens?

13 A  Yes.

14 Q  You were present when he was interviewed?

15 A  Yes, sir.

16 Q  Okay.  And I believe he indicated in that

17   interview that he was inside his vehicle when he

18   opened fire; is that correct?

19 A  I don't remember that, Mr. Noles.  I think he told

20   us he was outside of his vehicle.

21 Q  Okay.  Was he charged with capital murder?

22 A  I believe he was just charged with murder.

23 Q  With plain murder?

24 A  Yes.

25 Q  Okay.  Intentional murder?

Gavin v. Alabama                                          Case No. 04A136

1489

1    A    Yes.

2    Q    Okay.  He was eventually acquitted on that charge;

3         is that correct?

4    A    Yes.

5    Q    But the indictment was for murder?

6    A    As far as I remember, yes.

7    Q    Okay.

8              MR. NOLES:  Judge, if I could have a minute.

9         I had a Post It note to come off.  Judge, if I can

10        show this to the D.A. for just a minute.

11   Q    Ms. Jackson, I'm going to show you what's been

12        marked defendant's exhibit 2 for this court date

13        and ask if that appears to be a portion of the

14        transcript of the statement of that interview?

15   A    With Mr. Stephens.

16   Q    Is that correct?

17   A    Yes, that's correct.

18   Q    Okay.  Does the portion where he refers to being

19        in his truck, the firing of the first shot --

20   A    Yes, sir.

21   Q    -- reflect your memory of the -- Does that refresh

22        your memory?

23   A    Yes, sir.

24             MR. NOLES:  Judge, I would ask this to be

25        admitted.

Gavin v. Alabama                                    Case No. 04A136

1490

```
 1        THE COURT:  Any objection?
 2        MR. JOHNSTON:  No objection.
 3        THE COURT:  It's admitted.
 4             (Whereupon, defendant's exhibit number 2
 5             admitted into evidence at this time)
 6    Q    I believe Mr. Henderson was also white; is that
 7         correct?
 8    A    Yes, that's correct.
 9    Q    Let me ask you this.  I believe that at the time
10         of his death that Mr. Henderson was a duly
11         incumbent constable in DeKalb County; is that
12         correct?
13    A    That's correct.
14    Q    Okay.  Was there any indication in your
15         investigation that Mr. Henderson may have been
16         acting in his official capacity as a constable?
17    A    That was not determined --
18    Q    Okay.
19    A    -- Mr. Noles.
20    Q    All right.  Did you participate in the
21         investigation of Angela and David Mendenhall?
22    A    Yes.
23    Q    Are they both white?
24    A    Yes.
25    Q    And I assume since they're both white, their child
```

Gavin v. Alabama                                    Case No. 04A136

1491

1     was also white?

2  A  Correct.

3  Q  Okay.  Did you participate in any way in the

4     investigation of Mr. Jason Flemming for the murder

5     of Charles Smith?

6  A  Yes, sir.

7  Q  Okay.  Can you -- And I believe Mr. Flemming was

8     indicted for non-capital Murder in that case; is

9     that correct?

10 A  I'm not sure.

11 Q  Is that the best of your -- You have no knowledge

12    as to what he was indicted for?

13 A  Well, I wasn't the case agent.  I assisted in the

14    investigation.  I don't know if he was indicted

15    for Murder or Capital Murder.

16 Q  Is Mr. Flemming white?

17 A  Yes.

18 Q  And his victim, Mr. Smith, was also white?

19 A  Yes.

20 Q  Where did that murder take place?

21 A  On Lookout Mountain.

22 Q  Where exactly on Lookout Mountain?  Would it have

23    taken place at the camp ground?

24 A  Yes, sir.

25 Q  And I believe that the camp ground was owned by

Gavin v. Alabama                                    Case No. 04A136

1492

1            Mr. Smith?

2    A    Yes, sir.

3    Q    And the killing was done by a stabbing, I believe?

4    A    Yes.

5    Q    It did it take place inside a building or outside?

6    A    Outside.

7    Q    Was there some indication that Mr. Smith was

8            relieved of some money during the course of the

9            murder?

10    A    I'm not sure, Mr. Noles.

11    Q    Was there any property found to be missing?

12    A    I believe there was a gun missing.

13    Q    That had belonged to Mr. Smith?

14    A    Yes.

15    Q    Was that gun located?  Or do you know if it was in

16            any way connected to Mr. Flemming?

17    A    I'm not sure.

18    Q    Okay.  And I believe that case is still pending;

19            is that correct?

20    A    That's correct.

21    Q    There's been no disposition of that case?

22    A    Yes.

23          MR. NOLES:  Judge, I think that's all we have

24            of the witness.

25                CROSS EXAMINATION

Gavin v. Alabama                                          Case No. 04A136

1493

BY MR. JOHNSTON:

1     

2    Q    Was Clayton Simpson the primary investigator on

3         the Flemming case?

4    A    Yes, sir.

5    Q    Let me go back to the defendant's exhibit 2, let

6         me ask you to read Clayborn Simpson's question.

7    A    Was you still sitting in the truck when you first

8         fired the first shot?

9    Q    Is that John Stephens, J.S.?

10   A    Yes.

11   Q    Would you please read that one.

12   A    First one I was -- when I open the door and got

13        out on that next one.

14   Q    Next one, was that the next shot fired; is that

15        what the investigation revealed?

16   A    Yes.

17   Q    That's the one that killed him, isn't it?

18   A    Yes.

19        MR. JOHNSTON:  That's all.

20        MR. NOLES:  Judge, I don't think we have

21   anything else.

22        THE COURT:  You may come down.  Thank you very

23   much.

24        MR. NOLES:  We would consent she be excused.

25        THE COURT:  Thank you.  You may be excused.

Case No. 04A136

Gavin v. Alabama

1494

MR. NOLES:  Judge, we would call Mr. Bell,
Gary Bell.  I understand he's present now.

THE COURT:  Let's take a break for just a few
minutes and find the restrooms.  We've been going
for a little over an hour now.

(10:07 A.M.  Recess)

(Hearing resumed)

MR. NOLES:  Court ready?

THE COURT:  Yes, sir.

MR. NOLES:  Judge, we would call Mr. Gary Bell
to the stand.

GARY BELL

Being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. NOLES:

Q    Mr. Bell, would you state your name, place of
employment, position, please, sir.

A    My name is Gary Bell.  I work criminal
investigation, Fort Payne police.

Q    How long have you been employed in that capacity,
please?

A    I've been an investigator for about 20 years.

Q    And you were patrol for how long?

A    About five years.

Q    In the course of your investigation work, did you

1   have an occasion to investigate the murders of
2   Sonny Long and Martha Shankles Wooten?

3   A   Yes.

4   Q   Did you find that those individuals were shot by
5   Nell Rae Long?

6   A   Yes.

7   Q   Did those shootings occur within a few minutes of
8   each other?

9   A   Yes, they did.

10  Q   Or within seconds of each other.

11  A   Yes.

12  Q   Part of the same occurrence?

13  A   Right.

14  Q   And both individuals died as a result of that?

15  A   Yes.

16  Q   Nell Long is white; is that correct?

17  A   Yes.

18  Q   As were Sergeant Long and Mrs. Shankles Wooten?

19  A   Yes.

20  Q   And just for the record, I said Sergeant Long.  He
21  was a Sergeant with the Fort Payne Police
22  Department at the time of his death?

23  A   Right, uniform division.

24  Q   Uniform division.  The death didn't have anything
25  to do with his duties as a police officer, did it?

Gavin v. Alabama                                    Case No. 04A136

1496

1   A    No, it did not.

2   Q    It involved a love tringle, so to speak?

3   A    Right.

4   Q    Okay.  And is it correct that Mrs. Long was

5        charged with two counts of non-capital Murder in

6        those cases?

7   A    I believe that is correct.

8   Q    And she was tried and convicted on those?

9   A    I believe, yes.

10  Q    And is serving a prison sentence; is that correct?

11  A    She is serving a prison sentence yes, sir.

12  Q    That's not a life sentence, it's a 30 year or so

13       sentence; is that correct?

14  A    Right.

15  Q    And were you the lead case officer on that case?

16  A    Yes.

17  Q    Did you have an occasion, also, to participate in

18       the interview of Tammette Michelle Helms?

19  A    Yes.

20  Q    That would be in relation to the killing of her

21       daughter, Amber Helms?

22  A    Yes.

23  Q    I believe that was originally believed to be death

24       by natural causes; is that correct?

25  A    In the beginning, yes, that's right.

Gavin v. Alabama                                    Case No. 04A136

1   Q    The autopsy later revealed it was death by

2        suffocation?

3   A    Yes.

4            THE COURT:  Excuse me just a minute.  Is Helms

5        one of the cases that you have listed in your

6        memorandum of May the 30th?

7            MR. O'DELL:  It is not listed on his

8        prosecutions included in review.

9            MR. NOLES:  Let me ask two questions, Judge,

10       and then I think I need to look at something.

11   Q    The victim in that case was under the age of 14?

12   A    The victim, yes.

13   Q    And this was an intentional smothering; is that

14       correct?

15   A    Yes.

16   Q    And I believe that the defendant gave a statement

17       to that effect in the course of the investigation?

18   A    Yes.

19   Q    Okay.

20           MR. NOLES:  Judge, we may not have it in our

21       factual summary, I think it is on the -- I think

22       we may have inadvertently left it out of the

23       memorandum.

24           THE COURT:  I don't have any objection to you

25       questioning the witness about it, and I'm familiar

Gavin v. Alabama                                      Case No. 04A136

1498

1       with that case.

2           MR. NOLES:  Okay.  Well, let me just ask him

3       this.

4   Q   Mrs. Helms was white?

5   A   Yes.

6   Q   Okay, as was the victim?

7   A   Yes.

8   Q   And the victim was about 19 months old at the

9       time; is that correct?

10  A   Right.

11          MR. O'DELL:  Judge, if we're going to add that

12      one, I think just for the record we should also

13      include the Judith Nealley case which was a white

14      defendant and white victim and she was capitally

15      indicted and convicted.  Early Everett, who was

16      also a white defendant who was alleged to have

17      killed three white victims was also indicted for

18      Capital Murder.  Lonnie Hannah, I believe, was

19      also indicted for Capital Murder, who was a white

20      defendant who is alleged to have killed a white

21      victim, and we would like the record to have those

22      three, at least off the top of my head, that were

23      not included in this list.

24          THE COURT:  Thank you very much.

25          MR. NOLES:  Judge, I'm not sure where that got

1   into the -- into my stack.  We had the file on it.

2   I think it may have gotten into the perimeters --

3   it may have been entered into the computer within

4   the perimeters I was searching in and for some

5   reason it didn't get into my chart.  I don't know

6   what happened there, but I know it wouldn't be

7   in my file if it hadn't come up on the computer.

8       THE COURT:  I understand, and it's

9   understandable that you could have overlooked it

10  in preparing your brief, but I just wanted to make

11  sure that I had not overlooked it myself, and

12  you've verified that it's not in here and that's

13  fine.  Any other questions that you want to ask

14  this witness?

15      MR. NOLES:  I think we got that witness,

16  Judge.

17      MR. JOHNSTON:  No questions.

18      THE COURT:  Thank you very much.  May this

19  witness be excused?

20      MR. NOLES:  Yes.

21      THE COURT:  Thank you.  Go back to Cherokee

22  County.  I guess I -- now that I've said that, I

23  guess for the record we should show that Officer

24  Bell is an officer here in DeKalb County, but he

25  went to Cherokee County this morning because his

Gavin v. Alabama

1500

subpoena said to go to Cherokee County.

MR. NOLES:  Judge, maybe I should add for the record just so there is no reflection on Captain Bell that Ms. Smith, in my presence when these subpoenas were issued, tried for 20 minutes to make them -- make the computer print them out sending people here, but this case number is irretrievably welded to Cherokee County courthouse in the mind of the State's computer.

THE COURT:  Yeah, I can understand how that happened.

MR. NOLES:  She tried to make manual notes, but obviously Captain Bell didn't see that.

THE COURT:  Thank you.  Thank you for being here.

CAPTAIN BELL:  No problem, thank you.

MR. NOLES:  Judge, I would have expected to elicit some information from Investigator Clay Simpson of the DeKalb County Sheriff's Department, both with respect to the Stephens case which was discussed earlier and also potentially to the Spalding case which is one of the cases in the comprehensive table that's not one of the eight we relied on, and out of due diligence I had a question or two to ask him regarding it, I'm not

Gavin v. Alabama

1501

1  going to represent that I know he would have

2  testified to facts that would have made it capital

3  eligible, but I did feel due diligence to require

4  that I inquire.  I do feel that he would have

5  provided testimony that his investigation into the

6  Stephens case would have more firmly established

7  it as a capital eligible case.  I would also state

8  for the record that the subpoenas for all

9  witnesses who are in DeKalb County were hand-

10 delivered by myself to the office of the Sheriff

11 of DeKalb County on the date on which they were

12 issued, which I believe is going to be in the

13 early part of last week, and would also like the

14 record to reflect that I delivered those

15 personally to Mr. Walker Driskill, the chief clerk

16 of the sheriff's department, on that date and

17 would like the record to reflect that Investigator

18 Simpson is an employee of the sheriff's department

19 who, according to the Sheriff's earlier

20 statement, was on duty for at least a portion of

21 last week.

22      MR. JOHNSTON:  With respect to Investigator

23 Clayborn Simpson I would like to make known to the

24 Court some things for the record.  I don't have

25 any personal knowledge about whether or not he

Gavin v. Alabama                                                Case No. 04A136

D

THE RETURN OF CAPITAL INDICTMENTS IN THE NINTH CIRCUIT IS MADE IN A RACIALLY DISCRIMINATORY MANNER THAT VIOLATED THE DEFENDANT'S CONSTITUTIONAL RIGHTS

Having referred to the finding of capital indictments as arbitrary and capricious, the Defendant will now show that an actual pattern may be discernible. Unfortunately, this pattern likewise mandates dismissal of the indictment. It is painfully apparent, upon a review of the cases surveyed above, that the proportion of African-American defendants who are capitally indicted for their capital-eligible murders unconstitutionally exceeds that of corresponding white defendants.

In cases implicating the equal protection clause of U.S. Const., Amend. XIV as it relates to the imposition of the death penalty, the applicable standard is that established in the case of *McCleskey v. Kemp*, 481 U.S. 279 (1987). In that case, the defendant relied on the Baldus Study, an exhaustive statistical study of over 2,000 murder cases throughout the state of Georgia, to establish racial discrimination in the imposition of the death penalty. The Baldus Study indicated some moderate statistical deviation in the numbers of African-American defendants who were sentenced to death. In affirming the decisions of the lower courts that denied the defendant's claims of denial of equal protection, the court stated:

> Thus, to prevail under the Equal Protection Clause, McCleskey must prove that the decisionmakers in his case acted with discriminatory purpose. He offers no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence. Instead, he relies solely on the Baldus study. 481 U.S. at 292-93.

Having established this standard, the court, in a 5-4 decision, held that the Baldus Study did not show sufficiently particularized discriminatory intent on the part of the specific decisionmakers in the case before it. Despite the rather high bar set by the *McCleskey*

45

Case No. 04A136

avin v. Alabama

ecord in the instant case mandates a finding of discriminatory intent, which in

res vacation of the conviction and sentence and dismissal of the indictment.

irst and foremost, the statistical discrepancy evidencing discrimination in the

ase is far more pronounced than that in the Baldus Study.  The results of a

son of these statistics can perhaps be best appreciated graphically.[16]



General population and race-breakdown census data is available for DeKalb and Cherokee
ounties at http://govinfo.library.orst.edu/cgi-bin/buildit?1a-049.alc (Oregon State University census
tabase).  The data used are from the 1990 census. The raw numbers are n(total) = 74,194, and
African (black)) = 2,319.

