FILED

2020 Aug-18  PM 03:33
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

KEITH EDMUND GAVIN,     )
     )
   Petitioner,     )
     )
v.     )   Case No.  4:16-cv-00273-KOB
     )
JEFFERSON S. DUNN,     )
Commissioner of the Alabama     )
Department of Corrections,     )
     )
   Respondent.     )

# VOLUME 41

# State Court – Collateral Appeal Transcript Supplement

LUTHER STRANGE
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

*Supp 1    Vol 1 of 2*

| COURT OF CRIMINAL APPEALS NO. | SUPPLEMENT #1 TO | CR-10-1313 |

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _____ CHEROKEE _____ COUNTY, ALABAMA

CIRCUIT COURT NO _____ CC-98-61.60 & CC-98-62.60 _____

CIRCUIT JUDGE _____ David A. Rains _____

Type of Conviction/ Order Appealed From: _____ Rule 32 _____

Sentence Imposed: _____

Defendant Indigent: ☑ YES ☐ NO

## KEITH EDMUND GAVIN

_____ NAME OF APPELLANT

Stephen C. Jackson          205-254-1037
(Appellant's Attorney)                    (Telephone No.)

1901 Sixth Avenue North, Suite 2400
(Address)

Birmingham, AL  35203
(City)          (State)          (Zip Code)

### V.

## STATE OF ALABAMA

_____ NAME OF APPELLEE

(State represented by Attorney General)

NOTE:  If municipal appeal, indicate above, and enter

name and address of municipal attorney below.

df
_____

_____

(For Court of Criminal Appeals Use Only)

ELECTRONICALLY FILED
11/7/2011 10:12 AM
CC-1998-000061.60
CIRCUIT COURT OF
CHEROKEE COUNTY, ALABAMA
DWAYNE AMOS, CLERK

### IN THE NINTH JUDICIAL CIRCUIT COURT OF ALABAMA
### CHEROKEE COUNTY CIRCUIT COURT

| | |
|---|---|
| KEITH GAVIN, | ) |
| | ) |
| Petitioner, | ) CC-98-61.60 |
| | ) CC-98-62.60 |
| | ) |
| v. | ) |
| | ) |
| STATE OF ALABAMA, | ) |
| | ) |
| Respondent. | ) |

### MOTION TO SUPPLEMENT THE RECORD

Keith Gavin, through counsel, respectfully notifies this Court, pursuant to Rule 10(g) of the Alabama Rules of Appellate Procedure, that the record in this case, transmitted to the Alabama Court of Criminal Appeals on August 31, 2011 (Case No. CR-10-1313), is incomplete. Mr. Gavin moves that the record be supplemented as follows and certified for appeal.

1. The Alabama Rules of Appellate Procedure provide that the Clerk's Record shall include all papers and documents in the case, and that the Reporter's Transcript contain transcripts of all proceedings in the case designated on the Reporter's Transcript Order. Ala. R. App. P. 10(c).

02252614.1

2. The Record on Appeal in this matter does not contain the transcript of the deposition of Craig Haney, which was transmitted to the trial court on April 15, 2010. *See* Letter to Judge Rains transmitting Haney deposition, attached hereto as Exhibit A.

3. Pursuant to order of the trial court, the transcript of the deposition of Craig Haney is part of the record on the evidentiary hearing held by the trial court on Mr. Gavin's Rule 32 petition. *See* January 10, 2010 Order, attached hereto as Exhibit B. *See also* February 9, 2010 Hrg. Tr. at 589-590, 599-600, excerpts attached hereto as Exhibit C.

5. The failure to provide a complete appellate record prevents Mr. Gavin from appealing the claims in his Second Amended Rule 32 Petition and violates his rights protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law.

FOR THESE REASONS, Mr. Gavin requests that the Court order that the Clerk supplement the record with the above-mentioned transcript of Dr. Craig Haney.

Respectfully submitted,

Stephen C. Jackson
Maynard Cooper & Gale P.C.
1901 Sixth Avenue North
Suite 2400
Birmingham, Alabama 35203
Phone: (205) 254-1037
Fax: (205) 254-1999

*/s/ Stephen C. Jackson*
Prentice H. Marshall, Jr.
Melanie E. Walker
Caroline L. Schiff
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Phone: (312) 853-7000
Fax: (312) 853-7036
E-mail: phmarshall@sidley.com

Counsel for Appellant
Keith Gavin

## CERTIFICATE OF SERVICE

Stephen Jackson, one of the attorneys for Appellant Keith Gavin, certifies that the attached was served by first-class mail on November 7, 2011, to:

Corey Maze
Office of the Attorney General
500 Dexter Avenue
Montgomery, Alabama 36130
United States of America

Lane W. Mann
Clerk of the Court of Criminal Appeals
Judicial Building
300 Dexter Avenue
Montgomery, Alabama 36130-1555

/s/ Stephen C. Jackson
OF COUNSEL

02252614.1

ELECTRONICALLY FILED
11/7/2011 10:12 AM
CC-1998-000061.60
CIRCUIT COURT OF
CHEROKEE COUNTY, ALABAMA
DWAYNE AMOS, CLERK

6



| SIDLEY AUSTIN LLP | BEIJING | |
| ONE SOUTH DEARBORN | BRUSSELS | SHANGHAI |
| CHICAGO, IL 60603 | CHICAGO | SINGAPORE |
| (312) 853 7000 | DALLAS | SYDNEY |
| (312) 853 7036 FAX | FRANKFURT | TOKYO |
| | GENEVA | WASHINGTON, D.C. |
| | HONG KONG | |
| | LONDON | |

cschiff@sidley.com
(312) 853-7759

FOUNDED 1866

April 15, 2010

**By Federal Express**

The Hon. David A. Rains
Cherokee County Courthouse
100 Main Street
Centre, Alabama 35960

Re: *Gavin v. State of Alabama*, Nos. CC-98-61.60, CC-98-62.60

Dear Judge Rains:

Enclosed is a transcript of the deposition of Dr. Craig A. Haney, taken on March 31, 2010 in the above-referenced case.

Following the deposition, Ms. Casey informed us that she will require an extension of time to file a closing brief, and we agreed, pending your approval, that Petitioner's brief will be filed on or before July 1, 2010, and the state will file its brief on or before September 1, 2010.

Respectfully submitted,

Caroline L. Schiff

Caroline L. Schiff

cc: **Pamela Casey**

Enclosure

Sidley Austin LLP is a limited liability partnership practicing in affiliation with other Sidley Austin partnerships

ELECTRONICALLY FILED
1/12/2011 10:12 AM
CC-1998-000061.60
CIRCUIT COURT OF
CHEROKEE COUNTY, ALABAMA
DWAYNE AMOS, CLERK

State of Alabama,
        **PLAINTIFF**

        **vs.**

Keith Edmund Gavin,
        **DEFENDANT**

IN THE CIRCUIT COURT OF
CHEROKEE COUNTY, ALABAMA
CASE NO. -- CC-1998-061.60
        CC-1998-062.60

## O R D E R

   The Petitioner seeks leave of the Court to submit the deposition testimony of Dr. Craig Haney at the Rule 32 hearing on February 8-9-10, 2010. The State has objected thereto, and the matter has been submitted on the written argument of the parties. In consideration thereof it is

   ORDERED that the deposition of the witness may be used on condition that the State's Attorney is able to be physically present at the deposition at no cost or expense to the State. The Court will not allow the witness to be physically present with one or more of the Petitioner's attorneys while the State's attorney is only able to participate by video conference.

   DONE this day, January ___ 12 ___, 2010.

_David A. Rains, Circuit Judge_

**FILED**

JAN 1 2 2010

CIRCUIT CLERK, CHEROKEE COUNTY, AL

**ORDER**
Cherokee Co. CC-1998-061.60
CC-1998-062.60

Page 2

COPY TO:

Ms. Pamela L. Casey
Assistant Attorney General
Office of Attorney General
Capital Litigation Division
Alabama State House
11 South Union St.
Montgomery, AL  35130

Hon. Mike O'Dell
Ninth Judicial District Attorney
Mr. Robert F. Johnston
Assistant District Attorney

Mr. Stephen C. Jackson
Mr. C. Andrew Kitchen
MAYNARD, COOPER, AND GALE, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Ave. N.
Birmingham, AL  35203

Mr. Prentice H. Marshall, Jr.
Ms. Melanie Walker
Mr. Matt Lyon
SIDLEY, AUSTIN, BROWN, AND WOOD, LLP
One South Dearborn St.
Chicago, IL  60603

Ms. Leigh Frazier
SIDLEY, AUSTIN, BROWN, AND WOOD, LLP
1501 K Street, N.W.
Washington, D.C.  20005

Attorney for -

Plaintiff – State of Alabama

Plaintiff – State of Alabama

Defendant – Keith Edmund Gavin

Defendant – Keith Edmund Gavin

**FILED**

JAN 1 2 2010

CIRCUIT CLERK  CHEROKEE COUNTY, AL

ELECTRONICALLY FILED
11/7/2011 10:12 AM
CC-1998-000061.00
CIRCUIT COURT OF
CHEROKEE COUNTY, ALABAMA
DWAYNE AMOS, CLERK

9

## STATE OF ALABAMA

### IN THE CIRCUIT COURT FOR THE COUNTY OF CHEROKEE

#### NINTH JUDICIAL CIRCUIT

#### CRIMINAL

STATE OF ALABAMA,

VS.                                    CASE NO. CC-98-61; CC-98-62

KEITH EDMUND GAVIN,

    DEFENDANT

## REPORTER'S OFFICIAL TRANSCRIPT

BEFORE:
    His Honor David A. Rains, Circuit Judge
    Centre, Alabama
    February 8 and 9, 2010

APPEARANCES:

    FOR THE STATE OF ALABAMA:
        Pamela Casey, Assistant Attorney General
        Corey Maze, Assistant Attorney General
        Montgomery, Alabama

    FOR THE DEFENDANT:
        Printice Hank Marshall, Attorney at Law
        Melanie E. Walker, Attorney at Law
        Caroline L. Schiff, Attorney at Law
        Chicago, Illinois

TRINA S. TALLENT
Official Court Reporter
Ninth Judicial Circuit
Ft. Payne, Alabama

589

```
 1          Honor.
 2                    THE COURT:  Excellent.  That will
 3          be very helpful, thank you.
 4                    MR. MARSHALL:  Thank you, Your
 5          Honor.  That's 7, 8 and 9, right?
 6                    THE COURT:  It is, yes, sir.
 7                    (Whereupon, Defendant's exhibits 7,
 8          8, 9 admitted into evidence at this time)
 9                    MR. MARSHALL:  We're not prepared
10          to close our proof because Dr. Haney needs
11          to be examined.
12                    THE COURT:  Let's just make sure
13          we've gotten everything in today that we
14          want to get in today and then we'll figure
15          out what we've got to do about getting
16          Haney's deposition.  There was maybe another
17          matter or two that needed to be-dealt with,
18          but do we have anything else that we need to
19          do today?  Anything else from the State?
20                    MR. MAZE:  Not from the State, no.
21                    MS. CASEY:  No.
22                    THE COURT:  Anything else from the
23          defendant?
24                    MR. MARSHALL:  No.  And for the
25          record, we have agreed on a date for Dr.
```

590

1    Haney,

2              MS. CASEY:  Yes.

3              THE COURT:  What is that?

4              MS. CASEY:  March 31st.

5              THE COURT:  That's when Haney is

6    going to be deposed?

7              MS. CASEY:  Yes, sir.

8              MR. MARSHALL:  In Birmingham, I

9    believe.  Is that the agreement?

10             MS. CASEY:  Yes.

11             THE COURT:  Okay, and Mr. Webb was

12   going to provide or maybe you have them, the

13   interview sheets?

14             MS. WALKER:  That's right, Your

15   Honor, we have one issue there.  I believe

16   back at our offices we have all of Mr.

17   Webb's interview notes and certainly to the

18   extent they haven't been provided to counsel

19   I'm happy to ask Mr. Webb for them.  The

20   only issue there is, as you may recall, I

21   described how Mr. Webb sort of wore two hats

22   for us.  He performed an investigative role

23   as sort of our attorney work product, and

24   then he performed a role as an expert on

25   police procedures.  There are certain of the

599

1          about two minutes ago, they are hearsay and

2          shouldn't come in, so if they're hearsay one

3          way, then it should work both ways.

4                    THE COURT:  I'll take that under

5          consideration.  Thank you.  Anything else?

6                    MR. MARSHALL:  Not at this time,

7          Your Honor, no.

8                    THE COURT:  Thank you.  Now, ones

9          you have gotten the Haney deposition, I

10         assume that you want to file something.

11                   MR. MARSHALL:  Well, I think it

12         probably behooves all of us to try to

13         summarize what we think the evidence has

14         shown and its legal implications.  I do.

15         And then we'd be happy to argue it or to

16         brief it or if the Court prefers, both.  I

17         know it's a lot of work, but there is a lot

18         of materials.

19                   THE COURT:  Well, I'm not going to

20         ask you to come back and orally argue it.  I

21         think if once you have gotten the Haney

22         deposition, I think I'm going to give you

23         one more opportunity to present -- you can

24         submit the Haney deposition and any argument

25         that you want, written argument that you

600

1       want to make, about where you think this

2       case is and how it ought to be disposed of.

3                   MR. MARSHALL:  Sure.  Right.

4                   THE COURT:  Call that whatever you

5       want to call it and then let the State

6       respond to it.  But the Haney deposition

7       will come to me from the defendant.

8                   MR. MARSHALL:  Yes, Your Honor, it

9       will.

10                  THE COURT:  Okay.  But you will

11      give it to me in its entirety, don't just

12      give me a page here and a page there and a

13      page somewhere else.

14                  MR. MARSHALL:  Well, I suspect if

15      we're going to write a brief, obviously, we

16      will talk about selected portions within the

17      brief, but obviously we'll produce the

18      entire transcript.

19                  THE COURT:  Exactly.  Fine.

20                  MR. MARSHALL:  Which I think has

21      been the practice in this case so far.  I

22      think all of the transcripts have been fully

23      provided to the Court.

24                  MS. CASEY:  The State provided

25      them.

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 229-0751
Fax (334) 229-0521

November 8, 2011

**CR-10-1838**

Randall Shane Barnett v. State of Alabama (Appeal from Cherokee Circuit Court:
CC09-19)

## Notice

You are hereby notified that the record on appeal in the above-referenced cause was filed on November 7, 2011. Because the clerk's certificate of completion is dated November 7, 2011, the appellant's brief is due by December 5, 2011. Should the appellant seek an extension of time for filing the brief, the request for an extension must be made in accordance with the Court's policy as set out in the informational notice that was mailed to the appellant when this appeal was docketed. Any questions regarding this notice should be directed to the clerk's office.

IMPORTANT NOTE: This notice has no effect on any outstanding deficiencies. If you have received a notice or an order from this Court directing you to correct a deficiency, you must comply with that notice or order within the time directed. Failure to do so may result in the dismissal of your appeal.

Lane W. Mann, Clerk
Court of Criminal Appeals

cc: Hon. F. Dwayne Amos, Circuit Clerk
Daniel Randolph Phillips, Attorney
Office of Attorney General

ELECTRONICALLY FILED 15
11/14/2011 3:40 PM
CC-1998-000061.60
CIRCUIT COURT OF
CHEROKEE COUNTY, ALABAMA
DWAYNE AMOS, CLERK

## IN THE CIRCUIT COURT OF CHEROKEE COUNTY, ALABAMA

STATE OF ALABAMA                     )
                                     )
V.                                   )   Case No.: CC-1998-000061.60
                                     )
GAVIN KEITH EDMUND #Z-665            )
Defendant.                           )

## ORDER

The Defendant's Motion To Supplement Record with the transcript of the deposition of Craig Haney is hereby granted. The Clerk shall supplement the record on appeal accordingly pursuant to Rule 10(g) ARAP.

DONE this 14th day of November, 2011.

                              /s/ DAVID A RAINS
                              CIRCUIT JUDGE



SIDLEY AUSTIN LLP
ONE SOUTH DEARBORN
CHICAGO, IL 60603
(312) 853 7000
(312) 853 7036 FAX

BEIJING
BRUSSELS
CHICAGO
DALLAS
FRANKFURT
GENEVA
HONG KONG
LONDON

LOS ANGELES
NEW YORK
SAN FRANCISCO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
WASHINGTON, D.C.

cschiff@sidley.com
(312) 853-7739

FOUNDED 1866

April 15, 2010

**RECEIVED**

MAY 1 8 2010

OFFICE OF JUDGE DAVID A. RAINS

**By Federal Express**

The Hon. David A. Rains
Cherokee County Courthouse
100 Main Street
Centre, Alabama 35960

Re:  *Gavin v. State of Alabama*, Nos. CC-98-61.60. CC-98-62.60

Dear Judge Rains:

Enclosed is a transcript of the deposition of Dr. Craig A. Haney, taken on March 31, 2010 in the above-referenced case.

Following the deposition, Ms. Casey informed us that she will require an extension of time to file a closing brief, and we agreed, pending your approval, that Petitioner's brief will be filed on or before July 1, 2010, and the state will file its brief on or before September 1, 2010.

Respectfully submitted,

*Caroline L. Schiff*

Caroline L. Schiff

cc:     Pamela Casey

Enclosure

Page 1

1    IN THE NINTH JUDICIAL CIRCUIT COURT

2          OF ALABAMA

3    CHEROKEE COUNTY CIRCUIT COURT

4  KEITH GAVIN,          )

5      Petitioner,   )

6                )CASE NO:

7  VS.            )CC-98-61.60

8  STATE OF ALABAMA,  )CC-98-62.60

9                )DEPOSITION OF:

10    Respondent.  )CRAIG HANEY

11     S T I P U L A T I O N S

12    IT IS STIPULATED AND AGREED, by and

13  between the parties through their

14  respective counsel, that the deposition

15  of:

16          CRAIG HANEY,

17  may be taken before Dana Gordon,

18  Commissioner and Notary Public, State at

19  Large, at the Law Offices of Maynard,

20  Cooper & Gale, 1901 6th Avenue North, Suite

21  2400, Birmingham, Alabama 35203, on the

22  31st day of March, 2010, commencing at

23  approximately 10:00 a.m.

ORIGINAL

1      IT IS FURTHER STIPULATED AND AGREED

2  that the signature to and reading of the

3  deposition by the witness is waived, the

4  deposition to have the same force and

5  effect as if full compliance had been had

6  with all laws and rules of Court relating

7  to the taking of depositions.

8

9      IT IS FURTHER STIPULATED AND AGREED

10  that it shall not be necessary for any

11  objections to be made by counsel to any

12  questions, except as to form or leading

13  questions, and that counsel for the parties

14  may make objections and assign grounds at

15  the time of the trial, or at the time said

16  deposition is offered in evidence, or prior

17  thereto.

