FILED
2020 Aug-21  PM 12:45
U.S. DISTRICT COURT
N.D. OF ALABAMA


**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

KEITH EDMUND GAVIN,     )
                        )
     Petitioner,         )
                        )
v.                   )     Case No.  4:16-cv-00273-KOB
                        )
JEFFERSON S. DUNN,     )
Commissioner of the Alabama  )
Department of Corrections,     )
                        )
     Respondent.       )

# VOLUME 21

# State Court – Collateral Appeal Transcript

LUTHER STRANGE
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

Vol. 3 of 22

**COURT OF CRIMINAL APPEALS NO.** _____ CR-10-1313

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

**CIRCUIT COURT OF** ____CHEROKEE____ **COUNTY, ALABAMA**

**CIRCUIT COURT NO** CC-98-61.60 & CC-98-62.60

**CIRCUIT JUDGE** David A. Rains

Type of Conviction/ Order Appealed From: _____ Rule 32 _____

Sentence Imposed: _____

Defendant Indigent: ☑ YES ☐ NO

## KEITH EDMUND GAVIN

**NAME OF APPELLANT**

Stephen C. Jackson          205-254-1037

(Appellant's Attorney)                    (Telephone No.)

1901 Sixth Avenue North, Suite 2400

(Address)

Birmingham     Alabama     35203

(City)             (State)             (Zip Code)

### v.

## STATE OF ALABAMA

**NAME OF APPELLEE**

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter

name and address of municipal attorney below.

df

_____

_____

(For Court of Criminal Appeals Use Only)

1    Gavin.

                              ANNETTE GAVIN

2

3         Being duly sworn, testified as follows:

4                          DIRECT EXAMINATION

5    BY MR. SMITH:

6    Q    Mrs. Gavin, state your full name for the Court,

7         please.

8    A    Annette Gavin.

9    Q    Where do you live, ma'am?

10   A    Chicago, Illinois.

11   Q    And you're related to Keith Gavin, are you not?

12   A    Yes, that's my son.

13   Q    How many children do you have in all, Mrs. Gavin?

14   A    11 living children.  He's the second from eldest.

15   Q    Mrs. Gavin, I know that when you and I spoke

16        yesterday, I didn't really have an opportunity to

17        prep you for your testimony today, but I know that

18        you would like to address the Court and the jury

19        about your feelings about Keith and the options

20        that the jury has with regard to punishment.

21        Would you tell us what your thoughts are in that

22        regard, please, ma'am.

23   A    Basically as being one of, being a Jehovah

24        Witness.  Also, Keith was always exposed to that

25        life somewhat because I came, you know, came into

1    contact with that, with it, when he started to

2    grow up, so that's some part of his foundation.

3    So basically what was just said, I really feel the

4    same way, that knowing how he views things, that

5    he really has the ability to live as he should

6    live because he has taken up that course, you

7    know, because he had to, he had to see it, he sees

8    it now.  And so if he's given the opportunity, he

9    could help others.  He could really be a great

10   source of help to others and to our Creator.

11  Q   As the second living of 12 children, what would

12      you tell the jury about Keith's family values?

13  A   He's always family and for families, you know, he

14      is for families.  He got his view as he's always

15      felt a concern for other people.  That's been his

16      view all his life, since he was very young, by

17      what was fair.  He loves justice, he really does.

18  Q   Are you asking this Court to spare his life?

19  A   Yes.  Yes.  Because, you know, who among us, you

20      know, could make that decision, you know.

21          MR. SMITH:  Mrs. Gavin, that's all the

22      questions I have.  Answer any questions Mr. O'Dell

23      might have for you.

24          MR. O'DELL:  State has no questions of this

25      witness, Your Honor.

1300

1    Court, Case CC-98-61 Sentencing Verdict.  We, the

2    jury, recommend that the defendant, Keith Edmund

3    Gavin, be punished by death.  Vote is as follows:

4    10 death, two life without parole.  Signed Terry

5    L. Manley, Sr., Foreperson.

6         THE COURT:  Ladies and gentlemen, I can't tell

7    you how much I appreciate your service this week.

8    I know this has been a difficult experience for

9    all of you.  I'm going to ask you to retire to the

10   jury room now and Carolyn will be back there

11   shortly to give you your checks to pay you for

12   your service for this past week and I'll be back

13   to say goodbye to you in just a few minutes, so

14   you may retire to the jury room at this time.

15             (2:59 P.M.  Jury excused)

16   THE COURT:  Ladies and gentlemen, the sentence

17   hearing before the Court will be on December the

18   6th, or such other date as I might set by separate

19   Order and the lawyers will be notified of the

20   sentencing hearing by a formal Order.  Is the

21   probation officer in the courtroom?

22        THE BAILIFF:  Yes, sir.

23        THE COURT:  I'll speak to him later today and

24   if there happens to be a change before you leave

25   the courthouse, I'll let you know that.

B
404

STATE'S EXHIBIT # 6

MAR 25 1999  3:12PM     C C HILLS POLICE                    NO. 1040    P. 2

## OFFENSE / INCIDENT REPORT DEPARTMENT OF POLICE • COUNTRY CLUB HILLS, IL 60478-4698

CASE 98-3278

**INCIDENT**

| OFFENSE / INCIDENT | STOLEN Property | | CLASSIFICATION |
| --- | --- | --- | --- |

INCIDENT OCCURRED
DATE 03 0798  TIME 845  FROM DATE 03 0798  TIME UNKN  TO DATE 03 0798  TIME 845   WORK SECTION

TIME DISPATCHED 845   TIME ARRIVED  R4/6   TIME CLEARED 855

COMMON NAME   0810

LOCATION OCCURRED
4213 W 179 TH ST

LAST (BUSINESS) NAME: MEEKS   FIRST Dwayne   MIDDLE Lamark   AGE 33

ADDRESS
4213 W 179 TH ST

RESIDENCE PHONE 922-3040    OTHER PHONE         POE I TX IL  Dept of Corrections

**VICTIM**

| SEX M | RACE BLK | DOB 12 2864 | HT 5-10 | WT 230 | HAIR BLK | EYES BRO | DL NUMBER M200-1706-4369 | STATE IL | CLASS D |

MISC INFORMATION

**VIC-RP-WIT**

LAST    FIRST    MIDDLE    AGE    VICTIM / REPORTING PERS / OTHERS

ADDRESS

RESIDENCE PHONE    OTHER PHONE    POE I TX

| SEX | RACE | DOB | HT | WT | HAIR | EYES | DL NUMBER | STATE | CLASS |

MISC INFORMATION

**OFFENDER**

LAST    FIRST    MIDDLE    AGE    ADV   Y   N

ADDRESS

RESIDENCE PHONE    OTHER PHONE    POE I TX

| SEX | RACE | DOB | HT | WT | HAIR | EYES | DL NUMBER | STATE | POE |

OFFENSE TO JUVENILE ONLY:  ARRESTED/DISCHARGED  ARRESTED / NOT CHARGED

LOCAL SECURITY NUMBER    CDN #    ALIAS/NICKNAME

37977 DESCRIBE ON BODY

| HAIR | | FACIAL HAIR | | | COMPLEXION | |
| --- | --- | --- | --- | --- | --- | --- |
| ☐ S-CAP | ☐ PROCESSED | ☐ NONE | ☐ UPPER LIP | | ☐ LIGHT | |
| ☐ MEDIUM | ☐ CURLY | ☐ FULL BEARD | ☐ GOATEE | | ☐ MEDIUM | |
| ☐ LONG | ☐ OTHER | ☐ MUSTACHE | ☐ OTHER | | ☐ DARK | |
| ☐ STRAIGHT | | | | | ☐ OTHER | |

**SUSPECT**

GANG AFFILIATION     ☐ NONE      ☐ SUSPECT     ☐ KNOWN     GANG

☐ ADMITS MEMBERSHIP    ☐ TATTOOED WITH GANG SYMBOLS
☐ IN COMPANY OF IDENTIFIED GANG MEMBERS    ☐ INVOLVED IN GANG RELATED CRIMES
☐ NAMED BY 1 OR MORE GANG VENDORS AS BEING A MEMBER OF THEIR GANG    ☐ WEARING/POSSESSES GANG COLORS OR PARAPHERNALIA
☐ PHOTO OR WRITING THAT INDICATES GANG AFFILIATION    ☐ CONTACTED IN THE FIELD BY POLICE, PARTICIPATING IN GANG ACTIVITIES

CHARGES/COMMENTS                                                 COURT AND BOND INFORMATION

SEE NARRATIVE

L99/G98A3014

**VEHICLE**

INVOLVEMENT  D - CONFISCATED  D - DAMAGED  R - RECOVERED  S - STOLEN  T - TRAFFIC INVOLVEMENT  X - WANTED  V - VICTIM  I - IMPOUNDED  O - OTHER

| COLOR | LICENSE PLATE | STATE | LIC YR | # PLATES | MAKE | MISC VEHICLE INFORMATION |
| --- | --- | --- | --- | --- | --- | --- |
| MODEL | STYLE | YEAR | TOP COLOR | | LIGHT/FRONT/COLOR | TAIL/BACK/COLOR |

VIN #

**ADMIN**

REPORTING OFFICER SIGNATURE    ID#    DATE REPORTED 03 07   SUPERVISOR APPROVAL / SIGNATURE    DATE 03 07

☐ INFORMATION ONLY  ☐ JUVENILE  ☐ CLEARED BY ARREST  ☐ CLEARED  ☐ DEATH/FIRE/AND TO PROSECUTE  ☐ UNFOUNDED
☐ INITIAL/FOLLOW-UP  ☐ DETECTIVE

106

MAR. 25. 1999  1:13PM   C C MILLS POLICE                  NO. 1040  P. 4

**MISSING / STOLEN PROPERTY INVENTORY · DEPARTMENT OF POLICE · COUNTRY CLUB HILLS, ILLINOIS 60478-4698**

☐ OFFENSE / INCIDENT REPORT CONTINUATION     ☒ SUPPLEMENTAL REPORT     ☐ PROPERTY INVENTORY

| CLASS CODE | OFFENSE / INCIDENT CLASSIFICATION | CASE REPORT NO. |
|---|---|---|
| | STOLEN Property | 98-3278 |

DATE: 03 07 98   NAME: ☐ VICTIM ☐ OFFENDER  SEX/RACE/AGE    PAGE 1 OF 1

TIME:   ADDRESS    APT. NO.  PHONE NO.  REPORTING OFFICER: C. Allen  STAR NO. 31

TYPE CODES: M – MISCELLANEOUS   B – BICYCLES   C – CHECKS   D – DRUGS   F – FIREARMS
INVOLVEMENT CODES: C – CONFISCATED   S – STOLEN   O – OTHER

| LINE # | TYPE | SUB-TYPE | INVL | DESCRIPTION | MANUFACTURER | MODEL # | SERIAL NUMBER | VALUE | QUANTITY |
|---|---|---|---|---|---|---|---|---|---|
| 1 | F | B | S | 40. calibur HANDGUN (BLACK) | GLOCK | 27 | CCNYY90S LDSK98A3014 | $410.83 | 1 |

MAR. 25. 1998   3:12PM    C C HILLS POLICE                                      NO. 1040    P. 3

Case/Supplemental Report ✱ Country Club Hills Police Department ✱ Country Club Hills, IL 60478-4698

| Date 03 07 98 | Offense STOLEN Property | RD# 98-3278 |
| Time 0845 | Name S/R/DOB | Page # 2 of 2 |
| ☒ Case Report ☐ Supplemental Report | Address Phone | Officer # C. Allen 31 |

R/O SPOKE WITH THE VICTIM AND LEARNED THE FOLLOWING IN SUMMARY;

R/p STATES THAT HE LAST SAW HIS HANDGUN; A BLACK 40 CALIBER GLOCK APPROXIMATELY THREE WEEKS AGO. HE HAD PLACED THE WEAPON IN HIS BEDROOM DRAWER AND NOTICED IT GONE APPROXIMATELY 0300hrs THIS DATE.

R/p ADVISES HE'S HAD NO BREAK IN TO HIS HOME ONLY A FEW FRIENDS AND FAMILY RELATIVES HAVE BEEN THERE. VICTIM DOES HAVE A VALID VOID CARD. MISSING/ PROPERTY SHEET FURNISHED.

WEAPON DESCRIPTION AND SERIAL # ENTERED INTO LEADS LEADS # LDS/B98A3014   CA

✱VICTIM DOES NOT KNOW WHO MAY HAVE TAKEN HIS WEAPON. CA

C. Allen   31
Reporting Officer

Chief/ Commanding Officer

P. 1.

STATEMENT SHEET"

IN THE MATTER OF: _____ Dewayne Meeks

DATE OF STATEMENT 03-15-1998 . TIME 4:30 Am .

NAME OF OFFICER TAKING STATEMENT P+L Tony Burch

-7-1998 On Saturday at approx 6:30pm I was starting my shift at the Fort PAYNE Police Dept, when dispatches called me and told me I Ins asked to call 1-815-476-6483 and talk to Tom Arambach, I called it Not recognizing the Name or Number. When the person answered I told him who I was, and the person said thank you For calling Me Tony - this is Uncle Tom. I then realize who I was talking to. It was a Friend of mine - that lives in Joilet Illinois, Uncle Tom is what he liked his Friend's to call him, Uncle Tom then said Dewayne is here and he needs to talk to you. Dewayne meeks then got on the Phone (Dewayne Meeks had lived in Fort PAYNE and me and him had worked out together For several years and became close Friends).

   Dewayne then asked me if I was where I could talk. I told Dewayne if it was going to be too indepth and lengty, that I would need to go somewhere else. He replied it is very indepth. I told him I would Call him right back.

   I could tell by Dewayne's voice that something was wrong. I told my Lt. Wade parker that I had a Important call to make if he could have someone to cover my area For a whik, he said that Would be Fine.

   I then called Dewayne From a pay phone collect. Dewayne asked me if they caught the guy that did the Killing in Centre Al on 3-6-1998 I told him that he had been caught. Dewayne then asked

I HEREBY SIGN THIS STATEMENT TO BE TRUE AND CORRECT:

WITNESS(S):

P.2.

STATEMENT SHEET"

IN THE MATTER OF: ___Dewayne Meeks_____

DATE OF STATEMENT _____. TIME_____.

NAME OF OFFICER TAKING STATEMENT _____.

Me "Man you know how he got down there". I then replied, because
of the tone of his voice, "you brought him". Dewayne then said, "Are
you ready for this" and started telling the story.

   Dewayne said that Keith was his cousin and had been living with
him for a few weeks. Dewayne was the only one that would take Keith
because he had just gotten out prison after serving 17 years for murder.
Dewayne said that Keith got out on Dec-27-1997. Dewayne felt that
Keith wanted to do better.

   Keith told Dewayne that he wanted to get away from Joliet and
the gang that he had been a ranker; for many years (Black Gangsters).
Keith asked Dewayne to drive him to Chattnoga TN. Where his   T.B
girlfriend would pick him up. Dewayne told him he didn't have the
money to do or the time really. Keith told him that his girlfriend had
gotten her income taxs back and would pay Dewayne for the trip.
Dewayne decided he would take him. Dewayne had worked that day
and had to go back J-9-1998. Dewayne asked his wife and little boy
to go with them so his wife could drive some of the way and he could
sleep. So they drove to Chatt.TN where they got a room at the
Super 8 motel. While they were there Keith tried to call his girlfriend
in Center Al, but was not able to get in contact with her. Dewayne said
that Keith then talked him into driving to Fort PAYNE Al. Dewayne
left his wife and son at the motel, and drove to Ft. PAYNE AL.

   I HEREBY SIGN THIS STATEMENT TO BE TRUE AND CORRECT:

   WITNESS(S):

STATEMENT SHEET"

P3

IN THE MATTER OF: _____

DATE OF STATEMENT _____ . TIME _____ .

NAME OF OFFICER TAKING STATEMENT ___ Dewayne said he didn't want anybody
to see him in Ft. PAYNE, because he was afraid that his daughter
would find out and her feelings would be hurt because he didn't
have time to spend time with her. Dewayne said that they stoped at the
bowling Alley in Ft. PAYNE where Keith tried to contact his girlfriend
again. During this whole time Dewayne and Keith were argueing about
the money situation.

    Keith then talked Dewayne into takeing him to Center Al, where
he felt that he could find his girlfriend's house. DeWayne then
stated while they waited at a red light in center.
Keith stated "I'm going to ask this guy for direction".
Keith then got out of the vehicle and went up to a
White Van that was parked to the right of the vehicle
that Dewayne and Keith were in. Dewayne said while he was
waiting on Keith he notice a silver Toyota 4x4 Truck parked
on the left side of his vehicle and it seemed the people
in the truck were staring at him. As Dewayne tried to figure
out what they were staring at he looked to his right
and saw that Keith was standing at the van with the
door open argueing with the driver. Dewayne then said
he yelled "what the Hell are you doing" Keith did not
response. Dewayne next said that he saw the driver of the
Van shaking his head NO. Dewayne then yelled at Keith

I HEREBY SIGN THIS STATEMENT TO BE TRUE AND CORRECT: _____

WITNESS(S): _____

STATEMENT SHEET"

P. 4.

IN THE MATTER OF: _____

DATE OF STATEMENT_____. TIME_____

NAME OF OFFICER TAKING STATEMENT _____

again. Next he saw Keith grab at the driver's arm, the driver pulled away then Keith produced a pistol and shot the driver once.

Dewayne said that he was in shock and thought that Keith had went crazy. Dewayne said then he took off in his vehicle striking Keith with the open passenger side door. He said he then looked up in the rear view mirror and saw Keith shot the driver again and push him over in seat and got inside the vehicle and started chaseing Dewayne. Dewayne said I turned right and was trieg to get away from Keith for fear that Keith would then kill him. Dewayne said after going just a few miles he saw blue light flashing and knew they must be after Keith. Dewayne then told me the reason he didn't stop was he was afraid that they would not catch him and he would get to his wife and son before he could get to them. Dewayne then drove to chattanooga TN to get his wife and son. When he got there he told her what happen and they rushed back to Joilet Ill. Dewayne told me that he believed that Keith had used his 40 caliber Glock, because it was missing and he had access to it.

Dewayne then said Tony I'm a dead man, because

I HEREBY SIGN THIS STATEMENT TO BE TRUE AND CORRECT: _____

WITNESS(S): _____

P.S.

STATEMENT SHEET"

IN THE MATTER OF: _____

DATE OF STATEMENT _____. TIME _____.

NAME OF OFFICER TAKING STATEMENT _____.

Keith is a ranker and he will have the gang bangers to get me. But I want to make it right what do I Need to do. I told him that we need to get intouch with Cherokee county and tell them what you Know and did. I then gave him the phone Number For Cherokee County sheriffs department. I told him that I needed to go talk to somepeople about this and I would call him back. He said he would call the sheriffs department.

End of Statement

I HEREBY SIGN THIS STATEMENT TO BE TRUE AND CORRECT: Tony T Burch

WITNESS(S): Lt. Wade Parker    FPD

412

D

Interview with: DeWayne Meeks
DOB: 12-28-64
SSN: 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
423 West 179 Street
Country Club Hill, IL
Date: 3-09-98

Present at Interview:        Tom Arambasich
Tony Birch
Danny Smith
Larry Wilson

## STATEMENT OF DEWAYNE MEEKS

On 3-09-98, we talked with DeWayne Meeks about the murder of William Clinton Clayton, Jr. DeWayne said that Keith Gavin was his cousin and that he had been letting him stay with them since he got our of Prison to try and help him. DeWayne said Keith had been doing good since he got out. He said he had let him come to Fort Payne with him back in January to see his family and he didn't have any problems with him.

DeWayne said Keith asked him to take him to see his girlfriend in Chattanooga, Tennessee. He said he told Keith he didn't have the money to go. DeWayne said Keith told him that if he would use his credit card that his girlfriend would reimburse him the money, that she had gotten her Income Taxes. DeWayne said he would take him, but he was going to take his wife and baby. He said they went to Chattanooga, Tennessee, but she was not there so they got two rooms at the Super 8 Motel. He said they started up to the rooms and Keith

asked him for the keys to his Blazer.  He said he **gave** him the keys and
then him and his wife went on up to the room.  He said in a few minutes
with came on up and went to his room.  DeWayne said they stayed in
rooms 113 and 114.

