FILED

2020 Aug-21  PM 12:49
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

KEITH EDMUND GAVIN,  )
         )
  Petitioner,   )
         )
v.        )  Case No. 4:16-cv-00273-KOB
         )
JEFFERSON S. DUNN,   )
Commissioner of the Alabama )
Department of Corrections,  )
         )
  Respondent.   )

# VOLUME 33

# State Court – Collateral Appeal Transcript

LUTHER STRANGE
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

1

Vol. 15 of 22

COURT OF CRIMINAL APPEALS NO. _____ CR-10-1313

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

**CIRCUIT COURT OF** _____ CHEROKEE _____ **COUNTY, ALABAMA**

**CIRCUIT COURT NO** CC-98-61.60 & CC-98-62.60

**CIRCUIT JUDGE** _____ David A. Rains _____

Type of Conviction/ Order Appealed From: _____ Rule 32 _____

Sentence Imposed: _____

Defendant Indigent: ☑ YES ☐ NO

## KEITH EDMUND GAVIN

**NAME OF APPELLANT**

Stephen C. Jackson                   205-254-1037
(Appellant's Attorney)                     (Telephone No.)

1901 Sixth Avenue North, Suite 2400
(Address)

Birmingham      Alabama      35203
(City)                 (State)                (Zip Code)

### v.
## STATE OF ALABAMA

**NAME OF APPELLEE**

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter

name and address of municipal attorney below.

df
_____

_____

(For Court of Criminal Appeals Use Only)

2801

great deal of work left to be done on the mitigation case. A true and correct copy of that letter is attached as Exhibit H. I explained that in order to present an effective, comprehensive and adequate mitigation case, we needed to obtain comprehensive records, conduct additional interviews with family, friends and fellow inmates, collect sociological information about the culture in which Mr. Gavin grew up, and retain experts to make assessments and prepare testimony on the effect of Mr. Gavin's incarceration, his family and his neighborhood culture, including the amount of violence to which he was exposed, all of which was essential to explaining Mr. Gavin's behavior in a way might mitigate the offense. At that point, the work was not close to completed and the mitigation case could not be adequately developed without additional time.

18. On October 20, 1999, Mr. Smith sent me a letter documenting his refusal to seek a continuance to develop mitigation evidence, despite the fact that Mr. Gavin's family was beginning to cooperate in the development of the mitigation case and the investigation was only in its preliminary stages. Mr. Smith did in fact request a continuance for the trial, but rather than focusing on his inability to prepare a constitutionally adequate mitigation case in time for trial, his reasoning for seeking the continuance was because he was in pain from a broken foot. The judge denied that continuance. Mr. Smith was determined to proceed with the November 1, 1999 trial date and he requested that I forward him whatever information I had obtained up to that point. I forwarded the information and my involvement in Mr. Gavin's mitigation case ended. A true and correct copy of Mr. Smith's October 20, 1999 letter is attached as Exhibit I.

19. I believe that Mr. Smith could have developed an adequate mitigation case had he been more attentive to mitigation issues. Mr. Smith did not contact me for four months in the summer of 1999 to ensure that sufficient progress was made in preparing a mitigation case.

20. I believe that Mr. Smith could have developed an adequate mitigation case had he sought the continuance in October 1999 based on the additional time needed to prepare an adequate mitigation case, as I advised. While there was a great deal of work left to be done in our investigation as of October 13, 1999, we had made substantial progress towards identifying the issues and the information that we needed to develop. I believe it would have taken four to six months to develop an adequate mitigation case as of October 1999.

Further affiant sayeth not.

Lucia H. Penland

4

Subscribed and sworn to before
me this _29_ day of August, 2007

_Rachel Smith_

NOTARY PUBLIC

My commission expires: _September 14_, 20_08_.

CH1 3951298v.1

# EXHIBIT
# A

2804

### H. BAYNE SMITH
### ATTORNEY AT LAW
Phone (265) 447-0022/FAX (265) 447-0046
105 Seaboard Avenue, Piedmont AL 36272

**H. Bayne Smith**

December 24, 1998

Ms. Lucia Penland
Alabama Prison Project
215 Clayton Street
Montgomery, AL 36104

Re: Contract i/c/o *State v. Alabama v. Keith Edmund Gavin, CC 98-61 and 98-62,* Circuit Court of Cherokee County

Dear Ms. Penland,

In accordance with our conversation and your letter of October 11, 1998, enclosed is an executed Memorandum of Agreement in the above-styled case. Also enclosed for your records is a copy of Judge Rains' Order preapproving the sum of $2,500.00 for employment of your services.

At this time the earliest likely date for the trial of this case is the week beginning April 27, 1999. This is the first scheduled trial week in Cherokee County in 1999. However, it also appears that another capital case to which I am appointed in Calhoun County, *State v. Derrick McCloud,* is scheduled for trial during the first week of March, 1999, so that may push the Gavin case back even further.

Contact me at your convenience sometime after the first of the year and we will schedule a time to meet and map out a game plan. Until then, I wish you and your family the best during the holidays, and I look forward to working with you in the new year.

Sincerely,

H. Bayne Smith

HBS/bs

2805

**B**

# *ALABAMA PRISON PROJECT*

*215 Clayton Street   Montgomery, Alabama 36104*
*Phone: 334-264-7416  Fax: 334-264-4661  email: halbert @ mindspring.com*
*Lucia H. Penland, Executive Director*

| *Renascence Community* | *Mitigation Program* | *CURE* |
|---|---|---|
| *Douglass Porter, Chair* | *Lucia H. Penland* | *Aaron McCall* |
| *Steering Committee* | *Coordinator* | *Coordinator* |

March 19, 1999

March 19, 1999

H. Bayne Smith
105 Seaboard Ave.
Piedmont, AL  36272

Re: Keith Edmund Gavin

Dear Bayne:

In reference to our conversation concerning the above referenced case, it will be fall, at least before we can be prepared for this case. As you of course know, we have just finished work on McCloud, I have also just finished work on a Shelby County case, and I have a Pike County case set for trial May 3. Additionally, there are several others we have in the works, and have had for a while. In fact, we have more cases at this time than we have ever had at one time. In order for us to do the work needed on Mr. Gavin's case we will need a continuance until at least October, if not later. As you know, in this case we will be required to do a fair amount of out-of-state travel, which will add to the time needed.

Also, in reference to the travel which will be required, the amount of $2,500 will not be adequate for our work. These cases require interviews with family, friends, employers, in short, anyone who knows the defendant. Phone interviews will not suffice to obtain the sort of personal information required to develop an adequate mitigation presentation. I believe that this case will require a minimum of $6,000, and we should be able to increase that if the work warrants it. We always work to keep the costs in these cases down as much as possible, but when we have an out of state defendant, it is inevitable that the expense will be greater.

I look forward to working with you on this case, and hope to hear from you in the near future.

Sincerely yours,


Lucia H. Penland



Return-Path: <psylaw@cats.ucsc.edu>
Date: Fri, 23 Apr 1999 08:55:56 -0700 (PDT)
To: "Lucia H. Penland" <halbert@mindspring.com>
From: Craig Haney <psylaw@cats.ucsc.edu>
Subject: Re: DPcase in Albama

Hi Lucia:

OK, sounds fine (IF you get the continuance). I can mail or fax a current
CV. Give me an address or fax number and I'll do it right away.

I hope you are well.

Craig


Professor Craig Haney
Chair, Department of Psychology
University of California
Santa Cruz, California 95064
(408)-459-2153 (office)
(408)-425-3664 (fax)

2807

# *ALABAMA PRISON PROJECT*

*215 Clayton Street   Montgomery, Alabama 36104*
*Phone: 334-264-7416   Fax: 334-264-4661   email: halbert @ mindspring.com*
*Lucia H. Penland, Executive Director*

| Renascence Community | Mitigation Program | CURE |
|---|---|---|
| Douglass Porter, Chair | Lucia H. Penland | Aaron McCall |
| Steering Committee | Coordinator | Coordinator |

May 6, 1999

H. Bayne Smith
105 Seaboard Ave.
Piedmont, AL  36272

Re: State of Alabama v Keith Edmund Gavin

Dear Bayne:

In reference to a continuance in the above referenced case: I have a case going to trial on May 24, which I am still preparing for. Additionally, I am attending a conference May 14 – 16 which includes funding agents for the Prison Project. This obviously leaves little, if any, time to do the work needed for Mr. Gavin's defense.

Regarding that defense, what I see right now that will need to be done in this case is: retrieval and review of school, medical (if pertinent) and prison records. I will also need to travel to Chicago to interview family of Mr. Gavin, which consists of his mother and his 12 siblings, and interview friends and at least one teacher. I, of course, do not know what I'll find in Chicago, which might extend what I know now that I need to do there. Once I see what information I have I will need to identify what expert witnesses we might need to assist in presentation of the mitigation case, and work with you and them to develop the case strategy.

I think that you can see that there is not enough time between now and June to do adequate preparation on this matter. I hope that a continuance will be available to us, so that this case can be prepared properly and completely. Let me know if you have any other questions on this matter.

Sincerely yours,

Lucia H. Penland

Craig Haney, 06:48 AM 10/14/99, Re:

Return-Path: <psylaw@cats.ucsc.edu>
Date: Thu, 14 Oct 1999 06:48:10 -0700 (PDT)
To: "Lucia B. Penland" <halbert@mindspring.com>
From: Craig Haney <psylaw@cats.ucsc.edu>
Subject: Re:

Lucia:

OK, good luck with Johnson. Let me know what happens if you have a chance.
I wish I could help, but I'm really not in a position to respond to things
on such short notice anymore; doing so with some regularity in the past got
me into enormous trouble with the powers that be at my "other job." So,
when I can't plan for something in advance, I often can't do it because I'm
locked in to other commitments that I can't cancel or rearrange.

The out of the country thing is partly business--a conference talk to give
in Madrid. But I've never been there so it will certainly feel like
vacation.

Craig

>Craig - Thanks for the info. I'll try Johnson tomorrow. Yes they ought to
>be...  I'm still contemplating withdrawing from this case, tho I can
>hopefully document enough to help with appeals issues, and sort of hate to
>leave the defendant hanging. Unfortunately, there's no time for any sort of
>expertise to be obtained, so it's a real delimma. I'm also sorry to not
>have the opportunity to work with you again.
>Hope your out of country travel is something interesting - vacation maybe?
>Take care. Lucia
>
>At 09:12 AM 10/7/99 -0700, you wrote:
>>Hi Lucia,
>>
>>I got your telephone message. Yikes. I was hoping that the reason I didn't
>>hear from you folks was that you'd somehow settled. Sorry. I'm afraid I
>>don't have any good suggestions for you on this one, especially because
>>time is so short. There is unfortunately no way I can do it; I'm actually
>>not going to be in the country during the time period you mentioned. Maybe
>>Robert Johnson who is at American University (I think) in Washington DC.
>>Otherwise, I'm afraid I don't know. Attorneys who handle cases this way
>>ought to be...
>>
>>
>>Craig
>>
>>Professor Craig Haney
>>Chair, Department of Psychology
>>University of California
>>Santa Cruz, California 95064
>>(831)-459-2153 (office)
>>(831)-459-3519 (fax)
>>
>>
>>

2809

[Click here and type address]

F

# facsimile transmittal

| To: | Bayne Smith | Fax: | 256-447-0046 |
|---|---|---|---|
| From: | Lucia H. Penland | Date: | 10/13/99 |
| Re: | Gavin mitigation | Pages: | |
| CC: | | | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Bayne, I am forwarding on to you material from Mr. Sturman in Chicago. There are issues that need to be pursued in this case, including the atmosphere in which Mr. Gavin grew up, the effects of his incarceration, effect of poverty, racism, etc. Mr. Sturman said that during the time Mr. Gavin was growing up and in the area of town where his family lived, there was a great deal of violence, including the development of large gangs, and serious gang activity. All of these issues along with whatever is found in the family dynamics need to be thoroughly explored.

I would like to urge you again to request a continuance, based on the information we are developing, along with the lack of cooperation we have encountered, and the time factor on my part –having just this Monday finished with a trial on a prior case - which has not allowed us to be further along than we are at this time. It is not an unreasonable request under the circumstances. We need to have time to not only complete the preliminary work, but to engage some expertise to help present to the jury, and the judge, the issues which go to mitigation. An adequate mitigation case can not be developed otherwise.

I have determined that we also need to pursue Mr. Gavin's prison records from here. I am sure that the prosecution will have those, since he is likely to be using the sentence as an aggravating factor. Those should be available to us through discovery. If you will ask for them through that route it will be quicker than getting them from the Ill. Dept. of Corrections, but it we have to pursue them that way we'll need a court order and a request to be sent to the address in Mr. Sturman's fax (attached). Please get that request in asap, so we can see what we're looking at there.

As I surmised, Craig Haney will not be available to provide expert testimony. He has referred me to Dr. Robert Johnson, a professor at American University, and I have a call in to him. However, we do need some funding. I hope you have been able to get that motion heard.

I'll reiterate that I am very concerned about the time frame for trying to develop mitigation in this case. I hope that you will pursue a continuance so that we can do this work as it should be done. I do not think that it is an unreasonable request to the judge under the circumstances, and he should recognize that. Thanks. I'll be talking to you soon.

2810

6

*JOHN DAVID STURMAN & ASSOCIATES*
*Sentencing Consultants*
*836 South Ada Street * Chicago, Illinois 60607*
*Telephone and Facsimile (312) 226-3167*

## MEMORANDUM

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

Date:        October 13, 1999

To:          Lucia Penland, Alabama Prison Project

Regarding:   Keith Edmund Gavin

Subject:     Interview with Mrs. Annette Gavin


        I interviewed Mrs. Annette Gavin on October 12, 1999 in her home at 1140 North Lockwood in Chicago. The house was sparsely furnished and the interior unpainted and undecorated for years reflecting substantial poverty. Also intermittently present were her daughter, Sharon, and five grandchildren.

        Mrs. Gavin stated that Keith Gavin was born on March 30, 1960 to her and Willie Gavin Sr. at the University of Illinois at Chicago Hospital in an uneventful full term delivery. Mrs. Gavin stated that she and Willie Gavin Sr. were formally married on July 20, 1955, and that he was the biological father of all her 12 children.  Mr. Gavin Sr. died in 1989 due to complications from cardiac medications relative to a heart condition. He had worked as a local truck driver for Wells Forwarding Company.

        Mrs. Gavin continued that she brought Keith home from the hospital to 1532 West 15th Street where they lived for seven years. They next moved to 1401 South Throop where they lived for 13 years until moving to 1140 North Lockwood. [The first two addresses are in *The Projects* -- Chicago Housing Authority's ABLA Public Housing on the Near West Side while the Lockwood address is on the Far West Side in the Austin neighborhood.] Mrs. Gavin stated that Keith was raised by his immediate family all his life and that there was no Department of Children and Family Services involvement at any time.

        Mrs. Gavin was able to give the following information about her children, all surnamed Gavin:


*DEATH PENALTY MITIGATION AND ALTERNATIVE SENTENCING*

Willie,      age 40, died of liver cancer
Elaine,      age 41, is currently unemployed and has been a substance abuser for at
             least the last 10 years
Victor,      age 39, lives in Salk Village, Illinois (far south suburban Chicago)
Steven,      age 37, is unemployed and lives at 5341 W. Gladys in Chicago (773-
             626-3012) and spent 11 years in Cook County Jail and the Illinois
             Department of Corrections for attempted murder, agg. assault,
             etc. between 1979 and 1990
Sterling,    age 34, sometimes lives with his ex-wife (773-285-0523)
Adrian,      age 32, is in nursing school at Loyola University and sometimes lives at
             the 5341 W. Gladys address in Chicago (773-629-2752)
Sharon,      age 29, lives at the 1140 N. Lockwood address and baby sits in the home
Nicole,      age 24, lives at 1615 N. Mead  and works for Marriot in
             reservations
Latrice,     age 23, lives at the 1140 N. Lockwood address (773-379-8474) and is
             unemployed
Ezra,        age 21, lives in Quincy, Illinois
Geannetta,   age 19, lives at the 1140 N. Lockwood address (773-379-8474)


Mrs. Gavin stated further that all her kids had drug problems and that Elaine, Victor, Sterling, and Steven have all been arrested at some point and may have spent time in IDOC but she is unsure of their charges, etc.  She explained that she never went to visit her children in custody with the exceptions of Steven and Keith.

Mrs. Gavin noted that she sent Keith to the Monnonite Church when he was a child and later to various churches including the Jehovah's Witnesses which, she stated, Keith attended until he was approximately 17 years old.  She related that Keith has never been married and has no children that she knows about.

Mr. Gavin attended Medill Primary, and Medill Intermediate and Upper Grade Centers for elementary school and Crane High School. [records have been requested]  Mrs. Gavin continued that, at least at Medill, Keith was in Special Education classes.  She also noted that prior to the Instant Offense, Keith was submitting paperwork to Triton College in River Grove, Illinois to pursue a GED course of study.

Mrs. Gavin confirmed that Keith worked at Liberty Plaza Laundromat as a child, the Mayor's Summer Youth Employment Programs during the summer in his teens, and Jovan Industries as a security guard.  She also stated that he might have worked at the South Water Market [wholesale fruits and vegetables] as did some of her other children.  Mr. Gavin has no military history.

Mrs. Gavin stated that Keith had the normal childhood diseases and maladies.  She continued that Keith was hospitalized and treated at Cook County Hospital for Nephritis in

2

1970 when he was 10 years old and followed in the Fantus outpatient clinic of CCH for approximately the following year, perhaps more. Physicians told her his kidney problems would have to be controlled through diet, that they had no medications to give him at that time. Mrs. Gavin described Keith's condition as "losing protein through his kidneys." [medical records have been requested for both the University of Illinois at Chicago (formerly Illinois Research) and Cook County Hospitals.] Mrs. Gavin denied any mental health history for Keith as well as any history on either the paternal or maternal sides of his family, as far as she knows.

Mrs. Gavin stated that Kevin grew up in the CHA's *ABLA* Housing Project where he faced great peer pressure to gang affiliation [the ABLA projects were controlled by the Gangster Disciples Street Gang.] Mrs. Gavin related her family's, and Keith's constant exposure to street violence and shooting. "It was all around us -- drugs, violence, guns," she recalled. She continued that even she was threatened by gangbangers who wanted her sons as GDs for checking up on them and trying to keep them from the local gang and violence culture. [Note: I live across the street from part of the ABLA Homes which cover an area approximately a half mile square, and two weeks ago we were awakened five nights out of seven by automatic weapons fire. My neighbor took six bullets in her home one evening and we live in relatively respectable town homes. Of course it's still gangs and drugs which drive the deviance.]

Mrs Gavin explained that Keith generally got along well with his peers while growing up, enjoyed working as a child, got along in school, and was not one to fight, though others tried to provoke him. She continued that the level of violence to which they were exposed scared Keith. She recalled that the son of a neighbor, Dwayne Rogers age 13-14) who lived around the corner, and who Keith knew, was "shot up real bad in gang violence." She also noted that Keith's first case was related to gangs, drugs, and the Rogers family.

Finally, Mrs. Gavin recalled that she suspected there might have been some form of sexual abuse on the part of a neighbor but she could not be certain. Sometime later, she remembers Keith telling her, "You should have watched your kids more closely." She asked Keith what he meant but he didn't explain any further. She stated that she took it in reference to her suspicions.

Regards,

3

## JOHN DAVID STURMAN & ASSOCIATES

Sentencing Consultants

836 South Ada Street * Chicago, Illinois 60607

Telephone and Facsimile (312) 226-3167

### MEMORANDUM

=============================================================

Date:    October 13, 1999

To:    Lucia Penland, Alabama Prison Project

Regarding:  Keith Edmund Gavin

Subject:    Records and Interviews

       I have requested educational records from both Medill School and Crane High School. Your memo of your interview with Mr. Gavin mentioned that he "enrolled in a Community College (CYU) to get a GED but did not finish." We have no CYU in Chicago. Perhaps he meant City Colleges of Chicago (CCC). However his mother said it was Triton College in River Grove, but that he was never enrolled and had only received financial aid paperwork. Please clarify with him in case there's anything to actually pursue.

       Your memo also states, "When he was in prison, age 24, he was stabbed in the back 5 times....was at Civil Cross Hospital." There is no Civil Cross Hospital in Illinois according to the Illinois Department of Public Health. He may have been playing with the name Holy Cross Hospital but no IDOC prisoners would have been taken there, neither are inmates from the Cook County Jail. If he really was stabbed -- did you see the scars -- his IDOC records, called his CIMIS file and which can be subpoenaed from the institution from which he was paroled, should reflect emergency treatment and transportation. It appears, based on the IDOC warrant for parole violation included in the records you sent, that he was paroled from East Moline Correctional Center, 100 Hillcrest Road, East Moline, Il 61244 - (309) 755-4511) - Sergio Molina, Warden -- inmate #23865. If this is not correct, call and I'll give you the correct information if you don't already have it.

