FILED
2020 Aug-21  PM 12:51
U.S. DISTRICT COURT
N.D. OF ALABAMA


# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

KEITH EDMUND GAVIN, )
)
    Petitioner, )
)
v. )   Case No.  4:16-cv-00273-KOB
)
JEFFERSON S. DUNN, )
Commissioner of the Alabama )
Department of Corrections, )
)
    Respondent. )

# VOLUME 35

# State Court – Collateral Appeal Transcript

LUTHER STRANGE
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

VOL. 17 of 22

COURT OF CRIMINAL APPEALS NO. _____ CR-10-1313

## APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _____ CHEROKEE _____ COUNTY, ALABAMA

CIRCUIT COURT NO   CC-98-61.60 & CC-98-62.60

CIRCUIT JUDGE _____ David A. Rains _____

Type of Conviction/ Order Appealed From: _____ Rule 32 _____

Sentence Imposed: _____

Defendant Indigent:  ☑ YES  ☐ NO

## KEITH EDMUND GAVIN

**NAME OF APPELLANT**

Stephen C. Jackson          205-254-1037
(Appellant's Attorney)                    (Telephone No.)
1901 Sixth Avenue North, Suite 2400
(Address)
Birmingham     Alabama    35203
(City)                 (State)          (Zip Code)

**V.**

## STATE OF ALABAMA

**NAME OF APPELLEE**

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter

name and address of municipal attorney below.

**df**

_____

_____

(For Court of Criminal Appeals Use Only)

CR-06-0898

case and Mr. Daniel did not describe any efforts she made to do so. (Id.) Accordingly, the Court finds that Ms. Smith did not make any effort to locate or speak to any witnesses to prepare Mr. Smith's case either.

"c) Efforts by Walter Spain

"25. The only investigator Mr. Daniel retained to work on Mr. Smith's case was Walter Spain. (Hrg. Tr. 459:9-11). Mr. Smith called Mr. Spain and the Court heard his testimony at the November 2006 hearing.

"26. Mr. Spain had no meaningful investigative experience. He had never before investigated a criminal case, let alone a murder case. (Hrg. Tr. 34:20-22). His only prior law enforcement experience was as a patrolman in Homewood, Alabama for three months in 1962 -- over thirty years before his involvement in Mr. Smith's defense. (Id. at 35:4-14). He received no formal training for that position and never performed any investigative work. (Id. at 35:20-36:3). He described his duties simply as 'patrol traffic, direct traffic, make tickets.' (Id., at 35:17).

"27. While working as an office assistant for Mr. Daniel, Mr. Spain founded the Eagle Eye Detective Agency. (Hrg. Tr. 38:3-8). Mr. Spain was Eagle Eye's only employee (id. at 38:9-11), and its principal business was as a process server in divorce actions for Mr. Daniel and other attorneys in Huntsville. (Id. at 38:6-8) Other than the work Mr. Spain did for Mr. Smith's case, he never performed any investigative work in any criminal matters. (Id. at 38:12-14).

"28. Mr. Spain did not begin his investigation into the facts and circumstances of Mr. Smith's case until August 1, 1995 -- the week before the start of Mr. Smith's trial and five months after Mr. Daniel

21

CR-06-0898

was retained as counsel. (Hrg. Tr. 42:9-11; Ex. 1).
Some days prior to August 1, Mr. Daniel gave Mr.
Spain a list of four to five persons to investigate,
although neither Mr. Daniel nor Mr. Spain remember
whose names were on that list. (Id., at 39:21-23;
42:17-18; 45:13-17; 46:18-23). According to Mr.
Spain, Mr. Daniel expressly advised him not 'to
spend a lot of time on it.' (Id. at 45:16-17).

"29. On August 1, 1995, Mr. Spain spent one hour
'on phone investigation to find out whether Ray
Thomas was still at Barnett's Auto Repair and info
on Overlook Motel & Apartments about owner, manager
& other information.' (Hrg. Tr. 41:24-42:4; Ex. 1).
On August 3, 1995, Mr. Spain 'spent 4 hours on trip
to Guntersville and Albertville to interview Ray
Thomas and owner of Overlook.' (Hrg. Tr. 43:4-9;
Ex. 1). The round trip driving distance was 112
miles and took approximately two of the four hours
Mr. Spain spent working on Mr. Smith's case on
August 3, 1995. (Hrg. Tr. 43:16-22). Accordingly,
between August 1 and 3, 1995, Mr. Spain spent only
approximately three hours total investigating for
Mr. Smith's defense.

"30. At no time did Mr. Spain ever speak to Mr.
Smith about the case. (Hrg. Tr. 39:11-16). His
work was limited to the approximately three hours he
spent on August 1 and August 3, 1995, because Mr.
Daniel told him 'that's all he needed.' (Id. at
47:5). Mr. Spain submitted only the single bill (Ex.
1) for his work on Mr. Smith's case (Id. at
40:13-18; 41:17-20), and he said that if something
was not reflected in that bill, then he did not do
it. (Id. at 44:2-10).

"31. The Court finds that the three hours plus
driving time Mr. Spain spent investigating the facts
and circumstances of this case represent the
totality of Mr. Daniel's pretrial investigation.

        "d) Court assistance

22

CR-06-0898

"32. Even though Mr. Smith was an indigent defendant who was having difficulty paying Mr. Daniel's bills, Mr. Daniel never sought money from the Court to pay for a professional investigator. He asserted (Hrg. Tr. 427:5-7) that the Court would not have granted such assistance because, he says, it capped the funds it was willing to make available for an investigator or other experts at $3,500, which Mr. Daniel spent on a jury expert.

"33. Mr. Daniel later testified that he did not recall if he ever asked the Court for additional funds, but he said 'If I did, it would be in the record.' (Hrg. Tr. 519:15-16). There is nothing in the record of this case that such a request was made. Thus, this Court finds that Mr. Daniel made no effort to obtain additional funds from the Court. The Court further finds that Mr. Daniel's assertion that additional funds would not have been made available is not supported by the evidence.

--------

"[5]The testimony Mr. Daniel refers to was given by Kevin Harville, not Ray Thomas. (Trial Tr. 1038:23-1039:3). His mistake, however, does not alter the point, which is that he is referring to his memories of trial testimony, and not interviews or other efforts from any pretrial investigation."

(C. 17-26; one footnote omitted.)

Further, the circuit court concluded that, had counsel spoken with some of the trial witnesses before the day of trial, he would have discovered additional facts than those elicited at trial; the circuit court also noted that two additional fact witnesses were available and indicated that

CR-06-0898

they would have testified at trial.   With regard to one witness who testified at trial, the circuit court found:

> "40. At trial, Mr. Smith presented evidence supporting an alibi defense.   He described his activities on Friday, September 23, 1994, the day Mr. Harris disappeared, which included cashing his paycheck, paying on his rings, paying on a drug test, seeing his probation officer, and helping his mother-in-law move. (Trial Tr. 1359:16-1368:2).   He says he did not see Mr. Harris that day and had not seen him since at least the week before.   (Id. at 1368:9-12).

> "41. Kevin Harville, testifying for the State at trial, said that he had seen Mr. Smith and Mr. Harris at Mr. Harris's residence at the Overlook Motel.   (Trial Tr. 1033:3-7).   But Mr. Harville did not remember on what date he had seen Mr. Smith with Mr. Harris; he knew only that it was on a Friday in September 1994.   (Id. at 1036:16-18; Hrg. Tr. 305:1-4).

> "42. Mr. Harville knew Mr. Harris because Mr. Harris and Mr. Harville's wife were involved in an automobile accident in which Mr. Harville's truck was totaled.   (Trial Tr. 1030:25-1031:3; Hrg. Tr. 300:9-13).   Following the accident, Mr. Harris and Mr. Harville entered into an agreement by which Mr. Harris agreed to pay Mr. Harville $50 every week until the value of the truck was repaid. (Trial Tr. 1031:10-16).

> "43. Mr. Harville knew that he had seen Mr. Smith with Mr. Harris on a Friday because he knew Mr. Harris received his paycheck on Fridays and so that was the day of the week Mr. Harville would always go to collect money for his truck. (Trial Tr. 1031:17-1032:1; Hrg. Tr. 301:3-10).

CR-06-0898

"44. Neither Mr. Daniel, Mr. Spain nor anyone working on Mr. Smith's behalf spoke to Mr. Harville prior to Mr. Smith's trial. (Hrg. Tr. 308:4-13). If they had tried to, Mr. Harville would have been willing to speak with them about the case (id. at 308:14-17) and he would have told them the following:

"45. First, Mr. Harville would have said that on two successive Fridays after the day Mr. Harville saw Mr. Smith and Mr. Harris together at the Overlook Motel, Mr. Harville went to collect payments from Mr. Harris. (Hrg. Tr. 306:3-5). On both occasions, Mr. Harris did not answer his door and thus Mr. Harville could not collect his payment. (Id.)

"46. Second, Mr. Harville would have said that a few days after his second failed attempt to collect payment from Mr. Harris, Mr. Harville learned that Mr. Harris was dead. (Hrg. Tr. 306:13-16). At about that same time, on October 5, 1994, Mr. Harville was questioned by police regarding Mr. Harris's death. (Id. at 301:24-302:1).

"47. Third, if shown a calendar, Mr. Harville could have confirmed that the two successive Fridays prior to October 5, 1994 were September 30, 1994 and September 23, 1994. (Hrg. Tr. 307: 11-25). The date that Mr. Harville saw Mr. Smith and Mr. Harris together was September 16, 1994, the Friday before his first failed attempt to collect payment from Mr. Harris. (Id. at 308:1-3). Mr. Harville did not see Mr. Smith or Mr. Harris on September 23, 1994.

"48. Although it was not his testimony, at Mr. Smith's trial the prosecutor incorrectly asserted to the jury that Mr. Harville had seen Mr. Smith and Mr. Harris together at the Overlook Motel on September 23, 1994, the date on which Mr. Harris disappeared. (Trial Tr. 1471:19-21). Mr. Daniel did not object to the prosecutor's incorrect

25

CR-06-0898

assertion or make any attempt to clarify Mr. Harville's testimony at trial. No other evidence at trial suggested that Mr. Smith was with Mr. Harris on September 23."

(C. 18-32.) The circuit court further found that counsel had not adequately investigated evidence pointing to a third party as the perpetrator:

"57. In his testimony, Mr. Daniel expressed his desire to investigate Carl Cooper. For example, asked whether he conducted 'an investigation into Carl Cooper's criminal background,' Mr. Daniel said 'I <u>believe we tried</u> to look into it.' (Hrg. Tr. 474:6-9) (emphasis added). He claimed that he '<u>wanted</u> [Walter Spain] to go out and find as much as he could about the relationship between Carl Cooper and Dennis Harris.' (Id. at 409:2-4) (emphasis added). And he asserted that he '<u>thinks we tried</u>' but he could not say whether he or his investigator had been able to get in touch with Mr. Cooper's ex-wife, Sarah Johnson. (Id. at 407:12-20) (emphasis added). As noted (FF 15), Ms. Johnson testified at the November 2006 hearing that she was never contacted by Mr. Daniel or anyone working for him.

"58. Whatever Mr. Daniel's hopes and despite his suspicions, the Court finds that he did not make a meaningful effort to investigate Carl Cooper's -- or any other third party's -- likely involvement in the Harris murder. No records from his files of any criminal background checks of Mr. Cooper were ever introduced. Mr. Spain's billing records reflect no effort to investigate Mr. Cooper (Ex. 1), and Mr. Spain himself had no memory of trying to do so. (Hrg. Tr. 39:17-19) Further, as detailed below, Sarah Johnson and other witnesses with knowledge of evidence implicating Mr. Cooper and another potential suspect, Brian Fox, were available to talk to Mr. Daniel in the summer of 1995 and would have

26

CR-06-0898

been willing to do so, but they were never contacted.

"59. Instead, it appears that Mr. Daniel intended to rely on Mr. Smith's 16 year old wife to testify and to implicate Carl Cooper. Mr. Daniel provided no details about what knowledge he thought Tanya Smith had implicating Mr. Cooper. He simply professed 'hope' that 'she would help me point the finger [at Mr. Cooper] because I still to this day don't think Larry Smith committed that murder.' (Hrg. Tr. 412:18-20). Mr. Daniel continued: '[Tanya Smith] was present when [Mr. Cooper] said certain things and I can't remember right now what exactly they were.... But they would have been of an incriminating nature and would not have been hearsay.... It concerned Dennis Harris and, you know, basically going over and holding him up, I believe is what it was about.' (Id. at 413:2-14). The jury never heard anything about this possible defense, however, because, according to Mr. Daniel, Tanya Smith refused to testify at the trial (id. at 414:18-19), and Mr. Daniel had not located any other witness who might testify to Mr. Cooper's involvement in the Harris murder."

(C. 34-35.)  The circuit court also set out its findings with regard to Cooper's ex-wife.  The circuit court found that Cooper's ex-wife was a potential witness that Daniel was aware of at the time of trial; that she had given a statement to police investigators as part of the initial investigation into the murder; and that she had testified at the evidentiary hearing in the Rule 32 proceeding that she would have been willing to speak with the defense had they approached her.

27

CR-06-0898

The circuit court further found that Cooper's ex-wife had indicated that she would have informed the defense that she and Cooper were having financial troubles at the time of the murder and that Cooper had proposed the idea of robbing Harris but that Smith had been "dismissive of the idea because 'he didn't have to do anything [to] Dennis to receive money from him, because he was [a] good friend and he would help [Mr. Smith] out at any time.' (Id. at 249:15-22). (The Court notes that this matches the description of the conversation Mr. Daniel says Tanya Smith had described to him." (C. 36-37.) The circuit court further found that Cooper's ex-wife had testified at the evidentiary hearing that Cooper had purchased a handgun in July 1994; that Cooper had been "unusually interested in the newspaper coverage of the discovery of Dennis Harris's body" (C. 37); that Cooper had called the sheriff's department and an investigator had come to their house to take a statement; and that, before the investigator arrived, Cooper had threatened to kill her parents and her if she "ever went against him." (C. 37.) The circuit court also found that Cooper's ex-wife had indicated that she and Cooper had sat together when giving their statements to the

CR-06-0898

investigator and that she had merely substituted Smith's name

for Cooper's when providing details to the investigator.

"69. Eighth, Ms. Johnson [Cooper's ex-wife] testified, credibly, in the Court's view, that had she testified at trial, she would have corrected her earlier statement to the police by offering the following truthful information: (A) She never heard Mr. Smith suggest robbing Dennis Harris (id. at 263:15-264:3; 266:4-267:11); the only person she heard make that suggestion was Carl Cooper (id. at 261:20-21; 266:8-9). (B) She never saw Mr. Smith with a gun (id. at 264:6-18); rather, the gun and holster she had described in her statement belonged to Mr. Cooper. (C) She never heard Mr. Smith say he stole a gun from Larry Moffett (id. at 265:22-266:1), rather, she was simply parroting what Mr. Cooper had said in his statement.

"70. Ninth, Ms. Johnson would have said that on Friday, September 23, 1994, the day that Dennis Harris disappeared, Carl Cooper was gone from their apartment for much of the afternoon and evening. (Hrg. Tr. at 271:4-9). When he arrived home, Mr. Cooper was wet and muddy; his pants were torn at the knee and his sweatshirt was torn at the shoulder. (Id, at 273:10-17; 274:18-275:7). Mr. Cooper's only explanation for his appearance was that he had been attacked by a pack of dogs. (Id. at 276:13-15). After returning home, he took off his torn and muddy clothes and put them in a bag, which he took out of their apartment. (Id. at 276:22-277:4).

"71. Although Ms. Johnson felt threatened by Carl Cooper and had been afraid for her and her family's lives when she gave what she says was an untruthful statement to police in October 1994, she testified that by the summer of 1995 she would have been willing to tell the truth to investigators and at trial. (Hrg. Tr. 279:10-20). That is because in February 1995, Ms. Johnson left Mr. Cooper after he

29

CR-06-0898

> had broken their one-month-old daughter's arm.  (Id.
> at 279:16-17).  Ms. Johnson promptly filed charges
> against Mr. Cooper for child abuse and domestic
> abuse (id. at 295:9-18) and secured her divorce by
> April 1995.  (Id. at 294:6-10).  She had no other
> contact with Mr. Cooper after that point.  (Id. at
> 278:12-13).  The Court finds Ms. Johnson's testimony
> concerning her availability and willingness to
> cooperate with the defense, had she been approached,
> to be credible."

(C. 38-39.)[5]

The circuit court also made extensive findings regarding

the lack of expert testimony, particularly relating to police

investigative procedures during the questioning of Cooper and

his ex-wife and the interrogations of Smith.  One such expert

testified at the evidentiary hearing on the Rule 32 petition;

the circuit court found that that expert had been available

and had been listed in the National Directory of Expert

Witnesses at the time of trial.

> "Given these facts and his former position with the
> Birmingham police department, the Court is confident

---

[5]The circuit court also discussed in its order its
findings with regard to another witness who testified at the
Rule 32 hearing that she would have informed the defense that
she had overheard Cooper and another man discussing framing
Smith for a crime.  The circuit court found this witness's
testimony to be equivocal, and it accepted that testimony only
for the proposition that, had Daniel been aware of the
information this witness testified to, he might have conducted
additional investigation.

CR-06-0898

that Mr. Gaut [the expert witness] was known in the state to EJI and to experienced lawyers and law enforcement officials, and that he could have been located.

"98. The Court finds that at the time of Mr. Smith's trial, Mr. Gaut was available to provide information and testimony that would have allowed Mr. Daniel to undermine to the jury the credibility of Mr. Smith's alleged confession. (Hrg. Tr. 113:1-12). His testimony would also have been valuable in showing that the original statement to the police by Carl Cooper's former wife, Sarah Johnson, was taken in a highly flawed manner that led to it being deceptive. Had Mr. Daniel interviewed Ms. Johnson and had her testify at trial, this testimony from Mr. Gaut would have been extremely important.

"99. Mr. Daniel was not an expert on police procedures (Hrg. Tr. 496:10-16), and he did not retain experts on police procedures to assist in the defense of Mr. Smith. (Id. at 496:17-20). Although Mr. Daniel claimed he was 'knowledgeable' about police procedures (id. at 524:6-10), the trial record fails to show that Mr. Daniel challenged the State's failure to preserve a recording or transcript of Mr. Smith's first post-arrest interrogation. Mr. Daniel also failed to make any effort or offer any argument that this breach in police procedure, which Mr. Gaut testified was highly unusual (id. at 211:6-13), severely undermined the credibility of Mr. Smith's alleged confession taken in the second post-arrest police interrogation."

(C. 49-50.) The circuit court further made extensive findings regarding the lack of any expert testimony being offered in the area of false confessions, noting that the EJI manuals

31

CR-06-0898

Daniels testified he had referenced in preparing the defense identified available resources in the field, and that Daniels "seemed unfamiliar with this topic and the existence of possible expert witnesses in this area."  (C. 50.)[6]

Similarly, with regard to the prejudice prong of Strickland, the circuit court made extensive findings as to how each of these acts or omissions by counsel adversely impacted the defense.

To the extent that the circuit court found that Daniel had failed to conduct "any" investigation, such a finding is not accurate.  Similarly, the circuit court found that Daniel made "no" effort to locate certain witnesses.  Daniel's testimony at the Rule 32 hearing indicates that he performed "some" investigation, and there is evidence suggesting that Daniel did attempt to locate some of the witnesses described.

_____

[6]Although the circuit court found that an expert who testified at the evidentiary hearing on the Rule 32 petition had testified in Alabama as early as 1999, and could have testified at Smith's trial, we make no determination as to the propriety of the circuit court's finding that this particular witness was available at the time of Smith's trial.  However, the general premise that defense counsel should have been aware of the need for such an expert in this case, and the resources available at the time, do support the circuit court's findings that counsel did not adequately prepare with regard to this issue.

CR-06-0898

However, we construe the circuit court's language as indicating that the circuit court found that Daniel had not conducted any <u>meaningful</u> or <u>adequate</u> investigation.[7]   The evidence as to the amount and adequacy of that investigation was conflicting.   On the one hand, Daniel testified that he

---

[7]The circuit court indicated that it found Daniel's testimony regarding his efforts at the sentencing phase of Smith's trial to be "unpersuasive" and that "Mr. Daniel's [testimony] shows that he failed to conduct any meaningful investigation into evidence that could have been presented at the sentencing phase, and that the modest case he presented resulted from lack of preparation and investigation rather than an informed strategic choice."  (C. 87.)  With regard to the pretrial investigation, the circuit court stated:

> "The Court concludes that the adversarial process broke down in this case. Mr. Daniel made no meaningful effort at any pretrial investigation. There is no credible evidence that he personally undertook to locate or speak with any fact or expert witnesses who might have been helpful to Mr. Smith's defense.  There is some evidence that he modestly delegated investigative tasks to one other person, Walter Spain, but Mr. Spain did not have either the ability, time, resources or experience necessary to conduct a meaningful pretrial investigation into a case of this magnitude.  The Court cannot conceive of a capital murder case that could be adequately investigated in three hours, excluding transit time, which is all the time Mr. Spain spent on this case. Certainly, there was much more to be discovered, as evidenced by Mr. Smith's presentation at the November 2006 hearing."

(C. 88-89.)

