FILED

2020 Aug-21  PM 12:51
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

KEITH EDMUND GAVIN,    )
    )
    Petitioner,    )
    )
v.    )    Case No.  4:16-cv-00273-KOB
    )
JEFFERSON S. DUNN,    )
Commissioner of the Alabama    )
Department of Corrections,    )
    )
    Respondent.    )

# VOLUME 36

# State Court – Collateral Appeal Transcript

LUTHER STRANGE
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

Vol. 18 of 22

COURT OF CRIMINAL APPEALS NO. _____ CR-10-1313 _____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

**FROM**

CIRCUIT COURT OF ___CHEROKEE___ COUNTY, ALABAMA

CIRCUIT COURT NO  CC-98-61.60 & CC-98-62.60

CIRCUIT JUDGE            David A. Rains

Type of Conviction/ Order Appealed From:                      Rule 32

Sentence Imposed:

Defendant Indigent:      ☑ YES    ☐ NO

## KEITH EDMUND GAVIN

**NAME OF APPELLANT**

Stephen C. Jackson                    205-254-1037
(Appellant's Attorney)                          (Telephone No.)
1901 Sixth Avenue North, Suite 2400
(Address)
        Birmingham    Alabama    35203
(City)                      (State)                (Zip Code)

### V.
## STATE OF ALABAMA

**NAME OF APPELLEE**

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter

name and address of municipal attorney below.

df

(For Court of Criminal Appeals Use Only)

Dr. King's IQ results (both of which the Court concludes are unreliable for the reasons discussed below), Dr. Israelian's IQ testing stands alone as the only untainted and uncontroverted evidence of Mr. Lewis's IQ that has been presented to the Court.[33]  There also is no dispute that the full scale IQ score of 66 obtained by Dr. Israelian places Mr. Lewis well within the range of mental retardation.

### b.   Dr. Israelian's Achievement Testing.

In addition to her IQ testing, during the more than eight hours that Dr. Israelian spent with Mr. Lewis over three days, she administered the full Woodcock Johnson battery of achievement tests, which placed Mr. Lewis's academic achievement at an elementary school level, a fact that also is consistent with a diagnosis of mental retardation.  (HTr. 70-71; Israelian Report, PK 3, at 1, 4 (477, 480) (noting that she met with Mr. Lewis on three occasions and listing the tests that she administered).)  Specifically, Dr. Israelian's academic testing indicated that Mr. Lewis's reading ability is equivalent to that of an average 10 year-old (placing him in the fourth grade, sixth month), that his math skills are those of an 11 year-old (or sixth grade) and that his written skills are equivalent to a child of almost 8 years-old (a second grade skill level).  (HTr. at 70-71.)

Overall, Dr. Israelian testified that her academic achievement testing revealed that Mr. Lewis was "a 41 year old man who is functioning at a 10 year old level, at best."  (HTr. at 76.)

---

[33] Even if the "practice effect" arising from Dr. King's decision to administer the WAIS-III for a second time within the same year and his scoring error are disregarded and Dr. King's score of 71 is taken at face value, that score meets the definition of mental retardation.  *See* HTr. at 69-70 (Dr. Israelian testifying that Dr. King's score of 71 is consistent with her score of 66 and falls within the confidence interval) and HTr. at 208-10 (Dr. Swanson testifying that Dr. King's score of 71 "is consistent with someone who has significantly sub-average intellectual functioning" and that the score meets the definitions for mental retardation found in the Georgia Code, the DSM-IV-TR and promulgated by the AAMR).)

Dr. Israelian's test results also are consistent with the academic testing reflected in Mr. Lewis's Mississippi elementary school records and they are "consistent with his estimated intellectual abilities and congruent with a mild mental retardation diagnosis."[34] (Israelian Report, PX 8, at 5 (481).) As Dr. Israelian explained to the Court, in layman's terms, Mr. Lewis's intellectual abilities place him in the bottom 1% of his peer group: if there were 100 people standing in line based on their intellectual abilities, Mr. Lewis would be the last person in line.[35] (HTr. at 54-55.) The Court finds that Dr. Israelian was a credible witness and accepts her opinions regarding Mr. Lewis's intellectual functioning and her ultimate conclusion that he suffers from mental retardation.

## 2.   **Dr. Victoria Swanson, Ph.D.**

The Court finds that Dr. Swanson is uniquely qualified to render a diagnosis as to whether Mr. Lewis is mentally retarded because her entire career and her daily clinical practice have been focused exclusively in the field of mental retardation. (HTr. at 103-115; Swanson Report, PX 10, at 756-764 (Dr. Swanson's Curriculum Vitae); *see also United States v. Nelson*, 419 F. Supp. 2d 891 (E.D. La. 2006) (describing Dr. Swanson's extensive experience working with mentally retarded individuals and finding her to be qualified as an expert in psychology, "with a particular expertise in diagnosing and treating mental retardation").) Her specific area of expertise is evaluating adaptive behavior. (HTr. at 146-47.)

---

[34] Mr. Lewis's elementary school records from Mississippi were the only academic records available. (*See* HTr. at 74.) Mr. Lewis attended middle and high school in New Orleans. Exhaustive efforts by both counsel and Dr. Victoria Swanson, who used her professional ties to the New Orleans school system in an effort to locate any records, indicate that Mr. Lewis's New Orleans school records disappeared in the aftermath of Hurricane Katrina. (HTr. at 221.)

[35] Dr. Israelian administered a Victoria Symptom Validity Test to make sure that Mr. Lewis was not exaggerating his symptoms and she found no evidence of malingering. (HTr. at 72-73.) Respondent's expert likewise found no evidence of malingering.

Dr. Swanson received a bachelor's degree in psychology from the University of Louisiana and then worked at both Central Louisiana State Hospital, one of the largest mental health facilities in the country, and Pinecrest Developmental Center, the largest residential facility for people with mental retardation in the country. (HTr. at 106-07.) While at Pinecrest, Dr. Swanson began a clinical master's program at Northwestern State University. (HTr. at 108.) For her master's thesis she compared the Vineland Adaptive Behavior Scales to other measures for assessing the adaptive behavior component of mental retardation. (HTr. at 108-109.) She conducted her practicum while working toward her master's on providing clinical services, including mental status exams and assessment, intellectual assessments and academic achievement assessments and other testing of people with disabilities at a variety of developmental centers. (HTr. at 111-12.)

Dr. Swanson received her doctoral degree from Louisiana State University, where she again focused on the field of mental retardation and did clinical work with mentally retarded individuals. (HTr. at 109-10.)

Dr. Swanson completed a year of post-doctoral work as the head of the psychology department at Southwest Developmental Center in Auda, Louisiana. (HTr. at 112.) Dr. Swanson also has conducted a great deal of research related specifically to the area of mental retardation. (HTr. at 113; Swanson Report, PX 10, at 757-764) (listing Dr. Swanson's publications, manuscripts and papers presented at professional meetings).) She has extensive experience working in school systems and residential facilities, providing psychological services for pupil appraisal and special education programs. (*See e.g.*, HTr. at 111-12.) Dr. Swanson is a member of the national and local Chapters of the American Association on Intellectual and Developmental Disabilities, the definitive source for diagnostic and classification information

concerning mental retardation, and she is a member of the National Association of Qualified Mental Retardation Professionals. (HTr. at 115-118.) Dr. Swanson also has served as the past President of the psychology division of the national AAIDD, and on the national Board of Directors of that organization for three years. (HTr. at 118.)

Dr. Swanson is currently in private practice, where she works with a number of state agencies. (HTr. at 119-21.) Specifically, she is the contract psychologist for the Lake Charles Mental Health Center. (*Id.* at 120.) She also works with the Louisiana Special Education Center, where she treats people with mental retardation. She acts as the psychologist and coordinator of special education at a charter school in Glencoe, Louisiana, and conducts all of the special education testing there. (*Id.*) Finally, Dr. Swanson serves as a psychologist to persons living in community homes, where she performs annual and entry assessments, and formulates behavior management plans and programs. (*Id.* at 120-21.) Testifying as an expert witness, however, is not a substantial part of her practice, although she has been qualified as an expert in the field of mental retardation approximately ten times as both an independent and a defense expert. (HTr. at 118-19.) The Court finds that the fact that Dr. Swanson does not routinely act as an expert witness enhances her credibility.

### a.    Definitions of Adaptive Behavior or Functioning.

"Adaptive functioning," the second prong in the mental retardation diagnosis, "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." (DSM-IV-TR, PX 174, at 42 (5196); HTr. at 139.) In order to assess an individual who is over age 18 for mental retardation, it is necessary to

perform a "retrospective" diagnosis.[36]   A retrospective diagnosis requires, *inter alia*, careful examination of childhood records, anecdotal evidence from family members and others who knew the person during his or her formative years, and the administration of formal instruments which measure adaptive behavior.   (*See* AAIDD User's Guide, PX 14, at 17-22 (800-805) (listing guidelines for conducting a retrospective diagnosis); Retrospective Diagnosis Defined, PX 20, at 853; HTr. at 140-142 (Dr. Swanson explaining why it was necessary to perform a retrospective diagnosis on Mr. Lewis and the guidelines that she followed during her evaluation); *see also* J. Gregory Olley, *The Assessment of Adaptive Behavior in Adult Forensic Cases: Part 3: Sources of Adaptive Behavior Information*, APA Newsletter, Vol. 33, No. 1, PX 185, at 3 (5666) (recognizing that "[a] documented pattern of deficits in adaptive behavior from childhood until the time of the crime is a strong indicator that the defendant is not malingering or 'faking' mental retardation . . . no one would have a reason to 'feign' mental retardation throughout life.").)   The most widely used and accepted formal measures of adaptive behavior are the Vineland Adaptive Behavior Scales, Second Edition ("Vineland-II") and the Adaptive Behavioral Assessment Scale, Second Edition ("ABAS-II").  (HTr. at 147-148, 151-152.)

To determine adaptive functioning, Dr. Swanson followed the guidelines of the AAIDD, which defines significant limitations in adaptive behavior as performance results on a standardized measure (such as the Vineland-II or ABAS-II) that are at least two standard deviations below the mean on one of the three types of adaptive skills (conceptual, social,

---

[36] According to the AAIDD, "a retrospective diagnosis may be required when the individual with mental retardation did not receive an official diagnosis of mental retardation during the developmental period." (AAIDD User's Guide, PX 14, at 17 (800).)  The AAIDD specifically recognizes that a retrospective diagnosis may be necessary to "evaluat[e] individuals involved in legal processes including . . . sentencing eligibility questions such as those related to the recent *Atkins* (2002) case." (*Id.*)

practical), or a verbal score that is greater than two standard deviations below the mean on a standardized measure of those skills. (HTr. at 133-34, 146-147; AAIDD Definition of Mental Retardation, PX 16, at 849). The DSM-IV-TR specifies that a person with mental retardation must have adaptive deficits or impairments in at least two of 11 specified skill areas, which include communication, self-care, home living social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. (*See* DSM-IV-TR Definition of Mental Retardation, PX 15, at 848). Both definitions also require that the adaptive deficits be concurrent with cognitive deficits and be present before the age of 18.

After reviewing the testing performed by Dr. Israelian and Mr. Lewis's school records, Dr. Swanson testified that she was satisfied that Mr. Lewis had cognitive deficits consistent with mental retardation, and she then agreed to do the adaptive behavior assessment. (HTr. at 122-23.) When conducting her assessment of Mr. Lewis's adaptive behavior, Dr. Swanson reviewed the testing by Dr. Snook in 1998 and that of Dr. King, the Respondent's expert, the affidavits provided by family members, friends and employers of Mr. Lewis, and his school and medical records. (HTr. at 123-32 (testifying about the materials that she reviewed when performing her evaluation and the three reports that she generated).) She then personally interviewed three of Mr. Lewis's family members and administered a formal adaptive behavior assessment, the Vineland-II, to each of them. (HTr. at 126.) After completing these adaptive behavior assessments, she concluded that Mr. Lewis met all three criteria for a diagnosis of mental retardation. (HTr. at 131-132.) During her testimony, the Court was impressed by the depth of Dr. Swanson's knowledge regarding Mr. Lewis and his background and concludes that she conducted a careful and thorough analysis of Mr. Lewis's adaptive functioning.

### b. **Dr. Swanson's Standardized Testing.**

To assess Mr. Lewis's adaptive functioning, Dr. Swanson sought out people who acted as his care providers. (HTr. at 147-48 (noting that to assess adaptive behavior the "preference is to find a care provider that really knows them well and can tell you how well they do things" and that multiple assessments and corroborating evidence must be considered).) In particular, Dr. Swanson testified that an evaluating psychologist is "interested in skills that they've acquired, but much more important are the skills that they do typically every day, within their routine. Your child may have known how to make a bed, but did they make it every day?" (HTr. at 148.) Dr. Swanson testified that she "definitely" wanted to administer the Vineland-II to Mr. Lewis's mother, Eliza Jefferson, because she was the care provider who had known him the longest. (HTr. at 153-54.) She then looked for others who had assumed the role of care provider and attempted to find people who knew him before he was 18 so that she could determine if the deficits in adaptive behavior were present during his developmental period. (HTr. at 154-55.)

Dr. Swanson next chose to administer the Vineland-II to Brian Higgins, Mr. Lewis's brother. (HTr. at 155.) After Mr. Lewis repeated the first grade, Mr. Lewis and Brian were in the same grade in school and Brian acted as Mr. Lewis's care provider when they both moved out of their mother's house after dropping out of school. (HTr. at 155, 159-160.)

Finally, Dr. Swanson also administered the Vineland-II to Kenneth Jefferson, another of Mr. Lewis's younger brothers. While Kenneth Jefferson is several years younger than Mr. Lewis, Mr. Lewis moved into Kenny's home after their mother left New Orleans, and therefore Kenny "had direct knowledge about that time in [Mr. Lewis's] life about the things I needed to know about: How did he get dressed, could he cook, how did he buy things, could he meet his own health needs, who did he go to for assistance." (HTr. at 155.) Kenny reported to Dr. Swanson about Mr. Lewis's functioning when he was 25 years old. (HTr. at 155-56.) While 25

3408

is beyond the end of the "developmental period," Dr. Swanson testified that Kenny's results were important to her as corroborative evidence of Mr. Lewis's adaptive functioning deficits over time. (HTr. at 161).

Dr. Swanson conducted her Vineland-II assessments over the course of two days in May of 2007. (HTr. at 156.) She tested Brian Higgins at a prison in southwestern Louisiana. (HTr. at 156; Swanson Report, PX 11, at 1-5 (765-769) (noting the dates of the testing and discussing the results).) Eliza Jefferson was driven to New Orleans from Mississippi the following day to meet with Dr. Swanson, and Kenny Jefferson was tested in New Orleans after he got off work that same day. (HTr. at 156.) She administered the survey interview form of the Vineland-II to all three Lewis family members. The survey is a semi-structured interview where the trained examiner has "a very long, extended conversation with the care provider." (HTr. at 152.) The interview moves through the various domain areas of adaptive behavior and the examiner may at any point to ask specific questions regarding the various topics. (HTr. at 152-53.) The Vineland-II manual measures how answers are scored as either a zero, one or two.[37] (HTr. at 153.)

---

[37] Although Respondent's counsel speculated during these proceedings that the family members could have spoken to one another and compared notes in order to give answers that would make Mr. Lewis appear to be retarded, the Court finds that Dr. Swanson refuted that notion. (HTr. at 157-159.) Dr. Swanson noted that the family members had not seen Mr. Lewis for approximately 15 to 20 years when she spoke with them. (HTr. at 159.) While a clinician must always be aware of the possibility of bias, Dr. Swanson also testified that both the semi-structured interview format and her ability to compare the respondents' answers with other corroborating evidence allowed her to conclude that there was no evidence that family members coordinated their answers to favor Mr. Lewis or even that they had the ability to do so. (HTr. at 157-59 (noting that most people do not even think about adaptive behavior in connection with mental retardation and, as a result, are not aware that their answers effect the diagnosis); *see also* Dr. Sara Sparrow Aff., PX 23, at ¶ 8 (932-933) (the senior author of the Vineland-II testifying that the Vineland's "semi-structured interview format also reduces the possibility of response bias, in part because information about the individual's abilities is gathered through normal

Both Eliza Jefferson and Brian Higgins related Mr. Lewis's behavior for the time period when he was 17 years old, specifically the summer when he was 17.  (HTr. at 159-60.)  Kenny Jefferson provided care for Mr. Lewis when Mr. Lewis was 25 years old, giving Dr. Swanson a longitudinal view of Mr. Lewis's functioning and corroborating other evidence regarding that period in his life.   (HTr. at 161 (Dr. Swanson testifying that, because she conducts a "longitudinal study" in order to provide a retrospective diagnosis, Kenny's test results gave her another probe along his life.).)  Dr. Swanson used the normative tables for a person of 17 on Eliza and Brian's Vineland-II assessments, and the normative table for a person of 25 on Kenny's assessment.  (HTr. at 162; *see also* Vineland-II Score Summaries and Survey Interview Forms, PX 22 (855-929).)

To ensure that she was using the Vineland-II tests properly to conduct a retrospective diagnosis, Dr. Swanson consulted with Dr. Sara Sparrow, the senior author of the Vineland-II. (HTr. at 168-169; *see also* Sparrow Aff., PX 23, at ¶ 3 (930-931).)  Dr. Sparrow is Professor Emerita and a Senior Research Scientist at the Yale Child Study Center at Yale University School of Medicine, where she was Chief Psychologist until 2002.  (Sparrow Aff., PX 23, at ¶ 2 (930).)

Both in her conversation with Dr. Swanson and in her affidavit, Dr. Sparrow confirmed that Dr. Swanson used the proper methodology for conducting a retrospective assessment when she utilized the Vineland-II:

> When assessing adaptive behavior in accordance with the definition of mental retardation, which requires that both subaverage general intellectual functioning and significant

conversation with a respondent who does not know the item content or scoring method").)  The Court concludes that there is no evidence that Mr. Lewis's family members conspired in an effort to make Mr. Lewis appear to be mentally retarded.

> limitations in adaptive functioning be present prior to the age of 18, it is appropriate to ascertain whether the respondent has a clear memory regarding the individual and his or her adaptive functioning from the relevant time period. The examiner should emphasize that all items on the Vineland-II are in reference to functioning during the relevant time period. *If the examiner determines that the respondent has the required information and can report consistently as to functioning at that certain date, that date should be considered the date of functioning and be recorded on the front cover of the record booklet.* Scoring should be carried out using that date in order to compare the individual with the standardization sample of the same age. *For example, if the respondent reports adaptive functioning as of age 15, then age 15 should be considered the chronological age, and norms based on this age group should be used to derive the Vineland-II score.*

(Sparrow Aff., PX 23, at ¶ 10 (934-935) (emphasis added); *see also* HTr. at 166-69 (Dr. Swanson testifying that Dr. Sparrow confirmed to her that she was using the proper techniques to assess Mr. Lewis's adaptive behavior).)

The results of the Vineland-II standardized assessments revealed that prior to the age of 18, Mr. Lewis's "optimal functioning was in the mild deficit range of mental retardation." (HTr. at 164.) Mr. Lewis's scores were more than two standard deviations below the mean in the Vineland-II assessments given to his mother Eliza and his brother Brian. (HTr. at 162-66 (Dr. Swanson explaining her Vineland-II results).)[38]

Mr. Lewis's scores were much lower on the ratings by Kenny Jefferson, who rated Mr. Lewis's adaptive functioning when Mr. Lewis was 25 years old. (HTr. at 164.) Dr. Swanson noted that the fact Kenny Jefferson's scores were lower is consistent with the fact that Mr. Lewis had a significant drug abuse problem when he was 25 and that, as a result, at that time "[h]e wasn't able to maintain even the mild deficit functioning once he was doing the drugs that he

---

[38] Mr. Lewis's primary weaknesses were in language and functional academic skills, as well as domestic skills and the ability to live and work independently in the community. (HTr. at 164.)

was doing at that time."[39]   (HTr. at 165-66, 444-45 (Dr. Swanson testifying that because Kenneth's score was so low, she looked for an explanation and concluded that the low score was attributable to the fact that Mr. Lewis was a crack cocaine addict and was abusing other substances when he was 25); *see also* HTr. at 342 (Dr. King admitting that drug and alcohol use can adversely affect a person's adaptive functioning).)   Overall, Dr. Swanson's Vineland-II results led her to conclude that Mr. Lewis "functions at about the mild deficit range today." (HTr. at 165-166.)

Dr. Swanson also testified that her Vineland-II scores are consistent with the IQ scores obtained by Drs. Israelian, King and Snook.  (HTr. at 440.)  Furthermore, Dr. Swanson noted that the three Vineland-II scores also are consistent with one another, all falling more than two standard deviations below the mean.  (HTr. at 444.)  As a result, Dr. Swanson concluded that Mr. Lewis meets the adaptive behavior prong of the definition of mental retardation (*id.*) and the Court accepts her opinion on that subject and finds it to be credible.

---

[39] Respondent's expert, Dr. King, states that he did not consider Dr. Swanson's testing at all in reaching his conclusion that Mr. Lewis was not mentally retarded because she used norms for ages 17 and 25, rather than Mr. Lewis's chronological age of 41. (King Dep., PX 29 at 51-53 (1121); HTr. at 345-346.)  The affidavit of Dr. Sparrow, the author of the Vineland-II test, contradicts Dr. King's unsupported criticism and she testified that Dr. Swanson did use the appropriate norms.

Dr. King also testified that he disregarded Dr. Swanson's Vineland ratings because Kenny's ratings were so low.  In addition to explaining this phenomenon, Dr. Swanson testified that she did not need to factor in Kenny's ratings, since the assessments given to Eliza and Brian are sufficient to meet the adaptive functioning prong. (*See* Swanson Dep., PX 9, at 42-46 (744-45) (explaining how she utilized Kenny's Vineland-II results).)  Dr. Swanson included Kenny's ratings because they are consistent with the other ratings and illustrate a continuum of functioning consistent with mental retardation.

c.   **Mr. Lewis's Social History.**

The Court also finds that the affidavit evidence and the other evidence reviewed by Dr. Swanson (the other psychological experts who testified on Mr. Lewis's behalf) is consistent with the conclusion that Mr. Lewis is mentally retarded.  As Dr. Swanson confirmed, corroborating information is crucial in making a retrospective diagnosis.  (HTr. at 149-50.)  Therefore, an expert must consider "[a]ny kind of corroborating interviews you can get with other people, talk to the teachers, talk to the work supervisor and see if these deficits you see in one setting are holding up over other settings."  (HTr. at 148.)  The AAIDD's guidelines for a retrospective diagnosis also require clinicians to examine multiple sources of evidence, and determine whether the evidence is consistent.   Those guidelines specifically provide that clinicians assessing adaptive behavior should, *inter alia*, "use multiple informants and multiple contexts" and "realize that adaptive behavior refers to typical and actual functioning and not to capacity or maximum functioning."  (AAIDD User's Guide, PX 14, at 20 (803).)

