FILED
2020 Aug-21  PM 12:54
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

KEITH EDMUND GAVIN,    )
    )
    Petitioner,    )
    )
v.    )    Case No.  4:16-cv-00273-KOB
    )
JEFFERSON S. DUNN,    )
Commissioner of the Alabama    )
Department of Corrections,    )
    )
    Respondent.    )

# VOLUME 39

# State Court – Collateral Appeal Transcript

LUTHER STRANGE
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

1

Vol. 21 of 22

COURT OF CRIMINAL APPEALS NO.                CR-10-1313

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _____ CHEROKEE _____ COUNTY, ALABAMA

CIRCUIT COURT NO   CC-98-61.60 & CC-98-62.60

CIRCUIT JUDGE          David A. Rains

Type of Conviction/ Order Appealed From:                      Rule 32

Sentence Imposed:

Defendant Indigent:     ☑ YES     ☐ NO

## KEITH EDMUND GAVIN

NAME OF APPELLANT

Stephen C. Jackson            205-254-1037
(Appellant's Attorney)                              (Telephone No.)

1901 Sixth Avenue North, Suite 2400
(Address)

Birmingham    Alabama    35203
(City)                    (State)              (Zip Code)

### v.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter

name and address of municipal attorney below.

df

(For Court of Criminal Appeals Use Only)

1              MS. CASEY:  Objection, speculation.

2        If she says believe and doesn't know, then

3        we're going to ask to strike that testimony.

4    A    It was reported that that's where he slept.

5    Q    It was reported to you that Mr. Gavin slept

6        on the bunk bed when he was at home?

7    A    Yes.

8    Q    Is that also a picture of the bunk bed?

9    A    Yes, it is.

10   Q    What is this a picture of, Dr. Paramore?

11   A    That's a picture of the front door.  The

12       glass is missing, so it's covered with

13       plastic, and the handle is off, so there is

14       a string to pull to get in and out.

15   Q    Go to the next slide, please.  Is this

16       another room in the house?

17   A    Yes, it is.

18   Q    And the next slide.  Going back to your

19       overall opinions, do you believe it would

20       have been important at Mr. Gavin's original

21       sentencing hearing to discuss Keith's home

22       environment, both as a child and when he

23       returned from prison, and his neighborhood

24       as a risk factor?

25   A    Yes.  I mean, Keith -- It was reported that

1          Keith's major focus when he returned home,

2          he was really shocked at the condition of

3          the home, you know, and wanted to do things

4          like call Oprah to see, write letters to

5          Oprah Winfrey to see if she could help, you

6          know, with the repairs of the home.  He held

7          meetings with his siblings to see if they

8          could come together to raise money, could

9          pool the resources together to improve the

10         home condition.

11    Q    Now I would like to talk about Keith's

12         exposure to guns, gangs, crime and violence.

13         Let's talk first about Keith's exposure to

14         guns.  What did you learn about that?

15    A    I learned that Keith's -- that it was easy

16         for the kids in the complex to purchase a

17         gun from what was called the candy lady.

18         There was a person who sold candy out of her

19         apartment, and in addition to selling candy,

20         she sold guns.  So any child could go down,

21         if they had the money, and purchase a gun.

22    Q    Did Keith purchase a gun from the candy

23         lady?

24    A    Yes, that's what was reported to me.

25    Q    And when did Keith start carrying a gun?

1    A    After Victor was shot.

2    Q    Why is exposure to guns a risk factor?

3    A    It just increases the opportunity for

4         violence.

5    Q    Does it make a difference as to whether

6         you're exposed to people having guns for,

7         say, hunting as opposed to guns used for

8         illicit of purposes?

9    A    Yes, because in hunting you're looking at a

10        more socialized activity or sport.  But when

11        you're living in the housing project, you

12        know, the only sport would basically be

13        shooting each other.

14             MS. CASEY:  Objection, Your Honor.

15        There is no foundation for that opinion or

16        for her to draw that conclusion.

17             THE COURT:  Where are we in this

18        report?

19             MS. WALKER:  Excuse me?

20             THE COURT:  Where are we in this

21        report?

22             MS. CASEY:  Page 26 or --

23             THE COURT:  22?

24             MS. CASEY:  20.

25             MS. WALKER:  I mean, if you're

1     wondering how much longer we have, I would

2     say probably another 15 or 20 minutes.

3           THE COURT:  Let's move on.

4  Q    And we've talked some about Keith's exposure

5     to gangs; is that right?

6  A    Yes.

7  Q    Was Keith ever a gang member?

8  A    It was described that Keith, and reported by

9     Keith himself, that he started a little gang

10    referred to as the Pee Wee Gangsters.  After

11    he realized that he couldn't protect himself

12    from the larger organized gangs, just a

13    group of his friends, just so they could

14    just watch each other's back is how it was

15    described to me.

16  Q   And about what age was it when Keith formed

17    the Pee Wee Gangsters?

18  A   Eight or nine.

19  Q   And was Keith a member of a gang when he was

20    in prison in Illinois?

21  A   Yes, he was.

22  Q   Did he join a gang when he went to prison?

23  A   You know, research indicates that once you

24    are incarcerated and you come from a certain

25    neighborhood, you're basically known and

1      associated with the gangs associated in that

2      neighborhood.

3                   MS. CASEY:  Objection,

4      non-responsive.  The question was if he --

5                   THE COURT:  Sustained.

6    Q   Did Keith join -- Do you know if Keith

7      joined --

8    A   Yes.  He was associated with the gangs

9      associated with the neighborhood that he

10      lived in.

11   Q   Now I want to discuss some of the violence

12      outside of the home that Keith was exposed

13      to.  This slide is a little hard to read,

14      but does this summarize some of the violence

15      outside of the home that Keith was exposed

16      to?

17   A   Yes, it does.

18   Q   Okay.  I don't want to repeat the things

19      that we've already talked about.  What I

20      think we haven't talked about is the third

21      one where it says Victor at the age of 13

22      was held by his ankles out of a 15-story

23      window by gang members; is that accurate?

24   A   Yes.

25   Q   And it says that Victor witnessed a murder.

1      Do you know the circumstances of that?

2   A   Victor described it as he was walking down

3      the street and a car drove past and they

4      stopped, threw a body out in front of him

5      and drove off.

6   Q   And it says that Willie --

7            MS. CASEY:  Objection, Your Honor.

8      I would just like to have her testify as

9      what violence was in the neighborhood rather

10     than her reading off a list and letting her

11     confirm it.

12           THE COURT:  Well, and I think that

13     the question here is how the -- What did

14     Keith Gavin know and when did he know it?

15     The fact that there were other violent acts

16     observed by or which involved other family

17     members or other people in the neighborhood

18     have to be in some way tied back to Keith

19     Gavin to give this witness a basis on which

20     to draw some opinions about the affect on

21     Keith Gavin.  So the fact that Victor saw

22     somebody murdered and dumped out in the

23     street in front of him doesn't tell me

24     anything.

25           MS. WALKER:  Perhaps I could ask

1   Dr. Paramore some questions to have her try

2   to link that up for us.

3          THE COURT:  Well, what I want to

4   know is -- I mean, I think it's pretty clear

5   that Mr. Gavin grew up in a dysfunctional

6   family and that he lived in and was raised

7   in an area where there was a lot of

8   violence.

9          MS. WALKER:  Yeah, although I think

10   the State's expert is going to attempt to

11   dispute that.

12          THE COURT:  Well, I have a lengthy

13   report here which may or may not -- I don't

14   remember what it says about Victor's

15   exposure to acts of violence, but what

16   Victor was exposed to is irrelevant to me

17   unless you can tie it back to Keith Gavin in

18   some way.  Let's take a break for a few

19   minutes.  How about seeing if you can figure

20   out a way for us to get through.  We'll take

21   10 minutes.

22          (Recess)

23          (Proceedings resumed)

24          MR. MAZE:  Judge, before we start,

25   remind me before we go to lunch what we had

1       talked about yesterday as far as adding a

2       second witness.  We're going to want to add

3       the Sheriff and just show him some pictures

4       that we took that go directly to what Mr.

5       Gavin testified to yesterday.  We'll just

6       show the Court and counsel the pictures

7       before lunch just so nobody is kind of

8       caught off guard on what we're trying to do.

9       He'll be, like, three minutes.  He's just

10      authenticating them.

11              THE COURT:  Okay, we'll talk about

12      them before we leave here.

13              MR. MAZE:  I just wanted to bring

14      it up before I forgot.

15              THE COURT:  Thank you.

16              DIRECT EXAMINATION RESUMED

17      BY MS. WALKER:

18      Q    Dr. Paramore, I'm going to try to speed

19           things along a little bit here.  Was Keith

20           the victim of gang violence when he was

21           incarcerated in Illinois?

22      A    Yes, he was.

23      Q    What can you tell us about that incident?

24      A    He was, I believe, stabbed and subsequently

25           sent to the hospital, stabbed numerous

1          times.

2     Q    And was it your understanding that it was a

3          gang related stabbing?

4     A    Yes, it was.

5     Q    And Mr. Gavin was hospitalized for that?

6     A    Yes, he was.

7     Q    And was he then transferred to a different

8          prison?

9     A    Yes.

10    Q    And, now, just focusing on Keith's personal

11         exposure to guns, gangs and violence, what

12         in your view are the implications of that

13         for understanding Keith as a person?

14    A    First of all, you have to look at his

15         predispositions, you know, in the family.

16         You have significant history of prostitution

17         in his family, drug abuse, incarcerations,

18         criminal activity.  Some of the criminal

19         activity was supported by the father and he

20         actually benefited from some of that.  When

21         you look at all of the risk factors, those

22         things influence his life and the decisions

23         that he made in addition to the environment

24         that he lived in.

25    Q    Let's turn to the last two risk factors that

1              we're going to discuss.

2                          MS. WALKER:  Caroline, this is on

3              slide 18.  Thank you.

4     Q        The first one is disrupted schooling.  Is it

5              your opinion that Keith Gavin's schooling

6              was disrupted?

7     A        Yes.

8     Q        And what is the basis for that opinion?

9     A        When Keith was 13 he was involved in a

10             burglary, and as a result of that, when he

11             returned to school -- and, you know what,

12             I'm not really sure in terms of whether he

13             was sent to a vocational school, part of

14             that was because of, you know, the charges.

15             The other part was because of the academic

16             process and maybe with him not achieving up

17             to his potential.  He was sent to a

18             vocational school, and because of that had

19             difficulties graduating on time and with his

20             class, had to attend summer school prior to

21             his eighth grade graduation.  And also while

22             in eleventh grade he was arrested and once

23             he was released, was not allowed to return

24             to his high school.  And I believe that made

25             a major impact on his life because he

1       enjoyed school, that was a positive outlet

2       for him.  He was sent to an alternative

3       school and had to cross gang territory to

4       get there.  And because of that discomfort

5       and the risk involved in that, he eventually

6       was not able to complete his high school.

7    Q  Is it also your opinion that Keith's low

8       socioeconomic status was a risk factor?

9    A  Yes.

10   Q  And, obviously, it's a common circumstance

11      for people to have low socioeconomic status,

12      you're not suggesting that poverty causes

13      people to commit a crime, are you?

14   A  No, absolutely not.

15   Q  So why is that a risk factor for Keith?

16   A  It limited his exposure, you know, to

17      certain things and his outlet.  Keith had

18      limited interventions and resources

19      available to him to assist him in making

20      alternate decisions and choices in his life.

21   Q  Is it your opinion that Keith's low

22      socioeconomic status compounded some of the

23      other risk factors we've discussed?

