FILED
2020 Aug-21  PM 12:56
U.S. DISTRICT COURT
N.D. OF ALABAMA



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

KEITH EDMUND GAVIN,                    )
                                       )
    Petitioner,                     )
                                       )
v.                                     )    Case No.  4:16-cv-00273-KOB
                                       )
JEFFERSON S. DUNN,                     )
Commissioner of the Alabama            )
Department of Corrections,             )
                                       )
    Respondent.                     )

# VOLUME 46

# Collateral Appeal – Briefs and Orders

LUTHER STRANGE
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

CR-10-1313 (Death Penalty)

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

```
-------------------------------X
                               :
KEITH GAVIN,                   :
                               :
               Appellant,      :
                               :
      vs.                      : ON APPEAL FROM THE
                               : CIRCUIT COURT OF
STATE OF ALABAMA,              : CHEROKEE COUNTY,
                               : ALABAMA
               Appellee.       : No. CC-98-61.60
                               : No. CC-98-62.60
-------------------------------X
```

**REPLY BRIEF OF APPELLANT KEITH GAVIN**

Stephen C. Jackson          Melanie E. Walker
Drew Kitchen                Caroline L. Schiff
Maynard Cooper & Gale P.C   Sidley Austin LLP
1901 Sixth Avenue North     One South Dearborn Street
2400 AmSouth/Harbert Plaza  Chicago, IL 60603
Birmingham, AL 35203        Phone: (312) 853-7000
Phone: (205) 254-1105       Fax: (312) 853-7036
Fax: (205) 714-6337         E-mail: mewalker@sidley.com

Counsel for Appellant
Keith Gavin

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

PAGE(S)

TABLE OF CONTENTS ......................................... i

TABLE OF AUTHORITIES ..................................... iii

SUMMARY OF THE ARGUMENT .................................... 1

ARGUMENT .................................................. 3

I.   GAVIN RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL
     DURING THE GUILT PHASE OF THE TRIAL................... 3

     A.   The Right to Effective Assistance of Counsel
          Does Not Vanish When Counsel is Unavailable to
          Testify ........................................ 4

     B.   The State Ignores Counsel's Systematic Errors
          Only by Treating Each Error in Isolation,
          Contrary to Supreme Court Precedent ............ 7

     C.   Trial Counsel Rendered Ineffective Assistance ... 9

          1.   Trial Counsel Failed to Impeach Meeks ..... 10

          2.   Trial Counsel Failed to Exclude or Impeach
               Twilley's Unconstitutional and Unreliable
               Identification Testimony .................. 12

          3.   Trial Counsel Failed to Expose
               Investigative Irregularities ............. 14

          4.   Trial Counsel's Failure to Exclude
               Inflammatory References to Gavin's Prior
               Conviction ............................... 16

          5.   Gavin Should Have Been Called to Testify ... 17

II.  GAVIN RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL
     DURING THE PENALTY PHASE OF THE TRIAL............... 18

     A.   Counsel Rendered Deficient Performance During
          the Penalty Phase ............................. 20

1.   Counsel Cannot Delegate His Mitigation
      Responsibilities ...........................20

2.   Dr. Haney's Testimony Is Powerful
      Mitigating Evidence .......................12

3.   These Were Not Strategic Decisions ........26

B.   There is a Reasonable Chance That, Had Gavin
      Enjoyed Competent Counsel, the Outcome of the
      Penalty Phase Would Have Been Different ........29

III. GAVIN IS ENTITLED TO A REMAND FOR CONSIDERATION OF
     HIS JUROR MISCONDUCT CLAIM ON THE MERITS............31

A.   Gavin Properly Preserved His Misconduct Claim ...32

B.   Gavin Was Not Required to File Affidavits at
      the Pleading Stage ..........................36

C.   This Court Should Decline the State's
      Invitation to Adjudicate the Facts on the
      Pleadings ...................................36

IV.  GAVIN ASKS THAT THIS COURT CLARIFY WHICH PETITION
     IS THE OPERATIVE ONE................................37

CONCLUSION ............................................39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Adams v. Wainwright*,
   709 F.2d 1443 (11th Cir. 1983) ........................5, 6

*Berryman v. Morton*,
   100 F.3d 1089 (3d Cir. 1996) ..........................13

*Blake v. Kemp*,
   758 F.2d 523 (11th Cir. 1985) .........................26

*Borden v. State*,
   891 So.2d 393 (Ala. Crim. App. 2002) ..............35, 37

*Brazell v. State*,
   369 So.2d 25 (Ala. Crim. App. 1978) ...................13

*Brooks v. State*,
   929 So.2d 491 (Ala. Crim. App. 2005) ...................6

*Clark v. Quarterman*,
   2007 U.S. Dist. LEXIS 68249 (E.D. Tex. Sept. 14,
   2007) .................................................21

*Dobbs v. Turpin*,
   142 F.3d 1383 (11th Cir. 1998) ........................28

*Dobbs v. Zant*,
   506 U.S. 357 (1993) ....................................8

*Ex parte Borden*,
   60 So.3d 940 (Ala. 2007) ...............................4

*Ex parte Dobyne*,
   805 So.2d 763 (Ala. 2001) .............................37

*Ex parte Frazier*,
   729 So.2d 253 (Ala. 1998) .............................13

*Ex parte Jenkins*,
   972 So.2d 159 (Ala. 2005) ..........................24, 35

iii

*Ex parte Lasley*,
    505 So.2d 1263 (Ala. 1987) ............................37

*Ex parte Peraita*,
    897 So.2d 1227 (Ala. 2004) ....................16, 17, 25

*Ex parte Register*,
    680 So.2d 225 (Ala. 1994) ............................11

*Ex parte Rhone*,
    900 So.2d 455 (Ala. 2004) ........................34, 35

*Gell v. Town of Aulander*,
    2008 WL 5545036 (E.D.N.C. Dec. 1, 2008) ...............25

*Hamblin v. Mitchell*,
    354 F.3d 482 (6th Cir. 2003) ..........................21

*Harris v. Senkowski*,
    298 F. Supp. 2d 320 (E.D.N.Y. 2004) ..................14

*Harris v. State*,
    947 So.2d 1079 (Ala. Crim. App. 2004), *rev'd on other
    grounds*, *Ex parte Jenkins*,972 So.2d 159
    (Ala. 2005) ...........................23, 24, 26, 28, 31

*Hodges v. State*,
    2007 WL 866658 (Ala. Crim. App. Mar. 23, 2007) ........33

*Horton v. Zant*,
    941 F.2d 1449 (11th Cir. 1991) ........................24

*Johnson v. Bagley*,
    544 F.3d 592 (6th Cir. 2008) ....................2, 20, 21

*Johnson v. State*,
    835 So.2d 1077 (Ala. Crim. App. 2001) ..................9

*Lira v. Cate*,
    2009 U.S. Dist. LEXIS 91292 (N.D. Cal. 2009) ..........24

*Nichols v. Butler*,
    953 F.2d 1550 (11th Cir. 1992) ........................18

*Old Chief v. United States*,
    519 U.S. 172 (1997) ...................................17

*Porter v. McCollum*,
    130 S.Ct. 447 (2009) ...............................29, 31

*Reeves v. State*,
    807 So.2d 18 (Ala. Crim. App. 2000) ...................12

*Reeves v. State*,
    974 So.2d 314 (Ala. Crim. App. 2007) ..................18

*Rompilla v. Beard*,
    545 U.S. 374 (2005) ...........................21, 29, 31

*Ruiz v. Johnson*,
    37 F. Supp. 2d 855 (S.D. Tex. 1999) ...................25

*Skipper v. South Carolina*,
    476 U.S. 1 (1986) .....................................24

*Smith v. State*,
    961 So.2d 916 (Ala. Crim. App. 2006) ..................35

*Strickland v. Washington*,
    466 U.S. 668 (1984) ..............................passim

*Talley v. State*,
    802 So.2d 1106 (Ala. Crim. App. 2001) .................35

*Wiggins v. Smith*,
    539 U.S. 510 (2003) ...........................27, 29, 30

*Williams v. Allen*,
    542 F.3d 1326 (11th Cir. 2008) ........................28

*Williams v. Head*,
    185 F.3d 1223 (11th Cir. 1999) .........................6

*Williams v. Taylor*,
    163 F.3d 860 (4th Cir. 1998) ..........................29

*Williams v. Taylor*,
    529 U.S. 362 (2000) .................6, 7, 8, 10, 29, 31

*Wilson v. State*,
    911 So.2d 40 (Ala. Crim. App. 2005) ...............36, 37

**STATUTES AND RULES**

Alabama Rule of Criminal Procedure 32 ................passim

Alabama Rule of Criminal Procedure 32.2 ...................32

Alabama Rule of Criminal Procedure 32.6(b) ..............32

Alabama Rule of Criminal Procedure 32.7(d) ..............34

Alabama Rules of Evidence Rule 404(b) ...................11

Alabama Rules of Evidence Rule 616 ......................12

**OTHER AUTHORITIES**

1 Anthony G. Amsterdam, Trial Manual for the Defense of
   Criminal Cases 199 (1984) ..............................16

C. Gamble, *McElroy's Alabama Evidence*, § 149.01(8)(a)
   (5th ed. 1996) .......................................12

## SUMMARY OF THE ARGUMENT

The State's brief all but ignores Gavin's arguments and invokes a series of supposed rules without any basis in law in an attempt to convince this Court to do the same.

Gavin's opening brief describes how counsel provided systematic ineffective assistance during the guilt phase of the trial: he announced in opening statements a plan to implicate Meeks but then utterly failed to develop supporting testimony or to discredit or exclude key witnesses, or to cast doubt on the State's investigation. Rather than engage Gavin's claim directly, the State first suggests that Gavin is not entitled to make it at all, for Gavin did not have trial counsel testify during the Rule 32 hearing—though the State fails to mention that trial counsel is deceased and thus could not have been called. The State then addresses each of counsel's unprofessional errors in isolation, contrary to clearly established law providing that the right to effective assistance is *cumulative. See, e.g.*, *Strickland v. Washington*, 466 U.S. 668, 690 (1984) (allegations of ineffectiveness must be considered in light of all the circumstances).

1

The State repeats the same errors in its discussion of the penalty-phase *Strickland* violations, and it adds others for good measure. The State suggests, for example, that trial counsel can cast aside his professional duties by enlisting but not supervising the help of non-lawyers, notwithstanding the rule that improper delegation *itself* constitutes ineffective assistance. *See, e.g.*, *Johnson v. Bagley*, 544 F.3d 592, 602 (6th Cir. 2008). It also argues incorrectly that only recognized mental illness, rather than a person's overall social history, is relevant to mitigation, and that only defendants of a certain age (the State does not specify how old) can reasonably rely on evidence of a troubled childhood.

Had the State confronted the overwhelming mitigation evidence that Gavin's trial counsel failed even to investigate, much less to present, it would have been hard-pressed to deny that Gavin received ineffective assistance. Trial counsel's mitigation case consisted of testimony from two witnesses: the mother trial counsel told the jury he had not prepared, and the minister he had spoken to for less than five minutes just days before. No competent counsel would choose to present such a case over the

2

alternative of describing Gavin's coming of age in the
projects of Chicago, surrounded by gangs, drugs, and
violence, and the effects of Gavin's years in prison.

With respect to jury misconduct, the State suggests
that Gavin has somehow failed to preserve his claim for
review, notwithstanding pleading it below and repeatedly
moving to amend his allegations to further support the
claim. Gavin is entitled to review of his claim on the
merits, which he has never had. This court should at the
very least remand for consideration of the claim and an
evidentiary hearing.

Finally, the State appears to misunderstand Gavin's
request with respect to the operative pleading in this
case. Above all, Gavin simply asks that this Court clearly
identify which pleading is the operative one so that,
regardless of the outcome here, any further review of
Gavin's claims can focus on the appropriate petition.

## ARGUMENT

## I. GAVIN RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE GUILT PHASE OF THE TRIAL

The State avoids the guilt-phase denial of Gavin's
Sixth Amendment right to effective assistance of counsel by
relying on two key principles: (1) that a Rule 32

3

petitioner cannot establish a *Strickland* violation without testimony from his trial counsel, and (2) that each alleged professional error is to be considered in isolation. But neither of these principles has any basis in law. In light of the available evidence, and of his conduct throughout the guilt phase of the trial, Gavin's counsel rendered constitutionally deficient and prejudicial performance.

**A.    The Right to Effective Assistance of Counsel Does Not Vanish When Counsel is Unavailable to Testify**

Throughout its brief, the State argues that, because Gavin did not elicit testimony from his trial counsel at the Rule 32 hearing, this Court must conclude that counsel's performance was adequate. What the State fails to mention, however, is that Gavin's trial counsel could not testify because he died before the hearing took place. On the State's view, Gavin's Sixth Amendment rights died with his trial counsel.

It is true that trial counsel is presumed to have acted reasonably—regardless of whether he is called to testify in post-conviction proceedings—but that is nothing more than a statement of the burden of proof. *See, e.g.*, *Strickland*, 466 U.S. at 689 ("[D]efendant must overcome the presumption that, under the circumstances, the challenged action might

be considered sound trial strategy." (internal quotations omitted)). Neither in *Strickland* nor in any other case has the Supreme Court required testimony from trial counsel as a precondition to relief for a Sixth Amendment violation. Gavin has the burden of proving ineffective assistance of counsel, and he has met that burden with the evidence presented in the court below.

To suggest that the unavailability of Gavin's trial counsel should count against him, the State relies on selective and misleading quotations from case law. For example, it quotes *Adams v. Wainwright*, 709 F.2d 1443, 1445–46 (11th Cir. 1983), as follows: "Adams did not call trial counsel to testify at the state hearing and gave no indication to the district court as to how trial counsel would testify at any district court hearing. . . . [*Therefore,*] there is no basis in this record for finding that counsel did not sufficiently investigate Adams' background" (alteration in original, emphasis added). (Appellee Br. at 39). As quoted, the case appears to stand for the proposition that a failure to call trial counsel implies a lack of evidence; after all, there is nothing between the two propositions except the State's added

"Therefore." But in fact, the omitted material includes an account of the affirmative evidence that counsel *had* conducted a thorough investigation, including notes of counsel's interviews with potential witnesses. Far from invoking the State's supposed bar on relief, the *Adams* court weighed the evidence and found that counsel's investigation was adequate.

