
FILED
2017 Oct-12  PM 04:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| KEITH EDMUND GAVIN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:16-cv-273-KOB |
| | ) | |
| JEFFERSON S. DUNN, Commissioner of | ) | |
| the Alabama Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

## REPLY BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS ON PENALTY-PHASE CLAIMS

John D. Watson
(Local Counsel)
Grant A. Premo
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Phone: (205) 521-8436
Fax: (205) 488-6436

Melanie E. Walker (*pro hac vice*)
(Lead Counsel)
Steven J. Horowitz (*pro hac vice*)
Matthew Fogelberg (*pro hac vice*)
Nicholas K. Tygesson (*pro hac vice*)
Neil H. Conrad (*pro hac vice*)
Rachel R. Goldberg (*pro hac vice*)
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Phone: (312) 853-7000
Fax: (312) 853-7036

*Counsel for Petitioner Keith Edmund Gavin*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

ARGUMENT ......................................................................................2

I.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE DURING THE PENALTY-PHASE TRIAL IN VIOLATION OF GAVIN'S SIXTH AMENDMENT RIGHT. ..........2

    A.    Trial Counsel Rendered Constitutionally Deficient Performance. ................................................................4

        1.    Trial Counsel's Barebones Penalty-Phase Case Reflected A Lack of Preparation.......................................................4

        2.    The Post-Conviction Record Confirms That Extensive Mitigation Evidence Was Available.................................7

        3.    The Failure To Investigate And Present A Genuine Mitigation Case Was The Result Of Inattention And Incompetence.................................................................12

        4.    There Is No "Deceased-Trial-Counsel" Or "Uncooperative-Family" Exception To *Strickland*. .......16

    B.    Trial Counsel's Deficient Penalty-Phase Performance Was Prejudicial. ....................................................20

II.    GAVIN'S RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY WAS VIOLATED BECAUSE THE JURY VOTED TO EXECUTE HIM BEFORE CONSIDERING ANY MITIGATING EVIDENCE. .............................................25

    A.    The Relevant Facts................................................26

    B.    The Court Should Review This Claim *De Novo*. ...................27

    C.    The Constitutional Violation...................................28

i

D.     This Claim Presents A Federal Question That Can Be Reviewed On Federal Habeas Review.......................................30

E.     Even If This Court Were To Review The Claim Under § 2254(d), Gavin Would Be Entitled To Relief.......................34

     1.     The Constitutional Significance Of Mitigating Evidence In Capital Cases ..............................................34

     2.     Constitutional Exceptions To State-Law Evidence Rules .............................................................36

F.     Gavin Did Not Procedurally Default This Claim. ....................42

G.     The Remedy .................................................................43

III.    GAVIN'S RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY WAS ALSO VIOLATED BECAUSE THE JURY HAD IMPROPER CONTACT WITH AN OFFICER OF THE COURT. ...........................................................44

IV.    A FACTUAL FINDING NECESSARY TO THE IMPOSITION OF GAVIN'S DEATH SENTENCE WAS MADE BY THE TRIAL JUDGE IN VIOLATION OF HIS SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS..............................................................47

CONCLUSION ........................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdul-Kabir v. Quarterman,*
  550 U.S. 233 (2007)..............................................................34, 35

*Adkins v. Warden, Holman,*
  710 F.3d 1241 (11th Cir. 2013) .........................................42

*Ake v. Oklahoma,*
  470 U.S. 68 (1985)..............................................................31

*Apprendi v. New Jersey,*
  530 U.S. 466 (2000)..........................................................47, 49

*Blake v. Kemp,*
  758 F.2d 523 (11th Cir. 1985) ..........................................6

*Blanco v. Singletary,*
  943 F.2d 1477 (11th Cir. 1991) ........................................22

*Campbell v. Reardon,*
  780 F.3d 752 (7th Cir. 2015) ............................................44

*Chambers v. Mississippi,*
  410 U.S. 284 (1973)............................................................36

*Childers v. Floyd,*
  736 F.3d 1331 (11th Cir. 2013) ........................................28

*Coleman v. Thompson,*
  501 U.S. 722 (1991)............................................................33

*Cone v. Bell,*
  556 U.S. 449 (2009)...................................................*passim*

*Cooper v. Sec'y, Dept. of Corrs.,*
  646 F.3d 1328 (11th Cir. 2011) ....................................15, 19, 21, 22

iii

*Crane v. Kentucky*,
    476 U.S. 683 (1986).............................................................................36

*Crowe v. Hall*,
    490 F.3d 840 (11th Cir. 2007) ..........................................................42

*Cullen v. Pinholster*,
    563 U.S. 170 (2011).............................................................................44

*Cunningham v. Zant*,
    928 F.2d 1006 (11th Cir. 1991) .............................................5, 18, 23

*Daniel v. Comm'r, Alabama Dep't of Corrs.*,
    822 F.3d 1248 (11th Cir. 2016) ......................................14, 15, 43, 51

*Doan v. Brigano*,
    237 F.3d 722 (6th Cir. 2001) ..............................................................32

*Douglas v. Alabama*,
    380 U.S. 415 (1965).............................................................................32

*Eddings v. Oklahoma*,
    455 U.S. 104 (1982).............................................................................34

*Evans v. Sec'y, Dep't of Corrs.*,
    681 F.3d 1241 (11th Cir. 2012) ......................................................5, 8

*Ferrell v. Hall*,
    640 F.3d 1199 (11th Cir. 2011) .............................................16, 21, 28

*Fischer v. S/Y NERAIDA*,
    508 F.3d 586 (11th Cir. 2007) ...........................................................50

*Gavin v. State*,
    891 So. 2d 907 (Ala. Crim. App. 2003).............................................47

*Green v. Georgia*,
    442 U.S. 95 (1979)...............................................................................36

iv

*Gregg v. Georgia*,
    428 U.S. 153 (1976) ............................................................................41

*Griffin v. California*,
    380 U.S. 609 (1965) ..............................................................................5

*Hardwick v. Crosby*,
    320 F.3d 1127 (11th Cir. 2003) ...................................................18, 22

*Ex parte Harrison*,
    61 So. 3d 986 (Ala. 2010) ..................................................................43

*Hinton v. Alabama*,
    134 S. Ct. 1081 (2014) ........................................................................18

*Holmes v. South Carolina*,
    547 U.S. 319 (2006) ......................................................................37, 39

*Horton v. Zant*,
    941 F.2d 1449 (11th Cir. 1991) ..........................................................11

*Hurst v. Florida*,
    136 S. Ct. 616 (2016) ..........................................................................50

*Hurst v. State*,
    202 So. 3d 40 (Fla. 2016) ...................................................................49

*Irvin v. Dowd*,
    366 U.S. 717 (1961) ............................................................................29

*Johnson v. Bagley*,
    544 F.3d 592 (6th Cir. 2008) .......................................................13, 20

*Johnson v. Sec'y DOC*,
    643 F.3d 907 (11th Cir. 2011) ............................................................15

*Judd v. Haley*,
    250 F.3d 1308 (11th Cir. 2001) ..........................................................31

*Kennedy v. Louisiana*,
    554 U.S. 407 (2008)...........................................................................................41

*Kyles v. Whitley*,
    514 U.S. 419 (1995)...........................................................................................42

*Lee v. Comm'r, Alabama Dep't of Corrs.*,
    726 F.3d 1172 (11th Cir. 2013) .........................................................................48

*Lockett v. Ohio*,
    438 U.S. 586 (1978)...........................................................................................34

*Mattox v. United States*,
    146 U.S. 140 (1892)...........................................................................................45

*Miller v. Dunn*,
    2017 WL 1164811 (N.D. Ala. Mar. 29, 2017) ..................................................48

*Morgan v. Illinois*,
    504 U.S. 719 (1992).............................................................................29, 30, 35

*Mosely v. Atchison*,
    689 F.3d 838 (7th Cir. 2012) .............................................................................44

*Nebraska Press Ass'n v. Stuart*,
    427 U.S. 539 (1976)...........................................................................................28

*Panetti v. Quarterman*,
    551 U.S. 930 (2007)...........................................................................................36

*Porter v. McCollum*,
    130 S. Ct. 447 (2009)...........................................................................14, 21, 23, 24

*Rauf v. State*,
    145 A.3d 430 (Del. 2016) ..................................................................................49

*Remmer v. United States*,
    347 U.S. 227 (1954).....................................................................................44, 45

vi

*Reynolds v. United States,*
    98 U.S. 145 (1878)...............................................................................29

*Ring v. Arizona,*
    536 U.S. 584 (2002)........................................................................*passim*

*Rock v. Arkansas,*
    483 U.S. 44 (1987)...............................................................................37

*Rompilla v. Beard,*
    545 U.S. 374 (2005)........................................................................20, 23

*Skipper v. South Carolina,*
    476 U.S. 1 (1986)...........................................................................11, 34

*Smith v. Phillips,*
    455 U.S. 209 (1982)............................................................................29

*Smith v. Spisak,*
    558 U.S. 139 (2010)............................................................................35

*Strickland v. Washington,*
    466 U.S. 668 (1984)......................................................................*passim*

*Tanner v. United States,*
    483 U.S. 107 (1987)............................................................................40

*Turner v. Louisiana,*
    379 U.S. 466 (1965)..................................................................28, 29, 44

*United States v. Resko,*
    3 F.3d 684 (3d Cir. 1993) .................................................................31

*Wainwright v. Witt,*
    469 U.S. 412 (1985)............................................................................29

