# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| **KEITH EDMUND GAVIN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **4:16-00273-KOB** |
| **JEFFERSON S. DUNN,** | ) | |
| **Commissioner of the Alabama** | ) | |
| **Department of Corrections,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION</u>

Petitioner Keith Edmund Gavin has petitioned for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his 1999 convictions in Cherokee County, Alabama, for two counts of capital murder and one count of attempted murder, and his subsequent sentences of death for the capital murder convictions and life imprisonment for the attempted murder conviction. Mr. Gavin alleges that a variety of constitutional violations require reversal of his convictions and/or sentence. The parties have fully briefed Mr. Gavin's claims.

After careful consideration of the record, the pleadings, and the applicable provisions of 28 U.S.C. § 2254, and for the reasons stated below, the court finds that Mr. Gavin's petition is due to be granted on his claim that counsel were

constitutionally ineffective at the penalty phase of his trial, and that all other claims are due to be denied with prejudice.

## Table of Contents

I.      PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.     THE OFFENSE OF CONVICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    THE SENTENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.     LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        A.      Exhaustion of State Court Remedies:  The First Condition Precedent to Federal Habeas Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        B.      The Procedural Default Doctrine: The Second Condition Precedent to Federal Habeas Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        C.      Overcoming Procedural Default: The Cause and Prejudice Analysis 24

        D.      The Statutory Overlay:  The Effect of "the Antiterrorism and Effective Death Penalty Act of 1996" on Habeas Review . . . . . . . . . . . . . . . . 25

                1.      Title 28 U.S.C. § 2254(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . 26

                2.      28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        E.      Ineffective Assistance of Counsel Claims. . . . . . . . . . . . . . . . . . . . 29

                1.      The performance prong . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

                2.      The prejudice prong. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

3. Deference accorded state court findings of historical fact, and decisions on the merits, when evaluating ineffective assistance of counsel claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

V. Mr. Gavin's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

A. Juror Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

1. Premature Penalty Deliberations . . . . . . . . . . . . . . . . . . . . . . . 34

2. Improper Contact with an Officer of the Court . . . . . . . . . . . 39

B. Ineffective Assistance of Counsel in the Guilt Phase . . . . . . . . . . . 44

1. Failure to Investigate and Impeach the State's Key Witness, Dwayne Meeks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

a. Failure to Conduct a Minimal Investigation . . . . . . . . . 46

b. Failure to Impeach Mr. Meeks on Inaccuracies and Inconsistencies in His Testimony . . . . . . . . . . . . . . . . . 50

2. Failure to Expose Irregularities in the State's Investigation . . 53

a. Contamination of the Victim's Van . . . . . . . . . . . . . . . 53

b. Dewayne Meeks' "Interview" . . . . . . . . . . . . . . . . . . . 57

1. Advance Notice of Interview . . . . . . . . . . . . . . . 57

2. Dewayne Meeks's Interviewers were Personal Friends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

c. Dewayne Meeks' Polygraph Examination . . . . . . . . . . 62

d. Failure to Investigate Dewayne Meeks' Vehicle, Clothing, and Home . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

e.      Failure to Investigate Key Witnesses . . . . . . . . . . . . . . 67

f.      Irregularities in the Recovery of the Murder Weapon . 70

3.     Failure to Suppress Identification Evidence and to Effectively Cross-Examine Unreliable Identification Testimony . . . . . . . 73

      a.      Failure to Suppress Identification Evidence . . . . . . . . . 75

      b.      Failure to Effectively Cross-Examine Unreliable Identification Testimony . . . . . . . . . . . . . . . . . . . . . . . 79

4.     Failure to Prevent the Jury from Hearing Prejudicial Evidence of Mr. Gavin's Prior Conviction During the Guilt Phase . . . . . . 86

5.     Failure to Call Mr. Gavin to Testify in His Own Defense . . . 91

6.     The Cumulative Effect of Trial Counsel's Errors . . . . . . . . . 94

C.     Ineffective Assistance of Counsel in the Penalty Phase . . . . . . . . . . 96

1.     Available Mitigation Evidence . . . . . . . . . . . . . . . . . . . . . . . . 98

      a.      Lucia Penland . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

      b.      Betty Paramore, Ph.D. . . . . . . . . . . . . . . . . . . . . . . . . 105

      c.      Craig Haney, Ph.D. . . . . . . . . . . . . . . . . . . . . . . . . . . 109

2.     Deficiency of Counsel for Failing to Investigate . . . . . . . . 111

3.     Prejudice from Failure to Investigate . . . . . . . . . . . . . . . . . 117

4.     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

D.     Prosecutor's Comments on Mr. Gavin's Failure to Testify . . . . . . 134

E.     Admission of Tainted Eyewitness Identifications. . . . . . . . . . . . . . 149

    1.     Danny Smith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

    2.     Larry Twilley. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

F.     Violation of Mr. Gavin's Right of Self-Representation . . . . . . . . . 161

G.     Violation of *Ring v. Arizona* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

# I. PROCEDURAL HISTORY

In April, 1998, Mr. Gavin was indicted in the Cherokee County Circuit Court on two counts of capital murder for the shooting death of William Clinton Clayton, Jr. (Vol. 1, Tab 1 at 10-12).[1] The murder was made capital because it was committed during the course of a robbery, in violation of Ala. Code § 13A-5-40(a)(2), and because Mr. Gavin had been convicted of another murder within the previous twenty years, in violation of Ala. Code § 13A-5-40(a)(13). (*Id*. at 10). In a separate indictment, Mr. Gavin was indicted on one count of attempted murder, for attempting to shoot a police officer, Danny Smith, with a gun. (*Id*. at 13-15).

---

[1] References to the record are designated "(Vol. _ )." The court will list any page number associated with the court record by reference to the number in the upper right hand corner of the page, if available. Otherwise, the page number will correspond with the number at the bottom of the page. Additionally, citations to the record will include an easily identifiable tab number close to the cited material where available.

Mr. Gavin was represented at trial by court appointed attorneys H. Bayne Smith and John H. Ufford, II. (Vol. 1, Tab 1 at 9). He was convicted on November 6, 1999, of attempted murder and both counts of capital murder. (Vol. 11, Tab 24 at 1211-18). The penalty phase of the trial was held on November 8, 1999. (Vol. 11, Tab 25 at 1271 - Vol. 12, Tab 34 at 1301). The jury recommended by a vote of 10 to 2 that Mr. Gavin be sentenced to death. (Vol. 12, Tab 34 at 1300; Vol. 1, Tab 1 at 152). On January 5, 2000, the trial judge accepted the jury's recommendation and sentenced Mr. Gavin to death. (Vol. 12, Tab 36 at 1315). Additionally, the trial judge sentenced Mr. Gavin to a consecutive term of life imprisonment for the attempted murder conviction. (Vol. 12, Tab 35 at 1301).

Stephen P. Bussman represented Mr. Gavin on direct appeal. (Vol. 2 at 201). The Alabama Court of Criminal Appeals affirmed Mr. Gavin's convictions and sentences on September 26, 2003, and denied his application for rehearing on November 14, 2003. *Gavin v. State*, 891 So. 2d 907 (Ala. Crim. App. 2003). The Alabama Supreme Court denied Mr. Gavin's certiorari petition on May 28, 2004. *Ex parte Gavin*, 891 So. 2d 998 (Ala. 2004). The United States Supreme Court denied Mr. Gavin's petition for a writ of certiorari on January 24, 2005. *Gavin v. Alabama*, 543 U.S. 1123 (2005).

On May 26, 2005, Mr. Gavin, through new counsel, timely filed a Rule 32 petition in the Circuit Court of Cherokee County. (Vol. 19 at 21-36). On June 20, 2005, the trial court returned the petition to Mr. Gavin's attorneys for failure to use or follow the form required by Rule 32.6 of the Alabama Rules of Criminal Procedure, and permitted him to re-file the petition within thirty days. (*Id.* at 45). Mr. Gavin re-filed his petition in proper form on July 19, 2005. (*Id*. at Tab 58). On June 20, 2006, the trial court dismissed many of Mr. Gavin's claims, but granted him leave to file an amended petition expanding upon his ineffective assistance of counsel claims. (Vol. 20, Tab 61 at 272-94).

Mr. Gavin filed an amended petition on August 18, 2006. (Vol. 20, Tab 62 at 297-352). In January, 2007, the trial court dismissed all claims in the petition, except the ineffective assistance of counsel claims. (Vol. 21, Tab 64 at 581-88). The trial court held an evidentiary hearing on Mr. Gavin's ineffective assistance of counsel claims in February, 2010. (Vol. 37, Tab 78 at 63 - Vol. 40 at 670). At the end of the hearing, the parties were afforded time to file post-hearing briefs. (Vol. 40 at 664). Instead of filing a post-hearing brief, Mr. Gavin filed a second amended Rule 32 petition on April 2, 2010. (Vol. 32, Tab 70). On August 17, 2010, the trial court concluded that Mr. Gavin's second amended Rule 32 petition should be treated as a post-hearing brief. (*See* Vol. 36, Tab 76 at 3491).

On April 18, 2011, the trial court denied all of Mr. Gavin's ineffective assistance of counsel claims. (*Id.* at 3484-523). The Alabama Court of Criminal Appeals affirmed the trial court's denial of collateral relief on August 22, 2014, (Vol. 46, Tab 85), and overruled Mr. Gavin's application for rehearing on March 20, 2015 (Vol. 46, Tab 86). On October, 23, 2015, the Alabama Supreme Court denied Mr. Gavin's certiorari petition. (Vol. 47, Tab 88). The United States Supreme Court denied his certiorari petition on March 20, 2017. *Gavin v. Alabama*, 137 S. Ct. 1325 (2017).

On February 16, 2016, Mr. Gavin filed a § 2254 petition in this court. (Doc. 1). Respondents filed an answer and brief on November 7, 2016. (Docs. 32, 33). Mr. Gavin filed a reply brief on February 20, 2017. (Doc. 33). Respondents filed an amended answer and brief on June 16, 2017. (Docs. 43, 44). Mr. Gavin filed an amended reply brief on October 12, 2017. (Doc. 60).

## II. THE OFFENSE OF CONVICTION

In its opinion on direct appeal, the Alabama Court of Criminal Appeals summarized the evidence in the case:

> A little after 6:30 p.m. on March 6, 1998, Clayton, a contract courier for Corporate Express Delivery Systems, Inc., was shot and killed while sitting in a Corporate Express van outside the Regions Bank in downtown Centre. Clayton had finished his deliveries for the day and

had stopped at Regions Bank to obtain money from the ATM in order to take his wife to dinner.

There were four eyewitnesses to the crime, two of whom positively identified Gavin as the shooter. Ronald Baker and Richard Henry, Jr., testified that they were stopped at a traffic light near the Regions Bank and the courthouse in downtown Centre at the time of the shooting. According to Baker and Henry, they saw a man get out of a vehicle, walk to a van parked on the street, and shoot the driver of the van. Upon hearing the gunshots, Baker and Henry immediately fled the scene; neither could identify the shooter.

Larry Twilley testified that he, too, was stopped at a traffic light by the Regions Bank in downtown Centre at the time of the shooting. Twilley testified that while he was stopped at the light, he heard a loud noise, turned, and saw a man with a gun open the driver's side door of a van parked on the street and shoot the driver of the van two times. According to Twilley, the shooter then pushed the driver to the passenger's side, got in the driver's seat, and drove away. Twilley testified that when he first saw the shooter, he noticed something black and red around his head, but that after the shooter got in the van and drove away, the shooter no longer had anything on his head; at that point, Twilley said, he noticed that the shooter had very little hair. At trial, Twilley positively identified Gavin as the shooter.

Dewayne Meeks, Gavin's cousin and an employee of the Illinois Department of Corrections, testified that in early February 1998, he and Gavin traveled from Chicago, Illinois, where they were living, to Cherokee County, Alabama "[t]o pick up some girls . . . and just to really get away." (R. 651.) Meeks said that they stayed for a weekend and then returned to Chicago. In early March 1998, Meeks said, Gavin wanted to return to Alabama to find a woman he had met in February. Meeks testified that Gavin told him that if he drove Gavin to Chattanooga, Tennessee, to meet the woman, the woman would reimburse him for the travel expenses. Meeks said that he agreed to drive Gavin to Tennessee and that Meeks's wife and three-year-old son also accompanied them.

Meeks testified that they left Chicago on the night of March 5, 1998, arrived in Chattanooga on the morning of March 6, 1998, and checked into a Super 8 Motel. Meeks said that he rented two rooms at the motel, one for him and his family, and one for Gavin. After they arrived, Meeks said, Gavin made a telephone call, and he and Gavin then drove to a nearby gasoline service station to wait for the woman Gavin had come to see. According to Meeks, the woman did not show up and Gavin then asked him to drive to Fort Payne, Alabama, so that Gavin could find the woman. Meeks agreed and they drove to Fort Payne, but they were again unsuccessful at locating the woman. After they failed to locate the woman in Fort Payne, Meeks said, they drove to Centre to find the woman.

Meeks testified that at approximately 6:30 p.m. on March 6, 1998, he and Gavin arrived in downtown Centre. When they stopped at the intersection near the courthouse and the Regions Bank, Meeks said, Gavin got out of Meeks's vehicle and approached a van that was parked nearby. According to Meeks, he thought Gavin was going to ask the driver of the van for directions. However, when Meeks looked up, he saw that the driver's side door of the van was open, and Gavin was holding a gun. Meeks stated that he watched as Gavin fired two shots at the driver of the van. According to Meeks, immediately after seeing Gavin shoot the driver of the van, he fled the scene, and Gavin got in the van and followed him. Meeks testified that Gavin honked the horn of the van and flashed the lights in an attempt to get Meeks to stop. However, Meeks refused to stop because, he said, he was scared. Meeks stated that he drove back to Chattanooga and told his wife what had happened. He and his wife and child then checked out of the motel and drove back to Chicago.

Meeks testified that when he arrived in Chicago, he immediately informed several of his friends who were in law enforcement about the shooting. As a result of his conversations with friends, Meeks said, he realized the gun used by Gavin was probably the gun that had been issued to him by the Illinois Department of Corrections. Meeks said that he then checked his home and determined that his gun was, in fact, missing. According to Meeks, he kept the gun in a drawer at home and

he had not seen the gun for approximately two weeks before the shooting. Meeks testified that he immediately reported the gun as missing to law enforcement. Meeks admitted that he did not mention to law enforcement when he reported the missing gun that he believed the gun had been used in a shooting in Alabama, but he said that he did inform his boss at the Illinois Department of Corrections that he believed the gun had been used in the shooting. After reporting the gun missing and discussing the shooting with several friends, Meeks said, he then contacted Alabama law enforcement to inform them of his knowledge of the shooting. On March 9, 1998, and again on April 6, 1998, Meeks was interviewed in Chicago by investigators from Alabama. After the interviews, Meeks said, he was indicted for capital murder in connection with the murder of Clayton; that charge was subsequently dismissed.

Danny Smith, an investigator with the District Attorney's Office for the Ninth Judicial Circuit, testified that on the evening of March 6, 1998, he was returning to Centre from Fort Payne when he heard over the radio that there had been a shooting and that both the shooter and the victim were traveling in a white van with lettering on the outside. As he proceeded toward Centre, Investigator Smith said, he saw a van matching the description given out over the radio, and he followed it. According to Investigator Smith, the van was traveling approximately 75 miles per hour and the driver was driving erratically. Investigator Smith testified that he was speaking on the radio with various law-enforcement personnel regarding stopping the van when the van turned on its blinker and stopped on the side of the road. When he pulled in behind the van, Investigator Smith said, the van abruptly pulled back onto the road and sped away. Investigator Smith said that he continued pursuing the van and that, after he turned on his emergency lights, the van stopped in the middle of the road, near the intersection of Highways 68 and 48. Investigator Smith testified that when the van stopped, the driver got out of the vehicle, turned, fired a shot at him, ran in front of the van, turned and fired another shot at him, and then ran into nearby woods. Investigator Smith testified that the driver of the van was black, and that he was wearing a maroon or wine-colored shirt, blue jeans, and some type of toboggan or other type of cap. At trial, Investigator Smith

positively identified Gavin as the person who had gotten out of the van and shot at him.

After Gavin fled into the woods, Investigator Smith said, he went to the van and checked the victim. According to Investigator Smith, the victim was still alive, but barely, and he radioed for an ambulance. Investigator Smith testified that when he first went to the van, he saw blood between the two front bucket seats and on the passenger seat; however, there was "very little blood" on the driver's seat. (R. 567.) Investigator Smith said that when emergency personnel removed the victim from the van, blood was transferred to the driver's seat by the personnel who had to enter the van to secure the victim and remove him.

Investigator Smith also testified that, within minutes of Gavin's fleeing into the woods, several law-enforcement officers arrived at the intersection of Highways 48 and 68, and the wooded area into which Gavin had fled was encircled and sealed off so that "no one could come out and cross the road without being seen." (R. 563.) Members of several different law-enforcement agencies then conducted a search for Gavin.

At approximately 9:45 p.m., Tony Holladay, a dog handler for the Limestone Correctional Facility, arrived at the scene with his beagle. Holladay testified that when he first arrived, he obtained information indicating that Investigator Smith had chased the suspect for approximately 20 yards, but had stopped short of the woods. At that point, Holladay said, he had Investigator Smith show him the exact spot he had stopped the pursuit so that the dog would not track Investigator Smith's trail from the roadway but would track the trail of the person who had entered the woods. Holladay testified that he then carried his dog to that spot and put him down. Holladay said that the dog immediately picked up a scent and tracked it into the woods to a creek. Holladay testified that he saw a man, whom he positively identified at trial as Gavin, standing in the creek under a bush, and that when Gavin saw him, Gavin attempted to flee. Holladay stated that he ordered Gavin to stop, but that Gavin did not stop until Holladay fired a shot over Gavin's shoulder.

Gavin was then handcuffed and several law-enforcement officers assisted in maneuvering Gavin out of the creek, up the embankment, and through the woods to the roadway. Kevin Ware, a deputy with the Cherokee County Sheriff's Department, testified that he participated in the search for Gavin and that he was present as Gavin was brought out of the creek. Deputy Ware stated that he heard Gavin say "I hadn't shot anybody and I don't have a gun." (R. 780.) The evidence indicated that from the time Gavin was discovered by Holladay to the time he made the statement in Deputy Ware's presence, no one had had any conversation with Gavin regarding the shooting or why he was being arrested.

The record reflects that Clayton was pronounced dead upon arrival at the hospital. A subsequent autopsy revealed three gunshot wounds to his body caused by two bullets. Stephen Pustilnik, a medical examiner with the Alabama Department of Forensic Sciences, testified that one bullet passed through Clayton's left arm, entered his chest on the left side damaging both of Clayton's lungs and his heart, and exited the right side of the chest. The record reflects that that bullet was later found lodged in the passenger-side door of the van. The second bullet, Dr. Pustilnik said, entered Clayton's left hip and lodged in his back. Dr. Pustilnik testified that the wounds to Clayton's arm and hip would not have bled much because the bullets entered the muscles and the bleeding would have been contained inside those muscles. He stated that the wound to the chest would have bled quite a bit, and that, after blood filled the chest cavity, it would then exit the body at the lowest point. In addition, Dr. Pustilnik testified that there would not have been much "blow back" from the wounds, i.e., because the location of the wounds, the blood from the shots would not have blown backwards from the body toward the shooter. Dr. Pustilnik testified that the cause of Clayton's death was multiple gunshot wounds.

The record reflects that no "usable" fingerprints were found in the van and that no bloodstains were found on Gavin's clothing. (R. 926.) However, the State presented evidence indicating that a motel-room key was found in Gavin's pants pocket after his arrest; the key fit room 113 at the Super 8 Motel in Chattanooga where Meeks and Gavin had rented rooms. In addition, two .40 caliber shell casings were found in the street

outside the Regions Bank in downtown Centre, one .40 caliber shell casing was found in the roadway at the intersection of Highways 48 and 68, and a red and black toboggan cap was found near the woods by the intersection of Highways 48 and 68. The bullet found lodged in the passenger-side door of the van and the bullet in Clayton's back were also determined to be .40 caliber. Although law enforcement was unable to find the murder weapon on the night of the crime, several days later, on March 13, 1998, a .40 caliber Glock pistol was found near the woods where Gavin had been discovered. The evidence indicated that the three shell casings and the two bullets had been fired from the pistol, and that the pistol belonged to Dewayne Meeks. The State also presented evidence indicating that in 1982, Gavin had been convicted of murder in Cook County, Illinois. Gavin had served approximately 17 years of a 34-year sentence and had been released on parole only a short time before Clayton's murder.

The State also presented the testimony of Barbara Genovese, a supervisor at the Cherokee County jail. Genovese testified that in April 1998, both Gavin and Meeks were incarcerated at the jail, in separate cells. At one point, Genovese said, when she got Meeks and another inmate out of their cells to take them outside for exercise, Gavin called out to her from his cell and asked if he could go outside and exercise with Meeks and the other inmate. Genovese said that she told Gavin that he could not go outside with Meeks, and that Gavin asked her why. According to Genovese, she told Gavin that he could not go outside with Meeks because when Meeks had initially been brought to the jail, Gavin had become loud and unruly, "screaming and yelling and banging on the doors." (R. 1001.) At that point, Genovese said, Gavin said "Dewayne didn't do anything . . . I did it" and "Dewayne should not be in here." (R. 1002.) Genovese testified that she did not know what Gavin was referring to when he said "I did it." (R. 1002.)

*Gavin v. State*, 891 So. 2d 907, 927-30 (Ala. Crim. App. 2003).

# III.  THE SENTENCE

The trial court issued a written sentencing order on January 5, 2000. (Vol. 1, Tab 3 at 184-97). The following excerpts are taken from the trial court's sentencing order:

## FINDINGS CONCERNING THE EXISTENCE
## OR NONEXISTENCE OF AGGRAVATING CIRCUMSTANCES

The law requires the trial Court to enter specific findings concerning the existence or non-existence of each aggravating circumstances [sic] enumerated by statute. This Court finds that the following three aggravating circumstances were proven beyond a reasonable doubt:

1. THE CAPITAL OFFENSE WAS COMMITTED WHILE THE DEFENDANT WAS UNDER A SENTENCE OF IMPRISONMENT.

The term "under sentence of imprisonment" is defined under Title 13A-5-39(7) as "while serving a term of imprisonment, while under a suspended sentence, while on probation or parole, or while on work release, furlough, escape, or any other type of release or freedom while or after serving a term of imprisonment, other than unconditional release and freedom after expiration of the term of sentence."

The Defendant was convicted of Murder in the Circuit Court of Cook County, Illinois, on June 9, 1982, and he was sentenced to thirty-four years in prison. The Defendant was paroled on December 28, 1997, and was still on parole at the time of the murder on March 6, 1998.

At the time of the murder of William Clinton Clayton, Jr., on March 6, 1998, the Defendant was under a sentence of imprisonment as that term is defined by Alabama Law.

2. THE DEFENDANT WAS PREVIOUSLY CONVICTED OF ANOTHER FELONY INVOLVING THE USE OF VIOLENCE TO THE PERSON.

The Defendant was convicted of Murder in the Circuit Court of Cook County Illinois on June 9, 1982.

3. THE CAPITAL OFFENSE WAS COMMITTED WHILE THE DEFENDANT WAS ENGAGED IN OR WAS AN ACCOMPLICE IN THE COMMISSION OF OR AN ATTEMPT TO COMMIT, OR FLIGHT AFTER COMMITTING, OR ATTEMPTING TO COMMIT A ROBBERY.

Count One of the Indictment charged the Defendant with intentional murder in the course of committing a theft of a 1996 Ford van belonging to Corporate Express Delivery Systems, Incorporated by the use of force against the driver, William Clinton Clayton, Jr.

The Defendant took Meeks'[2] 40 calibre Glock pistol either from Meeks' residence or from the Meeks' vehicle without the consent or permission of Meeks. According to Meeks, the Defendant secreted the weapon until the Defendant used it to kill William Clinton Clayton, Jr. And took the vehicle which Mr. Clayton was driving.

The capital crime of intentional killing of another during the commission of robbery is a single offense consisting of two elements. The intentional killing of Mr. Clayton and the theft of the vehicle were part of a continuous chain of events. Therefore, the capital offense was committed while the Defendant was engaged in the commission of or attempt to commit robbery.

FINDINGS CONCERNING THE EXISTENCE
OR NONEXISTENCE OF MITIGATING CIRCUMSTANCES

---

[2] Mr. Gavin traveled to Alabama with his cousin Dwayne Meeks, who worked for the Illinois Department of Corrections. (Vol. 1, Tab 3 at 186). Mr. Gavin and Mr. Meeks both lived in the Chicago area prior to the crime. (*Id*.).

# I.

In compliance with the statutory requirement that the trial Court enter specific findings concerning the existence or nonexistence of each mitigating circumstance enumerated by statute, the Court finds THAT NONE OF THE FOLLOWING MITIGATING CIRCUMSTANCES EXIST in this case:

1. THAT THE DEFENDANT HAD NO SIGNIFICANT HISTORY OF PRIOR CRIMINAL ACTIVITY.

The Defendant was convicted of Burglary in Cook County, Illinois, on October 25, 1979. He was also convicted of Murder on June 9, 1982, in Cook County, Illinois.

The presentence report indicates that the Defendant has been charged or implicated in other criminal activity, but there is no record of conviction for any offense other than the prior crime[s] of murder and burglary as stated above. To the extent that the presentence report suggests any other criminal activity, same is not considered as an aggravating circumstance, and has not been weighed as such by this Court.

This Court finds that there is no support for this mitigating circumstance.

2. THAT THE CAPITAL OFFENSE WAS COMMITTED WHILE THE DEFENDANT WAS UNDER THE INFLUENCE OF EXTREME MENTAL OR EMOTIONAL DISTURBANCE.

During the few hours leading up to the murder of Mr. Clayton, Meeks had apparently insisted on being reimbursed for his expenses in bringing the Defendant to Alabama. These demands did not invoke extreme mental or emotional disturbance, although this may explain the Defendant's motive for the robbery.

The Defendant is an intelligent person capable of making independent choices.

There was no plea of mental disease or defect, and at no time did the Defendant seek to have a mental evaluation for the purpose of assenting such a defense.

The Court finds that there is no support for this mitigating circumstance.

3. THAT THE VICTIM WAS A PARTICIPANT IN THE DEFENDANT'S CONDUCT OR CONSENTED TO IT.

The Court finds that there is no support for this mitigating circumstance.

4. THAT THE DEFENDANT WAS AN ACCOMPLICE IN THE CAPITAL OFFENSE COMMITTED BY ANOTHER, AND HIS PARTICIPATION WAS RELATIVELY MINOR.

The Defendant was identified by an eye witness as the person who committed the offense in question. Likewise, Meeks reported that the Defendant committed the murder and robbery of Mr. Clayton. Nevertheless, Meeks was indicted along with the Defendant. The State subsequently dismissed the charge against Meeks who thereafter testified against the Defendant and on behalf of the State.

There is no direct evidence that the State's dismissal was a quid-pro-quo for Meeks' testimony, but throughout the trial, the Defendant's attorneys attempted to impeach Meeks' credibility by proving that he was originally charged in the case, and that by virtue of the dismissal of those charges, he was thereby motivated to testify falsely against the Defendant.

The Defendant's attorneys also challenged the forensic evidence in an effort to try to implicate Meeks as the guilty party. For example, the Defendant argued that the driver would have been covered with the

victim's blood, but no blood was found on the Defendant or on his clothes even by DNA examination. In addition, there was no evidence of the Defendant's fingerprints in or on the courier van. The Defendant also argued that even though he was arrested standing waist deep in a creek, he was not submersed long enough to completely cleanse blood from his clothes, and that if he had been submersed long enough to have that effect, he would have died from hypothermia.

The Defendant was identified by Officer Danny Smith who viewed the Defendant at a distance of only a few feet when the Defendant exited the stolen van, fired at Officer Smith and escaped into the woods. A toboggan matching the description reported by eyewitnesses was found near the site where the Defendant entered the woods as he escaped from Officer Smith.

The ballistics analysis established that the shell casings ejected by the weapon fired at Officer Smith were identical to the shell casings found in the street at the site where Mr. Clayton was short, and that the casings from both sites were fired by the weapon found in the woods near where the Defendant was apprehended.

In summary, the Defendant attempted to implicate Meeks as the killer by a combination of the challenges to the forensic evidence coupled with his challenge of Meeks' credibility. The Defendant emphasized the undisputed fact that Meeks drove the Defendant to the scene of the crime, and that Meeks' pistol was the murder weapon. The evidence of the Defendant's guilt is , however, overwhelming.

There is no basis on which to conclude that the defendant was merely an accomplice with minor participation in the crime. This court finds that there is no support for this mitigating circumstance.

5. THAT THE DEFENDANT ACTED UNDER EXTREME DURESS OR UNDER THE SUBSTANTIAL DOMINATION OF ANOTHER PERSON.

This Court finds that there is no support for this mitigating circumstance.

## 6. THAT THE CAPACITY OF THE DEFENDANT TO APPRECIATE THE CRIMINALITY OF HIS CONDUCT OR TO CONFORM HIS CONDUCT TO THE REQUIREMENTS OF LAW WAS SUBSTANTIALLY IMPAIRED.

This Court finds that there is no support for this mitigating circumstance.

## 7. THE AGE OF THE DEFENDANT AT THE TIME OF THE CRIME.

At the time of the commission of the offense on March 6, 1998, the Defendant was 37 years of age. The age of the Defendant is not a mitigating circumstance.

## II.

In addition to the mitigating circumstances specified by statute, and the findings of this Court relating thereto as set out above, mitigating circumstances include any aspect of the Defendant's character or record of any of the circumstances of the offense that the Defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the Defendant offers as a basis for a sentence of life imprisonment without parole instead of death.

As a supplement to the Probation Officer's written report, the Defendant has provided a memorandum from sentencing consultant John David Sturman and Associates of Chicago, Illinois; the whole of which said memorandum has been considered by this Court. In that memorandum the Defendant's mother is reported to have described the Defendant's life as influenced by, or subject to, a combination of drugs and gang violence while living in a Chicago housing project. The Defendant's mother also testified at the Sentence Hearing conducted

before the jury. The Defendant's attorney has advised the Court, however, that the Defendant denies ever having a drug problem.