Gavin v. Alabama

Alabama Ninth Judicial Circuit



Thus, two glaring differences become readily apparent.  First, in *McCleskey*, there was actually a marginal "reverse" discrimination when the investigated variable was the race of the offender; whites were marginally more likely than African-Americans to receive the death penalty. 481 U.S. at 286.  The court in *McCleskey* relied heavily on the ambiguous extent of the statistical evidence of the Baldus Study.  As the court stated:

> Viewed broadly, it would seem that the statistical evidence presented here, assuming its validity, confirms rather than condemns the system. The marginal disparity based on the race of the victim tends to support the state's contention that the system is working far differently from the one which *Furman v. Georgia*, 408 U.S. 238 (1972) condemned. 481 U.S. at 290. *quoting*, *McCleskey v. Zant*, 753 F.2d 877, 898 (11th Cir. 1985)(lower court opinion)

Certainly, where the baseline figures indicate that whites are more likely to be sentenced to death, as in *McCleskey*, "exceptionally clear proof" (see the quote *infra* this page) can be said to be lacking.  In the instant case, not only is the discriminatory evidence affirmative, it is overwhelmingly so.  A capital-eligible African-American defendant in the Ninth Circuit is almost twice as likely to be indicted capitally as a capital-eligible white defendant. More tellingly, the percentage of capitally-indicted defendants who are African-American in the Ninth Circuit is 13 times their percentage in the general

47

population. Such a difference is so quantitative as to be qualitative. Thus, *McCleskey* can be distinguished from the instant case on this point alone.

Secondly, the court in *McCleskey* relied heavily on the discretionary nature of sentencing decisions in general, and of the decision to impose the death penalty in particular. As the court itself put it:

> Because discretion is essential to the criminal justice process, we would demand *exceptionally clear proof* before we would infer that the discretion has been abused. The unique nature of the decisions at issue in this case also counsels against adopting such an inference from the disparities indicated by the Baldus study. Accordingly, we hold that the Baldus study is clearly insufficient to support an inference that any of the decisionmakers in McCleskey's case acted with discriminatory purpose. 481 U.S. at 297. (emphasis added)

Of course, in the instant case, we are not dealing, as shown *supra*, with a discretionary decision. Rather, the statistical evidence infers that a deliberate disregard of the charges and duties of grand juries is being undertaken. This provides a second, and independent, basis for distinguishing the holding in *McCleskey* from the case at bar.

A third basis for distinguishing *McCleskey* is found in that opinion's focus on the statewide nature of the Baldus Study. Although something of a corollary of the court's refusal to accept the statistical inference of particularized bias from the data, the statewide base of data was emphasized by that court:

> The Court has accepted statistics as proof of intent to discriminate in certain limited contexts. First, this Court has accepted statistical disparities as proof of an equal protection violation in the selection of the jury venire *in a particular district*. Although statistical proof normally must present a "stark" pattern to be accepted as the sole proof of discriminatory intent under the Constitution, *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977), "[b]ecause of the nature of the jury-selection task, . . . we have permitted a finding of constitutional violation even when the statistical pattern does not

Gavin v. Alabama                                      Case No. 04A136

approach [such] extremes." *Id.*, at 266, n. 13.   481 U.S. at 293-294
(emphasis added)

The instant case provides as discrete an evaluation as circumstances permit; this Court is
being asked to subject the outcomes of the grand juries of the Ninth Circuit alone to
constitutional scrutiny.  In the light of such a particularized evaluation, even *McCleskey*
would permit an inference of discriminatory intent.  The instant case is not unlike that in
*Locke v. State*, 631 So.2d 1062 (Ala.Crim.App. 1993), which dealt with grand jury
composition issues in a particular county, and in which statistical disparities alone were
deemed sufficient by this Court to meet the criminal defendant's burden of proof.

Nor should the opinion in *McCleskey* be taken without regard for the criticism it
has received – even from its author.  As one commentator noted:

> In a 5-to-4 opinion written by Justice Lewis Powell, the Court
> accepted the compelling data documenting racial bias in Georgia's death
> penalty but nonetheless upheld McCleskey's death sentence.  Justice
> Powell concluded that certain disparities based on race in the
> administration of capital punishment were "inevitable" and more
> properly an issue for the legislature to address.  Powell later stated after
> retiring from the Court that if he could change one vote during his tenure
> it would be *McCleskey*.  However, in the grim world of capital litigation
> there are no second chances.  Warren McCleskey was executed and the
> doctrine of race bias inevitability lives on.  Bryan Stevenson, *The Hanging
> Judges*, The Nation, Oct. 14, 1996.[17]

In normal circumstances, a compelling statistical showing of the kind shown
here would make a *prima facie* case of discriminatory intent, and the burden would then
shift to the "discriminator" to explain the statistical discrepancy on nondiscriminatory
grounds. *Batson v. Kentucky*, 476 U.S. 79 (1986); *Locke v. State*, 631 So.2d 1062
(Ala.Crim.App. 1993). *cf.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (Upon
plaintiff's showing of *prima facie* case of discriminatory impact violating employment
discrimination ban of 42 U.S.C. § 2000e-2(a)(1), burden shifts to employer to articulate

49

IV

# THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY REFUSING TO DISMISS APPOINTED COUNSEL AND OFFERING THE DEFENDANT THE OPTION OF PROCEEDING *PRO SE*

Immediately prior to the beginning of jury selection, the trial court denied a motion of the Defendant, made on his own behalf, to remove his appointed counsel. (R. 302). In so doing, the trial court clearly violated the right of the Defendant to represent himself, as guaranteed by U.S. Const., Amend. VI and Ala. Const., Art. I § 6. The fact pattern involved in the instant case virtually identical to that in *Faretta v. California*, 422 U.S. 806 (1975). This error of the trial court is fundamentally different from that which will later be addressed concerning earlier requests for new counsel. There, the Court was dealing with requests for replacement of appointed counsel. There, the Court is vested with a degree of discretion, and some deference would be presumed accorded thereto. With respect to the Defendant's request to simply dismiss his appointed counsel, his express right to self-representation is implicated.

The facts of *Faretta* are fairly simple. Faretta was charged with grand theft, and was appointed a public defender at arraignment. Before the trial, he asked the trial judge to dismiss his appointed counsel, and allow him to proceed representing himself. To this point, *Faretta* is on all fours with the case at bar. The trial judge in *Faretta*, unlike the trial court, engaged in a lengthy colloquy with the defendant to inform him of his right to counsel, and to attempt to dissuade him from proceeding *pro se*. Finally, the trial court in *Faretta* refused to relieve the public defender, and the case proceeded to trial with the public defender representing Faretta. He was convicted, and the appeal ensued. The California Court of Appeal affirmed, and the California Supreme Court denied review. The United States Supreme Court granted certiorari, and reversed. In so doing, it noted:

72

Gavin v. Alabama                                                    Case No. 04A136

It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring). 422 U.S. at 834.

Thus, the trial court plainly violated the clear mandate of *Faretta* by denying the Defendant the opportunity to represent himself.

The state courts in Alabama have recognized the rule in *Faretta* as well:

> The Supreme Court of the United States has interpreted these words to afford a criminal defendant the right to be represented by an attorney, see *Gideon v. Wainright*, 372 U.S. 335 (1963), and the right to represent himself without the assistance of counsel, see *Faretta v. California*, 422 U.S. 806 (1975). 'Because these rights are basic to our adversary system of criminal justice, they are part of the "due process of law" that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States.' *Faretta*, 422 U.S. at 818 and n. 14,

> "On the one hand, the Constitution guarantees an accused the right to assistance of counsel in his defense. On the other hand, it guarantees him the right to abandon the assistance of counsel and to present his own defense. Such an abandonment must be accompanied by a showing in the record that the accused made a knowing and intelligent decision to forgo counsel. *Faretta*, 422 U.S. at 835." *Drinkard v. State*, 1998 WL 881165 (Ala.Crim.App. 1998) at *61

73

The right to self-representation has further been held to apply even in capital cases. *Ford v. State*, 515 So.2d 34 (Ala.Crim.App. 1986)  The facts of *Ford* make it clear how pervasive this right is.  There was substantial evidence of mental illness on the part of Ford, and there was an IQ test indicating his IQ was 80.  Further, he had not finished the ninth grade.  515 So.2d 37-39.  Mr. Gavin, on the other hand, has attained a GED certificate.  Despite the troubling facts[29] of *Ford*, he was permitted to represent himself and was executed on 2 June 2000.  *The Mobile Register*, 3 June 2000.

This issue was properly preserved in the first instance by the Defendant's particularized request to proceed *pro se* (R. 302), and by the clear presentation of the applicable law to the trial court at new trial. (R. 1415)

Under these circumstances, it is clear that the rights of the Defendant were violated, and that the conviction and ensuing sentence must be vacated and a new trial afforded.

---

[29] As noted in a subsequent federal habeas corpus proceeding:

Ford understood the consequences of dismissing the habeas petition, as well as his options.  Thereafter, Ford's counsel elicited testimony from Ford about his ability to "translate" to places outside prison.  Ford stated that he had many wives, concubines, and children whom he had visited in various parts of the world, that he had been to church with one of his prison guards, and that he had once "visited Heaven."  Ford also testified that he has millions of dollars in a Swiss bank account and that after death he will sit at the left hand of God and be a member of the Holy Trinity. *Ford v. Haley*, 195 F.3d 603 (11th Cir. 1999)

Case 4:16-cv-00273-KOB   Document 35-18   Filed 11/07/16   Page 141 of 213

423

Q.    WHAT IS YOUR OPINION?

A.    MY OPINION IS THAT JUDICIAL ELECTROCUTION RESULTS IN

CONSIDERABLE ENORMOUS PAIN AND SUFFERING AS WELL AS OTHER

NEGATIVE EMOTIONAL EXPERIENCES.

        THE COURT:  RESULTED IN WHAT KIND OF PAIN?

        THE WITNESS:  EXCRUCIATING PAIN AND OTHER NEGATIVE

EMOTIONAL EXPERIENCES SUCH AS FEAR AND DREAD AND THINGS OF THAT

NATURE.

BY MS. ANDERSON:

Q.    DID YOU APPROACH CONSIDERING THE QUESTION OF WHETHER OR

NOT THERE'S CONSCIOUS PAIN AND SUFFERING UNDER JUDICIAL

ELECTROCUTION WITH THE SCIENTIFIC METHOD?

A.    YES, I DID.

Q.    WHAT IS THE SCIENTIFIC APPROACH TO THIS ISSUE?

A.    THE SCIENTIFIC APPROACH TO THIS ISSUE IS TO BRING TO BEAR

AS MUCH AS POSSIBLE ALL OF THE OBSERVATIONS ABOUT THE

CIRCUMSTANCES AND THE MECHANISMS THAT PAIN MIGHT BE PRODUCED OR

NOT PRODUCED AND, THROUGH SYSTEMATIC OBSERVATION, DEDUCE

WHETHER SUCH PAIN DOES OR DOES NOT OCCUR.

Q.    AND WHAT IS THE LAW OF PARSELONIAN SCIENCE?

A.    IT IS THAT YOU HAVE COMPETING THEORIES OR EXPLANATIONS OF

A PHENOMENON.  THE THEORY THAT IS CONSISTENT WITH THE GREATEST

NUMBER OF FACTS AND HAS THE LEAST NUMBER OF ASSUMPTIONS IS THE

BETTER THEORY.

Q.    IN YOUR STUDY OF THE QUESTION OF WHETHER CONSCIOUS PAIN

Gavin v. Alabama

Case No. 04A136

653

424

1   AND SUFFERING OCCURS IN A JUDICIAL ELECTROCUTION, WHAT

2   CATEGORIES OF EVIDENCE DID YOU FIND SUPPORTING YOUR OPINION

3   THAT CONSCIOUS PAIN AND SUFFERING OCCURS IN A JUDICIAL

4   ELECTROCUTION?

5   A.   NEUROPHYSIOLOGICAL EVIDENCE, ANATOMICAL EVIDENCE AND

6   BEHAVIORAL PSYCHOLOGICAL EVIDENCE.

7   Q.   CAN YOU GENERALLY SUMMARIZE FOR US WHAT ARE THE WAYS IN

8   WHICH PAIN AND SUFFERING ARE LIKELY TO BE ELICITED DURING A

9   JUDICIAL ELECTROCUTION?

10   A.   THERE ARE THREE GENERAL WAYS THAT PAIN COULD BE ELICITED.

11   ONE WAY IS THROUGH THE TIGHTENING OF THE STRAPS THAT ARE

12   STRAPPED AROUND THE FACE OF THE PRISONER AND STRAPPING THE BODY

13   IN, OTHER STRAPS THAT ARE STRAPPING THE BODY IN.

14        THE SECOND GENERAL WAY THAT PAIN COULD BE INDUCED IS

15   THROUGH PENETRATION OF THE HUMAN BRAIN WITH ELECTRICAL

16   CURRENTS, CURRENTS THAT WOULD ACTIVATE PAIN RELATED AND FEAR OF

17   RELATED AREAS OF THE HUMAN BRAIN.

18        THE THIRD GENERAL MECHANISM IS ELECTRICAL CURRENTS

19   THAT CAUSE DAMAGE AND BURNS AND MUSCLE CONTRACTIONS AND

20   STIMULATION OF BODY TISSUES.

21        SO THERE ARE THREE GENERAL POSSIBILITIES:   THE

22   STRAPPING OF THE FACE MASK AND OTHER STRAPS, THE PENETRATION TO

23   THE HUMAN BRAIN OF ELECTRICAL CURRENTS, AND PERIPHERAL

24   STIMULATION OF BODY TISSUES.

25   Q.   LET'S START WITH THE PENETRATION OF THE BRAIN WITH

DIANE C. WARD, RMR, CRR

Galvin v. Alabama

Case No. 04A136

654

425

1   ELECTRICAL CURRENTS.  CAN YOU EXPLAIN WHAT YOU MEAN BY THAT?

2   A.    WELL, IF AN ELECTRODE IS PLACED ON THE TOP OF THE HEAD

3   AND ANOTHER ELECTRODE NEAR THE KNEE AND YOU PASS ALTERNATING 60

4   CYCLE CURRENT AT HIGH AMPERAGE, PART OF THAT CURRENT, BUT ONLY

5   A VERY SMALL PART OF THAT CURRENT, IS LIKELY TO GET INTO THE

6   BRAIN.

7           MR. TAYLOR:  YOUR HONOR, OBJECTION AT THIS POINT IN

8   TIME.  NO PREDICATE BEEN LAID THAT HE HAS QUALIFICATIONS TO

9   RENDER THAT OPINION.

10          THE COURT:  OBJECTION OVERRULED.

11  A.    THAT THE PENETRATION OF THE HUMAN BRAIN WITH CURRENT FROM

12  THAT ELECTRODE COULD ACTIVATE MANY, MANY BRAIN AREAS, SOME OF

13  WHICH ARE CLEARLY INVOLVED IN PAIN AND OTHER KINDS OF NEGATIVE

14  EMOTIONS, AND THROUGH DIRECT ACTIVATION THROUGH THE CURRENT,

15  NERVE CELLS AND BRAIN AREAS THAT ARE INVOLVED IN THOSE

16  FUNCTIONS, I.E., PAIN AND SUFFERING COULD BE DIRECTLY ACTIVATED

17  BY THE CURRENT.

18  Q.    HAVE YOU MADE -- IN YOUR WORK, HAVE YOU MADE DIRECT

19  OBSERVATIONS SUPPORTING THE IDEA THAT THE APPLICATION OF

20  ELECTRIC CURRENT EXCITES REGIONS OF THE BRAIN?

21  A.    YES, I HAVE.  I HAVE MADE OBSERVATIONS ALONG THOSE LINES.

22  NEUROSURGEONS AND PHYSIOLOGISTS SOMETIMES CORROBORATE TOGETHER

23  TO STUDY THE HUMAN BRAIN.  WHEN THEY DO, THE NEUROSURGEONS

24  OFTEN PLACE AN ELECTRODE DEEP WITHIN THE HUMAN BRAIN AND

25  STIMULATES THROUGH --

DIANE C. WARD, RMR, CRR

Case No. 04A136

Gavin v. Alabama

655

426

MR. TAYLOR: YOUR HONOR, I OBJECT; NONRESPONSIVE TO

1

THE QUESTION.  THE QUESTION WAS HAS HE MADE OBSERVATIONS.