18                ***

19

20

21

22

23

```
 1              A P P E A R A N C E S

 2

 3   ON BEHALF OF KEITH GAVIN:

 4        CAROLINE L. SCHIFF

 5        PRENTICE H. MARSHALL, JR.

 6        Attorneys at Law

 7        Sidley Austin

 8        One South Dearborn

 9        Chicago, Illinois  60603

10

11   ON BEHALF OF THE STATE OF ALABAMA:

12        PAMELA L. CASEY

13        Office of the Attorney General

14        Capital Litigation Division

15        500 Dexter Avenue

16        Montgomery, Alabama  36130

17

18

19

20

21

22

23
```

Page 4

```
 1               I N D E X

 2                        PAGE:

 3    EXAMINATION BY MS. SCHIFF        6

 4    EXAMINATION BY MS. CASEY       152

 5    EXAMINATION BY MS. SCHIFF      256

 6    EXAMINATION BY MS. CASEY       262

 7

 8      MARKED PORTIONS OF THE TRANSCRIPT

 9

10    PAGE 26, LINE 12

11    PAGE 51, LINE 21

12    PAGE 55, LINE 23

13    PAGE 86, LINE 17

14    PAGE 90, LINE 6

15    PAGE 105, LINE 14

16    PAGE 112, LINE 3

17

18

19

20

21

22

23
```

```
 1              E X H I B I T   L I S T

 2

 3                DEFENDANT'S EXHIBITS

 4                          PAGE:

 5   Defendant's Exhibit 10          7

 6   Defendant's Exhibit 11         42

 7   Defendant's Exhibit 12        120

 8   Defendant's Exhibit 13        132

 9   Defendant's Exhibit 14        132

10

11               STATE'S EXHIBITS

12

13   State's Exhibit 101           153

14

15

16

17

18

19

20

21

22

23
```

1              I, Dana Gordon, a Court Reporter
2    of Birmingham, Alabama, and a Notary Public
3    for the State of Alabama at Large, acting
4    as Commissioner, certify that on this date,
5    pursuant to Rule 30 of the Alabama Rules of
6    Civil Procedure and the foregoing
7    stipulation of counsel, there came before
8    me on the 31st day of March, 2010, at the
9    law offices of Maynard, Cooper & Gale, 1901
10   6th Avenue North, Suite 2400, Birmingham,
11   Alabama, 35203, commencing at approximately
12   10:00 a.m., CRAIG HANEY, witness in the
13   above cause, for oral examination, whereupon
14   the following proceedings were had:
15              CRAIG HANEY,
16   being first duly sworn, was examined and
17   testified as follows:
18   EXAMINATION BY MS. SCHIFF:
19   Q         Will you please state your full
20   name for the record?
21   A         My name is Craig William Haney,
22   H-A-N-E-Y.
23   Q         And you have provided us with an

```
 1  updated copy of your CV, correct?
 2  A        I have, yes.
 3  Q        Is this it (indicating)?
 4  A        Let me see.  Yes, it is.
 5           MS. SCHIFF:  Can you please mark
 6  this as Defendant's Exhibit 10?
 7           (Defendant's Exhibit No. 10
 8           was marked for identification.)
 9  Q        (BY MS. SCHIFF:)  Can you please
10  describe your educational background?
11  A        I have a bachelor's degree in
12  psychology from the University of
13  Pennsylvania.  I went to graduate school at
14  Stanford University in psychology, received
15  a master's degree and a Ph.D.
16           Early in my graduate career in
17  psychology I became interested in law
18  related issues, and so I also went to --
19           MS. CASEY:  Objection as to
20  narrative.  I'll ask you to break the
21  questions up into -- or break the questions
22  down into questions rather than the witness
23  just testifying or talking.
```

```
 1   A          So I went to law school and
 2   got --
 3              MS. CASEY:  I'm going to ask you
 4   to break down -- break the questions down.
 5              MS. SCHIFF:  And I'm saying he
 6   can answer.
 7   A          I went to law school and got a
 8   J.D. Degree at the same time as my Ph.D.
 9   Q          Where did you get your J.D.?
10   A          At Stanford University where I
11   was also in graduate school.
12   Q          And where are you currently
13   employed?
14   A          At the University of California
15   at Santa Cruz.
16   Q          What's your position?
17   A          I'm a professor of psychology.
18   Q          And how long have you been a
19   professor at UC Santa Cruz?
20   A          I've been a professor there since
21   1978, I believe.
22   Q          What classes do you teach?
23   A          I teach a range of classes, some
```

1   in the undergraduate curriculum, some in the

2   graduate curriculum.  I teach an

3   undergraduate class in psychology and law,

4   and I teach a class called the Social

5   Context.  I teach a research seminar in

6   crime and the media.  Those are all

7   undergraduate classes.

8           I also teach in the graduate

9   curriculum, and over the years I've taught a

10  variety of courses:  Institutional analysis,

11  social psychological theory.  I've also

12  taught a lot of courses in methodology.  So,

13  I teach a course in experimental psychology

14  for graduate students in psychology, a

15  course on other kinds of research methods,

16  ethnography and also survey research

17  methods.

18  Q           And have you received any

19  academic awards or honors during your tenure

20  at UC Santa Cruz?

21  A           Yes, I have.  I've received

22  National Science Foundation grants, a number

23  of teaching awards.  I received an award for

1    a book I wrote a few years ago. A whole

2    range of different things.

3    Q       And are those included in your

4    CV?

5    A       They are.

6    Q       Do you have any area of academic

7    specialization?

8    A       Yes, psychology and law.

9    Q       And what are your areas of

10   expertise?

11   A       Well, within the general area of

12   psychology and law, which is the application

13   of psychological principles to legal issues,

14   I've focused on a couple of separate issues.

15         Very early in my career I started

16   working on prisons, the way in which people

17   are changed and affected by living and

18   working in prison environments. And that

19   was the area that I first began to do

20   research.

21         I also became interested in --

22   almost as an outgrowth of that work

23   interested in the kinds of forces, social

1  historical and social circumstances that
2  influence and affect people in criminal
3  behavior, essentially the social historical
4  determinants of criminal and particularly
5  serious criminal behavior.

6      So, I studied the backgrounds and
7  histories of people that have been involved
8  in serious violent crime, typically capital
9  cases. And I also became interested in the
10  various aspects of capital punishment, the
11  procedures by which the death penalty is
12  implemented in our society, the legal
13  process, the ways in which it differs from
14  other kinds of criminal cases and including
15  jury decision making in capital cases.
16  Q      You said when you first began you
17  were -- one of your areas of expertise was
18  the effect of institutional history. When
19  was that?
20  A      Well, I became interested in how
21  institutions affect people very early on. I
22  was still a graduate student, 1971, '72.
23  Q      And have you published any books

```
 1   or articles on that topic?
 2   A        I have published a lot of
 3   articles, book chapters and a book on the
 4   psychology of imprisonment.
 5   Q        What are the books that you have
 6   published?
 7   A        Well, I have published a book on
 8   the death penalty, on capital punishment
 9   called "Death by Design."
10            The book on prisons is called
11   "Reforming Punishment, Psychological Limits
12   to the Pains of Imprisonment."
13   Q        And who published your book
14   "Reforming Punishment"?
15   A        The American Psychological
16   Association.
17   Q        Are you a member of the American
18   Psychological Association?
19   A        Yes.
20   Q        And what's the process for
21   getting a book published by them?
22   A        Well, you submit a book proposal
23   to a series editor.  In this particular case
```

```
 1   it was -- the particular book series was
 2   "Psychology, Law and Public Policy."  And
 3   that's -- that proposal then is read by an
 4   editorial committee who reviews the quality
 5   of the proposal and the qualifications of
 6   the author.
 7            And then you -- if you're
 8   authorized to proceed with the book, then
 9   you are asked to in fact submit a
10   manuscript, and that manuscript is then sent
11   out to -- for review by an independent group
12   of reviewers as well as the editorial board
13   of the particular book series.  And if they
14   approve the book, then you proceed in
15   publication.
16   Q        And did that book win any awards?
17   A        It didn't win.  It was nominated
18   actually.  The American Psychological
19   Association Press, what's actually called
20   APA Books, like all publishers select a book
21   each year out of their entire collection of
22   books that were published that year and
23   nominate it for the National Book Award.
```

1           And the year my book was
2    published, 2006, there were several dozen
3    books that the APA published.  My book was
4    selected as a book that they nominated for
5    the National Book Award.  It didn't win, but
6    it was nominated for it.
7    Q         And in that book did you discuss
8    the concept of institutionalization?
9    A         Yes.  The book itself deals with
10   the issue of how people are changed and
11   affected by prisons in a variety of ways.
12   And institutionalization is a shorthand
13   expression for summarizing those changes,
14   those effects, if you will.
15   Q         So, just to summarize, the
16   American Psychological Association published
17   a book that you wrote on
18   institutionalization?
19   A         A book in which
20   institutionalization was a significant part
21   of the discussion and analysis, yes.
22   Q         Do you happen to know based on
23   the records you've reviewed in this case if

1   Dr. King, the State's witness, is a member

2   of the American Psychological Association?

3   A        I believe he is.  I assume he is,

4   yes.

5            MS. CASEY:  Objection.

6   Speculation.

7   Q        Did you ever get an opportunity

8   to see Dr. King's CV?

9   A        Yes.

10  Q        And is it listed that he's a

11  member of the American Psychological

12  Association?

13  A        Yes, that's what it indicates.

14  Q        And are you aware that Dr. King

15  testified at the Rule 32 hearing that he did

16  a search of the American Psychological

17  Association database and didn't find any

18  information on institutionalization?

19  A        Yes.

20  Q        And again, that's the same

21  organization that actually published your

22  book that deals with those concepts?

23  A        Yes.

```
 1            MS. CASEY:  Objection.   The
 2   witness has already testified that his book
 3   wasn't on institutionalization.
 4   Q         (BY MS. SCHIFF:)  Have you also
 5   written any book chapters in other books?
 6   A         Yes.
 7   Q         And on what subjects?
 8   A         Well, I've written a lot of book
 9   chapters on the topic of how people are
10   changed and affected by prison conditions,
11   their experiences in prison.
12            I've written book chapters on
13   other topics as well, on -- on how the study
14   of someone's social and institutional
15   history helps to explain their behavior,
16   their criminal behavior; how the study of
17   someone's social and institutional history
18   is an important part of a case in mitigation
19   and capital litigation.
20            I've written book chapters on
21   other topics having to do either with
22   prisons, prison conditions or having to do
23   with various aspects of capital punishment.
```

1  Q        And how many articles have you

2  published on that -- on this topic of

3  institutionalization?

4  A        You know, I honestly don't know.

5  I would say total publications probably a

6  couple of dozen things which bear directly

7  or either indirectly, but nonetheless

8  substantially on the issue of

9  institutionalization or the effects of

10  imprisonment.

11  Q        And have you published -- and

12  have any of those articles been published in

13  journals?

14  A        Yes, sure.

15  Q        And which ones?

16  A        Gee, there's a lot.  There's --

17  there are quite a few.  I began publishing

18  on this issue, this particular topic in

19  1973.  So, there's a number of different

20  publications which -- which address this

21  issue ranging back from 1973 to the present.

22          For example, one -- one

23  publication in the American Psychological

1  Association Journal called "Psychology, Law

2  and Public Policy" is a long article, a

3  50-plus page article on the effects of

4  imprisonment basically, about how prison

5  conditions have changed and how they've

6  changed the people who are confined in them,

7  including a discussion of

8  institutionalization and prisonization.

9  Q        And you used the word

10 "institutionalization" in that article or

11 prisonization?

12 A        I suspect I do, but I certainly

13 talk about the -- the phenomenon itself.

14 Q        And that's an article that was

15 published in the American Psychological

16 Association Journal? Is that --

17 A        Yes. Most of the -- most of --

18 most of the work that I do in psychology is

19 published in APA journals, "Law and Human

20 Behavior;" "Psychology, Public Policy and

21 Law," those kind of journals.

22 Q        And are those peer reviewed?

23 A        Yes, of course. They all are.

1   Q       And are any of those articles

2   relevant to your opinions in this case?

3   A       Well, yes. I mean, certainly the

4   articles and book chapters I have done on

5   the effects of imprisonment are all relevant

6   to my opinions in this case.

7   Q       Have you ever lectured or given

8   invited addresses on the topics of

9   institutionalization or the effects of

10  imprisonment?

11  A       Yes, yes, often.

12  Q       And have you served as a

13  consultant, and in what capacity?

14  A       Yes, I have been a consultant

15  actually quite a lot on this particular

16  topic, and it dates back to -- even when I

17  was still a graduate student in the 1970s I

18  worked as a consultant to the Palo Alto

19  Police Department and the San Mateo County

20  Sheriff's Department helping to train jail

21  guards or correctional officers who were

22  working in the local county jail facilities

23  on the effects of institutionalization and

1  the effects of being in a prison or

2  jail-like environment.

3         Again, back in those years I

4  served as a consultant to the California

5  Department of Corrections, the Napa County

6  Board of Supervisors; again, all strictly on

7  the issue of institutionalization or what

8  sometimes is called prisonization,

9  institutionalization in a prison-like

10 context.

11        Over the years I have served as a

12 consultant to the United States Department

13 of Justice, their special litigation unit.

14 I worked on analyzing prison conditions

15 throughout the United States, prison

16 conditions in some -- in some instances

17 forensic hospitals, prison-like hospital

18 facilities.

19        And I worked for them analyzing

20 the effects of specific prison institutional

21 environments on people who were confined in

22 them. So, the process of

23 institutionalization or prisonization as a

1  function of the nature of the conditions in

2  those institutions.

3        I worked for a number of

4  legislative committees primarily in

5  California on providing an analysis of the

6  effects of institutional conditions and

7  prisonization on prison violence levels both

8  in juvenile and adult facilities in

9  California.

10        I was on a task force that was

11  put together for the Department of Health

12  and Human Services in the 1990s under the

13  Bush administration who had become concerned

14  with the issue of people returning to prison

15  once they had been released from prison,

16  recidivism, and its impact on families.

17        And so I -- I worked with them

18  along with a number of other scholars

19  analyzing why rates of recidivism were so

20  high and what the Department of Health and

21  Human Services could do to reduce the amount

22  of recidivism or returning to prison that

23  was occurring.

```
 1              And my part of that was to
 2   analyze the effects of institutionalization
 3   and prisonization on people who were being
 4   released from prison as a factor that
 5   comprised their post-prison adjustment and
 6   made it more likely for them to go back into
 7   prison.
 8              I spent time with the Department
 9   of Health and Human Services training
10   representatives of community organizations,
11   many of them were church groups, but others
12   were civic organizations who came for
13   training in Washington, D.C. to take into
14   account the psychological effects or effects
15   of institutionalization on the people who
16   were returning to their communities from
17   prison facilities to minimize the negative
18   impacts of the prison experience and make it
19   more likely that they would be able to
20   reintegrate into their families and
21   reintegrate into the community.
22              I was -- I participated in a
23   summit at the White House in the year 2000
```

1  in which the -- the focus of the several day

2  summit was to bring together available,

3  existing knowledge from the scientific

4  community on the prevention of crime and on

5  the improvement of prison rehabilitation

6  programs.

7          And again, my part of that was to

8  talk about the effects of imprisonment

9  largely.  I talked about a few other things,

10 but the working group I ended up being

11 involved in continuing after that was --

12 dealt with the issue of institutionalization

13 and its effects.

14          I served as a trainer for the

15 International Committee of the Red Cross.

16 So, I spent a week --

17          MS. CASEY:  Objection.  There's

18 no question before the witness at this time.

19          MS. SCHIFF:  I'll move on.

20 Q          (BY MS. SCHIFF:)  At our request

21 have you agreed to testify in Keith Gavin's

22 Rule 32 proceeding?

23 A          Yes.

1    Q         And what specific areas of

2    expertise have you been asked to testify

3    about in this case?

4    A         You asked me to testify about --

5    provide opinions about the effects of

6    imprisonment generally, the effects of

7    imprisonment on Mr. Gavin, whether or not he

8    appeared to be institutionalized as a result

9    of his 17 years in prison, and also an

10   opinion about his potential for positive

11   adjustment in prison and the issue of

12   possible institutional failure in this case.

13   Q         And were you also asked to

14   testify about your -- any involvement in the

15   original trial of Keith Gavin?

16   A         Yes.

17   Q         And can you describe what you

18   mean by institutionalization just briefly?

19   A         Yes.    Institutionalization is the

20   process of change that occurs in people when

21   they are placed in institutional --

22   typically total institutional settings.

23   Q         And you mentioned some research

1  that you've done on this subject.  What did

2  that research consist of?

3  A       Well, I've done a wide range of

4  research on this topic beginning in 1971

5  when I and my colleagues did an experiment

6  on the effects of imprisonment.  And after

7  that we moved on to looking at

8  institutionalization or prisonization in

9  actual prison contexts, and I have been

10 studying that phenomenon ever since.

11         So, that kind of research, the

12 research on real institutions involves

13 interviews with -- primarily with prisoners

14 but also with staff, correctional officers

15 and the administrators sometimes and

16 sometimes the evaluation of institutional

17 files, records looking at people's

18 individual institutional histories or in

19 other instances aggregate records,

20 statistical summaries of the kinds of things

21 that go on in institutional settings;

22 sometimes, depending upon the issue,

23 correlating certain kinds of institutional

```
 1   conditions with certain kinds of changes
 2   that take place in prison.
 3   Q        And do you also tour and inspect
 4   prisons as part of your research?
 5   A        Yes.  That's a fundamental part
 6   of it.  I tour and inspect prisons all over
 7   the United States and the world really as
 8   part of that research.
 9   Q        And are you a clinical
10   psychologist?
11   A        No.  I'm a social psychologist.
12   Q        And have you attempted to
13   diagnose Mr. Gavin with any psychological
14   disorder?
15   A        No.  I don't diagnose people, and
16   I haven't diagnosed Mr. Gavin.
17            MS. CASEY:  I want to hear that
18   question again, please.
19            MS. SCHIFF:  Have you --
20            MS. CASEY:  Wait.  Let me ask the
21   court reporter to read it back, please.
22            (Record read.)
23            MS. CASEY:  And the answer was?
```

```
 1              THE WITNESS:  The answer was no,
 2    I don't do diagnoses.
 3              MS. CASEY:  No.  I'm asking the
 4    court reporter.
 5              (Record read.)
 6              MS. CASEY:  Could you mark that
 7    for me, please?
 8    Q         (BY MS. SCHIFF:)  Is
 9    institutionalization a recognized diagnosis?
10    A         No, I don't believe it is.
11    Q         Is it considered a social
12    phenomenon?
13    A         It's a social phenomenon or
14    process, yes.
15    Q         And is that -- is the social
16    phenomenon of institutionalization confirmed
17    by scientific data and literature?
18    A         Yes, it's a well confirmed,
19    elaborately researched phenomenon or
20    process.
21    Q         And some of that literature is
22    peer reviewed I think you mentioned?
23    A         Yes.  It dates back a long time
```

Page 28

1  ago and even in the old days they were doing

2  peer reviews.  But yes.

3  Q        So, if institutionalization is

4  not a diagnosis in your opinion, why is it

5  relevant to this case?

6          MS. CASEY:   Objection as to

7  his -- his belief as to why it's relevant.

8  Q        If institutionalization is not a

9  diagnosis in your opinion, why do you think

10  that it's relevant to this case based on

11  your experience?

12  A        Well, it's always relevant to a

13  potential case in mitigation in capital

14  cases.  To the extent to which somebody has

15  been in an institutional setting, then

16  that -- their institutional history and the

17  events and experiences that occurred while

18  they were in an institutional setting are

19  part of their social history.

20          Social histories are a

21  fundamental part of capital mitigation.

22  Institutional histories and

23  institutionalization is even more important

1  to study because institutional environments
2  are typically very powerful places where
3  very significant changes can take place in
4  people.
5          This is precisely the kind of
6  thing that is important to present -- to
7  understand and present when it is -- it's
8  significant in someone's life.  Also because
9  most lay people don't understand these
10 issues, don't understand what happens to
11 people in institutional settings.
12          Testimony that we give about
13 somebody's family dynamics, for example, is
14 typically easier for juries to understand
15 because they've had a family.  They've been
16 in families.  They have a feel for what
17 proper parenting is and so on and so forth.
18 But few of them have been in a prison.  Few
19 of them have ever come to terms with what
20 happens to people in prison and how people
21 who are in prison are changed by those
22 experiences.
23          So, this is a critical part of

1   the education process that takes place in

2   the case of mitigation.

3   Q        And in your experience you've

4   seen evidence of institutionalization

5   presented at the mitigation phase of capital

6   trials?

7   A        Yes.  In my experience it's

8   typically always done in a case where it's

9   present.  I mean, obviously it wouldn't be

10  presented if it wasn't part of the person's

11  social history or if the period of

12  institutional confinement was not

13  particularly lengthy or didn't have a

14  particularly significant impact.

15          On the other hand, when you're

16  talking about a significant period of

17  institutionalization, it then becomes part

18  of a person's social history, which is, as I

19  say, a required part of a case in

20  mitigation.