He said Keith asked him to take him to Fort Payne to meet
her.  DeWayne said he told Keith he didn't want to go to Fort Payne
because if he didn't go by and see his family they would be mad at him
and he didn't want them to get mad.  DeWayne said finally he told Keith
he would take him but he was not going to ride around all over Fort
Payne.  DeWayne said they went to Fort Payne to the bowling alley and
sat for an hour and then went to look for her house.  He said Keith
said he thought he could find it.  DeWayne said he told Keith he didn't
have the money to ride around all over the place looking for her.  He
said Keith said that she would give him the money when they found her.
DeWayne said he told Keith that his wife was going to be mad at him if
he didn't live up to his part of the bargain.  He said Keith kept on
until he told him he would take him to see if he could find where she
lived.  He said they rode around looking and wound up in Centre.  He
said they pulled up at the red light between the Courthouse and the
bank.  He said they were still fussing about the money.  He said there
was a van parked next to the bank.  He said Keith said pull up to the
van and he would ask him for directions.  He said he did and Keith got
out and went over to the van and told the guy to get out.  He said he
hollered at him and asked him what are you doing?  He said then Keith
got the guy and he turned and looked at him like he was next and he

door.  DeWayne said he turned right toward Leesburg.  He said as he started turning he looked back and saw Keith shoot the guy one or two more times and then push the guy over in the seat and get in the van and take off after him.  He said Keith tried to get him to stop several time but he wouldn't stop because he knew Keith would kill him.  He said they were going toward Collinsville.  He said he looked back and saw a patrol car stopping Keith.  He said he didn't stop because he was scared for his family's safety.  He said all he could think about was getting back to them before he did, because he knew if he beat him back to the motel Keith would kill his family and wait on him.  DeWayne said when he got back to the motel he told his wife what had happened.  He said they talked about it and decided it would be better to wait until they got back to Illinois to report it for their protection.  He said when he got back he called Marty Tutor and Nelson Burris and told them what happened.  Then he said had Tom Arambasich to come over to Marty Tutor's house and he told him what had happened.  DeWayne said then Tom called his superior officer and told him.  Then he said Tom and him called Tony Birch with the Fort Payne Police Department and told him what had happened.  DeWayne said then Tom called Cherokee County Sheriff's Department and told them he had a witness to the shooting.  Then they had Larry Wilson to call Tom and talk to him and to me.  DeWayne said the gun that Keith had was his gun.  He said he had come back and reported it stolen.  He said he didn't know when Keith took the gun out of his Blazer; at the motel or if he got it from out of his house.

x _Dwayne Meeks_
4-6-98

415

E

## TAPED INTERVIEW OF DEWAYNE MEEKS

TOPIC:       MURDER DURING THE COURSE OF ROBBERY/
             ATTEMPTED MURDER

LOCATION:    WILL COUNTY SHERIFF'S DEPARTMENT
DATE:        APRIL 6, 1998
INTERVIEWER: DANNY SMITH, DISTRICT ATTORNEY'S INVESTIGATOR
             LARRY WILSON, CHEROKEE COUNTY S. O. INVESTIGATOR


WILSON:        This will be an interview with Dewayne Meeks in the
               presence of Tom

ARAMABAISCH:   Arambasich

WILSON:        Danny Smith and myself, Larry Wilson.  This will be in
               reference to the death investigation of William Clinton
               Clayton, Jr.  Today's date is 4-06-98 the time is 10:15
               a.m.
               DeWayne if you will tell us what happened back on March
               6.

MEEKS:         Okay, um as far as I remember, my cousin wanted me to
               take him down to Alabama to see a female.  A girl he had
               met a couple months earlier.  Um, so I told him, yea no
               problem I will, but I don't have any cash like that just
               to ride up and down the road.  So he said when we get
               down there the girl will pay for this trip.  What he said
               was hit me and that um, would take care of the expenses
               for me driving all the way down there.  So I said Okay.
               So I told my wife, I said um, go with me, help me drive
               because I know that Keith is not a good driver as far as
               the highway you know he hasn't driven a car in allot of
               years.  So she didn't want to go, so I convinced her, I
               said you ride with me, we'll come back the next day.
               We'll just sleep over and come back in the morning.  Um,
               I told him that.  It was me, him, and my son.  We went
               down there.  Um, I put everything on the credit card and
               so when we got there to Chattanooga.  I was suppose to
               take him to Chattanooga.  So when we got to Chattanooga
               we went to the motel.  I got two rooms, he said that the
               girl may want to stay up there, you know and do their

thing or whatever.  I said we was going to leave in the morning.  So when I went in I noticed, I didn't think nothing of it then; but I um, I told Keith, "You want to go in and use the bathroom before we go?" He said no, no, no, but um, let me see your keys.  But I'm like I thought it was funny.  So I said Okay.  So me and my wife went in and checked in the room and everything and so I used the bathroom or whatever and I told her that I would be right back I'm going to drop him off at the gas station and he is going to call her and tell her we're gonna pick her up or whatever.  So um, when I'm on my way out to take him, he's on his way back in.  I said, "What are you doing man?"  So he said, I gotta go in the room for a minute.  I said alright, I thought that was strange, but I didn't think nothing about that.  Um, so when he finally got out there, um I took him to the gas station.  He stayed there for not long, 30 minutes at the most.  Um, then he said well just take me to Fort Payne then.  I said, "No, no, no!  I done told you I can't go to Fort Payne.  Because me and my baby's mother are in to it about who's going to tax, um, who can draw her on the tax this year."  I said um, we already into it, if I see her coming, um if my little daughter know I been coming there and didn't see her that would be more drama.  I already had a tough time and I know that if I go to Fort Payne, I know so many people there that somebody will pick me up.  So I said lets just go to the motel or something or a little part of town and no body will know you are there.  So I'm going, we go to Fort Payne.  We sit there, went to the bowling alley.  When I came in on the highway we pulled around and he said stop right here.  So we were at a bowling alley.  Um, so I'm kind of sleepy still, mad because I'm already nervous.  I kept saying man, somebody's gonna see me, somebody's gonna see me.  They gonna tell my little daughter I came here without seeing her, you know.  So we talking about, we stayed there for a little while, and he was saying um, that she's gonna hit me, kept reenforcing me.  We kept talking about the money issue.  I'd put everything on the card, and if I were coming back to that motel without any funds for the trip down there.  I said there's going to be some trouble between me and ole girl.  Cause we got a set amount of money that we can use for this and that and she didn't really care to much about Keith so that would have been a big, big fight about that.  So, I'm dozing off, waking back up saying man what's up?  What's up?  And he said well, I know where she lives.  She lives in a place like a, it sounds like an Indian.  I said, "Cherokee County?" He said, "Yeah, yes somewhere like that."  I said, "Alright!"  So we take off up 35.  He said, "Yeah, yeah

this is the way."  Remembering.  So, I'm going all this and that and in the mean time I've been up like 24 hours off and on dozing off.  And I'm getting kind of ill.  And when I get kind of ill, I get kind of sleepy, even tired, kind of irritable.  So I'm really, then feel like I'm being a Yo-Ke Doke.  And so we are talking back and forth.  So finally, um, we got to kind of like a dead-end, a street with a stop light, he said pull up, I'm going to ask this guy for directions.  I said, "Alright man, alright."  So he gets out and I noticed on my left at the stop light there's these guys in a pickup truck and they looking at me and I said oh, no.  I said to myself, I can remember this quite clearly, these guys are fixing to start something, they look like you know, some good ol' boys or whatever.  And Uh, so all of a sudden I keep looking at them and I noticed that they are not looking at me, they are not really looking at me they are looking through me, like this.  So I look back and I see Keith telling this guy, I really can't tell you what he said, but I see this guy shaking his head.  So I said, "Keith, what are you doing?"  I'm screaming and hollering and um all of a sudden a shot rang out and um I guess the car moved up or something and when, it like happened so fast when the first shot rang I floored it, the door was like open and it hit'em like that, bloop, and it close on when I hit'em like that.  So I took off and I moved up a little bit to the light, and when I see in the back, I see Keith fire again, you know.  And all of a sudden he pushed the guy over and then he follow after me.  So I said , "Oh no, the first thing I said was Oh, Sh__, like that."  So, I'm taking off I turned right.  I'm taking off I'm flying.  It's raining and stuff so I'm probably going 55 or 60.  All of a sudden he is behind me and he pulled up behind me.  Trying to blink at me, trying to get me to pull over.  I said, "No, no, no!" Because I was scared to death, I'm scared that he's mad because I took off and left him and um, or I'm a witness or whatever.  So all of a sudden, we going and going; I kept saying, "No, no!" I knew I had to get back to the apartment, the hotel, I gotta get Sharon; because if he gets there before I get there I'm in trouble.  So, finally I see a blue light, um pulls him over and I take off.  I get back to the motel room, and um, I tell her what happened, tell my wife what happened and um, she said okay, that we gonna do something.  So I said, "I need to make a statement", like that.  She said, "Yeah, you're right." So the baby was hollering and crying, because it was an upsetting moment and she said he ain't ate nothing and said, I said well go carry him to eat or something like that, for a minute to decide what we gonna do.  So they

went to McDonald's or somewhere and came back she said, "Sweetie, um I know why you didn't stop and tell the police then, because um, it may be a little racial thing about um, a White guy and a Black man." She said, "Let's go up North and you make your statement in Chicago." I said, "Okay, cool!" So we got in the car and drove back that night real fast. And so when I got there, um I got home I remember about 6:45, I called Marty Tutor, um I remember it was like, um 6:50 or something, cause Marty said, "Man, I'm just fixing to take my wife to the airport, she's going somewhere!" I said I need you to come over real quick, I got something to tell you, and um, its important. And Marty said, um I'll be over there in a minute. Well, he had to take his wife to the airport and he came over afterwards. And so I called Nelson Birch, in Alabama, and told him, "Man I need you to look up and make sure they caught this guy. Something happened in Centre, I need you to tell, make sure they caught this guy. Something happened and I want to make sure my family is safe or whatever. And then, Nelson never did call me back, because he didn't know what's going on. So I think the next person I called was Uncle Tom. You know he wasn't at home, so I left a message on his machine for him to contact me. So finally, me and my wife looked around the house, because I told her I think that gun, I don't know where he got that gun at, it may be mine. So we looked around the house and searching or whatever, and then finally I said, "Oh, no!" I found two clips that was there, but I had three clips to the gun. I said, um I think when I talked to you or Marty, Marty told me I need to make a police report and tell them the gun was stolen. He said don't tell them that you think it was used in a Robbery until you know for sure, just tell them you think whatever. So I said, "Okay." So I called Country Club Hills Police, made the report and then finally Marty come over and said you know you need to get out of here, find a lawyer and make this statement to him. So we went to Joliet, um to Marty's house and we kept trying to call Uncle Tom. Finally Uncle Tom called and I told him you need to come over real quick, I said it's very important. He came right over in less than about 15 or 20 minutes, and I told Uncle Tom what happened. He said, "No problem." He said, "We gonna take care of this." He said, "What we need to do is, um call down to Alabama." So, we um called Tony Birch and told Tony what happened and that's how we got started calling you guys on what happened and everything. I know I'm rambling, but everytime I repeat this it gets me shook.

SMITH:       Of course it's been some time since it happened, nobody
             expects you to remember everything detail by detail.  But
             for the benefit of the tape and I know when we talked to
             you before and started to tape and also on one prior
             occasion when we taped it and the tape didn't turn out.
             Um, Keith is a cousin of yours, is that correct?

MEEKS:       He's a First cousin.

SMITH:       Okay, and um Keith is a currently on Parole or was on
             Parole?  And what about, I told Larry that we didn't ask
             you, and I meant to, I don't know why we didn't.   But
             Keith, was he paroled out in anybody's, I don't know how
             they do that here, was he paroled out in anybody's
             custody that he had to have a particular address, a place
             to stay and a job when he come out?

MEEKS:       Okay......

SMITH:       How do they do that?

MEEKS:       Um,....

SMITH:       The main reason I'm asking is was he paroled out in your
             custody?

MEEKS:       No, he was paroled out to his mother or released to his
             mother or whatever.  I know he was staying over there.
             Um, because I thought he was released, I thought he had
             did his whole time.

SMITH:       Okay.

MEEKS:       Um, he was released to his Mom.  He was having problems
             at home off and on.  Because one time he used to call me
             all the time and say these terrible things about the
             murders and everything.  Him and his sister got into it
             one time.  And um, I said man just come over to the house
             and just chill with me, just chill for the weekend and
             get your mind right.  We got television, you can flip it,
             um, we live in like a nice part of town, no gang banging.
             Cause he lives in the gang banging part of town and I
             understand what he was going through.  So I said just
             come over here and chill.  So he was staying with us off
             and on every other weekend, or a week, whatever.

SMITH:       Okay, the trip to Alabama.  When he asked you to take
             him to Chattanooga to his girlfriend's.  Was that trip a
             a spur of the moment thing or did he talk about that for
             several days before he asked you to take him down there.

420

MEEKS:      Um, that day it was spur of the moment.  Because I know
            he wanted to go back there and see her.  Because he kept
            talking about her.  Because I told him, man you have to
            chill down South if you want to get away from the gangs
            and stuff.  So he said he'd been talking to that female.
            But that day was a surprise to me, that he wanted to go
            that day, you know.

SMITH:      I think before when we talked to you, um we had asked who
            the girl was and you didn't know the name at that
            particular time, but he did go home with you once before
            and you've got some family living there in Fort Payne.
            And on one prior trip back home, he rode home with you
            one weekend or something.  Okay, so he could have known
            or have you since found out the name of the girl.

MEEKS:      Cassandra is all I know.  And I found that out about a
            week or two ago.

SMITH:      Okay.  So all you know is the girl's name is Cassandra?

MEEKS:      Uh-Huh.

SMITH:      Okay.  I've got some pictures of....  I've got three
            photographs of the bank or that intersection there in
            Centre where the bank is.  I'm going to ask you a couple
            of questions, so to clarify in our minds.  You told as
            you were talking about the people that were sitting next
            to you in the truck.  That the guy was sort of turning
            looking back at you.  Which would indicate to me that he
            was park directly in front of you and um, that he was
            looking through you.  So just for clarity, I'm going to
            ask you to show me on the photographs if this in facts
            looks like the intersection to you.

MEEKS:      Uh-Huh..

SMITH:      How were ya'll position as far as the truck or the van
            was concerned over there that day?  I didn't know if
            ya'll had pulled up behind it like you were going to park
            or whether you were still out in the street?  But there
            is three photographs.  This one here is, they are staged,
            this one is coming up to the intersection, this one is
            setting at the intersection, this one makes the turn. But
            the courthouse is on this side of the street here.

MEEKS:      On the left?

SMITH:      Yeah..  This right here is the corner of one of the
            windows, the basement windows over at the courthouse.

MEEKS:       All right.

SMITH:       Um, but this for the record, this is the Regions Bank and this is the area where the shooting occurred.

MEEKS:       This is where it happened?

SMITH:       Yeah!

MEEKS:       I don't remember...

SMITH:       The photographs are not, is not a wide angle lens so there is going to limited view, but this right here is the turn going toward Leesburg.

MEEKS:       That's the way I went?

SMITH:       Yeah.   This is Main Street right here.

MEEKS:       Okay.   I pulled up, I say the truck was right here (pointing on the photograph) and the van was probably right here somewhere.

SMITH:       Okay.   Was the van pulled up real close to the intersection?

MEEKS:       Uh-uh, no, I thought we were further away to it.

SMITH:       Uh...Don't let me confuse you because I'm not trying to confuse you or trick you up on it, but when you said you heard the first shot fired....

MEEKS:       Uh-huh....

SMITH:       You pulled up the door hit him, and you looked in your mirror......

MEEKS:       Uh-huh.....

SMITH:       And you could see him.....

MEEKS:       Uh-huh.....

SMITH:       So, if you pulled up to the intersection......

MEEKS:       Yeah......

SMITH:       He had to be back a distance.....

MEEKS:          Yeah..

SMITH:          In order for you to see him.

MEEKS:          Yeah, it was back a distance.   I..um..if...the way it
                went I say we were about right here (pointing to the
                photograph) because the truck was pulled up right here
                (pointing to the photograph again) I didn't go all the
                way up, cause I never, when you pull all the way up to a
                car they looking down at you that's when stuff can start.
                So I kind of pulled behind him, so he really wouldn't....

SMITH:          You laid back when you stopped at.......

MEEKS:          Yea......

SMITH:          The intersection?

MEEKS:          Yeah, I laid back.   I never, like I said if there is two
                (2) cars right here (illustrating) and a third one
                together, what I would park..um pull up about in the
                middle.  Just because me be a security and working in
                security  environment.     I   try  not  to  get  in  a
                confrontation with people.    I figure, I'm from down
                South.  And so, I was like (illustrating again) the truck
                was right here and I was right here, I guess the van was
                right there too parked next to us, or whatever.   So I
                guess I was about maybe on ahh..the ahh..on this side
                right here (pointing at the photograph).

SMITH:          Uh-huh.....

MEEKS:          It was kind of dark.  And so when I pulled up and I
                looked in the mirror.  Yeah....Yeah that's what happened.

SMITH:          Okay.  Let me....I want you to think through it now,
                Because if you are sitting, sitting behind the truck...

MEEKS:          I wasn't behind the truck.....

SMITH:          Okay... Well, alright if you are sitting staged back,
                basically behind the truck.

MEEKS:          Uh-huh...

SMITH:          You take off your door hits him and closes.  Then you had
                to be back behind the vehicle.

MEEKS:          Okay......

SMITH:      So Keith would have been in front of you and the person
            would have been looking across.....

MEEKS:      Because, the truck when it first, the truck jumped, I
            guess it jumped and then it went like that (illustrating)
            for a minute.  And I took off......

SMITH:      The vehicle, that Uh....

MEEKS:      It jumped......

SMITH:      The one that was parked there on the side.

MEEKS:      Yeah......

SMITH:      Okay....

MEEKS:      It jumped......

SMITH:      Alright....

MEEKS:      It jumped and it kind of went up and he was in front of
            me a little bit for a minute.  Like the wild west, for
            the first of I remember I told you, it was like, it was
            like a shoot out at O-K Corral.  And so when he first
            jumped, um....like this (illustrating), I kind of like
            cringe like this (illustrating) and I just....vrooo...and
            it hit like boom like that and it shut my door like that.

SMITH:      Okay.  So, when Keith got out and asked for directions..

MEEKS:      Uh-huh

SMITH:      Are you looking forward, to your right or did you have to
            look over your shoulder......

MEEKS:      Yeah, its about like right here (illustrating)....

SMITH:      Okay....

MEEKS:      Right there....(illustrating)

SMITH:      So, you're parked just a little bit ahead of the
            vehicle.....

MEEKS:      Uh-huh....

SMITH:      You stopped in the lane of traffic?  You didn't pull over
            next to the curb or anything?

MEEKS:        No...Un-huh....No....

SMITH:        We had one witness that said it looked like the vehicle
              had pulled up behind it and parked.  I think another one
              said that it stopped beside it.  I told Larry, I said we
              didn't even ask to clarify that.

MEEKS:        I was next to the pick-up truck.

SMITH:        Okay.  But you did not pull up against the curb behind
              it.

MEEKS:        Nope....

SMITH:        Did you have a...uh...was a head light out on your truck
              on your truck that night?

MEEKS:        Uh-huh.....

SMITH:        Okay.  Do you remember which one?

MEEKS:        Uh.....Right.

SMITH:        Passenger side?

MEEKS:        Right side.....Yeah.

SMITH:        Okay.  Was there a...was there any other vehicles
              around...I mean behind you.  I mean.....

MEEKS:        I don't remember nothing about it....I know it was like
              several vehicles stopped over like maybe like (pointing
              and illustrating) right there, right here and right here.
              I remember two or maybe three vehicles besides myself.

SMITH:        Okay.  For the benefit of the tape, also the vehicle you
              were driving that night was a what?

MEEKS:        Blazer.  A Green Blazer.

SMITH:        Okay.  Is it dark or light green?

MEEKS:        Dark.

SMITH:        Okay.  Its um..I think its a S-10, 2-door, I believe,
              isn't it?

MEEKS:        Uh-huh....

SMITH:   Okay.   That will clear that up on which vehicle was which.   The witness described one with a headlight out. It was parked or whether they thought it was parked. I believe when we talked to you before, um...prior to the start of the tape, we provided you with our notes from the previous interview.....

MEEKS:   Yes..

SMITH:   And let you look through it. Um....the ah...other than maybe some misspelled words.   The statement that was dated 3-09-98, it that pretty much what, anything you want to take an issue with, was everything correct in it?

MEEKS:   It looks pretty good....

SMITH:   Okay. Alright.   The um.....Anything from Keith prior to this that would indicated to you that anything like this might happen?

MEEKS:   Uh.....No.  But when he kept.  When he called me at his house and um....I mean I was at work a couple of times when he called me and he said he was about to blow or he was going to get a case of something.   Cause he was having problems with his family, but I thought that was just...um...I ain't never heard of him hurting his family or nothing.  But I know he needed to cool off so that why I had him hanging around me, because I figured and that me and my belief is that if you hang around positive folks that something would rub off on you.  And so he was doing good.  As a matter of fact he had uh...I got him at this Elite, I think its a Day Labor place.   He was working there a little bit.   He was doing, which I thought was doing pretty good, you know, I know that in his neighborhood and everything.   And if you know anything about Chicago, some of the rough sides, sometimes these guys get to be a part of their environment.  So I figured if he hung around some different folks, you know.