       If you have it in your budget to pursue health and hospitalization records, please advise and I'll get requests out to Cook County and the University of Illinois (formerly Illinois Research) Hospitals.

*DEATH PENALTY MITIGATION AND ALTERNATIVE SENTENCING*

Mr. Gavin grew up just blocks from where I am in the Chicago Housing Authority's *ABLA* Public Housing Project -- not a great place and controlled by the Gangster Disciples. More interesting, however, were the riots on 12th street following the death of Martin Luther King, Jr. The whole area was in riot and on fire. Mr. Gavin would have been 8 years old so you might question him relative to PTSD and related diagnoses.

Do you have a "rap sheet" on Mr. Gavin. His mother says that he was charged with burglary when he was 13, charged with murder and transferred to adult court when he was 17, and she doesn't know what else. She thinks he was acquitted in a bench trial. I'll go to the Circuit Court Clerk's office when I'm at 26th Street tomorrow and see what's on computer or microfiche.

I'll send you a more detailed memo of my interviews in a few days. However, Mr. Gavin's mother began by explaining to me that Dewayne Meeks knew the victim, was "up into something" with him, asked Mr. Gavin to ride along down south to help him drive, and then set Mr. Gavin up for the charge by leaving him on a country road, promising to come back for him, and driving back to Joliet. "My boy isn't like that."

Regards,

2815

H

October 19, 1999

H. Bayne Smith
105 Seaboard Ave.
Piedmont, AL 36272

Re: Keith Edmund Gavin

Dear Mr. Smith:

In speaking with the mitigation specialist I retained in Chicago, and seeing the information he
has provided, it is clear to me that a great deal more work needs to be done on this case. We have
issues of Mr. Gavin being exposed to a violent atmosphere from a very early age, entering into
prison at a young age, which would only have exacerbated the effect of the exposure to violence,
with the potential for him to be suffering from Post Traumatic Stress Disorder. This disorder, if
present, could provide understanding of his behavior in this incident, if he is found guilty. We
would have to know if it is present, and to what extent it did and does effect his behavior.

Additionally, there is the level of poverty in which he apparently grew up, along with what
racism he encountered over the years. We know that he was a youngster when Martin Luther
King was assassinated, and that there were riots in the housing project he lived in when word of
that event reached there.

Gang culture was developing in the area in which he grew up, and during the time he was
growing up. We don't, at this point know what the effect of that was on him, other than his
mother has said that he was pressured to be a part of it. The gangs are a significant factor in his
neighborhood, and the area of Chicago he is from. We need to know how he and his siblings and
friends fit into that. We don't know if that culture spread into the prison culture he inhabited for
17 years, and where he fit in there, nor do we know what his prison record is like.

In order to present an effective, comprehensive and adequate mitigation case, the following
things must be done:

- Comprehensive records must be obtained.
- Additional interviews with family, friends, and fellow inmates must be conducted.
- Sociological information about the culture in which he grew up should be obtained.
- Experts must be retained and provided information to make assessments and prepare
  testimony on the effect of his incarceration, and on the effect of his family and the
  neighborhood culture, including the amount of violence he was exposed to. This is essential
  in pulling together the information obtained and presenting its' relevance to this case, and to
  explaining Mr. Gavin's behavior in a way that mitigates the offense.

With the schedule I have been working under, coupled with the lack of cooperation from Mr.
Gavin and his family, this work is not close to being completed. In our last conversation, you
indicated to me that you were not willing to request another continuance on this case. The
mitigation cannot be adequately developed without additional time.

To present mitigation that is neither thoroughly developed, nor has the expert assistance to put it into a context which will relate it to the case at hand is not providing Mr. Gavin with the best assistance available. Under the circumstances, it is in the best interest of Mr. Gavin for me to withdraw from this case. Should you obtain a continuance which will provide the time necessary to complete the work I would be pleased to re-enter the case.

I will be sending you material from Mr. Sturman as I receive it, keeping in mind your trial schedule and that you might have some use for it. I wish you the best of luck in this trial.

Sincerely yours,

Lucia H. Penland
Mitigation Coordinator

**H. BAYNE SMITH**
*105 Seaboard Avenue*
*Piedmont, AL 36272*
*(256) 447-0022/Fax 447-0046*

October 20, 1999

Lucia H. Penfand
Alabama Prison Project
215 Clayton Street
Montgomery, AL 36104

Re: Keith Edmund Gavin

Dear Lucia,

I certainly appreciate your position as set forth in your letter of October 19, 1999, regarding Keith's situation. In fact, he continues to be completely unwilling to discuss his background as it relates to development of mitigation evidence in this case, although his family is coming around and beginning to cooperate to some extent.

Please understand my position regarding a continuance. First, Judge Rains was very clear that the continuance he granted back in June was expressly for the purpose of allowing the Alabama Prison Project to develop mitigation evidence in this case. The fact that Keith and his family were unwilling to cooperate would, in my opinion, not only not be persuasive toward a continuance, but also would in fact be counterproductive in that regard as well as towards Keith as a whole. Be that as it may, I did yesterday move for a continuance of the case, on the basis of what was to my mind a far more legitimate and urgent ground. Last week, I broke a bone in my foot. Since last Thursday, I have been in a great deal of pain, have been heavily sedated, and have been in a walking cast. Nonetheless, the judge denied my continuance, noting the considerable logistical events which had been set in motion in view of the contemplated start date: 300 jurors summoned, witnesses flying in from all over the country, etc.. He is clearly determined to start this case on November 1. This was not a battle I could win, nor one that was going to create an appealable issue.

I would appreciate your forwarding to me any information you have obtained in Mr. Gavin's case. It may be that I can introduce documentary evidence through some of his family members or that the DA will stipulate to the admission of uncontested material. Also, I need to know as soon as possible what your fees will be. I do not want you to have done your work on this case for free, but if you have not expended all of the money ($2,500) that Judge Rains allocated, I would like to know that, as we may need it for other mitigation work.

I am very grateful for the work done by the Alabama Prison Project, not only on this case but in general. The work you guys did on McCloud was invaluable. I am sorry we could not have had a more successful collaboration on Gavin. I hope to work with you again in the future.

Sincerely,

H. Bayne Smith

HBS/cf

*Please give my best wishes to Aaron as well. Thanks*

2819

4

Re: Keith Gavin
Declaration of Betty K. Paramore

## Betty K. Paramore, Ph.D. L.C.P.C.
## Mitigation Specialist
P.O. Box 16727
Chicago, Illinois 60616-0727
Telephone: 312-203-9828

### Declaration of Betty K. Paramore

**Re: Keith Edmund Gavin**

I, Betty K. Paramore, Ph.D., hereby declare:

1. I am a licensed school psychologist, a licensed clinical professional counselor, and a licensed administrator in the State of Illinois. I have personal knowledge of the facts contained in this report, and am competent to testify about them.

2. I received a Bachelor of Arts degree in Social Work in 1978 and a Master's degree in Counseling in 1981 from Delta State University in Mississippi. I received a Specialist in Education, School Psychology, in 1989 from The University of Nevada, Las Vegas, and a Ph.D. in Psychology (with concentration in school psychology, research, and statistics) in 2002 from Loyola University, Chicago. I completed postgraduate work in Neuropsychology at Governor State University in 1992-1993, a Post-doctoral program in Administration from Loyola University, Chicago in 2004, and Post-doctoral seminars in the areas of Forensics and Mitigation from DePaul University College of Law, Center for Justice in Capital Cases in Chicago in 2003 and 2005, and from the Law Office of the Cook County Public Defender in 2006.

3. From 2002 until present, I have worked with the Cook County Public Defender's Office in Chicago, Illinois as a Mitigation Specialist. From 1989 to present, I have worked as a School Psychologist with the Chicago Public School System (CPS). I am currently assigned as the School Psychologist at the Cook County Juvenile Detention Center. My primary responsibilities include completing federal, district, and court mandated psychological evaluations on referred juvenile detainees. I conduct psychological assessments in all areas of exceptionality: cognitive, behavioral, social-emotional, clinical, sensory-motor, adaptive, personality, and academics. In addition, I conduct forensic and clinical interviews and present psychological reports and recommendations in a multidisciplinary conference.

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

4. I am proficient in the statistical and psychometric constructs of instruments used in conducting cognitive, clinical, behavioral, and educational assessments. I am also proficient in the statistical and psychometric construct of instruments used in completing assessments as well as skilled in the interpretation and classification of mental disorders as indicated in the *Diagnostic Statistical Manual-IV-TR* of the American Psychiatric Association.

5. Counsel for Mr. Keith Gavin from the law firm Sidley Austin LLP have requested my expertise in investigating the facts of Keith Gavin's life to provide evidence of mitigating culpability and to provide a reliable and accurate understanding of Keith Gavin's life that is inclusive of, but not limited to, intellectual functioning, family dynamics and predispositions, social and cultural factors, educational history, and medical, psychiatric and environmental factors. In this service, I have reviewed the transcript of the trial and sentencing, numerous records (see Appendix B), conducted interviews with collateral sources familiar with Keith Gavin, and reviewed research regarding the influences and effects of risk factors.

6. **Collateral Sources:**

   In-Person Interviews and relationship to defendant, Keith Gavin:

   Keith Gavin (defendant)
   Annette Gavin (mother)
   Sharon Gavin (sister)
   Geanetta Gavin (sister)
   Elaine Gavin (sister)
   Dwayne Gavin (cousin)
   Jabril Muhammad (a.k.a. Jerry Gavin, uncle)
   Mary Ann Morris (friend)

   Phone Interviews and relationship to defendant, Keith Gavin:

   Victor Gavin (brother)
   Sharon Gavin (sister-in-law)
   Nicole Gavin (sister)
   Latrice Gavin (sister)
   Adraine Gavin (sister)
   Jackie Gavin (cousin)
   Deloris Coleman (friend)

   **Records reviewed:**  See Appendix B.

2

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

## MITIGATION EVALUATION:  FULL REPORT

### TABLE OF CONTENTS

Introduction

I. Risk Factors, Protective Factors, and Resiliency ............................... 6

  A. Risk Factors ............................................................... 6

  B. Protective Factors ......................................................... 7

  C. Resiliency .............................................................. 8

II. Risk Factors, Protective Factors, and Mitigation: Keith Gavin ............. 8

  A. Risk Factors for Keith Gavin .................................................. 10

    1. Multi-Generational Family Dysfunction ............................. 11

      a. The Life History of Annette Gavin (mother) ...................... 11

      b. The Life History of Willie Gavin, Sr. (father) ..................... 12

      c. The Relationship Between Keith and his Siblings ............... 13

    2. Domestic Violence and Impaired Parenting .......................... 16

    3. Community ................................................... 18

      a. Home Environment and Neighborhood ........................... 18

      b. Exposure to Guns, Gangs, Crime, and Violence ................. 20

    4. Disruptive Schooling ....................................... 23

  B. Protective Factors for Keith Gavin ........................................... 24

    1. Warm, Supportive Relationships with Parents and Other Adults 25

      a. Annette Gavin (Mother) ................................................. 25

      b. Mary Ann Morris .......................................................... 25

      c. Deloris Coleman ....................................................... 26

Conclusion

2822

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

References

Appendix A

Appendix B

Appendix D

Appendix E

4

2823

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

## INTRODUCTION

This report evaluates the developmental factors and experiences that independently and collectively increased the likelihood that Keith Gavin would demonstrate dysfunction (e.g., psychological and social maladjustment, morality deficits, poor impulse control, poor judgment, violent criminal offending). Current research indicates that the presence of a single risk factor does not, by itself, cause maladjustment. Rather, it is now believed that, over the course of human development, multiple factors combine to contribute to and shape behavior. One way to understand the characteristics of an individual is to view him or her within an ecological framework, which recognizes that each person functions within a complex network of individual, family, school, community, and environmental contexts that impact their capacity to avoid risk. This report articulates the bio-psychosocial dynamics (e.g., biological, psychological, social maladjustments, morality deficits, cultural, environmental, and socioeconomic influences) that independently and collectively attributed to Keith Gavin's overall development and outcome.

Section I of this report summarizes the current research on risk factors, protective factors, and personal experiences and characteristics that may promote resiliency. Section II discusses in detail the risk factors and protective factors in Keith Gavin's life and the implications of those factors on Keith's psychological development. The subsection on the risk factors Keith faced centers on four key areas: multi-generational family dysfunction, domestic violence and impaired parenting, community, and disrupted schooling.

In brief, the research into Keith's background reveals that he faced an enormous number of risk factors and virtually no protective factors. Throughout his childhood and adolescence, Keith was constantly exposed to violence, criminality, and drug addiction – both within his immediate and extended family and in the broader community. Keith's father, Willie Gavin, physically abused Keith, Keith's mother, and Keith's siblings. Willie gambled away the little money the family had and even stole money that Keith acquired through criminal activity in an attempt to help provide for his mother and siblings. Keith's mother, Annette, was pregnant every year or two over the course of 24 years and was unable adequately to supervise her 12 children or protect them from the negative influences within the home and in the community. Indeed, the size of Keith's family exacerbated many of the problems he faced. The siblings closest in age to Keith, who had the most influence on him, became drug addicts as early as the age of thirteen, were gang members, and have histories of incarceration for drug possession and violent crime. As a result of the family's poverty, while Keith was growing up, the Gavins lived in a public housing complex that was rife with violence, gangs, and criminal activity. At an early age, Keith witnessed race riots and violent gang "initiations." He later was the target of

5

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

gang violence and was severely beaten by a large group of gang members. Keith's
siblings also were beaten and harassed by gang members. One of his brothers was
shot.

Keith is consistently described by his family and friends as the "protector" of
the family. He attempted to assume a parental role where his own parents failed.
Keith identifies three adults with whom he had warm relationships as a child – his
mother, Ann Morris, the mother of his teenage girlfriend, and Deloris Coleman, a
neighbor. However, rather than providing appropriate support and role-modeling
for Keith, these relationships were characterized by role-reversal, where the adults
looked to Keith to provide for them. Keith's efforts to protect and provide for those
around him contributed to Keith's exposure to risk factors. For example, Keith was
sent at a very young age to retrieve his older siblings from drug houses. Mrs. Morris
used Keith as the door man for "house parties." Keith's attempts to provide
economically for his family and friends also led him to resort to criminal activity.
With his parents' silent permission, Keith followed the model of others in his
community and robbed others and sold drugs. Keith's efforts to provide for those
around him ultimately fell short. As more and more of the people around him
succumbed to drugs and violence, Keith developed a sense of hopelessness. When
he was released from prison in 1998, he returned home to find that his mother's and
siblings' situations had even worsened.

The mitigating factors and implications were available, with even limited
investigation, to defense counsel at Mr. Gavin's capital murder trial in 1999.

## I.    RISK FACTORS, PROTECTIVE FACTORS, AND RESILIENCY

### A.    Risk Factors

A risk factor is a predictor that has been scientifically demonstrated to have a
strong link to adverse outcomes such as delinquency, adult antisocial behavior,
substance abuse, and other behavioral problems (Athey & Ahearn, 1991). While risk
factors do not inevitably lead to problems in the lives of children, they increase the
likelihood that such problems will arise. Risk factors are grouped into five domains:
(1) individual (e.g. temperament, being male, aggression, low IQ); (2) family (e.g. low
socioeconomic status, parental criminality, poor parent-child relationship, domestic
violence, abusive parents, neglect, large family size); (3) school (e.g. poor attitude
towards school, academic failure); (4) peer group (e.g. weak social ties, antisocial
peers, delinquent siblings, gang membership); and (5) community (e.g. neighborhood
crime, exposure to violence, drug use). (OJJDP Bulletin, 2003).

Low socioeconomic status (SES) is considered the single most significant factor
placing children at risk for maladjustment and antisocial or delinquent behaviors.
Children raised in poverty are more likely to have developmental delays, learning

6

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

problems, and other diseases and disorders due to poor nutrition and poor health care. (Mc Whirter et al., 1993). Low SES adolescents may engage in delinquent activities because they see little hope of finding a good job. Low SES leads to educational difficulties because the socio-cultural context of poverty and the life circumstances with which it is typically associated make it difficult for a young child to acquire the skills and values that are prerequisites for success in educational settings. The stressors encountered in every day life often result in parents having to focus their energies on the attainment of short term outcomes, such as the provision of food, shelter, and safety, with little time to concentrate on facilitating the development of skills and attitudes that will allow the child to function outside of the family (Egeland & Abery, 1991).

Risk factors usually exist in clusters, not in isolation. Studies show that the sheer number of risk factors that are present in life of a child is more significant than the presence of individual risk factors. Children who are abused or neglected tend to be in poor families in disadvantaged neighborhoods beset with violence, drug use, and crime. When risk accumulates – the addition of a third, fourth, and fifth risk factor – we see a precipitation of developmental damage. The more risk factors a child is exposed to, the greater the likelihood that he or she will become violent. One study, for example, has found that a 10 year old exposed to six or more risk factors is ten times as likely to be violent by age 18 as a 10 year old exposed to only one factor (Herrenkohl et al., 2000).

B.    Protective Factors

In contrast to risk factors, protective factors protect children from the damaging effects of exposure to risk by either reducing the impact of the risk or changing the way the child copes with the risk. Thus, protective factors can reduce the probability that problem behaviors arise. Similar to risk factors, protective factors are typically grouped into five domains: (1) individual (e.g. intolerant attitude toward deviance, high IQ, being female, positive social orientation, and perceived sanctions for transgression); (2) family (e.g. warm, supportive relationships with parents or other adults, parental monitoring); (3) peer group (e.g. friends who engage in 'conventional' behavior); (4) school (e.g. commitment to school, parental expectations of academic achievement); and (5) community (e.g. neighborhood organizations, neighborhood free from criminal influences). (OJJDP Bulletin, 2003).

Protective factors interact with risk factors to reduce their influence on violent behavior (Garmezy, 1985; Rutter, 1985; Stattin & Magnusson, 1996). For example, low family socioeconomic status is a risk factor for violence, and a warm, supportive relationship with a parent may be a protective factor. The warm relationship does not improve the child's economic status, but it buffers the child from some of the adverse effects of poverty. Protective factors may or may not have a direct effect on violence (Stattin & Magnusson, 1996).

7

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

### C.    Resiliency

Resilience reflects adaptation despite significant life adversity. As discussed above, the presence of any single risk factor does not usually cause antisocial behavior. Rather, it is the convergence of risk factors that leads to widespread dysfunction. The presence of protective factors fosters resiliency, or the ability to overcome adversity. Children will cope better with stress and be better able to master and overcome adversity when they have the following protective buffers:

- A healthy infancy; experienced nurturance, and learned to trust their caregivers

- A sense of self-esteem and self-confidence and close, trusting relationships

- Good coping skills—including an internal locus of control (that is, an ability to use their experiences as guides to their behavior), a willingness to plan, and a sense of humor—that help them deal with change and make adaptations

- Good intellectual skills, an ability to solve problems, and an ability to communicate well with others

- An ability to exercise control over decisions and over their future

- An achievement oriented focus and persistence in achieving goals

- A family that provides warmth, cohesion, support, and good communication and parents who allow age-appropriate autonomy, make themselves available at the time of the children's failures or distresses, buffer and protect the children against excessive stress, and set reasonable and consistent rules

- A middle or upper SES family

- Membership in the majority group

- A community with good schools, supportive teachers, positive role models, supportive social networks, and opportunities to learn and master new skills and challenges

(McWhirter et al., 1993; Werner 1990; Wright & Masten, 1997).

These findings highlight the importance of protective factors in the developmental process.

## II.    RISK FACTORS, PROTECTIVE, FACTORS AND MITIGATION: KEITH GAVIN

The United States Department of Justice Office of Juvenile Justice and Delinquency Prevention (OJJDP) Study Group on Serious and Violent Juvenile Offenders brought twenty two researchers together for two years to analyze current research on risk and protective factors and the development of serious and violent

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

juvenile offending careers (OJJDP Bulletin, 2000). OJJDP identified a number of risk
and protective factors that were related to serious and chronic delinquency as well as
youth violence.

These factors are listed in the chart below, with those present in Keith's
development presented in bold print. Inspection of these factors reveals that Keith
had many risk factors in the family, school, peer group, and community domain,
with only one protective factor in the family domain.