CR-06-0898

had performed 200-300 hours of personal investigation and that members of his staff had telephoned potential witnesses. On the other hand, in addition to eliciting testimony from Daniel that undermined the weight and credibility of Daniel's testimony, Smith's Rule 32 counsel presented a number of witnesses whose testimony suggested that the investigation was deficient and that Smith's defense was prejudiced as a result. As stated above, it was the duty of the circuit court to resolve those conflicts; the circuit court weighed the evidence and determined the credibility of the witnesses, and it is clear that it found that Smith had not received the effective assistance of counsel at trial. Although some of the language in the circuit court's order may not be technically accurate, the vast majority of its findings and its ultimate conclusion are supported by the record.

### B.

With regard to trial counsel's performance at the sentencing phase of Smith's trial, the State argues that counsel made the strategic decision to present two witnesses at the sentencing phase, rather than calling all the witnesses who had testified at the guilt phase, because their testimony

34

CR-06-0898

would be cumulative and would lose effectiveness with the
jury.  The State points to the following excerpt from Daniel's
testimony at the evidentiary hearing on the Rule 32 petition,
at which Daniel, after being asked why he did not present
additional details, stated:

> "[Daniel]: Okay. Anybody who has ever tried a
> number of jury trials where you basically have to go
> over there and you have to present an idea to a
> jury, there comes a point where you get -- you get
> the point across to those 12 people. They're not
> deaf.
>
> "[State]: Yes, sir.
>
> "[Daniel]: If you make your point, that's all
> you want to do.  If you get to the point to where
> you're constantly running 20 witnesses in and
> they're saying the same thing over and over again,
> you run the risk of basically over saturation and
> you run the great risk of alienating the jury
> against you.
>
> "[State]: Have you seen that happen before in
> other cases?
>
> "[Daniel]: Oh, yeah. I have seen several cases
> where lawyers on both sides didn't have any stopping
> sense.
>
> "[State]: Yes, sir.
>
> "[Daniel]:  And they wanted to bring in 20, 30
> witnesses and basically the jury, I have had juries
> tell me after cases that, you know, we got the
> point.
>
> "[State]: Yes, sir.

CR-06-0898

"[Daniel]: And it just irritated us because they kept beating the dead horse.  You got to know when you make your point when to stop because the quickest way to lose a case is to alienate the jury against your position.  And I had three witnesses who testified in that case to basically to what we needed to have testified.  There was no reason to overkill cause it was a judgment call."

(R.  430-31.)   Daniel's decision, the State avers, is permissible under Strickland, and, it asserts, the circuit court's reliance on the EJI guidelines as a basis for determining that Daniel's decision amounted to ineffective assistance of counsel was in error.

Although we agree that strategic decisions are within the purview of counsel and, as stated in part I of this opinion, that the Strickland standard is the proper standard to apply in determining whether trial counsel rendered ineffective assistance, the State's argument is not well taken.

"'Once counsel conducts a reasonable investigation of law and facts in a particular case, his strategic decisions are "virtually unchallengeable." [Strickland v. Washington, 466 U.S. 668] at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 [(1984)].  Tactical or reasonable professional judgments are not deficient but a failure to investigate a material matter due to inattention may be deficient. When the claim is that counsel failed to present a sufficient mitigating case during

CR-06-0898

> sentencing, the inquiry "is not whether counsel should have presented a mitigation case" but "whether the investigation supporting counsel's decision not to introduce mitigating evidence ... was itself reasonable." See <u>Wiggins</u> [v. <u>Smith</u>], 539 U.S. [510] at 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 [(2003)] (internal citations omitted).'"

<u>Davis v. State</u>, [Ms. CR-05-2050, Aug. 7, 2009] ___ So. 3d ___, ___ (Ala. Crim. App. 2009), quoting <u>Powell v. Kelly</u>, 562 F.3d 656, 670 (4th Cir. 2009). <u>See also Ex parte Land</u>, 775 So. 2d 847, 853-54 (Ala. 2000). "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." <u>Chandler v. United States</u>, 218 F.3d 1305, 1316 (11th Cir. 2000). <u>See also Provenzano v. Singletary</u>, 148 F.3d 1327, 1332 (11th Cir. 1998) ("Our strong reluctance to second guess strategic decisions is even greater when those decisions are made by experienced criminal defense counsel.").

However, it is clear that labeling a decision as "strategic" does not render that decision above reproach; rather, counsel must have performed an adequate enough investigation to make an informed and educated decision. "[A] strategic decision that is based on an incomplete

CR-06-0898

investigation may not be strategic or reasonable." <u>Harris v.</u>
<u>State</u>, 947 So. 2d 1079, 1119 (Ala. Crim. App. 2004), S.Ct.
quashed writ in part and aff'd. 947 So. 2d 1139.  <u>See also</u>
<u>Wiggins v. Smith</u>, 539 U.S. 510 (2003).

> "In cases where sentencing counsel did not
> conduct enough investigation to formulate an
> accurate life profile of a defendant, we have held
> the representation beneath professionally competent
> standards.  See, e.g., <u>Blanco</u> [<u>v. Singletary</u>], 943
> F.2d [1477] 1501-03 [(11th Cir. 1991)] (counsel's
> performance deficient where his sole attempt to
> procure mitigation witnesses for penalty phase was
> to leave messages for the witnesses and await their
> responses, and he thus ultimately conducted no
> interviews); <u>Harris</u> [<u>v. Dugger</u>], 874 F.2d [756] 763
> [(11th Cir. 1989)] (counsel deficient where he did
> not investigate defendant's family, scholastic,
> military and employment background); <u>Middleton</u> [<u>v.</u>
> <u>Dugger</u>], 849 F.2d [491] 493 [(11th Cir. 1988)]
> (performance deficient where 'trial counsel
> conducted almost no background investigation,
> despite discussions with Middleton concerning the
> existence of such mitigating evidence' as
> psychiatric problems, brutal childhood, physical,
> sexual and drug abuse, and low I.Q.); <u>Armstrong</u> [<u>v.</u>
> <u>Dugger</u>], 833 F.2d [1430] 1433-34 [(11th Cir. 1987)]
> (performance deficient where trial counsel's
> investigation of mitigating evidence was limited to
> single conversation with defendant and his parents,
> and another conversation with defendant's parole
> officer)."

<u>Jackson v. Herring</u>, 42 F.3d 1350, 1367 (11th Cir. 1995).

In its order addressing the sentencing phase, the circuit
court found:

CR-06-0898

> "Mr. Daniel had never before tried a capital
> murder case (Hrg. Tr. 484:23-25), so his 'judgment'
> was not based on experience with such cases. And
> while he said he had read EJI's recommendations of
> how to handle the sentencing phase of a capital
> murder case, and claimed he tried to follow these
> recommendations (id. at 521:10-24), the evidence,
> described above (FF ¶¶ 113-115), suggests
> otherwise."

(C. 56.)   Here, it is apparent that the circuit court's

findings are based heavily on the fact that Daniel was <u>not</u>

experienced in defending capital-murder cases.   Further, the

circuit court found "that the modest case [Daniel] presented

resulted from lack of preparation and investigation rather

than an informed strategic choice."   (C. 87.)   The circuit

court's findings are supported by the record, and nothing in

the State's brief warrants this Court's going behind the

circuit court's resolution of credibility choices to reverse

the circuit court's judgment.   Although Smith's showing of

prejudice as to this claim is not as strong as his showing

that counsel's performance was deficient in the investigation

and the presentation of Smith's defense at the guilt phase of

Smith's trial, we conclude that the circuit court correctly

determined that "a reasonable probability exists that but for

the ineffective assistance of Mr. Smith's counsel, the outcome

3220

CR-06-0898

of Mr. Smith's trial might well have been different." (C. 90.)

    For these reasons, the circuit court's judgment -- granting Smith's Rule 32 petition and ordering a new trial -- is affirmed.

    AFFIRMED.

    Welch, J., concurs.  Wise, P.J., and Windom and Kellum, JJ., concur in the result.

Cite as: 561 U. S. ____ (2010)   1

Per Curiam

# SUPREME COURT OF THE UNITED STATES

## DEMARCUS ALI SEARS *v.* STEPHEN UPTON, WARDEN

### ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME COURT OF GEORGIA

No. 09–8854.   Decided June 29, 2010

PER CURIAM.

According to an expert who testified during state post-conviction relief, petitioner Demarcus A. Sears performs at or below the bottom first percentile in several measures of cognitive functioning and reasoning. The cause of this abnormality appears to be significant frontal lobe brain damage Sears suffered as a child, as well as drug and alcohol abuse in his teens. But because—in the words of the state trial court—his counsel conducted a penalty phase investigation that was "on its face . . . constitutionally inadequate," App. to Pet. for Cert. 27B, evidence relating to Sears' cognitive impairments and childhood difficulties was not brought to light at the time he was sentenced to death.

After finding constitutionally deficient attorney performance under the framework we set forth in *Strickland* v. *Washington*, 466 U. S. 668 (1984), the state postconviction court found itself unable to assess whether counsel's inadequate investigation might have prejudiced Sears. App. to Pet. for Cert. 29B–30B. Because Sears' counsel did present *some* mitigation evidence during Sears' penalty phase—but not the significant mitigation evidence a constitutionally adequate investigation would have uncovered—the state court determined it could not speculate as to what the effect of additional evidence would have been. *Id.*, at 30B. Accordingly, it denied Sears postconviction relief. *Id.*, at 34B. Thereafter, the Supreme Court of Georgia summarily denied review of his claims. *Id.*, at 1A.



**FILED**
DEC 0 2 2010

CIRCUIT CLERK _____ COUNTY, AL

2                        SEARS *v.* UPTON

Per Curiam

For the reasons that follow, it is plain from the face of the state court's opinion that it failed to apply the correct prejudice inquiry we have established for evaluating Sears' Sixth Amendment claim. We therefore grant the petition for writ of certiorari, vacate the judgment, and remand for further proceedings not inconsistent with this opinion.[1]

## I

In 1993, a Georgia jury convicted Sears of armed robbery and kidnaping with bodily injury (which also resulted in death), a capital crime under state law. See Ga. Code Ann. §16–5–40(d)(4) (2006).[2] During the penalty phase of Sears' capital trial, his counsel presented evidence describing his childhood as stable, loving, and essentially without incident. Seven witnesses offered testimony along the following lines: Sears came from a middle-class background; his actions shocked and dismayed his relatives; and a death sentence, the jury was told, would devastate the family. See Pet. for Cert. 6–7. Counsel's mitigation

---

[1] Although this is a state-court decision, it resolved a federal issue on exclusively federal-law grounds. We therefore have jurisdiction. 28 U. S. C. §1257; see also *Padilla* v. *Kentucky,* 559 U. S. ___ (2010) (reviewing state postconviction decision raising Sixth Amendment question).

[2] Sears was sentenced to death for the Kentucky murder of a woman whom he and an accomplice kidnaped in Georgia. Under Georgia law, a jury may "impose a death sentence for the offense of kidnapping with bodily injury on the ground that the offense of kidnapping with bodily injury was committed while the offender was engaged in the commission of the capital felon[y] of murder . . . ." *Potts* v. *State,* 261 Ga. 716, 720, 410 S. E. 2d 89, 93 (1991). So long as "the murder . . . [is] sufficiently a part of the same criminal transaction," it may count as a "statutory aggravating circumstanc[e] of the offense of kidnapping with bodily injury." *Ibid.,* 410 S. E. 2d, at 94. Sears has raised a categorical Eighth Amendment challenge to the constitutionality of his death sentence for a kidnaping offense, which we decline to reach. And any jurisdictional or constitutional issue with respect to Georgia's ability to execute Sears for a murder occurring in Kentucky is not before us.

Cite as: 561 U. S. ____ (2010)      3

Per Curiam

theory, it seems, was calculated to portray the adverse impact of Sears' execution on his family and loved ones. 20 Record 5181. But the strategy backfired. The prosecutor ultimately used the evidence of Sears' purportedly stable and advantaged upbringing against him during the State's closing argument. With Sears, the prosecutor told the jury, "[w]e don't have a deprived child from an inner city; a person who[m] society has turned its back on at an early age. But, yet, we have a person, privileged in every way, who has rejected every opportunity that was afforded him." Pet. for Cert. 7 (quoting trial transcript; internal quotation marks omitted).

The mitigation evidence that emerged during the state postconviction evidentiary hearing, however, demonstrates that Sears was far from "privileged in every way." Sears' home life, while filled with material comfort, was anything but tranquil: His parents had a physically abusive relationship, Exh. 26, 6 Record 1676 (Affidavit of Demetrius A. Sears), and divorced when Sears was young, Exh. 22, *id.*, at 1654 (Affidavit of Virginia Sears Graves); he suffered sexual abuse at the hands of an adolescent male cousin, Exh. 26, *id.*, at 1681–1682; his mother's "favorite word for referring to her sons was 'little mother fuckers,'" Exh. 3, 2 Record 265 (Affidavit of Richard G. Dudley, Jr., MD); and his father was "verbally abusive," Exh. 37, 6 Record 1746–1747 (Affidavit of Carol Becci-Youngs),[3] and disciplined Sears with age-inappropriate

---

[3] In the particular instance recounted in this affidavit, Sears' art teacher stated that his father "berate[d] [him] in front of" the school principal and her during a parent-teacher conference. Exh. 37, 6 Record 1746. The event was significant: "I'll never forget the way he bullied him," the art teacher explained, "Mr. Sears was so verbally abusive and made such a scene, that it made everyone in the room uncomfortable." *Ibid.* The art teacher had "never been in a conference where a parent severely criticized a child in the presence of his teachers and meant it, as Mr. Sears did." *Id.*, at 1747.

4                     SEARS v. UPTON

Per Curiam

military-style drills, Exh. 3, 2 Record 263–264; Exh. 19, 6
Record 1622 (Affidavit of Frank Sears); Exh. 22, *id.*, at
1651; Exh. 28, *id.*, at 1694 (Affidavit of Kenneth Burns,
Sr.). Sears struggled in school, demonstrating substantial
behavior problems from a very young age. For example,
Sears repeated the second grade, Exh. 6, 3 Record 500–
501, and was referred to a local health center for evalua-
tion at age nine, Exh. 7, *id.*, at 503, 504, 508. By the time
Sears reached high school, he was "described as severely
learning disabled and as severely behaviorally handi-
capped." Exh. A to Exh. 1, 2 Record 174–176 (Affidavit of
Tony L. Strickland, M. S., Ph. D.).

Environmental factors aside, and more significantly,
evidence produced during the state postconviction relief
process also revealed that Sears suffered "significant
frontal lobe abnormalities." Exh. 1, *id.*, at 147. Two dif-
ferent psychological experts testified that Sears had sub-
stantial deficits in mental cognition and reasoning—*i.e.*,
"problems with planning, sequencing and impulse control,"
*ibid.*—as a result of several serious head injuries he suf-
fered as a child, as well as drug and alcohol abuse. See 1
Record 37–40 (Testimony of Dr. Strickland); *id.*, at 95–96
(Testimony of Dr. Dudley). Regardless of the cause of his
brain damage, his scores on at least two standardized
assessment tests placed him at or below the first percen-
tile in several categories of cognitive function, "making
him among the most impaired individuals in the popula-
tion in terms of ability to suppress competing impulses
and conform behavior only to relevant stimuli." Exh. 1, 2
Record 148; see also 1 Record 37. The assessment also
revealed that Sears' "ability to organize his choices, assign
them relative weight and select among them in a deliber-
ate way is grossly impaired." Exh. 1, 2 Record 149. From
an etiological standpoint, one expert explained that Sears'
"history is replete with multiple head trauma, substance
abuse and traumatic experiences of the type expected" to

Cite as: 561 U. S. ____ (2010)          5

Per Curiam

lead to these significant impairments. *Id.*, at 150; see also 1 Record 44.

Whatever concern the dissent has about some of the sources relied upon by Sears' experts—informal personal accounts, see *post*, at 5–7 (opinion of SCALIA, J.)—it does not undermine the well-credentialed expert's assessment,[4] based on between 12 and 16 hours of interviews, testing, and observations, see 1 Record 32, that Sears suffers from substantial cognitive impairment. Sears performed dismally on several of the forensic tests administered to him to assess his frontal lobe functioning. On the Stroop Word Interference Test, which measures response inhibition, *id.*, at 36–37, 99.6% of those individuals in his cohort (which accounts for age, education, and background) performed better than he did. *Ibid.* On the Trail-Making B test, which also measures frontal lobe functioning, *id.*, at 37–38, Sears performed at the first (and lowest) percentile. *Id.*, at 38. Based on these results, the expert's first-hand observations, and an extensive review of Sears' personal history, the expert's opinion was unequivocal: There is "clear and compelling evidence" that Sears has "pronounced frontal lobe pathology."[5] *Id.*, at 68.

---

[4] Dr. Strickland, a psychologist, is the director of a mild head injury clinic and the Sports Concussion Institute at Centinella Freeman Medical Center in Los Angeles. 1 Record 30. He is an associate professor of psychiatry in residence at the University of California at Los Angeles and directs a memory disorder and cerebral palsy clinic for that university's department of neuroscience. *Id.*, at 30–31. The State had no objection to his being tendered as an expert in neuropsychology. *Id.*, at 31.

[5] During a colloquy with the court, Dr. Strickland further explained:
"THE COURT: But by taking some history of head injuries, coupled with the results of the tests that you've given, you can comfortably conclude that the results of the tests that you've given were a consequence of frontal lobe head injuries?
"THE WITNESS: Absolutely. And, moreover, Your Honor, the patient has a lesion on the front of his head, which is something I can observe." *Id.*, at 78.

Per Curiam

Further, the fact that Sears' brother is a convicted drug dealer and user, and introduced Sears to a life of crime, 6 Record 1683–1686, actually would have been consistent with a mitigation theory portraying Sears as an individual with diminished judgment and reasoning skills, who may have desired to follow in the footsteps of an older brother who had shut him out of his life. *Post,* at 6. And the fact that some of such evidence may have been "hearsay" does not necessarily undermine its value—or its admissibility— for penalty phase purposes.[6] *Post,* at 5, n. 3.

Finally, the fact that along with this new mitigation evidence there was also some adverse evidence is unsurprising, *post,* at 7, given that counsel's initial mitigation investigation was constitutionally inadequate. Competent counsel should have been able to turn some of the adverse evidence into a positive—perhaps in support of a cognitive deficiency mitigation theory. In particular, evidence of Sears' grandiose self-conception and evidence of his magical thinking, *ibid.,* were features, in another well-credentialed expert's view,[7] of a "profound personality

---

[6] Like Georgia's "necessity exception" to its hearsay rules, see Ga. Code Ann. §24–3–1(b) (2006), we have also recognized that reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule. See *Green* v. *Georgia,* 442 U. S. 95, 97 (1979) *(per curiam)* ("Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause . . . . The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial"); see also *Chambers* v. *Mississippi,* 410 U. S. 284, 302 (1973) ("In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice"). We take no view on whether the evidence at issue would satisfy the considerations we set forth in *Green,* or would be otherwise admissible under Georgia law.

[7] Dr. Dudley, a psychiatrist, completed his internship and residency at Northwestern University Medical Center, and has been board certified in psychiatry by the American Board of Psychiatry and Neu-

Per Curiam

disorder." 1 Record 104. This evidence might not have made Sears any more likable to the jury, but it might well have helped the jury understand Sears, and his horrendous acts—especially in light of his purportedly stable upbringing.

Because they failed to conduct an adequate mitigation investigation, *none* of this evidence was known to Sears' trial counsel. It emerged only during state postconviction relief.

## II

Unsurprisingly, the state postconviction trial court concluded that Sears had demonstrated his counsel's penalty phase investigation was constitutionally deficient. See *Strickland*, 466 U. S., at 688 (explaining that first inquiry when evaluating Sixth Amendment ineffectiveness claim is whether counsel's representation "fell below an objective standard of reasonableness"). In its view, the cursory nature of counsel's investigation into mitigation evidence—"limited to one day or less, talking to witnesses selected by [Sears'] mother"—was "on its face . . . constitutionally inadequate." App. to Pet. for Cert. 27B.

What is surprising, however, is the court's analysis regarding whether counsel's facially inadequate mitigation investigation prejudiced Sears. See *Strickland, supra*, at 694. Although the court appears to have stated the proper prejudice standard,[8] it did not correctly conceptualize how that standard applies to the circumstances of this case.

---

rology for more than 35 years. 1 Record 91–92. The State also had no objection to his being tendered as an expert in psychiatry. *Id.*, at 93.

[8] The court asked whether "there is a reasonable likelihood that the outcome of his trial would have been different if his counsel had done more investigation." App. to Pet. for Cert. 29B–30B; see *Strickland*, 466 U. S., at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome").

8                               SEARS *v.* UPTON

Per Curiam

Because Sears' counsel did present some mitigation evi-
dence during his penalty phase, the court concluded that
"[t]his case cannot be fairly compared with those where
little or no mitigation evidence is presented and where a
reasonable prediction of outcome can be made." App. to
Pet. for Cert. 30B. The court explained that "it is impossi-
ble to know what effect [a different mitigation theory]
would have had on [the jury]." *Ibid.* "Because counsel put
forth a reasonable theory with supporting evidence," the
court reasoned, "[Sears] . . . failed to meet his burden of
proving that there is a reasonable likelihood that the
outcome at trial would have been different if a different
mitigation theory had been advanced."[9] *Ibid.*

There are two errors in the state court's analysis of
Sears' Sixth Amendment claim.  First, the court curtailed
a more probing prejudice inquiry because it placed undue
reliance on the assumed reasonableness of counsel's miti-
gation theory.  The court's determination that counsel had
conducted a constitutionally deficient mitigation investi-
gation, should have, at the very least, called into question
the reasonableness of this theory.  Cf. *Wiggins* v. *Smith*,
539 U. S. 510, 522 (2003) (explaining that "counsel's fail-
ure to uncover and present voluminous mitigating evi-
dence at sentencing could not be justified as a tactical
decision . . . because counsel had not 'fulfill[ed] their obli-

_____

[9] Channeling powers of telepathy, JUSTICE SCALIA asserts that what
the trial court actually decided in this case is that "Sears' trial counsel
presented a reasonable mitigation theory and offered evidence suffi-
cient to support it, so the prejudice inquiry was more difficult—so
difficult that Sears could not make the requisite showing." *Post*, at 4.
Such a highly favorable reading of the trial court's analysis would be
far more convincing had the trial court engaged with the evidence as
JUSTICE SCALIA does.  But it offered no such analysis in its opinion;
indeed, it appears the court did not even conduct any real analysis,
explaining that it was "*impossible* to know what effect" the evidence
might have had on the jury.  App. to Pet. for Cert. 30B (emphasis
added).