As noted above, Mr. Lewis offered affidavits from family members, friends, and employers who knew him throughout his life, including the periods when he was growing up in Mississippi, when he moved to New Orleans as a child, and when he moved back to Mississippi. (HTr. at 186.)  Dr. Swanson testified that her review of those materials provided her with additional specific examples of poor adaptive functioning throughout Mr. Lewis's life and her examination of the affidavits revealed "consistencies across the affidavits," and consistencies "between those affidavits and school reports, those affidavits and my own adaptive assessments." (*Id.*)  In sum, the affidavits helped Dr. Swanson tie all of the evidence together to conclude that Mr. Lewis was mentally retarded.

While the Court will not repeat all of the affidavit testimony and other documentary evidence discussed earlier in this opinion, the Court notes that the affidavits demonstrate that

from the start of his life, Mr. Lewis was consistently described as being "slow" and a "follower" who would do anything that anyone told him to do. The affidavits also are consistent with and corroborate Mr. Lewis's history of academic failure and establish that, while he was a good employee, he required constant supervision and lacked the ability to hold anything other than a menial job. Overall, Dr. Swanson concluded that the information in the affidavits also is consistent with the standardized adaptive behavior scores that she obtained and further corroborates that Mr. Lewis's cognitive and adaptive functioning deficits were present prior to the age of 18. (HTr. 185-86.) The Court agrees with Dr. Swanson's careful analysis of Mr. Lewis's social history and finds that it also supports a finding that Mr. Lewis is mentally retarded.

### d.      Dr. Swanson's Review of Academic Records.

The Court finds that Mr. Lewis's formal academic records and test scores further support Dr. Swanson's conclusion that Mr. Lewis is mentally retarded. Dr. Swanson testified that both the grades and standardized test scores in Mr. Lewis's elementary school records from Mississippi, the only formal records available, are consistent with her diagnosis of mental retardation.[40] Mr. Lewis was held back in the first grade, in Columbia, Mississippi. (HTr. at 214-215; Mississippi School Records, PX 13, at 1 (773) (indicating that Mr. Lewis was "retained" in the first grade after the 1971-72 school year).) After he failed the first grade, Mr. Lewis was administered a group screening test, the Otis Lennon, probably in order to grant him entry back into regular first grade. (HTr. at 221-23.) When Mr. Lewis was seven years and two

---

[40] Dr. Swanson reviews and interprets school records from a variety of sources on a regular basis, as part of the evidence for eligibility for state agencies and as part of her work at a charter school, a fact which enhances the credibility of her testimony about Mr. Lewis's school records. (HTr. at 220-21.)

months old, he was given a Peabody Picture Test, an individually administered verbal test, rather than an IQ test.  (HTr. at 223-25.)  Mr. Lewis scored in the first percentile on the Peabody Picture Test, which Dr. Swanson testified "is consistent with an IQ in the sixties on the Wechsler [WAIS test]."  (HTr. at 224.)  While Mr. Lewis was more than seven years old when he took it, the Peabody test also estimated his mental age to be four years and seven months old, and Dr. Swanson testified that the nearly three year difference in verbal ability also "is consistent with [Mr. Lewis] having substantial limitations prior to the age of 18."  (HTr. at 225; *see also Davis*, 2009 WL 1117401, at *29 (relying on Peabody testing as evidence supporting a finding of deficits in adaptive behavior).)

After being retained in the first grade, Mr. Lewis continued elementary school in the same grade as his brother Brian – who helped him with his work.  (HTr. at 215.)  While Mr. Lewis earned B's and C's during his first few years of elementary school, his grades fell to C's and D's by the time he reached fifth grade.  (Mississippi School Records, PX 13, at 1 (778).)  Dr. Swanson testified that Mr. Lewis's grades are consistent with a "plateau profile," where people with low cognitive ability can be pushed to progress academically until they reach the limits of their ability.  (HTr. at 215-16.)  Overall, Dr. Swanson found that Mr. Lewis's elementary school grades are indicative of "the academic profile of somebody with mental retardation or somebody with low cognitive ability" and she noted that Mr. Lewis was still functioning at an elementary school level when he was tested decades later by Dr. Israelian and Dr. King.  (*Id.*)

Mr. Lewis's scores on standardized achievement tests also are consistent with a diagnosis of mental retardation.  Mr. Lewis took the California Achievement Test, or the "CAT," three times in elementary school.  (Mississippi School Records, PX 12, at 2 (779).)  Dr. Swanson noted that when Mr. Lewis was tested during his second attempt at first grade, his scores were

either still at the "prereadiness level" or "barely hanging in there for the first grade." (HTr. at 217-18.)  When he next took the test during third grade (when he should have been in the fourth grade), he made no gains in some areas and minimal gains in others. (HTr. at 219.)  In terms of his percentage scores, some of his scores were in the second and third percentile range, which also "is consistent with someone in the mental retardation range." (*Id.*)  Mr. Lewis's final set of CAT scores, from fourth grade (when he should have been in the fifth grade) reflect that his abilities had reached a plateau.  They show that Mr. Lewis was well below the fourth grade level in almost every category and many of his percentile scores were in the single digits – facts that also are consistent with the academic profile for someone with mental retardation. (HTr. at 219-20.)

The Mississippi school records also indicate that during one of his attempts at the first grade, Mr. Lewis was evaluated by his teacher for "Social and Personal Assets" and for "Emotional Symptoms." (Mississippi School Records, PX 12, at 2 (779).)  With regard to his social and personal assets, Mr. Lewis was being given the lowest rating for the categories of assuming responsibility, initiative, leadership, and working well with others.[41]  (HTr. at 225-27.)  With regard to his "emotional symptoms," Mr. Lewis was marked as "moderately unsatisfactory" in every category. (HTr. at 228.)  Dr. Swanson found that this evidence also is "corroborative evidence of the validity of the scores that he obtained on the Vineland." (*Id.*)

---

[41] The only category where Mr. Lewis scored highly was "personal grooming" which, as Dr. Swanson noted, is typically performed by a parent when a child is in the first grade. (HTr. at 226-227.)

From the sixth grade until he dropped out of school after the ninth grade, Mr. Lewis attended school in New Orleans.[42]   While there are no records from the New Orleans schools as a result of Hurricane Katrina, Mr. Lewis's mother explained to Dr. Swanson that he also would have been held back in the sixth grade, but when his family moved to a new location in New Orleans, he simply entered the same class as his brother Brian.   (HTr. at 229-230; Swanson Report, PX 11, at 6 (770).)   Mr. Lewis was again held back in the ninth grade.   (*See* Snook Report, PX 62, at 2 (1668); Israelian Report, PX 3, at 2 (478).)   Through her review of the affidavits and her personal familiarity with the New Orleans public school system, Dr. Swanson also concluded that Mr. Lewis was in special labs in middle school and the equivalent of special education classes in almost every subject in high school.   (HTr. 229-31; *see also* Swanson Report, PX 11, at 6-7 (770-771))   The Court finds that Mr. Lewis's academic history supports its conclusion that Mr. Lewis is mentally retarded.

e.      <strong><u>Dr. Swanson's Interview With Mr. Lewis.</u></strong>

The information contained in the school records and observed by the affiants and other experts was further corroborated by Dr. Swanson when she interviewed Mr. Lewis in August 2007 to complete her evaluation.   (*See* Swanson Report, PX 11, at 1, 6-10 (770-774); HTr. at 175-76, 190-96, 212-13.)   As Dr. Swanson summarized in her report, she asked Mr. Lewis to perform basic adaptive skills such as looking up information in a dictionary and a phone book,

---

[42]   Because the records were destroyed by Katrina, it is unclear whether Mr. Lewis actually dropped out of high school after ninth or tenth grade.   (*Compare* Snook Report, PX 62, at 2 (1668) (Mr. Lewis told him that he repeated ninth grade and dropped out in tenth grade) with Swanson Report, PX 11, at 7 (771) (Mr. Lewis reporting that he dropped out of high school after failing the ninth grade) and Israelian Report PX 3, at 2 (478) (Mr. Lewis repeated ninth grade and dropped out in tenth grade).)   Ultimately, however, the Court concludes that whether Mr. Lewis dropped out in the ninth or tenth grade has no bearing on its conclusion that Mr. Lewis is mentally retarded.

identifying functional signs, using a ruler and tape measure, reading various measuring cups and spoons, identifying basic household cleansers, and choosing appropriate tools or cleansers for a specified task. (Swanson Report, PX 11, at 8 (772).) Dr. Swanson also asked Mr. Lewis to identify the correct response to questions based on machine dials, clocks, money, receipts, checks and bank statements. (*Id.* at 8-9 (772-773).) These types of questions are called "direct adaptive probes." (*Id.* at 8 (772).)

The results of Dr. Swanson's direct adaptive probes are entirely consistent with the academic achievement test results and were again consistent with adaptive behavior in the mild deficit range. (HTr. at 194-96.) For example, Dr. Swanson found that Mr. Lewis could not identify signs that identified something as flammable, the sign for an elevator, or some traffic signs. (Swanson Report, PX 11, at 8 (772).) While Mr. Lewis could identify some tools by name, he could not identify them by function. (*Id.*) He also had difficulty with a variety of health and safety issues and could not correctly identify which items cost the most on a printed menu. (*Id.*) Mr. Lewis could not identify foods that made up a balanced diet, or items used to clean dishes, shampoo hair, and prevent tooth decay. (*Id.*)

Mr. Lewis used a phone book by flipping through it until he reached the correct letter and then went down the page, rather than using the name guides on the upper corners of the pages; it took him several minutes to locate his brother Kenneth Jefferson's name. (*Id.* at 9 (773); *see also* HTr. at 196.) Mr. Lewis relied on the pictures to locate a service in the Yellow Pages. (Swanson Report, PX 11, at 9 (773).) It took Mr. Lewis five minutes per word to look up words

in the dictionary, and he used only the first letter of the word to search. (*Id.*) Mr. Lewis also could not explain the dictionary definitions that he could read.[43] (*Id.*)

Dr. Swanson's evaluation also revealed that while Mr. Lewis could tell time, he could not judge the passage of time or time appointments. (Swanson Report, PX 11, at 9 (773).) For example, Mr. Lewis could not compute the time that would be necessary to bathe, dress and walk to an appointment 15 minutes from his home. (*Id.*) He could not give the date of a return appointment if directed to return in two weeks. (*Id.*)

Mr. Lewis also could not read washer and dryer dials and he admitted to Dr. Swanson that he never learned how to work a washer and dryer. (*Id.* at 9-10 (774).) While Mr. Lewis could identify coins and bills, he could not determine what products cost the least or most and could not correctly read a cash register receipt. (*Id.* at 9 (773).) He did not know his own clothing sizes, and he could not make a grocery list of more than three items. (*Id.* at 10 (774).) When Dr. Swanson asked Mr. Lewis how he would measure items on construction jobs, he admitted that his boss either precut a standard measure against which to place the items he needed to cut, or marked the measuring tape and had him carry it to the item. (*Id.* at 9-10 (773-774).)[44]

Ultimately, based on her Vineland-II testing, the academic testing conducted by Drs. Snook, Israelian and King, her review of the available affidavit and academic evidence and her

---

[43] Dr. Swanson's findings about Mr. Lewis's inability to use a dictionary are consistent with the testimony provided by his mother, who testified about Mr. Lewis's difficulties with using a dictionary when he was a child and his inability to understand the definitions of words. (*See* Eliza Jefferson Aff., PX 90, at ¶ 20 (2789).)

[44] As noted above, Rex Hanner, one of Mr. Lewis's former bosses, confirmed that Mr. Lewis could not properly measure items when they worked together at the East Columbia Apartments. (Hanner Aff., PX 87, at ¶ 3 (2758-2759) (testifying that Mr. Lewis could not "do any calculations or measurements" and that he instead had to show Mr. Lewis what to do).)

3419

interview with Mr. Lewis, Dr. Swanson concluded that Mr. Lewis met all three prongs for a diagnosis of mental retardation. (HTr. at 232-33.) In fact, she concluded that every source of information regarding Mr. Lewis's adaptive behavior confirmed the diagnosis of mental retardation – with the sole exception being the results of Dr. King's ABAS-II adaptive behavior testing of Mr. Lewis (discussed below in Section VIII). (HTr. at 440-41 (testifying that Dr. King's ABAS-II score is an "outlier piece of data" that is not consistent with the IQ testing, the academic testing, the intellectual testing, the neuropsychological testing, the school records, or the affidavits); *see also Nelson*, 419 F. Supp. 2d at 900-01 (accepting Dr. Swanson's opinion that the defendant met the adaptive behavior criterion of the definition of mental retardation when her Vineland results were corroborated by people who knew the defendant throughout his life and by significant evidence of deficits in the defendant's functional academic skills).)

The Court finds that Dr. Swanson's credentials are impeccable and that she conducted a thorough and proper evaluation of Mr. Lewis's adaptive functioning. As a result, the Court agrees with Dr. Swanson's conclusions regarding Mr. Lewis's adaptive behavior and concludes that Mr. Lewis does have significant deficits in his adaptive behavior and that those deficits were present during the developmental period.

> **f.    Respondent's Criticisms Of Dr. Swanson's Evaluation Are Without Merit.**

In his response brief, Respondent suggests that Mr. Lewis has not met his burden of establishing that he suffers from "significant deficits" or impairment in adaptive behavior. (Resp. Br. at 121-23, 134-35.) As an initial matter, Georgia's statutory definition of mental retardation, found at OCGA § 17-7-131(a)(3), does not require that impairments in adaptive behavior be "significant," but instead provides that "[m]entally retarded means having significantly subaverage intellectual functioning *resulting in or associated with impairments in*

*adaptive behavior* which manifested during the developmental period" (emphasis added)   *See* Macvaugh and Cunningham, Supp. App. Ex. 3, at 12 (recognizing that the Georgia statute defining mental retardation uses "the three prongs common to widely accepted definitions in the field, but [it does] not operationalize any of these three criteria by identifying a specific IQ score, the required number of adaptive deficits, or a particular age of onset").   While both the DSM-TR-IV and the AAIDD's definitions of mental retardation refer to "significant limitations" in adaptive behavior, Dr. Swanson testified that all three of the relevant definitions of mental retardation are "substantially similar," and that because Mr. Lewis "meets the adaptive criteria under all three definitions," he is mentally retarded.   (*See* HTr. at 131-32, 232-233; Swanson Report, PX 10, at 4 (755) (stating that Mr. Lewis meets the Georgia, AAMR and DSM-IV-TR criteria for a diagnosis of mental retardation); Swanson Supplemental Report, PX 11, at 10 (774) (same).)   For the reasons discussed above, the Court agrees with Dr. Swanson's conclusions.

Respondent also argues that Dr. Swanson "inexplicably" chose to give the Vineland-II to Mr. Lewis's mother and two of his brothers.   (Resp. Br. at 132-33.)   Contrary to Respondent's assertion, as noted above, Dr. Swanson carefully explained that she chose to give the Vineland-II to Mr. Lewis's mother and his brother Brian because they were care providers for Mr. Lewis who acted in that role during Mr. Lewis's "developmental period" and Dr. Swanson specifically directed them to report on Mr. Lewis's adaptive behavior at age 17.   Moreover, numerous authorities support Dr. Swanson's view that it is important to interview the parents and caregivers of a subject when attempting to evaluate his adaptive behavior.   *See* Marc J. Tasse, Ph.D., *Adaptive Behavior Assessments and the Diagnosis of Mental Retardation in Capital Cases*, Journal of Psychiatry and Law (2009) (hereinafter "Tasse"), included in the Supplemental Appendix as Exhibit 7, at 15, 18 (recognizing that "the individual's parents or caregivers" are

ideal respondents to provide information regarding adaptive behavior and that when conducting a retrospective diagnosis it is important to focus the respondent on a clear time period for their report); Macvaugh and Cunningham, Supp. App. Ex. 3, at 33 (recognizing that the proper use of a standardized instrument for assessing adaptive behavior involves "*independently* querying a number of third parties who have had close observation of the defendant" (emphasis in original)); Caroline Everington, Ph.D. and J. Gregory Olley, Ph.D., *Implications of Atkins v. Virginia: Issues in Defining and Diagnosing Mental Retardation*, Journal of Forensic Psychology Practice, Vol. 8(1), (2008) (hereinafter "Everington and Olley"), included in the Supplemental Appendix as Exhibit 4, at 13 (specifically recommending that an examiner assessing adaptive behavior interview multiple informants, including family members).)

As noted above, Dr. Swanson also explained that she gave a third Vineland-II to another of Mr. Lewis's brothers, Kenneth, because he acted as Mr. Lewis's care provider when Mr. Lewis was 25 and that, while that time period is outside the "developmental period," the results of Kenneth's Vineland-II provided her with another source of data for her longitudinal evaluation of Mr. Lewis's adaptive behavior. (*See* HTr. at 161.) Dr. Swanson further explained the steps she took to ensure that her administration of the Vineland-II complied with psychological "best practices," including her discussions with Dr. Sparrow, the senior author of the Vineland-II. *See* Everington and Olley, Supp. App. Ex. 4, at 11 ("A valid assessment of adaptive skills should be based on information from several sources (e.g., standardized measures of adaptive skills, interviews, school and work records, and other archival data). Information should also come from different periods of development. A thorough assessment of adaptive skills requires some detective work . . . .").) Finally, Dr. Swanson testified that she conducted her retrospective diagnosis of Mr. Lewis in accordance with the AAIDD's guidelines. Once

again, the Court concludes that Respondent's complaint about the administration of the Vineland-II to Kenneth Jefferson is without merit and instead finds that Dr. Swanson's actions were proper and in accordance with the best practices of her profession.

Respondent next criticizes Dr. Swanson for not administering the Vineland-II directly to Mr. Lewis and asking him to self-report on his adaptive behavior on that standardized test. (Resp. Br. at 133.)  However, as discussed below in Section VII(B)6(b), the Court finds that it would have been improper for Dr. Swanson to administer a standardized assessment instrument to Mr. Lewis and ask him to self-report in light of his limited intellectual abilities and the fact that he is incarcerated.  As noted above, however, Dr. Swanson's adaptive behavior analysis did involve conducting an interview with Mr. Lewis, where she administered direct adaptive probes to gain additional data regarding his adaptive abilities.  Moreover, the results of those probes were fully consistent with the information that Dr. Swanson obtained from her other sources.

The Court finds that Respondent is also wrong when he claims that the Vineland-II was not an appropriate instrument for Dr. Swanson to use because there are "no norms for retrospective evaluations" or because its semi-structured interview format "allows a greater degree of subjectivity on the part of the interviewer."  (Resp. Br. at 133.)  As noted above, Dr. Swanson consulted with Dr. Sara Sparrow, the senior author of the Vineland-II, to confirm that she was administering and interpreting the test results properly.  Moreover, the 2008 Vineland II Expanded Interview Form Manual (the "2008 Vineland II Manual") now addresses the techniques that should be used for Retrospective Interviews and Dr. Swanson's evaluation of Mr. Lewis followed the guidelines set forth in that manual.[45]  *See* 2008 Vineland II Manual, the

---

[45] Specifically, the 2008 Vineland II Manual notes that retrospective interviews might be necessary when an individual has been in a restrictive environment, such as a prison, and that a

relevant portions of which are included in the Supplemental Appendix as Exhibit 8. Moreover, rather than introducing an impermissible level of subjectivity into her evaluation, Dr. Swanson testified – and Dr. Sparrow confirmed – that the semi-structured interview format of the Vineland-II allowed Dr. Swanson to probe deeper into the responses provided by the informants and that the semi-structured interview format *reduces* the possibility that the test results will be influenced by biased responses. Another recent article also confirms that the semi-structured interview format is preferred when conducting a retrospective evaluation. *See* Tasse, Supp. App. Ex. 7, at 14-15 (the semi-structured interview format is preferred because it elicits accurate and in-depth descriptions of the individual's functioning and allows the examiner to probe the responses and assess the reliability of the respondent).) In light of this evidence, the Court rejects Respondent's claim that Dr. Swanson acted inappropriately when administering the Vineland-II. *Cf. Davis*, 2009 WL 1117401, at *23, 25 (criticizing government experts who did not speak family members, friends, teachers or acquaintances of the defendant when attempting

---

retrospective diagnosis is necessary in that situation because *"functioning in the current restrictive environment cannot be taken as a valid measure of past adaptive functioning."* (*See* Vineland II Manual, Supp. App., Ex. 8, at 28 (emphasis in original).) Under those circumstances, conducting survey interviews "regarding the individual's adaptive behavior at an earlier age, is permissible." (*Id.*) Respondents for a retrospective interview should be persons who had regular contact with the individual during the period in question, such as a parent or other family member, and the examiner should emphasize during the interview that the questions refer to the individual's functioning at the designated earlier age. (*Id.* at 28-29.) The examiner must also ascertain whether the respondent has a clear memory regarding the individual's adaptive functioning at the specific earlier age and, if the examiner determines that the respondent can report accurately, the designated age should be recorded on the test and the norms for that age should be used when scoring the test. (*Id.* at 29-30.) Finally, the Vineland II Manual highly recommends "that separate administrations be conducted with more than one respondent (e.g., a mother and sibling)," that each administration be scored separately, and notes that similar results "can be considered corroborative evidence for the findings." (*Id.* at 30.) Notably, Dr. Swanson's evaluation of Mr. Lewis followed all of the guidelines and recommendations in the Vineland II Manual.

to evaluate adaptive behavior because the experts assumed that those observers would be unreliable and biased).

Respondent's next misguided attack on Dr. Swanson is his claim that she erred by conducting multiple Vineland-II assessments as part of her longitudinal evaluation of Mr. Lewis. (Resp. Br. at 134.) The only support offered by Respondent in support of that claim, however, is Dr. King's unsupported statement that "[t]he Vineland also requires that you only use one person to come up with the results, that you're not supposed to use multiple individuals to give responses." (*See* Resp. Br. at 134 (citing to Dr. King's testimony on page 347 of the hearing transcript).) If Respondent and Dr. King are suggesting that Dr. Swanson interviewed all three respondents simultaneously and used a composite of their responses to assess Mr. Lewis, they are simply mistaken and the evidence demonstrates that Dr. Swanson conducted separate sessions with those respondents and scored their tests separately. (*See* Vineland-II Score Summaries and Survey Interview Forms, PX 22 (855-929) (containing separate test results for all three respondents and separate scoring summaries).)