24   A  Yes.

25   Q  And why is that?

1   A   Keith remained in the neighborhood that he

2       lived in because of his low SES level.

3       Because of his income level, he was eligible

4       to continue to live in the projects and

5       living there compounded everything in terms

6       of his exposure to the risk.

7   Q   And I think you said before, you reviewed

8       Dr. King's notes of his interview with

9       Keith; is that right?

10  A   Yes, I did.

11  Q   And you're aware that Dr. King's interview

12      notes state that Keith told him, quote, we

13      wasn't rich, but we wasn't poor?

14  A   Yes.

15  Q   Do you recall that?  Does that statement by

16      Keith make you question whether the Gavins

17      had a low socioeconomic status while Keith

18      was growing up?

19  A   I'm sorry, could you repeat the question?

20  Q   Does the fact that Keith said that to Dr.

21      King make you question whether he, in fact,

22      had a low socioeconomic status growing up?

23  A   No.  It was obvious he had a low SES level

24      when he was growing up.

25  Q   Why do you say that?

1    A    Once again, he had to meet the income

2         criteria in order to be allowed to continue

3         to live in the projects.   In addition to

4         that, the father worked, but the father also

5         gambled, so they had limited income, and

6         Keith worked really hard to expose his

7         siblings to things outside of the

8         neighborhood.   So it is not unusual to want

9         to minimize your level in society when you

10        work so hard to overcome it.

11   Q    Now I would like to talk about the

12        protective factors in Keith Gavin's life.

13        Can you remind us quickly what protective

14        factors are?

15             MS. CASEY:   Objection, asked and

16        answered.

17             THE COURT:   Go ahead.

18   Q    In your research, Dr. Paramore, were you on

19        the lookout for protective factors that

20        might have applied to Keith?

21   A    Yes, I was.

22   Q    So in your research, you weren't just

23        looking for risk factors?

24   A    No.

25   Q    And did you identify any protective factors

```
 1              for Keith?
 2      A       Yes, I did.
 3      Q       And what are those?
 4      A       His mother and two of his adult friends.
 5      Q       How is Keith's relationship with his mother
 6              a protective factor?
 7      A       Because she loved him and they had a good
 8              relationship, she wanted to protect him.
 9              However limited in parenting, she still
10              wanted to support him in any way possible.
11      Q       And who is Mary Ann Morris?
12      A       She's an adult friend and also the mother of
13              Keith's childhood girlfriend.
14      Q       How did you come to identify Mrs. Morris?
15      A       She was named by Keith.
16      Q       And did you interview Mary Ann Morris?
17      A       Yes, I did.
18      Q       And did you say that Keith also mentioned
19              her when you interviewed him?
20      A       Yes.
21      Q       And what did you learn about their
22              relationship?
23      A       They had a good relationship.  Keith
24              supported her as much as she supported him.
25              She said she had known Keith since before
```

469

1          the age of seven and as well as his siblings

2          and his parents.  He would run errands for

3          her and it was significant her to that he

4          didn't charge her anything, didn't ask for

5          any money.  When she needed things, like her

6          phone was off or electricity was off, Keith

7          would often pay to have those services re-

8          connected.

9     Q    Would you characterize their relationship as

10         being one of role reversal as well?

11    A    Yes, I would.

12    Q    And did Keith also have a relationship with

13         Mrs. Morris' daughter?

14    A    Yes.

15    Q    And what did you learn about that?

16    A    He really cared for Patsy was her name, and

17         asked her to marry him.  And I think it was

18         significant because I believe at the time he

19         was 17, Keith felt that by marrying Patsy

20         and having his own family, it would kind of

21         pull him from some of the major

22         responsibilities for caring for his family

23         and, you know, his siblings and his nieces

24         and nephews and kind of give him a break

25         from that.  This is my family now, this is

470

1           who I'm responsible for.

2    Q     Did Patsy Morris agree to marry Keith?

3    A     No, she didn't.

4    Q     And what happened to Patsy?

5    A     The mother reports that Patsy is addicted to

6           drugs and lives in the streets.

7                   MS. CASEY:  Objection, relevance.

8                   THE COURT:  Overruled.

9    Q     And who is Deloris Coleman?

10   A     She's another adult friend from the

11          neighborhood.

12   Q     And how did you learn about Mrs. Coleman?

13   A     From Keith.

14   Q     And did you interview her?

15   A     Yes, I did.

16   Q     And what did she say about her relationship

17          with Keith?

18   A     Once again, very similar to Mrs. Morris,

19          they had a good relationship.  She had known

20          Keith since the age of seven, as well as his

21          siblings.  Her daughter and Elaine were best

22          friends and she saw Keith as someone who

23          worked really hard to try and protect and

24          take care of his family, and he was good to

25          the senior citizens in the complex.

1    Q    In your opinion, did the risk factors in

2         Keith's life outweigh the protective

3         factors?

4    A    Yes.

5    Q    Was any of the mitigation evidence we've

6         discussed today presented at Mr. Gavin's

7         sentencing hearing?

8    A    Not to my knowledge, they were not.

9    Q    And in your opinion, was the jury given any

10        insight into Mr. Gavin's life history?

11   A    They were not to my knowledge.

12   Q    And you obtained a lot of the evidence that

13        forms the basis for your opinions by

14        interviewing Keith's family members; is that

15        right?

16   A    Yes.

17   Q    Is it a customary approach to doing a

18        mitigation assessment to interview family

19        members?

20   A    Yes.

21   Q    And friends?

22   A    Yes.

23   Q    Do you have any reason to believe that this

24        information was not available at the time of

25        Keith's original trial?

1    A    No.  I believe it was available.

2    Q    And are you aware that Annette Gavin

3         testified at Keith's sentencing hearing?

4    A    Yes.

5    Q    Could she have told the jury about most of

6         the facts you've discussed today?

7                   MS. CASEY:  Objection, speculation.

8                   THE COURT:  Overruled.

9    Q    You can go ahead and answer.

10   A    I believe it would have been difficult for

11        Mrs. Gavin under testimony to share personal

12        and sensitive issues in her life, and also

13        to recall particular information.  It did

14        take her a while to be able to reflect and

15        to recall information with me, and that is

16        why it took at least five visits with her,

17        in addition to numerous phone conversations.

18   Q    So if you were to assume that,

19        hypothetically, that Keith's trial counsel

20        had not discussed any of these issues with

21        her in advance, would that have made it

22        difficult for her to testify to them?

23   A    Yes, it would.

24                   MS. WALKER:  That's all I have,

25        Your Honor.

1          THE COURT:  Thank you.

2                  CROSS EXAMINATION

3     BY MS. CASEY:

4     Q     Mrs. Paramore, you're a licensed school

5           psychologist; is that correct?

6     A     Actually, it's Dr. Paramore.

7     Q     I'm sorry, Dr. Paramore, you're a licensed

8           school psychologist?

9     A     Yes, I am.

10    Q     You work in schools?

11    A     Yes, I do.

12    Q     Do you have your own practice?

13    A     No, I don't.

14    Q     Are you under the laws of the state of

15          Illinois allowed to practice outside of a

16          school?

17    A     Yes, I am.

18    Q     As a psychologist?

19    A     Yes, I am.

20    Q     What type of psychology can you practice?

21    A     Clinical.  Clinical or school psychology.

22    Q     What kind of clinical psychologist training

23          do you have?

24    A     I'm certified under LCPC to perform clinical

25          activities in addition to diagnosis,

1               treatment planning, supervision.

2        Q     So what clinical experience do you have?

3        A     I've worked as a therapist in mental health

4               in the state of Mississippi.  I've worked as

5               a clinical social worker in the state of

6               Nevada, and I perform clinical duties as a

7               psychologist in Chicago Public School

8               System.

9        Q     I'm asking you what is a clinical duty?

10       A     I didn't understand that to be the question.

11       Q     What is a clinical duty?

12       A     Diagnosis, therapeutic intervention,

13              treatment planning.

14       Q     And as a school psychologist, you can

15              diagnosis people and give them treatment?

16       A     As an LCPC Certified Psychologist, yes, I

17              can.

18       Q     LCPC is not a Certified Psychologist, LCPC

19              is a Licensed Clinical Professional

20              Counselor.

21       A     I can still perform the duties that you

22              described with an LCPC.

23       Q     Are you allowed to write out prescriptions

24              for people?

25       A     No, I'm not a psychiatrist.

```
1    Q    Okay, are you allowed to go into hospitals
2         and perform any type of evaluations?
3    A    Yes, I am.
4    Q    Oh, you're allowed to go into --
5    A    If I'm employed in a capacity where I'm
6         allowed to go into that particular hospital,
7         yes.
8    Q    But you're not?
9    A    I'm employed by the Chicago Public School
10        System and the Public Defender's Office.
11   Q    Back to my question, you're not employed by
12        anyone that allows you to go into hospitals
13        and make diagnosis.
14             MS. WALKER:  Objection, relevance.
15             THE COURT:  I'm not sure that --
16        I'm not sure I understand the question.
17        Let's make sure that she does.
18             MS. CASEY:  Okay, I'm asking her at
19        this point is she able to go into any type
20        of hospital or clinic to make diagnosis?  I
21        believe she's overstated her qualifications
22        and our witness will point that.  I'm just
23        trying to get out what she says --
24             THE COURT:  What do you mean by is
25        she able to go?  I think that may be --
```

476

1    Q      Are you licensed to go into a hospital and

2           perform any type of diagnosis?

3    A      Not if I'm not working in the capacity to do

4           that.  You can't just walk into a hospital

5           and begin working with patients.

6    Q      Have you ever held my type of license that

7           you did that?

8    A      I haven't worked in that capacity.

9    Q      In this case I'm looking at your report,

10          page two, your sources in this case you said

11          you spoke to Keith Gavin in person?

12   A      Yes, I did.

13   Q      How many times did you speak to him?

14   A      Once.

15   Q      When was that?

16   A      2006, I believe.

17   Q      Do you recall what time of the year?

18   A      I believe it was March.

19   Q      Do you know how long you spoke to him?

20   A      Approximately three hours.

21   Q      Okay.  And Annette Gavin, when did you speak

22          to her?

23   A      I don't recall as I did.

24   Q      When did you speak to Sharon Gavin?

25   A      I don't have a list of the dates that I

```
 1              spoke with the people I interviewed.

 2     Q        So you can't tell me when you spoke to Keith

 3              Gavin, Annette Gavin, Sharon Gavin, Geanetta

 4              Gavin, Elaine Gavin, Dwayne Gavin, Jerry

 5              Gavin or Mary Ann Morris?

 6     A        I have the dates in my notes, I do not have

 7              the dates available to me now to give you

 8              those dates.

 9     Q        You can get your notes.  We can wait for to

10              you get them to look at.

11     A        I don't have my notes with me.

12     Q        You didn't bring your notes with you to

13              testify?

14     A        No.

15     Q        Did you provide those notes to counsel?

16     A        I believe they have the dates, yes, but I

17              don't know if they have them with them.

18     Q        Did you attach that to your report?

19     A        What?

20     Q        The dates that you interviewed these people.

21     A        I don't recall if it's in these notes.

22     Q        Okay.  The phone interviews that you had

23              with Victor Gavin, do you know when that

24              was?

25     A        No, I don't have the exact dates with me.
```

478

1    Q    Do you know how long that lasted?

2    A    With Victor?  No, I don't recall.

3    Q    Do you know Sharon Gavin, when you spoke to

4         her?

5    A    I spoke with Sharon several times, I don't

6         have the exact dates.

7    Q    Do you know how long that lasted, total, you

8         spoke to her?

9    A    I don't recall.

10   Q    Nicole Gavin, when did you speak to her?

11   A    It's the same thing for any of them, I don't

12        have any of the dates with me.