*Brooks v. State*, 929 So.2d 491, 497 (Ala. Crim. App. 2005), is similarly inapposite. There, trial counsel *was* called to testify at the Rule 32 hearing but was not asked about the claims Brooks was pursuing on appeal. *Id.* As a result, this Court deemed the claims "abandoned." *Id.* Brooks's failure to question counsel about the relevant issues at the hearing suggested that Brooks was uninterested in developing evidence on the subject. In contrast, Gavin presented evidence to support every aspect of his ineffective assistance of counsel claim to the Rule 32 court. *Brooks* is no bar to relief here.

The petitioner is not entitled to "the benefit of the doubt," *Williams v. Head*, 185 F.3d 1223, 1227 (11th Cir. 1999), but he is entitled to "a fair trial, a trial whose result is reliable." *Williams v. Taylor*, 529 U.S. 362, 390

(2000) (quoting *Strickland*, 466 U.S. at 687). Because the evidence adduced below established that trial counsel's performance was objectively unreasonable and prejudicial, Gavin is entitled to relief.

**B.   The State Ignores Counsel's Systematic Errors Only by Treating Each Error in Isolation, Contrary to Supreme Court Precedent**

In a footnote buried late in its brief, the State identifies what it suggests is a merely stylistic choice: "Gavin has a separate prejudice issue in his brief to this Court. The State has put its argument concerning prejudice in the body of Issue I rather than in a separate issue." Appellee Br. at 71 n.3. But the choice is deeply substantive, and contrary to clearly established Supreme Court precedent.

The State discusses prejudice caused by each of counsel's unprofessional errors in isolation, each time assuming away the effect of all the others. For example, the State argues that counsel's failure to competently cross-examine Meeks could not have changed the outcome because Twilley testified that Gavin was the shooter, Appellee Br. at 48, without considering counsel's failure

7

to exclude, or even to competently cross-examine, Twilley's testimony.

Contrary to the State's approach, the Sixth Amendment guarantee of effective assistance is *cumulative*, so the relevant question is not whether any particular error cost Gavin a fair trial, holding all else constant. The defendant is entitled to competent representation during the trial as a whole. *Strickland*, 466 U.S. at 690 (allegations of ineffectiveness must be considered "in light of all the circumstances"); *Williams*, 529 U.S. at 398-99(considering "the entire postconviction record, *viewed as a whole and cumulative of* mitigation evidence presented originally") (emphasis added); *Dobbs v. Zant*, 506 U.S. 357, 359 n.* (1993) (holding that "an inadequate or harmful closing argument, *when combined . . . with* a failure to present mitigating evidence, may be highly relevant to the ineffective-assistance determination") (emphasis added). Considering all of trial counsel's errors, his performance fell below the constitutional minimum.

## C.   Trial Counsel Rendered Ineffective Assistance

In his opening statement to the jury, Bayne Smith framed the trial as a test of two competing accounts: the State was going to argue that Gavin was guilty, but the defense would show that the evidence suggested that Meeks may well have been the shooter. R. 507-08. Implicating Meeks was the only reasonable trial strategy under the circumstances. But the promised trial never occurred, for Smith did not competently present Gavin's side of the story. As a result, the State's unchallenged account was the only one the jury heard, and a conviction was all but assured.

Minimally competent counsel would have understood the need to (1) discredit Meeks (and Twilley) before the jury, (2) cast doubt on the investigation into Gavin, and (3) present affirmative testimony suggesting that Meeks, not Gavin, committed the crime—which would require calling Gavin to the stand. The failure to do any one of these would have been an "unprofessional error." *Johnson v. State*, 835 So.2d 1077, 1081 (Ala. Crim. App. 2001) (quoting *Strickland*, 466 U.S. at 694). But Gavin's trial counsel failed at every turn, and his cumulative errors deprived

Gavin of "a trial whose result is reliable." *Williams*, 529
U.S. at 390 (quoting Strickland, 466 U.S. at 687).

### 1.   Trial Counsel Failed to Impeach Meeks

The State asserts that how Meeks obtained the gun used
in the murder was irrelevant, such that there would be no
reason to investigate it. But if the provenance of the
weapon were immaterial, the State, too, would have ignored
it. Instead, the State emphasized in closing argument that
the gun "had just been assigned through [Meeks's] job as a
correction officer just a few months before." R. 1104. The
State used Meeks's false testimony to distance him from the
crime in two ways. First, since Meeks was *just* assigned the
gun, he is not the kind of person who would have or need a
gun for personal reasons. And second, Meeks was assigned
the weapon as a *corrections officer*, i.e., for the good of
the public, not for any illicit purpose.

Had Meeks been properly cross-examined, the State would
not only have lost the chance to make such arguments, but
the story behind the gun would have been a source of latent
doubt. And a gun of uncertain origin would have buttressed
the factual story—readily available but never put before
the jury—that Meeks was violent and tied to the drug trade,

having gone to Alabama before to sell cocaine and heroin. P.C. 946.

The State resists this by suggesting that the missing evidence "amount[s] to nothing more than hearsay bad character evidence," and that it cannot be deficient performance not to adduce evidence that is inadmissible. Appelle Br. at 47. Of course, the evidence would not be hearsay if counsel called the witnesses to testify at trial, as any competent counsel would, so that aspect of the objection is beside the point. And the evidence is otherwise admissible.

First, Meeks's involvement with drugs, including his prior drug-dealing trips to Alabama, would not be offered as character evidence but instead as evidence of a possible motive for being in Alabama in the first place. Ala. R. Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is . . . admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident"); *Ex parte Register*, 680 So.2d 225, 227-28 (Ala. 1994) (allowing evidence of prior misconduct to show propensity for similar misconduct). Similarly, his drug- and gang-related debts

11

provide a possible motive for robbing, and ultimately killing, the victim.

And even if it were offered as character evidence, it would nonetheless be admissible to impeach Meeks by showing he was biased and had an interest in the case under Alabama Rule of Evidence 616. *See, e.g.*, *Reeves v. State*, 807 So.2d 18, 38–39 (Ala. Crim. App. 2000) ("[T]his rule permits cross-examination, and the introduction of independent evidence, regarding statements, acts, or relationships indicating bias or prejudice . . . even though such 'bad acts' are generally inadmissible" (citing C. Gamble, *McElroy's Alabama Evidence*, § 149.01(8)(a) (5th ed.1996)). If the jury found Gavin not guilty, Meeks might well be tried for the murder. Helping the prosecution secure Gavin's conviction was therefore very much in his interest.

### 2. Trial Counsel Failed to Exclude or Impeach Twilley's Unconstitutional and Unreliable Identification Testimony

The State is correct to note that the effective impeachment of Meeks, by itself, may not have led to Gavin's acquittal, particularly in light of Twilley's in-court identification of Gavin as the shooter. But precisely because identification testimony is so powerful, any

reasonably competent counsel would have sought to strike it, or at least to discredit it. Gavin's trial counsel did neither.

The State emphasizes the difficulty of suppressing identification testimony, but it neither distinguishes nor even cites *Brazell v. State*, 369 So.2d 25, 29 (Ala. Crim. App. 1978), or *Ex parte Frazier*, 729 So.2d 253 (Ala. 1998), two Alabama cases in which a less suggestive identification was deemed unconstitutional. Gavin was identified for the first time at trial—a murder trial could hardly be *more* suggestive of the State's view of Gavin's guilt—as the lone black man sitting between white lawyers at counsel's table. By contrast, in both *Brazell* and *Frazier*, the initial identification occurred during pretrial investigation, when the defendant was still a mere suspect.

The State also describes trial counsel's attempt at impeaching Twilley. But that attempt failed in two critical respects. First, counsel made no effort to use Twilley's prior inconsistent statement (here, regarding the shooter's height and weight), an error that has repeatedly been held to constitute ineffective assistance of counsel. *See, e.g.*, *Berryman v. Morton*, 100 F.3d 1089, 1102 (3d Cir. 1996);

13

*Harris v. Senkowski*, 298 F. Supp. 2d 320, 337–38 (E.D.N.Y. 2004). Second, although counsel told the jury that the evidence would show Meeks was the shooter, counsel failed to exploit the fact that Twilley's description of 6-foot tall shooter of average build better matches Meeks than Gavin. P.C. 486.

### 3. Trial Counsel Failed to Expose Investigative Irregularities

The State responds to Gavin's argument regarding investigative irregularities by raising factual questions—such as whether the Corporate Express van was towed, and whether Meeks was warned before being interrogated—and arguing that any failure to expose irregularities is insufficient by itself to constitute ineffective assistance.

The possibility of reasonable factual disputes could only have *helped* Gavin's case, contrary to the State's suggestion. The jury never heard that the van may have been contaminated, or that the other potential shooter may have had 18 hours to prepare for an initial interrogation, with friends at his side. Gavin did not have to prove his innocence, only reasonable doubt as to his guilt, and the

reasonable possibility of serious investigative failures
would contribute to such doubt.

More importantly, the investigative failures, if
properly exposed, would have contributed to Gavin's only
viable defense theory that Meeks, not Gavin, was
responsible. Any competent defense counsel would have
emphasized that the murder weapon was found a week after
Gavin's arrest in a wooded area that had not been monitored
in the interim, and only after officers had returned from
interviewing Meeks in Chicago. P.C. 484-85; *See also* P.C.
969-72. Police's failure to follow standard procedure and
secure the area raises the possibility that the weapon may
have been placed at the scene after the incident, P.C. 969-
70, a possibility the jury was not led to appreciate. That
delay, combined with the improper 18-hour warning to Meeks
prior to the initial police interview—during which he had
time to dispose of or hide evidence and prepare a story—
could well have tipped the scales of reasonable doubt, if
only it were exposed by competent counsel.

Gavin need not prove that a competent presentation of
these irregularities, in isolation, would likely have led
to a different outcome. Instead, his burden is to show

15

that, but for his counsel's cumulative unprofessional errors, there is a reasonable possibility the trial would have ended differently. He has met that burden here.

### 4. Trial Counsel's Failure to Exclude Inflammatory References to Gavin's Prior Conviction

The State downplays trial counsel's utter failure to exclude inflammatory references to Gavin's prior conviction. Indeed, Bayne Smith *himself* called Gavin a "heinous convicted criminal" in his opening statement, as no minimally competent counsel would. R. 513. Instead of highlighting Gavin's prior crime, competent counsel would have sought to stipulate to it, taking any facts or argument about it off the table. Criminal defense trial manuals had recommended this course for at least fifteen years before Gavin was tried. *E.g.*, 1 Anthony G. Amsterdam, Trial Manual for the Defense of Criminal Cases 199 (1984) ("Since there is ordinarily no contest to be made about the defendant's record, it is usually wise to plead guilty to the priors (or to stipulate the priors, as local practice may have it).").

The State suggests that this longstanding practice would have been unthinkable at the time, for *Ex parte*

16

*Peraita*, 897 So.2d 1227 (Ala. 2004), had not yet been decided. But *Peraita* did not invent stipulations to a prior conviction. In fact, it analyzed and applied a U.S. Supreme Court case decided well before Gavin's trial. *See Old Chief v. United States*, 519 U.S. 172 (1997). In that case, the Court held that an offer to stipulate to a prior conviction, where (as here) only the *fact* of conviction is relevant, bars the introduction of any other evidence regarding that conviction. *Id.* at 191 ("[T]he risk of unfair prejudice did substantially outweigh the discounted probative value of the record of conviction, and it was an abuse of discretion to admit the record when an admission was available."). In light of *Old Chief*, and of common criminal defense practice, an offer to stipulate would hardly have required that counsel forecast *Peraita*. It would simply have been the reasonable choice for any competent counsel to make.

### 5.  Gavin Should Have Been Called to Testify

Gavin's testimony, by itself, would not likely have changed the outcome at trial. But it was still unreasonable not to offer the testimony, for it was the only affirmative basis for implicating Meeks. On this point, the State

repeats the same legal error that appears throughout its brief by considering Gavin's testimony in isolation.

Perhaps the State is correct that Gavin's testimony would have been hard to credit in light of, for example, Twilley's identification testimony. Appellee Br. 70-71. But what the State never considers is the effect of Gavin's testimony at a trial where Twilley's testimony is excluded or impeached, Meeks is called out as an untrustworthy and violent drug dealer, and the State's investigative irregularities are exposed. At such a trial, Gavin would likely have been believed, or at the very least, there is a good chance the testimony would have contributed to reasonable doubt. The jury knew that either Gavin or Meeks had to have been the shooter, and only Gavin could have explained how Meeks was responsible. Under similar circumstances, this Court and others have found a violation of *Strickland*. *See Reeves v. State*, 974 So.2d 314, 324 (Ala. Crim. App. 2007); *Nichols v. Butler*, 953 F.2d 1550, 1553-54 (11th Cir. 1992).

## II.  GAVIN RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE PENALTY PHASE OF THE TRIAL

The State's discussion of counsel's penalty-phase performance repeats the errors that frame its discussion of

18

guilt: the State asserts that the failure to offer
testimony from trial counsel is an insurmountable obstacle,
and that each failure is to be considered in isolation.
But, as discussed above, both of these propositions are
false.

Moreover, the State wrongly suggests that this Court
can disregard entirely the detailed evidence presented
through Gavin's post-conviction mitigation specialist, Dr.
Paramore, in favor of the "notes" taken by the State's
witness, Dr. King, during a short interview with Mr. Gavin.
Putting aside for the moment that Dr. King himself
testified as to mitigating factors (which the State
conveniently ignores), by his own admission, Dr. King is
not a mitigation specialist and did not perform a
mitigation evaluation. The proper inquiry here is what
evidence Mr. Gavin's trial counsel *actually* presented
during the penalty phase of Mr. Gavin's trial as opposed to
the evidence he could have presented, as shown through the
testimony of Drs. Paramore and Haney. That contrast is deep
and stark. No competent counsel could have made a
"strategic" decision to put on evidence from two witnesses,
including a preacher who barely knew Mr. Gavin, without any

19

preparation whatsoever, rather than a full explanation of the horrific challenges facing Mr. Gavin from the very beginning.