*Ex Parte Waldrop,*
    859 So. 2d 1181 (Ala. 2002)..................................................47, 48, 49

vii

*Warger v. Shauers*,
    135 S. Ct. 521 (2014) ........................................................................40

*Washington v. Texas*,
    388 U.S. 14 (1967)............................................................................36

*Wiggins v. Smith*,
    539 U.S. 510 (2003)...........................................................12, 21, 24

*Williams v. Alabama*,
    791 F.3d 1267 (11th Cir. 2015) .......................................................33

*Williams v. Allen*,
    542 F.3d 1326 (11th Cir. 2008) ............................................7, 12, 13

*Williams v. Head*,
    185 F.3d 1223 (11th Cir. 1999) .......................................................15

*Williams v. Taylor*,
    163 F.3d 860 (4th Cir. 1998) ...........................................................23

*Williams v. Taylor*,
    529 U.S. 362 (2000)...............................................14, 21, 23, 24

*Witherspoon v. Illinois*,
    391 U.S. 510 (1968)..........................................................................29

*Woldt v. State*,
    64 P.3d 256 (Colo. 2003)..................................................................49

*Woodward v. Alabama*,
    134 S. Ct. 405 (2013)........................................................................49

## Statutes & Rules

28 U.S.C. § 2254 ...............................................................................*passim*

Ala. Code § 13A-5-47(e) ...................................................................48

Ala. R. Evid. 606(b) ...............................................................27, 37, 38

**Other Authorities**

John Clark, *Defense Rests at Trial of Suspect in Bar Slaying*, The
    Morning Call, Oct. 29, 1988 ................................................................23

Benjamin T. Huebner, Note, *Beyond Tanner: An Alternative
    Framework for Postverdict Juror Testimony*, 81 N.Y.U. L. Rev.
    1469 (2006) ...........................................................................................39

Eleventh Circuit Civil Pattern Jury Instructions (2013) .........................................50

# INTRODUCTION

Keith Gavin was sentenced to death in a state-court proceeding that violated his constitutional rights. This brief addresses the constitutional violations that infected his penalty-phase trial.

Gavin's Sixth Amendment right to adequate representation was violated because his trial counsel did not conduct a reasonable investigation for mitigating evidence and failed to prepare for the penalty-phase trial. That lack of preparation resulted in a woefully deficient mitigation case that boiled down to a naked plea for mercy. It did not include evidence about Gavin's abusive childhood, growing up in a gang-infested neighborhood, exposure to violence at a young age, his family's drug problems, and the effect of his earlier institutionalization—all evidence that was reasonably available to trial counsel but never pursued.

Gavin's right under the Sixth and Fourteenth Amendments to a fair trial by an impartial jury was violated because his jury voted on the sentence during the *guilt-phase* deliberations—before the penalty-phase trial had even begun and before any evidence in mitigation had been presented. A jury that has made up its mind on the sentence before the defendant even has a chance to persuade them otherwise is not impartial.

Gavin's right under the Sixth and Fourteenth Amendments to a fair trial by an impartial jury was also violated because the jury had improper contact with an

1

officer of the court. Several jurors, including the jury foreman, played golf with the trial court's bailiff while sequestered. That type of contact is presumptively prejudicial, and the State has not attempted to rebut that presumption.

Finally, Gavin's right under the Sixth, Eighth, and Fourteenth Amendments to a jury determination of any fact that is necessary for imposing the death penalty was violated. The critical factual question of whether aggravating circumstances outweighed mitigating circumstances was made by the judge, not the jury.

On the claims regarding ineffective assistance of counsel and the judge's unlawful determination about the relative weight of aggravating and mitigating circumstances, there is no need for further fact development, and this Court should grant the writ and order a new penalty-phase trial. On the two juror misconduct claims, because the State Court denied the claims on the pleadings, the proper remedy is to order an evidentiary hearing and provide Gavin an opportunity to prove the truth of his allegations.

## ARGUMENT

## I.   TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE DURING THE PENALTY-PHASE TRIAL IN VIOLATION OF GAVIN'S SIXTH AMENDMENT RIGHT.

Had Gavin received constitutionally adequate representation during the penalty phase of his trial, his life might well have been spared. The post-conviction

2

record reveals that Gavin was abused as a child, exposed to violence and extreme poverty, and deeply affected by spending most of his adult life in prison. Evidence of Gavin's troubled background would have made for a compelling mitigation case, if only Gavin's counsel had presented it. Instead, Gavin's counsel presented unprepared testimony of two witnesses and argued for mercy based on (among other things) a Civil War reference and a *Wizard of Id* comic strip he had read over the weekend. (Vol. 12, Trial Tr. at 1270–72.) As a result of counsel's deficient and prejudicial performance, Gavin is entitled to a new penalty-phase trial.

The State Court's contrary decision involved both "an unreasonable application of clearly established Federal law," 28 U.S.C. § 2254(d)(1), and an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2),[1] although either would suffice to justify *de novo* review of Gavin's penalty-phase *Strickland* claim. Because Gavin was denied the competent penalty-phase counsel to which he was entitled under the Sixth Amendment, this Court should issue the writ.

---

[1] The State's Amended Answer (at ¶ 47(a)) states that Gavin's Petition failed to allege an unreasonable application of clearly established law or an unreasonable determination of the facts under § 2254(d). Not so. (*See* Pet. ¶¶ 120, 174, 176–77, 179–84 (identifying unreasonable applications of various Supreme Court decisions and unreasonable determinations of fact).)

A.      **Trial Counsel Rendered Constitutionally Deficient Performance.**

Gavin's counsel failed to conduct a competent investigation that would have revealed powerful mitigation evidence that any reasonable lawyer would have presented instead of the weak, on-the-fly mitigation case counsel presented at trial.

1.      Trial Counsel's Barebones Penalty-Phase Case Reflected A Lack of Preparation.

With his client's life on the line, trial counsel presented testimony from two witnesses during the penalty phase of the trial: a minister whose name he had forgotten and Gavin's mother, whom he had not prepared to testify.

The minister was first. Trial counsel called "Mr. S.C. Johnson," but when Johnson took the stand, counsel asked, "Did I get those initials right?" (Vol. 11, Trial Tr. at 1243.) He did not: the minister went by "S.J." (*Id.*) Counsel apologized, explaining that he did not "have [his] notes … from where [the two had] talked the other day." (*Id.*) Those missing notes were from counsel's only prior meeting with the minister, at which the two spoke for only five minutes. (Vol. 33, Johnson Aff. at 2956.) The lack of preparation showed. For example, Johnson volunteered that Gavin "was blaming everybody except [himself]" for the situation he was in, even "blaming God for some of the things that happened," when Johnson and Gavin first met. (Vol. 11, Trial Tr. at 1246.) Johnson also highlighted Gavin's failure to

4

testify (*id.* at 1252)—a prejudicial move that, if made by the prosecutor, would
have violated Gavin's Fifth Amendment privilege against self-incrimination under
*Griffin v. California*, 380 U.S. 609, 615 (1965).

Next was Gavin's mother, whose testimony also began with an apology, this
time for counsel's lack of preparation. As counsel explained, "I didn't really have
an opportunity to prep you for your testimony today, but I know that you would
like to address the Court and the jury about your feelings about Keith and the
options that the jury has with regard to punishment." (Vol. 11, Trial Tr. at 1258.)
After this open-ended prompt, counsel asked about "Keith's family values,"
invited his mother to "ask[] this Court to spare his life," and sat down. (*Id.* at
1259.) With that, trial counsel rested on the penalty-phase case. (*Id.* at 1260.)

The Eleventh Circuit has relied on similar facts regarding a lack of
preparation to grant federal habeas relief under AEDPA. *See Evans v. Sec'y, Dep't
of Corrs.*, 681 F.3d 1241, 1270 (11th Cir. 2012). *Evans* emphasized that trial
counsel had met with the defendant's mother "only once prior to trial, and then
only for thirty minutes." *Id.* at 1257. Where counsel's efforts "to investigate and
prepare for the penalty phase" are "cursory," a limited presentation at trial is likely
to reflect unprofessional errors rather than reasonable professional judgment. *Id.* at
1259 n.15; *see also Cunningham v. Zant*, 928 F.2d 1006, 1017 (11th Cir. 1991)

5

("We remain troubled … by trial counsel's performance in preparing and presenting the witnesses they chose …."); *Blake v. Kemp*, 758 F.2d 523, 533 (11th Cir. 1985) ("an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness").

Having presented no substantial mitigation case, Gavin's trial counsel was left with little to argue in closing. He admitted to having spent the night before "in [his] office searching through all of [his] collected material" for "something, anything, one last shred of persuasive evidence or argument that [he] might place before [the jury]," but found "nothing that seemed really appropriate." (Vol. 12, Trial Tr. at 1271.) But that did not stop him from commenting on Gavin's race— "When … I learned that [Gavin] was a black man from Chicago, Illinois, and that he had a prior murder conviction, my reaction, quite simply, was, oh, my God, how can a man like that ever get a fair trial in Cherokee County, Alabama?" (Vol. 11, Trial Tr. at 1265)—or turning to the Sunday comics for a "[l]ittle gallows humor" from *The Wizard of Id.* (Vol. 12, Trial Tr. at 1270.) He was not in the position to argue that Gavin's troubled past made him less morally culpable, and as a result, the judge and jury were left with "an incomplete and misleading understanding of

6

[Gavin's] life history." *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008) (granting habeas relief under AEDPA).