At the Sentence Hearing conducted before the jury the Court heard testimony of Rev. A. J. Johnson who spoke eloquently on behalf of the Defendant as a result of his frequent meetings with the Defendant over the many months of the Defendant's incarceration. Rev. Johnson opines that the Defendant has concern and sympathy for the victim's family, and that the Defendant is capable of a closer relationship with God.

This Court has considered all matters presented by the Defendant, but this Court does not find any support for any non-statutory mitigating circumstance.

## CONCLUSION

This Court has carefully considered the aggravating circumstances which have been proven to the satisfaction of the Court beyond a reasonable doubt. There are no mitigating circumstances. The aggravating circumstances, therefore, outweigh the mitigating circumstances.

This Court has also carefully considered the jury recommendation that the Defendant be sentenced to death.

It is hereby ORDERED, ADJUDGED AND DECREED that the Defendant shall be punished by death. The sentence of death shall be consecutive to the sentence imposed in case number CC-98-62 in the circuit Court of Cherokee County, Alabama. The Sheriff shall remove the Defendant to the custody of the Alabama Department of Corrections where in strict accordance with the law the Defendant shall be put to death. In accordance with the Alabama Rules of Court the Supreme Court of Alabama shall set an execution date, and the Supreme Court Order fixing the execution date shall constitute the execution warrant.

(Vol. 1, Tab 3 at 1188-96) (alteration added).

# V. LEGAL STANDARD

"The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States.'" *Wilson v. Corcoran*, 526 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). As such, this court's review of claims seeking habeas relief is limited to questions of federal constitutional and statutory law. Claims that turn solely upon state law principles fall outside the ambit of this court's authority to provide relief under § 2254. *See Alston v. Dep't of Corr.*, 610 F. 3d 1318, 1326 (11th Cir. 2010).

## A. Exhaustion of State Court Remedies

A habeas petitioner must present his federal claims to the state court, and exhaust all of the procedures available in the state court system, before seeking relief in federal court. 28 U.S.C. § 2254(b)(1); *Medellin v. Dretke*, 544 U.S. 660, 666 (2005) (holding that a petitioner "can seek federal habeas relief only on claims that have been exhausted in state court"). This requirement serves the purpose of ensuring that state courts are afforded the first opportunity to address federal questions affecting the validity of state court convictions and, if necessary, correct violations of a state prisoner's federal constitutional rights. *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).

In determining whether a claim is properly exhausted, the Supreme Court has stated that "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6 (1982) (citations omitted). Instead, "an issue is exhausted if 'the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dep't Of Corr.*, 680 F.3d 1271, 1286-87 (11th Cir. 2012) (quoting *Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004)).

## B.    The Procedural Default Doctrine

Under the procedural default doctrine, federal review of a habeas petitioner's claim is barred if the last state court to examine the claim states clearly and explicitly that the claim is barred because the petitioner failed to follow state procedural rules, *and* that procedural bar provides an adequate and independent state ground for denying relief. *See Cone v. Bell,* 556 U.S. 449, 465 (2009); *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). The Supreme Court defines an "adequate and independent" state court decision as one that "rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment." *Lee v. Kemna,* 534 U.S. 362, 375 (2002) (quoting *Coleman v. Thompson,* 501 U.S. 722, 729 (1991)).

To be considered "independent," the state court's decision "must rest solidly on state law grounds, and may not be 'intertwined with an interpretation of federal law.'" *Judd v. Haley,* 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)). To be considered "adequate" to support the state court's judgment, the state procedural rule must be both "firmly established and regularly followed." *Lee v. Kemna,* 534 U.S. at 375 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). If the procedural rule is not firmly established, or if it is applied in an arbitrary, unprecedented, or manifestly unfair fashion, it will not be considered adequate, and the state court decision based upon such a rule can be reviewed by a federal court. *Card*, 911 F.2d at 1517. Conversely, if the rule is deemed adequate, the decision will not be reviewed by this court.

## C.     Overcoming procedural default: The Cause and Prejudice Analysis

"A federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default *and* actual prejudice resulting from the alleged constitutional violation." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (citing *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977)) (emphasis added). The Supreme Court has recognized that constitutionally ineffective assistance of counsel on direct appeal can constitute "cause" to excuse procedural default. *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991). However, any attorney error short of

constitutionally ineffective assistance of counsel does not constitute cause, and will not excuse a procedural default. *Id*.

In addition to proving the existence of "cause" for a procedural default, a habeas petitioner must show that he was actually "prejudiced" by the alleged constitutional violation. To show prejudice, a petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and *substantial* disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis added); *see also McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992) (*per curiam*). In the context of a defaulted ineffective assistance of trial counsel claim, a petitioner must show not only "cause," but also "that the underlying ineffective assistance of trial counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez v. Ryan*, 132 S. Ct. 1309, 1318-19 (2012).

**D.    The Statutory Overlay:  The Effect of "the Antiterrorism and Effective Death Penalty Act of 1996" on Habeas Review**

Miller's case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). To "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to

the extent possible under the law," the AEDPA establishes a deferential standard of review of state habeas judgments. *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### 1.    Title 28 U.S.C. § 2254(e)(1)

Section 2254(e)(1) requires district courts to *presume* that a state court's factual determinations are correct, unless the habeas petitioner rebuts the presumption of correctness with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also, e.g., Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001) (observing that § 2254(e)(1) provides "a highly deferential standard of review for factual determinations made by a state court"). The deference that attends state court findings of fact pursuant to § 2254(e)(1) applies to all habeas claims, regardless of their procedural stance. Thus, a presumption of correctness must be afforded to a state court's factual findings, even when the habeas claim is being examined *de novo*. *See Mansfield v. Secretary, Department of Corrections*, 679 F.3d 1301, 1313 (11th Cir. 2012).

### 2.    28 U.S.C. § 2254(d)

The presumption of correctness also applies to habeas claims that were adjudicated on the merits by the state court and, therefore, are claims subject to the standards of review set out in 28 U.S.C. § 2254(d)(1) or (d)(2). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court,

subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

The provisions of 28 U.S.C. § 2254(d)(1) and (d)(2) provide that when a state court has made a decision on a petitioner's constitutional claim, habeas relief cannot be granted, unless the federal court determines that the state court's adjudication of the claim *either*

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; *or*

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

The Supreme Court has explained the deferential review of a state court's findings:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

The court should remember that "an *unreasonable* application of federal law is different from an *incorrect* application." *Id.* at 410. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law *erroneously* or *incorrectly*. Rather, that application must also be *unreasonable*." *Id.* at 411 (emphasis added). To demonstrate that a state court's application of clearly established federal law was "objectively unreasonable," the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility for fairminded disagreement*." *Harrington v. Richter*, 562 U.S. at 786-87 (emphasis added).

The Eleventh Circuit has observed that § 2254(d)(1)'s "unreasonable application" provision is the proper statutory lens for viewing the "run-of-the-mill state-court decision applying the correct legal rule." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006).

> In other words, if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case, then the federal court should look to § 2254(d)(1)'s "unreasonable application" clause for guidance. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable."

*Id.* (quoting *Williams*, 529 U.S. at 409).

**E.    Ineffective Assistance of Counsel Claims**

An introduction to ineffective assistance of counsel claims is included here because of the relationship between such claims – which are governed by a highly deferential standard of constitutional law – and 28 U.S.C. § 2254(d), which is itself an extremely deferential standard of review. Additionally, because the majority of Miller's petition is based on allegations of ineffective assistance of counsel, a general discussion also provides a central reference point.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-pronged analysis for determining whether counsel's performance was ineffective. "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Id*. at 687. Both parts of the *Strickland* standard must be satisfied: that is, a habeas petitioner bears the burden of proving, by "a preponderance of competent evidence," that the performance of his trial or appellate attorney was *deficient*; *and*, that the deficient performance *prejudiced his defense. Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). Because a petitioner must prove both prongs, a federal court is not required to address both parts of the *Strickland* standard when the habeas petitioner makes an insufficient showing on

either one of the prongs. *See*, *e.g.*, *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation to *Strickland* omitted).

## 1. The performance prong

To satisfy the performance prong, the petitioner must "prove by a preponderance of the evidence that counsel's performance was unreasonable." *Stewart v. Secretary, Department of Corrections*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000)). The Sixth Amendment does not guarantee a defendant the very best counsel or the most skilled attorney, but only an attorney who performed reasonably well within the broad range of professional norms. *Stewart*, 476 F.3d at 1209. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992). Judicial scrutiny of counsel's performance must be highly deferential, because "[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland*, 466 U.S. at 693.

Indeed, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. "Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: '*petitioner must establish that no competent counsel would have taken the action that his counsel did take*.'" *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1315) (emphasis added). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds *unless it is shown that no reasonable lawyer*, *in the circumstances*, *would have done so*." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994) (emphasis added).

## 2. The prejudice prong

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. (quoting *Strickland*, 466 U.S. at 693) (alteration in original). Instead, to prove prejudice, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Strickland*, 466 U.S. at 694. "[W]hen a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695). The standard is high, and to satisfy it, a petitioner must present "proof of '"unprofessional errors" so egregious "that the trial was rendered unfair and the verdict rendered suspect."'" *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (quoting *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996)).

**3**.    **Deference accorded state court findings of historical fact, and decisions on the merits, when evaluating ineffective assistance of counsel claims**

A reviewing court must give state court findings of historical fact made in the course of evaluating a claim of ineffective assistance of counsel a presumption of correctness under 28 U.S.C. §§ 2254(d)(2) and (e)(1). *See, e.g.*, *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001). To overcome a state court finding of fact, the petitioner bears a burden of proving contrary facts by clear and convincing evidence.

Additionally, under the AEDPA, a federal habeas court may grant relief based on a claim of ineffective assistance of counsel *only if* the state court determination involved an "unreasonable application" of the *Strickland* standard to the facts of the

case. *Strickland* itself, of course, also requires an assessment of whether counsel's conduct was professionally unreasonable. But those two assessments cannot be conflated into one. *See Harrington v. Richter,* 562 U.S. 86, 101-02. Thus, habeas relief on a claim of ineffective assistance of counsel can be granted with respect to a claim actually decided by the state courts *only if* the habeas court determines that it was "objectively unreasonable" for the state courts to find that counsel's conduct was not "professionally unreasonable." "The standards created by *Strickland* and § 2254(d) are 'highly deferential,' . . . and when the two apply in tandem, review is 'doubly' so." *Id*. at 105.

## V. MR. GAVIN'S CLAIMS

### A. Juror Misconduct

Mr. Gavin claims that his Sixth and Fourteenth Amendment rights to a fair trial were violated and he was prejudiced by two separate instances of juror misconduct. (Doc. 1 at 15). Specifically, he contends that the jury conducted premature penalty phase deliberations and that improper contact occurred between several of the jurors and the bailiff. (*Id*. at 15-25).

The Respondent argues that this entire claim is procedurally barred because the Alabama Court of Criminal Appeals "noted" in its memorandum opinion that the claim "was procedurally barred because it could have been but was not raised at trial

or on direct appeal under Rule 32.2(a)(3) and (5), Ala.R.Crim.P." (Doc. 43 at 13, 16).

However, the Alabama Court of Criminal Appeals stated:

> "The general rules of preservation apply to Rule 32 proceedings." *Boyd v. State*, 913 So. 3d 1113, 1123 (Ala. Crim. App. 2003). Rules 32.2(a)(3) and (5), Ala. R. Crim. P. *would* preclude claims of juror misconduct if the claims could have been raised at trial or on appeal. See *Ex parte Pierce*, 851 So. 2d 606, 614 (Ala. 2000).

(Vol. 46, Tab 85 at 44) (emphasis added). The appeals court stated that the claims "would" be precluded if they could have been raised at trial or on appeal. The court never expressed an opinion on whether the claims *could* have been raised at trial or on appeal and never affirmatively stated that the claims were in fact procedurally defaulted. Thus, this court cannot find that the claims were procedurally defaulted based on the Alabama Court of Criminal Appeals statement.

## 1. Premature Penalty Phase Deliberations

Mr. Gavin first claims that the jurors prematurely engaged in penalty phase deliberations. (Doc. 1 at 16-21). Specifically, he alleges:

> Investigation by post-conviction counsel revealed that the jurors voted on guilt and sentencing at the same time, notwithstanding the trial court's repeated admonishments not to discuss the case before it was submitted for decision. This improper vote occurred before the penalty phase even began, and thus before any evidence was presented as to mitigation or aggravation and indeed before the jury was instructed on the law governing sentencing. Counsel spoke with jury foreman Terry Manley, who recalled the moment juror Clifford Higgins addressed the group, just before the guilt-phase vote. [Vol. 32, Tab 70 at] 2688. Mr.

Higgins said that if the other jurors thought that he would vote differently because he and the defendant were both black, he wanted them to know that he was going to vote guilty and in favor of the death penalty. Each of the jurors then formally voted by writing his or her vote down on a piece of paper, voting on both guilt and the sentence (death or life without parole) at the same time. The vote was unanimous in favor of guilt and 10 to 2 in favor of the death penalty. Jurors Cheryl Beard and Belinda Martinez have corroborated Mr. Manley's account that the jurors voted on both guilt and sentencing at the same time. *Id.*

The jury's premature deliberation on sentencing, and its commitment to a sentencing decision prior to the presentation of any evidence on the subject, was misconduct. As the Third Circuit has explained, premature deliberations (1) lead jurors to "continue to adhere to" opinions expressed, often despite the evidence; (2) deprive the defendant of a properly instructed jury; and (3) shift the burden of proof to the defendant, who must "chang[e] by evidence the opinion thus formed." [*United States v.*] *Resko*, 3 F.3d [684] at 689 [3d Cir. 1993]] (quoting *Winebrenner v. United States*, 147 F.2d 322 (8th Cir. 1945)).

(Doc. 1 at 17-18).

Mr. Gavin argues that the jury reached its 10-2 vote in favor of death without hearing any evidence to support the sentence, without being instructed on the law, and without weighing mitigating and aggravating factors. (*Id.* at 18-19). He adds that the jurors' misconduct is all the more significant because the jury's "ultimate vote at the conclusion of the sentencing trial was exactly the same as the illicit one during the guilt-phase deliberations: 10-2 in favor of death." (*Id.* at 19). He concludes that because the jurors were "set in their conclusions before they heard the sentencing phase evidence" and then "[t]en members of the jury voted automatically upon the

guilty verdict," his Sixth and Fourteenth Amendment rights under *Morgan v. Illinois*

[, 504 U.S. 719 (1992)] were violated. (*Id.*).

Mr. Gavin raised this claim in his second amended Rule 32 petition. (Vol. 32,

Tab 70 at 2687-89). Despite the trial court declining to address the claim,[3] the

Alabama Court of Criminal Appeals denied the claim on the merits:

> In his second amended petition Gavin asserted that he was denied
> a fair trial because, he alleged, his jury prematurely engaged in
> sentencing deliberations. Gavin specifically contended that the jurors in
> his trial "voted on guilt and sentencing at the same time – that is, after
> the guilt determination was submitted to the jury . . . but before the
> sentencing phase even began" ([Vol. 32, Tab 70 at] 2688 (emphasis in
> original).) In support of his claim, Gavin stated that T.M., the jury
> foreman, had related how, after the jury had discussed the evidence in
> deliberations, one juror stated that he was going to vote guilty and for
> the death penalty. The foreman also related that all the jurors then wrote
> down their votes for both the guilt and penalty phases.

---

[3] In his initial Rule 32 petition, Mr. Gavin raised a juror misconduct claim pertaining
to the jurors' reliance on religion during their deliberations. (Vol. 19, Tab 58 at 65-66). On
June 20, 2006, the trial court dismissed all of Mr. Gavin's claims except for his ineffective
assistance of counsel claims, and granted Mr. Gavin leave to file an amended Rule 32
petition with respect to his ineffective assistance of counsel claims. (*See* Vol. 36, Tab 76 at
3491). The trial court held an evidentiary hearing on the ineffective assistance of counsel
claims in February, 2010. (*Id.*). At the end of the evidentiary hearing, the parties agreed to
file briefs in support of and in opposition to the amended petition. (*Id.*). Instead of filing the
agreed upon brief, Mr. Gavin filed a "Second Amended Petition for Relief from Judgment
Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure." (Vol. 32, Tab 70). The
trial court construed Mr. Gavin's second amended petition as a brief, noting that "to the
extent that the Second Amended Rule 32 Petition asserts grounds for relief not asserted in
the First Amended Rule 32 Petition, and to the extent that the Second Rule 32 Petition relies
on evidence not otherwise part of the record, same would not be considered because of the
attorneys' agreement stated to the Court at the conclusion of the hearing conducted on
February 8-9, 2010." (Vol. 36, Tab 76 at 3491 n. 2).

We have explained:

> Rule 606(b), Ala. R. Evid., specifically excludes the admission of juror testimony to attack "internal influences." "[P]otentially premature deliberations that occurred during the course of the trial" . . . have been held to "constitute[] a potential internal influence on the jury." *United States v. Logan*, 250 F.3d 350, 380-81 (6th Cir. 2001). *See also Ledure v. BNSF Ry.*, 351 S.W.3d 13, 24 (Mo. Ct. App. 2011) ("Jurors' testimony post-verdict is not admissible to show alleged premature deliberations by a juror."); *United States v. Sabhnani*, 529 F. Supp. 2d 384, 395 (E.D.N.Y. 2008) ("[T]he Court finds that Rule 606(b)[, Fed. R. Evid.,] protects the finality of the verdict and bars any inquiry into the jurors' deliberative processes'").

> > "[W]hen there are premature deliberations among jurors with no allegations of external influence on the jury, the proper process for jury decision making has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial." *United States v. Resko*, 3 F.3d 684, 690 (3d Cir. 1993) . Indeed, "[p]reserving the finality of jury verdicts militates strongly in favor of barring post-trial juror assertions of pre-deliberation discussion. The probability of some adverse effect on the verdict is far less than for extraneous influences." *United States v. Williams-Davis*, 90 F.3d 490, 505 (D.C. Cir. 1996).

> *Taylor v. State*, 270 P.3d 471, 481 (Utah 2012).

*Perkins v. State*, [Ms. CR-08-1927, November 2, 2012] __ So. 3d __, __ (Ala. Crim. App. 2012).

Because T.M.'s testimony would have been inadmissible at a hearing held on Gavin's petition, the circuit court did not err in dismissing Gavin's claim.

(Vol. 46, Tab 85 at 44-45) (footnote omitted).

The Supreme Court has held that a jury must base its verdict only on evidence coming "from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisana*, 379 U.S. 466, 472-73 (1965). Prejudice is presumed if a defendant establishes that extrinsic contact with the jury in fact occurred. *McNair v. Campbell*, 416 F.3d 1291, 1307 (11th Cir. 2005). Once a defendant makes a showing of prejudice, the burden shifts back to the state to rebut the presumption by "showing that the jurors' consideration of the extrinsic evidence was harmless to the defendant." *Id*. (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)).

Mr. Gavin argues that the Alabama Court of Criminal Appeals's "did not decide this claim on the merits, relying instead on a state-law evidence rule to bar the only evidence of this constitutional violation." (Doc. 60 at 35-44). However, the appellate court's discussion of Rule 606(b) of the Alabama Rules of Evidence prohibiting a juror from testifying about the process of deliberations is grounded in the idea that the jurors' premature deliberations and vote on punishment were not "extraneous evidence" injected into the deliberations. The actions of the jurors were

part of the deliberative process itself, not something "extraneous" to the jury's deliberations. As such, the appellate court correctly concluded that the evidence offered on this issue was nothing more than prohibited juror testimony about the debate and deliberations of the jury. *See United States v. Siegelman*, 467 F.Supp.2d 1253, 1279 (M.D. Ala. 2006). Furthermore, Mr. Gavin has made no showing that the jurors' premature deliberations and vote on a potential sentence during the guilt phase of the trial affected the ultimate outcome of his trial in any way.

The Alabama Court of Criminal Appeals's determination that testimony concerning any premature deliberations would have been inadmissible at an evidentiary hearing on Mr. Gavin's collateral petition was neither contrary to, nor an unreasonable application of clearly established federal law.

## 2. Improper Contact with an Officer of the Court

Mr. Gavin claims that investigation by post-conviction counsel also revealed that while the jurors were sequestered over the weekend, between the guilt and penalty phases of the trial, several of the jurors played golf with the court's bailiff. (Doc. 1 at 22-25). He asserts that the "safeguards of sequestration were thwarted by having the bailiff – who was privy to information withheld from the jurors – spend several hours socializing with jurors beyond the watchful eye of the trial court and outside the presence of the defendant and his counsel." (*Id*. at 22). He argues that this

*ex parte* communication and contact with the bailiff was "intolerable, presumptively prejudicial, and entitles Gavin to a new trial on sentencing." (*Id*. at 23).

Gavin unsuccessfully raised this claim on appeal from the denial of his second amended Rule 32 petition. (Vol. 32, Tab 70 at 2689). In denying the claim, the Alabama Court of Criminal Appeals held:

> Gavin argues that he was denied a fair trial because, he says, his jury had improper contact with the circuit court's bailiff. Gavin alleged in his petition that juror T.M. reported that he and some other jurors had played golf with the bailiff during Gavin's trial; this, Gavin contends, "would justify reversal." (Gavin's brief, p. 90.) Gavin did not allege in his second amended petition that the bailiff had engaged in any improper communications with the sequestered jury, only that "[g]iven the seriousness of extra-juror influences, Mr. Gavin is entitled to a presumption of prejudice and an evidentiary hearing to examine these witnesses on what was discussed during the golf outing." (C. 2689.)

> The circuit court did not abuse its discretion in summarily dismissing this claim because Gavin failed to plead sufficient facts in support of the claim.

(Vol. 46, Tab 85 at 45-46). The dismissal of a claim for failure to plead sufficient facts in support of the claim constitutes a ruling on the merits. *See Frazier v. Bouchard*, 661 F.3d 519, 526-27 (11th Cir. 2011).

Mr. Gavin argues that this ruling was based on an unreasonable determination of the facts and involved an unreasonable application of Supreme Court precedent

such as *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965), *Remmer v. United States*, 347 U.S. 227, 229 (1954), and *Mattox v. United States*, 146 U.S. 140, 150 (1892)

As previously discussed, *Turner* held that a jury must base its verdict only on evidence coming "from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." 379 U.S. at 472-73. *Remmer* and *Mattox* held that private communications with jurors can be prejudicial. *Remmer*, 347 U.S. at 229 ("In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."); *Mattox*, 146 U.S. at 150 ("Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear.").

Mr. Gavin cites several cases in support of his contention that improper contact with court officers is especially troubling:

The Supreme Court has emphasized the risk of prejudice from improper contacts with a bailiff in particular. *See Parker v. Gladden*, 385 U.S. 363, 365 (1966) (per curiam) (noting that the "official character of the bailiff-as an officer of the court as well as the State-beyond question carries great weight with a jury which he had been shepherding"). So have other courts. *E.g., Turpin v. Todd*, 519 S.E.2d 678, 682 (Ga. 1999) ("The very nature of the bailiff's position serves to heighten the prejudicial potential a bailiff's communication may have on the jury."); *State v. Johnson*, 105 P.3d 85, 94 (Wash. Ct. App. 2005) (noting that a bailiff may be seen as "the judge's agent," and that "the bailiff is viewed by the jury as speaking on behalf of the judge").

(Doc. 1 at 24). However, in each of these cases, the bailiff made improper comments to one or more of the jurors.

In *Parker*, the

court bailiff assigned to shepherd the sequestered jury, which sat for eight days, stated to one of the jurors in the presence of others, while the jury was out walking on a public sidewalk: "Oh that wicked fellow (petitioner), he is guilty"; and on another occasion said to another juror under similar circumstances, "If there is anything wrong (in finding petitioner guilty) the Supreme Court will correct it."

385 U.S. at 363-64 (footnotes omitted).

In *Turpin*, the "jury had spent nearly half of their sentencing deliberations discussing the possibility of parole should [the defendant] be sentenced to life imprisonment and had decided to ask the trial court about parole because the written jury instructions they had did not answer their question." 519 S.E. 2d at 388. The jury foreman wrote out the jurors' question about parole and gave it to the bailiff to take

to the judge. The bailiff returned ten minutes later – without ever giving the question to the judge – and answered the question himself. *Id*. at 388 & n.2.

In *Johnson*, "the bailiff spoke with the foreperson to inquire how deliberations were proceeding and to offer suggestions for making the process run more smoothly." 105 P.2d at 94.

During Mr. Gavin's trial, the jurors were sequestered under the care of the court bailiff. Over the weekend – between the guilt and penalty phases of the trial – the bailiff played golf with the jurors. Mr. Gavin argues that the mere act of the bailiff playing golf with the jurors prejudiced him and entitles him to a new penalty phase determination. He claims that the golf game thwarted the safeguards of sequestration because it took place outside of the presence of the trial court and the defense counsel.

The jurors were sequestered over the weekend between the conclusion of the guilt phase of the trial and the beginning of the penalty phase of the trial. They were not deliberating over the weekend and they were not in court. Rather, they were sequestered in a hotel away from their families and friends – and also away from the court and defense counsel. During this time, the court's bailiff was charged with staying with them and tending to their needs.

Instead of requiring the jurors to spend all day sitting in a hotel room, the bailiff took them to play golf. Mr. Gavin has not alleged that any improper communications ever took place between the bailiff and the jurors – while they were playing golf, or while they were in the hotel. The fact that the bailiff and the jurors played golf together is of no consequence absent any improper communications between the jurors and the bailiff. It appears from the record that the bailiff was simply doing his job – taking care of the jurors while they were sequestered over the weekend.

Thus, the Alabama Court of Criminal Appeals finding that Mr. Gavin failed to plead sufficient facts to support this claim is not an unreasonable determination of the facts and did not involved an unreasonable application of *Turner*, *Remmer*, or *Mattox.*

## B. Ineffective Assistance of Counsel in the Guilt Phase

Mr. Gavin asserts that trial counsel rendered constitutionally ineffective assistance during the guilt phase of his trial by failing to investigate basic information surrounding the case and failing to adduce evidence that would have raised a reasonable doubt about his guilt. (Doc. 1 at 26).

### 1. Failure to Investigate and Impeach the State's Key Witness

Mr. Gavin claims that counsel were patently ineffective for failing to investigate and impeach Dwayne Meeks, the state's "key witness." (Doc. 1 at 27). He states:

> Meeks and Gavin traveled in Meeks' vehicle from Chicago to Alabama twice in early 1998. Unlike Gavin, Meeks had connections in Alabama, having spent much of his youth in Fort Payne and having attended high school there. Meeks' close proximity to Mr. Clayton at the time of the shooting, his ownership of the murder weapon, and his flight from the scene all suggests that he, and not Gavin, may have shot Mr. Clayton. In fact, Meeks was viewed by the lead investigators as a suspect in the crime, P.C. 835, was indicted by a grand jury, P.C. 857-58, and was initially charged, along with Gavin, with the murder of Mr. Clayton.

(*Id.*).

He argues that Mr. Meeks's testimony was essential to the state's case against him, yet counsel "utterly failed to undermine Meeks' credibility or to introduce evidence suggesting that Meeks may have been the shooter." (*Id.*). Specifically, Mr. Gavin alleges that counsel were ineffective for a) failing to conduct a minimal investigation that would have enabled them to effectively cross-examine Mr. Meeks or impeach many of his statements and through other witnesses and documents, and b) failing to impeach Mr. Meeks on many inaccuracies and inconsistencies in his testimony beyond those relating to the murder weapon.

### a. Failure to Conduct a Minimal Investigation

Mr. Gavin claims that counsel "failed to conduct even a minimal investigation that would have enabled him to effectively cross-examine Meeks or impeach many of Mr. Meeks' statements through other witnesses or documents. (*Id.* at 27). He faults counsel for failing to "uncover or exploit during cross-examination the unusual circumstances surrounding the murder weapon – Meeks' .40-caliber Glock." (*Id.*). He states that Mr. Meeks's account of his ownership and use of the weapon was suspicious and contradictory, and the seven day delay between the shooting and the recovery of the weapon provided ample delay for Mr. Meeks or someone else to plant the gun in the woods. (*Id*. at 27-28).

Mr. Gavin contends that although Mr. Meeks testified at trial that the murder weapon had been issued to him by his employer, the Illinois Department of Corrections, it later came to light that Mr. Meeks's personnel file contained no record that he had been issued a work-related weapon. (*Id*. at 28). He asserts that "any competent attorney would have investigated the weapon and its connection to the prosecution's central witness," but no record shows such an investigation took place. (*Id.*). Instead, counsel focused on Mr. Meeks's poor parenting skills in leaving his gun in an unlocked drawer despite having a three-year-old son in the home. (*Id*. at 29).

Mr. Gavin further alleges that counsel should have investigated and discovered that, instead of coming to Alabama to look for girls, Mr. Meeks was running drugs between Chicago and Alabama. (Doc. 1 at 29). He claims:

> Had trial counsel bothered to investigate, he would have learned from Meeks' cousin, Titus Johnson, that Meeks once brought him to Alabama to sell cocaine and heroin. P.C. 946. Johnson could have further explained that Meeks "use[d] his size to intimidate people, including other family members." P.C. 947. Gavin's brother-in-law, Keith Clark, could have revealed that, at the time of the shooting, Meeks "owed a large sum of money to Willie Lloyd, the former head of the Vice Lords gang," P.C. 954, a fact that Johnson could corroborate. P.C. 946.

(*Id.*). Mr. Gavin states Mr. Meeks offered to pay him to accompany him to Alabama to assist with Mr. Meeks's drug deals. (*Id*. at 30). He argues that this evidence would have been highly probative to show at trial that Mr. Meeks was the "likely shooter" instead of Mr. Gavin. (*Id.*).