2

THE COURT:  SUSTAINED.

3

4   A.    I HAVE MADE OBSERVATIONS.

5   Q.    CAN YOU DESCRIBE PROCEDURES THAT YOU YOURSELF HAVE

6   OBSERVED?

7   A.    I HAVE OBSERVED NEUROSURGEONS STIMULATING THE HUMAN BRAIN

8   IN DEEP AREAS OF THE HUMAN BRAIN.

9   Q.    AND WHAT HAS OCCURRED WHEN THE NEUROSURGEON DOES THE

10  STIMULATION?

11  A.    WELL, IT VARIES CONSIDERABLY, BUT A PARTICULAR INSTANCE

12  THAT IS, I THINK, RELEVANT TO THE ISSUE AT HAND IS THAT I

13  OBSERVED AT LEAST ON ONE OCCASION A NEUROSURGEON APPLYING MORE

14  THAN THE USUAL AMOUNT OF CURRENT TO A BRAIN AREA CALLED THE

15  CENTRAL GRAY OF THE MID-BRAIN OF A HUMAN PATIENT.  IT WAS A

16  LITTLE BIT ACCIDENTAL.

17          WHEN HE DID THIS, THE EXCESSIVE AMOUNT OF CURRENT

18  CAUSED THIS PATIENT TO SHOW CLEAR EVIDENCE OF AN ENORMOUS

19  AMOUNT OF DREAD AND FEAR AND BEGGED FOR THE CURRENT TO BE

20  STOPPED.

21  Q.    DO PUBLISHED ARTICLES IN YOUR FIELD SUPPORT YOUR OPINION

22  THAT APPLICATION OF ELECTRIC CURRENT EXCITES REGIONS OF THE

23  BRAIN?

24  A.    YES, THEY DO.

25  Q.    HOW ARE BRAIN NERVE CELLS NORMALLY ACTIVATED?

DIANE C. WARD, RMR, CRR

Gavin v. Alabama

427

A.    BRAIN CELLS NORMALLY -- I FIRST NEED TO SAY WHAT THEY ARE

WHEN THEY ARE NOT ACTIVATED.    BRAIN CELLS HAVE WHAT'S CALLED

RESTING POTENTIAL.    THE OUTSIDE IS POSITIVE, THE INSIDE IS

NEGATIVE.

WHEN CURRENTS ARE APPLIED TO THE MEMBRANE OF A NERVE

CELL, THE NERVE CELL BECOMES PARTIALLY DEPOLARIZED.    WHEN IT

DOES SO, IF IT IS DEPOLARIZED ENOUGH, IT WILL FIRE WHAT'S

CALLED IMPULSES OR ACTION POTENTIALS.

THOSE ACTION POTENTIALS THEN ARE TRAVELING WAVES THAT

TRAVEL DOWN THE AXON OR SORT OF LIKE THE CONDUITS OF THAT NERVE

CELL TO THE NEXT POINT IN A PATHWAY, FOR EXAMPLE.

SO NORMALLY NERVE CELLS WORK BY THE ELECTRICAL

CONDUCTION OF IMPULSES.    IMPULSES CAN BE ARTIFICIALLY INDUCED

IN NERVE CELLS BY APPLYING DEPOLARIZING CURRENTS AND THEY ARE

MOST OPTIMALLY ACTIVATED IF THE DEPOLARIZING CURRENTS ARE

REPETITIVE, SAY, AT 50 OR 60 CYCLES PER SECOND.

Q.    IS THIS DEPOLARIZATION YOU HAVE TALKED ABOUT, IS THAT A

NORMAL PART OF A WAY A NERVE CELL WORKS?

A.    WELL, NORMALLY NERVE CELLS ARE PHYSIOLOGICALLY

DEPOLARIZED BY WHAT ARE CALLED NEUROTRANSMITTERS.    THESE ARE

CHEMICAL AGENTS THAT ARE RELEASED AT SYNAPSIS, AND THESE

CHEMICAL AGENTS THEN DEPOLARIZE THE NERVE CELLS TO THE POINT

WHERE ACTION POTENTIALS OR IMPULSES ARE GENERATED.

PHYSIOLOGISTS SOMETIMES ARTIFICIALLY INDUCE ACTION

POTENTIALS BY APPLYING CURRENTS TO NERVE CELLS.

Gavin v. Alabama

Case No. 04A136

657

423

1    Q.    DOES DEPOLARIZATION OF A NERVE CELL MEAN A NERVE CELL

2    DOES NOT WORK ANYMORE?

3    A.    NO, NOT AT ALL.  IF THE CURRENT IS BRIEF, IF IT IS

4    REPETITIVE, IT CAN REPETITIVELY ACTIVATE THAT NERVE CELL.

5          IF IT IS DIRECT CURRENT AND IF IT IS STRONG DIRECT

6    CURRENT, THEN THERE IS THE POTENTIAL OF INACTIVATING A NERVE

7    CELL THROUGH DIRECT CURRENT, BUT DIRECT CURRENTS SOMETIMES HAVE

8    BEEN SHOWN TO INACTIVATE NERVE CELLS, BUT ALTERNATING CURRENTS

9    OR REPETITIVE PULSES NORMALLY DO NOT INACTIVATE OR INCAPACITATE

10   OR IN ANY WAY DESTROY NERVE CELLS.

11   Q.    BASED ON YOUR TRAINING, RESEARCH AND EXPERIENCE, DO YOU

12   HAVE AN OPINION, WITHIN A REASONABLE DEGREE OF SCIENTIFIC

13   CERTAINTY, WHETHER THE INITIAL CURRENT SURGE IN A JUDICIAL

14   ELECTROCUTION WOULD INSTANTLY AND PERMANENTLY DEPOLARIZE THE

15   BRAIN OF THE PERSON BEING ELECTROCUTED?

16         MR. TAYLOR:  OBJECTION.  THERE'S NO TESTIMONY OF WHAT

17   VOLTAGE OR THE AMPERAGE OF WHAT ELECTROCUTION.

18         THE COURT:  SUSTAINED.

19   BY MS. ANDERSON:

20   Q.    DR. PRICE, WHAT IS YOUR UNDERSTANDING OF WHAT OCCURS IN

21   TERMS OF THE VOLTAGES DURING A JUDICIAL ELECTROCUTION?

22   A.    MY UNDERSTANDING IS THAT THERE'S AN ELECTRODE PLACED ON

23   TOP OF THE HEAD, ANOTHER ELECTRODE PLACED ON THE BACK OF THE

24   KNEE, AND THAT AN ALTERNATING CURRENT IS APPLIED ACROSS THESE

25   TWO ELECTRODES.  THE VOLTAGE VARIES FROM STATE TO STATE, BUT IT

DIANE C. WARD, RMR, CRR

Gavin v. Alabama

429

1   TENDS TO BE AROUND 2,000 VOLTS, AND FROM SOMEWHERE AROUND SIX

2   TO NINE-AND-A-HALF OR SO AMPERS.

3   Q.   ARE YOU FAMILIAR WITH THE VOLTAGES THAT ARE SUPPOSED TO

4   OCCUR IN FLORIDA IN JUDICIAL ELECTROCUTIONS?

5   A.   YES, I AM.

6   Q.   CAN YOU EXPLAIN WHAT THOSE ARE?

7   A.   THE VOLTAGES ARE SOMETHING AROUND 2,000 -- 250 TO 2,000,

8   350 VOLTS FOR EIGHT SECONDS FOLLOWED BY 22 SECONDS OF 750 TO

9   1250 OR SO VOLTS, AND THEN A RETURN BACK TO THE INITIAL VOLTAGE

10  FOR UP TO EIGHT SECONDS; BUT IT IS, AS I UNDERSTAND IT,

11  SOMETIMES MANUALLY TURNED OFF AT FOUR SECONDS.

12  Q.   AND THE -- YOUR EXPERIENCE AND TRAINING AND RESEARCH AND

13  SO FORTH REGARDING HOW ELECTRICAL CURRENTS AFFECT THE BRAIN,

14  CAN YOU USE THAT BACKGROUND TO STATE AN OPINION REGARDING WHAT

15  THE INITIAL CURRENT SURGE IN A JUDICIAL ELECTROCUTION WOULD DO

16  TO THE HUMAN BRAIN?

17  A.   YES, I CAN.

18  Q.   BASED ON YOUR BACKGROUND, DO YOU HAVE AN OPINION, WITHIN

19  A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY, WHETHER THE

20  INITIAL CURRENT SURGE IN A JUDICIAL ELECTROCUTION WOULD

21  INSTANTLY AND PERMANENTLY DEPOLARIZE THE BRAIN?

22       MR. TAYLOR:  OBJECTION; IMPROPER PREDICATE.

23       THE COURT:  OVERRULED.

24  A.   YEAH.  I HAVE AN OPINION ON THAT ISSUE, YES.

25  Q.   WHAT IS YOUR OPINION?

Gavin v. Alabama                                      Case No. 04A136

659

                                                                    430

1   A.   MY OPINION IS THAT IT IS HIGHLY, HIGHLY UNLIKELY THAT THE

2   INITIAL CURRENT SURGE WOULD INSTANTLY AND PERMANENTLY

3   DEPOLARIZE OR INCAPACITATE THE HUMAN BRAIN.

4   Q.   CAN YOU SUMMARIZE THE BASIS OF THAT OPINION?

5   A.   THERE ARE A NUMBER OF LINES OF EVIDENCE THAT THE BRAIN IS

6   NOT INCAPACITATED DURING JUDICIAL ELECTROCUTION.  THERE ARE --

7   THERE IS BEHAVIORAL EVIDENCE, THERE IS NEUROPHYSIOLOGICAL

8   EVIDENCE, AND THERE'S ANATOMICAL EVIDENCE, ALL THREE OF WHICH

9   CONVERGE TO STRONGLY INDICATE THAT THERE IS NOT PERMANENT AND

10  INSTANT INCAPACITATION OR DEPOLARIZATION OF THE HUMAN BRAIN.

11          WE CAN GO THROUGH EACH OF THOSE LINES OF EVIDENCE, IF

12  YOU WISH.

13  Q.   DR. PRICE, DOES INFORMATION THAT THE HEART DOES NOT STOP

14  IMMEDIATELY ON JUDICIAL ELECTROCUTION BEAR ON THE ANALYSIS OF

15  WHETHER THERE'S INSTANT DEPOLARIZATION OF THE BRAIN?

16  A.   YES, IT DOES.

17  Q.   HAVE YOU REVIEWED INFORMATION REGARDING JUDICIAL

18  ELECTROCUTIONS INDICATING THAT SOMETIMES THERE'S A HEARTBEAT

19  DETECTED AFTER THE CURRENT IS DISCONTINUED?

20  A.   YES, I HAVE REVIEWED --

21          MR. TAYLOR:  OBJECT TO THE LEADING QUESTION, YOUR

22  HONOR.

23          THE COURT:  OVERRULED.

24  A.   I HAVE REVIEWED THOSE MATERIALS.

25  Q.   IN EXPLAINING YOUR OPINION -- WELL, LET ME BACK UP A

                    DIANE C. WARD, RMR, CRR

Gavin v. Alabama

Case No. 04A136

781

675

```
 1    regarding whether during a judicial electrocution a
 2    person's brain is instantly depolarized?  Yes or no?
 3         A    I do.  And the answer is no.
 4         Q    You do not have an opinion?
 5         A    That's why I'm trying to make this clear.
 6    I do have an opinion.
 7              THE COURT:  That's all we need.  You do
 8         have an opinion.
 9         A    I do have an opinion.
10              THE COURT:  I'm certain they're going to
11         ask you for it.
12         A    Okay.
13              THE COURT:  Okay.
14    BY MS. ANDERSON:
15         Q    What is your opinion?
16         A    I do not believe the brain is instantly
17    and simultaneously depolarized.
18         Q    Okay.  Do you have an opinion, within a
19    reasonable degree of medical certainty, regarding
20    whether electrocution is painful?
21         A    I do.
22         Q    What is that opinion?
23         A    That electrocution, judicial electrocution
24    can be pain --
25              MR. NUNNELLEY:  Your Honor, this was not
```

Gavin v. Alabama

Case No. 04A136

**782**

676

1    the question she asked him.  She asked him if

2    electrocution --

3         THE COURT:  Ask the question back, Ms.

4    Gay.

5         (Whereupon the following question and

6    answer was read by court reporter:

7    Q    Okay.  Do you have an opinion, within a

8    reasonable degree of medical certainty,

9    regarding whether electrocution is painful?

10   A    I do.

11   Q    What is that opinion?

12   A    It can be, yes.

13   BY MS. ANDERSON:

14   Q    Do you have an opinion whether persons who

15   are judicially electrocuted experience conscious

16   pain and suffering?

17   A    I do.

18   Q    And what is that opinion?

19   A    Again, that they can experience pain and

20   suffering.

21   Q    Do you have an opinion, within a

22   reasonable degree of medical certainty, whether

23   there is any medical or scientific support for the

24   proposition that judicial electrocution causes

25   immediate brain death, such that pain and suffering

Gavin v. Alabama

Case No. 04A136

343

II

## THE SENTENCE OF DEATH BY ELECTROCUTION UNNECESSARILY EXPOSES DEFENDANT TO A CONSTITUTIONALLY IMPERMISSIBLE RISK OF CRUEL AND UNUSUAL PUNISHMENT

The Defendant is secured from the imposition of cruel and unusual punishments by the provisions of U.S. Const., Amend. VIII and Ala. Const., Art. I § 15.

Electrocution as a method of execution was originally upheld in the case of *In re Kemmler*, 136 U.S. 436 (1890), the case which reviewed the constitutionality[32] of the then-novel method after New York became the first state to adopt it. In upholding the constitutionality of the new method, the Supreme Court approvingly quoted the opinion of the New York Court of Appeals, *Kemmler v. Durston*, 119 N.Y. 569, 24 N.E. 6 (N.Y. 1890):

> 'We have examined this testimony and can find but little in it to warrant the belief that this new mode of execution is cruel, within the meaning of the constitution, though it is certainly unusual. On the contrary, we agree with the court below that it removes every reasonable doubt that the application of electricity to the vital parts of the human body, under such conditions and in the manner contemplated by the statute, must result in instantaneous, and consequently in painless, death.' 136 U.S. at 443-444.

*Kemmler* has become a basis upon which courts have, over the following century, robotically affirmed the constitutionality of electrocution. The courts of Alabama are among these. *Jackson v. State*, 1999 WL 339263, *40 (Ala.Crim.App. 1999). However, as often happens, advances in knowledge knock the underpinnings from beneath outdated precedent. A recent survey of competent technical

---

[32]   *Kemmler* was litigated at the Supreme Court on the privileges and immunities clause of U.S. Const., Amend. XIV. The provisions of the punishments clause of U.S. Const., Amend. VIII were not held applicable to the states until later. *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947)

Gavin v. Alabama

information has scored the presumptions relied on by *Kemmler* and its progeny. Lonny J. Hoffman, *The Madness of the Method: The Use of Electrocution and the Death Penalty*, 70 Tex. L. Rev. 1039 (1992). As it states:

> The first and possibly strongest argument against electrocution is that the factual assumptions of the early cases have been thoroughly discredited by more recent evidence. In *Kemmler*, two critical findings of the lower courts-that electrocution results in an "instantaneous" and "painless" death-were the basis of the Supreme Court's decision. These two findings are no longer supportable, if they ever were. If the factual basis behind the Court's decision to uphold New York's Electrical Execution Law has been undermined, then future courts are not bound to follow *Kemmler* in upholding electrocution.

> Electrocution procedures vary from state to state. One common technique is to use an initial voltage of 2000 to 2200 at seven to twelve amperes for 60 to 90 seconds. The voltage and amperage may be lowered and reapplied at various intervals until the prisoner is dead. Another common procedure is to employ 700 to 1000 volts of electric current at six amperes for one minute. After a brief pause, a second jolt of approximately 2000 volts is applied for another minute.