21  Q        You mentioned that this has been

22  studied extensively.  So, other -- there

23  have been other studies and researchers who

```
 1  have looked at the effects of
 2  institutionalization?
 3              MS. CASEY:  Objection.  Leading.
 4  Q          Have there been any other studies
 5  or research done on institutionalization
 6  that have been published, to your knowledge?
 7  A          Yes, numerous, countless.
 8  Q          And are these -- are some of
 9  those examples listed in your declaration?
10  A          Yes, just a few of the vast
11  literature on this topic.
12  Q          And have you served as a
13  consultant in a capital murder case before?
14  A          Yes.
15  Q          Approximately how many times?
16  A          I don't know for sure.  I suspect
17  by now it's over a hundred, if you mean just
18  a consultant, have I consulted with
19  attorneys, have I evaluated information or
20  evidence, looked at case facts and so on.
21  Q          For what purpose are you usually
22  hired as a consultant?
23  A          For -- typically for two related
```

```
 1   purposes.  To analyze and potentially
 2   develop an analysis of somebody's social
 3   history, which would include all of the
 4   important facts and circumstances and events
 5   which impacted their development and the
 6   direction or path of their life course.  And
 7   that would include institutional related
 8   issues or institutionalization or
 9   prisonization, as I've called it, if -- to
10   the extent to which that was part of a
11   person's social history, and that could
12   include analyzing their juvenile
13   institutional history or adult institutional
14   history as part of the overall social
15   history.
16              And sometimes I've been consulted
17   to evaluate a more specific or focused
18   issue, which is somebody's potential for
19   positive future adjustment in prison as a
20   potential mitigating circumstance in a case
21   where the jury is being asked to sentence
22   them to prison for life without parole.
23   Q        Have you ever been qualified in
```

```
 1   court as an expert?
 2   A       Yes.
 3   Q       On the subject of
 4   institutionalization?
 5   A       Yes, both -- both specifically
 6   and then as a larger part of the issue of
 7   social history.
 8   Q       How many times have you been
 9   qualified in court as an expert
10   approximately?
11   A       On any topic?
12   Q       On any of those two topics.
13   A       I would estimate maybe 60 times
14   or so. I'm not sure. I haven't calculated
15   it precisely.
16           MS. SCHIFF: I would like to
17   tender Dr. Haney as an expert at this time
18   on the effects of institutionalization.
19           MS. CASEY: The State is going to
20   make its objection as to first of all
21   this -- Dr. Haney is not a clinical
22   psychologist.
23           Second of all, he's already
```

1    attempting -- he's already indicated and I

2    quote -- and the question was, "Mr." --

3    "Dr. Haney, did you diagnose Mr. Gavin with

4    any type of psychological disorder?"

5    Answer:  "No.  I don't diagnose people."

6            Therefore, this type of

7    phenomenon or any type of

8    institutionalization theory that's come up

9    would be completely irrelevant as it's not

10   generally accepted in the medical community.

11           Furthermore, the State is going

12   to object that Dr. Haney's theory regarding

13   institutionalization is not recognized

14   clinical psychological diagnosis, nor is it

15   mentioned in the "Diagnostic and Statistical

16   Manual IV-TR."

17           Therefore, any type of

18   determination as to institutionalization,

19   there's no standard by which it could be

20   governed by the Court or could have been

21   governed by a jury back in 1998.

22           With those objections on the

23   record, you may continue.

1 Q        (BY MS. SCHIFF:)  Dr. Haney, will

2 you tell us what the understanding of

3 institutionalization was as of 1999 if you

4 remember approximately?

5 A        Well, I do because it hasn't

6 changed very much.  It's -- this is a

7 phenomenon that has been described in the

8 scientific literature for many, many years;

9 decades.  It's been studied by

10 psychologists, sociologists, social workers

11 and other mental health professionals.

12        And it is, as I described it, the

13 understanding of what happens to people when

14 they are placed in institutional settings,

15 the way they are changed and affected by

16 those settings and often times changed and

17 affected by those settings in ways that

18 impede their readjustment to

19 non-institutional settings once they're

20 released.

21 Q        And you mentioned that you've

22 testified about 40 or 50 times.  Are you

23 usually hired by the defense, or have you

```
 1   ever testified on behalf of the State?

 2            MS. CASEY:   I'm going to object

 3   as to the form of the question.  The witness

 4   testified he had testified 60 times.  So,

 5   unless the --

 6            MS. SCHIFF:  I'm sorry.

 7            MS. CASEY:  Unless the witness

 8   wants to change his testimony, I'm going to

 9   object to the form of the question.

10            MS. SCHIFF:  You're right.

11   Q         (BY MS. SCHIFF:)  I'm sorry.

12   Dr. Haney, you testified approximately 60

13   times.  Are you usually hired by the

14   defense, or have you ever testified on

15   behalf of the State?

16   A         I've testified for the United

17   States Department of Justice, and I also --

18   I mean, included in that 60 cases are cases

19   in which there's not a prosecutor and a

20   defense.  Sometimes these are civil cases in

21   which there are other -- other issues,

22   non-criminal issues that are the focus of

23   the litigation.
```

1          So, it's probably around 40 or 50

2    times in a criminal proceeding and in the --

3    in those instances it's been for the

4    defense.

5    Q     And why do you think that is,

6    that it's been for the defense in those

7    criminal proceedings?

8          MS. CASEY:   Objection as to the

9    witness' belief or why he believes that's

10   been the case.  If counsel wants to ask him

11   why he's always testified for the defense, I

12   think that would be a more appropriate

13   question.

14         MR. MARSHALL:   Everything is

15   taken subject to the objection.

16   A     Well, most of the testimony that

17   I give in capital cases involves social

18   history, social and institutional history.

19   And that's not the kind of thing the

20   prosecution ordinarily presents.  They

21   typically don't present a witness on those

22   issues.

23   Q     And you mentioned that you've --

1  I'll strike that.

2        Have you ever been retained by

3  the defense and after reviewing the

4  defendant's records determined that the

5  person's institutional history did not

6  affect their subsequent behavior or was not

7  a mitigating factor?

8  A        Yes, yes, and particularly in

9  cases where somebody hasn't been

10  institutionalized for very long.  It's not

11  the case that everybody who steps into an

12  institutional setting is immediately

13  institutionalized.

14        So, you have to look at the

15  records.  You have to look at the length of

16  time.  You have to look at typically the

17  client's records as well as his or her --

18  the effects that they manifest and how they

19  talk about the experience.

20        So, there are cases in which

21  people have gone into institutional settings

22  typically for a brief period of time and

23  show no discernable effects of it and don't

1  have much trouble reintegrating back into

2  society once they've been released.

3  Q        Have you ever been -- reviewed a

4  defendant's records and determined that the

5  person does not have a potential for

6  positive future adjustment?

7  A        Yeah, that happens all the time.

8  That happens often because not everybody

9  can -- not everybody handles prison well.

10 They -- they -- they don't -- at the time I

11 look at them or at the time I look at the

12 file they may be on the upswing of the arc

13 of prison misbehavior or prison infractions

14 and -- and therefore are not a suitable

15 candidate for positive prison adjustment.

16 They may get to that point later on, but at

17 the time I look at the file, I'm not in a

18 position to say that yes, this person is

19 going to go to prison and do well.

20 Q        So then you've taken cases that

21 you haven't actually testified in because of

22 that, because you weren't able to find

23 positive future adjustment?

1    A        Oh, sure, yeah.  I mean,

2    I analyze a case -- you know, I said earlier

3    I had been a consultant on cases that I

4    didn't actually testify in.  When you look

5    at the file, you do an analysis of it and

6    you say this is -- this is my opinion.  I

7    don't -- you know, if the attorney decides

8    it's not going to be helpful, sure.

9    Q        You were hired by counsel for

10   Mr. Gavin, correct?

11   A        Yes.

12   Q        And what's your understanding of

13   what you were asked to do?

14            MS. CASEY:  Objection.  Asked and

15   answered.

16   Q        Specifically with regard to

17   institutionalization.

18   A        You asked me to form an opinion

19   about institutionalization or prisonization

20   in general, specifically with respect to

21   Mr. Gavin having reviewed various documents

22   and records which you provided me, also to

23   form an opinion about the extent to which

1  based on those records he appeared to be a

2  candidate for positive prison adjustment;

3  and also, as I recall, to analyze the issue

4  of institutional failure in this case

5  primarily based on the records and my

6  interview with him.

7  Q         In connection with this

8  assignment, did you submit a declaration?

9  A         I did.

10  Q         And is this a copy of that

11  (indicating)?

12  A         Yes, it is.

13  Q         And is that your signature on the

14  last page?

15  A         It is.

16         MS. SCHIFF:  I would like to

17  admit this declaration into evidence as

18  Defendant's Exhibit 11.  It should already

19  be part of the record and it can be

20  cross-referenced with Petitioner's Brief

21  Exhibit II.

22         MS. CASEY:  Are there any

23  additions or changes that have been made to

```
 1   that report since it's been submitted to the
 2   State?
 3              MS. SCHIFF:  No, there isn't.
 4              MS. CASEY:  No objection.
 5              MS. SCHIFF:  If you could mark
 6   this as Defendant's Exhibit 11.
 7              (Defendant's Exhibit No. 11
 8              was marked for identification.)
 9   Q          (BY MS. SCHIFF:)  Dr. Haney, does
10   this declaration reflect the opinions you've
11   reached in this case?
12   A          It does.
13   Q          And what documents did you review
14   in preparing the declaration?
15   A          I asked for and was provided by
16   you a set of materials that included
17   Mr. Gavin's prison records, his Illinois
18   Department of Corrections prison records.  I
19   was provided a copy of a declaration or a
20   report by Dr. Paramore, Betty Paramore.
21              You sent me some case-related
22   briefing material, I think the initial
23   briefs that were filed in the case.  You
```

1  sent me a transcript of the original 1999

2  jury trial, both phases of the trial from

3  Alabama.

4          Subsequently you have -- after

5  the preparation of this report you sent me

6  some additional material that had to do with

7  the transcripts of the hearing that occurred

8  in this case. So, it would have been the

9  testimony of Mr. Gavin, the testimony of

10  Dr. Paramore, the testimony of Lucia Penland

11  and the testimony of Dr. King.

12  Q        Did you also interview Mr. Gavin?

13  A        I did.

14  Q        And when did the interview take

15  place?

16  A        August 2007.

17  Q        What was the purpose of

18  interviewing Mr. Gavin?

19  A        I wanted to talk to Mr. Gavin

20  about his institutional experiences in the

21  Illinois Department of Corrections. I had

22  his -- I had his file, but I wanted to hear

23  his description of some of the ways in which

1    he was affected by the events that occurred

2    and what his experience of these places was

3    and also to hear his description of what it

4    was like for him to be released after 17

5    years and what difficulties he might have

6    experienced as he tried to reintegrate into

7    free society.

8    Q         The documents that you stated

9    that you reviewed including Mr. Gavin's

10   prison report and Paramore's mitigation

11   report, did you rely on -- and your

12   interview of Mr. Gavin, did you rely on that

13   in reaching your opinions in this case?

14   A         Yes, I did.

15   Q         And are these the type of

16   materials that are customarily relied upon

17   by professionals in your field?

18   A         Yes.

19   Q         Based on the records you

20   reviewed, what was Mr. Gavin's prior

21   experience being incarcerated?

22   A         He had not -- he had not been

23   incarcerated, not been imprisoned prior to

1  being sentenced to the Illinois Department

2  of Corrections and entering that prison

3  system in 1982.

4  Q        And what was he -- do you recall

5  what he was sentenced to?

6  A         Yes.  He was sentenced for, as I

7  recall, 34 years, 17 of which he served.

8  Q        And do all of your opinions in

9  this case relate to Mr. Gavin's experience

10  in the Illinois Department of Corrections

11  between 1982 and 1997?

12  A        Yes.

13  Q        And the effect of that

14  incarceration on Mr. Gavin's actions upon

15  release?

16  A        Yes.

17           MS. CASEY:  I'm sorry.  I didn't

18  hear what you said.

19           MS. SCHIFF:  And the effect of

20  that incarceration on Mr. Gavin's actions

21  upon release.

22           MS. CASEY:  I'm sorry.

23  Q        (BY MS. SCHIFF:)  Dr. Haney, what

1  opinions did you research -- did you reach

2  based on your review of relevant documents

3  and your interview with Mr. Gavin?

4  A       Well, I reached the opinion that,

5  first of all, institutional experiences like

6  the ones that Mr. Gavin had for the 17 years

7  that he was in the Illinois Department of

8  Corrections were significant and powerful,

9  that they had an impact on him, that he did

10  not emerge from those 17 years unscathed.

11  He was influenced and affected by the

12  institutionalization to which he was

13  subjected while he was incarcerated and that

14  those effects impeded or undermined his

15  ability to positively adjust to free society

16  once he had been released.

17  Q       How old was Mr. Gavin when he

18  entered the Illinois prison system?

19  A       He was 22 years old.

20  Q       Is that relevant to your

21  opinions?

22  A       It was, yes.

23  Q       Why is that?

1   A        Well, he -- at age 22 he was

2   still a relatively young man.  And so the

3   effect of institutionalization on him I

4   would expect to be based on his age

5   relatively powerful given the age at which

6   he entered and the length of the time that

7   he was there.

8           People who go in much later in

9   their life -- and it's not usual for

10  somebody to enter an institutional setting

11  late in life, but when they do, their --

12  their personality, their -- who they are,

13  their social maturity and so on has been

14  fairly well established.  And so they are

15  less likely to be fundamentally changed by

16  the experience.

17          A person going in at age 22 has

18  had some life experiences but still not had

19  many adult life experiences.  He would have

20  had his whole -- essentially his whole adult

21  life stretched out ahead of him and -- and

22  as you know, it was lived in a prison

23  environment.

```
 1              So, the kinds of things that
 2   20-year-olds typically do, people do through
 3   their 20s and through their 30s, learning
 4   who they are in the larger social world;
 5   establishing themselves in terms of
 6   occupation, job related status and identity,
 7   developing intimate relationships with
 8   people, developing long-term friendships,
 9   perhaps marrying, having a family, all of
10   the sorts of things that people do in their
11   20s and 30s.
12              In the case of somebody that
13   enters prison at 22 with a 34-year sentence,
14   those things are all going to happen inside
15   a prison, and they -- those -- many of those
16   events and experiences and maturing
17   processes are not going to occur at all
18   because of where -- where you are living and
19   those that do occur are going to occur in
20   the context of prison, and they're going to
21   occur therefore very differently from the
22   way those things occur outside of prison.
23              And then when somebody re-emerges
```

1  from that experience at age 39, as in

2  Mr. Gavin's case, there are an enormous

3  number of things they don't know,

4  experiences they haven't had and an enormous

5  number of things that have happened to them

6  that have led them to react and led them to

7  develop habits, habits of survival or

8  accommodation that are very dysfunctional

9  once they're released.

10      And absent any systematic and

11  in-depth transitional assistance, training,

12  counseling, therapy, once somebody is

13  released from an environment like that,

14  those habits that they've developed are

15  going to get in their way.  And those

16  absences or gaps in their development, the

17  things they haven't done that other 20 and

18  30-year-olds did do to learn how to be

19  functioning, normal social beings in the

20  larger society are also going to get in

21  their way.

22      And those are the adverse effects

23  of institutionalization.  And they are more

Page 50

1    significant for a 22-year-old than they

2    would be for a 47-year-old say.

3    Q        And you mentioned that when

4    Mr. Gavin was released from Illinois prison

5    he was 39 years old?

6    A        Yes.

7    Q        And that was relevant to your

8    opinion I believe you said because he left

9    prison suffering from institutionalization

10   or as an institutionalized man; is that

11   correct?

12   A        Yes.   He lived his -- he lived

13   his -- most of his 20s and -- you know, a

14   big percentage of his 20s and his 30s in an

15   atypical, very atypical environment where

16   what 20-year-olds and 30-year-olds need to

17   learn to do to function in the larger

18   society he was not exposed to.   And that

19   had -- that had an impact on him, a

20   significant impact.

21   Q        And how were you able to

22   determine how Mr. Gavin functioned while he

23   was incarcerated from 1982 to 1997?

1   A      Well, I did it in the -- in the

2   traditional way.  I looked at his prison

3   file.  Prison files contain a lot of

4   information about what people are doing when

5   they're in prison settings, how they're

6   functioning, how they're adapting.  And

7   there was -- the file in his case was a

8   significant one, a substantial one.  He was

9   in for 17 years.

10        I also interviewed him about

11  those things and listened to the way he

12  talked about what -- the kinds of changes

13  that he went through, the experiences that

14  he had, how he adapted to being in that

15  environment.

16  Q      And was Mr. Gavin's institutional

17  history relevant to any other issues in this

18  case?

19        MS. CASEY:  Objection as to

20  form.

21  Q      Was Mr. Gavin's institutional

22  history relevant to the -- your opinion

23  regarding institutional failure?

1    A        Yes, it was.  I was also

2    interested in looking at whether or not the

3    Illinois Department of Corrections addressed

4    any of Mr. Gavin's pre-existing needs or

5    problems and whether or not it appeared to

6    have prepared him adequately to reintegrate

7    back into free society once he was released

8    17 years after his prison sentence began.

9         So, this would have entailed

10   looking at things like the amount of time he

11   spent in vocational training, what kinds of

12   things he was involved in doing and how

13   often he did them, whether or not he

14   received any therapy or counseling for the

15   problems which he had which led him into

16   prison in the first place, whether he was

17   given transitional counseling or help to

18   deal with the issues of institutionalization

19   or prisonization and what kind of services

20   he was provided when he was released and

21   placed on parole, assisting him with doing

22   the -- on the one end, the kind of basic

23   things that people need to do in order to

1  reintegrate into society and get -- and get

2  meaningful work; and on the other hand, to

3  ease the transition by providing

4  psychological counseling dealing with some

5  of the issues that I have been alluding to,

6  particularly the effects of being

7  institutionalized or undergoing

8  prisonization for 17 years.

9         MS. CASEY:  Will you mark this

10  spot in the transcript for me, please?

11  Q        (BY MS. SCHIFF:)  Would

12  Mr. Gavin's institutional history have been

13  relevant to show his prospects for

14  institutional adjustment?

15  A        Yes, yes, very much so.  So, you

16  look at -- I looked at what kind of

17  trajectory he had in the prison system.  It

18  helps you understand -- by which I mean what

19  kind of disciplinary infractions did he

20  have, when did he have them, was there a

21  change in the pattern over time as a way of

22  determining the extent to which he was

23  adjusting to prison, which is an indication

```
 1   not only of something good taking place;
 2   i.e., his adjusting to prison -- the prison
 3   environment and is he engaging in less or
 4   fewer disciplinary infractions, but also
 5   from a psychological perspective of the
 6   process of institutionalization taking
 7   place, if he's beginning to adapt to or
 8   accommodate to the routines of the
 9   institution as everybody must who is placed
10   in these environments.
11          And it also gave me some insight
12   into what kind of a prisoner he would be in
13   the future.  You look at somebody's
14   trajectory in prison as well as their age.
15   Age, as I suspect you will ask me in a
16   little while, is a very important predictor
17   of somebody's adjustment to prison
18   environment.
19          So, I took those two things into
20   account in making that assessment as well as
21   talking to him about his own perspective
22   while in prison.
23   Q       And in your opinion was there any
```

1   reason for defense counsel not to pursue

2   these issues during Mr. Gavin's trial before

3   Judge Rains in 1999?

4          MS. CASEY:  Objection.

5   Relevance.

6   A        Absolutely not.

7          MS. CASEY:  Can you mark this in

8   the transcript, please?

9   Q        (BY MS. SCHIFF:)  I want to talk

10  now about Mr. Gavin's institutional

11  history.  You mentioned that you reviewed

12  Dr. Paramore's report, correct?

13  A        I did.

14  Q        And was there anything in that

15  report that was relevant to your opinion

16  that Mr. Gavin was institutionalized?

17  A        Yes.

18  Q        And what was that?

19  A        Well, I -- I found Mr. Gavin's

20  social history prior to going into prison to

21  be quite significant.  He was exposed to a

22  very problematic childhood and adolescence

23  that Dr. Paramore detailed in some length.

1    He lived in an impoverished area in Chicago

2    in a notorious -- notorious and violent

3    housing project, the kinds of places that

4    books have written about that are so

5    deteriorated and so violent and traumatic.

6          He was himself raised in a family

7    that had lots of problems and dysfunction.

8    He was exposed to domestic violence that his

9    mother suffered at the hands of his father.

10         There were times --

11         MS. CASEY:  I'm going to have an

12   ongoing objection to this as hearsay.