SMITH:   He, um....for the benefit of the tape also.  Keith had just been release in um...I think um...December 27......

MEEKS:   27th...

SMITH:   28th..  Um...from  a  detention  here  in  Illinois Penitentiary for Murder?  I think he had been there um.....

MEEKS:   17 straight years.

SMITH:     Okay.  So he hadn't been out long?  He just and um...if I
           gather from what you are saying.  Um....he had a problem
           re-adjusting to society or to civilian life and you were
           trying to help him work through that, by him calling you
           and saying that he was having trouble at home or he
           couldn't get along or whatever.

MEEKS:     Uh-huh.

SMITH:     Okay.  Um....but he hadn't been in any trouble that you
           know of since.....

MEEKS:     Not that I know of...  I mean he stayed with me, plus I
           was at work.  I even took him to the gym a couple of
           times with me.  Um...because that was always a thing for
           me.  Staying in the gym....um...do things feeling better
           about yourself and everything.

SMITH:     Okay.  Um.....how long had he stayed with you, before
           ya'll left to bring him to.....

MEEKS:     I think the weekend before.  He stayed a couple of days.
           Um....one day I tried to get him to stay.  Um....he said
           no take me home.  Lets go on.  I said, I was already back
           out at my house and I had to get up and go all the way
           back out there.  And that was a problem too, because my
           wife always thought I was out there doing something wrong
           because um.....I you know she had her reasons, but.

SMITH:     Yeah.  So it was causing you problems....

MEEKS:     Yeah.

SMITH:     Trying to be nice to him and accommodate him was causing
           you some problems at home too.

MEEKS:     Yeah.

SMITH:     He um...the night before ya'll left to come to
           Chattanooga.  Did he spend the night with you that night?
           Or did ya'll....

MEEKS:     He was at my house.  Um....yeah. Um....I think I went to
           get him and I came back and got my wife.

SMITH:     So he wasn't....you had to go pick him up at his
           mother's?

MEEKS:          Yeah.

SMITH:          Okay.  So he didn't spend the night there the night
                before you left?  Okay, I believe you told us that you
                worked third shift the night before.

MEEKS:          No.  Um....I worked that morning.

SMITH:          Okay.  You...anyway you had worked that day and after
                work was when ya'll left and come to Alabama?

MEEKS:          Yeah.  It was late at night, because I went to the gym,
                worked out, my usual thing.  Um...had to take care of
                some business or whatever.  I went and packed my stuff
                and told him I'll be there to get you and everything.

SMITH:          Okay.  When ya'll registered at the motel in Chattanooga,
                I think you said you registered in two rooms?

MEEKS:          Uh-huh

SMITH:          Um....because you though maybe that when his girlfriend
                got there that they might want to stay over or use the
                room?

MEEKS:          Uh-huh

SMITH:          Um...did you fill out the registration on both of them?

MEEKS:          Yes

SMITH:          Okay.   Did you show two adults in each room?

MEEKS:          Uh...I showed.  They asked who was going to be staying.
                And I said two, because I didn't want any problems with
                them.

SMITH:          Okay.  Well, we've gotten the information from them and
                the registration showed two adults in each room.  That's
                the reason....

MEEKS:          Because, you know I didn't want to have some problems
                later, you know...

SMITH:          What age is your son?

MEEKS:          He is 3.

SMITH:          Okay.  That's the one that went with you down there.
                What um..you called his name a while ago.....

MEEKS:       Kent.

SMITH:       Kent.  So it was him and your wife and you and Keith were
             the ones who actually made the trip.

MEEKS:       Uh-huh

SMITH:       The other adult was, so what you figured if she showed up
             that she would be in the room, so you went ahead and told
             them two.

MEEKS:       Uh-huh

SMITH:       Okay.  What time of the night did ya'll leave after the
             shooting happened?  You got back to the motel, do you
             remember about what time you left Chattanooga going back
             home?  Did ya'll stay the night?  Get up and leave the
             next morning?

MEEKS:       No...No...We left that night.  10ish, 10:45 something
             like that.

SMITH:       Okay.  So that put you getting home what....8:00 or 9:00
             in the morning?

MEEKS:       It was really quick.

SMITH:       Okay.  Do you remember anything about the service station
             in Chattanooga?  Where you went to sit and wait on her.

MEEKS:       Un-huh

SMITH:       But, ya'll left the motel, I believe you say in the
             previous interview, that um...you left the motel and you
             waited around at the station around 45 minutes to an hour
             and she didn't show up.  He wanted you to take him over
             to Fort Payne?

MEEKS:       Uh-huh

SMITH:       And um...that you didn't particularly want to, but you
             went ahead, you were that far, that close you just went
             ahead and made the trip.  Now, um...I think also in the
             notes of the other statement that you reviewed..um...you
             talked about the fact that the girlfriend looked like it
             was going to be a wash, looked like probably he was
             pulling your string on that....

MEEKS:       Uh-huh

SMITH:      That ya'll had argued about the money.  Um...how...to
            what extent....I mean....um....you didn't go into allot
            of detail then and you may not be able to now.  But when
            you say you argued, what, just how far did it go?

MEEKS:      Listen...you know...it..it really...to me it was just me
            being irritable and he said don't worry about it, don't
            worry.  I got you, I got you, cuz.  Just like that.  But
            it was an argument, but it was not like a fight.  I would
            never fight him.  Because I know would he _____.  It
            wasn't like I'm hollering or nothing.  But when I get
            irritable, I get sarcastic real bad.

SMITH:      Ya'll were having a serious discussion, to say the least
            about the fact that he promised you he would pay you the
            expenses and he wasn't coming across with his end of it.

MEEKS:      Uh-huh

SMITH:      And...um...did he say that if she didn't take of it, that
            he would?

MEEKS:      No.  He never would, because I knew he didn't have no
            money and I never would have fell for that.

SMITH:      I believe before you had said um...that she was going to
            hit you hard on it because she was getting like some
            Income Taxes back or something and that she would pay for
            your expenses.  Um...I'd asked you before if he had
            called from your house, um..um..called the girlfriend or
            anything with a number that we might be able to run down.
            Have you had the opportunity to look or have you found a
            number or something that we might be able..um...do you
            know of any way to contact her.  Mutual friend or
            something.

MEEKS:      Okay.  Um...Charles Carter introduced them...well his
            girl...his girlfriend introduced them.

SMITH:      So, if we get with Charles or his girlfriend, they should
            be able to tell us who the girl is?

MEEKS:      If they really know her like that, yeah.

SMITH:      Okay.  Um....the um...there wasn't um...I know we asked
            this before, but there wasn't any discussion about the
            robbery or anything that he said that might lead you to
            believe that he was going to do anything other than ask

for directions.

MEEKS:          No.

SMITH:          Did it um...did you not...did it not seem a little odd to
                you, of course I realize that you had been up and um....
                that you had worked all day and you had been on the road,
                um...I can relate to that because we did that yesterday,
                so I know how it is.  But did it not seem a little odd to
                you for him to have a girlfriend that was suppose to have
                been in Chattanooga, then Fort Payne and now we're over
                in Centre?   Then he's going  to pull up and ask for
                directions and don't even know her name or....just....is
                he just that quite and kept to himself that much?

MEEKS:          Yeah.  He was quite, but..um...I told him I didn't want
                to go to Fort Payne.  So he said take me close.  So I
                said, "Well I'll get you to Chattanooga, everybody knows
                where Chattanooga is at."  "It's straight up the highway
                so it will be easy to find."

SMITH:          Okay.  So the stop in Chattanooga was actually your....

MEEKS:          Uh-huh

SMITH:          Something that you told him you would do to keep from
                going to Fort Payne?  Um.....

MEEKS:          I told my wife, I said um..."We'll go to Chattanooga and
                it will be easier, we get back on the highway and you
                know go back to, you know Illinois."

SMITH:          I think..um...to clarify that...um...I think before that
                you told us that you and your wife had been to court on
                Child Support..or

MEEKS:          No...no...My child in Fort Payne.

SMITH:          Okay..

MEEKS:

SMITH:          Okay.  So you've got a daughter in Fort Payne...

MEEKS:          Uh-huh

SMITH:          You just been back to court or been back through DHR or
                something up here....

MEEKS:          For the....um....Child Support.   And we were getting...I

SMITH:    was going to claim her on taxes and um...we were having a thing about that too.
Okay.  So that was the reason that you just really didn't want to drive right back into Downtown Fort Payne, there was no other reason than that?  Um..I think that when we talked before and when we did I don't think at that particular time we hadn't recover a weapon.  But since then, we have.

MEEKS:    Yeah.  That was a blessing.

SMITH:    It is going to be the .40 caliber Glock.  The serial numbers and everything matches the one you reported here.

MEEKS:    That put the pressure off of me, from him thinking that I just snitched on him .

SMITH:    Yeah.  Has he um...had any contact with you since...

MEEKS:    Uh-huh

SMITH:    Since he's been locked up?

MEEKS:    Uh-huh

SMITH:    Anything out of the ordinary...Anything that we need to know, or anything that you think we might should know?

MEEKS:    I think I just told you the conversation consist of um.. when he finally told me...one day he called and um...my wife told me don't accept his phone call.  I wanted to know what was he thinking, you know as far as um...was he going to do something to me for leaving him or whatever?  So the thing was, the first time it was an alibi from Charles.  I said, "No, I can't do that, because Charles don't know nothing about this."  "I'm not getting Charles involved."  And he don't know that I had already told on him.  So, I really didn't say much.  So this last time that he called, I said they found the gun.  I asked Mr. Wilson, I said um..can ya'll like let him know that the gun is found.  --------- So um...he said I really can't tell him, but I can tell his lawyer.  So finally that Friday he called and I said like Okay.  I'm going to hold my breath.  I'm going to tell him, you know they found the gun.  And so I told him that and I think um...he just like got quite and like he said I'm sorry man and I know you didn't know the gun was gone.  I said I know man.  And um...and so he just said I'll take care of the rest.  Because I told him, I said man they got me, my wife hollering the kid crying.....(end of side one)

SMITH:      Okay.  The tape kicked off and I had to swap sides on the
            thing.  Just go ahead and finish up.  The um...this call
            he made to you of course was collect.  I'm sure it had to
            be considering.

MEEKS:      Uh-huh

SMITH:      Was it recorded?  By chance did you record on a answering
            machine or anything?

MEEKS:      No. No.

SMITH:      You didn't think about it?

MEEKS:      Should I?

SMITH:      Well, no...I just wondered if you did...um....

MEEKS:      Did ya'll record ya'lls?

SMITH:      Um...I'm assuming no.

MEEKS:      Well they do at Stateville.  So I figured that would
            have.....when he said that, I was like well.....

SMITH:      Have you received any threats from him or anything like
            that from him?

MEEKS:      From him?   No, not from him..

SMITH:      Okay.

MEEKS:      Have I received any threats?

SMITH:      Have there been any more generic, have you got
            um...related to this investigation....um... have there
            been any threats?

MEEKS:      Uh-huh.

SMITH:      Okay.  Tell me about them.

MEEKS:      Okay, I think I told you and I told Tom....um...first of
            all the first one was through a mutual friend Marty.
            Um..um..He told Uncle Tom..um..um...I guess he told ya'll
            all this stuff about something going on in my house.
            Um...about a car or something....um...um...he came to my
            house one day to see if I was alright, because he knew
            what had happened. And he said that um....that there is a

MEEKS:         From him?

SMITH:         From any of the family.  As far as anybody threatening, because um...we'll do whatever we can as far as the threats and the intimidation....

MEEKS:         Well, the other day.....

SMITH:         We'll try to deal with that as much as we can through the Illinois Police and help you on that.

MEEKS:         Well he made me a thing the other day to move out to the _____ house.  And um...I said well I can't really pick up like that.  I don't have the cash like that to just to pick up...pick up like that.  But the last time I talked to him, I really felt in my Spirit that he understands.  And I think um...that he's going um...admit everything and take his side of the responsibility.

SMITH:         Well, we had um....I don't think there is anything that would...as I can see that would indicate that um...that he holds any hard feelings toward you on anything that has happened so far.  We have had very little conversation with him and what feed back we've got from some of the others has not been anything negative as far as.....

MEEKS:         Nah...

SMITH:         Him blaming it on somebody else...

MEEKS:         Yeah.....

SMITH:         The um...um...he was um....Gosh let's see....is there anything that we need to clear up for the benefit of the tape.....

MEEKS:         Cause you know that day that I called you, ya'll was... I was in disarray then.  But I called both of ya'll at the same time.  Because, there was a lot of stuff going on.  Marty kept putting this stuff in my wife's head about, you gotta watch out, you gotta watch out, you know.  You'll never know how he is.  But then when I ____ can you kind of let him know that, you have to let the know that, hey you didn't snitch on me cuz, you had to take care of your family.  You know...

SMITH:         Now I want to clear of the gang affiliation.  Before you had told us that, he was affiliate with a .......

car acting very, very funny around your house.   And I
said well you know, before it happend..well...some of the
relatives that he told that he didn't do it or whatever,
been told that Keith called and told me that you better
give him an alibi, threatening and stuff.  I said what do
you mean alibi, I told you what happened.  He said that's
not what happened, this and that and you better give him
an alibi.  And um....another call came.  They all called
late at night.  Um...saying that um....what's that friend
of yours...that you know that ya'll...that he knows down
there named Charles?  I said, "Why?"  They said what's
his name?  I said, "Why?"  You know the thing was we'll
let the rat bite if you don't this and do that.  It was
like different things like...um...one day, I think I told
you...um...I went to pick up my son at school and I knew
that somebody was looking at me and that I know that for
a fact that was a threat.  Um...I don't know if he done
it per-say, but I know with his family mad at me, they
all think its my fault.  Because they said if you hadn't
never took him down there in the first place this
wouldn't happened.  Even um....my immediate family, got
me to feeling guilty like well....what if I didn't take
him to Alabama, and show him my friends and show him how
nice it was down there it may not have happened.  And so
they...all of them they are not putting the responsi-
bility on who done it, they putting the responsibility on
me for taking him down there  You know.

SMITH:      But as far as anybody...any direct threats...um..

MEEKS:      Indirect.....all indirect.

SMITH:      Everything has sort of been indirect.......

MEEKS:      Which I know what they are.....

SMITH:      Some suspicious stuff that um....as far the vehicle
            around...um... you feel like....

MEEKS:      Hanging up phone calls...hanging up...um...just different
            things.

SMITH:      Do you happen to have an answering machine?

MEEKS:      Uh-huh.

SMITH:      Um....on your late night calls, where um...you know...if
            nothing else...you might have it where at the beginning
            of the calls from them you might kick it on and record
            it.

MEEKS:          The Black Gangsters

SMITH:          The Black Gangsters.  And um....they um...can you get
                some more information on that?  As far as how long or
                what his status was with them, as you know it?

MEEKS:          Black Gangsters um.....20 plus years probably maybe
                longer.  He's 37 I think, maybe 30 years.  I don't know,
                they start young.  Um....he done something for the mob a
                long time ago.  They hold him in great honor.  Its
                because there is a guy up here by the name of Larry
                Hoover, which is um...one of the Fore Fathers of um...one
                of the biggest Black gangs in the country.  Which is the
                GD.  Um....it was a couple of Black Gangsters off the
                street, everybody was a Black Gangsters at one time, they
                started branching off into the _____ when he died
                so everybody was going there separate ways.  Um....the
                GD's, Larry Hoover was telling, everybody from Black
                Gangsters is coming to the GD's.  So this guy named Larry
                Gambrell, which I know him very well also, um...said the
                only person who stood said, "Black Gangsters" and stay
                Black Gangsters was him and Keith and several other ones.
                So the time was when Larry started stabbing and killing
                everybody up in Stateville.  If you we're not going Black
                Gangsters, this happened in '85, that we're killing
                everybody that's not going to come over to Black
                Gangsters.  Larry Gambrell, who was the principle Black
                Gangsters; and Keith, my cousin; took up and fought for
                their mob.  And that's held in high standards with them.
                And Keith told me that when he got out that they still
                hadn't repaid him for that debt.  So that's why I've been
                freaking out for the last, you know.

SMITH:          His affiliation with the um....gang related activities or
                any gang affiliation...was that pretty much documented in
                his portfolio with the corrections.

MEEKS:          Yeah.  If you look at this status for the gangs.  He's
                say Black Gangsters.

SMITH:          Okay.  I know...that in the paperwork we've seen so far I
                had seen the notation of that.  And I thought well, maybe
                they don't put it in there, because a lot of states do
                and a lot of them don't.

MEEKS:          Okay.  You have to be a State employee to get that or
                request that.  Because um....every computer...when I look
                up on the computer my code won't give that to me.  But if
                a parole agent look it up it will show his gang status.

SMITH:          Okay. Fine.  We just needed to be able to show that.  Its
                clear what the situation was and why every thing happened
                the way it did.  Thank you.  Do you have anything else?
                Oh yeah, I asked about the vehicle and all.  We didn't
                have a um...well we had a camera the other day but there
                was about a foot of snow on the ground when we were up
                here.  Do you have any objections to us taking a picture
                of your vehicle......

MEEKS:          Not at all, sir.

SMITH:          The um...did we ever get a photograph of Wayne?

UNKNOWN:        Okay.

SMITH:          _____ providing the photograph.  Okay.

MEEKS:          You don't have any objections to that do you?

SMITH:          No.  The purpose of the photograph of you and the vehicle
                is because we have located the people that was in the
                pickup next to you.  Um...I think it had a Florida tag on
                it.

MEEK:           I don't know.

SMITH:          They've been located and um...interviewed and this is for
                identification purposes.  That's all it is.

MEEKS:          Alright.  No problem.

SMITH:          The vehicle they talked about...one headlight out..um...
                there was some between different witnesses, there was
                some deviation as to whether it was Green or Gray or
                Black and um.....all we want it for is for identification
                purposes.  You don't have any objections to that?

MEEKS:          I'm not questioning that.

SMITH:          Um....I guess close it out then Larry.

WILSON:         This concludes the interview with DeWayne Meeks on this
                date 04-06-98.  The time is 10:55 a.m.

437

F

TO: Lt. Butkovie

FROM: Dep. T. Arambasich

SUBJECT: Information given by an eye witness to an out-of-state car-jacking/murder

DATE: March 7, 1998


On March 7, 1998 at approximately 2:00pm I had just picked up my son from his

weekly bowling league at Town & Country Lanes in Joliet, IL. I then decided to call

home to see if I had any calls to retrieve off of my answering machine;

- At this time Dwayne Meeks, who is a personal friend of mine and a Department of Corrections employee, had left a message to contact him right away.
- When I returned home at about 3:10pm I returned his call and he had already left his residence.
- I then left my home, with my son, and traveled to Coal City, IL to buy some kerosene.
- After leaving Coal City, I then drove to Wilmington, IL to pick up one of my son's friends, who was going to spend the night at my house.
- At about 4:45PM, while we were on our way home and just leaving the city of Wilmington, Mr. Meeks contacted me on my cell phone from the home of Marty Tutor (m/w D.O.B. 3-17-67), who resides at 23132 W. Marylou Ave., Channahon, Il 60410.
- At this time Mr. Meeks asked me to come over to Marty's home. He then stated that he needed to see me right away and that it was extremely urgent.
- Knowing Mr. Meeks since 1985, and by the sound of distress in his voice, I knew something was strongly amiss and I proceeded to Mr. Tutor's home right after I dropped my son and his friend off at my home.
- I arrived at Mr. Tutor's home at about 5:30PM where I was greeted at the door by Mr. Meeks, at this time Mr. Tutor had stepped out.

- **We both then sat down and I asked Mr. Meeks what was wrong and he began to tell me the events of the previous 22 hours;**

- **His Story is at follows;**

  - His cousin, Keith Gavin, asked him if he would give him a ride to Chattanooga, TN where he would meet his girlfriend and then she would take Gavin back to Fort Payne, AL.

  - Mr. Meeks explained to him that he didn't have the extra money in order to make the trip. His cousin, Keith Gavin, told him if he used his credit card for the trip that his girlfriend would reimburse him because she had just received her income tax refund check.

  - Upon their arrival in TN and at the place there were suppose to meet Mr. Gavin's girlfriend, she did not show up.

  - At this time Mr. Gavin asked Mr. Meeks if he would take him as far as Fort Payne, AL. Mr. Meeks agreed and continued on, after stopping to get a motel room for his wife and child, who also came for the ride, then he headed out to Fort Payne.

  - After arriving in Fort Payne  Mr.  Gavin's girlfriend still could not be located.  Mr. Gavin then asked Mr. Meeks if he would take him to her house, he wasn't sure where it was but remembered a partial route to it and he thought that he could recognize it.  Mr. Meeks then told Gavin that he would rather not do it because he has family in Fort Payne and would not have the time to visit and didn't want to hurt anyone's feelings.