9

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

## OJJDP Risk Factors and Protective Factors: As Applied to Keith Gavin

| Domain | Risk Factors | | Protective Factors |
|---|---|---|---|
| | Early Onset (ages 6-11) | Late Onset (ages 12-14) | |
| Individual | - General Offenses<br>- Substance Use<br>- **Being Male**<br>- Aggression<br>- Psychological Condition<br>  - Hyperactivity<br>- Problem (antisocial) behavior<br>- **Exposure to television violence**<br>- Medical, physical problems<br>- Low IQ<br>- Antisocial attitudes, beliefs<br>- Dishonesty | - General Offenses<br>- Psychological conditions<br>  - Restlessness<br>  - Difficulty concentrating<br>  - Risk taking<br>- Aggression<br>- Being male<br>- Physical violence<br>- Antisocial attitudes, beliefs<br>- Crimes against others<br>- Gang membership<br>- Low IQ<br>- Substance use | - Intolerant attitude<br>  toward deviance<br>- High IQ<br>- Being female<br>- Positive social<br>  orientation<br>- Perceived sanctions for<br>  transgressions |
| Family | - **Low socioeconomic status/<br>  poverty**<br>- **Parental criminality**<br>- **Poor parent-child relationship**<br>  - Harsh, lax, or inconsistent<br>    discipline<br>- Broken home<br>- Separation from parent(s)<br>- Domestic Violence<br>- Abusive parent(s)<br>  - Neglect<br>- **Large Family Size***  | - Poor parent-child relationship<br>  - Harsh or lax discipline<br>  - Poor monitoring, supervision<br>- Low parental involvement (father)<br>- Parental criminality (father)<br>- Broken home<br>- Low socioeconomic status/poverty<br>- Abusive parents<br>- Domestic Violence<br>- Family conflict<br>- Large Family size*<br>- Gang memberships | - Warm, supportive<br>  relationships with<br>  parent(s) or other<br>  adults<br>- Parent's positive<br>  evaluation of peers<br>- Parental monitoring |
| School | - Poor attitude, performance<br>- Academic failure<br>- **Living in poor family*** | - Poor attitude, performance<br>- Academic failure<br>- Living in poor family*<br>  - Concentration of delinquent peer<br>    groups* | - Commitment to school<br>- Recognition for<br>  involvement in<br>  conventional activities |
| Peer Group | - Weak social ties<br>- Antisocial peers<br>- Delinquent siblings<br>- Gang membership | - Weak social ties<br>- Antisocial delinquent peers<br>- Delinquent siblings<br>- Gang memberships | - Friends who engage in<br>  conventional behavior |
| Community | Poverty<br>Concentration of delinquent peer groups<br>Availability of drugs and firearms<br>Exposure to violence | | |

*R. Loeber and D.P. Farrington, eds. 2001

## Risk Factors for Keith Gavin

The section below documents Keith Gavin's history and the risk factors to which he was exposed, explaining the impact of those factors on his development. This history was available with even limited investigation to defense counsel at Mr. Gavin's capital murder trial in 1999 and could have been provided to the jury at Keith Gavin's sentencing phase.

10

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

## 1. Multi-Generational Family Dysfunction

The first relationship an individual has in this world is with his parents. That relationship should focus more on the child's needs than on the parents' needs. Sometimes this isn't so. Dysfunctional relationships are often propagated through multigenerational processes. Each generation adds an additional layer of dysfunction – The children of dysfunctional parents may parent as their own parents did, as they have no positive parenting role models to emulate. In order to understand Keith Gavin's home life, we must first examine who his parents are to understand why they parented Keith the way they did (Capaldi et al 2003).

### a. The life history of Annette Gavin (mother)

Information regarding Annette Gavin, Keith Gavin's mother, was gleaned from multiple sources – Annette Gavin herself and from interviews with several of her children. Mrs. Gavin was first interviewed in her home on August 21, 2006. She was subsequently interviewed several times over the telephone and in her home. Taken together, the information provided to this examiner indicates that Mrs. Gavin was victim of spousal abuse who depended heavily on Keith and was overwhelmed by the task of parenting twelve children.

Annette Gavin was born on September 9, 1937. She is the eldest of fourteen children. Five of her siblings are now deceased (Christine in 2006, Samuel in 2003, Billy in 1997, Joseph in 1967, and Everett). She reported that her family moved to Chicago from Boyle, Mississippi in 1949, where her parents, Joshua and Katie Matthews, were sharecroppers. In Chicago, her father worked as a day laborer, a politician, and later as a correctional officer. He died in 1965 at the age of 47. Katie Matthews currently lives with a son, Derek, in Gary, Indiana.

When asked to describe her family, Mrs. Gavin stated that she and her siblings did not always have an opportunity to attend school due to their rural location and the need to work on the farm. Mrs. Gavin completed her sophomore year of high school. They were whipped as a form of discipline. She stated that her parents lived by a strict moral code, which she hoped to instill in her own children. However, Mrs. Gavin noted that her brother Samuel and her sister Christine had histories of drug use and incarceration and her brother Everett was an alcoholic.

Mrs. Gavin met her husband in Chicago when she was fifteen and he was seventeen. They were married on July 20, 1955, a few months shy of Mrs. Gavin's eighteenth birthday. Mrs. Gavin gave birth to Willie Jr., her first child, at eighteen. The Gavins eventually became parents to twelve children. Mrs. Gavin and her children report that Mr. Gavin was physically and verbally abusive toward Mrs. Gavin and the Gavin children. Mr. Gavin's addictions to alcohol and gambling and Mr. Gavin's serial infidelity were significant sources of tension in the marriage.

11

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

Mrs. Gavin currently presents as a women of heavy stature, with an appearance of physical and emotional exhaustion. When I visited the Gavin home, it was cluttered with old clothing hanging and scattered throughout the rooms. Old toys, paper, and inoperative items collected throughout the years were in piles on the floor and spilling out of boxes. The kitchen counter tops, open cabinets, and the kitchen floor were covered with old food packages, product containers, and old cooking utensils. A container in the sink was filled with dirty dishes and dirty water. A hot plate sat on top of an inoperable stove. The state of the home was suggestive of dysfunction and total disarray (see Appendix E). Mrs. Gavin agreed that the house was in a very similar condition in 1997, when Keith last resided in the home. Mrs. Gavin's sense of dysphoria is reflective in her home environment and her melancholic discussion of clearing her home of clutter, having garage sales, and getting the roof and electric wiring repaired. The home was eventually sold to Adraine Gavin, one of Mrs. Gavin's daughters, in March 2007 because Mrs. Gavin could not afford needed repairs and was overwhelmed with the prospect of properly maintaining a house.

### b. The life history of Willie Gavin, Sr. (father)

Information regarding Willie Gavin, Sr., Keith Gavin's father, was gleaned from interviews with his wife Annette Gavin and several of their children. Taken together, the information provided to this examiner indicates that Mr. Gavin was raised in an abusive family system and later became an emotionally detached and abusive husband and father who battled alcohol and gambling addictions.

Willie Allen Gavin, Sr. was born on June 23, 1935 and died on April 4, 1989. Mr. Gavin was one of thirteen children, born to Jack Gavin and Rosetta Keen. Addictions and dysfunction plagued the Gavin family. Mr. Gavin spent his primary years under the care of an abusive, alcoholic maternal grandfather. At the age of fifteen, Mr. Gavin's parents decided to move the family to Chicago. Six of Mr. Gavin's siblings are now deceased (Willie, Classie, Geanetta, Ezra, Clarice, and Myrtle). Eight of his siblings were addicted to alcohol and/or drugs (Myrtle, Clarice, Jerry, Lucille, Larry, Classie, Easter, and Willie). Three have histories of incarceration (Willie, Jerry, and Classie). Classie was reportedly a "madam" of a prostitution house, where her sisters Myrtle, Lucille, and Easter also worked as prostitutes.

Mr. Gavin served three years in the Air Force after he married Annette. Following a three year tour of duty, Mr. Gavin returned to Chicago and struggled for two years to find permanent employment. He found work as a mechanic at a service station with his father. Later, he worked at a box company, a sign company, and eventually as a trucker for Wells Trucking Company from the late 1960s to the early 1980s.

12

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

In 1962, Mr. Gavin was incarcerated for robbery for nine months. During his incarceration, Mrs. Gavin was pregnant and left to care for four small children by herself. Keith, the third born of the twelve Gavin children, was two years old at that time. During the early stages of Keith's life, Mr. Gavin became a compulsive gambler (horses, lottery, and cards), an alcoholic, and a womanizer.

Mr. Gavin physically and emotionally abused his wife and children. Mr. Gavin often whipped the children with extension cords and with his fist. Often, his stopping point was when he drew blood.

Mr. Gavin struggled to provide financially for his large household. In 1981, Mr. Gavin became disabled due to a heart condition. He lost his job and the family income consisted of social security disability. Mr. Gavin's pension was not accessible until he reached the age of 65 and even then, the family was only eligible for $130.00 a month. With no medical benefits or food assistance, Mrs. Gavin attempted to support her family by working at the post office during the holidays from 1996 through 1999 and as a parent patrol monitor at the children's school from 2001 through 2003. Mr. Gavin died in 1989 at the age of 54.

### c. The Relationship between Keith and his Siblings

Large family size is one of the strongest predictors of early-onset violence (Derzon and Lipsey, 2000). Keith Gavin was the third born of twelve children. The Gavin family is best understood as consisting of two groups for two reasons. First, Mrs. Gavin gave birth to eight children very close together – within thirteen years. There was a six year gap between the eighth and ninth child. Second, in 1979, the family changed neighborhoods. The first eight children came of age in a substantially different environment from the last four Gavin children.

The oldest eight Gavin children – Willie Jr., Elaine, Keith, Victor, Steven, Sterling, Adraine and Sharon – were born between 1956 and 1969. They all spent a significant portion of their childhood living in housing projects. The second set of children – Nicole, Latrice, Ezra, and Geanetta – were born between 1975 and 1980 and spent all or nearly all of their childhood living in a private home in the West Side of Chicago. Keith and his seven oldest siblings were raised in the same chaotic home environment, with exposure to the same negative influences (*i.e.*, familial and community violence, crime ridden neighborhood, lack of support and guidance, ineffective parenting, and paternal alcohol abuse). The oldest six Gavin children all exhibit disordered conduct and became entrenched in the criminal lifestyle.

Keith's siblings universally describe Keith as a family-oriented, caring brother and son who would do anything for his family. Keith is seen as a protector and a provider who tried hard to rescue his mother, siblings, nieces and nephews from poverty and violence.

13

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

Willie Gavin, Jr. was born on August 18, 1956 and died in August, 1997 from liver cancer. Interviews were conducted with Willie's widow, Sharon Gavin, on October 16, 2006 and March 1, 2007. Willie was shot during a dice game on August 1, 1983 and left paralyzed from the waist down. Willie's wife, who was pregnant at the time, was left to care for their nine year old and five month old children. Willie's two youngest children died at the ages of four and five in a house fire in 1986. Willie had a history of incarceration and drug use. He battled alcoholism and drug addiction until his death. Sharon described Keith as the "responsible one" of the children. Keith would "get on Willie" about not taking care of his responsibilities, and even at the age of twelve, Keith would assist Sharon by babysitting and giving her money when needed.

Elaine Gavin was born on January 23, 1958. Elaine was interviewed on July 28, 2007 following a nine month incarceration at the Lincoln Correctional Center in Lincoln, Illinois on a repeat drug possession charge. This was Elaine's second incarceration. Elaine was affiliated with the Maniac Stones gang, a female gang specific to her neighborhood, at the age of twelve. Elaine began using drugs at thirteen and was a repeat runaway. Elaine became pregnant at fifteen and again at seventeen. She now has nine children and nine grandchildren. Elaine has a history of Department of Children and Family Services (DCFS) involvement in her family for neglect of her children. Her children spent a significant amount of time in foster care. Her oldest son is currently incarcerated on a sixty year drug charge. Elaine describes her brother Keith as very family oriented.

Victor Gavin was born on May 8, 1961. Victor was interviewed on January 18, 2007 and March 31, 2007. Victor has a history of incarceration for burglary. He also abused drugs as a teenager. Victor was affiliated with the Black Gangster/New Breed gang during his incarceration. Victor described his brother Keith as "good." Keith taught Victor how to ride a mini-bike and how to sell newspapers and shoe shines on Michigan Avenue. Victor visited with Keith in 1997 when Keith was living at their mother's house and stated that Keith was very concerned with the dilapidated condition of the house. Keith asked Victor to assist him in repairing their mother's house. Victor is currently employed as a fork-lift driver. He has five children and lives in Peoria, Illinois.

Steven Gavin was born on October 14, 1962. Steven was interviewed on August 6, 2007. Steven has a history of incarceration. Steven was convicted of attempted murder and aggravated battery at sixteen and served eleven years. He was incarcerated for the second time at twenty eight for armed robbery. The Gavin children describe Steven as abusive, explosive, unpredictable, and mentally unstable. Steven reports that he was a member of the Black Gangster/New Breeds gang. Steven has a history of drug addiction and recently completed a drug rehabilitation program.

14

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

Sterling Gavin was born on September 7, 1965 and died in November 2003 from heart problems. Sterling had a history of drug use. He was incarcerated for burglary.

Adraine Brooks Gavin was born on November 6, 1967. Adraine was interviewed on January 5, 2007 and March 1, 2007. Adraine is widowed and is currently employed as a registered nurse. She has lived in Mississippi and recently returned to Chicago. She has two adult daughters. Adraine describes her brother Keith as supportive, loving, caring and responsible. She shared memories of Keith, at twelve years old, as being responsible enough to take his sisters to the theater or shopping for clothes and music.

Sharon Gavin was born on October 14, 1969. Sharon was interviewed on January 4, 2007. She was born with developmental delays and was later diagnosed as cognitively impaired. Keith was dedicated to defending her from teasing and taunting of neighborhood children. Sharon cried as she discussed her time spent with her brother because "Keith protected me."

Nicole Gavin was born on August 9, 1975. She is the first of the second group of Gavin children, who grew up in a different neighborhood and who were still very young when Keith was sent to prison in Illinois. She was interviewed on January 7, 2007. Nicole has a thirteen year old son. Her daughter died at the age of four months. She described her brother as a family-oriented person, quiet, and "laid back."

Latrice Gavin was born on February 10, 1977. She was interviewed on January 5, 2007. Latrice stated that she felt safe when she was young and Keith lived at home because "Keith always made things better." When Keith lived with their mother in 1997, Keith encouraged her to leave a violent boyfriend after seeing Latrice with a black eye. Latrice has an eight year old daughter.

Ezra Gavin was born on May 27, 1978. He was incarcerated in 2002 on a forty year drug charge. Ezra has three children.

Geanetta Gavin was born on July 23, 1980. She is married to Keith Clark and was pregnant with her sixth child when interviewed on October 8, 2006. Geanetta was thirteen when she gave birth to her first child. On April 15, 2007, Geanetta's five youngest children were killed in a house fire.

Dwayne Gavin, the son of Classie Gavin, lived in the Gavin home for three years during his mother's incarcerations and struggles with drug addiction. Dwayne was interviewed on November 11, 2003. Close in age, Keith and Dwayne spent a great deal of time together. Keith was described as good-hearted person who enjoyed working with his hands. Keith would often make repairs to the car or other

15

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

items in the home. Dwayne stated that it was financially and emotionally difficult for the family when Mr. Gavin lost his job. Keith, the third of nine children, was sixteen and was under even more pressure to "help out." Dwayne visited Keith during his visit home in 1997.

## 2. Domestic Violence and Impaired Parenting

Keith and his siblings were exposed to domestic violence. Keith witnessed his father physically abuse his mother. Mrs. Gavin admits that her husband was abusive. According to Elaine Gavin, many of the incidents of spousal abuse in the Gavin home stemmed from Mr. Gavin's infidelity. Elaine Gavin described Mr. Gavin as a "very handsome man" and said that "women were just naturally attracted to him." Elaine reported that her father had "many women" and his relationships with these women caused turmoil in the marriage and served as a basis for physically abusing Mrs. Gavin. When Mrs. Gavin questioned her husband's relationships with other women or his whereabouts, she was silenced by slaps in the face or blows to the head. According to Elaine, Mrs. Gavin "didn't know when to shut up, she just nagged and nagged."

Mr. Gavin also abused his children. Victor, without hesitation, described his father as abusive, stating that his father abused his mother and also the Gavin children into adolescence. Victor, Steven, Elaine, and Keith all described being beaten with extension cords, sticks, hoses, their father's fist, and other items conveniently within their father's reach. His stopping point was usually when he "drew blood." Jackie Gavin, a cousin who lived with the Gavin family while her mother Classie Gavin struggled with drug addiction and incarceration, discussed witnessing and receiving Mr. Gavin's harsh whippings.

Keith would often claim responsibility for things his siblings had done to protect them from beatings with his father's extension cord or fist because he felt that he could handle the abuse better. One day, in an effort to protect his mother and siblings, Keith orchestrated a plan to "jump" his father when he arrived home intoxicated. The plan failed because Keith and his siblings did not follow through with it. However, by the age of thirteen, Keith confronted his father and told him that he would not be whipped again. Victor stated that Keith was the only one who stood up to their father – "He stopped the abuse."

Keith also witnessed violence and criminality among his extended family. Keith describes his worst childhood memory as witnessing his uncle beat his aunt, Barbara Jean. In the aftermath of the beating, Keith recalls helping his mother help his aunt clean the blood from her face. At the age of eleven, Keith witnessed his aunts Classie, Lucille, Easter, and Myrtle use drugs and prostitute themselves.

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

Exposure to domestic violence can have serious negative effects on children, particularly those who are exposed to other risk factors such as poverty, substance abuse, and low educational achievement of the principal provider. In cases of domestic violence, in which one parent is a victim of the violence and the other is the perpetrator, children may be even less able to turn to their parents for support and reassurance. The research to date on resilience and exposure to domestic violence indicates that maternal functioning, particularly as it relates to the mother's emotional availability, may be critical to the child's ability to cope with his turbulent home life (Cater et al., 1990). Additionally, Keith and his siblings were victims of abuse. Children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens (Lyon & Covell, 2006).

Keith sought to minimize conflict in the home in the home and became the "man of the house." Role reversal – where the child is the protector and the parent is needy – is common in the lives of violent boys (Garbarino, 1999). Mrs. Gavin depended on Keith to assist in monitoring his siblings. When Keith was nine, he was going in and out of drug apartments and crossing gang lines to retrieve his brother Willie and his sister Elaine, both of whom were drug users by thirteen years old. Elaine would run away from home and Keith was given the responsibility of locating her and bringing her home. He served as the caretaker in order to minimize the disruptions in the home. Mr. Gavin did not like to return home to find conflict and chaos.

Keith tried to help his family. He purchased school clothing and supplies for his siblings and gave them money to travel to and from school. He took his siblings on outings, taught them to ride bikes and how to earn money doing shoe shines or working at the laundromat. When more expensive items were needed, such as a family car, Keith resorted to theft and burglary.

Researchers have found that breakdown in the family contributes to youth violence. Keith's strong need to protect his family comes from the presence of an abusive father and his father's inability to adequately provide for his family. Without stable partnership in her life, Keith's mother turned to him for safety, protection, consolation, and reassurance. Keith was the reliable one; he made sure that things were going smoothly and that the other children were in place when their father arrived home to avoid setting off Mr. Gavin's volatile temper.

Keith's role of parent and protector at such an early age likely contributed to steering him closer to the negative influences of the streets. His increased responsibilities exposed him to behaviors that are defined as predictors of youth violence. At his mother's request, Keith was subjected to deviant behavior from his siblings. When Keith was only nine years old, his mother asked him to enter drug houses and cross gang lines to retrieve his older siblings. Older siblings who are

17

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

prone to delinquent behavior may reinforce antisocial behavior in a younger sibling, especially when there is a close, warm relationship.

The size of Keith's family also increased the risk of delinquency. The Cambridge Study found that boys with four or more siblings by the age of ten were twice as likely to offend, compared to boys who had fewer siblings (West and Farrington, 1973). By the age of ten, Keith had seven siblings. Large size households are related to diminished supervision. Mrs. Gavin, the mother of twelve, had little opportunity to learn or practice positive parenting with her children. Most of her children were born one or two years apart, leaving limited time for individual bonding and supervision. Keith's younger sister Sharon had special needs, further taxing Mrs. Gavin's abilities to nurture and supervise her children. Keith, by the age of nine, routinely slipped out of the family home to watch gang initiations. As a pre-teen, he regularly robbed a local convenience store with Mr. Gavin's approval. Several of his sisters became mothers in their teen years. Keith and several of his siblings sold drugs and were gang members. Willie, Elaine, Victor, Steven, Sterling, and Ezra Gavin all developed life long drug addictions and have histories of incarceration. In order for Keith and his siblings to have had the opportunity to engage in these types of behaviors, there must have been a near complete absence of parental influence. Mr. and Mrs. Gavin were incapable of meeting the financial, emotional, and physical needs of their twelve children. The family fostered criminality, substance abuse, violence, and a general lack of goal directed behavior.