Cite as: 561 U. S. ____ (2010)            9

Per Curiam

gation to conduct a thorough investigation of the defendant's background'" (quoting *Williams* v. *Taylor*, 529 U. S. 362, 396 (2000); alteration in original)). And, more to the point, that a theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced Sears. The "reasonableness" of counsel's theory was, at this stage in the inquiry, beside the point: Sears might be prejudiced by his counsel's failures, whether his haphazard choice was reasonable or not.

JUSTICE SCALIA chides the Court for concluding that the trial court assumed, rather than found, that counsel's mitigation theory was a reasonable one. *Post*, at 2. But our point is that any finding with respect to the reasonableness of the mitigation theory counsel utilized—in this case, family impact—is in tension with the trial court's unambiguous finding that counsel's investigation was itself so unreasonable as to be facially unconstitutional. This point is plain in *Williams:* We rejected any suggestion that a decision to focus on one potentially reasonable trial strategy—in that case, petitioner's voluntary confession— was "justified by a tactical decision" when "counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." 529 U. S., at 396. A "tactical decision" is a precursor to concluding that counsel has developed a "reasonable" mitigation theory in a particular case.[10]

---

[10]Moreover, the reasonableness of the theory is not relevant when evaluating the impact of evidence that would have been available and likely introduced, had counsel completed a constitutionally adequate investigation before settling on a particular mitigation theory. This point was also plain in *Williams:* "Whether or not . . . omissions [in the investigation] were sufficiently prejudicial to have affected the outcome of sentencing," they may nevertheless demonstrate deficiency. 529 U. S., at 396. The one inquiry, deficient mitigation investigation, is

Per Curiam

Second, and more fundamentally, the court failed to apply the proper prejudice inquiry. We have never limited the prejudice inquiry under *Strickland* to cases in which there was only "little or no mitigation evidence" presented, App. to Pet. for Cert. 30B. True, we have considered cases involving such circumstances,[11] and we have explained that there is no prejudice when the new mitigating evidence "would barely have altered the sentencing profile presented" to the decisionmaker, *Strickland, supra,* at 700. But we also have found deficiency *and* prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase. *E.g., Williams, supra,* at 398 (remorse and cooperation with police); *Rompilla* v. *Beard,* 545 U. S. 374, 378 (2005) (residual doubt). We did so most recently in *Porter* v. *McCollum,* 558 U. S. ___, ___ (2009) *(per curiam)* (slip op., at 3), where counsel at trial had attempted to blame his client's bad acts on his drunkenness, and had failed to discover significant mitigation evidence relating to his client's heroic military service and substantial mental health difficulties that came to light only during postconviction relief, *id.,* at ___ (slip op., at 11–12). Not only did we find prejudice in *Porter,* but—bound by deference owed under 28 U. S. C. §2254(d)(1)— we also concluded the state court had *unreasonably* applied *Strickland*'s prejudice prong when it analyzed Porter's claim. *Porter, supra,* at ___ (slip op., at 13).

We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant. To the contrary, we have consistently explained that the *Strick-*

---

distinct from the second, whether there was prejudice as a result.
 [11]See, *e.g., Wiggins* v. *Smith,* 539 U. S. 510, 515–516 (2003); *Strickland* v. *Washington,* 466 U. S. 668, 700 (1984).

Per Curiam

*land* inquiry requires precisely the type of probing and fact-specific analysis that the state trial court failed to undertake below.[12] In the *Williams* decision, for instance, we categorically rejected the type of truncated prejudice inquiry undertaken by the state court in this case. 529 U. S., at 397–398. And, in *Porter*, we recently explained:

> "To assess [the] probability [of a different outcome under *Strickland*], we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweig[h] it against the evidence in aggravation." 558 U. S., at ____ (slip op., at 11) (internal quotation marks omitted; third alteration in original).

That same standard applies—and will necessarily require a court to "speculate" as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase. Indeed, it is exactly this kind of probing inquiry that JUSTICE SCALIA now undertakes, *post*, at 4–8, and that the trial court failed to do. In all circumstances, this is the proper prejudice standard for evaluating a claim of ineffective representation in the context of a penalty phase mitigation investigation.

---

[12] Whether it did so implicitly is far from apparent, notwithstanding JUSTICE SCALIA's suggestion to the contrary. See *post*, at 3–4. The trial court stated that the record was "largely silent" on "what [evidence] would have been shown if [additional mitigating evidence] had been sought." App. to Pet. for Cert. 28B. This is a curious assertion in light of the 22 volumes of evidentiary hearing transcripts and submissions in the record, which spell out the findings discussed above. It also undermines any suggestion that the court did, in fact, do the reweighing JUSTICE SCALIA believes it undertook; it is plain the record is not "largely silent." And it also undermines any suggestion that the court simply discounted the value of the testimony; had it made any such finding, the court could have easily stated, instead, that the record evidence was unpersuasive.

SEARS *v.* UPTON

Per Curiam

## III

A proper analysis of prejudice under *Strickland* would have taken into account the newly uncovered evidence of Sears' "significant" mental and psychological impairments, along with the mitigation evidence introduced during Sears' penalty phase trial, to assess whether there is a reasonable probability that Sears would have received a different sentence after a constitutionally sufficient mitigation investigation. See *Porter, supra,* at ___ (slip op., at 11); *Williams, supra,* at 397–398; *Strickland, supra,* at 694. It is for the state court—and not for either this Court or even JUSTICE SCALIA—to undertake this reweighing in the first instance.

Accordingly, the petition for certiorari and the motion for leave to proceed *in forma pauperis* are granted. The judgment below is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE and JUSTICE ALITO would deny the petition for a writ of certiorari.

Cite as: 561 U. S. ____ (2010)          1

SCALIA, J., dissenting

# SUPREME COURT OF THE UNITED STATES

## DEMARCUS ALI SEARS *v.* STEPHEN UPTON, WARDEN

### ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME COURT OF GEORGIA

No. 09–8854.   Decided June 29, 2010

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

The Court concludes, *ante,* at 7–12, that the Superior Court of Butts County, Georgia, made errors of law in applying the prejudice inquiry for ineffective-assistance-of-counsel claims under *Strickland* v. *Washington,* 466 U. S. 668 (1984). In my view there was no error of law, and the Court today remands for the state court to do what it has already done: find no reasonable likelihood that the mitigation evidence the Court details in its opinion would have persuaded a jury to change its mind about the death sentence for this brutal rape-murder.

The state habeas court responsibly executed the first step in the *Strickland* analysis, finding that the investigation of mitigation evidence by Sears' trial counsel was deficient performance. The issue here is the second step: whether Sears was prejudiced by that deficiency. As the Court acknowledges, *ante,* at 7, the state habeas court correctly stated the prejudice standard under *Strickland:* The defendant has the burden to establish "a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." App. to Pet. for Cert. 24B–25B (citing 466 U. S., at 688, 694). "When applied to the sentencing phase of death penalty trials," that means "a reasonable probability that, absent [counsel's] errors, the sentencer would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." App. to Pet. for

SCALIA, J., dissenting

Cert. 25B–26B.

The Court today concludes that there were two errors in the *application* of that proper standard. First, it reasons that the court erroneously "curtailed a more probing prejudice inquiry because it placed undue reliance on the assumed reasonableness of counsel's mitigation theory" at trial. *Ante,* at 8. That argument is flawed on several levels. To begin with, the state habeas court did not *assume* trial counsel's mitigation theory was reasonable; it *found* that it was. It said: "[A]lthough counsel failed to investigate thoroughly, they did develop a reasonable mitigation theory with evidence to support it." App. to Pet. for Cert. 30B. After interviews of roughly a dozen potential mitigation witnesses, who, with the exception of Sears' father, gave positive accounts of Sears and his family, see 7 Record 2025, 2051–2052; 8 *id.,* at 2129, 2291–2344, Sears' trial counsel developed a mitigation theory that Sears came from a good family and had a solid middle-class upbringing; that his offense was completely out of character; that he cooperated with police; and that sentencing Sears to death would devastate his family and friends, see *id.,* at 2124–2125; 19 *id.,* at 4861–4862, 4916–4917, 4954–4955; 20 *id.,* at 5181. To support this approach his attorneys called seven witnesses, including Sears' mother, four family friends, and his high school guidance counselor. See Pet. for Cert. 6–7 (citing trial transcript pages between 2375 and 2451). The state habeas court did not declare that this mitigation theory "might be reasonable, in the abstract," as the Court puts it, *ante,* at 8. Rather, it concluded that counsel "put forth a reasonable theory with supporting evidence." App. to Pet. for Cert. 30B.

The Court's argument is also flawed because the habeas court's reasonableness finding did *not* cause it to "curtai[l]" its prejudice inquiry, or lead to the conclusion that it could "obviate the need to analyze" whether pursuing a different

SCALIA, J., dissenting

mitigation theory would have made a difference. *Ante*, at 9.   The reasonableness finding merely meant that the prejudice determination had to be made by asking, not whether the jury's mind would probably have been changed by hearing Sears' new mitigation theory instead of hearing no mitigation theory at all; but rather whether it would probably have been changed by substituting Sears' new mitigation theory for the reasonable mitigation theory that was presented and rejected.[1] After hearing all the witnesses and other evidence Sears presented before it, the state court concluded that "it is just not possible to know what effect a *different* mitigation theory would have had." App. to Pet. for Cert. 30B (emphasis added).[2]

The second, "and more fundamenta[l]," legal error the Court alleges, *ante*, at 10–11, is really encased within the first.   The Court claims that the state habeas court "limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented." *Id.*, at 10 (quoting App. to Pet. for Cert. 30B). The court erred, we are told, by determining that "present[ation of] *some* mitigation evidence should foreclose an inquiry into whether" Sears was prejudiced. *Ibid.* That is not a fair reading of the opinion.   The state court did not hold that a defendant could never suffer prejudice whenever his counsel provided *any* mitigation evidence. Rather, it stated that "[t]his case *cannot be fairly com-*

---

[1] The Court contends, *ante*, at 9, that there was a "tension" between the state court's conclusion that the investigation was deficient and its conclusion that the mitigation theory presented to the jury was reasonable.  This terribly misreads the state court's opinion. It did not say (as the Court's point assumes) that counsel's *using* the mitigation theory they did was reasonable; it said that the *theory itself* was reasonable, making it hard to say whether a different theory would have persuaded the jury.  This presents no conceivable "tension."

[2] On the fair reading we owe the state court, its opinion provides no basis for inferring that it failed to "engag[e] with the evidence" and "did not even conduct any real analysis." *Ante*, at 8, n. 8.

*pared* with those where little or no mitigation evidence is presented and where a reasonable prediction of outcome can be made." App. to Pet. for Cert. 30B (emphasis added). That is absolutely correct. This case is not like the prejudice cases on which the Court relies, where it could readily be said that the overlooked mitigation theory would have made a much deeper impression on the jury than the utterly unsupported theory (or absence of any theory) offered at trial. See *Porter* v. *McCollum*, 558 U. S. ___, ___ (2009) *(per curiam)* (slip op., at 12); *Rompilla* v. *Beard*, 545 U. S. 374, 378, 393 (2005); *Wiggins* v. *Smith*, 539 U. S. 510, 515, 537 (2003); *Williams* v. *Taylor*, 529 U. S. 362, 369 (2000). Sears' trial counsel presented a reasonable mitigation theory and offered evidence sufficient to support it, so the prejudice inquiry was more difficult—so difficult that Sears could not make the requisite showing. Clearly referring to the evidence in this particular case, the court said:

> "Although here, the Petitioner can argue that a prior appeal shows the difficulty one juror was having reaching the same verdict as the others, it is just not possible to know what effect a different mitigation theory would have had on her, just as it is impossible to know what effect it would have had on other jurors." App. to Pet. for Cert. 30B.

Since the habeas court made no legal error en route to its *Strickland* conclusion, the only basis for reversing the judgment here would be disagreement with the conclusion itself: that Sears had not established that his new mitigation theory would probably have caused the jury to impose a life sentence instead of death.

The Court makes no attempt to contradict that conclusion. Doing so would require a fact-intensive inquiry into the 22-volume record to measure the persuasiveness of the evidence supporting Sears' new mitigation theory—an

Cite as: 561 U. S. ____ (2010)          5

SCALIA, J., dissenting

inquiry the Court purports to disavow, *ante*, at 12, but nonetheless tendentiously undertakes, *ante*, at 3–6. The reader might think the state habeas court's conclusion highly questionable from the Court's account, which recites as solid all the evidence supporting Sears' new mitigation theory, see *ante*, at 3–7. It is far from solid. Some is likely inadmissible as unreliable hearsay under Georgia law, see *Gissendaner* v. *State*, 272 Ga. 704, 714, 532 S. E. 2d 677, 688–689 (2000); *Gulley* v. *State*, 271 Ga. 337, 347, 519 S. E. 2d 655, 664 (1999)—such as much of the evidence for the uncorroborated second-hand claim that Sears "suffered sexual abuse at the hands of an adolescent male cousin," *ante*, at 3.[3]   Other evidence a competent attorney would likely not have placed before the jury—such as all the testimony about Sears' childhood from his brother Demetrius, an admitted drug dealer and drug user, 6 Record 1682–1684, 1695, 1752, and a convicted felon (for bank fraud, wire fraud, identity theft, and cocaine trafficking), *id.*, at 1687. No juror would have been impressed by such a character witness.

Some of the evidence is incredible, such as the psychiatrist's assertion that Sears had "substantial deficits in mental cognition and reasoning . . . as a result of serious

---

[3]The Court's reliance on *Green* v. *Georgia*, 442 U. S. 95, 97 (1979) *(per curiam)*, *ante*, at 6, n. 6, to suggest that this unreliable hearsay would be admissible for sentencing purposes is entirely misplaced. In *Green*, we held it violated constitutional due process to exclude testimony regarding a co-conspirator's confession that he alone committed the capital murder with which the defendant was charged. Our holding depended on "th[e] unique circumstances" of the case: the testimony to be used at sentencing was "highly relevant" and "substantial[ly]" reliable as a statement against penal interest made to a close friend; it was corroborated by "ample" evidence and was used by the State to obtain a conviction in a separate trial against the co-conspirator. 442 U. S., at 97. Here there are no such circumstances. The testimony is uncorroborated second-hand reporting from self-interested witnesses that is unreliable and therefore likely inadmissible.

head injuries he suffered as a child," *ante*, at 4. The serious head injuries consisted of Sears' hitting his head at a roller-skating rink sometime early in elementary school, 1 Record 76; 2 *id.*, at 225, running into an end table as a child, 6 *id.*, at 1651, and getting hit with a golf club sometime later in elementary school, 1 *id.*, at 79; 2 *id.*, at 225.[4] (The last of these major injuries might not have been introduced anyway, since that would have provided the prosecution an opportunity to refute both the extent of the injury and the mercy-worthiness of Sears, by introducing into evidence Sears' boast that when he was 11 or 12 he "beat the s*** out of" someone after he was hit on the head with a golf club, 8 *id.*, at 2195.) Likewise incredible was the assertion that Demetrius "introduced Sears to a life of crime," *ante*, at 6. According to testimony on which the Court relies, Demetrius would "never let [Sears] hang around" with him and his drug-dealing friends. 6 Record 1685–1686.

A jury also would have discredited the psychiatric testimony of Dr. Strickland that "[f]rom an etiological standpoint . . . Sears' 'history is replete with multiple head trauma, substance abuse and traumatic experiences of the type expected' to lead to these significant [mental] impairments," *ante*, at 4–5 (quoting 2 *id.*, at 150). As already noted, the evidence of brain-damaging trauma is nonexistent. The psychiatric testimony of Dr. Dudley relied upon the self-interested reporting of Sears himself and the

---

[4]There is an unsubstantiated claim from Sears himself, 8 Record 2195, that when he was a teenager he was hit with a "hatchet" above his right eye. Of course, that is the same place where he collided with an end table, 6 *id.*, at 1651, leaving the "lesion"—better known as a scar—on his head that Dr. Strickland noted, *ante*, at 5–6, n. 5 (quoting 1 Record 78). There is no corroborating evidence for this event: no medical records, 1 *id.*, at 77, no other apparent scars, 2 *id.*, at 245; 6 *id.*, at 1651, and, tellingly, no family or friends to confirm what surely would have been memorable had it happened.

SCALIA, J., dissenting

testimony of his less-than-trustworthy brother, Demetrius, see, *e.g.*, 1 Record 122, 133. And then there are the unfavorable parts of Dr. Dudley's testimony: Sears is a "narcissis[t]," *id.*, at 135, with a "grandiose" opinion of himself, *id.*, at 98–99; 2 *id.*, at 246. Dr. Dudley's affidavit portrays Sears as arrogant and self-centered, *id.*, at 246, 247, and notes what he termed Sears' "fantastical" boasting of his first sexual experience with a woman at the age of six and his other "innumerable sexual experiences," 1 *id.*, at 98–99, 100; 2 *id.*, at 246–247. It is hard to see how it could be thought probable that Sears' so-called "magical thinking," 1 *id.*, at 84, would have helped his plea for leniency, see *ante*, at 6–7. It seems to me more likely the jury would conclude that Sears' "profoun[d] personality disorder," 1 Record 104, made him exactly the kind of person who would commit heinous crimes in the future.

And some of the evidence the Court recounts is so utterly unlikely to affect a jury's determination that this brutal murder deserved death that its recitation is just plain hilarious. For example, the claim that Sears' father "was 'verbally abusive,'" *ante*, at 3, resting on nothing more than an art teacher's recollection that Sears' father "severely criticized" him—"and meant it"!—at a conference with the principal concerning his son's poor academic performance, 6 Record 1747; the claim that his father "disciplined Sears with age-inappropriate military-style drills," *ante*, at 3–4, which consisted of positively Von-Steubenesque acts such as dousing the kid with cold water when he refused to get up for school, and making him run extra laps after sports practices, 6 Record 1622; and the claim that his mother's "'favorite word'"—actually three words—to refer to her sons was scatological, *ante*, at 3 (quoting 2 Record 265).

While the Court takes pain to describe all the elements of Sears' new mitigation theory, down to the silliest, it does not trouble to describe the brutal circumstances of

8                                    SEARS v. UPTON

SCALIA, J., dissenting

the crime—which are at least just as relevant to assessing whether the different mitigation theory would probably have altered the sentence. But the jury heard all about them. See *Sears* v. *State*, 268 Ga. 759, 759–760, 493 S. E. 2d 180, 182 (1997). They heard Sears' confession that he kidnaped, raped, and murdered Gloria Wilbur, a 59-year old wife and mother. Sears, carrying a briefcase containing various instruments of mayhem—brass knuckles, knives, and handcuffs—and his accomplice, Phillip Williams, were surveying a supermarket parking lot on a Sunday evening in October 1990, looking for a car to steal to drive back home to Ohio from Georgia. As the victim was putting her groceries in the trunk of her car, Sears approached, punched her in the face with his brass knuckles, shoved her into the car, and drove to pick up Williams. Sears then handcuffed her and pulled her into the backseat as Williams drove. After they passed into Tennessee, Sears raped her. Later in the evening, after they had crossed into Kentucky, Sears told Williams to stop the car. Sears forced her, still handcuffed, into the woods by the side of the highway as she begged for her life. After throwing her on the ground, he stabbed her in the neck. In his confession he showed no regret or remorse for his heinous crimes.[5]

I do not know how anyone could disagree with the habeas court's conclusion that it is impossible to say that substituting the "deprived-childhood-*cum*-brain-damage" defense for the "good-middle-class-kid-who-made-a-mistake" defense would probably have produced a different verdict. I respectfully dissent.

_____

[5]The jury also heard from several corrections officers who testified that while Sears was incarcerated awaiting trial and sentencing, he racked up dozens of disciplinary infractions, including assaults on other inmates. "'Predatory,'" "'[i]ncorrigible,'" and incapable of reform was how they described him. 10 *id.,* at 2951–2957; 19 *id.,* at 4868.

3241

IN THE SUPERIOR COURT OF BUTTS COUNTY
STATE OF GEORGIA

CHRISTOPHER K. LEWIS,

       Mr. Lewis,

vs.

HILTON HALL, Warden, Georgia Diagnostic
and Classification Prison,

       Respondent.