To the extent that Dr. King was suggesting that the Vineland-II system limits a psychologist to testing only one respondent, Dr. King is wrong. Instead, the AAIDD's guidelines for a retrospective diagnosis, Dr. Sparrow and numerous other authorities advise psychologists to use *multiple informants* when making a retrospective diagnosis. (*See* AAIDD User's Guide, PX 14, at 20 (803) (advising that examiners conducting a retrospective diagnosis of adaptive behavior should use "multiple informants and multiple contexts"); Dr. Sara Sparrow Aff., PX 23, at ¶ 9 (934) (testifying that "[i]t is also highly recommended that more than one informant be interviewed" when conducting a retrospective assessment of adaptive behavior); *see also* 2008 Vineland II Manual, Supp. App. Ex. 8, at 30 (recommending that separate

administrations be conducted with separate respondents and that the scores be compared to determine whether they provide corroborating evidence); ABAS-II Manual, PX 65, at 44 (1776) (advising that a single assessment instrument "never should" be used to develop a diagnosis and that instead a comprehensive evaluation must be performed using multiple sources); Everington and Olley, Supp. App. Ex. 4, at 9 (noting that a practitioner can compensate for the issues that arise when conducting a retrospective assessment by relying "on several sources of information, rather than adaptive scales alone" and by administering the standardized "instrument to multiple informants" and recognizing that, "if the results are congruent, one can be more confident in the validity of the results").)

Finally, Respondent cites to Dr. King's claim that Dr. Swanson's Vineland-II testing resulted in "grossly different results" and that those results call into question her adaptive behavior analysis. (Resp. Br. at 134.) Once again, Dr. King is simply incorrect: the Vineland-II results obtained for the period when Mr. Lewis was 17 years old from Mr. Lewis's mother – 2.53 standard deviations below the mean – and the results from his brother Brian – 2.33 standard deviations below the mean – are very similar. The only "outlier," as Dr. Swanson explained during her testimony, is the composite score obtained from Mr. Lewis's brother Kenneth – which was 4.93 standard deviations below the mean. As Dr. Swanson explained, however, Kenneth was asked to rate Mr. Lewis's adaptive skills when Mr. Lewis was 25 years old and during a period when Mr. Lewis was a crack cocaine addict, and Dr. Swanson concluded that Mr. Lewis's drug abuse explained Kenneth's lower scores. (*See* HTr. at 165-66, 444-45).)

In sum, the Court finds that Respondent's largely unsupported criticisms of Dr. Swanson's evaluation methodology do not withstand scrutiny. Instead, the evidence establishes that Dr. Swanson consistently employed psychological best practices when she evaluated Mr.

Lewis's adaptive behavior and her analysis demonstrates that Mr. Lewis met the adaptive behavior prong for a diagnosis of mental retardation.

### 3.   Dr. George Woods, M.D.

After conducting two clinical interviews with Mr. Lewis, reviewing the testing conducted by both Drs. Israelian and Swanson, and considering other evidence, Dr. George Woods, M.D., found that Mr. Lewis meets the criteria for mental retardation under Georgia and Federal law. (*See* Woods Report, PX 198, at 1-4 (5779-82).) Dr. Woods is a psychiatrist who specializes in neuropsychiatry and maintains a private practice in consultive psychiatry in California, where he has been licensed since 1979. (George Woods C.V. at 1, Pet. App., Ex. C.) He is certified by the American Board of Psychiatry and Neurology and is a Diplomate of the American College of Forensic Examiners. (*Id.*) Dr. Woods is also a member of the American Psychiatric Association and has taught postgraduate students at the University of California, Davis, in the Department of Forensic Psychiatry. (*Id.* at 1, 4.) He currently serves on the faculty of the Morehouse School of Medicine in Atlanta and the California State University, Sacramento. (*Id.* at 3.)

Dr. Woods found that "Mr. Lewis has significant cognitive deficits as well as limited intelligence," and that Mr. Lewis's strong work ethic "masked his multiple cognitive deficits throughout his life." (Woods Report, PX 198, at 3-4 (5781-5782).) Dr. Woods also noted that Mr. Lewis displayed "the hallmark of mental retardation" – a "slow processing speed" – throughout Dr. Israelian's neuropsychological testing. (*Id.*) This means that while there are functions and tasks that Mr. Lewis can complete, he cannot do so effectively because he is "consistently hampered" by the time it takes him to adequately understand the task. (*Id.*)

During his clinical interviews, Dr. Woods found that Mr. Lewis's "fund of knowledge was extremely limited." (Woods Report, PX 198, at 3 (5781).) While Mr. Lewis could attempt

to answer questions or stay focused on a topic of conversation, Dr. Woods found that "his poverty of thought limited his answers to many questions." (*Id.*)

Dr. Woods reviewed Mr. Lewis's history of drug and alcohol abuse as a possible source of some of his deficits but concluded that Mr. Lewis's deficits "were clear before the onset of his drug use, as described in the information provided by school records and by family members and friends." (*Id.* at 2-3 (5780-5781).) Mr. Lewis's drug and alcohol use, however, further impaired Mr. Lewis's executive functioning and his "already limited ability to suppress or modulate his behavior." (*Id.* at 4 (5782).) As Dr. Woods noted, a person functioning on Mr. Lewis's level "cannot process information well even when calm and relatively organized. When inebriated, he would become even more disinhibited and neurologically disrupted, further impeding his ability to conform his behavior to law." (*Id.*)

In addition, Dr. Woods noted that Mr. Lewis was exposed prenatally to heavy sporadic drinking and concluded that prenatal exposure to alcohol "most certainly contributed to his extremely low cognitive functioning." (Woods Report, PX 198, at 4 (5782); *see also* Eliza Jefferson Aff., PX 90, at ¶ 18 (2788).) As a result of evidence of Mr. Lewis's prenatal exposure to alcohol, and of his physical appearance, Dr. Woods and Dr. Israelian have diagnosed Mr. Lewis as suffering from Fetal Alcohol Spectrum Disorder. (Woods Report, PX 198, at 3-4 (5781-5782); Israelian Report, PX 3, at 2, 6 (478-482).) While mental retardation is a functional diagnosis, and therefore it is not necessary to establish causation, "causation can be extremely useful, in terms of determining or assessing the third prong, the developmental prong." (HTr. at 76-77 (testimony of Dr. Israelian).)

Overall, the Court concludes that Dr. Israelian's evaluation, Mr. Lewis's academic and standardized testing records from Mississippi, Dr. Swanson's adaptive behavior assessments and

informal probes, and the evidence supplied by people who knew him before he was 18, establish that Mr. Lewis's cognitive deficits and adaptive functioning limitations manifested during the developmental period, thus meeting all three criteria for a diagnosis of mental retardation. (Swanson Report, PX 10, at 4 (755); Israelian Report, PX 3, at 6 (482); Woods Report, PX 198, at 4 (5782).)

The Respondent does not directly challenge any of the opinions contained in Dr. Wood's report and has offered no facts undermining his credentials or his credibility. As a result, the Court accepts his opinion as additional proof that Mr. Lewis is mentally retarded.

### 4.    Dr. Steven Snook's Pretrial IQ Testing.

While the Court has already concluded that Dr. Snook's last minute evaluation of Mr. Lewis was seriously flawed, immediately before the trial in 1998, Dr. Snook gave Mr. Lewis an earlier version of the WAIS, the WAIS-R, which resulted in a full scale IQ score of 76. (*See, e.g.,* Snook Aff., PX 61, at ¶ 4 (1662-1663).) Respondent claims that the score of 76 is valid and that it is just outside the range for a finding of mental retardation. Due to the serious flaws associated with Dr. Snook's administration of the WAIS-R to Mr. Lewis, however, the Court concludes that Dr. Snook's score should be disregarded or, at a minimum, the score must be adjusted downward to a 69 in light of the so-called "Flynn Effect."

### a.    Dr. Snook's Administration Of An Outdated IQ Test.

When Dr. Snook administered the WAIS-R to Mr. Lewis in 1998, that test had already been superseded by the WAIS-III and the WAIS-R test norms were 20 years old. (HTr. at 90; Snook Aff., PX 61, at ¶ 4 (1662-1663).) As a result, for the reasons discussed below, the Court finds that Dr. Snook's use of the superseded WAIS-R was contrary to accepted psychological best practices and resulted in an inaccurate IQ score for Mr. Lewis.

The AAIDD recognizes that "[a]ll intellectual assessments must use a reliable and appropriate individually administered intelligence test," and that "[i]n cases of tests with multiple versions," like the WAIS, "*the most recent version with the most current norms should be used at all times.*" (*See* AAIDD User's Guide: Mental Retardation (the "AAIDD User's Guide"), PX 14, at 20-21 (803-804) (emphasis added).) Both Drs. Israelian and Swanson also testified that it was improper for Dr. Snook to evaluate Mr. Lewis using an outdated IQ test. (*See* HTr. at 53, 89, 91, 96-97 (Dr. Israelian testifying that it was improper for Dr. Snook to use the superseded test and that his results were invalid); HTr. at 202-03 (Dr. Swanson testifying that Dr. Snook's WAIS-R results are an "outlier," that the WAIS-R results are higher because the test was outdated, and that "[b]est practice demands that you use the best and most recent version of the test.").) Similarly, a recently published article also emphasizes that practitioners must give the current version of any IQ test when measuring an individual's intellectual functioning in connection with a mental retardation evaluation:

> . . . it is no longer appropriate to administer the WAIS-R, because the standardization norms for the newer version, the WAIS-III, yield a more accurate score. There is also a tendency of IQ scores to increase in the general population as a test is used over time (Flynn, 1998; Kanaya, Scullin, & Ceci, 2003). It is important to understand this "Flynn effect," because a person's IQ score may be artificially raised if an out-of-date test is given. Kanaya et al. (2003) indicated that persons with mental retardation may be particularly susceptible to this effect. It is important in capital cases that the scores from previous tests are carefully interpreted and explained.

(*See* Everington and Olley, Supp. App. Ex. 4, at 7.)

Respondent's present claim that it was proper for Dr. Snook to administer the WAIS-R to Mr. Lewis also is in direct conflict with the position that the State took during Mr. Lewis's trial, where the prosecutor impeached Dr. Snook with the fact that he gave an outdated test and emphasized that Dr. Snook violated the Code of Conduct of the American Psychological

Association by giving Mr. Lewis an outdated IQ test. (TTr. at 1918-1923.) In fact, even Dr. Snook now admits that his decision to administer the WAIS-R was "contrary to the general practice and the directives of the American Association on Mental Retardation." (Snook Aff., PX 61, at ¶ 4 (1662-1663.)

In order to justify Dr. Snook's decision to give the WAIS-R, Respondent attempts to frame the issue as "a battle between the experts" presented by Mr. Lewis and his expert, Dr. King. (Resp. Br. at 112-13.) In particular, Respondent argues that "it is clear that there exists substantial debate among practitioners on this issue, which should negate Petitioner's suggestions that the IQ test obtained by Dr. Snook should somehow be invalidated" and he claims that "[o]ther mental health experts have concurred in Dr. Snook's choice of instrument." (Resp. Br. at 112-113.)

The Court finds, however, Respondent's plural references to "experts" and a debate among "practitioners" are seriously misleading because the only purported expert cited by Respondent to support his argument is Dr. King. (*See* Resp. Br. at 113 (citing only to Dr. King's testimony).) Dr. King, in turn, did not cite to a single authoritative source supporting his view and instead the authoritative sources cited above all unanimously agree that it is improper to administer an outdated IQ test. Rather than cite to an authoritative source, Dr. King merely testified that he "can point to the Social Security Administration that orders which tests you're supposed to give, and when there's a revision, for approximately a year they will list both, meaning you can do either one."[46] (Resp. Br. at 113; HTr. at 343 (King's testimony).) There is no evidence, however, that the Social Security Administration is an accepted authority on the

---

[46] While Dr. King testified that he could "point" to the Social Security Administration (the "SSA"), he never provided a specific reference to any particular "list" issued by the SSA.

diagnosis of mental retardation.  Instead, as Dr. King was forced to admit during the evidentiary

hearing, the SSA's guidelines regarding the diagnosis of mental retardation for its purposes

violate all of the accepted definitions of mental retardation because the SSA does not allow the

psychologists who perform its "contract" evaluations to conduct an adaptive behavior analysis

and it instead requires that a psychologist render a "diagnosis" based solely on an IQ test score.[47]

(*Cf.* HTr. at 355-56 (where Dr. King admits that, although most of what he does on a "daily

basis" is conduct "contract evaluations" for the SSA, he does not do any adaptive behavior

analysis in connection with those evaluations because the SSA doesn't allow him to do so).)

Because Dr. King's opinion on the propriety of administering an outdated IQ test as a

measure of intellectual functioning is directly contrary to the authoritative guidelines of his

profession, the Court rejects that opinion.  In addition, the Court finds that the testimony of both

Dr. Israelian and Dr. Swanson that Dr. Snook's score should be disregarded because it was

obtained by using an outdated IQ test to be credible and concludes that Dr. Snook's WAIS-R IQ

score should be disregarded entirely and that it is entitled to no weight.[48]  (*See* HTr. at 53, 89, 91

(Dr. Israelian testifying that it was improper for Dr. Snook to use the superseded test, that his

results were invalid and that Dr. Snook's score of "76 is not a valid assessment of [Mr. Lewis's]

intellectual abilities and, as such, I don't believe that it's necessary to do any type of conversion

with it because its essentially an error"); HTr. at 202-203 (Dr. Swanson testifying that Dr.

---

[47] The practice of rendering a diagnosis of mental retardation based solely on an IQ score is contrary to the definitions of mental retardation found in the Georgia Code, the definition promulgated by the American Association of Intellectual and Developmental Disabilities and the definition found in the DSM-IV-TR, all of which require an analysis of the subject's adaptive functioning.

[48] By way of analogy, Dr. Israelian testified that to attempt to obtain a true IQ score by administering a test with outdated norms is "like saying the value of $20 today is exactly the same as the value of $20 in the 1950's.  It renders it meaningless."  (HTr. at 89.)

Snook's WAIS-R results are an "outlier," that the WAIS-R results overstate Mr. Lewis's IQ because the test was outdated, and noting that "[b]est practice demands that you use the best and most recent version of the test.").)

          **b.**     **The Flynn Effect And Its Application To The IQ Score Obtained By Dr. Snook.**

Even if the Court were to find that Dr. Snook's IQ score should not be disregarded, the Court also finds that there is persuasive evidence indicating that Dr. Snook's WAIS-R score of 76 was inflated due to the fact that the norms for that test were 20 years old in 1998 and that a downward adjustment to a score to 69 would be warranted to account for the so-called "Flynn Effect."

As Dr. Swanson explained, IQ test norms "get soft" over time and that phenomenon results in higher IQ scores and the need to revise the tests. (HTr. at 203.) Dr. Swanson's testimony was confirmed by the WAIS-III Technical Manual indicates that the WAIS-R was revised because, *inter alia*, "there is a real phenomenon of IQ-score inflation over time," and therefore "norms for a test of intellectual functioning should be updated regularly (Flynn, 1984, Matarrazzo, 1972)." (*See* WAIS-III Technical Manual, PX 68, at 8 (2361).) Dr. Israelian also testified that:

> We see it often, when a recently normed test is compared to a previous version we find that individuals tend to perform better on the previous version than the newer version. That is why examiners routinely renorm tests, because the population changes. IQ test scores are meaningful only with respect to the confidence that we can have in comparing an individual's performance to the population, otherwise, they're meaningless.

(HTr. at 89.)

The phenomenon that IQ scores rise as the norms become outdated is known as the "Flynn Effect" – named after the scientist who discovered it, Dr. James R. Flynn. While Dr.

King disputes its existence, psychological experts and the professional literature uniformly recognize the existence of the Flynn Effect and both the WAIS-III Technical Manual and the AAIDD User's Guide discuss it. (*See* Updated 2002 WAIS-III Technical Manual, PX 199, at 9 (5785) (the WAIS-R was revised to the WAIS-III due to the Flynn Effect); HTr. at 204-05 (Dr. Swanson testifying that the AAIDD/AAMR recognizes the Flynn Effect); Stephen Greenspan, *Issues in the Use of the "Flynn Effect" to adjust IQ Scores When Diagnosing MR,* APA Newsletter, Vol. 31, No. 3, PX 184, at 3-7 (5659-5663) (recognizing that the use of the Flynn Effect to adjust individual IQ scores is an appropriate, indeed essential, practice, and that the failure to adjust IQ using the Flynn Effect turns eligibility for execution into a lottery that is dependent on whatever IQ test a psychologist happens to have in stock); Tomoe Kanaya, Matthew H. Scullin and Stephen J. Ceci, *The Flynn Effect and U.S. Policies: The Impact of Rising IQ Scores on American Society*, American Psychologist, October 2003, PX 188, at 779 (5686) (noting that "[a]lthough there is not a consensus among professionals as to why [I.Q. score] gains are occurring or what these gains actually mean . . . all are in agreement that the gains occur and that they hold great theoretical and practical importance"); Ceci, Scullin and Kanaya, *The Difficulty of Basing Death Penalty Eligibility on IQ Cutoff Scores for Mental Retardation*, Ethics & Behavior, 13, PX 189, at 12 (5699) (recognizing the general professional acceptance of the Flynn Effect).)

The AAIDD User's Guide specifically recommends that an outdated IQ test score be adjusted by .33 points per year from the time that the test was normed. (*See* AAIDD User's Guide, PX 14, at 20-21 (803-804); *see also* WAIS-III Technical Manual, PX 68, at 8 (2361) ("The inflation rate of IQ scores is about 0.3 points each year").) As a result, the AAIDD specifically directs that practitioners conducting a retrospective diagnosis must:

[r]ecognize the "Flynn Effect."  In his study of IQ tests across populations, Flynn . . . discovered that IQ scores have been increasing from one generation to the next in all 14 nations for which IQ data existed.  This increase in IQ scores over time has been dubbed the Flynn Effect. . . . On average, the Full-Scale IQ increased by approximately 0.33 points for every year elapsed since the test was normed (Flynn 1999).  *The main recommendation resulting from this work is that all intellectual assessments must use a reliable and appropriately administered intelligence test.  In cases of tests with multiple versions, the most recent version with the most current norms should be used at all times.  In cases where a test with aging norms is used, a correction for the age of the norms is warranted.* . . . Hence, using the AAMR 2002 System, [which requires] significant deficits in intellectual functioning of "at least two standard deviations below the mean" . . . . the approximate Full-Scale IQ cutoff would be approximately 73 (plus or minus the standard error of measurement).  *Thus the clinician needs to use the most current version of an individually administered test of intelligence and take into consideration the Flynn Effect as well as the standard error of measurement when estimating an individual's true IQ score.*

(AAIDD User's Guide, PX 14, at 20-21 (803-804) (emphasis added).)  Thus, when adjusted for the Flynn Effect, the IQ score of 76 that Dr. Snook obtained when he administered the superseded WAIS-R equates to a full scale IQ score of 69, which is consistent with significant sub-average intellectual functioning and a diagnosis of mental retardation.  (*See* HTr. at 207 (Dr. Swanson testifying that Dr. Snook's IQ score should be adjusted using the Flynn Effect to 69).)

Dr. Snook also explained in this proceeding that he was unaware of the Flynn Effect when he tested Mr. Lewis and that when Mr. Lewis's score is adjusted to take the Flynn Effect into consideration, Mr. Lewis's full scale IQ score should have been 69.  (Dr. Snook Aff., PX 61, at ¶¶ 4-5 (1662-1663).)  In fact, Dr. Snook testified that, while trial counsel never told him that mental retardation is an absolute defense to the death penalty, if he had been aware of that fact he would have informed Walker that "his IQ score indicated that Mr. Lewis was probably functioning on the level of mental retardation" and he would have stressed the need for a more complete evaluation.  (Snook Aff., PX 61, at ¶ 6 (1663-1664).)

194

While the Court has already held that Dr. Snook's IQ score should be disregarded, even if were to be considered, the Court finds that the Flynn Effect is a valid scientific principle and that Dr. Snook's score must be adjusted downward to a 69 to take the Flynn Effect into account. That corrected score would be consistent with the score obtained by Dr. Israelian and would place Mr. Lewis's intellectual functioning in the significantly subaverage category, thereby meeting the first prong for a diagnosis of mental retardation. (*See* HTr. at 202-08 (Dr. Swanson testifying that Dr. Snook's IQ score should be adjusted to take the Flynn Effect into account); Swanson Supplemental Report, PX 11, at 2 (766) (illustrating how the IQ scores obtained by Drs. Snook, Israelian and King should be adjusted to take the Flynn Effect into consideration).)

Respondent argues that this Court should ignore the Flynn Effect because he claims: (1) that it is "exclusively used in capital litigation cases," (2) that "recent articles including Dr. Flynn's own 'Tethering the Elephant' have undermined the alleged effect," and (3) that "courts have been reluctant to recognize the Flynn Effect as more than a disputed theory." (Resp. Br. at 114-115.)  The Court concludes that each of those arguments are meritless.

First, Respondent's brief cites only to Dr. King's testimony in support of his claim that the Flynn Effect is used exclusively in capital cases.  (Resp. Br. at 115.)  In particular, Respondent quotes Dr. King's testimony that the Flynn Effect "is never used by the Social Security Administration or vocational rehabilitation services."[49] (*Id.*)

However, the Court concludes that Dr. King is not an authoritative source on the propriety of using the Flynn Effect in a capital case and, in fact, as discussed in Section VII(B)6 below, he is not even an expert in the field of mental retardation.  Dr. King has never published

--------

[49] As noted above, the SSA is not an accepted authority on the diagnosis of mental retardation.

any papers on the subject of mental retardation and he has never done any research on mental retardation or on the validity of the Flynn Effect. (HTr. at 354-55.) In addition, on cross-examination, Dr. King admitted that the AAIDD's User's Guide requires that clinicians recognize the existence of the Flynn Effect and advises that IQ scores should be corrected in accordance with the Flynn Effect when they were obtained by administering a test with aging norms. (HTr. at 368, 370-71.) Dr. King also admitted on cross-examination that the WAIS-III Technical Manual acknowledges that the Flynn Effect is real and that it was one of the reasons why the WAIS-R was updated and replaced with the WAIS-III. (HTr. at 372-75.)

Moreover, contrary to Dr. King's unsupported opinion, several recently published articles also specifically advise practitioners that the Flynn Effect *should be applied in capital cases.* See Macvaugh and Cunningham, Supp. App. Ex. 3, at 24 (because the Flynn Effect has gained sufficient scientific acceptance, Flynn-corrected scores should be reported in *Atkins* cases so that the court can understand those scores); Frank M. Gresham, *Interpretation of Intelligence Scores in Atkins Cases: Conceptual and Psychometric Issues*, Applied Neuropsychology (forthcoming June 2009) (hereinafter "Gresham"), included in the Supplemental Appendix as Exhibit 5, at 9-11 (explaining the Flynn Effect and noting that "[i]t is well established that there has been a substantial increase in measured intelligence test performance over time because IQ test norms become obsolete").