13   Q    So you can't tell this Court when you spoke

14        to any of these witnesses today in court?

15        You can't sit and tell Judge Rains when you

16        spoke to any of these witnesses?

17   A    Not the exact date, no.

18   Q    Can you tell him how long you spoke to any

19        of these witnesses?

20   A    Not the exact time, no.

21   Q    I want to look at your Appendix B, the

22        records you reviewed.  Is this a list of the

23        records you reviewed in making your -- doing

24        your mitigation report?

25   A    Yes.

```
1    Q    The Circuit Court of Cook County Adult
2         Probation Pre-sentencing Social
3         Investigation Report?
4    A    If it's listed there, yes.
5    Q    The City of Chicago arrest record?
6    A    Yes.
7    Q    And whose arrest record was that?
8    A    Mr. Gavin.
9    Q    Keith Gavin, the defendant?
10   A    Yes.
11   Q    Okay.  And the Office of State Attorneys
12        arrest record; would that have been of Keith
13        Gavin?
14   A    Yes.
15   Q    Illinois Department of Law Enforcement
16        transcript, what would that have been a
17        transcript of?
18   A    These documents were all related to Mr.
19        Gavin.
20   Q    But what was it a transcript of?
21   A    His incarceration history.
22   Q    Transcript from his first trial or a
23        transcript -- it's going to have to be a
24        transcript of some type of court proceeding,
25        what type of court --
```

1   A   I don't recall.

2   Q   But you reviewed it in making your

3       conclusions?

4   A   Yes, I did.

5   Q   And you don't recall.  Do you have that

6       transcript with you?

7   A   No, I don't.

8   Q   The FBI Investigation Crime Information

9       Report.  Who was that related to?

10  A   Mr. Gavin.

11  Q   And what was the contents of that report?

12  A   Information related to an arrest at that

13      time.

14  Q   Which arrest?

15  A   The one in the report, 584 560 R8.

16  Q   That's what I'm asking you.  What crime or

17      what investigation was -- what were they

18      investigating at 584 560 R8?

19  A   I don't have that with me.

20  Q   You don't remember?

21  A   I don't have it with me, no.

22  Q   My question is do you remember what that was

23      about?

24  A   No, I don't.

25  Q   But you used that in making this report?

1    A    Yes.  At that time I had it with me.

2    Q    You were aware you were coming to trial

3         today to testify about this case, aren't

4         you?

5    A    Yes.

6    Q    And as a part of testifying, to review your

7         report?

8    A    Yes.

9    Q    And you did that?

10   A    Yes, I did.

11   Q    And you still don't recall several of these

12        things that you reviewed?

13   A    No, I don't.

14   Q    You reviewed memos of interviews of the

15        Gavin family.  Whose memos were those?

16   A    The ones admitted by defense team.

17   Q    Do you know where those memos came from?

18   A    From their interview with Mrs. Gavin.

19   Q    It says Gavin family.  How many memos were

20        there?

21   A    I believe there were several memos related

22        to Mrs. Gavin and other family members,

23        Sharon, that was submitted by defense team.

24   Q    Do you know who did interviews?

25   A    Yes, members of the defense team.

```
 1     Q     But you didn't do the interviews of the

 2           memos that you have, those weren't

 3           interviews that you did?

 4     A     No.

 5     Q     Did you prepare any memos or any notes from

 6           those interviews that you did?

 7     A     No.  No.

 8     Q     So you have notes that says when you talked

 9           to them, but you didn't take any notes while

10           you were interviewing them?

11     A     No.

12     Q     You interviewed --

13                 MS. WALKER:  Your Honor, I don't

14           think the witness understands the question.

15                 MS. CASEY:  Your Honor, that's not

16           an objection.

17     Q     I'm going to ask again, you took no notes

18           while you were interviewing the Gavin

19           family?

20     A     Oh, yes, I did.

21     Q     Oh.  Did you make memos?

22     A     I don't understand the question.

23     Q     Did you write down those -- Were those notes

24           written?

25     A     No.  Just notes.
```

| | | |
|---|---|---|
| 1 | Q | Did you write the notes down that you took? |
| 2 | A | Yes, I did. |
| 3 | Q | And you gave those to defense counsel? |
| 4 | A | No, I did not. |
| 5 | Q | Do you have those with you? |
| 6 | A | I gave the results of the notes to the |
| 7 | | defense team in the form of the report.  The |
| 8 | | notes were used to develop the report. |
| 9 | Q | And you don't have those notes with you? |
| 10 | A | No, I don't. |
| 11 | Q | I've never seen those notes. |
| 12 | A | They don't have those notes. |
| 13 | Q | You said that you reviewed the state of |
| 14 | | Illinois Department of Corrections |
| 15 | | disciplinary record; that of Mr. Gavin? |
| 16 | A | Yes. |
| 17 | Q | And you reviewed the Adjustment Committee |
| 18 | | summary? |
| 19 | A | Yes. |
| 20 | Q | And you reviewed work assignments? |
| 21 | A | Yes. |
| 22 | Q | And are you aware of what type of work Mr. |
| 23 | | Gavin did while he was in the department of |
| 24 | | Illinois corrections? |
| 25 | A | He worked in medical records. |

1   Q   Anything else?

2   A   Clerk positions.

3   Q   Anything else?

4   A   Not that I recall in detail.

5   Q   Are you familiar with the fact that he did

6       plumbing work?

7   A   Yes, I am.

8   Q   Okay.  What other -- That's all the work you

9       remember, though?

10  A   I'm sorry?

11  Q   You don't remember any other work history?

12  A   No.

13  Q   So if Mr. Gavin testified he did more than

14      those three, you would just not remember

15      that from that report?

16  A   That was not part of my interview with Mr.

17      Gavin.

18  Q   You didn't ask Mr. Gavin about what kind of

19      work he did in the Illinois Department of

20      Corrections?

21  A   My role as mitigation specialist was to deal

22      with Mr. Gavin's life, not his incarceration

23      history.

24  Q   So your job was to look at all the bad stuff

25      and ignore the good stuff.

1              MS. WALKER:  Objection,

2         argumentative and mischaracterizes the

3         record.

4              THE COURT:  Sustained.

5    Q    You didn't talk to him about anything that

6         happened, any work he did in the Department

7         of Corrections?

8    A    That was not my role, no.

9    Q    But you just testified earlier that he had

10        been stabbed several times or attacked by

11        gangs in the Department of Corrections.

12   A    You asked me if I reviewed the records and I

13        indicated yes, but that was not part of my

14        role and responsibilities to be concerned

15        with incarceration history.

16   Q    But wouldn't it be important that you do

17        that in determining mitigation in this case?

18   A    Not in my opinion.

19   Q    So 17 years that Mr. Gavin spent in the

20        Illinois Department of Corrections, you

21        would say it was not important to

22        mitigation?

23   A    It was not my role at the time to

24        investigate his incarceration history.

25   Q    Did you rely on any of that in coming to

1          your conclusions?

2     A    No, I did not.

3     Q    So 17 years of Mr. Gavin's life are not even

4          included in any of the reports that you

5          created?

6     A    My role was to look at his life prior to his

7          incarceration.

8     Q    That wasn't my question, Dr. Paramore.  My

9          question was you didn't include 17 years of

10         his life in your report?

11    A    I did not.

12    Q    Those were the 17 years previous to this

13         murder?

14    A    That was not my role.

15    Q    That's not my question.  The 17 years he was

16         in the Illinois Department of Corrections

17         was the 17 years directly prior to this

18         murder?

19    A    What is the question?  I don't understand

20         the question.

21              MS. WALKER:  Your Honor, and I

22         object to this line of questioning.  As

23         counsel knows full well, we have a separate

24         expert to discuss Mr. Gavin's time in the

25         Illinois Department of Corrections.

1          THE COURT:  Well, this is a person

2     who appears here today as a mitigation

3     expert, and the question is are those 17

4     years that Mr. Gavin spent in the state

5     penitentiary in Illinois relevant to her

6     findings with respect to mitigation?  And

7     she's apparently taken the position that

8     they are not relevant.  I find that a little

9     bit surprising, quite frankly.

10          MS. WALKER:  I don't believe that

11    Dr. Paramore has been asked that question.

12          THE COURT:  Well, she hasn't

13    answered the question very directly, and I

14    think the question has been asked very

15    directly.  Let's move on.  Ask the question

16    again and let's get an answer.

17   Q    Okay.  Do you believe that the 17 years that

18        Mr. Gavin was in the Department of Illinois

19        Corrections, which was the 17 years previous

20        to this crime, do you believe those were

21        important to your determination of

22        mitigation?

23   A    I believe that they're important,

24        absolutely, in terms of mitigation.  But

25        once again, my role was clearly defined.  We

```
 1              had another psychologist who was responsible

 2              for the other part that you are asking about

 3              and that was not my responsibility.

 4      Q      So as a mitigation specialist, you pick and

 5              choose what you look at?

 6      A      No.  As a member of the defense team, my

 7              role was very clearly defined in terms of

 8              what was expected.

 9      Q      So you're a member of the defense team now?

10      A      Mitigation specialists are members of the

11              defense team.

12      Q      You didn't talk to Mr. Gavin about any of

13              the years that he was in prison?

14      A      No, I don't recall discussing issues in

15              prison.

16      Q      You just testified earlier that he was

17              attacked in prison by a gang several times

18              on direct.

19                    MS. WALKER:  Objection,

20              mischaracterizes the testimony.

21                    MS. CASEY:  Your Honor, she

22              testified, I have the notes written right

23              here.

24                    MS. WALKER:  She did not testify he

25              was attacked several times in prison.
```

```
 1                    THE COURT:  I'm looking back at her
 2          report.  I know that she did say at page 24
 3          -- no, I'm sorry, that's not the right page.
 4          I do think that the report includes, and I
 5          think her testimony includes, and I'm not
 6          going to go back and try to study my notes
 7          right now, but she has spoken to some of the
 8          experiences that Mr. Gavin had while in
 9          prison.  Now, whether she said that he was
10          stabbed several times in prison, I don't
11          recall.
12                    MS. CASEY:  And I can withdraw that
13          and ask it a different way, Your Honor.
14                    THE COURT:  Okay, thank you very
15          much.
16     Q    You testified earlier about violent
17          experience that Mr. Gavin had while in the
18          Illinois Department of Corrections, correct?
19     A    I said I reviewed the records indicating the
20          experience that he had.
21     Q    You never discussed -- you reviewed all
22          these records, but never discussed it with
23          Mr. Gavin?
24     A    My opportunity to personally interview Mr.
25          Gavin was limited.
```

| | | |
|---|---|---|
| 1 | Q | You're saying that -- |
| 2 | A | My focus was basically with his childhood |
| 3 | | history.  I do not recall in depth |
| 4 | | interviews regarding incarceration with Mr. |
| 5 | | Gavin. |
| 6 | Q | Okay.  Did you ever ask defense counsel to |
| 7 | | re-interview Mr. Gavin, for more time? |
| 8 | A | No. |
| 9 | Q | You testified that he had had some, a |
| 10 | | violence in the Illinois Department of |
| 11 | | Correction.  Do you know whether or not he |
| 12 | | provoked any of that violence? |
| 13 | A | I testified that I read the reports. |
| 14 | Q | Based on the reports, are you aware of |
| 15 | | whether or not he provoked any of that |
| 16 | | violence? |
| 17 | A | No, I'm not aware. |
| 18 | Q | Going back to your Appendix B, you reviewed |
| 19 | | State of Illinois Department of Corrections |
| 20 | | Adjustment Committee summary, the Offender |
| 21 | | Tracking System-transfer reports, work |
| 22 | | assignments and medical records; is that |
| 23 | | correct, from the Illinois Department of |
| 24 | | Corrections? |
| 25 | A | Yes. |

| | | |
|---|---|---|
| 1 | Q | And then interview transcripts of Keith |
| 2 | | Gavin.  What interview transcripts did you |
| 3 | | review? |
| 4 | A | Those were the interview transcripts by the |
| 5 | | defense team. |
| 6 | Q | Okay, how much or how many transcripts were |
| 7 | | there?  How big was the transcript? |
| 8 | A | They were from several different team |
| 9 | | members. |
| 10 | Q | Okay.  When was the interview done? |
| 11 | A | I don't have the dates in front of me. |
| 12 | Q | Was it more than one occasion? |
| 13 | A | Yes, it was. |
| 14 | Q | How was it recorded? |
| 15 | A | I'm sorry, I don't understand the question. |
| 16 | Q | How were those interviews recorded in order |
| 17 | | to have a transcript?  Was it by a tape? |
| 18 | | How do you know -- |
| 19 | A | Yes. |
| 20 | Q | So they took a tape into Holman and recorded |
| 21 | | interviews? |
| 22 | A | Yes. |
| 23 | | THE COURT:  Excuse me for |
| 24 | | interrupting you just a second.  I want to |
| 25 | | ask her a question at this point about her |

1       Appendix B.  You indicated earlier that you

2       reviewed memos of interviews of Gavin

3       family, that's about mid-way down on your

4       Appendix B, and then, of course, the last

5       entry on Appendix B is interview

6       transcripts.  And I think in response to the

7       questions respecting both of those entries,

8       you've said that those were interviews

9       conducted by the defense team, not your

10      interviews.  Am I right about that?