### A. Counsel Rendered Deficient Performance During the Penalty Phase

#### 1. Counsel Cannot Delegate His Mitigation Responsibilities

The State can defend Bayne Smith's mitigation investigation only by pawning off responsibility on others. But the duty to investigate cannot be blindly delegated— contrary to the State's contention, trial counsel was not "justified in relying on [Lucia Penland]" to do his job for him. Appellee Br. 74. Just as a doctor cannot delegate his medical responsibilities to an unlicensed third party, trial counsel is not entitled to delegate his legal responsibilities. The failure to perform an investigation into Gavin's background falls squarely on trial counsel's shoulders. *See, e.g., Johnson*, 544 F.3d at 602 (finding deficient performance in part due to "lack of structure and supervision over the investigation").

Trial counsel did not competently supervise what little investigation others had done, and when asked, he concealed his neglect. On the day before the trial, he told the trial

court he did not have any mitigation evidence. P.C. 498. In
fact, trial counsel had a memorandum from a mitigation
specialist indicating many potential leads, but suggesting
that additional follow-up was required. P.C. 490-95. There
is a straightforward explanation for counsel's
misrepresentation to the court: he did not want to admit
that he failed to conduct a minimally competent search for
mitigation evidence. *See* P.R. 646-48. Tellingly, the State
does not even address these facts in its response.[1]

---

[1] The State also contends that trial counsel's failure to
perform an adequate mitigation investigation can be blamed
on Gavin's family's lack of cooperation. Appellee Br. at
82-83.  This contention is contrary to well-established
Supreme Court precedent that a defendant's or his family
members' lack of cooperation does not excuse counsel from
performing an investigation into the defendant's
background. *See Rompilla v. Beard*, 545 U.S. 374, 377 (2005)
(defendant's lack of cooperation in a mitigation case and
reports by family members that there was no mitigating
evidence in defendant's background did not excuse counsel's
failure to examine record of prior conviction); *see also
Johnson*, 544 F.3d at 603 ("Uncooperative defendants and
family members [] do not shield a mitigation investigation
(even under AEDPA's deferential standards) if the attorneys
unreasonably failed to utilize other available sources that
would have undermined or contradicted information
received."); *Hamblin v. Mitchell*, 354 F.3d 482, 492 (6th
Cir. 2003) ("ABA and judicial standards do not permit the
courts to excuse counsel's failure to investigate or
prepare because the defendant so requested"); *Clark v.
Quarterman*, No. 2:03cv357, 2007 U.S. Dist. LEXIS 68249
(E.D. Tex. Sept. 14, 2007) (counsel's failure to interview
petitioner's parents constituted deficient performance

### 2.   Dr. Haney's Testimony Is Powerful Mitigating Evidence

The State argues that it was reasonable for trial counsel to withhold evidence of Gavin's institutionalization because it would alert the jury to the fact that he had been convicted of a prior murder. Appellee Br. at 77. This argument is silly. The State had already told the jury no fewer than 6 times during the guilt phase of Gavin's trial that Mr. Gavin was a "convicted murderer from Chicago," R. 492, 494, 497, 1061, 1092, 1095, and made Mr. Gavin's prior conviction the centerpiece of its aggravation case. R. 1229-39; *See also* P.C. 68.

In addition, the State's contention that institutionalization "is not a recognized clinical psychological diagnosis" is simply a red herring. There is no legal requirement that mitigation testimony must be about recognized psychological disorders. Evidence of Gavin's institutionalization explains the dramatic impact on him of being incarcerated for 17 years, almost his entire adult life, which would have been powerful evidence

despite fact that petitioner insisted they not be called: "[t]he duty to investigate [mitigating evidence] exists regardless of the expressed desires of a client.").

to the jury to explain his behavior after he was released. *See* App. B. at 28 (Institutionalization is "always relevant to a potential case in mitigation in capital cases. To the extent to which somebody has been in an institutional setting, then [] their institutional history and the events and experiences that occurred while they were in an institutional setting are part of their social history"). None of the jurors on Gavin's case had any experience with life in such a setting.  Dr. Haney's testimony would have assisted the jury to understand a person and circumstance that was not familiar to them. *See* App. B. at 238 ("Mitigation is not just something that explains the crime. Mitigation is designed to explain the person.")

Most importantly, Dr. Haney testified that Gavin will not be a threat while he remains in prison, which established case law suggests is important mitigating evidence.[2] *See Harris v. State*, 947 So.2d 1079, 1128 (Ala. Crim. App. 2004) (finding deficient performance in part due

---

[2] Notably, the State's Rule 32 witness, Dr. King, concurred with Dr. Haney's assertion that Gavin would not be a threat to others while in prison. P.R. 628 ("[I]t would be my opinion based on the knowledge that I have and my knowledge about how we predict violence and offenses and things of that nature that [Gavin] would not pose a risk" if he were incarcerated, rather than executed).

to failure to expose that defendant "had successfully acclimated herself to prison life"), *rev'd on other grounds*, *Ex parte Jenkins*, 972 So.2d 159 (Ala. 2005); *Horton v. Zant*, 941 F.2d 1449, 1463 (11th Cir. 1991) ("Horton . . . successfully adjusted to previous stays in prison. Our Circuit has in the past held that a failure to present similar mitigating evidence at sentencing for a similar crime was sufficient to establish prejudice."); *see also Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (vacating death sentence due to exclusion of evidence that defendant was a "well-adjusted" prisoner"). At minimum, this information should have been presented to the jury.

The State also contends that Dr. Haney's opinions on institutionalization are unpersuasive, seeking to substitute its biased view for the judgment of the jury. But Dr. Haney has been retained to testify at the mitigation hearings in over one hundred capital cases and has been qualified as an expert witness approximately 60 times. App. B. at 31, 33; *See also Lira v. Cate*, No. C 00-0905 SI, 2009 U.S. Dist. LEXIS 91292 (N.D. Cal. 2009) (noting that Dr. Haney is a "nationally recognized authority on the mental health effects of prolonged

confinement in isolating conditions."); *Gell v. Town of Aulander*, 2008 WL 5545036 (E.D.N.C. Dec. 1, 2008) (recognizing that Dr. Haney "has been qualified as an expert in federal courts on multiple occasions."); *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 909, n.93 (S.D. Tex. 1999) (finding that Dr. Haney is "well-qualified to assess the psychological affects of various forms of incarceration").

Finally, the State completely mischaracterizes *Ex Parte Peraita*, where Dr. Haney was not permitted to testify during the <u>guilt</u> phase of the defendants trial as to the defendant's self defense claim, because too much time had elapsed between the crime and the defendant's interview with Dr. Haney.[3] *Ex Parte Peraita*, 897 So. 2d at 1232. This is unrelated to mitigation.

---

[3] The State's unfounded assertion that Dr. Haney's evaluation of Gavin was too remote from the crime to provide an accurate assessment is misguided. Dr. Haney makes clear from his report and testimony that his opinions relate only to Gavin's time in Illinois prison, and there was an extensive record of Gavin's 17 years in Illinois prison that formed the basis of Dr. Haney's opinions. P.C. 1052; App. B. 40-42. Moreover, any failure on the part of Dr. Haney to timely interview Gavin is the result of Gavin's trial counsel dropping the ball.

### 3. These Were Not Strategic Decisions

The State argues that "Gavin has not presented any evidence that counsel failed to investigate mitigating evidence," Appellee Br. at 80, once again citing the failure to examine the deceased trial counsel at the Rule 32 hearing. *Id.* But Gavin can prove trial counsel's neglect without asking counsel himself.

The most obvious evidence of counsel's investigative failures is the mitigation case he presented, which consisted of two unprepared witnesses examined by an unprepared lawyer. Trial counsel's failure in this regard is inexcusable. He admitted in front the jury and on the record that he had not prepared for Gavin's mother's testimony. R. 1258. And he approached the only other witness, Reverend Johnson, for the first time three days before Johnson testified for less than five minutes—without asking a single question to prepare for the upcoming testimony. P.C. 2956-57. *See Harris*, 947 So.2d at 1131 ("'failure to seek out and prepare any witnesses as to mitigating circumstances deprived him of . . . an opportunity to put on mitigating evidence." (quoting *Blake v. Kemp*, 758 F.2d 523, 535 (11th Cir. 1985) alteration in

26

original)). If that is the best mitigation case trial counsel could muster, he must not have engaged in any meaningful investigation at all. Failure to investigate takes deference to lawyer strategy off the table. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 526 (2003) ("The record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment.").

Any competent counsel would have discovered and, having discovered, presented the extensive evidence of Gavin's abusive childhood, gang-infested neighborhood, and exposure to violence at a young age, as well as his family's drug problems. Reasonable counsel also would have presented evidence regarding the institutionalization that Gavin experienced during his time in prison in Illinois.

In the face of such powerful evidence, the State's primary response is that reasonable counsel could have chosen to present a minister's testimony instead to the Cherokee County, Alabama jury. Appellee Br. at 84–85. But the "the idiosyncrasies of the particular decisionmaker" are constitutionally irrelevant, *Strickland*, 466 U.S. at

27

695, for the *Strickland* inquiry requires "an objective standard that presumes a reasonable decisionmaker." *Williams v. Allen*, 542 F.3d 1326, 1345 (11th Cir. 2008). For this reason, a defendant's exposure to "promiscuity, alcohol and violence" is powerful mitigating evidence in nearby Walker County, Georgia, *Dobbs v. Turpin*, 142 F.3d 1383, 1388 (11th Cir. 1998), as is childhood violence in Mobile County, *Williams*, 542 F.3d at 1342, or childhood poverty and abuse in Montgomery County, *Harris*, 947 So.2d at 1128.

Even setting aside the State's implicit suggestion that Cherokee County jurors are unable to understand the effects of drugs, gangs, and violence on children, its argument is based on a false dichotomy. Gavin's counsel could have presented *both* the minister's testimony *and* the evidence of Gavin's troubled youth. Indeed, the stories are complementary. Gavin had a difficult childhood that led him to crime, but he is a good soul who has turned to God and deserves compassion.

**B.    There is a Reasonable Chance That, Had Gavin
Enjoyed Competent Counsel, the Outcome of the
Penalty Phase Would Have Been Different**

The State leads its prejudice analysis by arguing that childhood background is irrelevant to the mitigation of crimes committed by a 38-year-old. But this is wrong as a matter of law, and the State suggests otherwise only by citing cases that predate almost all of the Supreme Court's major opinions on ineffective assistance of counsel during the penalty phase. *See Porter v. McCollum*, 130 S.Ct. 447 (2009); *Rompilla*, 545 U.S. 374 (2005); *Wiggins*, 539 U.S. 510; *Williams*, 529 U.S. 362.

In *Porter*, the Supreme Court expressly rejected the State's very argument, holding the position not just wrong but unreasonable. *See* 130 S.Ct. at 455 ("It is unreasonable to discount to irrelevance the evidence of Porter's abusive childhood."). Porter was 54 at the time of his crime—much *older* than Gavin—while Ronald Rompilla was Gavin's age;[4] Terry Williams was 31;[5] and Kevin Wiggins was in his late twenties.[6] And yet the Supreme Court found, for each,

---

[4] *See* http://articles.mcall.com/1988-10-29/news/2666317_1_stab-wounds-prosecution-second-knife.
[5] *Williams v. Taylor*, 163 F.3d 860 (4th Cir. 1998)
[6] *See* http://articles.baltimoresun.com/2002-11-

counsel's failure to present mitigation evidence relating to their childhood supported a finding of ineffective assistance of counsel.

The remainder of the State's argument is directed primarily at distinguishing *Wiggins*. But the State's effort is ultimately unavailing, based as it is primarily on a mischaracterization of the compelling story of Gavin's troubled past.

The State suggests Gavin had an idyllic childhood, relying on what Gavin revealed to the State's witness, Dr. King, in a short interview. It is no surprise that Gavin would be less than forthcoming about his troubled past, particularly with someone who was *not* doing a mitigation workup but instead met with Gavin briefly to prepare to testify *for the State* at the Rule 32 hearing.

In relying on Dr. King's testimony, the State ignores the overwhelming evidence of poverty and abuse. Gavin may have told Dr. King he was "not poor but moderate," Appellee Br. at 94, but all the while he was living in the Chicago housing projects—not exactly the home of a middle-class family. P.C. 1025; P.R. 437-42, 445-47. His family included

19/news/0211190357_1_wiggins-death-sentence-death-row.

gang members and drug users, P.R. 411, 413-16, 420-21; P.C. 1026, and he was himself a victim of gang violence in the neighborhood. P.R. 419. He may have told Dr. King that his neighborhood was safe at certain points in time, Appellee Br. at 93, but one of his brothers was shot in the back, and another shot two gang members responsible for beating Gavin so badly he needed to be hospitalized. P.R. 416, 419.

The State also ignores the many cases that found ineffective assistance on similarly compelling facts. For example, it does not even cite, much less distinguish, the U.S. Supreme Court's recent decisions in *Porter*, *Rompilla*, and *Williams.* Nor does the State address this Court's *Harris* case. Instead, the State simply asserts that a competent presentation—including Gavin's exposure to violence, gangs, drugs, and imprisonment, as well as his ability to adapt to life in prison—could not possibly have led to a different outcome from a case consisting of two unprepared witnesses.  Merely stating this untenable position refutes it.

## III. GAVIN IS ENTITLED TO A REMAND FOR CONSIDERATION OF HIS JUROR MISCONDUCT CLAIM ON THE MERITS

Despite repeated attempts to put the claim before the trial court, Gavin's juror misconduct claim has never been

considered on the merits. The State's response is that the claim has not been preserved, lacks evidentiary support in the record, and is meritless. But Gavin raised the claim in every motion he reasonably could, and his claim is a strong one, not that it should matter in this posture: Gavin is entitled to have his claim considered on the merits, for the State does not and cannot argue that his proposed amendments were prejudicial or dilatory.

## A.   Gavin Properly Preserved His Misconduct Claim

The trial court dismissed Gavin's initial petition for failure to comply with Rules 32.2 and 32.6(b) of the Alabama Rules of Criminal Procedure, June 19, 2006 Order, and it never allowed Gavin the chance to amend his juror misconduct claim. Gavin twice thereafter attempted to file an amended petition with the specificity that Rule 32 requires, but the trial court would not allow it. In response to Gavin's first attempt, the court held that, "[t]o the extent that the Defendant's amended Rule 32 petition seeks to restate claims which were dismissed . . . , said restated claims are DISMISSED." P.C. 586. And again in 2010, the Court held that "to the extent that the Defendant's April 2, 2010 filings assert grounds

32

different from those previously asserted, or rely on evidence not otherwise made part of the record in this case, same shall not be considered by this Court." P.C. 2971-72.