        2.      The Post-Conviction Record Confirms That Extensive Mitigation Evidence Was Available.

***Keith Gavin.*** **—** During post-conviction proceedings, Gavin was able to testify about his emotional and physical state leading up to the murder. (*Id.* at 116–19.) In particular, he testified that, after serving seventeen years in prison, he returned home to his mother's house only to see that it was filthy, in disrepair, and overcrowded—full of siblings "strung out on drugs" who had "let [his] mother down." (*Id.* at 118–19.) Gavin was "depressed, sad, [and] hurt" (*id.*), and despite having developed skills in prison, he was unable to find gainful employment to help turn the situation around. (*Id.* at 117–18.)

***Dr. Betty Paramore.*** **—** The primary mitigation expert called during the post-conviction proceedings in State Court was Dr. Betty Paramore, a Ph.D. in Psychology and a long-time mitigation specialist. (Vol. 38, R. 32 Tr. at 380–82.)

      Paramore interviewed Gavin and many others—including his mother, eight of his surviving siblings, his sister-in-law, two cousins who lived with the Gavins while Gavin was growing up, and an uncle—to develop a mitigation profile. (*See* Vol. 24, Paramore Decl. at 1091.) She also reviewed arrest reports, prison records,

7

and school records, which trial counsel apparently did not obtain. (*See id.* at 1124;

Vol. 38, R. 32 Tr. at 389–90.) All of this could have and should have been

discovered by Gavin's trial counsel. *See Evans*, 681 F.3d at 1256 (noting that "[n]o

competent counsel in 1999 would have failed to collect and review such

information," and "no competent counsel in 1999 would have conducted only a

circumscribed interview of the defendant's mother").

Based on her investigation, Paramore identified numerous psychological risk

factors that would bear on his culpability and might have affected the decision at

sentencing—risk factors that were scientifically linked to adverse outcomes,

making him more predisposed to engage in delinquent behaviors. (Vol. 38, R. 32

Tr. at 394–96.) As Paramore explained, evidence of risk factors is important in

mitigation proceedings because "these risks influence decisions and choices … and

[allow the jury] to understand the person's life better." (*Id.* at 437.)

One risk factor that Paramore identified was multi-generational family

dysfunction. (*Id.* at 402.) Gavin's parents, Annette and Willie, both came from

highly dysfunctional families with histories of drug use, alcoholism, and

incarceration. (*See* Vol. 24, Paramore Decl. at 1100–02; Vol. 38, R. 32 Tr. at 404–

06.) Willie was incarcerated for nine months when Keith was two, leaving behind

four children and a pregnant wife. (Vol. 38, R. 32 Tr. at 407.) Some of Willie's

8

sisters were involved in prostitution, which Keith witnessed at a young age. (*Id.* at 406–07.) And when Keith was 14, Willie was shot in the chest. (*Id.* at 407–08.) Moreover, Keith was one of twelve children;[2] Keith's closest siblings all have histories of incarceration and drug use (*id.* at 411, 413–16, 420–21); and most were gang members. (*Id.* at 420–21.)

Paramore also addressed the history of domestic violence and impaired parenting in Gavin's home. Gavin's father physically abused Keith's mother, Keith, and the other Gavin children (*id.* at 426–29), stopping "when he drew blood." (*Id.* at 429.) Keith was beaten more than his other siblings because "Keith actually accepted responsibilities for things he had not done because he felt that he was strong enough to accept the whippings." (*Id.* at 428–30.) And in this abusive home, there was a "role reversal" between Keith Gavin and his mother: although Keith was the child, he took on adult responsibilities, caring for his siblings because his mother was unable to do so. (*Id.* at 412, 434–35.) Keith turned to crime to get money needed to support his family. (*See id.* at 435–36.)

---

[2] The judge and jury learned that Gavin was one of twelve children, but they did not know, because they were not told, that "[l]arge family size is one of the strongest predictors of early-onset violence." (Vol. 24, Paramore Decl. at 1102.)

Gavin's community was also an important risk factor. Gavin grew up in the Chicago public housing projects, where, at one time, "roughly 13 family members [lived] in a four bedroom apartment." (*Id.* at 446.) Inside, the apartment was dilapidated: it flooded due to clogged sewage pipes, lacked heat, and was infested with rats. (*Id.* at 446–47.) Outside, the Gavins were surrounded by gangs, violence, and poverty. (*Id.* at 440–42.) Over time, seven of the Gavin children joined gangs (*id.* at 444), and several members of the Gavin family—including Keith—were victims of gang violence. For example, when he was 17 years old, Keith was hospitalized after being attacked by a group of gang members that beat him with baseball bats and guns. (*Id.* at 419; *see also* Vol. 24, Paramore Decl. at 1111.)

***Dr. Craig Haney.*** — Gavin also introduced testimony from Dr. Craig Haney, an expert on the psychological effect of "institutionalization," a "well confirmed, elaborately researched phenomenon or process" that describes "what happens to people when they are placed in institutional settings … and often times changed and affected by those settings in ways that impede their readjustment to non-institutional settings once they're released." (Vol. 41, Haney Dep. at 27, 35.) Because Gavin had spent almost his entire adult life in prison, Lucia Penland of the Alabama Prison Project had urged trial counsel to engage Haney as an expert in order to explain the "impact of incarceration" at Gavin's original trial (Vol. 38, R.

10

32 Tr. at 336–37), but trial counsel never reached out to Haney or even obtained Gavin's Illinois prison records. (Vol. 41, Haney Dep. at 149.)

In the state post-conviction proceedings, Haney offered two primary opinions that could have made a difference in the determination of Gavin's sentence. First, Haney concluded that Gavin's seventeen years in the Illinois prison system had "impeded or undermined his ability to positively adjust to free society once he had been released." (*Id.* at 46.) Gavin was particularly susceptible to the effects of institutionalization because he was incarcerated from a relatively young age (22) and spent almost two decades in prison before his release. (*Id.* at 46–49.)

Second, Gavin was able "to adjust well" to living "in an institutional environment," and to "adapt his conduct to the requirements of that environment." (*Id.* at 126–27.) Indeed, the State's own expert acknowledged that Gavin was "what you might describe almost as a model prisoner." (Vol. 39, R. 32 Tr. at 619.) This evidence would have been important to the jury: as Haney explained, "[j]urors are often concerned about the future, what's going to happen with this guy if and when we send him to prison," and evidence of "positive adjustment is important for them to be reassured." (Vol. 41, Haney Dep. at 128–29.) *See Horton v. Zant*, 941 F.2d 1449, 1463 (11th Cir. 1991) (relying on evidence that the defendant had "successfully adjusted to previous stays in prison"); *cf. also Skipper v. South*

11

*Carolina*, 476 U.S. 1, 4 (1986) (vacating death sentence due to exclusion of evidence that defendant was a "well-adjusted" prisoner).

> 3.    The Failure To Investigate And Present A Genuine Mitigation Case Was The Result Of Inattention And Incompetence.

Any competent counsel would have discovered and presented the extensive evidence of Gavin's abusive childhood, gang-infested neighborhood, and exposure to violence, as well as his family's drug problems. Reasonable counsel also would have presented evidence regarding Gavin's institutionalization. But Gavin's counsel presented two unprepared witnesses and appealed for mercy. *See Wiggins v. Smith*, 539 U.S. 510, 526 (2003) ("The record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment.").

The Supreme Court has "looked to standards promulgated by the American Bar Association (ABA) as appropriate guides" in "assessing the reasonableness of an attorney's performance." *Williams*, 542 F.3d at 1339 (citing *Wiggins*, 539 U.S. at 524). Among other things, the ABA standards have long provided that "a sentencing phase investigation should comprise efforts to discover all reasonably available mitigating evidence," and that counsel has "a duty to collect information

12

pertaining to family and social history (including physical, sexual or emotional abuse), and to obtain names of collateral persons or sources to verify, corroborate, explain and expand upon the information obtained." *Id.* (quoting 1989 ABA Guidelines) (alterations and internal quotation marks omitted).

The post-conviction record reveals that Gavin's trial counsel did not meet these standards. Trial counsel engaged Penland to do the mitigation investigation. (Vol. 36, R.32 Circuit Ct. Op. at 3515; *see also* Vol. 33, Bayne Smith Aff. at 2946 ("I initiated contact almost immediately with [Penland] to obtain the services of the APP to investigate matters involving mitigation.").) But counsel failed to follow through by managing the investigation. Counsel arranged only one meeting between Penland and Gavin (Vol. 38, R. 32 Tr. at 346), and there was no contact between counsel and Penland at all between May 1999—when Penland sent counsel a list of potential leads to pursue and suggested that more time was needed to pursue them (Vol. 24, May 6, 1999 Letter at 1019)—and mid-September 1999—when counsel asked for a status update six weeks before trial, having never before mentioned the impending trial date. (Vol. 38, R. 32 Tr. at 326–27.)

Counsel can reasonably choose to work with mitigation specialists to coordinate an investigation, but the ultimate responsibility to perform a constitutionally adequate investigation falls on the lawyer. *See, e.g.*, *Johnson v.*

13

*Bagley*, 544 F.3d 592, 602 (6th Cir. 2008) (holding that state court unreasonably

applied *Strickland* and its progeny by denying relief where there was "a lack of

structure and supervision" over a mitigation investigation that counsel had

delegated to a mitigation specialist). After all, the Sixth Amendment, as interpreted

by the Supreme Court, guarantees a competent *lawyer* who will "conduct a

thorough investigation of the defendant's background" in every capital case.

*Williams v. Taylor*, 529 U.S. 362, 396 (2000); *see also Porter v. McCollum*, 130 S.