The Rule 32 court denied the claim, finding the following:

> The Defendant has presented nothing to indicate that the Defendant's trial attorneys knew or should have known prior to trial that Meeks would offer testimony relating to where he got the murder weapon, or that he would testify that the weapon was state issued. The Defendant's trial attorneys had absolutely no reason to investigate where Meeks got the weapon.
>
> Because the evidence overwhelmingly establishes that the Defendant shot and killed Mr. Clayton, the Defendant's trial attorneys appropriately concentrated on trying to impeach Meeks with respect to what Meeks said about how the Defendant got the weapon. In this regard the Defendant's trial attorneys sought to prove that Meeks and

the Defendant were on a joint venture when they came to Alabama, and that Meeks was responsible, in whole or in part, for the weapon being accessible or available for use in this crime.

While Meeks attempted to disassociate himself from the weapon by claiming to be unaware that it was in the vehicle, the Defendant's attorneys attempted to discredit him by pointing out the improbability of this testimony. Meeks' own self contradiction about where the weapon was kept added to the suggestion of culpability.

Because it was undisputed that Meeks and the Defendant came to Alabama in an unwholesome alliance, the Defendant's trial attorneys made a reasonably convincing argument by direct and circumstantial evidence that Meeks was complicit in the course of conduct which resulted in Mr. Clayton's tragic death.

The Defendant's trial attorneys were not ineffective in attempting to implicate Meeks. At most, however, Meeks was complicit. There is no evidence that Meeks was the shooter. Indeed, the evidence is overwhelming that the Defendant was the shooter, and mere proof that Meeks lied about the gun being IDOC [Illinois Department of Corrections] issued would not change that fact."

(Vol. 32, Tab 76 at 3493-94).

The Alabama Court of Criminal Appeals affirmed the trial court's denial of the claim, finding that Mr. Gavin failed to establish how such an investigation would have altered the outcome of Mr. Gavin's trial. (Vol. 46, Tab 85 at 19-23).

To succeed on this claim, Mr. Gavin must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. 687. Because both parts of the *Strickland* standard must be

satisfied, this court is not required to address both parts of the *Strickland* standard when the habeas petitioner makes an insufficient showing on either one of the prongs. *See*, *e.g.*, *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation to *Strickland* omitted).

Thus, even assuming that counsel were deficient for failing to investigate and discover the truth about Mr. Meeks - that the murder weapon was Mr. Meeks's personal weapon and that the purpose of their trip to Alabama related to dealing drugs rather than picking up women – Mr. Gavin cannot succeed on this claim, because he is unable to show he was prejudiced by counsel's failure to elicit this information at trial. Although Mr. Gavin maintains that this information would have suggested that Mr. Meeks might have been the shooter rather than Mr. Gavin, it does not overcome the overwhelming evidence that Mr. Gavin was in fact the shooter. Such testimony would, at best, have shown that Mr. Meeks was a dishonest drug dealer. But, simply no evidence implicates Mr. Meeks as the shooter.

The overwhelming evidence pointed to Mr. Gavin as the shooter. Larry Twilley identified Mr. Gavin as the shooter. (Vol. 8, Tab 18 at 521-23). Investigator Danny Smith testified that he followed Mr. Gavin in the victim's stolen van, Mr. Gavin got

out of the van when he stopped, Mr. Gavin shot at him before fleeing into the woods, and that he found the victim's body in the van after Mr. Gavin fled. (Vol. 8, Tab 18 at 555-65, 592-94). Tony Holladay testified that he, with the assistance of his search dog Spanky, found Mr. Gavin hiding in a creek in the woods. (Vol. 9 at 735). Investigator Smith identified Mr. Gavin as the man who had shot at him before running into the woods. (Vol. 8, Tab 18 at 593-94). Shell casings from the scene where Mr. Gavin shot at Investigator Smith then ran into the woods matched the shell casings found at the murder scene. (Vol. 10 at 962-63).

Given this evidence, if counsel had investigated and discovered that Mr. Meeks's weapon was his personal weapon and that he was involved in running drugs between Chicago and Alabama, no reasonable probability arises that the results of the proceeding would have been different. Thus, the Alabama Court of Criminal Appeals's holding that Mr. Gavin failed to establish *Strickland* prejudice was not unreasonable.

### b. Failure to Impeach Mr. Meeks on Inaccuracies and Inconsistencies in His Testimony

Mr. Gavin asserts that counsel also failed to impeach Mr. Meeks's testimony on many other inaccuracies and inconsistencies. Specifically, he claims that

> [a]t trial Meeks testified that Gavin took his gun without permission and used it to shoot Mr. Clayton, but Meeks- unbeknownst to Gavin's jury -

50

had earlier reported no knowledge of who might have taken his gun. R. 722-24; P.C. 876-78. Meeks also reported to investigators that Gavin had been living with him - perhaps to explain how Gavin would have access to Meeks' gun - although Meeks later testified that Gavin lived with his mother after his release from prison (which was true). R. 648-49. Meeks also asserted at trial that "everybody in the family" knew about Gavin's murder conviction, R. 649, but Meeks failed to report his cousin's incarceration on his application for employment with IDOC. P.C. 913. Trial counsel never brought these disparities to the jury's attention.

(Doc. 1 at 30-31). Mr. Gavin contends that no conceivable strategic reason could justify counsel's failure to expose these inconsistencies and that counsel's utter failure to impeach Mr. Meeks with this readily available evidence was deficient. (*Id.* at 32).

In affirming the trial court's denial of his Rule 32 petition, the Alabama Court of Criminal Appeals stated:

> Regarding the firearm that was used in the murder the circuit court noted that Gavin's "trial attorneys sought to prove that Meeks and the Defendant were on a joint venture when they came to Alabama, and that Meeks was responsible, in whole or in part, for the weapon being accessible or available for use in this crime." (C. 3493.) The circuit court also stated that Gavin's "trial attorneys focused on trying to implicate Meeks in the murder by proving that Meeks' testimony was not credible." (C. 3494.) The circuit court generally concluded that:

> > The Defendant contends that his trial attorneys did not undertake a sufficient investigation to make informed strategic decisions about whether to offer certain evidence or examine/cross-examine witnesses on certain subjects. The Defendant's argument is based on the Defendant's

assumptions about what investigation the trial attorneys undertook, and what information they knew or failed to know.

There is no basis on which to support the Defendant's assumptions which are at the heart of his Rule 32 Petition. Neither this Court, nor the Defendant and his current attorneys, should speculate about what the Defendant's trial attorneys knew or did not know, or what they did or did not do.

(C. 3520.)

During his trial, Gavin's attorneys cross-examined Meeks about the facts surrounding Gavin and Meeks's trip to Centre, the events immediately following the shooting of Clayton, Meeks's connection to the handgun used in the murder including how he kept it unlocked in his home where his small son lived, and prior statements Meeks made to law enforcement. How that cross-examination was conducted was a strategic decision. Moreover, Gavin has failed to establish how he was prejudiced by the cross-examination his trial counsel conducted. Gavin is due no relief on this claim.

(Vol. 46, Tab 85 at 24-25).

Counsel conducted a vigorous cross-examination of Mr. Meeks. During the cross-examination, counsel elicited details that showed that Mr. Meeks cheated on and lied to his wife about his trips to Alabama; that some of his friends and relatives were unsavory characters; that Mr. Meeks could not give a basic description of the girl he and Mr. Gavin claimed to have come to Alabama to meet; that he fled back to Chicago after the shooting, instead of calling the police; that although he was aware

Mr. Gavin was on parole and not allowed to leave the state, he took Mr. Gavin to Alabama with him; that Mr. Meeks consulted with several friends and tried to contact a lawyer before reporting the crime after he returned to Chicago; that he kept his gun in an unlocked drawer in his house with a three year old child; and that he told inconsistent stories to the police about who he thought might have stolen his gun and where it was when it was stolen. (Vol. 9 at 698-728). Thus, the Alabama Court of Criminal Appeals's finding that counsel were not deficient in failing to cross-examine Mr. Meeks on his knowledge of who took his gun, where Mr. Gavin lived after he was released from prison, and Mr. Meeks's failure to report Mr. Gavin's incarceration on his employment application was not unreasonable.

Furthermore, given the overwhelming nature of the evidence against Mr. Gavin, the appellate court's finding that Mr. Gavin was not prejudiced by counsel's failure to more rigorously cross-examine Mr. Meeks on these facts was not unreasonable.

### 2. Failure to Expose Irregularities in the State's Investigation

### a. Contamination of the Victim's Van

Mr. Gavin contends that the van in which the victim was shot was "almost immediately compromised when a rescue squad drove the van to the Cherokee County Sheriff's Office for processing, P.C. 796, sitting where the victim and shooter

both sat." (Doc. 1 at 33). He explains that the evidence at trial was "muddled as to how law enforcement handled the van once it was recovered," and testimony showed that the van was driven – not towed – from where it was recovered. (*Id*. n.5) (citing Vol. 8, Tab 18 at 568).[4] According to Mr. Gavin, this procedure "risked the van's becoming contaminated and thus losing or tainting evidence associated with the crime." (*Id*. at 33-34). He argues that counsel were ineffective for failing to investigate or expose the extent to which evidence was compromised by the police's failure to follow standard procedure because "marshal[ing] these irregularities" might have "raise[d] the specter of doubt in juror's minds." (*Id*. at 34).

In affirming the trial court's denial of this claim in Mr. Gavin's Rule 32 proceedings, the Alabama Court of Criminal Appeals found:

> Gavin asserts that his trial counsel were ineffective in failing to investigate and later inform the jury how law-enforcement officers processed the Corporate Express van that, he contends, "was almost immediately compromised when a rescue squad drove the van to the Cherokee County Sheriff's Office for processing." (Gavin's brief, p. 46.)
>
> Danny Smith, an investigator with the District Attorney's Office for the Ninth Judicial Circuit, testified at Gavin's trial that a rescue-squad member had driven the Corporate Express van to the Cherokee County Sheriff's Office after Clayton's body was removed. Gavin's trial counsel did not cross-examine Smith about the

---

[4] Investigator Smith testified that after the victim was removed from the van and transferred to the hospital, he returned to the manhunt after asking that "one of our rescue squad members there on the scene drive the vehicle in for them." (Vol. 8, Tab 18 at 568-69).

transportation of the van. During a deposition taken in the Rule 32 proceedings, Smith said that "the van would have been taken by wrecker back to the sheriff's department." (C. 1923.) Larry Wilson, the chief deputy for the Cherokee County Sheriff's Department, testified at Gavin's trial that the Corporate Express van had been "pulled and [taken] to the sheriff's department where it was locked up, and then [the sheriff's department] asked for forensic sciences to have somebody come and fingerprint[] the van." (Record on direct appeal, R. 872.) The circuit court, in denying Gavin's claim regarding the preservation of the Corporate Express van, noted:

> The jury heard the trial testimony of Smith and Wilson. Based on Smith's post-trial testimony it appears that if trial counsel had solicited additional trial testimony about this subject it may have resulted in the testimony being "corrected" or clarified to remove the apparent conflict between the testimony of Smith and Wilson.
>
> The Defendant's trial attorneys apparently chose not to pursue this matter further. The trial attorneys thereby allowed the jury to have the conflicting testimony [regarding the handling of the Corporate Express van] in this regard. The conflict was more helpful to the Defendant than would have been the "corrected" testimony. By leaving the testimony in a state of conflict between [the investigating officers] the Defendant's trial attorneys were able to leave the jury with the argument that the improper handling of the crime scene had destroyed evidence.

(C. 3498-99.)

In the instant case, the circuit court correctly concluded that, had Gavin's trial counsel cross-examined Smith regarding the transportation of the van, Smith would have been allowed to "correct" his testimony to Gavin's detriment. Therefore, Gavin has failed to establish how he was prejudiced by the cross-examinations his trial counsel conducted, and he is due no relief on this claim.

(Vol. 46, Tab 85 at 25-27).

Mr. Gavin has offered nothing to show that an investigation by counsel into the way law enforcement handled the van would have created doubt in the juror's minds as to his guilt. Rather, it appears that the basis for this claim – that the van was driven from the crime scene instead of being towed – is not even accurate. Deputy Larry Wilson of the Cherokee County Sheriff's Department testified that the van was "pulled and took to the Sheriff's Department where it was locked up" and later fingerprinted. (Vol. 10 at 872). Although Investigator Smith testified at trial that he had "one of our rescue squad members there on the scene drive the vehicle in for them," it is not clear that Investigator Smith meant that the rescue squad member sat inside the van and drove it back, because he later testified in a deposition during the Rule 32 proceedings that the van would have been taken to the sheriff's department by wrecker. (*See* Vol. 8, Tab 18 at 568-69 & Vol. 28 at 1923[5]). If counsel had cross-examined Investigator Smith about his statement that he asked one of the rescue squad members to "drive the vehicle in for them," more than likely, he would have clarified to state that the vehicle was actually towed and not driven.

---

[5] Investigator Smith stated in the deposition that "the van would have been taken by wrecker back to the sheriff's department and . . . there would have been an officer that accompanied that vehicle to maintain security and custody on that vehicle." (Vol. 28 at 1923-24).

In any event, the jury was left with conflicting testimony as to whether the van was towed to the sheriff's department or driven. The jury could have concluded from the testimony that the evidence might have been contaminated if it believed the van was driven before being checked for evidence. This testimony was obviously not persuasive to the jury. It is unlikely that counsel's failure to somehow expose the alleged contamination of the van to the jury would have changed the outcome of the trial. Thus, the Alabama Court of Criminal Appeals's finding that Mr. Gavin failed to establish that he was prejudiced by this alleged deficiency in counsel's performance is not unreasonable.

### b.    Dewayne Meeks' Interview

Mr. Gavin alleges that counsel failed to explore the irregularities in the investigation of Mr. Meeks's involvement in the shooting. (Doc. 1 at 34). He claims that Mr. Meeks should have been investigated and interrogated as a suspect, rather than interviewed as a mere witness to the crime. (*Id*. at 35).

### 1.    Advance Notice of Interview

Mr. Gavin maintains that law enforcement provided Mr. Meeks with "significant advance notice that they intended to interview him," which he contends was improper because it eliminated the element of surprise and gave him an

opportunity to get his story straight. (*Id*. at 35-36). Mr. Gavin argues that counsel were ineffective for failing to expose this fact to the jury.

The Alabama Court of Criminal Appeals affirmed the trial court's denial of this claim:

> Gavin asserts that his trial counsel were ineffective in investigating Meeks's involvement in the murder. Gavin argues that his trial counsel should have informed the jury about the advance notice Meeks had that law-enforcement officers were coming to interview him. . . .

> At the evidentiary hearing held on this claim, Gavin presented the expert testimony of Kenneth M. Webb, Sr., a licensed private detective and Chief Executive Officer of Fact Finders Group, Inc. Webb testified that it was his "understanding" that Meeks had been "given advanced notice that he was going to be interviewed." (R. 244.) No evidence was presented that established how far in advance of the interview Meeks was allegedly informed that law-enforcement officers wanted to speak with him. During the deposition taken in the instant case, Danny Smith testified that he had not spoken with Meeks before interviewing him. Smith said that an officer in Illinois "facilitated a place for the interview [of Meeks] to take place and assured [Alabama law-enforcement officers] that Meeks would be available when [the Alabama law-enforcement officers] got there." (C. 1936.)

> . . . .

> In denying Gavin's petition the circuit court generally found that Gavin had "not met his burden of proving that his trial attorneys failed to sufficiently investigate this case. Merely because the Defendant's trial attorneys did not present certain evidence or examine/cross-examine witnesses on certain subjects does not mean that the attorneys failed to make informed decisions regarding such evidence and/or testimony."

(C. 3521.)

> The record does not support Gavin's argument and he is due no relief on this claim. . . .

(Vol. 46, Tab 85 at 27-28).

Even assuming that Mr. Meeks's was given advance notice that the authorities intended to interview him, it is unlikely that if counsel had made the jury aware of this fact, the outcome of his trial would have been different. Thus, Mr. Gavin is not able to establish that counsel's failure to investigate and inform the jury that Mr. Meeks had advance warning that he was going to be interviewed prejudiced his defense. The Alabama Court of Criminal Appeals's determination that this claim has no merit was not unreasonable.

## 2. Mr. Meeks's Interviewers were Personal Friends

Mr. Gavin maintains that counsel were ineffective for failing to bring to light the fact that Mr. Meeks was interviewed by his personal friends and Officer Smith, who was also one of Mr. Gavin's victims, which created "troubling conflicts of interest." (Doc. 1 at 35-36). He asserts that allowing Mr. Meeks's friends to be present during the interview created an atmosphere that was friendly, and thus, improper. (*Id*. at 35).

In affirming the denial of this claim on collateral appeal, the Alabama Court of Criminal Appeals reasoned:

> Gavin next argues that his trial counsel failed to "bring to light at trial the troubling conflicts of interest that should have barred [Will County, Illinois, Deputy Sheriff] Tom Arambasich, [Fort Payne Police Department Officer] Tony Burch, and Investigator Danny Smith from participating in the investigation." (Gavin's brief, p. 49.) Gavin specifically contends that Deputy Arambasich and Officer Burch "should not have had any role in the investigation" because they were "personal friends" with Meeks. (Gavin's brief, p. 49.) Gavin asserts that Investigator Smith should not have participated in investigating the case because Gavin was charged with the attempted murder of Smith.

> In denying the portion of this claim relating to Smith, the circuit court noted that there was "no evidence that the case against [Gavin] was tainted by Smith's participation as an investigator." (C. 3502.) The circuit court, in denying the portion of this claim that related to Arambasich and Burch, stated that if Gavin's trial counsel had emphasized the fact that Arambasich and Burch had attended the interview of Meeks "the jury might have been given the explanation which is now asserted before this Court; that is, they were allowed to attend in order to facilitate a free flow of information."

(C. 3503.)

> During the hearing held on Gavin's petition Webb, a licensed private detective, testified that the presence of Arambasich and Burch at the interview of Meeks was improper because "it created an atmosphere that was friendly to [Meeks]." (R. 241.) Webb also stated that the participation of Arambasich and Burch in the investigation created a bias and that "they could render an opinion that would not be normally accepted." (R. 253.) Webb said that Smith should not have investigated Gavin because "when you start getting victims involved in criminal investigations, they have a tendency to create an aura of

impropriety. And from a police perspective, when you're a victim, someone else usually conducts the investigation." (R. 266.)

In the deposition he gave in the instant case, Smith said that Arambasich was present for the interview because "Meeks had already told Arambasich what had happened so there was a value to have him in there in case Meeks told a different story." (C. 1949.) Smith testified that Burch had gone to the interview of Meeks because Burch could make Meeks "feel comfortable talking with [officers investigating the murder]." (C. 1947.) Smith also said that Gavin's having shot at him did not impact his investigation of the case.

Gavin failed to establish that the performance of his attorneys were deficient as to the allegations in this claim or that he suffered prejudice as a result of their allegedly deficient performance. Therefore, he is due no relief on this claim.

(Vol. 46, Tab 85 at 28-30) (footnote omitted).

Mr. Gavin has not explained how the purported conflicts of interest with the authorities who questioned Mr. Meeks's affected or might have affected the outcome of their interview with Mr. Meeks. If counsel had made the jury aware that Mr. Meeks's questioners had these conflicts of interest, no reason exists to think the outcome of his trial would have been different. Thus, Mr. Gavin is not able to establish that this alleged deficiency prejudiced his defense. The Alabama Court of Criminal Appeals's determination that this claim lacks merit was not unreasonable.

### c. Dewayne Meeks' Polygraph Examination

Kenneth Webb, a retired police officer from Chicago, testified at the evidentiary hearing as an expert in police investigative procedures. (Vol. 37, Tab 78 at 220). He testified that of the three polygraph examinations that were set up for Mr. Meeks, he only took two of them, and was uncooperative during the first one. (*Id*. at 235-36). Officer Webb stated that as an investigator, he would see a witness's failure to cooperate in a polygraph examination as a reason to continue an investigation into that witness's involvement in the crime. (*Id.* at 238). He concluded that "Dwayne Meeks should have been interrogated rather than interviewed" because "red flags . . . came up relative to his fleeing the scene, involvement of the weapon and the vehicle." (*Id*. at 239). Mr. Gavin contends that counsel were ineffective for failing to expose this information to the jury, either through an expert or by cross-examination of witnesses. (Doc. 1 at 37).

Respondent argues that this claim is procedurally defaulted because Mr. Gavin did not raise the claim on appeal from the denial of his Rule 32 petition. (Doc. 33 at 23-24). Mr. Gavin counters that the claims are not defaulted because factual basis and legal argument supporting this claim were "explicitly presented" in state court. (Doc. 38 at 72).

To provide the state courts with a full and fair opportunity to address a claim, a petitioner must "fairly present" the claim to the state courts in a manner to alert the courts to the federal nature of the claim. 28 U.S.C. § 2254(b)(1); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971)). "[F]or purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (citing *Picard*, 404 U.S. 270). Mr. Gavin did not "fairly present" this claim to the state courts.

In the statement of facts in his brief on appeal from the denial of his Rule 32 petition, Mr. Gavin summarized the evidence adduced at the evidentiary hearing. (Vol. 43, Tab 80 at 4-34). In the section summarizing the testimony of Kenneth Webb, Mr. Gavin set out the following:

> **3. Meeks's polygraph examination**. According to Webb, evidence of a witness's lack of cooperation during a polygraph examination raises the probability that the witness may have participated in the crime. P.R. 238-39. Meeks was asked to take a polygraph examination, but refused. P.R. 236-38. This should have been yet another red flag to law enforcement to take a meaningful look at Meeks's involvement but, inexplicably, there is no evidence that law enforcement ever acted on this information. Gavin's jury was never told this, either through an expert or by cross-examination of witnesses.

(*Id*. at 13).

Later, in the argument section of his brief, Mr. Gavin claimed that trial counsel were ineffective for failing to expose irregularities in the state's investigation of the case. (*Id*. at 46-50). Within this claim, Mr. Gavin argued that counsel were ineffective for failing to investigate law enforcement's failure to preserve the van in which the victim was shot; law enforcement's failure to secure the woods in which Mr. Gavin was apprehended; the notice law enforcement gave Mr. Meeks before interviewing him; law enforcement's failure to search Mr. Meeks's vehicle, clothing, and home for evidence; and troubling conflicts of interest with several investigators on the case. (*Id.*). Mr. Gavin alleged that these failures violated *Strickland*. (*Id*. at 46).

Mr. Gavin argues that by listing the "factual bases" of this claim in the statement of facts, then discussing *Strickland* in the argument section of his brief where he alleged counsel were ineffective for failing to expose irregularities in the state's investigation of the case, he "explicitly presented" both the factual and legal basis for this claim to the Alabama Court of Criminal Appeals. However, he never mentioned Mr. Meeks's polygraph examination in the argument section of his brief and never tied the factual allegations concerning the polygraph examination to his ineffective assistance of counsel claim.

The court finds that setting out the factual basis for the claim in the section of his brief summarizing the Rule 32 testimony of one of his witnesses, then discussing

*Strickland* in an argument in his brief, in which he never even mentioned the factual basis of this particular claim, was not sufficient to alert the state courts that he was claiming trial counsel violated *Strickland* by failing to expose information concerning the polygraph examination to the jury. Because this claim is not exhausted and it is now too late for Mr. Gavin to exhaust the claim, it is procedurally barred from review in this court. *See Collier v. Jones*, 901 F.2d 770, 772 (11th Cir. 1990).

Moreover, even assuming the claim were not defaulted, it would be due to be denied. Mr. Gavin has offered nothing to support a finding that the outcome of his trial would have been different if the jury had known that Mr. Meeks did not cooperate during a polygraph examination. Based on the overwhelming evidence of Mr. Gavin's guilt, it is not likely that the jury would have viewed Mr. Meeks's lack of cooperation during a polygraph examination as evidence that Meeks committed the murder rather than Mr. Gavin. Thus, Mr. Gavin could not make a showing that he was prejudiced by counsel's failure to present this evidence to the jury.

> **d.    Failure to Investigate Dewayne Meeks' Vehicle, Clothing, and Home**

Mr. Gavin further claims that counsel were deficient for failing to make the jury aware that law enforcement did not impound Mr. Meeks's vehicle, confiscate his clothing, or search his home. (*Id*. at 37-38).

The Alabama Court of Criminal Appeals affirmed the trial court's denial of this claim:

> Gavin argues that his trial counsel should have informed the jury about . . . the failure of officers to impound or inspect Meeks's Chevrolet Blazer sport-utility vehicle, clothing, and home.
>
> . . . .
>
> At Gavin's trial, during the cross-examination of Deputy Wilson, Wilson admitted that law-enforcement officers had not impounded the Chevrolet Blazer sport-utility vehicle or "examine[d] [its] interior in any way." (Record on direct appeal, R. 903.) Gavin's trial counsel also had Deputy Wilson confirm that law-enforcement officers had not questioned Meeks about the clothing he had been wearing at the time of the murder and that they had not collected that clothing.
>
> In denying Gavin's petition the circuit court generally found that Gavin had "not met his burden of proving that his trial attorneys failed to sufficiently investigate this case. Merely because the Defendant's trial attorneys did not present certain evidence or examine/cross-examine witnesses on certain subjects does not mean that the attorneys failed to make informed decisions regarding such evidence and/or testimony."
>
> (C. 3521.)
>
> The record does not support Gavin's argument and he is due no relief on this claim. Moreover, Gavin is due no relief on his claim related to the alleged failure of his trial counsel to inform the jury about the failure of officers to impound or inspect Meeks's Chevrolet Blazer sport-utility vehicle and clothing because it is directly refuted by the record. *See*, *e.g.*, *McNabb v. State*, 991 So. 2d 313, (Ala. Crim. App. 2007).

(Vol. 46, Tab 85 at 27-28).

Counsel in fact did bring out evidence to establish that law enforcement did not impound Mr. Meeks's vehicle or confiscate his clothing. At trial, Deputy Larry Wilson testified on cross-examination that, although he took two or three photos of the outside of Mr. Meeks's vehicle, he did not impound the vehicle or otherwise examine it. (Vol. 10 at 902-03). Deputy Wilson further testified on cross-examination that investigators did not confiscate Mr. Meeks's clothing. (Vol. 10 at 906). The jury was aware that authorities did not impound Mr. Meeks's vehicle or confiscate his clothing. Therefore, counsel were not deficient in this regard.

Further, Mr. Gavin has not alleged what evidence he believes could have been obtained by a search of Mr. Meeks's house or how such evidence might have assisted his defense. No reason exists to believe that if counsel had made the jury aware of this fact, the outcome of his trial would have been different. Thus, Mr. Gavin is not able to establish that counsel's failure to investigate and inform the jury that Mr. Meeks's house was never searched prejudiced his defense in any way. The Alabama Court of Criminal Appeals's determination that this claim has no merit was not unreasonable.

### e.     Failure to Investigate Key Witnesses

Mr. Gavin argues that counsel were ineffective for failing to "exploit" inconsistencies between potentially critical witnesses at trial. (Doc. 1. at 39). Mr. Gavin claims that because it is common for two eyewitnesses to perceive the same

event differently, it was important for law enforcement to interview all eyewitnesses. (Doc. 1 at 38). He adds that law enforcement did not interview "potentially critical witnesses" like Mr. Meeks's wife Sharon Meeks, Mr. Meeks's friend Marty Tutor, and Mr. Twilley's wife Vickie Twilley. (*Id*.). Mr. Gavin alleges that Mrs. Twilley, who was at the murder scene with her husband, told Officer Webb "a version of events different from the testimony her husband provided at Gavin's trial." (*Id*.) Officer Webb testified at the evidentiary hearing that Mrs. Twilley "gave [a] conflicting statement relative to the conditions of the night when the incident occurred." (Vol. 38 at 256).

Respondent argues that this claim is procedurally defaulted because Mr. Gavin did not raise the claim on appeal from the denial of his Rule 32 petition. (Doc. 33 at 23-24). Mr. Gavin counters that the claims are not defaulted because factual basis and legal argument supporting this claim were "explicitly presented" in state court. (Doc. 38 at 72).

In his brief on appeal from the denial of his Rule 32 petition, in the section of the statement of facts summarizing the testimony of Officer Webb, Mr. Gavin set out the following:

> **5. <u>Failure to interview key witnesses</u>.** Law enforcement also improperly failed to interview potentially critical witnesses. (Gavin's trial lawyer Bayne Smith both failed to retain a police procedures expert

to establish this impropriety and failed to interview these witnesses himself.) P.R. 253-56. Sharon Meeks, Dwayne Meeks's wife, accompanied Gavin and Meeks on the trip from Illinois, and was with them for several hours shortly before Clayton was shot. She was again with her husband for many hours thereafter as Meeks fled the scene, picked her and their son up in Chattanooga, and returned to Chicago. P.R. 253-54. Marty Tutor was a friend of Meeks and was the first person Meeks contacted after Clayton was shot. P.R. 254-55. Vickie Twilley was at the scene of the crime and told Webb a version of events different from the testimony her husband provided at Gavin's trial. P.R. 255-56. It is, of course, common for two eyewitnesses to perceive the same event differently, which is why it is important that law enforcement interview all eyewitnesses. None of these individuals was ever questioned by law enforcement, and [counsel] failed to exploit these inconsistencies on Gavin's behalf at trial.

(*Id*. at 14-15).

Later, in the argument section of his brief, Mr. Gavin argued that trial counsel were constitutionally ineffective for failing to expose irregularities in the state's investigation of the case. (*Id*. at 46-50). Although he listed several alleged irregularities in the state's investigation, he did not mention the failure to interview these witnesses.

As discussed above, setting out the factual basis for this claim in the section of his brief summarizing the Rule 32 testimony of one of his witnesses, then discussing *Strickland* in an argument in his brief, in which he never even mentioned the factual basis of this claim, was not sufficient to alert the state courts that he was claiming trial counsel violated *Strickland* by failing to exploit these inconsistencies

69

at trial. Because this claim is not exhausted and it is now too late for Mr. Gavin to exhaust the claim, it is procedurally barred from review in this court. *See Collier v. Jones*, 901 F.2d 770, 772 (11th Cir. 1990).