> But electrocution almost never results in instantaneous death. Prisoners have different levels of body resistance, complicating the electrocutioner's job enormously. Physical size and apparent strength are not reliable indicators of physiological resistance. One early executioner lamented the administrative difficulties of the method: "I gave him two full shocks of the full current and kept it on for two minutes. The doctors were so sure he was dead I didn't bother with a third one. I wish now I had." The need for recurrent shocks is so commonplace, in fact, that execution by electrocution has been infamously dubbed "death by installments." When John Louis Evans was electrocuted on April 22, 1983, three jolts of electricity and fourteen minutes were required to kill him. At Jesse Tafero's execution in early 1990, numerous power surges were required to complete the electrocution. Five minutes and three jolts of electric current were necessary before John Spinkelink died in May 1979. Indiana's seventy-two year old electric chair took seventeen minutes and five jolts of electricity to extinguish William Vandiver's life in 1985.

> The evidence supporting the contention that death is painless is no longer beyond "every reasonable doubt" as the New York Court of

42

Gavin v. Alabama

Case No. 04A136

345

Appeals and the United States Supreme Court thought in 1890. Today, there is credible evidence that prisoners do suffer pain during an electrocution. As one French scientist explained, " in every case of electrocution, ... death inevitably supervenes but it may be very long, and above all, excruciatingly painful.... This method of execution is a form of torture." 70 Tex. L. Rev. at 1055-57

In addition, the Defendant expects shortly to submit the affidavits of Drs. Leuchter and Bernstein to the effect that electrocution is by necessity a more painful and barbaric method of execution than other methods.

Even assuming that an execution carried out in perfect fashion is not painful and barbaric, assuming that an execution carried out in Alabama will be carried out in a competent manner calls for an act of saintly faith. As Hoffman further points out, when Alabama electrocuted John Louis Evans on April 22, 1983, three jolts of electricity and fourteen minutes were required to kill him. 70 Tex. L. Rev. at 1056. The two staffers of the Department of Corrections who connected the electric chair to the generating system for the execution of Horace Dunkins by Alabama in 1989 admitted they connected the cables from the chair to the wrong wall receptacles. *Ibid.*, at 1057. Although the court in *Thomas v. Jones*, 742 F.Supp. 598 (S.D. Ala. 1990), engaged in jurisprudential acrobatics to uphold a death sentence, it noted that:

> Some of the documentary evidence and live testimony tended to show that corpses of prisoners executed in Alabama's electric chair bear unexplained burns. (Richardson Autopsy Report, Dunkins Autopsy Report.) 742 F.Supp. at 606

It should be noted, in evaluating the opinion in *Thomas v. Jones*, that it relies heavily on the judge's conclusions of fact regarding the technical and medical aspects of electrocution, specifically its finding that

> The Court finds that in a properly performed judicial electrocution the initial application of electricity is *meant* to cause

43

Gavin v. Alabama

instant brain death.  Cardiac arrest is secondary.  742 F.Supp. at 606
(emphasis added)

As the affidavits of Drs. Leuchter and Bernstein are expected to show, this is simply not a medically tenable position.  The skull, being a largely nonconductive insulator, deflects the current from the vicinity of the brain.  Thus, the current reaches other parts of the victim's body prior to brain death, causing pain and suffering.  This pain and suffering would be more serious if the current were of insufficient voltage or amperage to bring prompt unconsciousness.

The Defendant further expects to produce affidavits that will establish that the design and structure of the electric chair currently in use by the Department of Corrections is faulty and poses a substantial risk of malfunction.  Also, Defendant expects to adduce affidavits and other evidence, which establish that the Alabama Department of Corrections has a history of human error in the use of its electric chair.  These errors have resulted in pain and suffering to prisoners being executed, and have frequently resulted in mutilation and burning of the prisoners' bodies during and at the conclusion of these executions.

Hoffman summarizes the empirical evidence as follows:

The historical record on electrocution is replete with evidence of the method's unreliability.  Mechanical failures, technical mishaps, and other problems plague its administration. Many of the difficulties stem from the complexity of administration.  While too much current can cause blistering and burning, too little may be insufficient to kill the prisoner.

* * *

Witnesses customarily report that when the first charge of electricity hits the prisoner, the body lurches forward abruptly against the straps. The skin may turn bright red, and smoke, sparks, and even flames may leap out from the prisoner's body.  The prisoner may vomit blood,

44

Gavin v. Alabama

defecate, and urinate.  The smell of burning flesh is often nauseating.
For this reason, nearly all electrocution chambers come equipped with
sickness bags. 70 Tex. L. Rev. at 1057.

Any person doubting the inherent barbarity of electrocution need only look to
the Florida execution of Allen Lee Davis on 8 July 1999.  As described in the *Miami
Herald*, 8 July 1999:

> Blood poured from the chest and mouth of convicted killer Allen Lee
> Davis as he was electrocuted early Thursday in Florida's first use of its
> new electric chair. Davis let out two muffled screams from behind a
> chin mask after four guards strapped him into the electric chair. As the
> 2,300 volts of electricity began to surge through the metal cap on his
> head, Davis jerked back against the oak chair, his fists clenched.
>
> A tiny trickle of blood began to stain his white long-sleeved dress shirt
> as witnesses watching the execution behind glass gasped in horror.
> Corrections officers in the death chamber looked at each other in
> alarm, their eyes wide. None of them moved, but watched as the blood
> thickened.
>
> The black-hooded executioner flipped the switch at 7:05 and power
> was shut off at 7:07, corrections officials said. Davis' chest convulsed at
> least twice before two prison medical officials declared him dead at
> 7:15 a.m.[33]



This photograph of the aftermath, later ordered released by
the Florida Supreme Court, reflects the gruesome and
inhumane demise of Davis.  Earlier, in the Florida execution
of Pedro Medina, on 25 March 1997, orange and blue flames
shot from the top of the victim's head and thick white smoke
filled the execution chamber. *Amnesty International website*,
http://www.derechos.net/amnesty/dp/97/pedrmedi.html.
Hoffman summarizes the issue of risk of error as follows:

---

[33]     Available online at http://www.agitator.com/dp/99/adbotch.html.

Gavin v. Alabama

These incidents can, of course, be characterized as isolated. No doubt they are, if what is meant by isolated is that no multistate conspiracy to botch electrocutions exists.  But taken together, the innumerable episodes of mechanical failure and human error evidence the reality that the problems with electrocution are inherent in the method and are not limited to the particular equipment or the personnel employed. 70 Tex. L. Rev. at 1059.

This Court may, and indeed must, take into account that electrocution is coming to be seen as an unreliable and barbaric method of execution.  In the face of the granting of a writ of certiorari in the case of *Bryan v. Moore*, 120 S.Ct. 394 (1999), the state of Florida abandoned electrocution in favor of lethal injection.[34]  2000 Fla. Laws ch. 2000-1, amending Fla. Stat. Ann. § 922.10.

Justice Brennan, in dissenting from a denial of certiorari, correctly stated the applicable law:

> This is because the Eighth Amendment requires that, as much as humanly possible, a chosen method of execution minimize the risk of unnecessary pain, violence, and mutilation.  If a method of execution does not satisfy these criteria—if it causes "torture or a lingering death" in a significant number of cases, *In re Kemmler*, 136 U.S. at 447, 10 S.Ct. at 933 — then unnecessary cruelty inheres in that method of execution and the method violates the Cruel and Unusual Punishments Clause. *Glass v. Louisiana*, 471 U.S. 1080, 1086 (1985)

The arguments for electrocution are no longer defensible.  To protect the rights of the Defendant under U.S. Const., Amend. VIII and Ala. Const., Art. I § 15 to be free from cruel and unusual punishments, the sentence of death in the instant case *must* be vacated.

---

[34]   The writ of certiorari was later quashed as moot after Florida amended its statute. *Bryan v. Moore*, 120 S.Ct. 1003 (2000)

Gavin v. Alabama                                                    Case No. 04A136

## II

## THE SENTENCE OF DEATH BY ELECTROCUTION UNNECESSARILY EXPOSES DEFENDANT TO A CONSTITUTIONALLY IMPERMISSIBLE LIKELIHOOD OF CRUEL AND UNUSUAL PUNISHMENT

The Defendant is secured from the imposition of cruel and unusual punishments by the provisions of U.S. Const., Amend. VIII and Ala. Const., Art. I § 15.

Electrocution as a method of execution was originally upheld in the case of *In re Kemmler*, 136 U.S. 436 (1890), the case which reviewed the constitutionality[22] of the then-novel method after New York became the first state to adopt it. In upholding the constitutionality of the new method, the Supreme Court approvingly quoted the opinion of the New York Court of Appeals, *Kemmler v. Durston*, 119 N.Y. 569, 24 N.E. 6 (N.Y. 1890):

> 'We have examined this testimony and can find but little in it to warrant the belief that this new mode of execution is cruel, within the meaning of the constitution, though it is certainly unusual. On the contrary, we agree with the court below that it removes every reasonable doubt that the application of electricity to the vital parts of the human body, under such conditions and in the manner contemplated by the statute, must result in instantaneous, and consequently in painless, death.' 136 U.S. at 443-444.

*Kemmler* has become a basis upon which courts have, over the following century, robotically affirmed the constitutionality of electrocution. The courts of Alabama are among these. *Barksdale v. State*, 2000 WL 336955 at *9 (Ala.Crim.App. 2000) However, as often happens, advances in knowledge knock the underpinnings from beneath outdated precedent. A recent survey of competent technical

---

[22] *Kemmler* was litigated at the Supreme Court on the privileges and immunities clause of U.S. Const., Amend. XIV. The provisions of the punishments clause of U.S. Const., Amend. VIII were not held applicable to the states until later. *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947)

Gavin v. Alabama                                    Case No. 04A136

information has scored the presumptions relied on by *Kemmler* and its progeny. Lonny J. Hoffman, *The Madness of the Method: The Use of Electrocution and the Death Penalty*, 70 Tex. L. Rev. 1039 (1992). As that survey states:

> The first and possibly strongest argument against electrocution is that the factual assumptions of the early cases have been thoroughly discredited by more recent evidence. In *Kemmler*, two critical findings of the lower courts-that electrocution results in an "instantaneous" and "painless" death-were the basis of the Supreme Court's decision. These two findings are no longer supportable, if they ever were. If the factual basis behind the Court's decision to uphold New York's Electrical Execution Law has been undermined, then future courts are not bound to follow *Kemmler* in upholding electrocution.

> Electrocution procedures vary from state to state. One common technique is to use an initial voltage of 2000 to 2200 at seven to twelve amperes for 60 to 90 seconds. The voltage and amperage may be lowered and reapplied at various intervals until the prisoner is dead. Another common procedure is to employ 700 to 1000 volts of electric current at six amperes for one minute. After a brief pause, a second jolt of approximately 2000 volts is applied for another minute.

> But electrocution almost never results in instantaneous death. Prisoners have different levels of body resistance, complicating the electrocutioner's job enormously. Physical size and apparent strength are not reliable indicators of physiological resistance. One early executioner lamented the administrative difficulties of the method: "I gave him two full shocks of the full current and kept it on for two minutes. The doctors were so sure he was dead I didn't bother with a third one. I wish now I had." The need for recurrent shocks is so commonplace, in fact, that execution by electrocution has been infamously dubbed "death by installments." When John Louis Evans was electrocuted on April 22, 1983, three jolts of electricity and fourteen minutes were required to kill him. At Jesse Tafero's execution in early 1990, numerous power surges were required to complete the electrocution. Five minutes and three jolts of electric current were necessary before John Spinkelink died in May 1979. Indiana's seventy-two year old electric chair took seventeen minutes and five jolts of electricity to extinguish William Vandiver's life in 1985.

> The evidence supporting the contention that death is painless is no longer beyond "every reasonable doubt" as the New York Court of

56

Gavin v. Alabama                                                   Case No. 04A136

Appeals and the United States Supreme Court thought in 1890. Today, there is credible evidence that prisoners do suffer pain during an electrocution. As one French scientist explained, " in every case of electrocution, ... death inevitably supervenes but it may be very long, and above all, excruciatingly painful.... This method of execution is a form of torture." 70 Tex. L. Rev. at 1055-57

At the hearing on the Defendant's motion for new trial, the Defendant entered into evidence substantial proof of the painful and inhumane nature of death by electrocution.

Among this evidence was the testimony of Donald Price, Ph.D., a neurophysiologist at the University of Florida. (Defendant's Exhibit 1 of 4 August 2000, C. 635). The essence of his testimony was that "judicial electrocution results in considerable, enormous pain and suffering as well as other negative emotional experiences." (C. 652). He further testified that, within " a reasonable degree of scientific certainty. ... it is highly, highly unlikely that the initial current surge [in a judicial electrocution] would instantly and permanently depolarize or incapacitate the human brain." (C. 659). The significance of this, he explains, is that this permits the initial and subsequent surges to stimulate pain and fear centers within the brain, causing sensations of pain and fear in the executee even in the absence of actual physical damage to his body. (C. 667). He testified that these conclusions were supported by numerous autopsy studies at both the gross and microscopic levels. (C. 675). Dr. Price also states that it is "highly likely" that a judicial electrocutee will experience peripheral pain caused by extreme muscle contraction and the burning of tissues at electrode contact points. (C. 679). He notes studies and reports of electrocution executions in which moans, gasping, and screaming, indicate pain. (C. 681)

Defendant also offered the prior testimony of Orrin Devinsky, M.D. (Defendant's Exhibit 1 of 4 August 2000, C. 748). Dr. Devinsky is a graduate of

57

Gavin v. Alabama                                    Case No. 04A136

**144**

STATE'S EXHIBIT # 42



– 2 –

IN RE:     KEITH GAVIN
           INDICTMENT NO:  81-2719

OFFICIAL STATEMENT OF FACTS

The facts in this Indictment are briefly as follows:

Defendant and victim were attending a party at 1351 S. Throop
Street when they got into a verbal argument.  Defendant forced
victim out of the party at gun point.  He led victim down
the street while hitting him and poking him with the gun.
Victim begged for his life as defendant led him to a secluded
area behind a building located at 1416 S. Blue Island.
Defendant then pulled out a gun and shot victim between
the eyes.  Victim died as a result of this gun shot wound
which penetrated his brain.  Three bullet fragments were
recovered from victim's skull.  Defendant was arrested a
short time later at 1432 S. Blue Island where he was
sleeping.

RICHARD M. DALEY
State's Attorney

By:   _Michelle Jordan_

Michelle Jordan
Assistant State's Attorney

MJ:hc

the underlying proceedings.  The necessity for counsel in all phases of a proceeding has been defined as follows:

> After a defendant's Sixth Amendment right to counsel attaches, he has a right to the advice of counsel "at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *United States v. Wade*, 388 U.S. 218 (1967).   The Supreme Court has referred to such a stage as a "critical stage" of a criminal proceeding. *Michigan v. Jackson*, 475 U.S. 625 (1986); *see also Maine v. Moulton*, 474 U.S. 159 (1985). *United States v. Hidalgo*, 7 F.3d 1566 (11th Cir. 1993)

As the record fails to reflect that counsel was provided at each critical stage of the Illinois proceeding, the conviction should not have been admitted.   For the reasons argued in the preceding section, the error was plain error within the context of Ala.R.A.P. 45A.

## D

## THE COURT ERRONEOUSLY ADMITTED A PURPORTED COPY OF AN "OFFICIAL STATEMENT OF FACTS" FROM THE ILLINOIS STATE'S ATTORNEY INTO EVIDENCE

State's exhibit 42 (C. 144) consists of what purports to be a document submitted by the Illinois district attorney to the Illinois court; it has no ready analog in Alabama practice.  It purports to set out details of the Defendant's Illinois charge. It is over the purported signature of an assistant state's attorney.  It is clearly "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ala.R.Evid. 801(c).  Thus, it is hearsay, and inadmissible under Ala.R.Evid. 802.  The closest hearsay exception under which it might be admissible states that an exception exists for:

Gavin v. Alabama                                          Case No. 04A136

> (8) *Public Records and Reports.* Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, *excluding, however, when offered against the defendant in criminal cases, matters observed by police officers and other law enforcement personnel* Ala.R.Evid. 803(8). (emphasis added)

First, the State's Attorney is clearly "law enforcement personnel" within the meaning of the exclusionary clause. Even if she is not, there is clearly a tacit hearsay-within-hearsay declarant, the police official providing her information. Ala.R.Evid. 805. As such, the admission of this evidence violated the right of the Defendant to confrontation of adverse witnesses under U.S. Const., Amend. VI and Ala. Const., Art. I § 6.