13   A        There were times when he was also

14   himself mistreated by his father.  He grew

15   up in a family where the other children in

16   the family began to suffer significant

17   problems.  I believe all of his brothers --

18   all of the brothers in the Gavin family have

19   been incarcerated at some point in time.

20         He was surrounded as he grew up

21   by gangs and -- and people engaged in

22   criminal activity.

23         The family struggled throughout

1  his life with issues of poverty.  They lived

2  in this housing project for most of his life

3  around other low income people and what was

4  in essence a segregated community.  Only

5  African-Americans lived in those housing

6  projects, which was the subject of actually

7  some litigation in Chicago during the years

8  that Mr. Gavin was in the housing project.

9        So, he had in many ways a

10  classically traumatic and abusive

11  childhood.  And that means that he was

12  exposed to a number of risk factors that --

13  that can create significant problems for

14  children and adolescents that create in them

15  vulnerabilities and tendencies towards

16  suffering a range of problems as adults.

17  Q      And how does Mr. Gavin's social

18  history affect the risk that he would become

19  institutionalized later on?

20  A      Well, because he came from a

21  trauma and risk factor filled life before he

22  went into an institutional setting, which

23  meant he had some vulnerabilities, that he

1   was not -- he was not necessarily

2   psychologically unscathed as he entered the

3   prison system.

4        And in addition, this means that

5   a number of the experiences that he would

6   have had or encountered in prison would have

7   produced what is sometimes called

8   retraumatization.  That is to say he would

9   have encountered things in prison that were

10  parallel to or similar to the kinds of

11  things that had already happened to him and

12  the kinds of things from which he had

13  suffered the psychological effects of

14  already.

15       So, what happened in prison would

16  have compounded or sat on top of those

17  earlier experiences making him somewhat more

18  vulnerable to the pains of imprisonment,

19  making him somewhat more vulnerable to the

20  shaping process that takes place inside

21  prison.

22  Q        Is there also scientific data to

23  suggest that pre-incarceration exposure to

1  trauma and violence increases the risk of

2  victimization in prison?

3  A        Yes.   There's -- actually there's

4  a recent study on exactly that issue, that

5  people who have these kinds of significant

6  trauma histories are much more likely to be

7  victimized in prison and to have problems

8  once they go to prison.

9  Q        And what effect can that have on

10  an inmate upon release from prison, those

11  early traumatic experiences and the

12  increased risk for victimization?

13  A        Well, two -- two effects.  One is

14  that the effects of risk factors don't

15  necessarily go away in somebody like --

16  unless you've been treated for them.

17            So, you have -- the long-term

18  effects of these risk factors are still

19  present in somebody's life.  And then on top

20  of that there is the negative consequence or

21  negative burden of institutionalization

22  which somebody has to grapple with.

23            And to the extent to which

Page 60

```
 1   that -- those earlier traumas and risks

 2   increase the power or the capacity of the

 3   institution to further negatively affect

 4   you, then the effects of

 5   institutionalization are even greater once

 6   you are -- you are released, the negative

 7   effects of institutionalization.

 8   Q        You heard yourself Mr. Gavin was

 9   convicted of murder in 1982 and sentenced to

10   34 years in prison at the age of 22,

11   correct?

12   A        Yes.

13   Q        And according to his records, had

14   he ever been incarcerated prior to that?

15            MS. CASEY:  Objection.  Asked and

16   answered.

17   A        No, he hadn't.

18   Q        And in your experience is that

19   unusual?

20   A        Yeah, it is.

21            MS. CASEY:  Objection as to the

22   relevance.

23   A        He -- it is unusual because
```

1    usually by the time somebody goes to prison

2    with a long prison sentence like the one he

3    had they have had some prior experience in

4    an institutional setting.

5           It's unusual in my -- for me at

6    least in my professional experience to

7    interview somebody who has been sentenced to

8    prison for murder and that's their first

9    prison term.  It's not unheard of to be

10   sure, but it's an unusual event.

11   Q         Going back to Mr. Gavin's social

12   history and the risk factors, are you aware

13   that Dr. King opined in his declaration that

14   it was contradictory to state that Mr. Gavin

15   was exposed to many risk factors, yet did

16   not have a criminal record or juvenile

17   record?

18   A         Yes.

19   Q         And does the fact Mr. Gavin had

20   no juvenile record necessarily mean that he

21   did not engage in criminal behavior as a

22   juvenile?

23   A         No, it doesn't at all.  I mean, I

1   really don't quite understand that, but let

2   me explain it accurately.

3        I -- if I understood Dr. King, he

4   was suggesting that somehow because somebody

5   could have been exposed to those factors and

6   they don't engage in criminal behavior is a

7   contradiction. There is no contradiction

8   whatsoever. That's not what the risk factor

9   model suggests or -- or predicts even.

10        Risk factors are just that.

11   They're risks. They're probabilities.

12   They -- they attach a certain kind of

13   probability to something happening in

14   somebody's life.

15        And the fact that the

16   predicted -- the predicted behavior hasn't

17   occurred doesn't mean that the risks haven't

18   had an impact or an effect and that those

19   risks may not have an impact or an effect at

20   a later point in time. This is not a model

21   which is time limited.

22        So, somebody who has been exposed

23   to risks has had certain vulnerabilities

1    created in them, which could impact them at

2    a later point in time. And the fact that

3    they didn't impact -- at least as Dr. King

4    saw it, impact Mr. Gavin immediately doesn't

5    mean that they were not going to impact him

6    later on.

7              There's nothing at all

8    inconsistent about that with the risk factor

9    model. The risk factor model contemplates

10   that. It's an explicit part of the risk

11   factor model that suggests that these

12   negative consequences can occur at different

13   points in time in somebody's life.

14              They are not, contrary to what he

15   said, models which look only at juvenile

16   delinquency. They rather predict adult

17   behavior as well. All of the risk factor

18   models take that into account.

19              So, there is -- there is no --

20   there is no contradiction whatsoever there.

21              And in addition, incidentally,

22   the fact that Mr. Gavin was not convicted of

23   crimes as a juvenile does not mean that he

Page 64

1   did not engage in them.  And in fact, he

2   did.  He simply was not apprehended and was

3   not incarcerated for them.

4          I was interested in whether or

5   not he had experiences in institutional

6   settings, not whether or not he had engaged

7   in crime.

8   Q         And what was Mr. Gavin's

9   educational history when he entered prison

10  for the first time?

11         MS. CASEY:  Objection as to the

12  relevance of this with this witness.

13  A         He had relatively sparse

14  education.  He hadn't finished high school;

15  didn't have a GED and as I recall, dropped

16  out of school at around 10th grade maybe.

17  Q         And what was his employment

18  history at that time?

19  A         Also spotty, sporadic.  He had

20  worked in a variety of menial jobs and

21  not -- not for any consistent period of

22  time.  Odd -- odd jobs here and there.

23  Q         And did the fact that he was

1  relatively uneducated and had limited work

2  experience affect his experiences in prison?

3  A       Yes, it did, very much so.

4  Q       In what way?

5  A       Well, he -- first of all, because

6  of his limited educational history he was

7  not able to participate in very many

8  significant -- or what might have been

9  significant vocational training programs or

10 work experiences.

11        People like Mr. Gavin who go in

12 without a high school diploma and without a

13 GED are typically assigned to very menial

14 tasks in prison. And indeed his prison

15 record reflects exactly that.

16 Q       I'll ask you a little bit more

17 about that later, but where was Mr. Gavin

18 initially housed when he entered prison?

19 A       He came into the intake or

20 reception center of Joliet Correctional

21 Facility in Illinois.

22 Q       And then from there where was he

23 transferred?

1    A        He was assigned to the maximum

2    security prison at Stateville.

3    Q        And you mentioned in your

4    declaration that the Illinois maximum

5    security prisons where Mr. Gavin was housed

6    for a majority of his sentence were

7    notorious.  What did you mean by that?

8    A        Well, as somebody who studies

9    prisons -- you study the history of prisons

10   and the history of prison systems.  Joliet

11   is a well-known facility in the history of

12   American prisons, Stateville even more so.

13   Again, books have been written about -- a

14   very famous book by James Jacobs written

15   about the Stateville institution.

16            It's also famous because it has

17   the circular prison housing units that are

18   relatively unique in modern American

19   corrections.  It's -- both places are large

20   facilities, Stateville much larger than

21   Joliet.  And Stateville is a particularly

22   notoriously violent prison and has been for

23   many, many years and was during the period

1   of time that Mr. Gavin was there.

2   Q        And was the majority of

3   Mr. Gavin's time in prison spent in those

4   type of maximum security prisons?

5   A        Yes.  He went from Stateville

6   directly to Menard, which is another very

7   large maximum security prison with a

8   notorious reputation.  Not just in Illinois

9   but nationally.

10  Q        What effect does that have on

11  your opinions, the fact that Mr. Gavin spent

12  most of his time in maximum security

13  institutions in Illinois?

14  A        Well, it has a big effect on

15  my opinions.  He went into a very

16  significant -- significantly dangerous

17  environment from the very outset.

18          He was a young man with no prior

19  prison history, and he went into one of the

20  most notorious prisons in the United

21  States.  It was and he perceived it to be a

22  very dangerous place.

23          Also, it was a maximum security

1  prison where there were lots of rules and

2  regulations where disciplinary infractions

3  were dealt with very harshly and where there

4  are relatively few opportunities for him to

5  program or rehabilitate.

6  Q        You mentioned Stateville and

7  Menard in Illinois.  Do you think that a

8  jury in Alabama would have an understanding

9  in your experience about the kind of -- what

10  kind of place that is and how that might

11  affect somebody?

12         MS. CASEY:  Objection.

13  Speculation as to what an Alabama jury might

14  think or -- about any type of description of

15  an Illinois prison.

16  A        I don't think a jury anywhere

17  would understand.  There's no reason why

18  they would understand --

19         MS. CASEY:  Objection.  Lack of

20  foundation for -- for any type of

21  speculation on that matter.

22  A        -- the nature of prison

23  conditions; certainly not in these very

1   dangerous, large, maximum security prisons
2   and certainly not the notoriety of places
3   like Joliet and Stateville and Menard.

4           There has been actually quite a
5   bit of research done on what people
6   understand about the nature of prison and
7   public misconceptions about what prison life
8   is like, about how people are affected by
9   prison conditions.

10          And the public in general does
11  not know, does not understand what goes on
12  inside of these places, cannot understand
13  why prisoners aren't rehabilitated from the
14  many experiences which they had inside which
15  are supposed to promote their positive
16  social growth.

17          And part of what they don't
18  understand is they don't understand all of
19  the rest of the things that prisoners deal
20  with when they're in a maximum security
21  prison that work to undermine the
22  development of those -- of those positive
23  qualities or outcomes.

```
 1   Q        So, in your opinion do you think
 2   that it would be important for an expert on
 3   those types of issues to explain that to a
 4   jury at the mitigation phase of the trial?
 5           MS. CASEY:  Objection to form of
 6   the question.  I'm not sure what that is and
 7   those are.
 8   A        I think it would be critically
 9   important to explain the nature of prison
10   life and how people are affected by prison
11   life in a case where somebody has been in
12   prison for 17 years and committed a crime
13   shortly after they were released.
14   Q        And you mentioned that Mr. Gavin
15   perceived those prisons as dangerous
16   places.  Did he tell you how he felt when he
17   first entered prison?
18   A        Yeah.  He was terrified.  He was
19   very frightened.  He didn't know what to
20   expect, and as it turned out, his fears were
21   well founded.
22           MS. CASEY:  I would like to put
23   an objection on the record as to hearsay.
```

1   Q       (BY MS. SCHIFF:)   Did Mr. Gavin's
2   prison record support that he felt that it
3   was a dangerous place?
4   A       Yes.   He told -- as he entered
5   the prison system he told a correctional
6   interviewer that he was concerned because he
7   was being harassed by a prison gang when he
8   entered the prison.   He was subsequently
9   involved in being attacked.
10          On one occasion just a couple of
11  years into his prison term he was actually
12  violently attacked.
13  Q       And I'll ask you about that, but
14  you mentioned that Mr. Gavin upon entering
15  the prison told the prison guards that he
16  was concerned with his safety.   Do his
17  records reflect that was he placed in
18  protective custody?
19  A       Yes, it did.   He was put in
20  protective custody early on.
21  Q       And what is -- in your experience
22  what does being in protective custody
23  entail?

1    A        Well, it entails pretty much the
2    same thing in each prison system and in
3    Illinois as well you're placed in a special
4    housing unit where you have limited contact
5    with the rest of the prison.  You are
6    surrounded by other people who have -- who
7    are vulnerable, who have protection related
8    concerns and they would -- they would
9    vary in -- they would run the gamut.  In a
10   prison setting there's a variety of reasons
11   why people would be in what's called either
12   protective custody or safekeeping.

13           And your -- your -- because your
14   contact with the rest of the prison system
15   or the rest of the inside of that prison is
16   limited your activity is restricted.  You
17   are often times kept in your cell for long
18   periods of time.  You are prohibited from
19   being involved in many of the kinds of jobs
20   or vocational training experiences that take
21   place, you know, outside of the prison
22   because that would require you to have
23   contact with the larger general population

1  of the prison.

2         So, they're very -- they're very
3  restrictive units, and there's typically not
4  very much for people to do in these units,
5  and there's often times a very long or large
6  amount of in-cell time.  You sit in your
7  cell a lot.

8  Q         Does being placed in protective
9  custody have any effect on how an inmate is
10  viewed by other inmates in your experience?
11  A .         Yes, it typically does.  It is
12  not something which other prisoners look on
13  kindly.  It suggests to other prisoners that
14  you are not able to take care of problems
15  yourself or it sometimes may imply that
16  you've done something that involves
17  cooperating with prison authorities and so
18  on and that that's why you've been placed in
19  protective custody.

20         So, yes, there is a certain kind
21  of degraded status that prisoners who are in
22  protective custody are given by the other --
23  other prisoners.  It's not a badge of

1  honor.  Quite the opposite.

2  Q        Besides being placed in

3  protective custody, do Mr. Gavin's records

4  indicate that he was concerned with his

5  safety while in prison?

6         MS. CASEY:  Objection.  Asked and

7  answered.

8  A        Yes.  There are numerous

9  instances of him telling authorities that he

10 is concerned about his own safety and in a

11 number of instances asking to be placed in

12 protective custody or safekeeping, other

13 instances in which the prison responds to

14 his concern by transferring him to other

15 institutions because of his concerns about

16 being victimized by other prisoners.

17 Q        And we'll talk about his transfer

18 history also in a little bit, but you

19 mentioned that Mr. Gavin was a victim of

20 physical violence while in prison.  Can you

21 tell us about that?

22 A        Well, he -- yes.  He was involved

23 in -- there were a couple of instances in

```
 1   which he was involved in fights.  They
 2   appear to be mutual combat.
 3          He tells me he was being
 4   pressured by gang members and other
 5   prisoners in the institution.  And
 6   eventually because he wouldn't comply with
 7   their demands he was violently attacked
 8   with -- with a prison-made weapon, a shank,
 9   and was severely injured.  He was placed in
10   the hospital, had a fairly -- as far as the
11   medical records reflect, a fairly lengthy
12   hospital stay and continuing medical
13   problems after that and as a result of that
14   was placed in protective custody again for a
15   long period of time.
16   Q          Do you recall the year that he
17   was stabbed?
18   A          August 1984.
19   Q          And besides being hospitalized,
20   were there any other measures taken to
21   protect Mr. Gavin as a result of that
22   stabbing according to records?
23   A          Well, eventually he was
```

1    transferred.  He was placed in protective

2    custody and then he was transferred out of

3    the institution.

4           This happened when he was at

5    Stateville.  This happened in this big and

6    notorious maximum security prison that he

7    was in.

8           But then he went -- he was

9    transferred to Menard, which is another big

10   and notorious maximum security prison, but

11   it wasn't -- but obviously the advantage of

12   being at Menard was that the people who

13   attacked him were not there and presumably

14   whatever problem had led to that particular

15   attack was not present at Menard.

16   Q        Do the records indicate why

17   exactly he was transferred to Menard?  Did

18   they say?

19   A        I thought, as I recall, they

20   reflected that it was because of this,

21   because it was -- out of protection related

22   concerns.

23   Q        And do the records indicate also

1   after that stabbing if Mr. Gavin felt the

2   need to protect himself?

3   A        Yes, yes.  He -- he was written

4   up for having a weapon of his own, an inmate

5   shank.

6   Q        And do the records indicate if

7   Mr. Gavin ever used that shank to inflict

8   violence upon any inmates or guards?

9   A        No.  The records are actually

10  unclear as to whether it was really his

11  shank, but he clearly didn't use it and --

12  so, he didn't use it on an inmate and he

13  certainly never used it on a correctional

14  officer and he never has.

15  Q        And do you remember another

16  inmate signing an affidavit saying it was

17  his shank or something like that?

18  A        Yes, exactly.  The -- the shank

19  was found in the vicinity of the two of

20  them, and the other inmate took

21  responsibility for having it.

22  Q        And this was considered a serious

23  violation?

```
 1   A        Yes, it was.

 2   Q        And do you recall what punishment

 3   he received as a result of that?

 4   A        A hundred and eighty days loss of

 5   good time.

 6   Q        Did Mr. Gavin receive any other

 7   serious disciplinary write-ups, in your

 8   opinion what you would consider serious

 9   write-ups?

10   A        No.  In my opinion he's -- that's

11   the only serious, significant write-up he

12   has.  He has others.  He certainly has

13   others.  They are for either clearly minor

14   and trivial things, but -- but the kinds of

15   things that people get written up for in

16   prison.

17            And even some write-ups that he

18   has that are listed as major write-ups but

19   are for otherwise insignificant things,

20   having his television on too loud, listening

21   to his television without his earphones on,

22   these are things that are legitimate things

23   certainly to write up a prisoner for, but
```

1  they're not major.  They're not major

2  disciplinary infractions.

3  Q          You mentioned that the shank

4  incident was the only what you would

5  consider a serious disciplinary write-up.

6  Is that the only write-up where he lost any

7  significant amount of good time credits as

8  well?

9  A          Yes, exactly, which I find

10  remarkable for somebody in for 17 years in

11  those prisons.

12  Q          And is this information that

13  could have or should have been submitted to

14  a jury?

15  A          In my opinion it should.

16          MS. CASEY:  Objection as to this

17  witness' opinion as to whether or not this

18  information should have been subjected to a

19  jury.

20  Q          Is this information that could

21  have been submitted to a jury?

22  A          Of course.

23  Q          And in your experience should

```
1   this have been submitted to a jury?
2            MS. CASEY:  Same objection.
3   A        Yes.
4   Q        What is your assessment of what
5   happened after Mr. Gavin recovered from this
6   incident of being stabbed and spent some
7   more time in the prison system?
8   A        Well, he -- a lot of things
9   happened.  He -- he was transferred to
10  Menard.
11            He -- while at Stateville he
12  continued to have some medical problems, and
13  that's reflected in his medical file.  He
14  spent a number of periods of time in
15  subsequent institutions in Menard and
16  elsewhere in protective custody units.  Not
17  exclusively, but there were a number of
18  instances in which he has concerns over his
19  safety or the prison system has concerns
20  over his safety.  These were not all
21  initiated by him by any means.  And so they
22  put him in a protective housing unit to
23  safeguard him.
```

1            And his -- his behavior in the

2    prison system begins to stabilize eventually

3    over time so that there are fewer

4    disciplinary infractions.  But he is also

5    transferred to a number of different

6    institutions throughout the system, often

7    times for security related concerns, a

8    couple of instances in which he requested

9    the transfer on his own without -- clearly

10   being security or protection related issues,

11   but the bulk of the transfers appear to be

12   based on the concerns that either he or the

13   institution has about his safety.

14   Q  .        Do you know how many times

15   Mr. Gavin transferred prisons in the 17

16   years that he spent in the Illinois

17   Department of Corrections?

18   A          My count was 12.

19   Q          And you mentioned that the

20   records indicate that the majority of those

21   transfers were either done on behalf of the

22   institution or Mr. Gavin?