  - Mr. Gavin talked Mr. Meeks into trying to find the house at least once.

  - Mr. Meeks again asked him if this so-called girlfriend of his was going to pay him to cover the expenses of the trip.  He explained to Mr.  Gavin that his wife would be mad at Mr. Meeks if Mr. Gavin didn't live up to his part of the bargain.

  - Mr. Gavin then became upset.

- Unable to find the girlfriend's home the two ended up in Centre, AL, a city just outside of Fort Payne.

- As they came up to a red stop light in Centre, Mr. Meeks told Mr. Gavin that enough was enough ( these are not exact words) and he better do something about getting in touch with this girlfriend of his.

- Mr. Meeks then restated his concerns over the expense of the trip.

- Mr. Gavin then exited Mr. Meeks Blazer and approached an adjacent car which was occupied by at least one person.

- Mr. Meeks then said Gavin pulled out a hand gun and order the driver out of his car.

- Mr. Meeks began screaming at Mr. Gavin "What Are You Doing" several times.  Then as Mr. Meeks watched, the driver of the car refused to give up his vehicle and Mr. Gavin then shot the driver and then turned towards Mr. Meeks as if he was going to shoot him next.

- Mr. Meeks then pressed down hard on the gas pedal driving away from  Gavin and striking him with the open door of his Blazer.

- Mr. Meeks than looked back at Mr. Gavin and saw him shoot maybe two (2) more times and then pushed the victim towards the passenger side of the then hijacked car, pursuing Mr. Meeks.

- Mr. Gavin made numerous attempts to get Mr. Meeks to pull over, but fearing for his life, Mr. Meeks kept on going with only one thought in his mind, to get to his family before his cousin did, possibly to get rid of witnesses.

- As the chase continued Mr. Meeks noticed what he believed to be squad car lights closing in on Mr. Gavin and that Gavin had ceased the pursuit.

- Mr. Meeks then returned to his motel room and told his wife what had happened.  They both agreed that the incident be reported, but because of the possibility that his cousin may be on his way to the motel and the level of emotions because of the hijacking/shooting, the three should return to Illinois and report it after securing safe haven for his family.

- I then told Dwayne that we had to report this right away and he should report this to a superior officer in his department and then I would do the same.

- At this time a friend of Mr. Meeks, Roy Smith (m/b D.O.B. 8-23-67) who resides at 204 Redbud Dr., Joliet, IL 60433, entered Mr. Tutors house. He stated that Mr. Tutor had called him and requested that he come over to Mr. Tutor's house as soon as possible and that it was an emergency.

- Mr. Smith thought that Mr. Tutor was just joking with him and that's why he took his time getting there. Mr. Meeks then told him what had happened and that he needed to contact his attorney so that he could have representation while telling his side of the story. Mr. Smith then attempted to contact Jeff Tomczak but was unable to do so.

- Mr. Meeks then told me that he couldn't figure out how or where Mr. Gavin could have acquired a handgun so when he came home he checked to see if his .40 caliber Glock was in its hiding place and that it was in fact missing, but the two (2) extra magazines were still there. Mr. Meeks then said he called the Illinois State Police and reported it missing and he believed that a family member, who was an ex-felon, may have taken it.

- At this time other neighbors and friends of Mr. Tutors were coming over to visit, I then suggested that I take Dwayne to my house were he could contact his superiors with a little more privacy, and I would do the same. We then exited Mr. Tutor's home.

- As we arrived at my home, at about 6:15PM, Dep. Vanazz Washington was just pulling up in her private car (we were suppose to go to a movie together). I explained to her what had happened and what we were about to do.

- We then entered my home and Mr. Meeks made several attempts to contact a D.O.C. Supervisor finally contacting a Mr. Pirini, told him what had happened and what he was going to do and then hung up.

- At about 6:45PM, I contacted Lt. Craig Butkovic at the A.D.F. told him the story and he told me to contact the investigating agency who was handling the case and to write a to-from on what had happened and how I became involved.

- Mr. Meeks then told me it happened in Cherokee County, AL at about 7:30PM on March 6, 1998, so I called the Sheriff's office in Cherokee County, identified myself and told them that I had an eyewitness to the car-jacking/shooting and a possible homicide.

- The Cherokee County dispatcher, Officer Pribe, took my name and phone number and said he would give it to an investigator and that he would be contacting me as soon as possible.

- I then contacted the Fort Payne,. AL Police Department to try to get in touch with Officer Tony Birch, who is a personal friend of mine and Mr. Meeks.  I left a message for Officer Birch to call me at my house.  Officer Birch called back sometime between 7:30 and 8:00PM.

- I then told him that I was going to have Mr. Meeks tell him what had happened  and then I gave the phone to Dwayne.

- After about five minutes Dwayne hung up the phone and a Detective Larry Wilson from the Cherokee County Sheriffs Office called.

- I then isolated myself and told him what had happened.

- He then relayed to me that the driver of the car was dead and that they had the shooter in custody who was giving the name of Keith Edmonds.

- I then asked Det. Wilson if he would like to talk to Mr. Meeks, he said yes, and Mr. Meeks told his story to Detective Wilson.

- After talking to Dwayne Det. Wilson said he needed to contact the District Attorney and that he would get back to me.

- A little while later Det. Wilson called back and told me that he would be in town at the A.D.F. on Monday at 9:30AM.

- About an hour later Officer Birch of the Fort Payne Police Department called me back and said that his department was sending him along with Det. Wilson.

- He also advised me that a friend of his was one of the responding officers and that Mr. Gavin had shot at him while trying to get away.

### END OF REPORT



Illinois Department of Corrections
INTERNAL INVESTIGATIONS

I N T E R V I E W   S H E E T

EMPLOYEE

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 98-WDE-224 | MEEKS, DWAYNE L., (C.R.C. I) | | West Side C.C.C. |
| Investigator | Nature of Incident | | Date of Report |
| NEATHERY | Socializing; Conduct of Individual | | 04/01/98 |

<u>PARENTI, DONALD W., Public Service Administrator</u>

PARENTI is a white male, 61 years old (DOB: 04/03/37); 210 lbs., 5'9" tall, and who has been employed by the Department of Corrections as a Public Service Administrator for 5 years, assigned to the 8:30 a.m. to 5:00 p.m. shift. His regular days off are Saturday and Sunday.

PARENTI was interviewed by Investigator NEATHERY at 3:00 p.m., on 04/01/98, by telephone, and stated, substantially, the following:

PARENTI sated that he had been contacted on 03/07/98, by MEEKS who advised that he had witnessed a murder, committed by his cousin, while in Alabama on 03/06/98. PARENTI stated that MEEKS was waiting to talk to Lieutenant BUTKOVIC of the Will County Sheriff's Department concerning this matter and he informed MEEKS to bring in the Police Report from the Will County Sheriff's Department the following day, he produced a point-by-point memorandum from Deputy ARAMBASICH to Lieutenant BUTKOVIC concerning his information. PARENTI stated that the weapon used would not be Department issued and only the transport team would need a valid FOID card for employment and MEEKS was not on the transport team. There is no documentation in the personnel file of MEEKS concerning any relatives incarcerated or paroled from the Department with his application dated 07/18/94, reflecting no relatives incarcerated. PARENTI stated that MEEKS was very fearful that his cousin was going to retaliate against him and he picked up his wife and child at the motel and returned to Illinois, where he reported what he saw. It doesn't appear that he knew his cousin had been apprehended. PARENTI stated that MEEKS is one of the better employees with no problems being exhibited.

Interview concluded.

TN:ajs

DC 1114-2 (R. 8/86)
IL 416-6057                     Page 1 of 1 page(s)              Attachment     7



Illinois Department of Corrections
INTERNAL INVESTIGATIONS

**REPORT OF INVESTIGATION**

| Case Number | Report Date | Institution | Case Investigator |
|---|---|---|---|
| 98-WDE-224 | 05/13/98 | West Side C.C.C. | NEATHERY |

Time, Date and Nature of Incident

Socializing; Conduct of Individual; Official Misconduct

| | Name (Last, first, middle) | Complainant ☐ Victim ☐ Inmate ☐ |
|---|---|---|
| S U B J | MEEKS, DWAYNE L., (C.R.C. I) | Offender ☒ Witness ☐ Employee ☒ |
| | Institution Number | S.S.A.N. | Institutional Nickname (s) |

REPORT STATUS:     Initial Open ☒          Final ☒

Interviewed:

1.  PARENTI, DONALD W., Public Service Administrator
2.  MAGEE, PHILLIP J., Public Service Administrator
3.  MEEKS, SHARON L., Corrections Residence Counselor I

Case Summary:

This investigation was conducted at the request of Superintendent JIMMY ELLIS, after Parolee KEITH GAVIN, -23865, was arrested in Centre, Alabama on the charge of Murder. Information provided by GAVIN's mother indicated that GAVIN had traveled to Alabama with his cousin, DWAYNE MEEKS, who works for this Department. This information was confirmed that MEEKS is employed at West Side Community Correctional Center as a Corrections Residence Counselor I (Attachment #1).

Additional information indicates that GAVIN was arrested on 03/06/98, after murdering a man in the course of a robbery and stealing his van. GAVIN was later stopped, where he shot at the officer and was subsequently arrested. On 03/07/98, MEEKS telephonically contacted Assistant Supervisor DON PARENTI and advised him that he had witnessed a murder while visiting in Alabama, which was committed by his cousin. MEEKS returned to Illinois fearing for the safety of his wife and children and was willing to give a statement to the Will County Sheriff's Department. MEEKS advised Deputy T. ARAMBASICH, Will County Sheriff's Department, that GAVIN, who is his cousin, asked him to take him to Chattanooga, Tennessee, where he could meet his girlfriend with his girlfriend reimbursing him for his expenses. Upon arrival in Tennessee, GAVIN's girlfriend didn't show up with MEEKS agreeing to take him to Fort Payne, Alabama, after getting a room for his wife and child. After arrival in Fort Payne, the girlfriend couldn't be located, with a conversation taking place between MEEKS and GAVIN concerning reimbursement and GAVIN getting upset. While at a red light, GAVIN got out of MEEK's vehicle and approached an adjacent car, pulled out a handgun and ordered the driver out of his car. After refusing to give up his vehicle, GAVIN shot the driver and turned towards MEEKS, as if to shoot him. MEEKS left the area and while looking back saw GAVIN shoot the victim possibly 2 more times and hijacking his van. GAVIN attempted numerous times to get MEEKS to stop with the chase ceasing after what MEEKS believed to be squad car lights closing in on GAVIN. After returning to the motel and telling his wife what had happened, they agreed that it needed to be reported, but because of the possibility that GAVIN could be on his way to the hotel, they returned to Illinois and reported it after being safe (Attachments #2 through #5).

Information obtained through the Offender Tracking System, indicates GAVIN was admitted to this Department 11/24/82, sentenced to 34 years for Murder out of Cook County. GAVIN was paroled to his mother's residence in Chicago on 12/28/97, after serving 15 years of his sentence (Attachment #6).

DC 346
IL 426-0438

Continued

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 98-WDE-224 | MEEKS, DWAYNE L., (C.R.C. I) | | West Side C.C.C. |

On 03/31/98, Detective LARRY WILSON was telephonically contacted and advised Reporting Investigator of the same basic information and stated that MEEK's weapon (glock) was recovered and that MEEK's didn't know if he had taken the weapon with him. WILSON was to have checked with the District Attorney for approval to send Reporting Investigator documents pertaining to this investigation.

On 04/01/98, Lieutenant CRAIG BUTKOVIC, Will County Sheriff's Department, was telephonically contacted and advised that Deputy ARAMBASICH had talked with MEEKS and submitted a to-from document concerning this conversation. Lieutenant BUTKOVIC will check with the Deputy Chief regarding releasing any documents they have concerning this incident.

On 04/01/98, Master Sergeant TAMMY HEERDE, Division of Internal Investigations, Illinois State Police, telephonically contacted Reporting Investigator and advised that they would be taking the case concerning Official Misconduct and acting as liaison between Alabama Officials and the Department of Corrections.

Public Service Administrator DONALD PARENTI stated that on 03/07/98, he was contacted by MEEKS who advised that he had witnessed a murder committed by his cousin, while in Alabama. MEEKS was going to talk to the Will County Sheriff's Department and was instructed by PARENTI to bring in the Police Report the following day, which he did. PARENTI advised that the weapon used would not have been a Department owned weapon and that MEEKS was not on the transport team. Their was also no documentation in his file regarding having any relatives incarcerated or paroled from this Department with his application dated, 07/18/94, reflecting no relatives as being incarcerated (Attachment #7).

On 04/03/98, Reporting Investigator obtained a copy of the employment application of Mr. MEEKS where it reflects MEEKS as having no known relatives presently incarcerated or currently on parole, mandatory supervised release or electronic detention (Attachment #8).

Public Service Administrator PHILLIP MAGEE stated that GAVIN last reported at the parole center on 02/26/98, with no changes being noted. There was no request for travel submitted or any talk of traveling being noted. If GAVIN would have submitted a request it would have been denied, due to no death or immediate death of an immediate family member. MAGEE advised that GAVIN's mother advised him that GAVIN traveled to Alabama and they thought it was okay, due to him traveling with her nephew, who is employed by this Department (Attachments #9 and #10).

On 04/15/98, Reporting Investigator received copies of Deputy ARAMBASICH's memorandums regarding MEEKS from Lieutenant BUTKOVIC, Joliet Police Department, with no additional information being obtained (Attachment #11).

On 04/14/98, MEEKS was indicted by the Cherokee County Grand Jury on a charge of Capital Murder and Robbery and was subsequently, arrested on 04/16/98, by agents of the Illinois State Police, Division of Internal Investigations and Investigator RUSS NELSON of this agency (Attachment #12).

On 04/16/98, Reporting Investigator telephonically spoke with Investigator WILSON, Cherokee County Sheriff's Department and was advised that MEEKS had stated that he knew GAVIN was a parolee and had served 15 years in our facilities. MEEKS advised him that GAVIN had been out for approximately 3 months and had been staying with him.

Corrections Residence Counselor I SHARON MEEKS stated that GAVIN is a cousin to her husband and had been to their home, but was not staying with them. She had heard through relative rumors that GAVIN had been locked up, but she and her husband had never talked about it. She was never told by her husband that GAVIN was on parole or saw any documents to indicate he was on parole with no inquiries being made by her

Continued

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 98-WDE-224 | MEEKS, DWAYNE L., (C.R.C. I) | | West Side C.C.C. |

concerning the rumors. MEEKS stated that her husband was doing GAVIN a favor and asked her to come along (Attachment #13).

Conclusion:

Based on MEEKS' statement to Detective WILSON concerning GAVIN having been incarcerated by this Department and no documentation of this being reported, along with the arrest of MEEKS, the Administrative charges of Conduct of Individual and Socializing are substantiated against Corrections Residence Counselor I DWAYNE MEEKS.

Based on statements made by SHARON MEEKS that she had heard that GAVIN had been locked up and that he had been to their residence, the Administrative charge of Socializing and Conduct of Individual is also substantiated against Corrections Residence Counselor I SHARON MEEKS.

Attachments:

1.      Incident Report, MAGEE, 03/26/98
2.      Offense Report, WILSON, 03/07/98
3.      Arrest Report, GAVIN, 03/06/98
4.      Memorandum, PARENTI
5.      Memorandum, Deputy ARAMBASICH, 03/07/98
6.      PROFS, GAVIN, 04/01/98
7.      Interview, PARENTI, 04/01/98
8.      Application, MEEKS, 06/22/94
9.      Interview, MAGEE, 04/03/98
10.     Service Center Log, GAVIN, 04/03/98
11.     Memorandum, Lieutenant BUTKOVIC, 04/10/98
12.     Indictment, MEEKS, 04/14/98
13.     Interview, MEEKS, 05/05/98

TN:ajs

446



**Illinois**
Department of
**Corrections**

**Rod R. Blagojevich**
Governor

**Roger E. Walker Jr.**
Director

James R. Thompson Center / 100 W. Randolph Street / Suite 4-200 / Chicago, IL 60601 / Telephone: (312) 814-3017 / TDD: (800) 526-0844

May 18, 2006

Mr. Matthew R. Lyon
Sidley Austin, LLP
One South Dearborn
Chicago, Illinois  60603

Re:  <u>Keith Gavin v. State of Alabama, Case No. 05 L 014036</u>

Dear Mr. Lyon,

Please find enclosed the response to your subpoena for documents in the above matter.

Sincerely,

Delcine M. Thompson

**HIGHLY
CONFIDENTIAL**

447

2181 - Served
2281 - Not Served
2381 - Served By Mail
Subpoena - for Deposition                    (Rev.12/11/01) CCG 0014

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

KEITH GAVIN, Petitioner

v.                                      No.   05 L 014036

STATE OF ALABAMA, Respondent

### SUBPOENA FOR DEPOSITION   (RECORDS ONLY)

To: Illinois Department of Corrections
    James R. Thompson Center
    100 West Randolph Street
    Chicago, Illinois 60601          produce records

**YOU ARE COMMANDED** to appear to give your deposition before a Notary Public at:  Sidley Austin, LLP,

One South Dearborn Street , Room _____ , Chicago , Illinois   60603
         (address)                                    (city)                (zip)

on   May 15 _____ , 2006 , at   9:00   a.m.
                                              p.m.

**YOU ARE COMMANDED ALSO to bring the following:**

All documents in Schedule A hereto

your possession or control.      PRODUCE RECORDS
    **YOUR FAILURE TO APPEAR IN RESPONSE TO THIS SUBPOENA WILL SUBJECT YOU TO PUNISHMENT
FOR CONTEMPT OF THIS COURT.**

WITNESS                April 27        , 2006

                                 _Dorothy Brown_
                                 Clerk of Court

Firm
Att. No.   38315
Name:   Matthew R. Lyon, Esq.
Attorney for:   Keith Gavin
Address: One South Dearborn Street
City/State/Zip:   Chicago, Illinois 60603
Telephone:  (312) 853-7000

    I served this subpoena by handing a copy to _____
_____ on _____ , _____ .

I paid the witness $ _____ for witness and mileage fees.

Signed and sworn to before me on this _____ day of _____ , _____

                                                    _____ Notary Public

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

HIGHLY
CONFIDENTIAL

## DOCUMENT REQUESTS

1.     All documents or communications related to the issuance of a weapon to Dwayne Meeks, in the course of his employment with you or otherwise.

   **ANSWER:**  None found.

2.     All documents or communications related to whether **Dwayne Meeks** was required, directed or encouraged to obtain a Firearm's Owner Identification ("FOID") card in the course of his employment with you or otherwise.

   **ANSWER:**  None found.

3.     All documents or communications related to a .40 caliber Glock weapon with serial number CCN449US, including, but not limited to, the ownership or registration of that weapon by you or Dwayne Meeks.

   **ANSWER:**  None found.

4.     All documents or communications related to your policies, practices and regulations, whether formal or informal, as to the issuance of weapons and the categories of your employees who are issued weapons.

   **ANSWER:**  See attached.

5.     All documents or communications describing or reflecting the position or positions in which Dwayne Meeks was employed by you in February and March 1998, including his job title(s), duties and responsibilities, whether the position or positions were such that Dwayne Meeks would have been issued a weapon by you as a matter of policy or practice.

   **ANSWER:**  See attached.

**HIGHLY
CONFIDENTIAL**

# ALABAMA PRISON PROJECT

*215 Clayton Street   Montgomery, Alabama 36104*
*Phone: 334-264-7416   Fax: 334-264-4661   email: halbert @ mindspring.com*
*Lucia H. Penland, Executive Director*

| *Renascence Community* | *Mitigation Program* | *CURE* |
|---|---|---|
| *Douglass Porter, Chair* | *Lucia H. Penland* | *Aaron McCall* |
| *Steering Committee* | *Coordinator* | *Coordinator* |

October 19, 1999

H. Bayne Smith
105 Seaboard Ave.
Piedmont, AL  36272

Re: Keith Edmund Gavin

Dear Mr. Smith:

In speaking with the mitigation specialist I retained in Chicago, and seeing the information he has provided, it is clear to me that a great deal more work needs to be done on this case. We have issues of Mr. Gavin being exposed to a violent atmosphere from a very early age, entering into prison at a young age, which would only have exacerbated the effect of the exposure to violence, with the potential for him to be suffering from Post Traumatic Stress Disorder. This disorder, if present, could provide understanding of his behavior in this incident, if he is found guilty. We would have to know if it is present, and to what extent it did and does effect his behavior.

Additionally, there is the level of poverty in which he apparently grew up, along with what racism he encountered over the years. We know that he was a youngster when Martin Luther King was assassinated, and that there were riots in the housing project he lived in when word of that event reached there.