### 3. Community

#### a. Home Environment and Neighborhood

Keith's infancy and early childhood was spent in a two bedroom "row" apartment located at 1532 West 15th Street in Chicago Housing Authority's ABLA Public Housing Projects near the west side of Chicago. The name "ABLA" was an acronym for four different housing developments that together constitute one large site. Those four developments were: the Jane Adams Homes (thirty-two 4, 3, and 2-story buildings), Grace Abbott Homes (seven 15-story buildings and thirty-three 2-story row house buildings), Robert Brooks Homes (800 row houses), Robert Brooks Extensions (3 16-story buildings), and Loomis Courts (126-unit complex consisted of 2 buildings of 7 stories). It spanned from the infamous Cabrini Street on the north to 14th Street on the south; and from Loomis on the east to Racine on the west (see Appendix D). This racially isolated concentration of homogenously poor, economically deprived, and socially troubled group became a host for an epidemic of violence.

The Gavin family apartment was in a "row house," a building that consisted of four double rows of four two level unit apartments. The row houses were concentrated around seven to fifteen story high rise apartment buildings. The

18

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

Gavins' two bedroom row house apartment was located in the Grace Abbott development. Keith shared a small bedroom with four of his siblings. Elaine slept in her own bed, while the four boys shared the other three bunk beds. Mrs. Gavin described the community as livable in the 1950's but a "war zone" by the 1960's.

Keith was four years old during what Mrs. Gavin described as one of the many racial uprisings in Chicago. She reported his fascination as he witnessed the violent outbreak in his neighborhood. Hispanics were targeted as they invaded the neighborhood. Anyone who trespassed without connections in the complex was considered an outsider. They were beaten with baseball bats, sticks, pipes, and anything available to the residents. One of Keith's earliest memories is standing outside his apartment, witnessing the violence.

Steven reports the paralyzing fear the family experienced during the 1968 racial riots following the death of Dr. Martin Luther King Jr. He reports that although Mrs. Gavin insisted that the children to remain indoors, through their windows, they could see people running in distress and they could hear screams and gunshots. The riots lasted for three days.

In addition to racial unrest, the neighborhood was plagued with gang activity. The Gavin boys were constantly recruited by gangs. One local drug lord would have his "boys" recruit by bringing children to his apartment. If the boys refused to join a gang – and if they were lucky – they were told "not to play ball in the courtyard" or "not to be caught in a certain area." If they were not lucky, they were "jumped." One day, Keith was attacked by fifteen to twenty gang members with baseball bats.

The neighborhood gang lord threatened to kill Mrs. Gavin and throw her in a trash can if she did not stop asking questions that might interfere with the gang activity. Mrs. Gavin prohibited the children from visiting the high rise apartment buildings due to the increased risk of harm. Because of their architectural design, the high rise apartments were known as safe havens for those hiding from law enforcement. Nonetheless, the Gavin children sometimes visited the apartments. Willie and Elaine visited drug apartments and by thirteen, both were drug users. Thirteen year old Victor, during a visit to the high rise apartments, found himself hanging by his ankles out of a fifteenth floor window pleading for his life. His friends and other on-lookers pleaded with the adult males holding his ankles not to drop him. He was released only later to witness, while he was walking down the street, a man who had been shot to death get thrown from a passing vehicle. He ran to avoid identification as a witness.

In 1967, Mr. and Mrs. Gavin and their seven children moved to 1401 South Throop, a four bedroom apartment in the same public housing development. As the family quickly expanded, the apartment became grossly overcrowded. In 1974, Willie Jr. was married and was often in and out of the apartment with his family.

19

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

Elaine was pregnant at fifteen and again at seventeen, adding to the overcrowded living conditions. The apartment was without adequate heat during the winter, so the family burned the kitchen oven to keep warm. The family crammed upstairs because "heat rises to the top."

In 1979, the family moved from the projects and purchased a home at 1140 North Lockwood, located on the west side of Chicago. Mr. Gavin used a GI loan to secure financing. Unfortunately, the Gavins found it difficult to maintain the new home. By the 1990s, the home was severely neglected. When Keith returned to the home in 1997, there was no electricity or heat and the foundation was cracked. Keith worked for days, clearing the home of garbage. Currently, the home has faulty electrical wiring with exposed wires and lighting only available in certain rigged lamp outlets. Cooking is done on a hot plate resting on an inoperable stove. Counter tops, open cabinets, and the kitchen floor are covered with boxes, containers of food and old cooking utensils. The ceilings are damaged from a leaking roof. The front door has plastic covering what used to be a glass opening. A string is used as a handle to open and close the door. The unfinished basement, where the family dog is often kept, is covered with dog feces and torn mattresses. The basement betrays water damages. The house is infested with roaches, and in the summer, with flies. (see Appendix E). Mrs. Gavin agreed that the home was in a very similar condition in 1997, when Keith returned home.

### b. Exposure to Guns, Gangs, Crime and Violence

Harvard University sociologist William Julius Wilson documented the phenomenon of public housing in Chicago by demonstrating how an end to strict racial segregation allowed affluent and middle class African American families to leave the ghettos to which they had been confined and find homes in middle class, integrated communities. The remaining families were forced to live in low income clustered public housing projects. These communities were universally poor, as middle class families were unable to live in public housing due to the income ceiling. The ethnic minorities living in the ghettos suffered confinement and restricted opportunities within the city. The ghetto commune produced a consciousness of experience among its residents, of which a sense of entrapment was an integral aspect. Frequent riots and uprising resulted from hostility toward depressed conditions and towards those who perpetuated the environment. Neighborhoods that were once complete and resilient communities became homogenously poor and socially troubled, the perfect host for an epidemic of violence. (Gabarino, 1999). This phenomenon results in an infectious cluster of economically and emotionally depressed families living in a war zone like neighborhood.

Keith was surrounded by violence. Not only did he witness and experience domestic violence, he also observed violence in his neighborhood. Guns were prevalent in the ABLA housing projects. Victor explained that the children who lived

20

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

in their public housing development were recruited by the gangs to be gun carriers. The gun carriers were responsible for carrying the guns across gang territories and issuing them out to the older members when needed. If caught by the police, they would only be charged with a juvenile offense.

The highest risk factors for gang membership are the availability of drugs, the presence of troubled neighborhood youth, a child's feelings of insecurity in his neighborhood, low neighborhood attachment, low levels of neighborhood integration, area poverty, and neighborhood disorganization. (Howell, 2003) The Gavin children were exposed to all of these. Indeed, lacking effective methods of coping with the psychological distress that accompanies chronic community violence, fear, anger, and anxiety, many of the Gavin children report gang affiliation during childhood and adolescence. Elaine was a member of the Maniac Stones, an all female gang specific to the neighborhood, at twelve. Steven and Victor were members of the Black Gangsters/New Breed. At the age of nine, Keith organized a crew of twelve friends to "watch his back" and the backs of his family members. The crew became known as the Pee Wee Gangsters. Keith was known as the shepherd of the gang. In addition to protecting its members from outside threats, the crew also engaged in drug selling and burglary activities, typical responses of youths living in pathological conditions.

Elaine reports that while working at the South Water Market, Keith discovered that the market owners were cheating the government. Keith began to rob the market, knowing that the market owners were unlikely to file charges. According to Elaine, "Keith was like Robin Hood." Keith assisted the family and his needy friends and neighbors with his illegal profits. Keith would take the money home and give it to Elaine for safe keeping. Once, Mrs. Gavin – apparently unaware of her children's activities – found the money hidden in the radiator and gave it to the police. Mr. Gavin was furious with his wife for turning the money over. Mr. Gavin eventually began to steal the stolen money from his children. On one occasion, Mr. Gavin lied to Elaine and told her that Keith had given him permission to take money from the hidden stash. Elaine gave her father $1,800.00, which he spent as if it had been legitimately earned.

Keith became known around the neighborhood for having large sums of money. This exposed him to danger from rival gang members who threatened to rob him.

Disadvantages at the neighborhood level are also of primary importance in the development of antisocial behaviors (Catalano and Hawkins, 1996). Disorganized neighborhoods with few controls may have weak social control networks that allow criminal activity to go unmonitored and even unnoticed (e.g. Elliott et al., 1996; Sampson and Lauritsen, 1994). In terms of violent crimes, one study concluded that social disorganization and concentrated poverty within the community lead to

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

residents' decreased willingness to intervene when children are engaging in antisocial and unlawful acts, further contributing to a greater likelihood of violence within neighborhoods (Sampson, Raudenbush, and Earls, 1997). For the children, the impact of exposure to violence goes beyond contributing to emotional and behavioral disorders. It affects a child's world view, expectations of future happiness, and moral development (Gabarino et al 1991, Ney et al 1994).

As the Gavin children reached adolescence, they increasingly became victims of violent crime. At sixteen, Victor was shot in the back by a gang member who was "gunning" after him over a girl. The bullet is still lodged in his body. After the shooting, Keith began to feel vulnerable and unprotected. At seventeen, Keith witnessed one of his friends shoot another friend in the head. Around the same time, Keith saw gang members attack his cousin Dwayne Gavin. Keith was unable to help his cousin and felt helpless. To compound his sense of helplessness, Elaine and Victor reported that when Keith was seventeen, he was attacked by a group of 15-20 members of the Rolling Twenties Gang. He was beaten with baseball bats and guns. A friend of Keith's pleaded for his life. Semi-comatose, Keith required hospitalization and upon his release, needed to ambulate with a cane. Due to the lack of medical insurance, Keith was reportedly released from the county hospital while his head was still swollen and bruised. Steven reports that he was unrecognizable. The next day, Steven was approached by the same group of gang members and the confrontation ended with Steven shooting two of the gang members. He was charged for attempted murder and served eleven years. Keith realized that if he were to survive and if he were to protect himself and his siblings, he had to be prepared to fight back.

After this series of violent events, Keith began to carry a gun. Mrs. Gavin reports that sixteen year old Keith's first gun was purchased from the so-called "candy lady"—a resident that lived in the complex that sold candy and guns to anyone who had the funds to purchase them.

At seventeen, Keith was forced to use his gun to defend himself. Keith's paternal uncle Jerry Gavin (a.k.a. Jabril Muhammed) purchased a three story apartment building upon his release from the Navy in 1976. Keith helped Jerry manage the building. Collateral reports indicate that Keith, at the age of seventeen, hosted a party at Jerry's apartment. Keith was confronted by the upstairs tenant and a few of the tenant's friends. The tenant, who was also his uncle's best friend, was described as a gang chief with an extremely muscular build. The tenant, who was upset with Keith's brother, Willie Jr., over a bad drug deal, demanded that the group leave the premises. When the group refused, the tenant pushed Keith, ignoring the pleas from Keith and Willie Jr. that they had their uncle's permission to be on the premises. The tenant ordered his friend to retrieve his gun from his upstairs apartment. Keith, torn between using the gun he was carrying or waiting until the neighbor's friend returned with his gun, continued his attempts at reasoning. When

22

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

all pleas failed, Keith pulled his gun and shot. The case was ruled a self-defense shooting.

In 1981, Keith was collecting money at a house party when he was confronted by the leader of the group of Rolling Twenties gang members that had attacked him years earlier. The gang leader asked Keith if he remembered him. He reminded Keith of the prior beating and began to taunt him. Keith eventually shot the gang leader and was convicted of his murder. As a consequence, Keith was incarcerated from 1981 until 1997.

Helplessness, fear, anger, and high arousal are typical reactions to repeated victimizations (Bell, Jenkins, & Hood, 1993). And when these victimizations (gang beatings, shooting of loved ones, physical abuse, domestic violence) are recurring events, over time the child may experience persistent, high levels of provocation that disrupt his or her efforts in age appropriate academic and social pursuits. Keith's experience of violence and crime is not only determined by the nature of the violent events, but his own capacities to appraise and understand violence, to respond to and cope with danger. Keith lacked the environmental resources that offer protection and support. Mr. and Mrs. Gavin demonstrated impaired parenting. Mr. Gavin was an abusive alcoholic who was not only aware of Keith's criminal behaviors, but actively encouraged it by accepting "cuts" from his burglaries. Whether due to the sheer number of children she had, the effects of the spousal abuse she suffered, or other factors, Mrs. Gavin was unable to effectively monitor her children. Keith's two older siblings were troubled drug addicts. Keith's extended family was also troubled – his aunts Christine, Amarie, Easter, Classie, Lucille, Clarice, and Myrtle and his uncles Samuel, Everett, Larry, and Jerry were all addicted to drugs, alcohol, or both. Several of his paternal aunts were known prostitutes.

In Keith's life, the conditions of his family and neighborhood deteriorated for years before suddenly achieving a critical mass for lethal youth violence. Keith was surrounded by drug and alcohol addicts, gamblers, prostitutes, and victims and perpetrators of abuse. He lacked the protective factors of family members, especially parents, who could protect him from violence, emphasize the importance of education, and offer support and involvement.

### 4. Disrupted Schooling

Keith attended Medill Primary and Intermediate School in the Chicago Public School District from kindergarten through eighth grade. The Medill School is located in the ABLA public housing development. He failed to meet the requirements needed for completion of eighth grade and thus attended summer school and graduated eighth grade in the summer. He attended Crane High School for ninth, tenth, and part of eleventh grade. Both Medill and Crane were homogenously poor,

23

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

economically deprived and racially isolated, like the surrounding ABLA housing projects.

Small in stature, Keith often encountered bullies. Continued gang solicitation often made it difficult for him to focus on the instructional process. School plays an important role in the socialization of children and the development of antisocial behavior. Keith's school, located in the midst of the public housing development, was plagued with the same violence, drug use, and gang activity Keith found on the streets.

During the eleventh grade, Keith entered the legal system after he shot a man in self-defense. Upon his release, Keith was not allowed to return to school due to expulsion for school code violations and lack of attendance. Keith talked with school counselors in attempts to complete his education. He enrolled in an alternative program that required him to take public transportation. Because Keith lived in the ABLA housing projects, he was automatically affiliated with the Gangster Disciples. To reach the alternative school, Keith had to cross gang territory, which he found dangerous because various gangs disapproved of Keith's entering their territory. Due to daily threats of violence, Keith dropped out of school. He received a grant to complete his GED, but the grant was only approved for one semester. Due to limited finances, Keith was unable to complete the program.

Data from the New York City Department of Education indicates that more than two-thirds of high school age offenders do not return to school upon their release. Often, as in Keith's situation, the community lacks an effective system for re-enrolling students (U.S. Department of Justice, 2004). As a high school dropout and an unskilled laborer, Keith was unable to enter the work force. Youthful offenders are much more likely to become recidivist offenders if they do not receive the necessary support to help them reenter the community.

**B.      Protective Factors for Keith Gavin**

Risk factors and protective factors combine to contribute to and shape behavior over the course of development. The more risk factors present in life, the greater the probability of problem behaviors. However, protective factors can mitigate the effect of risk factors. As discussed above, Keith's risk factors for violence and delinquency include multi-generational family dysfunction, neighborhood disadvantages, poverty, exposure to crime and violence, abuse, lack of parental supervision, and inconsistent schooling. These risk factors far outweigh any protective factors in his life. While Keith had warm relationships with his mother, Mary Ann Morris, and Delores Coleman, these relationships were insufficient to buffer Keith from the multitude of risk factors he faced.

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

### 1. Warm, Supportive Relationships with Parents and Other Adults

#### a. Annette Gavin (Mother)

Keith had a warm relationship with his mother. He loves her very much and faithfully corresponds to his mother while in prison. However, his mother did not act as a caretaker for Keith. In fact, Keith was a caretaker for his mother. Keith's mother was a victim of domestic violence and a mother of twelve children – one with special needs and others with delinquent behaviors – who was simply unable to physically and emotionally care for Keith. He protected her from his father's wrath and struggled to raise her standard of living. As a child, Keith stole money to pay for clothing for his siblings, to buy food for the family and to finance a family car. Instead of monitoring Keith and limiting his exposure to drugs, crime, and violence, Mrs. Gavin relied on Keith to fetch his older siblings from drug houses, forcing Keith to enter gang territory and witness deviant behavior. She was so consumed with her own stresses, she was unable to monitor Keith, who slipped away from the apartment at nine years old to watch gang initiations, engaged in robberies starting at age thirteen, and started carrying a gun at age sixteen. When Keith was released from prison as an adult, Keith was distressed to find his mother living in a filthy, dilapidated home and fought with his siblings and his cousin Dwayne Gavin to repair the family home on North Lockwood.

Keith's relationship with his mother was characterized by role reversal. This role reversal was a form of child neglect (Gabarino, 1999). Mrs. Gavin was simply unable to provide the emotional support and guidance that is required to promote healthy adolescent development. Without adequate supervision, most of her children – particularly the oldest children – developed drug addictions and many became parents as teenagers. Mrs. Gavin was functionally absent from the lives of her children and remains today naively unaware of the extent of their illegal activities and substance abuse. With twelve children, Mrs. Gavin was pregnant most of Keith's childhood. She was limited not only by her parenting skills, but also in the availability of personal time for each of her children. Mrs. Gavin, a victim of abuse, could not protect Keith and his siblings from their father's frequent beatings and from the dangers in the streets.

#### b. Mary Ann Morris

Keith named Mary Ann Morris as someone who has "like a mother" to him. Keith visited Mrs. Morris during his 1997 release from prison. Mrs. Morris has known Keith since he was seven years old. She and her family lived at 1351 South Throop, across the Street from the Gavins' 1401 South Throop apartment. She continues to live in the same neighborhood. Keith dated Mrs. Morris' daughter Patsy for two and a half years. At seventeen, Keith asked Patsy to marry him, but Patsy refused. Keith said that he was devastated by her rejection. Patsy had been drawn

25

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

into a life of drugs and prostitution by a local pimp. Keith tried to help Patsy turn her life around, but was unsuccessful. Mrs. Morris reports that both of her daughters, Patsy and Sharon, are drug addicts and often live on the streets.

Mrs. Morris was interviewed on November 18, 2006. Mrs. Morris describes Keith as a loving, caring, helpful, and giving young man. Mrs. Morris provided Keith with emotional support, but she admits that she asked more of Keith than he did of her. Keith's relationship with Mrs. Morris, similar to his relationship with his mother, was characterized by role reversal. At an early age, Keith would complete chores and run errands for her, without accepting pay. As he got older, Keith assisted Mrs. Morris financially by paying needed bills. At one point, Keith paid to reconnect Mrs. Morris' telephone service. Mrs. Morris did little to shield Keith from the influences of the streets. Mrs. Morris earned extra money by having house parties and charging an admission fee. Keith was in charge of collecting money at the door. It was while collecting money at one of Mrs. Morris' house parties that Keith shot the gang member who had beaten him years earlier.

### c.  Deloris Coleman

Keith described Deloris Coleman as a mother figure. Mrs. Coleman lived at 1415 South Throop, near the Gavins' residence at 1401 South Throop. Mrs. Coleman worked for the city as a community service worker, conducting home visits for wellness checks, testing children for lead poisoning and sickle cell anemia, and assisting with food and shelter services.

Mrs. Coleman was interviewed on February 2, 2007. She stated that she met Keith when he was seven years old. Keith and his sister Elaine became friends with Mrs. Coleman's daughter Judy. Keith was described as respectful and kind. He would take out the garbage and go to the store for her. Mrs. Coleman described Elaine as "wild." Elaine and Judy would go out and stay out all night. Judy became pregnant at twelve. Mrs. Coleman believes that Judy's early motherhood "slowed her down" and prevented her from getting hooked on drugs, as Elaine did at thirteen.

### CONCLUSION

Keith Gavin was exposed to multiple risk factors that have been linked to delinquency, adult antisocial behavior, substance abuse, and other behavioral problems. Keith grew up in a family plagued with multigenerational dysfunction, domestic violence, physical abuse, and neglect. He lived in a community that was homogenously poor, rife with gangs, guns, violence and crime. Violence was chronic and threats of violence were constant, both in his home and on the streets. Keith lacked the protective factors necessary to buffer the impact of those risk factors.

26

Department of Justice.

McWhirter, J.J., McWhirter, B., McWhirter, A. M. & McWhirter, E. H. (1993). At-risk youth: A comprehensive response. Pacific Grove, CA: Brooks/Cole.

Overcoming Barriers to School Re-entry. Office of Juvenile Justice and Delinquency Prevention, Fact Sheet 03, (2004).

29

2845

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

Perry, B. D. (1997). Incubated in terror: Neurodevelopmental factors in the 'cycle of violence' in: Children, Youth, and Violence: The Search for Solutions (J Osofsky, Ed.). Guilford Press, New York, pp. 124-148, 1997.