HABEAS CORPUS

No. 2004-V-818

FILED
BUTTS SUPERIOR COURT
2008 JUN 10 P 2:14
BY: _____
RHONDA SMITH, CLERK

## PETITIONER'S PROPOSED OPINION AND ORDER

This case is before the Court on Christopher K. Lewis's Initial Amended Petition for Writ

of Habeas Corpus (the "Amended Petition") as to his conviction and sentence of death imposed

by the Superior Court of Clayton County, Georgia, Case No. 97-CR-01995-6, in November

1998. After careful consideration of the pleadings, the record, the arguments of counsel and the

parties' post-hearing briefs, the Court makes the following findings of fact and conclusions of

law, pursuant to OCGA § 9-14-49, and GRANTS the Amended Petition as to Mr. Lewis's

conviction and his sentence.[1]

---

[1] The following citation forms will be used throughout this Opinion and Order. The
transcript from the original trial will be cited as "TTr." and the transcript from the March 2008
evidentiary hearing as "HTr." Pretrial or other hearings will be cited by referring to the date of
the hearing and a description of the subject matter of the hearing (e.g. "July 23, 1998 Ex Parte
Hearing"). The exhibits offered during the habeas hearing will be referred to by a description of
the exhibit, the exhibit number using "PX" for Mr. Lewis's exhibits and "RX" for Respondent's
exhibits, the original paragraph or page number of the exhibit (if available) and a parenthetical
citation to the page number of the record prepared by the reporter (e.g. Hicks Aff., PX 44, at ¶ 8
(1517).)

      The Court hereby admits all of the exhibits offered by the parties at the evidentiary
hearing into evidence. In addition, Mr. Lewis submitted several other exhibits and articles in an

**FILED**

DEC 0 2 2010

CIRCUIT CLERK, CHEROKEE COUNTY, AL

INTRODUCTION AND PROCEDURAL HISTORY............................................................. 6

FINDINGS OF FACT AND CONCLUSIONS OF LAW......................................................... 12

I.  FINDINGS OF FACT REGARDING THE CONDUCT OF TRIAL COUNSEL
    AND COUNSEL DURING THE DIRECT APPEAL. ................................................. 12

    A.  Trial Counsel Failed to Adequately Investigate Mr. Lewis's Case and
        Prepare for Trial. ....................................................................................... 12

        1.  Walker and Hicks Were Not Experienced Death Penalty Lawyers. ......... 12

        2.  Trial Counsel Did Not Adequately Prepare for Trial During the
            Period From April 1998 Through September 1998.................................. 14

        3.  Trial Counsel Did Not Adequately Prepare For Trial During The
            Period Running From Late September 1998 Until The Trial Began
            On November 9, 1998. ...................................................................... 19

        4.  An Adequate Mitigation Investigation Was Not Conducted Prior to
            Trial. ............................................................................................... 21

            a.  Neither Walker Nor Hicks Conducted a Mitigation
                Investigation.............................................................................. 21

            b.  Respondent's Claim That Other Individuals Conducted A
                Mitigation Investigation Are Without Merit.............................. 24

                (i)    Patrick Coffey Did Not Conduct A Mitigation
                       Investigation................................................................. 24

                (ii)   Pamela Leonard Did Not Conduct A Mitigation
                       Investigation................................................................. 25

                (iii)  Joe Jones Did Not Conduct a Mitigation
                       Investigation................................................................. 26

                (iv)   Dr. Steven Snook Did Not Conduct A Mitigation
                       Investigation................................................................. 28

    B.  Walker and Hicks Were Not Prepared When Mr. Lewis's Trial Began On
        November 9, 1998.......................................................................................... 32

        1.  Walker And Hicks Did Not Have An Agreement Regarding Who
            Would Be Responsible For The Examination of Witnesses.................... 33

        2.  Walker And Hicks Did Not Agree On A Theory Of The Case.............. 34

Appendix to his Post-Hearing Brief in Support of his Initial Amended Petition for Writ of Habeas Corpus (the "Mr. Lewis's Appendix" or "Pet. App.") and in a Supplemental Appendix to His Reply Brief in Support of his Initial Amended Petition for Writ of Habeas Corpus (the "Supplemental Appendix" or "Supp. App."). The Court grants Mr. Lewis's requests that the exhibits contained in those appendices also be admitted into evidence.

3.    The Defense Did Not Adequately Investigate Its Actual Innocence Theory...................................................................................... 37

4.    Walker's Opening Statement................................................... 39

5.    Walker And Hicks Failed To Prepare To Cross-Examine The State's Witnesses. ................................................................. 41

6.    The Defense Failed To Prepare For Its Case-In-Chief. ............................ 46

7.    Closing Arguments And The Guilty Verdict........................................... 48

8.    Walker And Hicks's Failure To Prepare For The Penalty Phase Of the Trial.................................................................................. 49

    a.    The Defense Was Unprepared And "Winged" The Penalty Phase. ....................................................................... 50

    b.    Lorraine France And Maxine Bryson ......................................... 50

    c.    Dr. Steven Snook ................................................................ 52

    d.    Penalty Phase Closing Arguments And The Death Verdict. ........ 56

C.    Walker Is Removed As Trial Counsel. ................................................ 57

D.    Martin Replaces Walker As Counsel For The Direct Appeal............................ 58

II.    CONCLUSIONS OF LAW REGARDING TRIAL COUNSEL'S INEFFECTIVENESS DURING THE GUILT/INNOCENCE PHASE OF THE TRIAL.................................................................................... 58

A.    The Right To Effective Assistance Of Counsel. .................................... 58

    1.    The Standards For Deficient Performance. .............................. 59

    2.    The Standards For Prejudice................................................ 60

    3.    Trial Counsel Conducted No Investigation And Had No Investigative Or Trial Strategy. .............................................. 63

    4.    Walker Was Ineffective When He Argued That Robbie Epps Was Responsible For The Crime And Failed To Pursue The Evidence Pointing To Manslaughter. ................................................... 68

        a.    Robbie Epps.................................................................... 68

        b.    The Blood Spatter Evidence. ................................................ 69

        c.    Mr. Lewis's Confessions. .................................................. 73

        d.    Walker's Failure To Consult With Mr. Lewis Regarding Trial Strategy. ................................................................. 74

        e.    A Proper Investigation Would Have Found Additional Support For A Voluntary Manslaughter Theory....................... 76

    5.    Leon Hicks Failed To Adequately Defend Mr. Lewis And Effectively Abandoned The Case. .......................................... 79

6.    Trial Counsels' Failures To Attack The State's Case................................ 80

7.    The Failure To Present Evidence Of Mental Retardation. ......................... 82

B.    Mr. Lewis Was Prejudiced By Trial Counsel's Deficient Performance
During The Guilt/Innocence Phase. ........................................................ 87

III.    FINDINGS OF FACT REGARDING THE MITIGATION EVIDENCE THAT
WAS NOT INVESTIGATED BY TRIAL COUNSEL. ........................................ 89

1.    Mr. Lewis's Family History. ........................................................ 90

a.    Mr. Lewis's Mother And His Birth In New York City. ............ 90

b.    Mr. Lewis's Early Childhood In Mississippi. ......................... 93

c.    Mr. Lewis's Childhood In New Orleans. ................................. 98

d.    Mr. Lewis Descends Into A Life of Drug Abuse. ................... 103

e.    Mr. Lewis Moved Back To Mississippi. ................................. 104

f.    Mr. Lewis Moved Back To New Orleans And Marries Mrs.
Lewis. .................................................................................. 108

g.    Mr. Lewis Moved To Georgia. ............................................. 110

2.    The Mitigation Evidence Is Undisputed And Admissible. ..................... 112

IV.    CONCLUSIONS OF LAW REGARDING TRIAL COUNSEL'S
INEFFECTIVENESS DURING THE PENALTY PHASE OF THE TRIAL. ........... 115

A.    The Importance Of Mitigation Evidence In A Capital Case. .......................... 115

B.    Trial Counsel Failed To Conduct A Proper Investigation Of Possible
Mitigation Evidence. ............................................................................... 116

1.    Trial Counsel Was Obligated To Conduct A Mitigation
Investigation. ........................................................................... 116

2.    Mr. Lewis's Trial Counsel Did Not Conduct A Mitigation
Investigation. ........................................................................... 119

3.    Walker "Winged" The Penalty Phase. ......................................... 120

a.    Walker Called Only Two Lay Witnesses. ............................. 120

b.    Walker Called Dr. Snook Without Preparing Him To
Testify. .............................................................................. 121

c.    Walker's Penalty Phase Closing Argument Was Not
Effective. ........................................................................... 123

C.    The Mitigation Case Should Have Included Mr. Lewis's Childhood, His
History Of Substance Abuse And Evidence Of His Mental Retardation. ......... 124

D.    There Was No Strategic Reason For Trial Counsel's Failure To Investigate
And Present The Mitigation Evidence. ....................................................... 127

E.   The Failure To Investigate And Present Mitigating Evidence Prejudiced
     Mr. Lewis. ................................................................................................. 131

     1.   The Failure To Present Available Evidence Prejudiced Mr. Lewis. ....... 131

     2.   The Prosecution Took Advantage Of Trial Counsel's Failure To
          Present Mitigation Evidence. .................................................................. 135

V.   FINDINGS OF FACTS REGARDING THE CONDUCT OF APPELLATE
     COUNSEL. ........................................................................................................ 136

     A.   Martin Did Not Raise Ineffective Assistance Of Counsel On Direct Appeal
          Because He Mistakenly Believed That It Was Inappropriate To Do So. ......... 137

          1.   Martin Did Not Reject The Ineffective Assistance Of Counsel
               Claim Because He Believed That He Had Stronger Issues. ................... 138

          2.   Martin Did Not Investigate Whether Walker and Hicks Had Been
               Ineffective. ............................................................................................ 141

          3.   Mr. Martin Did Not Rely On His Experience When Deciding Not
               To Raise An Ineffectiveness Claim. ...................................................... 143

VI.  CONCLUSIONS OF LAW REGARDING APPELLATE COUNSEL'S
     INEFFECTIVENESS ON DIRECT APPEAL. ................................................... 145

     A.   The *Strickland* Standard Applies To Claims Of Ineffective Appellate
          Counsel. .......................................................................................................... 145

     B.   Appellate Counsel Was Ineffective As A Result Of His Failure To Raise
          The Claim Of Ineffective Assistance Of Trial Counsel. ................................ 149

     C.   Martin's Decision Not To Raise The Ineffective Assistance Of Trial
          Counsel Is Not Entitled To Deference. ........................................................... 151

     D.   Appellate Counsel's Failure To Raise Trial Counsel's Ineffectiveness
          Prejudiced Mr. Lewis. .................................................................................... 153

     E.   Mr. Lewis Demonstrates Both Cause And Prejudice To Overcome The
          Procedural Bar To Raising Ineffective Assistance Of Trial Counsel. .............. 154

VII. FINDINGS OF FACT REGARDING MR. LEWIS'S MENTAL
     RETARDATION. ............................................................................................... 155

     A.   The Definitions of Mental Retardation. .......................................................... 155

     B.   The Expert Witnesses Who Testified On Behalf Of Mr. Lewis. ...................... 158

          1.   Dr. Marlyne Israelian, Ph.D. ................................................................. 159

               a.   Dr. Israelian's IQ Testing. ............................................................ 160

               b.   Dr. Israelian's Achievement Testing. ........................................... 161

          2.   Dr. Victoria Swanson, Ph.D. .................................................................. 162

               a.   Definitions of Adaptive Behavior or Functioning. ....................... 164

               b.   Dr. Swanson's Standardized Testing. ............................................ 167

|   |   | c. | Mr. Lewis's Social History. | 172 |
|   |   | d. | Dr. Swanson's Review of Academic Records. | 173 |
|   |   | e. | Dr. Swanson's Interview With Mr. Lewis. | 176 |
|   |   | f. | Respondent's Criticisms Of Dr. Swanson's Evaluation Are Without Merit. | 179 |
|   | 3. |   | Dr. George Woods, M.D. | 186 |
|   | 4. |   | Dr. Steven Snook's Pretrial IQ Testing. | 188 |
|   |   | a. | Dr. Snook's Administration Of An Outdated IQ Test. | 188 |
|   |   | b. | The Flynn Effect And Its Application To The IQ Score Obtained By Dr. Snook. | 192 |
|   |   | c. | Dr. Snook Did Not Evaluate Mr. Lewis For Mental Retardation. | 202 |
|   | 5. |   | Dr. Cheatham Did Not Evaluate Mr. Lewis For Mental Retardation | 206 |
|   | 6. |   | Respondent's Expert. | 208 |
|   |   | a. | Dr. King's IQ Testing. | 211 |
|   |   | b. | Dr. King's Adaptive Behavior Analysis. | 215 |
|   |   |   | (i) The Techniques Employed By Dr. King Are Contrary To Psychological Best Practices. | 216 |
|   |   | c. | Dr. King's References To Other Alleged Facts Do Not Support His Diagnosis. | 226 |
| C. |   |   | Respondent's Other IQ Arguments. | 233 |
|   | 1. |   | The "Culture Fair" Test. | 233 |
|   | 2. |   | The Lack Of IQ Testing Before Mr. Lewis Turned 18. | 237 |
| VIII. |   |   | CONCLUSIONS OF LAW REGARDING MENTAL RETARDATION. | 239 |
| A. |   |   | Mr. Lewis Is Mentally Retarded. | 240 |
| B. |   |   | The Eighth And Fourteenth Amendments To The United States Constitution Prohibit The Execution of Mr. Lewis. | 241 |
| CONCLUSION | | | | 242 |

## INTRODUCTION AND PROCEDURAL HISTORY

In the early morning hours of December 20, 1996, the Riverdale police responded to a 911 call and went to Kimberly Silinzy's residence at the Chateau Forest Apartments in Riverdale, Georgia. (TTr. at 1252.) The victim in this case, Cheryl Lewis, along with her two

children, Kellee and Sean Dunn, had been staying with Ms. Silinzy for approximately a month. (Silinzy Aff., PX 106, at ¶ 2 (2860).)  The first Riverdale police officer, Phil Ingalls, arrived within 45 seconds after the 911 call because the Riverdale Police Department is located across the street from the Chateau Forest complex.  (TTr. at 1252.)

When Officer Ingalls arrived at the parking lot of the complex, he saw a man standing outside in the snow wearing nothing but boxer shorts.  (TTr. at 1253.)  That man was Robbie Epps, Mrs. Lewis's co-worker and boyfriend.  (*See* Silinzy Aff., PX 106, at ¶¶ 2-3, (2860); Thompson Aff., PX 110, at ¶ 2 (2874).)  The pair had attended a Christmas party earlier that evening and then returned to the apartment to spend the night.  (TTr. at 1136, 1170; Notes from D.A. Investigator Gary Kelley, PX 147, at 4388, 4396.)  The police found condoms in the apartment and Mr. Epps admitted that he and Mrs. Lewis had sex that night.  (TTr. at 1346; D.A.'s Witness Index and Witness Forms, PX 142, at 4263 (summarizing Robbie Epps' testimony as showing that he and Cheryl had gone to a Christmas party where they drank alcohol, and then returned to the apartment where they had sex and he went to sleep).)  Officer Ingalls stated that Mr. Epps appeared to be intoxicated and in an agitated state of mind when he encountered him that night.  (TTr. at 1254.)

As Officer Ingalls started toward the apartment, Cheryl Lewis's daughter, Kellee Dunn, ran out from a neighboring apartment and into Ms. Silinzy's apartment.  (TTr. at 1255-56.) Detective Ingalls left Mr. Epps unattended outside the apartment, and followed Kellee inside and upstairs.  (TTr. at 1256.)

Upon entering the Silizny apartment, Detective Ingalls saw Kellee running up to the second floor and he followed her.  (TTr. at 1256.)  When he followed Kellee into the bedroom at the top of the stairs, Detective Ingalls saw large amounts of blood.  (TTr. at 1256.)  Mrs. Lewis

was lying across the room from the door, partially leaning against a file cabinet. (TTr. at 1257, 1260.) It was obvious to Detective Ingalls that Mrs. Lewis was dead, both from her injuries and the amount of blood in the room. (TTr. at 1258.)

Detective Ingalls found Mrs. Lewis's son Sean when he performed a protective sweep of the upstairs rooms. (TTr. at 1259.) Detective Ingalls then encountered Mr. Epps coming back upstairs, apparently to retrieve some clothing. (TTr. at 1259-60; 1262.) Detective Ingalls allowed Mr. Epps to enter the crime scene and pick up his clothes, after which Mr. Epps and Sean went downstairs to wait in the living room. (TTr. at 1262.)

An hour later, Kellee Dunn identified Mr. Lewis, Cheryl's husband and her stepfather, as the person who killed her mother. (TTr. at 1270-72.) Ronald Bedingfield, the Chief of the Riverdale Police Department, later arrested Mr. Lewis at his apartment complex, which was approximately a 30-minute walk from Ms. Silinzy's apartment. (TTr. at 1324-1325.) After Chief Bedingfield saw Mr. Lewis, he identified himself as the chief of police. (TTr. at 1326.) According to Chief Bedingfield, Mr. Lewis said something to the effect that he knew "y'all would catch up with me." (TTr. at 1326.)

Chief Bedingfield frisked Mr. Lewis and found a butcher knife – which was determined not to be the murder weapon – in his sweatshirt sleeve, which Mr. Lewis said he was carrying for "protection." (TTr. at 1327, 1331.) Chief Bedingfield placed Mr. Lewis under arrest at approximately 4:00 a.m. on December 21, 1996. (Riverdale P.D. Report, PX 145, at 4355.) At no time did Mr. Lewis offer Chief Bedingfield any resistance, either to the search or to being placed under arrest. (TTr. at 1334.)

At the station, Detective Alex Manning led the interrogation of Mr. Lewis. (July 23, 1998 Mot. to Suppress Tr., Pet. App., Ex. A, at 38-39.) As Detective Manning testified at a

pretrial hearing on a motion to suppress Mr. Lewis's statement, she asked Mr. Lewis to sign a Miranda waiver and he refused to do so. (*Id.* at 43-44, 48.)  She then questioned him for two or two and a half hours.  (*Id. at*  49.)  Mr. Lewis repeatedly told Detective Manning that he had been drinking at a friend's house earlier that night and that he was starting to sober up. (Transcript of Christopher Lewis's Interview, Pet. App., Ex. D, at 3, 5, 8, 22, 37, 50-51, 65, 68; *see also* Snook Report, PX 62, at 5 (1671) (relating that Mr. Lewis told him that he had been smoking crack and drinking at "Joe's house" on the night of the murder); Farrell Aff., PX 83, ¶ 3 (2743) (testifying that "Joe" told him that he had been drinking with Mr. Lewis all day on the day of the murder); Hicks Aff., PX 44, at ¶ 7 (1517) (relating that he initially was going to look for "Joe," the person Mr. Lewis was drinking with on the day of the murder).

Halfway through the interrogation, Mr. Lewis requested a lawyer. (July 23, 1998 Mot. to Suppress Tr., Pet. App., Ex. A, at 49.)  Detective Manning claims at that point she began to gather her things to exit the room, but Mr. Lewis volunteered that he still wanted to keep talking to her. (*Id.* at 53-55.)  She continued to interrogate him until he gave a confession and he made a written statement as well. (*Id.* at 55, 58.)  In his oral confession, Mr. Lewis admitted to the killing, lamented the amount of alcohol he had consumed, and repeatedly expressed regret and remorse for his actions. (*See* Transcript of Christopher Lewis's Interview, Pet. App., Exs. B and D).)  The hand-written statement that Mr. Lewis gave to Detective Manning begins "The biggest mistake of my life was when I drinked all that beer and took the most preseiese [sic] person I'm so sorry I".  That line is crossed out, and the statement then reads, in full, "I'm so sorry I took the life of my wife went though [sic] the kichen [sic] windor [sic] it started as a joke just to sckair [sic] her but made a mistake and cut her went back door over the fence by the post office up Hwy 86 home ate took a walk."  There is a another sentence under the signature, "I never ment [sic]

for any of this to happen I'm sorry." (*See* Handwritten confession of Christopher Lewis, Pet. App., Ex. B.)

The State charged Mr. Lewis with the murder of Cheryl Lewis.  On November 13, 1998, nearly two years after Mrs. Lewis's murder, Mr. Lewis was convicted by a jury of murder, aggravated battery, burglary and possession of a knife during a felony.  The penalty phase began immediately after the conclusion of the guilt phase of the trial and, after an extremely brief and ineffective penalty phase presentation by the defense (discussed in detail below), Mr. Lewis was sentenced to death on November 14, 1998.

On December 11, 1998, Mr. Lewis's lead trial counsel, David Walker, filed a motion for new trial in which he raised, *inter alia*, an ineffective assistance of counsel claim based on his own performance.  (*See* HTr. at 408; Motion for New Trial, PX 120, at ¶ 3 (2952); April 28, 1999 Motion for New Trial Tr., PX 123, at 38-45 (2996-3003).)  In this proceeding, Walker testified that he raised his own ineffectiveness because he knew that he was not ready for trial, but had lacked the courage to admit that fact to the Court.  (HTr. at 408-409 ("I hadn't been able to get completely prepared, and instead of standing up and saying, Judge, I'm not ready, I'm not ever going to be ready until the proper resources are made available to me to get ready, and I'm not ready.  And when I didn't have the intestinal fortitude to do that, rather than just say, well, I guess I'm as ready as I can get, that in and of itself, in my estimation, was ineffective assistance of counsel.").)  Moreover, Mr. Walker felt that the rule against raising his own ineffectiveness was not etched in stone.  (HTr. at 409.)

Walker withdrew the ineffective assistance claim in an amendment to the motion and replaced it with a claim that the trial judge answered a note from the jury outside the presence of counsel.  Walker testified that he dropped the ineffective assistance of counsel claim because Mr.

Lewis requested that he stay on the case. (HTr. at 410.) Eventually, however, Walker was removed as counsel at a hearing on motion for new trial after the State acknowledged that Walker's ineffectiveness was an issue. (HTr. at 410-11; April 28, 1999 Motion for New Trial Tr., PX 123, at 38-43 (2996-3001).)