Respondent also claims that other mental heath practitioners have published articles that support Dr. King's opinion that the Flynn Effect should not be applied in this case. (Resp. Br. at 115.) Rather than citing to multiple articles from multiple practitioners, however, Respondent cites only to a single Letter to the Editor of Division 33 of the American Psychological Association authored by *one practitioner*, Dr. Roger B. Moore, Jr. (included in the record as part

of Petitioner's Exhibit 191).  When citing to the Moore letter, Respondent ignores two articles contained in the very next volume of the publication *Psychology in Mental Retardation and Developmental Disabilities*, the Official Publication of Division 33 of the American Psychological Association (included in the record as Petitioner's Exhibit 192).  These articles respond to Dr. Moore's letter and refute his claims that the Flynn Effect should not be used to adjust IQ scores that are obtained by using tests with aging norms.

Dr. Flynn authored the first response to Dr. Moore, entitled *Capital Offenders and the Death Sentence: A Scandal That Must Be Addressed.  (See* PX 192 (5730-5733).)  Dr. Flynn responds point by point to Dr. Moore's arguments and notes that Dr. Moore does not dispute the fundamental premise that "IQs should be lowered by .3 points for every year between when the test was normed and when the subject sat the test."  (PX 192 at 5 (5732).)  Instead, as Dr. Flynn notes, Dr. Moore's real point of contention appears to be Dr. Flynn's conclusion that the WAIS-III test was improperly normed and therefore that any scores obtained with that test should be subject to an additional adjustment of 2.34 points.  That issue, however, simply has no bearing in this case because Dr. Snook administered the obsolete WAIS-R to Mr. Lewis, not the WAIS-III.

The second response to Dr. Moore is entitled *Flynn-Adjustment is a Matter of Basic Fairness: Response to Roger B. Moore, Jr.,* and was written by Dr. Stephen Greenspan, the psychologist who authored the article that triggered Dr. Moore's letter.  (*See Issues in the Use of the "Flynn Effect" to Adjust IQ Scores When Diagnosing MR,* PX 184 (5659-5663).)  In his response, Dr. Greenspan noted that by 2006 courts were moving toward accepting the Flynn Effect and that the main dispute regarding the Flynn Effect's application to the WAIS-III revolves around Dr. Flynn's contention that the WAIS-III was improperly normed and should be subject to an additional 2.34 point adjustment.  Dr. Greenspan also noted that the Flynn Effect

has been "fundamentally accepted" by "the science of psychology." (PX 192 at 7-8 (5734-5735).) Finally, Dr. Greenspan recognized that the life or death stakes in death penalty litigation highlight the need to apply the Flynn Effect in capital cases. (*Id.*) After reviewing these articles, the Court rejects Respondent's assertion that Dr. Moore's letter to the editor constitutes persuasive authority undermining the validity of the Flynn Effect.

Respondent does not even attempt to explain his statement that Dr. Flynn's 2006 article entitled *Tethering the Elephant* has somehow "undermined" the Flynn Effect. (Resp. Br. at 114.) Rather than "undermining" the Flynn Effect, the Court finds that subsequent articles published by Dr. Flynn and other prominent psychologists establish that the Flynn Effect has been generally accepted by the psychological community and that an adjustment to IQ scores is warranted when they are obtained by using a test with stale norms. *See* James R. Flynn, *The WAIS-III and WAIS-IV: Daubert Motions Favor the Certainly False Over the Approximately True*, Applied Neuropsychology (forthcoming June 2009) (hereinafter "Flynn"), included in the Supplemental Appendix as Exhibit 6, at 9-20 (reviewing the data that justify the .3 points per year adjustment to IQ scores for each year after a test has been normed and recognizing that "one thing we know for certain: IQ gains have not been nil. Unadjusted IQs presume that fiction. All of the evidence suggests that a rate of 0.30 is about right and varying it from case to case lacks any rationale."); Macvaugh and Cunningham, Supp. App. Ex. 3, at 21-22 (recognizing that the "Flynn Effect is a well-established finding that IQ scores are inflating (becoming increasing over-estimates) by approximately .31 points per year from the date of the test standardization to the date of test administration," that "the Flynn Effect is a well-established statistical phenomenon of intelligence tests and has gained general acceptance in the scientific community" and noting that Dr. Flynn and others "have advocated that it is appropriate to adjust individual

test scores to account for the Flynn Effect in *Atkins* cases"); Daniel J. Reschly, *Documenting the Developmental Origins of Mild Mental Retardation*, Applied Neuropsychology (forthcoming June 2009) (hereinafter "Reschly"), included in the Supplemental Appendix as Exhibit 2, at 22 (noting that some psychologists improperly fail to recognize that the Flynn Effect applies to IQ scores in the borderline range); Everington and Olley, Supp. App. Ex. 4, at 7 (recognizing the validity of the Flynn Effect); *see also Thomas v. Allen*, --- F.Supp.2d ---, 2009 WL 1353722, at *11 (N.D. Ala. April 21, 2009) (recognizing that professor Flynn has documented the fact that IQ scores have been increasing from one generation to the next in a series of fifteen or more publications beginning in 1984).[50]

When arguing that "courts" – plural – "have readily found similar problems with Flynn and have been reluctant to embrace an application of the Flynn Effect" (Resp. Br. at 116), Respondent cites only to a single unpublished opinion – *Ledford v. Head*, 2008 WL 754486 (N.D. Ga. March 18, 2008). However, there is no indication that the *Ledford* court was presented with any evidence comparable to the evidence presented by Mr. Lewis in this proceeding regarding the validity and use of the Flynn Effect. Moreover, the *Ledford* court recognized that its discussion of the Flynn Effect ultimately was "for the most part academic" dicta because even if the Flynn Effect were applied to the IQ scores at issue in that case, those scores would still not fall within the range of mental retardation.[51] *Ledford*, 2008 WL 754486, at *8.

---

[50] The Court also notes that Dr. King's credibility on this subject is further undermined by the fact that he testified under oath in 2004 that the Flynn Effect was a real phenomenon. (HTr. at 366-367).)

[51] The *Ledford* court's reference to the claim that the yearly gain on the WAIS-III is closer to .17 per year, rather than .3, is beside the point in this case because Mr. Lewis's experts have testified that the Flynn Effect should be applied to the score that Dr. Snook obtained using

Significantly, while *Ledford* remains pending before the district court, the Eleventh Circuit, in *Holladay v. Allen*, 555 F.3d 1346 (2009) ("*Holladay II*"), recently recognized that the Flynn Effect is valid scientific principle.  In *Holladay v. Campbell* ("*Holladay I*"), the district court exhaustively examined the evidence presented on the issue of mental retardation and the methodologies and credentials of the testifying experts when it held that Holladay was mentally retarded.  463 F. Supp. 2d 1324 (2006).  When it affirmed *Holladay I*, the Eleventh Circuit cited with approval to expert testimony "that IQ scores have been increasing over time — the Flynn Effect — and so IQ tests must be recalibrated to reflect the rising scores" and recognized that older test scores "may have reflected elevated scores because of the Flynn effect."  *Holladay II*, 555 F.3d at 1350 n.4, 1358; *see also Walker v. True*, 399 F.3d 315, 322-325 (5th Cir. 2005) (instructing the district court to consider the Flynn Effect on remand); *People v. Vidal*, 40 Cal.4th 999, 1007, 155 P.3d 259, 263 (Cal. 2007) (upholding trial court's finding of mental retardation based, in part, on the Flynn Effect).

Finally, the Court finds that the recent opinions in *Thomas v. Allen*, --- F.Supp.2d ---, 2009 WL 1353722 (N.D. Ala. April 21, 2009) and *United States v. Davis*, --- F.Supp.2d ---, 2009 WL 1117401 (D. Md. April 24, 2009) are additional persuasive authority supporting the application of the Flynn Effect in this case.  In *Thomas*, as part of an exhaustive discussion of the proper methods to be employed to evaluate whether a defendant is mentally retarded, the Court rejected a contention that the Flynn Effect had not been generally accepted in the psychological community.  2009 WL 1353722, at *11-15.  In so ruling, the *Thomas* court found that there was

---

the WAIS-*R*, and there is no need to apply the Flynn Effect to the scores that were obtained by Dr. Israelian and Dr. King using the WAIS-III because those scores are both within the range of mental retardation without any correction for the Flynn Effect. *Cf. Ledford*, 2008 WL 754486, at *7-8.

200

no justification for "ignoring [the Flynn Effect] in the face of its unchallenged existence" held

that:

> Contrary to respondent's argument that there is no diagnostic or legal basis by which this court may properly adjust petitioner's raw IQ scores in answering the question of whether he suffers from significantly subaverage intellectual functioning, the adjustments to raw IQ scores mandated by the "standard error of measurement" and the "Flynn effect" are well-supported by the accumulation of empirical data over many years. Both methodologies have been subjected to rigorous peer review and, while some psychologists may still ponder the precise cause(s) of the Flynn effect, no reputable member of the relevant professional communities denies that IQ scores have been increasing at an average rate of 0.30 points a year since the 1930s. General acceptance of both methodologies has come "as results of and theories continue to hold, even under the scrutiny of peers, in an environment that encourages healthy skepticism.

> Therefore, this court has taken both factors into account when evaluating the extent of petitioner's intellectual functioning abilities. Stated differently, even though the legal cut-off score for a finding of "significantly subaverage functioning" is stated in opinions of the Alabama Supreme Court as "an IQ score of 70 or below," a court should not look at a raw IQ score as a *precise* measurement of intellectual functioning. A court must also consider the Flynn effect and the standard error of measurement in determining whether a petitioner's IQ score falls within a *range* containing scores that are less than 70.

*Id.* at *15.

In *Davis*, an opinion issued just three days after *Thomas*, the court also carefully examined the literature concerning the Flynn Effect and rejected claims that the Flynn Effect should not be applied because they did not believe that it was routinely applied in clinical settings. 2009 WL 1117401, *12-15. In so ruling, the court distinguished a typical clinical setting, where the precise value given to an individual's IQ has very little consequence, from the forensic evaluations that are conducted in death penalty cases, where an individual's life may depend on an IQ score and "a greater effort to achieve accurate results is both necessary and

appropriate." *Id.* at 14-15.  Therefore, the *Davis* court held that it was compelled to consider the Flynn Effect and "the Flynn-adjusted scores in its evaluation of the defendant's intellectual functioning." *Id.* at 15.

Like the courts in *Thomas* and *Davis*, this Court finds that the evidence is overwhelming as to the existence of the Flynn Effect and holds that it should be applied in this case.  As a result, the Court finds that if Dr. Snook's WAIS-R IQ test score of 76 is not entirely disregarded, that score must be adjusted utilizing the Flynn Effect to a score of 69.  Because a score of 69 is within the range of mental retardation, the Court finds that Dr. Snook's IQ testing is additional evidence that Mr. Lewis is mentally retarded.

> **c.    Dr. Snook Did Not Evaluate Mr. Lewis For Mental Retardation.**

Respondent claims that Dr. Snook was specifically retained by Walker to evaluate whether Mr. Lewis was mentally retarded, and Dr. Snook rendered an affirmative diagnosis that Mr. Lewis was not mentally retarded before his trial in 1998.  Those claims fly directly in the face of the evidence presented in this proceeding.

While the Court has already concluded that Walker gave Dr. Snook virtually no guidance as to what he should look for when he conducted his last minute evaluation, Respondent attempts to bolster his argument that Mr. Lewis is not mentally retarded by making the specious claim that:

> Dr. Snook was retained by trial counsel several weeks prior to trial to determine whether there were any psychoses which might make Petitioner mentally unfit, to see if Petitioner even had the mental capacity to commit the crime, and *to determine if there were any mitigating factors, including mental retardation, as trial counsel understood that mental retardation was a complete defense to the death penalty.*

(Resp. Br. at 108 (emphasis added); *see also* Resp. Br. at 95 (claiming that Dr. Snook determined that Mr. Lewis "was not mentally retarded but an individual of limited intellectual functions").) In support of the claim that Dr. Snook was hired specifically to determine whether Mr. Lewis was mentally retarded, the Respondent cites to pages 389 and 402 of the transcript from the evidentiary hearing.   (Resp. Br. at 108; *see also id.* at 94 (citing to page 389 of the hearing transcript and claiming that Dr. Snook was retained to evaluate Mr. Lewis "for evidence in support of mitigation").)  The Court finds, however, that the testimony on those two pages does not come close to establishing that that Dr. Snook was hired by Walker to evaluate Mr. Lewis for mental retardation.   Instead, the undisputed evidence is that Walker and Dr. Snook never discussed the subject of mental retardation.

Respondent attempts to sidestep the undisputed evidence that Walker and Hicks never discussed the subject of mental retardation by engaging in a sleight of hand and asserting that mental retardation was a "mitigating factor" that Walker instructed Dr. Snook to explore. However, Walker testified – on the same page of the hearing transcript cited by Respondent – that he "didn't see [mental health generally] as a mitigating factor in this case."  (HTr. at 389.) The court also finds that other page of the transcript cited by Respondent in support of his claim that Walker asked Snook to look for "any mitigating factors, including mental retardation" does not actually support that proposition.  (*Cf.* Resp. Br. at 108.)  Instead, Walker made a rambling and confused statement that he "needed to have [Mr. Lewis] evaluated" to determine whether Mr. Lewis was "mentally unfit," "crazy, at the time that it was committed," or if Mr. Lewis had the "mental capacity to commit a crime," and "I guess to a lesser degree to find out is there anything psychologically there which might help out in the defense, can he assist the defense." (HTr. at 402 (Walker's testimony); *see also* Walker Dep., PX 45, at 70 (1540) (testifying that he

was asking Dr. Snook to evaluate Mr. Lewis for "[g]eneral sanity and mental capability").) No where in that testimony does Walker mention the terms "mitigation" or "mental retardation." By making these types of unsupported arguments, Respondent continues to stretch his credibility beyond the breaking point and the Court finds that his claims that Dr. Snook was instructed by Walker to evaluate whether Mr. Lewis was mentally retarded and that he actually conducted such an evaluation are demonstrably false.

Moreover, the Court has already concluded in Section II that Walker's testimony that he knew that mental retardation could be a bar to the death penalty at the time of Mr. Lewis's trial is not credible. The Court also has already found that (1) Walker never told Dr. Snook that mental retardation was a defense to the death penalty, (2) Walker and Dr. Snook never discussed the issue of mental retardation, and (3) neither Walker nor anyone else ever instructed Dr. Snook to evaluate whether Lewis was, in fact, mentally retarded. Instead, Dr. Snook interpreted Walker's vague instructions as indicating that Walker wanted him to evaluate Mr. Lewis for "future dangerousness."[52]

---

[52] On page 66 of his Response Brief, Respondent selectively quotes from Walker's deposition testimony in an attempt to create the impression that Walker had specific goals in mind when he "turned [Dr. Snook] loose to go and examine Christopher." When Walker's entire testimony is considered, however, it further demonstrates that Walker had absolutely no idea as to what Dr. Snook should look for and illustrates his lack of knowledge concerning psychological testimony and its use in a capital case:

> Q.    Why did you have a psychological evaluation of Mr. Lewis done?
>
> A.    State's trying to kill my client.  Anything that can possibly be brought up as to his psychological condition, makeup, capabilities, abilities, inabilities, I think it's important that we find something out about that.  I'm not a psychologist.  I can't tell if somebody's crazy.

Respondent also attempts to support his claim that Dr. Snook conducted a mental retardation evaluation by asserting that "[t]rial counsel testified to this Court that if Dr. Snook had found Petitioner to be mentally retarded, they would have presented that evidence at trial." (*See* Resp. Br. at 108-09). As an initial matter, Respondent's plural references to "trial counsel" and what "they" would have done are misleading because Walker was the only member of the defense team ever to speak with Dr. Snook and Hicks had never heard of Dr. Snook before he took the stand. Moreover, Walker's offhand statement in response to a hypothetical posed by Respondent's counsel as to what he would have done "if Dr. Snook had found Petitioner to be mentally retarded" (HTr. at 402.), simply is not evidence that Walker instructed Dr. Snook to look for mental retardation.

In a final attempt to support his claim that Dr. Snook conducted a mental retardation evaluation, Respondent cites to a single page from Dr. Snook's deposition and claims that Dr. Snook "determined that Petitioner had an IQ of 76 and was **not mentally retarded**." (*See* Resp. Br. at 109 (bolded emphasis in Respondent's Brief); *see also id.* at 95, 120.) The testimony upon which Respondent relies is as follows:

> Q.    [By Respondent's counsel] You found that Mr. Lewis had an IQ of 76 on your testing?

> And if they're crazy, you have a defense. If they're incompetent, you have a defense of – you've got something to work with. And the only way to do that is to have a head shrinker go shrink the head.

> Q.    Were you hoping – was there anything in particular that you were seeking to have Dr. Snook evaluate the petitioner for?

> A.    General sanity and mental capability.

(Walker Dep., PX 45, at 70 (1540).)

> A. Yes.
>
> Q. Because Mr. Lewis's IQ was not within the mental retardation range, was it necessary to look at his adaptive functioning skills?
>
> A. *From my point of view at that time, no.*

(Snook Dep., PX 60, at 16 (1644) (emphasis added).) When Dr. Snook's deposition testimony is read in context with (1) the other evidence establishing that Dr. Snook was never instructed to conduct an evaluation for mental retardation, (2) that Dr. Snook was not informed that mental retardation was even a potential issue in the case, and (3) Dr. Snook's admission that he should not have given the outdated WAIS-R IQ test to Mr. Lewis, the Court concludes that the statement "[f]rom my point of view at that time, no" shows only that Dr. Snook was not spurred to conduct a mental retardation evaluation on his own initiative because of the IQ score and the fact that he did not have a clue about the importance of the issue.

The Court also finds that Respondent's claim that Dr. Snook looked for mental retardation is further belied by his testimony that (a) if he had known that mental retardation was a defense to the death penalty, (b) if he had recognized the flaws in the IQ score that he obtained by using the WAIS-R, and (c) if he had been provided with the background materials that he requested from Walker, then he would have informed Walker "that Lewis was probably functioning on the level of mental retardation" and he would have stressed the need for a more complete mental retardation evaluation. (*Cf.* Snook Aff., PX 61, at ¶ 6 (1663-1664).) There is simply no way to reconcile that testimony with Respondent's claim that Dr. Snook actually evaluated Mr. Lewis for mental retardation in 1998.

**5.     Dr. Cheatham Did Not Evaluate Mr. Lewis For Mental Retardation.**

Even more outrageous than Respondent's baseless claim that Dr. Snook evaluated Mr. Lewis for mental retardation is the claim that the State's expert, Dr. James Cheatham, also

rendered a diagnosis that Mr. Lewis was not mentally retarded. Respondent points only to the Dr. Cheatham's report in support of that proposition. (Resp. Br. at 109-110; 120.)

Dr. Cheatham, however, was not called as a witness by the State at trial and he therefore never testified regarding any of his activities or his findings. Moreover, Dr. Cheatham's report, which he issued during the trial on November 10, 1998, shows that he did not administer any testing of his own, but instead concurred with all of Dr. Snook's report – including his flawed WAIS-R IQ testing. (*See* November 10, 1998, Memorandum from Dr. James Cheatham, M.D. to Brandon Hornsby, Assistant District Attorney, PX 182, at 3 (5304).) Thus, there is absolutely no evidence that Dr. Cheatham ever considered whether Mr. Lewis is mentally retarded and he did not perform any testing related to Mr. Lewis's intellectual or adaptive functioning.

The Court also finds that there is no basis for the Respondent's suggestion that Dr. Cheatham could have ruled out mental retardation merely on the basis of his "personal interview" with Mr. Lewis. *See* Macvaugh and Cunningham, Supp. App. Ex. 3, at 14, 28 (noting that an accurate diagnosis for defendants falling in the mild category of mental retardation can be particularly difficult "because their impairments are often not immediately observable" and because "persons with mental retardation often attempt to compensate for their limitations through behaviors that mask their disability" and further recognizing that evaluations of mental retardation "should be based on a solid foundation of scientific knowledge and not the 'gut instinct' or 'seat-of-the-pants' impression of the examiner"); Everington and Olley, Supp. App. Ex. 4, at 7 (recognizing that, while clinical observation is an essential part of diagnosing mental retardation, it cannot take the place of testing and "seat of the pants impressions" are not part of "clinical judgment"); Gresham, Supp. App. Ex. 5, at 6 (recognizing that persons with "mild" mental retardation may blend into society after exiting school and might appear to function

normally in community settings).   In sum, there is no evidence that Dr. Cheatham even considered that Mr. Lewis might be mentally retarded.

### 6.   Respondent's Expert.

The Georgia Attorney General's Office hired Dr. Glen King, a psychologist and part-time lawyer, to examine Mr. Lewis.  (*See* Psychological Evaluation by Dr. Glen D. King (the "King Report"), PX 30, at 1 (1187).)  On a daily basis, Dr. King spends the majority of his time doing contract evaluations for the Alabama Vocational Rehabilitation Services and the Social Security Administration.   (HTr. at 355.)   As noted above, however, Dr. King does not do adaptive behavior analyses in connection with his "contract evaluations" and instead he renders a mental retardation diagnosis based solely on an individual's IQ score.[53]  (HTr. at 355-56.)  Dr. King also spends a portion of his time practicing law and he has a limited clinical practice, which consists only of seeing five to six longtime patients.  (HTr. at 356.)  Dr. King also testified that he spends five to ten percent of his time acting as an expert witness in death penalty cases.  (HTr. at 356.)

In sharp contrast to Dr. Swanson, Dr. King has almost no experience working with mentally retarded people and he last worked with a mentally retarded population at a Florida hospital for three months more than 35 years ago.  (HTr. at 354.)  Dr. King has never published any papers about mental retardation or done any research in the field.  (*Id.*)  After he completes his contract evaluations, Dr. King does not continue to work with persons who are mentally retarded and he rarely even refers them to social services providers for treatment.  (HTr. at 355.)

Since the *Atkins* ruling in 2002, Dr. King has been hired five times in death penalty cases by the Georgia Attorney General's Office to evaluate prisoners with mental retardation claims in

---

[53] The Court notes that if Dr. King followed his "contract evaluation" procedure in this case, Mr. Lewis's low IQ scores would have mandated a finding that he is mentally retarded.

post-conviction proceedings. (HTr. 297-98, 356-57.) In addition, Dr. King has been hired by the State of Alabama approximately 25 to 50 times in similar capital cases. (HTr. at 297, 356-57.) Of all the capital cases in which Dr. King has conducted evaluations, he has found only "three to four" inmates whom he believed to be mentally retarded – and in each of those cases the defendant had an IQ of "like 50 to low 60s." (King Dep., PX 29, at 122-123 (1139).) Dr. King also is the only person who evaluated Mr. Lewis for mental retardation in connection with these proceedings who concluded that Mr. Lewis was not mentally retarded.