11   A   Yes, sir.

12              THE COURT:  So this report where

13      you have a list of people that were

14      interviewed beginning on page 14, Elaine,

15      Victor, Steven and so forth on over for a

16      couple of pages from that, did you interview

17      those people or did someone else interview

18      those people?

19   A   No, I interviewed them.

20              THE COURT:  And would I understand,

21      then, that there are interviews of people

22      other than those people whose names appear

23      in this report?

24   A   No, there were interviews that were

25      conducted prior to my involvement that I

1    reviewed, but I interviewed everyone that I

2    documented in this report personally.

3              THE COURT:  All right.  Well, were

4    there people other than the ones who are

5    named in this report who gave interviews

6    that you reviewed -- that gave interviews to

7    other people, to the defense team, and you

8    reviewed those interviews, that you did not

9    include in this report, and if so, why?

10   A    Okay, let me make sure I understand the

11       question.

12              THE COURT:  Well, let's suppose

13       that one of the lawyers over here at this

14       table goes out and interviews John Doe.

15   A    Okay.

16              THE COURT:  And John Doe tells them

17       that -- gives them information about Keith

18       Gavin that they make a memorandum of or

19       notes of or a report about, or that Mr. John

20       Doe gives a tape recorded statement.  And

21       the defense team gives you that report of

22       that interview, either in its tape recorded

23       form or its written form.

24   A    Okay.

25              THE COURT:  And you decided that

1         you would or would not use it in this

2         report.  I want to know whether any such

3         interviews, and, if they are not included in

4         here, I want to know why.

5    A    There are interviews.  I did not take

6         information from their interviews for my

7         report because I gathered my own information

8         from my interviews.  There were people, I

9         believe, that were interviewed that I did

10        not even list or include because that wasn't

11        -- I didn't feel that was the focus that I

12        wanted to take in my investigation.  There

13        were people I believe that the investigator

14        had interviewed that was not related to, I

15        felt was not related to information I was

16        trying to get for Mr. Gavin's life.

17             THE COURT:  Well, if the opposite

18        of mitigation is aggravation, were there

19        interviews done which might be classified as

20        evidence in aggravation rather than evidence

21        in mitigation which you did not include in

22        the report because your job was to focus on

23        mitigation only?

24   A    I believe the information that they had that

25        I reviewed in their reports was very similar

1    to the information that I retained from the

2    family.  But I reviewed the documents just

3    to review the documentation because they

4    sent me the documentation.  I wanted to

5    conduct an independent investigation for my

6    purpose without including information that

7    was related to what they were looking for in

8    their interviews.  Part of the interviews

9    that they conducted included information

10   related to the trial, and that wasn't my

11   focus.  So I just reviewed them just to

12   review the documentation, but I didn't

13   include that information in my report.

14            THE COURT:  When you conduct a

15   mitigation study, and I understand you've

16   done this four times before this case; is

17   that right?

18   A    Yes.

19            THE COURT:  This is number five?

20   A    Yes.

21            THE COURT:  If you come upon

22   information which you feel is damaging to

23   the defendant, and information which is not

24   in mitigation of the crime, but, in fact, is

25   an aggravating factor, what do you as a

1          mitigation specialist do with that

2          information?

3    A     I report it.

4                    THE COURT:   To who?

5    A     To the defense team.

6                    THE COURT:   Okay.   It's not

7          included in your written report?

8    A     Yes, it is.   I report it in written form to

9          the defense team.

10                   THE COURT:   So if you found any

11         such information, would it be in this

12         report?

13   A     Yes, it would.

14                   THE COURT:   Since there is nothing

15         in this report that you classify as an

16         aggravating factor or aggravating

17         information, may I conclude from that that

18         you found no other information which you

19         found to be aggravating?

20   A     No, all the information I found is included

21         in this report.

22                   THE COURT:   Okay.   I didn't mean to

23         take over from you, I'm sorry.

24                   MS. CASEY:   I can make a point,

25         Your Honor, I think to answer your question

1    that you're going after if you will give me

2    just one or two questions about that

3    question you just asked.

4              THE COURT:   Okay, go ahead.

5    Q    On direct testimony you testified that Mr.

6         Gavin had committed burglary at the age of

7         13; is that correct?

8    A    Yes.

9    Q    Can you point out in your report where you

10        listed that he had committed burglary at the

11        age of 13?

12   A    I know I documented that he committed

13        illegal acts in order to attain financial

14        gains to support the family.  That is the

15        reference to that.

16   Q    You said it disrupted his schooling, didn't

17        you?  That the reason --

18              THE COURT:   That was, it says he

19        got shot in self-defense.

20              MS. CASEY:   But what I'm getting at

21        is on page 23 she said that he committed

22        burglary, and that's the reason why in

23        eighth grade he had to go to summer school.

24        If you look at page 23, she said he failed

25        to meet the requirements needed for

1           completion of eighth grade, she doesn't

2           refer to that burglary as the reason why he

3           didn't finish eighth grade.  Now, when you

4           turn the page, she said during the eleventh

5           grade he shot a man in self-defense.  She

6           included that.  She didn't include the

7           burglary which disrupted schooling, which

8           she testified earlier prevented him from

9           finishing the eighth grade and required him

10          to go to summer school.

11      A   But I said I wasn't sure whether it was the

12          burglary or his school performance the

13          reason they transferred him to the

14          vocational center.

15      Q   But the point is, you put in your report he

16          failed to meet the requirements.  You didn't

17          put in your report you're not sure whether

18          he failed to meet the requirements or it's

19          because he committed a burglary.  Is that

20          correct?  You didn't put the burglary part

21          in that, did you?

22      A   No, I don't see that in this part, no.

23      Q   So it's true there could be other

24          aggravating circumstances that you found

25          that you didn't include in your report?

1    A    No.   I received a copy of his school records

2         that indicated low performance after the

3         report was submitted.   And that's why I

4         testified in terms of additional records

5         that I was interested in, that's why I

6         included the school records was the one I

7         was interested in.

8    Q    But you said you didn't get those.   If you

9         could have gotten them -- you wanted school

10        records if you could get --

11   A    No, I did get them after the fact.

12   Q    You never amended your report, did you?

13   A    No.

14   Q    You didn't amend your report to say that you

15        reviewed those records, did you?

16   A    No, I didn't.

17   Q    Appendix B doesn't list his educational

18        records, does it?

19   A    I'm sorry?

20   Q    Appendix B where it lists the records you

21        reviewed doesn't include his educational

22        records, does it?

23   A    No, it does not.

24   Q    So are you saying there is a lot of other

25        stuff you reviewed that we don't know you

1           reviewed?

2    A      No.   That is why when asked what information

3           I needed to update, I included the

4           information that I received in the very

5           beginning of the testimony, the school

6           records.

7    Q      All right, just so I have it clear, Dr.

8           Paramore.   What other information, other

9           than what's listed in Appendix B did you

10          review that's not listed?

11   A      Those two pages of school records.

12   Q      So two pages of school records?

13   A      Yes.

14   Q      That's it?

15   A      That's it.

16   Q      But you would agree with me that on page 23

17          in disrupted schooling, you did not include

18          any information about a burglary that you

19          testified to.

20              MS. WALKER:   Objection, asked and

21          answered.

22              THE COURT:   Sustained, let's move

23          on.

24   Q      Okay.   Now, you just told Judge Rains that

25          as a mitigation specialist, it's important

1          to have an independent evaluation, right?

2     A    I said that I wanted to conduct my own

3          independent evaluation, that that was

4          important to me, yes, I did say that.

5     Q    You also said you reviewed all the memos

6          prior to interviewing the family members,

7          correct?

8     A    Well, I didn't say prior to.  They were not

9          all reviewed prior to my interviews with the

10         family because I had so many documents.  I

11         began my investigation prior to reviewing

12         all of the records that I had obtained from

13         the defense team.

14    Q    Okay.  So the family members that you

15         interviewed, did you read any of the memos

16         from defense counsel before you went to talk

17         to them?

18    A    No, I don't recall.

19    Q    And I think you made this comment several

20         times during direct that you need to review

21         someone repeatedly to exhaustion.

22    A    You need to -- If you find new information,

23         then you need to be able to go back to

24         review someone who may have relevant

25         information about the information that

1          someone else has reported.

2     Q    Okay.  And you testified that sometimes

3          people may remember things that an

4          individual might not remember about their

5          life?

6     A    Yes.

7     Q    Okay.  And in this case, did you find things

8          that Mr. Gavin didn't remember about his

9          life from family members?

10    A    Yes, I did.

11    Q    Did you go back and re-interview Mr. Gavin

12         after that to confirm or deny that

13         information?

14    A    The information came from Mr. Gavin, and I

15         re-interviewed someone else to discuss the

16         information with them.  I re-interviewed

17         Mrs. Gavin to discuss the information.

18    Q    Dr. Paramore, follow me for just a second.

19         You testified earlier that you've only

20         interviewed Mr. Gavin one time, correct?

21    A    Yes.

22    Q    And then you testified that there is some

23         information that Mr. Gavin didn't recall

24         that you got from other people, didn't you?

25    A    I don't believe I said there was information

1        that Mr. Gavin didn't recall.   I said there

2        is information sometimes when, not recalled,

3        that you may get information from other

4        people, from several sources.

5    Q    Did you get any information from other

6        sources concerning Keith Gavin's life?

7    A    Yes, I did.

8    Q    Did you ever go back and talk to Keith Gavin

9        about that information?

10    A    Actually, most of the information that

11        people mentioned about Mr. Gavin, Mr. Gavin

12        mentioned to me in my interview with him.

13    Q    That was not my question, Dr. Paramore, and

14        we can move this along a lot quicker if you

15        will listen to my question and answer it.

16        Did you ever go back and re-interview Keith

17        Gavin after you learned some information

18        from other family members?

19    A    No, I did not.   I only interviewed Mr. Gavin

20        once.

21    Q    And in this case, how did these interviews

22        that you did of the family members, how were

23        they set up?