Unwilling to allow that order to go unchallenged, Gavin asked the Court again to grant his motion for leave to amend his Second Amended Petition. P.C. 2987-3071. Gavin argued, as he had earlier, that the State would not be prejudiced by the amendment. But the trial court did not grant Gavin's motion.

Notwithstanding Gavin's repeated efforts, the State argues that Gavin "failed to object" to the dismissal of his juror misconduct claim and therefore has failed to preserve them. Appellee Br. 96. In the State's view, three motions for leave to amend, including one renewed after the Order denying relief on Gavin's Rule 32 petition, are not enough. That cannot be. It is true but irrelevant that the "general rules of preservation apply to post conviction proceedings, and issues that are not first raised in the circuit court are not properly before [this court] on appeal." *Hodges v. State*, No. CR-04-1226, 2007 WL 866658, at *46 (Ala. Crim. App. Mar. 23, 2007). Gavin put his juror

33

misconduct claim before the trial court three times, but the trial court refused even to consider it. *See Ex parte Borden*, 60 So.3d 940, 946 (Ala. 2007) ("[R]eliance on this well settled principle is misplaced in the present case; there is an adverse ruling from the trial court regarding [the] juror-misconduct claims.").

Alabama Rule of Criminal Procedure 32.7(d) provides that leave to amend a Rule 32 petition "shall be freely granted." And the Alabama Supreme Court has held that, under 32.7(d), "only grounds such as actual prejudice or undue delay will support a trial court's refusal to allow, or to consider, an amendment to a Rule 32 petition." *Ex parte Rhone*, 900 So.2d 455, 458 (Ala. 2004). But the trial court refused to allow Gavin's amendments without any such finding. Indeed, on the State's own account, the court in its *initial order* refused to give Gavin "permission to amend his Rule 32 petition to include a juror misconduct claim," Appellee Br. at 95–96, before Gavin even filed a motion to amend, and so before the State had a chance to argue prejudice.

The situation here is just like that in *Rhone*, where the Alabama Supreme Court reversed the denial of leave to

34

amend based on a petitioner's motion "request[ing] that the court grant his previously filed motion to amend his Rule 32 petition." *Id.* at 457. An identical motion was filed in this case, and nothing more was required. And *Rhone* is no outlier: this court regularly remands for consideration of amended Rule 32 petitions where the trial court failed to identify prejudice. *See, e.g.*, *Smith v. State*, 961 So.2d 916 (Ala. Crim. App. 2006) (reversing for failure to consider amended petition); *Talley v. State*, 802 So.2d 1106 (Ala. Crim. App. 2001) (same); *see also Ex parte Jenkins*, 972 So.2d 159 (holding that petitioner was entitled to amend his petition to allege jury misconduct).

In this case, the trial court denied Gavin's initial petition, and then it simply referred to its initial denial in response to each of Gavin's attempts to amend. But as this Court has explained, a trial court cannot "'carry over' its dismissal order from the original petition to the dismissal of the amended petition." *Borden v. State*, 891 So.2d 393, 397 (Ala. Crim. App. 2002). Instead, the court must "determine whether an evidentiary hearing should be held" on the claims, or "submit a specific written order addressing any claims that are dismissed without a

hearing." *Id.* Gavin is entitled to "a thorough review of all of his properly pleaded claims, and he is entitled to an opportunity to prove the allegations of those claims that are not due to be summarily dismissed." *Wilson v. State*, 911 So.2d 40, 47 (Ala. Crim. App. 2005).

### B.   Gavin Was Not Required to File Affidavits at the Pleading Stage

The State suggests that the juror misconduct claim is also barred because Gavin "never requested . . . an evidentiary hearing on this claim, and never proffered any facts [i.e., affidavits] to support this claim while his case was pending." Appellee Br. at 96. But the State never explains how Gavin was supposed to introduce evidence or seek a hearing on a claim that had been *dismissed* by the trial court. Gavin agrees with the State that his claim must be tested with evidence presented in an evidentiary hearing. This Court should remand so that the trial court can hold such a hearing.

### C.   This Court Should Decline the State's Invitation to Adjudicate the Facts on the Pleadings

The State also argues that Gavin's misconduct claim is "incredible" and based on facts that are "highly unlikely." Appellee Br. at 98. Again, there is no evidence before the

36

Court because the claim was improperly dismissed on the
pleadings. There was simply no way to introduce the
evidence the State contends is lacking.

Regardless of whether, in the State's view, the
allegations are "unlikely," Gavin is entitled to
consideration of his claim on the merits. *Borden*, 891 So.2d
at 397; *Wilson*, 911 So.2d at 47. And given the central
importance of an impartial jury, the test for misconduct is
a forgiving one: "in determining whether a new trial or a
reversal is warranted because of juror misconduct . . . the
test is whether the defendant *might* have been prejudiced,
not whether he actually was prejudiced, by such
misconduct." *Ex parte Dobyne*, 805 So.2d 763, 771 (Ala.
2001) (emphasis added); *see also Ex parte Lasley*, 505 So.2d
1263, 1264 (Ala. 1987) (noting the "light burden" for juror
misconduct claims). Given the opportunity, Gavin will
present more than enough evidence to meet this burden.

## IV. GAVIN ASKS THAT THIS COURT CLARIFY WHICH PETITION IS THE OPERATIVE ONE

In the opening brief on appeal, Gavin asks this Court
to "clarify the record that Gavin's Second Amended Petition
is the operative pleading or, to the extent this Court
finds that the trial court denied Gavin's motion for leave

37

to amend in whole or in part, reverse that decision and
enter an order granting Gavin's motion." Appellant Br. at
97. Gavin cannot reasonably be expected to seek further
review, or (if successful here) to oppose the State's
efforts on further appellate review, without knowing which
petition is the operative one. The State has no reason to
resist this request for clarification, and yet it does so.

The State contends that "the Rule 32 court considered
the second amended Rule 32 petition," Appellee Br. at 100,
but it never takes a position on which petition *this* Court
should be considering. The Rule 32 court undoubtedly looked
at Gavin's second amended petition—and in that sense at
least, "considered" it—but it never clearly denied leave to
file the petition or accepted the filing but denied relief.
In other words, Gavin contends that the denial of relief
from his Rule 32 petition was error, but an essential
threshold question is *which* petition was erroneously
rejected. The State asks this Court not to answer that
question, but Gavin respectfully submits that the Court
must do so. The Court must determine what order or orders
are under review.

## CONCLUSION

This Court should reverse the judgment of the trial court, or at least remand for consideration of Gavin's juror misconduct claims.


Respectfully submitted,

s/Stephen C. Jackson


Stephen C. Jackson          Melanie E. Walker
Drew Kitchen                Caroline L. Schiff
Maynard Cooper & Gale P.C   Sidley Austin LLP
1901 Sixth Avenue North     One South Dearborn Street
2400 AmSouth/Harbert Plaza  Chicago, IL 60603
Birmingham, AL 35203        Phone: (312) 853-7000
Phone: (205) 254-1105       Fax: (312) 853-7036
Fax: (205) 714-6337         E-mail: mewalker@sidley.com

**CERTIFICATE OF SERVICE**

I certify that on May 18, 2012, I served a copy of the

foregoing document via Federal Express upon:

Corey Maze
State of Alabama
Office of the Attorney General
Capital Litigation Division
500 Dexter Avenue
Montgomery, Alabama 36130

                              s/Stephen C. Jackson
                              Stephen C. Jackson

CR-10-1313 (Death Penalty)

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

```
-------------------------------X
                               :
KEITH GAVIN,                   :
                               :
            Appellant,         :
                               :
    vs.                        : ON APPEAL FROM THE
                               : CIRCUIT COURT OF
STATE OF ALABAMA,              : CHEROKEE COUNTY,
                               : ALABAMA
            Appellee.          : No. CC-98-61.60
                               : No. CC-98-62.60
-------------------------------X
```

**APPLICATION FOR REHEARING AND SUPPORTING BRIEF
OF APPELLANT KEITH GAVIN**

Stephen C. Jackson          Melanie E. Walker
Drew Kitchen                Steven J. Horowitz
Maynard Cooper & Gale P.C.  Sidley Austin LLP
1901 Sixth Avenue North     One South Dearborn Street
2400 AmSouth/Harbert Plaza  Chicago, IL 60603
Birmingham, AL 35203        Phone: (312) 853-7000
Phone: (205) 254-1105       Fax: (312) 853-7036
Fax: (205) 714-6337         E-mail: mewalker@sidley.com


            Counsel for Appellant
                 Keith Gavin

## TABLE OF CONTENTS

**PAGE**

REHEARING APPLICATION ......................................1

PROPOSED STATEMENT OF FACTS ..............................1

I.   FACTS RELATED TO COUNSEL'S INEFFECTIVE ASSISTANCE AT
     THE GUILT PHASE OF THE TRIAL........................1

     A.   Background on the Trial .......................1

     B.   Evidence Adduced During Gavin's Rule 32 Hearing ..5

II.  FACTS RELATED TO COUNSEL'S INEFFECTIVE ASSISTANCE AT
     THE PENALTY PHASE OF THE TRIAL.....................12

     A.   Mitigation Evidence Presented at the Penalty
          Phase .......................................12

     B.   Counsel's Interactions With the Alabama Prison
          Project, Which Revealed to Counsel That an
          Investigation Would Likely Uncover Powerful
          Mitigation Evidence .........................16

     C.   Available Evidence and Testimony in Mitigation
          That Was Never Presented by Counsel ..........21

     D.   Testimony of Dr. Craig Haney and Effects of
          Institutionalization .........................32

III. FACTS RELATED TO GAVIN'S JUROR MISCONDUCT CLAIM......36

     A.   Premature Deliberation on Sentencing ...........36

     B.   Improper Extra-Juror Communication with the
          Bailiff .....................................37

BRIEF IN SUPPORT OF REHEARING ............................37

STATEMENT OF THE CASE ...................................37

STATEMENT OF THE ISSUES .................................39

STATEMENT OF THE STANDARD OF REVIEW ....................40

i

SUMMARY OF THE ARGUMENT ................................. 40

ARGUMENT ............................................... 44

I.   REHEARING IS WARRANTED BECAUSE THIS COURT ERRED IN
     RULING THAT GAVIN'S TRIAL COUNSEL WAS NOT INEFFECTIVE
     DURING THE GUILT PHASE OF THE TRIAL.................. 44

     A.   Trial Counsel Failed to Investigate and Impeach
          the State's Key Witness, Dwayne Meeks .......... 45

     B.   Trial Counsel Failed to Expose Irregularities in
          the State's Investigation ..................... 53

     C.   Trial Counsel Failed to Suppress Identification
          Evidence and to Effectively Cross-Examine
          Unreliable Identification Testimony ............ 58

     D.   Trial Counsel Failed to Prevent the Jury From
          Hearing Evidence of Gavin's Prior Conviction
          During the Guilt Phase ........................ 64

     E.   Trial Counsel Failed to Counsel Gavin to Testify
          in His Own Defense ............................ 67

II.  REHEARING IS WARRANTED BECAUSE THE COURT OVERLOOKED KEY
     FACTS AND PRECEDENT RELEVANT TO GAVIN'S PENALTY-PHASE
     INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM.............. 69

     A.   This Court Improperly Attributed Counsel's
          Investigative Failures to Others ............... 70

     B.   The Information Provided to Trial Counsel Should
          Have Led Him to Investigate Further. ........... 77

     C.   This Court Failed to Appreciate the Prejudice in
          Trial Counsel's Failures Because the Court
          Mistakenly Focused on the Idiosyncrasies of the
          Particular Decisionmaker ...................... 84

III. THIS COURT IMPROPERLY DENIED RELIEF REGARDING JUROR
     MISCONDUCT BASED ON A RULE NEVER CITED BY THE CIRCUIT
     COURT OR IN THE STATE'S BRIEFS...................... 92

A.    Juror Testimony is Admissible Under Rule 606(b) Where, as Here, it Relates to Pre-trial Discussions ......................................94

B.    Applying Rule 606(b) To Bar the Juror Testimony Here Would Be Unconstitutional ..................99

C.    This Court Should Remand for an Evidentiary Hearing ........................................106

CONCLUSION ...........................................108

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Almandarez-Torres v. United States*,
    523 U.S. 224 (1998) ................................. 65, 66

*Apprendi v. New Jersey*,
    530 U.S. 466 (2000) ................................... 65

*Arizona v. Youngblood*,
    488 U.S. 51 (1988) .................................... 59

*Berryman v. Morton*,
    100 F.3d 1089 (3d Cir. 1996) ...................... 63, 64

*Brazell v. State*,
    369 So.2d 25 (Ala. Crim. App. 1978) ................... 61

*California v. Ramos*,
    463 U.S. 992 (1983) .................................. 106

*City of Homewood v. Bharat, LLC*,
    931 So.2d 697 (Ala. 2005) ............................. 98

*Clark v. Quarterman*,
    2007 WL 2727129 (E.D. Tex. Sept. 14, 2007) ............ 72

*Dickerson v. Bagley*,
    453 F.3d 690 (6th Cir. 2006) .......................... 90

*Dobbs v. Zant*,
    506 U.S. 357 (1993) ................................... 45

*Ex parte Borden*,
    60 So.3d 940 (Ala. 2007) ........................ 107, 108

*Ex parte Burgess*,
    21 So.3d 746 ......................................... 106

*Ex parte DeBruce*,
    651 So.2d 624 (Ala. 1994) ............................. 99

*Ex parte Dobyne*,
    805 So.2d 763 (Ala. 2001) ............................ 104

iv

*Ex parte Frazier*,
   729 So.2d 253 (Ala. 1998) ...........................61, 62

*Ex parte Harrison*,
   61 So.3d 986 .......................................106

*Ex parte Hodges*,
   No. 1100112, 2011 WL 3780100 (Ala. Aug. 26, 2011) .....106

*Ex parte McGriff*,
   908 So.2d 1024 (Ala. 2004) ...........................40

*Ex Parte Peraita*,
   897 So.2d 1227 (Ala. 2004) ...........................65

*Ex parte Womack*,
   541 So.2d 47 (Ala. 1988) .............................53

*Ferguson v. Georgia*,
   365 U.S. 570 (1961) ..................................68