Ct. 447, 452 (2009) (holding that counsel's obligation to conduct a thorough

investigation was "unquestioned … under the prevailing professional norms").

Penland may have been overworked (*see* Vol. 24, May 6, 2009 Letter at 1019), but

Penland's lack of time to devote to Gavin's case does not excuse trial counsel's

failure to provide competent representation.

Moreover, Penland's preliminary investigation raised red flags that would

have compelled any reasonable trial counsel to look further into Gavin's

background. *Cf. Daniel v. Comm'r, Alabama Dep't of Corrs.*, 822 F.3d 1248, 1267

(11th Cir. 2016) (identifying "red flags" that should have "alert[ed counsel] to the

need for more investigation"). Specifically, on October 13, 1999, Penland sent trial

counsel a fax imploring counsel to pursue "the atmosphere in which Mr. Gavin

grew up, the effects of his incarceration, effect of poverty, racism, etc." (Vol. 24,

14

Oct. 13, 1999 Fax at 1023.) And she enclosed a report from an investigator who had learned from Gavin's mother that Gavin grew up in the gang-infested Chicago housing projects; that his siblings had spent time in prison (including for attempted murder) and had drug problems; and that Gavin was constantly exposed to "street violence and shooting." (Vol. 24, Oct. 13, 1999 Memorandum at 1025–27.) Any reasonable lawyer would have pursued these issues further, including by speaking directly to Gavin's family. But Gavin's counsel decided not to prepare for the penalty phase of the trial until he met with the minister for five minutes mere days before the penalty phase began. *See Williams v. Head*, 185 F.3d 1223, 1247 (11th Cir. 1999) ("Our circuit has long recognized that failing to interview family members is indicative of ineffective assistance of counsel.").

If counsel undertakes a mitigation investigation and encounters information that should raise "red flags" in the mind of any reasonable attorney, a failure to follow up on that information constitutes deficient performance under *Strickland*. *See, e.g.*, *Daniel*, 822 F.3d at 1267; *Cooper v. Sec'y, Dept. of Corrs.*, 646 F.3d 1328, 1352 (11th Cir. 2011); *Johnson v. Sec'y DOC,* 643 F.3d 907, 932 (11th Cir. 2011). The State Court unreasonably applied *Strickland* when it determined that trial counsel provided constitutionally adequate representation, notwithstanding his failure to follow up on the many leads Penland identified.

15

To be sure, trial counsel only learned that useful mitigation evidence might be available weeks before trial. But that was because counsel never spoke to Gavin's mother—from whom the information came—and failed to manage Penland's investigation. Despite his failures, however, trial counsel himself recognized that he could introduce at least some of the relevant mitigation evidence "through some of [Gavin's] family members." (Vol. 24, Oct. 20, 1999 Letter at 1034.) And indeed he could easily have prepared Gavin's mother to testify to the same background information that she had provided to the investigator. *See Ferrell v. Hall*, 640 F.3d 1199, 1230 (11th Cir. 2011) (holding that counsel rendered deficient performance where "the very witnesses who were called by the defense to testify … could have provided detailed information about his deeply troubled mental health and his childhood if they had ever been asked"). But instead, as he admitted on the record and in front of the judge and jury, trial counsel did not prepare Gavin's mother to testify at all. (Vol. 11, Trial Tr. at 1258.)

4.  There Is No "Deceased-Trial-Counsel" Or "Uncooperative-Family" Exception To *Strickland*.

The State attempts to excuse counsel's deficient performance by suggesting that Gavin cannot obtain relief because he failed to present testimony from his deceased trial counsel during post-conviction proceedings, and because, in the

16

State's view, counsel's unprofessional errors are attributable to Gavin's family rather than counsel's own inattention or incompetence. (State's Penalty Br. at 15–16.) But neither of these theories can justify counsel's failures.

It is true but irrelevant that Gavin's deceased trial counsel could not be called to testify in state post-conviction proceedings. The extent of counsel's investigation—or lack thereof—is clear from the record before the post-conviction court. Indeed, the post-conviction court did *not* deny relief due to a lack of evidence regarding counsel's investigation. To the contrary, it had no trouble discerning counsel's approach based on the documentary record and an affidavit counsel executed before his death: Smith "rel[ied] on [Penland] to do what was needed" to "conduct the mitigation investigation." (Vol. 36, R. 32 Circuit Ct. Op. at 3515; *see also* Vol. 33, Bayne Smith Aff. at 2945.) Nor is there any doubt in the record regarding counsel's preparations for the penalty-phase case he chose to present: he admitted to his lack of preparation on the record. To deny relief based merely on Gavin's inability to call trial counsel to testify would be to create a deceased-trial-counsel exception to *Strickland*'s constitutional guarantee, where no such exception exists.

The State suggests (without evidence) that counsel's decision not to introduce evidence of Gavin's background should be presumed to be based on a

17

strategic judgment because such evidence "would have been afforded little, if any, mitigating weight because Gavin was 38 years old" at the time of the crime. (State's Penalty Br. at 18.) Again, however, counsel's utter lack of preparation for the penalty-phase trial cannot be explained by appealing to strategic judgment, because no reasonable lawyer would choose to present two unprepared witnesses to offer a bare plea for mercy where there was evidence—of which counsel was aware—that went to the "particularized characteristics of the defendant," suggesting that he was less culpable than the jury might have been led to believe. *Cunningham*, 928 F.2d at 1019; *see also Hardwick v. Crosby*, 320 F.3d 1127, 1164 (11th Cir. 2003) ("When mental health mitigating evidence was available, and absolutely none was presented by counsel to the sentencing body, and no strategic reason was put forward for this failure, our court determined that this omission was objectively unreasonable." (alterations and internal quotation marks omitted)). In any event, if Gavin's counsel had thought a middle-aged man's troubled youth is irrelevant to mitigation, he would have been wrong as a matter of law, as discussed below. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").

18

Nor can counsel's failures be attributed to Gavin's family's asserted lack of cooperation.[3] Gavin was unhelpful in Penland's initial (and only) meeting with him because he was focused on guilt issues, but Penland testified that that is typical and did not foreclose further investigation. (Vol. 38, R. 32 Tr. at 321–22.) The bigger problem here was that neither trial counsel nor anyone acting at his direction followed up on that initial meeting for months, until the eve of trial. And when that follow-up *did* occur (at Penland's direction, not trial counsel's), Gavin's mother gave the investigator extensive background information that (1) could have been introduced at trial through Mrs. Gavin herself and (2) would have led any competent attorney to dig deeper. Mrs. Gavin's assistance and her unprompted decision to travel to Alabama and testify on her son's behalf reveals that cooperation was not a barrier to further investigation. And trial counsel certainly could have spoken to others from Gavin's past, obtained Gavin's Illinois prison records, and engaged Dr. Haney—an expert Penland specifically recommended to counsel—even if Gavin and his mother were unhelpful. *See Cooper*, 646 F.3d at

---

[3] The State attempts to shift the blame onto Gavin's family while, at the same time, arguing that the State Court did not make such an error in its opinion. (State's Penalty Br. at 27.) Gavin disagrees with the State's characterization of the State Court's opinion, but in any event, the argument is no stronger in the State's Brief than it was in the State Court's opinion.

19

1351 (noting, in the course of granting habeas relief in an AEDPA case, that

"Cooper's attorneys … unreasonably decided to end the background investigation

after only talking to Cooper, Cooper's mother and [a clinical psychologist].");

*Johnson*, 544 F.3d at 603 ("Uncooperative defendants and family members,

however, do not shield a mitigation investigation (even under AEDPA's deferential

standards) if the attorneys unreasonably failed to utilize other available sources that

would have undermined or contradicted information received.").

### B. Trial Counsel's Deficient Penalty-Phase Performance Was Prejudicial.

To establish that he is entitled to relief under *Strickland*, Gavin must show

that "there is a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different." *Strickland v. Washington*,

466 U.S. 668, 694 (1984). In this case, given the stark contrast between the

threadbare penalty-phase case trial counsel actually presented, and the evidence of

Gavin's background that any reasonably competent counsel would have presented,

Gavin has demonstrated such prejudice, and the State Court's contrary

determination involved an unreasonable application of *Strickland*. *See Rompilla v.*

*Beard*, 545 U.S. 374, 393 (2005) (noting that the mitigating evidence in the post-

20

conviction record "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury").

The judge and jury in Gavin's case "labored under a profoundly misleading picture" of Gavin's "moral culpability because the most important mitigating circumstances were completely withheld from [them]." *Ferrell*, 640 F.3d at 1236. Indeed, they did not hear *any* individualized evidence that would explain why Gavin was particularly susceptible to criminal activity. *See Cooper*, 646 F.3d at 1355 ("the jury heard very little that would humanize Cooper"). Such evidence has been found to be sufficient to justify relief under *Strickland* in a string of Supreme Court cases. *See, e.g.*, *Williams*, 529 U.S. at 398 ("the graphic description of Williams' childhood, filled with abuse and privation … might well have influenced the jury's appraisal of his moral culpability"); *Wiggins*, 539 U.S. at 537 ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."); *Porter*, 130 S. Ct. at 454 ("Had Porter's counsel been effective, the judge and jury would have learned of the kind of troubled history we have declared relevant to assessing a defendant's moral culpability." (internal quotation marks omitted)).