Additionally, even assuming the claim were not defaulted, it would be due to be denied. Neither Mrs. Meeks nor Mr. Tutor was at the scene of the murder, and Mr. Gavin has not identified what, if anything, they would have revealed to law enforcement if they had been interviewed. Further, Mr. Gavin's only claim regarding Mrs. Twilley, who was with her husband at the crime scene, is that she "told Webb a version of events different from the testimony her husband provided at Gavin's trial." (Doc. 1 at 38). He has not indicated what Mrs. Twilley would have told officers if she had been interviewed, or how her version of events differed from her husband's trial testimony. Mr. Gavin has offered nothing that would support a finding that counsel's failure to "exploit these inconsistencies" would have altered the outcome of his trial. Thus, he could not make a showing that he was prejudiced by counsel's failures in this regard.

### f. Irregularities in the Recovery of the Murder Weapon

The murder weapon was found several days after the crime, in the woods, near the place Mr. Gavin was apprehended. Mr. Gavin argues that law enforcement's failure to follow standard procedures for securing the area, searching for the gun, and

logging ingress and egress to the crime scene, created a risk that the murder weapon was planted during the week after he was arrested and in custody. (Doc. 1 at 39). He claims that "this risk of planted evidence" could well have created a reasonable doubt in the jury's mind, given law enforcement's failure to follow standard procedures. (*Id*.).

Respondent argues that this claim is procedurally defaulted because Mr. Gavin did not raise the claim on appeal from the denial of his Rule 32 petition. (Doc. 33 at 23-24). Mr. Gavin counters that the claims are not defaulted because factual basis and legal argument supporting this claim were "explicitly presented" in state court. (Doc. 38 at 72).

In his brief on appeal from the denial of his Rule 32 petition, in the section of the statement of facts summarizing the testimony of Officer Webb, Mr. Gavin set out the following:

> **6. Irregularities in the recovery of the murder weapon.** The murder weapon was recovered in the same general area where Gavin was apprehended hours after the shooting. P.C. 482. But the gun was not recovered for one full week after the crime. R. 264. Law enforcement failed to follow standard procedures for (1) securing the area, (2) searching for the weapon, and (3) logging ingress and egress to the crime scene. P.R. 259-62. These improprieties created a risk that the murder weapon was planted during the week after Gavin was arrested and in custody. P.R. 264-65.

(*Id*. at 15-16).

Later, in the argument section of his brief, Mr. Gavin argued that trial counsel were constitutionally ineffective for failing to expose irregularities in the state's investigation of the case. (*Id*. at 46-50). Although he listed several alleged irregularities in the state's investigation, he did not mention the alleged irregularities in the recovery of the murder weapon.

As previously discussed, setting out the factual basis for this claim in the section of his brief summarizing the Rule 32 testimony of one of his witnesses, then discussing *Strickland* in an argument in his brief, in which he never even mentioned the factual basis of this claim, was not sufficient to alert the state courts that he was claiming trial counsel violated *Strickland* by failing to point out the alleged irregularities in the recovery of the murder weapon. Because this claim is not exhausted and it is now too late for Mr. Gavin to exhaust the claim, it is procedurally barred from review in this court. *See Collier v. Jones*, 901 F.2d 770, 772 (11th Cir. 1990).

Moreover, even assuming the claim were not defaulted, it would be due to be denied. Mr. Gavin has offered nothing to support a finding that, if the jury had heard testimony to the effect that law enforcement failed to follow standard procedures in securing the murder weapon, it would have believed the weapon was planted there by someone else. Absolutely no evidence supports a finding that the gun was planted

by anyone in an effort to make Mr. Gavin look guilty. Rather, the overwhelming evidence establishes that Mr. Gavin had the gun with him immediately before he fled into the woods after shooting at Investigator Smith, and the gun was found several days later in the same area. Given this evidence, it is not likely that the outcome of the trial would have been different if the jury had heard testimony that law enforcement did not properly search for the weapon or secure the area. Thus, Mr. Gavin could not make a showing that he was prejudiced by counsel's failure to present this evidence to the jury.

### 3. Failure to Suppress Identification Evidence and to Effectively Cross-Examine Unreliable Identification Testimony

Mr. Gavin next faults counsel for failing to make "every effort to exclude or at least impeach the testimony of Larry Twilley, who provided an unreliable cross-racial identification of Gavin." (Doc. 1 at 41). Mr. Twilley was an eye-witness to the murder. (Vol. 8, Tab 18 at 519-29). Mr. Twilley testified that he was in his car, stopped at a red light, when he heard "a loud noise" that caught his attention. (*Id*. at 519-20). When he turned around to identify the noise, he saw a "black guy" with very little hair and a goatee jerking open the door to a van being driven by an "older white man." (*Id.* at 519-21). Mr. Twilley saw the black man with a gun – then heard the black man fire two shots at the older white man. (*Id*. at 522). Mr. Twilley watched the

black man "give the [white] guy a push," get into the van, then drive off in the van. (*Id*.). Mr. Twilley described the shooter as not "real heavy, but [not] slim." (*Id*. at 521). When asked if the shooter was wearing a cap or anything on his head, Mr. Twilley testified that he "kept seeing something seems like something red, but [he did not] know if it was on his head or not." (*Id*.). Mr. Twilley stated that he was able to see the side of the shooter's face when he "turned and came around," but added that his "hairline is what stood out the most." (*Id*. at 523). Mr. Twilley explained that although the shooter had something red and black around his head at first, "[w]hen he come around the corner, he didn't have anything on his head." (*Id*. at 529). When asked if he could identify the shooter, Mr. Twilley pointed to Mr. Gavin who was sitting in the courtroom at a table with his lawyers. (*Id*.). Defense counsel did not object to Mr. Twilley's identification of Mr. Gavin as the shooter.

Mr. Gavin alleges that Mr. Twilley "never gave a detailed description of Gavin that would distinguish him from Dwayne Meeks, the other black man at the scene of the crime, nor did Twilley identify Gavin in a line-up or photo array." (Doc. 1 at 41). Mr. Gavin points out the following as deficiencies in Mr. Twilley's testimony:

> Twilley only saw the side of the shooter's face, and only for a few moments as the shooter turned. R. 523. His prior description matched neither Gavin nor the testimony he gave at trial. To police, Twilley described the shooter as a "black male," "slim, about 6 feet tall." P.C. 979. But Gavin is only 5'8" tall, and at trial, Twilley testified ( contrary

74

to his prior description) that the shooter "wasn't slim." R. 521. Gavin is slim, weighing only 145 pounds at the time of the shooting. P.C. 980. Twilley's identification also lacked conviction; he weakly stated that he thought Gavin was the shooter because of his "hairline." R. 523. And there was a significant length of time-over eighteen months-between the incident and identification.

(*Id*. at 42).

He claims that counsel "fell far short of professional obligations" by failing to either have Mr. Twilley's identification testimony excluded or failing to effectively impeach his testimony. (*Id*. at 41). He adds that Mr. Twilley's in-court identification of Mr. Gavin was suggestive because he was not asked to choose among several similar-looking candidates, thereby creating a "very substantial likelihood of irreparable misidentification." (*Id*.).

### a.       Failure to Suppress Identification Evidence

Mr. Gavin contends that "[e]ven on its own," counsel's failure to "seek to exclude Twilley's identification testimony at a pre-trial hearing, notwithstanding its obvious unreliability," constitutes ineffective assistance of counsel under *Strickland*. (*Id*. at 42). He argues that he was prejudiced because a "motion to exclude Twilley's testimony should have been granted by the trial court, leaving the State with the drug

dealing Meeks as the sole eyewitness to the crime – and without much of a case." (*Id.* at 42-43) (footnote omitted[6]).

The Alabama Court of Criminal Appeals found this claim to be without merit:

> Gavin asserts that his trial counsel provided ineffective assistance in failing to more to suppress eyewitness-identification evidence. Specifically, Gavin argues that his "trial counsel should have made every effort to exclude . . . the testimony of Larry Twilley, who provided an unreliable cross-racial identification of Gavin." (Gavin's brief, p. 51.)

> In dismissing this claim, the circuit court found that even if Gavin had requested that the trial court "conduct a hearing out of the presence of the jury, Mr. Twilley's testimony would have been allowed for the jury to give it such weight as the jury found it entitled to receive." (C. 3508.) On direct appeal, under a plain-error standard of review, this Court "conclude[d] that the trial court did not err in allowing Twilley to identify Gavin at trial. *Gavin v. State*, 891 So. 2d 907, 962 n.23 (Ala. Crim. App. 2003). Gavin has not demonstrated that the circuit court erred in denying his Rule 32 ineffective-assistance-of-counsel claim based on the admission of Twilley's identification of Gavin, and Gavin therefore is due no relief on this claim.

(Vol. 46, Tab 85 at 30).

Mr. Gavin argues that this finding was unreasonable because the state court relied upon its earlier decision on direct appeal without conducting "any analysis of Gavin's underlying due process claim under the applicable standard established in

---

[6] In the footnote, Mr. Gavin explains that although the fact that Mr. Meeks was dealing drugs "never surfaced" at the trial, the state acknowledged "Meeks' drug dealing" at the hearing on the Rule 32 petition. (Doc. 1 at 43 n.7).

*Neil v. Biggers*, 409 U.S. 188, 198 (1972)." (Doc. 38 at 39-40). He claims that this was not appropriate because

> [t]he entirety of the State Court's direct appeal analysis and decision regarding Gavin's due process claim on Twilley's identification is limited to a footnote in its opinion, which stated:
>
> > We have reviewed the record and conclude that the trial court did not err in allowing Twilley to identify Gavin at trial.
>
> (Vol. 16, Dir. App. State Court Op. at 82.) There is no discussion of the applicable constitutional standard. Even assuming the State Court considered Gavin's claim under the *Biggers* standard in its one-sentence footnote, such a brusque dismissal of Gavin's claim cannot serve as the backbone for dismissing Gavin's post-conviction claim for ineffective assistance of counsel. There is no discussion of whether Twilley's identification was unduly suggestive or whether it created a substantial likelihood of misidentification. *Biggers*, 409 U.S. at 198. None of the factors laid out in Biggers' "totality of the circumstances" test is discussed. And because the post-conviction State Courts simply relied upon this one-sentence determination, no court has properly analyzed Gavin's claim under the constitutional standard yet.

(Doc. 38 at 40-41).

Mr. Gavin fails to mention, however, that when he raised this claim on direct appeal, he claimed only that "Twilley's identification . . . fails to meet the parameters set out in the consensus of modern research for producing a reliable identification, and it was plain error under Ala.R.A.P. 45A to admit it, the lack of a specific objection notwithstanding." (Vol. 14, Tab 42 at 90). Mr. Gavin did not allege the

claim as a federal constitutional violation. Thus, the state courts did not treat it as such.[7]

But, the Alabama Court of Appeals does not appear to have based its decision denying Mr. Gavin's ineffective assistance of counsel claim on its denial of the substantive claim on direct appeal. Rather, the Alabama Court of Criminal Appeals based its decision on the trial court's statement that even if the trial court had been requested to "conduct a hearing out of the presence of the jury, Mr. Twilley's testimony would have been allowed for the jury to give it such weight as the jury found it entitled to receive." (C. 3508.) (Vol. 46, Tab 85 at 30) (quoting Vol. 36, Tab 76 at 3508).

The trial court made clear that even if counsel had requested and obtained a hearing on a motion to suppress Mr. Twilley's testimony, it would have denied such

_____

[7]     The Alabama Court of Criminal Appeals denied the claim in a footnote:

> We note that Gavin also contends that the trial court erred in allowing Twilley to identify him at trial. Gavin did not object to Twilley's identification, and his entire argument on appeal regarding Twilley's identification is: "Twilley's identification likewise fails to meet the parameters set out in the consensus of modern research for producing a reliable identification, and it was plain error under [Ala.R.App.P.] 45A to admit it, the lack of a specific objection notwithstanding." (Gavin's brief at p. 90.) We have reviewed the record and conclude that the trial court did not err in allowing Twilley to identify Gavin at trial.

*Gavin*, 891 So. 2d at 962 n. 23.

a motion, allowing the jury to determine the weight the testimony deserved. Thus, even assuming counsel were deficient for failing to object to Mr. Twilley's identification testimony or his in-court identification of Mr. Gavin as the perpetrator, Mr. Gavin was not prejudiced by this failure. So, the outcome of the trial would not have been affected. The Alabama Court of Criminal Appeals's finding that Mr. Gavin is not due relief on this claim is not unreasonable.

### b. Failure to Effectively Cross-Examine Unreliable Identification Testimony

Mr. Gavin further claims that having failed to seek to exclude Mr. Twilley's testimony, counsel compounded the error by failing to impeach his testimony on cross-examination. Specifically, Mr. Gavin contends:

> Twilley offered inconsistent accounts of the assailant's height and weight-from 6 feet initially to the identification of the 5' 8" defendant and from "slim" to "not slim"[8] but trial counsel neglected to confront Twilley with these discrepancies, even though the description of a 6-foot tall shooter of moderate build with a distinctive hairline better matches Meeks than Gavin. *See* P.C. 981 (stating that Meeks was 5'10" and weighed 240 pounds); P.C. 982 (photograph of Dwayne Meeks). Failure to use height and weight discrepancies to impeach identification testimony is a standard ground for relief under *Strickland.*

---

[8] In his written statement given the day of the shooting, Mr. Twilley described the shooter as a "black male," "slim about 6 ft. tall," wearing "dark cloth[e]s" and a "black striped bogin [sic]." (Vol. 21 at 486). At trial, Mr. Twilley described the shooter as a black guy with very little hair and a goatee, who "wasn't real heavy, but he wasn't slim." (Vol. 8, Tab 18 at 521).

(Doc. 1 at 42). He adds that counsel also failed to emphasize that Mr. Twilley did not

identify Mr. Gavin until the trial – more than eighteen months after the shooting. (*Id*.

at 42-43).

When Mr. Gavin presented this claim in his Rule 32 proceedings, the trial court

denied the claim as follows:

> The Defendant's trial attorneys were not constitutionally deficient
> in their cross-examination of Mr. Twilley. For example, the trial
> attorneys elicited testimony that indicated that the position of Mr.
> Twilley's car in relation to the murder made it difficult for him to have
> seen the murderer. Testimony was elicited that Mr. Twilley's attention
> was not drawn to the scene of the shooting until after the shots were
> fired. The trial attorneys established that Mr. Twilley could only see the
> side of the shooter's face for a short time.

> During closing argument these aspects of Mr. Twilley's testimony
> were emphasized to the jury, and the Defendant's trial attorneys faulted
> law enforcement for failing to have Mr. Twilley view a lineup in the
> twenty months preceding the trial.

> The Defendant apparently contends that there was a fatal
> inconsistency between Mr. Twilley's description of the assailant as
> given on the night of Mr. Clayton's murder, and the description given
> at trial. The Defendant points out that in his statement Mr. Twilley
> described the assailant as "about six feet tall" and as "slim," but at trial
> he stated that the assailant "wasn't real heavy, but he wasn't slim."

> The Defendant argues that the description given by Mr. Twilley
> on the night of the crime, and the description given, at trial, more closely
> describes Mr. Meeks than the Defendant, and that the trial attorneys
> were deficient in failing to make these comparisons.

The Defendant was five feet eight inches tall and weighed 146 pounds at the time of his arrest. Meeks was five feet ten inches tall and weighed 240 pounds at the time. Meeks weighed almost one hundred pounds more than the Defendant.

This Court finds it unrealistic to believe that Mr. Meeks, who weighed almost 100 pounds more than the Defendant, and who was only two inches taller than the Defendant, more closely fits the description given by Mr. Twilley on the night of the murder, and again at trial.

Mr. Twilley testified that the assailant's most distinctive feature was his hairline. Indeed, the Defendant has a distinctive hairline. Although Mr. Meeks has a receding hairline, the Defendant's physical appearance as observed by Mr.Twilley on the night of the murder and at trial was the factor which adds certainty to Mr. Twilley's in-court identification.

This Court finds that the Defendant's trial attorneys were not ineffective merely because they failed to convince the jury that Meeks' physical characteristics fit Mr. Twilley's description given on the night of the murder and at trial. On the contrary, the Defendant's physical characteristics more closely fit Mr. Twilley's description of the assailant given on the night of the murder.

(Vol. 36, Tab 76 at 3508-10).

In affirming the trial court's denial of this claim, the Alabama Court of Criminal Appeals stated:

Gavin argues that his trial counsel were ineffective in cross-examining the witnesses who identified him at trial. Gavin specifically contends that his "trial counsel should have made every effort . . . to imeach the testimony of Larry Twilley, who provided an unreliable cross-racial identification of Gavin." (Gavin's brief, p. 51.) In denying this claim, the circuit court found:

The Defendant's trial attorneys were not constitutionally deficient in their cross-examination of Mr. Twilley. For example, the trial attorneys elicited testimony that indicated that the position of Mr. Twilley's car in relation to the murder made it difficult for him to have seen the murderer. Testimony was elicited that Mr. Twilley's attention was not drawn to the scene of the shooting until after the shots were fired. The trial attorneys established that Mr. Twilley could only see the side of the shooter's face for a short time.

(C. 3508.)

The circuit court also noted that it found "it unrealistic to believe that Mr. Meeks, who weighed almost 100 pounds more than the Defendant, more closely fits the description given by Mr. Twilley on the night of the murder, and again at trial." (C. 3509.)

In the instant case, Gavin's trial counsel did not directly challenge Twilley's in-court identification of Gavin. Instead, they chose to challenge Twilley's vantage point from which he saw the murderer and the length of time Twilley saw him. Gavin has failed to demonstrate that the circuit court erred in denying his Rule 32 ineffective-assistance-of-counsel claim of Twilley and is, thererfore, due no relief on this claim.

(Vol. 46, Tab 85 at 30-31). Mr. Gavin argues that this holding is an unreasonable

application of *Strickland* because the court failed to seriously consider his claims.

(Doc. 38 at 46).

On cross-examination, defense counsel questioned Mr. Twilley as follows:

Q.    Now, you said you heard a loud noise?

A.    Right.

82

Q.      Was that loud noise the first shot you heard or was there something else that attracted your attention?

A.      I don't know if the first noise was a shot, but then there was two shots.

Q.      All right. And the individual that you described, according to what you just said then, he would have opened the door in that direction, correct?

A.      Right.

Q.      Wouldn't that have put the door between him and you?

A.      Well, I didn't really see him that well until he started turning out, and that's when I –

Q.      All right. So you didn't see him at the time that he opened the door and jumped in the van?

A.      No, I could see the driver and his arms.

Q.      All right. And you said that you saw one side of his face?

A.      Right.

Q.      And that was as he drove past you turning right, headed west toward Leesburg; is that right?

A.      Right.

Q.      And you said this process took how long, now?

A.      No more than three or four minutes.

Q.      No more than three or four minutes. (Pause) That's 15 seconds. I would suggest, although I'm not going to put the Court to the

test of, you know, standing here for three or four minutes and see how long that is. From what you've described you thought seriously that it took three or four minutes for all this to transpire; is that what you're telling us?

A.    It happened in one cycle of the red light.

Q.    Very quickly?

A.    Right.

Q.    Less than two minutes?

A.    About right along in there. I mean, it seemed like it took forever.

Q.    Less than a minute. I mean, forever is a long time. 15 seconds is a long time if we're standing here counting that off; isn't that true? So it took considerable less than three or four minutes is that what you're telling us[?]

A.    Yeah.

Q.    All right. And you testified that the gentleman seated over here at the defense table, Mr. Gavin, is the individual that you saw, but you also said you only saw him that brief moment, is that correct? However long it was?

A.    (Nodded in the affirmative)

Q.    And you told us you recognized him this morning because of his hairline; is that correct?

A.    That the part that stands out the most.

Q.    That's the part that stands out. Well, now, didn't you tell the police back on the 6th of March when you gave a statement that he was wearing a red and black striped boggin?

A.    I said he had something red and black.

Q.    On his head?

A.    Around his head.

Q.    Okay. And yet, though he had this red and black thing on his head, the only way you can identify him, the thing that stands out in your memory is his hairline; is that correct?

A.    When he come around the corner, he didn't have anything on his head.

Q.    He didn't have anything on his head when he came around the corner?

A.    No.

(Vol. 8, Tab 18 at 526-29).

Although counsel conducted a vigorous cross-examination of Mr. Twilley, Mr. Gavin faults counsel for failing to impeach Mr. Twilley with the descrepancies in his descriptions of Mr. Gavin's height and build. He believes that Mr. Twilley's descriptions of Mr. Gavin – who was five feet, eight inches tall and weighed 145 pounds – as "about six feet tall," "slim," and not "real heavy," but not "slim," more closely described Mr. Meeks – who was five feet, ten inches tall and weighed 240 pounds. However, as the trial court pointed out, it would be unrealistic to believe that Mr. Meeks, who was only two inches taller and weighed almost 100 pounds more

than Mr. Gavin, more closely fit the descriptions given by Mr. Twilley in his statement the night of the murder and again at trial.

Rather than making an argument that seems quite unlikely to have swayed the jury, counsel instead elicited testimony from Mr. Twilley on cross-examination, to show that Mr. Twilley did not have a good view of the shooter, that his attention was not drawn to the scene of the shooting until after the shots were fired, and that he only saw the side of the shooter's face for a very short time. (Vol. 8, Tab 18 at 526-29). Additionally, counsel attacked Mr. Twilley's identification testimony in Mr. Gavin's closing argument. (Vol. 11, Tab 21 at 1126-29).

The state courts' findings that counsel's strategy in cross-examining Mr. Twilley was not deficient was not unreasonable under *Strickland*.

4. **Failure to Prevent the Jury from Hearing Prejudicial Evidence of Mr. Gavin's Prior Conviction During the Guilt Phase**

Mr. Gavin was charged with murder made capital because he had been convicted of another murder within the previous twenty years, in violation of Ala. Code § 13A-5-40(a)(13). That provision required the state to prove as an element of the capital murder charge that Mr. Gavin had been convicted of another murder within the twenty years preceeding the current murder.

Mr. Gavin argues that counsel were deficient for failing to stipulate to the fact of the prior conviction, which would have eliminated the risk that the prosecution would present prejudicial and inflammatory evidence of the prior murder. (Doc. 1 at 44-45). He states that standard practice is for defense counsel to offer to stipulate to the fact of prior convictions. (*Id*. at 45). He maintains that the details of his prior murder conviction were irrelevant and unduly prejudicial. (*Id*. at 44). He contends that because of counsel's failure to stipulate to the fact of his prior murder conviction, the court did not exclude the prosecutor's repeated references to him as the "convicted murderer from Chicago." (Doc. 1 at 45).[9] Mr. Gavin asserts that counsel's failure to preclude unnecessarily inflammatory references to his prior crime from being presented to the jury "was at least reasonably likely to prejudice the jury." (Doc. 1 at 51).

The Alabama Court of Criminal Appeals affirmed the Rule 32 court's denial of this claim:

> Gavin asserts that "[w]hen the jury is asked to determine the fact of a prior conviction, it is standard practice for defense counsel to offer to stipulate to that fact, thereby eliminating the rist that the prosecution

---

[9] In his reply brief, Mr. Gavin alleges additional facts that were not presented to the Alabama Court of Criminal Appeals and were not included in his petition. (See Doc. 38 at 46-47). These facts are not before this court for review because "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

will present prejudicial and inflammatory evidence of the prior crime." (Gavin's brief, p. 58.) Although Gavin argues "the prosecution presented highly prejudicial evidence of Gavin's prior conviction to the jury," his only citation to the trial record references the prosecutor's referral "to Gavin as the 'convicted murderer from Chicago.'" (Gavin's brief, p. 57 (citing trial transcript).)

In denying this claim the circuit court found that Gavin had "failed to explain how a stipulation of his prior conviction would have mitigated the evidence of a prior conviction which was required to be proved as an element of the charged offense." (C. 3512.)

Gavin was charged with murder made capital because he had committed a prior murder within 20 years preceding the murder of William Clinton Clayton, Jr., a violation of § 13A-5-40(a)(13), Ala. Code 1975. On direct appeal, Gavin contended that the evidence of his prior conviction had been improperly admitted because it serves as "imroper evidence of his bad character." *Gavin*, 891 So. 2d at 950. This Court held that "Gavin's 1982 murder conviction was an element of the capital offense that the State was required to prove beyond a reasonable doubt; therefore, evidence of that conviction was properly admitted." *Id*.

Because Gavin failed to demonstrate that his trial counsel provided deficient performance or that he suffered prejudice as a result of their alleged deficiency he is due no relief on this claim.

(Vol. 46, Tab 85 at 31-32).

Mr. Gavin argues that the state court's holding that he was not prejudiced by counsel's failure to stipulate to the fact of his prior murder conviction is an unreasonable application of *Strickland*. (Doc. 38 at 48). He cites *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), in support of his argument that "there is 'significant prejudice' associated with 'the introduction of evidence of a defendant's

prior crimes.'" (Doc. 38 at 48) (quoting *Almendarez-Torres*, 523 U.S. at 235). However, *Almendarez-Torres* is not particularly helpful to Mr. Gavin.

In *Almendarez-Torres*, the court was asked to interpret 18 U.S.C. § 1326, which forbids an alien who was once deported from returning to the United States without special permission. Subsection (a) provides that a violation of the statute is punishible by imprisonment for up to two years. Subsection (b)(2) provides for an additional penalty for aliens who were removed after conviction for commission of an aggravated felony. The defendant pled guilty to violating 18 U.S.C. § 1326 (a), and admitted that the earlier deportation had taken place pursuant to three earlier convictions for aggravated felonies. 523 U.S. at 227. At sentencing, Almendarez-Torres argued that because the indictment had not mentioned the earlier aggravated felony convictions, he could not be sentenced to more than two years imprisonment. *Id.* The trial court rejected the argument and sentenced him to eighty-five months' imprisonment. *Id.* The Fifth Circuit Court of Appeals also rejected his argument, holding that "subsection (b)(2) is a penalty provision that simply permits a sentencing judge to impose a higher sentence when the unalwfully returning alien also has a record of prior convictions." *Id.*

The Supreme Court affirmed, holding that "Congress intended to set forth a sentencing factor in subsection (b)(2) and not a separate criminal offense." *Id*. at 235. In explaining its decision, the Court pointed out:

> [T]he contrary interpretation – a substantive criminal offense – risks unfairness. If subsection (b)(2) sets forth a separate crime, the Government would be required to prove to the jury that the defendant was previously deported "subsequent to a conviction for commission of an aggravated felony." As this Court has long recognized, the introduction of evidence of a defendant's prior crimes risks significant prejudice. *See*, *e.g.*, *Spencer v. Texas*, 385 U.S. 554, 560, 87 S.Ct. 648, 651–652, 17 L.Ed.2d 606 (1967) (evidence of prior crimes "is generally recognized to have potentiality for prejudice"). Even if a defendant's stipulation were to keep the name and details of the previous offense from the jury, *see Old Chief v. United States*, 519 U.S. 172, 178-179, 117 S.Ct. 644, 649, 136 L.Ed.2d 574 (1997), jurors would still learn, from the indictment, the judge, or the prosecutor, that the defendant had committed an aggravated felony. And, as we said last Term, "there can be no question that evidence of the . . . nature of the prior offense," here, that it was "aggravated" or serious, "carries a risk of unfair prejudice to the defendant." *Id*., at 185, 117 S.Ct., at 652 (emphasis added). Like several lower courts, we do not believe, other things being equal, that Congress would have wanted to create this kind of unfairness in respect to facts that are almost never contested. *See*, *e.g.*, *United States v. Forbes*, 16 F.3d, at 1298-1300; *United States v. Rumney*, 867 F.2d 714, 718-719 (C.A.1 1989); *United States v. Brewer*, 853 F.2d 1319, 1324-1325 (C.A.6 1988) (*en banc*); *United States v. Jackson*, 824 F.2d, at 25-26; *Government of Virgin Islands v. Castillo*, 550 F.2d 850, 854 (C.A.3 1977).

*Id*. at 234-35.

Unlike the charge against the defendant in *Almendarez-Torres*, the fact that Mr. Gavin had been convicted of another murder within the previous twenty years was an

element of the capital murder charge against him that the state was required to prove. Even if counsel had stipulated to the fact that he had been convicted of murder within the previous twenty years, the jury would necessarily have known about the prior conviction. While *Almendarez-Torres* states "the introduction of evidence of a defendant's prior crimes risks significant prejudice," *id*. at 235, the fact remains that Mr. Gavin has not shown a reasonable probability that, but for counsel's failure to stipulate to the fact of his prior murder conviction, the results of the proceeding would have been different.

Mr. Gavin seems to believe that if counsel had stipulated to the prior conviction, the prosecution would not have referred to him as the "convicted murderer from Chicago." But, the prosecutor just as likely would have still referred to him as the murderer from Chicago, regardless of whether counsel stipulated to the fact of his prior murder conviction. Further, there thing in the record suggests that but for the prosecutor's references to Mr. Gavin as the murderer from Chicago, the jury would have reached a different result.

Because the prior murder conviction was an element of the capital murder charge against him, the jury would necessarily have been well aware that Mr. Gavin had previously been convicted of murder, regardless of whether the prosecution

referred to him as the murderer from Chicago. Thus, the state court's finding that Mr.

Gavin failed to prove a violation of *Strickland* was not unreasonable.

### 5.    Failure to Call Mr. Gavin to Testify in His Own Defense

Mr. Gavin alleges that trial counsel's decision not to allow him to testify was

constitutionally deficient. (Doc. 1 at 46-49). He claims:

> In this case, the only conceivable strategy for raising a reasonable doubt as to Gavin's guilt was to implicate Meeks. Because Gavin and Meeks were alone during the time period leading up to and during the shooting of Mr. Clayton, in order to rebut Meeks' account, it was imperative that Gavin testify to provide his version of the facts. And he had wanted to testify on his own behalf at his criminal trial, but his attorney Bayne Smith advised against it. P.R. 108-09. Gavin further explained that his lawyers "wouldn't allow me to testify" at his criminal trial. P.R. 169.

(*Id*. at 46) (footnote omitted).