> (t)he primary object of the (confrontation clause) was to prevent depositions or *ex parte* affidavits ... being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. *Proffitt v. Wainwright,* 685 F.2d 1227, 1251 (11th Cir. 1982)

Further, the document is not properly authenticated under Ala.R.Evid. 902. Finally, the admission of this testimony based solely on a writing violated the Defendant's right to testimony based solely on personal knowledge under Ala.R.Evid. 602. Its admission was prejudicial and reversible error. Trial counsel made a timely and adequate objection to this exhibit, preserving the issue for review. (R. 1234, 1238) The admission of this blatant hearsay requires the vacation of the Defendant's sentence and the granting of a new sentencing hearing.

Case No. 04A136

Gavin v. Alabama

396

# IN THE CIRCUIT COURT OF CHEROKEE COUNTY, ALABAMA

STATE OF ALABAMA,                          *

    Plaintiff,                            *

Vs.                                        *       CASE NOS. CC-98-61
                                               CC-98-62

KEITH EDMUND GAVIN,                         *

    Defendant.                            *

## STATE'S MEMORANDUM SUPPORTING
## STATE'S OBJECTION TO DEFENDANT'S
## MOTION FOR NEW TRIAL

*Filed
6-29-2000
(signature)*

### STATEMENT OF FACTS

William Clinton Clayton, Jr. was a contract courier for Corporate Express Delivery Systems, Incorporated. Although his routine typically involved the use of his private automobile to provide courier services, on March 6, 1998, he drove a Corporate Express van because his personal vehicle was having mechanical problems.

As Mr. Clayton sat in the driver's seat of this marked van at the curb near the entrance to Region's Bank in Centre, Cherokee County, Alabama, the Defendant approached him from the street, opened the driver's door, and shot Mr. Clayton twice. One of the bullets passed through his heart and both lungs. The other through his hip. He died of these multiple gunshot wounds.

The reason for the Defendant's presence at that place and at that time was recounted by the Defendant's companion on this occasion, Mr. Dwayne Meeks. Meeks and the Defendant are cousins and both were residing in the Chicago, Illinois area in early 1998. Meeks worked for the Illinois Department of Corrections, and the Defendant had been recently paroled after serving approximately seventeen years of a thirty-four year sentence imposed by the Circuit Court of Cook County, Illinois, for Murder.

Meeks grew up in Fort Payne, Alabama, and had other relatives and friends residing in this area. Meeks brought the Defendant to Fort Payne in February 1998, for a "change of scenery" and to go "whoring." Following the February visit to Alabama, the Defendant wanted to return in March to find a woman whom he had met the previous month. Meeks agreed to drive the Defendant to Chattanooga, Tennessee, where Meeks charged two motel rooms on his credit card, and from which said location Meeks and the Defendant were to conduct the search for the woman. If she was located, the Defendant

Gavin v. Alabama

397

intended to remain in this area, and Meeks planned to return to Chicago after being reimbursed by the woman for the motel and other expenses.

In addition to the Defendant, Meeks was accompanied to Chattanooga by his wife and child, where they remained while the efforts to locate the woman proceeded. Meeks and the Defendant went to Fort Payne, and from there to Centre, Alabama, at the corner where Mr. Clayton sat in his courier van.

There was tension between Meeks and the Defendant because of the expenses which Meeks had incurred for this trip, and because of Meeks' concern that he would not be reimbursed if the woman could not be located. Nevertheless, when the Defendant exited the car at the intersection by Region's Bank, Meeks thought the Defendant was going to ask for directions. Instead, the Defendant shot and killed William Clinton Clayton, Jr.

Meeks fled from the scene in his car. The Defendant pushed the mortally wounded courier aside and followed Meeks in the Corporate Express van. When the Defendant stopped in response to a blue light, he exited the van. When Investigator Danny Smith exited his pursuit vehicle, the Defendant took aim at short range and attempted to kill Smith by firing two shots at him. The Defendant fled into the nearby woods.

Following a four hour manhunt the Defendant was apprehended standing waist deep in a creek where he was detected by search dogs.

## ISSUES

I. **WHETHER THE GRAND JURY IN THE NINTH JUDICIAL CIRCUIT RETURNS INDICTMENTS IN AN ARBITRARY AND CAPRICIOUS MANNER?**

II. **WHETHER THE SENTENCE OF DEATH BY ELECTROCUTION VIOLATES THE CONSTITUTIONAL CLAUSE PROHIBITTING CRUEL AND UNUSUAL PUNISHMENT?**

III. **WHETHER THE DEFENDANT'S CONVICTION FOR CAPITAL MURDER MADE POSSIBLE BY 13A-5-40(a)(13) VIOLATED HIS CONSTITUTIONAL RIGHTS TO EQUAL PROTECTION, DUE PROCESS OF LAW, AND FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT?**

IV. **WHETHER THE COURT ERRED BY REFUSING TO DISMISS APPOINTED COUNSEL AND REQUIRING THE DEFENDANT TO PROCEED *PRO SE*?**

Gavin v. Alabama

Case No. 04A136

398

**V. WHETHER THE DEFENDANT'S RIGHTS WERE VIOLATED BY THE METHODS OF CONVENING THE GRAND AND PETIT JURIES?**

**VI. WHETHER THE COURT ERRED IN FINDING THAT THE DEFENDANT DID NOT MAKE A PRIMA FACIE SHOWING FOR A <u>BATSON</u> VIOLATION?**

**VII. WHETHER THE COURT ERRONEOUSLY ADMITTED EVIDENCE OVER TIMELY AND WELL TAKEN OBJECTIONS?**

ARGUMENT

I.  It is the role and function of the grand jury that "[o]nce the grand jury is empanelled and sworn as provided by statute, 'it becomes the supreme inquisitorial body of the county[.]'" *Committee Comments to Rule 12.3, Alabama Rules of Criminal Procedure.* In the case at bar, and in all cases referenced by the Defendant in brief, the grand juries of the Ninth Judicial Circuit have fulfilled their duty to "indict . . . *if, in the opinion of the grand jury, the evidence justifies the indictment.*" *Section 12-15-202, Code of Alabama, (1975)(superceded)(emphasis added).*

    A.  Grand juries are not comprised of automatons which function as robots without common sense or understanding of human behavior.  They are charged with the duty to indict *when the evidence justifies the indictment.*

        1.  "It shall likewise be the duty of the judges to charge the grand jury as to all other matters which may be required by law and to instruct the grand juries that it is their duty to indict for the above named offenses, *if, in the opinion of the grand jury, the evidence justifies the indictment.*" *Section 12-15-202(b), Code of Alabama (1975)(superceded)(emphasis added);*

        2.  "It shall be the duty of the grand jury to:
           (1) Inquire into all *indictable offenses* committed or triable within the county.*" Rule 12.3( c ), Alabama Rules of Criminal Procedure (emphasis added)(see Appendix D, D-1);*

        3.  "The rule merely directs the judges of the courts in which grand juries relative to the criminal laws against certain offenses;  [*sic*] to charge the grand jury as to all other matters which may be required by law; and to instruct the grand jury that it is their duty to indict of *offenses if, in their opinion, the evidence justifies the indictment.*" *Committee Comments, Rule 12.3(b), Alabama Rules of Criminal Procedure (emphasis added);*

Gavin v. Alabama                                    Case No. 04A136

399

4. It is clear from this case, and in all cases discussed in brief, that the grand juries of the Ninth Judicial Circuit have thoroughly sifted through the facts and have returned capital murder indictments, *if, in their opinion, the evidence justified the indictments.*

B. The grand juries of the Ninth Judicial Circuit have clearly not acted "with discriminatory purpose" in violation of the Equal Protections Clause. *McCleskey v. Kemp*, 481 U.S. 279 (1987).

1. According to the information submitted in brief by the Defendant, the grand juries of the Ninth Circuit have returned true bills of indictment for capital murder against nine Caucasians and six Afro-Americans in recent years;

2. It is interesting to note that five of the six Afro-Americans against whom grand juries have returned indictments involve just two cases of homicide. Timothy Dupree, Reynard Ford, and Jonathan Betton were indicted along with Jonathan Phillips (white male) for murder during a robbery in DeKalb County, Alabama. Dewayne Meeks and the Defendant were each indicted for the car-jacking homicide of William Clinton Clayton, Jr. (*See Defendant's Brief Appendix, Murder Prosecutions Included in Review*);

3. In each of the above cases the grand juries have returned indictments because, *in their opinion, the evidence justified the indictments*;

4. Only two defendants have been sentenced to death in the Ninth Judicial Circuit since the death penalty was reinstituted: Keith Edmund Gavin (Afro-American) and Judith Ann Neeley (Caucasian). They represent the only two defendants brought to trial in this circuit who intentionally murdered victims who were completely unknown to them, directly or indirectly. They killed at random without pity and have committed just the sort of heartless crimes that *justify* the gravest sanction.

C. Counsel for the Defendant is grossly misinformed about the cases he refers to as "capital-eligible." The facts and circumstances surrounding each case reveal that the grand juries failed to return indictments for capital murder in those cases because, *in their opinion, the evidence did not justify an indictment.*

1. *State v. Jason Fleming*, CC-98-96 (DeKalb County). There was insufficient evidence from which the grand jury could have inferred that the murder was committed in the course of a burglary or robbery. (*see Appendix A, A-1*);

2. *State v. Wilson Floyd,* CC-95-388 (DeKalb County). There was insufficient evidence from which the grand jury could have inferred that the murder was committed during the course of a robbery. (*see Appendix A, A-2*);

3. *State v. Charlie Berdell Kerley,* CC-93-560 (DeKalb County). There was insufficient evidence from which the grand jury could have inferred that the murder was committed during the course of a burglary. (*see Appendix A, A-3*);

4. *State v. Nell Rae Long,* CC-95-80 and CC-95-254 (DeKalb County). Although there was some evidence from which the grand jury could have inferred that the murders were committed pursuant to one course of conduct, it is apparent that *the grand jury felt, in their opinion, an indictment for capital murder was not justified by the evidence. (The trial court is well aware of the surrounding facts and circumstances from which a grand jury could render an opinion that an indictment for capital murder was not justified.*);

5. *State v. Angela Mendenhall,* CC-96-493 and *State v. David Mendenhall,* CC-96-464 (DeKalb County). There was insufficient evidence from which the grand jury could have inferred that the death of Sarah Mendenhall was intentionally caused. Each Defendant was indicted for causing the infant's death in the course of committing child abuse. *(felony murder)(see Appendix A, A-4 and A-5)*;

6. *State v. John Allen Stephens,* CC-94-398 (DeKalb County). There was insufficient evidence from which the grand jury could have inferred that the murder was committed while the defendant was in his vehicle. (*see Appendix A, A-6*);

7. *State v. Michelle Teems,* CC-95-69 (Cherokee County). There was no evidence from which the grand jury could have inferred that the death was intentionally caused. The Defendant was not indicted for intentional murder under 13A-6-2(a)(1), but for "reckless murder" under 13A-6-2(a)(2). (*see Appendix A, A-7*);

8. *State v. Michael Wayne Thompson,* CC-94-27 and *State v. Johnny Young,* CC-94-18 (DeKalb County). There was insufficient evidence from which the grand jury could have inferred that the murder was committed during the course of a kidnapping. (*see Appendix A, A-8*).

Gavin v. Alabama                                    Case No. 04A136

1415

1    but there are two words that are dispositive of

2    this issue.  First word is Faretta and the second

3    word is California.  You can put a "v" in between

4    them if you chose because the case is on all

5    four's.  Faretta is a case in the United States

6    Supreme Court that came out of the state of

7    California, and I'm going to probably need a cue

8    from Ms. Higgins, is the pagination going to be

9    the same on the final record?

10           COURT REPORTER:  Yes.

11           MR. NOLES:  Okay, thank you.  Judge, on around

12    page 302 on the existing record, immediately prior

13    to the commencement of the trial, the Court heard

14    from Mr. Gavin to the extent that he wished to

15    replace or remove his counsel and proceed pro se.

16    He made the request to dismiss Mr. Smith and

17    indicated it was his understanding from his

18    conversations with Mr. Ufford did not wish to

19    proceed alone.  In essence he said I would rather

20    have no help than bad help was the point of his

21    issue at that time.  Now, I'm not at this time

22    going to address the earlier efforts by Mr. Gavin

23    because I think those are a bit actually more

24    complicated, and I think we need the benefit of

25    the entire record to look at those issues and

Gavin v. Alabama                                              Case No. 04A136

1   issues of possible prejudice.  This one, however,

2   is fairly discrete because the record is fairly

3   clear at that focused point because at that point

4   in the record the case irretrievably becomes on

5   all four's with Faretta.  What happens with Mr.

6   Faretta is Mr. Faretta does exactly what Keith

7   Gavin did, he said I want to represent myself.

8   And I think this Court, like the trial court in

9   Faretta, had extremely good intentions on the

10  issue, and I mean that with respect to the rights

11  of the defendant as well as the rights of judicial

12  administration to proceed orderly.  The trial

13  Judge in Faretta fully went further than Your

14  Honor did and it's almost amusing tried to show

15  Mr. Faretta how little he knew about the law,

16  you know, asked him a few questions about hearsay

17  exceptions and things.

18      MR. BUSSMAN:  Judge, that starts on page 293

19  starting at line nine or eight through 10.

20      THE COURT:  Thank you.

21      MR. NOLES:  But Mr. Faretta kept insisting he

22  didn't want a lawyer, but the trial judge said in

23  essence, no, I don't think you're capable of

24  representing yourself, so I'm going to leave your

25  lawyer sitting there.  And the public defender who

Gavin v. Alabama                                    Case No. 04A136

1417

1    was assigned to Mr. Faretta carried forward. The

2    case went up through the California appellate

3    courts and was affirmed after conviction. Then

4    the United States Supreme Court granted cert and

5    in some very, very pointed language which I quote

6    at some length at the top of page 54 of the brief,

7    the United States Supreme Court said that the

8    right to represent one's self is nothing but the

9    flip side of the right to have counsel, and that

10   it is just as wrong to deny one the right of self-

11   representation as it is to deny one the right of

12   an attorney when one is desired. If you get a

13   chance to read the Faretta, I mean I think you're

14   going to need to read the Faretta decision, but if

15   you get a chance to give it a close leisurely

16   reading and look through the footnotes, there are

17   some interesting and fascinating things in there

18   about the history of anti-lawyer sentiment in the

19   United States and how lawyers were looked down

20   upon in many quarters at the time the Sixth

21   Amendment was written. Also point out, Your

22   Honor, that this principle has been picked up and

23   recognized by our courts and I'll give you some

24   citations and quotes on that in there. Frankly,

25   the most -- all of the cases I found dealing with

1418

1  Faretta in our state courts deal with the converse

2  problem which is defendant asks to go pro se and

3  the Judge permits him to without adequately having

4  some form of colloquy or other warning that, you

5  know, this might not be a good idea, you might not

6  want to do this.  Those seem to be where trial

7  courts in Alabama have had a problem with this

8  issue.  But there again, Faretta is squarely on

9  point in that it deals with a lawyer who was

10  forced upon a defendant and that's unfortunately

11  what happened in this case.  I earlier alluded to

12  the Ford execution that's set this week and at

13  page 55 of the brief I deal briefly, there is that

14  same issue in Ford.  The original direct appeal in

15  Ford from 1986 dealt with this issue because his

16  lawyers at that time said that he should not have

17  been allowed to exercise that right because he was

18  not competent.  In the Ford case we're dealing

19  with a gentleman who wore a toga to his sentencing

20  hearing and who has manifest other weird things,

21  just to put it bluntly, in all of the years

22  subsequent to his imposition of his death sentence

23  down in Calhoun County.  Given those problems with

24  Mr. Ford, given the fact that he had a ninth grade

25  education, given the fact he was only 19 at the

Gavin v. Alabama                                    Case No. 04A136

1419

1   time of trial, our courts have consistently ruled

2   and the courts dealing with federal habeas have

3   consistently ruled in his case that he had the

4   right to make a foolish choice.  Now, I'm not

5   going to stand here at this point and say yea or

6   nay as to whether Mr. Gavin was making a wise

7   choice or seeking to make a wise choice.  The

8   point is that the Sixth Amendment U.S.