23   A          Yes, that's my -- that was my

```
 1   reading of the file.  There -- it's
 2   explicitly mentioned in a number of them
 3   that he ends up being placed in a protective
 4   custody unit when he gets to the new
 5   institution.
 6   Q         In your view what effects do
 7   constant transfers have on a prisoner?
 8   A         Well, this kind of multiple
 9   transferring is problematic, and it's
10   problematic in terms of the prisoner's
11   ability to function or adjust inside the
12   institution.
13             Transfers are very disruptive.
14   Prisoners have to undergo a new
15   orientation.  Each time you go to a new
16   institution you go through a new orientation
17   procedure.  You're typically housed in a
18   special unit where you have significantly
19   fewer privileges or freedoms because you're
20   in orientation.
21             You often times either lose or
22   have to wait a long period of time for your
23   property as it's transferred from one
```

1  institution to another. So, that's
2  disruptive if you have personal property and
3  so on. The prison has to transfer their
4  items and you don't carry that with you when
5  you go from one place to the next. So,
6  there is always inefficiency in terms of
7  getting that material to you in your
8  appropriate cell at your new prison.

9         You also -- and this is perhaps
10 the most significant part of it. You have
11 to learn a new set of rules and
12 regulations. Even though the overall rules
13 and regulations for the Illinois Department
14 of Corrections would be the same, there are
15 always local rules. There are always local
16 practices. There are always individuals who
17 have responsibility over you who have their
18 own interpretation of the rules and
19 they're -- and exercise their own discretion
20 one way or the other. And you've got to
21 learn all that.

22         And so that transition is often
23 times very difficult for people to -- for

1  people to accommodate.

2         And the other part of that is

3  that you have different -- there's different

4  programming at other institutions.  If you

5  were in a program at the institution where

6  you were housed, you are automatically going

7  to be out of that program and into the new

8  program in the institution to which you go.

9         So, job assignments, if you

10  happen to be in school or if you happen to

11  be in some kind of training program, you're

12  going to have to wait to get into that at

13  the new place that you go into.  And

14  wherever you were in the program -- let's

15  say, for example, you were in school at the

16  facility from which you're being

17  transferred.  That ends at that point.

18         There's no -- it's like

19  transferring -- it's like moving from one

20  place to the next.  You go from one school

21  system to the next except the difference is

22  you don't automatically go into school, you

23  don't automatically go into a job because

1  these kinds of things are relatively rare in

2  prison and you have to wait your turn.

3  Q        And do constant transfers make it

4  more or less likely that a prisoner will

5  become institutionalized in your experience?

6  A        It can make it more likely

7  because you have to -- you have to -- in

8  order to accommodate to these many transfers

9  you really have to become a person who just

10 accepts the rules whatever they are wherever

11 you go.  You really have to just learn how

12 to comply generically to what's going on

13 around you.  You cannot assume that what you

14 learned in the last institution about how to

15 behave is going to work here.

16       So, you have to basically give

17 into the contingencies of the facility into

18 which you are entering.  And that can erode

19 somebody's autonomy, their self-initiative.

20 Because trying to assert yourself in a new

21 environment is very problematic and can

22 result in punishment and disciplinary

23 write-ups and so on.  So, you have to kind

1    of just become relatively passive in the

2    face of these transfers.

3    Q        And in your opinion was

4    Mr. Gavin's history of being transferred 12

5    times in 17 years unusual?

6    A        Yes, it is unusual in my

7    experience.  It's not utterly and completely

8    unheard of, but it's certainly unusual and I

9    think problematic in terms of his

10   adjustment, problematic in terms of his

11   long-term ability to adjust to -- to the

12   free world and also problematic in terms of

13   his ability or opportunity to get any real

14   programming going because he was moving --

15   in a number of instances he was moving from

16   one institution to the next.

17   Q        You also mention in your

18   declaration that after a period of time

19   Mr. Gavin began to adapt to prison life

20   after spending a certain amount of time

21   there.  What do you mean by that?

22   A        Well, this is

23   institutionalization or prisonization at

1   work.  You -- you learn to adapt to, adjust

2   to, model your behavior around the

3   contingencies of the environment.  You learn

4   not to initiate behavior unless instructed

5   to do so.  You learn to comply with whatever

6   rules and regulations are imposed upon you.

7   You learn to turn right when you're told to

8   turn right or left when you're told to turn

9   left; not to go outside of the lines, as it

10  were, and basically give into the

11  contingencies of the institution.  It's

12  perfectly appropriate, and this is what

13  prisoners are supposed to do.

14          The problem is that this kind of

15  compliance doesn't translate over into free

16  society.  So, you begin -- you begin to

17  become institutionalized by adjusting to the

18  contingencies of prison life.  You also

19  learn how to become guarded, hypervigilant

20  and careful around other people.

21          MS. CASEY:  Will you please mark

22  that?

23  A          Guarded, hypervigilant and

```
 1   careful around other people, weary of
 2   others.
 3           And so you start -- you start to
 4   adjust to this environment in ways that make
 5   your institutional adjustment good and
 6   positive and may very well create problems
 7   for you once you're released.
 8           In fact, there have been studies
 9   that show that people who adjust really well
10   to prison, often times this is negatively
11   correlated with their post-prison
12   adjustment.
13   Q       You mentioned that Mr. Gavin had
14   one serious disciplinary infraction and some
15   others when he first entered prison, and
16   then it kind of tapered off after he spent
17   about 10 years there.  Do you know what
18   percent of his disciplinary infractions
19   occurred during the first 10 years that he
20   was in prison?
21   A       Well, yes.  Let me -- let me
22   clarify.  There was one and only one serious
23   infraction in my opinion, and that was the
```

1   one we've talked about with the shank.

2   There were other disciplinary infractions

3   that he was written up for during that first

4   10-year period.  And my rough calculation of

5   this was that in the first 10 years about 85

6   percent of the total number of disciplinary

7   infractions that he engaged in occurred.

8           In the final seven years of his

9   incarceration there were about 15 percent of

10  the infractions that were left.  And by the

11  time -- as we got closer and closer to the

12  end, there were fewer and fewer of them.

13  Q       And is that consistent with your

14  opinion that Mr. Gavin became

15  institutionalized?

16  A       Yes.  He learned how to adapt

17  himself, his habits of thinking and acting

18  to the requirements of the institution.

19  This is what the prison wants of prisoners,

20  and you can understand why.  But it can be

21  problematic for people once they're

22  released.

23          MS. CASEY:  Is this a good time

```
 1    to take a restroom break?

 2            MS. SCHIFF:  Oh, sure.

 3            (A break was taken at 11:21 a.m.

 4            and the deposition resumed at

 5            11:26 a.m.)

 6    Q        (BY MS. SCHIFF:)   You mentioned

 7    that Mr. Gavin appeared to adapt to life in

 8    prison.   In your view what are the -- some

 9    of the day-to-day realities of prison life?

10    What are the kinds of things that prisoners

11    generally deal with on a regular basis?

12            MS. CASEY:  Object as to form.

13    A            Again, prison requires a lot of

14    psychological accommodation.   This includes

15    something I alluded to earlier.   You have to

16    become dependent on the rules and the

17    structure of the institution which govern

18    virtually all aspects of your behavior.

19            Obviously people in the outside

20    world are expected to follow certain rules

21    and regulations, but there's an enormous

22    area -- or there are enormous areas of our

23    life where we have total discretion over
```

1   what we do and how we do it.  In prison this

2   is not the case.

3          So, things like where you sleep

4   and when you sleep and what you eat and

5   where you eat and what kind of clothes you

6   wear and how much toilet paper you use and

7   all of these things are very carefully

8   regulated, and you must comply to the

9   demands of the institution with respect to

10  these things.

11         And so there are fewer and fewer

12  areas of your life where you make any

13  decisions at all.  And over a long period of

14  time people begin to lose their capacity to

15  make decisions in a meaningful way.  Because

16  the more straightforward way to govern your

17  behavior is simply to governate as a

18  function of what the institution is telling

19  you to do and what the institution is

20  telling you in terms of where you should go

21  and how you should be.

22         The other thing that begins to

23  happen is that you live in an environment

1  where you are surrounded by risks and

2  dangers.  And people learn fairly quickly to

3  become hypervigilant or to become

4  particularly sensitive to threats from other

5  people.  They become weary.  They can become

6  weary and suspicious and distrustful of

7  other people.

8        You learn in this regard not --

9  typically not to show weakness because

10  weakness is a sign of potential

11  vulnerability.  And some people in that

12  immediate environment may see that as a --

13  as an opportunity to exploit you or to

14  victimize you.

15        MS. CASEY:  Will you mark that,

16  please?

17  A        And so people become relatively

18  unwilling to acknowledge problems which

19  they're having.  And as I say, weakness is

20  one of the vulnerabilities which they may

21  experience.

22        Sometimes people withdraw from

23  the surrounding environment.  And so, for

1   example, you see in Mr. Gavin's case he goes

2   into protective custody at some sacrifice to

3   himself.   Protective custody is not an easy

4   place to live.

5         So, he withdraws there partly

6   because he's frightened or concerned about

7   the larger prison society, and yet at the

8   same time he ends up in an environment where

9   there was a fair amount of isolation from

10  other people.

11        Prisoners also live under very

12  diminished circumstances.   They learn to

13  live without privacy.   They learn to live

14  without many of the kinds of goods and

15  services, if you will, that people in the

16  free world come to take for granted.

17        They often times live under very

18  inhospitable and deteriorated living

19  conditions, and many times they feel like

20  they're being treated very badly by these

21  conditions.   And sometimes they begin to

22  internalize those things and come to think

23  of themselves as the kinds of people who

1  deserve this -- this kind of treatment and

2  nothing more.

3        So, it can have a negative effect

4  on your self-esteem.  It can lead to periods

5  or bouts of sadness, a sense of

6  hopelessness, a lack of direction in their

7  life.

8        And it can create enormous

9  problems if you've been disconnected from

10 the outside world and from contact with the

11 outside world in terms of renewing

12 relationships with people once you are --

13 once you're released.

14 Q        You mentioned that being

15 incarcerated for long periods of time can

16 give prisoners a diminished sense of

17 self-worth.  Are you aware that Mr. Gavin

18 talked about that upon his release from

19 prison he was depressed?

20 A        Yes.

21 Q        And that's consistent with

22 your -- with the fact that he was

23 institutionalized?

1  A       Yes.  He told me the same thing,

2  that he felt sad and depressed.  And it's

3  the kind of thing that I -- many prisoners

4  have told me they anticipate great happiness

5  once they're released.  It's something that

6  they've looked forward to you for years and

7  years and years.  And then upon being

8  released they find that they're faced with a

9  number of enormous, seemingly insurmountable

10  obstacles and they tend to find themselves

11  becoming what they describe as depressed or

12  sad or feeling hopeless.

13  Q       And what effect can

14  institutionalization have on an inmate's

15  relationships upon release?

16  A       This is a devastating consequence

17  of institutionalization.  This is part of

18  what we dealt with with the Department of

19  Health and Human Services.  It's a huge

20  issue in the prisoner reintegration programs

21  that have been developed throughout the

22  United States.

23          There are two components to it.

1    One component is the simple fact of

2    separation and distance -- emotional and

3    psychological distance from one's family.

4          Unless a prisoner is fortunate

5    enough to gets lots and lots of visits --

6    and Mr. Gavin was not -- then family

7    relationships and -- and social

8    relationships begin to erode.  Family

9    connections and ties are fragmented and

10   fractured.  And so there is an emotional

11   distance that gets created between the

12   prisoner and the people to whom he will

13   return.

14         And then the other thing that

15   happens is that once somebody comes out of

16   prison, they have in many ways lost the

17   capacity to form intimate, genuine

18   connections with people.

19         For many prisoners these things

20   begin to come back over a period of months

21   or years, but the initial transition is very

22   difficult because they have lived in an

23   environment where you are not supposed to

1   show weakness, where you are not supposed to

2   show vulnerability, where you're not really

3   in a position to have intimate -- intimate,

4   close personal relationships with people.

5          And then you come back into an

6   environment where those things are expected

7   of you, where that's how you form a

8   relationship with somebody.  You form

9   relationships by sharing events, by sharing

10  concerns, by talking about vulnerabilities,

11  by engaging in intimate conversation and so

12  on and so forth.

13          Prisoners are not in a position

14  to even express affection over the period of

15  time or during the period of time that

16  they're incarcerated.  They don't of course

17  have intimate or sexual relationships or

18  typically don't on a long-term basis where

19  they're affectionate with one another.  They

20  have very few opportunities to express

21  affection even -- even in passing with

22  members of the opposite sex.

23          And so again, these are all kinds

1  of things that they have to relearn once

2  they get out of prison and they have to

3  overcome these barriers of reconnecting with

4  the world that has changed in a very

5  significant way when you're talking about a

6  period -- a hiatus of 17 years when you come

7  back into a family that is fundamentally

8  different and you encounter people who are

9  now 17 years older than they were when you

10  left, when you encounter a world that has

11  changed 17 years' worth since you left it.

12  Q    . . . And if a prisoner is released and

13  enters a family that is considered

14  dysfunctional or has a lot of problems, what

15  effect can that have on his release or on

16  his behavior upon release?

17  A        Well, it's a huge problem.

18  I mean, the only -- in my experience the

19  only way that prisoners make it when they

20  come out is if they go back into a very

21  warm, supportive, stable family where

22  they -- where the family is able to

23  concentrate on the prisoner's problems and

1  needs or if they -- and you -- hopefully --
2  and -- and they get -- they get counseling.
3  They get help.  They get transitional
4  service.  They get put in counseling groups
5  or therapy groups where they are given an
6  opportunity for people to talk them through
7  some of the kinds of problems that I've been
8  talking about.
9         If they don't get any -- if they
10 don't get the latter and they come into a
11 family that is beset with its own problems
12 and they're not going to get the kind of
13 attention and the kind of focus that they
14 need, then there's really nobody to help
15 them through this transitional period.  And
16 so the effects of institutionalization or
17 prisonization are things they're going to
18 have to grapple with on their own, and most
19 people do this very ineffectively.
20 Q        And in your view what effect did
21 Mr. Gavin's situation of being released into
22 a family with a lot of problems have on
23 his --

```
 1           MS. CASEY:  Objection.  Asked and
 2   just answered.
 3   Q        Mr. Gavin specifically.
 4   A        Well, he did enter a family that
 5   was beset with a lot of their own problems.
 6   And he talked to me about his brothers
 7   dealing with problems.  His mom -- you know,
 8   he was -- he felt very guilty about the
 9   situation that his family was in and
10   particularly -- he felt particularly
11   troubled by the fact that he was not in a
12   position to do anything to help; that he had
13   left this family, at least in his own mind,
14   as having been a person who was able to help
15   his brothers and sisters in some way,
16   provide them some kind of minimal guidance.
17   He was able to help them a little bit
18   economically and had been, he thought,
19   looked up to as a kind of provider and a
20   kind of significant figure in the family.
21           And now he was coming back 17
22   years later with his siblings grown up and
23   having very serious problems many of them,
```

1  his mom still struggling and him as now a

2  39-year-old man who should have been in a

3  position to do something about this and help

4  in a significant way, but he -- he felt

5  unable to.

6          He told me -- and it makes

7  sense -- that it diminished him.  He felt as

8  though he was -- he was unable to address

9  any of these important issues.  And I think

10 that's part and parcel of the

11 institutionalization problem I've been

12 talking about.

13         He was not prepared to re-enter

14 society.  He came back having problems that

15 you would anticipate somebody having and he

16 came back to a family that needed his help

17 rather than being in a position to help him.

18 Q        And do the records indicate if

19 Mr. Gavin was provided any counseling of any

20 kind prior to his release?

21 A        There was no -- there was no

22 record of that anywhere in -- in the file

23 that I could find throughout the -- not only

 1   prior to his release but in the course of
 2   his entire 17 years.
 3   Q        And even if Mr. Gavin was never
 4   diagnosed with a mental illness, does that
 5   mean that he shouldn't have had counseling
 6   upon release or at any time during his
 7   prison sentence?
 8   A        No, absolutely not.  We're
 9   talking about -- talking about somebody who,
10   first of all, went into prison for a very
11   serious crime and so therefore has to have
12   had some kinds of problems that prison
13   systems typically feel compelled to address.
14           I mean, this is a very serious,
15   violent crime and ordinarily some kind of
16   treatment or therapy or counseling is
17   provided to somebody whether or not they
18   have a diagnosable mental disorder before
19   they are released.
20           In addition to that, for the
21   reasons that I have been describing, he
22   lived in an extraordinary society for 17
23   years.  And it is widely understood in

1   corrections that people who live in these
2   places for that length of time suffer from
3   the effects of institutionalization.  This
4   is not just a psychological theory.  It's a
5   correctional theory.  It's well understood
6   in corrections.

7          And that if somebody is going to
8   make a successful transition, they need to
9   have help in order to do that.  They need to
10  be given practical advice about certain
11  things they need to do, how to get a
12  driver's license, how to get a birth
13  certificate, how to do a job interview and
14  so on.

15         And they need to be given
16  psychological help, how to deal with living
17  in such a -- such an unusual and potentially
18  psychologically damaging environment for 17
19  years and now moving into another world
20  where things that you haven't done for 17
21  years are going to be expected of you now by
22  everybody around you.  And you need -- you
23  need help to be able to understand that and

1    you need help to be able to do that.  He

2    didn't get any of that.

3    Q        And again, is this the kind of

4    information that could have been presented

5    to the jury during the mitigation phase of

6    Mr. Gavin's trial?

7    A        Of course.

8    Q        I want you to assume that when

9    Mr. Gavin was released from prison he

10   entered a dysfunctional family situation

11   that was chaotic and where there were no

12   rules or structure and that along came a

13   seemingly successful authority figure,

14   Dewayne Meeks.  Would the fact that

15   Mr. Gavin had been institutionalized make it

16   more likely that he would follow Meeks'

17   command?

18   A        Sure.

19   Q        Why is that?

20   A        Well, Mr. Gavin spent 17 years

21   taking orders from people like Mr. Meeks.

22   Q        Who is Dewayne Meeks?

23   A        Dewayne Meeks is his cousin

1  employed at the time Mr. Gavin

2  re-encountered him after his release from

3  prison as a correctional officer at the

4  Illinois Department of Corrections.

5  Q        And Mr. Meeks was a co-defendant

6  in the case at one time, correct?

7  A        Yes, that's what I understand

8  from the documents.

9         MS. CASEY:  I'm going to object

10 as to the co-defendant.  He was never a

11 co-defendant with this defendant.  He was

12 indicted, but they were not indicted

13 together.

14 Q        (BY MS. SCHIFF:)  And how could

15 Mr. Gavin's institutionalization affect his

16 behavior with Mr. Meeks in his position as a

17 correctional officer?

18 A        Well, the relative status between

19 the two of them would have been dramatic and

20 was dramatic in my opinion.  We have a

21 correctional officer who was -- who would

22 have been in an institutional setting a

23 person in charge, a person to whom Keith

1    Gavin would have had to have complied with,

2    followed orders given by; over the years

3    would have undoubtedly learned to do that

4    implicitly, intuitively.

5        I mean, it's part of the

6    institutionalization process not to -- not

7    to question, not to -- but rather to --

8    rather to do what you were told.

9        Now, nobody can do this a hundred

10   percent, but people learn how to do it.

11   They're conditioned to do it.  They're

12   socialized to do it when you're in prison.

13   And you would assume that this would

14   carry -- or I would assume it would carry

15   over into free world society.

16       Mr. Gavin also talked with me

17   about feeling disoriented and not quite

18   understanding what he was supposed to do

19   when he got out of prison, how to get his

20   life in order, implement plans, figure out

21   how to -- how to do the kinds of things that

22   he was supposed to do in order to get a

23   job.  He applied for jobs, but he wasn't

1  sure why he wasn't succeeding and so on.

2  And this --

3          MS. CASEY:  I'm going to object

4  now as to non-responsive.  The question was

5  about Meeks and whether or not any type of

6  influence Meeks would have had on Gavin when

7  he got out of prison.  At this point he's

8  talking about job selections.

9  Q          (BY MS. SCHIFF:)  Okay.  We'll

10 get to that in just a moment.

11         MS. CASEY:  And I'm going to ask

12 the court reporter to read back to me from

13 what he just testified.  I would assume this

14 is correct, could you please read that back

15 to me?

16         MR. MARSHALL:  Do you have an

17 objection?

18         MS. CASEY:  No.  I want to

19 hear -- I want it to be read back from the

20 record.