Gang culture was developing in the area in which he grew up, and during the time he was growing up. We don't, at this point know what the effect of that was on him, other than his mother has said that he was pressured to be a part of it. The gangs are a significant factor in his neighborhood, and the area of Chicago he is from. We need to know how he and his siblings and friends fit into that. We don't know if that culture spread into the prison culture he inhabited for 17 years, and where he fit in there, nor do we know what his prison record is like.

In order to present an effective, comprehensive and adequate mitigation case, the following things must be done:

- Comprehensive records must be obtained.
- Additional interviews with family, friends, and fellow inmates must be conducted.
- Sociological information about the culture in which he grew up should be obtained.

- Experts must be retained and provided information to make assessments and prepare testimony on the effect of his incarceration, and on the effect of his family and the neighborhood culture, including the amount of violence he was exposed to. This is essential in pulling together the information obtained and presenting its' relevance to this case, and to explaining Mr. Gavin's behavior in a way that mitigates the offense.

With the schedule I have been working under, coupled with the lack of cooperation from Mr. Gavin and his family, this work is not close to being completed. In our last conversation, you indicated to me that you were not willing to request another continuance on this case. The mitigation cannot be adequately developed without additional time.

To present mitigation that is neither thoroughly developed, nor has the expert assistance to put it into a context which will relate it to the case at hand is not providing Mr. Gavin with the best assistance available. Under the circumstances, it is in the best interest of Mr. Gavin for me to withdraw from this case. Should you obtain a continuance which will provide the time necessary to complete the work I would be pleased to re-enter the case.

I will be sending you material from Mr. Sturman as I receive it, keeping in mind your trial schedule and that you might have some use for it. I wish you the best of luck in this trial.

Sincerely yours,

Lucia H. Penland
Mitigation Coordinator

451



### State of Alabama
### vs.
### Keith Edmund Gavin

## Witness List

**(I) Initial Scene Witnesses**

1. **Larry Twilley**...saw shooting at the bank;  shooter was a *black male, slim, about 6' tall, wore dark clothes and a red and black striped toboggan.* Shooting occurred about 6:40 pm.   Shot *3 times*.  Driver of the van started jerking, the shooter pushed him over into the van and got in under the wheel and sped off towards Leesburg.
   <u>*Special Note:*</u>  *The driver had his hands up when the black male shot him.*

2. **Troy Chamblee**...saw white van next to curb at bank around 6:45 pm;  Heard at *least two shots (possibly three)* from what sounded like a high caliber gun.  Then *another shot or shots,* then the white van went west towards Leesburg.

3. **Ronald Baker**...saw shooting;  Had stopped at red light when a vehicle came up behind them;  He then heard a shot;  *Black guy had gotten out of the vehicle  behind us* and went over to a van parked next to the curb.  The *man* opened the door and the black guy shot the man in the van.  We took off and went straight across from the light...

**4. Ricky Henry...**At red light at Courthouse; *Vehicle pulled up to the back of us in the other lane;   A black male* got out of the vehicle and went over to a van that was parked at the bank. *He* opened the door, and it looked like the man in the van *started to get out when the black male shot him.  {He had one hand up on the door and looked like he was surrendering...I could see the look on his face}.* Told Ron to go and we ran the red light... As we were going under the light, *I heard another shot.*

(II).  Response Witnesses.

**5. Danny Smith...**Around 6:45 pm 911 dispatch put out a BOLO for a white delivery van.  Black male approached van, shot the driver, pushed him over in the seat and then shooter jumped in the vehicle and drove off towards Leesburg.  I was returning to Centre from Fort Payne when BOLO given out. *It was raining and visibility was limited.* Met van and turned around on it.  {Chase description}.  I advised my location and *put on my blue lights.* Van slammed on the brakes and slid to an immediate stop in the middle of the highway. *Special Note:  As I stepped out of my vehicle, the driver--a black male—opened the driver's door and jumped out of the van, stepping away from the door out in front of traffic...he had a pistol in his right hand...he took aim and fired one shot at me as I stepped out of my vehicle. Did not take a shot back due to traffic behind him.  After firing that shot, the b/m then turned and ran in front of the van, stopping and turning toward me and firing another shot as I reached inside my vehicle to radio that we were on foot, shots were fired, and requested a 00 Zero.*
  {Status of victim at this time}
  {Assisted in "packaging" victim in ambulance}

*For Re-call:*  Smith returned to assist in search...requested dog handlers; he then went to our office in Centre as they waited for dog handlers.  Apparently Gavin retrieved from creek while he was gone, Smith requested they meet him and let him make certain they had the right guy.

  *Smith gave description of suspect: Black Male, around 25

*years old, 5'7" tall, short hair, <u>clean shaven</u>, with a "wine-colored" shirt, jeans and a "cap or 'boggin'" on.
Note: Smith took pictures of bullets, toboggan, gun, shell casings, and one projectile (from van). Also took all of the aerial photographs.*

**6. Chief Val Courtney...assisted in search off Highway 68...Courtney and another officer went back to the original shooting scene and looked for evidence. *Located 2 shell casings in road between the bank and courthouse.***

*CHAIN: ( 2 SHELL CASINGS)*

*From Courtney_____ to  Larry Wilson _____*

**7. Deputy Jimmy DeBerry...assisted in search off Highway 68...*located a toboggan at the search scene--black and red***

*CHAIN: (TOBOGGAN)*

*(a)From DeBerry_____to  Larry Wilson_____*

*(b)From Wilson_____to  DeBerry _____ to DFS locker in B'ham_____*

**8. Tony Holladay...dog handler from Limestone Prison; assisted in locating suspect in the woods--*specifically from the creek.*{Describe capture}**

**9. Deputy Camp Reese....assisted in the search at H-68;  assisted in the arrest of the suspect. *Spontaneous statement made by the suspect.***

10. **Deputy Kevin Ware**...assisted in the search off H-68; assisted in the arrest of the suspect. *Spontaneous statement made by the suspect.*

11. **Investigator Larry Wilson**...arrived at H-68 around 7:22 pm; Smith described the suspect (as related in Smith's statement). Observed the van and took pictures of it. *Noticed a bullet hole in the passenger side door of van. Found (one) spent .40 cal hull on Highway 68 where suspect shot at Smith. Found .40 cal Glock pistol. Found key on suspect.*

**CHAIN:**

*1.* (1) .40 cal spent hull on Highway 68

*Found by Wilson_____ to David Higgins _____*

*2.* (1) .40 cal Glock pistol

*Found by Wilson _____to David Higgins _____*

*3.* (2) .40 cal spent hulls at bank/courthouse

*Found by Courtney_____to Wilson_____to David Higgins_____*

*4.* (1) Black/red Toboggan

*Found by DeBerry_____to Wilson_____to DFS Locker_____to Angello Della Manna_____to UPS _____to Wilson_____to DeBerry_____to DFS Locker_____to A.D. Manna_____to Mark Hopwood_____to John Case_____{ to _____}*

*5.* (1) Expended Bullet from Bank/Courthouse

*Found by Tom Brown_____to Danny Smith_____to Larry Wilson_____ to Mary Miller_____to Locker "B"_____to Mitch Rector_____*

*6. Gavin's Clothing*

*Taken by Wilson_____ to _____ _____ to _____ _____ to _____ _____ to _____ _____*

7.  *(1) Hotel key taken from Gavin's Pocket {#47}*

      *Taken from Gavin by Wilson_____*

    *Special Note:  Larry Wilson went to the Super 8 Hotel just outside Chattanooga. Got copies the hotel registration form and the Meeks' charge slip from 3/6/98 to 3/7/98.  He also had an occasion to "try the key out at the hotel"--it fit Room 113, rented for Gavin by Meeks.*

    *Identified Victim from billfold and driver's license retrieved by Coroner Don Rogers.*

    *Requested DFS Lab to come and process the Van...particularly for fingerprints and possible projectiles.*

    *Advised Gavin of his Miranda Rights...told him of the charges...Gavin responded:*
        *" He did not kill anybody or shoot at anybody...he was with his cousin but*
           *he would not give us his name."*
        *He (suspect) gave Wilson name of Keith Edmund.*

    *We continued to search the area in an attempt to locate gun.  Gun was found about a week later (3-13-98).*

    *Wilson had dispatcher run serial number on Glock...came back registered to Meeks.*

    *Wilson spoke to Sandy Gornati from Corporate Express...learned that Clayton's vehicle had broken down and they had brought him a Corporate Express van to finish his run.  She did not know why he was in Centre.  Also, the drivers did not carry money.*

    *Wilson received notification that an investigator from Illinois had called and said he had an eye-witness to the shooting.  Was given the suspect's full name. Was told that the gun used was probably his (Meeks').*

**(III).  Prior Conviction.**

    *Produce and introduce into evidence the prior murder conviction in Illinois.*

12. **Dewayne Meeks...{entire episode}...**Indictment dismissal; stolen gun report; why he didn't stop and notify police. {does he remember what Gavin was wearing that night?}  Time frames don't make much sense;  what about first visit here a month or so prior to shooting;  doesn't make sense that he would just drive around "looking for this girl"....explanation of how how Gavin got his gun...

_Have Meeks identify gun as his_____

_Have Meeks identify Super 8 receipt_____

_Have Meeks identify Gavin as prior murderer_____

_Have Meeks talk about Gavin being on parole_____
    _—did he have parole officer's permission to take him out of state_____

13. _____...assisted/treated victim at scene...transported victim to CBMC

    *BODY CHAIN:*

    _____ *to  CBMC*_____

14. _____...attending physician at CBMC...declared victim dead.

    _____ to  *Coroner Don Rogers*_____

15. Don Rogers (Coroner)....assisted in investigation...retrieved billfold and driver's license. *Received victim's body at CBMC and placed in morgue;  Turned over to contract driver for an autopsy.*

    *Coroner Don Rogers*_____to *CBMC Morgue*_____to *Joseph Dooley*_____
                                          *(DFS)*

16. Joseph Dooley (Contract Driver)...got victim's body and took to B'ham lab for an autopsy.

    *Dooley*_____*to  DFS Lab*_____*to  Dr. Stephen Pustilnik*_____

17. Dr. Pustilnik....Forensic Pathologist...B'ham lab;  did autopsy and recorded the cause of death; *retrieved from the body a .40 cal bullet; took autopsy photos*

    *CHAIN:*

    *(1) .40 cal projectile from Clayton's body*

    *Dr. Pustilnik*_____*to  Evidence Cabinet*_____*to  David Higgins*_____*to Mitch Rector*_____

    **INTRODUCE AUTOPSY PHOTOS**_____

18. Sandy Gornati...Corporate Express Representative...*nature of Clayton's job; why he was in Corporate Express van;  log; why in Centre; do driver's carry money; contents void of money--had paper transactions only.*

19. **Angela Phinney (or new manager)...Super 8 Hotel just outside Chattanooga; on duty when Meeks and Gavin checked in;  has the original records set aside for court;  *Identified the key taken from Gavin's clothes as a key to Room # 113 at that Super 8...#47 key is based on code they use.***

*Have clerk/manager identify the key (#47) from Gavin_____*

**(IV).  Investigation/Lab Witnesses**

20. **Mark Hopwood...DFS Forensic Scientist...called upon to process the van for any fingerprints or projectiles;  *No fingerprints in van; recovered .40 cal projectile from the van.***

**CHAIN:**

A.  *(1) .40 cal projectile from the van*

*Mark Hopwood_____to Bryant Dooley_____to David Higgins_____to Mitch Rector_____*

B.  *(1) Toboggan from arrest scene*

*DeBerry____to Larry Wilson____to DFS Locker____to A. Della Manna_____ to UPS_____ to Wilson_____to DeBerry____to A.D. Manna_____to Mark Hopwood_____to John Case_____ [to _____ ____]*

21. **Bryant Dooley...DFS contract driver;  received projectile from van that was found by Hopwood.**

**CHAIN:**

*(1) .40 cal projectile retrieved from the van by Hopwood*

*Hopwood_____to Bryant Dooley_____to David Higgins_____to Mitch Rector_____*

22.  John Case...DFS Forensic Scientist...*part of chain on toboggan...also did hair analysis on toboggan*

   **CHAIN:**

   (1) Black/red Toboggan

   *Hopwood*_____to *John Case*_____ [to _____ ____]

23.  David Higgins...former lab employee...DFS...*received all the items utilized in the ballistics examination.*

   **CHAIN:**

   A. (1) .40 cal projectile from van

   *Hopwood*_____to *Bryant Dooley*_____ to *D. Higgins*_____to *Mitch Rector*_____

   B. (1).40 cal casing from Highway 68

   *Wilson*_____to *D. Higgins*_____to *Mitch Rector*_____

   C. (1) .40 cal Glock Pistol

   *Wilson*_____to *D. Higgins*_____to *Mitch Rector*_____

   D. (2) .40 cal shell casings from bank/courthouse

   *Courtney*_____to *Wilson*_____to *D. Higgins*_____to *Mitch Rector*_____

   E. (1) .40 cal projectile from Victim's body

   *Dr. Steve Pustilnik*_____to *Evidence Locker--DFS*_____to *D. Higgins*_____ to *Mitch Rector*_____

24. Angelo Della Manna...DFS Lab in B'ham...serology expert; *examined toboggan and Gavin's clothing for blood--no blood found; Special note: also examined toboggan for hair and fiber*

CHAIN:

A. (1) Toboggan from arrest scene

DeBerry____to Wilson____to DFS Locker____to A.D. Manna____to UPS____ to Wilson____to DeBerry____to DFS Locker____to A.D. Manna____to Hopwood____to John Case____ [to _____ ____]

B. Clothing from Suspect Gavin

Wilson____to D. Higgins____to Evidence Locker____to A. D. Manna____ to UPS____to Wilson____

25. Mitch Rector....DFS Ballistics Specialist...Firearms Expert; *received and did examination on all ballistics items*

CHAIN:

A. (1) .40 cal projectile from van

Hopwood____to Bryant Dooley____to Higgins____to Rector____

B. (1) .40 cal shell casing Highway 68

Wilson____to Higgins____to Rector____

C. (1) .40 cal Glock Pistol

Wilson____to Higgins____to Rector____

D. (2) .40 cal shell casings from bank/courthouse

Courtney____to Wilson____to Higgins____to Rector____

*E. (1) .40 cal projectile from Victim's body*

*Pustilnik_____ to Evidence Locker_____ to Higgins_____ to Rector_____*

*Special Note:  Introduce the Chart after identifying the individual items and having them admitted into evidence.  Be sure to introduce his Report as well.  Photos need to be in evidence as well.*

26.  Larry Wilson....*recall on the issue of the motel key...let him testify to trying out the key at our request--it fit Room # 113*

27.  Keisha _____...*Illinois Parole Officer;  Gavin was one of hers; need her to identify him as being on parole for a previous murder--sameGavin as in ourconviction/same conviction.*

28.  Barbara Genovese...jailer for Cherokee County Sheriff's Office; *After Meeks was arrested, incident in which Gavin complaining about not being allowed to exercise with Meeks and Hudgins-- Gavin stated:*

"*Meeks should not be here...Dewayne did not do anything—I did it, he should not be here.*"

29.  Danny Smith...*Recall: For identification of Gavin at the time of his arrest.*

30.  Elizabeth Clayton...wife of victim..*married 37 years; photo of victim; Regions Bank Account;  money for Friday night supper?*

**ADDITIONAL WITNESSES IF NEEDED:**

31. Tom Brown...found projectile at scene bank/courthouse..turned it into Danny Smith almost a year later...
*Tom Brown___to Danny Smith_____to  Larry Wilson_____to  Mary Miller_____to DFS Locker "B"_____to  Mitch Rector_____*

32.  Mary Miller...chain on above.

462

AUG- 4-98 TUE 12:28 PM   WEST SIDE CCC          FAX NO.   3126333989          P. 2

## ILLINOIS DEPARTMENT OF CORRECTIONS
## APPLICANT INFORMATION SHEET

Applicant's Name: _Dwayne Meeks_          Date of Birth: _12-28-67_

Social Security Number: _____     Daytime Telephone #: _(813) 723-9523_

Driver's License Number: _M200-1726-4369_     Evening Telephone #: _(815) 727-3807_

State: _IL_

Federal Selective Service Registration Number (males 18 to 26 years of age): _____
NOTE: If you have served in the military and have been discharged, but are 26 years of age or younger, you must still have registered with the Federal Selective Service.

1.  Have you ever been convicted of anything other than a minor traffic violation?
    (A conviction may include a fine, conditional discharge, probation, jail sentence, periodic imprisonment, prison term or other sentence imposed in a court of law.)

    Yes ☐   No ☑

    If yes, what type of sentence: _____

    What offense? _____

    When? _____

    Location: _____
    City      County      State

Explain: _____

Explain: _____

Type of sentence: _____

What offense? _____

When? _____

Location: _____
City      County      State

2.  Do you have any criminal charges pending against you?

    Yes ☐   No ☑

    If yes, what? _____

3.  Are you currently under probation or court supervision?

    Yes ☐   No ☑

    Type of supervision: _____

    What offense? _____

    When? _____

    Location: _____
    City      County      State

DC 5906 (Rev. 11/92)
IL 426-16430

AUG- 4-98 WED 11:21 AM          3126333989          P. 2

AUG- 4-98 TUE 12:29 PM   WEST SIDE CCC                    FAX NO.  3126333989              P. 3

4. Have you ever been discharged (fired) from a job?

   If yes, please explain the circumstances surrounding your discharge: _____

   Yes [ ]   No [✓]

   Company: _____

   Address: _____

   From: _____ to: _____
         Mon/Year              Mon/Year            Zip Code

5. Do you have any known *relative or **close associate who is currently employed by or who provides services to the Department?

   Yes [✓]   No [ ]

   * relative means spouse, parents, siblings, children.
   ** close associate means any person other than a relative with whom the individual is residing.

   If so, who? (Wife) Sharon Moore

   Position: CRC 1

   Relationship: Wife

   Facility: Mae Houston

6. Do you have any known relatives who are presently incarcerated within the Illinois Department of Corrections or who are currently on parole, mandatory supervised release, or electronic detention?

   Yes [ ]   No [✓]

   * relative means spouse, parent, sibling, child, grandchild, grandparent, aunt, uncle, niece, nephew, cousin, including first-blood, step, half, foster or in-law relationships.

   If yes, who? _____

   Relationship: _____

   Facility: _____

7. Are you a former employee, intern or contractual employee of the Illinois Department of Corrections?

   Yes [ ]   No [✓]

   If yes, what position? _____

   Facility: _____

   When: _____

   Reason for leaving: _____

8. Are you presently or have you ever been affiliated with a street gang?

   Yes [ ]   No [✓]   If yes, explain: _____

CC 0306 (Rev. 11/93)
IL 428-15490

AUG- 4-98 TUE 12:29 PM   WEST SIDE CCC          FAX NO.   3126333989          P. 4

9.  How many years of work experience in SECURITY, LAW ENFORCEMENT, OR CORRECTIONS completed
    in good standing do you have?

A.  Company: _A & R   Security_          Telephone Number: _____
                                          Total # of hours
    Position Title: _Security_            worked per week: __40__
    Address: _1216   Jefferson   St_      From _5-97_ to _7-98_
                                               Month/Year    Month/Year
    _Joliet   Il   60435_
              Zip Code
    Reason for leaving: _Better   Job_

B.  Company: _Montgomery  WARD_          Telephone Number:(815) _729-6606_
                                          Total # of hours
    Position Title: _Loss Prevention_     worked per week: __40__
    Address: _2500   W. Jefferson_        From _8-92_ to _1-11-93_
                                               Month/Year    Month/Year

    Reason for leaving: _Work  for   Stateville_
                                    Zip Code

C.  Company: _Jewel  Food_               Telephone Number: _____
                                          Total # of hours
    Position Title: _Loss Prevention_     worked per week: __40__
    Address: _W.  Jefferson_             From _7-88_ to _____
                                               Month/Year    Month/Year
    _Joliet  Il   60435_
              Zip Code
    Reason for leaving: _Went to work in  Earth grain_

10. Have you ever held a supervisory position?

    Yes ☑   No ☐

    If yes, Company: _Earth Grain Bakery_     From _1990_ to _1992_
                                                   Date      Date
    Job Title: _Leadman_          No. of employees supervised: _20 +_

11. Have you ever received a promotion from your present or a previous employer?

    Yes ☑   No ☐

    If yes, Company: _Earth Grain Bakery_     Old Title: _Helper_

    Title promoted to: _Leadman_

CC 5904 (Rev. 11/95)
IL 426-18035

AUG- 4-98 WED 11:22 AM          3126333989                           P. 4

AUG- 4-98 TUE 12:29 PM   WEST SIDE CCC          FAX NO. 3126333989          P. 5

**12.** Have you attended any college classes since completing high school?

Yes [✓]   No [ ]

If yes, how many credit hours have you accumulated?  (Transcripts and/or Diploma required.)