Risk and protective factors for youth violence. National Youth Violence Prevention Resource Center (2006). Rockville, MD.

Sattler, J.M. (1998). *Clinical and forensic interviewing of children and families (p.30).* Jerome Sattler Publisher, Inc. San Diego, CA.

Sattin, H., & Magnusson, D. (1996). Antisocial development: A holistic approach. *Development and Psychopathology,* 8, 617-645.

Shinn, M. (1996). Ecological assessment: Introduction to the special issue. *American Journal of Community Psychology,* 24-1-2.

Stetler, R. (1999). Mitigation evidence in death penalty cases. *National Association of Criminal Defense Lawyers.*

The 8% Solution. Office of Juvenile Justice and Delinquency Prevention, Fact Sheet 39, (2001).

Thompson, K.B., Glymph, D. & Sturgeon, W. (2002). Youth offenders: today's challenges, tomorrow's leaders. *Corrections Today,* 64-6. American Correctional Association.

*Youth Violence: A Report of the Surgeon (2001).* Office of the Surgeon General, Washington, D.C.

Wasserman, G.A., Keenan, K., Tremblay, R.E., Coie, J.D., Herrenkohl, T.I., Loeber, R., and Petechuk, D. (2003). Risk and protective factors of child delinquency. *Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice.*

Wilson, W.J. (1993).The ghetto underclass. *Social Science Perspectives.* Sage. Newbury Park, CA.

Wright, M. O'D., & Masten, A. S., (1997). Vulnerability and resilience in young children. *Handbook of child and adolescent psychiatry.* New York: Wiley.

Zagar, R., Arbit, J., Sylvies, R., & Busch, K.G. (1991). Homicidal adolescents: a replication. *Psychological Reports,* 67 (3), 1235-1242.

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

**Appendix A**

**CURRICULUM VITAE**

Betty Knight Paramore, Ph.D.
3420 South Prairie
Chicago, Illinois 60616
Home Phone (312) 225-4035
Cell Phone (312) 203-9828

## ACADEMIC HISTORY

Loyola University Chicago School of Education
Chicago, Illinois
Doctorate of Philosophy, School Psychology
**Ph.D., January 2002**

Loyola University Chicago School of Education
Chicago, Illinois
General Administration
Type 75, June 2004

Governor State University
University Park, Illinois
Postgraduate, Neuropsychology
September 1992 – May 1993

University of Nevada, Las Vegas
Las Vegas, Nevada
Specialist in Education, School Psychology
Ed.S., May 1989

Delta State University
Cleveland, Mississippi
Masters of Education, Counseling
M.Ed., December 1979

Delta State University
Cleveland, Mississippi
Bachelors of Arts, Social Work
B.A., May 1978

## Post-Doctoral Training Programs

Law Office of the Cook County Public Defender
Summer Institute
*One Team, One Voice; A Team Approach to Mitigation*
Chicago, 2006

31

2847

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

ABA Death Penalty Representation Project
and
DePaul University College of Law
Center for Justice in Capital Cases
Forensics and Mitigation Training Program
Chicago, 2005

DePaul University College of Law
Center for Justice in Capital Cases
Forensic Seminar
*Pathology, Fire Investigation, DNA, and Psychology*
Chicago, 2003

## EXPERIENCE

**Cook County Public Defender**
**Mitigation Specialist**
**June 2002 – present**

Responsible for identifying, obtaining, analyzing, interpreting, and incorporating relevant mitigating evidence into the theory of a capital case; Responsible for assisting the defense counsel in understanding the defendant in the context of the factors that lead up to the offense; Also responsible for working as an integral part of the defense team, following the instructions of defense counsel regarding the handling of the case, and maintaining the confidentiality of all information obtained while working on the case. The position requires knowledge of legal terminology and the law governing the introduction of mitigating evidence at the penalty phase of a capital case; knowledge of psychological, behavioral, and neurological disorders, and addictions; knowledge of interviewing protocols and psychological evaluations; and the skills necessary for the compilation of data into a comprehensive psychosocial report.

**Chicago Public Schools**
**School Psychologist**
**July 2006 – present**

Responsible for completing federal, district, and court-ordered mandated psychological evaluations on referred juvenile detainees. Psychological assessments are conducted in all areas of exceptionality: cognitive, behavioral, social-emotional, clinical, sensory-motor, adaptive, personality, and academics. Forensic and clinical interviews are conducted and psychological reports and recommendations are presented in a multidisciplinary conference. The position requires proficiency in statistical and psychometric construct of instruments used in completing assessments as well as expert skills in the interpretation and classification of mental disorders as indicated in the *Diagnostic Statistical Manual-IV-TR* of the American Psychiatric Association.

32

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

**Chicago Public Schools**
**School Psychologist**
**September 1989 – September 1996**
**September 2004 – present**

Responsible for systematically assessing the individual child in all areas of exceptionality: cognitive functioning, personality, adaptive behavior, sensory-motor development and academic achievements. In addition to providing individual and/or group counseling, also provided instructional and consultative intervention skills. The position also requires an understanding of the recent edition of the Diagnostic and Statistical manual of Mental Disorders, State and Federal education guidelines, Mental Health and Community agencies, the organizational structure and operation of the Chicago Public School System, and the ability to work effectively within a team structure.

**Chicago Public Schools**
**School Based Problem Solving Facilitator**
**September 1996 – September 2004**

Involved directly with Chicago Public School administrators and consultants in the development of the district's mandated alternative service delivery model (School-Based Problem Solving). Facilitated the school's implementation of the model by working directly with principals and designated staff. Responsible for providing skill-oriented training in specific content areas including: curriculum and instructional planning, managing the conditions of learning, functional analysis of academic and behavioral performance, curriculum-based assessment in reading and math, systematic behavior observation, positive behavioral interventions and support, and staff collaboration.

**Nevada Department of Human Resources, Las Vegas**
**Clinical Social Worker II**
**June 1986 – June 1989**

Specialist in Family Reunification/Preservation Program. Provided intensive clinical services to families involved in the state's child welfare system. Worked with families charged with child abuse and neglect. Provided strategic family systems therapy that centered on issues of parenting, alcohol and chemical dependency and basic life skills (assertiveness training and other issues). Responsible for completing family assessments, developing and implementing treatment plans, court representations, case documentations, and agency referrals.

**Nevada Department of Human Resources, Las Vegas**
**Medical Social Worker II**
**August 1985 – June 1986**

**St. Rose de Lima Hospital, Henderson, NV**
**Coordinator of Social Services II**
**August 1983 – August 1985**

RE: Keith Edmund Gavin
Declaration of Betty K. Paramore, Ph.D.

## PROFESSIONAL PRESENTATIONS

Learning Disabilities Association 2003 International Conference
Presentation: *School-Based Problem Solving: A Problem Solving Approach to Intervention – Putting
it into Practice*
Chicago, Illinois
February 28, 2003

National Association of School Psychologist 33rd Annual Conference
*Serving All Children*
Presentation: *School-Based Problem Solving: Assessing Implementation Integrity and its
Relationship to Selected Student Outcomes*
Chicago, Illinois
February 28, 2002

Illinois School Psychologist Association Annual Convention
Presentation: *School-Based Problem Solving*
Arlington Heights, Illinois
March 8-10, 2001

Annenberg Challenge Practitioners Conference
*Using and Sharing Data for School Improvement*
Snowbird, Utah
May 5-7, 1999

National Association of School Psychologist 30th Annual Conference
*A Blueprint for the Future*
Presentation: School-Based Problem Solving
Las Vegas, Nevada
April 6-10

## PROFESSIONAL MEMBERSHIPS

National Association of School Psychologists
Illinois Association of School Psychologists
Chicago Association of School Psychologists

## CERTIFICATIONS/LICENSED

State of Illinois, Administrative, Type 75
State of Illinois, School Psychologist, Type 73
State of Illinois, Licensed Clinical Professional Counselor

34

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

### Appendix B

### Records Reviewed

| | Title | Description |
|---|---|---|
| Case 81 I 2719 | Circuit Court of Cook County-Adult Probation | Pre-Sentencing Social Investigation Report |
| ISB# 1851482 | City of Chicago/Dept of Police | Arrest Record |
| IDC # 81-2719 | Office of State's Attorney | Arrest Record |
| IR#495479 | Illinois Dept of Law Enforcement | Transcript |
| 584 560 R8 | Federal Bureau of Investigation | Crime Information Report |
| 31477-90020 | Transcript of Mitigation/Penalty Phase | Keith Gavin |
| | Memos of Interviews of Gavin Family | |
| | State of Illinois – Dept of Corrections | Data Summary Report |
| N23865 | State of Illinois – Dept of Corrections | Disciplinary Record |
| | State of Illinois – Dept of Corrections | Adjustment Committee Summary |
| | State of Illinois – Dept of Corrections | Medical Records |
| | State of Illinois – Dept of Corrections | Work Assignments |
| | State of Illinois – Dept of Corrections | Offender Tracking System-Transfer Reports |
| | State of Illinois – Dept of Corrections | Adjustment Committee Summary |
| | Interview Transcripts | Keith Gavin |

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

**Appendix C**

# Keith Gavin Family Genogram

Joshua Matthews — d. 1965    Katie Matthews    Jack Gavin    Rosetta Gavin

Willie Gavin, Sr. — hx of incarceration   m. 7/20/1955    Annette Gavin — Domestic Abuse Victim

d. 1989

Annette b.09/09/1937 — victim of domestic abuse

Willie b.06/23/1935 — victim of abuse -MGF

**Willie, Jr.** hx of incarceration — victim of gang shooting — 3 children
b.08/18/1956  d.08/1997

**Elaine** hx of incarceration — teenage pregnancy-15 — 9 children-DCFS
b. 01/23/1958

**Keith** currently incarcerated
b. 03/30/1960

**Victor** hx of incarceration — victim of gang shooting — 5 children
b. 05/08/1961

**Steven** hx of incarceration
b.10/14/1962

**Sterling** hx of incarceration — 2 children
b.09/07/1965  d. 11/2003

**Adraine** 2 children
b.11/06/1967

**Sharon** special needs
b.10/14/1969

**Nicole** teenage pregnancy-18 — 2 children
b.08/09/1975

**Latrice** victim-domestic violence — 1 child
b.02/10/1977

**Ezra** currently incarcerated — 3 children
b.05/27/1978

**Geanetta** teenage pregnancy-13 — 6 children
b.07/23/1980

**Samuel** d. 2003

**Amarie**

**Evelyn**

**Essie**

**Nathaniel**

**Easter** hx. prostitution

**Bobbi Jean** victim-domestic abuse

**Classie** hx. prostitution

**Jacob**

**Jeanetta**

**Joseph** d. 1967

**Frances**

**Billy** d. Vietnam, 1967

**Larry**

**Katie**

**Lucille** hx. prostitution

**Florence**

**Jerry** hx of incarceration

**Loretta**

**Ezra** d. Vietnam

**Christine** d. 2006

**Clarice**

**Derek**

**Myrtle** hx. prostitution

**Everett**

## Legend

Keith Gavin Index Person | male | female | death | substance abuser | recovering substance abuser | alcohol abuse | incarceration

**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

**Appendix D**

























2857











2859



**RE: Keith Edmund Gavin**
Declaration of Betty K. Paramore, Ph.D.

**Appendix E**
































2868











2870















2874
















2877



FILED

OCT 0 9 2007

CIRCUIT CLERK, CHEROKEE COUNTY, AL



U.S. Department of Justice
Office of Justice Programs
*Office of Juvenile Justice and Delinquency Prevention*

**J. Robert Flores, Administrator**

April 2003

*A Message From OJJDP*

Preventing children from engaging in delinquent behavior is one of OJJDP's primary goals. Early intervention is crucial to achieving this goal, and understanding the factors related to child delinquency is essential to effective early childhood intervention. As part of its effort to understand and respond to these needs, OJJDP formed the Study Group on Very Young Offenders.

This Bulletin, part of OJJDP's Child Delinquency Series, focuses on four types of risk and protective factors: individual, family, peer, and school and community. It is derived from the chapters devoted to these critical areas for prevention and intervention in the Study Group's final report, *Child Delinquents: Development, Intervention, and Service Needs*.

To succeed, intervention methods designed to prevent child delinquency from escalating into serious and violent juvenile offending must address a range of risk and protective factors. In addition to the factors addressed in this Bulletin, OJJDP is pursuing research to examine the role of religious traditions and training as protective factors in the life of a child.

Preventing delinquency early in a child's life can pay significant dividends by reducing crime rates and decreasing crime-related expenditures of tax dollars. More important, it can help children avoid the consequences of delinquent behavior by increasing their chances of leading law-abiding and productive lives.

# Risk and Protective Factors of Child Delinquency

Gail A. Wasserman, Kate Keenan, Richard E. Tremblay, John D. Coie, Todd I. Herrenkohl, Rolf Loeber, and David Petechuk

*Sparked by high-profile cases involving children who commit violent crimes, public concerns regarding child delinquents have escalated. Compared with juveniles whose delinquent behavior begins later in adolescence, child delinquents (offenders younger than age 13) face a greater risk of becoming serious, violent, and chronic juvenile offenders. OJJDP formed the Study Group on Very Young Offenders to examine the prevalence and frequency of offending by children younger than 13. This Study Group identified particular risk and protective factors that are crucial to developing effective early intervention and protection programs for very young offenders.*

*This Bulletin is part of OJJDP's Child Delinquency Series, which presents the findings of the Study Group on Very Young Offenders. This series offers the latest information about child delinquency, including analyses of child delinquency statistics, insights into the origins of very young offending, and descriptions of early intervention programs and approaches that work to prevent the development of delinquent behavior by focusing on risk and protective factors.*

Some aspects of children's behaviors, such as temperament, are established during the first 5 years of life. This foundation, coupled with children's exposure to certain risk and protective factors, influences the likelihood of children becoming delinquent at a young age. However, the identification of these multiple risk and protective factors has proven to be a difficult task. Although no magic solutions exist for preventing or correcting child delinquency, identifying risk and protective factors remains essential to developing interventions to prevent child delinquency from escalating into chronic criminality.

According to the Study Group on Very Young Offenders, a group of 39 experts on child delinquency and child psychopathology convened by the Office of Juvenile Justice and Delinquency Prevention (OJJDP), risk factors for child delinquency operate in several domains: the individual child, the child's family, the child's peer group, the child's school, the child's neighborhood, and the media. Most professionals agree that no single risk factor leads a young child to delinquency. Rather,

**Access OJJDP publications online at *ojjdp.ncjrs.org***

the likelihood of early juvenile offending increases as the number of risk factors and risk factor domains increases.

Although some risk factors are common to many child delinquents, the patterns and particular combination of risk factors vary from child to child. Professionals have learned a great deal about which risk and protective factors are relevant for screening and intervention. For example, most professionals agree that early on in a child's life, the most important risks stem from individual factors (e.g., birth complications, hyperactivity, sensation seeking, temperamental difficulties) and family factors (e.g., parental antisocial or criminal behavior, substance abuse, and poor child-rearing practices). As the child grows older and becomes integrated into society, new risk factors related to peer influences, the school, and the community begin to play a larger role.

Although focusing on risk factors is important, examining protective factors that reduce the risk of delinquency is as important for identifying interventions that are likely to work. For example, some common protective factors against child delinquency and disruptive behavior are female gender, prosocial behavior (such as empathy) during the preschool years, and good cognitive performance (for example, appropriate language development and good academic performance). The proportion of protective factors to risk factors has a significant influence on child delinquency, and protective factors may offset the influence of children's exposure to multiple risk factors.

This Bulletin is based on four chapters from the Study Group's final report, *Child Delinquents: Development, Intervention, and Service Needs* (Loeber and Farrington, 2001): "Individual Risk and Protective Factors," "Family Risk and Protective Factors," "Peer Factors and Interventions," and "School and Community Risk Factors and Interventions."

## Child Delinquency Research: An Overview

Historically, delinquency studies have focused on later adolescence, the time when delinquency actually peaks. This was particularly true in the 1990s, when most researchers studied chronic juvenile offenders because they committed a disproportionately large amount of crime. Research conducted during this period by OJJDP's Study Group on Serious and Violent Juvenile Offenders revealed that youth referred to juvenile court for their first delinquent offense before age 13 are far more likely to become chronic offenders than youth first referred to court at a later age. To better understand the implications of this finding, OJJDP convened the Study Group on Very Young Offenders in 1998. Its charge was to analyze existing data and to address key issues that had not previously been studied in the literature. Consisting of 16 primary study group members and 23 coauthors who are experts on child delinquency and psychopathology, the Study Group found evidence that some young children engage in very serious antisocial behavior and that, in some cases, this behavior foreshadows early delinquency. The Study Group also identified several important risk factors that, when combined, may be related to the onset of early offending. The Study Group report concluded with a review of preventive and remedial interventions relevant to child delinquency.

The *Child Delinquency Bulletin Series* is drawn from the Study Group's final report, which was completed in 2001 under grant number 95–JD–FX–0018 and subsequently published by Sage Publications as *Child Delinquents: Development, Intervention, and Service Needs* (edited by Rolf Loeber and David P. Farrington). OJJDP encourages parents, educators, and the juvenile justice community to use this information to address the needs of young offenders by planning and implementing more effective interventions.

The risk factors for child delinquency discussed in this Bulletin are categorized into four groups: (1) individual, (2) family, (3) peer, and (4) school and community. A greater understanding of these risk and protective factors could serve as the basis for future social policies designed to prevent and control delinquency (see Burns et al., in press, another OJJDP Bulletin in this series).

## Individual Risk Factors

Children's behavior is the result of genetic, social, and environmental factors. In relation to child delinquency, the Study Group defined individual risk and protective factors as an individual's genetic, emotional, cognitive, physical, and social characteristics. These factors are frequently interrelated, yet the underlying mechanism of how this occurs is not fully understood.

## Antisocial Behavior

Early antisocial behavior may be the best predictor of later delinquency. Antisocial behaviors generally include various forms of oppositional rule violation and aggression, such as theft, physical fighting, and vandalism. In fact, early aggression appears to be the most significant social behavior characteristic to predict delinquent behavior before age 13. In one study, physical aggression in kindergarten was the best and only predictor of later involvement in property crimes (Haapasalo and Tremblay, 1994; Tremblay et al., 1994). In contrast, prosocial behavior (such as helping, sharing, and cooperation), as rated by teachers, appeared to be a protective factor, specifically for those who have risk factors for committing violent and property crimes before age 13.

Studies conducted in Canada, England, New Zealand, Sweden, and the United

## Childhood Risk Factors for Child Delinquency and Later Violent Juvenile Offending

The following risk factors are discussed in this Bulletin.

**Individual factors**

* Early antisocial behavior
* Emotional factors such as high behavioral activation and low behavioral inhibition
* Poor cognitive development
* Low intelligence
* Hyperactivity

**Family factors**

* Parenting
* Maltreatment
* Family violence
* Divorce
* Parental psychopathology
* Familial antisocial behaviors
* Teenage parenthood

* Family structure
* Large family size

**Peer factors**

* Association with deviant peers
* Peer rejection

**School and community factors**

* Failure to bond to school
* Poor academic performance
* Low academic aspirations
* Living in a poor family
* Neighborhood disadvantage
* Disorganized neighborhoods
* Concentration of delinquent peer groups
* Access to weapons

Source: This list is largely based on R. Loeber and D.P. Farrington, eds. 2001. *Child Delinquents: Development, Intervention, and Service Needs.* Thousand Oaks, CA: Sage Publications, Inc.

States have confirmed that early anti-social behavior tends to be the best predictor of early-onset delinquency for boys. For example, in a study by Patterson and colleagues, antisocial behavior was the best predictor of age at first arrest when compared with family social disadvantage, parental monitoring, and parental discipline. Long-term results also indicated that those with an early arrest (before age 13) were most likely to be chronic offenders by age 18 (Patterson, Crosby, and Vuchinich, 1992; Patterson et al., 1998). Likewise, the Cambridge Study in Delinquent Development in London, England, showed that one of the strongest predictors of a conviction between ages 10 and 13 was trouble-some behavior between the ages of 8 and 10, as rated by teachers and peers (Farrington, 1986).

In another study, the two best predictors of later antisocial behavior were mothers' ratings of their children as difficult to manage at 3 years of age and parents' ratings of behavior problems at 5 years of age (White et al., 1990). Most children whose caregivers perceived them as difficult to manage at age 3 did not become delinquents before age 13. However, most children who became delinquents before age 13 had behavior problems that had emerged in the first years of life.