The judge who presided over the trial, the Honorable Deborah C. Benefield, then appointed new counsel, T. Michael Martin, who amended the motion for new trial on April 17, 2001. A second judge, the Honorable William H. Ison, was brought in to hear the claim regarding the jury note, and a hearing was held at which Judge Benefield testified that she did not answer a note from the jury. After Judge Ison denied relief on the juror note issue, and Judge Benefield considered and rejected the remaining claims in the motion for a new trial.

Martin then appealed to the Georgia Supreme Court, which ruled that Judge Benefield should not have both testified and ruled on other parts of the motion for a new trial, and remanded the case to the trial court. *Lewis v. State*, 275 Ga. 194, 565 S.E.2d 437 (2002). On remand, the motion for new trial was denied by Judge Ison on January 9, 2003. Mr. Lewis then appealed that ruling and the Georgia Supreme Court affirmed his convictions and the sentence of death on January 20, 2004. *See Lewis v. State,* 277 Ga. 534, 592 S.E.2d 405 (2004).

Mr. Lewis filed a *pro se* petition for writ of habeas corpus with this Court on September 17, 2004. After obtaining the assistance of *pro bono* counsel, Mr. Lewis filed his Initial Amended Petition for Writ of Habeas Corpus on May 16, 2007.

On March 3 and 4, 2008, the Court convened an evidentiary hearing at the Georgia Diagnostic and Classification Prison in Jackson, Georgia. At the hearing, the evidence focused on Mr. Lewis's claims that he is mentally retarded and therefore not eligible for the death penalty and that his trial and appellate counsel rendered constitutionally ineffective assistance of counsel.

11

At the conclusion of the hearing and in appendices to his post-hearing briefs, Mr. Lewis submitted approximately 220 exhibits, including numerous affidavits, and Respondent submitted 69 exhibits. The Court also heard testimony from two expert witnesses in support of Mr. Lewis's claim that he is mentally retarded, an expert offered by Respondent on that issue, both of Mr. Lewis's trial attorneys and his appellate counsel. Thereafter, the parties submitted voluminous post-hearing briefs. Based upon the evidentiary record, the Court makes the following findings of fact and conclusions of law and finds that Mr. Lewis is entitled to habeas relief, both with respect to his sentence and his conviction.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.    FINDINGS OF FACT REGARDING THE CONDUCT OF TRIAL COUNSEL AND COUNSEL DURING THE DIRECT APPEAL.**

Throughout these proceedings, both in their affidavits and during their testimony before this Court, both of Mr. Lewis's trial lawyers, David Walker and Leon Hicks, repeatedly admitted that they were not prepared when his trial began in November 1998, and the Court finds that the other evidence thoroughly corroborates those admissions. Moreover, the evidence establishes that trial counsels' performance was so shockingly deficient that the Court has no difficulty concluding Mr. Lewis's Sixth Amendment right to assistance of counsel was violated and that, as a result, he must be granted a new trial.

**A.    Trial Counsel Failed to Adequately Investigate Mr. Lewis's Case and Prepare for Trial.**

**1.    Walker and Hicks Were Not Experienced Death Penalty Lawyers.**

David Walker was appointed to act as lead counsel for Mr. Lewis in April 1998, only seven months before the beginning of his trial. He was paid by Clayton County at a rate of $85.00 per hour. (Walker Aff., PX 46, at ¶ 3 (1550); HTr. at 384.) Prior to Walker's appointment, Mr. Lewis had been represented by Lee Sexton, who resigned due to a conflict of

interest created by his representation of Lt. Keith Knowles, one of the officers who investigated the murder and who later testified during the trial. (Walker Aff., PX 46, at ¶ 4 (1550); Hicks Aff., PX 44, at ¶ 3 (1515).)  Mr. Lewis also was represented by Leon Hicks, who had been previously appointed as second chair to Mr. Sexton in February 1998. (Hicks Aff., PX 44, at ¶ 3 (1515).)  Despite the fact that Mr. Lewis had been incarcerated for 16 months, Walker neither requested nor received any files or any other materials from Mr. Lewis's former attorneys when he took over as lead counsel. (Walker Aff., Ex. PX 46, at ¶ 4 (1550).)

With regard to their experience in capital cases, at the time of their appointments, neither Walker nor Hicks had acted as lead counsel in a death penalty case, had ever been involved in the trial of a capital case and they had never worked together on any case. (HTr. at 386-87, 427-428; Walker Aff., PX 46, at ¶ 5 (1550-1551); Hicks Aff., PX 44, at ¶ 3 (1515).)  In his post-hearing brief, Respondent claims that Walker was an experienced death penalty lawyer whose purported "strategic decisions" are entitled to deference by this Court.  In particular, Respondent cites to Walker's testimony that he allegedly had tried ten murder cases and had worked on two other death penalty cases.   The evidence, however, does not support Respondent's characterization of  Walker as an experienced death penalty lawyer who knew how to prepare and try such a case.

Instead, Walker's admissions establish that his role in the two prior death penalty cases was minimal, that he was not lead counsel in either case, that he was removed from one case because he lacked experience, and that he had no idea how to conduct a mitigation investigation. (HTr. at 386-87 (Walker testifying that he was "summarily taken off" his first death penalty case and that two other attorneys did the majority of the work on the second case); 413-14 (Walker testifying that he was only on the first death penalty case for ten days to two weeks, that he did

13

not conduct the mitigation investigation in the second case and that he did not know how to conduct such an investigation); Walker Aff., PX 46, at ¶ 5 (1550-1551) (Walker testifying that he had not served as lead counsel in any death penalty case beyond initial appointment when he began representing Mr. Lewis).)  In addition, with respect to Walker's claim that he previously tried ten non-death penalty murder cases, the record is devoid of any evidence as to what he did in those cases or how those cases might have provided him with experience that he used when representing Mr. Lewis.

Finally, while Respondent does not explicitly argue that Hicks was qualified to try a death penalty case, the evidence establishes that he had never tried a death penalty case before being appointed to represent Mr. Lewis and that he took Mr. Lewis's case in an attempt to get experience.  (HTr. at 427-428; Hicks Aff., PX 44, at ¶ 3 (1515) ("I had never tried a death penalty case before, though I had participated in one other which resulted in a plea.  I was trying to get second-chair experience so that eventually I would qualify as first-chair.").)

2.     **Trial Counsel Did Not Adequately Prepare for Trial During the Period From April 1998 Through September 1998.**

The Court finds that Walker's own time records are compelling evidence and uncontroverted demonstrating that Walker and Hicks engaged in almost no substantive preparation for trial from the time of their appointment until September 1998. (*See* Walker Aff., PX 46, at ¶ 3 (1550); Walker Time Records, PX 47, at 1-3 (1561-1563); HTr. at 413.)  During the first two months after he was appointed, April and May 1998, Walker's time records establish that he spent less than 33 hours working on the Mr. Lewis's case.  The vast majority of that time – more than 25 hours – was spent editing and filing form pretrial motions that Walker acquired from the Multi-County Public Defender's office.  (Walker Aff., PX 46, at ¶ 6 (1551); Walker Time Records, PX 47, at 1561; HTr. at 395-96; Walker Dep., PX 45, at 20 (1527)

(testifying that after his appointment he spent the "bulk of [his] time . . . just preparing motions"); *see also* Hicks Dep., PX 43, at 24-25 (1510-1511) (Walker did not discuss the motions that he intended to file with Hicks).)

Respondent attempts to justify Walker's performance by asserting that he was "drawing on the resources of the Multi-County Public Defender [sic] Office" when he prepared his pretrial motions and suggesting that someone from the Multi-County Defender's Office might have done something to help Walker prepare for trial. The evidence, however, shows only that Walker received a disk of "all of [the Multi-County Public Defender's] motions" and that he edited and filed them by himself. (*Cf.* Resp. Br. at 58 and HTr. at 395 (Walker testifying only that he requested a "disk of all of their motions").)  Other than providing Walker with some form motions, there is no evidence that the Multi-County Public Defender's Office played any substantive role in Mr. Lewis's defense. (*See* Walker Dep., PX 45, at 25 (1529) (testifying that the Multi-County Public Defender's Office did not provide any assistance other than providing the form motions and providing one of their investigators to testify at the hearing of Walker's *ex parte* motion seeking funds to hire a mitigation investigator).)

During the third month of his representation, June 1998, Walker's records reflect that he spent only 3.7 hours working on the case.  (Walker Time Records, PX 47, at 2 (1562).) According to those records, that time was spent discussing the pretrial motions, requesting the appointment of a third lawyer – Patricia Angeli, who was later hired solely to conduct legal research and who withdrew before trial – and conducting an initial interview with Patrick Coffey, a crime scene investigator who was not hired until months later.[2]

---

[2] Ms. Angeli's affidavit establishes that her "role was solely to provide research assistance," that she performed some research on two issues, and that she withdrew when she

While Walker spent nearly 20 hours working on the case during July 1998, much of that time was again attributable to the form pretrial motions, culminating in a hearing on those motions on July 23, 1998.  Walker attributed his lack of activity during this period to his belief that "[o]ther than review of the discovery materials provided by the District Attorney, there was little else that could be done pending a hearing on the [pretrial] motions."  (Walker Aff., PX 46, at ¶ 6 (1551); Walker Time Records, PX 47, at 1562-1564.)

On July 23, 1998, the trial court heard argument on several of the defense's pretrial motions.  The trial court began by conducting an *ex parte* hearing on Walker's form motions seeking funds to, *inter alia*, hire a mitigation investigator and to conduct a psychological examination of Mr. Lewis.  During that hearing, Walker presented testimony from Pamela Leonard, a mitigation specialist from the Multi-County Public Defender's Office, regarding the time and funding that would be required to conduct a complete mitigation investigation in Mr. Lewis's case.  (*See* July 23, 1998 Ex Parte Hearing Tr., PX 173, at 10-21 (5136-5147).)  Ms. Leonard testified that it was "rare" for an attorney to have the necessary training to conduct a mitigation investigation and that she "very briefly" spoke with Mr. Lewis before taking the stand.  (July 23, 1998 Ex Parte Hearing Tr., PX 173, at 13-14, 16 (5139-5140, 5142).)

Based on that brief conversation, Ms. Leonard testified that in order to complete a mitigation investigation for Mr. Lewis's case, the investigator would have to gather and review records from New York, New Orleans and Mississippi, and perhaps travel to those locations to

realized that she previously represented Kellee Dunn in a juvenile court proceeding.  (Angeli Aff., PX 72, at ¶ 3 (2709-2710).)  Angeli also recalled that Walker and Hicks "were not in agreement about Lewis's defense strategy" and she did not follow the case at all after her motion to withdraw was granted about 10 days before trial.  (*Id.*, at ¶¶ 3-5 (2709-2710).)  While Respondent suggested in his post-hearing brief that Angeli was engaged in a mitigation investigation (Resp. Br. at 62), there is no evidence that she was qualified to conduct such an investigation or that she ever attempted to do so.

interview witnesses.  (*Id.* at 16 (5142).)  In addition, Ms. Leonard noted that the indications of

prior substance abuse would "certainly" need to be examined.  (*Id.*)  Significantly, Ms. Leonard

also recognized that Mr. Lewis's mental health – in particular the question of whether he is

*mentally retarded* – would be a vital issue and she testified that because there were "indicators of

some slowness in school where you really will be in a situation *where you need to rule out any*

*defenses of mental retardation* and mental health . . . it seems to me that the *indications are*

*sufficient that you've really got to delve into it.*"  (*Id.* at 16-17 (5142-5143) (emphasis added).)

Leon Hicks's brother, a psychiatrist, also testified during the *ex parte* hearing about the

costs of a psychological workup.  (July 23, 1998 Ex Parte Hearing Tr., PX 173, at 23-36 (5149-

5162).)    Specifically, Dr. Hicks testified that the defense should retain both a forensic

psychologist and a psychiatrist to provide a complete picture of Mr. Lewis's mental condition

and estimated that such an evaluation would cost approximately $4,000.  (*Id.*)  The trial court did

not rule at the conclusion of the *ex parte* hearing and instead stated "I'll take it all under

consideration and get out an order as to what this court will allow."  (*Id.* at 65 (5191).)

Later on July 23, 1998, the trial court conducted a Jackson-Denno hearing related to

Walker's form motion to suppress Mr. Lewis's oral confession to the crime.[3]  (*See* July 23, 1998

Motion to Suppress Tr., Pet. App., Ex. A, at 80-83 (Walker arguing that Mr. Lewis's oral

statement at the Riverdale Police Station should be suppressed because Mr. Lewis requested a

lawyer); December 20, 1996, Transcript of Christopher Lewis Interview, Pet. App., Ex. D, at 57

(where Mr. Lewis stated that "I did it").)  Walker argued the motion to suppress the oral

confession before conducting any investigation into the confession.  Instead, he first received a

---

[3] While Mr. Lewis also gave a written confession, there is no indication that Walker
moved to suppress that statement or that he was even aware of its existence.

transcript of Detective Manning's interrogation the day before the hearing and he did not review it until 10:00 p.m. that evening. (*Id.* at 65-66.) Moreover, despite eliciting testimony that Mr. Lewis claimed to have been drinking heavily before giving his confession, Walker did not raise any issue regarding whether Mr. Lewis was intoxicated and he argued only that the confession was inadmissible because Mr. Lewis at one point requested a lawyer. (*Id.* at 71-72, 82-83.) On October 6, 1998, the trial court ruled that Mr. Lewis had clearly waived his rights, and that his confession was admissible. (*See* October 6, 1998 Order, Pet. App., Ex. E.)

Following the hearings on July 23, 1998, Walker's time records demonstrate that he did almost no work on Mr. Lewis's case during the entire month of August 1998 and for the first several weeks of September 1998. For the entire month of August 1998, Walker spent only *three quarters of an hour* on the case – with the sole time entry occurring on August 10, 1998 for a "planning conference" and the review of a pretrial motion. (*See* Walker Time Records, PX 47, at 3 (1563).) Walker then did *no work* on the case during the nearly five-week period running from August 10, 1998 until September 19, 2008. (*Id.*) In his affidavit, Walker attempts to justify his inactivity during this period by pointing to he and Hicks' lack of training in crime scene analysis or in conducting a mitigation investigation. (*See* Walker Aff., PX 46, at ¶ 8 (1552).)

Hicks repeatedly admitted that he did nothing substantive to prepare for trial. For example, Hicks testified that he "had very little involvement in the case" before trial and he stated that the defense team "conducted minimal investigation and I certainly was never in charge of conducting such an investigation." (Hicks Aff., PX 44, at ¶ 6 (1516); *see also* Hicks Dep., PX 43, at 16 (1508) (agreeing with Respondent's counsel that he was "not asked to do very many tasks" during the pretrial phase and he was not aware of anyone else preparing for trial).) Hicks's billing records corroborate his admissions that he did nothing to prepare for trial and that

he was not prepared when the trial began on November 9, 1998.  In particular, the evidence is uncontroverted that Hicks worked a total of only 19.6 hours on the case from the time that he was appointed in February 1998 until the trial began on November 9, 1998. (*See* HTr. at 433-34; Hicks Aff., PX 44, at ¶¶ 8, 20 (1517, 1521-1522); Billing Record of Leon Hicks, PX 167, at 4797-4798 (Hick's request for payment from the County indicating that he spent 19.60 hours at $50 per hour for [pretrial] preparation").)   Another indication of the lack of activity by the defense team to prepare for trial was Hicks's testimony that Walker simply did not return any of the calls that he made during 1998 inquiring as to whether he could do anything to help prepare for trial.  (HTr. at 436; Hicks Aff., PX 44, at ¶ 5 (1516); Hicks Dep., PX 43, at 21-22 (1510) (Hicks stating that he was "out of the two man loop").)

> **3.    Trial Counsel Did Not Adequately Prepare For Trial During The Period Running From Late September 1998 Until The Trial Began On November 9, 1998.**

On September 25, 1998, approximately six weeks before the trial began, the trial court ruled on the *ex parte* motions for funds to hire experts.  (*See* HTr. at 415-418; Walker Aff., PX 46, at ¶ 9 (1552); September 25, 1998 Order, PX 172, at 5124-5126).  In its order, the trial court noted that the defense had requested $15,000 to hire experts, but ruled that:

> [T]his Court hereby AUTHORIZES payment of $8,000.00 to the defense for the employment of experts as outlined at the hearing. *Despite the fact that this amount is significantly less than the requested amount, this court hereby puts the defense on notice that any request for further funds will be scrutinized by this court and possibly denied.* Therefore, the defense should take care to spend this money carefully and only as necessary.  This court is particularly concerned about the number of hours the experts said would be needed.  The projected number of hours appeared excessive to this court.

(*See* September 25, 1998 Order, PX 172, at 5124-5126 (emphasis added); *see also* Walker Aff.,

PX 46, at ¶ 9 (1552).)  Walker understood the trial court's order to mean there was no possibility

that he could obtain any additional funds.  (HTr. at 418.)

Approximately two weeks after its ruling on the defense request for funds, on October 7,

1998, the trial court sent a letter to counsel setting the case for trial one month later – on

November 9, 1998.  (Letter Calling Case to Trial, PX 153, at 4468.)  During the evidentiary

hearing, Walker testified that he "broached" the subject of a continuance with the trial court at

some point in late September or early October 1998, but that the trial court refused to continue

the case and effectively said that "I only gave you half the money you asked for, so you should

only need half the time to prepare [for trial]."  (HTr. at 404; *see also* HTr. at 409 (Walker did not

believe that the trial court would grant him a continuance).)

Despite the fast approaching trial date, Walker's time records indicate that he spent only

20.75 hours working on the case during October 1998.  (Walker Time Records, PX 47, at 1561-

1566.)  He spent the largest block of that time – five hours on October 23, 1998 – trying to

"[r]eview, organize and classify juror questionnaires."  (Walker Time Records, PX 47, at 1561-

1566.)

In the four business days before jury selection on Monday, November 9, 1998, Walker

worked a total of 13.75 hours on Mr. Lewis's case and he did not work at all over the weekend of

November 7 and 8, 1998.  (Walker Time Records, PX 47, at 1561-1566.)  In total, Walker's time

records establish that he worked less than 100 total hours during the more than seven-month

period beginning with his appointment in April 1998 through the beginning of the trial on

November 9, 1998 – which this Court finds is a shockingly small amount of time for a lawyer

who was lead counsel in a death penalty case.

4.   **An Adequate Mitigation Investigation Was Not Conducted Prior to Trial.**

 a. **Neither Walker Nor Hicks Conducted a Mitigation Investigation.**

The evidence demonstrates that neither of Mr. Lewis's trial lawyers viewed themselves as responsible for conducting a mitigation investigation or putting together a mitigation case. The evidence also is overwhelming that no substantive mitigation took place.  For example, Walker flatly admitted in an affidavit that no substantive mitigation investigation occurred and that, despite his role as lead counsel, he did not believe that it was his responsibility to ensure that a mitigation investigation was conducted:

> Because expert funding was not authorized until late September, little could be done in terms of investigation or preparation of a mitigation case.  Most records regarding Mr. Lewis's background were out of state and would require either travel or employment of out of state assistance.  *The failure to prepare a mitigation case was certainly not a matter of trial strategy.  To the best of my recollection, mitigation was to have been the primary responsibility of Mr. Hicks.*  After the Court made its ruling on funds, we did hire Mr. Joe Jones, who I believe was a paralegal/investigator for attorney John Beall.  I do not recall who first contacted Mr. Jones or how he was brought to our attention.  Mr. Jones agreed to help and met briefly with me and later with Mr. Lewis without my presence.  *At that point, we were only about four weeks away from trial.*  [Jones'] effort was initially focused on obtaining records and I believe he did the best he could given the limitations of time and money.  Mr. Jones had contacted Mr. Lewis's sister in Tennessee but had gotten very little information.  She indicated that she would try to come for the trial but did not make it.  Without her, there was no family mitigation case.  *I relied on the efforts of Mssrs[sic] Hicks and Jones and never talked directly to the sister.* ... I did speak briefly with two mitigation witnesses [Lorraine France and Maxine Bryson] with whom Mr. Lewis had stayed before his arrest and their input was favorable.  They had been previously interviewed by Pat Coffey for character information, although he had not been asked to assist in the mitigation investigation.  Overall the mitigation preparation was unsatisfactory and we were prevented from doing more by both inadequate funds and insufficient time.  Due to the out of state information necessary to perform a complete mitigation

3262

investigation and case preparation, we needed at least several months and a lot more money than was allowed.

(Walker Aff., PX 46, at ¶ 10 (1552-1553) (emphasis added).)[4]

In contrast to Walker's assertion that Hicks was responsible for the mitigation investigation, Hicks denied during the evidentiary hearing that he was put in charge of conducting a mitigation investigation:

> Q.   [By Petitioner's Counsel] One other question about your responsibilities.  The issue of a mitigation investigation has come up.  It came up with Mr. Walker a few minutes ago.  So the record is clear, were you ever put in charge of conducting a mitigation . . . investigation in this case?
>
> A.   *I've been asked that before, and to the best of my memory, no.  And I've thought about it since then and, you know, when the mitigation portion of the trial went on, that's on the record, I didn't know, I don't recall meeting any of those folks before trial. I didn't meet with his landlords [Lorraine France and Maxine Bryson].  I didn't meet with the psychologist [Dr. Snook].  I've never seen these people, so if I was in charge I really did a bad job.*
>
> Q.   You mentioned the mitigation phase.  There were three witnesses presented by the defense, two ladies?
>
> A.   Yes.  I recall –
>
> Q.   What was your interaction with Maxine Bryson and Lorraine France?
>
> A.   I don't remember their names.  I saw their testimony, and I drove them home.
>
> Q.   So, you drove them home after they testified?  You left court?
>
> A.   David instructed me to take them home.
>
> Q.   So you weren't present when Dr. Snook took the stand?