In fact, Dr. King apparently has never found a Georgia inmate to be mentally retarded. In two cases currently pending in Butts County, Dr. King conducted evaluations just months before he evaluated Mr. Lewis and found that both petitioners had Full Scale IQ scores under 70 – Keith Tharpe with a 67, and Willie James Pye with a 68. (*See* Psychological Evaluation of Willie Pye by Dr. Glen D. King, PX 165 at 4769-4777; Psychological Evaluation of Keith Tharpe by Dr. Glen D. King, PX 166 at 4778-4795.) Despite those low IQ scores, Dr. King gave an opinion that mirrors his opinion in this case when he opined that those prisoners did not have adaptive behavior deficits qualifying them for a diagnosis of mental retardation after he administered the ABAS-II directly to them and relied on them to self-report about their adaptive behavior skills.

In an attempt to bolster Dr. King's credibility, Respondent points to Dr. King's testimony that he has "conducted approximately 10,000 tests of intellectual functioning." (Resp. Br. at 123-24.) However, there is no indication as to the nature of those tests – *i.e.*, whether they were IQ tests or some other form of test – and the fact that Dr. King may have administered many

"intellectual functioning" tests does not establish that he has any expertise in the separate field of adaptive behavior.[54]

Respondent also refers to the fact that Dr. King is a "certified forensic examiner having completed approximately 3,500 examinations to date." (Resp. Br. at 124.) Once again, however, there is no indication as to the number of those "examinations" that involved diagnosing mental retardation generally, or adaptive behavior in particular. *Cf.* Olley, Supp. App. Ex. 1, at 4 (noting that "most forensic psychologists have little training or experience with people with mental retardation"); Tasse, Supp. App. Ex. 7, at 22 (recognizing that forensic psychologists may lack training in mental retardation). Instead, the evidence discussed above demonstrates that that Dr. King is not an expert in the field of mental retardation.

Finally, Respondent attempts to bolster Dr. King's questionable qualifications in the area of mental retardation by pointing out that the States of Georgia and Alabama have hired Dr. King dozens of times of times to evaluate mental retardation claims in capital cases since *Atkins* was decided in 2002. (Resp. Br. at 124; *see also* HTr. at 297-99 (Dr. King testifying that he has only been making mental retardation determinations about prisoners "since the advent of the *Atkins* case, which has been in the last few years.").) Rather than establish that Dr. King is an expert in mental retardation, however, that evidence leads this Court to conclude that Dr. King is a "hired gun" expert and that Georgia and Alabama prefer to hire him because he will diagnose an inmate

---

[54] In comparison to Dr. King, Dr. Swanson's specific area of expertise is evaluating adaptive behavior. (*See* HTr. at 146-147 (Dr. Swanson's testimony regarding her experience), 57-59 (Dr. Israelian testifying that, after her IQ and other intellectual testing indicated that Mr. Lewis met the criteria for mental retardation, she suggested that Mr. Lewis's counsel hire Dr. Swanson to evaluate his adaptive behavior because Dr. Swanson is a "true expert" in the field of mental retardation generally and particularly in the assessment of adaptive behavior.).)

as being mentally retarded only when his IQ score is so low – "like 50 to low 60s" – that he has no other choice.

The facts that Dr. King has extremely limited actual experience in the field of mental retardation and the fact that he routinely testifies on behalf of the States of Georgia and Alabama alone cause this Court to seriously question his credibility. *Cf. Nelson*, 419 F. Supp. 2d at 895, 903 (finding that the government's expert's opinion "was deserving of less" weight that Dr. Swanson's where that expert had "never published on the issue of mental retardation" and did not have "any special expertise in mental retardation"); *Eldridge v. Quarterman*, Civ. No. H-05-1847, 2008 WL 700949, at *14 (S.D. Tex. 2008) (finding expert's testimony unreliable where she "lacked the expertise and experience to express a reliable opinion as to whether [the defendant] is retarded"); Gresham, Supp. App. Ex. 5, at 6, 16 (recognizing that forensic experts who testify for the prosecution despite the fact that they often have little or no training in the field of mental retardation often reinforce a court's incorrect preconceived notion about what mental retardation looks like); Macvaugh and Cunningham, Supp. App. Ex. 3, at 3 (recognizing that the need for published evaluation standards in *Atkins* cases is demonstrated by the fact that psychologists who lack specialized training in mental retardation often are conducting evaluations of defendants).) When those facts are combined with Dr. King's willingness to disregard the established standards of his profession and to give opinions based on methods that directly contradict those standards, the Court concludes that Dr. King's opinions in this case are entitled to absolutely no weight and that the testing that the intellectual and adaptive testing that he performed is scientifically unsound and must be disregarded.

### a.   Dr. King's IQ Testing.

Dr. King met with Mr. Lewis once, for a total of three to four hours on July 11, 2007. (HTr. at 357.) During that meeting, Dr. King spent 40 to 45 minutes administering the WAIS-III

211

IQ test – the very same IQ test that was previously administered by Dr. Israelian.[55] (HTr. at 358-59.) Dr. King reported that Mr. Lewis had a full scale IQ score of 71 – which he admitted was consistent with the IQ score of 66 obtained by Dr. Israelian.[56] (HTr. at 310, 312; *see also* HTr. at 69-70 (Dr. Israelian testifying that Dr. King's score of 71 is consistent with her score of 66 and falls within the confidence interval); HTr. at 208-10 (Dr. Swanson testifying that Dr. King's score of 71 "is also consistent with someone who has significantly sub-average intellectual functioning" and that the score meets the definitions for mental retardation found in the Georgia Code, the DSM-IV-TR and promulgated by the AAMR).)

There is a strong likelihood, however, that Dr. King's IQ score of 71 is inflated because he violated established psychological best practices when he chose to administer the *same* WAIS-III IQ test within a year after Dr. Israelian administered that test.[57] (HTr. at 235, 364-65

---

[55] While Dr. King did not administer a full achievement test battery like Dr. Israelian, he spent 30 to 40 minutes of his time with Mr. Lewis administering a Wide Range Achievement Test (the "WRAT"), a screening test for achievement abilities. (HTr. at 361-362.) Dr. King's achievement test results were consistent with both the results of Dr. Israelian's broader battery of achievement testing and with a diagnosis of mental retardation. (*See* HTr. at 62, 70-73 (Dr. Israelian testifying about the battery of tests that she gave Mr. Lewis); HTr. at 361-62 (Dr. King testifying about the Wide Range Achievement Test that he gave Mr. Lewis).)

Dr. Israelian's academic achievement testing placed Mr. Lewis at an elementary school level – a level consistent with a diagnosis of mental retardation. (HTr. at 70-72, 75-76.) Dr. King's WRAT results also placed Mr. Lewis at an elementary school level and he found that Mr. Lewis's was reading skills were at a 4th grade level, his spelling was at grade level 3.5, and his math skills were at a 5th grade level. (*See* King Report, PX 30, at 7 (1193).) In terms of Mr. Lewis's percentile rank, Dr. King found that he scored in the single digits in every category. (*Id.*) Indeed, Dr. King testified that Mr. Lewis's skill levels might have been even lower than the extremely low skill levels reflected in Mr. Lewis's elementary school records. (HTr. at 362.)

[56] Dr. Swanson testified that when Dr. King's IQ score of 71 is adjusted for the Flynn Effect, that score would be a 67. (HTr. at 208.)

[57] In an apparent attempt to avoid this issue, Respondent misleadingly asserts that Dr. King "also administered the WAIS-III to Petitioner approximately one year [after Dr. Israelian]." (Resp. Br. at 110.) In fact, Dr. King did not give the WAIS-III "approximately one year" after

(Dr. Swanson testifying that the "best practice" is not to give the same test twice in *three* years).)
While Dr. King conceded that the AAIDD is "authoritative" both in terms of its definition of
mental retardation and of how an assessment for mental retardation should be conducted, he
admitted that he had read only "portions" of the AAIDD's User's Guide.  (HTr. at 359-60.)
Moreover, while Dr. King claimed that he did not recall seeing the provisions describing the so-
called "practice effect" before, he admitted both that (1) the AAIDD's User's Guide defines the
term "practice effect" as referring to "gains in IQ scores on tests of intelligence that result from a
person being retested on the same test" and (2) the AAIDD specifically recommends "*against
administering the same intelligence test to someone within the same year*."  (AAIDD User's
Guide, PX 14, at 21 (804) (emphasis added); HTr. at 363-65; *see also* Gresham, Supp. App.
Ex. 5, at 13 (recognizing that the practice effect "is not speculation but rather a well-established
empirical fact" and that "[i]n *Atkins* cases, the courts must be made to understand the average
practice effect gains in IQ scores and how these artificially inflated test scores produce an
overestimate of an individual's true score"); Macvaugh and Cunningham, Supp. App. Ex. 3, at
20-21 (specifically recommending that evaluators "[a]void administration of the same
intellectual assessment within twelve months" because the "practice effect" may result in an
artificially high IQ score).)

Undaunted by the AAIDD's guidance, Dr. King stated that he personally has decided not
to follow the AAIDD's recommendation against administering the same test within a year.
Instead, Dr. King testified that he relies on some unspecified portion of the WAIS "technical
manual" and his personal "professional judgment" to support his decision to give the same IQ

---

Dr. Israelian, but rather he improperly gave Mr. Lewis the WAIS-III a second time within a one
year period.

test twice within one year to Mr. Lewis. (HTr. at 308-09, 364-365.) Dr. King's decision to ignore the recommendation of the AAIDD alone justifies this Court's decision that his intellectual testing is entitled to no weight and should be disregarded. *See Mason v. Home Depot*, 283 Ga. 271, 278, 658 S.E.2d. 603, 610 (Ga. 2008) (upholding trial court's exclusion of expert witness, because her methods were "based only on her own experience and opinions, without any support in published scientific journals or any reliable techniques").)

As for the WAIS-III manual, Dr. King correctly recalled during his deposition that the WAIS-III manual recommends against administering the same test within "a year to two years," but he again disregarded that recommendation in favor of his "general practice" to wait only six months before administering the same test. (King Dep., PX 29, at 206-209 (1160).) Dr. King's "general practice," however, is in direct conflict with the WAIS-III Administration and Scoring Manual, which states that the "practice effects on the Performance subtests are minimized after an interval of 1-2 years; for the Verbal subtests, that interval is shorter." (WAIS-III Administration and Scoring Manual (the "WAIS-III Manual"), PX 67, at 34-35 (2146-2147).) In other words, the WAIS-III manual also does not support Dr. King's decision to give Mr. Lewis a second WAIS-III test within one year. Moreover, Dr. Swanson testified that "best guidelines" for clinicians provide that the same test should not be given within a *three* year period and, that if retesting is required during that period, a different IQ test should be used. (HTr. at 234-36.)

Dr. King's willingness to disregard both the recommendations of the AAIDD and the WAIS-III Manual in favor of his unsupported "personal judgment" leads this Court to conclude that he is not credible as an expert and that the IQ score that he obtained was artificially inflated as a result of the practice effect. *Cf. Nelson*, 419 F. Supp. 2d at 898-99 (criticizing the government's expert for ignoring the practice effect by giving a second WAIS-III test to the

defendant 51 weeks after he took that test and agreeing with Dr. Swanson's opinion that the practice effect artificially inflated the second IQ score).

There is also another problem with Dr. King's IQ testing. After reviewing Dr. King's WAIS-III protocol, Dr. Swanson testified that Dr. King scored a question incorrectly and that, as a result, Dr. King's full scale IQ score should have been 70 and not 71. (*Compare* HTr. at 209 (Swanson's testimony); Swanson Supplemental Report, PX 12 at 777 (explaining Dr. King's scoring error); WAIS-III Administration and Scoring Manual, PX 67, at 104 (2217) (addressing the question at issue) *with* HTr. at 316 (Dr. King explaining why he believes that he scored the question correctly).) Dr. Swanson ultimately concluded, however, that the scoring error did not affect her overall opinion in this case because Dr. King's reported score of 71 IQ still meets the definition for mental retardation. (HTr. at 208-210 (Dr. Swanson's testimony); *see also* HTr. at 69-70 (Dr. Israelian testifying that Dr. King's IQ score is consistent with her IQ score of 66 and falls within the confidence interval); Everington and Olley, Supp. App. Ex. 4, at 6 (noting that a score of 71 does not disqualify a defendant from a finding of mental retardation because of the standard error of measurement).) However, the Court finds that the fact that Dr. King might have made a scoring error, and his caviler attitude when confronted with that possibility during this proceeding, further undermines his credibility. *See* Macvaugh and Cunningham, Supp. App. Ex. 3, at 19-20, 28 (emphasizing the need to recheck scoring and to "candidly and proactively" acknowledge scoring errors and recognizing that it is a proper exercise of clinical judgment to check for and explain scoring errors).)

### b. Dr. King's Adaptive Behavior Analysis.

Dr. King attempted to measure Mr. Lewis's adaptive behavior skills by administering the ABAS-II adaptive behavior test directly to Mr. Lewis and requesting that he "self-report" on his abilities. (HTr. at 326-27 (Dr. King testifying that he uses the ABAS-II as a "formal instrument"

to evaluate adaptive behavior because it is the only instrument that includes a self-report form).)

Dr. King administered the ABAS-II by reading the questions out loud to Mr. Lewis and he

concluded that Mr. Lewis's "general adaptive composite score was in the low average range, just

barely." (HTr. at 329, 332.)  Dr. King decided to administer the self-report form of the ABAS-II

to Mr. Lewis despite the fact that he recognized that it is problematic to ask someone "who's

been incarcerated for a lengthy period of time" to self-report about their current abilities because

"they're not engaged in lots of the activities that they ordinarily do on a day to day basis." (HTr.

at 327, 330-31.)  Dr. King justified his use of the ABAS-II self-report form by stating that the

ABAS manual "specifically says that it's for use in prisons." (HTr. at 330.)

In addition, Dr. King did not attempt to obtain specific information about Mr. Lewis's

adaptive behavior skills before he turned 18 (*i.e.* the "developmental period").  Instead, Dr. King

testified that he used the norms for a 41 year old man when scoring his ABAS-II results and that

those results reflect a "composite" of what Mr. Lewis now does in prison and what Mr. Lewis

believes that he could do if he were not in prison.  (King Dep., PX 29, at 272-75 (1176-1177);

ABAS-II Test Results, PX 39, at 1 (1292).)  Overall, Dr. King testified that, while he relies "on

some formal assessments of adaptive behavior," his adaptive behavior analysis boils down to his

subjective belief about whether a person "could live on his own, live independently." (HTr. at

325-326; *see also* King Report, PX 30, at 9 (1195) (concluding that "Mr. Lewis does not now

have [sic] nor has he ever been mentally retarded" because, while his intellectual functioning is

low, "he certainly was able to and did live independently").)

      **(i)**      **The Techniques Employed By Dr. King Are Contrary
To Psychological Best Practices.**

The Court finds that Dr. King again violated the established standards of the

psychological profession when he read the ABAS-II questions to Mr. Lewis, an individual who

he knew had been diagnosed by Drs. Israelian, Swanson and Woods as being mentally retarded and whom academic testing indicated functioned at an elementary school level. Initially, the Court rejects Dr. King's claim that the ABAS-II manual supports his decision to give the self-report form to Mr. Lewis because it contains a single reference to "prisons" in the introductory chapter to the ABAS-II Manual. (*Cf.* King Dep., PX 29, at 289-295 (1180-1182).) In particular, Dr. King justified his decision by pointing to only the following paragraph – specifically the final word of the paragraph – where the authors of the ABAS-II system discussed generally the *possible* applications of that system as a whole:

> Applications of the ABAS-II
>
> Uses of the ABAS-II include diagnostic assessment, identification of adaptive skill strengths and limitations, identification of service needs, program planning and monitoring, and research and evaluation. The ABAS-II may be used in many settings and agencies including settings that provide services for children, such as public or private schools, daycare programs, community agencies, and medical or residential settings. The ABAS-II may be used as part of the comprehensive assessment of children and adults who are being evaluated for possible diagnosis of disabilities or problems, in addition to those who have previously been diagnosed with disabilities or problems. Similarly, the ABAS-II may be used in a variety of programs and settings for adults including public and private service provider agencies, medical and health facilities, residential facilities or group homes, community programs and agencies, vocational and occupational training programs, and *prisons*.

(*See* ABAS-II Manual, PX 65, at 11 (1744); (emphasis added); King Dep., PX 29, at 290-92 (1181).) Nowhere, however, does the ABAS-II Manual state that the self-report form (as opposed to the other ABAS-II test forms) should be used to evaluate an incarcerated inmate who functions at a significantly subaverage level according to intellectual testing. (*See* HTr. at 54-55, 58, 62-65 (Dr. Israelian testifying that Mr. Lewis's intellectual functioning is "significantly subaverage"); King Dep., PX 29, at 297-298 (1182-1183) (testifying that Mr. Lewis is

"subaverage in intelligence").)  The Court also notes that there is not a single other reference to the word "prison" in the entire ABAS-II Manual.

Contrary to Dr. King's approach, the rest of the 171 page ABAS-II Manual and Dr. Thomas Oakland, the co-author of the ABAS-II testing system, both specifically caution against using the self-reporting form under the circumstances of this case.  First, while Dr. King testified that he relied *exclusively* on Mr. Lewis's self-reported ABAS-II score as a formal assessment of Mr. Lewis's adaptive behavior, the ABAS-II Manual emphasizes that "whenever possible" an examiner "should obtain ratings from multiple respondents" because "[u]sing multiple sources of information about an individual improves the validity of the assessment and can provide information about the individual's skills in a variety of settings and in response to various environmental demands."  (*Compare* King Dep., PX 29, at 253-254 (1171-1172) *with* ABAS-II Manual, PX 65, at 19 (1751) *and* ABAS-II Manual, PX 65, at 7, 36, 114 (1740, 1768, 1845) (recommending that, while it is possible to assess adaptive skills with a single form, multiple rating forms should be used to ensure a comprehensive assessment).)  Indeed, the ABAS-II Manual specifically cautions that:

> *A single assessment instrument never should be used to develop a diagnosis or determine a placement for a child or adult.  Instead, a diagnosis or placement decision should be based on a comprehensive evaluation that includes multiple assessment instruments and techniques and relies on many sources of information to evaluate adaptive skills displayed in a variety of settings and over some period of time.*  Although ABAS-II results may assist in decision-making about diagnoses or disorders, they always should be used in conjunction with other assessment results.

(ABAS-II Manual, PX 65, at 44 (1776) (emphasis in original); *see also* Oakland Aff., PX 24, at 3 (956) (noting that the ABAS-II manual recommends the use of multiple respondents).)  The AAIDD agrees with the ABAS-II Manual and it also recognizes that an examiner should "*use*

218

*multiple informants and multiple contexts*" to assess adaptive behavior.  (*See* AAIDD User's Guide, PX 14, at 20 (803) (emphasis added).)

Second, the ABAS-II Manual provides that only "[i]ndividuals who display a *high level of functioning* may complete the [self-report] form themselves" and that "[t]he Adult Form may be completed by the individual being evaluated for self-rating *if his or her functional skills are judged to be adequate for providing valid responses to the items.*" (ABAS-II Manual, PX 65, at 8, 16 (1741, 1748) (emphasis added).)  Dr. Oakland also testified that:

> The [ABAS-II] self report form was not intended to be used with persons who may be mentally retarded and thus are likely to lack the mental ability to describe their prior and current skill levels accurately.  Persons who display diminished functioning (e.g. low intelligence) are unlikely to provide reliable and valid information and should not be the sole respondent when completing the ABAS-II or other measures of adaptive functioning.  Simply reading the questions aloud to the respondent does not eliminate these concerns.

(Oakland Aff., PX 24, at 3 (956) (emphasis added).)   Dr. Oakland also cautioned that "professionals should not form judgments of the adaptive behavior based principally on data from . . . someone who displays evidence of mental retardation or significantly diminished intelligence." (Oakland Aff., PX 24, at 4 (957).)

In this case, Dr. King had the test results from Dr. Israelian and Dr. Swanson before he examined Mr. Lewis and issued his report.  (*See* King Report, PX 30, at 2 (1188); *see also* HTr. at 308-09 (Dr. King testifying that he administered the WAIS-III so that he could compare his results with those obtained by Dr. Israelian).)  Therefore, Dr. King's decision to administer the ABAS II to Mr. Lewis was directly contrary to the guidance provided by the ABAS-II Manual and Dr. Oakland because he knew before administering the ABAS-II directly to Mr. Lewis that (1) Dr. Israelian's IQ testing had revealed that Mr. Lewis has a full scale IQ of 66 and (2) both Drs. Israelian and Swanson had diagnosed Mr. Lewis as being mentally retarded.

Dr. King also admitted that he administered the ABAS-II by reading the questions to Mr. Lewis, a procedure that is only permitted if the respondent "does not have the reading skills to complete the rating form independently" – another fact that calls into question whether Mr. Lewis possesses the necessary cognitive ability to accurately self-report his abilities. (ABAS-II Manual, PX 65, at 7 (1740).)   Under those circumstances and in light of the clear recommendations in the ABAS-II Manual and the guidance provided by Dr. Oakland's Affidavit, the Court finds that it was improper for Dr. King to proceed by administering the ABAS-II self-report form directly to Mr. Lewis and that his results are entitled to no weight as a result. *See* Macvaugh and Cunningham, Supp. App. Ex. 3, at 15-16 (recognizing that in *Atkins* cases "it is essential that forensic assessment methods are consistent with standards of professional practice and psychological testing").

The Court also finds that Dr. King's decision to rely on Mr. Lewis to self-report on his adaptive skills though he has been incarcerated for more than a decade was improper.  The AAIDD reminds clinicians that they must "realize that adaptive behavior refers to typical and actual functioning and not to capacity or maximum functioning." (AAIDD User's Guide, PX 14, at 20 (803).)   The ABAS-II Manual similarly notes that the ABAS system "focuses on independent behaviors and measures what an individual actually does, in addition to measuring what he or she may be able to do." (ABAS-II Manual, PX 65, at 3 (1736).)

Finally, while the ABAS-II allows an examiner to read the questions to a respondent if he is satisfied that the respondent has the cognitive ability to respond, the respondent must be told under those circumstances that he should tell the examiner if a response is based on a guess and the examiner is specifically instructed to ask a respondent whether he is guessing. (ABAS-II Manual, PX 65, at 23 (1755).) If the respondent guesses on four or more items in a skill area, the

ABAS-II Manual instructs the examiner to determine the reason for the large number of guesses and to consider whether it is appropriate to continue with the evaluation. (ABAS-II Manual, PX 65, at 23-24 (1755-1756).)