24    A    I received phone numbers from Mrs. Gavin,

25        you know, of her children and I called them,

504

1    scheduled appointments and times to
2    interview them.
3  Q  And where did you interview them?
4  A  Mrs. Gavin's home.  Some interviews, as
5    listed here, were conducted over the phone.
6  Q  Okay, and would you say that all the people
7    you spoke to were cooperative?
8  A  Yes.
9  Q  Okay.  Would you have gotten any of this
10   information from them if they hadn't spoke,
11   wouldn't be willing to talk to you?
12  A  I'm sorry, I need to go back.  They were not
13    all cooperative at the time.  I had a
14    difficult time reaching and interviewing
15    Steven Gavin.
16  Q  And that's because he was in jail?
17  A  No, he was home.  He just would not talk
18    with me.  He was actually in the home while
19    I was present in the home and just refused
20    to talk with me until after his rehab.
21        THE COURT:  Until after what?
22  A  Rehab.  He checked himself into a rehab
23    facility.  And at that point, Mrs. Gavin
24    called me and said he was ready to talk with
25    me.

1    Q    Okay, let me ask you this.  Was Keith Gavin

2         willing to talk to you about information,

3         mitigation information in his life?

4    A    Yes, he was.

5    Q    Okay.  Was Annette Gavin willing to speak to

6         you?

7    A    Yes.

8    Q    Was Sharon Gavin?

9    A    Yes.

10   Q    Was Geanetta?

11   A    Yes.

12   Q    Elaine?

13   A    Yes.

14   Q    So all the people listed, other than Victor?

15   A    Steven.

16   Q    Steven, I'm sorry, Steven.  Was cooperative?

17   A    Yes.  And he was eventually.

18   Q    Okay.  And if these people had not been

19        cooperative, you wouldn't have gotten that

20        information out of them, would you?

21   A    No, I would not have.

22   Q    And if the defendant had instructed them not

23        to talk to you and you wouldn't have been

24        able to talk to them, you couldn't have

25        gotten that information out of them, could

1        you?

2    A    No, I wouldn't have.

3    Q    I want to talk about this risk factor

4        /protective factor theory.  And correct me

5        if I'm wrong, but a risk factor is a

6        predictor that has been scientifically

7        demonstrated to have a strong link to

8        adverse outcome such as delinquency,

9        antisocial behavior, substance abuse, other

10       behavioral problems?

11   A    Yes.

12   Q    Okay.  So if you have a lot of risk factors,

13       that increases your chance of being violent?

14   A    Yes.

15   Q    Do you ever look at the number of people who

16       have the same risk factors who never commit

17       a crime?

18   A    I haven't done research on other people in

19       regarding risk factors.

20   Q    So you're saying because Mr. Gavin is a

21       male, he's more likely to commit a crime?

22   A    No, I'm saying that being male is one of the

23       risk factors but it is the accumulation of

24       risk factors that the higher the number of

25       risk factors, the higher the probability.

1          Just being male, no, that would not -- I

2          would not conclude that he would commit a

3          crime just because he's male.

4     Q    You said exposure in your report, exposure

5          to television violence was a risk factor,

6          correct?

7     A    Yes, it's listed.

8     Q    And the way you made out, Mr. Gavin's family

9          is extremely poor, correct?

10    A    Yes.

11    Q    Did we see a television anywhere in that

12         house that you showed us pictures of?

13    A    There was a television.  They have a

14         television in their home.

15    Q    In the pictures?

16    A    I don't know if you could see it in the

17         pictures, but.

18    Q    And you're saying that they lived in the

19         projects and it was torn down, and they

20         still have a television?

21    A    You said torn down?

22    Q    It was, you know, in bad -- in need of

23         repair.  But they still had a television?

24    A    Families had cars, some families had

25         television.  Yes, they had personal

1   entertainment items.

2   Q   What television violence was he exposed to?

3   A   I don't recall.

4   Q   You listed it in your report.

5   A   Well, you know, the risk factors are listed

6       based on the research.  I didn't list the

7       factors.  They're listed based on research.

8       The things that he watched in childhood,

9       when asked did you ever watch anything on

10      television of a violent in nature, then the

11      answer was yes.

12  Q   Correct me if I'm wrong, but on page 10 of

13      your report you put in bold exposure to

14      television violence.

15  A   Yes.

16  Q   And you said that's a risk factor that would

17      lead someone to commit violent acts.

18  A   It is listed by the Office of Juvenile

19      Justice as a risk factor.

20  Q   Okay, and I'm asking again, what television

21      shows did he watch that exposed him to

22      violence?

23  A   I don't recall the list of shows that he

24      watched.

25  Q   Did he give you a list?

1    A    Yes, he did discuss shows that he watched,
2         but I don't recall the shows that he
3         watched.
4    Q    Are those shows listed in your report?
5    A    No, they're not.
6    Q    Is everyone that has a large family, does
7         that increase their likelihood of committing
8         criminal activity?
9    A    It's listed as a risk factor.
10   Q    That's not my question.  Does it increase
11        the likelihood of committing criminal
12        activity?
13   A    No.  No, it doesn't.
14   Q    If you had a, hypothetically, based on this,
15        if you had a parent who was one of eight and
16        another parent that was one of 12, would
17        their children have an increased likelihood
18        of committing criminal activity?
19   A    Large family members -- see, I can't answer
20        that.  Large family members are listed as a
21        risk factor.  So that large family member
22        would put that -- is it a male or female
23        that you're referring to -- would list that
24        person in a category of being at risk.
25   Q    Let's say it's a male.

1    A    Okay, then he would be listed as being at

2         risk and coming from a large family.

3    Q    You would agree with me, Dr. Paramore, that

4         there are people out there who are male,

5         exposed to television violence, come from a

6         low socioeconomic status, their parents

7         committed some type of criminality, had a

8         poor parent/child relationship, separation

9         from parents, domestic violence, abusive

10        parent, large family size, weak social ties,

11        anti-social peers, delinquency in siblings,

12        gang membership, there are people out there

13        that have all these risk factors who haven't

14        killed two people, correct?

15   A    Correct.

16   Q    Do you know how many people out there that

17        have these things that have not committed a

18        crime?

19   A    I do not.

20   Q    And isn't it likely that that number can be

21        extremely higher than the number of people

22        who actually commit a crime?

23   A    I don't know.

24             MS. WALKER:   Objection to the form.

25             MS. CASEY:   She answered she

1       doesn't know.

2                       THE COURT:  Asked and answered.

3       Move on.

4   Q   Dr. Paramore, do you know how many people

5       are the population of Alabama?

6   A   No, I don't.

7   Q   And let's hypothetically say that that's

8       four million people, okay?  Do you know the

9       number of people that live in poverty in the

10      state of Alabama?

11  A   I do not.

12  Q   If the report showed that was 30 percent of

13      the people, which was essentially 1.2

14      million people, do you know how many people

15      are on death row in Alabama for committing a

16      crime?

17  A   I do not.

18  Q   200 people.  Okay?  How does the risk factor

19      number play into you have 1.2 million people

20      in Alabama in poverty, and only 200 people

21      are on death row?

22                      MS. WALKER:  I object to form.

23                      MS. CASEY:  Hypothetically

24      speaking.  She's an expert.  If she's going

25      to put these risk factors out here and

1    analyse them and say it increases, I want

2    her to explain the discrepancy.

3              MS. WALKER:  Your Honor, I just

4    frankly don't understand the question and I

5    don't see its relevance.

6              THE COURT:  In this report, and I'm

7    really not trying to answer for her, but I

8    do think that it's important that you and

9    she are on the same wave link.  In this

10   report, she talks about the affect of the

11   cumulative affect of these factors, any one

12   factor or even any one combination of

13   factors, I think, according to this report,

14   might not lead one to a crime of violence.

15   So you are only asking about how one factor,

16   poverty, would lead to a crime of violence,

17   and in this report it is clear, I think,

18   that one factor, using the one you've

19   chosen, poverty, would not necessarily mean

20   that a person would have a life of crime or

21   violence.

22             MS. CASEY:  That's what I'm going

23   after, Your Honor, I've started with one and

24   I want to know how much it increases, does

25   she know how much it increases?  She said

1       the more you compound, the higher the

2       likelihood it is.  Well, at two risk

3       factors, how much higher is it?  At three

4       risk factors, how much higher is it?  At

5       four or five, she says it compounds to

6       create a likelihood of criminal activity,

7       well, I need to know how much more likely

8       you are?  If you have all of them, does that

9       mean you're definitely going to commit

10      criminal activity?

11              THE COURT:  Well, you can ask her

12      those questions,  I think, in a broader way

13      rather than go through each one, I mean,

14      there are probably 50 factors here and I

15      don't want you to go over 50 factors one at

16      a time.

17              MS. CASEY:  All right.

18              THE COURT:  And the combinations

19      are almost unlimited as to which ones may or

20      may not exist, so let's move on here if we

21      can.

22  Q   Okay.  Do you know the probability or how

23      much a likelihood a life of violence

24      increases depending on the number or the

25      variation of risk factors that a person has?

1    A    No, but it's directly related to the

2         protector factors, also.

3    Q    Your answer is no?

4    A    You don't just have the risk factors in

5         isolation of protective factors.  So if you

6         have someone that have a significant number

7         of risk factors and they have protective

8         factors to balance that out to assist them

9         in overcoming that, then the outcome would

10        be different.

11   Q    So the point is, there is no calculation or

12        way to calculate this?

13   A    I did not calculate it.  I don't know if

14        there is a way to do it, but that is just

15        not something that I did.

16   Q    So you use the system, you just don't know

17        if there is some way to calculate it.

18             MS. WALKER:  Object to form.

19             THE COURT:  Well, it's cross-

20        examination.  She may answer.

21   Q    You use this system in doing a report for

22        Mr. Gavin; is that correct?

23   A    Yes, I did.

24   Q    And you don't know if there is a way to

25        calculate the likelihood?

1    A    You cannot even consider the likelihood

2         until you consider the protective factors.

3    Q    Dr. Paramore, can you listen to my question?

4         It's a yes or no.  Okay?  Yes or no, you

5         don't know if there is a way to calculate

6         it?

7              THE COURT:  When you say calculate

8         it, are you asking her to quantify?

9              MS. CASEY:  She said there is no

10        way, just in her answer, there is no way to

11        calculate how this affects.

12   A    I said I don't know, I have not calculated

13        it, I don't know a way to calculate it.  I

14        answered it that way.

15             MS. CASEY:  Okay, I'll move on.

16             THE COURT:  While you're taking

17        that deep breath, let me ask her another

18        question.  On your chart on page 10, there

19        is an asterisk by some of those risk

20        factors, and that asterisk is key to the

21        bottom of the chart.  Explain to me why some

22        of those are -- some of those risk factors

23        have an asterisk by them.  I don't quite

24        understand that.

25   A    Just from the research, Your Honor.  I just

1        included the asterisk just to identify and

2        reference the researcher that identified

3        that as a risk factor.

4                    THE COURT:  Well, I take it that

5        this chart came out of some standardized

6        work in this field?

7   A    Yes, it did.

8                    THE COURT:  And they have

9        attributed some of these risk factors to

10       those two authors whose names appear there

11       at the bottom by that asterisk?

12  A    Yes.

13                   THE COURT:  But the other risk

14       factors are not attributed to any particular

15       source of any particular expert or

16       authority.  What --

17  A    The research was conducted through the

18       Office of Juvenile Justice.  They reference

19       the ones that came from the other

20       researchers.  They conducted -- they pulled

21       together 22 researchers that worked for over

22       two years to compile the research.