*Flowers v. State*,
   922 So.2d 938 (Ala. Crim. App. 2005) .................96

*Green v. Georgia*,
   442 U.S. 95 (1979) ...................................99

*Hamblin v. Mitchell*,
   354 F.3d 482 (6th Cir. 2003) .........................72

*Harries v. Bell*,
   417 F.3d 631 (6th Cir. 2005) .........................77

*Harris v. Senkowski*,
   298 F. Supp. 2d 320 (E.D.N.Y. 2004) ..............59, 63

*Harris v. State*,
   947 So.2d 1079 (Ala. Crim. App. 2004) .........81, 82, 83

*Hayes v. State*,
   647 So.2d 11 (Ala. Crim. App. 1994) ............101, 107

*Holland v. State*,
   587 So.2d 848 (Miss. 1991) .....................102, 103

*Holmes v. South Carolina*,
    547 U.S. 319 (2006) ...................................100

*Horton v. Zant*,
    941 F.2d 1449 (11th Cir. 1991) .........................82

*Jells v. Mitchell,*
    538 F.3d 478 (6th Cir. 2008) ...................81, 90, 91

*Johnson v. Bagley,*
    544 F.3d 592 (6th Cir. 2008) ..............72, 76, 77, 81

*Mason v. Mitchell*,
    543 F.3d 766 (6th Cir. 2008) ......................87, 88

*Matthews v. Abramajtys*,
    319 F.3d 780 (6th Cir. 2003) ...........................63

*McDonald v. Pless*,
    238 U.S. 264 (1915) ...................................100

*Miller v. Alabama*,
    132 S. Ct. 2455 (2012) ................................103

*Neil v. Biggers*,
    409 U.S. 188 (1972) ....................................60

*Nichols v. Butler*,
    953 F.2d 1550 (11th Cir. 1992) ....................68, 69

*Nixon v. Newsome*,
    888 F.2d 112 (11th Cir. 1989) .........................47

*Old Chief v. United States*,
    519 U.S. 172 (1997) ...................................65

*Perkins v. State*,
    144 So.3d 457 (Ala. Crim. App. 2012) ..................98

*Porter v. McCollum*,
    558 U.S. 30 (2009) ................................86, 87

*Reeves v. State*,
    974 So.2d 314 (Ala. Crim. App. 2007) ..................68

*Richards v. Quarterman,*
   566 F.3d 553 (5th Cir. 2009) ............................54

*Rock v. Arkansas,*
   483 U.S. 44 (1987) .....................................99

*Rompilla v. Beard,*
   545 U.S. 374 (2005) ....................................72

*Ross v. State,*
   614 S.E.2d 31 (Ga. 2005) ...............................65

*Shillcutt v. Gagnon,*
   827 F.2d 1155 (7th Cir. 1987) .........................100

*Skipper v. South Carolina,*
   476 U.S. 1 (1986) ..................................83, 92

*Smith v. Philips,*
   455 U.S. 209 (1982) ...................................106

*State v. Henderson,*
   27 A.3d 872 (N.J. 2011) ................................59

*Strickland v. Washington,*
   466 U.S. 668 (1984) ...............................passim

*Sumner v. Shuman,*
   483 U.S. 66 (1987) ....................................103

*Tanner v. United States,*
   483 U.S. 107 (1987) ...................................105

*Thomas v. Varner,*
   428 F.3d 491 (3d Cir. 2005) ............................62

*Tobias v. Smith,*
   468 F. Supp. 1287 (W.D.N.Y. 1979) ......................99

*Turner v. Louisiana,*
   379 U.S. 466 (1965) ...................................104

*Tyler v. State,*
   793 So.2d 137 (Fla. Ct. App. 2001) .....................47

*United States v. Resko*,
   3 F.3d 684 (3d Cir. 1993) ...............................102

*United States v. Villar*,
   586 F.3d 76 (1st Cir. 2009) ...........................100

*Valdez v. State,*
   196 P.3d 465 (Nev. 2008) ..............................103

*Wiggins v. Smith*,
   539 U.S. 510 (2003) ...............................passim

*Williams v. Allen*,
   542 F.3d 1326 (11th Cir. 2008) ....................passim

*Williams v. Taylor*,
   529 U.S. 362 (2000) ...............................44, 45

STATUTES

Ala. Code § 13A-5-40(a)(13) ..............................65

Ala. Code § 13A-5-43 .....................................96

Ala. Code § 13A-5-46(e)(3) ...........................96, 97

Ala. Code § 13A-5-46(f) .................................102

Ala. Code § 13A-5-48 ....................................104

OTHER AUTHORITIES

Ala. R. Evid. 606(b) .................................passim

Ala. Const. art. I, § 6 ..................................44

Fed. R. Evid. 606(b) ....................................100

U.S. Const. amdt. VI .................................passim

U.S. Const. amdt. VIII ..................................103

U.S. Const. amdt. XIV ....................................99

## REHEARING APPLICATION

Pursuant to Rule 40 of the Alabama Rules of Appellate Procedure, Keith Gavin respectfully applies for rehearing of all issues decided by this Court's August 22, 2014 opinion. This is a death penalty case in which Gavin has raised violations of his constitutional rights with respect to both phases of his trial. In requesting rehearing, Gavin incorporates as a basis for relief all grounds arising under the state and federal constitutions and statutes cited in his previous briefs and in his brief in support of this application.

### PROPOSED STATEMENT OF FACTS

### I.   FACTS RELATED TO COUNSEL'S INEFFECTIVE ASSISTANCE AT THE GUILT PHASE OF THE TRIAL

#### A.   Background on the Trial

The criminal case against petitioner Keith Gavin focused on the 1998 murder of William Clayton. R 1212, 1212, 1215.[1] Clayton was shot with a gun owned by Dwayne

---

[1] References to the court reporter's transcript of the Rule 32 evidentiary hearing are cited herein as "PR ___." References to the clerk's postconviction record are cited herein as "PC ___." References to the court reporter's transcript of the original trial are cited herein as "R ___." On November 14, 2011, the Circuit Court granted Mr.

1

Meeks, Gavin's cousin, who had brought Gavin to Alabama from Chicago. R 688, 652. Gavin maintains and testified during the Rule 32 hearing that Meeks shot Clayton; Meeks contends that Gavin was the shooter. PR 160; R 671. Although both Gavin and Meeks were indicted for the crime, PC 444, once Meeks agreed to testify against his cousin, the prosecution dropped the charges against Meeks. R 690; PC 1969, 3487. As a result, only Gavin was tried for murder, and—because of trial counsel's unprofessional errors—only Meeks's account was heard by the jury. On November 6, 1999, Gavin was found guilty of the crime. R 1211. Gavin was also convicted of the attempted murder of a law-enforcement officer named Danny Smith. Opinion, p. 2.

Meeks was the star witness for the prosecution at Gavin's trial. PC 2717. He testified that Gavin shot William Clayton. R 679. Besides Meeks, only one other eyewitness testified about Mr. Clayton's murder. PC 977. Larry Twilley was stopped in his truck across the

---

Gavin's Motion to Supplement the Record with the transcript of the deposition of Craig Haney; references to the deposition and accompanying exhibits are herein cited as "PX ___." References to this Court's prior opinion in this case are herein cited as "Opinion, p. ___."

2

intersection when the shooting occurred. R 534-36. Twilley testified that he only saw the side of the shooter's face, and only saw it for a few moments.[2] R 526-28.

Twilley's testimony about the shooter was inconsistent and did not describe Gavin. PC 2662-63. The only fact he stated consistently was that the shooter was a "black male," a description that fit both Meeks and Gavin. PC 979. Twilley first described the shooter as "about 6 feet tall." PC 979. But Gavin is much shorter, only about 5'8" tall. PC 2663. Twilley originally stated that the shooter was "slim." PC 979. Twilley then testified that the shooter "wasn't real heavy, but he wasn't slim." R 521. Gavin was very slender at the time of the shooting; he weighed only 145 pounds. PC 2758. Meeks, in contrast, is 5'10" and powerfully built—not heavy, and not slim. PC 2758.

Prior to his testimony at trial, Twilley never picked Gavin out of a line-up or photo array, nor was he asked to do so. PC 977. The first time he was asked to identify the shooter was at trial, 18 months after the crime had taken place. R 23. Twilley later explained in an affidavit that

---

[2] Twilley also testified that he never saw the face of shooter at all. R 536-37.

3

he identified Gavin at trial by simply looking over at the defendant's table, where he "saw Gavin sitting between his two [white] attorneys." PC 977. Gavin's trial attorney, Bayne Smith,[3] did not seek to exclude Twilley's identification or even emphasize the inconsistencies in Twilley's story to the jury.[4]

Gavin has asserted consistently that he is innocent, and that Meeks shot Clayton and fired shots near Danny Smith. PR 114-15. Gavin also has asserted consistently that Meeks and Gavin were in Alabama at the time of the crime so that Meeks could deal drugs. PR 139-40, 147. Meeks had previously hired Gavin's brother, Sterling, to drive for him during drug deals, but he turned to Gavin after becoming dissatisfied with Sterling. PR 185-86. At the Rule 32 hearing, Assistant Attorney General Maze did not dispute Gavin's version of events in this regard: "Nobody doubts that there was a drug deal going on during the first trip . . . ." PR 140-41. But that was not the position the State

---

[3] Bayne Smith is deceased.

[4] Smith acknowledged in an affidavit: "In hindsight, it certainly seems arguable that more thorough preparation to cross-examine Mr. Twilley was appropriate." PC 2758.

took at trial when they had Meeks testify that he and Gavin went to Alabama "for girls and to party." R 650.

Gavin never got a chance to assert his version of events at trial, however, because Gavin's lawyers would not let him testify. PR 169.

### B.   Evidence Adduced During Gavin's Rule 32 Hearing

Gavin's Rule 32 hearing exposed new key evidence. First, Gavin finally had the opportunity to testify. PR 91. Gavin explicitly denied shooting William Clayton and testified that Meeks shot Clayton and fired the shots at Officer Danny Smith. PR 114-15. Furthermore, serious issues with the State's pretrial investigation, issues that Gavin's trial attorney failed to bring to light at trial, were exposed.

Specifically, Gavin's Rule 32 attorneys called Kenneth Webb to testify on police investigative procedures and the pretrial investigation in this case. PR 214. Webb is a retired police officer who has investigated approximately 500 violent crimes. PR 216-17. He was tendered and accepted without objection as an expert in police investigative procedures. PR 220.

Webb testified that the State's investigation was tainted in several ways. PR 224-269. First, Webb stated that the van in which Clayton was shot was not properly preserved according to police procedures. PR 224, 228, 230. Clayton was shot inside a Corporate Express van, making the van a crime scene. PR 223. The evidence at trial established that the van was driven (rather than towed) from where it was recovered. R 568-69. Webb testified that driving the van was contrary to standard police practices, as it risked the van's becoming contaminated and thus losing or tainting evidence associated with the crime, such as hair samples, drug residue, and fingerprints. PR 230. Standard police procedure is to tow a vehicle to avoid such contamination. R 228. In this case, after the van was driven, no useable fingerprint evidence was ever recovered from the van. R 927-28.

Second, Webb criticized the interview police conducted with Meeks several days after the crime. PR 230-31. Webb testified that further investigation of Meeks was needed due to Meeks's behavior immediately after Clayton was shot. PR 231. It is uncontested that Meeks fled the scene, picked up his wife and son in Chattanooga, drove back to Chicago,

and telephoned a close friend, Marty Tutor. PR 231; PC 885-86; R 672-76. Tutor immediately drove to Meeks's home to discuss the incident. PC 676-78, 680. Mr. Tutor then drove Meeks to his own home. R 680-81. There, the two men tried to reach Tom Arambisich, "Uncle Tom," a Sheriff in Will County, Illinois. R 677. Once he was reached, Uncle Tom immediately joined the two men at Marty's house. PR 678. Meeks told Uncle Tom his version of the incidents. R 676-79. Meeks said that he was at the scene when Clayton was shot, Meeks's vehicle was involved, Meeks fled the scene, and Meeks likely owned the murder weapon.[5] R 676-79. At this point, according to expert Webb, standard police practice would be to consider Meeks a suspect. PR 239-41.

But law enforcement did not interrogate Meeks. PR 241. Instead, Meeks's personal friends interviewed him. PR 241-42. Not only was Uncle Tom, "a fatherly figure" to Meeks, present, but Fort Payne police officer Tony Burch was present as well. PR 241-42, 252. Like Uncle Tom, Burch was Meeks's personal friend, and the two had already discussed the incident before the interview. PR 242, 273. Allowing

---

[5] Meeks testified at trial that his gun was issued to him by the Illinois Department of Corrections. R 720-21. Gavin's Rule 32 attorneys proved this was false. PC 909.

Meeks's friends to be present during the interview "created an atmosphere that was friendly" and therefore, "it was improper," according to expert Webb. PR 241. Webb stated that before this case, he had never seen, permitted, or heard of a friend of the suspect sitting in on an interview of a key suspect, especially in a murder case. PR 243. Meeks's friends/the police on the case also provided Meeks with almost two days' advance notice that they intended to interview him. PR 243-45. Webb criticized this practice as "most interrogations are based upon the element of surprise" and such advance notice allows the witness "an opportunity to get [his] story straight." PR 247. Gavin's jury was never told any of this, either through an expert or through cross-examination of witnesses. Furthermore, the police on this case never sought to search Meeks's home, car, or clothing. PR 250. Webb testified that searching each would have been standard police procedure. PR 249-51. Meeks's car and gun were used in the crime; confiscating Meeks's clothing or vehicle could have uncovered "trace evidence" and possible "blood splatter or fibers taken from the crime scene." PR 251. Searching Meeks's house could

have uncovered "[a]ny evidence of the clothes that he wore, [or] anything that would connect him to the scene." PR 251.

"In my opinion, the entire investigation was a miscarriage of justice," the expert testified. PR 252. The jury in this case did not hear Webb's opinion, or the facts on which that opinion was based.