21

Indeed, the fact that two jurors voted against the death penalty, notwithstanding the lack of a competent presentation from trial counsel, only further underscores the prejudice here. *See Cooper*, 646 F.3d at 1356 ("Given that some jurors nonetheless were inclined to mercy even with having been presented with so little mitigating evidence and that a great deal of mitigating evidence was available to Cooper's attorneys had they more thoroughly investigated, it is possible that, if additional mitigating evidence had been presented, more jurors would have voted for life." (alterations and internal quotation marks omitted)); *Hardwick*, 320 F.3d at 1191 (same); *Blanco v. Singletary*, 943 F.2d 1477, 1505 (11th Cir. 1991) (same). Had a jury heard about Gavin's youth in the gang-infested Chicago projects and the abuse he suffered, along with the rest of the available mitigation evidence presented in post-conviction proceedings, those two votes in Gavin's favor could easily have turned into seven or more.

The State argues that "[i]t is well established that evidence concerning a 38 year-old murderer's childhood poverty and childhood background would have been entitled to little, if any, mitigating weight." (State's Penalty Br. at 22.) Such a blanket pronouncement that mitigation could make no difference runs contrary to the "primary purpose of the penalty phase," which is "to insure that the sentence is individualized by focusing [on] the particularized characteristics of the defendant."

22

*Cunningham*, 928 F.2d at 1019. But more to the point, the cases on which the State relies for this "well established" proposition all predate *Porter*, in which the Supreme Court held that a state court unreasonably applied *Strickland* when it had "discount[ed] to irrelevance the evidence of Porter's abusive childhood," 130 S. Ct. at 455, in part because "he was 54 years old at the time of trial." *Id.* at 451. If the State's cases could be read to establish the rule the State identifies, the rule did not survive *Porter*. And even before *Porter*, Gavin's age could not have been a bar to relief: he was the same age as Ronald Rompilla[4] and just seven years older than Terry Williams,[5] both of whom were granted relief by the Supreme Court based on similar evidence, notwithstanding AEDPA's high bar. *See Rompilla*, 545 U.S. 374; *Williams*, 529 U.S. 362.

The State also argues that evidence of institutionalization would have "opened the door to further evidence showing the cold-blooded manner in which Gavin committed murder prior to any incarceration." (State's Penalty Br. at 23.) As an initial matter, the fact that a defendant's best mitigation arguments would invite

---

[4] *See* John Clark, *Defense Rests at Trial of Suspect in Bar Slaying*, The Morning Call, Oct. 29, 1988, *available at* http://articles.mcall.com/1988-10-29/news/2666317_1_stab-wounds-prosecution-second-knife (last visited Oct. 11, 2017).

[5] *Williams v. Taylor*, 163 F.3d 860 (4th Cir. 1998)

some harmful testimony does not foreclose a prejudice finding under *Strickland*. *See Porter*, 130 S. Ct. at 455; *Williams*, 529 U.S. at 396 (granting relief even where "not all of the additional evidence was favorable to Williams"). The State also does not explain—and it is difficult to imagine—what could pass through the purported "open door" that was not already discussed by the prosecution in depth at the penalty-phase trial. (*See, e.g.*, Vol. 11, Trial Tr. at 1263 (noting that the victim "begged for his life as defendant [led] him to a secluded area" and "shot the victim between the eyes," and that Gavin "was arrested a short time later … where he was sleeping [nearby]").) If anything, the facts of Gavin's crimes only made the need to humanize the defendant more apparent.

Finally, the State argues that the evidence of abuse in Gavin's past is not as powerful as in *Wiggins*. (State's Penalty Br. at 24.) But *Wiggins* did not enact a constitutional floor for relief under *Strickland*; if it had, *Rompilla*, *Porter*, and the many post-*Wiggins* cases granting relief under *Strickland* might well have come out differently. The standard in this case, as in *Wiggins*, is whether there is a reasonable probability that "the result of the proceeding would have been different" if the defendant had enjoyed the constitutionally adequate representation to which he was entitled. *Wiggins*, 539 U.S. at 534. For purposes of that assessment, the relevant comparison is not between Gavin's past and Wiggins's

24

past, but instead between the threadbare penalty-phase case Gavin's trial counsel presented and the penalty-phase case that any reasonable attorney would have presented. In light of the powerful mitigation evidence that was available, and the fact that two jurors already voted in Gavin's favor, there is a reasonable probability that the outcome of Gavin's penalty-phase trial would have been different.

## II.   GAVIN'S RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY WAS VIOLATED BECAUSE THE JURY VOTED TO EXECUTE HIM BEFORE CONSIDERING ANY MITIGATING EVIDENCE.

Gavin's right to a fair trial by an impartial jury was violated when his jury voted 10-2 to sentence him to death *before* his penalty-phase trial had even begun. This Court should review this claim *de novo* because the State Court did not decide this claim on the merits, relying instead on a state-law evidence rule to bar the only evidence of this constitutional violation.

If this Court decides, however, that the State Court did decide the claim on the merits and AEDPA's deferential standard of review therefore applies, then Gavin is still entitled to relief because the State Court unreasonably applied clearly established federal law in two ways: (1) it ignored the special constitutional significance of mitigating evidence in capital cases, and (2) it did not recognize that a non-constitutional rule of evidence must yield to federal constitutional

25

interests when the rule infringes on a weighty interest of the accused and is arbitrary and disproportionate to the interests the rule is designed to serve.

Upon reviewing the claim *de novo*—either because the State Court did not adjudicate the claim on the merits or because Gavin has satisfied § 2254(d)—this Court should hold that Gavin has alleged a violation of his constitutional rights and order an evidentiary hearing to provide him an opportunity to prove the allegations.

### A.    The Relevant Facts

The question of Gavin's guilt was submitted to the guilt-phase jury on November 6, 1999. (Vol. 32, Second Am. R. 32 Pet. at 2688–89.) After discussing the evidence of guilt, the jurors decided to vote by secret ballot. But before the ballots were distributed, the guilt deliberations veered off course. (*Id.*)[6]

A juror named Clifford Higgins spoke up to address what he apparently regarded as an underlying racial tension in the jury room. Higgins announced that, if the other jurors thought that he would vote differently than they would because he (Higgins), like Gavin, was black, they were mistaken. (*Id.*) Higgins wanted his fellow jurors to know that, notwithstanding the fact that Gavin was black, Higgins

---

[6] The facts concerning this claim are set forth in Gavin's Second Amended Petition for Relief From Judgment (Vol. 32 at 2687–89) and must be taken as true because the claim was summarily dismissed on the pleadings in the state-court proceedings (Vol. 46, R. 32 State Court Op. at 44).

was going to vote to find Gavin guilty and to recommend a sentence of death. (*Id.*) The jurors then cast their votes by secret ballot, with each juror voting on both guilt *and sentence*. (*Id.*) The jury unanimously voted to convict Gavin, and it voted 10 to 2 to recommend a sentence of death. (*Id.*)

After the jury returned its guilty verdict, the penalty-phase trial began on November 8, 1999. (*Id.*) But by then the die was cast. The jury's vote following the sentencing phase was the same as before. (*Id.*)

### B.     The Court Should Review This Claim *De Novo*.

In denying Gavin's claim for post-conviction relief, the State Court completely ignored the merits of his federal constitutional claim. Instead, it rejected the claim by invoking a state-law rule of evidence. It stated flatly: "Because [the juror's] testimony would have been inadmissible at a hearing held on Gavin's petition, the circuit court did not err in dismissing Gavin's claim." (Vol. 46, R. 32 State Court Op. at 44–45.) This cursory discussion, which is focused exclusively on Alabama's "no-impeachment" rule, Ala. R. Evid. 606(b), takes the State Court's decision outside the ambit of § 2254(d).

AEDPA's deferential standard of review applies only when the claim was "adjudicated on the merits in State court proceedings." *Cone v. Bell*, 556 U.S. 449,

27

472 (2009) (quoting 28 U.S.C. § 2254(d)). When the claim was not decided on the merits, it is reviewed *de novo*. *Id.*; *see also Ferrell*, 640 F.3d at 1224.

Here, the State Court did not decide Gavin's claim on the merits, because it relied exclusively on Alabama's no-impeachment rule. The court did not discuss the constitutional significance of mitigating evidence in capital cases, nor did it otherwise explain how applying Alabama's no-impeachment rule to bar the only evidence of the jury's unconstitutional vote could be reconciled with the Sixth and Fourteenth Amendments. Under these circumstances, AEDPA's deferential standard of review does not apply.[7]

### C.    The Constitutional Violation

Through the Sixth and Fourteenth Amendments, the U.S. Constitution guarantees every criminal defendant the right to a fair trial by an impartial jury. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 551 (1976); *Turner v. Louisiana*,

---

[7] This is not a case like *Childers v. Floyd*, where the court held that the challenged state-law rule of evidence was coextensive with the relevant federal constitutional protection. *See* 736 F.3d 1331, 1335 & n.9 (11th Cir. 2013) (en banc) (per curiam) ("Although the court expressly analyzed Childers's claim under only the Florida rules of evidence, the underpinnings of these rules fit hand in glove with the rights guaranteed under the Confrontation Clause."); *see also id.* at 1334 ("In essence, the [state] court was observing that Florida's rules of evidence gave Childers the same right of confrontation he enjoyed under the [federal] Confrontation Clause …." (internal quotation marks omitted)).