In denying this claim on appeal from the denial of Mr. Gavin's Rule 32

petition, the Alabama Court of Criminal Appeals reasoned:

> At the hearing held on this petition, Gavin testified that he told his trial counsel that he wanted to testify at his trial, but Gavin did not say what he had told his trial counsel he wanted to say under oath. In an affidavit he submitted, Gavin's lead trial counsel [H. Bayne Smith] stated "that for the entire 22 months from the time [he] was appointed to represent Mr. Gavin . . . Mr. Gavin . . . vehemently insisted that he was not present at the scene of the shooting."[10] (C. 984.) On the day

---

[10] Mr. Smith signed the sworn affidavit on July 24, 2000, during the proceedings on Gavin's motion for a new trial. (*See* Vol. 23 at 983-85). Mr. Smith died on October 25, 2006, prior to the February, 2010 evidentiary hearing on Gavin's Rule 32 petition.

Gavin's trial began, however, "Mr. Gavin acknowledged for the first time that he had in fact been present at the scene of the shooting." (C. 984.) Although attorney Smith did not state in his affidavit why he did not call Gavin to testify in his own defense, Gavin's last-minute change of story would have given Smith a reason to not call Gavin as a witness. Moreover, Gavin concedes that his trial "testimony, by itself, would not likely have changed the outcome at trial." (Gavin's reply brief, p. 17.)

The circuit court did not err in denying this claim and Gavin is due no relief.

(Vol. 46, Tab 85 at 33).

Mr. Gavin argues that this holding was an unreasonable application of *Strickland* because "trial counsel's decision not to allow Gavin to testify 'fell below an objective standard of reasonableness.'" (Doc. 38 at 28). Mr. Gavin points to his Rule 32 testimony in which he denied shooting the victim; testified that Mr. Meeks was the shooter, but he did not know in advance that he was going to shoot the victim; testified that Mr. Meeks, who was running drugs between Chicago and Alabama, offered to pay Mr. Gavin to help him drive from Chicago to Alabama to conduct drug deals and help with his drug business. (Doc. 1 at 47-48). He claims that if counsel had elicited this testimony from him at trial, Mr. Meeks's "concocted testimony" – that the reason for the trips to Alabama was to go "whoring" – would have been completely undermined. (*Id*. at 48).

Nothing in the record indicates why trial counsel did not call Mr. Gavin to testify in his own defense at trial. But, even assuming that counsel were deficient in failing to have him testify, Mr. Gavin cannot show that this failure prejudiced his defense. To show prejudice, Mr. Gavin must show a reasonable probability that but for counsel's failure to call him to testify, the result of his trial would have been different. *See Strickland*, 466 U.S. at 694. Mr. Gavin conceded in his reply brief to the Alabama Court of Criminal Appeals that his testimony, "by itself, would not likely have changed the outcome of the trial." (Vol. 46, Tab 83 at 17). The court agrees. Given the overwhelming evidence implicating him in the murder, no reasonable probability existst that his testimony would have changed the outcome of his trial. Thus, the Alabama Court of Criminal Appeals's finding that Mr. Gavin failed to prove a *Strickland* violation was not unreasonable.

### 6.    The Cumulative Effect of Trial Counsel's Errors

Finally, Mr. Gavin argues that because, taken as a whole, trial counsel's performance violated *Strickland*, the Alabama Court of Criminal Appeals improperly denied relief on his guilt phase ineffective assistance of counsel claims by considering each claim in isolation rather than performing a cumulative analysis of the effect of counsel's failures on the trial as a whole. (Doc. 1 at 49-57; Doc. 38 at 49-54). Respondent counters that the cumulative claim is procedurally defaulted because

it was not fairly presented to the Alabama Court of Criminal Appeals, so the court did not address it. (Doc. 33 at 25-28). Mr. Gavin contends that his cumulative error claim is not a separate claim or allegation that must be exhausted, but that it is "part and parcel" of his claim that counsel's performance was deficient. (Doc. 38 at 77). He adds that in any event, he fairly presented the claim to the appellate court. (*Id*.).

Regardless of whether this claim was properly presented to the state court, it is due to be denied on the merits. "The cumulative-error doctrine provides that 'a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial.'" *Finch v. Secretary, Dept. of Corrections*, 643 Fed. App'x 848, (11th Cir. 2016) (quoting *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014)). "We address claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (citing *United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir. 1997).

The Eleventh Circuit Court of Appeals has made clear that without any error, a cumulative error argument lacks merit. *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014). Although the Supreme Court has not addressed the

applicability of *cumulative error* in the context of ineffective assistance of counsel claims, it has held, in the context of an ineffective assistance of counsel claim, that "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *United States v. Cronic*, 466 U.S. 648, 659 n.26 (1984) (citations omitted).

Mr. Gavin has not alleged a meritorious ineffective assistance of counsel claim. He cannot accumulate his non-meritorious claims into a meritorious claim of cumulative error. Therefore, this claim is without merit.

## C. Ineffective Assistance of Counsel in the Penalty Phase

In the penalty phase of Mr. Gavin's trial, counsel called just two witnesses on Mr. Gavin's behalf: S. J. Johnson, a minister from the local Kingdom Hall of Jehovah's Witnesses in Centre, Alabama, and Mr. Gavin's mother, Annette Gavin.

Mr. Johnson testified that he met Mr. Gavin in jail shortly after he was arrested for the Clayton murder, after getting word that Mr. Gavin had asked for someone from the church to visit him. (Vol. 11, Tab 29 at 1244). He stated that he met with Mr. Gavin weekly over the twenty months prior to Mr. Gavin's trial, spending about an hour with him on each occasion. (*Id*. at 1244-45). Mr. Johnson testified that Mr. Gavin "seemed to have an attitude that he was blaming everybody except" himself.

(*Id*. at 1246). Mr. Gavin blamed God for some of the things that happened to him, and asked Mr. Johnson why God allowed him to get into "various situations, bad company, and end up in his life just being a mess." (*Id.* at 1246-47). Mr. Johnson stated that he answered Mr. Gavin's question by telling him:

> God gives us free will with free moral agents and we have a choice in the decisions that we make. Now, being a minister I pointed out that the Bible has certain requirements, God has outlined certain requirements for us in the Bible, and it is up to us as to whether we adhere to those requirements or we chose some other course. At the same time we're going to have to suffer whatever consequences for what actions we take.

(*Id.*).

Eventually, Mr. Gavin "began to get the point," stopped blaming others so much, and took some responsibility. (*Id*. at 1247). Mr. Johnson described how Mr. Gavin went from causing trouble in jail to humbling himself to the authorities in accordance with scripture. (*Id*. at 1247-48). He testified:

> based on my experience with Keith and things that I've observed and what seem to be some attitude changes, I feel that if Keith is given an opportunity to continue to live, he has the potential to cultivate a deeper relationship with God and I feel that there is hope for Keith if he's given time and opportunity.

(*Id*. at 1249). After discussing the Biblical principle of "an eye for an eye, tooth for a tooth, soul for a soul," and reciting the story of King David and Bathsheba, Mr.

Johnson stated that "there are occasions even today where mercy might override just cold justice." (*Id*. at 1250-52).

At the end of counsel's direct examination of Mr. Johnson, Mr. Johnson asked if he could make a statement. (*Id*. at 1252). He stated:

> In Mr. Gavin's case, he didn't testify here, but in our conversations he did on one occasion mention his concern for the Clayton family. He mentioned the fact that he was sure they were feeling grief and they would like to see justice and truth come out in this case and I feel the same way.

(*Id*. at 1252-53). Mr. Johnson went on to extend his "sincere sympathy" to the victim's family. (*Id.* at 1253).

Counsel immediately asked for a sidebar in which he stated, "Judge, obviously, the comment about Mr. Gavin's failing to testify was unsolicited, it was not responsive to my question, and in fact, there was no question on the table at that point." (*Id*. at 1254). Counsel verified with the prosecutor that he did not intend to question Mr. Gavin about his failure to testify on cross-examination. (*Id.*).

Annette Gavin testified that she felt Mr. Gavin "has the ability to live as he should live because he had to, he had to see it, he sees it now" and that he "could really be a great source of help to others and to our Creator." (*Id*. at 1259). She added that Mr. Gavin had always been exposed to the Jehovah's Witness faith and that it

was part of his foundation. (*Id*. at 1258-59). When asked to tell the jury about Mr. Gavin's family values, Annette stated:

> He's always family and for families, you know, he is for families. He got his view as he's always felt a concern for other people. That's been his view all his life, since he was very young, by what was fair. He loves justice, he really does.

(*Id*. at 1259). Annette ended her testimony by asking the jury to spare Mr. Gavin's life. (*Id*.).

### 1. Available Mitigation Evidence

Mr. Gavin alleges that counsel were deficient because they "failed to conduct any meaningful investigation into mitigating evidence at all, although there was ample mitigating evidence available that should have been presented to the jury." (Doc. 1 at 58). He argues that at his Rule 32 hearing, post-conviction counsel tendered numerous witnesses, including Lucia Penland, Betty Paramore, and Craig Haney, who "presented a compelling mitigation case and exposed trial counsel's failure to develop, or even attempt to prepare, such a case." (*Id*. at 59). The testimony of the pertinent Rule 32 witnesses is summarized below.

### a. Lucia Penland

Lucia Penland testified at the evidentiary hearing that she was a mitigation specialist with the Alabama Prison Project at the time of Mr. Gavin's trial. (Vol. 38

at 302). Part of her job as a mitigation specialist included assisting trial counsel in identifying appropriate experts to testify during the penalty phase. (*Id*.). Mr. Gavin's attorney Bayne Smith contacted Ms. Penland in October, 1998 and asked for her assistance in preparing mitigation evidence in Mr. Gavin's case. (*Id*. at 309-10). Ms. Penland agreed to help if she had time, then counsel formally retained her in early 1999. (*Id*. at 310-11). Ms. Penland interviewed Mr. Gavin in April, 1999, but did not have access to Mr. Gavin's records at that time. (*Id*. at 320-22). She testified that she had a difficult time convincing Mr. Gavin to give her any information. (*Id*. at 346).

Also in April, 1999, Ms. Penland contacted Dr. Craig Haney, who indicated he was available to testify at trial as an expert on institutionalization, assuming counsel could get a continuance, which they did. (*Id*. at 344-45). However, Mr. Haney was never contacted by counsel. (Vol. 41 at 149).[11]

In May, 1999, shortly after her meeting with Mr. Gavin, Ms. Penland wrote trial counsel informing them of the work she needed to do obtaining and reviewing records, and interviewing family, friends, and teachers before she could determine which expert witnesses were necessary. (Vol. 24 at 1019). However, counsel did not provide her with the records she needed and did not contact her again until September

---

[11] As it turned out, Mr. Haney was not available to testify at the later trial date. (Vol. 21 at 490).

20, 1999, just weeks before the trial was set to begin on November 1, 1999. (Vol. 38 at 324-28). Ms. Penland again urged counsel to seek a continuance, but counsel told her he did not believe he could get one. (*Id*. at 326-28).

On October 5, 1999, Ms. Penland engaged John Sturman, a sentencing consultant, to conduct interviews in Chicago and to search for Mr. Gavin's prison and educational records. (Vol. 24 at 1010). On October 13, 1999, after Mr. Sturman had completed his work, Ms. Penland sent his work product to counsel, along with a message to counsel explaining that there were

> issues that need to be pursued in this case, including the atmosphere in which Mr. Gavin grew up, the effects of his incarceration, effect of poverty, racism, etc. Mr. Struman said that during the time Mr. Gavin was growing up and in the area of town where his family lived, there was a great deal of violence, including the development of large gangs and serious gang activity. All of these issues along with whatever is found in the family dynamics need to be thoroughly explored.

(Vol. 21 at 490-95). Ms. Penland again urged counsel to try to get a continuance to allow for more time to develop a mitigation case,"based on the information [she was] developing, along with the lack of cooperation [she had] encountered, and the time factor on [her] part – having just this Monday finished with a trial on a prior case – which has not allowed us to be further along that we are at this time." (*Id*.). Ms. Penland testified at the evidentiary hearing that neither Mr. Gavin nor his family

would cooperate with her. (Vol. 38 at 346-49). In May, 1999, when Ms. Penland was in Chicago, Annette Gavin refused to speak to her. (*Id*. at 348).

Mr. Sturman's work product included details from an interview he had with Mr. Gavin's mother Annette. In his first memorandum to Ms. Penland, dated October 13, 1999, Mr. Sturman explained that he had requested Mr. Gavin's educational records and asked Ms. Penland to pursue health and medical records if it was in her budget. (Vol. 21 at 491). Then Mr. Sturman summarized some of the facts he had gleaned from Annette:

> Mr. Gavin grew up just blocks from where I am in the Chicago Housing Authority's ABLA Public Housing Project – not a great place and controlled by the Gangster Disciples. More interesting, however, were the riots on 12th Street following the death of Martin Luther King, Jr. The whole area was in riot and on fire. Mr. Gavin would have been 8 years old so you might question him relative to PTSD and related diagnoses.

> Do you have a "rap sheet" on Mr. Gavin[?] His mother says that he was charged with burglary when he was 13, charged with murder and transferred to adult court when he was 17, and she doesn't know what else. She thinks he was acquitted in a bench trial. I'll go to the Circuit Court Clerk's office when I'm at 26th Street tomorrow and see what's on computer or microfiche.

> I'll send you a more detailed memo of my interviews in a few days. However, Mr. Gavin's mother began by explaining to me that Dewayne Meeks knew the victim, was "up into something" with him, asked Mr. Gavin to ride down south to help him drive, and then set Mr. Gavin up for the charge by leaving him on a country road, promising to come back for him, and driving back to Joliet. "My boy isn't like that."

(*Id*. at 492).

Mr. Sturman's "more detailed memo" was also dated October 13, 1999. In that memo, he summarized his October 12, 1999 interview with Annette, which took place at her home. Mr. Sturman described her home as "sparsely furnished and the interior unpainted and undecorated for years reflecting substantial poverty." (*Id*. at 493).

Annette explained that for the first twenty years of Gavin's life, they lived in the ABLA Public Housing Project where he was raised by his immediate family without any intervention by the Department of Children and Family Services. (*Id*.). She explained that Gavin faced great peer pressure to join a gang and was constantly exposed to drugs, street violence, and shootings. (*Id*. at 495). She recounted a recent week when her family had been "awakened five nights out of seven by automatic weapons fire," and her neighbor "t[aking] six bullets in her home one evening." (*Id*.).

Annette provided Mr. Sturman with the names and addresses of Gavin's siblings, including telephone numbers for most of them. (*Id*. at 494). She stated that all of her children had drug problems and that "Elaine, Victor, Sterling, and Steven have all been arrested at some point and may have spent time in IDOC but she is unsure of their charges." (*Id*.).

Annette stated that she sent Gavin to the "M[e]nnonite Church when he was a child and later to various churches including the Jehovah's Witnesses which, she

stated, [he] attended until he was approximately 17 years old." (*Id.*). She named the schools Gavin had attended, stating that Gavin had been in special education classes at some point. (*Id.*). She also stated that prior to the Clayton murder, Gavin had been pursuing a GED. (*Id.*). She added that Gavin generally got along well with his peers, enjoyed working as a child, got along in school, and was scared by the level of violence in the neighborhood. (*Id.*). Finally, she recalled that she had suspected a neighbor might have sexually abused Gavin, but stated that she could not be certain. (*Id.*).

Ms. Penland wrote to counsel on October 19, 1999, again describing the work that remained to be done in preparing an effective, comprehensive and adequate mitigation case and repeating that she needed additional time to complete her work. (Vol. 24 at 1031-32). She stated that she would withdraw from the case if counsel did not obtain a continuance, but that she would "be pleased to re-enter the case" if counsel obtained a continuance. (*Id.* at 1032).

On October 20, 1999, trial counsel replied:

> I certainly appreciate your position as set forth in your letter. . . . In fact, [Gavin] continues to be completely unwilling to discuss his background as it related to development of mitigation evidence in this case, although his family is coming around and begining to cooperate to some extent.

Please understand my position regarding a continuance. First, Judge Rains was very clear that the continuance he granted back in June was expressly for the purpose of allowing the Alabama Prison Project to develop mitigation evidence in this case. The fact that Keith and his family were unwilling to cooperate would, in my opinoin, not only not be persuasive toward a continuance, but also would in fact be counterproductive in that regard as well as towards [Gavin] as a whole. Be that as it may, I did yesterday move for a continuance of the case, on the basis of what was to my mind a far more legitimate and urgent ground. Last week, I broke a bone in my foot. Since last Thursday, I have been in a great deal of pain, have been heavily sedated, and have been in a walking cast. Nonetheless, the judge denied my continuance, noting the considerable logistical events which had been set in motion in view of the contemplated start date: 300 jurors summoned, witnesses flying in from all over the country, etc. He is clearly determined to start this case on November 1. This was not a battle I could win, nor one that was going to create an appealable issue.

I would appreciate your forwarding to me any information you have obtained in Mr. Gavin's case. It may be that I can introduce documentary evidence through some of his family members or that the DA will stipulate to the admission of uncontested material. Also . . . if you have not expended all of the money . . . that Judge Rains allocated, I would like to know that, as we may need it for other mitigation work.

I am very grateful for the work done by the Alabama Prison Project, not only on this case but in general. . . . I am sorry we could not have had a more successful collaboration on Gavin. . . .

(Vol. 21 at 496-97).

In an October 31, 1999 letter to the trial judge, counsel stated:

In accordance with your instructions, enclosed are copies of all materials received from the Alabama Prison Project in connection with this case. As you can see, it consists only of correspondence from Ms. Penland and not, at this point, any useable mitigation material.

. . . in separate pleadings, I am today requesting allocation of additional funds for the procurement of experts to testify in the guilt/innocence phase of the case.

(Vol. 21 at 498). Mr. Gavin alleges that in this letter, counsel "misled the trial court and concealed the work Sturman and Penland had done," by "transmitting correspondence from Penland – but not the Sturman materials." (Doc. 1 at 63).

### b.    Betty Paramore, Ph.D.

Dr. Betty Paramore also testified at the evidentiary hearing as a mitigation specialist. (Vol. 38 at 384). As part of her mitigation investigation, she conducted face-to-face interviews with Mr. Gavin, his mother, three of his sisters, a cousin, an uncle, and a friend, and she conducted telephone interviews with his brother, sister-in-law, three other sisters, another cousin, and another friend. (Vol. 24 at 1091). She also reviewed arrest reports, prison records, and available school records. (Vol. 38 at 390, Vol. 24 at 1124).

Dr. Paramore testified that in putting the information she had on Mr. Gavin in context, she considered risk factors, protective factors, and resiliency. (Vol. 38 at 394-95). She identified numerous risk factors[12] present in Mr. Gavin's life, including

---

[12] Recognized risk factors include individual factors, family factors, school-related factors, peer grouping, and environmental or social factors. (Vol. 38 at 395-96).

106

multi-generational family dysfunction, domestic violence and impaired parenting, and the poor, violent community in which Mr. Gavin grew up.

As to multi-generational family dysfunction, Dr. Paramore found that Mr. Gavin's parents – Annette and Willie – both came from dysfunctional families with histories of drug use, alcoholism, and incarceration. (Vol. 24 at 100-02). Annette's brother and sister had histories of drug abuse and incarceration, and another brother was an alcoholic. (*Id*. at 1100). Of Willie's twelve siblings, eight were alcholics, three had histories of incarceration, and one was the "madam" of a prostitution house where three of Willie's sisters worked as prostitutes. (*Id*. at 1101). Willie was physically abused as a child, he had problems with gambling and alcohol abuse, was incarcerated when Mr. Gavin was two years old, and was shot in the chest when Mr. Gavin was fourteen years old. (Vol. 38 at 405-07, Vol. 24 at 1101-02). Mr. Gavin argues that all of these factors impacted his parents' ability to raise their twelve children. (Doc. 1 at 66).

The dysfunction in Willie and Annette's generation continued with their twelve children. Mr. Gavin's siblings Willie, Jr., Elaine, Victor, Steven, and Sterling had histories of incarceration and drug use; Elaine, Victor, and Steven were gang members; Victor was the victim of a gang shooting when he was sixteen; and Steven shot two gang members who had attacked Mr. Gavin. (Vol. 24 at 1103-04, 1111, Vol.

38 at 415-16, 419). As a child, Mr. Gavin was often sent to highly dangerous parts of housing projects to retrieve Elaine and Willie, Jr., and when he was seventeen, Mr. Gavin was hospitalized after being attacked by a group of gang members. (Doc. 38 at 412-13, 419, Doc. 24 at 1111). When he was twenty-one, Mr. Gavin shot and killed the leader of the gang that had attacked him. (Doc. 24 at 1112). He was convicted of murder and incarcerated from 1981 through 1997. (*Id.*).

With respect to the risk factor of domestic violence and impaired parenting, Dr. Paramore testified that Willie, Sr. physically abused Mr. Gavin, Annette, and Mr. Gavin's siblings with his hands, extension cords, and anything else that was available, stopping only when he drew blood. (Vol. 38 at 427-29). She testified that Mr. Gavin was beaten more often than his siblings because he often took responsibility for things his siblings did to shield them from abuse. (*Id*. at 429-30). Mr. Gavin had a very close relationship with his mother, but took on the adult responsibility of caring for his siblings because she was not able to do so. (*Id*. at 434-36). Mr. Gavin engaged in criminal activities to get money to support the family. (*Id*.).

With respect to the community risk factor, Dr. Paramore testified that Mr. Gavin grew up in the "ABLA" Chicago public housing projects, in overcrowded houses that were in poor condition. (Vol. 38 at 445-46). The residents of the housing

projects were poor, and the projects were riddled with gangs, drug activity, crime, violence, and riots. (*Id*. at 441-44).

Upon being released from prison in 1997, at the age of thirty-seven, Mr. Gavin returned to live with Annette, who had moved out of the housing projects. (*Id.* at 447-48). At the time, two of his sisters, one of his brothers, and four of his nieces and nephews also lived with his mother. (*Id*. at 448-49). The home was in deplorable condition. It was filled with clutter and garbage, the kitchen sink did not work, there were exposed wires and pipes, and the front door was broken. (*Id*. at 450-54, Vol. 39 at 455-56). Mr. Gavin was upset by the conditions of Annette's home and tried to get his siblings and cousins to raise money to assist with repairs; he was upset that several of his siblings were on drugs; and although he wanted to help, he was unable to find work because of his criminal record and having spent his entire adult life in prison. (Vol. 39 at 456, Vol. 23 at 1000, Vol. 24 at 1001, Vol. 37 at 117). Mr. Gavin states that these conditions made him "particularly susceptible to the negative influences of Dwayne Meeks, his first cousin and a corrections officer, who lured Mr. Gavin with the promise of easy money by driving Meeks around as Meeks did his drug deals." (Doc. 1 at 70).

Ms. Paramore testified that she "fe[lt] that the information that is included in the mitigation report was available during trial and should have been considered." (Vol. 38. at 389).

### c. Craig Haney, Ph.D.

Dr. Craig Haney was retained by Rule 32 counsel to provide his opinion on the effects of imprisonment on Mr. Gavin and his potential for positive adjustment in prison.[13] (Vol. 41, Tab 79 at 24). Although Ms. Penland urged trial counsel to retain Dr. Haney to review Mr. Gavin's prison history for mitigation and to possibly testify at the penalty phase, Dr. Haney never heard from counsel. (*Id*. at 150-51, 178-80).

Dr. Haney explained that institutionalization is "what happens to people when they are placed in institutional settings, the way they are changed and affected by those settings and often times changed and affected by those settings in ways that impede their readjustment to non-institutional settings once they're released." (*Id*. at 35). He testified that Mr. Gavin's incarceration for seventeen years had a profound effect on him. (Vol. 24 at 1054-58). Early in his imprisonment, Mr. Gavin was stabbed by gang members. (*Id*. at 1060). Dr. Haney identified as factors that influenced Mr. Gavin's degree of institutionalization, the relatively early age –

---

[13] Dr. Haney did not testify at the evidentiary hearing; rather, he was deposed and submitted a sworn declaration. (Vol. 41, Tab 79 at 1 - Vol. 42 at 271, Vol. 24 at 1047-89).

twenty-two – at which he was incarcerated, the length of his incarceration, and his traumatic pre-incarceration childhood. (Vol. 41 at 47-49, 57-58).

Dr. Haney opined that over time, Mr. Gavin adjusted to prison, but institutionalization made it difficult for him to adjust to life outside of prison seventeen years later when he was paroled. (*Id*. at 1083, Vol. 41 at 46). However, over time, Mr. Gavin had become a model prisoner, receiving only one serious write-up in his seventeen years in custody. (Doc. 41 at 77-79).[14] Dr. Haney testified that evidence of good conduct in prison has an important mitigating effect because jurors are often "concerned about the future, what's going to happen with this guy if and when we send him to prison," and evidence indicating that a defendant will have a positive adjustment in prison reassures the jury that the defendant will not be a threat to other people in prison. (*Id*. at 129-30).

Mr. Gavin claims that trial counsel could have offered evidence that he would be able to adjust to a prison environment and adapt his conduct to the requirements of that environment but did not. (Doc. 1 at 73-74).

## 2. Deficiency of Counsel for Failing to Investigate Mr. Gavin's Background

---

[14] The serious write-up was for possessing a shank – but the shank was never used. (Doc. 41 at 77-79). He received other write-ups for infractions Dr. Haney described as insignificant, such as having his television on too loud and listening to his television with earphones. (*Id*. at 78).

Mr. Gavin argues that "counsel failed to conduct a competent investigation that would have revealed powerful mitigation evidence that any reasonable lawyer would have presented instead of the weak, on-the-fly mitigation case counsel presented at trial." (Doc. 60 at 14). He claims that counsel's barebones penalty phase case reflected a lack of preparation. (*Id*.). Mr. Gavin points out that during the penalty phase, counsel basically admitted that he was unprepared and had not spent sufficient time with his witnesses to prepare them for their testimony. (*Id*.).

When counsel called Mr. Johnson to testify, he called "Mr. S. C. Johnson." (Vol. 11, Tab 29 at 1243). Counsel asked Mr. Johnson if he got "those initials right," and Mr. Johnson indicated that his name was "S. J." Johnson. (*Id*.). Counsel then apologized, "S.J., thank you, sir. I don't have my notes with me from where we talked the other day and I wasn't sure about that, so thank you, and I apologize for the correction." (*Id*.). Counsel's missing notes were from his only meeting with Mr. Johnson prior to his testimony. (Vol. 33 at 2956). Mr. Johnson stated in an affidavit that counsel first approached him concerning testifying about three days before the penalty phase of the trial. (*Id*.). He stated that the only meeting he had with counsel was on November 5, 1999, during a short break from the trial. (*Id*.). The meeting lasted approximately five minutes and counsel asked him what his impression of Mr.

Gavin was – but did not ask him any other questions in preparation for Mr. Johnson's testimony. (*Id.*).

Mr. Gavin explains that counsel's lack of preparation showed in Mr. Johnson's testimony:

> For example, Johnson volunteered that Gavin "was blaming everybody except [himself]" for the situation he was in, even "blaming God for some of the things that happened," when Johnson and Gavin first met. (Vol. 11, Trial Tr. at 1246.) Johnson also highlighted Gavin's failure to testify (*id.* at 1252) – a prejudicial move that, if made by the prosecutor, would have violated Gavin's Fifth Amendment privilege against self-incrimination under *Griffin v. California*, 380 U.S. 609, 615 (1965).

(Doc. 60 at 4-5).

Similarly, prior to Annette Gavin's testimony, counsel admitted that he had not prepared her to testify:

> Mrs. Gavin, I know that when you and I spoke yesterday, I didn't really have an opportunity to prep you for your testimony today, but I know that you would like to address the Court and the jury about your feelings about Keith and the options that the jury has with regard to punishment. Would you tell us what your thoughts are in that regard, please, ma'am.

(Vol. 11, Tab 29 at 1258). Mr. Gavin argues that after this "open-ended prompt, counsel asked about 'Keith's family values,' invited his mother to 'ask[ ] this court to spare his life,' and sat down," resting his penalty phase case. (Doc. 60 at 15).

Mr. Gavin contends:

Having presented no substantial mitigation case, Gavin's trial counsel was left with little to argue in closing. He admitted to having spent the night before "in [his] office searching through all of [his] collected material" for "something, anything, one last shred of persuasive evidence or argument that [he] might place before [the jury]," but found "nothing that seemed really appropriate." (Vol. 12, Trial Tr. at 1271.) But that did not stop him from commenting on Gavin's race – "When . . . I learned that [Gavin] was a black man from Chicago, Illinois, and that he had a prior murder conviction, my reaction, quite simply, was, oh, my God, how can a man like that ever get a fair trial in Cherokee County, Alabama?" (Vol. 11, Trial Tr. at 1265) – or turning to the Sunday comics for a "[l]ittle gallows humor" from The Wizard of Id. (Vol. 12, Trial Tr.at 1270.) He was not in the position to argue that Gavin's troubled past made him less morally culpable, and as a result, the judge and jury were left with "an incomplete and misleading understanding of [Gavin's] life history." *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008) (granting habeas relief under AEDPA).

(*Id*. at 16-17).

Mr. Gavin argues that if counsel had conducted a reasonable investigation, they would have uncovered the extensive mitigation evidence that was available to them as set out above. (Doc. 1 at 75) (*see also* Doc. 60 at 17-22). He contends that no competent counsel would have failed to collect and review such information or would have conducted only a circumscribed interview with Mr. Gavin's mother. (Doc. 60 at 18).

Mr. Gavin blames counsel's failure to investigate and present a genuine mitigation case on counsel's inattention and incompetence. He argues that competent counsel would have discovered and presented evidence of Mr. Gavin's abusive

childhood, gang-infested neighborhood, his exposure to drugs and violence, and his institutionalization. (*Id*. at 22). Mr. Gavin asserts that counsel's actions in his case cannot be chalked up to trial strategy:

> As the record makes clear, the supposed "choice" here not to follow up on or present evidence related to Gavin's background was not a matter of considered professional judgment at all, but rather the result of unforgiveable inattentiveness. Under *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Williams*, 542 F.3d at 1337 (quoting *Strickland*, 466 U.S. at 690-91.) The deference owed to counsel's strategic judgments about mitigation is directly proportional to the adequacy of the investigations supporting such judgments. *See Wiggins*, 539 U.S. at 521.