9   Constitution as well as section six of the Alabama

10  Constitution absolutely guarantee him the right to

11  represent himself and we respectfully submit that

12  however well the Court may have meant, the Court

13  violated that right by forcing Bayne Smith and

14  John Ufford on him at the point in the record we

15  have referred to.

16      THE COURT:  I think even though the State has

17  been making some brief responses, and I would

18  certainly welcome a response to this issue by the

19  State at this time, I still want the State to

20  respond more fully in a written form and we'll

21  work out that time schedule later, but if you wish

22  to respond to that now, I certainly would be

23  pleased for you to do so.

24      MR. JOHNSTON:  May I have a moment?  I don't

25  want to prolong this, but we have just spent the

Petition for Writ of Certiorari, Appendix Page 270

Gavin v. Alabama                                    Case No. 04A136

1420

1    last few moments reading from page 293 to 303 and

2    on 293 Mr. Gavin, and I recall this now or

3    recollection has been refreshed by reading it,

4    said he had a couple of motions he wanted to make

5    pro se and the process of it asked for Bayne Smith

6    to be removed, but I think the Court will recall

7    very well Mr. Gavin was very pleased with Mr.

8    Ufford, his rapport and relationship with Mr.

9    Ufford throughout the proceedings, and at no time

10   in any of these pages that we've read

11   that have been propounded as being pertinent on

12   this issue does Mr. Gavin express any desire to

13   represent himself pro se at the trial of this

14   cause.  He wanted counsel.  And had a good

15   relationship with Mr. Ufford.  He mentions during

16   this pro se motion that he made that Mr. Smith be

17   removed, but that's as far as it goes.  And, of

18   course, we'll respond further in brief.

19        THE COURT:  Issue number five.  And I think I

20   may have this one out of order from the way they

21   appear in the brief, but they are in the way you

22   outlined them when we started, so let's stay with

23   that and issue number five, according to my list,

24   is the Batson issues which are briefed at pages

25   60-62.

Gavin v. Alabama                                    Case No. 04A136

range with a .40 caliber pistol. There was no
reasonable theory from this evidence that
Gavin did not intend to kill Clayton.
Therefore, the trial court did not err in not
instructing the jury on felony murder as a
lesser-included offense of capital murder
during a robbery. Opinion at *52 (citations
omitted)

In the case of *Ex parte Stork*, 475 So.2d 623 (Ala.
1985), this Court held:

An accused has the right to have the jury
charged on ' "any material hypothesis which
the evidence in his favor tends to establish."
475 So.2d at 624

These statements of the law or the substance of the
opinion are in conflict and the appellate court erred
in failing to follow the decision of the Supreme Court
on the same point of law. See, Brief at p. 57 *et seq.*

c.   The basis of this petition for the writ is
that the decision is in conflict with a prior decision
of the Supreme Court of the United States and/or this
Supreme Court on the same point of law. In its opinion,
the appellate court held:

The trial court did not err in denying Gavin's
oral motion to remove his counsel. Opinion at
*18

In the case of *Faretta v. California*, 422 U.S. 806
(1975), the U.S. Supreme Court held:

Gavin v. Alabama                                  Case No. 04A136

> It is the defendant, therefore, who must be
> free personally to decide whether in his
> particular case counsel is to his advantage.
> And although he may conduct his own defense
> ultimately to his own detriment, his choice
> must be honored out of 'that respect for the
> individual which is the lifeblood of the law.'
> *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970)
> (Brennan, J., concurring). 422 U.S. at 834.

These statements of the law or the substance of the *Faretta* opinion are in conflict and the appellate court erred in failing to follow the decision of the Supreme Court on the same point of law. See, Brief at p. 63 *et seq.* (The Petitioner further submits that the trial court abused its discretion in denying his earlier and separate motions to replace his appointed counsel. See, Brief at p. 123 *et seq.*)

d.   The basis of this petition for the writ is that the decision is in conflict with a prior decision of the Supreme Court of the United States and/or this Supreme Court on the same point of law. In its opinion, the appellate court held:

> Because the primary method of execution in
> Alabama has been changed from electrocution to
> lethal injection, Gavin's argument is moot.
> Opinion at *60

In the case of *State ex rel. Eagerton v. Corwin*, 359 So.2d 767 (Ala. 1977), the Court held:

37

No. 04-6734
CAPITAL CASE

## In the SUPREME COURT of the UNITED STATES

♦

KEITH EDMUND GAVIN,
Petitioner,

v.

STATE of ALABAMA,
Respondent.

♦

On Petition for Writ of Certiorari to
the Supreme Court of Alabama

## BRIEF OF THE STATE OF ALABAMA IN RESPONSE TO THE PETITION

Troy King
*Attorney General*

Kevin Newsom
*Solicitor General*

Beth Jackson Hughes
Assistant Attorney General
Counsel of Record *

Tracy M. Daniel
*Assistant Attorney General*
State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130-0152
(334) 242-7401, 353-9782 *

December 23, 2004

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

QUESTIONS PRESENTED ........................................................... 1

STATEMENT OF THE CASE ........................................................ 2

A.    Alabama's Tripartite Capital Sentencing Scheme ..................... 2

    1.   Guilt Phase ...................................................................2

    2.   Sentencing Phase — Jury ........................................... 2

    3.   Sentencing Phase — Judge.......................................... 4

B.    Facts of McNabb's Case.......................................................... 5

C.    Proceedings and Disposition Below ...................................... 15

REASONS FOR DENYING THE PETITION......................................... 16

I.    This Court Should Not Grant Certiorari To Review the Question Whether Gavin's Equal Protection Rights Were Violated Under *McCleskey v. Kemp*, Because Gavin Did Not Timely Present This Claim To the Trial Court and Because the Claim Involves Only the Fact-Bound Application of Settled, Conflict-Free Law. ................................................................... 16

II.    This Court Should Not Grant Certiorari To Review the Question Whether Alabama's Capital Sentencing Regime Violates *Ring v. Arizona*, Because Gavin Does Not Have Standing To Raise This Claim and Because His Claim Hinges on an Erroneous Contention Concerning Alabama Law..................... 20

III.    This Court Should Not Grant Certiorari To Review the
        Question Whether the Trial Court Violated the Confrontation
        Clause By Admitting an "Official Statement" of His Prior
        Murder Conviction Prepared By the Illinois State Attorney's
        Office, Because Gavin Did Not Present This Claim To the Trial
        Court and Because the Claim Involves Only the Fact-Bound
        Application of Settled, Conflict-Free Law.......................................... 23

IV.     This Court Should Deny Certiorari Review of Gavin's Claim
        That the Court Below Mischaracterized His Oral Motion To
        Proceed *Pro Se* as a Motion To Dismiss Counsel, Because the
        Claim Is Fact-Bound, Splitless, and Meritless. ................................... 27

V.      This Court Should Deny Certiorari Review of Gavin's Claim
        That Death by Electrocution Constitutes Cruel and Unusual
        Punishment, Because Gavin Will Be Executed by Lethal
        Injection and Thus Does Not Have Standing To Make This
        Claim. ................................................................................................ 30

CONCLUSION.................................................................................................31

CERTIFICATE OF SERVICE .......................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Crawford v. Washington*, 124 S. Ct. 1354 (2004) ............................................. 25, 26

*Ex parte Gavin*, 2004 WL 1178756 (Ala. May 27, 2004) ............................... passim

*Faretta v. California*, 422 U.S. 806 (1975) .......................................... 22, 23, 27, 32

*Gavin v. State*, No. CR-99-1127 (Ala. Crim. App. Sept. 26, 2003) ................ passim

*Johnson v. State*, 59 P.3d 450 (Nev. 2002) ...................................................... 22, 23, 32

*King v. Moore*, 831 So. 2d 143 (Fla.), *cert. denied*, 537 U.S. 1067
    (2002) .......................................................................................................... 22, 23

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................ 21

*McCleskey v. Kemp*, 481 U.S. 279 (1987) .................................................. 15, 16, 20

*Ohio v. Roberts*, 448 U.S. 56 (1980) ................................................................ passim

*State v. Canez*, 74 P.3d 932 (Ariz. 2003), *cert. denied*, 124 S. Ct. 1043
    (2004) ...................................................................................................... 22, 23, 32

*State v. Gales*, 658 N.W.2d 604 (Neb. 2003) ..................................................... passim

*State v. Whitfield*, 107 S.W.3d 253 (Mo. 2003) ................................................. passim

*Torres v. State*, 58 P.3d 214 (Okla. Crim. App. 2002), *cert. denied*,
    538 U.S. 928 (2003) ................................................................................... passim

*Wrinkles v. State*, 776 N.E.2d 905 (Ind. 2002) .................................................. passim

## Statutes

Ala. Code § 13A-5-40(a)(17) ............................................................................... 2, 15

Ala. Code § 13A-5-40(a)(2) .................................................................................. 3, 15

Ala. Code § 13A-5-40(a)(5) ......................................................................... 2, 15

Ala. Code § 13A-5-46(e)(1) ...................................................... :......... 4, 15

Ala. Code § 13A-5-49(4) ............................................. 3, 15, 20, 32

Ala. Code § 13A-5-40(13) ........................................................... 23

Ala. Code § 13A-5-40(a) ........................................................... 2, 15

Ala. Code § 13A-5-45(d) ................................................. 15, 20, 24

Ala. Code §§ 13A-5-40(a)(2) and (13) ........................................ passim

# CAPITAL CASE

# QUESTIONS PRESENTED

1. Should this Court grant certiorari to review the question whether Gavin's equal protection rights were violated under *McCleskey v. Kemp*, when Gavin did not timely present this claim to the trial court and when the claim involves only the fact-bound application of settled, conflict-free law?

2. Should this Court grant certiorari to review the question whether Alabama's capital sentencing regime violates *Ring v. Arizona*, when Gavin does not have standing to raise this claim and when his claim hinges on an erroneous contention concerning Alabama law?

3. Should this Court grant certiorari to review the question whether the trial court violated the confrontation clause by admitting an "Official Statement of Facts" of his prior murder conviction prepared by the Illinois State Attorney's Office, when Gavin did not present this claim to the trial court and when the claim involves only the fact-bound application of settled, conflict-free law?

4. Should this Court grant certiorari review of Gavin's claim that the court below mischaracterized his oral motion to proceed *pro se* as a motion to dismiss counsel, when the claim is fact-bound, splitless, and meritless?

5. Should this Court grant certiorari review of Gavin's claim that death by electrocution constitutes cruel and unusual punishment when Gavin will be executed by lethal injection and thus has no standing to make this claim?

## STATEMENT OF THE CASE

### A.   Alabama's Tripartite Capital Sentencing Scheme

Alabama's capital sentencing regime is tripartite.  A trial for capital murder proceeds through three phases.

### 1.   Guilt Phase

Before a defendant may be sentenced to death, the jury first must find him guilty, beyond a reasonable doubt, of a capital offense.  Alabama has designated eighteen specific types of intentional murder as "[c]apital offenses."  Ala. Code § 13A-5-40(a).  Here, for instance, a jury convicted Gavin of capital murder because he committed the murder during the course of a robbery, *see id.* § 13A-5-40(a)(2), and because he because he had been convicted of another murder in the 20 years preceding the murder in this case, *see id.* § 13A-5-40(a)(13).

### 2.   Sentencing Phase — Jury

In addition, before a defendant convicted of capital murder may be sentenced to death, the jury must determine whether he committed the murder in conjunction with at least one aggravating circumstance.  "Unless, at least one aggravating circumstance ... exists, the sentence shall be life imprisonment without

2

parole," not death. Ala. Code § 13A-5-45(f). Alabama has enumerated ten circumstances as aggravating. *See id.* § 13A-5-49. Some of these aggravating circumstances correspond to, or overlap with, the circumstances that make a murder capital in the first instance. *Compare, e.g., id.* § 13A-5-40(a)(2) (defining as a "[c]apital offense" "[m]urder by the defendant during a robbery in the first degree or an attempt thereof ..."), *with, e.g., id.* § 13A-5-49(4) (defining as an "aggravating circumstance" the fact that "[t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, ... robbery ..."). Accordingly, while the State bears the "burden of proving beyond a reasonable doubt the existence of any aggravating circumstances," *id.* § 13A-5-45(e), Alabama's capital sentencing scheme makes clear that a jury's verdict convicting a defendant of a type of capital murder characterized by a corresponding aggravator also, by definition, constitutes a finding that at least one aggravating circumstance exists, *see id.* ("[A]ny aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing.").

Here, two of the aggravating circumstances enumerated in § 13A-5-49 correspond to or overlap with the circumstances that made Gavin's crimes capital – that the capital offense was committed during the course of a robbery, § 13A-5-

49(4), and that Gavin had been previously convicted of a felony (here, murder) involving the use or threat of violence to the person, § 13A-5-49(2).

If the jury finds the existence of one or more aggravating circumstances, it must then determine whether the aggravating circumstances outweigh the mitigating circumstances in the case. *See id.* § 13A-5-46(e). If, but only if, the jury finds that the aggravating circumstances outweigh the mitigating (by at least a 10-2 vote, *see id.* § 13A-5-46(f)), it shall return a recommendation of death. *See id.* § 13A-5-46(e)(3). If the jury does not find any aggravating circumstances, *see id.* § 13A-5-46(e)(1), or finds that the aggravating circumstances do not outweigh the mitigating, *see id.* § 13A-5-46(e)(2), it must return a recommendation of life in prison without parole. Here, the jury recommended by a vote of 10 to 2 that Gavin be sentenced to death.

### 3.    Sentencing Phase — Judge

Finally, the trial court must review the jury's sentencing recommendation and decide whether to accept it. *See* Ala. Code § 13A-5-47(e). The trial court must make its own determination from the evidence in the case whether an aggravating circumstance exists – provided, however, as noted above, that "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." *Id.* § 13A-5-

45(e). After "consider[ing]" the jury's weighing determination, the court must then decide whether the aggravating circumstances outweigh the mitigating. *See id.* § 13A-5-47(e). In the light of *Ring v. Arizona*, 536 U.S. 584 (2002), the trial court may not sentence a defendant to death unless there is evidence that the jury found the existence of at least one aggravating circumstance beyond a reasonable doubt.

### B.   Facts of Gavin's Case

In its opinion affirming Gavin's capital convictions and death sentence, the Alabama Court of Criminal Appeals made the following findings:

"The evidence adduced at trial indicated the following. A little after 6:30 p.m. on March 6, 1998, Clayton, a contract courier for Corporate Express Delivery Systems, Inc., was shot and killed while sitting in a Corporate Express van outside the Regions Bank in downtown Centre. Clayton had finished his deliveries for the day and had stopped at Regions Bank to obtain money from the ATM in order to make [sic] his wife to dinner.

"There were four eyewitnesses to the crime, two of whom positively identified Gavin as the shooter. Ronald Baker and Richard Henry, Jr., testified that they were stopped at a traffic light near the Regions Bank and the courthouse in downtown Centre at the time of the shooting. According to Baker and Henry, they saw a man get out of a vehicle, walk to a van parked on the street, and shoot the

5

driver of the van. Upon hearing the gunshots, Baker and Henry immediately fled the scene; neither could identify the shooter.

"Larry Twilley testified that he, too, was stopped at a traffic light by the Regions Bank in downtown Centre at the time of the shooting. Twilley testified that while he was stopped at the light, he heard a loud noise, turned, and saw a man with a gun open the driver's side door of a van parked on the street and shoot the driver of the van two times. According to Twilley, the shooter then pushed the driver to the passenger's side, got in the driver's seat, and drove away. Twilley testified that when he first saw the shooter, he noticed something black and red around his head, but that after the shooter got in the van and drove away, the shooter no longer had anything on his head; at that point, Twilley said, he noticed that the shooter had very little hair. At trial, Twilley positively identified Gavin as the shooter.