21         MR. MARSHALL:  For what purpose?

22         MS. CASEY:  Because -- okay.

23 Mark it.  I'll read it during the break.

1    Q        (BY MS. SCHIFF:)   Could the fact

2    that Mr. Gavin was aware that Mr. Meeks

3    possessed a firearm also have influenced his

4    behavior?

5    A        Well, sure.  Again, you're

6    talking about somebody living in an

7    environment where there are people with

8    firearms who are in control.  And that's

9    the -- that's the nature of a prison

10   setting.  And they give the orders and you

11   comply.

12   Q        What's your understanding of

13   Mr. Meeks' educational history at the time

14   that Mr. Gavin was released from prison?

15   A        He I think was just short of

16   having a college degree.  That's what the

17   documents suggested.

18   Q        And how could the fact that

19   Mr. Gavin was institutionalized affect his

20   behavior with someone significantly more

21   educated than himself?

22   A        Again, there's a status

23   differential between -- Mr. Gavin had gotten

1   his GED degree in -- in prison, but he

2   had -- he had only taken a few college

3   courses in prison and certainly was not

4   anywhere near as well educated as

5   Mr. Meeks.  And so that would have enhanced

6   the status difference between them.

7   Q        And what is your understanding of

8   Mr. Meeks' physique at the time Mr. Gavin

9   was released from prison?

10  A        Well --

11          MS. CASEY:  Objection as to

12  relevance.

13  A        -- Mr. -- it's my understanding

14  that Mr. Meeks was an ex-football player,

15  was a weight lifter and was pretty

16  physically imposing.

17  Q        So, you would assume that he was

18  significantly bigger than Mr. Gavin?

19  A        Mr. Gavin --

20          MS. CASEY:  Objection as to

21  speculation, if you're going to ask him to

22  assume.

23  Q        So, Mr. Meeks was significantly

1   bigger than Mr. Gavin in your opinion?

2          MS. CASEY:  Objection as to

3   leading.

4   A          Mr. Gavin in the documents is

5   described as weighing about a hundred and

6   forty-five pounds.

7   Q          And what effect --

8   A          So, there appears to have been a

9   significant differential between them.

10  Q          And what effect could that have

11  on Mr. Gavin's institutionalization -- what

12  effect did Mr. Gavin's institutionalization

13  have on his behavior with someone who was

14  significantly bigger than him?

15  A          Well, again, this is a man who

16  has learned how to -- learned how to comply

17  and be concerned about issues of physical

18  intimidation and has himself been in

19  protective custody units because of his

20  victimization.  So, it would be a carryover

21  into the free world.

22  Q          And are you aware that Mr. Gavin

23  testified at his Rule 32 hearing and in his

1    affidavit that he was being unduly

2    influenced by Dewayne Meeks?

3    A         Yes.

4    Q         And that's consistent with

5    institutionalization?

6          MS. CASEY:  Objection as to

7    leading.

8    A         The potential to be influenced by

9    others, particularly others with these kind

10   of characteristics, particularly

11   correctional officers, it is certainly

12   consistent with institutionalization.

13   Q         And in your view would this

14   information have been relevant in the

15   mitigation phase of Mr. Gavin's trial also?

16   A         Yes, it would have been broadly

17   relevant to explain his behavior generally

18   and even specifically.

19   Q         And in your opinion was there any

20   other evidence of Mr. Gavin's institutional

21   history -- I think you mentioned

22   institutional failure.  Do you believe that

23   that should have been presented at the

1  mitigation phase of Mr. Gavin's trial?

2  A      I do.

3  Q       And what specifically -- what

4  specific evidence of institutional failure

5  could trial counsel have put before them?

6  A       Well, the Illinois Department of

7  Corrections had Keith Gavin in their custody

8  for 17 years.  And based on the records that

9  I reviewed and my interview with Mr. Gavin,

10  they do not appear to have done anything to

11  deal with any underlying psychological

12  issues or problems that he may have had.

13       Quite apart from any diagnosable

14  mental disorders, there are a range of

15  issues that prison systems understand are

16  useful to deal with inmates about before

17  they are released.

18       With respect, for example, to

19  inmates who have engaged in a violent crime,

20  things like anger management and so on,

21  programs for prisoners to be given an

22  opportunity to participate in.  There were

23  no such programs in the Illinois Department

1   of Corrections, and Mr. Gavin was not part

2   of them.

3          He was not counseled by anyone.

4   There was not a single therapeutic hour that

5   I could see that he spent with anybody

6   talking about the effects of these risk

7   factors that we talked about earlier, the

8   kinds of things that happened to him earlier

9   in his life and so on.  Those kinds of

10  things were not addressed by anyone with him

11  in the Department of Corrections.

12          In a more practical sense, he was

13  not in any kind of significant or meaningful

14  vocational training program that would have

15  prepared him for a job in the outside world

16  that was a career path for a 39-year-old man

17  being released into free society.

18          MS. CASEY:  Will you mark that,

19  please?

20  Q        (BY MS. SCHIFF:)  Let's talk

21  about his employment history while in

22  prison.  Based on your review, what kind of

23  jobs did Mr. Gavin hold while -- while

1    incarcerated?

2    A         Well, he held an enormous number

3    of jobs, almost all of which with a very few

4    exceptions were menial labor jobs, which

5    would not have provided him with any

6    particular vocational training or skills

7    which he could have used as a means of

8    acquiring any kind of significant or

9    meaningful employment once he was released.

10         And I went through his

11   institutional records and identified the

12   various jobs which he held, many of which

13   were jobs that he held for only a very short

14   period of time, sometimes for a day.

15         What he describes and what is

16   reflected in his records is that the

17   institution put him to work when it needed

18   something to be done, which is -- which

19   makes perfect sense from an institutional

20   perspective.

21         But from Mr. Gavin's perspective,

22   he was not being provided with any

23   long-term, consistent training that would

1  give him the skills with which he could

2  obtain employment once he was released or

3  indeed show a potential employer that he had

4  these level of skills, that he obtained

5  these certifications, et cetera.

6          There's no evidence of

7  certifications of any kind except the GED,

8  which he acquired. Not insignificant, but

9  something he acquired near the end of the

10  period he was incarcerated.

11         And here are the jobs that he

12  worked starting from when he was in the --

13         MS. CASEY: I'm going to object

14  as non-responsive at this time. There is no

15  question before him to which he is

16  testifying. He is simply just talking.

17         Now, if counsel would please put

18  questions to the witness, I think we can

19  move through this a lot quicker.

20  Q     (BY MS. SCHIFF:) Dr. Haney, can

21  you describe the jobs that Mr. Gavin held

22  while in prison specifically?

23  A     Sure. He was --

```
1              MS. CASEY:  I'm going to object
2    as to relevance.
3    A         He was a utility man, a janitor,
4    a carpenter, a plumber, a utility man, a
5    transit man, a utility man, a transit man, a
6    janitor, a warehouseman in the general
7    store, a clerk, a floor man in the dining
8    room, a food cart man in the dining room, a
9    transit man in the general store, a
10   warehouseman in the general store, a floor
11   man in the dining hall, a kitchen worker, a
12   floor man in the kitchen, a cook, a transit
13   man, a kitchen worker, a janitor, a
14   plumber's helper, a labor pool worker, a
15   janitor, a janitor in one wing, a janitor in
16   another wing, a janitor in a third wing, a
17   night worker in the south house, extra help
18   in the dietary department, an operator in
19   the data entry unit, a clerk in the library,
20   a worker in the dietary department, a
21   housing unit worker and a housing unit
22   worker in another housing unit.
23   Q         And in your opinion were those
```

```
 1  considered mostly menial jobs?

 2  A        They were overwhelmingly so, and

 3  in addition, many of them held for only a

 4  very brief period of time.

 5  Q        And in your opinion would any of

 6  those jobs have prepared Mr. Gavin to gain

 7  meaningful employment upon release from

 8  prison?

 9           MS. CASEY:  Objection as to

10  outside this witness' expertise.  There's

11  been no testimony as to whether or not or

12  how he knows what meaningful employment is,

13  how he makes that determination, how it

14  would have been done back in 1999 or '98 --

15  I mean, '97 when he was released.  None of

16  that information is on the record for this

17  witness to make any type of conclusion such

18  as that.

19  A        No, none -- none of them in my

20  opinion would have prepared him.  He --

21  there are prison vocational training

22  programs where prisoners learn actual skills

23  and get certificates, actually get certified
```

1  to do certain kinds of things. This is
2  critically important.

3      Again, this is part of the work
4  we did with the Department of Health and
5  Human Services, and it's issues I've been
6  looking at for a long time, what kind of
7  prison rehabilitation programs help people
8  to actually reintegrate into free society
9  and get work.

10      This is -- this is in my opinion
11  evidence of somebody who was moved hither
12  and yon, willy-nilly around the prison
13  system to do the jobs the prison needed,
14  not -- there is no certificate. There's no
15  vocational training program that he
16  completed that he could have used to show an
17  employer, a potential employer that despite
18  being an ex-convict that he had learned
19  particular skills in prison which would
20  qualify him to do anything other than the
21  kind of job for which anybody could compete,
22  mainly the kind of menial labor jobs that he
23  had been doing in prison.

1   Q        Are you aware that Dr. King

2   testified at the Rule 32 hearing that

3   Mr. Gavin was employed the whole time he was

4   in prison?

5   A        Yes, I am.

6   Q        And is that consistent with the

7   records -- the Illinois Department of

8   Correction records that you reviewed?

9   A        That's significantly factually

10  wrong.  I have no idea how or why Dr. King

11  would have asserted that.  It's very clear

12  from the prison records that he was -- he

13  was employed about 10 percent of the time

14  that he was in prison.  The prison records

15  show starting and ending dates of his

16  employment.

17          So, these are jobs that are

18  listed, but they are jobs that end at

19  particular points in time.  And then there's

20  no jobs for months after that.

21          So, he was clearly not -- he was

22  clearly not employed for most of the time

23  that he was in prison, not just -- not was

1   pretty much consistently employed.  Most of

2   the time he was not employed and when he

3   was, I just read you the kind of jobs he was

4   employed in.

5          MS. CASEY:  I'm going to ask that

6   that be marked as an exhibit, if he's

7   referring to it.

8          MS. SCHIFF:  The prison records?

9          MS. CASEY:  That -- well, mark it

10  right now so that it can go in this

11  deposition, what's been -- actually been

12  discussed from it, or I can mark it on

13  cross.  I want that put in this deposition.

14  Attach it as an exhibit to --

15         MS. SCHIFF:  This (indicating)?

16         MS. CASEY:  Whatever he just read

17  off of.

18         MS. SCHIFF:  Let's mark this as

19  Defendant's Exhibit 12.

20         (Defendant's Exhibit No. 12

21         was marked for identification.)

22  Q      (BY MS. SCHIFF:)  Is that one

23  record of Mr. Gavin's employment from --

1  A         Yes.  It shows his housing and it

2  shows his employment.

3              MS. CASEY:  Can I see that,

4  please?

5              MS. SCHIFF:  (Indicating).

6  Q         (BY MS. SCHIFF:)  And based on

7  your review of the records, did Mr. Gavin's

8  educational experience in prison help

9  prepare him to find gainful employment upon

10  release?

11  A         Yes and no.  He obtained his

12  GED.  A couple of years before he was

13  released from prison he obtained his GED.

14  And that's not unimportant.  But in -- it's

15  not -- it's not a particularly -- it's not a

16  particularly useful certificate to have

17  in -- in the job market.  I mean, it is

18  obviously certification of the lowest level

19  of academic achievement.  And I'm not

20  suggesting it's insignificant that he

21  obtained it.  I'm glad that he did.

22              But other than that, there were a

23  few college courses that he took.  You know,

```
 1   I saw, for example, when he was released
 2   from prison -- right before he was released
 3   in 1996 he took a couple of courses.  He was
 4   in a world issues course, political science
 5   and sociology.  I think those are great
 6   courses to take.  It's not clear to me how
 7   they would lead a man in his position to
 8   employment.
 9   Q        And when -- what year did
10   Mr. Gavin receive his GED?  I apologize if
11   you already said that.
12   A         I believe it was 1987.  Let me
13   see if I can -- oh, excuse me.  No, it
14   wasn't.  It was 1993.
15   Q        1993.  So, that was --
16   A         It was a few years before he was
17   released.
18   Q        A few years before he was
19   released.  And do you believe that any --
20   you mentioned a couple of college classes.
21   Do you believe that those classes could
22   prepare him to enter the free world upon
23   release and find a job?
```

1   A        Well, not the specific content of

2   the classes that he -- I mean, again, these

3   are fine courses and I'm glad he took them.

4   But I'm not clear on how taking a class in

5   sociology would lead to employment not given

6   the situation he was in.

7          He had a long way to go, for

8   example, for a college degree and that --

9   and that would be something that would be

10  useful to him clearly.  So, this wasn't

11  irrelevant, but it hardly prepared him once

12  he got out for any kind of meaningful

13  employment.

14  Q          Now, are you aware at trial that

15  Dr. King testified -- I mean, I'm sorry, are

16  you aware that Dr. King testified at the

17  Rule 32 hearing that Mr. Gavin was regularly

18  taking college courses while incarcerated?

19  A          Yeah.

20  Q          And is that consistent with the

21  review of his records?

22  A          No, it's not at all.  It's not at

23  all consistent.  There were a couple of

```
 1   instances of him being enrolled in a college
 2   course even before he had gotten his GED.
 3   So, it's unclear what kind of a college
 4   course that was or what kind of -- what kind
 5   of benefit he would have obtained from
 6   sitting in on a college class even before he
 7   obtained a GED degree.
 8            But the college courses that he
 9   participated in were few and far between.
10   And the only -- the only actual ones that he
11   participated in after he obtained his GED
12   are the ones that I read to you.
13   Q        And should this evidence of
14   institutional failure that we just talked
15   about have been presented to a jury during
16   the mitigation phase of trial?
17            MS. CASEY:  Objection as to --
18   Q        In your opinion.
19            MS. CASEY:  -- his opinion.
20   A        Yes.
21   Q        And in your experience what
22   effect does evidence of institutional
23   failure have upon capital jurors?
```

```
 1            MS. CASEY:   Objection.
 2   Speculation as to any type of -- how this
 3   witness can testify as to what effect his
 4   testimony would have had on 12 jurors in
 5   Centre, Alabama 13 years ago -- or 12, 11
 6   years ago.
 7   Q       Based on your research -- have
 8   you done any research on the effect of
 9   evidence of institutional failure upon
10   capital jurors?
11   A       Again, these are some of the
12   kinds of things that jurors find mitigating,
13   an understanding of somebody's social and
14   institutional history; including
15   institutional failure is something that
16   jurors in general find mitigating.
17   Q       And we talked about the potential
18   for future prison adjustment.  Did you
19   evaluate whether or not Mr. Gavin was a good
20   candidate for future prison adjustment?
21   A       Yes.
22   Q       And what did you conclude?
23   A       Oh, I concluded that he was,
```

1    certainly.

2    Q        And why is that?

3    A        Well, it was based on several

4    things.  One is that his overall

5    institutional record in the Illinois

6    Department of Corrections was very good.

7              So, we're talking about somebody

8    who was in prison for 17 years and who has

9    in my opinion one serious write-up, no

10   violence where he initiates violence against

11   another person in prison and no violence at

12   all against correctional staff.

13             In addition to the general

14   overall record, he's -- the pattern of

15   institutional adjustment improved over

16   time.  You would expect that to be the case

17   for reasons that I will mention in a second,

18   but seeing that is the case is important.

19             So, this is a man who has learned

20   how to live in an institutional environment,

21   to adjust well in that environment, to adapt

22   his conduct to the requirements of that

23   environment and that, too, bodes well for

1  his ability to adjust in the future.

2         And the final factor is -- is his

3  age.  He is a person who is entering middle

4  to older age in prison by prison society

5  standards.  There is a very reliable

6  phenomenon identified in the criminological

7  literature called Aging Out.  And aging out

8  occurs in terms of criminal behavior in the

9  society at large and in terms of

10  disciplinary infractions inside the prison

11  itself.

12         So, the older people -- all other

13  things being equal, the older somebody is

14  the better a candidate they are for positive

15  adjustment in an institutional setting

16  because the assumption is they will have

17  aged out.

18         Most of the disciplinary

19  infractions that are engaged in in prison

20  settings are engaged in by younger prisoners

21  who are jostling for position and staking

22  out their territory and establishing their

23  reputations.

```
 1            By the time somebody gets to be
 2   39 years old, those issues are behind them
 3   for the most part.  And they're not only
 4   physically older and less able to
 5   participate in those activities, but they're
 6   also socially and emotionally more mature.
 7   And that process will be expected to
 8   continue over time.
 9            Mr. Gavin looked like he was
10   already in it, in that aging-out period
11   while -- while he was institutionalized.
12            When he was in the Illinois
13   Department of Corrections, I told you about
14   his very good adjustment near the very end
15   of that period, and you would expect that to
16   be resumed once he went back into prison.
17   Q        And in your opinion should trial
18   counsel have presented evidence of
19   Mr. Gavin's future prison adjustment?
20   A        Yes.
21   Q        And in your experience what
22   effect does evidence of a defendant's likely
23   prison adjustment have on a juror, on a
```

1  capital juror?

2  A         Again, it's --

3              MS. CASEY:   The same objections

4  ongoing on this line of questioning as to

5  speculation and completely irrelevant.

6  A         It's an important mitigating

7  effect.  Jurors are often concerned about

8  the future, what's going to happen with this

9  guy if and when we send him to prison.  And

10  evidence to the effect that he's going to

11  have a positive adjustment is important for

12  them to be reassured of.

13  Q         Have you written an article that

14  concluded that capital jurors are less

15  likely to sentence a defendant to death if

16  they don't view them as a threat to society

17  and the community?

18  A         Yes.

19  Q         And in your opinion should the

20  jury have been aware of this in determining

21  whether to sentence Mr. Gavin to life

22  without parole or to sentence him to death,

23  his potential for positive future prison

1  adjustment?

2  A          Yes, of course.  It's important

3  to be reassured that this is a person who is

4  going to go to prison and not be a threat to

5  other people in prison, if that's the case,

6  if that's true, and I believe in this case

7  it was.

8  Q          And have you done any research or

9  written any articles on the effect of

10  mitigation evidence on jurors generally?

11  A          Yes.

12  Q          What were those?

13  A          Oh, I --

14  Q          A couple of examples.

15  A          I supervised several

16  dissertations in which my graduate students

17  and I interviewed capital jurors about what

18  was important to them.  I also have done

19  surveys, statewide surveys in which jurors

20  have been asked questions -- potential

21  jurors have been asked questions, persons

22  who are eligible to be jurors have been

23  asked questions about what kind of things

1    they find mitigating and aggravating.

2         And those -- those two kinds of

3    studies were synthesized in a couple of

4    papers, one in the Santa Clara Law Review

5    and another that was published in the

6    Stanford Law Review.

7    Q    And did you rely on those

8    articles -- you mentioned the Santa Clara

9    and the Stanford Law Review articles -- in

10    reaching your opinions in this case?

11    A    Yes.

12    Q    And were they referenced in your

13    declaration?

14    A    Yes.

15         MS. SCHIFF:  I would like to

16    submit these as Defendant's Exhibits 13 and

17    14.

18         MS. CASEY:  Objection as to

19    hearsay.  Any type of article outside of

20    the -- that he wrote is completely

21    irrelevant.  If she wants to refer to

22    certain sections -- assuming in this case he

23    didn't just cut and paste it into his report

```
 1    like he usually does, then that might be
 2    different.
 3              But if you're going to discuss --
 4    if we're going to discuss those full
 5    articles, I'm going to object to them
 6    because they're hearsay unless you can show
 7    me where in the article they're referred to
 8    and the specific sections that he's going to
 9    testify to.
10              MS. SCHIFF:  Would you like a
11    copy?
12              MS. CASEY:  Then I'm going to
13    want to take an hour or two to sit there and
14    read it.
15              MS. SCHIFF:  I was just wondering
16    if you would like a copy.
17              MS. CASEY:  Okay.  We're going to
18    have to go into break then.
19                   (Defendant's Exhibit Nos. 13 and
20                    14 were marked for
21                    identification.)
22    Q         (BY MS. SCHIFF:)  What's just
23    been marked as Defendant's Exhibit Number
```

1   13, is this the article that you wrote

2   entitled "Violence and the Capital Jury"?