Hours earned:  __90__ semester hrs. _____ quarter hrs.   Degree earned: ____ Associate ____ Bachelor

**13.** Do you have Spanish bilingual skills?

Yes [ ]   No [✓]

If yes and Spanish skills are or may be required by the job description, a Spanish test will be administered to assess your bilingual abilities.

**14.** Have you ever served in the military?   If yes, in what branch did you serve? _____

Yes [ ]   No [✓]   Years served: From _____ to _____

Total number of years served:  Active Duty: _____   Inactive Duty: _____

**15.** Have you ever been dishonorably discharged from the service?

Yes [ ]   No [✓]   If yes, explain: _____

_____

_____

_____

_____

**16.** Are you presently a resident of the state of Illinois?

Yes [✓]   No [ ]

If no, where do you reside? _____
_____
City/State

**17.** Have you resided outside of the state of Illinois during the past five years?

Yes [✓]   No [ ]

If yes, where? __Fort Payne   Al__
_____
City/State
City/State

**18.** Are you currently in default on the repayment of any State Education Loans?

Yes [ ]   No [✓]

If yes, amount in default: _____

Financial Institution: _____

What arrangements have been made for repayment? _____

_____

_____

_____

_____

DCS 9408 (Rev. 11/92)
IL A26-1523)

AUG- 4-98 TUE 12:30 PM    WEST SIDE CCC          FAX NO.  3126333989          P. 6

19. EMPLOYMENT REFERENCES: List three individuals who have had supervisory responsibility over you at previous positions.

A. Supervisor's name: Capt. Cverte

   Business name: Stateville

   Address: P.O Box 112    Joliet I        Zip Code: 60436

   Telephone Number: (815) 727-3607    Total time worked: 18 mo.

B. Supervisor's name: Mike Pickens

   Business name: Earth Grain Bakery

   Address: Old Valley Head Rd          Zip Code: 35967

   Telephone Number: (205) 845-4850      Total time worked: 3 yrs

C. Supervisor's name: John Babey

   Business name: Montgomery Wards

   Address: 2500 W. Jefferson St.        Zip Code: 60434

   Telephone Number: 815 729-6606       Total time worked: 2 yrs

20. PERSONAL REFERENCES: List three individuals whom we may contact that have known you personally for at least three years.

A. Name: Jeff Stukel      Telephone Number: 815-725-3745

   Address: Bethlehem   Joliet I    Zip Code: 60434

B. Name: Tom Arambasich    Telephone Number: (815) 476-6483

   Address: 57 Greystone   Willington Il   Zip Code:

C. Name: Abby Amos        Telephone Number: (815) 722-6383

   Address: Collin St. Joliet Il       Zip Code: 60436

I understand that the references I have listed will be contacted for information on my personal and employment conduct.

CC MAIL (Rev. 11/93)
IL 428-15470

AUG- 4-98 WED 11:23 AM          3126333989          P. 6

21. If you are applying for a COT/YST position and have successfully completed all of the screening tests, you may have your name placed on the eligibility lists for three Adult AND/OR three Juvenile Correctional facilities.

Please list your preferences below:

| Adult Institutions | Juvenile Institutions |
|---|---|
| 1. _____ | 1. _____ |
| 2. _____ | 2. _____ |
| 3. _____ | 3. _____ |

I am willing to accept employment at any maximum security correctional facility in the State of Illinois and wish to also have my name placed on a maximum security eligibility list. The maximum security institutions are: Stateville, Joliet, Pontiac, Menard and Menard Psychiatric Center.

Yes ☐    No ☐

**ADULT**

| | |
|---|---|
| A  Big Muddy | Q  Robinson |
| B  Centralia | R  Shawnee |
| C  Danville | S  Sheridan |
| D  Dixon | T  Stateville* |
| E  Dwight | U  Taylorville |
| F  East Moline | V  Vandalia |
| G  Graham | W  Vienna |
| H  Hill | X  Western |
| I  Illinois River | |
| J  Jacksonville | **JUVENILE** |
| K  Joliet* | 1  Harrisburg |
| L  Lincoln | 2  Joliet |
| M  Logan | 3  Pere Marquette |
| N  Menard* | 4  St. Charles |
| O  Menard Psych.* | 5  Valley View |
| P  Pontiac* | 6  Warrenville |

*MAXIMUM SECURITY FACILITIES

DC 9900 (Rev. 11/92)
IL 426-16820

AUG- 4-98 TUE 12:30 PM   WEST SIDE CCC          FAX NO.  3126333989          P. 8

In the event of an emergency, please contact:

Name: Shawon  Meeks          Relationship: Wife

Address: 101 Alin Ave        Telephone #: 815-722-9323
                                          (Day)
         Joliet  IL  60434    Telephone #: 815-722-9323
                                          (Evening)

## ALL APPLICANTS MUST COMPLETE THE FOLLOWING:

I certify that the information on this form is true and correct to the best of my knowledge. I understand that providing false information may be grounds for ineligibility or termination from employment.

Dwayne  Meeks
Print name

Dwayne Meeks          7-19-94
Signature    Date

Screener's Signature

Witnessed on: (date)

CC 9006 (Rev. 11/93)
IL 434-1563

AUG- 4-98 WED 11:23 AM          3126333989          P. 8



469

# Cherokee County Sheriff's Department
## RECEIPT FOR PROPERTY

NAME: GOTNATI, SANDRA FREEMAN

CASE NO.: 980030032

ADDRESS: CORPORATE EXPRESS

OWNER'S NAME: CORPORATE EXPRESS

2032 SHAGBARK RD. B'HAM, AL. 35244

OWNER'S ADDRESS:

SOCIAL SECURITY #: #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    D.O.B.: 01/22/54    DATE: 3/10/98    TIME: 11:40 AM

LOCATION WHERE PROPERTY WAS OBTAINED:

| ITEM NO. | QUANTITY | DESCRIPTION OF PROPERTY (include model, serial number, identifying marks, condition, and value, when appropriate.) |
|---|---|---|
| 01 | 01 | SET OF KEYS - 1-FORD VAN IGNITION KEY, 1-FORD VAN REAR DOOR KEY |
| 01 | 01 | 1996 FORD ECONOLINE 250 SER # 1FTHE24YOTHA49835 AL TAG # 1CP3656 (CORPORATE EXPRESS LOGO ON VAN) |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

NAME AND I D NUMBER OF OFFICER OBTAINING PROPERTY: H. DEAN BUTTRAM, III

SIGNATURE X

I D NUMBER: CE-12

## CHAIN OF CUSTODY

| ITEM NO. | DATE | RELINQUISHED BY | RECEIVED BY | PURPOSE OF CHANGE OF CUSTODY |
|---|---|---|---|---|
|  | 3/10/98 |  | and Gornal | RETURN TO OWNER |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

EMPIRE PRINTING • CENTRE, AL • (205) 927-6460

## CHAIN OF CUSTODY *(Continued)*

| ITEM NO. | DATE | RELEASED BY | RECEIVED BY | PURPOSE OF CHANGE OF CUSTODY |
|---|---|---|---|---|
| | | SIGNATURE | SIGNATURE | |
| | | NAME | NAME | |
| | | SIGNATURE | SIGNATURE | |
| | | NAME | NAME | |
| | | SIGNATURE | SIGNATURE | |
| | | NAME | NAME | |
| | | SIGNATURE | SIGNATURE | |
| | | NAME | NAME | |
| | | SIGNATURE | SIGNATURE | |
| | | NAME | NAME | |
| | | SIGNATURE | SIGNATURE | |
| | | NAME | NAME | |
| | | SIGNATURE | SIGNATURE | |
| | | NAME | NAME | |
| | | SIGNATURE | SIGNATURE | |
| | | NAME | NAME | |

### FINAL DISPOSAL ACTION

RELEASE TO OWNER OR OTHER *(NAME/UNIT)* _____

DESTROY _____

OTHER *(SPECIFY)* _____

### FINAL DISPOSAL AUTHORITY

ITEM(S) _____ON THIS DOCUMENT, PERTAINING TO THE INVESTIGATION INVOLVING _____
                                                                                    *(Grade)*

_____ (IS) (ARE) NO LONGER
      *(Name)*                          *(Organization)*

REQUIRED AS EVIDENCE AND MAY BE DISPOSED OF AS INDICATED ABOVE. (If article(s) must be retained, do not sign, but explain in separate correspondence.)

_____         _____         _____
   *(Typed/Printed Name)*                  *(Signature)*                    *(Date)*

### WITNESS TO DESTRUCTION OF EVIDENCE

THE ARTICLE(S) LISTED AT ITEM NUMBER(S) _____ (WAS) (WERE) DESTROYED BY THE EVIDENCE

CUSTODIAN, IN MY PRESENCE, ON THE DATE INDICATED ABOVE

_____         _____
   *(Typed/Printed Name, Organization)*                  *(Signature)*

EMPIRE PRINTING · CENTRE, AL · (205) 927-8460

471

OFFENSE                    MURDER DURING THE COURSE OF ROBBERY
                           ATTEMPTED MURDER


DATE OF OFFENSE            3-06-98


DATE OF REPORT             3-06-98


DATE OF ARREST             3-06-98


VICTIM              ,      WILLIAM CLINTON CLAYTON, JR.
                           DANNY SMITH


DEFENDANT                  KEITH EDMUND GAVIN


OFFICERS                   LARRY WILSON - CHEROKEE COUNTY S. O.
                           DANNY SMITH - D.A.'S INVESTIGATOR
                           DARREL   COLLINS    -   D.A.'S   INVESTIGATOR
                           CAMPANELLA REESE - CHEROKEE CO. S.O.
                           KEVIN WARE - CHEROKEE COUNTY S. O.
                           MIKE PUTMAN - CHEROKEE COUNTY S. O.

On 3-06-98 at 6:43 p.m., Larry Twilley and his wife came to the Centre Police Department and reported a shooting. Mr. Twilley said a Black Male had shot a man in a delivery van next to Regions Bank. He said they were coming from Leesburg and stopped at the red light and heard a bang. He said he looked to the left and saw a Black male jerk the driver's door open on a White van and shoot three times. He said the White male in the Express van started jerking. The Black male then pushed the man over in the van and got in and sped off toward Leesburg. Mr. Twilley said the driver of the van had his hands up when the Black male shot him. Mr. Twilley said the Black male was slim built, about 6 feet tall and was wearing dark clothes and had a red and black stripped bogging on. Mr. Twilley said there was a Black and Gray Toyota King Cab sitting at the red light and it took off and ran the red light and went down South River Street. He said he didn't know whether the people in the truck was with him or not.

The dispatcher gave the call out to all the Centre Units, County Units, Collinsville Police Department, and Etowah County Sheriff's Department. The dispatcher told them to be on the look out for a White van with writing on the side and that a Black male had shot the driver of the van and that the driver was still inside the van. Dispatch advised the van was going toward Leesburg when it was last seen. The shooting happened between the courthouse and the Regions Bank. D. A. Investigator, Danny Smith was coming from Collinsville when the call was given out. Danny Smith met the van coming up the mountain on

Highway 68 from Leesburg. Danny turned around on the van. Danny got behind the van and called in the tag number. Danny said the driver of the van stopped the van in the middle of the road. This was on Highway 68 at the intersection of 68 and County Road 48. When he stopped the Black male came out of the van and fired twice at him and then ran into the woods. Danny called and advised dispatch to send an ambulance 10-17 and to send all available units, that the subject had ran into the woods. Collinsville Police Officer, Rex Leath, was there with Danny and went in the woods looking for the subject. While Danny tried to help the man in the van, officers from Etowah County Sheriff's Department, Gadsden Police Department, DeKalb County Sheriff's Department, Fort Payne Police Department, troopers from Gadsden and DeKalb, ABC Officer, Tom Oliver; Water Patrol Officer, Rick Sides; and the Game Wardens came to help search for the subject that did the shooting and to help close off the area so he could not get away. Danny asked Reserve Deputy and Drug Dog Handler, Doug Machleit to take pictures of the scene. I, Investigator Larry Wilson was called at 7:09 p.m. I arrived on the scene at 7:22 p.m. Danny said the subject was a Black male, approximately 25 years old, 5'7" tall, short hair clean shaven with a Wine colored shirt, jeans and cap or bogging on. I started taking pictures of the scene and the van. There was a bullet hole in the passenger side door of the van. The ambulance picked up the driver of the van and took him to BMC-Cherokee Hospital where he did. Coroner Don Rogers went to the hospital and took pictures of the victim and locked his body in the morgue until the Department of

Forensic Science from Birmingham could pick him up.  Don picked up his billfold and driver's license.  While we were looking for the subject in the woods, Chief Val Courtney and Officer Covington, went to the scene where the shooting happened between the courthouse and Regions Bank.  They found two (2) spent .40 caliber hulls.  He also talked with witness, Larry Twilley, and took a statement.  We called dispatch and asked them to call Limestone Prison and asked them to send the dog team to help look for the subject in the woods.  I found one (1) spent .40 caliber hull on Highway 68 at the intersection of 68 and 48, where the subject had shot at Danny Smith.  I had the van pulled to the Sheriff's Department and locked up to be fingerprinted.

I called dispatch and asked them to call the witness and Coroner, Don Rogers and have them meet me at the office.  When I arrived at the Sheriff's Department, I went down to the Police Department and talked with Chief Val Courtney and Officer Covington.  Chief Courtney turned over two (2) spent .40 caliber hulls that he found between the bank and the courthouse.  He also turned over the statement of Mr. Twilley to me.  He said there was another witness to the shooting, Troy Chamblee. He also said Jeff Pollard called in a tag number of the vehicle that two boys was in at the Express Mart talking about seeing the shooting. The tag number was WFL-96B (Florida).  We ran the tag and it came back to Ronald K. Baker of 14440 Cr. 561A, Clermont, Florida.  On a 1986 Nissan Pickup, Gray and Black in color.  This was the same type vehicle that Mr. Twilley had seen at the red light.  I took Mr. Twilley and his wife back upstairs to my office and talked with him again.

I then talked with Coroner Don Rogers and got the name of the victim and his address.  Don Rogers said he took pictures of Mr. Clinton William Clayton, Jr.  He said that Mr. Clayton had been shot twice in the left side and that one had went through his chest and through his right arm and came out.  Don called the department of Forensic Science in Birmingham and asked them to do an autopsy on Mr. Clayton.  I also asked them to send someone to fingerprint the van. Dispatch called the Birmingham Police Department and asked them to notify the family about what had happened.

At 10:02 p.m. the subject was found by the Dog Team Officers, Daryl Holt and Tony Holloday along with Deputies Mike Putman, Campanella Reese, and Kevin Ware.  The subject was found in the creek just off County Road 48 where he had went into the woods.  The subject was brought to the Cherokee County Jail.  He did not have any identification on him.  He gave the name of Keith Edmund.  They took his wet clothes off and gave him some dry clothes.  Danny Smith said that he was the subject that shot at him.  I took the clothes and searched them and found a motel rook key with the number 47 on it, I then took the clothes and locked them up to be sent to the lab to see if there was any blood on them.  He was wearing tennis shoes, blue jeans and a long john type shirt with flowers on it.

Darrell Collins, Campanella Reese, and I talked with Keith Edmund. After I advised him of his rights, he asked what he was being charged with and I told him <u>Murder During the Course of Robbery and Attempted Murder</u>.  He said he had not killed anybody or shot at anybody.  He said

that he was with his cousin.  We asked him who he was and he wouldn't say.  Then he said he wanted to talk to a lawyer, that he didn't have anything to say.

We went back and looked for the gun, but was unable to find it that night.  Deputy Jimmy DeBerry found a black bogging with a red strip in the woods where the subject had went into the woods.  Deputy DeBerry brought the bogging in and turned it turned it over to me at 12:45 a.m. on 3-07-98.

On 3-07-98, I talked with Sandy Gornati, General Manager of Corporate Express Delivery Systems, Incorporated.  She said usually Mr. Clayton drove his own vehicle, but it had broken down with him in Pell City that morning and they had carried him the van to drive.  She said the last time she talked with him was at 3:25 p.m. and he was in Valley Head.  She said she didn't know why he was in Centre at Regions Bank, because he didn't pick up for that bank.  Sandy Gornati said all they carried was checks and papers for the banks, they did not carry any money.  I advised Ms. Gornati that we were going to hold the van until we could fingerprint it and check the van.  I advised her we would release it back to her as soon as we could.

We went back to the scene on Highway 68 and looked for the gun again, but was unable to find it.

On 3-07-98, Mark Hopwood and Warren Stewart from the Lab came and printed the van and took the bullet out of the passenger side door. They were unable to find any prints.  I took all the personal property of Mr. Clayton out of the van.  I also took all the bags that he had

picked up from the banks and put them in my office.  On 3-07-98 at 7:15 p.m., the dispatcher from Centre Police Department called and said Officer Tom Arambasich from Joliet, Illinois called and said he had an eye witness to the shooting that we had.  At 7:30 p.m., I called Tom Arambasich back and he said that he had a witness there that was with the guy that did the shooting.  He said his name was DeWayne Meeks.  He asked me if the man that was shot died and I told him yes.  He asked me if we had the shooter and I told him that we did.  He asked me what name we had and I told him that he said his name was Keith Edmund.  He said the guy's real name was Keith Edmund Gavin.  He said that DeWayne Meeks was a friend of his and had been for a long time.  He said DeWayne had him what had happened.  He said DeWayne had told Marty Tutor what had happened then he called him.  Mr. Arambasich said he and Mr. Meeks had called their supervisors and told them what had happened.  Tom Arambarisch is an officer with Will County Sheriff's Department and DeWayne Meeks is an correctional officer with Illinois Department of Corrections.

Then I talked with DeWayne Meeks.  DeWayne said he was with Keith Gavin when he shot the man.  He said they were in his Blazer.  He said that Keith Gavin was his cousin and that he had been staying with him and that Keith wanted him to bring him to Chattanooga, Tennessee to see a girl that he had met.  DeWayne said he told him he didn't have the money.  He said Keith said that if he would use his credit card that his girlfriend would pay  him back the money for the trip because she had received her income tax check.  DeWayne said he told him he would

take him, but he was going to take his wife and child.  He said, when they got to Chattanooga, Tennessee Keith's girlfriend was not there. They got two rooms and him and his wife went up to the room.  He said Keith asked him for his keys to his Blazer, so he gave them to him.  He said then in a few minutes Keith came on up to the room.  Then he wanted him to take him to Fort Payne to the bowling alley to get with his girlfriend.  He said they went to the bowling alley and sat for over an hour waiting on his girlfriend.  but she didn't come, so Keith wanted him to take him to his girlfriend's house but he was not sure where it was but he thought he could find it.  So they rode around looking for it.  DeWayne said he told Keith that he couldn't keep riding around looking for her because he didn't have any money.  He said he told Keith if he didn't find his girlfriend and get some money that his wife was going to be mad at him.  He said they fussed about the money.  Then he said Keith wanted him to go to Centre.  DeWayne said he kept telling him he didn't have the money to keep riding around on.  He said they went to Centre and they were fussing about the money. He said they pulled up to the red light and Keith said pull over to this van parked next to the curb and he would ask him for directions. DeWayne said he pulled up and Keith got out and went over to the vehicle and opened the door and told the man to get out and he wouldn't get out.  DeWayne said he hollered at Keith several times and asked him, "What are you doing?"  He said then Keith shot the man and turned and looked at him like he was going to shoot him.  DeWayne said he took off and he looked back and he saw Keith shoot the man one or two more

times and then pushed him over toward the passenger side and got into the van and took off after him. He said Keith tried to get him to stop several times but he said he knew not to stop that he was afraid that he would kill him. He said all he could think about was getting back to his family before his cousin did. Because he thought that if he got back before he did he would kill his family and wait on him and kill him. DeWayne said as they were going back toward Collinsville he saw a patrol car light stopping Keith. DeWayne said he went on back to the motel and told his wife what had happened. DeWayne and his wife decided to wait until he got back to Illinois to report what happened, to make sure his family was safe first. He said his wife went and got something to eat and then they left and went back to Illinois. DeWayne said he called and reported what had happened to his friends, Marty Tutor and Tom Arambasich and then to his superior officer. DeWayne said he thought the gun was his that Keith Gavin had. He said it was a .40 caliber Glock. He also said he had reported it stolen when he got back. I told Mr. Meeks that I would call the D. A. and tell him what he had told me and I would call him back. Then Mr. Arambasich took the phone back and I told him that I would call him back after I talked to the D. A. I told him that we would need to come up there and take a statement from DeWayne Meeks. Mr. Arambasich said that if we come up to meet them at the Will County Sheriff's Department.

I called the D. A., Mike Odell and told him what DeWayne Meeks said. Mike said that we needed to go and interview him, DeWayne Meeks. I called Tom Arambarich back and told him that we would meet them at

Will County Sheriff's Department on 3-09-98 at 9:30 a.m. Tom Arambasich said that he and DeWayne Meeks had talked to Tony Birch with the Fort Payne Police Department and told him what happened. He said they were friends with him.