### Emotional Factors

Although early aggressive behavior is the most apparent and best predictor of later delinquency, other individual factors may contribute to later antisocial

behaviors. By the end of the third year of life, children can express the entire range of human emotions, including anger, pride, shame, and guilt. Parents, teachers, and even peers affect children's socialization of emotional expression and help them learn to manage negative emotions constructively. Thus, how children express emotions, especially anger, early in life may contribute to or reduce their risk for delinquency.

Many studies of delinquency have focused on the concepts of behavioral inhibition and behavioral activation. Behavioral inhibition (in response to a new stimulus or punishment) includes fearfulness, anxiety, timidity, and shyness. Behavioral activation includes novelty and sensation seeking, impulsivity, hyperactivity, and predatory aggression. The Study Group found evidence that high levels of behavioral activation and low levels of behavioral inhibition are risk factors for antisocial behavior. For example, high levels of daring behavior at ages 8–10 predicted convictions and self-reported delinquency before age 21, whereas measures of anxiety and guilt did not (Farrington, 1998). Overall, studies have shown that impulsive, not anxious, boys are more likely to commit delinquent acts at 12 to 13 years of age. More studies are needed to determine whether emotional characteristics in childhood are causes of or simply correlates of later antisocial behavior.

### Cognitive Development

Emotional and cognitive development appear to be associated with children's ability to control social behavior within the first 2 years of life. Evidence suggests that these factors play an important role in the development of early delinquency and may affect the learning of social rules. In addition to traditional measures such as IQ, the Study Group considered cognitive development in terms of language development, social cognition, academic achievement, and neuropsychological function.

### The Terrible Twos

The Study Group identified evidence linking behavior problems around age 3 with delinquency by age 13. Antisocial behaviors, such as anger and physical aggression, can appear during the first year of life but often peak at the end of the second year after birth. Thus, before age 3, most children engage in behavior that would be considered antisocial at a later age, including physical aggression. However, most children outgrow early problem behavior. The ones who do not outgrow such behavior are of concern here because of the increased risk that they may become child delinquents.



Poor cognitive development and behavior problems during early childhood could explain the association between academic achievement and delinquency. For example, numerous studies have shown that delinquents' verbal IQs tend to be lower than their nonverbal IQs (e.g., Moffitt, 1993). Delinquents also have lower mean global IQs and lower school achievement rates compared with nondelinquents (e.g., Fergusson and Horwood, 1995; Maguin and Loeber, 1996).

Mild neuropsychological deficits present at birth can snowball into serious behavior problems by affecting an infant's temperament (Moffitt, 1993). These deficits can affect children's control of behaviors such as language, aggression, oppositional behavior, attention, and hyperactivity. Basic cognitive deficits may also be associated with impaired social cognitive processes, such as failure to attend to appropriate social cues (e.g., adults' instructions, peers' social initiations).

## Hyperactivity

Studies have shown that restless, squirmy, and fidgety children are more likely to be involved in later delinquent behavior (e.g., Farrington, Loeber, and Van Kammen, 1990; Lynam, 1997). Clinical studies of hyperactive children have shown that they also are at high risk of delinquency (e.g., Loeber et al., 1995). For example, motor restlessness (hyperactive or hyperkinetic behavior), as rated by kindergarten teachers, was a better predictor of delinquency between ages 10 and 13 than lack of prosocial behavior and low anxiety (Tremblay et al., 1994). Another study concluded that hyperactivity leads to delinquency only when it occurs with physical aggression or oppositional behavior (Lahey, McBurnett, and Loeber, 2000).

## Family Risk Factors

Children and their families defy narrow descriptions. Social, environmental, and family risk factors tend to cluster, and any number of them can occur together within the same family. Understanding the role and influence of each of these factors is a difficult task. For example, early child offending may develop through several pathways. For some children, the primary risk factor may be a family risk factor such as lack of parental supervision; for others, it may be an individual risk factor such as a diagnosis of attention deficit hyperactivity disorder (Cicchetti and Rogosch, 1996).

### A Question About Biological Factors

All behavior, including delinquency, is influenced by biological factors. These factors include not only physical strength but also brain functioning, such as neurotransmitters that pass signals to the brain. Serotonin receptors, for instance, are neurotransmitters that have been associated with impulsive behavior (Goldman, Lappalainen, and Ozaki, 1996). Other biological factors have also been associated with delinquency. Compared to nondelinquents, delinquents tend to have a lower heart rate and a lower skin response (Raine, 1993), which are measures of autonomic nervous activity. Another line of research has concentrated on hormones, including testosterone. However, a high level of testosterone during the elementary school years is not known to predict later delinquency. Currently, research on genes has come as far as the identification of proteins associated with neurotransmitters, but it is unlikely to shed light on complex processes such as delinquency (Rowe, 2002). In summary, it is far from clear to what extent biological processes determine delinquency at a young age.

Studies have shown that inadequate child-rearing practices, home discord, and child maltreatment are associated with early-onset delinquency (e.g., Derzon and Lipsey, 2000). In addition, the strongest predictors of early-onset violence include family size and parental antisocial history. Early temperamental difficulties in the child coupled with parental deficiencies that interfere with proactive parenting are also thought to be important in the development of early-onset behavior problems.

In looking at the clustering of family risk factors, one goal is to identify which combinations of risk factors promote early misbehavior because, more than likely, early misbehavior is the result of an accumulation of a number of factors. The number of risk factors and stressors and the length of exposure to them have a strong impact on child behavior (e.g., Tiet et al., 1998; Williams et al., 1990).

A number of social adversities in families can affect children's delinquency. These factors include parenting, maltreatment, family violence, divorce, parental psychopathology, familial antisocial behaviors, teenage parenthood, family structure, and family size.

## Parenting

Inadequate parenting practices are among the most powerful predictors of early antisocial behavior (e.g., Hawkins et al., 1998). Compared with families in which the children do not have conduct problems, families of young children with conduct problems have been found to be eight times more likely to engage in conflicts involving discipline, to engage in half as many positive interactions, and, often unintentionally, to reinforce negative child behavior (Gardner, 1987; Patterson and Stouthamer-Loeber, 1984). Three specific parental practices are particularly associated with early conduct problems: (1) a high level of parent-child conflict, (2) poor monitoring, and (3) a low level of positive involvement (Wasserman et al.,

1996). In the Pittsburgh Youth Study, the co-occurrence of low levels of monitoring and high levels of punishment increased the risk of delinquency in 7- to 13-year-old boys. Conversely, attachments to conventional parents and to society's institutions are hypothesized to protect against developing antisocial behavior (Hirschi, 1969).

## Maltreatment

Child maltreatment or abuse commonly occurs with other family risk factors associated with early-onset offending. Focusing specifically on the relationship between physical abuse and children's aggression, one study suggests that 20 percent of abused children become delinquent before reaching adulthood (Lewis, Mallouh, and Webb, 1989). Clearly, most physically abused children do not go on to become antisocial or violent. However, one study that compared children without a history of abuse or neglect with children who had been abused or neglected found that the latter group accrued more juvenile and adult arrests by the age of 25 (Widom, 1989). Abused or neglected children also offended more frequently and began doing so at earlier ages.

## Family Violence

Each year, approximately 3.3 million children witness physical and verbal spouse abuse (Jaffe, Wolfe, and Wilson, 1990). Witnessing domestic violence has been linked to increased child behavior problems, especially for boys and younger children (Reid and Crisafulli, 1990). Little is known about the age range in which children may be most vulnerable or how long associations persist. In most families, when the woman is battered, children are also battered (McKibben, De Vos, and Newberger, 1989). The co-occurrence of child abuse and witnessing domestic violence affects children's adjustment more than twice as much as witnessing domestic violence alone (Hughes, Parkinson, and Vargo, 1989). Other

factors that impose additional risk in violent families include a high incidence of other behavior problems (e.g., alcohol abuse and incarceration) in male batterers. Maternal psychological distress may also expose children to additional indirect risks, such as the mother being emotionally unavailable to the children (e.g., Zuckerman et al., 1995).

## Divorce

Compared with boys whose parents remained married, boys whose parents divorced have been found to be more likely to have continuing problems with antisocial, coercive, and noncompliant behaviors through age 10 (Hetherington, 1989). As with many family factors, establishing the exact effects of divorce on children is difficult because of other co-occurring risks, such as the loss of a parent, other related negative life events (e.g., predivorce child behavior problems, family conflict, decrease in family income), and a parent's subsequent remarriage. When these related factors are considered, the impact of divorce itself is substantially less.

## Parental Psychopathology

High rates (as high as 45 percent) of parental antisocial personality disorder have been consistently reported for parents of boys (including preadolescents) referred for conduct problems (e.g., Lahey et al., 1988). Similar rates occurred for parental substance abuse and depression (Robins, 1966). Depressed parents show many parenting deficiencies associated with increased antisocial behaviors in children, such as inconsistency, irritability, and lack of supervision (Cummings and Davies, 1994). Parental psychopathology has been linked to increased rates of psychiatric disorder among school-aged children (Costello et al., 1997). The Pittsburgh Youth Study found that the association between delinquency and parental anxiety or depression was stronger in younger than in older children (Loeber et al., 1998).

## Familial Antisocial Behaviors

A long history of research demonstrates that aggressive behavior and criminality are more prevalent in some families than in others. For example, the Cambridge Study in Delinquent Development, which followed 411 families, found that offending was strongly concentrated in a small group of families and that approximately 5 percent of the families accounted for about half of the juvenile criminal convictions (West and Farrington, 1977).

Antisocial adults tend to select antisocial partners (e.g., Farrington, Barnes, and Lambert, 1996). Overall, antisocial parents show increased levels of family conflict, exercise poorer supervision, experience more family breakdown, and direct more hostility toward their children. In addition, having an antisocial sibling also increases a child's likelihood of antisocial behaviors (e.g., Farrington, 1995). The influences of siblings are stronger when the siblings are close in age.

## Teenage Parenthood

Being born to a teenage mother has been found to strongly predict offending in adolescence (Conseur et al., 1997), although much of this effect may stem from the mother's own antisocial history and involvement with antisocial partners (Rutter, Giller, and Hagell 1998).

## Family Structure

Many single parents are able to raise their children very well. However, children from single-mother households are at increased risk for poor behavioral outcome (Pearson et al., 1994; Vaden-Kiernan et al., 1995; McLanahan and Booth, 1989; Sampson, 1987), even controlling for the fact that single-mother households on average have fewer economic resources. Other factors could explain this relationship. Especially as compared with partnered women, single mothers report more mental health problems (e.g., Guttentag, Salasin, and

Belle, 1980), have higher levels of residential mobility (McLanahan and Booth, 1989; McCormick, Workman-Daniels, and Brooks-Gunn, 1996), and have fewer resources to monitor their children's activities and whereabouts. Each of these factors on its own contributes to increased levels of early childhood behavior problems.

## Family Size

The more children in a family, the greater the risk of delinquency. The Cambridge Study found that, compared with boys who had fewer siblings, boys who had four or more siblings by the age of 10 were twice as likely to offend, regardless of the parents' socioeconomic status (West and Farrington, 1973). These associations may be related to diminished supervision in larger families.

# Peer Risk Factors

Peer influences on child delinquency usually appear developmentally later than do individual and family influences. Many children entering school, for example, already show aggressive and disruptive behaviors. Two major mechanisms associated with peer factors or influences are association with deviant peers and peer rejection.

## Association With Deviant Peers

Association with deviant peers is related to increased co-offending and, in a minority of cases, the joining of gangs. Since a 1931 report showing that 80 percent of Chicago juvenile delinquents were arrested with co-offenders, empirical evidence has supported the theory that deviant peer associations contribute to juvenile offending (Shaw and McKay, 1931). The unresolved question is whether deviant peers model and reinforce antisocial behaviors or whether the association with deviant peers is simply another manifestation of a child's predisposition to delinquency. In other

### Sibling Influences

Based on data from the 1979 National Longitudinal Survey of Youth, a number of publications have underscored the role played by siblings in influencing delinquent behavior in both the domains of family and peer influence. For example, compared with teens with lower rates of offending, teens with high rates of offending were more likely to have siblings who also committed delinquent acts at a high rate. Some studies speculate that older siblings who are prone to delinquent behavior may reinforce antisocial behavior in a younger sibling, especially when there is a close, warm relationship (Rowe and Gulley, 1992).

words, do "birds of a feather flock together" or does "bad company corrupt"?

The Study Group found that a strong case could be made that deviant peers influence nondelinquent juveniles to become delinquent. For example, according to data from the National Youth Survey on a representative sample of U.S. juveniles ages 11 to 17, the most frequent pattern was a child moving from association with nondelinquent peers to association with slightly deviant peers, and then on to commission of minor offenses. More frequent association with deviant peers and more serious offending followed, leading to the highest level of association with deviant peers (Elliott and Menard, 1996; Keenan et al., 1995).

Deviant peers influence juveniles who already have some history of delinquent behavior to increase the severity or frequency of their offending. A few studies of children younger than 14 support this hypothesis. For example, in a study of Iowa juveniles, involvement in the juvenile justice system was highest for those who engaged in disruptive behavior and associated with deviant peers at a young age (Simons et al., 1994). The Study Group concluded that deviant

peers contribute to serious offending by child delinquents during the period of their transition to adolescence.

Although an extreme form of association with deviant peers, gangs provide a ready source of co-offenders. Not surprisingly, gang membership reflects the highest degree of deviant peer influence on offending. The Rochester Youth Development Study, the Denver Youth Survey, and the Seattle Social Development Project have all shown that gangs appear to exert a considerable influence on the delinquent behavior of individual members. Juveniles are joining gangs at younger ages, and the role of gangs in crimes committed by youthful offenders appears to be an increasing problem (Howell, 1998). In the case of violence, even after accounting for other risk factors (such as association with delinquent peers who are not gang members, family poverty, lack of parental supervision, and negative life events), gang membership still has the strongest relationship with self-reported violence (Battin et al., 1998).

## Peer Rejection

The evidence that peer rejection in childhood is a risk factor for antisocial behaviors is relatively new compared with evidence about association with deviant peers. Recent findings have shown that young aggressive children who are rejected by peers are at significantly greater risk for later chronic antisocial behaviors than children who are not rejected, whether or not they were aggressive early on. For example, one study found that peer rejection in third grade predicted increasingly greater antisocial behaviors from sixth grade onward, even when boys' earlier aggressiveness was accounted for in the predictions (Cole et al., 1995). The frequency of violent offending in adolescence was greater for these rejected, aggressive juveniles, and they were more likely to persist in violent offending in early adulthood. In the early school years, peer rejection accentuates the relation between early attention and

hyperactivity problems and conduct problems in fourth grade.

One explanation for the role of peer rejection in increasing antisocial behaviors is that it leads to greater suspiciousness of other people's motives as hostile and hence to greater aggression in response. A second explanation is that rejection causes children to have fewer positive social options and, consequently, to become part of lower status and deviant peer groups. Rejected, aggressive children are more likely than others to be members of deviant peer groups and tend to be peripheral members of these groups (Bagwell et al., 2000). Their tenuous sense of belonging may dispose them to engage in more antisocial activity in an effort to gain standing in these groups.

Peer rejection and deviant peers are mediating factors rather than primary causes of child delinquency. As shown in the diagram (on page 8), early community, family, and individual risk factors can lead to early aggressive and disruptive behaviors. The already "at-risk" child then enters school, where peer risk factors can culminate in preadolescent or very early adolescent serious offending. The Study Group concluded that three factors combine to account for a juvenile's accelerated movement toward more serious offending in early adolescence:

- The high-risk juvenile's own antisocial tendencies.

- The negative consequences of peer rejection resulting from these tendencies.

- The resulting deviant peer associations.

The Study Group believes that peer influence is an important mediating factor in child delinquency. Research suggests that peer influence has an impact on delinquency in two ways: (1) the initial offending of relatively late starters and (2) the escalation of serious offending among very early starters.

# School and Community Risk Factors

Few studies have addressed risk factors that emerge from young children's socialization in schools and communities. The Study Group focused on a social development model integrating insights from current theories that consider the influence of community and schools on child delinquents (Catalano and Hawkins, 1996; Farrington and Hawkins, 1991; Hawkins and Weis, 1985). The model proposes that socialization involves the same processes in producing either prosocial or antisocial behaviors. These processes include the following:

- Children's opportunity for involvement in activities and interactions with others.

- Children's degree of involvement and interaction with others.

- Children's ability (skills) to participate in these involvements and interactions.

- Reinforcements received from individuals for children's performance in involvements and interactions with others.



## School Factors

The Study Group found that the failure to bond to school during childhood can lead to delinquency. In addition, as stated above, early neurological deficiencies, when combined with the failure of family, school, and community to provide adequate socialization, lead to early-onset offending that persists throughout life. A specific school risk factor for delinquency is poor academic performance. A meta-analysis of more than 100 studies examined the relationship between poor academic performance and delinquency and found that poor academic performance is related to the prevalence, onset, frequency, and seriousness of delinquency (Maguin and Loeber, 1996). In young children ages 8 to 11, academic performance has been related to serious later delinquency (Loeber et al., 1998). Even when individual intelligence and attention problems are taken into account, academic performance remains a predictor of delinquency.

Children with weak bonds (low commitment) to school, low educational aspirations, and poor motivation are also at risk for general offending and for child delinquency (e.g., Hawkins et al., 1998; Le Blanc, Côté, and Loeber, 1991). It is likely that children who perform poorly on academic tasks will fail to develop strong bonds to school and will have lower expectations of success. As a result, academic achievement and school bonding are, in many ways, interdependent. For example, one study found that boys who engage in delinquency are less committed to school and are also more likely to have "shorter plans" for their schooling. These boys described themselves as bad students (Le Blanc et al., 1991).

## Community Factors

Numerous risk factors for young children's offending lie within the community domain. For example, findings from studies of childhood exposure to family poverty have been very consistent. Children raised in poor, disadvantaged families are at greater risk for offending than children raised in relatively affluent families (e.g., Farrington, 1989, 1991, 1998). Disadvantages at the neighborhood level are also of primary importance in the development of antisocial behaviors (Catalano and Hawkins, 1996). Disorganized neighborhoods with few controls may have weak social control networks that allow criminal activity to go unmonitored and even unnoticed (e.g., Elliott et al., 1996; Sampson and Lauritsen, 1994). In terms of violent crimes, one study concluded that social disorganization and concentrated poverty within the community lead to residents' decreased willingness to intervene when children are engaging in antisocial/unlawful acts, further contributing to a greater likelihood of violence within neighborhoods (Sampson, Raudenbush, and Earls, 1997).

Certain residential areas may support greater opportunities for antisocial learning. For example, disadvantaged inner-city neighborhoods are often characterized by a predominance of delinquent peer groups and gangs that draw young people into crime (Sutherland and Cressey, 1970). Juveniles living within high-crime neighborhoods are often exposed to norms favorable to crime and are at high risk for offending (Developmental Research and Programs,



**Development of Early Offending Behavior and Peer Influences**

Source: J.D. Coie and S. Miller-Johnson. 2001. Peer factors and interventions. In *Serious and Violent Juvenile Offenders: Risk Factors and Successful Interventions*, edited by R. Loeber and D.P. Farrington. Thousand Oaks, CA: Sage Publications, Inc., pp. 191–209.

### Who's in Control at School?

Schools play an important role in the socialization of children and the development of antisocial behavior. When schools are poorly organized and operated, children are less likely to value their education and do well on academic tasks and more likely to experience peer influences that promote delinquency and opportunities for antisocial behavior (Gottfredson, 2001). For example, schools with fewer teacher resources and large enrollments of students have higher levels of teacher victimization by pupils. Teacher victimization is also higher in schools with lower cooperation between teachers and administrators and with poor rule enforcement. Furthermore, poor rule enforcement within schools has been associated with higher levels of student victimization. Disciplinary problems are also more common in schools with less satisfied teachers (Ostroff, 1992). Although much more research is needed on the relationship between school organization and processes and children's delinquency, available evidence suggests that, in addition to those already noted, several other specific school characteristics may be linked to antisocial behavior of students, including poor student/teacher relations, norms and values supporting antisocial behaviors, and poorly defined rules and expectations for appropriate conduct.

1996). In addition, having ready access to weapons generally increases the risk for violence (Brewer et al., 1995).

## Interventions

Although the Study Group's findings concerning interventions for child delinquency will be discussed more fully in *Treatment, Services, and Intervention Programs for Child Delinquents* (Burns et al., 2003), the following brief overview of the issues associated with intervention focuses on the risk factors just discussed. In general, the Study Group found that the number of adequately designed experimental interventions is insufficient to guide policymakers in their efforts to prevent child delinquency. The lack of interventions targeting antisocial behaviors in young children is particularly conspicuous. The Study Group believes focusing on children's early years is essential to better understand the socialization failures that lead to juvenile delinquency

and, eventually, criminal behavior in adulthood.