---

[4] Joe Jones's minor role in this case is discussed below.

A.    No sir, I was not.

Q.    Had you ever met him?

A.    No sir, I did not.

Q.    Never talked to him before trial?

A.    Not to the best of my knowledge.

Q.    Had you ever even heard his name?

A.    Not that I recall.

(HTr. at 437-38 (emphasis added).)[5]    Specifically, with regard to the penalty phase and

mitigation evidence, Hicks testified that:

> Sadly, my primary role in this case came down to buying clothes
> for Chris to wear at the trial, doing some very basic research, and
> acting as a chauffeur during the sentencing phase of the trial. For
> example, David directed me to leave Court and pick up the two
> women who were the "mitigation" witnesses. After they testified
> and while the sentencing phase was still going on, David just
> turned to me and said "take them home." So I did and I felt like
> nothing more than a chauffeur. I also know that no one had
> prepared them for cross-examination. Lorraine France was not
> even told before she testified that Chris had been convicted. *The
> bottom line is that David had nothing prepared for the penalty
> phase – he just winged it.* My total involvement in the penalty
> phase was limited to driving Lorraine France and her mother
> home. I never even met the psychologist who testified [Dr. Snook]
> and I did not hear his trial testimony because I was out driving the
> witnesses home.

(Hicks Aff., PX 44, at ¶ 11 (1518-1519) (emphasis added).)  The Court finds Hicks's testimony

that he was not responsible for conducting a mitigation investigation to be credible and finds that

neither of Mr. Lewis's trial lawyers took the steps necessary to ensure that a thorough mitigation

investigation took place.

---

[5] Dr. Snook confirmed that he never spoke with anyone associated with the defense team other than David Walker. (Snook Dep., PX 60, at 10 (1638).)

**b.**   **Respondent's Claim That Other Individuals Conducted A Mitigation Investigation Are Without Merit.**

In his post-hearing brief, Respondent ignored the admissions of Walker and Hicks that no mitigation investigation took place and argued that four other individuals – Patrick Coffey, Pamela Leonard, Joe Jones and Dr. Steven Snook – conducted the constitutionally required mitigation investigation. The Court has carefully reviewed the evidence regarding each of those individuals and finds there is no evidentiary support for the conclusion that they, either individually or collectively, conducted an adequate mitigation investigation.

**(i)**   **Patrick Coffey Did Not Conduct A Mitigation Investigation.**

Following the trial court's September 28, 1998 order granting the defense $8,000 to hire experts, Walker hired Patrick Coffey, a crime scene investigator, and Dr. Steven Snook, a psychologist (whose actions are discussed below). The evidence is uncontroverted that Coffey was not a mitigation investigator, that he was not retained to conduct a mitigation investigation and that he did not conduct a mitigation investigation in this case.

Walker testified that Coffey was only a "crime scene investigator" and that he was not asked to conduct a mitigation investigation. (HTr. at 415; *see also* Walker Aff. PX 46, at ¶ 10 (1552-1553) (stating that Coffey "had not been asked to assist in the mitigation investigation.").) Coffey similarly testified that he was hired *only* "to look at the crime scene and interview witnesses connected to the crime scene." (Coffey Aff., PX 77, at ¶ 4 (2722).) Specifically, Coffey testified that the only interviews he was assigned were with the victim's children and the people with whom Mr. Lewis was living at the time of the crime. (Coffey Aff., PX 77, at ¶ 5 (2722-2723).)

Coffey's assistant, Sam Clevenger, attempted to conduct those interviews, and Clevenger also has confirmed that he was not hired to do a mitigation investigation. (*See* Clevenger Aff.,

PX 76, at ¶ 3 (2720) (testifying that he is "not a mitigation investigator and I was not hired to do an mitigation investigation" and that he did very little work on the case.)) Further, both Hicks and Coffey have confirmed that they did not meet each other before Coffey took the stand, thereby ruling out any possibility that Hicks might have told Coffey to conduct a mitigation investigation. (*See* Coffey Aff., PX 77, at ¶ 6 (2723) (testifying that he only met with Walker and Mr. Lewis and that "I do not recall Leon Hicks having much involvement at all in the case. I never spoke with him about it. In fact, I was quite surprised he knew who I was when he called me later and asked me to work on a subsequent case."); Hicks Aff., PX 44, at ¶ 7 (1517) (stating that he "never had any interaction with [Coffey] at all on [Mr. Lewis's] case").) In light of this uncontroverted evidence, the Court concludes that Coffey did not conduct a mitigation investigation in this case.

### (ii)     Pamela Leonard Did Not Conduct A Mitigation Investigation.

There is no evidence supporting Respondent's assertion that Pam Leonard "assisted trial counsel throughout their investigation" (*see* Resp. Br. at 90) and the Court is troubled by Respondent's counsel's repeated willingness to state factual conclusions that are not supported by the evidence. Instead, as noted above, Ms. Leonard's only participation in Mr. Lewis's case was her testimony at the July 23, 1998 motion hearing seeking funds to hire *someone else* to conduct a mitigation investigation.

Apart from that hearing, there is no evidence that Ms. Leonard provided any "assistance" to Walker or Hicks. (*See* July 23, 1998 Ex Parte Hearing Tr., PX 173, at 15 (5141) (Leonard testifying that she was personally unable to investigate Mr. Lewis's case and that the Multi-County Public Defender's Office could not provide an investigator for Mr. Lewis); Walker Dep.,

PX 45, at 25 (1529) (testifying that Leonard could not conduct the mitigation investigation for Mr. Lewis's trial).)

Indeed, on the page of Walker's deposition transcript that Respondent cites for the proposition that Ms. Leonard "assisted trial counsel throughout their investigation," Walker testified that:

> . . . when I contacted [Leonard] about mitigation in this case, she told me upfront – to the best of my recollection, she told me upfront that she would not be able to do it because of the workload, but she would help with whatever we were allowed to try and help me find somebody, and she would help with the hearing to try and get us the funds.

(Walker Dep., PX 45, at 26 (1529).)  On the next page of his transcript, Walker emphasized Leonard's limited role:

> Q.    (By Respondent's counsel)  You also said a second ago that Pam Leonard said she would help your team try to find somebody since she couldn't act as mitigation expert?
>
> A.    I believe she said that she would try to help with some people who could possibly help in that investigation, the names, but that would be about as far as what could be done.

(Walker Dep., PX 45, at 27 (1529).)  Simply put, Respondent's claim that Leonard "assisted trial counsel throughout their investigation" is false, and Respondent's representation that she provided such assistance represents either gross negligence by Respondent's counsel in the drafting of his brief or a deliberate attempt to mislead this Court by creating "facts" that have no evidentiary support.

### (iii)    Joe Jones Did Not Conduct a Mitigation Investigation.

Joe Jones was a paralegal who sent out a few last minute requests for Mr. Lewis's school and employment records and spoke briefly to one of Mr. Lewis's sisters.  (Defense Witness Notes, RX 24, at 6993-6974; Documents Related to Employment and School Records, RX 22, at

26

6951-6962; and Barbara Higgins Aff., PX 88, at ¶ 19 (2769-2770).)  Specifically, the evidence indicates that on or about October 1, 1998 – approximately six weeks before trial – Jones apparently interviewed Mr. Lewis and got a list of family members, employers, and the name of a New Orleans school that Mr. Lewis had attended.  (Jones Aff., PX 95, at ¶ 4 (2810).)

Other documents found in Walker's files suggest that on October 6 Jones sent out letters to three companies in Georgia where Mr. Lewis had worked since moving to the area at the end of 1995 and that on October 13 Jones wrote to Mr. Lewis's high school.  (Documents Related to Employment and School Records, RX 22, at 6951-6962.)  There is no evidence that Jones made any attempts to obtain other school records or that he sent any requests for information to any of Mr. Lewis's prior employers in Louisiana or Mississippi.  Moreover, the only evidence that Jones actually obtained any information as a result of his last minute and superficial inquiries is a short pay summary from Express Personnel showing Mr. Lewis's pay for four weeks in November and December 1996, *i.e.* the period immediately before the murder.  (Documents Related to Employment and School Records, RX 22, at 6955; *see also* HTr. at 419).)

The only family member Jones ever contacted was Mr. Lewis's sister, Barbara Higgins, who lived in Chattanooga, Tennessee.  (*See* Defense Witness Notes, RX 24, at 6972-6974); Jones Aff., PX 95, at ¶ 4 (2810).)  Even that phone call did not take place until October 26, 1999, a mere 14 days before the trial.  While Ms. Higgins provided Jones with some information regarding the whereabouts of Mr. Lewis's mother and other siblings, there is no indication that anyone made any attempt to contact those family members.  (*See* (Barbara Higgins Aff., PX 88, at ¶ 19 (2769-2770); Kenneth Jefferson Aff. PX 91, at ¶ 18 (2800).)  During their interview, Mr. Jones asked Mrs. Higgins if she would be available for trial and she told him she would testify but needed advance notice to obtain child care.  (Barbara Higgins Aff., PX 88, at ¶ 19 (2769-

27

2770); *see also* Joe Jones Notes, RX 24, at 6974 (indicating that Barbara Higgins "would try to come and testify," but that she needed "as much advance notice as possible" so that she could get "someone to take care of her children").)  No one from the defense team ever contacted her again. (Barbara Higgins Aff., PX 88, at ¶ 19 (2769-2770).)

In his affidavit, Jones testified that "[m]y memory of what I did in the Lewis case is very sketchy, because I did so little." (Jones Aff., PX 95, at ¶ 3 (2810).)  Jones also confirmed that while he sent some letters to Mr. Lewis's former employers and to his high school in New Orleans *in early to mid-October 1998 – i.e.,* a few weeks before trial – he received a response from only one employer.  Other than that single response, Jones stated that there was no time to obtain additional records before the trial began on November 9, 1998. (Jones Aff., PX 95, at ¶ 5 (2810-2811).)  Jones does not recall doing anything else on the case or whether he was paid for the little work that he did. (Jones Aff., PX 95, at ¶¶ 3, 6 (2810-2811).)  In light of this evidence, the Court concludes that Jones made only a few superficial and last minute inquiries and that he did not, in fact, conduct an adequate mitigation investigation.

>             (iv)    **Dr. Steven Snook Did Not Conduct A Mitigation Investigation.**

Respondent's post-hearing brief also erroneously suggests that Dr. Steven Snook, a psychiatrist hired by Walker to evaluate Mr. Lewis shortly before trial, conducted a mitigation investigation by stating that Dr. Snook was retained to determine if there were "mitigating factors, including mental retardation." (*See* Resp. Br. at 94, 108.)  While the Court discusses the fundamental flaws in Dr. Snook's evaluation below, the evidence establishes that Dr. Snook's last minute evaluation was not a mitigation investigation.  Indeed, the evidence establishes that Walker met with Dr. Snook only once before he evaluated Mr. Lewis, that Walker did not give

Dr. Snook any guidance as to what he should look for and that they never even discussed the issue of mental retardation.

Walker met with Dr. Snook only one brief time, and that meeting took place before Dr. Snook evaluated Mr. Lewis and before Dr. Snook was called to testify at trial. (*See* Walker Time Records, PX 47, at 1563 (October 2, 1998 entry); HTr. at 418 (responding to a question as to whether he met briefly with Dr. Snook when he initially hired him, Walker testified, "I don't think it was when we initially hired him. It's when I was seeing what he would need to get hired, I believe"); Walker Aff., PX 46, at ¶ 11 (1553) (stating that he "was allowed one brief meeting with Dr. Snook prior to his employment and evaluation"); Snook Dep., PX 60, at 12 (1640) (Snook testifying that he did not speak with anyone on the defense team other than Walker either before or after his evaluation); Snook Aff., PX 109, at ¶ 3 (2869) (stating that "I had one face to face meeting with Mr. Walker prior to the evaluation, and that was when he hired me.").) Walker also had (1) never hired a mental health expert before, (2) never conducted a direct-examination of such an expert and (3) no training in evaluations for mental retardation or any issues related to mental retardation. (HTr. at 407-08, 422; Walker Aff., PX 46, at ¶ 22 (1559-1560) (Walker admitting that he is not "schooled in the field of psychology").)

Dr. Snook also had never examined a criminal defendant before seeing Mr. Lewis (Snook Dep., PX 60, at 7-8 (1635-1636)), and he worked for a community clinic.[6] Snook also testified that Walker "certainly never informed me that in 1998, mentally retarded persons could not be executed in Georgia" and the evidence is uncontroverted that Walker and Dr. Snook never discussed the issue of mental retardation. (Walker Aff., PX 46, at ¶ 11 (1553-1554); Snook Aff.,

---

[6] Dr. Snook's practice in 1998 consisted of evaluating medical professionals with alcohol and drug problems and doing evaluations for Social Security and the Department of Family and Children Services. (Snook Dep., PX 60, at 8 (1636).)

PX 109, at ¶ 6 (2870-2871).)   In other words, the evidence establishes that Walker never discussed mental retardation with Dr. Snook in either the context of a guilt/innocence defense or as a mitigating issue to be raised during the penalty phase.

The evidence also demonstrates that Walker effectively gave no guidance to Dr. Snook and that he instead simply:

> turned [Dr. Snook] loose to go and examine Christopher.   I contacted his office once or twice and was told his report was coming or that he was, you know, at what stage of the work he was in.   That's about all he could do.

(HTr. at 401 (emphasis added).)   Walker also testified at the evidentiary hearing that he had Mr. Lewis evaluated because:

> We needed to have him evaluated to see if there are any psychoses which might make him mentally unfit, crazy, at the time it was committed, to see if he even had the mental capacity to commit a crime.   I guess to a lesser degree to find out is there anything psychologically there which might help out in the defense, can he assist in the defense.   And that's what I wanted to find out.   I believe specifically he was told to go through something and evaluate his mental capacity, whatever else.   And I told him there was only a certain amount of money available.

(HTr. at 402.)   In his affidavit, Walker further states that when he hired Dr. Snook, he "was interested in showing that Mr. Lewis did not suffer any mental disorders which indicate a propensity toward future violent crime." (Walker Aff., PX 46, at ¶ 11 (1553).)

Dr. Snook testified that he understood that "Mr. Walker's main interest appeared to be in ascertaining mental status at the time of the crime – that Mr. Lewis was not a dangerous individual and would not be dangerous in the future" and Dr. Snook thought that "Mr. Walker's purpose in having me testify was ostensibly to show that Mr. Lewis was not a 'psychopath', i.e. that he would not be dangerous in the future." (See Snook Aff., PX 109, at ¶¶ 2, 10 (2869, 2872-2873); see also Snook Dep., PX 60, at 9 (1637) (when Walker met with Snook, Walker "was

concerned . . . about the level of dangerousness that this individual may present").) As to whether Dr. Snook was to conduct a mitigation investigation, Walker specifically testified during the evidentiary hearing that *"didn't see [mental health] as a mitigation factor in this case."* (HTr. at 389.)

In addition, while Dr. Snook asked Walker for background materials regarding Mr. Lewis to assist him with his evaluation, Walker acknowledged that he had no materials to provide to him. (Snook Aff., PX 109, at ¶ 3 (2869) (testifying that "it is vital in performing evaluations of intellectual functioning and cognitive testing to get as much collateral information as possible, I asked for all sorts of background materials: e.g. school records, health records, family history, criminal records, employment records, et cetera. I never received any of those records."); Snook Dep., PX 60, at 14-15 (1642-1643) (testifying that he emphasized to Walker the importance of reviewing collateral data as part of a comprehensive psychological evaluation and that he never received such data); HTr. at 419 (Walker testifying that he did not provide background materials to Snook because he did not have any); Walker Aff., PX 46, at ¶ 11 (1553-1554) (stating that "Dr. Snook did ask for materials and records relating to Mr. Lewis's background, such as school and health records, but I had none in my possession or control and, absent sufficient mitigation investigation prior to evaluation, there was no way to obtain or provide anything to Dr. Snook").) Based upon this evidence, the Court rejects Respondent's argument that Dr. Snook's last minute and flawed evaluation satisfied the constitutional requirement that the defense actually conduct a thorough mitigation investigation.

**B.      Walker and Hicks Were Not Prepared When Mr. Lewis's Trial Began On November 9, 1998.**

As noted above, both Walker and Hicks have repeatedly acknowledged that they were

unprepared when the trial began on November 9, 1998.  In fact, Walker testified that he raised a

claim of his own ineffectiveness in his initial motion for a new trial because

> [i]t just hit me so much that I had done everything that I could
> within my capacity to get ready for the trial.  *I hadn't been able to
> get completely prepared, and instead of standing up and saying,
> Judge, I'm not ready, I'm not ever going to be ready until the
> proper resources are made available to me to get ready, and I'm
> not ready.  And when I didn't have the intestinal fortitude to do
> that, rather than just say, well, I guess I'm as ready as I can get,
> that in and of itself, in my estimation, was ineffective assistance of
> counsel.*

(HTr. at 408-09 (emphasis added).)  Walker also stated that he was not prepared for trial in his

affidavit:

> When the trial began on November 9, 1998, *the case had not been
> adequately prepared and we were not ready.   When called for
> announcement, I did state we were as ready as we could get, rather
> than stating that we had not been allowed to be truly ready and
> that I was not ready.*  I greatly regret that I did not have the
> intestinal fortitude to state on the record that we were not ready,
> and that I did not request [a] continuance until we could complete
> preparation.
>
> . . .
>
> . . . I chose to file the Motion for New Trial as that was the wish of
> Mr. Lewis and I did not wish to abandon him if that was what he
> wanted.  Also, *I felt it important to make the first indication of
> ineffective assistance of counsel owing to my inhibitions and
> failure to announce that I was not fully prepared for trial.*   I
> wished to make it known that I had done all that I could and all
> that I had been allowed to do according to the resources allocated
> me for this case, and that it was simply insufficient.
>
> . . .
>
> I do not believe Mr. Lewis deserved the death penalty. ...  [I]f I had
> at the call of the case announced "Not Ready" and inability to get

ready until sufficient resources were made available, there is little doubt in my mind that the result would have been different.

(Walker Aff., PX 46, at ¶¶ 14, 20, 21 (1555, 1558-1559) (emphasis added).)  For his part, Hicks testified that "David Walker did not assign me any significant tasks for trial, including preparing for or examining any witnesses.  As a result, Hicks testified that "I did not expect to have any role examining witnesses and I did not prepare for any witnesses."  (Hicks Aff., PX 44, at ¶ 9 (1517).)  The evidence regarding trial counsel's inept performance during the trial corroborates their admissions that they were not prepared and belies any argument that Walker and Hicks are understating their level of preparation in this proceeding.

    **1.**       **Walker And Hicks Did Not Have An Agreement Regarding Who Would Be Responsible For The Examination of Witnesses.**

Walker stated that he and Hicks did not agree on even the fundamental issue of who would be responsible for cross-examining the State's witnesses before trial.  Instead, Walker testified that decisions were made about who would examine various witnesses during the trial and that he conducted examination without advance preparation:

> [p]rior to trial, Leon Hicks and I had not agreed on who would handle each individual witness for the State.  It was our general concept we would alternate witnesses, with the exception of the pathologist, who I personally wanted to question.  During the trial there were several instances where I believed an objection should be entered during direct examination of witnesses who were to be handled by Mr. Hicks.  As he did not make the objection, I was forced to interject and found myself taking those witnesses without full preparation.
>
> . . .
>
> During the direct examination of the medical examiner, Mr. Hicks objected to the photographs and he resultantly assumed cross-examination.  The only specific assignments for cross examination I had made prior to trial were that I would handle the Medical Examiner and Leon would handle the children, Kellee and Sean.  I believed we understood that we would meet nightly after court to prepare for the following day, but Mr. Hicks was unable to come

> several nights due to other work.  I would note that as assistant
> counsel, his fees were limited to $45.00 per hour by rules for the
> appointment of counsel.

(Walker Aff., PX 46, at ¶ 15 (1555-1556) (emphasis added).)   Hicks's testimony directly

contradicted Walker's claim regarding the existence of a "general concept" that the defense

lawyers would alternate witnesses and he testified that Walker did not assign him any witnesses

before trial and that he did not prepare to examine any witnesses.  (Hicks Aff., PX 44, at ¶ 9

(1517).)  In light of this evidence, the Court finds that it would have been impossible for either

Walker or Hicks to properly and competently prepare to cross-examine the State's witnesses and

concludes that they did not do so.  Moreover, based on the demeanor and motives of both Walker

and Hicks when they testified, the Court concludes that Walker's testimony regarding the

existence of a "general concept" of alternating witnesses is incredible.  Instead, the Court finds

that Walker and Hicks had no plan regarding who would examine the State's witnesses before

the trial began.