When evaluating Mr. Lewis, however, Dr. King testified that he never asked Mr. Lewis to indicate if he was guessing about an answer and he never followed up to determine if Mr. Lewis's responses were simply guesses:

> Q. *But you asked [Mr. Lewis] to indicate if he was **guessing**, correct?*
>
> A. *That's not in the instructions.* I just asked him to give me a response. If he would have said something like I'm just guessing or I don't know, then I would have, you know, made some kind of entry like that. But in his case, he gave an actual response to every question.
>
> Q. *Is there any way you follow up to determine whether he's guessing?*
>
> A. *No.*

(King Dep., PX 29, at 263-64 (1174) (emphasis added).) Since Dr. King failed to follow the testing protocol in the ABAS-II Manual, it is not surprising that Mr. Lewis never volunteered that he was guessing when he responded to the more than 200 questions contained on the ABAS-II self-reporting form. (*See* ABAS-II Protocol, PX 25, at 2-3 (1085-1086) and ABAS-II Test Results, PX 39, at 2-3 (1293-1294); *see also* HTr. at 179-80 (Dr. Swanson testifying that she reviewed Dr. King's ABAS protocol and not a single response was marked as a guess).)

Because Mr. Lewis is incarcerated, however, the Court finds that *he must have guessed* to respond to the ABAS-II questions about what he might be able to do if he lived outside the prison. For example, Mr. Lewis would have indisputably had to guess to answer questions about subjects such as ordering meals when eating out, finding a department in a large store, traveling about the community, crossing streets, investigating product information and purchases,

budgeting money, balancing checkbooks, operating electrical appliances, cooking, maintaining

appliances, obeying traffic signals, planning ahead for leisure activities and working because he

had not had the opportunity to demonstrate those skills for more than a decade.[58]  (*See* ABAS-II

Protocol, PX 25 (1084-1095) and 39 (1294-1303).)  As Dr. Oakland stated:

> Adaptive behavior refers to a person's ability to care for himself or herself and to respond to the needs of others.  For adults, measures of adaptive behavior consider their ability to function independently (i.e., with little or no help from others) in reference to the following skill areas: communication, use of community resources, functional academics, home living, health and safety, leisure, self-care, self-direction, social, and work.
>
> *The display of these skills requires an opportunity to live in a typical and natural environment, not a prison.  A prison severely restricts one's opportunity to independently display behaviors and thus to make personal choices as to the use of one's time and other resources.*
>
> For example, prisons do not provide an environment that allows one to independently communicate freely with others, to use community resources (e.g., public transportation, credit cards, shop at stores), to assume responsibilities for up keep of one's apartment or home, or to independently attend to health issues.  Severe restrictions on use of leisure time, the display of self-direction, social engagement, and work opportunities also preclude the assessment of adaptive behaviors displayed in prison.

(Oakland Aff., PX 24, at 3-4 (956-957) (emphasis added); *see also* Tasse, Supp. App. Ex. 7 at 10

(adaptive behavior is not a measure of capacity or knowledge, but rather of what the individual

typically does and his degree of independence in performing those skills); Everington and Olley,

Supp. App. Ex. 4, at 10 (the focus of a person's adaptive behavior is actual performance, not just

---

[58] While Dr. King also administered the questions contained in the "Work skill" area of the ABAS-II protocol, both the WAIS-II Manual and the WAIS-II protocol instruct that the Work skill area of the test should be administered *"only if the individual being rated holds a part-time or full-time job."*  (*See* ABAS-II Protocol, PX 25 (1093) and 39 (1301) at 10; ABAS-II Manual, PX 65, at 5 (1738).)  Of course, Mr. Lewis is not employed on death row and this Court concludes that his answers to those questions also had to have been guesses.

his knowledge of a skill or estimated potential to perform a skill).)  For those reasons, Dr. Oakland testified that "professionals *should not* form judgments of the adaptive behavior based principally on data from . . . someone confined to a prison." (*Id.* at 4 (957) (emphasis added); *see also* Olley, Supp. App. Ex. 1, at 9-10 ("information from the defendant is of questionable value in the diagnosis of mental retardation" and, while an expert should meet with the defendant, "the defendant's assessment of his own functioning is not a valid source of data on which to form a diagnosis").)  Dr. King's failure to consider whether Mr. Lewis was guessing when he responded to his questions constitutes yet another serious breach of the ABAS-II testing protocols.  *See* Tasse, Supp. App. Ex. 7, at 12 (noting that the ability to rely on standardized adaptive behavior scales is seriously compromised by "relying on protocols in which the respondent provided numerous 'guessed' estimates rather than relying on actual observations of the individual's behavior").)

On a similar note, the AAIDD's guidelines for a retrospective diagnosis provide that examiners must "[r]ecognize that self-ratings have a high risk of error in determining 'significant limitations in adaptive behavior.'" (AAIDD User's Guide, PX 14, at 21 (804).)  As a result, the AAIDD also cautions that self-ratings should be used only in conjunction with "multiple informants or respondents" and then only if the examiner recognizes that "people with [mental retardation] are more likely to attempt to look more competent and 'normal' than they really are" and that "people with [mental retardation] typically have a strong acquiescence bias or inclination to say yes or agree with the authority figures." (*Id.* at 21-22 (804-805).)  Several recent scholarly articles make the same points. *See* Everington and Olley, Supp. App. Ex. 4, at 10 (recognizing that "self-report should never be used as the sole basis for the assessment of adaptive skills" because "individuals with mental retardation have a strong tendency for

acquiescence," a "strong desire to hide their disability to pass as normal" and they "inflate their accomplishments and hide their areas of deficiency"); Tasse, Supp. App. Ex. 7 at 16-17, 21 (recognizing that "relying solely on the individual's self-report is fraught with problems" and that "individuals with low IQ may not always be reliable self-reporters" because they often overestimate their skills and abilities in an attempt to conceal their disability, are particularly susceptible to acquiescence and leading questions and often respond in the affirmative to questions that they don't fully understand or when they are unsure of the correct answer); Macvaugh and Cunningham, Supp. App. Ex. 3, at 34-35 (noting that people with mental retardation "have a strong tendency to acquiesce . . . and present with a 'cloak of competence' in an attempt to appear normal" and that, as a result, "examiners are cautioned about taking the defendant's self-descriptions at face value").)   The fact that Dr. King failed to take these considerations into account when rendering his diagnosis, and he instead simply reported and relied on the ABAS-II scores obtained by asking Mr. Lewis to self-report on his abilities, is another reason that the Court finds that his opinions are entitled to no weight.

Finally, Dr. King's decision to rely on Mr. Lewis to self-report his adaptive behavior abilities was soundly criticized by both Dr. Israelian and Dr. Swanson.  Dr. Israelian testified that:

> Mr. Lewis's intellectual functioning places him at the first percentile, Your Honor.  Basically, for me to, for anyone to accurately get an assessment of his adaptive functioning the last thing I would want to do is to ask Mr. Lewis to report on his own behavior.  The IQ test . . . Mr. Lewis's functioning on the verbal sub-test of the IQ indicated that he did not possess the ability to comprehend and to respond in a way that would be consistent with a valid assessment of his abilities if someone were to ask him directly.

(HTr. at 58.)

Like the AAIDD and the ABAS-II Manual, Dr. Swanson noted the high instance of error associated with self-reporting, particularly when the respondent has low cognitive ability. (HTr. at 150-51, 169-70.)  Dr. Swanson also recognized that Mr. Lewis does not have the level of cognitive ability necessary to self-report his adaptive behavior and that he simply does not have the ability to comprehend the ABAS-II instructions and to keep them in mind as he answered more than 200 questions posed by Dr. King.  (HTr. at 174-75.)  Finally, Dr. Swanson confirmed that the best practices guidelines prohibit giving a self-report test to someone with low cognitive ability in a prison setting.  (HTr. at 174-77 (noting that in a prison setting, the subject does not have a choice as to what they are going to do adaptively and what you do is decided for you).)

Moreover, because Dr. King's ABAS-II test results were an "outlier" and did not match any of the other evidence about Mr. Lewis's adaptive behavior (HTr. at 175-76, 440-41), Dr. Swanson attempted to walk Mr. Lewis though the ABAS-II test procedure when she met with him and discovered that he could not (1) retain the instructions, (2) remember the four-point answer scale or (3) remember to indicate if he was guessing at an answer.  (HTr. at 175-76, 192; Swanson Report, PX 11, at 7-8 (771-772).)  As a further test of the validity of Dr. King's results, Dr. Swanson also conducted a series of direct adaptive behavior probes to determine whether Mr. Lewis could perform a variety of the common daily activities referred to in the ABAS-II test questions, and found that Mr. Lewis's performance on those probes supported her finding that his adaptive behavior was in the mild deficit range and consistent with her diagnosis of mental retardation.  (HTr. at 191-96; *see also* Swanson Report, PX 11, at 7-10 (771-774) (discussing the direct adaptive behavior assessments that she performed when she met with Mr. Lewis).)  Ultimately, for all of these reasons, Dr. Swanson determined that Dr. King's ABAS-II results are

entitled to no weight.[59]   (HTr. at 184-85; *see also Nelson*, 419 F. Supp. 2d at 901 (rejecting the government's expert's adaptive behavior opinion when that expert gave an ABAS-II and relied on self-reporting because self-reporting "is often inaccurate" and mentally retarded individuals often overstate their abilities).)   This Court agrees with Dr. Swanson and finds that Dr. King's ABAS-II test results are entitled to no weight.   *Cf. Davis*, 2009 WL 1117401, at *17, 23-27 (recognizing that whether an expert followed the professional best practices for the assessment of adaptive behavior bears on an experts credibility and rejecting the opinions of experts who deviated from, or ignored, those practices).

c.      **Dr. King's References To Other Alleged Facts Do Not Support His Diagnosis.**

In addition to his self-reported ABAS-II score, Dr. King attempted to support his diagnosis by "cherry picking" the record and pointing to facts that he believes demonstrated Mr. Lewis's adaptive behavior skills.   During the hearing, Respondent's counsel pointed to a number of activities that Mr. Lewis purportedly engaged in and asked Dr. King if "these behaviors would support a finding of his having some adaptive behavior skills or not."   (HTr. at 335-336.) Specifically, Respondent's counsel asked about (1) letters that Mr. Lewis purportedly wrote to his counsel, (2) the fact that he allegedly drove a car, (3) his filings of requests for health care or other items while in prison, (4) his employment, and (5) his alleged efforts to buy a HUD

---

[59]   Dr. Swanson also testified that, after she became concerned about Dr. King's administration of the ABAS-II, she spoke directly with Dr. Oakland twice and he confirmed her opinion that it was not appropriate for Dr. King to rely on a self-reported ABAS-II score in this case. (HTr. at 183-84.)

home.[60]  (HTr. at 335-42.)  Dr. King agreed that each of those items constituted evidence of adaptive behavior.

That type of cherry-picking, however, has been disapproved by experts in the field and the Court finds Dr. King's approach is improper. *See* Everington and Olley, Supp. App. Ex. 4, at 8 (criticizing psychologists who focus on a subject's practical skills and use the existence of those skills to declare that there are no deficits in adaptive behavior); *see also Nelson*, 419 F. Supp. 2d at 903 (criticizing the state's expert for "cherry picking" facts when rendering his opinion on adaptive behavior and finding that his willingness to do so suggested that he was biased toward a finding of no mental retardation); *Holladay I*, 463 F. Supp. 2d at 1343 (recognizing that "[i]t is important, in determining whether a person is or is not mentally retarded, not to pick and choose so as to over-emphasize certain characteristics").

As Dr. Swanson explained, however, the fact that a person can do certain things or even does certain things well does not preclude a diagnosis of mental retardation.  (HTr. at 187.)  In fact, as the ABAS-II Manual notes, whether a person meets the adaptive behavior prong of the definition of mental retardation is determined not by what the person can do, but instead by the person's adaptive behavior *deficits* and *limitations*.  (ABAS-II Manual, PX 65, at 8-9 (1741-1742) (discussing the definitions of mental retardation promulgated by the AAMR and the DSM-TR-IV, each of which focuses on whether limitations in adaptive behavior exist); *see also Woods*

---

[60] Dr. King focused on the letters that Mr. Lewis purportedly wrote to his trial lawyers and stated that he was "quite impressed" with those letters. (HTr. at 336-37.)  Dr. King admitted during his deposition, however, that he did not (1) ask Mr. Lewis any questions about those letters when he met with him, (2) know whether Mr. Lewis had help writing those letters, or (3) ask Mr. Lewis to write even a single sentence when he met with him.  (*See* King Dep., PX 29, at 29-31, 82 (1115-1116, 1129).)  In fact, the only evidence in the record on the subject is that Mr. Lewis seeks help from a fellow inmate to read the letters that he receives and to help him write letters.  (*See* Jack Alderman Aff., PX 70, at ¶ 9 (2704).)  Under the circumstances, the Court rejects Dr. King's conclusion that the letters provide evidence of Mr. Lewis's adaptive abilities.

Report, PX 198, at 2 (5280) (noting "the clinical understanding that deficits define mental retardation, rather than some combination of deficits and strengths").)   Therefore, as Dr. Swanson pointed out, the fact that Mr. Lewis held a series of manual labor jobs is not evidence of adaptive behavior, and instead the examiner must consider the type of job he held and how his job performance compared with the performance of someone with an average IQ.  (HTr. at 187-90 (testifying that the types of jobs Mr. Lewis held are consistent with a diagnosis of mental retardation).)

More importantly, however, Dr. King's own testimony raises serious questions about whether he carefully reviewed the factual information contained in the numerous affidavits offered by Mr. Lewis before he rendered his diagnosis:

> Q.    [By Respondent's counsel] You stated earlier that you read a whole bunch of those affidavits that were provided by Mr. Lewis's counsel.
>
> A.    Yes.
>
> Q.    Okay.  Are you aware that when Mr. Lewis was living in New Orleans that he was living in the projects?
>
> A.    *I don't believe that I was aware that he was living in the projects.*

(HTr. at 341-42 (emphasis added).)  As discussed in detail above, the affidavits offered by Mr. Lewis in this proceeding are replete with statements establishing that Mr. Lewis grew up in a ghastly environment in the Fischer Projects in New Orleans.  Therefore, the Court finds that it is incredible that Dr. King could have carefully reviewed those affidavits without noting that critical fact.  *Cf. Nelson*, 419 F. Supp. 2d at 903 (criticizing the government's expert for "cherry-picking" when drafting his report by focusing on an isolated comment, while ignoring the overwhelming evidence pointing toward mental retardation, and finding that such an action

"suggests a bias on [the expert's] part in favor of a finding of no mental retardation which undermines his credibility").

Respondent's attempt to show what he deems to be "adaptive behavior" goes beyond the cherry-picked facts that his counsel discussed with Dr. King during the evidentiary hearing, and he now resorts to citing an "Inmate Contraband/Property Disposal Agreement" for the proposition that Mr. Lewis "had in his possession" the following materials: *Basic Math & Pre-Algebra for the Clueless*, two Webster's vest pocket dictionaries, *The Georgetown Law Journal, The New York Times Almanac (2002), The Koran, Islamic Spirituality, The Eternal Message of Muhammad*, and *A Popular Dictionary of Islam*."[61]   (Resp. Br. at 136.)  Respondent also claims that prison records reflect that Mr. Lewis has said that he "plays chess for recreation" and that he has "expressed interest in earning his GED."[62]   (Resp. Br. at 137.)   Finally, Respondent

---

[61] While the Property Disposal Agreement requires that Mr. Lewis dispose of those materials, there is no indication as to how they came into his possession.  Moreover, even if Mr. Lewis had the materials cited by Respondent, there is no evidence that he actually read them or that he could do so.  Instead, Dr. Israelian and Dr. King both found that Mr. Lewis reads at a fourth grade level – a fact which is consistent with a diagnosis of mental retardation.  (*See* HTr. at 70-71) (citing to Dr. Israelian's testimony that Mr. Lewis's reading ability is equivalent to that of an average 10 year old, placing him in the fourth grade, sixth month); King Report, PX 30, at 7 (1193); (Dr. King found that Mr. Lewis was reading at a 4th grade level); *see also* Tasse, Supp. App. Ex. 7, at 20 ("it is well established that adults with mild mental retardation can achieve reading and writing commensurate with a grade equivalent of 5th or 6th grade"); Reschly, Supp. App. Ex. 2, at 27 (many persons with mild mental retardation attain basic literacy skills, typically reading at about the fourth grade level).)  In addition, one of Mr. Lewis's fellow inmates testified that "it is common practice for inmates who read a lot to ask non-reading inmates like Lewis to order extra books for them."  (*See* Alderman Aff., PX 70, at ¶ 9 (2074).)  Finally, another of Mr. Lewis's fellow inmates testified that he tried to help Mr. Lewis study Islam, but that Mr. Lewis was "confused by the whole concept of Islam."  (*See* Israel Jones Aff., PX 94, at ¶ 5 (2807-2808); *see also* Alderman Aff., PX 70, at ¶ 8 (2703-2704) (Mr. Lewis's understanding of Islam is superficial and he does not read his Qu'ran).)

[62] While Mr. Lewis may have expressed interest in earning his GED, the prison record cited by the Respondent indicates that he was not eligible for the GED program and there is no evidence that he completed any educational programs while incarcerated.  (*See* RX 62 (9036).)  Moreover, the academic testing in this case overwhelmingly establishes that Mr. Lewis would be

repeatedly cites to some of Mr. Lewis's self-reported ABAS-II answers, assumes that those answers reflect reality, and then points to those "data points" as examples of "adaptive behavior" or, alternatively, claims that they are either consistent with or inconsistent with Dr. Swanson's findings.[63]  (Resp. Br. at 137-39, 141-43, 144.)

Ultimately, this shotgun approach demonstrates only that Respondent is fundamentally mistaken about how a psychological expert should evaluate an individual's adaptive behavior.  In fact, Dr. King's approach of interpreting adaptive behavior by focusing on what a person can do and then declaring that a defendant has no deficits in adaptive behavior simply by noting that a person might have a job, can drive a car or is married is improper.  As one prominent expert on mental retardation recently wrote:

> Because people with mild mental retardation typically show some adequate functioning, the emphasis [when assessing adaptive behavior] is on documenting the individual's deficits, not his strengths.  Assessment of one's functioning is based on actual behavior; the diagnosis is not presumed potential or what the individual might have done under other circumstances.  Further the defendant's knowledge is not sufficient evidence of competent functioning.  The ability to answer questions or point to pictures correctly is not the same as community functioning, and tests using this format . . . are not appropriate for the diagnosis of mental retardation . . . .

---

unable to complete his GED because his academic skills are at an elementary school level.  *Cf.* Everington and Olley, Supp. App., Ex. 4, at 13 (recommending that examiners assessing adaptive behavior consider actual assessments of academic and language skills.)  Dr. Swanson also reviewed Mr. Lewis's prison records and testified that there is nothing in those records that is inconsistent with a diagnosis of mental retardation.  (*See* HTr. at 231).)  Finally, one of Mr. Lewis's fellow inmates testified that his chess abilities are limited to knowing how each piece is supposed to move and that he does not employ any strategy when he attempts to play.  (*See* Alderman Aff., PX 70, at ¶ 10 (2704).)

[63] Of course, the Respondent's approach ignores the threshold issue that it was improper for Dr. King to rely on Mr. Lewis to self-report his abilities and that, as a result, this Court holds that Mr. Lewis's self-reported answers are entitled to no weight.

> [The diagnosis of adaptive behavior with respect to mental
> retardation] is based on typical functioning.  The identification of
> isolated examples of competent functioning does not disprove the
> diagnosis of mental retardation.  Typical community functioning is
> difficult to assess in an individual who is incarcerated; the essential
> information is performance in the community before incarceration.
> It is not behavior in the structured environment of a jail or prison
> where a person with mental retardation may function quite well.

*See* Olley, Supp. App. Ex. 1, at 8-9; *see also* Macvaugh and Cunningham, Supp. App. Ex. 3, at

31 (criticizing mental health professionals who view adaptive behavior skills "only in terms of

practical daily living skills, such as toileting, eating, dressing, driving, meal preparation, money

management and maintaining household activities" and then cite to the existence of such skills as

"evidence that is contraindicative of mental retardation"); Reschly, Supp. App. Ex. 2, at 27

(many people with mild mental retardation can drive a car, pass a written driver's license

examination, live independently in the community and secure employment and economic self-

support, typically in low level jobs that do not require complex reasoning and decision making);

*Holladay I*, 463 F. Supp. 2d at 1343 (recognizing that the fact a person is capable of regular

employment in unskilled jobs is not inconsistent with a finding of mental retardation).

   In other words, rather than focusing on an array of things that an individual can do (or in

this case *might* be able to do), a person's adaptive behavior abilities are properly defined by

examining that person's adaptive behavior *deficits and limitations.*  *See Davis*, 2009 WL

1117401, at *26 ("[I]t is well-established that assessment of adaptive behavior focuses on

weaknesses, rather than strengths, and isolated achievements cannot 'trump' broad deficits.");

Olley, Supp. App. Ex. 1, at 8 (quoted above); *see also* Tasse, Supp. App. Ex. 7, at 7-8, 20

(mentally retarded individuals will have areas of "strengths and areas of ability" and those

"strengths may confound a layperson or a professional with limited clinical experience with

individuals with mild mental retardation" leading them to "erroneously interpret these pockets of

strengths and skills as inconsistent with mental retardation because of their misconceptions regarding what someone with mental retardation can or cannot do"); Everington and Olley, Supp. App. Ex. 4, at 8 (noting that "[t]he argument is often made that if a person has certain practical skill strengths, the person cannot have mental retardation, when, in fact, all of the major professional definitions of mental retardation allow for intraindividual differences in adaptive behavior").)

Finally, Respondent emphasizes the fact that Dr. King purportedly "looked at all facets of Petitioner's life history" when rendering his diagnosis. (Resp. Br. at 144.) Dr. King, however, did not even attempt to interview anyone other than Mr. Lewis in connection with his adaptive behavior analysis. *Cf. Holladay II*, 555 F.3d at 1362 (finding the defendant's expert more credible than the state's expert when the defense expert spoke with people who knew the defendant during the developmental period and tested two of the defendant's brothers, while the state's expert made no comparable efforts). Moreover, any suggestion that Dr. King carefully reviewed the materials related to Mr. Lewis's life history was belied by Dr. King's own testimony during the evidentiary hearing when he admitted in response to a question posed by *Respondent's counsel* that he was unaware of the fact that Mr. Lewis grew up in a hellish environment in the projects in New Orleans – a basic fact that, as noted above, was repeatedly referred to in the affidavits that Dr. King claims to have reviewed. The Court concludes that Dr. King's failure to recognize or remember that fact is further evidence of the slipshod nature of his adaptive behavior analysis.