23                   THE COURT:  I guess I just don't

24       understand why some of these are attributed

25       to two named authors and the rest of them

1         are not attributed to anybody, but it

2         doesn't matter, we won't spend any time on

3         that.

4   A    I just don't want to alter the chart because

5         I pulled it from their research and this is

6         the way they had it referenced.  Because

7         from their research, they included large

8         family sizes and living in poor families.

9   Q    On that same note, that came from the office

10        of juvenile, those are related to juveniles,

11        right?

12   A    Yes.

13   Q    Not a 37-year-old man who kills someone?

14   A    Yes, juveniles.

15   Q    When you spoke to Mr. Gavin, was he coherent

16        in his conversation with you?

17   A    Yes, he was.

18   Q    Fairly intelligent man, isn't he?

19   A    Yes, he is.

20   Q    Seems to know the difference between right

21        and wrong?

22   A    I didn't do an evaluation on Mr. Gavin.

23   Q    You interviewed him.

24   A    Just my general interview with him.

25   Q    You interviewed him, though.

1    A    Yes.

2    Q    And it is your testimony earlier that at the

3         age of nine he started a gang.

4    A    Yes.

5    Q    And by the age, I think you said, I could be

6         wrong, 13 he was carrying a gun?

7    A    No, he was older than that.  I think he was

8         16.

9    Q    By the age 16 he was carrying a gun that he

10        had bought from the candy lady?

11   A    Yes.

12   Q    He had committed burglary at the age of 13?

13   A    I don't know if he was charged with that,

14        but he was pulled in for questioning for

15        that, according to my -- according to the

16        reports.

17   Q    And it's your testimony that this

18        information is mitigation evidence?

19             MS. WALKER:  Objection,

20        argumentative.  It's for a jury to decide

21        whether it's mitigating or not.

22             THE COURT:  Sustained.

23   Q    You would have told this information to a

24        jury during sentencing phase, or it's your

25        testimony this should have been told?

519

1      A      Yes.

2                        MS. CASEY:  Your Honor, can we

3      break for lunch and then may I review my

4      notes before we come back?

5                        THE COURT:  Sure, if it's time.

6      Yeah, it's about noon.  There was a question

7      about a matter you want to take up before

8      lunch.  Can we wait until later to do that?

9                        MR. MAZE:  Oh, any time is fine.

10                       MS. WALKER:  Your Honor, could we

11     maybe see how much time Ms. Casey needs?  I

12     mean, I would like to let Dr. Paramore get

13     back to Chicago as soon as possible.  If she

14     only needs 10 minutes, I'm willing to wait.

15                       THE COURT:  Could you do that?

16     Could you take a minute and just let's maybe

17     take a 10 minute break.

18                       MS. CASEY:  Sure.  Okay.

19                       THE COURT:  Then let's see if we

20     can finish and let her go back to Chicago.

21                       MS. CASEY:  We'll be done in five

22     minutes if you will just give us a second.

23                       THE COURT:  Okay, five minute

24     break.  Thank you.

25                       (Recess)

```
 1              (Proceedings resumed)

 2                   MS. CASEY:  Briefly, Your Honor.

 3    Q    Dr. Paramore, you testified about several of

 4         Mr. Gavin's siblings having been shot, a

 5         bullet lodged in the body?

 6    A    Yes.

 7    Q    About Steven being jumped by a gang,

 8         admitted to the hospital?

 9    A    Victor, one of the siblings, yes.

10    Q    Did you review any records to confirm that?

11    A    No.

12    Q    Okay.  You also testified that a good bit,

13         if not a majority, of Mr. Gavin's family had

14         been incarcerated or committed crimes,

15         correct?

16    A    Yes.

17    Q    Did you ever review any records relating to

18         those incarcerations?

19    A    No.

20    Q    Did you ever do anything to confirm those

21         incarcerations by looking at the incident

22         reports?

23    A    No, I did not.

24                   MS. CASEY:  No further questions.

25                   MS. WALKER:  Your Honor, I just
```

1          have one question.

2                    RE-DIRECT EXAMINATION

3     BY MS. WALKER:

4     Q     Dr. Paramore, do you know how many hours,

5           either exactly or approximately, you spent

6           on putting together your mitigation

7           evaluation?

8     A     75 hours.

9                    MS. WALKER:  Thank you.  That's all

10          I have.

11                   RE-CROSS EXAMINATION

12    BY MS. CASEY:

13    Q     Dr. Paramore, how much do you charge per

14          hour?

15    A     $100 per hour.

16                   THE COURT:  Your report is dated

17          October the 4th of 2007.  When were you

18          engaged to make this study?  How long before

19          that were you engaged to make that study?

20    A     Your Honor, I believe March of '06 I met

21          with defense team and shortly after that I

22          met with Mr. Gavin and proceeded forward

23          until the submission of the report.

24                   THE COURT:  Okay.  So from March of

25          '06 until October of '07, and we're going to

1        call that maybe a year and a half, 18

2        months?

3    A   Yes, sir.

4                THE COURT:  But you only spent

5        about 75 hours on this project?

6    A   Just in interviews, 75 hours just for

7        interviews.

8                THE COURT:  How much time did you

9        spend from start to finish getting this

10       report done?

11   A   It was over 100 hours.

12               THE COURT:  Okay, thank you.

13       Anything else from either of you?

14               MS. WALKER:  No, Your Honor.

15               THE COURT:  Thank you very much,

16       you may come down.  Hope you get your flight

17       out okay.

18   A   Thanks.

19               THE COURT:  All right, do you have

20       any other witnesses that you plan to offer?

21               MR. MARSHALL:  Your Honor, just for

22       the record, Dr. Haney is not going to be

23       here, he's got to be deposed.

24               THE COURT:  Yes.

25               MR. MARSHALL:  But we have no other

1    live witnesses to offer, Your Honor.

2              THE COURT:  Yes, that's my

3    question.  So, when we come back after

4    lunch, we ought to be able to get started

5    with your witness.

6              MS. CASEY:  Yes, sir.

7              THE COURT:  And you've got a

8    question about some photographs?

9              MR. MAZE:  Yes, sir.

10             THE COURT:  Can we just do that

11   after lunch?

12             MR. MAZE:  Absolutely.  We'll just

13   do it all when we get back.  If they don't

14   object to us just putting them in, then we

15   won't put the Sheriff on.

16             THE COURT:  Have you shown them the

17   pictures?

18             MR. MAZE:  No, that's what I was

19   going to do, but we can do that now and then

20   deal with it when we come back.

21             THE COURT:  Well, it's five minutes

22   after 12, let's break until 1:15.  If you

23   have time to show them the photographs,

24   maybe there could be an agreement reached

25   about those.

1           MR. MARSHALL:  Yeah, I don't know

2     what it is, but I think I know what it may

3     be.  Why don't you show us the photographs

4     before lunch, see if we can reach, you know,

5     we may an argument on admissibility, but not

6     on the authenticity, in which case we don't

7     need a witness.

8           THE COURT:  All right, we'll be in

9     recess until 1:15, thank you.

10          (Recess for the noon hour)

11          (Proceedings resumed)

12          THE COURT:  Okay, the State has

13    marked four photographs.  On State's exhibit

14    number 1 there are two photographs, and on

15    State's exhibit number 2 there are two

16    photographs.  These are the photographs we

17    talked about before lunch?

18          MR. MAZE:  Yes, sir.

19          THE COURT:  You wanted to

20    introduce?

21          MR. MAZE:  Yes, sir.

22          THE COURT:  Are you introducing

23    them at this time?

24          MR. MAZE:  Yes, sir.

25          THE COURT:  What says the

1    defendant?

2              MR. MARSHALL:  Your Honor, we do

3    not object to their authenticity, and my

4    understanding is that if Sheriff Shaffer

5    were called to testify, he would testify

6    that they accurately portray the signage,

7    which I think is the purpose for which

8    they're being offered, and that he would

9    also testify that the signage has not

10   changed since March of 1998.  And if he were

11   to so -- we'll stipulate that that would be

12   his testimony.

13             MR. MAZE:  That's all we would call

14   him for, would be for those questions.

15             MR. MARSHALL:  So our only question

16   would be to relevance because we don't think

17   it's impeaching.

18             MR. MAZE:  Our answer to that, I

19   think the Judge knows what our argument

20   would be, but if you want me to get it on

21   the record.

22             THE COURT:  Go ahead.

23             MR. MAZE:  Our argument would be

24   yesterday when Mr. Gavin was testifying, the

25   argument is that trial counsel was

1    ineffective for not allowing him to testify

2    and tell the story that he told yesterday.

3    And during Mr. Gavin's testimony yesterday,

4    he was asked how he knew to go towards

5    Leesburg, then to Sand Rock, Collinsville,

6    up towards I-65 North to Chattanooga if he

7    had never been in this area before, because

8    it's the State's theory that he was actually

9    following Mr. Meeks who does know this area

10   and was headed back to Chattanooga, and

11   specifically Ms. Casey asked did you see a

12   sign that said I-65 North so you knew to

13   turn right at the intersection at Leesburg?

14   And his answer was, no, I was going north,

15   so when I saw a sign pointing north, I just

16   tried to go north.  And the purpose of the

17   pictures is to show that each time that Mr.

18   Gavin turned right, the first time it would

19   have been turning right from Cedar Bluff

20   Road to Main Street, which is Highway 411.

21   The signs actually show that you should turn

22   left to go north, and yet Mr. Gavin turned

23   right.  The second picture is the next

24   immediate sign that you see after that turn,

25   and it shows that he was traveling south,

1    not north.  And then the last two pictures,

2    the first one shows that none of the cities

3    that were pointed as to which direction you

4    would go if you turned or went straight are

5    Chattanooga or any other cities that are

6    other than local Alabama cities that Mr.

7    Gavin wouldn't know.  And then, finally,

8    when he turned right, he turned right on to

9    Highway 68 West, not North, so it couldn't

10   be true that he turned right in Leesburg

11   because he was turning right because of a

12   sign that said North.  In fact, the only

13   signage said south is forward and right is

14   to the west.  So his testimony yesterday is

15   contradicted by the actual signs on the

16   roads where he turned.

17            THE COURT:  Just for the sake of

18   the record, the interstate number is I-59

19   rather than I-65.

20            MR. MAZE:  You're right.  Yes, sir.

21            THE COURT:  But I think he was

22   actually asked or maybe he volunteered that

23   it was I-65, but in any case, it is 59.  All

24   right, I'm going to admit the exhibits,

25   State's 1 and 2.  Thank you.

1              MR. MARSHALL:  Over our objection.

2              THE COURT:  Yes, it is.

3              (Whereupon, State's exhibits 1 and 2

4         admitted into evidence at this time)

5              MR. MAZE:  And for that reason,

6         we're not going to have any other witnesses

7         other than Dr. King.

8              THE COURT:  All right, is he

9         available?

10             MR. MAZE:  Yes, sir.

11             MS. CASEY:  The State calls Dr.

12        Glen King to the stand.  And, Your Honor,

13        just for you to follow along, Dr. Glen

14        King's declaration was listed at Volume Five

15        exhibit number 9 at the State's reply brief,

16        just so you will have that declaration if

17        you wanted to look at it for testimony.

18             THE COURT:  Wait just a minute, let

19        me think where that is.

20             MS. CASEY:  I have an extra copy if

21        you would like me to bring one up.

22             THE COURT:  I think it would be

23        helpful if I had a copy to look at rather

24        than this copy that's in the bound volume,

25        but I do find it as Exhibit 9 in Volume Five

529

1          of your attachments to the brief --

2                    MS. CASEY:  Yes, sir.

3                    THE COURT:  Which is dated --

4                    MS. WALKER:  And I have an extra

5          copy.