Webb's testimony identified other missteps in the police investigation as well, such as the failure to interview crucial witnesses, including Sharon Meeks, Marty Tutor, and Vickie Twilley. PR 253. Sharon, Meeks's wife, accompanied Gavin and Meeks on the trip from Illinois, and was with them for several hours shortly before Clayton was shot. PR 253-54. She was also with her husband Meeks as he fled the crime scene, after he picked her and their son up in Chattanooga to return to Chicago. PR 253-54. Sharon Meeks should have been interviewed. PR 253.

Marty Tutor is another crucial witness who was not interviewed by the Alabama investigators in this case. PR 253-55. Tutor was the first person with whom Meeks discussed Clayton's shooting. PR 254-55. Webb, the expert, testified that Tutor should have been interviewed in order

to uncover, among other things, any inconsistencies in Meeks's story as he relayed it to different people. PR 253.

Vickie Twilley was at the scene of the crime. PR 255. In fact, she was an eyewitness to the shooting of Mr. Clayton. PR 255. Yet, the police neither interviewed Mrs. Twilley nor took her statement. PR 255. Like her husband, Mrs. Twilley was sitting in a car across the intersection when the shooting occurred. PR 255. Though her husband testified at trial, Mrs. Twilley's observations differed significantly from that testimony. PR 255-56. For instance, Mrs. Twilley stated that at the time of the shooting, it was raining hard and visibility was poor. PC 323; PR 258. Mr. Twilley, oppositely, said visibility was fine and that it had stopped raining. PR 258. Mrs. Twilley said that the shooter was wearing a blue or black toboggan, while Mr. Twilley testified at trial that he did not remember the shooter having anything on his head, and if the shooter did have something on his head, it was red. PC 323; R 521.

None of these individuals was ever questioned by law enforcement. PR 253. Likewise, Gavin's trial lawyer failed to interview these witnesses himself, and thus failed to

10

exploit these inconsistencies on Gavin's behalf at trial. PR 253-56.

Webb also concluded that law enforcement's failure to follow standard procedures created a risk that the murder weapon was planted. PR 265. Though Meeks's gun was found in the same general area where Gavin was apprehended, Meeks's gun was not recovered for one full week after the crime. PC 482; R 264. Webb found that law enforcement failed to follow standard procedures for (1) securing the area, (2) searching for the weapon, and (3) logging ingress and egress to the crime scene. PR 259-62. These improprieties created a risk that the murder weapon was planted after Gavin was arrested and in custody. PR 264-65.

Gavin's trial counsel, Bayne Smith, did not expose this series of pretrial investigation problems. Smith did not call an expert in police investigative procedures at trial. Nor did he request from the court authority to spend funds on such an expert. Had trial counsel offered called an expert witness to testify regarding proper police investigative procedures, he could have elicited testimony showing serious defects in the investigation into the

11

shooting of Mr. Clayton, which would have seriously
undermined the State's case against Gavin.

## II.  FACTS RELATED TO COUNSEL'S INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE OF THE TRIAL

On November 8, 1999, after the jury found Gavin guilty,
the penalty phase of trial took place. R 1217. At this
time, Gavin's attorney, Bayne Smith, had the opportunity to
persuade the jury to spare Gavin's life by presenting
mitigation evidence. R 1227. But Smith presented no
substantial mitigation evidence to speak of,
notwithstanding the fact that such evidence was readily
available to him. The difference between the threadbare
mitigation case Smith actually presented and the compelling
case that any reasonable lawyer would have presented, as
developed at the Rule 32 hearing, is stark.

### A.   Mitigation Evidence Presented at the Penalty Phase

Smith's presentation during the penalty phase consisted
solely of testimony from two lay witnesses: first, a
reverend, who briefly knew Gavin in jail; and, second,
Gavin's mother, whom Smith never prepared to testify. R
1244, 1258. And notwithstanding the fact that these two
witnesses represented Smith's entire mitigation case, he
did not spend more than five minutes preparing either one

12

of them to testify. *See, e.g.,* PC 2956-57 (Johnson); R 1258 (Annette Gavin).

Smith's first witness was a minister from the local Kingdom Hall of Jehovah's Witnesses named Reverend S.J. Johnson. R 1243-60. Smith's failure to prepare Johnson was clear from the moment Johnson was called to the stand, when Smith mistakenly called Johnson by the wrong name. As Gavin's attorney explained on the record and in front of the jury: "I don't have my notes with me from where [sic] we talked the other day and I wasn't sure about [his name]." R 1243.

After that inauspicious start, Smith elicited testimony from Johnson that revealed that Johnson did not know Gavin especially well and, in particular, could not offer any insight into Gavin's background or family history. The Reverend first met Gavin while Gavin awaited trial. R 1252. They met for an hour about once a week. R 1244-45. Reverend Johnson testified that during their meetings the two discussed the Bible and Gavin's relationship with God. R 1245-46. The conversations pertained mainly to religion because the Reverend "tried to keep [his conversations with Gavin] on the spiritual level." R 1245.

Reverend Johnson was a lay witness and gave no testimony regarding Gavin's mental or emotional state. *See* R 1243-60. He gave no testimony regarding Gavin's character. *See* R 1243-60. He gave no testimony regarding Gavin's mitigating circumstances. *See* R 1243-60. The majority of Reverend Johnson's testimony consisted of talking about the Bible. R 1250-57. The Reverend then suggested that the jury should grant mercy on Gavin like God granted mercy on David in the Bible. R 1250-52. This generic plea had nothing to do with the mitigating circumstances in Gavin's particular case.

At the same time, parts of Reverend Johnson's unprepared testimony were affirmatively harmful to Gavin's case. Johnson explained to the jury, for example, that "under certain conditions the death penalty was administered and God said an eye for an eye, tooth for a tooth, soul for a soul." R 1250. The State could hardly have hoped for better testimony to support its preferred sentence of death than a direction from a Reverend to the jury that "God said an eye for an eye." Further assisting the State in its cause, Reverend Johnson reminded the jury that Gavin "didn't testify here." R 1252.

The other witness Bayne Smith called was Annette Gavin, Keith Gavin's mother. Again, Smith explicitly conceded on the record and in front of the jury that he had not "prepare[d] [Annette] for [her] testimony." R 1258. Annette was asked few substantive questions and spent little time testifying. R 1258-59. Smith asked if Annette was asking the court to spare her son's life. R 1259. She responded, "Yes. Because, you know, who among us, you know could make that decision, you know." R 1259. Smith asked Annette no questions about Gavin's background. R 1258-59. He asked Annette no questions about Gavin's childhood. R 1258-59. He asked Annette no questions relating to Alabama's statutory mitigating factors. *Compare* R 1258-59, *with* Ala. Stat. § A-5-51, 52. R 1258-1260.

On November 8, 1999, the jury recommended (10-2) that Gavin be sentenced to death. R 1299-1300. The court found no mitigating circumstances, accepted the jury's recommendation, and sentenced Gavin to death on January 5, 2000. R 1313-15.

**B.    Counsel's Interactions With the Alabama Prison Project, Which Revealed to Counsel That an Investigation Would Likely Uncover Powerful Mitigation Evidence**

The presentation Bayne Smith made during the penalty phase was not based on a strategic decision not to pursue a conventional mitigation case. To the contrary, Smith initiated an investigation into possible evidence—he simply failed to follow through. Specifically, Smith initially sought help from Lucia Penland of the Alabama Prison Project to "investigate matters involving mitigation." PC 984. But Smith barely surpassed this point of initial contact and ignored Penland's numerous pleas for more time. *See, e.g.*, PR 309-10, 323; PC 1019. He did not monitor Penland's progress, push Penland to move forward with the investigation in a timely fashion, or find someone else who would meet the court's deadlines. And although Penland had provided helpful preliminary findings, Smith failed to present even these to the jury. *See* R 1243-60.

Penland was the Executive Director of the Alabama Prison Project, which focused on providing "assistance to defense attorneys in [c]apital cases in developing the mitigation aspect of the case[s]." PR 302. Her work involved doing extensive interviews and identifying

16

appropriate experts to testify during the penalty phase of

the trial. PR 302, 307. As Penland explained:

> [I]n order to present a full mitigation case,
> there needs to be expert witnesses that can put
> the defendant into the context of the crime. They
> need to . . . show who the person is and how he or
> she got to the place where they were involved in
> this crime, and that takes . . . witnesses that
> can look at and attest to the circumstances of the
> person's life.

PR 323.

Smith had worked with Penland on a prior case and, in

October 1998, "initiated contact" to get assistance in

Gavin's mitigation case. PR 309-10. Penland agreed,

provided there was "time to prepare a case and to be sure

there is enough flexibility . . . to prepare the case." PR

310. Although this first contact was in October 1998, Smith

did not send Penland an engagement letter until the end of

December 1998. PR 309-15. Smith did not contact Penland

again until March 1999. PR 315. Smith did not arrange for

Penland to interview Gavin until April 28, 1999. PR 320-22.

Smith had not procured any of Gavin's records by that time.

PR 318. This is the only meeting Smith ever arranged

between Penland and Gavin. PR 346.

Penland testified that, although Gavin was hesitant in

the first meeting, PR 321, she was able to get "[b]asic

17

background information, schools he went to, where he lived,
. . . any medical-emergency type injuries, illnesses . . .
[and] information about his family." PR 321. Gavin's
hesitation was typical of defendants facing capital murder
charges, PR 321-22, but Penland testified that she obtained
enough information to move the fledgling mitigation
investigation forward by procuring records and getting
names of people to interview. PR 322. Penland also
recommended one expert in particular, Dr. Craig Haney. PR
2714-15. Though Gavin's attorney expressed interest in
using Dr. Haney as a institutionalization expert, he never
contacted Dr. Haney. R 2715, 2723. As his testimony during
the Rule 32 proceeding made clear, Dr. Haney would have
been helpful at the original sentencing hearing, just as
Penland suggested originally. R 2715.

Penland wrote Smith shortly after the April 1999
meeting. PC 1019. Penland told Smith exactly what would be
needed to put together a mitigation defense:

> Regarding the defense, what I see right now that
> will need to be done in this case is: retrieval
> and review of school, medical (if pertinent) and
> prison records. I will also need to travel to
> Chicago to interview family of Gavin, which
> consists of his mother and his 12 siblings, and
> interview friends and at least one teacher. . . .
> Once I see what information I have I will need to

> identify what expert witnesses we might need to
> assist in preparation of the mitigation case, and
> work with you and them to develop the case
> strategy.

PC 1019. Smith did not respond to the letter, PR 326, and
there is no evidence that Smith ever pursued any of these
tasks himself or sought the assistance from another
mitigation expert to do so.

Instead of monitoring and directing a mitigation
investigation as it progressed, Smith did nothing to
advance the case for five months and then, less than six
weeks before trial, he contacted Penland and "basically
said where are we with mitigation[?]" PR 326. For her part,
Penland had not heard from Smith and did not know that
trial was set for November 1999 until Smith told her the
news. PR 327. Penland knew that she could not complete the
investigation herself in six weeks, and she urged Smith to
seek a continuance in order to prepare and present an
adequate mitigation defense. PR 326-28. Smith did not seek
a continuance, PR 327-28, nor is there any indication that
he investigated potential mitigation evidence for himself.
*See* PC 2761-63.

Mere weeks before trial, it was Penland, not Gavin's
lawyer, who engaged the services of a Chicago-based

sentencing consultant, John Sturman. PC 1010. Within days, Sturman had conducted initial interviews and requested educational records. PC 1025-29. On October 13, 1999, Penland sent Sturman's work product via facsimile to Smith and wrote "[t]here are issues that need to be pursued in this case." PC 1023. She requested that Smith get Gavin's prison records through discovery as it would be quicker than getting them from the Illinois Department of Corrections. PC 1023. Penland also pled, again, "I would like to *urge you again* to request a continuance . . . . An adequate mitigation case can not be developed otherwise." PC 1023 (emphasis added). Smith did not seek to delay the trial, PR 331-33, or to assist in the development of the mitigation case by providing Penland the requested records— or any other records for that matter. PR 324-25.

On October 19, 1999, Penland wrote to Smith again and stressed that "a great deal more work needs to be done on this case." PC 449. She raised key issues for mitigation, such as possible posttraumatic stress disorder, the scars of living through riots and gangs, and the effect of institutionalization as Gavin entered prison at a young age. PC 1031. "In order to present an effective,

comprehensive, and adequate mitigation case," more work had to be done. PC 1031-32. Among other things, expert witnesses had to be retained and additional witness interviews had to be conducted. PR 332-33.

Smith could have asked the court to delay trial so that he could explore the mitigation evidence that was being developed and prepare a competent case. Instead, Smith told the court that there was not any usable mitigation evidence to speak of—without even mentioning the materials that Smith had received from Sturman. PC 498. Specifically, on the day before trial, Smith sent the court the following letter, enclosing correspondence from Penland:

> October 31, 1999
> Dear Judge Rains,
>     In accordance with your instructions, enclosed are copies of all materials received from the Alabama Prison Project in connection with this case. As you can see, it consists only of correspondence from Ms. Penland and not, at this point, any useable mitigation material.
>         * * *
>                               Sincerely,
>                               H. Bayne Smith

PC 498.

### C.   Available Evidence and Testimony in Mitigation That Was Never Presented by Counsel

Competent counsel would have followed up on the leads identified by Penland and, having done so, would have been

in a position to present a compelling mitigation case.
Although no mitigation evidence was ever presented to the
jury, testimony from Gavin, Dr. Betty Paramore, and Dr.
Craig Haney elicited in the Rule 32 court revealed that the
evidence was available and strong.

### 1. Testimony of Keith Gavin

Gavin had wanted to testify at his original criminal
trial, but his attorney did not call him to do so. PR 169.
But when given the chance at the Rule 32 hearing, Gavin was
able to testify about his emotional and physical state
leading up to the murder. PR 116-19. Gavin's testimony
outlines the mitigating evidence that is corroborated and
expanded upon by the experts' testimony at the Rule 32
hearing.

Gavin entered the Illinois prison system when he was
twenty-two years old. PC 1058. After serving seventeen
years, Gavin was released from prison in 1997. PR 116-17,
119. He moved in with his mother. PR 116. He could not find
employment, though he had developed various employment
skills in prison.[6] PR 116-17.