28

379 U.S. 466, 471–72 (1965). This right is fundamental to our criminal justice system because the "failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

This guarantee of impartiality requires that the jury's verdict "be based upon the evidence developed at the trial," not on prior judgments or conclusions. *Turner*, 379 U.S. at 472; *see also Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it."); *Reynolds v. United States*, 98 U.S. 145, 155 (1878) ("The theory of the law is that a juror who has formed an opinion cannot be impartial."). In the specific context of capital sentencing, the Supreme Court has held that the Constitution is violated if even a single member of the defendant's jury would vote automatically for the death penalty upon a guilty verdict. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). A juror who has prejudged the sentence is not impartial, because that juror "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Id.*; *see also Wainwright v. Witt*, 469 U.S. 412, 418 (1985) (a jury "uncommonly willing to condemn a man to die" is not impartial); *Witherspoon v. Illinois*, 391 U.S. 510, 520–21 (1968) (same).

Gavin's right to a fair trial by an impartial jury was violated by the jury's premature vote on his sentence. The vote occurred during guilt-phase deliberations

29

before the penalty-phase trial had even begun and before the jurors had considered any mitigating evidence. *Morgan* held that the Constitution is violated if even one member of the jury would vote automatically for the death penalty upon a guilty verdict; in Gavin's case, *ten* jurors voted this way. There is no question that those jurors failed in good faith to consider the evidence of mitigating circumstances—they cast their votes before any such evidence had even been introduced.

### D.   This Claim Presents A Federal Question That Can Be Reviewed On Federal Habeas Review.

The State does not dispute that the State Court's decision relied exclusively on a state-law evidence rule. Indeed, it does not even argue in its Brief that § 2254(d) applies. (*See* State's Penalty Br. at 3–8.) Instead, the State contends that this court "should not consider this claim because it presents only a question of state law." (*Id.* at 3.)

But a decision on a state-law ground is still reviewable on federal habeas where the ground is either (1) not independent of the federal question or (2) is inadequate to support the judgment. *Cone*, 556 U.S. at 465 (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). Here, the State Court's decision is neither independent of the federal question nor adequate to support the judgment.

It is not independent, because it is "intertwined with an interpretation of federal law." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (internal quotation marks omitted). In fact, the State Court's decision to apply Alabama's no-impeachment rule was explicitly informed by its interpretation of federal law. Relying on *United States v. Resko*, 3 F.3d 684, 690 (3d Cir. 1993), a Sixth Amendment case in federal court, the State Court explained its view that, when there are "premature deliberations" without "external influence on the jury … there is no reason to doubt that the jury based its ultimate decision only on [the] evidence formally presented at trial." (Vol. 46, R. 32 State Court Op. at 45.) In other words, it would be sensible to exclude the necessary juror testimony because the misconduct such testimony would prove—namely, a premature vote—was not likely to substantially affect the fairness of the trial. (*See id.* (discussing "the probability of some adverse effect on the verdict").) Where the application of a state-law rule reflects a judgment about the relative importance of a claim of federal constitutional right, it is not "independent." *See Ake v. Oklahoma*, 470 U.S. 68, 75 (1985) (holding that state court's application of a waiver rule was not "independent" because it depended, whether "explicitly or implicitly," on a "determination of whether federal constitutional error ha[d] been committed").

31

Nor was the State Court's evidentiary ruling adequate to support the judgment. The claim here is that the jury's premature vote violated Gavin's rights under the Sixth and Fourteenth Amendments. Applying an evidentiary rule to bar the only evidence of that violation renders the rule unconstitutional as applied. And whenever a state-law rule is challenged as being unconstitutional as applied, a federal question exists that is ripe for federal review. *See Cone*, 556 U.S. at 465 ("We have recognized that the adequacy of state procedural bars to the assertion of federal questions is not within the State's prerogative finally to decide; rather, adequacy is itself a federal question." (alterations and internal quotation marks omitted)); *see infra* at pp. 36–37 (collecting cases in which the U.S. Supreme Court reviewed the constitutionality of state-law evidence rules).

*Douglas v. Alabama*, 380 U.S. 415 (1965), illustrates the principle. There, the petitioner alleged a violation of his rights under the Confrontation Clause. The state court rejected this claim on the ground that his counsel had failed to object at trial and had therefore waived the federal claim. *Id.* at 418. The Supreme Court, "accepting [this] finding as an authoritative interpretation of Alabama law," nevertheless reviewed the claim because the adequacy of state-law rules "to the assertion of federal questions is itself a federal question." *Id.* at 422. The same reasoning applies here. *See Doan v. Brigano*, 237 F.3d 722, 728 (6th Cir. 2001)

32

(holding that Ohio's no-impeachment rule was not an independent and adequate state ground where the petitioner challenged its constitutionality in federal habeas proceedings), *overruled on other grounds by Wiggins*, 539 U.S. 510. And where the state court "did not reach the merits of a petitioner's claim based on some ground that is not adequate to bar federal review," the court must review the claim *de novo*. *Williams v. Alabama*, 791 F.3d 1267, 1273 (11th Cir. 2015).

That federal review of this claim is available makes sense in light of the broader purposes of the independent and adequate state ground doctrine. "In the context of federal habeas proceedings, the independent and adequate state ground doctrine is designed to 'ensure that the States' interest in correcting their own mistakes is respected in all federal habeas cases.'" *Cone*, 556 U.S. at 465 (quoting *Coleman*, 501 U.S. at 732 (brackets omitted)). Enforcing the requirement ensures that the state has an opportunity to address the federal claims in the first instance. *See id.* That is why, when a petitioner fails to raise his federal claims in compliance with state procedural rules, "the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review." *Id.*; *see also Coleman*, 501 U.S. at 731. But Gavin fairly presented his claim to the State Courts, and he did not run afoul of any state procedural rules about how to raise that claim. Where, as here, the State Courts had ample

33

opportunity to address the constitutional issues in the first instance, the independent and adequate state ground doctrine has no application. *See Cone*, 556 U.S. at 465.

### E.     Even If This Court Were To Review The Claim Under § 2254(d), Gavin Would Be Entitled To Relief.

Even if § 2254(d) did apply, Gavin is still entitled to relief because the State Court unreasonably applied clearly established federal law, for two reasons.

#### 1.     The Constitutional Significance Of Mitigating Evidence In Capital Cases

The State Court unreasonably applied clearly established federal law by ignoring the constitutional significance of mitigating evidence in a capital case. As the Supreme Court has explained, "[a] careful review of our jurisprudence in this area makes clear that well before [1989], our cases had firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007).

Beginning with *Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality), and continuing with *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and *Skipper v. South*

34

*Carolina*, 476 U.S. 1 (1986), the Supreme Court clearly established the principle that "the Constitution guarantees a defendant facing a possible death sentence not only the right to introduce evidence mitigating against the death penalty but also the right to *consideration* of that evidence by the sentencing authority." *Abdul-Kabir*, 550 U.S. at 251 n.13; *accord Smith v. Spisak*, 558 U.S. 139, 144 (2010).

This line of cases dovetails with *Morgan*—also decided before the State Court resolved Gavin's claim here—which held that a criminal defendant's right to an impartial jury is violated if even one juror votes automatically for the death penalty, without considering mitigating evidence. *See* 504 U.S. at 729 ("If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.").

In brushing aside Gavin's federal constitutional claim, the State Court's decision fails to account for these cases. In fact, the relevant part of the opinion does not even mention "mitigating evidence." Where, as here, a state court ignores the basic principles established by the relevant precedents, its decision involves an unreasonable application of clearly established federal law, and § 2254(d) does not bar relief. *See, e.g.*, *Abdul-Kabir*, 550 U.S. at 258.

That none of these cases involved a premature vote by the jury is of no moment. AEDPA does not "prohibit a federal court from finding an application of

35

a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced.'" *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)). The constitutional violation here is the same as in the cases cited above: Gavin's jury voted to impose the death penalty before the jurors had any opportunity to consider mitigating evidence.

### 2. Constitutional Exceptions To State-Law Evidence Rules

The State Court also unreasonably applied clearly established federal law by failing to recognize that state-law evidence rules must sometimes yield to federal constitutional interests. The Supreme Court has repeatedly held that non-constitutional rules of evidence must yield when necessary to protect a criminal defendant's Sixth Amendment or due process rights. *See Washington v. Texas*, 388 U.S. 14 (1967) (state evidence rule prohibiting persons charged as principals, accomplices, or accessories in the same crime from testifying for one another was unconstitutional); *Chambers v. Mississippi*, 410 U.S. 284 (1973) (application of state's hearsay rule and its voucher rule was unconstitutional); *Green v. Georgia*, 442 U.S. 95 (1979) (per curiam) (state evidence rule barring testimony from a co-defendant tried in a separate trial was unconstitutional); *Crane v. Kentucky*, 476 U.S. 683 (1986) (state evidence rule barring evidence about the voluntariness of a

36

confession was unconstitutional); *Rock v. Arkansas*, 483 U.S. 44 (1987) (state

evidence rule excluding hypnotically refreshed testimony was unconstitutional);

*Holmes v. South Carolina*, 547 U.S. 319 (2006) (state evidence rule prohibiting a

criminal defendant from introducing evidence of third-party guilt where the

prosecution had produced evidence that, if believed, strongly supported guilty

verdict was unconstitutional).

These cases clearly establish that a criminal defendant's rights under the

Sixth and Fourteenth Amendments are "abridged by evidence rules that 'infring[e]'

upon a weighty interest of the accused' and are 'arbitrary' or 'disproportionate to

the purposes they are designed to serve.'" *Holmes*, 547 U.S. at 324 (quoting *United

States v. Scheffer*, 523 U.S. 303, 308 (1998)). But the State Court did not conduct

this balancing analysis.