> Trial counsel's investigation into Gavin's background in this case, done almost entirely through the Alabama Prison Project ("APP") and sentencing consultant John Sturman, was limited to one interview with Gavin and one interview with his mother. Still, Sturman's interview with Annette Gavin revealed some information regarding Gavin's background that would have prompted reasonable counsel to inquire further, including that many of Gavin's siblings had drug problems and criminal histories, that he grew up in a gang-infested neighborhood and was exposed to significant violence and racial riots, and that he entered prison at a young age. Nonetheless – and despite the fact that the APP specifically informed trial counsel that the limited evidence they had uncovered indicated that additional investigation was warranted, [Vol. 38 at] 330 – trial counsel never followed up by interviewing additional witnesses, obtaining records, or finding or preparing anyone to testify as to these matters during the penalty phase of Gavin's trial. [Vol. 38 at] 331-33. Under these circumstances, trial counsel's failure to broaden the scope of the investigation was unreasonable under prevailing professional norms.

(Doc. 1 at 75-77).

He explains that in assessing the reasonableness of an attorney's performance, the Supreme Court has looked to American Bar Association (ABA) standards as a guide. (Doc. 60 at 22) (quoting *Williams v. Allen*, 542 F.3d 1326, 1339 (11th Cir. 2008) (in turn citing *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)). He points out that

> the ABA standards have long provided that "a sentencing phase investigation should comprise efforts to discover all reasonably available mitigating evidence," and that counsel has "a duty to collect information pertaining to family and social history (including physical, sexual or emotional abuse), and to obtain names of collateral persons or sources to verify, corroborate, explain and expand upon the information obtained." *Id*. (quoting 1989 ABA Guidelines) (alterations and internal quotation marks omitted).

(*Id*. at 22-23).

Mr. Gavin alleges that the post-conviction record reveals that counsel did not meet these standards because although he engaged Ms. Penland to conduct a mitigation investigation, he did not follow through by managing her investigation:

> Counsel arranged only one meeting between Penland and Gavin (Vol. 38, R. 32 Tr. at 346), and there was no contact between counsel and Penland at all between May 1999 – when Penland sent counsel a list of potential leads to pursue and suggested that more time was needed to pursue them (Vol. 24, May 6, 1999 Letter at 1019) – and mid-September 1999 – when counsel asked for a status update six weeks before trial, having never before mentioned the impending trial date. (Vol. 38, R. 32 Tr. at 326-27.)

(*Id*. at 23).

Mr. Gavin points out that counsel cannot blame his failure to investigate on Ms. Penland because the ultimate responsibility for the investigation falls on the lawyer. (Doc. 1 at 77-78; Doc. 60 at 23 (citing *Johnson v. Bagley*, 544 F.3d 592, 602 (6th Cir. 2008) (holding that state court unreasonably applied *Strickland* and its progeny by denying relief where there was "a lack of structure and supervision" over a mitigation investigation that counsel had delegated to a mitigation specialist))). He claims that because the Sixth Amendment guarantees a competent lawyer who will "'conduct a thorough investigation of the defendant's background' in every capital case, *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *see also Porter v. McCollum*, 130 S. Ct. 447, 452 (2009) (holding that counsel's obligation to conduct a thorough investigation was 'unquestioned . . . under the prevailing professional norms')," Ms. Penland's lack of time to devote to his case does not excuse counsel's failure to conduct a competent investigation. (Doc. 60 at 24).

Mr. Gavin contends that Ms. Penland's preliminary investigation raised red flags that would have compelled any reasonable attorney to further investigation his background:

> Specifically, on October 13, 1999, Penland sent trial counsel a fax imploring counsel to pursue "the atmosphere in which Mr. Gavin grew up, the effects of his incarceration, effect of poverty, racism, etc." (Vol. 24, Oct. 13, 1999 Fax at 1023.) And she enclosed a report from an investigator who had learned from Gavin's mother that Gavin grew up in the gang-infested Chicago housing projects; that his siblings had

spent time in prison (including for attempted murder) and had drug problems; and that Gavin was constantly exposed to "street violence and shooting." (Vol. 24, Oct. 13, 1999 Memorandum at 1025-27.)

(*Id.* at 24-25). He submits that a reasonable attorney would have pursued these issues further, particularly by speaking to Mr. Gavin's family members prior to trial, rather than waiting until the eve of the sentencing hearing to speak with Mr. Johnson and Annette Gavin. (*Id.* at 25). Mr. Gavin maintains that counsel were deficient for failing to investigate this type of potentially mitigating evidence. (*Id.* at 80).

### 3. Prejudice from Failure to Investigate Mr. Gavin's Background

Mr. Gavin argues that he was prejudiced by counsel's failure to perform an adequate mitigation investigation, because the judge and jury "heard almost nothing that would humanize Gavin or allow them to accurately gauge his moral culpability." (*Id.* at 81). Rather, "[t]hey learned about Gavin's crimes, that he had been visited by an evangelist minister in jail, and almost nothing else. Annette Gavin's testimony was, charitably, pitiful. The jury returned its 10-2 recommendation to execute Gavin after only 1 hour and 15 minutes of deliberation. R. 1298." (*Id.* at 81).

Mr. Gavin points out that the jury heard none of the voluminous and compelling mitigation evidence that was readily available at the time of the trial. (Doc. 1 at 81). He argues:

> The judge and jury in Gavin's case "labored under a profoundly misleading picture" of Gavin's "moral culpability because the most

important mitigating circumstances were completely withheld from [them]." *Ferrell*, 640 F.3d at 1236. Indeed, they did not hear any individualized evidence that would explain why Gavin was particularly susceptible to criminal activity. *See Cooper*, 646 F.3d at 1355 ("the jury heard very little that would humanize Cooper"). Such evidence has been found to be sufficient to justify relief under *Strickland* in a string of Supreme Court cases. *See, e.g., Williams*, 529 U.S. at 398 ("the graphic description of Williams' childhood, filled with abuse and privation . . . might well have influenced the jury's appraisal of his moral culpability"); *Wiggins*, 539 U.S. at 537 ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."); *Porter*, 130 S. Ct. at 454 ("Had Porter's counsel been effective, the judge and jury would have learned of the kind of troubled history we have declared relevant to assessing a defendant's moral culpability." (internal quotation marks omitted)).

(Doc. 60 at 31).

Mr. Gavin asserts that the fact that two jurors voted against the death penalty after hearing only the scant mitigation case presented by counsel underscores the prejudice in his case. (*Id*. at 32). Indeed, the Eleventh Circuit has held that "[g]iven that some jurors nonetheless 'were inclined to mercy even with[ ] having been presented with [so little] mitigating evidence and that a great deal of mitigating evidence was available to [Petitioner's] attorneys had they more thoroughly investigated,' it is possible that, if additional mitigating evidence had been presented, more jurors would have voted for life." *Cooper v. Sec'y, Dep't of Corr*., 646 F.3d 1328, 1356 (11th Cir. 2011) (quoting *Blanco v. Singletary*, 943 F.2d 1477 1505 (11th Cir. 1991). Mr. Gavin contends that if the jury had heard about his youth in the gang-

infested Chicago projects and the abuse he suffered, along with the rest of the available mitigation evidence presented in the Rule 32 proceedings, the two votes against the death penalty could have easily turned into seven or more votes against it. (Doc. 60 at 32).

Mr. Gavin argues that "no conceivable tactical advantage" supported not presenting this evidence because the most damaging evidence concerning Mr. Gavin's prior murder conviction was already before the jury, and "a competent mitigation would not have opened the door to anything else." (Doc. 1 at 82). He asserts that if counsel had been competent, "the judge and jury would have learned of the 'kind of troubled history' the United States Supreme Court has 'declared relevant to assessing a defendant's moral culpability.'" (*Id*. at 81) (quoting *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) and citing *Mason v. Mitchell*, 543 F.3d 766, 773 (6th Cir. 2008) ("The Supreme Court has specifically observed that 'the graphic description of [a defendant's] childhood, filled with abuse and privation . . . might well have influenced the jury's appraisal of his moral culpability." (quoting *Williams v. Taylor*, 529 U.S. 362, 398 (2000))). Therefore, he concludes that counsel's performance was prejudicial under *Strickland*. (*Id*. at 83).

### 4.    Analysis

In affirming the Rule 32 court's denial of this claim, the Alabama Court of Criminal Appeals found the following:

> During the penalty phase of Gavin's trial, defense counsel presented the testimony of S.J. Johnson, a Jehovah's Witness minister, and Gavin's mother, Annette Gavin. In the affidavit he submitted in the instant case, Gavin's lead trial counsel said that Johnson was "a local minister with whom the Defendant had established a relationship during his incarceration in Cherokee County." ([Vol. 23 at] 984.) In denying this claim the circuit court noted that it could not "conclude that the trial attorneys erred in choosing to emphasize the Defendant's relationship with Rev. Johnson and the minister's opinion about the Defendant's redemptive qualities." ([Vol. 32, Tab 76 at] 3517.) The circuit court also stated that "[i]f the purpose of such testimony [regarding Gavin's past] would have been to 'humanize' the Defendant, the portrayal of the Defendant as the product of a violent family from a violent, gang ridden, and drug-infested Chicago ghetto where the Defendant had previously committed a murder would not be likely to achieve that result in the eyes of a Cherokee County, Alabama, jury." ([Vol. 32, Tab 76 at] 3517.)

> . . . .

> In the affidavit he submitted, Gavin's lead trial attorney stated that he had "initiated contact almost immediately with Lucia Penland of the Alabama Prison Project (APP) to obtain the services of the APP to investigate matters involving mitigation." ([Vol. 23 at] 984.) In his one meeting with Penland, Gavin "adamantly refused to discuss mitigation matters." ([Vol. 23 at] 984.) Attorney Smith also indicated that, while Penland was in Chicago, members of Gavin's family "refused to speak with her, apparently because the Defendant had not authorized them to speak with [Gavin's] defense team." ([Vol. 23 at] 984.)

> At the evidentiary hearing held on Gavin's petition Penland testified that during her interview with Gavin, which occurred on April 28, 1999, Gavin was hesitant to provide any mitigation evidence and insisted that he had not committed the murder. Gavin did, however, provide Penland with "[b]asic background information" such as his

educational, medical, and family histories. ([Vol. 38 at] 321.) Penland testified that she "had a difficult time . . . convincing [Gavin] to give [her] any information." ([Vol. 38 at] 346.) Penland also said that, at the insistence of Gavin, Gavin's mother would not speak with her while Penland was in Chicago. Penland stated that she did not know how much investigative work regarding mitigation attorney Smith had conducted on his own.

Penland stated that she had not completed her investigation of mitigation evidence before the commencement of Gavin's trial. Correspondence between Penland and attorney Smith demonstrates that, on October 13, 1999, Penland sent a facsimile to Smith in which Penland urged Smith to request a continuance "based on the information [APP was] developing, along with the lack of cooperation [APP had] encountered, and the time factor on [Penland's] part – having just this Monday finished with a trial on a prior case – which has not allowed [APP] to be further along than [APP was] at [that] time." ([Vol. 21 at] 490.) Smith replied to Penland in a letter stating that asking for a continuance based in part on the lack of cooperation by Gavin and Gavin's family "would . . . not only not be persuasive toward a continuance, but would in fact be counterproductive in that regard as well as towards [Gavin] as a whole." (C. 496.) Smith requested that Penland forward to him "any information [she had] obtained in Mr. Gavin's case." ([Vol. 21 at] 496.)

Based on the foregoing, we are unable to say that the investigative steps taken by Gavin's trial counsel were unreasonable, and the circuit court did not err in denying this claim.

Moreover, we have conducted our own de novo review and have reweighed the alleged omitted mitigation evidence against the evidence that was presented at Gavin's trial and sentencing hearing. *See Wiggins v. Smith*, 539 U.S. 510 (2003). The trial court found the existence of three aggravating circumstances: (1) that the capital offense was committed while Gavin was under a sentence of imprisonment, see § 13A-5-49(1), Ala. Code 1975; (2) that Gavin had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala. Code 1975; and

(3) that the murder was committed during the course of a robbery in the first degree, see § 13A-5-49(4), Ala. Code 1975. Additionally, the trial court found that no statutory mitigating circumstances existed and that there were no nonstatutory mitigating circumstances. The evidence presented at Gavin's Rule 32 evidentiary hearing was to a great extent centered around Gavin's childhood in Chicago and imprisonment and, as the circuit court noted, likely would have been given very little weight by the jury. *See, e.g., Washington*, 95 So. 3d at 45-46. Thus, we agree with the circuit court that the admission of this evidence would not have changed the verdict in the penalty phase.

Accordingly, Gavin has failed to establish that he was prejudiced by the alleged omission of the above mitigating evidence. We agree with the circuit court that this testimony would have been unlikely to have humanized Gavin with his jury, and the circuit court correctly denied this claim.

(Vol 46, Tab 85 at 33-43) (footnote omitted). Mr. Gavin argues that this decision "involved an unreasonable application of the clear precedent from *Strickland* and its progeny and was based on an unreasonable determination of the facts in light of the evidence before it." (Doc. 1 at 57).

To succeed on this claim, *Strickland* requires that Mr. Gavin show counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687. When examining counsel's performance at the penalty phase of trial, the court must decide "whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court." *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th

Cir. 2006). To meet the requirements of *Strickland*, counsel does not need to investigate "every conceivable line of mitigating evidence" regardless of its likelihood of benefitting the defendant at sentencing. *Pittman v. Sec'y, Florida Dep't of Corr.*, 871 F.3d 1231, 1250 (11th Cir. 2017) (quoting *Wiggins v. Smith*, 539 U.S. 510, 533 (2003)).

In fact, the *Strickland* standard does not even "require defense counsel to present mitigating evidence at sentencing in every case." *Id.* Rather, the *Strickland* standard for counsel's performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. And, of course, reasonableness depends upon the context of the particular case. *See Wiggins*, 539 U.S. at 522-23. This objective standard of reasonableness means that "whether the challenged actions of counsel were the product of a deliberate strategy or mere oversight" does not matter; counsel's actual motivation is not relevant but instead "what reasonably could have motivated counsel." *Pittman v. Sec'y, Florida Dep't of Corr.*, 871 F.3d at 1250 (quoting *Gordon v. United States*, 518 F.3d 1291, 1301 (11th Cir. 2008)).

Mr. Gavin claims that counsel were deficient for failing to investigate and present non-statutory mitigating evidence about his background. "Counsel's failure to 'conduct an adequate background investigation,' *Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1351 (11th Cir. 2011), or to pursue 'all reasonably available

mitigating evidence' can satisfy [*Strickland*'s deficient performance prong]. *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)." The Supreme Court has held that based on standards applicable in 1999 when Mr. Gavin was tried, attorneys representing capital defendants were obligated "to conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

In Mr. Gavin's case, counsel failed to conduct an adequate background investigation or pursue all reasonable available mitigating evidence. Although counsel hired Ms. Penland to conduct the mitigation investigation for them, counsel failed to adequately supervise and assist her to insure she had the information she needed to perform a mitigation investigation and that she knew when the information was needed for trial. This included failing to communicate with Ms. Penland at all, for months at a time.

The limited investigation Ms. Penland was able to perform raised red flags that should have compelled counsel to look further into Mr. Gavin's background. Despite the information from Mr. Sturman giving him a glimpse into Mr. Gavin's early life, and counsel's own admission that Mr. Gavin's family was finally "coming around and beginning to cooperate to some extent," counsel did not arrange for any family members other than Mr. Gavin's mother Annette to testify on Mr. Gavin's behalf.

Counsel called just two witnesses in the penalty phase, a minister who met Mr. Gavin while he was in jail after the murder, and Mr. Gavin's mother Annette – and neither offered much more than a plea that Mr. Gavin's life be spared. Although details of Mr. Sturman's interview with Annette had been provided to counsel, counsel did not ask her a single question about Mr. Gavin's background or upbringing – and actually admitted at the begining of her testimony that he had not prepared her to testify.

Counsel were totally unprepared for the penalty phase of Mr. Gavin's trial. Counsel's lack of preparation cannot be excused by the initial failure of Mr. Gavin and his family to cooperate with counsel or Ms. Penland, because Mr. Sturman was able to get mitigating evidence from Annette prior to trial. That counsel did not, at the very least, elicit the same evidence from Annette when she testified at the penalty phase is inexplicable.

Further, counsel made no attempt to "introduce documentary evidence through some of [Mr. Gavin's] family members" or to have the district attorney "stipulate to the admission of uncontested material," although he mentioned this possibility to Ms. Penland. Even worse, counsel failed to pursue further mitigating evidence after learning some of the details about Mr. Gavin's background from Mr. Sturman's interview with Annette. If counsel had pursued further investigation into Mr. Gavin's background, they could have uncovered the wealth of mitigating evidence provided

in the Rule 32 proceedings. This information included evidence of multi-generational dysfunction in Mr. Gavin's family,[15] domestic violence and impaired parenting,[16] community risk factors,[17] and the effect of imprisonment on Mr. Gavin.[18]

Counsel's minimal investigation – performed by Ms. Penland and Mr. Sturman – should have raised red flags in counsel's minds and counsel's failure to follow up on these was deficient under *Strickland. See Daniel v. Comm'r*, 822 F.3d 1248, 1267 (11th Cir. 2016); *Wiggins*, 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). Instead, "counsel abandoned their investigation of petitioner's background after having acquired only rudimentiary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524.

---

[15] Mr. Gavin's parents' families had histories of drug abuse, alcoholism, prostitution, and incarceration. Mr. Gavin's siblings were gang members with histories of drug use, violence, and incarceration.

[16] Mr. Gavin's father Willie, Sr., was physically abusive to Mr. Gavin's mother and to Mr. Gavin and his siblings. Mr. Gavin's mother was unable to take care of her adult responsibilities so Mr. Gavin tried to compensate for her shortcomings by committing crimes to get money to support the family.

[17] Mr. Gavin grew up in a gang-infested housing project in Chicago, living in overcrowded houses that were in poor condition, where he was surrounded by drug activity, crime, violence, and riots.

[18] After spending his entire adult life in prison, Mr. Gavin was unable to find legitimate work, leaving him susceptible to the negative influences around him.

Rather than pursuing the leads provided to him by Ms. Penland, counsel chose to go into the penalty phase of the trial with only two witnesses, Mr. Gavin's mother Annette and a minister who had just met Mr. Gavin while he was incarcerated in the Cherokee County Jail. Because counsel did not testify at the Rule 32 hearing,[19] we have no insight into counsel's decision to present only the two witnesses who did little more than plead for Mr. Gavin's life. But, as the Supreme Court has held, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 528 (quoting *Strickland*, 466 U.S. at 690-91). The limited investigation was unreasonable under the circumstances of what the limited investivation had revealed. Counsel even admitted to conducting only cursory interviews with Mr. Johnson and Annette, shortly before the penalty phase began.

Likewise, we have no insight into counsel's decision not to elicit testimony concerning Mr. Gavin's background from Annette. Had counsel questioned Annette about Mr. Gavin's background, she could have provided details into his troubled background. The Eleventh Circuit has held that counsel were deficient when the "very witnesses who were called by the defense to testify at [the defendant's] trial . . . could

---

[19] Mr. Gavin's main attorney Mr. Smith died before the Rule 32 hearing.

have provided detailed information about his . . . childhood if they had ever been asked." *Ferrell v. Hall*, 640 F.3d 1199, 1230 (11th Cir. 2011).

Trial counsel did not conduct an adequate background investigation, did not pursue all reasonably available mitigating evidence, and did not make a reasonable effort to present the mitigating evidence they had. Mr. Gavin has clearly established that counsel were deficient under *Strickland.* Thus, it follows that the Alabama Court of Criminal Appeals's finding to the contrary is objectively unreasonable.

Because Mr. Gavin has proven the first prong of *Strickland* – that counsel were deficient – this court must now determine whether counsel's deficient perfomance prejudiced him. Mr. Gavin must also meet a high burden to establish that counsel's deficient performance caused prejudice to his case. *See Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002). He cannot meet that high burden merely by showing "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* (quoting *Strickland*, 466 U.S. at 693). Instead, he must show "'a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart*, 476 F.3d at 1209 (quoting *Strickland*, 466 U.S. at 695).

In evaluating whether Mr. Gavin has shown a reasonable probability that, if counsel had not been deficient, he would not have been sentenced to death, the court

must "consider 'the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding' – and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. at 397-398) *see also Sears v. Upton*, 561 U.S. 945, 956 (2010) (holding that a proper prejudice analysis under *Strickland* must take into account the newly uncovered mitigation evidence, along with the mitigation evidence introduced during the penalty phase of the trial, to assess whether a reasonable probability arises that the petitioner would have received a different sentence after a constitutionally sufficient mitigation investigation.).

Mr. Gavin argues that he was prejudiced by counsel's failure to perform an adequate mitigation investigation, because the judge and jury "heard almost nothing that would humanize Mr. Gavin or allow them to accurately gauge his moral culpability." (Doc. 1 at 81). Counsel preseted none of the evidence Ms. Penland had uncovered. This evidence – though limited – would have "paint[ed] a vastly different picture of his background than that created by [Annette's] abbreviated testimony." *Williams v. Allen*, 542 F.3d at 1342. Nor did counsel pursue further information about Mr. Gavin's background that is the "kind of troubled history" the Supreme Court has "declared relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535 (citing *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("[E]vidence about the

defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse") and *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (noting that consideration of the offender's life history is a "part of the process of inflicting the penalty of death")).

If counsel had presented the evidence Mr. Gavin produced at the Rule 32 hearing, the jury would have heard evidence that Mr. Gavin's parents' families had histories of drug abuse, alcoholism, prostitution, and incarceration; Mr. Gavin's siblings were gang members with histories of drug use, violence, and incarceration; Mr. Gavin's father Willie, Sr., was physically abusive to Mr. Gavin's mother and to Mr. Gavin and his siblings; Mr. Gavin's mother was unable to take care of her adult responsibilities so Mr. Gavin tried to compensate for her shortcomings by committing crimes to get money to support the family; and that Mr. Gavin grew up in a gang-infested housing project in Chicago, living in overcrowded houses that were in poor condition, where he was surrounded by drug activity, crime, violence, and riots.

The Alabama Court of Criminal Appeals discounted the evidence of Mr. Gavin's background, finding that this evidence would "likely have been given very little weight by the jury." (Vol. 46, Tab 85 at 43). However, the Eleventh Circuit

Corut of Appeals and the United States Supreme Court disagree. "In the penalty phase of a trial, '[t]he major requirement . . . is that the sentence be individualized by focusing on the particularized characteristics of the individual." *Cooper*, 646 F.3d at 1354 (quoting *Armstrong v. Dugger*, 833 F.2d 1430, 1433 (11th Cir. 1987). "It is unreasonable to discount to irrelevance the evidence of [a defendant's] abusive childhood." *Porter*, 558 U.S. at 43. Rather, this information presents exactly the type of evidence that could have humanized Mr. Gavin in the eyes of the jury. *See Rompilla v. Beard*, 545 U.S. 374, 390-92 (2005) (defendant grew up in "the slum environment of Allentown, Pa."; early in his life, he came to the attention of the juvenile authorities and started a series of incarcerations for assaults commonly related to alcohol abuse; he dropped out of school after nine years, having scored no higher than third grade level; his parents were severe alcoholics; his mother drank while she was pregnant with him; his father frequently beat his mother and bragged about cheating on her; his mother stabbed his father on one occasion; his father was physically abusive to him; and his home had no indoor plumbing and no heat); *see also Porter*, 588 U.S. 30, 33-36 (2009) (defendant repeatedly witnessed his father beat his mother – once so severely that she was hospitalized; his father was violent every weekend, defendant was his father's favorite target; his father once shot at him for coming home late, then beat him because the bullet missed him; defendant

eventually joined the Army, serving in the Korean War where he suffered a gunshot wound; defendant was imprisoned for going AWOL from the Army; after leaving the Army, the defendant developed a serious drinking problem); *Wiggins*, 539 U.S. at 516-17 (defendant's mother was an alcoholic who frequently left him and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage; his mother was abusive, beating the children for breaking into the kitchen; his mother had sex with men while her children slept in the same bed; and his mother once forced his hand onto a hot stove burner and he had to be hospitalized for the burn; and at the age of six, he was placed into foster care where he was physically abused, molested, and raped); *Williams*, 529 U.S. at 370, 396 (defendant was mistreated, abused, and neglected during his early childhood; he was "borderline mentally retarded" and completed only the sixth grade in school; he had suffered repeated head injuries; he "might have [had] mental impairments organic in origin"; and experts testified that if he were kept in a structured environment, he would not pose a future danger to society); *Daniel*, 822 F.3d at 1265-66 (defendant's step-father terrorized all members of the household, often walking around the house carrying a gun and wearing a sash of bullets; his step-father often beat his mother and threatened her with various forms of torture; and the defendant was physically abused by his step-father at least twice a week, on one occasion suffering a ruptured kidney as a result of a

beating; the defendant and his siblings were reoutinely forced to perform sexual acts on each other while their step-father watched, then their step-father would engage in sexual acts with the defendant and his siblings); and *Johnson v. Sec'y*, DOC, 643 F.3d 907, 936-37 (11th Cir. 2011) (defendant's parents were abusive alcoholics; defendant was emotionally abused and he was physically abused more often than his siblings; defendant witnessed his mother's suicide attempts and evenutally found her body when she succeeded in killing herself).

The potentially mitigating evidence absent in the penalty phase of Mr. Gavin's trial "bears no relation to the few naked pleas for mercy actually put before the jury." *Rompilla*, 545 U.S. at 393. After reweighing the considerable evidence offered in aggravation – that the murder was committed while Mr. Gavin was under a sentence of imprisonment, that Mr. Gavin had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person, and that the murder was committed during the course of a first degree robbery – against the considerable evidence that could have been, but was not offered in mitigation – the court concludes that if counsel had not performed deficiently, but had offered the evidence offered at the Rule 32 evidentiary hearing, a reasonable probability exists that he would have been sentenced to life imprisonment rather than death. Because of the numerous Supreme Court cases discussed above placing value on such

mitigation evidence, the Alabama Court of Criminal Appeals's contrary finding is an unreasonable application of *Strickland*.

Mr. Gavin has established that counsel were constitutionally deficient during the penalty phase of his trial and that he was prejudiced as a result. Thus, habeas relief is due to be granted on this claim.

## D.  Prosecutor's Comments on Mr. Gavin's Failure to Testify

Mr. Gavin claims that his Fifth Amendment rights were violated by the state's repeated references to the fact that he did not testify at trial. (Doc. 1 at 90). Specifically, Mr. Gavin asserts that the theme of the state's closing argument was that the evidence against him was "uncontroverted":

> For example, [the state] argued that Meeks "saw Mr. Gavin shoot the driver. Now, is that a controverted fact? Absolutely not." [Vol. 11, Tab 20 at] 1094. The State continued summarizing Meeks' narrative for the jury-Meeks heard shots, he starting driving away, his car door hit Gavin causing it to close, and he turned back towards Leesburg-and then asserted once again that "[t]hose facts are uncontroverted." [Vol. 11, Tab 20 at] 1095. Additionally, the State argued that Danny Smith's testimony that Gavin fired a shot at him constituted "uncontroverted" evidence. [Vol. 11, Tab 20 at] 1098. And in arguing to the jury that there is only one reason Gavin would have been found in the woods, the State contended, "Why? You know why. The facts that we presented in this case are uncontroverted." [Vol. 11, Tab 20 at] 1102. In all, the State referred to "uncontroverted" evidence over a dozen times during the closing.

(*Id*. at 90-91). Mr. Gavin maintains that by characterizing all of the facts the state presented as uncontroverted, the state implicitly challenged Mr. Gavin to take the

stand to contradict the state's version of events and suggested to the jury that it could

treat Mr. Gavin's silence as evidence of his guilt. (*Id*. at 91).

In denying this claim on direct appeal, the Alabama Court of Criminal Appeals

found the following:

> Gavin contends that during closing arguments the prosecutor improperly commented on his decision not to testify. (Issue XIV in Gavin's brief.) Specifically, he maintains that the prosecutor made "thinly veiled" references to his decision not to testify by repeatedly referring to the facts, evidence, and testimony as "uncontroverted." (Gavin's brief at p. 121.) Gavin specifically objected to three of the prosecutor's references, but he did not do so until after the conclusion of the prosecutor's closing argument; therefore, his objection was not timely. In addition, he did not object to any of the other references about which he now complains on appeal. Thus, we review this claim only for plain error. *See* Rule 45A, Ala.R.App.P.

> The record reflects that during opening statements, Gavin's counsel [made] the following [statement]:

>> What you're going to hear over the next several days is some facts and the State's interpretation of those facts. But the Judge is going to tell you that your primary role in this case is to determine the facts and interpret those facts for yourself. And I ask you first and foremost, don't determine the facts in your mind until you've heard all the facts. In truth, while [the prosecutor] appears to have woven a very persuasive tale of two men or three men, there are few incontrovertible facts that he is going to present to you. There are a lot of unanswered questions. Indeed, there are a lot of unasked questions, questions that should have been asked, questions which I submit to you as a jury you're going to be asking yourself over the next few days, and you're not going to get the answers because the State is not going to tell you the answers to those questions because

136

they haven't asked the questions. It is incontrovertible and we will not argue that on the evening of March 6, 1998, someone shot William Clinton Clayton to death around 6:30, 6:40 p.m. right out here at the Regions Bank. And it is uncontroverted that some three hours, three hours and 15 minutes later Keith Gavin was arrested about 12 or 15 miles northwest of here in a wooded area up off of Highway 68 and the intersection of [Highway] 48 as [the prosecutor] told you, and that seven days later, the gun that the State alleges, and it appears fairly convincing, the gun that the State alleges was used to kill William Clinton Clayton was found in that same wooded area. The evidence is not going to show that there was any type of security between March the 6th, midnight, and March the 13th, seven days later when that gun was found, even though they were looking for it in that area for seven days and for seven days they couldn't find it, but after seven days of looking for it, they found the gun, but in that seven days there had been no security and they're not going to tell you that anything on that gun is going to connect itself, is going to connect that gun to Keith Gavin. But the evidence is going to show that that was Dewayne Meeks's gun. . . . And the evidence is going to show that when Mr. Meeks returned to Chicago, and not before, he reported to authorities that that gun had been stolen. . . . But those are pretty much incontrovertible facts about this case.