"Dewayne Meeks, Gavin's cousin and an employee of the Illinois Department of Corrections, testified that in early February 1998, he and Gavin traveled from Chicago, Illinois, where they were living, to Cherokee County, Alabama "[t]o pick up some girls ... and just to really get away." (R. 651.)  Meeks said that they stayed for a weekend and then returned to Chicago. In early March 1998, Meeks said, Gavin wanted to return to Alabama to find a woman he had met in February. Meeks testified that Gavin told him that if he drove Gavin to

6

Chattanooga, Tennessee, to meet the woman, the woman would reimburse him for the travel expenses. Meeks said that he agreed to drive Gavin to Tennessee and that Meeks's wife and three-year-old son also accompanied them.

"Meeks testified that they left Chicago on the night of March 5, 1998, arrived in Chattanooga on the morning of March 6, 1998, and checked into a Super 8 Motel. Meeks said that he rented two rooms at the motel, one for him and his family, and one for Gavin. After they arrived, Meeks said, Gavin made a telephone call, and he and Gavin then drove to a nearby gasoline service station to wait for the woman Gavin had come to see. According to Meeks, the woman did not show up and Gavin then asked him to drive to Fort Payne, Alabama, so that Gavin could find the woman. Meeks agreed and they drove to Fort Payne, but they were again unsuccessful at locating the woman. After they failed to locate the woman in Fort Payne, Meeks said, they drove to Centre to find the woman.

"Meeks testified that at approximately 6:30 p.m. on March 6, 1998, he and Gavin arrived in downtown Centre. When they stopped at the intersection near the courthouse and the Regions Bank, Meeks said, Gavin got out of Meeks's vehicle and approached a van that was parked nearby. According to Meeks, he thought Gavin was going to ask the driver of the van for directions. However, when Meeks looked up, he saw that the driver's side door of the van was open, and Gavin was holding a gun. Meeks stated that he watched as Gavin fired two shots at the driver

7

of the van.  According to Meeks, immediately after seeing Gavin shoot the driver

of the van, he fled the scene, and Gavin got in the van and followed him.  Meeks

testified that Gavin honked the horn of the van and flashed the lights in an attempt

to get Meeks to stop.  However, Meeks refused to stop because, he said, he was

scared.  Meeks stated that he drove back to Chattanooga and told his wife what had

happened.  He and his wife and child then checked out of the motel and drove back

to Chicago.

  "Meeks testified that when he arrived in Chicago, he immediately informed

several of his friends who were in law-enforcement about the shooting. As a result

of his conversations with friends, Meeks said, he realized the gun used by Gavin

was probably the gun that had been issued to him by the Illinois Department of

Corrections. Meeks said that he then checked his home and determined that his

gun was, in fact, missing. According to Meeks, he kept the gun in a drawer at

home and he had not seen the gun for approximately two weeks before the

shooting.  Meeks testified that he immediately reported the gun as missing to law

enforcement.  Meeks admitted that he did not mention to law enforcement when he

reported the missing gun that he believed the gun had been used in a shooting in

Alabama, but he said that he did inform his boss at the Illinois Department of

Corrections that he believed the gun had been used in the shooting. After reporting

the gun missing and discussing the shooting with several friends, Meeks said, he

then contacted Alabama law enforcement to inform them of his knowledge of the shooting. On March 9, 1998, and again on April 6, 1998, Meeks was interviewed in Chicago by investigators from Alabama. After the interviews, Meeks said, he was indicted for capital murder in connection with the murder of Clayton; that charge was subsequently dismissed.

"Danny Smith, an investigator with the District Attorney's Office for the Ninth Judicial Circuit, testified that on the evening of March 6, 1998, he was returning to Centre from Fort Payne when he heard over the radio that there had been a shooting and that both the shooter and the victim were traveling in a white van with lettering on the outside. As he proceeded toward Centre, Investigator Smith said, he saw a van matching the description given out over the radio, and he followed it. According to Investigator Smith, the van was traveling approximately 75 miles per hour and the driver was driving erratically. Investigator Smith testified that he was speaking on the radio with various law-enforcement personnel regarding stopping the van when the van turned on its blinker and stopped on the side of the road. When he pulled in behind the van, Investigator Smith said, the van abruptly pulled back onto the road and sped away. Investigator Smith said that he continued pursuing the van and that, after he turned on his emergency lights, the van stopped in the middle of the road, near the intersection of Highways 68 and 48. Investigator Smith testified that when the van stopped, the driver got out of the

vehicle, turned, fired a shot at him, ran in front of the van, turned and fired another shot at him, and then ran into nearby woods. Investigator Smith testified that the driver of the van was black, and that he was wearing a maroon or wine-colored shirt, blue jeans, and some type of toboggan or other type of cap. At trial, Investigator Smith positively identified Gavin as the person who had gotten out of the van and shot at him.

"After Gavin fled into the woods, Investigator Smith said, he went to the van and checked the victim. According to Investigator Smith, the victim was still alive, but barely, and he radioed for an ambulance. Investigator Smith testified that when he first went to the van, he saw blood between the two front bucket seats and on the passenger seat; however, there was "very little blood" on the driver's seat. (R. 567.) Investigator Smith said that when emergency personnel removed the victim from the van, blood was transferred to the driver's seat by the personnel who had to enter the van to secure the victim and remove him.

"Investigator Smith also testified that, within minutes of Gavin's fleeing into the woods, several law-enforcement officers arrived at the intersection of Highways 48 and 68, and the wooded area into which Gavin had fled was encircled and sealed off so that "no one could come out and cross the road without being seen." (R. 563.) Members of several different law-enforcement agencies then conducted a search for Gavin.

10

"At approximately 9:45 p.m., Tony Holladay, a dog handler for the Limestone Correctional Facility, arrived at the scene with his beagle. Holladay testified that when he first arrived, he obtained information indicating that Investigator Smith had chased the suspect for approximately 20 yards, but had stopped short of the woods. At that point, Holladay said, he had Investigator Smith show him the exact spot he had stopped the pursuit so that the dog would not track Investigator Smith's trail from the roadway but would track the trail of the person who had entered the woods. Holladay testified that he then carried his dog to that spot and put him down. Holladay said that the dog immediately picked up a scent and tracked it into the woods to a creek. Holladay testified that he saw a man, whom he positively identified at trial as Gavin, standing in the creek under a bush, and that when Gavin saw him, Gavin attempted to flee. Holladay stated that he ordered Gavin to stop, but that Gavin did not stop until Holladay fired a shot over Gavin's shoulder.

"Gavin was then handcuffed and several law-enforcement officers assisted in maneuvering Gavin out of the creek, up the embankment, and through the woods to the roadway. Kevin Ware, a deputy with the Cherokee County Sheriff's Department, testified that he participated in the search for Gavin and that he was present as Gavin was brought out of the creek. Deputy Ware stated that he heard Gavin say "I hadn't shot anybody and I don't have a gun." (R. 780.) The evidence

11

indicated that from the time Gavin was discovered by Holladay to the time he made the statement in Deputy Ware's presence, no one had had any conversation with Gavin regarding the shooting or why he was being arrested.

"The record reflects that Clayton was pronounced dead upon arrival at the hospital. A subsequent autopsy revealed three gunshot wounds to his body caused by two bullets. Stephen Pustilnik, a medical examiner with the Alabama Department of Forensic Sciences, testified that one bullet passed through Clayton's left arm, entered his chest on the left side damaging both of Clayton's lungs and his heart, and exited the right side of the chest. The record reflects that that bullet was later found lodged in the passenger-side door of the van. The second bullet, Dr. Pustilnik said, entered Clayton's left hip and lodged in his back. Dr. Pustilnik testified that the wounds to Clayton's arm and hip would not have bled much because the bullets entered the muscles and the bleeding would have been contained inside those muscles. He stated that the wound to the chest would have bled quite a bit, and that, after blood filled the chest cavity, it would then exit the body at the lowest point. In addition, Dr. Pustilnik testified that there would not have been much "blow back" from the wounds, i.e., because the location of the wounds, the blood from the shots would not have blown backwards from the body toward the shooter. Dr. Pustilnik testified that the cause of Clayton's death was multiple gunshot wounds.

"The record reflects that no "usable" fingerprints were found in the van and that no bloodstains were found on Gavin's clothing. (R. 926.) However, the State presented evidence indicating that a motel-room key was found in Gavin's pants pocket after his arrest; the key fit room 113 at the Super 8 Motel in Chattanooga where Meeks and Gavin had rented rooms. In addition, two .40 caliber shell casings were found in the street outside the Regions Bank in downtown Centre, one .40 caliber shell casing was found in the roadway at the intersection of Highways 48 and 68, and a red and black toboggan cap was found near the woods by the intersection of Highways 48 and 68. The bullet found lodged in the passenger-side door of the van and the bullet in Clayton's back were also determined to be .40 caliber. Although law enforcement was unable to find the murder weapon on the night of the crime, several days later, on March 13, 1998, a .40 caliber Glock pistol was found near the woods where Gavin had been discovered. The evidence indicated that the three shell casings and the two bullets had been fired from the pistol, and that the pistol belonged to Dewayne Meeks. The State also presented evidence indicating that in 1982, Gavin had been convicted of murder in Cook County, Illinois. Gavin had served approximately 17 years of a 34-year sentence and had been released on parole only a short time before Clayton's murder.

13

"The State also presented the testimony of Barbara Genovese, a supervisor at the Cherokee County jail. Genovese testified that in April 1998, both Gavin and Meeks were incarcerated at the jail, in separate cells.  At one point, Genovese said, when she got Meeks and another inmate out of their cells to take them outside for exercise, Gavin called out to her from his cell and asked if he could go outside and exercise with Meeks and the other inmate.  Genovese said that she told Gavin that he could not go outside with Meeks, and that Gavin asked her why.  According to Genovese, she told Gavin that he could not go outside with Meeks because when Meeks had initially been brought to the jail, Gavin had become loud and unruly, "screaming and yelling and banging on the doors." (R. 1001.)  At that point, Genovese said, Gavin said "Dewayne didn't do anything ... I did it" and "Dewayne should not be in here." (R. 1002.)  Genovese testified that she did not know what Gavin was referring to when he said "I did it." (R. 1002.)"

App. at 27-31.

## C.    Proceedings and Disposition Below

Petitioner Keith Edmund Gavin was convicted of two counts of capital murder and sentenced to death for the intentional murder of William Clayton, Jr. The murder was capital because it was committed during a robbery in the first degree and because Gavin had been convicted of murder within the 20 years preceding the murder of Clayton (Ala. Code §§ 13A-5-40(a)(2) and (13) ).  The jury recommended, by a vote of 10-2, that Gavin be sentenced to death for his capital-murder convictions.  The trial court accepted the jury's recommendation and sentenced Gavin to death. Gavin was also convicted of the attempted murder of a law-enforcement officer.  For that conviction, he was sentenced as an habitual felony offender to life imprisonment.

While the appeal was pending in the Court of Criminal Appeals, this Court decided *Ring v. Arizona*, 536 U.S. 584 (2002).  After ordering and considering

15

supplemental briefing concerning *Ring*'s effect on Alabama's capital sentencing statute, the Court of Criminal Appeals issued a 192-page opinion on September 26, 2003, unanimously affirming Gavin's convictions and sentences. *Gavin v. State*, 2003 WL 22220950 (Ala. Crim. App. Sept. 26, 2003). His application for rehearing was overruled on November 14, 2003.

Gavin filed a petition for certiorari on January 30, 2004, which was denied by the Alabama Supreme Court. *Ex parte Gavin*, 2004 WL 1178756 (Ala. May 27, 2004).

## REASONS FOR DENYING THE PETITION

I.  **This Court Should Not Grant Certiorari To Review the Question Whether Gavin's Equal Protection Rights Were Violated Under *McCleskey v. Kemp*, Because Gavin Did Not Timely Present This Claim To the Trial Court and Because the Claim Involves Only the Fact-Bound Application of Settled, Conflict-Free Law.**

Gavin (who is white) appears to argue (as he did on direct appeal) that, because capital indictments are allegedly returned in a discriminatory manner (on the basis of race) in the ninth judicial circuit in Alabama, which includes Cherokee and DeKalb Counties, his equal protection rights were violated under *McCleskey v. Kemp*, 481 U.S. 279 (1987). Because this claim was not properly preserved in the courts below (it was raised for the first time in Gavin's motion for new trial), the Court of Criminal Appeals reviewed it for plain error.

16

Under Alabama procedural rules, an argument not preserved may be reviewed only for "plain error." Ala. R. App. P. Rule 45A. While this Court might still be entitled to review the issue, the fact that it would have to do so through a state law prism makes this case an unattractive vehicle for addressing the underlying issue.

In any event, the issue standing alone does not warrant certiorari. Gavin recognizes that he has failed to present the Court with any conflict. However, he nevertheless argues that, because lower courts are "misconstru[ing] and misapply[ing]" *McClesky*, "an amplification and extension of [that] decision is long overdue." Pet. at 8, 14. He further argues that it is "imperative that this Court grant certiorari and provide a clearer signal to the lower courts that demonstrable racial bias has no place in the capital sentencing process." Pet. at 14.

Gavin has failed to demonstrate any compelling reason why this Court should grant certiorari review. This Court's Rule 10 lists several bases for certiorari jurisdiction. *See* Sup. Ct. R. 10. Gavin has not invoked, let alone established the existence of, any of them. He has alleged no conflict among lower federal courts or state courts of last resort; nor has he alleged that this claim constitutes an important question of federal law that has not been, but should be, settled by this Court. Instead, what Gavin seeks – at most – is fact-bound error

17

correction, pure and simple. That, as a rule, is not enough. *See* R. Stern, E.

Gressman, et. al., *Supreme Court Practice*, §4.17, at 255 (8th ed. 2002):

Moreover, the Court of Criminal Appeals correctly held, with respect to

Gavin's equal protection claim, that he presented "no evidence that the grand jury

that indicted *him* did so with a discriminatory purpose." App. at 32-33 (emphasis

added). As the lower court noted, under *McKlesky*, Gavin must prove the

existence of purposeful discrimination. But "Gavin presented *no evidence specific*

*to his own case* that would support an inference that race played a role in his being

indicted for capital murder; he presented only evidence regarding other indictments

in the ninth judicial circuit." App. at 33 (emphasis added).

The Court went on to discuss in detail the reasons why the more general

evidence[3] of alleged discrimination that Gavin *did* present to the trial court was

insufficient to raise an inference of discrimination for purposes of equal protection,

or to show a violation of due process or the prohibition against cruel and unusual

punishment. *Id.* at 33-34. Specifically, the Court of Criminal Appeals observed

that Gavin's argument concerning the return of indictments in the ninth judicial

---

[3] That evidence consisted of statistical evidence regarding the number of murder
indictments in the ninth judicial circuit and the race of the defendants in those
cases; the number of those cases that Gavin alleged were eligible for capital
treatment; the number of those cases that were in fact indicted capitally; and
testimony from several law enforcement officers concerning several homicides in
Dekalb County that, according to Gavin, should have been but were not indicted
capitally, because the defendant was white.

circuit was based on the circuit as a whole – not the return of indictments in Cherokee County, the county in which he was indicted.  App. at 33.  In fact, the court noted, all of the evidence Gavin presented at the hearing on his motion for new trial focused on the ninth judicial circuit as a whole, and all of the testimony from law enforcement concerned crimes committed in DeKalb (not Cherokee) County.  Because grand juries in Alabama are drawn from counties, not circuits, even if grand juries in DeKalb County were returning indictments in a discriminatory manner, it would have no effect on Gavin's constitutional rights, because he was indicted in Cherokee County.  The Court pointed out that the statistics he offered reflected that all of the homicides Gavin maintained were eligible for capital treatment in Cherokee County were, in fact, indicted capitally. App. at 33.