3          MS. CASEY:   May I put on the

4   record that Counsel has just given me one

5   article that's 41 pages long and another

6   article that's 41 pages long that she's

7   attempting to introduce into evidence.  And

8   the State may have an ongoing -- a request

9   to have Dr. Haney redeposed once she has had

10  time to read these articles.

11          And in that case, the State would

12  put another motion before the Court as to

13  any type of expenses or time issues

14  concerning having Dr. Haney brought back to

15  Alabama to be deposed on those two articles.

16          MR. MARSHALL:   Well, I think we

17  should respond to that.

18          These are articles that are

19  referenced in the witness' CV as well as the

20  witness' report.

21          MS. CASEY:   I agree.

22          MR. MARSHALL:   So, your lack of

23  preparation would not be a valid ground for

1    seeking costs, and we will object to your

2    attempt to reopen the deposition.

3         MS. CASEY:  And let me just let

4    the Court also know that defense counsel has

5    not attempted to submit the other 31

6    different other articles that have been

7    submitted.  And it's kind of -- Counsel is

8    wondering why it's relevant that these two

9    law articles be introduced into evidence on

10   the record.

11        MR. MARSHALL:  That would be a

12   perfectly appropriate subject of

13   cross-examination.  I'm sure you have all

14   the articles.  You certainly have access to

15   them.  You've had access to them for months,

16   if not years.

17        MS. CASEY:  I am not disagreeing

18   with you.  Putting them into the record is a

19   different story.

20        MR. MARSHALL:  You're entitled to

21   do that.

22        MS. CASEY:  Fine.  I'm not going

23   to argue with you right now, Hank.  I'm

1  putting it on the record.

2        MR. MARSHALL:  Me, too.

3  Q        (BY MS. SCHIFF:)  In your view

4  and based on these articles, why is evidence

5  of a defendant's institutional history

6  generally relevant to mitigation?

7  A        Well, because it's part of

8  somebody's social history, first of all, and

9  social history is clearly relevant to

10  mitigation.  It's in many ways the

11  centerpiece of defending cases in

12  mitigation.

13        And secondly, it's particularly

14  important because, as I described earlier,

15  that these are things about which many

16  juries are unfamiliar.  And so learning

17  about the dynamics of institutional life and

18  how people are affected by those dynamics is

19  quite important.

20  Q        So, because jurors have

21  misconceptions of this, expert testimony is

22  particularly important on the subject?

23  A        They either have no knowledge or

1  the knowledge that they have is often times

2  erroneous.  So, providing an accurate

3  description of the way things work inside a

4  prison and how people are affected by those

5  things is important.

6  Q     Are you aware that the State's

7  expert, Dr. King opined that your

8  declaration holds the Illinois Department of

9  Corrections responsible for Mr. Gavin's

10  alleged criminal behavior rather than

11  holding Mr. Gavin himself responsible?

12  A     Yes.

13  Q     And how would you respond to

14  that?

15  A     Well, first of all, clearly

16  Mr. Gavin and not the Illinois Department of

17  Corrections was on trial.  So, nobody was

18  being held legally responsible for Mr. Gavin

19  but Mr. Gavin.

20        But talking about things that

21  helped to influence somebody, talking about

22  forces and factors in somebody's life that

23  have shaped their life and have shaped them

1  and have influenced or affected their

2  behavior is the essence of mitigation.

3       It's not saying someone else is

4  responsible.  It is explaining the

5  defendant's behavior in the context of that

6  defendant's past history including their

7  past institutional history.

8       That's what mitigation is.  It

9  doesn't hold anybody else responsible for

10  what the defendant has done, but it puts the

11  defendant's behavior in a context that

12  allows the jury to understand it and in the

13  appropriate case to reach a decision to

14  sentence them to life rather than death

15  because they understand the forces that have

16  helped to shape the defendant and influence

17  what he's done.

18  Q       And was any of the mitigation

19  evidence that we've discussed today

20  presented at Mr. Gavin's sentencing hearing?

21  A       No.

22  Q       And in your view was the jury

23  given any insight into Mr. Gavin's life in

1    prison and the effect that it had on him?

2    A        No, of course not.

3    Q        And were they given any insight

4    into the institutional failure of the

5    Illinois Department of Corrections to

6    provide him with training or counseling

7    services?

8    A        None.

9    Q        And were they given any insight

10   into Mr. Gavin's potential for positive

11   future adjustment at his original trial?

12   A        None.

13   Q        And you obtained all of this

14   evidence primarily through reviewing

15   Mr. Gavin's prison records and interviewing

16   Mr. Gavin, correct?

17   A        The information I've testified to

18   about his institutional history?

19   Q        Yes.

20   A        Yes.

21   Q        And do you have any reason to

22   believe that this information was not

23   available at the time of Mr. Gavin's

1   original trial in 1999?

2   A     Well, no.  I mean, quite the

3   opposite.  I'm sure it was available because

4   these records were generated at a much

5   earlier point in time.  These were -- these

6   are records -- the end date on the records

7   is 1997 when he was released from prison.

8   Q     And if you would have testified

9   at that original trial, you would have told

10   the jury about all of these issues, correct?

11          MS. CASEY:  Objection as to

12   leading.

13   A     Yes.

14   Q     Now I would like to talk a little

15   bit about your prior involvement in this

16   case.

17          Prior to Mr. Gavin's prior trail

18   counsel contacting you in May 2007 regarding

19   this Rule 32 petition, were you previously

20   aware of Mr. Gavin?

21   A     I was.

22   Q     And how?

23   A     I was contacted by an Alabama

1    mitigation investigator named Lucia Penland.

2    Q         And had you ever worked with

3    Ms. Penland before?

4    A         I had and not -- not in -- not

5    with respect to an Alabama case, but a case

6    in California which involved a young man who

7    had grown up in Alabama.  And she -- I --

8    she was a local person in Alabama who was

9    familiar with the Alabama prison system.

10   She worked I believe for the Alabama Prison

11   Project.

12            And so I met her in that context,

13   and she worked with -- with me and several

14   other people.  I wasn't the only person she

15   worked with.  There were some lawyers and

16   someone back here who she worked with as

17   well.

18   Q         And what was your understanding

19   of why Ms. Penland originally contacted you

20   about this case?

21   A         Well, I learned from e-mails that

22   you -- copies of e-mails that had been

23   exchanged between her and me -- I had

1  forgotten that she had called me in April of

2  1999 apparently about this case. I don't

3  even remember if she mentioned the name of

4  the case. And I -- it was a very brief

5  contact, and I don't remember having talked

6  to her about any of the specifics of the

7  case. She may have asked me for a CV or

8  something. I don't know.

9       And then she contacted me again

10  in October to say that the case was about to

11  go to trial and asking if I could work on

12  the case. And at that point I had to

13  decline.

14       But that was the -- that was the

15  first time I -- I remembered at least that I

16  had talked to her about this particular

17  case. As I say, it turns out that she had

18  called me earlier in April about the same

19  case, but I didn't realize that.

20  Q       So, in April 1999, you didn't

21  agree to assist on Mr. Gavin's case when she

22  contacted you?

23  A       No. I didn't have anything to

1   assist on.  I think it was a very brief

2   contact and I said if there are -- I would

3   have said what I always say, which is, you

4   know, if there are materials that you want

5   me to review, I'm willing to try to do that

6   time permitting, but let me know.

7            At that point it was very, very

8   vague.  As I say, too vague for me even to

9   remember what she would have talked to me

10  about.  And then there was no activity on

11  the case at least between Ms. Penland and

12  I.  I don't know what else was going on,

13  but -- until -- the next time I heard from

14  her was in October of 1999.

15  Q        And you mentioned Ms. Penland

16  didn't contact you after April '99 when she

17  briefly asked you if you might be interested

18  in working on the case.  Did anyone ever

19  contact you from -- did Mr. Gavin's trial

20  counsel ever contact you?

21  A        No, absolutely not.  No one -- no

22  one associated with this case ever contacted

23  me.

1  Q        And did Mr. Gavin's trial counsel

2  ever contact you?

3  A        Never.  I didn't know Mr. Gavin's

4  trial counsel's name until you contacted --

5  your office contacted me years later.

6  Q        So, in October 1999 when

7  Ms. Penland contacted you again, you

8  mentioned that you declined to -- you said

9  that you weren't able to testify on

10 Mr. Gavin's behalf.  Why not?

11 A        Well, there were a couple of

12 reasons.  One is that I -- that it was --

13 the trial was about to commence.  This was

14 in October of 1999.  It was in the middle of

15 a school term.  It was far too short.  In

16 other words, I could not possibly get ready.

17         But much more importantly, I had

18 no idea what my -- what my opinions would

19 be.  I had seen not a single document with

20 respect to the case.  I couldn't possibly

21 commit to doing testimony in a case that I

22 hadn't received and reviewed no documents

23 in.  I had no idea what it is they wanted me

1    to talk about or testify to.

2         The -- and I asked about prison

3    records.  Ms. Penland indicated to me that

4    the client -- her client had been in prison

5    for 17 years.  And I asked whether or not

6    they had prison records available, and she

7    said that they didn't, that they hadn't

8    obtained prison records.

9         And at that point it was clear to

10   me that I couldn't possibly -- I couldn't

11   possibly participate in the case.  There was

12   nowhere near enough time or nowhere near

13   enough information.

14   Q         Generally how long would it take

15   to conduct a proper analysis in your

16   experience after you get the records?

17   A         Well, it would take -- it would

18   take months to -- I mean, you need to get

19   the records, first of all.  And then you

20   need to look carefully at the records.  And

21   there are hours involved in that, 10 to 15

22   hours.  It would depend on how many -- how

23   voluminous the files were.  And then you

1   would typically need to interview the

2   client.

3           And so there -- and maybe --

4   maybe more than once, but maybe not

5   depending upon how much information was in

6   the files.  And you have -- you have to also

7   discuss what -- what kind of -- what kind of

8   testimony you were being expected or

9   anticipated to -- to present.

10          And none of those discussions

11  had -- had taken place.  And this is --

12  particularly in a case where the records

13  have not yet been obtained, this is often

14  times a very time-consuming process because

15  getting -- getting prison records is a

16  complicated business sometimes.  It requires

17  the cooperation of the Department of

18  Corrections.  They're not always eager to

19  leap to the task.

20          And so not having those records

21  in hand suggested to me that this was

22  probably -- we were probably looking at

23  months before we got the records, I and

1    perhaps somebody else had a chance to look

2    at the records, I had a chance to interview

3    the client, formulate an opinion.  This

4    could not be done from my --

5    Q    .    So, you didn't review any of the

6    prison records in preparation for the

7    original trial in this case?

8    A         I never -- I was never sent a

9    single piece of paper, let alone a prison

10   record.

11   Q         And based on your review of the

12   documents in this case, is there any

13   indication that trial counsel ever even

14   requested Mr. Gavin's prison records?

15   A         Well, I saw no indication of it,

16   none in any of the files that you sent me

17   and not in any of the materials that you

18   sent me.  And I was told by Ms. Penland --

19              MS. CASEY:  Objection.  Hearsay.

20   A         -- that they had not -- that they

21   didn't have them.  Now, I don't know whether

22   they had been requested or not.

23   Q         And that was in October of 1999?

1   A        Yes.

2   Q        So, as of October 1999, there was

3   no indication that Ms. Penland had ever seen

4   Mr. Gavin's Illinois Department of

5   Correction records?

6   A        Well, based on what she told me,

7   I was sure she hadn't.  She said they didn't

8   have them.

9   Q        And why is this significant in

10  your opinion?

11           MS. CASEY:  Objection.

12  A        Well, again, we're talking

13  about -- this is a significant 17-year

14  period of her client's life, his entire

15  adult life essentially behind bars.  And the

16  record of that is contained in the

17  institutional or prison files from the

18  Illinois Department of Corrections.

19           It's fundamental to understanding

20  the client, understanding his social and

21  institutional history, understanding his

22  behavior once he was released from prison,

23  fundamentally.

1   Q       And whose responsibility is it to

2   subpoena prison records?

3   A       The attorney's.

4   Q       And in your experience working

5   with defense counsel on capital cases is

6   counsel usually aware that it's their

7   responsibility to do so?

8           MS. CASEY:  Objection.  This is

9   now outside the scope of -- this is --

10  Q       Based on your experience.

11  A       On every legal team that I've

12  been involved with or connected to, the --

13  in a capital case the attorneys are the

14  people who direct these activities.

15  Q       And is that usually done

16  immediately because it takes so long to

17  subpoena those records?

18          MS. CASEY:  Objection.  Lack of

19  foundation that there's been any testimony

20  that there was a long amount of time to

21  subpoena records.

22  Q       You mentioned that it takes a

23  significant amount of time to get past

1  prison records.  In your experience working

2  with defense counsel, are those records

3  usually requested immediately because of

4  that?

5          MS. CASEY:  Objection.  There's

6  been no testimony that in this case there

7  was a long amount of time in order to

8  subpoena records.

9  A        Yes.  It's often times said in

10  literature, which is produced about how to

11  do capital mitigation investigation, first

12  get the records, get all the records.

13  That's the first thing you do.  And in

14  particular it's the first thing you do in

15  the case of prison cases because, as I said

16  earlier, it takes typically so long to get

17  them.

18  Q        And did Mr. Gavin's trial counsel

19  ever contact you about setting up an

20  interview with Mr. Gavin?

21  A        No.

22  Q        And in your experience who is

23  responsible for setting up the interview

```
 1  between you and a client?
 2  A         Well, the attorney has to do it,
 3  has to provide the legal authorization,
 4  indicate and certify to the prison system
 5  that I'm coming in as an agent of the
 6  attorney and need to be afforded an
 7  opportunity to do a legal interview.
 8  Q         So, in this case if you -- if
 9  Bayne Smith wanted you to work on this case,
10  you would have expected him to set up an
11  interview with -- between you and Mr. Gavin,
12  correct?
13  A         Among other things, I would have
14  expected him to talk to me, which he never
15  did, but certainly also to talk to the
16  prison to set up an interview.
17  Q         And to your knowledge, did Lucia
18  Penland or anyone else on the defense team
19  try to arrange an interview between you and
20  Mr. Gavin?
21  A         Not to my knowledge.
22  Q         Would you have been able to
23  assist with this case under other
```

1    circumstances, if you had had more time?

2            MS. CASEY:  Objection as to form

3    as to what other circumstances are.

4    Q       You mentioned that you weren't

5    able to assist with the case in October of

6    1999 because you didn't feel that there was

7    sufficient time and you hadn't seen any

8    records and you hadn't -- no one had tried

9    to set up an interview with you.  If all of

10   those things had happened, would you have

11   been able to assist with this case?

12   A       Yes.  I mean, I -- pending some

13   unforeseen circumstance, of course.  I can't

14   imagine why I wouldn't have.

15   Q       And had you testified, you would

16   have talked about all the issues related to

17   Mr. Gavin's institutional history that we

18   have discussed today, correct?

19   A       Yes.

20           MS. CASEY:  I would like to take

21   a break.

22           MR. MARSHALL:  Okay.

23           (A break was taken at 12:23 p.m.

```
 1              and the deposition resumed at
 2              1:01 p.m.)
 3   EXAMINATION BY MS. CASEY:
 4   Q         Dr. Haney, I'm Pamela Casey with
 5   the Attorney General's office.  I'm going to
 6   be asking you several questions.  If at any
 7   point you don't understand my question, just
 8   feel free to ask -- or ask me to restate it
 9   so we can make sure that we're on the same
10   page about a question.  All right?
11   A         Good.
12   Q         Let me just -- I'm going to have
13   to jump around because I want to cover
14   several things that Ms. Schiff talked to you
15   about, and then I'll have some questions
16   that I personally want to get into in
17   relation to the State's case or State's
18   response.
19              What is your personal opinion on
20   the death penalty?
21   A         I'm personally opposed to the
22   death penalty.
23   Q         So, you're opposed to the death
```

1    penalty; is that correct?

2    A        Yes, that's what I just said.

3    Q        And actually, you've stated that

4    to several media outlets, haven't you?

5    A        I'm not sure I have.

6    Q        You've never talked to the Los

7    Angeles Times about your opinions on the

8    death penalty and your opposition to the

9    death penalty?

10   A        I'm not sure I have.  I don't

11   recall.

12            MS. CASEY:  Can I mark this as

13   State's 101?

14            (State's Exhibit No. 101

15            was marked for identification.)

16   Q        (BY MS. CASEY:)  I'm going to

17   show you an interview that apparently you

18   did in September of last year with Carol

19   Williams.  And this is your name at the

20   bottom.  The professor queried several

21   Californians, yada, yada and asked if he had

22   a personal opinion about the death penalty.

23   He said his 30 years of work in the field

1  had led him to the conclusion that capital

2  punishment is unnecessary and cannot be

3  properly, fairly or effectively implemented.

4  A        Yes.

5  Q        Do you recall now having

6  conversations -- or stating your opinion

7  concerning the death penalty to the media?

8  A        Yes, I did in this particular

9  context in that way.

10  Q        So, it's your opinion that never

11  put anyone to death as a result of their

12  crime?

13  A        Yes, that's my opinion.

14  Q        Regardless of the crime they

15  committed?

16  A        That's correct.

17  Q        You are not actually licensed to

18  practice law, are you?

19  A        No, I am not a lawyer, have never

20  been.

21  Q        Did you ever sit for the bar

22  exam?

23  A        Never.

1    Q        Never in California, nowhere else

2    in the country?

3    A        No, never anywhere.

4    Q        You had indicated that you worked

5    on several capital cases; is that right, as

6    a defense expert?

7    A        More than several.  I have worked

8    on a number of them.

9    Q        Approximately how many?  And let

10   me -- let me just clarify this so that it

11   will make your answer easier.  I'm talking

12   about capital murder or capital punishment

13   cases where it's State versus defendant.

14   A        And worked on?  Not testified in

15   but worked on?

16   Q        Well, we'll break it down.  Let's

17   start with worked on.

18   A        I don't know.  I mean, there have

19   been -- there have been many of them and

20   they're in varying capacities.  I am often

21   times asked to review files, to give an

22   opinion about something.  It happens very

23   often.  I don't have any idea how many

1    times.

2    Q          More than a hundred?

3    A          Probably.

4    Q          More than 200?

5    A          I wouldn't think so.

6    Q          So, between a hundred and 200

7    cases that you've either consulted on or

8    actually maybe testified in?

9    A          Well, it's certainly not a

10   hundred that I've -- between a hundred and

11   200 that I've testified in, but where

12   people -- over the course of 30 some years

13   doing this kind of work it could certainly

14   be over a hundred.

15   Q          How many cases have you testified

16   in, capital murder cases where you have

17   actually gone and testified in court?

18   A          Again, an estimate, I would think

19   maybe in the neighborhood of -- capital

20   cases?

21   Q          Capital murder cases where the

22   defendant is subject to the death penalty.

23   A          I would just estimate 40, 50,

1  something like that.

2  Q      In what states have those been?

3  A      Most of them in California.   In

4  New Mexico.

5  Q .      Where else?

6  A .      Oregon, Florida.   That might be

7  it.

8  Q      Isn't it true that you were

9  actually hired to testify in an Alabama

10  death penalty case approximately 10 years

11  ago?

12  A . .      Yes.

13  Q      And in that case, isn't it true,

14  that the Court failed to find you as an

15  expert, failed to determine that you were an

16  expert?

17  A      No, I don't believe that's

18  correct.

19  Q      You weren't allowed to testify in

20  front of the jury, were you?

21  A      But not for that reason.

22  Q      How many sentencing phases have

23  you testified in where you've got guilt

1   phase, then you've got punishment phase?

2   A       Almost virtually all of the

3   testimony that I give -- not literally all

4   of it, but most -- almost all of it is in

5   the sentencing phase.

6   Q       And of those 40 to 50, have all

7   of those been -- your testimony been for the

8   defendant?

9   A       Yes.

10  Q       You have never testified on

11  behalf of the State?

12  A       In a capital case, no.

13  Q       At what point did you become

14  employed by Sidley Austin in this case?

15  A       I don't remember the exact date.

16  It's sometime in 2007.  I don't recall

17  exactly when.