On 3-08-98 I met Danny Smith at the Sheriff's Department and we went over to the clerk's office and took warrants on Keith Edmund Gavin for Murder and Attempted Murder. Then Danny Smith, Tony Birch and I went to Joliet, Illinois. On 3-09-98 we went to Will County Sheriff's Department and talked with DeWayne Meeks and Tom Arambasich. We took a statement from DeWayne Meeks.(SEE ATTACHED STATEMENT). We also got a written statement from Tom Arambasich. We asked Officer Tom Arambasich to take a statement from Marty Tutor. He said he would and send it to us.

On 3-10-98 I had Investigator Dean Buttram, III to release the bank bags and papers back to Sandy Gornati after he took pictures of them and their contents. I also had him to release the van back to her. Then Sandy Gornati release the bank bags back to the officials for the banks.

Chief Val Courtney brought me a statement from Troy Chamblee, who was one of the witnesses.(SEE ATTACHED STATEMENT). I had Deputies Campanella Reese, Kevin Ware, and Mike Putman to write a statement about what Keith Gavin said when he was found and taken into custody. They said that Keith Gavin said, "I have not shot no one and I have not murdered no one."

On 3-12-98 I called Clermont Florida Police Department and asked

them if they would check and see if Ronald K. Baker still lived at 14440 Cr. 561A, Clermont, Florida and see if he still owned a 1986 Nissan Pickup, tag number WFL-96B. I asked them to have him to contact me if he did at the Cherokee County Sheriff's Department in reference to him being in Centre, Alabama on March 6, 1998 and witnessing a shooting. They called back later and said that Ronald Baker had moved to Indiana, but they had a phone number where I could call him. I called the number they gave me and talked with Ronald Baker.

I asked Mr. Baker about seeing the shooting. Mr. Baker said that him and Richard Henry had come down to go fishing. He said they missed their turn off to go to Peeks Campground and went uptown to the red light at the courthouse. He said they stopped at the light then a vehicle came up behind them and then he heard a shot. He said Richard said a Black guy got out of his vehicle and went over to a van parked next to the curb. He said the man opened the door and then the Black guy shot the man in the van. He said they took off and went straight across from the light, then went down and turned around and came back out and went to the Express Mart and told the lady what they saw. He said then they left and went to the campground. I asked him to have Ricky Henry call me. Later Ricky Henry called me and I asked him about the shooting. Ricky Henry said that Ronald Baker and him missed their turn off and they went up to the red light at the courthouse. He said a vehicle pulled up to the back of them in the other lane a Black male got out of the vehicle and went over to the van that was parked at the bank. He said the Black guy opened the door and it looked like the man

in the van started to get out then the Black guy shot him.  Ricky said
he told Ronald Baker to go and they ran the red light and went across
and down the street.  Ricky said as they were going under the light he
heard another shot.  He said they went down the street and turned
around and came back and the van was gone.  He said they went down to
the Express Mart and told the lady what they saw.  I advised him that
we would need them to come to court and testify when the case went to
court.

On 3-13-98 we went back to the scene on Highway 68 and looked for
the gun.  I recovered the gun in the woods off of County Road 48 where
Keith Gavin had went in the woods.  The gun was under some leaves about
30 feet from the road.  On 3-16-98 I carried the evidence to the lab in
Birmingham.

On 3-16-98 I went over to Shozee's Pizza and talked with Robert
Durate, Kimberly Durate, and Kitty Lynn Tidwell about what they saw on
3-06-98.  They all said they didn't see the shooting or see who did the
shooting.  They said they heard the shots and saw two (2) vans leaving
from the bank.  They said one was a White van with writing on the side
and one was a Silver van.(SEE ATTACHED STATEMENT).

On 3-24-98 I called the Super 8 Motel in Chattanooga, Tennessee
and talked with the manager, Angela Phinney.  I asked her to check and
see if DeWayne Meeks and Keith Gavin stayed at their motel on 3-06-98.
She checked and said that there were two rooms under the name DeWayne
Meeks, Room 113 and 114.  She said he paid with his Visa Credit card.
She said they checked in on 3-06-98 and checked out on 3-07-98.  She

said it showed that there was two (2) adults in each room.  I advised her that I would need a copy of their ticket and credit card ticket.  I advised her I would get a subpoena for the records and bring it to her the next date.  I also asked her about what kind of keys they used for the rooms.  She said it was a large key with their code on it.

On 3-25-98 I called the Chattanooga Police Department and asked them to send an officer out to the Super 8 Motel off of Interstate 24 to serve a subpoena for me.  I met Officer Atkins at the motel and he served the subpoena on Angela Phinney.  I picked up a copy of the tickets and credit card receipts from Angela Phinney.  I showed her the key we found in Keith Gavin's clothes the night he was arrested.  She said it was the key to Room 113.  She said the 47 on the key was a code they used on their keys so no one could use the keys if they were lost.  She advised she could not give me a copy of the code system for security reason.  But that she would have one for us and that she would bring it to court if we need it.

On 3-25-98 I had the dispatcher to run the serial number on the .40 caliber Glock we had recovered so I could get a copy of the theft report that was filed by DeWayne Meeks on 3-07-98 Country Club Hills Police Department in Country Club Hills, Illinois.

## ALABAMA UNIFORM INCIDENT/OFFENSE REPORT

| | | | | | |
|---|---|---|---|---|---|
| VICTIM'S SSN | COMPLAINANT'S SSN | 1 ☐ INCIDENT ☒ OFFENSE<br>☐ SUPPLEMENT | 2 CASE # 98.03.0.13 | | 3 SFX |

| | | | | |
|---|---|---|---|---|
| 6 ORI # 013.0000 | 8 DATE AND TIME OF THIS REPORT 03.13.98 1100 ☐ AM ☒ PM ☐ NN | 9 AGENCY NAME CHEROKEE Co-So. | 4 SUPPLEMENT ORIGINAL OFFENSE DATE M D Y | |

| | | | |
|---|---|---|---|
| 6 REPORTED BY ☐ VICTIM OR | 7 ADDRESS (STREET, CITY, ZIP) | | 10 PHONE ( ) |

☐ VICTIM'S MILT. / ☐ LE OFFICERS

| | | | | |
|---|---|---|---|---|
| 12 VICTIM (LAST, FIRST, MIDDLE NAME) MEERS DEWAYNE | 1 P 2B 25 | 13 ADDRESS (STREET, CITY, STATE, ZIP) 4213 W179th St. IL. | 14 PHONE 708 922-3040 | |
| 15 EMPLOYER/SCHOOL | | 16 OCCUPATION | 17 ADDRESS (STREET, CITY, STATE, ZIP) | 15 PHONE ( ) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 19 ☐ RESIDENT<br>☐ NON-RESIDENT | 20 INJURY ☒ 1 ☒ N | 21 RACE ☒ W A ☐ B ☐ | 22 SEX ☒ A MALE ☐ FEMALE | 23 HGT | 24 WGT | 25 DOB M D Y | 26 AGE | 27 WAS OFFENDER KNOWN TO VICTIM? ☐ Y ☐ N | 28 VICTIM WAS (EXPLAIN RELATIONSHIP) | 29 CODE |

| | | | | | |
|---|---|---|---|---|---|
| 30 TYPE INCIDENT OF OFFENSE ☐ FEL. ☒ MISD.<br>RECOVERY | | 31 DEGREE (CIRCLE) 1 2 3 | 32 UCR CODE | 33 STATE CODE/LOCAL ORDINANCE | |
| 34 TYPE INCIDENT OF OFFENSE ☐ FEL. ☒ MISD. | | 35 DEGREE (CIRCLE) 1 2 3 | 36 DCR CODE | 37 STATE CODE/LOCAL ORDINANCE | |

| | |
|---|---|
| 38 PLACE OF OCCURRENCE OFF County ROAD 45 in Cherokee County. | 39 SECTOR |

<table>
<tr><td>40 POINT OF ENTRY</td><td>☐ DOOR ☐ ROOF<br>☐ WINDOW ☐ OTHER</td><td>41 METHOD OF ENTRY</td><td>☐ FORCIBLE ☐ ATT. FORCIBLE<br>☐ NO FORCE</td><td colspan="2">42 ASSAULT ☐ SIMPLE ☐ AGGR.</td><td>43 TREATMENT FOR ASSAULT INJURY ☐ Y ☐ N</td><td>52 CODE</td></tr>
<tr><td colspan="2">OCCURED ON OR BETWEEN<br>50 TIME 51 ☐ AM ☒ PM ☐ MIL.<br>03.13.98 9:55<br>M D Y<br>52 TIME ☐ AM ☐ PM ☐ MIL.</td><td colspan="2">46 [boxes]<br>47 [boxes]</td><td>47 LIGHTING<br>☐ NATURAL<br>☐ MOON<br>☐ ART. EXT.<br>☐ ART. INT.<br>☐ UNK.</td><td>48 WEATHER<br>☐ CLEAR<br>☐ CLOUDY<br>☐ RAIN<br>☐ FOG<br>☐ SNOW<br>☐ HAIL<br>☐ UNK.</td><td>49 PREMISE<br>☐ HWY.—ST.—ALLEY ☐ BANK<br>☐ RAILROAD ☐ DRUG STORE<br>☐ RESIDENCE ☐ APT./TWN. HSE.<br>☐ CHURCH ☐ SHOPPING CENTER<br>☐ SCHOOL ☐ PARKING LOT<br>☐ CONVENIENCE ☐ OTHER COMMER.<br>☐ INDUSTRIAL ☐ OTHER<br>☐ SERVICE STA.</td><td></td></tr>
<tr><td>54 VERIFY FOR ☐ Y ☐ N<br>RAPE EXAM ☐ N</td><td colspan="2">57 TREAT. FOR ☐ Y ☐ N<br>RAPE INJURY ☐ N</td><td colspan="2">56 CIRCUMSTANCES - HOMICIDE & ASSAULT 57 CODE<br>LOCATION: RAPE</td><td colspan="2"></td></tr>
<tr><td>58 WEAPON USED ☐ FIREARM ☐ HANDS, FISTS, VOICE, ETC.<br>☐ KNIFE ☐ OTHER  DANGEROUS</td><td colspan="2">59 DESCRIPTION OF WEAPONS/FIREARMS/TOOLS USED IN OFFENSE<br>DESCRIBE:</td><td colspan="2"></td><td>☐ HANDGUN ☐ RIFLE ☐ SHOTGUN ☐ UNKNOWN</td><td></td></tr>
</table>

**PROPERTY DESCRIPTION**

| 60 QUANTITY | 61 STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR, ETC.) | 62 DOLLAR VALUE | | 63 RECOVERED | |
|---|---|---|---|---|---|
| | | STOLEN | DAMAGED | DATE | VALUE |
| | Recovered one 40 cal Glock S.N. CCN449us off County Road 45 in woods, weapon was used in a murder in centre AL.<br><br>Gun was Reported stolen by Dewayne Meers on 3-7-98 at ☐ CONTINUED IN NARRATIVE | | | | |

**DOLLAR VALUE**

| 64 MOTOR VEHICLE | 65 CURRENCY, NOTES | 66 JEWELRY | 67 CLOTHING/FURS | 68 FIREARMS | 69 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C | S R D C |
| 70 ELECTRONICS | 71 HOUSEHOLD | 72 CONSUMABLE GOODS | 73 LIVESTOCK | 74 MISCELLANEOUS | |
| S R D C | S R D C | S R D C | S R D C | S R D C | |

**VEHICLES**

| 75 CHECK CATEGORIES: | ☐ STOLEN ☐ RECOVERED ☐ SUSPECTS VEH. ☐ VICTIMS VEH. ☐ UNAUTH. USE ☐ ABANDONED | | | |
|---|---|---|---|---|
| 76 # STOLEN | 77 LIC. | 78 LIS. | 79 LIY. | 80 TAG COLOR | 81 VIN |
| 82 VYR | 83 VMA | 84 VMO | 85 VST. | 86 VCO: TOP: BOTTOM: | 87 ADDITIONAL DESCRIPTION |
| STOLEN MTRL. VEH ONLY | 88 AREA STOLEN ☐ BUS. ☐ RES. ☐ RUR. | 89 OWNERSHIP VERIFIED BY: | ☐ TAG RECEIPT ☐ BILL OF SALE ☐ TITLE ☐ OTHER | 90 WARRANT SIGNED ☐ Y ☐ N # |
| 91 AUTO INSURER NAME (COMPANY)  ADDRESS (STREET, CITY, STATE, ZIP) | | | | 92 PHONE ( ) |
| MOTOR VEH. RECOVERY ONLY REQUIRED FOR 33 & 34 UCR CODE | 93 STOLEN IN YOUR JURISDICTION? ☐ Y WHERE? | | 94 RECOVERED IN YOUR JURISDICTION? ☐ Y WHERE? | |

**TYPE OR PRINT IN BLACK INK**

ACJIC—32 REV. 10-90

INCHES   1   2   3   4   5   6

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| INCIDENT/OFFENSE REPORT CONTINUED | 95 DATE AND TIME OF REPORT 03/13/98  1130 | 94 CASE # 98 0 013 01/13 | 87 SEX | 88 ☐1 OFFENDER ☐4 CHECK IF MULTIPLE ☐2 SUSPECT ☐3 MISSING PERSON |

| 99 NAME (LAST, FIRST, MIDDLE) | 100 NICKNAME/ALIAS | 101 RACE ☐1 W ☐3 A ☐2 B ☐4 I | 102 SEX ☐1 M ☐2 F | 103 DOB M    D    Y | 104 AGE |

| 105 ADDRESS (STREET, CITY, STATE, ZIP) | | | 106 HGT | 107 WGT | 108 EYE | 109 HAIR | 110 COMPLEXION |

| 111 PROBABLE DESTINATION | 112 ARMED? ☐1 Y ☐2 N ☐3 UNK. | 113 WEAPON |

| 114 CLOTHING | ☐1 SCARS ☐1 MARKS ☐1 TATOOS | 115 ☐1 ARRESTED ☐2 WANTED |

| 116 NAME (LAST, FIRST, MIDDLE) | 117 NICKNAME/ALIAS | 118 RACE ☐1 W ☐3 A ☐2 B ☐4 I | 119 SEX ☐1 M ☐2 F | 120 DOB M    D    Y | 121 AGE |

| 123 ADDRESS (STREET, CITY, STATE, ZIP) | | | 125 HGT | 124 WGT | 126 EYE | 126 HAIR | 127 COMPLEXION |

| 128 PROBABLE DESTINATION | 129 ARMED? ☐1 Y ☐2 N ☐3 UNK. | 130 WEAPON |

| 131 CLOTHING | ☐1 SCARS ☐1 MARKS ☐1 TATOOS | 132 ☐1 ARRESTED ☐2 WANTED |

### WITNESSES

| | 133 NAME (LAST, FIRST, MIDDLE) SEX, RACE, DOB | | 134 ADDRESS (STREET, CITY, STATE, ZIP) | 135 RES. PHONE | 136 BUS. PHONE |
|---|---|---|---|---|---|
| #1 | | SEX ☐1 M ☐2 F  RACE ☐1 W ☐3 A ☐2 B ☐4 I  M   D   Y | | ( ) | ( ) |
| #2 | | SEX ☐1 M ☐2 F  RACE ☐1 W ☐3 A ☐2 B ☐4 I  M   D   Y | | ( ) | ( ) |
| #3 | | SEX ☐1 M ☐2 F  RACE ☐1 W ☐3 A ☐2 B ☐4 I  M   D   Y | | ( ) | ( ) |
| #4 | | SEX ☐1 M ☐2 F  RACE ☐1 W ☐3 A ☐2 B ☐4 I  M   D   Y | | ( ) | ( ) |

| WITNESS #1 SSN | WITNESS #2 SSN | WITNESS #3 SSN | WITNESS #4 SSN |

### NARRATIVE

137 County Club Hills Police Dept. in IL.

| | CONTINUED ON SUPPLEMENT ☐1 ☐2 |
| ASSISTING AGENCY ORI | ASSISTING AGENCY CASE # | SFX |

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying this agency if any stolen property or missing person hereby reported is returned.

SIGNATURE _____

| 138 LOCAL USE |
| 139 STATE USE |

### ADMINISTRATION

| MULTIPLE CASES CLOSED | 140 CASE # | 141 SFX | 142 CASE # | 143 SFX | 144 CASE # | 145 SFX | 146 ADDITIONAL CASES CLOSED NARRATIVE |

| 147 CASE STATUS/ ☐1 PENDING ☐2 INACTIVE ☐3 CLOSED  ENTERED ACIC/NCIC ☐Y ☐N  DATE | 148 CASE DISPOSITION: ☐1 CLEARED BY ARREST (JUV.) ☐2 CLEARED BY ARREST (ADULT) ☐N UNFOUNDED | ☐4 EXCEPTIONAL CLEARANCE: ☐A SUSPECT/OFFENDER DEAD ☐B OTHER PROSECUTION ☐C EXTRADITION DENIED ☐D LACK OF PROSECUTION ☐E JUVENILE, NO REFERRAL ☐F DEATH OF VICTIM | 149 REPORTING OFFICER  Gary Wilson 05-21                                    ID # |
| | | | 150 ASSISTING OFFICER                                                          ID # |
| | | | 151 SUPERVISOR APPROVAL               ID # | 152 WATCH CMDR.               ID # |



Larry Twilley
D.O.B. 1-15-66
SSN. 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
525 SouthRiver St.
Centre AL.
927-4193

I WAS Coming From Leesburg At. 6:40 p.m.
Stopped At Red Light Heard A Bang. Looked
To The Left And SAW A BLACK MAN Jerk the
driver side door OPEN And Shoot 3 times.
The White male in the Express van Started
Jerking. The BLACK MALE Then pushed him
Over in the Van And got under the Wheel
And Sped off Toward Leesburg. I Came
Straight to the police Dept..
My Wife Vickie Twilley And our ~~baby~~
WAS With me.
There WAS A BLACK And Gray Toyota
King Cab pickup beside The Van. The pickup
Took OFF FAST And RAN THE Red Light And
WENT down South River St..
I don't Know Where The people in the
Truck WAS with him or Not.
ALSO the driver of the van had his hands
up When the BLACK MALE Shot him. The
BLACK MALE WAS Slim About 6 Ft. TALL AND WAS
WORE dark cloths and had a Red and   Larry Twilley
BLACK STRIPED Bogin.                3-6-98

487

Q

ALABAMA UNIFORM ARREST REPORT

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

1 3 0 0 0 0    Cherokee Co. So.    95.10.30.032

Gavin  Keith Edward    Keith Edward

B  M  5'8  195  Bro  Blk  med

Chicago, Cook Co. IL    3/13  15/71  171  171  29.30.0166  87

1440 West 19 St. Chicago IL

93.10.60.71.102

Middle during the course    4th member

TYPE OR PRINT IN BLACK INK ONLY    AOUC-34 REV. 10-90

# ALABAMA UNIFORM ARREST REPORT

| Fingerprinted | R84 Completed |
|---|---|
| [1] Yes | [1] Yes |
| [2] No | [2] No |

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

## IDENTIFICATION

| 1 ORI # | 2 AGENCY NAME | 2 CASE # | 4 SFX |
|---|---|---|---|
| 01.30.000 | Cherokee Co. So. | 98.004.009.1 | |

5 LAST, FIRST, MIDDLE NAME: Meeks Dwayne Lenair
6 ALIAS-AKA:

| 7 SEX | 8 RACE | 9 HGT. | 10 WGT. | 11 EYE | 12 HAIR | 13 SKIN | 14 | [1] SCARS | [2] MARKS | [3] TATOOS | [4] AMPUTATIONS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [X] M [ ] F | [X] W [ ] B [ ] A [ ] I | 5'10" | 240 | Bro | Blk | | | | | | |

| 15 PLACE OF BIRTH (CITY, COUNTY, STATE) | 16 SSN | 17 DATE OF BIRTH | 18 AGE | 19 MISCELLANEOUS ID # |
|---|---|---|---|---|
| Chicago | 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-0555 | 12 28 64 | 33 | |

| 20 SID # | 21 FINGERPRINT CLASS | KEY | MAJOR | PRIMARY | SCDV | SUB-SECONDARY | FINAL | 22 OL# | 23 ST |
|---|---|---|---|---|---|---|---|---|---|
| | HENRY CLASS | | | | | | | | |
| 24 FBI # | NCIC CLASS | | | | | | | 25 IDENTIFICATION COMMENTS | |

| 26 [ ] RESIDENT [X] NON–RESIDENT | 27 HOME ADDRESS (STREET, CITY, STATE, ZIP) 4213 W 179 St. Country Club Hills, Chicago | 28 RESIDENCE PHONE 708 922-3546. | 29 OCCUPATION (BE SPECIFIC) C.O |
|---|---|---|---|
| 30 EMPLOYER (NAME OF COMPANY/SCHOOL) | 31 BUSINESS ADDRESS (STREET, CITY, STATE, ZIP) | | 32 BUSINESS PHONE |