### Individual

If the impulse control necessary to avoid trouble is learned largely during the preschool years, the best time to help those who have difficulty in acquiring this control would be during the "sensitive period" of early childhood. It is difficult to imagine that later interventions would have nearly as much effect. Instead of looking for the onset of aggression and antisocial behaviors after children enter school, it is more important to focus on the preschool years, when clearly much of the development of impulse control is taking place (e.g., Broidy, Nagin, and Tremblay, 1999; Tremblay et al., 1998).

### Family

Several types of programs provide family-based interventions. For example, Olds and colleagues (1998) reported on nurses' home visits to unmarried women living in households with low socioeconomic status during pregnancy to the end of the second year after birth. These visits subsequently had a positive effect on the 15-year-old children's reports of arrests, convictions, violations



### Violence and the Media

Some studies have shown that antisocial behaviors, such as violence, can be learned by viewing violence in the media. For example, children exposed to high levels of television violence at age 8 were found to be more likely to behave aggressively at that age and subsequently, up to age 30 (Eron and Huesmann, 1987). In addition, children of parents who frequently watched violence on television and showed aggression were found to be more likely than other children to exhibit aggression and to prefer violent programs (Huesmann and Miller, 1994).

## Bad Company

Sometimes even the best intentions go astray. The fact that antisocial juveniles are often grouped together in intervention programs may, in fact, promote friendships and alliances among these juveniles and intensify delinquent behavior rather than reduce it (e.g., McCord, 1997; Dishion, McCord, and Poulin, 1999). For example, group discussions among antisocial peers may inadvertently reinforce antisocial attitudes and promote antisocial friendships that may continue outside group sessions.

of probation, consumption of alcohol, sexual activity, and running away from home. Earlier reports (Olds et al., 1997; Olds et al., 1986) had shown that this intervention also reduced the incidence of childhood injuries and child abuse and neglect.

Many family-based interventions that focus on issues such as spousal violence and divorce conflict disregard children completely or deal with them only in the abstract. Conversely, interventions for reducing aggression in young children do not always target family issues, such as domestic violence or parental psychopathology, that may contribute to the child's behavior problems. Focused, family-based approaches, such as Parent Management Training (Wasserman and Miller, 1998), have helped reduce the risk of poor family management practices and physically abusive behavior, which can contribute to antisocial behaviors in children. Nevertheless, a lack of sensitivity to co-occurring risk factors has generally led to interventions that are too narrowly focused. As a result, they fail to address adequately the multiple sources of risk for children in family life.

## Peers

Interventions to reduce antisocial behaviors associated with peer influence

should focus on reducing contact with deviant peers for juveniles predisposed to antisocial behaviors and on promoting the development of prosocial skills (e.g., skills for resolving peer conflicts) (Hawkins and Weis, 1985). Studies have shown that peer relations training (in combination with parent training) reduces children's involvement with deviant peers during preadolescence, thus helping to protect them from subsequent involvement in delinquent activities.

## School

Several types of school programs have shown promise as interventions for reducing aggressive behavior in the classroom. For example, evaluations of the Good Behavior Game showed that proactive behavior management can positively affect the long-term behavior of the most aggressive elementary school children (Murphy, Hutchinson, and Bailey, 1983; Kellam and Rebok, 1992; Kellam et al., 1994). The Seattle Social Development Project has also demonstrated effectiveness in reducing disruptive behavior in children (Hawkins et al., 1992; Hawkins, Von Cleve, and Catalano, 1991; Hawkins et al., 1999; O'Donnell et al., 1995). Numerous schools have also developed social competence curriculums to promote norms against aggressive, violent, and other antisocial behaviors (e.g., Greenberg, 1997). Other efforts include conflict resolution and violence prevention curriculums, bullying prevention programs, multicomponent classroom programs to improve academic achievement and reduce antisocial behaviors, after-school recreation programs, and mentoring programs.

## Community

Because most studies have not specifically focused on child delinquency, surprisingly little is known about community risk factors for child delinquency. Several community approaches for preventing and reducing juvenile crime have been developed in recent years (e.g., Brewer

et al., 1995; National Crime Prevention Council, 1994). Most take a comprehensive approach to addressing behavior across several risk domains, but their effect on child delinquency remains to be demonstrated. Multicomponent instruction programs have been developed in several big cities, and these programs will be discussed in *Treatment, Services, and Intervention Programs for Child Delinquents* (Burns et al., 2003).

## Summary

The Study Group stresses that the focus on risk factors that appear at a young age is the key to preventing child delinquency and its escalation into chronic criminality. By intervening early, young children will be less likely to succumb to the accumulating risks that arise later in childhood and adolescence and less likely to incur the negative social and personal consequences of several years of disruptive and delinquent behaviors.

Child delinquency usually stems from a combination of factors that varies from child to child. No single risk factor is sufficient to explain it. To develop effective methods for preventing child delinquency and its escalation into serious and violent juvenile offending, intervention methods must account for the wide range of individual, family, peer, school, and community risk factors. Some effective intervention programs that focus on reducing persistent disruptive behavior in young children have reduced later serious, violent, and chronic offending. Some interventions focus on parent behaviors that increase the risk of persistent disruptive behavior in children. Peer relations training and school/classroom programs have also shown some promise. Still, many gaps exist in our knowledge about the development of child delinquency, the risk and protective factors that contribute to it, and effective prevention and intervention methods. Addressing these gaps offers an exceptional opportunity to reduce overall crime levels

and to decrease future expenditures of tax dollars.

# References

Bagwell, C.L., Coie, J.D., Terry, R.A., and Lochman, J.E. 2000. Peer clique participation and social status in preadolescence. *Merrill-Palmer Quarterly* 46:280–305.

Battin, S.R., Hawkins, J.D., Thornberry, T.P., and Krohn, M.D. 1998. *The Contribution of Gang Membership to Delinquency Beyond the Influence of Delinquent Peers.* Bulletin. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Brewer, D.D., Hawkins, J.D., Catalano, R.F., and Neckerman, H.J. 1995. Preventing serious, violent, and chronic juvenile offending: A review of evaluations of selected strategies in childhood, adolescence, and the community. In *A Source Book: Serious, Violent, and Chronic Juvenile Offenders*, edited by J.C. Howell, B. Krisberg, J.D. Hawkins, and J.J. Wilson. Thousand Oaks, CA: Sage Publications, Inc., pp. 61–141.

Broidy, L., Nagin, D., and Tremblay, R.E. 1999. The linkage of trajectories of childhood externalizing behaviors to later violent and nonviolent delinquency. Paper presented at the Biennial Meeting of the Society for Research in Child Development, Albuquerque, NM.

Burns, B.J., Howell, J.C., Wiig, J.K., Augimeri, L.K., Welsh, B.C., Loeber, R., and Petechuk, D. 2003. *Treatment, Services, and Intervention Programs for Child Delinquents.* Bulletin. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Catalano, R.F., and Hawkins, J.D. 1996. The social development model: A theory of antisocial behavior. In *Delinquency and Crime: Current Theories*, edited by J.D. Hawkins. New York, NY: Cambridge University Press, pp. 149–197.

Cicchetti, D., and Rogosch, F.A. 1996. Equifinality and multifinality in developmental psychopathology. *Development and Psychopathology* 8:597–600.

Coie, J.D., Terry, R.A., Lenox, K., Lochman, J.E., and Hyman, C. 1995. Childhood peer rejection and aggression as predictors of stable patterns of adolescent disorder. *Development and Psychopathology* 7:697–713.

Conseur, A., Rivara, F.O., Barnowski, R., and Emmanuel, I. 1997. Maternal and perinatal risk factors for later delinquency. *Pediatrics* 99:785–790.

Costello, E.J., Farmer, E.M., Angold, A., Burns, B., and Erkanli, A. 1997. Psychiatric disorders among American Indian and white youth in Appalachia: The Great Smoky Mountains Study. *American Journal of Public Health* 87:827–832.

Cummings, E.M., and Davies, P.T. 1994. Maternal depression and child development. *Journal of Child Psychology and Psychiatry* 35:73–112.

Derzon, J.H., and Lipsey, M.W. 2000. The correspondence of family features with problem, aggressive, criminal, and violent behavior. Unpublished manuscript. Institute for Public Policy Studies, Vanderbilt University.

Developmental Research and Programs. 1996. *Promising Approaches To Prevent Adolescent Problem Behaviors.* Seattle, WA: Developmental Research and Programs.

Dishion, T.J., McCord, J., and Poulin, F. 1999. When interventions harm: Peer groups and problem behavior. *American Psychologist* 54:755–764.

Elliott, D.S., and Menard, S. 1996. Delinquent friends and delinquent behavior: Temporal and developmental patterns. In *Delinquency and Crime: Current Theories*, edited by J.D. Hawkins. New York, NY: Cambridge University Press, pp. 28–67.

Elliott, D.S., Wilson, W.J., Huizinga, D., Sampson, R.J., Elliott, A., and Rankin, B. 1996. The effects of neighborhood disadvantage on adolescent development. *Journal of Research on Crime and Delinquency* 33:389–426.

Eron, L.D., and Huesmann, L.R. 1987. Television as a source of maltreatment of children. *School Psychology Review* 16:195–202.

Farrington, D.P. 1986. Stepping stones to adult criminal careers. In *Development of Antisocial and Prosocial Behavior*, edited by D. Olweus, J. Block, and M. Radke-Yarrow. New York, NY: Academic Press, pp. 359–384.

Farrington, D.P. 1989. Early predictors of adolescent aggression and adult violence. *Violence and Victims* 4:79–100.

Farrington, D.P. 1991. Childhood aggression and adult violence: Early precursors and later-life outcomes. In *The Development and Treatment of Childhood Aggression*, edited by D.J. Pepler and K.H. Rubin. Hillsdale, NJ: Erlbaum, pp. 5–29.

Farrington, D.P. 1995. The development of offending and antisocial behavior from childhood: Key findings from the Cambridge Study in Delinquent Development. *Journal of Child Psychology and Psychiatry* 36:929–964.

Farrington, D.P. 1998. Predictors, causes and correlates of male youth violence. In *Youth Violence*, vol. 24, edited by M. Tonry and M.H. Moore. Chicago, IL: University of Chicago Press, pp. 421–447.

Farrington, D.P., Barnes, G.C., and Lambert, S. 1996. The concentration of offending in families. *Legal and Criminological Psychology* 1:47–63.

Farrington, D.P., and Hawkins, J.D. 1991. Predicting participation, early onset, and later persistence in officially recorded offending. *Criminal Behavior and Mental Health* 1:1–33.

Farrington, D.P., Loeber, R., and Van Kammen, W.B. 1990. Long-term universal outcomes of hyperactivity-impulsivity-attention deficit and conduct problems in childhood. In *Straight and Devious Pathways From Childhood to Adulthood*, edited by L.N. Robins and M. Rutter. Cambridge, England: Cambridge University Press, pp. 62–81.

Fergusson, D.M., and Horwood, L.J. 1995. Early disruptive behavior, IQ, and later school achievement and delinquent behavior. *Journal of Abnormal Child Psychology* 23:183–199.

Gardner, F.E.M. 1987. Positive interaction between mothers and conduct-problem children: Is there training for harmony as well as fighting? *Journal of Abnormal Child Psychology* 15:283–293.

Goldman, D., Lappalainen, J., and Ozaki, N. 1996. Direct analysis of candidate genes in impulsive behaviors. In *Genetics of Criminal and Antisocial Behavior*, edited by G.R. Bock and J.A. Goode. Toronto, Canada: John Wiley and Sons, pp. 139–152.

Gottfredson, D.C. 2001. *Schools and Delinquency*. New York, NY: Cambridge University Press.

Greenberg, M.T. 1997. Improving peer relations and reducing aggressive behavior: The classroom level effects of the PATHS curriculum. Paper presented at the Society for Research in Child Development, Washington, DC, April.

Guttentag, M., Salasin, S., and Belle, D. 1980. *The Mental Health of Women*. New York, NY: Academic Press.

Haapasalo, J., and Tremblay, R.E. 1994. Physically aggressive boys from ages 6 to 12: Family background, parenting behavior, and prediction of delinquency. *Journal of Consulting and Clinical Psychology* 62:1044–1052.

Hawkins, J.D., Catalano, R.F., Kosterman, R., Abbott, R., and Hill, K.G. 1999. Preventing adolescent health-risk behaviors by strengthening protection during childhood. *Archives of Pediatrics and Adolescent Medicine* 153:226–234.

Hawkins, J.D., Catalano, R.F., Morrison, D.M., O'Donnell, J., Abbott, R.D., and Day, L.E. 1992. The Seattle Social Development Project: Effects of the first four years on protective factors and problem behaviors. In *Preventing Adolescent Antisocial Behavior: Interventions From Birth Through Adolescence*, edited by J. McCord and R.E. Tremblay. New York: Guilford Press, pp. 139–161.

Hawkins, J.D., Herrenkohl, T., Farrington, D.P., Brewer, D., Catalano, R.F., and Harachi, T.W. 1998. A review of predictors of youth violence. In *Serious and Violent Juvenile Offenders: Risk Factors and Successful Interventions*, edited by R. Loeber and D.P. Farrington. Thousand Oaks, CA: Sage Publications, Inc., pp. 106–146.

Hawkins, J.D., Von Cleve, E., and Catalano, R.F. 1991. Reducing early childhood aggression: Results of a primary prevention program. *Journal of the American Academy of Child and Adolescent Psychiatry* 30:208–217.

Hawkins, J.D., and Weis, J.G. 1985. The social development model: An integrated approach to delinquency prevention. *Journal of Primary Prevention* 6:73–97.

Hetherington, E.M. 1989. Coping with family transitions: Winners, losers and survivors. *Child Development* 60:1–14.

Hirschi, T. 1969. *Causes of Delinquency*. Berkeley, CA: University of California Press.

Howell, J.C. 1998. *Youth Gangs: An Overview*. Bulletin. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Huesmann, L.R., and Miller, L.S. 1994. Long-term effects of repeated exposure to media violence in childhood. In *Aggressive Behavior: Current Perspectives*, edited by L.R. Huesmann. Plenum Series in Social/Clinical Psychology. New York, NY: Plenum Press, pp. 153–186.

Hughes, H.M., Parkinson, D., and Vargo, M. 1989. Witnessing spouse abuse and experiencing physical abuse: A "double whammy"? *Journal of Family Violence* 4:197–209.

Jaffe, P., Wolfe, D., and Wilson, S.K. 1990. *Children of Battered Women*. Newbury Park, CA: Sage Publications, Inc.

Keenan, K., Loeber, R., Zhang, Q., Stouthamer-Loeber, M., and Van Kammen, W.B. 1995. The influence of deviant peers on the development of boys' disruptive and delinquent behavior: A temporal analysis. *Development and Psychopathology* 7:715–726.

Kellam, S.G., and Rebok, G.W. 1992. Building developmental and etiological theory through epidemiologically based preventive intervention trials. In *Preventing Antisocial Behavior: Interventions From Birth Through Adolescence*, edited by J. McCord and R.E. Tremblay. New York, NY: Guilford Press, pp. 162–195.

Kellam, S.G., Rebok, G.W., Ialongo, N., and Mayer, L.S. 1994. The course and malleability of aggressive behavior from early first grade into middle school: Results of a developmental epidemiologically-based preventive trial. *Journal of Child Psychology and Psychiatry and Allied Disciplines* 35:259–281.

Lahey, B.B., McBurnett, K., and Loeber, R. 2000. Are attention-deficit/hyperactivity disorder and oppositional defiant disorder developmental precursors to conduct disorder? In *Handbook of Developmental Psychopathology*, 2d ed., edited by A. Sameroff, M. Lewis, and S.M. Miller. New York, NY: Plenum Press, pp. 431–446.

Lahey, B.B., Piacentini, J.C., McBurnett, K., Stone, P., Hartdagen, S., and Hynd, G. 1988. Psychopathology in the parents of children with conduct disorder and hyperactivity. *Journal of the American Academy of Child and Adolescent Psychiatry* 27:163–170.

Le Blanc, M., Coté, G., and Loeber, R. 1991. Temporal paths in delinquency: Stability, regression and progression analyzed with panel data from an adolescent and delinquent sample. *Canadian Journal of Criminology* 33:23–44.

Le Blanc, M., McDuff, P., Charlebois, P., Gagnon, C., Larrivee, S., and Tremblay, R.E. 1991. Social and psychological consequences, at 10 years old, of an earlier onset of self-reported delinquency. *Psychiatry* 54:133–147.

Lewis, D.O., Mallouh, C., and Webb, J. 1989. Child abuse, delinquency, and violent criminality. In *Child Maltreatment: Theory and Research on the Causes and Consequences of Child Abuse and Neglect*, edited by D. Cicchetti and V. Carlson. New York, NY: Cambridge University Press.

Loeber, R., and Farrington, D.P., eds. 2001. *Child Delinquents: Development, Intervention, and Service Needs*. Thousand Oaks, CA: Sage Publications, Inc.

Loeber, R., Farrington, D.P., Stouthamer-Loeber, M., and Van Kammen, W.B. 1998. *Antisocial Behavior and Mental Health Problems: Explanatory Factors in Childhood and Adolescence*. Mahwah, NJ: Lawrence Erlbaum.

Loeber, R., Green, S.M., Keenan, K., and Lahey, B.B. 1995. Which boys will fare worse? Early predictors of the onset of conduct disorder in a six-year longitudinal study. *Journal of the American Academy of Child and Adolescent Psychiatry* 34:499–509.

Lynam, D.R. 1997. Pursuing the psychopath: Capturing the fledgling psychopath in a nomological net. *Journal of Abnormal Psychology* 106:425–438.

Maguin, E., and Loeber, R. 1996. Academic performance and delinquency. In *Crime and Justice: A Review of Research*, vol. 20, edited by M. Tonry. Chicago, IL: University of Chicago Press, pp. 145–264.

McCord, J. 1997. Some unanticipated consequences of summer camps. Paper presented at the biennial meetings of the Society for Research in Child Development, Washington, DC, April.

McCormick, M., Workman-Daniels, K., and Brooks-Gunn, J. 1996. The behavioral and emotional well-being of school-age children with different birth weights. *Pediatrics* 97:18–25.

McKibben, L., De Vos, E., and Newberger, E. 1989. Victimization of mothers of abused children: A controlled study. *Pediatrics* 84:531–535.

McLanahan, S., and Booth, K. 1989. Mother-only families: Problems, prospects, and politics. *Journal of Marriage and the Family* 51:557–580.

Moffitt, T.E. 1993. The neuropsychology of conduct disorder. *Development and Psychopathology* 5:135–151.

Murphy, H.A., Hutchinson, J.M., and Bailey, J.S. 1983. Behavioral school psychology goes outdoors: The effect of organized games on playground aggression. *Journal of Applied Behavioral Analysis* 16:29–35.

National Crime Prevention Council. 1994. *Taking the Offensive To Prevent Crime: How Seven Cities Did It*. Washington, DC: National Crime Prevention Council.

O'Donnell, J., Hawkins, J.D., Catalano, R.F., Abbott, R.D., and Day, L.E. 1995. Preventing school failure, drug use, and delinquency among low-income children: Long-term intervention in elementary schools. *American Journal of Orthopsychiatry* 65:87–100.

Olds, D.L., Eckenrode, J., Henderson, C.R., Jr., Kitzman, H., Powers, J., Cole, R., Sidora, K., Morris, P., Pettitt, L.M., and Luckey, D. 1997. Long-term effects of home visitation on maternal life course and child abuse and neglect:

Fifteen-year follow-up of a randomized trial. *Journal of the American Medical Association* 278:637–643.

Olds, D.L., Henderson, C.R., Chamberlin, R., and Tatelbaum, R. 1986. Preventing child abuse and neglect: A randomized trial of nurse home visitation. *Pediatrics* 78:65–78.

Olds, D., Henderson, C.R., Cole, R., Eckenrode, J., Kitzman, H., Luckey, D., Pettitt, L., Sidora, K., Morris, P., and Powers, J. 1998. Long-term effects of nurse home visitation on children's criminal and antisocial behavior: Fifteen-year follow-up of a randomized controlled trial. *Journal of the American Medical Association* 280:1238–1244.

Ostroff, C. 1992. The relationship between satisfaction, attitudes, and performance: An organizational level analysis. *Journal of Applied Psychology* 77:963–974.

Patterson, G.R., Crosby, L., and Vuchinich, S. 1992. Predicting risk for early police arrest. *Journal of Quantitative Criminology* 8:335–355.

Patterson, G.R., Forgatch, M.S., Yoerger, K.L., and Stoolmiller, M. 1998. Variables that initiate and maintain an early-onset trajectory for juvenile offending. *Development and Psychopathology* 10:531–547.