### 2.    Walker And Hicks Did Not Agree On A Theory Of The Case.

Walker and Hicks also did not reach an agreement on the fundamental issue of what the

defense theory should be at trial.  For his part, Walker appears to have vacillated between

attempting to convince the jury that Mrs. Lewis's murder was not a capital offense, while at the

same time suggesting that Mr. Lewis was innocent and that Mr. Epps, for some inexplicable

reason, committed the murder and then waited for the police to arrive while Mr. Lewis fled.  For

example, Walker testified that as he knew that "Mr. Lewis and his wife had had a rocky

relationship, but that there had not been any death sentences returned on a domestic case that I

had been able to locate" so he "remained hopeful we could obtain a plea to life or life without

parole."[7]   (Walker Aff., PX 46, at ¶ 12 (1554).)   Walker also believed that there were

"guilt/innocence questions" because Mr. Lewis "had only the slightest amount of blood" on his

clothes when he was arrested and because he believed that the police improperly ruled out

Robbie Epps as a suspect.   (Walker Aff., PX 46, at ¶ 12 (1554-1555).)   Walker had these

"guilt/innocence questions" despite his belief that the State would introduce Mr. Lewis's

confessions after the murder at trial.  (Walker Aff., PX 46, at ¶ 16 (1556); Handwritten Statement

of Christopher Lewis, Pet. App., Ex. B; Transcript of Christopher Lewis's Interview, Pet. App.,

Ex. D).)  Walker also never attempted to suggest a motive for Mr. Epps to kill Mrs. Lewis or a

reason why he would have remained at the scene after killing her.

    Although he was second chair, Hicks testified that (1) he had no involvement in

formulating the trial strategy, (2) he did not agree with Walker's decision to focus on the

guilt/innocence phase of the trial and ignore mitigation phase, and (3) the defense simply did not

present any coherent theory at trial.  Hicks testified that he had little involvement in the case and

that:

> [w]hat I remember most is fighting with David, because what I
> thought we should be doing was diametrically opposite to what
> David thought we should be doing.  *I believed the strategy, given*
> *the facts, should have been to make the entire case about*
> *mitigation and essentially concede guilt.  I firmly believe that the*
> *outcome of the case would have been different if we had spent time*
> *and money on the penalty phase, rather than David's decision to*
> *focus on the guilt phase.  But David was convinced that there was*
> *no way a jury was going to give Chris the death penalty in this*
> *case because he hardly had any blood spatter on him when he was*
> *arrested, even though Chris had confessed to the killing and the*
> *judge had ruled that the confession was admissible.  So while we*

---

[7] However, Walker claims he didn't consider the possibility of entering into a plea bargain, because there was "never anything to plead to" and that the only time they discussed the issue, the prosecutor, Brandon Hornsby, told him "if he pleads, we'll tell them to turn up the electricity." (Walker Dep. PX 45, at 93-94 (1546).)

got some money to use for the case, which was far less than we asked for and which was supposed to pay for the whole case, David's focus was on the crime scene stuff and everything else was an afterthought. *The result was that we conducted minimal investigation and I certainly was never in charge of conducting such an investigation.*

. . .

I strongly believed that the money we received from the Court should have been spent to investigate mitigation issues ....

. . .

*. . . There was no plan [by the defense for the trial].* While we had to assume that Chris' confession was going to come into evidence, David still insisted that we should say Chris was not at the scene when the victim was murdered and that instead he came into her apartment and found the body, then panicked and fled. The only support he had for this was the relatively small amounts of blood found on Chris. While the Assistant District Attorney, Brandon Hornsby, ended up not using the confession in his case in chief, I am sure that the State did not offer the confession because it actually made Chris look sympathetic. David, however, had no way of knowing that the State would not use the confession before trial or when he made his opening statement.[8]

(Hicks Aff., PX 44, at ¶¶ 6, 8, 10 (1516-1518) (emphasis added).)   Ultimately, Hicks

emphatically denied that there was a "difference" in strategy between Walker and him because,

in the end, he did not believe that Walker had a trial strategy.  (HTr. at 428-29, 436; *see also*

Hicks Dep., PX 43, at 16-19 (1508-1509) (testifying that saying "that your client is **not guilty** is

not a theory of the case.  And having said that . . . I don't know of a theory of the case.  And if

[Walker] espoused one, I missed it").)

Based upon its review of the trial record, the Court finds that the defense ultimately failed

to present any coherent theory to the jury and that Walker instead presented a hodgepodge of

---

[8] While the State did not use Mr. Lewis's confession during its case-in-chief, it did refer to the confession when it impeached Dr Snook with it during the penalty phase.  (TTr. at 1928.)

arguments, which either conflicted with other evidence or were merely stated as conclusions and presented without any evidence to support them.

       **3.**      **The Defense Did Not Adequately Investigate Its Actual Innocence Theory.**

       Walker's actual innocence theory was based on his belief that Robbie Epps might have murdered Mrs. Lewis.  The defense, however, never investigated Epps' role and, as a result, Walker's attempt to blame Epps was presented to the jury without any evidentiary support. Walker testified repeatedly during the evidentiary hearing that he asked Patrick Coffey to find Epps and that Coffey was able to find him several times, but that someone – presumably, an agent for the prosecution – would "move" Epps before the defense could interview him.  (*See* HTr. at 394-95; *see also* Walker Aff., PX 46, at ¶ 13 (1555) (Walker claiming that he asked Coffey to find Epps, that Coffey found him in South Georgia and at two locations in Florida, that Epps was gone before he could get anyone there to talk with him and that the "moves were not entirely coincidental").)

       Directly contradicting Walker's testimony, Coffey denied that Walker ever asked him to locate Robbie Epps and he had no knowledge that anyone was ever investigating Epps as a suspect:

> I recall that David Walker found the fact Chris Lewis had so little blood on him to be very persuasive as to his innocence, especially given that the wife's boyfriend, Robbie Epps, was never really investigated as a suspect. *I was never asked to find and talk with Epps, however.  In fact, I specifically recall David Walker telling me not to mess with Epps, in that it would be tampering with a witness.  Mr. Walker said that the police had eliminated him as a suspect so we shouldn't mess with him.  To my knowledge, no one ever really investigated him – the police automatically eliminated him as a suspect, and no one checked the bathroom to see if he could have showered off before the police arrived.*  It seemed odd, since my investigation of the crime scene was to show that the physical evidence didn't fit with the State's theory that Chris

> Lewis had done it, that David Walker didn't try to go after the guy
> who should have been the key suspect.

(Coffey Aff., PX 77, at ¶ 9 (2724) (emphasis added).)[9]

Moreover, there is no evidence that Mr. Epps, who died of HIV in 1999, was being "moved" so that the defense could not speak with him. To the contrary, Mr. Epps' sister testified that Mr. Epps was living with her at the time of the crime and that "Robbie always lived in the Riverdale [Georgia] area in the years after the murder. He never left to live in Florida or anywhere else [before he died]." (*See* Epps Williams Aff., PX 112, at ¶¶ 3-4 (2885).) In addition, Mr. Epps' wife testified that:

> Robbie was living with his sister Irma in Riverdale in December
> 1996, when Cheryl Lewis was killed. I was in Florida, and moved
> up in early 1997. We lived with Irma at first, then got our own
> place. We continued to live in the area until 1999, when Robbie
> died. I moved in 2000.
>
> . . .
>
> *There was never any time during this period between 1996 and his*
> *death that Robbie was gone from the Riverdale area of Georgia, or*
> *lived in Florida or any other state.*

(Thompson Aff., PX 110, at ¶¶ 3-4 (2874) (emphasis added).) Epps' wife also was not aware that anyone other than police detectives tried to contact Mr. Epps. (*Id.*, ¶ 5 (2874).)

Based upon the lack of evidence that anyone was "moving" Epps, Coffey's testimony that he was actually instructed not to look for Epps and the uncontroverted evidence that Epps

---

[9] Consistent with Hicks' testimony that he had almost no involvement in preparing the case for trial, both Hicks and Coffey have confirmed that they did not meet each other before Coffey took the stand. (*See* Coffey Aff., PX 77, at ¶ 6 (2723) (testifying that he only met with Walker and Mr. Lewis and that "I do not recall Leon Hicks having much involvement at all in the case. I never spoke with him about it. In fact, I was quite surprised he knew who I was when he called me later and asked me to work on a subsequent case."); Hicks Aff., PX 44, at ¶ 7 (1517) (stating that he "never had any interaction with [Coffey] at all on [Mr. Lewis's] case").)

never left the Riverdale area, the Court concludes that Walker's testimony that he instructed Coffey to look for Epps and that someone was "moving" him is incredible.  Instead, the Court finds that Walker simply failed to investigate Epps and decided to argue that Epps may have committed the crime at trial without making any attempt to obtain evidence to support that claim.

### 4.    Walker's Opening Statement.

After two days of jury selection, the trial started on November 11, 1998 with opening statements.  During its opening statement and throughout the trial, the State's theory was that Mr. Lewis was a controlling, abusive husband, and the State emphasized the history of domestic disturbances between Mr. and Mrs. Lewis.   The State also claimed that shortly before the murder, Mrs. Lewis "let [Mr. Lewis] know you just can't be coming around anymore." (TTr. at 1058.)  Mr. Hornsby further argued that Mrs. Lewis's request for a divorce pushed Mr. Lewis over the edge, and that Mr. Lewis killed her when he realized that he would not be able to control her. (TTr. at 1707-08; 1715-16.)

Because Walker and Hicks failed to investigate the case before trial, the defense was not prepared to respond to the State's arguments by arguing and introducing available evidence establishing that Mrs. Lewis had an ongoing, sexual relationship with Mr. Lewis even after the two were no longer living together.  (*See* Silizny Aff., PX 106, at ¶¶ 2-3 (2860) (testifying that Cheryl Lewis was still seeing Mr. Lewis while she was dating Robbie Epps and that Mr. and Mrs. Lewis had sex two weeks before the murder).)

Instead, David Walker gave an extremely brief opening statement for the defense (which spans only three pages of the transcript), which he began by referring to the Lewis's "troubled marriage," then suggesting that the couple was in the process of reconciling.  (TTr. at 1069-70.) Walker also made a conclusory reference to "a botched criminal investigation" without explaining what he meant.  (TTr. at 1070.)

And despite the evidence that Mr. Lewis had been banging on the door of the Silizny apartment earlier in the evening (TTr. at 1142-43, 1203-1204), Walker's opening fancifully claimed during his opening that Mr. Lewis went to the apartment on the night of the murder with "the advance knowledge and consent of Cheryl Lewis, Sean Lewis [sic], Sean Dunn, and Kellee Dunn," that he left, and that he later went back at "the time that he believed that his wife would be back" in an attempt to reconcile with her. (TTr. at 1070.) Walker had no evidence to support that argument.

Walker also claimed during his opening that Mr. Lewis entered the apartment through a kitchen window, "[b]ecause of difficulties Chris was not allowed to have a key, but because of attempts that they could get back together the kitchen window was left unlocked to allow his entry." (TTr. at 1070.) Not only did that argument lack any factual foundation, it actually conflicted with the physical evidence showing that the window had been jimmied open. (TTr. at 1402-1407 (GBI investigator testifying that evidence indicated window had been forced open); *see also* Tressel Aff., PX 111, at ¶ 8 (2878) (concluding the window had been jimmied open).)

Walker then presented his unsupported actual innocence theory by claiming that after Mr. Lewis entered the apartment by crawling through the window, he found his wife "dead or dying," got blood on his shoes, and then left the apartment "wondering what can I do now." (TTr. at 1071.) Mr. Walker then concluded his opening by again referring to the purportedly "botched" investigation and suggested that the police had intentionally "overlooked" evidence and other suspects (presumably meaning Epps):

> The botched investigation is going to show many things that the police have overlooked, that the police failed to check, that the police intentionally did not inquire into, and based upon that evidence, the evidence showing impossibilities, the evidence is going to show Chris Lewis was in that apartment, he's not guilty.

40

> After the evidence is closed we will come back and again go over
> what has then truly been shown at that time and ask you for your
> verdict.

(TTr. at 1071-72.)

### 5.   Walker And Hicks Failed To Prepare To Cross-Examine The State's Witnesses.

As discussed above, Walker claimed that he and Hicks had agreed on a "general concept" that they would alternate cross-examining the State's witnesses before trial. Even if such a "concept" were in place, however, the Court notes that it would not have allowed Walker and Hicks to properly prepare to cross-examine the State's witnesses because they had no way of knowing the order in which the State would call its witnesses and, as a result, they could not know which witnesses would be their responsibility before trial. Moreover, Walker's claim that there was a concept to alternate witnesses is further belied by the fact that he cross-examined eight of the eleven witnesses presented by the State during the guilt/innocence phase of the trial. (TTr. at 1101, 1123, 1384, 1498.)  Simply put, as noted above, the Court concludes that Walker and Hicks had not agreed on any plan regarding the conduct of cross-examinations prior to trial.

The circumstances surrounding Leon Hicks's cross-examination of three witnesses for the State – Sean Dunn, Kellee Dunn and Steven Dutton – further demonstrate that the defense was not prepared for the trial.  The testimony of Sean Dunn (who was 12 years old when he testified nearly two years after the murder) and Kellee Dunn (who was 15 years old at the time of the trial) was critically important because they were the only eyewitnesses who placed Mr. Lewis in the apartment at the time of the murder.  (TTr. at 1159, 1206-1207, 1212-1213.)  Kellee's testimony was even more crucial because she testified on direct examination that she actually saw Mr. Lewis in the act of committing the murder – testimony which gutted Walker's claim of actual innocence.  (TTr. at 1206-1208, 1212-1213.)

41

In particular, on direct examination, Kellee testified that she woke up when she heard her mother call for help and that she saw Mr. Lewis in the room across the hall kneeling over Mrs. Lewis with a knife in his hand. (TTr. at 1206-09, 1212-13.) Kellee also testified that she tried to get into the room where Mr. Lewis was attacking Mrs. Lewis, but that Mr. Lewis pushed the door shut and that she then ran to a neighbor's apartment to call the police. (TTr. at 1206-1207, 1214.) This testimony conflicted with pretrial testimony by Riverdale Police Lt. Keith Knowles that Kellee had *not* actually witnessed the killing. (December 27, 1996 Preliminary Hearing Tr., PX 119 at 11, 28 (2937).)[10]

While Hicks conducted the cross-examinations of both of the children, he has repeatedly stated that he was not prepared to do so because Walker never told him before trial that he would be responsible for those examinations. Instead, Hicks testified "with great clarity" that Walker first informed him that he would handle those two critical cross-examinations when Sean, the first child to testify, was already on the stand:

> Q.     How did you find out that you were going to cross-examine Kelly Dunn and Sean Dunn?
>
> A.     David Walker asked me to do that at trial. I mean right after the direct he said, "You do the cross," and that was, you know --
>
> Q.     As best you can, can you explain for the Court exactly what David Walker said and how it came about at trial that you ended up cross-examining the two children?
>
> A.     I don't remember which child came first, but after the direct examination of the child David said to me, "You cross. Take this witness." And I said, "I haven't prepared to take this witness." And he said, "You're good at doing children; I've seen

---

[10] The court reporter failed to number page 11 of the December 27, 1996 Preliminary Hearing Transcript in the habeas record. That page appears between record page 2920 and record page 2921.

you do it before." And I said, "Well, yeah, but I didn't prepare to do this." He said, "Go ahead and do it." So I crossed both children.

Q.   So, you cross-examined the children without any preparation?

A.   Nothing beyond reading the discovery material. I had not prepared a strategy for it. I did not know where I was going with the questioning beyond trying to find, you know, just holes in their testimony. And not having prepared, I wasn't sure where to go with it or, you know, how to methodically get there.

(HTr. at 435-36.) In his affidavit, Hicks also confirmed that:

> David Walker did not assign me any significant tasks for trial, including preparing for or examining any witnesses. As a result, I did not expect to have any role examining witnesses and I did not prepare for any witnesses. When the State put the victim's children (Kellee Dunn and Sean Dunn) on the stand at trial, however, David leaned over to me *during* their testimony and told me to cross-examine them because I "was good with kids." I had done absolutely nothing to prepare for that examination and I will never forget David springing it on me. While I attempted to come up with something on the fly, I had no strategic reason for anything I asked them or did not ask them. Looking back, probably the most appropriate thing to do would have been to waive cross-examination rather than reinforce their direct by having them repeat it. I had never even seen a transcript of the preliminary hearing and I did not know that Detective Knowles testified during the hearing that Kellee had not seen the actual attack. As a result, I could not cross-examine her on her trial testimony stating she'd actually seen Chris stabbing her mother.

(Hicks Aff., PX 44, at ¶ 9 (1517-1518) (emphasis in original).) Overall, the Court finds that

Hicks's cross-examinations of the children consisted of reaffirming the details of their mother's

death and it actually served to emphasize the horrific ordeal that the children went through.

(TTr. at 1149-1179, 1215-1246.)

In contrast to Hicks's testimony, Walker claimed that he assigned Hicks the task of cross-

examining the children prior to the trial, while at the same time admitting that he also cross-

examined witnesses "without full preparation." (Walker Aff., PX 46, at ¶ 15 (1555-1556).)

During the evidentiary hearing, Walker provided a convoluted story about how Hicks ended up cross-examining the children, and he ultimately testified that his decision rested on the fact that Hicks and the children are all African-American:

> Q.    [By Respondent's counsel] In fact, Leon Hicks did handle the cross-examination of the children.  Why did you have Leon cross-examine the children?
>
> A.    *It was a race thing. . . .*
>
> Q.    So, just to clarify, the children and Mr. Hicks are all African-American?
>
> A.    That's correct.

(HTr. at 398 (emphasis added).)

Additional evidence that Walker simply did not prepare for trial was adduced during his testimony about whether he actually read the statements provided by the victim's children before the trial.  Walker eventually testified that he read those statements at some unspecified time only after he was directly confronted by this Court about his failure to remember whether he read the statements before trial:

> Q.    [By Respondent's counsel] Had you reviewed the police reports that contained the children's statements?
>
> A.    Yes.
>
> Q.    So, did you have an idea of what they were going to say, what they could say at trial?
>
> A.    *That might have been something that I got caught up in and passed off to Leon because I thought Leon was going to handle the children.*
>
> . . .
>
> THE COURT:    Well, you didn't read the statements of the children?  You never read the statements?

44

A.      I read the statements at some point in time, Judge, but I can't remember where or what, and *that was primarily Leon Hicks's assignment.*

THE COURT:  But you were the lead attorney?

A.      Yes, sir.

THE COURT:  And you didn't even read, I mean, I assume they're eyewitnesses?

MS. ROSELLI:  Yes, Your Honor, they were eyewitnesses.

THE COURT:  And you didn't read their statements?

THE WITNESS:  Yes sir, I did.

THE COURT:  When did you read them?

THE WITNESS:  But I do not recall them –

THE COURT:  Okay.

THE WITNESS:  – at this point in time.

THE COURT:  All right.

THE WITNESS:  Or my reaction at that time.

THE COURT:  All right, go ahead.

(HTr. at 397-99 (emphasis added).)   While Walker eventually testified that he read the statements when he was questioned by the Court, the Court finds his testimony incredible in light of his demeanor and his strong motive to project some level of competence while testifying. Instead, the Court finds that Walker never read the statements before trial.  Furthermore, the Court finds that Hicks's testimony about the circumstances that led to him conducting the cross-examination of the children to be credible and finds that Walker's testimony that he assigned that task to Hicks before trial to be incredible.  In sum, the Court concludes that Walker essentially "dumped" the cross-examination of the two children on Hicks during the heat of the trial and

that, as a result, Hicks was completely unprepared to conduct those crucial examinations and that he muddled through them.

The State's final witness during its case-in-chief was Steven Dutton, the medical examiner who performed the autopsy on Cheryl Lewis and who testified that she suffered more than 40 stab wounds. (TTr. at 1510-1513.)  During the direct examination, Hicks renewed the defense's objection to the admission of 28 photographs of Mrs. Lewis's body. (TTr. at 1521-22.) According to Walker, the fact that Hicks asserted that objection required another deviation from Walker's purported "plan" going into trial, which he claimed provided that he would examine Dutton as the sole exception to the "alternating witness" scheme that would otherwise govern. (Walker Aff., PX 46, at ¶ 15 (1555-1556).)  Even if Walker's testimony is accurate on that point, the Court finds that Walker's own testimony once again establishes that the defense actually had no real plan for the trial and that Hicks's cross-examination of Dutton also would have been conducted without adequate pretrial preparation.

### 6.   The Defense Failed To Prepare For Its Case-In-Chief.

Walker and Hicks's failures to prepare for trial also resulted in the presentation of a perfunctory and startlingly ineffective defense case-in-chief.  Because they were unprepared, the defense team did not call any of the witnesses that could have rebutted the State's portrayal of Mr. Lewis as a relentless stalker.  Instead, Walker called only two witnesses during the guilt/innocence phase, Patrick Coffey and Lt. Keith Knowles.

Coffey's brief testimony consisted primarily of offering opinions about the crime scene based upon his review of photographs and his opinion that Mr. Lewis would have been covered in blood if he had committed the murder. (TTr. at 1564-1565.)  On cross-examination, however, Coffey's opinions were completely undermined when was forced to admit that:

1.    He did not begin to work on the case until September 29, 1998, and that he and his investigator (Sam Clevenger) spent only a total of 20 hours on the case;

2.    He never visited the crime scene;

3.    He did not have time to examine Mr. Lewis's clothing before the trial – despite the fact that Walker's actual innocence theory hinged on the allegedly small amount of blood on Mr. Lewis;

4.    He never spoke with Mr. Lewis about what happened on December 20, 1996;

5.    If the throat of a victim were slashed from behind, the perpetrator would not necessarily be covered in blood;

6.    He never attempted to interview the State's crime scene experts and did not go to the state crime lab to review the evidence before trial; and

7.    He did not know if Mr. Lewis changed clothes before he was arrested and he did not know if Mr. Lewis had an opportunity to wash his clothes before he was arrested.