Overall, the Court finds that Dr. King's own testimony demonstrates that he frequently substitutes his unsupported subjective beliefs or his "kind of concept about what mental retardation involves" for firmly established psychological guidelines and principles whenever he

believes that it is necessary to do so to justify his diagnosis. This Court cannot condone such behavior and Dr. King's repeated willingness to violate the established standards of his profession renders his opinion that Mr. Lewis is not mentally retarded a sham. As a result, the Court concludes that his mental retardation analysis and his opinions are entitled to no weight.

## C.   Respondent's Other IQ Arguments.

After attempting to foist Dr. King and his dubious analysis on this Court and after repeatedly misrepresenting the record in connection with his arguments regarding the ineffective assistance of counsel issues, Respondent's counsel utterly destroyed any credibility that they might have retained with their final two mental health arguments.

### 1.   The "Culture Fair" Test.

In what can only be viewed a conscious attempt to mislead this Court, Respondent's counsel raises the utterly specious claim that:

> [p]etitioner was also given *an IQ test by the State while incarcerated.* The *Culture Fair test* administered to [Mr. Lewis] by the Georgia Department of Corrections on or about February 15, 1999 *evidenced an IQ of 87* demonstrating that Petitioner was functioning in the low average range of intelligence at that time.

(Resp. Br. at 111 (emphasis added).) This statement is false and there is no evidence showing that the "Culture Fair" test given to Mr. Lewis is an IQ test. In fact, as Respondent knows, or certainly should know, the undisputed evidence in the record when Respondent's counsel made the statement conclusively establishes that the Culture Fair test, as administered by the Georgia Department of Corrections, is *not a valid IQ test* and the results from that test cannot be used to determine whether Mr. Lewis is mentally retarded. Instead, the Culture Fair is merely a prison screening test to allow prison officials to get a general idea of an inmate's aptitude for placement purposes.

The affidavit of Herbert W. Eber, Ph.D., the psychologist who created the Correctional Diagnostic System for the Georgia Department of Corrections and the modified Culture Fair test used by the GDC, establishes that it is not an IQ test. (*See* Affidavit of Herbert W. Eber, Ph.D., PX 170 (the "Eber Affidavit"), at ¶ 2 (5091-5092).) Under Dr. Eber's program, Mr. Lewis was administered a "modified Culture Fair Intelligence Test," when he entered the Georgia Diagnostic Prison in 1999 and he scored an 87.[64]  (*Id.* at ¶ 3 (5092).)  Dr. Eber specifically testified, however, that the Culture Fair *is not an IQ test* and that Mr. Lewis's results "are not valid for the purpose of diagnosing or ruling out mental retardation." (*Id.* at ¶¶ 10-11 (5095-5096).) Dr. Eber has repeatedly stated that the Culture Fair was intended to provide him with "a general idea of [a prisoner's] individual aptitudes rather than obtaining accurate and reliable psychological data" and that the test "was designed to assess the inmate's general aptitude —

---

[64] Unlike the raw data generated by accepted IQ tests, the modified Culture Fair test results are contained on a single page. (*Compare* Test of "g": Culture Fair, Scale 2 Answer Sheet, RX 62, at 8517 with Israelian Report of WAIS-III Testing and Raw Data, PX 4.) Furthermore, another page of the record cited by Respondent for the proposition that the Culture Fair test is an IQ test (Resp. Br. at 111) explicitly raises a red flag about the legitimacy of the Culture Fair results when it states that:

> THIS COMPUTER GENERATED REPORT SHOULD BE VIEWED WITH CAUTION. IT MAY NOT ACCURATELY DESCRIBE THIS OFFENDER. THESE STATEMENTS ARE BASED ON THE BEHAVIORS AND HISTORIES OF PERSONS WITH SIMILAR TEST SCORES, INTERVIEW RESPONSES, AND PERSONAL CHARCTERISTICS. THE DIAGNOSTIC AND TREATMENT SUGGESIONS BELOW SHOULD BE CONSIDERED AS HYPOTHESES WHICH SHOULD BE CONFIRMED OR RULED OUT FOLLOWING EXAMINATION BY THE DIAGNOSTIC STAFF OR OTHER PERSONNEL.

(*See* Georgia Department of Corrections Offender Profile Report, HTr. at 8512 (capitalization in original).)

3475

rather than his intelligence quotient – so as to more appropriately place him in a prison program." (*Id.* at ¶¶ 4-5 (5092-5093).)

In addition, Dr. Eber specifically referred to the factors that prevent the modified Culture Fair from being a valid IQ test:

> (1)   Contrary to the requirement that intellectual tests used to diagnose mental retardation be individually administered and timed, the Culture Fair test taken by Mr. Lewis in 1999 was administered in a group setting and it was not timed. (Eber Aff., PX 170, ¶¶ 4, 8 (5092-5094).)  Dr. Eber noted that the publisher of the Culture Fair also warned that it should not be given in an untimed format when attempting to measure a subject's IQ because untimed tests artificially inflate IQ scores. (*Id.* at ¶ 8 (5093-5094).);[65]
>
> (2)   The Culture Fair was not given to Mr. Lewis by a trained psychological professional, as required by the Ethical Standards of the American Psychological Association, and instead it was administered by a counselor who, to Dr. Eber's knowledge, "did not even possess a college degree." (*Id.* at ¶ 5 (5093).);
>
> (3)   The Culture Fair does not take into account reading skills, which are a major and necessary factor in determining IQ, and the Culture Fair used by Dr. Eber was "specifically designed to eliminate reading skills from the equation." (*Id.* at ¶ 7 (5093).);
>
> (4)   The norms used to evaluate Mr. Lewis on the Culture Fair were not the norms generated based on a representative cross-section of the general population as a whole.  Instead, Dr. Eber created his own norms for evaluating inmate Culture Fair scores based on a research study of other Georgia inmates. (*Id.* at ¶ 9 (5094-5095).)  As a result, the scores obtained on the Culture Fair "have absolutely no validity in determining general intellectual functioning" and they "are completely unreliable as independent measurements and cannot be used as an indicator of IQ." (*Id.*).

---

[65] Other experts have specifically cautioned against using group-administered tests conducted in a prison setting as a means of ruling out mental retardation. *See* Macvaugh and Cunningham, Supp. App., Ex. 3, at 17 ("Because independent effort cannot be assured, mental health professionals are also cautioned about relying on scores from group-administered tests, particularly when administered in a correctional setting, to rule out mental retardation.").

Finally, Dr. Eber testified that Mr. Lewis's Culture Fair score of 87 is not inconsistent with the 66 that Mr. Lewis scored on the WAIS-III IQ test and he agreed with Dr. Israelian's conclusion that Mr. Lewis's WAIS-III score "indicate[s] Mr. Lewis is indeed of significantly subaverage intellectual functioning." (Eber Aff., PX 170, at ¶¶ 11, 15 (5095-5096).)

Dr. Swanson also testified that she reviewed the Culture Fair results in Mr. Lewis's prison records, that she recognized that the Culture Fair is not an IQ test and that it "wouldn't even be considered an intelligence test." (HTr. at 231-32.)  Other experts have echoed Dr. Swanson's opinion and have cautioned that prison screening tests should not be used as a measure of an inmate's intellectual functioning in a capital case.  *See* Macvaugh and Cunningham, Supp. App. Ex. 3, at 16 (emphasizing that when evaluating an individual for mental retardation, "intellectual functioning must be assessed using standardized, individually administered measures of intelligence" and that "only global measures of intelligence are acceptable for making a diagnosis of mental retardation"); Everington and Olley, Supp. App. Ex. 4, at 6-7 (criticizing attempts to use the results of group-administered screening tests that were administered upon entry into prison as a means of determining intellectual functioning in capital cases and noting that such screening tests "are not valid measures for determining mental retardation and should not be compared to a test of global intelligence, such as a Wechsler scale.").

Finally, Respondent's attempt to portray the Culture Fair as a reliable measure of Mr. Lewis's intelligence is all the more egregious in light of the fact that his expert, Dr. King, previously testified in another case involving the Respondent, and which Respondent cited in his post-hearing brief, that the Culture Fair is not an IQ test.  *See Ledford v. Head*, 2008 WL 754486, at *5 (where the court noted that Dr. King agreed that the Culture Fair was not a reliable

measure of intellectual functioning).  In sum, there is absolutely no support for Respondent's claim that the Culture Fair results are a valid measure of Mr. Lewis's IQ and the Court believes that Respondent's counsel was either grossly negligent when asserting that argument, or much more troubling, intentionally engaged in professional misconduct by attempting to mislead this Court.

### 2.     The Lack Of IQ Testing Before Mr. Lewis Turned 18.

In a single conclusory paragraph, and without citation to *any authority,* Respondent claims that the absence of an IQ score before age 18 in Mr. Lewis's personal history, his school records or elsewhere constitutes "compelling evidence" that Mr. Lewis was not mentally retarded during the developmental period and that his claim of mental retardation is a recent fabrication.  (Resp. Br. at 147-48.)  Initially, the Court notes that Respondent's reference to Mr. Lewis's school records glosses over the fact that Mr. Lewis's elementary school records are his only school records that survived Hurricane Katrina.  In addition, Respondent ignores (1) both Dr. Israelian's and Dr. Swanson's testimony that the information contained in those elementary school records is entirely consistent with the fact that Mr. Lewis is mentally retarded, and (2) the fact that Mr. Lewis was not diagnosed as being mentally retarded in elementary school does not rule out a diagnosis of mental retardation.  (*See* Israelian Report, PX 3, at 5 (481); HTr. at 214-231 (Swanson's testimony about Mr. Lewis's academic history); *see also* Reschly, Supp. App. Ex. 2, at 10-20 (recognizing that schools often do not properly diagnose mentally retarded students and that when reviewing school records an examiner should focus on other information such as grades, whether the student repeated grade levels and scores on standardized achievement tests); Gresham, Supp. App. Ex. 5, at 15 (noting that it is not uncommon for mentally retarded individuals to lack a diagnosis of their condition in their school records); Macvaugh and Cunningham, Supp. App. Ex. 3, at 36, 44 (noting that "[t]he absence of a

diagnosis of mental retardation in a defendant's school records does not demonstrate that mental retardation was not present" and that "[s]chool records in particular provide an invaluable source of information in determining whether or not there was evidence of mental retardation during the developmental period"); Everington and Olley, Supp. App. Ex. 4, at 12 (recognizing that "in communities where there is widespread poverty, it is possible for a child to go through a school without a placement in Special Education" and that "[i]n these cases, other factors, such as failing grades, below grade test scores, and early school separation can be important factors").) Indeed, the documented proof of Mr. Lewis's academic and social struggles in his elementary school records shows that Mr. Lewis was mentally retarded before he turned 18. *See* Macvaugh and Cunningham, Supp. App. Ex. 3, at 35-36 (recognizing that school records are especially valuable evidence of mental retardation "since academic achievement is usually adversely affected by mental retardation").

Mr. Lewis's elementary school records also corroborate Dr. Israelian's conclusion that Mr. Lewis did not feign his mental retardation. (HTr. at 72-73, Dr. Israelian's testimony that she determined Mr. Lewis was not malingering); *see also* King Dep., PX 29, at 37 (1117) (testifying that he believed that Mr. Lewis gave to a good effort during his testing and was not trying to fake any symptoms.) Simply put, it is incredible that a child in elementary school would or could attempt to act in a manner that is consistent with mental retardation. *Nelson*, 419 F. Supp. 2d at 902-903 (rejecting the State's claim that the defendant was malingering when his childhood test scores were consistent with a diagnosis of mental retardation). Moreover, the AAIDD has recognized that there may be myriad reasons why a mentally retarded individual might not have been diagnosed before the age of 18:

> A number of reasons might explain the lack of an earlier, official diagnosis of mental retardation, including: (a) the individual was

excluded from a full school experience; (b) the person's age precluded his/her involvement in specialized services such as special education programs; (c) the person was given no diagnosis or a different diagnosis for "political purposes" such as protection from stigma or teasing, avoidance of assertions of discrimination, or related to conclusions about the potential benefits or dangers of a particular diagnosis; (d) the school's concern about over-representation for data reporting purposes of specific diagnostic groups within their student population; (e) parental concerns about labels; (f) contextual school-based issues such as availability or nonavailability of services and potential funding streams at that time; and (g) the lack of entry referral into the diagnostic-referral process due to cultural and linguistic differences or other reasons.   In addition to these potential reasons, in reference to people in the criminal justice system, some criminal defendants fall at the upper end of the MR/ID severity continuum (i.e., people with mental retardation who have a higher IQ) and frequently present a mixed competence profile.  They typically have a history of academic failure and marginal social and vocational skills (Lewis & Balla, 1976; Greenspan & Switzky, in press).   Their previous and current situations frequently allowed formal assessment to be avoided or led to assessment that was less than optimal.

(See AAIDD User's Guide", PX 14, at 18 (insert); see also Macvaugh and Cunningham, Supp. App. Ex. 3, at 36 (listing some of the reasons why a student might not have been properly diagnosed).)   Ultimately, the Court finds that the fact that Mr. Lewis apparently turned 18 without a formal diagnosis of mental retardation does nothing to alter this Court's finding that he is mentally retarded.  See Tasse, Supp. App. Ex. 7, at 5 (noting that the "developmental period" requirement "does not preclude making a first time diagnosis of mental retardation when an individual is an adult"); Everington and Olley, Supp. App. Ex. 4, at 14 (recognizing that "[t]he AAMR 2002 standard does not require that an adult have a childhood IQ score in order for a diagnosis of mental retardation to be made").

## VIII.   CONCLUSIONS OF LAW REGARDING MENTAL RETARDATION.

Regardless of the propriety of his trial, Mr. Lewis's death sentence must be vacated because he is mentally retarded.  The evidence presented in this habeas proceeding establishes

beyond a reasonable doubt that Mr. Lewis is mentally retarded, and the Supreme Court has held that the Eighth and Fourteenth Amendments categorically prohibit the execution of mentally retarded persons. Accordingly, this Court grants Mr. Lewis habeas relief and vacates his death sentence.

### A.   Mr. Lewis Is Mentally Retarded.

As discussed above in Section VII, the testimony offered in this proceeding from Drs. Israelian, Swanson and Woods establishes that Mr. Lewis is mentally retarded.   After considering all of the available evidence and properly administering standardized IQ and adaptive behavior tests, those experts testified that Mr. Lewis meets all of the three criteria for the diagnosis of mental retardation found in OCGA § 17-7-131(a)(3). Specifically, those experts found that Mr. Lewis has (1) significantly subaverage intellectual functioning (including an IQ of 66 as determined by Dr. Israelian), (2) resulting in or associated with impairments in adaptive behavior (as evidenced by the comprehensive assessment performed by Dr. Swanson), (3) which manifested during the developmental period (as evidenced by historical documents, standardized testing and a wealth of anecdotal evidence). This Court finds that their testimony and careful analysis is credible and likewise finds that Mr. Lewis is mentally retarded beyond a reasonable doubt.

While the State's expert, Dr. King, testified that Mr. Lewis is not mentally retarded, his opinion is based primarily on the results of his seriously flawed ABAS-II adaptive behavior testing and his repeated violations of the generally accepted standards applicable to the psychological profession. As a result, this Court concludes that Dr. King's opinion is entitled to absolutely no weight and the proof offered by Mr. Lewis on the mental retardation issue stands as unrebutted.  *See United States v. Nelson*, 419 F. Supp. 2d at 895-903 (rejecting the government's expert's opinion that the defendant was not mentally retarded when that expert did

not have special expertise in mental retardation, ignored the "practice effect" and gave a second WAIS-III IQ test within the same year, relied on a self-reported ABAS-II score to support his finding that the defendant did not have significant deficits in adaptive behavior and evidenced a bias toward a finding of no mental retardation by cherry-picking the evidence to find a comment that supported his conclusion); *State v. Tousley*, 271 Ga. App. 874, 876-877, 611 S.E.2d 139, 143 (2005) (holding "evidence based on a scientific procedure or technique requires two findings regarding the evidence's reliability: such evidence is admissible upon a showing by the party offering the evidence that (1) general scientific principles and techniques involved . . . are valid and capable of producing reliable results, and (2) the person performing the test 'substantially performed the scientific procedures in an acceptable manner" and recognizing that "if the expert substantially departed from principles and procedures that are the basis for the evidence's usual reliability, the evidence should be declined." (internal quote marks and citations omitted).)   In the end, the Court concludes that the diagnoses of mental retardation made by Dr. Israelian, Swanson and Woods represent the opinions of highly qualified individuals utilizing the proper techniques and this Court adopts their findings over the opinions arrived at by Dr. King by using unsound methods and ignoring the best practices of his profession.

**B.    The Eighth And Fourteenth Amendments To The United States Constitution Prohibit The Execution of Mr. Lewis.**

Having found that Mr. Lewis is mentally retarded, the legal analysis and the consequences that flow from that finding are straightforward.  The United States Supreme Court has held that the Eighth Amendment categorically prohibits the execution of mentally retarded offenders because they lack the requisite moral culpability to make them eligible for the death penalty.  *Atkins v. Virginia*, 536 U.S. at 318-320; *see also Davis*, 2009 WL 1117401, at *1 (recognizing that mental retardation "is a condition, the existence of which disqualifies a person

241

from capital punishment"). In 1986, well before both the *Atkins* decision and Mr. Lewis' trial, Georgia was the first state in the nation to enact a law prohibiting the execution of any person determined to be mentally retarded. *See* OCGA § 17-7-131(j); *see also Atkins*, 536 U.S. at 314 n.9. Georgia's statute "reflect[ed] a decision by the people of Georgia that the execution of mentally retarded offenders makes no measurable contribution to acceptable goals of punishment." *Fleming v. Zant*, 259 Ga. 687, 690, 386 S.E.2d 339, 342 (1989). Without the "procedural protections that our capital jurisprudence steadfastly guards," a mentally retarded defendant faces a "[special] risk 'that the death penalty will be imposed in spite of factors which may call for a less severe penalty.'" *See Atkins*, 536 U.S. at 317-20 (quoting *Lockett v. Ohio*, 438 U.S. 586, 605 (1978)). Because Mr. Lewis is mentally retarded, the State of Georgia is constitutionally prohibited from executing him.[66]

## CONCLUSION

At the close of the evidentiary hearing, this Court asked Respondent's counsel the overriding question raised in this proceeding: whether the State took the position that Mr. Lewis received a fair trial. (HTr. at 447.) The overwhelming evidence vividly answers this Court's question and establishes that Mr. Lewis's trial actually represented a gross miscarriage of justice.

This Court finds that Petitioner Christopher K. Lewis is entitled to relief on his Initial Amended Petition. Specifically, and for the reasons set forth above, the Court holds that Mr.

---

[66] The Court notes that Mr. Lewis raised a number of other claims in his Initial Amended Petition for Writ of Habeas Corpus, and his post-hearing brief contains arguments related to alleged *Brady* violations, prosecutorial misconduct, and errors by the trial court. In addition, Mr. Lewis contends that his death sentence was disproportionate, that Georgia's lethal injection procedures are unconstitutional and that the cumulative effect of the alleged errors deprived him of his constitutional right to a fair trial. Because the Court has already found that Mr. Lewis is entitled to a new trial and that he is not eligible for the death penalty, the Court defers ruling on Mr. Lewis's other claims.

Lewis has established that (1) his trial counsel were ineffective during the guilt/innocence phase of his trial, (2) his trial counsel were ineffective during the penalty phase of his trial, (3) his appellate counsel was ineffective when he failed to raise the issue of trial counsels' ineffectiveness on direct appeal, and (4) that he is mentally retarded and therefore ineligible for the death penalty.   Accordingly, the Court hereby vacates Petitioner's conviction and his sentence of death and remands this case for a new trial.

Because the Court has ordered all of the relief requested by Petitioner, the Court has not reached and defers ruling on the remaining claims in the Initial Amended Petition.

SO ORDERED this the _____9_____ day of ___June___, 2009.

The Honorable Jerry W. Baxter
Superior Court of Butts County
Sitting by Designation

243

ELECTRONICALLY FILED
4/18/2011 10:20 AM
CC-1998-000061.60
CIRCUIT COURT OF
CHEROKEE COUNTY, ALABAMA
DWAYNE AMOS, CLERK

State of Alabama,
      PLAINTIFF

          vs.

Keith Edmund Gavin,
      DEFENDANT

       * IN THE CIRCUIT COURT OF
       * CHEROKEE COUNTY, ALABAMA
       * CASE NO. CC-1998-061.60
       *       CC-1998-062.60

### ORDER OF APRIL 18, 2011

On November 6, 1999, the Defendant was convicted of two counts of Capital Murder in connection with the murder of William Clinton Clayton, Jr. The murder was made capital (1) because it was committed during the course of a robbery in the first degree [Title 13A-5-40(a)(2) Code of Alabama (1975)], and (2) because the Defendant had been convicted of another murder within 20 years of the murder of Mr. Clayton [Title 13A-5-40(a)(13) Code of Alabama (1975)].

On September 26, 2003, the Alabama Court of Criminal Appeals affirmed the Defendant's conviction and sentence of death. Gavin v. State, 891 So. 2d 907 (2003). The Defendant's petition for writ of certiorari to the Alabama Supreme Court was denied on May 28, 2004 [Gavin v. State, 891 So. 2d 998 (2004)], and his petition for writ of certiorari to the United States Supreme Court was denied on January 24, 2005 [Gavin v. Alabama, 125 S. Ct. 1054 (2005)].

On direct appeal, the Alabama Court of Criminal Appeals stated the facts of Gavin's crimes, and his corresponding trial, as follows:

> A little after 6:30 p.m. on March 6 1998, Clayton, a contract courier for Corporate Express Delivery Systems, Inc. was shot and killed while sitting in a Corporate Express van outside the Regions Bank in downtown Centre. Clayton had finished his deliveries for the day and had stopped at Regions Bank to obtain money from the ATM in order to take his wife to dinner.

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
                CC-1998-062.60

Page 2

There were four eyewitnesses to the crime, two of whom positively identified Gavin as the shooter. Ronald Baker and Richard Henry, Jr. testified that they were stopped at a traffic light near the Regions Bank and the courthouse in downtown Centre at the time of the shooting. According to Baker and Henry, they saw a man get out of a vehicle, walk to a van parked on the street, and shoot the driver of the van. Upon hearing the gunshots, Baker and Henry immediately fled the scene; neither could identify the shooter.

Larry Twilley testified that he, too, was stopped at a traffic light by the Regions Bank in downtown Centre at the time of the shooting. Twilley testified that while he was stopped at the light, he heard a loud noise, turned, and saw a man with a gun open the driver's side door of a van parked on the street and shoot the driver of the van two times. According to Twilley, the shooter then pushed the driver to the passenger's side, got in the driver's seat, and drove away. Twilley testified that when he first saw the shooter, he noticed something black and red around his head, but that after the shooter got in the van and drove away, the shooter no longer had anything on his head; at that point, Twilley said, he noticed that the shooter had very little hair. At trial, Twilley positively identified Gavin as the shooter.