6                    THE COURT:  Dated June the 9th,

7          2008.

8                    MS. CASEY:  And then, Judge, just

9          before we get started, just so you'll

10         understand our order of testimony.  Your

11         Honor granted the State the ability to

12         interview Mr. Gavin, and as a result of that

13         interview at Holman Prison there was a

14         dictation of notes from the interview that

15         we have supplied to defense counsel.  I'm

16         not sure the Court has a copy.  The State

17         intends to introduce a copy today during

18         testimony.  Would you like to wait until we

19         get to that point or would you like to go

20         ahead and have a copy of those?

21                   THE COURT:  Has it been

22         transcribed?

23                   MS. CASEY:  Yes, sir.

24                   THE COURT:  You can go ahead and

25         give it to me.  Thank you.

1          MS. CASEY:  Just so everybody has.

2          THE COURT:  So State's exhibit

3     number 1 is the report -- no, yes -- is that

4     correct?

5          MS. CASEY:  I think it would be 3

6     because our pictures would have been 1 and

7     2, and that would be 3.

8          THE COURT:  All right.

9

10              DR. GLEN DAVID KING

11     Being duly sworn, testified as follows:

12              DIRECT EXAMINATION

13     BY MS. CASEY:

14     Q     Will you please introduce yourself for the

15           record.

16     A     My name is Glen, with one "n", David King,

17           K-i-n-g.

18     Q     Okay.  And, Dr. King, how are you employed?

19     A     I'm employed with Kirkland and King Clinical

20           & Forensic Psychologists, Professional

21           Corporation, with our main office in

22           Montgomery, Alabama, and I'm also a

23           practicing attorney.

24     Q     Okay.  And let's talk a little bit about

25           your educational background.  Will you

1          please tell the Court where you received

2          your initial undergraduate degree.

3     A    Sure.  I earned my Bachelor of Arts degree

4          from the University of Minnesota in 1968

5          with a major in psychology and a minor in

6          chemistry.

7     Q    Did you receive any other educational

8          degrees or any degrees?

9     A    I did.

10    Q    And what were those?

11    A    I earned my Master of Science degree with a

12         major in clinical psychology from Florida

13         State University in 1970.  I then earned my

14         Doctoral degree in clinical psychology from

15         Florida State University in 1972.  As part

16         of the requirements for the Doctoral degree,

17         I completed a one year full time residency

18         at Mayo Hospital, University of Minnesota

19         Medical School in the department of

20         psychiatry.  I entered law school in 1996

21         and earned my J.D. degree in 1999, was

22         admitted to the Bar in May of 2000.

23    Q    Have you ever served as a faculty for any

24         universities?

25    A    I have.  Following completion of my degree

1         at Florida State University, I then went to

2         Auburn University where I served full time

3         as a faculty member for 12 years rising to

4         the rank of full professor.  My major duties

5         there were teaching, of course, doing

6         research program, directing the psychology

7         research and training clinic, and primarily

8         training clinical psychology graduate

9         students.

10   Q    Okay.  At what point did you enter private

11        practice?

12   A    I actually had a part time private practice

13        beginning at the time of my licensure in

14        this state in 1973.  I then started a full

15        time private practice in 1983 and have been

16        in full time private practice since that

17        time.

18   Q    Are you board certified?

19   A    I am board certified as a clinical

20        psychologist by the American Board of

21        Professional Psychology since 1979, and I

22        also am a certified forensic examiner for

23        the court system for the state of Alabama.

24   Q    And what is a certified forensic examiner?

25   A    The designation of a certified forensic

1    examiner is from Rule 11 of the Alabama

2    Rules of Criminal Procedure, and requires

3    that through certification by the state

4    department of mental health, an examiner is

5    either a licensed psychiatrist or a licensed

6    clinical psychologist who completes a three

7    day intensive workshop at Taylor Hardin

8    Secure Medical Facility, passes a written

9    examination, and then spends time with a

10   previously certified forensic examiner to

11   complete three supervised forensic

12   examinations.  After that is completed,

13   there is a requirement for six hours of

14   continuing education per year, and the

15   certified forensic examiners do contract

16   evaluations for the Court to determine

17   usually competency to stand trial and mental

18   state at the time of alleged offense for

19   criminal defendants, and I've been working

20   on contract for the State Department of

21   Mental Health since 1992 continuously.

22   Q    Okay, and do you know how many certified

23        forensic examiners there are in the state of

24        Alabama?

25   A    There are less than a dozen at this time.

1          The vast majority are on faculty or are on

2          the staff at Taylor Hardin Secure Medical

3          Facility.   There are only three of us that

4          are doing contract work for the courts on an

5          outpatient basis.

6     Q    And do you have any type of licensing in the

7          state of Alabama other than your law degree?

8     A    Yes, I'm licensed by the Alabama Board of

9          Examiners and Psychology to be a clinical

10         psychologist.   I'm also licensed by the

11         Georgia Board of Examiners and Psychology to

12         practice psychology in the state of Georgia.

13    Q    And just for the record, what is the

14         difference between clinical psychology and

15         let's say forensic psychology?

16    A    Clinical psychology is a specialty within

17         psychology where the training includes four

18         years minimum of graduate school, one year

19         full time residency in some type of,

20         typically some type of medical school

21         department of psychiatry to be trained to

22         diagnose and treat mental illnesses of one

23         type or another.   Forensic psychology most

24         often is a sub-specialty under clinical

25         psychology, and forensic psychology involves

1          the application of psychological principals

2          to help courts of various types make

3          decisions where they might find

4          psychological input to be helpful, such as

5          competency to stand trial or mental state at

6          the time of alleged offense or competency to

7          be executed and things of that nature.

8      Q   And how many evaluations have you conducted

9          for the court system in Alabama to determine

10         competency or mental state at the time of

11         the events or competency to waive Miranda

12         Rights?

13     A   To date I have completed in excess of 4,000

14         of those evaluations.

15     Q   And do you know how many counties you have

16         worked in the state of Alabama doing

17         evaluations?

18     A   I have -- there's been a ton when I actually

19         was responsible for doing all of the

20         evaluations in 22 counties.  Because I also

21         personally am responsible for evaluating

22         those individuals who violate parole or

23         probation and get returned to the Department

24         of Corrections, I might end up in any other

25         county in the state, so I probably have

1          testified or done reports for more than half

2          the counties in the state of Alabama.

3     Q    All right, let me ask you a question.  Have

4          you ever interviewed or evaluated inmates

5          who are on death row in the state of

6          Alabama?

7     A    I have.  I've also done post-conviction

8          evaluations for the state of Alabama

9          Attorney General's Office and also for the

10         state of Georgia Attorney General's Office.

11    Q    And how many death row inmates have you

12         evaluated in the state of Alabama?

13    A    If you're asking me about post-conviction,

14         probably in the neighborhood of about 50.

15    Q    And do you currently know how many inmates

16         are on death row right now?

17    A    I think in Alabama about 200.  I'm not sure

18         about Georgia.  I think it would be about

19         the same.

20    Q    Okay.  How many times have you testified on

21         behalf of the State versus on behalf of the

22         defendant?

23    A    Well, I would like to kind of answer that in

24         two different ways.  If we're talking about

25         preconviction evaluations that I do or guilt

1    phase evaluations, I will usually testify

2    about 50 percent for the defense and 50

3    percent for the prosecution.  That just

4    seems to be the way that it works out.  On

5    post-conviction cases in every case I have

6    been retained by the respective Attorney

7    General's Office, whether it's Georgia or

8    Alabama.  In Alabama there have been five

9    cases where, after I completed my

10   evaluation, I formed the opinion that was

11   favorable to the petitioner and ended up

12   being actually hired by petitioner's

13   attorney on two occasions to testify in his

14   behalf.

15   Q   Okay, and why have you testified 50 percent

16       for the defense in the evaluation you've

17       done pretrial or pre-conviction?

18   A   It just seems to be the way it works out.

19       Most the time -- 94 percent of the time my

20       opinion favors, I'll put it this way, favors

21       the prosecution about mental state at the

22       time of the offense and also competency to

23       stand trial.  But in terms of how the cases

24       actually go to trial or go to hearing, I

25       wind up about 50 percent testifying for one

538

```
 1           side or the other.
 2      Q    And were you retained by the Attorney
 3           General's Office in this case?
 4      A    I was.
 5      Q    And in regard to this case, were you
 6           supplied any documents or anything to
 7           review?
 8      A    Yes, I was.
 9      Q    And can you tell the Court what you were
10           asked to review?
11      A    For this case, I reviewed the declaration of
12           Craig Haney, the declaration of Betty
13           Paramore, records from the State of Alabama
14           Department of Corrections, report of
15           investigation of the Alabama Board of
16           Pardons and Paroles.  There were some
17           records from the Illinois Department of
18           Corrections, records from Larry Wilson, the
19           Sheriff of Cherokee County, records from
20           Prison Health Services, and various Orders
21           and legal documents from the Circuit Court
22           here in Cherokee County.  In addition, I
23           also conducted a personal interview and
24           evaluation of Mr. Gavin.
25      Q    I want to break these apart and first ask
```

539

| | | |
|---|---|---|
| 1 | | you did you complete a declaration in regard |
| 2 | | to your review of the records in this case |
| 3 | | or documents? |
| 4 | A | I did. |
| 5 | Q | And what was the date of that declaration? |
| 6 | A | June 5th, 2008. |
| 7 | Q | And does this declaration contain the |
| 8 | | information and your opinions as a result of |
| 9 | | that review of those documents? |
| 10 | A | It does. |
| 11 | Q | Okay.  And I would ask you from the time |
| 12 | | that you did this declaration, did you have |
| 13 | | the opportunity to meet with Keith Gavin? |
| 14 | A | I did. |
| 15 | Q | And can you tell the Court the date you met |
| 16 | | with Keith Gavin? |
| 17 | A | I met with Mr. Gavin at Holman Prison on |
| 18 | | September 30th of 2009. |
| 19 | Q | At that time were you able to interview him |
| 20 | | or speak with him? |
| 21 | A | I was. |
| 22 | Q | Okay.  I want to start by talking about your |
| 23 | | declaration. |
| 24 | | MS. WALKER:  Your Honor, I don't |
| 25 | | mean to interrupt, but I'm wondering if the |

1            State is intending to offer Dr. King as an

2       expert, and if so, in what areas?

3                 MS. CASEY:  Your Honor, the State

4       at this time, then, will offer Dr. King as

5       an expert in clinical forensic psychology --

6       in clinical and forensic psychology.

7                 MS. WALKER:  Your Honor, I don't

8       have an objection to Dr. King's

9       qualifications, however, I do have a

10      relevancy objection to any opinions based on

11      forensic psychology.  We have not offered

12      any opinions in this case that trial counsel

13      was ineffective for failing to bring forth

14      evidence that Mr. Gavin suffers from a

15      mental illness, nor have we raised any

16      issues under Rule 11 of the Alabama Rules of

17      Criminal Procedure.

18                MS. CASEY:  May I respond?

19                THE COURT:  Sure.

20                MS. CASEY:  We're not offering him

21      for mental evaluations, and I think he will

22      testify he didn't perform a mental

23      evaluation, but they did offer Dr. Betty

24      Paramore as a forensic -- had her talk about

25      forensic psychology.

1    THE COURT:  I understand from his

2    report which you've marked as State's

3    exhibit number 3 that he also spends a good

4    bit of time questioning the conclusions

5    reached by Dr. Haney who has not yet been

6    deposed but apparently you have a report

7    that you expect --

8    MS. CASEY:  Yes, Your Honor.

9    THE COURT:  -- that you expect Dr.

10   Haney to testify about.  I find that this

11   witness is qualified to testify as an expert

12   in the area of clinical psychology and

13   forensic psychology.