_____

[6] While in prison, Gavin worked with plumbing, the custodial
maintenance department, and the sewer sanitation system. PR

It was difficult for Gavin to live at his mother's home during this time. PR 118. The house was filthy and in substantial disrepair, including the plumbing. PR 118. The house was also too crowded, as Gavin's sisters Sharon and Geanetta, his brother-in-law, and his nephew and three nieces all lived in his mother's house too. PR 118. It was a difficult group for Gavin to move in with; his siblings were "strung out on drugs." PR 119. It was especially hard to see his mother's house in its current state. PR 119. He testified, "I was depressed, sad, hurt." PR 119. Gavin explained he felt this way because his siblings had let his mother's house deteriorate. PR 119. "I felt they let my mother down." PR 119.

Hearing Gavin's story in his own voice might well have led the jury to show compassion for him. And the experts involved in the Rule 32 proceedings, and who could have testified at trial, would have made Gavin's case all the stronger, since they were able to give a more complete

---

117. He also worked as a filing clerk, computer programmer, and a computer processing clerk. PR 117. Regardless of this experience, once released, Gavin could not find a job; he looked for work but was unsuccessful. PR 117.

picture of Gavin's life and background, including how that background would likely affect his susceptibility to crime.

### 2.   Testimony of Dr. Betty Paramore

The primary mitigation expert called during the Rule 32 proceedings was Dr. Betty Paramore, a Ph.D. in Psychology and a long-time mitigation specialist in the Cook County Public Defender's office. PR 380-82. She was retained by Gavin's Rule 32 attorneys to develop a mitigation profile for Gavin. PC 1091. The court found Dr. Paramore qualified to testify as a mitigation specialist. PR 383-84. In her expert declaration and her testimony at the Rule 32 hearing, Dr. Paramore identified several mitigating factors that were not presented during the sentencing phase of Gavin's trial. PR 388-472.

Dr. Paramore interviewed Gavin, Gavin's mother, eight of his surviving siblings, his sister-in-law, two cousins who lived with the Gavins while Gavin was growing up, an uncle, and two women from Gavin's neighborhood whom he identified as having been positive influences in his life. PC 1091. Dr. Paramore interviewed some of these individuals on multiple occasions, including Gavin's mother, whom she interviewed five times. PR 404. Dr. Paramore also reviewed

24

arrest reports, prison records, and available school records. PR 389-90; PC 1124. All of this information could have and should have been discovered and used by Gavin's trial attorney at the sentencing phase. PR 388-472.

In order to put the information she had uncovered regarding Gavin's life in context, Dr. Paramore drew on the concepts of risk factors, protective factors, and resiliency, which are well recognized in the field of psychology. PR 394-95. Dr. Paramore identified numerous risk factors present in Gavin's life. PR 396. The dominant risk factors in Gavin's life were (1) multi-generational family dysfunction; (2) domestic violence and impaired parenting; and (3) the poor, violent community in which Gavin grew up. Dr. Paramore also described the environmental conditions Gavin encountered upon his release from prison. PC 1114. Dr. Paramore elaborated upon each of these risk factors in detail at the evidentiary hearing. PR 401-64. The jury learned none of this relevant information about Gavin's life before recommending that he be sentenced to death. *See* R 1243-60.

### a.   Multi-generational family dysfunction.

Keith Gavin's parents, Annette and Willie, both came from highly dysfunctional families with histories of drug use, alcoholism, and incarceration. PC 1100-02. Willie, Keith Gavin's father, was physically abused as a child and later abused his own children and wife. PR 405-06, 427-28. Willie also had problems with gambling and alcohol abuse. PR 406. Willie was incarcerated when Keith was two, leaving behind four children and a pregnant wife. PR 407. Some of Willie's sisters were involved in prostitution, which Keith witnessed at a young age. PR 406-07; PC 1101. When Keith was 14, Willie was shot in the chest and out of work for approximately six months. PR 407-08. Annette Gavin, Keith's mother, was born in Boyle, Mississippi. PR 404. She spent most of her childhood in the fields, picking cotton. PR 404. Annette moved to Chicago when she was 13 or 14. She met Willie at 15, married at 17, and had her first child at 18. PR 404.

These facts impacted Willie and Annette's ability to raise their twelve children, including their son Keith. PR 405, 412.

Keith was the third of the twelve Gavin children and was most influenced by the five siblings closest to him in age: Willie, Jr., Elaine, Victor, Steven, and Sterling. PR 408-09. Each of these siblings has a history of incarceration and drug use, PR 411, 413-16, 420-21, and most were gang members. PR 420-21. Willie, Jr. and Elaine both started abusing drugs at 13 or 14. PR 411, 413. Keith was responsible for bringing them home, so he often had to visit highly dangerous areas to retrieve his siblings. PR 412-13. In addition to having a history of incarceration, drug use, and gang membership, Keith's brother Victor was a victim of a gang shooting when he was sixteen. PR 415-16. Steven, who was described by some family members as abusive and mentally unstable, has a history of incarceration for violent crime. PR 419-20.

When Keith was released from prison in 1997, Willie, Jr. had passed away and Elaine, Steven, and Sterling were all struggling with drug addiction. PR 409-10, 414, 420-21. Keith Gavin testified at the Rule 32 hearing how difficult it was to move into a home full of his struggling siblings. PR 116-18.

Keith Gavin's trial lawyer never presented any of this information to the jury that sentenced Keith to death. *See* R 1243-60.

### b.   Domestic violence and impaired parenting.

Keith Gavin's father physically abused Keith's mother, Keith, and the other Gavin children. PR 426-29. When asked to describe the "whippings" they received, several of the Gavin children reported that Willie would stop "when he drew blood." PR 429. Keith was beaten more than his other siblings because "Keith actually accepted responsibilities for things he had not done because he felt that he was strong enough to accept the whippings." PR 428-30.

Although Keith had a close and loving relationship with his mother, that relationship was characterized by what Dr. Paramore described as "role reversal." R 434-35. Although Keith was the child, he took on adult responsibilities, caring for his siblings because his mother was unable to do so. PR 412, 434-35. Keith's mother stated that "she depended on Keith . . . to make sure the kids were in place when [her] husband came home because they did not want him to get upset." PR 434. Keith tried to work at a young age and would engage in criminal activities to get the money he

needed to support the family. PR 435-36. Keith's parents did not discourage this; in fact, his father would take and use money Keith had stolen. PR 435-36.

Dr. Paramore explained why it would be important for this information to be included in any sort of mitigation proceedings: "these risks influence decisions and choices . . . and [would have allowed the jury] to understand the person's life better." PR 437. The jury did not hear any of this before it recommended a sentence of death. *See* R 1243-60.

### c.   Community.

Keith Gavin grew up in the "ABLA" Chicago public housing projects. PR 437-38. The Gavins lived in a two bedroom row house until 1967. PR 446. Four children and two adults shared the two bedroom home. PR 446. In 1967, they moved to a four bedroom row house. PR 445. Overcrowding remained a problem; "roughly 13 family members [lived] in a four bedroom apartment." PR 446. Conditions in the apartment were poor. PR 446-47. The apartment flooded due to clogged sewage pipes, lacked heat, and was infested with rats. PR 446-47.

As of 1965, there were 13,600 people living in the ABLA development, which was riddled with gangs, violence, and poverty. PR 440-42. Growing up, Keith Gavin witnessed race riots, gang riots, and tenant riots, including the 1968 riots following the assassination of Dr. Martin Luther King, Jr. PR 442-43. As gang and drug activity increased, guns became prevalent. PR 443-44. Gavin's mother was threatened by gang members, who told her that "if she didn't stop causing problems, [the gang] would kill her and throw her in the trash can." PR 444.

Over the years, seven of the Gavin children joined gangs. PR 444. And several members of the Gavin family—including Keith—were victims of gang violence in the neighborhood. For example, when he was 17 years old, Keith was hospitalized after being attacked by a group of gang members that beat him with baseball bats and guns. PR 419; PC 1111. Due to a lack of medical insurance, Keith was released from the hospital the next day still unrecognizable: he was swollen, bruised, and could only walk with a cane. PR 1111.

Keith Gavin lived in the ABLA development apartment until he was nineteen. PR 447. The day the Gavins moved out

30

of the housing projects was a significant day for the family. PR 447. As Dr. Paramore recounted in her testimony, "Mrs. Gavin could not readily recall her marriage date, but she knew the exact date that they moved into this new home." PR 448.

When Gavin was released from prison in 1997, he returned to "this new home," PR 448, but it was nothing like the home he had left. His sister Geanetta and her four children lived there too, along with his sister Sharon. PR 448-49. His brother Sterling lived there off and on. PR 449. The condition of the house was deplorable, filled with clutter and garbage. PR 450-56. The kitchen sink was not working, there were exposed wires and pipes, and the front door was broken. PR 450-56. Keith slept on a bunk bed in the unfinished basement, where there was "dog feces and exposed plastering on the walls" as well as "interior wiring and pipes" that were "hanging down from the ceiling." PR 452-54. Keith was very distressed by the conditions in which his mother was living and tried to get his cousins and siblings to raise money and assist with repairs. PR 456. Keith also "spent days clearing out and working, trying to clean the home." PR 453.

31

Although all of this information regarding Keith's background was available at the time of the original trial, trial counsel presented none of it to the jury. PR 471-72. In fact, trial counsel affirmatively misrepresented to the trial judge that there was no mitigating evidence to be found. PC 498.

### D.   Testimony of Dr. Craig Haney and Effects of Institutionalization

Dr. Craig Haney has a bachelor's degree in psychology from the University of Pennsylvania, a master's degree in psychology from Stanford University, and a PhD and J.D. from Stanford University. PX 7-8. He has been a professor of psychology at the University of California at Santa Cruz since 1978. PX 8. He studies many areas of psychology, law, and social policy, with an emphasis on the psychological effect of "institutionalization and prisonization." PX 10-18. As Dr. Haney explained in his deposition, institutionalization is "the process of change that occurs in people when they are placed in institutional—typically total institutional settings." PX 24. Institutionalization is "a well confirmed, elaborately researched phenomenon or process," which describes "what happens to people when they are placed in institutional settings . . . and often times

32

changed and affected by those settings in ways that impede their readjustment to non-institutional settings once they're released." PX 35.

Lucia Penland had urged Bayne Smith to retain an expert on prison institutionalization issues given Gavin's history of incarceration in Illinois prior to his arrest in Alabama. PR 336. Specifically, Penland recommended that Smith retain Dr. Haney to review Gavin's prison history and possibly to testify at Gavin's sentencing trial. PR 336-37. However, as Dr. Haney testified in the Rule 32 proceeding, Smith never retained Dr. Haney, never spoke to Dr. Haney, and—in violation of ABA standards—did not get Gavin's Illinois prison records before the trial. PX 150-51, 178-80.

Dr. Haney was finally retained by Gavin's current Rule 32 counsel to testify concerning "the effects of imprisonment on Gavin, whether or not he appeared to be institutionalized as a result of his 17 years in prison, and [to opine] about his potential for positive adjustment in prison...." PX 24.

In reaching his opinions in Gavin's Rule 32 proceeding, Dr. Haney primarily relied on Gavin's prison records for

the seventeen years he was incarcerated within the Illinois
Department of Corrections as well as a three-to-four-hour
interview of Gavin. PX 42-44. After reviewing the prison
records and interviewing Gavin, Dr. Haney concluded that
Gavin's seventeen years in the Illinois prison system had
"impeded or undermined his ability to positively adjust to
free society once he had been released." PX 46.

Dr. Haney identified several underlying factors that
influenced Gavin's degree of institutionalization. PX 46-
52. Gavin's relatively young age when first incarcerated
was one factor—Gavin was incarcerated when he was twenty-
two years old. PX 47. Another factor was Gavin's length of
incarceration—Gavin was incarcerated for almost two
decades. PX 48-49. Gavin's traumatic pre-incarceration
childhood also impacted the degree of Gavin's
institutionalization once he was incarcerated. PX 57-58.
Gavin's "relatively sparse education" and "spotty,
sporadic" work history before his incarceration also
impacted Gavin's social development while in prison. PX 64.

Dr. Haney noted, "[Gavin] was a young man with no prior
prison history, and he went into one of the most notorious
prisons in the United States." PX 67. "He was terrified"

34

and "his fears were well founded." PX 70. Still, Gavin was
able to adjust relatively well to the prison environment.
PX 66-67. He became virtually a model prisoner; he had only
one serious write-up in seventeen years, and this was near
the beginning of his sentence. PX 79, 126. Dr. Haney
continued:

> [T]his is a man who has learned how to live in an
> institutional environment, to adjust well in that
> environment, to adapt his conduct to the
> requirements of that environment and that, too,
> bodes well for his ability to adjust in the
> future.

PX 126-27. Dr. Haney thought it was especially problematic
that the jury did not hear this information:

> It's an important mitigating effect. Jurors are
> often concerned about the future, what's going to
> happen with this guy if and when we send him to
> prison. And evidence to the effect that he's going
> to have a positive adjustment is important for
> them to be reassured of.

PX 129.

This information about institutionalization and Gavin's
experience in prison was available to Gavin's trial
attorney, had he performed his responsibilities as counsel.
PX 138-39. It is the defense attorney's responsibility to
subpoena prison records and to ensure that a proper
mitigation investigation is conducted. PX 148. Here, there

35

is no indication that Gavin's attorney ever saw Gavin's prison records. PR 324-25. Gavin's "entire adult life essentially behind bars" was not examined prior to him being sentenced to death. PX 147.

## III. FACTS RELATED TO GAVIN'S JUROR MISCONDUCT CLAIM

### A.   Premature Deliberation on Sentencing

Rule 32 counsel's post-conviction investigation revealed that the jury voted on both guilt and sentencing at the same time, thus reaching a conclusion on the penalty before the penalty-phase trial had even begun. PC 2688.[7] Jury foreman Terry Manley recalled that after discussing the evidence the jury decided to vote by secret ballot. PC 2688. Before the ballots were distributed, however, juror Clifford Higgins addressed the jury. PC 2688. Mr. Higgins said that if any of the jurors thought his vote would be different because he and Gavin were both black, he wanted them to know that he was going to vote guilty and in favor of the death penalty. PC 2688.

---

[7] The facts related to juror misconduct are set forth in Gavin's Second Amended Petition, PC 2638, which was considered and rejected on the merits by the Rule 32 court. *See* Opinion, pp. 46-47.