Instead, it mechanically applied its no-impeachment rule to bar the only

evidence of the jury's unconstitutional vote. In doing so, it failed to recognize that

it extended its no-impeachment rule to apply in an exceptional situation here—one

that goes beyond the traditional rule. On its face, Alabama Rule 606(b) is

substantially similar to Federal Rule 606(b). It provides that, when a party

challenges "the validity of a verdict or indictment, a juror may not testify in

impeachment of the verdict … as to any matter or statement occurring during the

37

course of the jury's deliberations." Ala. R. Evid. 606(b). But Gavin did not seek to introduce testimony regarding deliberations that led to a verdict in order to challenge *that verdict*. He sought to introduce evidence from the deliberations in one trial (on guilt) to show why the jury in the second, separate trial (on penalty) was not impartial. The traditional justifications for the no-impeachment rule, such as promoting full and frank discussions among jurors during deliberations, preserving the finality of verdicts, and minimizing the incentive of losing parties to harass jurors, do not fit the State Court's extension of the rule in Gavin's case.

There is no reason to worry that permitting juror testimony in these circumstances would inhibit full and frank discussion among jurors. If permitted to testify, the jurors here would have spoken only to objective conduct—that is, that a premature vote took place. It would be neither necessary nor proper for the court to investigate the jurors' internal mental processes during guilt-phase deliberations, or even what issues or evidence affected the jury's deliberation of Gavin's guilt.

Likewise, there is no reason to fear that permitting juror testimony regarding the premature deliberations during the trial on guilt would undermine the finality of the verdict that resulted from those deliberations—that is, the verdict on guilt. Gavin's claim here is not that he was denied a fair trial before an impartial jury on the question of guilt; it is that he was denied a fair penalty-phase trial because the

38

jury had already reached its decision before that trial began. And the challenge to the penalty-phase verdict would not require any juror testimony regarding the penalty-phase deliberations. Thus, there is no connection here between the application of Rule 606(b) and the interest in preserving the finality of verdicts. An evidentiary rule that deprives a criminal defendant of critical evidence of a constitutional violation cannot stand if it does not advance some overriding interest. *See Holmes*, 547 U.S. at 331 ("Because the rule applied by the State Supreme Court in this case did not heed this point, the rule is 'arbitrary' in the sense that it does not rationally serve the end that the *Gregory* rule and other similar third-party guilt rules were designed to further.").

Finally, applying Rule 606(b) in these circumstances does not materially affect a losing party's incentive to contact jurors after a verdict has been rendered. In the typical capital case, jurors are already contacted by defense investigators about whether extraneous information infected juror deliberations. *See, e.g.*, Benjamin T. Huebner, Note, *Beyond Tanner: An Alternative Framework for Postverdict Juror Testimony*, 81 N.Y.U. L. Rev. 1469, 1486 (2006). Permitting juror testimony about a narrow issue of whether the objective act of premature voting took place would not appreciably increase a criminal defendant's incentive to reach out to jurors.

39

Against all this, the State argues that the State Court correctly denied relief on this claim in light of *Tanner v. United States*, 483 U.S. 107 (1987) (excluding evidence that juror was intoxicated), and *Warger v. Shauers*, 135 S. Ct. 521 (2014) (excluding evidence that a juror had been dishonest during voir dire). (State's Penalty-Phase Br. 5.) There are three problems with this position.

First, neither *Tanner* nor *Warger* dealt with mitigating evidence in a capital case—an issue of special constitutional significance. (*See supra* at pp. 34–36.)

Second, the State Court's extension of the no-impeachment rule here went farther than the application of the no-impeachment rule in either *Tanner* or *Warger*. (*See supra* at pp. 37–39.)

Finally, the "aspects of the trial process" that sufficiently protected the criminal defendant's right to a competent jury in *Tanner* do not adequately protect a defendant's right to an impartial sentencing decision in Gavin's circumstances. Those aspects are: (1) the ability to observe the jury during trial, (2) the ability to consider non-juror evidence concerning misconduct during deliberations, (3) the ability of other jurors to report misconduct before a verdict, and (4) the ability to inquire into potential bias during voir dire. *See Tanner*, 483 U.S. at 127; *see also Warger*, 135 S. Ct. at 529.

40

Unlike juror intoxication, a premature sentencing vote is not generally susceptible to observation by the court, counsel, or court personnel. Except in the unusual case where a juror announces a premature sentencing decision in open court, the only evidence of a premature vote will come in the form of juror testimony regarding what happened during guilt-phase deliberations. Nor will pre-trial voir dire detect the problem, since the violation will not have occurred until after the jury has been seated. In short, these *Tanner* safeguards will not suffice.

As for the remaining *Tanner* safeguard, it is of course possible that non-juror evidence will expose the problem—*e.g.*, court personnel could find physical evidence, such as a piece of paper tallying the votes. But that safeguard is unlikely to work in the typical case. And, in any event, courts should not treat the fluke case where a jury's premature sentencing vote is discovered through non-juror evidence differently than the case where identical conduct goes undiscovered because doing so would result in the arbitrary imposition of the death penalty. *Cf. Kennedy v. Louisiana*, 554 U.S. 407, 436 (2008) (the Supreme Court has "insist[ed] upon general rules that ensure consistency in determining who receives a death sentence"); *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) ("where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and

41

limited so as to minimize the risk of wholly arbitrary and capricious action"); *see also Kyles v. Whitley*, 514 U.S. 419, 422 (1995) ("[O]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." (internal quotation marks omitted)).[8]

\* \* \*

Because the State Court unreasonably applied clearly established federal law—by ignoring the constitutional significance of mitigating evidence in capital cases and by failing to recognize that non-constitutional rules of evidence must give way to federal constitutional interests under certain circumstances—Gavin has satisfied § 2254(d), and this Court must undertake a *de novo* review of the record. *See, e.g.*, *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1255 (11th Cir. 2013). For the reasons explained above (*see supra* at pp. 28–30), Gavin's constitutional rights under the Sixth and Fourteenth Amendments were violated as a result of the jury's premature deliberations.

## F.   Gavin Did Not Procedurally Default This Claim.

The State's assertion that Gavin procedurally defaulted this claim for failure to raise it at trial or on direct appeal is meritless. (*See* State's Penalty Br. 1–2.)

---

[8] Because Gavin is challenging the adequacy of the *Tanner* safeguards, *Crowe v. Hall*, 490 F.3d 840 (11th Cir. 2007), is distinguishable.

First, the State Court did *not* hold that Gavin procedurally defaulted this claim; to the contrary, it acknowledged that Gavin presented the claim to the State Courts and ultimately rejected it by applying a state-law evidence rule. (*See* Vol. 46, R. 32 State Court Op. at 44–45.) It is well-established that federal courts conducting habeas review should not hold that a claim was procedurally defaulted where the state court did not so conclude. *See Cone*, 556 U.S. at 468.

Second, the factual basis for this claim was discovered during the state collateral-review process, and Gavin raised the claim as soon as he could. The Alabama Supreme Court has held repeatedly that juror misconduct claims are not precluded on post-conviction review where, as here, the defendant neither knew nor could have reasonably known of the misconduct at trial or on direct appeal. *See, e.g.*, *Ex parte Harrison*, 61 So. 3d 986, 990–91 (Ala. 2010).

## G.    The Remedy

Having established that § 2254(d) does not bar relief, that Gavin has established a violation of his Sixth and Fourteenth Amendment rights on this record, and that this claim has not been procedurally defaulted, the question is what remedy to provide. Where, as here, the state court rejected a meritorious claim on the pleadings, the Court should order an evidentiary hearing to provide the petitioner an opportunity to prove his allegations. *See, e.g.*, *Daniel*, 822 F.3d at

43

1280–81 (holding that petitioner satisfied § 2254(d) and remanding for an evidentiary hearing); *Campbell v. Reardon*, 780 F.3d 752, 772–73 (7th Cir. 2015) (same); *Mosely v. Atchison*, 689 F.3d 838, 853 (7th Cir. 2012) (same); *see also Cullen v. Pinholster*, 563 U.S. 170, 205 (2011) (Breyer, J., concurring in part and dissenting in part) (explaining scenarios where evidentiary hearings are warranted).

## III.   GAVIN'S RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY WAS ALSO VIOLATED BECAUSE THE JURY HAD IMPROPER CONTACT WITH AN OFFICER OF THE COURT.

Gavin's Sixth and Fourteenth Amendment right to a fair trial by an impartial jury was further violated by several jurors' improper contact with the trial court's bailiff while they were sequestered. The Sixth Amendment protects against outside influences because they pose a serious threat to the fairness of a criminal proceeding and thus are presumptively prejudicial. (Pet. ¶¶ 54–59.) That is particularly so in capital cases. (Pet. ¶ 57.) Gavin alleged that the jury foreman reported that on the Sunday between the guilt and sentencing phases of trial, while the jurors were sequestered at a hotel in Lake Guntersville, he and other jurors played golf with the trial court's bailiff. (Vol. 32, Second Am. R. 32 Pet. at 2689.)

As explained in the Petition (at ¶¶ 53–59), the State Court's decision that this misconduct, as alleged, did not violate Gavin's constitutional rights involved an unreasonable application of *Turner v. Louisiana*, 379 U.S. 466 (1965), *Remmer*

44

*v. United States*, 347 U.S. 227 (1954), and *Mattox v. United States*, 146 U.S. 140 (1892). In particular, the Supreme Court held in *Remmer* that "[i]n a criminal case, any private communication [or] contact … with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial" if not made pursuant to court rules and with knowledge of the parties. 347 U.S. at 229. The State has not attempted to rebut that presumption.