(R. 505-07.)(Emphasis added.)

During closing arguments, the prosecutor stated, in pertinent part:

I went back last night to when we concluded here and I began to look over some of the things that we both said during our opening statements, and one of the things that really struck me about what [Gavin's counsel] said was there were few uncontroverted facts and many questions that should have been answered. Well, I believe you've seen and heard at the conclusion of this case that there are

> a great many uncontroverted facts. In fact, I would venture
> to submit to you, ladies and gentlemen, that based on the
> evidence you heard, there are no gaps or facts that have not
> withstood the test of time and the test of truth.

> (R. 1091-92.) The prosecutor then began sifting through the evidence
> that had been presented during the trial, repeatedly referring to facts,
> evidence, and testimony as "uncontroverted." In all, the prosecutor used
> the term "uncontroverted" 15 times during his closing argument.

*Gavin v. State*, 891 So. 2d 907, 979-80 (Ala. Crim. App. 2003). The court found that

the prosecutor's references did not violate Mr. Gavin's constitutional rights. *Id.* at

983-85.

The Fifth Amendment "forbids either comment by the prosecution on the

accused's silence or instructions by the court that such silence is evidence of guilt."

*Griffin v. California*, 380 U.S. 609, 615 (1965). An indirect comment on silence

violates the Fifth Amendment only if "the statement was *manifestly intended* to be a

comment on the defendant's failure to testify" or "the statement was of such a

character that a jury would naturally and necessarily take it to be a comment on the

failure of the accused to testify." *Jones v. GDCP Warden*, 753 F.3d 1171, 1194 (11th

Cir. 2014) (emphasis in original) (citing *United States v. Knowles*, 66 F.3d 1146,

1162-63 (11th Cir. 1995) (internal quotation marks omitted)).

The Eleventh Circuit has strictly enforced the requirement that a defendant

show that the allegedly offensive comment was either manifestly intended to be a

comment on his silence or that the comment naturally and necessarily related to his silence. *Isaacs v. Head*, 300 F.3d 1232, 1270 (11th Cir. 2002). "The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury *necessarily* would have done so." *Knowles*, 66 F.3d at 1163. The defendant bears the burden of establishing the existence of one of the two factors and the comment must be examined in context, to evaluate the prosecutor's motive and to discern the impact of the statement on the jury. *Id*.

Mr. Gavin first challenges the portion of the state's closing argument in which the prosecutor characterized Mr. Meeks's testimony about the shooting as uncontroverted. (Doc. 1 at 90). The prosecutor argued:

> And you heard Mr. Meeks tell you that when he turned to look he saw a gun and he saw the driver, and he saw Mr. Gavin shoot the driver. Now, is that a controverted fact: Absolutely not. . . . What did Mr. Meeks tell you? He said after he heard the shots he pulled up, his door hit Mr. Gavin, it shut his door, he went to the right, turned right towards Leesburg. There is no disparity there, ladies and gentlemen. Those facts are uncontroverted.

(Vol. 11, Tab 20 at 1094-95).[20]

---

[20] In his reply brief Gavin also challenges – for the first time – the portions of the state's closing argument concerning "the whole of Meeks's testimony" and "addressing the possibility that Meeks himself had been the killer." (Doc. 38 at 57-58). The Eleventh Circuit Court of Appeals has repeatedly held that arguments raised for the first time in a reply brief are not properly before a reviewing court. *See, e.g., Herring v. Secretary, Dept. of Corrections*, 397 F.3d 1338 (11th Cir. 2005); *United States v. Coy*, 19 F.3d 629, 632 n. 7 (11th Cir.1994) (citation omitted); *United States v. Whitesell*, 314 F.3d 1251, 1256 (11th Cir.2002) (Court need not address issue raised for first time in reply brief), *cert. denied*, 539

The Alabama Court of Criminal Appeals determined:

> After thoroughly reviewing the prosecutor's closing argument, we conclude that the majority of the prosecutor's references to "uncontroverted" facts, testimony, and evidence were not directed toward Gavin's decision not to testify; they "merely refer[red] to the fact that the evidence was uncontradicted." *Arthur*, 711 So.2d at 1049. The comments did not "virtually identify" Gavin as the only person who could contradict the evidence, but were general comments, in direct response to Gavin's opening statement, on the fact that the majority of the State's evidence was uncontradicted.[21]

*Gavin*, 891 So. 2d at 983. Regarding the prosecutor's comment that Mr. Meeks's testimony about the shooting was uncontroverted, the appellate court found that the comments did not "virtually identify" Mr. Gavin as the only person would could contradict this evidence, because three other people witnessed the murder.[22] *Id*.

Mr. Gavin argues that the record does not bear out this view. (Doc. 1 at 91). He asserts:

---

U.S. 951 (2003); *United States v. Dicter*, 198 F.3d 1284, 1289 (11th Cir. 1999) (issue raised for first time in reply brief was waived); *United States v. Martinez*, 83 F.3d 371, 377 n. 6 (11th Cir. 1996) (declining to consider arguments raised for the first time in a reply brief); *See also* Rules Governing Habeas Corpus Cases Under Section 2254, Rule 2(c) (2008) ("The petition must . . . specify all the grounds for relief available to the petitioner[.]"). Thus, the court will not consider this claim because it is not properly before the court.

[21] In his opening statement, Gavin argued that only a "few incontrovertible facts that [the prosecutor] is going to present," but there were "a lot" of unanswered and unasked questions that should have been asked. (Vol. 8, Tab 17 at 504-05).

[22] Mr. Gavin argued in his brief on direct appeal that "[o]nly the Defendant could contradict Meeks' assertion (R. 671) that it was he who alighted from Meeks' van and shot Clayton." (Vol. 14, Tab 42 at 123).

Two of the eyewitnesses – Ronald Baker and Richard Henry – testified that they could not identify the shooter because they could not even see his face. R. 537; R. 545. At most, Henry stated that the shooter was a black male. R. 545. Similarly, as has been shown above, Twilley's identification of Gavin was highly unreliable to the point of being unconstitutional. Thus, as the jury was well aware, none of these men was in a position to contradict Meeks' testimony that Gavin, and not he, was the shooter-Gavin alone had that power.

(*Id*. at 91-92).

Mr. Gavin is correct that neither Mr. Baker nor Mr. Henry was able to contradict Mr. Meeks's testimony that Mr. Gavin was the shooter. Mr. Baker, who saw the shooter approach the victim's van, then heard gunfire, testified that he was unable even to identify the race of the shooter. (Vol. 8, Tab 18 at 535-36). Mr. Henry described the shooter as a black man, but testified that he did not see his face. (*Id*. at 546).

However, Mr. Twilley testified that he was able to see the shooter's face, and proceeded to identify Mr. Gavin at trial as the shooter. (*Id.* at 523, 529). Mr. Gavin argues that Mr. Twilley's identification of Mr. Gavin was "highly unreliable to the point of being unconstitutional." He implies that the jury was "well aware" that Mr. Twilley's identification of Mr. Gavin was unreliable, so the jury necessarily knew that Mr. Twilley could not have contradicted Mr. Meeks's testimony. But, the defense did not object to Mr. Twilley's identification of Mr. Gavin in court. Although defense counsel elicited testimony from Mr. Twilley on cross-examination that he did not

141

have a good view of the shooter and only saw the side of his face for a short time, Mr. Twilley was able to identify Mr. Gavin as the shooter, whether or not the identification procedure was constitutionally sound. Mr. Twilley was in a position to contradict Mr. Meeks's testimony if he disagreed with it. Thus, the jury could have thought the prosecutor was referring to Mr. Twilley and not necessarily to Mr. Gavin.

Mr. Gavin has failed to show that the state court's decision involved an unreasonable application of *Griffin*. Quite clearly, the prosecutor's references to uncontradicted facts were in response to Mr. Gavin's opening statement, in which he argued that the state could prove only a few incontrovertible facts. No evidence intimates that the prosecutor's comments were "manifestly intended" to comment on Mr. Gavin's failure to testify. Mr. Gavin has not shown that the jury would "naturally and necessarily" have viewed the prosecution's references to Mr. Meeks's testimony as being uncontradicted as a comment on Mr. Gavin's failure to testify, especially in light of the fact that Mr. Gavin was not the only one who could have contradicted Mr. Meeks's testimony. This claim is due to be denied.

Mr. Gavin further challenges the portion of the state's closing argument in which the prosecutor argued:

> You had the testimony of Danny Smith, and I won't go over his testimony at length because you heard it. He took you from the start when he got the BOLO, the be on the lookout, to the moment Mr. Gavin

fired those two shots at him, to the very instant that he ran him into the woods. Uncontroverted.

(Vol. 11, Tab 20 at 1098-99).

The Alabama Court of Criminal Appeals held that the prosecutor's reference

to Investigator Smith's testimony as uncontroverted violated *Griffin*:

> The record also reflects, however, that the prosecutor referred to Investigator Smith's testimony regarding his following the van and his identification of Gavin as the person who was driving the van and who shot at him as uncontradicted. It is clear from the evidence presented at the trial that the only person who could have contradicted Investigator Smith's testimony that it was, in fact, Gavin, who had been driving the van and who shot at him and then fled into the woods, was Gavin himself.

*Gavin*, 891 So. 2d at 983. However, it found the *Griffin* error to be harmless under

*Chapman v. California*, 386 U.S. 18 (1967):

> After thoroughly reviewing the entire record, we conclude that any error in the prosecutor's comment that Investigator Smith's testimony was uncontradicted was harmless. This particular remark was not one of the comments Gavin objected to at trial, thus indicating that, at the time it was made, Gavin did not believe the remark to be prejudicial. In addition, in response to Gavin's objection at trial, the prosecutor stated that he had not intended any of his references to "uncontradicted" evidence to be comments on Gavin's decision not to testify. Moreover, all of the prosecutor's references to "uncontradicted" facts, testimony, and evidence were in direct response to Gavin's opening statement. Finally, the evidence against Gavin in this case was overwhelming. *See, e.g., Thomas v. State*, 824 So.2d 1, 31-32 (Ala.Crim.App.)(noting that some factors to be considered in evaluating whether a prosecutor's comment was harmless are the lack of a contemporaneous objection, the prosecutor's intent in making the comment, and the overwhelming evidence of the appellant's guilt). In

143

light of the evidence presented in this case and the circumstances surrounding the prosecutor's comment, we conclude that any error was harmless beyond a reasonable doubt.

*Gavin*, 891 So. 2d at 984-85.

Mr. Gavin asserts that the state court unreasonably applied the *Chapman* harmless error standard. (Doc. 38 at 59-61). *Griffin* errors are subject to harmless error review. *See Chapman v. California*, 386 U.S. 18, 24-26 (1967). However, the *Chapman* standard, which holds that a constitutional violation is considered "harmless if the government can show beyond a reasonable doubt that the error did not contribute to the verdict," applies only on direct review, *Al-Amin v. Warden*, 932 F.3d 1291, 1298 (11th Cir. 2019).

> While a federal constitutional error may be considered harmless on direct review if the reviewing court can determine that it was harmless beyond a reasonable doubt, *see Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012), *cert. denied*, — U.S. — , 133 S.Ct. 861, 184 L.Ed.2d 675 (2013), a federal constitutional error is considered harmless on collateral review unless there is 'actual prejudice.' *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (internal quotation marks omitted). "Actual prejudice" requires that the error have had a 'substantial and injurious effect or influence' upon the verdict. *Id*. (internal quotation marks omitted). Under this standard, an error is not harmless where one is left in grave doubt as to whether the error substantially and injuriously affected or influenced the verdict. *See O'Neal v. McAninch*, 513 U.S. 432, 437-38, 115 S. Ct. 992, 995, 130 L.Ed.2d 947 (1995).

*Gay v. Sec'y, Fla. Dep't of Corr.*, 523 Fed. Appx. 560, 563 (11th Cir. 2013).

*Brecht*'s harmless error review is "necessarily fact-specific and must be performed on a case-by-case basis." *Mansfield*, 679 F.3d at 1313. To determine whether a trial error was harmless, this court must "consider the magnitude of the error, the effect of any curative instruction, and whether the prosecution otherwise presented overwhelming evidence of guilt to the jury." *Al-Amin*, 932 F.3d at 1300.

"Ultimately, 'for a federal court to grant habeas relief, it must be true both that the state court's application of the *Chapman* harmless beyond a reasonable doubt standard was objectively unreasonable and that the error had a substantial and injurious effect or influence on the verdict.'" *Al-Amin*, 932 F.3d at 1299 (quoting *Mansfield*, 679 F.3d at 1307-08)). However, because a petitioner must satisfy both tests to obtain habeas relief, it necessarily follows that a federal court may deny habeas relief based solely on a determination that the error is harmless under the *Brecht* standard. *Mansfield*, 679 F.3d at 1308.

Mr. Gavin is unable to meet the *Brecht* harmless error standard. Although the prosecution used the term "uncontroverted" fifteen times during the its closing argument, the court finds that the repeated references to evidence being uncontroverted were in direct response to Mr. Gavin's opening statement in which he argued that the state would be able to present "few incontrovertible facts." (*See* Vol. 8, Tab 17 at 505). After arguing that the state would be able to present "few

incontrovertible facts," Mr. Gavin proceeded to identify the "few" incontrovertible facts, mentioning incontrovertible or uncontroverted facts three different times, and specifically referring to Mr. Meeks's eyewitness testimony as being "controvert[i]ble." (*Id.* at 506, 507 & 512).

In the state's closing argument, the prosecutor explained that he:

> went back last night to when we concluded here and I began to look over some of the things that we both said during our opening statements, and one of the things that really struck me about what [Gavin's counsel] said was there were few uncontroverted facts and many questions that should have been answered. Well, I believe you've seen and heard at the conclusion of this case that there are a great many uncontroverted facts. In fact, I would venture to submit to you, ladies and gentlemen, that based on the evidence you heard, there are no gaps or facts that have not withstood the test of time and the test of truth.

(Vol. 11, Tab 20 at 1091-92). The prosecutor then went through the evidence that had been presented at trial, pointing out the portions the state believed to be uncontroverted. Clearly, the jury had good reason to believe that the prosecution's references to uncontroverted evidence were simply in response to Mr. Gavin's assertion that not much of the evidence was incontrovertible – and not commentary on Mr. Gavin's failure to testify.

Additionally, the trial court instructed the jury that what lawyers say in court is not evidence, and further that the jury should not draw any inferences from Mr.

Gavin's decision not to testify. In its opening instructions to the jury, the trial court

stated:

> Now, what the lawyers say to you is not the evidence, but I think you
> will find it of some help to you, some assistance in helping you
> understand the case and understand what they expect to be able to prove
> to you during the course of this trial.

(Vol. 8, Tab 15 at 474). In its instructions to the jury prior to deliberations, the court

stated:

> Mr. Gavin has no burden of proof. Mr. Gavin is not required to
> prove his innocence because the law presumes that he is innocent. The
> defendant has the right under the law to elect not to testify. And if he
> does so elect, this creates no presumption against him. You should draw
> no inference nor any conclusion from the fact that Mr. Gavin did not
> testify, and the defendant's election not to testify should have no weight
> in reaching your verdict. In other words, the fact that Mr. Gavin has not
> testified in this case is not a matter that you should consider in your
> deliberations. Mr. Gavin has a right not to testify and the exercise of this
> right must not be used against him. Just as the presumption that Mr.
> Gavin is innocent remains with him throughout every stage of the trial,
> likewise, the burden of proof remains on the State of Alabama
> throughout every stage of the trial.

> . . . .

> In determining what the true facts are, you are limited to the evidence
> that's been presented in the form of the testimony from witnesses, and
> in the form of exhibits of proof as opposed to the matters that have been
> stated to you by the lawyers during the course of the trial. What the
> lawyers have said, both for the State and for the defendant, is not
> evidence. What they have argued to you at various points in the trial is
> not the evidence. The lawyers have a right and a duty at the appropriate
> times in the case to comment on the evidence and to draw reasonable
> inferences from the evidence as they argue their respective positions to

you. But the comments and the arguments of the lawyers is not evidence.

(Vol. 11, Tab 23 at 1182-83 & 1200). Jurors are presumed to follow instructions and Petitioner presented no basis to believe they did not do so in Mr. Gavin's case. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

Finally, the evidence of Mr. Gavin's guilt was overwhelming. As previously set out in detail, two of the four eyewitnesses to the crime, Mr. Twilley and Mr. Meeks, identified Mr. Gavin as the man who shot the victim. Investigator Smith, who heard the BOLO over his radio, spotted a van matching the description given over the radio and followed it. After a high speed chase, the driver suddenly stopped, exited the van, and fired two gunshots at Investigator Smith before fleeing into the woods. Investigator Smith found the shooting victim in the van after Mr. Gavin abandoned it. Law enforcement officers surrounded the wooded area and eventually located Mr. Gavin hiding in the woods, in a creek, under a bush. Investigator Smith had correctly identified the clothing Mr. Gavin had been wearing when he fled the van and ran into the woods, and identified him as the man who shot at him, then ran into the woods. After being apprehended in the woods, but prior to anyone telling him why he was being arrested or mentioning a shooting, Mr. Gavin spontaneously stated that he "hadn't shot anybody" and that he didn't have a gun. The murder weapon was found several days later, near the woods where Mr. Gavin had been taken into custody.

While Mr. Gavin was incarcerated awaiting trial, he told one of the jailers that he "did it," and that Mr. Meeks should not be in jail.

Nothing in the record suggests that the prosecution's reference to Investigator Smith's testimony as uncontroverted had a "substantial and injurious effect or influence" on the verdict. Given the context in which the prosecution argued the evidence was incontrovertible, the court's clear instructions to the jury that the lawyer's arguments were not evidence, the court's clear instructions to the jury that no inference could be drawn from Mr. Gavin's failure to testify, and the overwhelming evidence of Mr. Gavin's guilt, Mr. Gavin did not suffer actual prejudice from any *Griffin* error. Because Mr. Gavin cannot satisfy the *Brecht* standard, the court need not consider whether the Alabama Court of Criminal Appeals unreasonably applied the *Chapman* harmless error standard in denying relief. *See Mansfield*, 679 F.3d at 1308.

## E.    Admission of Tainted Eyewitness Identifications

Mr. Gavin alleges that the trial court erroneously admitted eyewitness identification of him that consisted of, or was tainted by, impermissibly suggestive show-up procedures. (Doc. 1 at 93). He claims that the identifications of him at trial by Danny Smith and Larry Twilley were both unreliable and violated his due process rights. (*Id*. at 93-97).

### 1.     Danny Smith

Danny Smith, an investigator for the District Attorney of Cherokee and Dekalb Counties, testified that after hearing about the shooting on his police radio, he found the van matching the description of the van being driven by the shooter and chased the van. (Vol. 8, Tab 18 at 552-56). Suddenly, the van stopped in the middle of the road and the driver exited the van. (*Id*. at 556). The driver fired two shots at Investigator Smith before running into the woods. (*Id*. at 556-60). Investigator Smith testified that the gunman was wearing blue jeans, a maroon or wine colored shirt, and a cap or a toboggan. (*Id*. at 560). Within seconds, several police officers arrived and surrounded the wooded area where the gunman had fled, sealing it off so that "no one could come out and cross the road without being seen." (*Id*. at 562-63). Investigator Smith returned to the suspect's van to check on the victim of the shooting. (*Id*. at 563). He stayed with the victim until an ambulance arrived, then returned to the manhunt. (*Id*. at 563-69).

Investigator Smith briefly left the search scene around 9:30 p.m. to return to his office. (*Id*. at 569). When Investigator Smith was driving back to the search scene, he received word that the search team had apprehended the suspect. (*Id*. at 569-70). Investigator Smith testified that he met the vehicle that was transporting the suspect to the jail at around 10:30 p.m., so he could talk to the officers who had apprehended

the suspect and "look at the suspect that they had in custody to make sure that they, in fact, had the right person." (*Id*. at 570).

Following a hearing in which Mr. Gavin unsuccessfully objected to Investigator Smith's identification testimony, Investigator Smith testified at trial that the suspect he saw in the patrol car was the same person who had shot at him earlier that night. (*Id*. at 593). Investigator Smith then positively identified Mr. Gavin at trial as the person who had been driving the van, who had shot at him, and who he had seen in the back of the patrol car. (*Id*. at 594).

Mr. Gavin contends that Mr. Smith's identification of him violated his due process rights because it resulted from an unnecessarily and impermissibly suggestive show-up lineup. (Doc. 1 at 95-97). Specifically, he argues that:

> A "showup" lineup – such as Officer Smith's identification of Gavin in the police vehicle – "has been widely condemned" because it is especially suggestive. *Stovall* [*v. Denno*], 388 U.S. [293] at 302. And here, . . . the circumstances are far more suggestive than a photo array because Officer Smith was not merely shown a photo of the suspect, he was instructed to view Gavin while Gavin was handcuffed in the back of a police vehicle. *See Biggers v. Tennessee*, 390 U.S. 404, 407 (1968) (Douglas, J., dissenting) ("Whatever may be said of lineups, showing a suspect singly to a victim is pregnant with prejudice. The message is clear: the police suspect this man.").

(*Id*. at 96-97).

In denying this claim on direct appeal, the Alabama Court of Criminal Appeals found that the show-up was not unnecessarily and impermissibly suggestive:

Investigator Smith, a trained law-enforcement officer, requested that the officers transporting Gavin to the jail meet him in Leesburg so that he could "look at the suspect that they had in custody to make sure that they, in fact, had the right person." (R. 570.) It is clear from Investigator Smith's testimony that his identification of Gavin in the patrol car was not based on any preconceived notion that the person the police had in custody was, in fact, the person who had shot at him, but rather, was a precautionary measure to ensure that the right man was in custody so that the manhunt that had been going on for a little over three hours could be called off. *See, e.g., Davis v. State*, 216 Ga.App. 580, 581, 455 S.E.2d 115, 116 (1995)("It is recognized that any psychological effect a one-on-one showup may have on a potential witness is greatly diminished when that witness is a law enforcement officer who, through experience, training or both, has learned certain witness identification techniques and procedures."), and *People v. Cinatus*, 200 A.D.2d 754, 754, 607 N.Y.S.2d 363, 364 (1994)(holding "that the witness was a police officer is relevant in determining whether or not the identification procedure employed was unduly suggestive"). Under these circumstances, we find that the one-man showup was not unnecessarily or impermissibly suggestive.

*Gavin*, 891 So. 2d at 960-961. The court went on to find that even if the showup was unnecessarily and impermissibly suggestive, the likelihood that Mr. Gavin was misidentified was low:

However, even assuming that the showup was unnecessarily and impermissibly suggestive (which we hold it was not), it was not so "'"'conducive to irreparable mistaken identification' . . . or had such a tendency 'to give rise to a very substantial likelihood of irreparable misidentification' . . . that allowing the witness to make an in-court identification would be a denial of due process."'" *Ex parte Appleton*, 828 So.2d at 900, quoting *Brazell v. State*, 369 So.2d 25, 29 (Ala.Crim.App. 1978). Applying the five factors set forth in *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), we conclude that the likelihood of misidentification in this case was low.

First, Investigator Smith had ample opportunity to view Gavin at the time of the crime. Investigator Smith testified that although it was dark and it had begun raining, when Gavin shot at him the first time, while standing in the middle of the road, Gavin was illuminated by the headlights from Investigator Smith's vehicle and from the headlights of oncoming traffic. In addition, according to Investigator Smith, when Gavin first got out of the van, he took the time to aim before firing at Investigator Smith.

Second, Investigator Smith's degree of attention at the time of the crime was clearly high as he was a trained law-enforcement officer. As noted by the United States Supreme Court in addressing a similar issue in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977):

> [A]s a specially trained, assigned, and experienced officer, he could be expected to pay scrupulous attention to detail, for he knew that subsequently he would have to find and arrest [the suspect]. In addition, he knew that his claimed observations would be subject later to close scrutiny and examination at any trial.

432 U.S. at 115, 97 S.Ct. 2243. *See also People v. Rupert*, 192 A.D.2d 1072, 1073, 595 N.Y.S.2d 998, 999 (1993)("[T]he danger of misidentification was greatly reduced because this confirmatory identification was made by police officers who are trained to be both accurate and objective.").

Third, the record reflects that after Gavin fled into the woods, Investigator Smith provided a description of him to other law-enforcement personnel. Investigator Smith testified that he described Gavin as a black male, wearing a maroon or wine-colored shirt, blue jeans, and some type of toboggan cap or other cap on his head. When Gavin was found, he was wearing blue jeans and a wine-colored shirt; although he was not wearing a toboggan cap, a toboggan cap was found at a point near where Gavin had entered the woods. We recognize that as part of his initial description, Investigator Smith also stated that based on the "thickness" of the gun as he saw it,

he believed, but "wasn't sure" (R. 604), that Gavin had a revolver when, in fact, the weapon found was a .40 caliber semiautomatic Glock pistol; however, we do not believe this discrepancy undermines Investigator Smith's otherwise accurate description of Gavin.

Fourth, Investigator Smith testified that when he saw Gavin in the patrol car later that evening, he was positive that the right man was in custody. He also positively identified Gavin at trial. And finally, only a little over three hours had elapsed between the crime and the identification.

Under the circumstances, we conclude that the trial court did not err in allowing Investigator Smith's identification testimony.

*Id*. at 961-62 (footnote omitted).

Mr. Gavin argues that this holding was "based on an unreasonable determination of the facts and an unreasonable application of [*Neil v.*] *Biggers*[, 409 U.S. 188 (1972),] because it ignored critical facts contrary to its determination and gave undue deference to Smith's status as a law enforcement officer rather than the victim of a crime." (Doc. 38 at 64).

A criminal conviction may not constitutionally rest upon an identification derived from a procedure that was "unnecessarily suggestive or conducive to irreparable mistaken identification." *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). *See also Manson v. Braithwaite*, 432 U.S. 98, 104 (1977); *Neil*, 409 U.S. at 198. But, a suggestive identification procedure, alone, does not violate due process. *See Neil*, 409 U.S. at 198-99. Rather, to violate due process, the "identification procedure used

by the police must be unnecessarily suggestive and create a substantial risk of misidentification." *Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987) (citing *Neil*, 409 U.S. 188 (1972)). The "central question" is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil*, 409 U.S. at 199. *See also Manson*, 432 U.S. at 114 ("Reliability is the linchpin in determining the admissibility of identification testimony.").

The Supreme Court has identified several factors to be used in evaluating the "likelihood of misidentification," including (1) the opportunity of the witness to view the perpetrator at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the accused, (4) the level of certainty demonstrated by the witness at the time of the confrontation, and (5) the length of time between the crime and the confrontation. *Neil*, 409 U.S. at 199-200.

"Although show-ups are widely condemned, immediate confrontations allow identification before the suspect has altered his appearance and while the witness' memory is fresh, and permit the quick release of innocent persons." *Johnson*, 817 F.2d at 729 (citations omitted). Thus, "[t]he due process check for reliability . . . comes into play only after the defendant establishes improper police conduct." *Perry v. New Hampshire*, 565 U.S. 228, 241 (2012) (citing *Manson*, 432 U.S. at 112-13).

Mr. Gavin challenges Investigator Smith's identification of him after a show-up in the police vehicle immediately after he was apprehended in the woods. Because nothing suggests that the police aggravated the suggestiveness of the show-up, the confrontation was not unnecessarily suggestive. Rather, the immediate identification of the suspect was necessary for law enforcement to insure they had apprehended the correct person.

Moreover, even if the out-of-court identification of Mr. Gavin had been unnecessarily suggestive, the identification met the *Neil v. Biggers* test and was nonetheless reliable. As the Alabama Court of Criminal Appeals noted, Investigator Smith had ample opportunity to view Mr. Gavin; his degree of attention at the time was high because he was a trained law enforcement officer; his description of Mr. Gavin's clothing proved to be accurate; he indicated that he was positive Mr. Gavin was the perpetrator; and just over three hours had elapsed between the crime and the identification.

Mr. Gavin argues that the Alabama Court of Criminal Appeals gave undue deference to Investigator Smith being a law enforcement officer rather than a victim of the crime. (Doc. 38 at 65). However, as the Alabama Court of Criminal Appeals pointed out, the Supreme Court has held:

> as a specially trained, assigned, and experienced officer, he could be expected to pay scrupulous attention to detail, for he knew that

subsequently he would have to find and arrest [the suspect]. In addition, he knew that his claimed observations would be subject later to close scrutiny and examination at any trial.

*Manson*, 432 U.S. at 115. Mr. Gavin has offered nothing to support his theory that after he shot at Investigator Smith, Investigator Smith became a victim of the crime, unable to perform his normal duties as a law enforcement officer. In fact, Investigator Smith continued on with his law enforcement duties after Mr. Gavin shot at him and fled into the woods.

Mr. Gavin further alleges that the Alabama Court of Criminal Appeals ignored Investigator Smith's testimony that when he first saw the perpetrator, it was "dusky dark," it was "beginning to mist a little," and that the perpetrator was silhouetted from the back with headlights from another vehicle that had almost hit the perpetrator. (Doc. 38 at 65). He maintains that these details of Investigator Smith's testimony establish that he did not have ample opportunity to view the perpetrator or the degree of attention necessary to positively identify the perpetrator. (*Id*. at 66).

However, the Alabama Court of Criminal Appeals acknowledged and considered this testimony:

> Investigator Smith testified that although it was dark and it had begun raining, when Gavin shot at him the first time, while standing in the middle of the road, Gavin was illuminated by the headlights from Investigator Smith's vehicle and from the headlights of oncoming traffic.

*Gavin*, 891 So. 2d at 961. Moreover, Investigator Smith never indicated that these facts prevented him from sufficiently viewing the perpetrator to identify him. Investigator Smith testified that he was able to "get a good look at the man who came out of that van," correctly identified Mr. Gavin as a black male, and correctly described the clothing Mr. Gavin was wearing at the time. (Vol. 8, Tab 18 at 556, 560).

Based upon these facts, the Alabama Court of Criminal Appeals's finding that the trial court did not err in allowing Investigator Smith's identification testimony was not unreasonable.