Even considering the evidence and statistics regarding homicides in both DeKalb and Cherokee Counties, the court still found, for several reasons which are set out below, that Gavin failed to show that indictments in the ninth judicial circuit are returned in an arbitrary, capricious, or discriminatory manner:  (1) Gavin's argument was premised on the erroneous assumption that grand juries are under an affirmative duty to indict for the highest possible offense; Alabama law , however, places no such duty on grand juries; (2) Gavin's presentation of evidence regarding those cases in DeKalb County that he claims should have been indicted

19

capitally but were not, shows that most were not capital eligible and that the limited evidence he actually did present regarding those crimes makes it highly questionable whether the remaining cases were capital eligible either; (3) Gavin presented no evidence indicating that the limited testimony he presented from DeKalb County law enforcement authorities was even presented to the grand juries that returned the indictments in those cases; and (4) Gavin presented no testimony that the district attorney chose to pursue a capital charge with respect to any of the crimes, or that the district attorney presented witnesses to the grand jury who could have given testimony that a circumstance existed that qualified the offense as a capital one.

For all of these reasons, this Court should not grant certiorari review of this claim.

**II.    This Court Should Not Grant Certiorari To Review the Question Whether Alabama's Capital Sentencing Regime Violates *Ring v. Arizona*, Because Gavin Does Not Have Standing To Raise This Claim and Because His Claim Hinges on an Erroneous Contention Concerning Alabama Law.**

Gavin next argues that Alabama's capital sentencing regime, allowing judges to override a jury's recommendation of life and impose the death penalty, violates *Ring v. Arizona*, 536 U.S. 584 (2002). Gavin has no standing to raise this argument. The jury recommended a sentence of death by a vote of 10 to 2. The trial court did not override the jury's recommendation; it accepted it. Gavin thus

suffered no injury in fact from the judge's involvement in this case, whether or not the judge's involvement violated *Ring*. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992); *see also State v. Property at 2018 Rainbow Drive Known as Oasis*, 740 So. 2d 1025, 1027 (Ala. 1999).

Gavin attempts to sidestep this problem by arguing that *Alabama law* requires the jury's sentencing recommendation to be unanimous. Pet. at 26. Because the jury's recommendation of death in this case was not unanimous, he contends that the jury did not unanimously find the aggravating circumstances to outweigh the mitigating circumstances and thus did not make a finding of fact that was essential to establishing death as the maximum available sentence under *Ring*. This argument suffers several flaws. First, and most obviously, this Court has no jurisdiction to review a claim of state-law error. Second, Gavin's characterization of Alabama law is patently incorrect. *Ex parte Apicella*, 809 So. 2d 865, 873 (Ala. 2001) (the constitutional right to trial by jury does not encompass assessing punishment in capital cases, nor does § 11 of the Constitution of Alabama 1901). Third, the weighing of aggravating and mitigating circumstances is not a finding of fact that the jury must make under *Ring*.

On the third issue, the State must acknowledge, as it has before, that there is a split among the state supreme courts. On one side of the divide, the Supreme Courts of Alabama, Delaware, Florida, Indiana, and Nebraska, plus the Oklahoma

Court of Criminal Appeals, have ruled that the weighing of aggravating and mitigating circumstances need not be performed by the jury under *Ring*. *See Ex parte Waldrop*, 859 So. 2d 1181 (Ala. 2002); *Ex parte Hodges*, 856 So. 2d 936 (Ala.), *cert. denied*, 124 S. Ct. 465 (2003); *Brice v. State*, 815 A.2d 314 (Del. 2003); *Bottoson v. Moore*, 833 So. 2d 693 (Fla.), *cert. denied*, 537 U.S. 1070 (2002); *King v. Moore*, 831 So. 2d 143 (Fla.), *cert. denied*, 537 U.S. 1067 (2002); *Wrinkles v. State*, 776 N.E.2d 905 (Ind. 2002); *State v. Gales*, 658 N.W.2d 604 (Neb. 2003); *Torres v. State*, 58 P.3d 214 (Okla. Crim. App. 2002), *cert. denied*, 538 U.S. 928 (2003). On the other side, the Supreme Courts of Arizona, Colorado, Missouri, and Nevada have ruled in the wake of *Ring* that weighing must be performed by the jury. *See State v. Canez*, 74 P.3d 932 (Ariz. 2003), *cert. denied*, 124 S. Ct. 1043 (2004); *State v. Pandeli*, 65 P.3d 950; *Woldt v. People*, 64 P.3d 256; *State v. Whitfield*, 107 S.W.3d 253 (Mo. 2003); *Johnson v. State*, 59 P.3d 450 (Nev. 2002). Nevertheless, this Court has repeatedly declined to grant certiorari to review this split in cases that presented the split more clearly and cleanly. *See McNabb v. Alabama* 2004 WL 2071171 (Nov. 29, 2004); *Lee v. Alabama*, 2004 WL 2049972 (Oct. 12, 2004); *Waldrop v. Alabama*, 124 S. Ct. 430 (2003). There is no reason for this Court to depart from this practice and grant certiorari here, particularly given Gavin's mischaracterization of Alabama law.

**III.    This Court Should Not Grant Certiorari To Review the Question Whether the Trial Court Violated the Confrontation Clause By Admitting an "Official Statement" of His Prior Murder Conviction Prepared By the Illinois State Attorney's Office, Because Gavin Did Not Present This Claim To the Trial Court and Because the Claim Involves Only the Fact-Bound Application of Settled, Conflict-Free Law.**

Gavin contends that the trial court erred in admitting into evidence at sentencing a document entitled "Official Statement of Facts," which set forth a very brief (one paragraph) summary of the facts surrounding his prior murder conviction in Illinois in 1982.  At trial, Gavin objected to admission of the official statement on hearsay grounds, but he did not object on the ground that he raised on appeal and that he now raises in this Court — that admission of the official statement violated his Sixth Amendment right to confrontation.  Under Alabama law, his Sixth Amendment claim is therefore subject only to "plain error" review. For this reason, as well as for the reasons that it is fact-bound and splitless, this claim is not worthy of certiorari review.

Gavin was charged with murder made capital under Ala. Code § 13A-5-40(13) because he had been convicted of murder in the 20 years preceding the present crime.  Evidence of the prior conviction was an element of the capital offense that the State was required to prove to the jury beyond a reasonable doubt at the guilt phase and did so by introducing a certified copy of the Illinois conviction.  At sentencing, the State introduced the "Official Statement of Facts" concerning the prior conviction through the testimony of an Illinois parole

23

supervisor. The statement, which was prepared by the Illinois state attorney's

office pursuant to a duty imposed on that office by Illinois law read, in its entirety:

> "Defendant and victim were attending a party at
> 1351 S. Troop Street when they got into a verbal
> argument. Defendant forced victim out of the party at
> gunpoint. He led victim down the street while hitting him
> and poking him with the gun. Victim begged for his life
> as defendant led him to secluded area behind a building
> located at 1416 S. Blue Island. Defendant then pulled out
> a gun and shot victim between the eyes. Victim died as a
> result of this gunshot wound which penetrated his brain.
> Three bullet fragments were recovered from the victim's
> skull. Defendant was arrested a short time later at 1432 S.
> Blue Island where he was sleeping."

Gavin objected that the official statement was hearsay, but the trial court

overruled his objection, finding that the document was relevant to sentencing under

Ala. Code § 13A-5-45(d) and that Gavin was given a fair opportunity to rebut the

facts in the official statement.

On appeal, Gavin argued – for the first time – that  introduction of the

official statement violated the Sixth Amendment's Confrontation Clause.  Under

Alabama procedural rules, a constitutional argument not preserved at trial is

reviewable only for "plain error."  Ala. R. App. P. 45A.  While this Court might

still be entitled to review the issue, it would have to do so through a state law

prism, which makes this case an unattractive vehicle for addressing the

Confrontation Clause issue.

In any event, the Confrontation Clause issue standing alone does not warrant certiorari. Gavin, citing *Crawford v. Washington*, 124 S. Ct. 1354 (2004), urges this Court to review the case to explore "what this Court considers to be 'testimonial'" evidence. Standing alone, exploration of the nature of "testimonial" evidence is not a ground for this Court to grant certiorari.

Gavin has not invoked, let alone established the existence of, any of the grounds in this Court's Rule 10 for certiorari. He has alleged no conflict among lower federal courts or state courts of last resort; nor has he alleged that this claim constitutes an important question of federal law that has not been, but should be, settled by this Court. What Gavin seeks is, at most, fact-bound error correction. That, again, is not enough. *See* R. Stern, E. Gressman, et. al., *supra*, § 4.17, at 255.

In any event, the trial court did not commit plain error under *Crawford* in admitting the "Official Statement of Facts." In *Crawford*, this Court held that out-of-court statements by witnesses that are "testimonial" in nature are barred by the Confrontation Clause unless the witnesses are shown to be unavailable and the defendant has had a prior opportunity to cross-examine the witnesses (regardless of the reliability of the statements, thus abrogating its earlier decision in *Ohio v. Roberts*, 448 U.S. 56 (1980)). The statement in *Crawford* involved a verbal statement made by the defendant's wife during police interrogation, in which she described her husband's stabbing of the victim. The recorded statement was

25

played to the jury, even though the witness was unavailable (the marital privilege had been invoked) and the defendant had no opportunity to cross-examine her.

While this Court in *Crawford* distinguished between testimonial and nontestimonial hearsay evidence, and applied the newly announced rule only to testimonial statements, it left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Id.* at 1374. The Court did, however, identify examples of testimony that would be considered "testimonial" – grand jury testimony, prior trial testimony, *ex parte* testimony at a preliminary hearing, and statements taken by police officers in the course of interrogations.

If, by contrast, the challenged evidence is nontestimonial, *Crawford* recognized that the normal rules of evidence, including hearsay rules, would apply. "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law – as does *Roberts*, and as would an approach that exempted such statements from the Confrontation Clause altogether." *Id.* Thus, state courts may consider "reliability factors beyond prior opportunity for cross-examination when the hearsay statement at issue was not testimonial." *Id.* at 1368.

Here, the "Official Statement of Facts" does not fall within any of the categories of testimonial statements expressly identified in *Crawford* and, for that matter, bears little if any resemblance to those categories. Nor does it appear to be

26

the type of statement that this Court in *Crawford* found had historically been the primary objective of the Constitution's framers' concerns in enacting the Confrontation Clause. *Id.* at 1363-65. The "Official Statement of Facts" included in Gavin's Illinois parole record and prepared by the state attorney's office under requirement of law, is not the type of evidence that would lead an objective person to reasonably believe that the statement would be available for use in a later tiral. *Id.* at 1364. Thus, in the end, the trial court cannot be said to have committed plain error, if it committed error at all, in admitting the "Official Statement of Facts."[4]

For all of these reasons, the Court should deny certiorari as to the Confrontation Clause issue.

**IV. This Court Should Deny Certiorari Review of Gavin's Claim That the Court Below Mischaracterized His Oral Motion To Proceed *Pro Se* as a Motion To Dismiss Counsel, Because the Claim Is Fact-Bound, Splitless, and Meritless.**

Gavin also asks this Court to grant certiorari because, he argues, the Alabama Court of Criminal Appeals "mischaracterized" his oral motion (made during jury selection) to proceed at trial *pro se* as a motion instead to dismiss his attorneys, an thus, violated *Faretta v. California*, 422 U.S. 806 (1975). He

---

[4] Notably, although this Court had not yet decided *Crawford* when the Alabama Court of Criminal Appeals reviewed Gavin's confrontation clause claim for plain

maintains that this "mischaracterization" provides this Court "a compelling reason to grant the writ in this case, so that the published record may be rectified." Pet. at 34.

Gavin acknowledges that this issue "might not be particularly certworthy on its own legs." Pet. at 32. On this point, at least, he is correct. "Rectifying the published record" is not a basis for certiorari. Presumably Gavin wants the Court to go one step further and reverse his conviction on the ground that he was denied his right to proceed at trial without counsel. If so, what he seeks is fact-bound error correction; his claim of error is meritless, in any event.

The Court of Criminal Appeals correctly ruled that Gavin never invoked his right to proceed without counsel. "Contrary to Gavin's contention, at no point during the colloquy did he request to proceed *pro se*. In addition, a review of the colloquy clearly shows that Gavin did not want to proceed *pro se*." App. at 42-43. The court noted that Gavin directed his request to remove counsel solely at his lead attorney, Mr. Smith, not his second attorney, Mr. Ufford.

The record reveals that during his oral motion to the trial court, Gavin specifically asked the court to "have his attorney removed as [his] defense attorney," because, according to Gavin, Smith was pressuring him into pleading guilty. App. at 166-67. Because, Gavin said, Smith did not believe that he was

---

error, *Crawford* had been on the books for nearly three months when the Alabama

innocent, it would be "a gross miscarriage of justice if [he] [was] forced to go to trial with Mr. Bayne Smith as [his] *lead* attorney." App. at 168 (emphasis added). This was the third motion Gavin made requesting that Smith, and only Smith, be removed as his attorney. App. at 168. In fact, before filing his first motion seeking to have Smith dismissed, Gavin asked Mr. Ufford whether he would "take the lead." App. at 169. Any attempt by Gavin in his motion for new trial, or in his petition in this Court, to imply that the Gavin's oral motion was one to proceed *pro se* because Gavin referred to both attorneys, is simply a misrepresentation of the record. Although the trial court, in denying the oral motion referred to the motion as a "motion to remove your *attorneys*," everything that occurred during the hearing on the motion, preceding the trial court's denial, plainly showed that the motion was directed only at Mr. Smith, and that Gavin in no form or fashion, either directly or indirectly, expressed any desire to proceed to trial *pro se*.

Even assuming, as the Court of Criminal Appeals did, that Gavin meant to direct his oral request at both attorneys, the court found that "Gavin did not merely move to have counsel removed, he requested a mistrial, thus further showing that he did not want to proceed *pro se*, but that he wanted the trial delayed so that new counsel could be appointed." App. at 42-43. Because the court correctly

---

Supreme Court denied Gavin's petition for certiorari.

concluded that Gavin never invoked his right to proceed *pro se*, this ruling is not worthy of certiorari review.

## V.     This Court Should Deny Certiorari Review of Gavin's Claim That Death by Electrocution Constitutes Cruel and Unusual Punishment, Because Gavin Will Be Executed by Lethal Injection and Thus Does Not Have Standing To Make This Claim.

Gavin acknowledges that Alabama "has installed a lethal injection regime" instead of electrocution.  Pet. at 37.  Gavin nevertheless contends that this Court should grant certiorari review of his claim that death by electrocution constitutes cruel and unusual punishment, because "[a]ll parties, other jurisdictions, and death penalty jurisprudence generally, would be well[-]served if the Court granted the writ, if for no other reason, to consign the electric chair to the scrap heap of barbaric history, along with the rack and guillotine."  Pet. at 37.  The Alabama Court of Criminal Appeals correctly held that Gavin's claim was moot.  App. at 81-82.  This Court does not have the jurisdiction to issue advisory rulings on an issue that does not even affect the petitioner.  It should therefore decline to review this claim.

## CONCLUSION

For the foregoing reasons, this Court should deny Gavin's petition for certiorari.

Respectfully submitted,

Troy King
*Attorney General*

Kevin C. Newsom
*Solicitor General*

Tracy M. Daniel
*Assistant Attorney General*

Beth Jackson Hughes
*Assistant Attorney General*
Counsel of Record *

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, AL  36130-0152
December 23, 2004                              (334) 242 7401, 353-9782 *

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of December, 2004, a copy of the

foregoing was served on the attorneys for the petitioner by placing the same in the

United States Mail, first class postage prepaid, and addressed as follows:

Stephen P. Bussman
P.O. Box 680925
Fort Payne, Alabama 35968


Beth Jackson Hughes
*Assistant Attorney General*
Counsel of Record *

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, AL  36130-0152
(334) 242-7401, 353-9782 *

December 23, 2004

32

125 S.Ct. 1054
Supreme Court of the United States

Keith Edmund GAVIN, petitioner,
v.
ALABAMA.

No. 04-6734.
|
Jan. 24, 2005.

Case below, 891 So.2d 907.

**Opinion**

Petition for writ of certiorari to the Court of Criminal Appeals of Alabama denied.

**All Citations**

543 U.S. 1123, 125 S.Ct. 1054 (Mem), 160 L.Ed.2d 1073, 73 USLW 3448

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.