18  Q       Did you enter into a contract

19  with them?

20  A       They sent me a letter, yes,

21  retaining me.

22  Q       And what are the terms of the

23  contract?

```
 1  A          That I would be compensated at an
 2  hourly rate of a hundred and fifty
 3  dollars -- or excuse me.  $195 an hour; that
 4  I would, as I recall, I think be compensated
 5  for reasonable travel expenses.  And I
 6  believe they contracted with me for -- there
 7  was an hour -- number of hours.  I think it
 8  might have been 50 hours.
 9  Q          How many hours have you worked on
10  this case?
11  A          I think about 50 hours.
12  Q          And does your testimony time
13  here -- do you get paid more for that per
14  hour --
15  A          No.
16  Q          -- than you do for review?
17  A          No.
18  Q          How many hours did you spend
19  reviewing the documents in this case?
20  A          I'm going to estimate 15 or so
21  hours.  I'm not sure.  And that was -- that
22  was the initial time and then there was some
23  subsequent time.  There have been additional
```

1    documents.   Somewhere around 15.

2    Q        And everything you reviewed you

3    got from Sidley Austin?

4    A        Oh, sure.  I didn't have any

5    other file in the case.

6    Q        And that was his entire

7    Department of Corrections' file?

8    A        Yes.

9    Q        His parole and prison review

10   board trial?

11   A        File, yes.

12   Q        File.  I'm sorry.  The transcript

13   from both phases of his capital murder

14   trial?

15   A        Yes.

16   Q        And you read -- and the

17   declaration submitted by Paramore,

18   Dr. Paramore?

19   A        Correct.

20   Q        And that's it?

21   A        And then there was -- then there

22   was additional information that was

23   provided, these -- the hearing, the most

1   recent hearing testimony.

2   Q        And you reviewed that whole

3   transcript?

4   A  .       I don't -- I don't know that I --

5   I don't know that I reviewed the whole

6   transcript. I reviewed -- certainly

7   reviewed Mr. Gavin's testimony,

8   Dr. Paramore's testimony, Lucia Penland's

9   testimony, Dr. King's testimony. That

10  probably was it. There may have been -- and

11  probably the -- some of the introductory

12  materials just to get to the testimony.

13  Q        So, you spent 15 hours reviewing

14  all of that?

15  A        Well, I don't know. I mean, you

16  asked for me an estimate. That was my best

17  estimate. It's not a precise estimate.

18  Q    .   What have you been doing the

19  last -- the other 35 hours what did you do?

20  A        Well, I came out here and

21  interviewed Mr. Gavin. I spent some time

22  then reanalyzing the records, going back

23  based on what he told me looking at his

Page 162

1   prison file.

2          I spent some time doing

3   calculations of where he was and when he was

4   in the prison file, exact -- exact dates and

5   times of where things were so I could get a

6   clearer picture in my head about where --

7   which particular prisons he was in.

8          I looked at which -- I tried to

9   match up which prisons he was in with where

10  he was in various kinds of activities.  So,

11  I went back and reanalyzed the prison file

12  with those things in mind.

13  Q       Now, let's talk about your

14  interview with Keith Gavin.  What date was

15  that?

16  A       It was in August of 2007.

17  Q       And did you fly here from

18  California I would assume?

19  A       Uh-huh, yes.

20  Q       And you met with him at Holman

21  Prison?

22  A       I did.

23  Q       Where did you meet with him at at

1    Holman?

2    A       In the arch interview area in the

3    center of the prison.

4    Q       Where the snack machines and

5    stuff are, the tables with the different

6    chairs?

7    A       Yeah, the big tables and there's

8    a fan there.

9    Q       How long did you meet with him?

10   A       I -- probably three or four

11   hours, something like that.

12   Q       Did you take any paper or a pen

13   with you when met and talked with him?

14   A       Yes.

15   Q       Did you take notes?

16   A       Yes.

17   Q       Have you provided those notes to

18   Sidley Austin?

19   A       No.

20   Q       Have they requested those notes

21   from you?

22   A       No.

23   Q       Did you bring those notes with

1  you today?

2  A        No.

3  Q        Approximately how many notes or

4  the volume of notes did you take during that

5  time?

6  A        I use a little note pad, a little

7  stenographer pad, which probably I would say

8  was 25 or so pages.

9  Q        And you don't recall whether it

10  was three or four hours that you met with

11  him?

12  A        No.  That's a good estimate I

13  would think.

14  Q        How much did you bill?

15  A        I don't recall.

16  Q        Did you ever talk to Betty

17  Paramore in person?

18  A        No.

19  Q        Did you ever talk to any of

20  Mr. Gavin's counsel, trial counsel in

21  preparing this report?

22  A        No.

23  Q        Are you even aware of who

1    Mr. Gavin's trial counsel is?

2    A         I recall one of his counsel's

3    name is Bayne Smith.  I don't recall the

4    other gentleman's name.  And Mr. Smith I

5    understand is deceased.

6    Q         And where did you learn that

7    information from?

8    A         I believe from present counsel.

9    It may have been referred to in the

10   transcript material that I read.

11   Q         Let's see where we want to go

12   next.  You testified earlier that -- let's

13   break this into two different -- or three

14   different sections.

15             Let's talk about your contact,

16   first of all, with defense attorney -- or

17   defense back in 1998, '99.  You submitted a

18   report in this case, right?

19   A         I did.

20   Q         And in that report you indicated

21   that you never heard from -- the first time

22   you had contact with Ms. Penland was

23   actually in October of 1999, correct?

Page 166

1    A        The first time I had contact with

2    her in conjunction with this case.

3    Q        That's what you put in your

4    report?

5    A        That's what I believed, yes.

6    Q        But subsequently you've learned

7    that you actually had spoken to her prior to

8    October of 1999 in regard to this case?

9    A        That's right.

10   Q        You had actually exchanged

11   e-mails?

12   A        Yes.

13   Q        And in those e-mails you

14   indicated that -- that if you get a

15   continuance that it would -- you would work

16   on the case?

17   A        Yes.

18   Q        And are you aware that she got a

19   continuance in this case, there was a

20   continuance issued at that time?

21   A        I became aware of it in October

22   when she contacted me again and said that

23   they had gotten a continuance and that they

1    were now about to go into trial.

2    Q          And that she said that she --

3    excuse me.  You told her you could mail or

4    fax a current CV?

5    A          Yes.

6    Q          Do you recall whether or not you

7    did that?

8    A          I would assume I did if she

9    requested it, yes.

10   Q          But you don't recall anything

11   about talking to her in April of 1999?

12   A          I don't recall anything about

13   this particular case, no.  I mean, I don't

14   even know if she mentioned the name of this

15   case or if she mentioned anything about the

16   case.  You know, this is many years ago and

17   obviously I don't -- I don't -- it was not a

18   particularly in-depth or substantive

19   conversation.  And then there was no

20   follow-up.

21              So, I wouldn't have had any

22   reason to connect the October phone call to

23   any -- to this particular case until it was

1  pointed out to me by her that -- by her --

2  by the e-mails that that was what had

3  happened.

4  Q      And isn't it true that

5  Mr. Gavin's defense counsel could have made

6  a calculated decision not to hire you?

7  A        I don't know what that would have

8  been based on, but I have no reason to know

9  or believe anything about whether any

10  decision was made with respect to me.

11  Q      Isn't it true that it's possible

12  that they could have decided not to hire

13  you?

14  A        Anything is possible.  I have no

15  idea.  They -- you will recall that they

16  contacted me again in October.  So, if there

17  was a --

18  Q        Their defense attorney didn't.

19  A        Well, I understood when

20  Ms. Penland contacted me that she was

21  contacting me at the request of the

22  attorney, but I'm not -- I can't of course

23  say for sure since I had no contact with the

```
 1  attorney at any point in time.
 2  Q       So, you think that Ms. Penland
 3  contacted you at the request or -- at the
 4  request of the attorney?
 5  A       Well, I would have -- I'm
 6  assuming that's the case because she was
 7  asking me if I could participate in a trial
 8  that was about to begin.  And I would have
 9  just been assuming that she wouldn't have
10  done that without some conversation with the
11  attorney.  I can't be certain, of course.
12  Q       And you can't be certain that --
13  well, let me ask it like this:  The e-mail
14  exchange that you and Ms. Penland had -- and
15  you actually discussed the attorneys, did
16  you not?
17  A       The attorneys in this case?
18  Q       Yes.
19  A       I -- well, I didn't know anything
20  about them.  I discussed the behavior of the
21  attorneys, what I --
22          MS. SCHIFF:  Can you clarify
23  which e-mail you're talking about?
```

```
 1              MS. CASEY:  GG, Exhibit E.
 2   Q        (BY MS. CASEY:)  But actually at
 3   that point you had never even spoken to the
 4   attorneys, had you?
 5   A        No, at that point they had never
 6   bothered to call me.
 7   Q        And that could have been a
 8   decision that they made?
 9   A        It -- it could have been.
10   Q        And they could have decided not
11   to present any evidence of
12   institutionalization, couldn't they have?
13   A        Yes, they could have based on
14   very little information because they didn't
15   even have his prison file.  But they could
16   have.
17   Q        You don't know what they had, do
18   you?
19   A        Well, I was told that they didn't
20   have his prison file.
21   Q        You do not know what they had, do
22   you?
23   A        I only know what Ms. Penland told
```

1   me.

2   Q       So, that's a yes to my question

3   that you don't know what they had?

4   A       No, only as she -- only as she

5   represented it.

6   Q       Never went to their office and

7   looked in their files?

8   A       Never even knew who they were.

9   They never called me.

10  Q       So, they could have made a

11  decision not to hire you?

12  A       Anything is possible.

13  Q       Have you ever been to Centre,

14  Alabama?

15  A       No.

16  Q       Have you ever been to Cherokee

17  County, Alabama?

18  A       I don't believe so.

19  Q       Do you know anything about the

20  people that live there?

21  A       Anything about the people who

22  live there?

23  Q       Potential jurors, the jurors.  Do

1  you know anything about the people, the

2  makeup of that community?

3  A         I've never been there, as far as

4  I know.

5  Q         You're aware that Mr. Smith and

6  Mr. Ufford are from that area, correct?

7  A         Yes, I believe that's the case.

8  Q         And understand the people of

9  their community?

10 A         I don't know that to be true.

11 Q         And let me just clarify so I

12 understand what Ms. Schiff asked you earlier

13 is that you believe that the defense

14 attorney should have put into evidence the

15 fact that -- at sentencing the fact that

16 Mr. Gavin had killed someone previously 17

17 years ago, gone to prison, got into fights

18 while he was in prison, was transferred all

19 the time while he was in prison, he should

20 have put that information into a -- before

21 an Alabama -- Centre, Alabama jury in the

22 sentencing phase?

23 A         Well, first of all, part of that

1   was already in front of the Alabama jury.

2   The fact that he had killed somebody and

3   gone to prison for 17 years was already in

4   front of them.  They knew that.

5            What he should have done -- what

6   in my opinion --

7   Q        Listen, I appreciate -- my

8   question was a yes or no question.

9            MR. MARSHALL:  Let him answer the

10  question.

11  Q        And if she wants to follow up --

12           MR. MARSHALL:  Let him answer the

13  question.

14  Q        Yes of no, you believe --

15           MR. MARSHALL:  Let him answer the

16  question.  You've asked an open-ended

17  question.

18           MS. CASEY:  It wasn't open ended,

19  Hank.  And I'm not going to fight with you.

20  Q        (BY MS. CASEY:)  Then I'll

21  withdraw the question, and I'll ask it

22  again.

23           Yes or no, you believe that the

1  defense attorneys of Keith Gavin should have

2  put before a jury the fact that he had been

3  in prison for 17 years, had gotten into

4  fights and I believe, as a record you

5  referred to, had over 60 disciplinaries

6  while he was in prison and that after

7  getting out, three or four months later

8  killed another person, that that information

9  should have been in front of a jury?  Yes or

10 no?

11 A         That's not the only information

12 that should have been put in front of the

13 jury.  Some of that was already in front of

14 the jury.  And what was lacking was a

15 context for all that information, and that

16 should have been put in front of the jury.

17 Q         And I appreciate that, but I'm

18 going to take you right back to the yes or

19 no question.  It's your opinion in front of

20 a Centre, Alabama jury that these defense

21 attorneys should have put in all these

22 problems, disciplinaries, the fact he was in

23 prison for 17 years, the issues he had in

1    prison, that that should have gone in front

2    of the jury at sentencing?

3    A        And I will take you right back to

4    my answer, which is that that's not all they

5    should have put in front of the jury.

6    Q        And I understand you're saying

7    that.  I'm just asking yes or no should that

8    have gone in front of them.

9    A        But I just answered it.

10              MR. MARSHALL:  He has answered

11   the question.

12   A        I just answered it for you.

13   Q        Yes or no?

14   A        I just answered no, not only

15   that.  They should have presented his entire

16   prison history as I presented it this

17   morning.

18   Q        Everything he did in prison, the

19   shank, all that information should have gone

20   in front of a jury?

21   A        All of that information should

22   have gone in front of the jury and put in

23   the context of what else happened to him in

1   prison and what else he did and how his

2   record as a model prisoner stood up against

3   other prisoners.  As your own expert said, a

4   model prisoner.

5   Q       Now, I'm confused about this

6   institutionalization, and we're going to get

7   to that in a second.  But I want to go back

8   to this -- what we're talking about right

9   now.

10          You believe that if all of that

11  information had gone in there, that he would

12  have been sentenced to life without parole?

13  A       I believe that that was an

14  important thing to present, yes, and it

15  would have changed the way the jury

16  understood and analyzed the case as they

17  understood who Keith Gavin was.

18  Q       But you don't know anything about

19  the jury or the people of Centre, Alabama,

20  do you?

21  A       I don't have any reason to

22  believe they're any different from jurors

23  anywhere else.  I don't have any reason to

1   believe that.

2           In terms of wanting to know about

3   the defendant in terms of being responsive

4   to mitigation -- there's no law in

5   mitigation which is different for one

6   jurisdiction in Alabama versus the rest of

7   the United States.

8   Q        But as a psychologist you will

9   agree that people base their decisions off

10  of their experiences?

11  A        They base their decisions off of

12  their experiences, but everybody, everybody,

13  whatever their experiences, everybody is

14  educable.  And if presented in the right way

15  with the right kind of information, they can

16  learn and understand things properly.  And

17  that's what this jury was never given an

18  opportunity to do.

19  Q        But it could have been that the

20  defense attorney decided not to present it?

21  A        I don't know what the defense

22  attorney decided.  I never had a

23  conversation with him.  It appears to me --

1    it appears to me that he didn't have

2    sufficient information upon which to make

3    that decision.

4    Q        But you never went to their

5    office and looked at their files?

6    A        I never even knew where their

7    office was because they never contacted me.

8    Q        So, you think every defense --

9    capital defense attorney should hire you if

10   there's been a defendant who's been

11   incarcerated prior to committing a crime?

12   A        No.  I do think they need to get

13   their prison records well in advance of

14   doing the trial.  That's true for any

15   defense attorney.  That's in the

16   ABA standards.

17   Q        And you don't know what was at

18   that office?

19            MR. MARSHALL:  Do you have a good

20   ground to ask that question?  Because we all

21   know, yourself included, Pamela, what was in

22   the defense counsel's file.

23            MS. CASEY:  I'm asking him if he

1   knows.   Even I know --

2            MR. MARSHALL:   I'm asking you if

3   you have good grounds to ask the question

4   that suggests that Mr. Smith had the --

5            MS. CASEY:   Are you making an

6   objection on the record?

7            MR. MARSHALL:   I am.

8            MS. CASEY:   State the rule.

9            MR. MARSHALL:   The rule is in

10  every jurisdiction that as a matter of

11  professional courtesy an examiner --

12           MS. CASEY:   I'm waiting on the

13  rule.

14           MR. MARSHALL:   I don't know the

15  number of the rule, but I know this to be

16  the case.   That an examiner has to have good

17  grounds to ask a question.

18           The question that Ms. Casey is

19  asking implies that Mr. Smith had the prison

20  records when in point of fact we know that

21  he did not until after the jury had

22  sentenced -- made its recommendation.

23  Q        (BY MS. CASEY:)   Do you know what

1   was in the file that defense counsel had?

2   A        I didn't see the file.  Obviously

3   I don't know what was in it.  I only know

4   what Ms. Penland represented to me.

5   Q      . Do you know whether or not

6   Mr. Gavin was cooperating with his attorney

7   at the time of his sentencing?

8   A        I don't know.

9   Q        And isn't it true that if a

10  defendant refuses to cooperate with his

11  attorney it makes it much more difficult to

12  present mitigation evidence?

13  A        It might, but not necessarily.

14  Q        And if he refuses to allow family

15  or anyone related to him or connected to him

16  to talk to his defense attorney that it

17  would be difficult to have a mitigation --

18  to create a mitigation report?

19  A        Difficult, but not

20  insurmountable.  And it's no excuse for not

21  doing it, absolutely not.  And you encounter

22  this often in cases and you have -- and you

23  have to compile the mitigation anyway.  And

1    often times you have to spend a lot of time

2    with the client explaining what mitigation

3    is and explaining to them why it's

4    necessary.  And eventually if you spend the

5    right amount of time with them, 99 percent

6    of them actually begin to understand why

7    it's needed and begin to cooperate.

8    Q        You don't know how much time was

9    spent with him trying to convince him to

10   cooperate?

11   A        I don't know.

12   Q        Are you aware that Mr. Gavin's

13   mother refused to talk to defense counsel or

14   to Ms. Penland?

15   A        The same problem, the same

16   solution.  You have to spend time with

17   people explaining why it is you need this

18   information.  And even if the mother doesn't

19   cooperate and the defendant doesn't

20   cooperate, there are lots of people from

21   whom mitigation evidence can be acquired.

22   Q        You're not a mitigation

23   specialist, are you?

```
 1   A          No, but I write about and analyze

 2   mitigation and present it all the time in

 3   court.

 4   Q          But you will agree that it's

 5   difficult when a defendant refuses to

 6   cooperate with his attorney?

 7   A          It's more difficult, but it's by

 8   no means an insurmountable problem.

 9   Q          So, you agree that you forgot

10   about some of this case of what happened

11   back in 1999?

12   A          No, I don't agree at all.  I

13   didn't know that that phone call was related

14   to the Gavin case.  That's how -- that's how

15   brief the conversation was.  So, it

16   wasn't -- I didn't even know the phone calls

17   were connected.  That's I guess a better way

18   to describe it.

19   Q          I believe on direct you indicated

20   that you had forgotten and it wasn't until

21   you had seen the copies of the e-mails.

22   A          Well, I should have said -- I

23   don't know what I said on direct, but I
```

```
 1   didn't realize that the two things were
 2   connected, that that earlier conversation
 3   that I had with Ms. Penland had anything to
 4   do with the Gavin case.
 5   Q        So, you forgot aspects of this
 6   case back in 1999?
 7   A        Well, it assumes that I even knew
 8   in April that this was connected to that
 9   case, and I'm not even sure I did know in
10   April of 1999 that it had anything to do
11   with the Gavin case.  So, it's not even --
12   it's not a matter of so much forgetting.
13   It's a matter of not connecting the two
14   conversations.
15   Q        And it could be possible that
16   there might be other things out there you
17   haven't connected?
18   A        Yeah, it could be.  I don't --
19   there's no record of anything else.  And you
20   know, it's fairly clear that -- from my
21   conversation with Ms. Penland in October
22   that nothing had transpired between us
23   between April and October.
```

1    Q        But you could have forgotten it?

2    A        You know, I don't know how to

3    answer that.  I don't have any reason to

4    believe that I have forgotten anything with

5    respect to it.  The next time she contacted

6    me on anything about anything was in October

7    of 1999.

8    Q        You interviewed Mr. Gavin in

9    2007, right?

10   A        Yes.

11   Q        When did this crime occur?

12   A        The crime occurred in I believe

13   1997.

14   Q        All right.  Did you interview

15   Mr. Gavin in 1997?

16   A        Of course not.

17   Q        '98?

18   A        No.

19   Q        '99?

20   A        No.  2007.

21   Q        So, it was some 10 years after

22   the crime occurred?

23   A        Correct.