## ARREST

| 33 LOCATION OF ARREST (STREET, CITY, STATE, ZIP) Chicago IL PD. | 34 SECTOR # | 35 ARRESTED FOR YOUR JURISDICTION? [X] YES [ ] NO |
|---|---|---|

36 [1] IN-STATE [2] OUT-OF-STATE AGENCY

| 36 CONDITION OF ARRESTEE: [1] DRUNK [X] SOBER [2] DRINKING [3] DRUGS | 37 RESIST ARREST [1] YES [X] NO | 38 INJURIES? [X] NONE [2] OFFICER [3] ARRESTEE | 39 ARMED? [1] Y [X] N | 40 DESCRIPTION OF WEAPON [1] HANDGUN [4] OTHER FIREARM [2] RIFLE [5] OTHER WEAPON [3] SHOTGUN |
|---|---|---|---|---|

| 41 DATE OF ARREST 04 18 98 | 42 TIME OF ARREST 1 00 | [ ] 1 AM [X] 2 PM [3] MIL. | 43 DAY OF ARREST S M T W T F [X]S | 44 TYPE ARREST [1] ON VIEW [2] WARRANT | 45 ARRESTED BEFORE? [1] YES [2] NO [3] UNKNOWN |
|---|---|---|---|---|---|

| 46 CHARGE–1 [1] FEL [2] MISD Murder Capital - Robery | 47 UCR CODE | 48 CHARGE–2 [1] FEL [2] MISD | 49 UCR CODE |
|---|---|---|---|
| 50 STATE CODE/LOCAL ORDINANCE 13A-085-640 | 51 WARRANT # 9000748 | 52 DATE ISSUED M D Y | 53 STATE CODE/LOCAL ORDINANCE | 54 WARRANT # | 55 DATE ISSUED M D Y |
| 56 CHARGE–3 [1] FEL [2] MISD | 57 UCR CODE | 58 CHARGE–4 [1] FEL [2] MISD | 59 UCR CODE |
| 60 STATE CODE/LOCAL ORDINANCE | 61 WARRANT # | 62 DATE ISSUED M D Y | 63 STATE CODE/LOCAL ORDINANCE | 64 WARRANT # | 65 DATE ISSUED M D Y |

| 66 ARREST DISPOSITION [X] HELD [2] BAIL [3] RELEASED [4] TOT–LE [5] OTHER | 67 IF OUT ON RELEASE WHAT TYPE? | 68 ARRESTED WITH (1) ACCOMPLICE (FULL NAME) |
|---|---|---|
| | | 69 ARRESTED WITH (2) ACCOMPLICE (FULL NAME) |

## VEHICLE

| 70 VYR | 71 VMA | 72 VMO | 73 VST | 74 VCO TOP BOTTOM | 75 TAG # | 76 LIS | 77 LIY |
|---|---|---|---|---|---|---|---|
| 78 VIN | | | | 79 IMPOUNDED? [1] YES [2] NO | 80 STORAGE LOCATION/IMPOUND # | | |
| 81 OTHER EVIDENCE SEIZED/PROPERTY SEIZED | | | | | | | |

[ ] CONTINUED IN NARRATIVE

## JUVENILE

| 82 JUVENILE DISPOSITION: | [1] HANDLED AND RELEASED [2] REF. TO WELFARE AGENCY [3] REF. TO JUVENILE COURT [4] REF. TO OTHER POLICE AGENCY | [5] REF. TO ADULT COURT | 83 RELEASED TO |
|---|---|---|---|
| 84 PARENT OR GUARDIAN (LAST, FIRST, MIDDLE NAME) | | 85 ADDRESS (STREET, CITY, STATE, ZIP) | 86 PHONE ( ) |
| 87 PARENTS EMPLOYER | 88 OCCUPATION | 89 ADDRESS (STREET, CITY, STATE, ZIP) | 90 PHONE ( ) |

## RELEASE

| 91 DATE AND TIME OF RELEASE M D Y | [ ] AM [ ] PM [ ] MIL. | 92 RELEASING OFFICER NAME | 93 AGENCY/DIVISION | 94 ID # |
|---|---|---|---|---|
| 95 RELEASED TO: | | 96 AGENCY/DIVISION | 97 AGENCY ADDRESS | |
| 98 PERSONAL PROPERTY RELEASED TO ARRESTEE [1] YES [2] NO [3] PARTIAL | 99 PROPERTY NOT RELEASED/HELD AT: | | 100 PROPERTY # | |
| 101 REMARKS (NOTE ANY INJURIES AT TIME OF RELEASE) | | | | |

| 102 SIGNATURE OF RECEIVING OFFICER | 103 SIGNATURE OF RELEASING OFFICER | LOCAL USE STATE USE |
|---|---|---|

## CASES CLOSED

| 104 CASE # | 105 SFX | 106 CASE # | 107 SFX | 108 CASE # | 109 SFX | 110 ADDITIONAL CASES CLOSED NARRATIVE [ ] Y [ ] N |
|---|---|---|---|---|---|---|

| 111 ARRESTING OFFICER (LAST, FIRST, M.) Wood Richard | 112 ID # 5 | 113 ARRESTING OFFICER (LAST, FIRST, M.) Ferguson C. | 114 ID # 03 | 115 SUPERVISOR ID # | 116 WATCH CMDR. ID # |
|---|---|---|---|---|---|

## TYPE OR PRINT IN BLACK INK ONLY

ACJIC–34 REV. 10-90








C-LINE #62028

[Click here and type address]

# facsimile transmittal

| | | | |
|---|---|---|---|
| **To:** | Bayne Smith | **Fax:** | 256-447-0046 |
| **From:** | Lucia H. Penland | **Date:** | 10/13/99 |
| **Re:** | Gavin mitigation | **Pages:** | |
| **CC:** | | | |

☐ Urgent     ☐ For Review     ☐ Please Comment     ☐ Please Reply     ☐ Please Recycle

Bayne, I am forwarding on to you material from Mr. Sturman in Chicago. There are issues that need to be pursued in this case, including the atmosphere in which Mr. Gavin grew up, the effects of his incarceration, effect of poverty, racism, etc. Mr. Sturman said that during the time Mr. Gavin was growing up and in the area of town where his family lived, there was a great deal of violence, including the development of large gangs, and serious gang activity. All of these issues along with whatever is found in the family dynamics need to be thoroughly explored.

I would like to urge you again to request a continuance, based on the information we are developing, along with the lack of cooperation we have encountered, and the time factor on my part –having just this Monday finished with a trial on a prior case - which has not allowed us to be further along than we are at this time. It is not an unreasonable request under the circumstances. We need to have time to not only complete the preliminary work, but to engage some expertise to help present to the jury, and the judge, the issues which go to mitigation. An adequate mitigation case can not be developed otherwise.

I have determined that we also need to pursue Mr. Gavin's prison records from here. I am sure that the prosecution will have those, since he is likely to be using the sentence as an aggravating factor. Those should be available to us through discovery. If you will ask for them through that route it will be quicker than getting them from the Ill. Dept. of Corrections, but it we have to pursue them that way we'll need a court order and a request to be sent to the address in Mr. Sturman's fax (attached). Please get that request in asap, so we can see what we're looking at there.

As I surmised, Craig Haney will not be available to provide expert testimony. He has referred me to Dr. Robert Johnson, a professor at American University, and I have a call in to him. However, we do need some funding. I hope you have been able to get that motion heard.

I'll reiterate that I am very concerned about the time frame for trying to develop mitigation in this case. I hope that you will pursue a continuance so that we can do this work as it should be done. I do not think that it is an unreasonable request to the judge under the circumstances, and he should recognize that. Thanks. I'll be talking to you soon.

*[handwritten note in left margin:] Johnson Would Need TWF*

**JOHN DAVID STURMAN & ASSOCIATES**
Sentencing Consultants
836 South Ada Street * Chicago, Illinois 60607
Telephone and Facsimile (312) 226-3167

**MEMORANDUM**

=================================================

Date:      October 13, 1999

To:       Lucia Penland, Alabama Prison Project

Regarding:   Keith Edmund Gavin

Subject:    Records and Interviews

   I have requested educational records from both Medill School and Crane High School. Your memo of your interview with Mr. Gavin mentioned that he "enrolled in a Community College (CYU) to get a GED but did not finish." We have no CYU in Chicago. Perhaps he meant City Colleges of Chicago (CCC). However his mother said it was Triton College in River Grove, but that he was never enrolled and had only received financial aid paperwork. Please clarify with him in case there's anything to actually pursue.

   Your memo also states, "When he was in prison, age 24, he was stabbed in the back 5 times....was at Civil Cross Hospital." There is no Civil Cross Hospital in Illinois according to the Illinois Department of Public Health. He may have been playing with the name Holy Cross Hospital but no IDOC prisoners would have been taken there, neither are inmates from the Cook County Jail. If he really was stabbed -- did you see the scars -- his IDOC records, called his CIMIS file and which can be subpoenaed from the institution from which he was paroled, should reflect emergency treatment and transportation. It appears, based on the IDOC warrant for parole violation included in the records you sent, that he was paroled from East Moline Correctional Center, 100 Hillcrest Road, East Moline, Il 61244 - (309) 755-4511) - Sergio Molina, Warden -- inmate #23865. If this is not correct, call and I'll give you the correct information if you don't already have it.

   If you have it in your budget to pursue health and hospitalization records, please advise and I'll get requests out to Cook County and the University of Illinois (formerly Illinois Research) Hospitals.

*DEATH PENALTY MITIGATION AND ALTERNATIVE SENTENCING*

492

Mr. Gavin grew up just blocks from where I am in the Chicago Housing Authority's *ABLA* Public Housing Project -- not a great place and controlled by the Gangster Disciples. More interesting, however, were the riots on 12th street following the death of Martin Luther King, Jr. The whole area was in riot and on fire. Mr. Gavin would have been 8 years old so you might question him relative to PTSD and related diagnoses.

Do you have a "rap sheet" on Mr. Gavin. His mother says that he was charged with burglary when he was 13, charged with murder and transferred to adult court when he was 17, and she doesn't know what else. She thinks he was acquitted in a bench trial. I'll go to the Circuit Court Clerk's office when I'm at 26th Street tomorrow and see what's on computer or microfiche.

I'll send you a more detailed memo of my interviews in a few days. However, Mr. Gavin's mother began by explaining to me that Dewayne Meeks knew the victim, was "up into something" with him, asked Mr. Gavin to ride along down south to help him drive, and then set Mr. Gavin up for the charge by leaving him on a country road, promising to come back for him, and driving back to Joliet. "My boy isn't like that."

Regards,

**JOHN DAVID STURMAN & ASSOCIATES**
*Sentencing Consultants*
*836 South Ada Street * Chicago, Illinois 60607*
*Telephone and Facsimile (312) 226-3167*

<u>**MEMORANDUM**</u>

=============================================

Date:       October 13, 1999

To:         Lucia Penland, Alabama Prison Project

Regarding:  Keith Edmund Gavin

Subject:    Interview with Mrs. Annette Gavin

I interviewed Mrs. Annette Gavin on October 12, 1999 in her home at 1140 North Lockwood in Chicago. The house was sparsely furnished and the interior unpainted and undecorated for years reflecting substantial poverty. Also intermittently present were her daughter, Sharon, and five grandchildren.

Mrs. Gavin stated that Keith Gavin was born on March 30, 1960 to her and Willie Gavin Sr. at the University of Illinois at Chicago Hospital in an uneventful full term delivery. Mrs. Gavin stated that she and Willie Gavin Sr. were formally married on July 20, 1955, and that he was the biological father of all her 12 children. Mr. Gavin Sr. died in 1989 due to complications from cardiac medications relative to a heart condition. He had worked as a local truck driver for Wells Forwarding Company.

Mrs. Gavin continued that she brought Keith home from the hospital to 1532 West 15th Street where they lived for seven years. They next moved to 1401 South Throop where they lived for 13 years until moving to 1140 North Lockwood. [The first two addresses are in *The Projects* -- Chicago Housing Authority's ABLA Public Housing on the Near West Side while the Lockwood address is on the Far West Side in the Austin neighborhood.] Mrs. Gavin stated that Keith was raised by his immediate family all his life and that there was no Department of Children and Family Services involvement at any time.

Mrs. Gavin was able to give the following information about her children, all surnamed Gavin:

*DEATH PENALTY MITIGATION AND ALTERNATIVE SENTENCING*

| Willie, | age 40, died of liver cancer |
| Elaine, | age 41, is currently unemployed and has been a substance abuser for at least the last 10 years |
| Victor, | age 39, lives in Salk Village, Illinois (far south suburban Chicago) |
| Steven, | age 37, is unemployed and lives at 5341 W. Gladys in Chicago (773-626-3012) and spent 11 years in Cook County Jail and the Illinois Department of Corrections for attempted murder, agg. assault, etc. between 1979 and 1990 |
| Sterling, | age 34, sometimes lives with his ex-wife (773-285-0523) |
| Adrian, | age 32, is in nursing school at Loyola University and sometimes lives at the 5341 W. Gladys address in Chicago (773-629-2752) |
| Sharon, | age 29, lives at the 1140 N. Lockwood address and baby sits in the home |
| Nicole, | age 24, lives at 1615 N. Mead  and works for Marriot in reservations |
| Latrice, | age 23, lives at the 1140 N. Lockwood address (773-379-8474) and is unemployed |
| Ezra, | age 21, lives in Quincy, Illinois |
| Geannetta, | age 19, lives at the 1140 N. Lockwood address (773-379-8474) |

Mrs. Gavin stated further that all her kids had drug problems and that Elaine, Victor, Sterling, and Steven have all been arrested at some point and may have spent time in IDOC but she is unsure of their charges, etc.  She explained that she never went to visit her children in custody with the exceptions of Steven and Keith.

Mrs. Gavin noted that she sent Keith to the Monnonite Church when he was a child and later to various churches including the Jehovah's Witnesses which, she stated, Keith attended until he was approximately 17 years old.  She related that Keith has never been married and has no children that she knows about.

Mr. Gavin attended Medill Primary, and Medill Intermediate and Upper Grade Centers for elementary school and Crane High School. [records have been requested]  Mrs. Gavin continued that, at least at Medill, Keith was in Special Education classes.  She also noted that prior to the Instant Offense, Keith was submitting paperwork to Triton College in River Grove, Illinois to pursue a GED course of study.

Mrs. Gavin confirmed that Keith worked at Liberty Plaza Laundromat as a child, the Mayor's Summer Youth Employment Programs during the summer in his teens, and Jovan Industries as a security guard.  She also stated that he might have worked at the South Water Market [wholesale fruits and vegetables] as did some of her other children.  Mr. Gavin has no military history.

Mrs. Gavin stated that Keith had the normal childhood diseases and maladies.  She continued that Keith was hospitalized and treated at Cook County Hospital for Nephritis in

1970 when he was 10 years old and followed in the Fantus outpatient clinic of CCH for approximately the following year, perhaps more.  Physicians told her his kidney problems would have to be controlled through diet, that they had no medications to give him at that time.  Mrs. Gavin described Keith's condition as "losing protein through his kidneys." [medical records have been requested for both the University of Illinois at Chicago (formerly Illinois Research) and Cook County Hospitals.]  Mrs. Gavin denied any mental health history for Keith as well as any history on either the paternal or maternal sides of his family, as far as she knows.

Mrs. Gavin stated that Kevin grew up in the CHA's *ABLA* Housing Project where he faced great peer pressure to gang affiliation [the ABLA projects were controlled by the Gangster Disciples Street Gang.]  Mrs. Gavin related her family's, and Keith's constant exposure to street violence and shooting.  "It was all around us -- drugs, violence, guns," she recalled.  She continued that even she was threatened by gangbangers who wanted her sons as GDs for checking up on them and trying to keep them from the local gang and violence culture.  [Note: I live across the street from part of the ABLA Homes which cover an area approximately a half mile square, and two weeks ago we were awakened five nights out of seven by automatic weapons fire.  My neighbor took six bullets in her home one evening and we live in relatively respectable town homes.  Of course it's still gangs and drugs which drive the deviance.]

Mrs Gavin explained that Keith generally got along well with his peers while growing up, enjoyed working as a child, got along in school, and was not one to fight, though others tried to provoke him.  She continued that the level of violence to which they were exposed scared Keith.  She recalled that the son of a neighbor, Dwayne Rogers age 13-14) who lived around the corner, and who Keith knew, was "shot up real bad in gang violence."  She also noted that Keith's first case was related to gangs, drugs, and the Rogers family.

Finally, Mrs. Gavin recalled that she suspected there might have been some form of sexual abuse on the part of a neighbor but she could not be certain.  Sometime later, she remembers Keith telling her, "You should have watched your kids more closely."  She asked Keith what he meant but he didn't explain any further.  She stated that she took it in reference to her suspicions.

Regards,

3

496

**H. BAYNE SMITH**
*105 Seaboard Avenue*
*Piedmont, AL 36272*
*(256) 447-0022/Fax 447-0046*

October 20, 1999

Lucia H. Penland
Alabama Prison Project
215 Clayton Street
Montgomery, AL 36104

Re: Keith Edmund Gavin

Dear Lucia,

I certainly appreciate your position as set forth in your letter of October 19, 1999, regarding Keith's situation. In fact, he continues to be completely unwilling to discuss his background as it relates to development of mitigation evidence in this case, although his family is coming around and beginning to cooperate to some extent.

Please understand my position regarding a continuance. First, Judge Rains was very clear that the continuance he granted back in June was expressly for the purpose of allowing the Alabama Prison Project to develop mitigation evidence in this case. The fact that Keith and his family were unwilling to cooperate would, in my opinion, not only not be persuasive toward a continuance, but also would in fact be counterproductive in that regard as well as towards Keith as a whole. Be that as it may, I did yesterday move for a continuance of the case, on the basis of what was to my mind a far more legitimate and urgent ground. Last week, I broke a bone in my foot. Since last Thursday, I have been in a great deal of pain, have been heavily sedated, and have been in a walking cast. Nonetheless, the judge denied my continuance, noting the considerable logistical events which had been set in motion in view of the contemplated start date: 300 jurors summoned, witnesses flying in from all over the country, etc.. He is clearly determined to start this case on November 1. This was not a battle I could win, nor one that was going to create an appealable issue.

I would appreciate your forwarding to me any information you have obtained in Mr. Gavin's case. It may be that I can introduce documentary evidence through some of his family members or that the DA will stipulate to the admission of uncontested material. Also, I need to know as soon as possible what your fees will be. I do not want you to have done your work on this case for free, but if you have not expended all of the money ($2,500) that Judge Rains allocated, I would like to know that, as we may need it for other mitigation work.

I am very grateful for the work done by the Alabama Prison Project, not only on this case but in general. The work you guys did on McCloud was invaluable. I am sorry we could not have had a more successful collaboration on Gavin. I hope to work with you again in the future.

Sincerely,

H. Bayne Smith

HBS/cf

*Please give my best wishes to Aaron as well. Thanks*

498



***H. BAYNE SMITH***
*105 Seaboard Avenue*
*Piedmont, AL 36272*
*(256) 447-0022/Fax 447-0046*

October 31, 1999

Judge David A. Rains
300 Grand Avenue SW
Suite 403
Fort Payne, AL 35967

Re: ***State of Alabama v. Gavin, CC-61***

Dear Judge Rains,

In accordance with your instructions, enclosed are copies of all materials received from the Alabama Prison Project in connection with this case. As you can see, it consists only of correspondence from Ms. Penland and not, at this point, any useable mitigation material. Should I receive any material which actually appears useful, I will of course provide it to the District Attorney as soon as possible. However, at this time, it seems to me the material here enclosed is all attorney work product and should not be released to the District Attorney.

Ms. Penland advises that at this time, her fees for her participation will be approximately $1,300. This is $1,200 less than the $2,500 originally allocated for the defense to spend on the mitigation phase. I note this because, in separate pleadings, I am today requesting allocation of additional funds for the procurement of experts to testify in the guilt/innocence phase of the case.

Sincerely,

H. Bayne Smith

THIS CORRESPONDENCE IS SUBMITTED UNDER SEAL.
NO COPY HAS BEEN PROVIDED TO THE DISTRICT ATTORNEY



Bayne A. Smith                                                8-19-98
105 Seaboard Ave.
Piedmont, Al 36272


Dear Mr. Smith,

    I, Keith Gavin, Am writing because I request
to see you at your earliest possible convenience. Also
I request IF possible to have a copy of all the
statements that Dewayne Meeks made against me, and
the statement that Danny Smith made against me,
or any other witnesses made, and copy of all news
Articles that where in the paper here in Cherokee or
in Fort Payne.
    Thanking you in advance For giving this matter
your attention, and hope to be seeing you soon.

                                Respectfully,

                                Keith Gavin