Patterson, G.R., and Stouthamer-Loeber, M. 1984. The correlation of family management practices and delinquency. *Child Development* 55:1299–1307.

Pearson, J.L., Ialongo, H.S., Hunter, A.G., and Kellum, S.G. 1994. Family structure and aggressive behavior in a population of urban elementary school children. *Journal of the American Academy of Child and Adolescent Psychiatry* 33:540–548.

Raine, A. 1993. *The Psychopathology of Crime: Criminal Behavior as a Clinical Disorder*. New York, NY: Guilford Press.

Reid, W.J., and Crisafulli, A. 1990. Marital discord and child behavior problems: A meta-analysis. *Journal of Abnormal Child Psychology* 18:105–117.

Robins, L.N. 1966. *Deviant Children Grown Up.* Baltimore, MD: Williams and Wilkins.

Rowe, D.C. 2002. *Biology and Crime.* Los Angeles, CA: Roxbury.

Rowe, D.C., and Gulley, B. 1992. Sibling effects on substance abuse and delinquency. *Criminology* 30:217–233.

Rutter, M., Giller, H., and Hagell, A. 1998. *Antisocial Behavior by Young People.* New York, NY: Cambridge University Press.

Sampson, R.J. 1987. Urban black violence: The effect of male joblessness and family disruption. *American Journal of Sociology* 93:348–382.

Sampson, R.J., and Lauritsen, J.L. 1994. Violent victimization and offending: Individual-, situational-, and community-level risk factors. In *Understanding and Preventing Violence: Social Influence,* vol. 3, edited by A.J. Reiss and J.A. Roth. Washington, DC: National Academy Press, pp. 1–115.

Sampson, R.J., Raudenbush, S.W., and Earls, F. 1997. Neighborhoods and violent crime: A multilevel study of collective efficacy. *Science* 277:919–924.

Shaw, C.T., and McKay, H.D. 1931. *Report on the Causes of Crime,* vol. 2. Washington, DC: U.S. Government Printing Office.

Simons, R.L., Wu, C.I., Conger, R.D., and Lorenz, F.O. 1994. Two routes to delinquency: Differences between early and late starters in the impact of parenting and deviant peers. *Criminology* 32:247–276.

Sutherland, E., and Cressey, D. 1970. *Criminology.* New York, NY: Lippincott.

Tiet, Q.Q., Bird, H.R., Davies, M., Hoven, C.W., Cohen, P., Jensen, P.S., and Goodman, S. 1998. Adverse life events and resilience. *Journal of the American Academy of Child and Adolescent Psychiatry* 37:1191–1200.

Tremblay, R.E., Pihl, R.O., Vitaro, F., and Dobkin, P.L. 1994. Predicting early onset of male antisocial behavior from preschool behavior. *Archives of General Psychiatry* 51:732–739.

Tremblay, R.E., Schaal, B., Boulerice, B., Arseneault, L., Soussignan, R.G., Paquette, D., and Laurent, D. 1998. Testosterone, physical aggression, dominance, and physical development in early adolescence. *International Journal of Behavioral Development* 22:753–777.

Vaden-Kiernan, N., Ialongo, N.S., Pearson, J.L., and Kellam, S.G. 1995. Household family structure and children's aggressive behavior: A longitudinal study of urban elementary school children. *Journal of Abnormal Child Psychology* 23:553–568.

Wasserman, G.A., and Miller, L.S. 1998. The prevention of serious and violent juvenile offending. In *Serious and Violent Juvenile Offenders: Risk Factors and Successful Interventions,* edited by R. Loeber and D.P. Farrington. Thousand Oaks, CA: Sage Publications, Inc., pp. 197–247.

Wasserman, G.A., Miller, L., Pinner, E., and Jaramillo, B.S. 1996. Parenting predictors of early conduct problems in urban, high-risk boys. *Journal of the American Academy of Child and Adolescent Psychiatry* 35:1227–1236.

West, D.J., and Farrington, D.P. 1973. *Who Becomes Delinquent?* London, England: Heinemann.

West, D.J., and Farrington, D.P. 1977. *The Delinquent Way of Life.* London, England: Heinemann.

White, J.L., Moffitt, T.E., Earls, F., Robins, L., and Silva, P.A. 1990. How early can we tell? Predictors of childhood conduct disorder and delinquency. *Criminology* 28:507–533.

Widom, C.S. 1989. The cycle of violence. *Science* 244:160–166.

Williams, S., Andersen, J., McGee, R., and Silva, P.A. 1990. Risk factors for behavioral and emotional disorder in preadolescent children. *Journal of the American Academy of Child and Adolescent Psychiatry* 29:413–419.

Zuckerman, B., Augustyn, M., Groves, B.M., and Parker, S. 1995. Silent victims revisited: The special case of domestic violence. *Pediatrics* 96:511–513.

This Bulletin was prepared under grant number 95–JD–FX–0018 from the Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice.

Points of view or opinions expressed in this document are those of the authors and do not necessarily represent the official position or policies of OJJDP or the U.S. Department of Justice.

The Office of Juvenile Justice and Delinquency Prevention is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, the Bureau of Justice Statistics, the National Institute of Justice, and the Office for Victims of Crime.

**Acknowledgments**

Gail A. Wasserman, Ph.D., is Professor of Clinical Psychology in Child Psychiatry, Columbia University. Kate Keenan, Ph.D., is Assistant Professor, Department of Psychiatry, University of Chicago. Richard E. Tremblay, Ph.D., is Professor, Department of Psychology, University of Montreal. John D. Coie, Ph.D., is Professor, Department of Psychology, Duke University. Todd I. Herrenkohl, Ph.D., is Assistant Professor, Social Welfare Department at the University of Washington. Rolf Loeber, Ph.D., is Professor of Psychiatry, Psychology, and Epidemiology, University of Pittsburgh, PA; Professor of Developmental Psychopathology, Free University, Amsterdam, Netherlands; and Director of the Pittsburgh Youth Study. David Petechuk is a freelance health sciences writer.

Photo on page 4 © 2002 Corbis Images; photos on pages 7 and 9 © 1999–2002 Getty Images, Inc.



# Find OJJDP Products Online

**W**ant to know more about the issues in this Bulletin or related information? Log on to ojjdp.ncjrs.org:

➤ Browse titles alphabetically or by topic.

➤ Discover the latest OJJDP releases.

➤ Subscribe to OJJDP's listserv JUVJUST and the electronic newsletter JUSTINFO.

➤ Link to the NCJRS Abstracts Database to search for publications of interest.

**Share With Your Colleagues**

Unless otherwise noted, OJJDP publications are not copyright protected. We encourage you to reproduce this document, share it with your colleagues, and reprint it in your newsletter or journal. However, if you reprint, please cite OJJDP and the authors of this Bulletin. We are also interested in your feedback, such as how you received a copy, how you intend to use the information, and how OJJDP materials meet your individual or agency needs. Please direct your comments and questions to:

Juvenile Justice Clearinghouse
Publication Reprint/Feedback
P.O. Box 6000
Rockville, MD 20849–6000
800–638–8736
301–519–5600 (fax)
E-mail: tellncjrs@ncjrs.org

NCJ 193409



**IN THE CIRCUIT COURT OF CHEROKEE COUNTY, ALABAMA**

KEITH GAVIN,              )
                          )
          Petitioner,       )
                          )   CC-98-61.60
      v.                    )   CC-98-62.60
                          )
STATE OF ALABAMA,     )
                          )
         Respondent.    )
                          )

## <u>AFFIDAVIT OF KEITH GAVIN</u>

KEITH GAVIN, being first duly sworn, hereby deposes and says:

1. My name is Edmund Keith Gavin. I was born on March 30, 1960 and am currently 47 years old. I make this affidavit on the basis of my personal knowledge, information and belief.

2. I am currently incarcerated at Holman Correctional Facility in Atmore, Alabama. I make this affidavit in support of my petition for post-conviction relief from my conviction for the murder of William Clinton Clayton and the attempted murder of Danny Smith and from my death sentence.

3. When I was twenty years old, I was arrested on murder charges. I was sentenced at age twenty-one and I served seventeen years. While I was in prison, Dwayne Meeks, my cousin, was working at a different prison as a correctional officer. On information and belief, he was bringing drugs into the prison so that the prison gangs could sell the drugs to other prisoners.

4. I was paroled and released from prison on December 26, 1997. I hoped to find a job and create a better life, but I did not receive any assistance from the Department of Corrections or State of Illinois. When I was released, they had no programs to help me find a job. I was given only clothes to wear out of the prison and $50.

5. When I was released from prison I returned to Chicago to live with my mother. At that time, my sister Sharon, who is mentally disabled, was living with my mother. My sister Geanetta, her husband, and three children also were living with my mother. I had to share a room and bed with my nephew, Lil' Keith, who was then 2 1/2 years old.

6. When I was released from prison, I was very upset to discover that several of my siblings had become addicted to cocaine and other drugs. I believe my sister Elaine and my brother Sterling were both doing cocaine. Sterling looked very bad.

7. I was also very upset by the condition of my mother's home. It needed substantial repairs and was very messy and dirty. I wanted to do whatever I could to help my mother, both emotionally and financially. However, it was very difficult for me to find work given my prison record and the fact that the State of Illinois did not provide any employment counseling or other resources. It was also difficult for me to find work because I had spent my entire adult life in prison and it was difficult for me to adjust to life on the outside.

8. After my release, a friend of mine, Troy Roberts, said that he would help me get a job at a welding company around 14th and Laramie in Chicago. On the day that we were supposed to meet outside of the welding company so Troy could introduce me to the foreman, Troy did not show up, so I filled out an application.

9. On or around December 27, 1997, Dwayne Meeks came to my mother's house, where I was staying. I had not seen Dwayne for twenty years. Dwayne had only contacted me one time while I was in prison. About two years before I was released, he wrote me a letter saying that he and his wife were trying to get custody of my nephew Lil' Keith. I later learned that this was not true.

10. On that first visit after my release, Dwayne told me that he was a corrections officer at a state prison, and bragged about how well he was doing.

11. Dwayne told me that he had been "dipping and diving here and again in the game." He said that he was selling cocaine to police officers and lawyers in Alabama and Illinois. He said that he had friends in the police departments in Fort Payne, Alabama and in Joliet, Illinois, who helped him out.

12. Dwayne offered to set me up selling drugs, but I said that I was not going to have anything to do with drugs or anybody that messed with drugs. Then he asked me if I wanted some money, and I said yes. We were sitting in my mother's driveway and he pulled out a thick wad of cash. He was showboating. Dwayne gave me some of the cash, about $50.

13. Dwayne asked me if I wanted to visit anyone and offered to take me around. Dwayne and I and my brother Sterling went to 14th and Troop to visit Ann Morris, my old girlfriend's mother. We left there and then we went to Joliet to visit some relatives, including Nate Matthews and his wife.

14. Dwayne took me and Sterling to see his house. He said he wanted to show me how he was living. We went to his house and stayed about 30 minutes and he introduced me to his wife, Sharon.

15. Over the following days, Dwayne took me to see more relatives and took me back to the neighborhood where I grew up again to see my old girlfriend's mother again and her sons. They were like family to me.

2

16. Dwayne offered to take me to a New Year's Eve party and said that I could bring Sterling.

17. When Dwayne came to pick me up on New Year's Eve, he told me that Sterling used to go down to Alabama with him to deal drugs but that Sterling did not like it. Then he asked me again if I was interested in dealing drugs or if I could find someone to "set up shop" down in Fort Payne. I told him that I did not know anybody. Dwayne told me that he had friends down in Fort Payne who would protect me if I went down there. He said that they were policemen. I told Dwayne that I was not going to sell drugs because my brother Sterling and my sister Elaine were messed up on drugs.

18. Before we went to the party, we picked up Sterling, our cousin Kiki Johnson, and Dwayne's sister, Anita Meeks.

19. Dwayne bought me ten bottles of champagne, each of which cost around $13. He also bought other drinks for the other people we were with.

20. We went to the party, which was held at Tom Arambasich's house. Tom was a police officer in Joliet, Illinois.

21. On January 2, Dwayne came to my mother's house to see me. He said that he and Sterling had a falling out the last time that they were down in Alabama. He said that Sterling thought Dwayne still owed him money. Dwayne said that he knew that Sterling respected me and would do whatever I asked him to do. Dwayne said, "Why don't you holler at him and see could he get himself a spot somewhere out here on the west side. I got a lot of heroin man I'm trying to get off and I got people waitin' on this money." I told Dwayne that I would not encourage Sterling to do it. Dwayne said, "Come on cuz I need you on this one man. I got people I owe." I said that I would ask Sterling but that I would not encourage him.

22. I told Sterling that Dwayne had come by and asked me to ask Sterling to set up a heroin spot for Dwayne. I guess Sterling was desperate because he agreed to do it. I told Sterling that I would contact Dwayne and let him know that Sterling would do it for him, but I said I don't think you ought to mess with it. Before I had a chance to contact Dwayne, he came by the next day (January 3) in a work release correctional van. I said that I had talked to Sterling and that Sterling had agreed to do it. Dwayne had four girls in the van and asked if I wanted one of them. He said the girls were still strung out on drugs. I said no, I did not want one of them nasty girls.

23. A few weeks later, Dwayne told me that Sterling was not moving the heroin fast enough. He told me that he had Sterling give the heroin back to him. Dwayne told me that he was under a lot of financial pressure because of the mortgage on his house.

24. Dwayne asked if I would go to Alabama with him over the Martin Luther King, Jr. holiday weekend. I was not allowed to leave the state due to the conditions of my parole,

but Dwayne assured me that because his wife worked for the Illinois Department of Corrections ("IDOC"), there would be no problem with me traveling out-of-state.

25. Dwayne offered me $300, plus expenses, for helping him drive to Alabama. I agreed because all I had to do was drive. I wanted the money for repairs to my mother's house.

26. Dwayne and I made the trip along with Dwayne's niece, Nita, who was about seventeen years old at the time. Dwayne said that he wanted someone to travel with us so that if we got pulled over it would look like we were on a family trip.

27. We left Illinois on Friday night and arrived in Fort Payne, Alabama, the following day around noon. It is about an 11 hour drive from Chicago to Fort Payne. When we got to Forty Payne, we took Nita to her grandmother's house. (Nita's grandmother is also Dwayne's daughter's grandmother. Nita is the daughter of Dwayne's sister and Dwayne's first wife's brother.)

28. We then went to the home of a man who Dwayne introduced as his brother-in-law. Afterwards, we went to Dwayne's mother-in-law's house to use the phone. When we left there, we went to a hotel in Fort Payne and got a room.

29. That evening, we took Dwayne's daughter, his niece, and one of their cousins out to dinner. After dinner, we brought the kids back to Dwayne's mother-in-law's house.

30. That night, we went to a house-party out in the country with Dwayne's brother-in-law. We were there until about 11:00 and then we went to a nightclub, where Dwayne and his brother-in-law met up with two white women. Dwayne left with one of the women. The brother-in-law was too drunk to drive, so I drove his car and he and the other white woman rode in the back seat. They had sex in the backseat while I was driving.

31. I did not meet or have sex with any women that night or any other night that I was in Alabama. I did not develop a relationship with any woman in Alabama at this or any other time.

32. In the morning, we went to Dwayne's in-laws' house to see them and Dwayne's daughter. After lunch, around 4:00 p.m., we left Dwayne's mother-in-law's house and drove to a town about forty-five minutes away. I had never been to Alabama before and I am not familiar with that area. Dwayne grew up in Alabama and is very familiar with the area.

33. Dwayne drove to a gas station. At the gas station, we waited in the parking lot, a good distance from the pumps, for about thirty minutes. Eventually, two black men drove up, and Dwayne got out and spoke to them. Dwayne pulled a gray and black gym bag out of the back of his car. I saw one of the men dip his finger into a plastic bag full of white powder and taste it. The men took the package and walked away.

4

34. When Dwayne returned, he gave me a black sack of money and told me to count the 10- and 20-dollar bills. My count came to about $4000. While I was counting, Dwayne was counting the 5- and 50-dollar bills. Dwayne give me $300 and we returned to Fort Payne.

35. We then drove back to Illinois and arrived there at 4:00 a.m. on Monday morning. Dwayne dropped me off at my mom's house.

36. During that first trip to Alabama, Dwayne boasted to me about his police friends and his connections in Fort Payne. He would go on about how they got his back and things of that nature.

37. During that first trip to Alabama, Dwayne also introduced me to Danny Smith, a police officer. Danny he pulled up next to us while we were sitting outside Dwayne's mother-in-law's house. Dwayne got out and went to sit in Danny's car for a few minutes.

38. After we returned from Alabama in January, I saw Dwayne off and on. Dwayne often took me out to eat. I had never before had anyone spend money on me like that.

39. Around this time Dwayne tried to solicit me to try to set up a heroin spot. He said that he knew that I just got out of the joint and that I did not want to mess with drugs and selling. He said that maybe I could holler at somebody and get them to set up a spot for the heroin he had. He said that he had just picked the heroin up from down south. I saw what appeared to be heroin in Dwayne's car in his garage. It was in a plastic bag.

40. On March 5, 1998, Dwayne called my mom's house and asked if I would drive to Alabama with him again. He said that he was going to Alabama to pick up a package and pick up some money from someone who owed him. He again offered me $300 and all expenses paid to help with the driving. That was a lot of money to me because I did not have any other source of income and was having trouble finding a job.

41. Dwayne said that the only person he could get to go with us on this trip was his wife, but he did not want to bring her. He asked me if I could find someone else to go with us, but I said no.

42. While I was packing a bag to get ready for the trip, my brother Sterling came to talk to me about Dwayne. Sterling told me to stop going down to Alabama with Dwayne. He said, "Dwayne is not what you think he is." Sterling said that he used to make trips to Alabama with Dwayne. I told Sterling that I was just going to help Dwayne drive, so everything would be alright.

43. Dwayne came to pick me up around 10:30 p.m. or 11:00 p.m. the night of March 5. When he arrived at my mother's house and asked if I was ready to go, I said that I was worried about leaving town again because I did not have approval from my parole officer. Dwayne said words to the effect that because he was a work release officer, and because his wife worked for a branch of the Illinois Department of Corrections, it was okay.

44. Dwayne's wife Sharon and their three year old son were in the car. We drove until 4:00 a.m. or 5:00 a.m., when we stopped at a hotel in Indiana, near the Kentucky border. Dwayne got a hotel room for his family and a separate hotel room for me. When I got in my hotel room, I immediately went to sleep. Just a few hours later, Dwayne knocked on my door and told me to get up because we were leaving again. We had breakfast at McDonald's and then drove to Chattanooga. We stopped for lunch along the way. When we arrived in Chattanooga, we stopped at a hotel. Dwayne again got a room for his family and a separate room for me. Dwayne's wife and son stayed at the hotel in Chattanooga, and Dwayne and I drove to Fort Payne.

45. On the way to Alabama, we were pulled over in Indiana by a state trooper. Dwayne flaunted his status as an employee of the IDOC to avoid a ticket.

46. We arrived in Fort Payne around 4:00 p.m. Dwayne drove the whole way. While he was driving, I asked him why he brought his wife on the trip if he had drugs in the car and was going to deal drugs. He said words to the effect, "It is like I told you before, you have to make it look like it's a family trip or a family outing. You couldn't get nobody to come, so I had to get somebody to camouflage our trip."

47. Once we got to Fort Payne, we went to a parking lot near a strip mall along the main street. The parking lot was across the street from a bank. Dwayne drove around to the other side of the parking lot near a pool hall or bowling alley and we sat there for about twenty minutes.

48. Dwayne got out and made a couple of calls from a pay phone. He returned and told me to get into the driver's seat and start the car. Dwayne got into the passenger's side.

49. We sat for another fifteen to twenty minutes and then saw a white van across the street. Dwayne told me to follow the van. We turned left off of the main street in Fort Payne, and then followed the man to Centre. The drive took thirty or forty-five minutes. By the time we arrived in Centre, it was dark, and Dwayne's car had only one headlight.

50. We reached an intersection and the driver of the van pulled over to the right and came to a complete stop. Dwayne indicated I should pull up beside the white van. Dwayne then pulled a black ski mask over his head and reached into the glove compartment. He pulled out a gun and jumped out of the car. He then opened the driver's side door of the van and said something to the driver. I could see that the driver responded to Dwayne, but I could not hear what they were saying. I had no idea what was going on. I heard a gunshot and saw Dwayne fire twice at the driver. The driver slumped over, and I saw Dwayne pushing the driver over to the passenger side of the van.

51. I was shocked and confused. The car in front of the van sped off and turned left. Dwayne's door was still open, but I panicked and drove off, turning right in front of the van. As I turned, the driver's side door of the van hit the passenger door of the car, and

6