(TTr. at 1595-1598, 1607-1608, 1613-15.)[11]  Ultimately, Coffey had to admit to the jury that, due

to the very brief time that he had to conduct his investigation and the lack of resources available

to him, his investigation "was not as thorough as it should have been."  (TTr. at 1625-26.)

The only other defense witness was Keith Knowles, a former Lieutenant with the

Riverdale Police Department, who took a statement from Kellee Dunn on the night of the crime.

(TTr. at 1639.)  Knowles was called by Walker at the last minute because Hicks had failed to

impeach Kellee Dunn with her prior inconsistent statement to Knowles that she did not see what

happened in the room where her mother was killed.  (TTr. at 1626-40.)  On cross-examination,

however, Lt. Knowles was able to "clarify" his pretrial testimony and he testified that Kellee told

_____

[11]  On cross-examination, the prosecutor even had Coffey step down and physically reenact the State's version of the crime.  (TTr. at 1608-09.)  Although the defense objected, the Court never ruled on the objection and the defense did not insist on a ruling.  (TTr. at 1608-09.)

him only that she did not see the initial confrontation between Mr. and Mrs. Lewis.  (TTr. at 1643.)  Knowles then testified that (1) Kellee told him that she had no doubt that Mr. Lewis was in the room with Mrs. Lewis when she first heard screaming, (2) she identified Mr. Lewis as being present in the apartment and gave a detailed description of Mr. Lewis clothing, and (3) she *did* see Mr. Lewis in the act of attacking her mother.  (TTr. at 1641-46.)  Having permitted the prosecution to elicit that extremely damaging testimony, the defense rested its case.

Contrary to Respondent's arguments, this Court simply cannot conclude that the presentation of such a brief and slipshod case – which did not support the arguments that Walker made in his opening statement – satisfied Walker and Hicks's duty to provide Mr. Lewis with effective assistance of counsel.

### 7.   Closing Arguments And The Guilty Verdict.

After the State recalled its crime scene investigator to rebut portions of Coffey's opinion and Walker conducted a very short cross-examination (TTr. at 1655-1663), the State waived its opening closing statement and Walker then proceeded to give what the Court finds was a rambling and wholly ineffective closing argument for the defense.  Walker dismissed Kellee Dunn's eyewitness identification as the product of the "power of suggestion" and repeatedly asked rhetorical questions about what Robbie Epps had been doing at the time of the crime.  (TTr. at 1696-1698, 1700-1702, 1704.)  Notably, Walker could not cite to any evidence offered during the trial that even suggested that Kellee's identification of her stepfather resulted from an improper "suggestion" or that Robbie Epps was responsible for Mrs. Lewis's murder.

Walker also attempted to push his unsupported actual innocence theory by admitting that Mr. Lewis had been at the scene on December 20, but then arguing, without any evidentiary support, that Mr. Lewis "panicked" and left after he heard footsteps outside, and that there would have been more blood on him if he committed the crime.  (TTr. at 1697-1698, 1703-04.)  Several

times, Walker also made a point of contrasting the resources available for the defense with the resources available to the State, without explaining why that fact should matter.  (TTr. at 705-06.)

In the State's closing argument, the lead prosecutor, Brandon Hornsby, continued to portray Mr. Lewis as a cold, calculating killer who wanted to control Mrs. Lewis and, when he couldn't, he killed her.  He argued that Mr. Lewis planned the murder "just like the O.J. Simpson situation," which demonstrated his "wickedness of mind."  (TTr. at 1714, 1716, 1719, 1721.) Hornsby also reminded the jury that the defense presented no evidence to support the claims that Walker made during his opening statement that: (1) Mr. Lewis went to the scene on December 20 with the permission of Cheryl Lewis, (2) the kitchen window was purposefully left open to allow him to enter the apartment, and (3) he found his wife already dead or dying in the apartment.  (TTr. at 1717.)  Hornsby also ridiculed the crime scene investigation conducted by Patrick Coffey.  (TTr. at 1717-21.)

Following the closing arguments, the jury deliberated for less than three hours before returning a verdict of guilty on all counts.  (TTr. at 1761-1762.)   Further demonstrating the chaotic and uncoordinated nature of the defense "team," the transcript reflects that Hicks was not even in the courtroom when the verdicts were returned, and that Walker had to tell the trial court that he needed to find Hicks to "assist me in getting witnesses" before he could begin with the penalty phase.  (TTr. at 1761, 1771, 1778.)  The Court finds that Walker's inept and unsupported arguments are additional evidence of his ineffectiveness as lead trial counsel.

### 8.    Walker And Hicks's Failure To Prepare For The Penalty Phase Of the Trial.

The penalty phase began immediately after the verdicts were returned late in the afternoon on November 13, 1998.  (TTr. at 1782.)  The State presented 15 witnesses – including

law enforcement officers, therapists, and friends and family members of Cheryl Lewis.   The State's witnesses testified about several prior domestic disturbances and the impact that Mrs. Lewis's death had on her friends and family.

a.   **The Defense Was Unprepared And "Winged" The Penalty Phase.**

Given that Walker and Hicks failed to ensure that a mitigation investigation took place before trial, the Court finds that it was inevitable that they were unprepared for the penalty phase of the trial.   The Court also finds that the evidence supports Hicks's admission that Walker did nothing to prepare for the mitigation case and that he instead attempted to "wing it."   (Hicks Aff., PX 44, at ¶ 11 (1518-1519) (testifying that "[t]he bottom line is that David [Walker] had nothing prepared for the penalty phase – he just winged it."); *see also* HTr. at 437-38 (Hicks testifying that, after he watched the testimony of France and Bryson, he was instructed by Walker to leave court and drive them home).)

The defense presented only three witnesses: Maxine Bryson and Lorraine France, a mother and her daughter who let Mr. Lewis sleep in their apartment when he was working with them in late 1996, and Dr. Steven Snook.   None of those witnesses was prepared by the defense to testify.

b.   <u>Lorraine France And Maxine Bryson</u>

Walker testified that he called Bryson and France to testify during the penalty phase because:

> Basically, that's about all that I had.   They had lived with him. He'd lived with them.   They knew him.   They knew he was not a violent person, somebody that would just premeditatedly go in and kill another like that.   They had – I talked with them before calling them.   They had presented well enough that I thought perhaps they might be of some assistance to [Mr. Lewis].

(HTr. at 400.)  Walker also testified that he "felt that [Bryson and France] would be able to provide some evidence that Christopher was not this remorseless, hopeless critter that the State was wanting to prosecute and perhaps save his life by putting them up." (HTr. at 406.)

Lorraine France testified first and her testimony takes up less than four pages of the transcript. (TTr. at 1888-1892.)  Ms. France testified that she met Mr. Lewis when he worked with her as a housekeeper at a hotel and he was never violent around her.  She said she and her mother (Maxine Bryson) let him sleep on their couch when it "became cold" in 1996, and she would let Mr. Lewis stay with her again under the circumstances that existed "back then."  (TTr. at 1888-92.)  On cross-examination, however, the prosecutor took advantage of the fact that Ms. France had not been prepared by Walker to testify and he impeached her with the fact that she had not been told of the details of the crime for which Mr. Lewis had been convicted:

> Q.  Do you know that the defendant was convicted for stabbing a woman approximately 40 times?
>
> A.  No, I didn't know that.
>
> Q.  Did you know that when he was stabbing her he stuck the knife so deeply into her neck that it went into her spine?
>
> A.  No.
>
> Q.  Did you know that he stuck a knife about two inches behind her ear?
>
> A.  (no response)
>
> Q.  Didn't know that?
>
> A.  (witness nodded head in the negative)
>
> Q.  Let me show you what's been marked as State's Exhibit Number 85.  I want you to take a look at this woman and what he did to her.
>
> A.  (witness examining exhibit)
>
> Q.  *Would you let him back in your house now?*

> A.    *No.*

(TTr. at 1894 (emphasis added).)

Walker then called Ms. Frances' mother – Maxine Bryson.  Ms. Bryson testified that she knew Mr. Lewis through her daughter and that during the time that he stayed with them she never saw him angry.  Ms. Bryson also testified that she first spoke with Walker "maybe five [or] six days ago" – meaning that she first spoke with Walker either right before or after the trial started – and that she also had not been told that the jury had just convicted Mr. Lewis.[12]  (TTr. at 1898-99.)  The State did not cross-examine Ms. Bryson.

Had trial counsel bothered to perform an adequate mitigation investigation, they would have learned, as Cora Bryson (Ms. Bryson's other daughter) testified in this proceeding, that Cheryl and Mr. Lewis continued to have a relationship up until Cheryl's death and they could have presented that evidence.  (*See* Bryson Aff., PX 75, at ¶ 4 (2717).)  In fact, contrary to the State's portrayal of Mr. Lewis as an enraged stalker and Mrs. Lewis as a helpless victim, Cora Bryson could have testified that Mrs. Lewis "would call the house for him regularly, mainly around pay period.  Sometimes she would leave a message for him to call sometimes for him to come by.  Sometimes she had her daughter to call for her."  (Bryson Aff., PX 75, at ¶ 4 (2717).)  The Court finds that there is no excuse for Walker and Hicks's failure to conduct an investigation into the nature of Mr. and Mrs. Lewis's relationship.

### c.    Dr. Steven Snook

Although Walker testified during this proceeding that he "didn't see [mental health] as a mitigation factor in this case" (HTr. at 389), the third and final witness called by the defense

---

[12] Sam Clevenger, Coffey's assistant, located the Bryson family during his brief investigation into the circumstances surrounding the crime.

during the penalty phase was Dr. Steven Snook.  As discussed above, Dr. Snook conducted an

evaluation of Mr. Lewis for "future dangerousness" and Walker did not inform Dr. Snook that

mental retardation was a defense to the death penalty.

   After Dr. Snook completed his last-minute evaluation a few days before the trial began,

Walker failed to: (1) meet with him to discuss his findings, (2) meet with him to prepare him to

testify, or (3) inform him that the State's expert, Dr. James S. Cheatham, had examined Mr.

Lewis on November 7, 1998 and had diagnosed him as having "an anti-social personality

disorder."  (*See* HTr. at 407, 422 (Walker admitting that he did not talk to Dr. Snook prior to trial

and that he also did not provide Snook with the report issued by Dr. Cheatham); Walker Aff., PX

46, at ¶ 11 (1553-1554) (admitting that he was "unable to meet with Dr. Snook before trial to

discuss his testimony or otherwise assist in his trial preparation"); Snook Dep., PX 60, at 12-13

(1640-1641) (Snook does not recall speaking with Walker after completing his report, Snook

"definitely" did not meet with him in person at that time and Snook does not recall ever

discussing his report with Walker); Snook Aff., PX 61, at ¶ 10 (1665) (stating that "Mr. Walker

did not meet with me prior to calling me to the trial and putting me on the stand.  He did not go

over my testimony with me or the likely areas of cross-examination."); *see also* November 10,

1998, Memorandum from Dr. James Cheatham, M.D. to Brandon Hornsby, Assistant District

Attorney, PX 182 at 5303 (noting that he examined Mr. Lewis on November 7, 1998 – *i.e.* the

Saturday before the trial started on November 9).)

   When Respondent's counsel asked Walker why he did not talk with Dr. Snook prior to

putting him on the stand during the evidentiary hearing, Walker responded with a laundry list of

excuses:

> He wasn't available.  His report wasn't finished.  We had a
> thousand other things going on at that time.  And I was hoping,

yeah, we would be able to get it and have enough time to see it, move on.

(HTr. at 407.)  The Court finds, however, that there is no valid excuse for Walker's failure to meet with Dr. Snook to discuss his findings and to prepare him to testify.  Indeed, Walker's negligence on the point is underscored by the fact that the prosecutor was able to find time to talk with Dr. Snook so that he would be prepared to cross-examine him.  (TTr. at 1908; Snook Dep., PX 60, at 14 (1642).)

The Court finds that Walker's brief direct examination of Dr. Snook reflects that Walker did not understand the nature of Dr. Snook's examination and that Dr. Snook was not prepared to testify.  (TTr. at 1900-08.)  The Court also finds that Walker's questions reveal that he did not understand the subject matter of Dr. Snook's testimony and, as a result, his examination consisted of asking open-ended questions about the types of tests that Dr. Snook utilized and ended with Walker asking Dr. Snook for his "bottom line assessment of Mr. Lewis."  (TTr. at 1907-1908.)

On cross-examination, the State was able to destroy any negligible benefit to the defense arising from Walker's weak direct examination of Dr. Snook.  Mr. Hornsby first had Dr. Snook confirm that Mr. Lewis was competent and that he knew the difference between right and wrong.  (TTr. at 1909-10.)  Mr. Hornsby also suggested that Mr. Lewis might have been malingering when Dr. Snook examined him and that he could have lied during the examination.  (TTr. at 1914.)  In addition, Mr. Hornsby specifically criticized Dr. Snook for his failure to review background materials – including Mr. Lewis's school records – and also took him to task for not interviewing Mr. Lewis's family members or his teachers.  (TTr. at 1910-11.)

In addition, in a series of questions that rebuts Respondent's present claim that Dr. Snook acted appropriately, Mr. Hornsby extensively cross-examined Dr. Snook on his decision to

administer the Weschler Adult Intelligence Scale-Revised (the "WAIS-R") test to determine Mr. Lewis's IQ, even after that test had been superseded by the Weschler Adult Intelligence Scale, Third Edition (the "WAIS-III"), and he emphasized that the norms for the WAIS-R were outdated when Dr. Snook administered the test in 1998. (TTr. at 1918-23.)  The State also cross-examined Dr. Snook on Walker's failures to provide Dr. Snook with: (1) the report of the State's psychiatrist, Dr. Cheatham, (2) Mr. Lewis's confession, (3) any employment records, (4) any juvenile criminal records, (5) any adult criminal history, (6) any unspecified "discipline records," (7) any parole records, or (8) any jail records.[13]  (TTr. at 1923-29.)  The State's reference to Mr. Lewis's confession was the first time that the jury was informed that Mr. Lewis had confessed to the crime.

Walker's redirect examination made things even worse for the defense and his questions resulted in Dr. Snook admitting that personality disorders are generally resistant to treatment. (TTr. at 1929-30.)  With that door opened, on recross-examination, Mr. Hornsby elicited an admission that Dr. Snook could not predict whether Mr. Lewis would "kill again" and that "the best predictor of future behavior is past behavior."  (TTr. at 1936-37.)  This Court finds that Walker's failure to prepare for the examination of the few witnesses that he called during the mitigation phase is inexcusable and that their testimony ultimately did not provide any helpful mitigation evidence for the defense.

---

[13] Notably, Mr. Lewis has no "juvenile criminal records" and, despite Dr. Cheatham's diagnosis, he does not meet the DSM-IV-TR criteria for borderline personality disorder, which requires evidence of conduct disorder prior to the age of 15.  (Snook Aff., PX 61, at ¶ 9 (1665) ("Had I been given the collateral information I requested, I could have disputed the prosecution's assertions that Mr. Lewis was anti-social.  I have also been shown a copy of Dr. Cheatham's report in which he makes this diagnosis of anti-social personality disorder and nothing contained in his report supports such a diagnosis.").)  Walker's ineffectiveness and his failure to prepare meant that he did nothing to counter this misleading testimony.

**d.    Penalty Phase Closing Arguments And The Death Verdict**

On the morning of Saturday, November 14, 1998, the jury heard closing arguments in the

penalty phase.  Mr. Hornsby gave a lengthy closing in which he again emphasized the brutal

nature of the crime, suggested that the children had to be "protected" from Mr. Lewis and even

suggested that a death sentence was mandated by the Bible.  (TTr. at 1959-1984.)  Mr. Hornsby

also argued that

> Mitigating evidence is evidence that lessens the defendant's moral
> culpability. . . .
>
> . . .
>
> Mitigating evidence is evidence that lessens the moral culpability
> and *you have none.*
>
> *And even if you did have some, and I'm suggesting to you that the*
> *evidence suggests you have none, no real mitigating evidence;*
> indeed, what is it, *the mitigating evidence that you have is that he's*
> *perfectly normal, but he has a little lower intelligence.*

(TTr. at 1968 (emphasis added).)   Finally, Mr. Hornsby also alleged that Mr. Lewis was

particularly vile because he was "smiling and smirking" during the children's testimony – a fact

that, if true, would be consistent with the fact that Mr. Lewis is mentally retarded.  (TTr. at 1974;

*see also Atkins v. Virginia*, 536 U.S. 304, 320-21 (2002) (recognizing that the demeanor of

mentally retarded defendants "may create an unwarranted impression of lack of remorse for their

crimes").)  Based on the extremely weak mitigation case presented by Walker, this Court agrees

with Mr. Hornsby's characterization and finds that the defense effectively presented no

mitigation case.

Walker's closing for the defense was brief and ineffective.  (TTr. at 1985-91.)  In

addition to a series of general pleas for mercy, Walker once again fell back on making

speculative statements about "what other evidence wasn't shown" and asked "where was Robbie Epps" and whether Epps played some role in the murder. (TTr. at 1985-86.)

After the jury was charged, it deliberated for only 38 minutes (TTr. at 2010) before it announced a verdict of death and the trial court immediately imposed that sentence. (TTr. at 2021.)

### C.  **Walker Is Removed As Trial Counsel.**

As noted above, Walker asserted his own ineffectiveness in the initial motion for a new trial, but he withdrew that claim after Mr. Lewis told him that he wanted him to stay on the case. Mr. Lewis then gave Walker Christopher Johnson's name, a lawyer at the Southern Center for Human Rights who assisted with death penalty cases. Walker apparently "requested help with an issue of prosecutorial misconduct in closing argument, specifically, the prosecutor's quoting from the Bible." (Johnson Aff., PX 93, at ¶ 3 (2804).) Johnson agreed to assist in drafting the direct appeal brief and the Southern Center's investigation revealed that there was an issue of whether there had been an improper communication between the Court and the jury during its deliberations.

Walker ultimately was removed from the case at a hearing on motion for new trial after the State acknowledged that Walker's ineffectiveness was an issue. (HTr. at 410-11; April 28, 1999 Motion for New Trial Tr., PX 123, at 38-43 (2996-3001).) According to Johnson, at the time Walker was removed from the case, his team that he assembled had researched several issues for the appeal, including the trial court's failure to give the requested voluntary manslaughter instruction, repeated instances of prosecutorial misconduct, admissibility of victim impact testimony, and a number of other substantive claims. (*See* Resp. Ex. 53 (7635-7874).) When Walker was removed, however, Johnson's involvement with the case ended. (*See* Johnson Aff., PX 93, at ¶ 7 (2805).)

**D.**    **Martin Replaces Walker As Counsel For The Direct Appeal.**

Mr. Walker was replaced as counsel by T. Michael Martin on or about October 1, 1999.

(Martin Aff., PX 102, at ¶ 3 (2848).)   The Court's findings of fact regarding Mr. Martin's

performance as appellate counsel are contained in Section V *infra*.

**II.    CONCLUSIONS OF LAW REGARDING TRIAL COUNSEL'S INEFFECTIVENESS DURING THE GUILT/INNOCENCE PHASE OF THE TRIAL.**

**A.**    **The Right To Effective Assistance Of Counsel.**

The Sixth Amendment affords all citizens facing criminal charges the right to the

assistance of counsel for their defense.  U.S. Const., Amend. VI; *Strickland v. Washington*, 466

U.S. 668, 686 (1984).  This right exists "in order to protect the fundamental right to a fair trial."

*Id.* at 684.  "That a person who happens to be a lawyer is present at trial alongside the accused,

however, is not enough to satisfy the constitutional command." *Id.* at 685.  Because "a fair trial

is one in which evidence [is] subject to adversarial testing," the right to counsel necessarily

means the right to *effective* counsel:

> The Sixth Amendment recognizes the right to the assistance of
> counsel because it envisions counsel's playing a role that is critical
> to the ability of the adversarial system to produce just results.  An
> accused is entitled to be assisted by an attorney, whether retained
> or appointed, who plays the role necessary to ensure that the trial is
> fair.  For that reason, the Court has recognized that "the right to
> counsel is the right to the effective assistance of counsel."

*Id.* at 685-86 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  The Supreme

Court has also recognized that "[a]ccess to counsel's skills and knowledge is necessary to accord

defendants the 'ample opportunity to meet the case of the prosecution' to which they are

entitled." *Strickland*, 466 U.S. at 685 (quoting *Adams v. United States ex rel. McCann*, 317 U.S.

269, 275 (1942)).

In *Strickland*, the Supreme Court held that counsel's performance is constitutionally deficient if it "so undermine[s] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. Thus, to prevail on a claim of ineffective assistance, the Mr. Lewis "must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Strickland*, 466 U.S. at 687.

## 1.   The Standards For Deficient Performance.

Counsel's performance is constitutionally deficient "if it falls below an objective standard of reasonableness, which is defined in terms of prevailing professional norms." *Wiggins*, 539 U.S. at 511. Both the United States and the Georgia Supreme Courts have recognized the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") as the norms courts should consider when evaluating whether counsel rendered effective assistance in death penalty cases. *Wiggins*, 539 U.S. at 524 (finding trial counsel ineffective where his conduct "fell short of the standards for capital defense work articulated by the American Bar Association (ABA) – standards to which we long have referred to as 'guides to determining what is reasonable'"); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (finding counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background, citing the ABA Guidelines); *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003) ("The *Wiggins* case . . . stands for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases."); *Hall v. McPherson*, 284 Ga. 219, 221, 663 S.E.2d 659, 661 (2008) (holding that the habeas court properly relied on the ABA Guidelines as the standard to evaluate trial counsel's performance).