Dewayne Meeks, Gavin's cousin and an employee of the Illinois Department of Corrections, testified that in early February 1998, he and Gavin traveled from Chicago, Illinois, where they were living, to Cherokee County, Alabama "[t]o pick up some girls...and just to really get away." (R. 651.) Meeks said that they stayed for a weekend and then returned to Chicago. In early March 1998, Meeks said, Gavin wanted to return to Alabama to find a woman he had met in February. Meeks testified that Gavin told him that if he drove Gavin to Chattanooga, Tennessee, to meet the woman, the woman would reimburse him for the travel expenses. Meeks said that he agreed to drive Gavin to Tennessee and that Meeks' wife and three-year-old son also accompanied them.

Meeks testified that they left Chicago on the night of March 5, 1998, arrived in Chattanooga on the morning of

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
            CC-1998-062.60
Page 3

March 6, 1998, and checked into a Super 8 Motel. Meeks said that he rented two rooms at the motel, one for him and his family, and one for Gavin. After they arrived, Meeks said Gavin made a telephone call, and he and Gavin then drove to a nearby gasoline service station to wait for the woman Gavin had come to see. According to Meeks, the woman did not show up and Gavin then asked him to drive to Fort Payne, Alabama, so that Gavin could find the woman. Meeks agreed and they drove to Fort Payne, but they failed to locate the woman in Fort Payne, Meeks said they drove to Centre to find the woman.

Meeks testified that at approximately 6:30 p.m. on March 6, 1998, he and Gavin arrived in downtown Centre. When they stopped at the intersection near the courthouse and the Regions Bank, Meeks said, Gavin got out of Meeks's vehicle and approached a van that was parked nearby. According to Meeks, he thought Gavin was going to ask the driver of the van for directions. However, when Meeks looked up, he saw that the driver's side door of the van was open, and Gavin was holding a gun. Meeks stated that he watched as Gavin fired two shots at the driver of the van. According to Meeks, immediately after seeing Gavin shoot the driver of the van, he fled the scene, and Gavin got in the van and followed him. Meeks testified that Gavin honked the horn of the van and flashed the lights in an attempt to get Meeks to stop. However, Meeks refused to stop because, he said, he was scared. Meeks stated that he drove back to Chattanooga and told his wife what had happened. He and his wife and child then checked out of the motel and drove back to Chicago.

Meeks testified that when he arrived in Chicago, he immediately informed several of his friends who were in law enforcement about the shooting. As a result of his conversations with friends, Meeks said, he realized the gun used by Gavin was probably the gun that had been issued to him by the Illinois Department of Corrections. Meeks said that he then checked his home and determined that his gun was, in fact, missing. According to Meeks, he kept the gun in a drawer at home and he had not seen the gun for approximately two weeks before the shooting. Meeks testified that he immediately reported

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
CC-1998-062.60
Page 4

the gun as missing to law enforcement. Meeks admitted
that he did not mention to law enforcement when he
reported the missing gun that he believed the gun had
been used in a shooting in Alabama, but he said that he
did inform his boss at the Illinois Department of
Corrections that he believed the gun had been used in the
shooting. After reporting the gun missing and discussing
the shooting with several friends, Meeks said, he then
contacted Alabama law enforcement to inform them of his
knowledge of the shooting. On March 9, 1998, and again
on April 6, 1998, Meeks was interviewed in Chicago by
investigators from Alabama. After the interviews, Meeks
said, he was indicted for capital murder in connection
with the murder of Clayton; that charge was subsequently
dismissed.

Danny Smith, an investigator with the District Attorney's
Office for the Ninth Judicial Circuit, testified that on the
evening of March 6, 1998, he was returning to Centre
from Fort Payne when he heard over the radio that there
had been a shooting and that both the shooter and the
victim were traveling in a white van with lettering on the
outside. As he proceeded toward Centre, Investigator
Smith said, he saw a van matching the description given
out over the radio, and he followed it. According to
Investigator Smith, the van was traveling approximately
75 miles per hour and the driver was driving erratically.

Investigator Smith testified the he was speaking on the
radio with various law-enforcement personnel regarding
stopping the van when the van turned on its blinker and
stopped on the side of the road. When he pulled in
behind the van, Investigator Smith said, the van abruptly
pulled back onto the road and sped away. Investigator
Smith said that he continued pursuing the van and that,
after he turned on his emergency lights, the van stopped
in the middle of the road, near the intersection of
Highways 68 and 48. Investigator Smith testified that
when the van stopped, the driver got out of the vehicle,
turned, fired a shot at him, ran in front of the van, turned
and fired another shot at him, and then ran into nearby
woods. Investigator Smith testified that the driver of the
van was black, and that he was wearing a maroon or
wine-colored shirt, blue jeans, and some type of

3488

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
      CC-1998-062.60

Page 5

toboggan or other type of cap. At trial, Investigator Smith
positively identified Gavin as the person who had gotten
out of the van and shot at him.

After Gavin fled into the woods, Investigator Smith said,
he went to the van and checked the victim. According to
Investigator Smith, the victim was still alive, but barely,
and he radioed for an ambulance. Investigator Smith
testified that when he first went to the van, he saw blood
between the two front bucket seats and on the passenger
seat; however, there was "very little blood" on the
driver's seat. (R. 567.) Investigator Smith said that when
emergency personnel removed the victim from the van,
blood was transferred to the driver's seat by the
personnel who had to enter the van to secure the victim
and remove him.

Investigator Smith also testified that, within minutes of
Gavin's fleeing into the woods, several law-enforcement
officers arrived at the intersection of Highways 48 and 68,
and the wooded area into which Gavin had fled was
encircled and sealed off so that "no one could come out
and cross the road without being seen." (R. 563.)

Members of several different law enforcement agencies
then conducted a search for Gavin.

At approximately 9:45 p.m., Tony Holladay, a dog handler
for the Limestone Correctional Facility, arrived at the
scene with his beagle. Holladay testified that when he
first arrived, he obtained information indicating that
Investigator Smith had chased the suspect for
approximately 20 yards, but had stopped short of the
woods. At that point Holladay said, he had Investigator
Smith show him the exact spot he had stopped the
pursuit so that the dog would not track Investigator
Smith's trail from the roadway but would track the trial of
the person who had entered the woods. Holladay
testified that he then carried his dog to that spot and put
him down. Holladay said that the dog immediately picked
up a scent and tracked it into the woods to a creek.
Holladay testified that he saw a man, whom he positively
identified at trial as Gavin, standing in the creek under a
bush, and that when Gavin saw him, Gavin attempted to

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
CC-1998-062.60

Page 6

flee. Holladay stated and he ordered Gavin to stop, but that Gavin did not stop until Holladay fired a shot over Gavin's shoulder.

Gavin was then handcuffed and several law-enforcement officers assisted in maneuvering Gavin out of the creek, up the embankment, and through the woods to the road way. Kevin Ware, a deputy with the Cherokee County Sheriff's Department, testified that he participated in the search for Gavin and that he was present as Gavin was brought out of the creek. Deputy Ware stated that he heard Gavin say "I hadn't shot anybody and I don't have a gun." (R. 780.) The evidence indicated that from the time Gavin was discovered by Holladay to the time he heard the statement in Deputy Ware's presence, no one had had any conversation with Gavin regarding the shooting or why he was being arrested.

The record reflects that Clayton was pronounced dead upon arrival at the hospital. A subsequent autopsy revealed three gunshot wounds to his body caused by two bullets. Stephen Pustilnik, a medical examiner with the Alabama Department of Forensic Sciences, testified that one bullet passed through Clayton's left arm, entered his chest on the left side damaging both of Clayton's lungs and his heart, and exited the right side of the chest. The record reflects that that bullet was later found lodged in the passenger-side door of the van. The second bullet, Dr. Pustilnik said, entered Clayton's left hip and lodged in his back. Dr. Pustilnik testified that the wounds to Clayton's arm and hip would not have bled much because the bullets entered the muscles and the bleeding would have been contained inside those muscles. He stated that the wound to the chest would have bled quite a bit, and that, after blood filled the chest cavity, it would then exit the body at the lowest point. In addition, Dr. Pustilnik testified that there would not have been much "blow back" from the wounds, i.e., because the location of the wounds, the blood from the shots would not have blown backwards from the body toward the shooter. Dr. Pustilnik testified that the cause of Clayton's death was multiple gunshot wounds.

The record reflects that no "usable" fingerprints were

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
                    CC-1998-062.60
Page 7

found in the van and that no bloodstains were found on
Gavin's clothing. (R. 926.) However, the State presented
evidence indicating that a motel-room key was found in
Gavin's pants pocket after his arrest; the key fit room 113
at the Super 8 Motel in Chattanooga where Meeks and
Gavin had rented rooms. In addition, two .40 caliber shell
casings were found in the street outside the Regions
Bank in downtown Centre, one .40 caliber shell casing
was found in the roadway at the intersection of Highways
48 and 68, and a red and black toboggan cap was found
near the woods at the intersection of Highways 48 and
68. The bullet found lodged in the passenger-side door of
the van and the bullet in Clayton's back was also
determined to be .40 calibers. Although law enforcement
was unable to find the murder weapon on the night of the
crime, several days later, on March 13, 1998, a .40 caliber
Glock pistol was found near the woods where Gavin had
been discovered. The evidence indicated that the three
shell casings and the two bullets had been fired from the
pistol, and that the pistol belonged to Dewayne Meeks.
The State also presented evidence indicating that in 1982,
Gavin had been convicted of murder in Cook County,
Illinois. Gavin had served approximately 17 years of a 34-
year sentence and had been released on parole only a
short time before Clayton's murder.

The State also presented the testimony of Barbara
Genovese, a supervisor at the Cherokee County jail.
Genovese testified that in April 1998, both Gavin and
Meeks were incarcerated at the jail, in separate cells. At
one point, Genovese said, when she got Meeks and
another inmate out of their cells to take them outside for
exercise, Gavin called out to her from his cell and asked
if he could go outside and exercise with Meeks and the
other inmate. Genovese said that she told Gavin that he
could not go outside with Meeks, and that Gavin asked
her why. According to Genovese, she told Gavin that he
could not go outside with Meeks because when Meeks
had initially been brought to the jail, Gavin had become
loud and unruly, "screaming and yelling and banging on
the doors." (R. 1001.) At that point, Genovese said,
Gavin said "Dewayne didn't do anything. I did it" and
"Dewayne should not be in here." (R. 1002.) Genovese
testified that she did not know what Gavin was referring

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
　　　　CC-1998-062.60
Page 8

to when he said "I did it." (R. 1002.)

Gavin v. State, 891 So. 2d 907, 927-930 (2003).

On May 26, 2005, the Defendant filed a Petition For Relief From Conviction Or Sentence Pursuant to Rule 32 ARCrP. That Petition was returned to the Defendant's attorney for failure to use or follow the form prescribed by, and accompanying, Rule 32.6(a). Accordingly, on July 19, 2005, the Defendant refilled his Rule 32 Petition using and following the correct form.

On June 20, 2006, this Court dismissed many of Gavin's Rule 32 claims for the reasons set out in said Order.[1]  The Defendant was, however, granted leave to file an amended Rule 32 petition with respect to his claim(s) of ineffective assistance of counsel (IAC).

On August 18, 2006, the Defendant filed his Amended Petition For Relief From Conviction Or Sentence Pursuant To Rule 32 ARCrP (First Amended Petition). The Court conducted an evidentiary hearing on February 8-9, 2010. At the conclusion of the evidentiary hearing the State and the Defendant agreed to supplement the record with the deposition of Dr. Craig A. Haney and to thereafter submit their proposed briefs to support and oppose the Defendant's First Amended Petition.

On April 2, 2010, the Defendant filed a Second Amended Rule 32 Petition rather than file a brief.  On August 17, 2010, this Court concluded that the Defendant's Second Amended Rule 32 Petition and the materials filed in support thereof should be treated as the Defendant's brief.[2]

---

[1] On June 4, 2007, this Court entered an Order clarifying that the Order of June 20, 2006, was "a final order as to those claims dismissed by said Order."

[2] The Court's Order of August 17, 2010, also states that to the extent that the Second Amended Rule 32 Petition asserts grounds for relief not asserted in the First Amended Rule 32 Petition, and to the extent that the Second Rule 32 Petition relies on evidence not otherwise part of the record, same would not be considered because of the attorneys' agreement stated to the Court at the conclusion of the hearing conducted on February 8-9, 2010.

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
CC-1998-062.60
Page 9

## ASSERTED GROUNDS FOR RELIEF

This Court has attempted to organize the Defendant's IAC contentions by the subjects which the Defendant's multiple filings address.

## I.   IMPEACHMENT OF DEWAYNE MEEKS:

The Defendant's ineffective assistance of counsel (IAC) claims focus on the trial attorneys' failure to implicate and/or impeach Dewayne Meeks who was the State's key witness.  The Defendant is apparently suggesting that Meeks was either the shooter, or that Meeks was complicit in the shooting.

### 1. Ownership of the Murder Weapon.

At trial Meeks testified that when he was interviewed by the investigators he told them that "The gun [Gavin] used was probably mine." Meeks also testified as follows:

> Q.  And where did you get it?
> A.  Illinois Department of
> Q.  Corrections. So it was your---
> A.  Work.
> Q.  ---official weapon for your job?
> A.  Uh-huh.

**(Tr@ 679)**                    ***

> Q. How long had you been --- how long had it
>    been since you had been issued that gun?
> A. I don't remember. It was a couple of
>    months.
> Q. You had it a couple of months?

---

The Defendant's Second Amended Rule 32 Petition includes an additional ground for relief based on the trial attorneys' advice to the Defendant concerning whether to testify at trial.  Notwithstanding the Rule 32 attorneys' February 8-9 agreement to submit the matter on the theretofore filed petitions, this Court has considered the Second Amended Rule 32 Petition and the arguments advanced therein.

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
           CC-1998-062.60
Page 10

> A. Probably.
> Q. You'd never fired it?
> A. Never shot it.
> Q. Where did you keep it?
> A. In my drawer, top drawer in my house. I took
>    it to work sometime, but not all the time.

**(Tr. @ 720-721).**

On the basis of this testimony the Defendant now contends that the Defendant's trial attorneys were ineffective due to their failure to subpoena records of the IDOC to prove that the weapon was not issued to Meeks by the State of Illinois.

The Defendant has presented nothing to indicate that the Defendant's trial attorneys knew or should have known prior to trial that Meeks would offer testimony relating to where he got the murder weapon, or that he would testify that the weapon was state issued. The Defendant's trial attorneys had absolutely no reason to investigate where Meeks got the weapon.

Because the evidence overwhelmingly establishes that the Defendant shot and killed Mr. Clayton, the Defendant's trial attorneys appropriately concentrated on trying to impeach Meeks with respect to what Meeks said about how the Defendant got the weapon. In this regard the Defendant's trial attorneys sought to prove that Meeks and the Defendant were on a joint venture when they came to Alabama, and that Meeks was responsible, in whole or in part, for the weapon being accessible or available for use in this crime.

While Meeks attempted to disassociate himself from the weapon by claiming to be unaware that it was in the vehicle, the Defendant's attorneys

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
                CC-1998-062.60
Page 11

attempted to discredit him by pointing out the improbability of this testimony. Meeks' own self contradiction about where the weapon was kept added to the suggestion of culpability.

Because it was undisputed that Meeks and the Defendant came to Alabama in an unwholesome alliance, the Defendant's trial attorneys made a reasonably convincing argument by direct and circumstantial evidence that Meeks was complicit in the course of conduct which resulted in Mr. Clayton's tragic death.

The Defendant's trial attorneys focused on trying to implicate Meeks in the murder by proving that Meeks' testimony was not creditable. In their effort to discredit Meeks he was examined about his irresponsibility for keeping a weapon in an unlocked drawer where a young child lived. Meeks was also questioned about his inconsistencies when stating that the weapon was maintained in his dresser drawer and later stating that it may have been in his vehicle.

The Defendant's trial attorneys were not ineffective in attempting to implicate Meeks. At most, however, Meeks was complicit. There is no evidence that Meeks was the shooter. Indeed, the evidence is overwhelming that the Defendant was the shooter, and mere proof that Meeks lied about the gun being IDOC issued would not change that fact.

2. Access to the Murder Weapon:

The Defendant argues that his trial attorneys failed to impeach Meeks by showing the inconsistency between Meeks' trial testimony that the Defendant was "living with him" and Meeks' pretrial statement that Gavin was living with his

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
            CC-1998-062.60
Page 12

mother.

    This Court finds the distinction to be without any impeachment value.  It
is clear that Meeks and the Defendant had meaningful contact after the Defendant's
release from prison, and that the Defendant was in Meeks' home before the trip to
Alabama.   Whether he was in Meeks' home as a visitor or as a resident is a
distinction without any material difference.

    3.  Meeks' Version of the Shooting:

    The Defendant argues that his trial attorneys failed to impeach Meeks by
pointing out the inconsistency between Meeks' trial testimony that the Defendant
opened the van door and immediately shot the driver, and Meeks' pretrial
statement to officer Burch that the shots were preceded by an apparent argument
between the Defendant and the driver.   The Defendant apparently believes that a
more aggressive cross-examination of Meeks would have led the jury to believe
that the shooter acted in self defense.

    In preparation for trial, the Defendant's attorneys were furnished the
investigative file which indicates that some witnesses to the incident observed the
immediacy of the shooting as described by Meeks' trial testimony.   Another
witness said that prior to the shooting Mr. Clayton appeared to be attempting to
surrender or exit the vehicle.

    The cross-examination which the Rule 32 counsel now claims would have
impeached Meeks at trial is actually testimony which would arguably have been
more prejudicial to the Defendant.   Any argument or suggestion that the shooter

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
         CC-1998-062.60
Page 13

acted in self defense is wholly without support, and would have further discredited the defense, rather than discredit Meeks. Accordingly, this Court is unwilling to conclude that the Defendant's trial attorneys were ineffective in deciding not to pursue a course which could have been even more prejudicial to their client.

    4. The Mystery Woman:

    At trial Meeks testified that he did not know the name of the woman whom the Defendant wanted to find when they came to Alabama. During an investigative interview Meeks told the interviewing officer that the only name he knew was "Casandra."

    The Defendant now claims that the trial attorneys were ineffective for failing to point out this inconsistency to the jury. The Defendant also argues that the trial attorneys were ineffective for failing to investigate further to learn the woman's name.

    Neither this Court nor the Defendant's Rule 32 counsel know the extent to which the Defendant's trial attorneys tried to learn the name of the mystery woman, or to locate her for trial; however, during the trial Meeks was effectively examined with respect to the credibility of his story about the woman whom he and the Defendant were trying to find. Not only was Meeks unable to provide her name, he was unable to provide a physical description. Even though he said that he had met the woman before, he could not even say whether she was tall or short, or skinny or fat.

    The Defendant's trial attorneys were not ineffective in discrediting Meeks'

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
                CC-1998-062.60
Page 14

explanation for the trip to Alabama.

    5. Meeks' Job Application:

    When Meeks applied for his job with the Illinois Department of Corrections in 1994 he falsely stated on his job application that he did not know of any relative who was serving a prison sentence or was on parole. Of course, he did know that the Defendant was a state prison inmate at that time.[3]

    The Defendant now contends that his trial attorneys were ineffective for failing to obtain Meeks' job application from IDOC.

    Of all the things that the Defendant's attorneys had to do to prepare for a trial in this case, obtaining Meeks' IDOC job application was hardly high on the list. Even though Meeks apparently lied to his prospective employer, this Court is unwilling to conclude that the trial attorneys provided ineffective assistance of counsel by failing to seek and obtain this piece of information.

    If the trial attorneys had gotten Meeks' IDOC job application it would only have proven that Meeks lied to get a job. It is not realistic to conclude that this false statement on Meeks' job application, approximately 3 years before Mr. Clayton's murder, would have resulted in a different outcome in this case.

II.    INVESTIGATION IRREGULARITIES:

    The Defendant contends that the Defendant's trial attorneys provided ineffective assistance because they failed to investigate and bring to light the

---

[3] The Defendant was convicted of Murder in the Circuit Court of Cook County, Illinois, on June 9, 1982, and he was sentenced to thirty-four years in prison. The Defendant was paroled on December 26, 1997. The murder of Mr.

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
            CC-1998-062.60
Page 15

State's deficiencies and irregularities in the investigation of this case.

    1. Destruction of Evidence.

       Mr. Clayton was shot while sitting in the driver's seat of a corporate van in Centre, Alabama. The shooter drove the van several miles from the location of the shooting, and then abandoned it on foot into the nearby woods.

       The Defendant argues that the State possibly allowed valuable evidence to be destroyed by allowing a rescue squad member to drive the van to the Sheriff's Office before the van underwent an examination by the Department of Forensic Sciences.

       Although Investigator Danny Smith testified that the vehicle was driven back to the Sheriff's Office by a rescue squad member, Investigator Larry Wilson testified that it was "pulled" back to the Sheriff's Office. In his post-trial testimony Investigator Smith corrected his trial testimony by stating that the van was towed from the scene by a wrecker.

       The jury heard the trial testimony of Smith and Wilson. Based on Smith's post-trial testimony it appears that if trial counsel had solicited additional trial testimony about this subject it may have resulted in the testimony being "corrected" or clarified to remove the apparent conflict between the testimony of Smith and Wilson.

       The Defendant's trial attorneys apparently chose not to pursue this matter further. The trial attorneys thereby allowed the jury to have the conflicting

---

Clayton occurred on March 6, 1998.

ORDER OF APRIL 18, 2011
Cherokee Co. CC-1998-061.60
           CC-1998-062.60
Page 16

testimony in this regard.  The conflict was more helpful to the Defendant than would have been the "corrected" testimony.  By leaving the testimony in a state of conflict between Smith and Wilson the Defendant's trial attorneys were able to leave the jury with the argument that the improper handling of the crime scene had destroyed evidence.

     2.  Contamination of Evidence:

     It is undisputed that Mr. Clayton was dying when the driver fled on foot.  It is further undisputed that several people were in and out of the van at the scene where Mr. Clayton was found.

     After the vehicle arrived at the Sheriff's Office it was examined by an experienced forensic investigator from the Alabama Department of Forensic Sciences.  The investigator found no blood on the driver's side front seat and no useable fingerprints.

     There was substantial testimony and cross-examination about whether the position of Mr. Clayton's body adequately explained why blood was not found on the driver's side of the vehicle.  In addition to the Defendant's trial attorneys' examination on this point, the forensic examiner was also cross-examined about the State's failure to use Luminal to detect blood in the vehicle.  The trial attorneys also cross-examined the forensics expert about the State's failure to use the "fuming" method of detecting fingerprints.

     Mr. Clayton was murdered on Friday, March 6, 1998.  The van was inspected by the forensic examiner over the weekend, and it was returned to the