14   MS. CASEY:  And, Judge, as you

15   pointed out, Dr. Haney has not yet

16   testified, however we're going off the

17   report that he submitted in this case, and

18   while it may be a little vice versa, we

19   would like to have Dr. King testify as to

20   his review of that declaration and go ahead

21   and make that testimony on the record, even

22   though Dr. Haney has not yet testified.

23   THE COURT:  He may do so.

24   MS. CASEY:  Okay.

25  Q   I would like to kind of break this apart,

1          Dr. King, and go look at your declaration

2          first and then talk about your interview of

3          Mr. Gavin.  First of all, did you review the

4          report of Dr. Haney?

5    A    I did.

6    Q    And is Dr. Haney a clinical forensic

7          psychologist?

8    A    As far as I can tell he is not.

9    Q    According to or according to your knowledge,

10        based on your knowledge, what is his area of

11        expertise?

12   A    Dr. Haney declares his expertise as a social

13        psychologist, and I believe he also has a

14        law degree from Stanford University.

15   Q    And based on your information, is Dr. Haney

16        licensed in any state?

17   A    Not that I can determine.  He's not listed

18        on the roster of licensed psychologists in

19        California where he resides, nor is he

20        listed on the roster for Alabama.

21   Q    Okay.  And based on Dr. Haney -- or let me

22        ask you, what is your interpretation or

23        understanding of Dr. Haney's diagnosis of

24        the defendant?

25            MS. WALKER:  Objection, Dr. Haney

1     did not make a diagnosis of Mr. Gavin.

2             THE COURT:  I don't have the report

3     from Haney.

4             MS. CASEY:  I'll respond that he

5     has indicated he suffers from

6     institutionalization.

7             MS. WALKER:  Well, lay a foundation

8     to what you're referring to, please.

9  Q   And my question is what is your

10    understanding of what Dr. Haney said?  I can

11    ask it like this.  First of all, is there a

12    term or a word that Dr. Haney repeatedly

13    uses in his discussions of the defendant,

14    Keith Gavin?

15  A   There is.

16  Q   And what is that word?

17  A   He uses the term institutionalization or he

18    refers to Mr. Gavin as an institutionalized

19    man or institutionalized inmate.

20  Q   And what is your understanding of the term

21    institutionalization or institutionalized

22    man?

23  A   Well, actually, I don't really have an

24    understanding of what that term is.  It is

25    not a scientific term, it's not a clinical

1          term that any of us uses for any diagnostic

2          category, clinically or forensically.  I

3          think that I have run across that term in

4          some years past as a kind of sociological

5          term for what sociologists typically believe

6          happens to or explore about what happens to

7          individuals who are in penal institutions

8          for some period of time.

9     Q    Is there any such diagnosis or reference to

10         the term institutionalization or

11         institutionalized man within the

12         diagnostical and statistical manual?

13    A    There is not.

14    Q    Is this a recognized condition or diagnosis

15         in clinical practice?

16    A    It is not.

17    Q    Is this essentially a theory, a sociological

18         theory?

19    A    I'm not sure that I would even grace it with

20         the term theory because theory is usually a

21         scientific kind of notation that allows us

22         to make some kinds of predictions,

23         quantifications, and that sort of thing.

24         It's more of an opinion or an idea, I think,

25         rather than a theory because it really

1        doesn't predict anything.

2   Q    Okay.  And according to Dr. Haney, how did

3        the defendant in this case or what is your

4        understanding of how the defendant in this

5        case became institutionalized?

6   A    It appears to me that he simply was labeled

7        as institutionalized because he spent 17

8        years in the Department of Corrections.

9        There are a number of other descriptions

10       that Dr. Haney makes about institutionalized

11       people in general, but as best I can

12       ascertain, it is just based on the fact that

13       he was in prison for 17 years.

14   Q   And based on your experience as a

15       psychologist, forensic psychologist and

16       clinical psychologist, is there any evidence

17       to support the mere fact that you're in the

18       Department of Corrections for many years

19       would lead you to commit crimes?

20   A   Absolutely not.

21   Q   Did Dr. Haney indicate that Mr. Gavin was in

22       any type of special education classes?

23   A   I don't recall whether it was Dr. Haney or

24       Dr. Paramore that referred to that, but I

25       believe there was some reference in some

1        report I read that he was in special

2        education classes.

3   Q   Did they also indicated that he was of low

4        intelligence?

5   A   I believe I saw some reference to that at

6        some point, yes.

7   Q   And was that contradicted by anything that

8        was found within Dr. Haney's report?

9   A   Well, I think that the fact that Mr. Gavin

10       earned his GED while in prison and took

11       college courses and also benefited from

12       other kinds of experience or activities

13       would not indicated he was mentally retarded

14       or of low intelligence, and I think that

15       would be contradictory.

16   Q   Okay.  And that was when he was in prison

17       the first time?

18   A   That's correct, when he was in the

19       Department of Corrections in the state of

20       Illinois.

21   Q   In Dr. Haney's declaration, did he ever

22       assert that Mr. Gavin was exposed to

23       numerous risk factors that would predispose

24       him to juvenile violence?

25   A   He did.

547

1    Q    And were there any contradictions in Dr.

2         Haney's reports as to that assertion?

3    A    Yes, there are.  As far as I can tell by Mr.

4         Gavin's report and all the other information

5         I've reviewed, he was never arrested or

6         charged as a juvenile, so he was at risk for

7         all these factors, he wasn't arrested or

8         charged as a juvenile.

9    Q    I want to ask you about your interview now

10        with Mr. Gavin.  When did you interview him?

11   A    I saw him on September 30th of 2009, last

12        September 30th.

13   Q    And do you recall -- well, first of all,

14        where did you interview him at?

15   A    I saw Mr. Gavin in Holman Prison in what is

16        typically referred to, I think, as the break

17        room, it's the visitor's room that's right

18        inside the entrance to the prison.

19   Q    And how long did you speak to Mr. Gavin?

20   A    We spent somewhere about two and a half

21        hours, I think, together.  It may have been

22        a little longer.  I think they may have had

23        a count and we ended up talking a little

24        longer after the interview was concluded.

25   Q    And describe for the Court how that

1          interview began.

2     A    I started the interview with Mr. Gavin by

3          informing him, as I always do, about who

4          hired me, why I was there, what would happen

5          with any and all information that he

6          provided to me.  Basically explaining that

7          there was no confidentiality and no

8          privilege attached to our conversation or my

9          interview.  And I also told him that if I

10         were to testify or if my interview notes

11         were to be used in litigation, that copies

12         would be provided to his attorneys for their

13         use well in advance.  He understood all of

14         that and we then proceeded on through an

15         interview and history.

16    Q    What was Mr. Gavin's demeanor when you first

17         started to interview him?

18    A    Throughout the interview Mr. Gavin was most

19         pleasant.  We had a good conversation.  He

20         was a little reserved right at the very

21         beginning, but once I explained who I was

22         and what was going to happen and what would

23         happen with any of the information, he

24         warmed up and he was absolutely a gentleman

25         throughout the entire time that I spent with

1        him.

2    Q    Okay.  Did Mr. Gavin report to you any

3        physical or medical difficulties?

4    A    He did not.  He indicated, actually, a

5        history that was fairly devoid of those

6        kinds of problems.  He had three

7        hospitalizations, by his report, from

8        earlier in his life, but he did not have any

9        serious physical or medical difficulties

10       that were a continuing problem for him.

11   Q    And did he ever indicate to you that he had

12       any current or past problems with drugs or

13       alcohol?

14   A    He did not.  And when I asked him specific

15       questions about his alcohol and drug usage,

16       it was apparent to me that he had actually a

17       history that was remarkably lacking in

18       problems with alcohol or drugs.

19   Q    Would you consider, based on your interview

20       and discussion with Mr. Gavin, would you

21       consider him a substance abuser or a drug

22       abuser?

23   A    Absolutely not.  He had some reports of what

24       I would call typical usage, occasional use

25       of marijuana, and that was the only drug

1        that he had used on occasion.  The kind of

2        use that he reported I would not even

3        classify as abuse.  His alcohol intake was

4        very occasional and he had no history of

5        usage of any other drugs.

6    Q   Okay.  And did you speak with the defendant

7        about his family?

8    A   I did.

9    Q   Okay.  And will you tell us, first of all,

10       how that conversation began?

11   A   When I ask questions about family, it's

12       usually in what we call a social history.

13       By that time I've asked questions about

14       whether he's had any previous history with

15       mental health professionals, substance abuse

16       and so on, and I asked Mr. Gavin in a very

17       systematic fashion the ages of his parents

18       and whether they had any history of physical

19       or medical problems or mental problems, and

20       that would include substance abuse problems,

21       and also asked him, you know, a sentence or

22       two describe what your mother was like and

23       describe what your father was like.  In both

24       cases, he indicated that he thought his

25       parents were loving, devoted and good

1          parents.

2    Q     Okay.  Did he indicate that his father was

3          deceased?

4    A     He did.  He reported that his father had

5          died, I think, of a heart attack.

6    Q     Okay.  And did he indicate whether or not

7          his parents were still living together at

8          the time of his father's death?

9    A     It is my understanding they were.

10    Q     Did he ever tell you anything about his

11          father, his father's behavior, toward him?

12    A     I asked specifically whether Mr. Gavin had

13          ever been sexually abused as a child and he

14          reported he had not.  I asked if he had ever

15          been physically abused as a child and he

16          reported that he had not.  I did engage in

17          some follow-up questioning about that

18          because I had read previous reports that his

19          father was reported to have been abusive,

20          and I asked Mr. Gavin if he was sure about

21          that or if there were times when his father

22          might have been abusive, and his response to

23          that was that his father -- he didn't really

24          see his father as abusive.  He said on

25          occasion maybe his punishment got a little

1        exaggerated or a little bit, I think his

2        word was borderline, actually, maybe

3        bordered on that, but that was the extent of

4        the report of anything close to physical

5        abuse.

6    Q    Okay.  And did you feel that Mr. Gavin

7        during your conversation was very forthright

8        and open with you?

9    A    He was.  He answered all my questions

10       directly and I didn't sense that he was

11       malingering or trying to exaggerate one way

12       or the other throughout the evaluation.

13   Q    And did you and Mr. Gavin discuss his

14       siblings?

15   A    We did.

16   Q    And according to your conversation with him,

17       can you describe the number of siblings he

18       has or tell us the number of siblings he

19       had?

20   A    He told me that he had 11 siblings.  He has

21       five brothers and six sisters.  And he told

22       me that he understood two of his brothers

23       were deceased, and he went through briefly

24       each one of his siblings by name, their

25       approximate ages, or the ages of their death

553

1           if he knew it, and whether he knew of any

2           physical or mental problems that any of them

3           had or substance abuse problems.  In

4           addition, he indicated that -- he described

5           his family as quite close, that all of his

6           brothers and sisters got along extremely

7           well and that he was often the caretaker for

8           all his siblings, both the two older ones

9           and the younger ones.

10      Q   Did he ever indicate to you that he

11          attempted to make sure they didn't get in

12          trouble or that they did not get in the

13          wrong crowd?

14      A   He did, actually.  He indicated that his

15          mother had kind of charged him with

16          following his siblings around and making

17          sure that they stayed out of trouble, and

18          that he was supposed to look after them and

19          make sure that they didn't get in with the

20          wrong crowd.

21      Q   Okay.  Let me ask you just a little bit

22          about his social history, that being first

23          of all, his school.  Did he talk to you

24          about his school, his educational history?

25      A   He did.