After Mr. Higgins's comment, each of the jurors wrote their votes down on a piece of paper, voting on both guilt and sentence (death or life without parole). PC 2688. At that point, the vote was unanimous in favor of guilt and 10 to 2 in favor of the death penalty. PC 2688. Jurors Cheryl Beard and Belinda Martinez have confirmed that the jury voted on both guilt and sentencing at the same time, before the sentencing hearing. PC 2688.

**B.   Improper Extra-Juror Communication with the Bailiff**

Counsel's post-conviction investigation also revealed that several jurors had played golf with the bailiff while sequestered. PC 2689. Mr. Manley recalled that on Sunday, November 7, 1999, between the guilt and penalty phases of trial, he and several other jurors played golf with the bailiff while staying at a hotel in Lake Guntersville. PC 2689.

**BRIEF IN SUPPORT OF REHEARING**

**STATEMENT OF THE CASE**

Gavin was indicted in 1997 on two counts of capital murder and one count of attempted murder. Gavin pled not guilty and has maintained his innocence at all times.

37

On November 6, 1999, a Cherokee County jury convicted Gavin on all counts. On November 8, 1999, the jury recommended (10-2) that he be sentenced to death. The court accepted the jury's recommendation and sentenced Gavin to death.

On September 26, 2003, the Alabama Court of Criminal appeals affirmed Gavin's conviction and sentence of death. 891 So.2d 907 (2003). Gavin's petition for writ of certiorari to the Alabama Supreme Court was denied on May 28, 2004, 891 So.2d 998 (2004), and his petition for writ of certiorari to the United States Supreme Court was denied on January 24, 2005. 543 U.S. 1123 (2005).

Gavin filed a Rule 32 Petition on May 26, 2005. PC 21-36. He filed amended Rule 32 Petitions on July 19, 2005, PC 46-70, August 18, 2006, PC 297-500, and April 2, 2010, PC 2633-2700. On January 4, 2007, the Circuit Court dismissed all claims other than ineffective assistance of counsel and ordered Gavin to tender his evidence supporting his ineffective assistance of counsel claims by written submission, pursuant to Rule 32.9, PC 581-87, which Gavin did on October 9, 2007. PC 688-1185. That submission included 11 affidavits, four depositions, numerous

38

documents and several expert reports. The State then
requested an evidentiary hearing so it could cross-examine
Gavin (who had submitted an affidavit denying his guilt),
as well as Gavin's expert witnesses. Following an
evidentiary hearing held for that purpose on February 8-9,
2010, the Circuit Court denied all claims for relief in a
Final Order entered on April 18, 2011. PC 3484-3526.

Gavin filed a timely Notice of Appeal. PC 3527-29.
After briefing and oral argument, this Court issued an
opinion affirming the Rule 32 court's judgment on August
22, 2014.

## STATEMENT OF THE ISSUES

1. This Court denied Gavin's guilt-phase *Strickland* claim by
   considering each of counsel's unprofessional errors in
   isolation. The first issue, therefore, is whether the
   Court should permit rehearing so that it can correct its
   misapplication of *Strickland*, which requires
   consideration of the cumulative effect of counsel's
   failures.

2. The second issue is whether this Court should permit
   rehearing of Gavin's penalty-phase *Strickland* claim so
   that the Court can correct (a) its mistaken view that

deficient performance may be excused by attributing counsel's failures to others, and (b) its failure to appreciate that prejudice is judged from the perspective of an objectively reasonable jury.

3. This Court held that Gavin's juror misconduct claim was properly dismissed on the merits based on an evidentiary rule, Ala. R. Evid. 606(b), that was neither relied upon by the Circuit Court nor cited in the State's appellate brief. The third issue is whether the Court should permit rehearing to correct its misapprehension of the law regarding the competence of jurors to testify.

## STATEMENT OF THE STANDARD OF REVIEW

Rehearing should be granted if the application reveals any points of law or any facts that this Court has overlooked or misapprehended. *Ex parte McGriff*, 908 So.2d 1024, 1043 (Ala. 2004) (citing Ala. R. App. P. 40(b)).

## SUMMARY OF THE ARGUMENT

This Court misapprehend key points of law related to each of the three primary issues on appeal. These points of law, if properly applied, would likely have led the Court to reverse the decision below. This Court should therefore

grant rehearing to reconsider Gavin's claims in light of the proper legal framework.

With respect to Gavin's guilt-phase ineffective assistance of counsel claim, this Court considered each of counsel's unprofessional errors in isolation, without addressing the cumulative effect of those errors on the ultimate outcome at trial. But controlling U.S. Supreme Court precedent requires a comparison between the full trial as it actually occurred and the trial as it would have occurred, if only Gavin's counsel had presented the case that any reasonable lawyer would have presented. Had the Court engaged in that kind of cumulative comparison, it would likely have recognized that, but for counsel's deficient performance, there is a reasonable chance that the outcome of the guilt trial would have been different.

With respect to Gavin's penalty-phase ineffective assistance of counsel claim, this Court made two key legal errors that led the analysis astray. First, the Court improperly attributed counsel's failure to investigate to an overworked paraprofessional from the Alabama Prison Project and to Gavin's family. But the U.S. Supreme Court has held that counsel's duty to investigate mitigating

41

evidence cannot be delegated away. If, as in this case, the initial investigation revealed that further digging would likely have uncovered useful mitigation evidence, counsel must investigate further or manage the investigative work of others to ensure that any such evidence is uncovered. Had trial counsel done the investigation that *Strickland* requires, he would have been in a position to present a powerful mitigation case that might well have led the jury to spare Keith Gavin his life.

Second, this Court adopted the Rule 32 court's improper conclusion that a Cherokee County jury would not have been moved by the plight of a poor man from the violent, drug-ridden, gang-invested, and predominantly black Chicago housing projects. This was legal error. *Strickland* teaches that the idiosyncrasies of a particular decisionmaker are constitutionally irrelevant. The question is how a reasonable jury would have responded to a competent presentation.

Furthermore, the Court unfairly denied Gavin's juror misconduct claim based on an evidentiary rule that does not apply and was never cited by either the Rule 32 court below or by the State in its brief in this Court. Specifically,

42

the Court held that Ala. R. Evid. 606(b) would have barred testimony from the jury foreman establishing that the jury voted to put Gavin to death before the verdict on guilt had even been rendered. But Rule 606(b) is trial- and verdict-specific: it forbids introduction of testimony regarding deliberations during a particular proceeding that would impeach the verdict in *that* proceeding. Gavin does not seek to use the jury's deliberations during the trial on guilt to impeach its verdict in that trial. Instead, Gavin instead seeks to introduce testimony from the jury's *guilt* deliberations to challenge the *penalty phase* verdict. By its own terms, Rule 606(b) does not apply.

Finally, even if Rule 606(b) were best construed to bar the foreman's testimony, the testimony would be admissible because the Rule would be unconstitutional as applied. A rule of evidence cannot impermissibly burden a defendant's constitutional rights, and using Rule 606(b) to exclude the sole evidence that the jury had committed to recommend the death penalty before the penalty-phase trial had even begun would render meaningless Gavin's Sixth Amendment right to a fair trial by an impartial jury. Thus Gavin is entitled to have this issue decided on the merits after an evidentiary

43

hearing. At the very least, Gavin should be permitted to address the Rule 606(b) issue, which he has never had the opportunity to brief or argue.

**ARGUMENT**

**I.   REHEARING IS WARRANTED BECAUSE THIS COURT ERRED IN RULING THAT GAVIN'S TRIAL COUNSEL WAS NOT INEFFECTIVE DURING THE GUILT PHASE OF THE TRIAL**

This Court's decision failing to find that Gavin was denied his right to effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution, Article I, Section 6 of the Alabama Constitution, and Alabama state law misapprehends both the factual record and precedent governing counsel's obligations. *See Strickland v. Washington*, 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003).

The facts make clear that Gavin's trial counsel failed to investigate basic information surrounding the case, failed to impeach the State's key witnesses, and failed to exclude prejudicial evidence. Each of these failures alone demonstrates trial counsel's ineffectiveness, but when considered together—as they must be—there is no doubt that trial counsel failed to meet the constitutional minimum for

effective representation. Although counsel's failures are addressed categorically *infra*, and were in the briefing below for organizational purposes, the court must view them holistically. *Strickland*, 466 U.S. at 690 (allegations of ineffectiveness must be considered "in light of all the circumstances"); *Williams*, 529 U.S. at 398-99(considering "the entire postconviction record, *viewed as a whole and cumulative of* mitigation evidence presented originally") (emphasis added); *Dobbs v. Zant*, 506 U.S. 357, 359 n.* (1993) (holding that "an inadequate or harmful closing argument, *when combined . . . with* a failure to present mitigating evidence, may be highly relevant to the ineffective-assistance determination") (emphasis added). But this Court's opinion affirming the Rule 32 court's denial of relief improperly considered each of Bayne Smith's unprofessional errors in isolation. Because counsel's failures were pervasive and prejudicial to Gavin, the Court should grant his application for rehearing.

### A.    Trial Counsel Failed to Investigate and Impeach the State's Key Witness, Dwayne Meeks

Gavin argued that his trial counsel was patently ineffective in failing to adequately investigate and impeach Meeks—the State's key witness. This Court rejected

45

Gavin's claim for ineffective assistance on this claim for two reasons. First, the Court found that "Gavin failed to establish how [an investigation into Meeks and the murder weapon] would have altered the outcome of [his] trial." Opinion, p. 23. Second, the Court held that counsel's cross-examination was a strategic decision and that Gavin had failed to establish how he was prejudiced by trial counsel's ineffective cross-examination. Opinion, p. 25. These holdings, however, neglect both the factual record and precedent.

To begin with, the factual record makes clear that an investigation into Meeks and the provenance of the murder weapon should have been key defense tactics. Meeks's close proximity to Clayton at the time of the shooting, his ownership of the murder weapon, and his flight from the scene all would suggest that he, and not Gavin, may have shot Clayton. The State originally viewed Meeks as a suspect in the crime. PC 835. In fact, he was indicted by a grand jury, PC 857-58, and charged, along with Gavin, with the murder of Clayton. Those charges were later dropped after Meeks agreed to implicate Gavin. Although Meeks's testimony was essential to the State's case against Gavin,

46

trial counsel completely failed to undermine Meeks's credibility or to introduce evidence suggesting that Meeks may have been the shooter. That is so because trial counsel did not conduct even a minimal investigation that would have enabled him to effectively cross-examine Meeks or impeach many of Meeks's statements through other witnesses or documents. Courts have found ineffective assistance of counsel in similar circumstances. *See, e.g.*, *Nixon v. Newsome*, 888 F.2d 112, 115 (11th Cir. 1989) (holding that trial counsel's failure to impeach key witness was "not within the wide range of professional competence" because it "sacrificed an opportunity to weaken the star witness's inculpatory testimony"); *Tyler v. State*, 793 So.2d 137, 144 (Fla. Ct. App. 2001) ("[T]rial counsel's failure to impeach a key witness with inconsistencies constitutes ineffectiveness of counsel and warrants relief.").

The Court's finding that Gavin did not explain how the trial would have differed had counsel investigated the murder weapon ignores the facts in this case. There is no question that the murder weapon belonged to Meeks. The gun was not found in Gavin's possession; rather, it was found in the woods seven days after he was apprehended. At trial,

Meeks testified falsely that the gun used to shoot Clayton had been issued to him by his employer, the Illinois Department of Corrections ("IDOC"). R 679. Had counsel conducted any investigation, he would have known that Meeks had lied on the stand. IDOC had "no record in Dwayne Meeks's personnel file of him being issued a weapon by the Illinois Department of Corrections in the course of his employment." PC 909-10. And Meeks never told the investigators that the gun was state-issued in his first interview. PC 886. Both of these facts were readily obtainable, and yet counsel never used them to impeach Meeks.

Any competent attorney would have investigated the murder weapon and its connection to the prosecution's central witness. However, trial counsel failed to do so. And the prosecution capitalized on trial counsel's failures to investigate the murder weapon by bolstering Meeks's credibility and the false provenance of the murder weapon. R 1104 ("This is the same Glock that he (Meeks) testified he had just been assigned through his job as a corrections officer just a few months before."). Had counsel investigated the gun, he could have shown Meeks's account

48

of his ownership and use of the weapon was suspicious and contradictory, while highlighting that the seven-day delay between the shooting and the discovery of the weapon provided ample opportunity for Meeks (or someone else) to plant the gun in the woods. Such a line of questioning, backed up by a thorough investigation, would have severely damaged the testimony of the State's key witness, opening the door for the jury to consider whether Meeks himself was the shooter.

This Court's holding that Gavin's trial counsel's failure to cross-examine Meeks on many other inaccuracies and inconsistencies in his testimony similarly misapprehends the record and law. The Court labeled counsel's failures as "strategic," Opinion, p. 25, but the only strategy such failures could support was a losing strategy. The record makes clear that any competent attorney would have confronted Meeks and challenged his credibility. There was no other reasonable strategy. Indeed, the only other attorneys working on the case, the prosecutors no less, doubted the accuracy of Meeks's statements. PC 940 (noting that Meeks's "[t]ime frames don't make much sense" and that it "doesn't make sense that

49

he would just drive around 'looking for this girl'"). The investigators likewise questioned Meeks's version of events. PC 837-39 (stating the opinion that Meeks was "guilty" and was "involved" in the crime). But somehow Gavin's trial counsel never did, and therefore Gavin's jury had little basis to question Meeks's credibility.

The list of inaccuracies in Meeks's trial testimony is so long that no competent attorney would have strategically failed to address it. This list includes: Meeks first reported that he had no knowledge of who might have taken his gun, but then testified that Gavin took his gun without permission and used it to shoot Clayton. R 722-24; PC 876-78. Meeks initially told investigators that Gavin had been living with him—likely to explain how Gavin could have taken Meeks's gun—but he testified that Gavin lived with his mother. R 648-49. Meeks did not report Gavin's murder conviction on his IDOC employment application, PC 913, even though he testified that "everybody in the family" knew about Gavin's conviction. R 649. Trial counsel failed to bring any of these disparities to the jury's attention.

No conceivable strategic reason could justify counsel's failure to expose these inconsistencies—readily available