Nonetheless, the State Court rejected Gavin's claim because he failed to allege that the "communications" between the bailiff and the jurors were "improper." (Vol. 46, R.32 State Court Op. at 45–46.) But the contact in and of itself was improper, and the Court in *Remmer* vacated the judgment even though it did "not know from this record, nor [did] the petitioner know, what actually transpired or whether the incidents that may have occurred were harmful or harmless." 347 U.S. at 229.[9]

The arguments the State presents in response to this claim—which are largely procedural in nature—are unavailing. To begin with, the State asserts that Gavin's claim is nothing more than "bare allegation that is not supported by any

---

[9] The State's attempt to distinguish *Turner* and *Remmer* on their facts (State's Penalty Br. at 10) takes too narrow a view—AEDPA does not require factual identity in order to apply a clearly established legal rule. (*See supra* at pp. 35–36.)

45

facts." (State's Penalty Br. at 9; *see also* State's Am. Ans. at ¶ 36(b).) That argument is circular. Because this claim was dismissed on the pleadings, despite Gavin's request for an evidentiary hearing on the issue, he was deprived of the opportunity to establish those facts on post-conviction review. Moreover, Gavin's pleadings set out the particulars of the timing, location, and parties involved in the extra-juror communications at issue. (Vol. 32, Second Am. R. 32 Pet. at 2689.)

In addition, the State asserts, without explanation, that this claim "presents only a question of state law." (State's Am. Ans. ¶ 36(c).) That is plainly wrong. This claim is rooted in the Sixth and Fourteenth Amendment guarantee of trial by an impartial jury—as Gavin has consistently argued. (Pet. ¶¶ 54, 59; Vol. 43, R. 32 App. Br. at 83, 91–94.)

Finally, the State's assertion that Gavin procedurally defaulted this claim for failure to raise it at trial or on direct appeal (State's Am. Ans. ¶ 36(a)) is baseless for the same reasons discussed in connection with the premature vote claim. (*See supra* at pp. 42–43.)

Because Gavin has established that § 2254(d) does not bar relief and that he pled a violation of his Sixth and Fourteenth Amendment rights for the reasons discussed above and in his Petition, this Court should order an evidentiary hearing to provide an opportunity to prove these allegations. (*See supra* at pp. 43–44.)

IV.   **A FACTUAL FINDING NECESSARY TO THE IMPOSITION OF GAVIN'S DEATH SENTENCE WAS MADE BY THE TRIAL JUDGE IN VIOLATION OF HIS SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS.**

The key factual finding underlying Gavin's death sentence—that the aggravating circumstances outweigh the mitigating circumstances—was made by the judge rather than by a unanimous jury. (*See* Vol. 12, Trial Tr. at 1314–15.) Removing that finding from the province of the jury violated his constitutional rights as clearly established in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002). Criminal defendants "are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589. This requirement, originally formulated in *Apprendi*, requires the jury in a capital case to make any finding of fact that is "necessary for imposition of the death penalty." *Ring*, 536 U.S. at 609.

Echoing the State Court's holding, the State argues that *Ring* does not require that a jury make the weighing determination. (State's Penalty Brief at 32–37); *see Gavin v. State*, 891 So. 2d 907, 987 (Ala. Crim. App. 2003). According to the State, all *Ring* requires is that the jury find the existence of a single aggravating factor. (*Id.* at 34.) This position is derived from the Alabama Supreme Court's opinion in *Ex Parte Waldrop*, 859 So. 2d 1181 (Ala. 2002), which held that the

47

weighing determination need not be made by the jury because it "is not a finding of fact or an element of the offense." *Id.* at 1190.

Gavin acknowledges that this Court and the Eleventh Circuit have previously accepted the State's argument in this regard. *Lee v. Comm'r, Alabama Dep't of Corrs.*, 726 F.3d 1172, 1197–98 (11th Cir. 2013); *Miller v. Dunn*, 2017 WL 1164811, at *73 (N.D. Ala. Mar. 29, 2017). However, he seeks to preserve this issue for appeal and respectfully submits that these cases were wrongly decided.

Under Alabama law, the finding of a statutory aggravator is but one of two factual findings that must be made before a death sentence can be imposed. The other is that the aggravating circumstances outweigh the mitigating circumstances. *See* Ala. Code § 13A-5-47(e) ("[T]he trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist."). That finding is thus "necessary for the imposition of the death penalty" *Ring*, 536 U.S. at 609, and the State does not dispute that the jury made no findings in that regard. In fact, the jury's role in the penalty-phase trial is merely advisory; it renders a non-binding recommendation that need not be (and in fact was not) unanimous. *See* Ala. Code § 13A-5-47(e); Vol. 12, Trial Tr. at 1300 (two jurors recommended against death sentence) (added to the record in Dkt. 45).

48

It does not matter how state law labels the weighing determination, *e.g.*, whether or not it is an "element of the offense." *Waldrop*, 859 So. 2d at 1190. As the Supreme Court has instructed, "the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Apprendi*, 530 U.S. at 494. Without a finding that aggravating circumstances outweighed those in mitigation Gavin could not have been exposed to the death sentence.

Moreover, the weighing determination is a factual one. As Justice Sotomayor has pointed out, "a defendant is eligible for the death penalty in Alabama only upon a specific factual finding that any aggravating factors outweigh the mitigating factors he has presented." *Woodward v. Alabama*, 134 S. Ct. 405, 410 (2013) (dissenting from denial of petition for certiorari). And multiple courts addressing capital sentencing schemes similar to Alabama's have reached the same conclusion. *See, e.g.*, *Rauf v. State*, 145 A.3d 430, 485 (Del. 2016) ("the weighing determination in Delaware's statutory sentencing scheme is a factual finding necessary to impose a death sentence"); *Hurst v. State*, 202 So. 3d 40, 53 (Fla. 2016) (referring to Florida's weighing requirement as "factfinding"); *Woldt v. State*, 64 P.3d 256, 264–66 (Colo. 2003) (Colorado law violated *Ring* because it "required judges to make findings of fact that render a defendant eligible for

49

death," including "whether the mitigating factors outweighed the aggravating factors").[10]

The Supreme Court's decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016), further underscores the error in the State's position. While *Hurst* was not decided until after Gavin's direct appeal, it is illustrative in that it applied the principles clearly established in *Ring* without, as the State notes, "add[ing] anything of substance to *Ring*." (State's Penalty Brief at 33.)[11] Following *Ring*, the Court in *Hurst* struck down Florida's death penalty scheme because it gave the trial court the final authority to make "the critical findings necessary to impose the death penalty." *Id*. at 622. This includes the weighing determination. The Florida law was problematic insofar as it provided that "[t]he trial court alone must find the facts that sufficient aggravating circumstances exist and *that there are insufficient*

---

[10] Indeed, outside of the death penalty context, the Eleventh Circuit recognizes that juries are routinely charged with reaching factual conclusions based on the weighing of competing evidence. *See Fischer v. S/Y NERAIDA*, 508 F.3d 586, 592 (11th Cir. 2007) (describing "determinations of the … weight of the evidence" as "findings of fact"); *see also, e.g.*, Eleventh Circuit Civil Pattern Jury Instructions at 61, 621, 652 (2013) (instructions to "weigh" multiple factors).

[11] To be clear, Gavin's claim is based on law clearly established in *Apprendi* and *Ring*—not in *Hurst*—and he does not advance a separate "*Hurst* claim." Accordingly, the State's "alternative arguments" regarding an "independent" *Hurst* claim, *e.g.*, that such a claim has been procedurally defaulted, are moot. (State's Penalty Brief at 2; State's Am. Ans. at p. 45 n.2, ¶ 53(e)–(g).)

50

*mitigating circumstances to outweigh the aggravating circumstances*." *Id.* (alterations and internal quotation marks omitted) (emphasis added).

In short, the State Court's decision involved an unreasonable application of *Apprendi* and *Ring*. And for the same reasons, this Court, reviewing *de novo*, *Daniel*, 822 F.3d at 1260, should hold that Gavin's sentencing violated the Sixth, Eighth, and Fourteenth Amendments. Because Gavin's sentence arose from a proceeding that violated his constitutional rights, an error that the State has not even attempted to argue was harmless, the Court should grant the writ.

## CONCLUSION

For the reasons set forth herein, Petitioner Keith Edmund Gavin respectfully requests that the Court issue a writ of habeas corpus granting him relief from his unconstitutionally obtained sentence of death or, with respect to his juror misconduct claims, grant him an evidentiary hearing.

Dated: October 12, 2017                    Respectfully submitted,

                                           /s/ *John D. Watson*

                                           John D. Watson
                                           (Local Counsel)
                                           Grant A. Premo
                                           Bradley Arant Boult Cummings LLP
                                           One Federal Place
                                           1819 Fifth Avenue North
                                           Birmingham, AL 35203

51

Phone: (205) 521-8436
Fax: (205) 488-6436

Melanie E. Walker (*pro hac vice*)
(Lead Counsel)
Steven J. Horowitz (*pro hac vice*)
Matthew Fogelberg (*pro hac vice*)
Nicholas K. Tygesson (*pro hac vice*)
Neil H. Conrad (*pro hac vice*)
Rachel R. Goldberg (*pro hac vice*)
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Phone: (312) 853-7000
Fax: (312) 853-7036

*Counsel for Petitioner*

52

## CERTIFICATE OF SERVICE

I certify that on October 12, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

> Beth Jackson Hughes
> State of Alabama
> Office of the Attorney General
> 501 Washington Avenue
> P.O. Box 300152
> Montgomery, AL 36130
> *Counsel for Respondent*

/s/ *John D. Watson*
John D. Watson