### 2. Larry Twilley

Mr. Gavin further alleges that Larry Twilley's in-court identification of Mr. Gavin as the man who shot the victim was unreliable in violation of his due process rights. (Doc. 1 at 93-94). Mr. Twilley was an eye-witness to the murder. (Vol. 8, Tab 18 at 519-29). Mr. Twilley testified that he was in his car, stopped at a red light, when he heard "a loud noise" that caught his attention. (*Id*. at 519-20). When he turned around to identify the noise, he saw a "black guy" with very little hair and a goatee jerking open the door to a van being driven by an "older white man." (*Id.* at 519-21). Mr. Twilley saw the black man with a gun – then heard the black man fire two shots at the older white man. (*Id*. at 522). Mr. Twilley watched the black man "give the

[white] guy a push," get into the van, then drive off in the van. (*Id.*). Mr. Twilley described the shooter as not "real heavy, but [not] slim." (*Id.* at 521). When asked if the shooter was wearing a cap or anything on his head, Mr. Twilley testified that he "kept seeing something seems like something red, but [he did not] know if it was on his head or not." (*Id.*). Mr. Twilley stated that he was able to see the side of the shooter's face when he "turned and came around," but added that his "hairline is what stood out the most." (*Id.* at 523). Mr. Twilley explained that although the shooter had something red and black around his head at first, "[w]hen he come around the corner, he didn't have anything on his head." (*Id.* at 529). When asked if he could identify the shooter, Mr. Twilley pointed to Mr. Gavin who was sitting in the courtroom at a table with his lawyers. (*Id.*). Defense counsel did not object to Mr. Twilley's identification of Mr. Gavin as the shooter.

Mr. Gavin alleges that "Twilley's in-court identification of Mr. Gavin approximately 18 months after the crime was the first and only time the State sought such an identification" and "no evidence [showed] that Twilley ever selected Gavin out of a photo or in-person lineup." (Doc. 1 at 94). He asserts that Mr. Twilley's identification of Mr. Gavin in court was unduly suggestive because Mr. Gavin was the sole black man seated at the defense table. (*Id.*). Mr. Gavin concludes that Mr. Twilley's identification of Mr. Gavin was "so unnecessarily suggestive and conducive

to irreparable mistaken identification" that he was denied due process of the law. (*Id*. at 95).

When Mr. Gavin raised his tainted eyewitness identification claim on direct appeal, he focused almost entirely on Danny Smith's identification of Mr. Gavin as the shooter. In his appellate brief, Mr. Gavin noted that "both Smith and Twilley saw the perpetrator at significant distances, and for only a few seconds each" and that "the events surrounding both initial observations were violent and stressful, including gunfire." (Vol. 14, Tab 42 at 90). Mr. Gavin's only argument concerning Mr. Twilley's identification of him as the shooter was that it failed "to meet the parameters set out in the consensus of modern research for producing a reliable identification, and it was plain error under Ala.R.A.P. 45A to admit it, the lack of a specific objection notwithstanding." (*Id*.).

The Alabama Court of Criminal Appeals denied the claim in a footnote:

> We note that Gavin also contends that the trial court erred in allowing Twilley to identify him at trial. Gavin did not object to Twilley's identification, and his entire argument on appeal regarding Twilley's identification is: "Twilley's identification likewise fails to meet the parameters set out in the consensus of modern research for producing a reliable identification, and it was plain error under [Ala.R.App.P.] 45A to admit it, the lack of a specific objection notwithstanding." (Gavin's brief at p. 90.) We have reviewed the record and conclude that the trial court did not err in allowing Twilley to identify Gavin at trial.

*Gavin*, 891 So. 2d at 962 n. 23.

The respondent argues that Mr. Gavin is procedurally barred from raising his claim that Mr. Twilley's in-court identification of him was unduly suggestive because it is not the same claim he presented on direct appeal. (Doc. 43 at 39). Mr. Gavin counters that the claim cannot be barred as procedurally defaulted because the state court addressed the merits of the claim. (Doc. 38 at 80).

As previously mentioned, Mr. Gavin did allege in his direct appeal brief that "both Smith and Twilley saw the perpetrator at significant distances, and for only a few seconds each" and that "the events surrounding both initial observations were violent and stressful, including gunfire." (Vol. 14, Tab 42 at 90). However, Mr. Gavin did not state his claim as it pertained to Mr. Twilley as a violation of federal law. Rather, he set apart his claim concerning Mr. Twilley in a separate paragraph at the end of his argument, clearly alleging only that Mr. Twilley's identification of him failed to "meet the parameters set out in the consensus of modern research for producing a reliable identification, and it was plain error under Ala.R.A.P. 45A to admit it." (Vol. 14, Tab 42 at 90).

Mr. Gavin's claim in this court alleges new facts – that "Twilley's in-court identification of Gavin approximately 18 months after the crime was the first and only time the State sought such an identification" and there is "no evidence that Twilley

ever selected Gavin out of a photo or in-person lineup"– and clearly states the claim as a violation of his federal due process rights. (Doc. 1 at 93-95).

The claim is procedurally barred from review in this court because Mr. Gavin never presented the current claim in state court. *See Teague v. Lane*, 489 U.S. 288 (1989). It is of no consequence that the Alabama Court of Criminal Appeals denied his claim concerning Mr. Twilley on the merits, because Mr. Gavin raised a different claim in that court.

**F.    Violation of Mr. Gavin's Right of Self-Representation**

On March 9, 1998, H. Bayne Smith and John H. Ufford, II, were appointed to represent Mr. Gavin. (Vol. 1, Tab 1 at 9). On September 22, 1998, Mr. Gavin filed a pro-se motion requesting that counsel be dismissed for "conflict of interest," "ineffective assistance of counsel," "misrepresentation," and "plain lack of interest," and further requesting that "new counsel's [sic] be appointed to represent" him. (*Id*. at 17).

Mr. Gavin withdrew the motion on October 13, 1998, informing the court that "after talking to them that day, Mr. Ufford, we got everything understood now." (Vol. 5, Tab 6 at 9). Mr. Gavin indicated his desire that his case be postponed, with Mr. Smith and Mr. Ufford remaining as his counsel, giving counsel more time to prepare

162

for his trial. (*Id*. at 9-10). The court postponed the trial at Mr. Gavin's request. (*Id*. at 11-12).

On July 14, 1999, Mr. Gavin moved to renew his motion to dismiss his attorneys for "those reasons stated," and again asked the court to "appoint another counsel." (Vol. 1, Tab 1 at 69). The trial court held a hearing on the motion on August 10, 1999. (Vol. 13, Tab 40 at 1549-63). Mr. Gavin testified that his attorneys were "not putting no emphasis on [his] innocence" and that they were "biased and inaccurate, ineffective to handle [his] case under due process of law to represent [him] in this serious matter charges." (*Id*. at 1552). He added that Mr. Smith was "not ready" and "not at all concerned about [his] life or [his] innocence." (*Id*. at 1554). Mr. Gavin stated that he hated for the court to "have to appoint another attorney and then we have to start over again," but that he was "willing to wait another year" before going to trial even if it meant he had to "sit here another year until [he got] some attorneys who are willing to seek the truth." (*Id*. at 1554-55). Mr. Smith stated that he was fully prepared to try Mr. Gavin's case, but felt confident that if the court decided to remove him from the case, his experts could "work just as smoothly with someone else." (*Id*. at 1556). The court denied Mr. Gavin's renewed motion to dismiss his counsel on August 12, 1999. (Vol. 1, Tab 1 at 79).

On November 2, 1999, at the beginning of the second day of jury selection, Mr. Gavin orally moved for a mistrial and to have Mr. Smith "removed as [his] defense attorney in this matter on the grounds of conflict of interest, misrepresentation, and poorly advisement." (Vol. 7 at 293). Mr. Gavin indicated that he and Mr. Smith had been "bickering back and forth about the truth, the facts, the evidence, and the law concerning this case," and that Mr. Smith had tried to pressure him into taking a plea deal for life imprisonment. (*Id*. at 294). Mr. Gavin explained that he wanted to have Mr. Smith removed from his case and for the court to declare a mistrial because

> I've been telling Mr. Bayne Smith from the very day that I am innocent of shooting Mr. William Clayton. He doesn't hear me, Judge. He tried to persuade me. Not only that, he tried to pressure me into taking this plea of life imprisonment without the possibility of parole. He went as far as calling my investigator to have him call my mother and pressure her into telling me or convincing me to plead to this case, this charge, when I'm not guilty of it. That's why I'm asking you to declare this as a mistrial at this moment because this is, my life is at stake. It doesn't matter, really, what people think when it comes to an innocent person. Mr. Bayne Smith does not hold me as presumably innocent until proven guilty. He don't have that presumption of innocence from his standpoint. True, he might have did a lot of work, that's procedure, that's his job to do a lot of work or whatever work he might have done, but the fact of the matter is, Judge, he cannot go in this trial in front of this jury with a clear conscious [sic] and try to defend me with his complete heart. It is not there with him. It would be, it would be a gross miscarriage of justice if I am forced to go to trial with Mr. Bayne Smith as my lead attorney in this matter. This is my third request to have Mr. Bayne Smith removed. The first one, I withdrew that one under advisement of Mr. Ufford, to my right. The second one, you've written an Order on that and denied my motion to have Mr. Bayne Smith removed from this case. Judge, I'm sorry I have to come to you like this here, but, I've been

trying to work with Mr. Bayne Smith. Mr. Bayne Smith doesn't want to work with me. Our differences is irreconcilable and it's not going to get any better.

(*Id*. at 294-95). Mr. Gavin stated that Mr. Ufford was "assumably neutral," but "shares the same views of Mr. Smith," and had declined Mr. Gavin's request to take the lead in his defense. (*Id*. at 296). The court denied Mr. Gavin's motion for a mistrial and his motion to remove his "attorneys." (*Id*. at 302).

Mr. Gavin contends that the trial court's denial of his motion to dismiss counsel violated his Sixth Amendment right to represent himself at trial. (Doc. 1 at 99). The Alabama Court of Criminal Appeals denied this claim on the merits on direct appeal:

> On appeal, Gavin contends that the trial court's denial of his motion to remove Smith as his lead counsel denied him his right to represent himself because, he says, he made a "particularized request to proceed *pro se*." (Gavin's brief at p. 74.) The record refutes this claim. Contrary to Gavin's contention, at no point during the colloquy did he request to proceed *pro se*. In addition, a review of the colloquy clearly shows that Gavin did not want to proceed *pro se*. As the State correctly points out in its brief to this Court, Gavin's request to remove his counsel was directed solely at Smith. Gavin specifically stated that he and Smith had been having problems communicating, but that his relationship with Ufford was "neutral," and he never requested that Ufford be removed as his counsel, thus indicating that he did not, in fact, want to proceed *pro se*. However, even assuming that Gavin's request was directed at both Smith and Ufford, Gavin did not merely move to have counsel removed, he requested a mistrial, thus further showing that he did not want to proceed *pro se*, but that he wanted the trial delayed so that new counsel could be appointed. Contrary to Gavin's contention, his right to represent himself is not implicated in this case. *See, e.g., Ex parte Clemons*, 720 So.2d 985 (Ala. 1998).

*Gavin*, 891 So. 2d at 942-43 (footnote omitted).

Mr. Gavin maintains that the Alabama Court of Criminal Appeals's decision was based on an unreasonable determination of the facts and involved an unreasonable application of *Faretta v. California*, 422 U.S. 806 (1975). (Doc. 1 at 100). *Faretta* held that the Sixth Amendment right to counsel implicitly includes the right to self-representation. *Faretta*, 422 U.S. at 819, 833-334. To trigger the dictates of *Faretta*, a defendant must assert the right to self-representation "clearly and unequivocally, understandable to the trial court by the reasonable person standard." *Stano v. Dugger*, 921 F.2d 1125, 1144 (11th Cir. 1991).

Mr. Gavin argues that he made multiple attempts to invoke his right to self-representation, but the trial court ignored him. (Doc. 38 at 67). He contends that the record "plainly" shows that he wanted to proceed *pro se*:

> Gavin requested to represent himself on three separate occasions. On September 22, 1998, Gavin filed a pro se motion to dismiss his counsel. (Vol. 1 at 17-18.) After withdrawing the motion at a hearing, Gavin renewed his pro se motion to have counsel dismissed. (Vol. 1 at 69.) At the August 10, 1999 hearing on the motion, Gavin explained that he had withdrawn his earlier motion because counsel had "lured me into thinking that things could work out." (Vol. 13, Trial Tr. at 1552–53.) But he had come to realize that trial counsel was "putting no emphasis on my innocence," and that "there has been a conflict [with counsel] from the first day." *Id*. The trial court denied his motion. (Vo1. 1 at 71.) On November 2, 1999, Gavin again addressed the Court "to make a couple of motions . . . on behalf of myself as pro se," including a motion to remove his attorneys. (Vol. 7, Trial Tr. at 293.) While Gavin's more serious issues were with attorney Mr. Smith, and he felt more neutral

166

towards attorney Mr. Ufford, Mr. Ufford still "shares the same views of Mr. Smith." (*Id*. at 296.) The trial court then held "[t]he motion to remove your attorneys is denied." (*Id*. at 302 (emphasis added).) During this colloquy, Gavin made no mention of having new counsel appointed. (*See id*. at 293-302.)

In short, Gavin speaking on "on behalf of [him]self as pro se" asked for his attorneys – plural – to be removed. This is sufficient to invoke the right to self-representation. *See Ferguson*, 527 F.3d at 1147 ("To invoke his Sixth Amendment right under *Faretta* a defendant does not need to recite some talismanic formula hoping to open the eyes and ears of the court to his request." (internal quotation omitted)).

*Id*. at 67-68 (footnote omitted).

However, no indication in the record indicates that Mr. Gavin made an unequivocal request to represent himself. Rather, the record shows that Mr. Gavin's wish all along was for Mr. Smith to be dismissed from his case to allow for Mr. Ufford and/or some other court-appointed attorney(s) to represent him. In his September 22, 1998 motion, Mr. Gavin requested that the court "dismiss appointed counsels" and that "new counsel's be appointed to represent" him. (Vol. 1, Tab 1 at 17-18).

In his July 14, 1999 motion, Mr. Gavin requested that the court "remove counsel . . . and appoint another counsel." (*Id*. at 69). At the hearing on that motion, Mr. Gavin complained about both attorneys not being prepared to defend him, but clearly indicated that his desire was not to represent himself, but to have new, different counsel appointed to represent him:

I have tried to maintain my peace with Mr. Smith. It's not working, Judge. I hate for you to have to appoint another attorney and then we have to start over again, but I'm willing to wait another year before I go to trial. . . . But, if I have to sit here another year until I get some attorneys who are willing to seek the truth because the truth is in the pudding, Judge, it's right before his face and I'm getting nothing. I'm getting nothing out of him.

(Vol. 13, Tab 40 at 1354-55).

Then on November 2, 1999, just prior to trial, Mr. Gavin requested a mistrial and to have Mr. Smith removed as his attorney. (Vol. 7 at 293-302). Despite stating that he wanted to "make a couple of motions . . . on behalf of [him]self *pro se*," Mr. Gavin never even hinted that he wanted to represent himself in his capital murder trial. (*See Id.*). Rather, he asked for a mistrial and to have his "attorney" removed as his "defense attorney" because he and Mr. Smith had been "bickering back and forth" and Mr. Smith was trying to pressure him into entering a guilty plea. (*Id*. at 293-97). Mr. Gavin's only complaint about Mr. Ufford was that he "shares the same views as Mr. Smith" and that he had declined to "take the lead in the defense." (*Id*. at 296).

After the court heard Mr. Gavin's arguments, the following transpired:

THE COURT:     Did you indicate to me when we started that there were two motions that you wanted to make, one was for the mistrial and the other was for the removal of the attorney, Mr. Smith. Is there anything else that you have or other motion that you are making at this time?

168

| MR. GAVIN: | Yes, sir, I also would like to ask that you dismiss that second count, Section 13A-5-40, 13A-540 – 13A-5-40[(a)(13)] of the Code of Alabama. I believe that violates my Sixth and Eighth Amendment right to have that in the indictment. I'm asking the Court that you drop that count from the indictment. |
|---|---|
| THE COURT: | Is that Count Two of the indictment? |
| MR. GAVIN: | Yes, sir. |
| THE COURT: | What other motions do you have to make this morning? |
| MR. GAVIN: | That's it, Your Honor. That is it. |

(*Id*. at 296-97). The trial court denied the motion for mistrial and denied the "motion to remove [Mr. Gavin's] attorneys." (*Id*. at 302).

Despite the court's reference to the motion as a motion to remove his "attorneys," it appears from the record that Mr. Gavin was seeking only to remove Mr. Smith as his attorney. At no time during the November 2, 1999 argument on his motion, or in the two prior motions, did Mr. Gavin indicate that he was seeking to represent himself. Indeed, in his first two motions, Mr. Gavin specifically stated – in writing – that he wanted new counsel appointed to represent him. And, in the hearing on his second motion to dismiss Mr. Smith as counsel, Mr. Gavin specifically contemplated having to wait a year longer for his trial if new counsel were appointed.

The record simply does not support Mr. Gavin's claim that he made any attempt to invoke his right to self-representation. Thus, the Alabama Court of

Criminal Appeals's finding that *Faretta* is not implicated in this case is not unreasonable.

**G.    Violation of *Apprendi v. New Jersey* and *Ring v. Arizona***

Finally, Mr. Gavin claims that he was sentenced in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002), because the "key factual finding underlying the sentence in this case – that the aggravating circumstances outweigh the mitigating circumstances – was made by the judge rather than by a unanimous jury." (Doc. 1 at 101). Mr. Gavin argues that because *Ring* requires a jury to make any finding of fact that increases a defendant's authorized punishment, the jury – and not the trial judge – is required to make the "factual determination regarding the relative weight of aggravating and mitigating circumstances." (*Id*. at 102-03).

When Mr. Gavin raised this claim on direct appeal, the Alabama Court of Criminal Appeals denied the claim, holding that "Gavin's death sentence is not invalid under *Ring*." *Gavin*, 891 So. 2d 907, 987-88. Mr. Gavin asserts that this decision was an unreasonable application of *Apprendi* and *Ring*. (Doc. 60 at 61).

In *Ring*, the Supreme Court applied its ruling in *Apprendi* to capital cases. *Ring*, 536 U.S. at 584. *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory

170

maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. In applying *Apprendi* in the death penalty context, *Ring* held that aggravating circumstances used to justify an increase in the maximum punishment from life imprisonment to death become "the functional equivalent of an element of a greater offense," and must be found by a jury rather than a judge. *Ring*, 536 U.S. at 609.[23]

In *Hurst v. Florida*, 136 S. Ct. 616 (2016), the Supreme Court applied *Ring* to find Florida's previous capital sentencing scheme unconstitutional.[24] The Court in *Hurst* held that in light of *Ring*, Florida's former death penalty scheme violated the defendant's Sixth Amendment right to an impartial jury because it "required the judge alone to find the existence of an aggravating circumstance" to impose the death penalty. *Id*. at 624. Under Florida law, life imprisonment was the maximum sentence a defendant convicted of first degree murder could receive on the basis of his conviction alone. *Id*. at 620. A death sentence could be imposed only if an additional

---

[23] The holding in *Ring* does not apply retroactively to cases that were already final on direct appeal when the Court announced *Ring*. *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004). *Ring* applies to Mr. Gavin's case because his direct appeal was pending when *Ring* was decided. *Id*.

[24] Because *Hurst* had not been decided at the time Mr. Gavin's conviction became final on direct appeal, the court discusses *Hurst* "only to the extent it reflects an application and explication of the Supreme Court's holding in *Ring*." *Waldrop v. Comm'r, Alabama Dep't of Corr*., 711 F. App'x 900, 923 n.6 (11th Cir. 2017).

sentencing proceeding resulted in "findings by the court that such person shall be punished by death." *Id.*

The additional sentencing proceeding in Florida was a hybrid proceeding "in which [a] jury render[ed] an advisory verdict but the judge ma[de] the ultimate sentencing determinations." *Id.* (quoting *Ring*, 536 U.S. at 608, n.6). First, the sentencing judge was required to hold an evidentiary hearing before the jury, then the jury rendered an "advisory sentence" without specifying the factual basis for its recommendation. *Id.* Finally, the sentencing judge, notwithstanding the jury's recommendation, independently weighed the aggravating and mitigating circumstances and entered a sentence of life imprisonment or death. *Id.* Although the judge was required to give the jury's recommendation "great weight," the sentence was required to reflect the judge's "independent judgment about the existence of aggravating and mitigating factors." *Id.*

In Hurst's case, the advisory sentencing jury recommended the death penalty by a vote of seven to five, but did not indicate which one of the two aggravating factors charged by the sentencing judge it had found beyond a reasonable doubt. *Id.* at 619-20. The trial judge then sentenced Hurst to death, basing the death sentence in part on her independent determination that two aggravating factors existed, and assigning "great weight" to her findings as well as the jury's recommendation of

death. *Id.* at 620. The Supreme Court found that Florida's capital sentencing scheme violated *Ring* because it "*required the judge alone*," and not the jury, "to find the existence of an aggravating circumstance." *Id*. at 624 (emphasis added).

Alabama also bifurcates the guilt and penalty phases of capital trials. *See* Ala. Code § 13A-5-45. After a defendant is convicted of a capital offense, the trial court conducts a separate sentencing hearing to determine the defendant's sentence. *See* Ala. Code § 13A-5-45(a). A defendant convicted of a capital offense may not be sentenced to death unless "at least one aggravating circumstance as defined in 13A-5-49 exists." Ala. Code § 13A-5-45(f). Certain capital offenses, like murder during a robbery, and murder by a defendant convicted of another murder in the twenty years preceding the crime, for which Mr. Gavin was convicted, have built-in aggravating circumstances that correspond to the aggravating circumstances listed in § 13A-5-49. *Compare* Ala. Code § 13A-5-40(a)(2) (listing as a capital offense "[m]urder by the defendant during a robbery in the first degree") *with* Ala. Code § 13A-5-49(4) (listing as an aggravating circumstance that the "capital offense was committed while the defendant was engaged . . . in the commission of . . . robbery") and *compare* Ala. Code § 13A-5-40(a)(13) (listing as a capital offense "[m]urder by a defendant who has been convicted of any other murder in the 20 years preceding the crime") *with* Ala. Code § 13A-5-49(2) (listing as an aggravating circumstance that the "defendant

was previously convicted of another . . . felony involving the use or threat of violence to the person"). Alabama law provides that when a defendant is convicted of such a capital offense, "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing." Ala. Code § 13A-5-45(e).

The sentencing hearing usually takes place before the same jury that convicted the defendant. Alabama law at the time of Mr. Gavin's conviction and sentencing required the jury to "hear the evidence and arguments of both parties, deliberate, and return an advisory verdict recommending either life imprisonment without parole (if it determined that no aggravating circumstances existed, or that the aggravating circumstances did not outweigh the mitigating circumstances) or death (if it determined that one or more aggravating circumstances existed, and that they outweighed the mitigating circumstances)." *Waldrop v. Comm'r, Alabama Dep't of Corr.*, 711 F. App'x 900, 922 (11th Cir. 2017) (citing the pre-2017 version of Ala. Code § 13A-5-46(e)). After hearing the jury's advisory verdict, the court would then "independently determine the appropriate sentence." *Id*. (citing the pre-2017 version of Ala. Code § 13A-5-47(a)). "If the court found that at least one aggravating circumstance existed, and that they outweighed any mitigating circumstances, it could

impose a death sentence, notwithstanding a contrary jury recommendation." *Id*.; *see also* Ala. Code § 13A-5-47(e) (pre-2017 version).[25]

The Alabama Court of Criminal Appeals's decision was not an unreasonable application of *Apprendi* and *Ring*. Mr. Gavin became death-eligible under Alabama law when the jury convicted him of murder during a robbery, and murder by a defendant convicted of another murder in the twenty years preceding the crime, both of which are aggravating circumstances under Ala. Code § 13A-5-49(2) & (4). As explained above, Alabama law requires the existence of only *one* aggravating circumstance for a defendant to be death-eligible. In Mr. Gavin's case, the jury found the existence of *two* aggravating circumstances – that the capital offense was committed during a robbery and that it was committed after the defendant was previously convicted of a felony involving the use of violence to the person – when it returned guilty verdicts in the guilt phase of the trial. *See* 13A-5-45(e). Thus, every fact that made Mr. Gavin death-eligible was found by the jury, beyond a reasonable doubt, at the guilt phase of his trial. That finding by the jury comports with what *Ring* requires.

---

[25] In 2017, Alabama amended its capital sentencing laws. *See* S.B. 16, 2017 Leg., Reg. Sess. (Ala. 2017). Under the new sentencing scheme, the jury's sentence recommendation binds the court. *See* Ala. Code § 13-A-5-47(a) (2017) ("Where a sentence of death is not returned by the jury, the court shall sentence the defendant to life imprisonment without parole.").

Mr. Gavin argues that *Ring* requires more than a jury finding of the existence of an aggravating factor beyond a reasonable doubt. He contends that *Ring* also requires the jury – not the judge – to *weigh* the aggravating and mitigating factors. (Doc. 60 at 57). The Alabama Court of Criminal Appeals rejected this argument:

> Gavin also contends that the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requires that his sentence of death be vacated. (Issue I in Gavin's supplemental brief.) Gavin makes several arguments regarding the impact of *Ring*, all of which have been addressed and decided adversely to him either by this Court or by the Alabama Supreme Court. See Ex parte Smith, [Ms. 1010267, March 14, 2003] —— So.2d —— (Ala. 2003); *Ex parte Hodges*, 856 So.2d 936 (Ala. 2003); *Ex parte Waldrop*, 859 So.2d 1181 (Ala. 2002); *Clark v. State*, [Ms. CR–99–1062, June 27, 2003] —— So.2d ——, —— (Ala.Crim.App. 2000)(opinion on return to remand and on application for rehearing); *Ziegler v. State*, 886 So.2d 127, 150 (Ala.Crim.App. 2003)(opinion on return to remand); *Lee v. State*, [Ms. CR–00–0084, June 27, 2003] —— So.2d ——, —— (Ala.Crim.App. 2001)(opinion on return to remand); *Lewis v. State*, 889 So.2d 623 (Ala.Crim.App. 2003); *Peraita v. State*, [Ms. CR–01–0289, May 30, 2003] —— So.2d —— (Ala.Crim.App. 2003); *Martin v. State*, [Ms. CR–99–2249, May 30, 2003] —— So.2d —— (Ala.Crim.App. 2003); *McNabb v. State*, 887 So.2d 929, 989 (Ala.Crim.App. 2001)(opinion on application for rehearing); *Moody v. State*, 888 So.2d 532 (Ala.Crim.App. 2003); *Duke v. State*, 889 So.2d 1, 40 (Ala.Crim.App. 2002)(opinion on return to remand); *Stallworth v. State*, 868 So.2d 1128, 1177 (Ala.Crim.App. 2001)(opinion on return to second remand); *Harrison v. State*, 869 So.2d 509, 526 (Ala.Crim.App. 2002)(opinion on application for rehearing); *Turner v. State*, [Ms. CR–99–1568, November 22, 2002] —— So.2d —— (Ala.Crim.App. 2002); and *Tomlin v. State*, [Ms. CR–98–2126, November 22, 2002] —— So.2d ——, —— (Ala.Crim.App.2002)(opinion on application for rehearing). Gavin's death sentence is not invalid under *Ring*.

*Gavin*, 891 So. 2d at 987-88.

This conclusion is not "so unreasonable that no 'fairminded jurist' could agree with the conclusion." *Waldrop*, 711 F. App'x at 923 (citing *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Alabama Court of Criminal Appeals's conclusion that "Gavin's death sentence is not invalid under *Ring*" is consistent with Justice Scalia's explanation of the holding in *Ring*:

> What today's decision says is that the jury must find the existence of the fact that an aggravating factor existed. Those [s]tates that leave the ultimate life-or-death decision to the judge may continue to do so – by requiring a prior jury finding of aggravating factor in the sentencing phase or, more simply, by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase.

*Ring*, 536 U.S. at 612-13 (Scalia, J., concurring). Further, as the Eleventh Circuit has explained, the Alabama Court of Criminal Appeals's application of *Ring* is also consistent with *Hurst*, which held that "the Sixth Amendment does not allow the trial court 'to find an aggravating circumstance, *independent of a jury's factfinding*, that is necessary for imposition of the death penalty.'" *Waldrop*, 711 Fed. App'x at 924 (quoting *Hurst*, 136 S. Ct. at 624) (emphasis in Eleventh Circuit's opinion).

Additionally, Mr. Gavin's argument that *Ring* requires the jury – and not the judge – to weigh the aggravating and mitigating factors is foreclosed by *Lee v. Comm'r, Alabama Dept. of Corr.*, 726 F.3d 1172 (11th Cir. 2013).[26] In *Lee*, an

---

[26] Mr. Gavin acknowledges that *Lee* precludes this claim, but states that he seeks to preserve this issue for appeal and "respectfully submits" that *Lee* was "wrongly decided."

Alabama jury found the existence of an aggravating circumstance when it convicted the defendant of murder during the course of a robbery. *See id.* at 1197-98. The Eleventh Circuit concluded that "[n]othing in *Ring* – or any other Supreme Court decision – forbids the use of an aggravating circumstance implicit in a jury's verdict." *Id.* at 1198. The court further held that "*Ring* does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances." *Id*.

The Alabama Court of Criminal Appeals's rejection of Mr. Gavin's *Ring* claim was not an unreasonable application of *Apprendi* or *Ring*. Thus, Mr. Gavin is not entitled to relief on this claim.

## VI. CONCLUSION

For all these reasons, and after careful review, the court concludes that Mr. Gavin's petition (Doc. 1) is due to be **GRANTED** on his claim that he was denied the effective assistance of counsel during the penalty phase of his trial (Claim C), and **DENIED** with prejudice on the remainder of his claims. A separate order will be entered.

---

(Doc. 60 at 58).

**DONE** and **ORDERED** this 17th day of March, 2020.

_____

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE